**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph L. DePalma
Katrina Blumenkrants
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile: 973-623-0858

*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| HENRY TAYLOR, Derivatively on Behalf of Nominal Defendant CHIQUITA BRANDS INTERNATIONAL, INC., | Case No. |
| Plaintiff, | |
| v. | |
| FERNANDO AGUIRRE, MORTEN ARNTZEN, JEFFREY D. BENJAMIN, ROBERT W. FISHER, CYRUS F. FREIDHEIM, JR., CLARE M. HASLER, RODERICK M. HILLS, DURK I. JAGER, JAIME SERRA, and STEVEN P. STANBROOK, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, and | **JURY TRIAL DEMANDED** |
| CHIQUITA BRANDS INTERNATIONAL, INC., | |
| Nominal Defendant. | |

Plaintiff Henry Taylor ("Plaintiff"), residing at 3394 Bridle Run Trial, Marietta, GA 30064, by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge

165286 v1

1

with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a shareholder's derivative action brought for the benefit of nominal defendant Chiquita Brands International, Inc. ("Chiquita" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of its former executive officers seeking to remedy defendants' breaches of fiduciary duties.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that complete diversity of citizenship exists between Plaintiff on the one hand and Defendants on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

4. Plaintiff Henry Taylor is, and was at all relevant times, a shareholder of nominal defendant Chiquita. Plaintiff is a citizen of the State of Georgia.

165286 v1

2

5. Nominal defendant Chiquita is a New Jersey corporation with its principal place of business located at 250 East Fifth Street, Cincinnati, Ohio 45202. According to its public filings, Chiquita, together with its subsidiaries, operates as a leading international marketer and distributor of bananas and other fresh produce sold under the "Chiquita" and other brand names in approximately 80 countries, and packaged salads sold under the "Fresh Express" brand name primarily in the United States. Chiquita also distributes and markets fresh-cut fruit and other branded, value-added fruit-based products. The Company produces approximately 30% of the bananas it markets on its own farms, and purchases the remainder of the bananas, all of the lettuce and substantially all of the other fresh produce from third-party suppliers throughout the world. During the calendar year 2003, Chiquita reported over $2.6 billion in revenue. At all relevant times herein until it was sold by the Company in June 2004, Chiquita also owned and operated C.I. Bananos de Exportacion S.A. ("Banadex"), a foreign subsidiary located in Colombia, South America. Chiquita is a citizen of the State of New Jersey and the State of Ohio.

6. Defendant Fernando Aguirre ("Aguirre") has served as the Company's President, Chief Executive Officer and Chairperson of the Board since January 2004. Upon information and belief, Aguirre is a citizen of the State of Ohio.

7. Defendant Morten Arntzen ("Arntzen") has served as a director of the Company and as a member of the Audit Committee of the Board (the "Audit Committee") since 2002. Upon information and belief, Arntzen is a citizen of the State of New York.

8. Defendant Robert W. Fisher ("Fisher") has served as a director of the Company since March 2002. Fisher also served as the Company's Acting Chief Operating Officer from March 2002 to August 2002 and as a member of Chiquita's Executive Committee from 2003 to 2004. Upon information and belief, Fisher is a citizen of the State of California.

165286 v1

3

9. Defendant Clare M. Hasler ("Hasler") has served as a director of the Company since October 2005. Upon information and belief, Hasler is a citizen of the State of California.

10. Defendant Durk I. Jager ("Jager") has served as a director of the Company since December 2002. Upon information and belief, Jager is a citizen of the State of Ohio.

11. Defendant Jaime Serra ("Serra") has served as a director of the Company since January 2003. Upon information and belief, Serra is a citizen of Mexico.

12. Defendant Steven P. Stanbrook ("Stanbrook") has served as a director of the Company and as a member of the Audit Committee since December 2002. Upon information and belief, Stanbrook is a citizen of the State of Wisconsin.

13. Defendant Jeffrey D. Benjamin ("Benjamin") served as a director of the Company and as a member of the Audit Committee from March 2002 until his resignation on February 6, 2007. Upon information and belief, Benjamin is a citizen of the State of New York.

14. Defendant Roderick M. Hills ("Hills") served as a director of the Company and as a member of the Audit Committee until his retirement on May 24, 2007, including as Chairman of the Audit Committee from early 2002 to February 2004. Upon information and belief, Hills is a citizen of Washington, D.C.

15. Defendant Cyrus F. Freidheim, Jr. ("Freidheim") served as the Company's non-executive Chairman of the Board from January 10, 2004 to his retirement in May 2004, as Chief Executive Officer and as the Chairperson of the Board from March 2002 to January 2004 and as President from May 2002 to January 10, 2004. Upon information and belief, Friedheim is a citizen of the State of Illinois.

16. Collectively, defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook are referred to herein as the "Director Defendants."

165286 v1

4

17. Collectively, defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra, Stanbrook, Benjamin, Hills and Freidheim are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

19. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

20. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make

165286 v1

5

                    it possible to provide the highest quality performance of its business;

     b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

     c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

     d.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

     e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

21. The Individual Defendants, particularly the executive officers and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

     (1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

     (2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

          (a)     transactions are executed in accordance with management's general or specific authorization; and

(b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## SUBSTANTIVE ALLEGATIONS

22. According to its public filings, Chiquita, together with its subsidiaries, operates as a leading international marketer and distributor of bananas and other fresh produce sold under the "Chiquita" and other brand names in approximately 80 countries, and packaged salads sold under the "Fresh Express" brand name primarily in the United States. Chiquita also distributes and markets fresh-cut fruit and other branded, value-added fruit-based products. The Company produces approximately 30% of the bananas it markets on its own farms, and purchases the remainder of the bananas, all of the lettuce and substantially all of the other fresh produce from third-party suppliers throughout the world.

23. Banadex, Chiquita's wholly-owned subsidiary, produced bananas in the Urabá and Santa Marta regions of Colombia and by 2003 was the Company's most profitable banana production outlet. Chiquita subsequently sold Banadex in June 2004.

24. However, before the sale of Banadex, Chiquita, with the approval and at the direction of its Board, made illegal payments to gain "protection" for Banadex from the terrorist Colombian paramilitary group Autodefensas Unidas de Colombia, translated as the United Self-Defense Forces of Colombia (the "AUC").

25. Between 1989 and 1997, Chiquita made payments to certain violent left-wing terrorist groups operating in Colombia, Fuerzas Armadas Revolucionarias de Colombia, translated as the Revolutionary Armed Forces of Colombia (the "FARC") and the Ejército de Liberación Nacional, translated as the National Liberation Army (the "ELN"). In October 1997,

165286 v1

7

the FARC and the ELN were designated by the Secretary of State of the United States as Foreign Terrorist Organizations ("FTO") pursuant to Title 8, United States Code, Section 1189.

26. In or about 1997, the then-General Manager of Banadex met with the then-leader of AUC, Carlos Castaño. Castaño advised that the FARC was about to be ousted from Urabá by the AUC and that Banadex had to make payments to a "convivir," a private security company generally licensed by the Colombian government to assist local police and military in security but used by the AUC as fronts to collect monies from local businesses. Though it was not explicitly stated, Castaño's clear message was that if Banadex did not make payments to the convivir, physical harm to the subsidiary's personnel and property could result.

27. Chiquita complied with Castaño's demands. From 1997 through February 4, 2004, Chiquita made at least 100 cash payments to AUC using convivirs in the Santa Marta and Urabá regions of Colombia, through checks drawn on Banadex's accounts. Chiquita accounted for these payments as "security payments," payments for "security" or "security services" in its corporate financial records, despite the fact that no actual security services were provided by AUC.

28. On September 10, 2001 and again on September 10, 2003, the United States Secretary of State designated AUC as an FTO. As a result of this designation, after September 10, 2001, the knowing provision of material support and resources, including currency and monetary instruments, to the AUC was a federal crime.

29. Additionally, on September 23, 2001, pursuant to the authority granted to him by the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, President George W. Bush issued Executive Order 13224. Executive Order 13224, among other things, prohibited any United States person from engaging in transactions with any foreign organization or

165286 v1

8

individual determined by the United States Secretary of State, in consultation with the United States Secretary of the Treasury and the United States Attorney General, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States, labeled a "Specially-Designated Global Terrorist" ("SDGT"). The prohibition included making any contribution of funds to or for the benefit of an SDGT without first obtaining a license or similar authorization from the United States Government.

30. The United States Secretary of State, in consultation with the United States Secretary of the Treasury and the United States Attorney General, designated the AUC as an SDGT on October 31, 2001.

31. However, despite the Individual Defendants' knowledge that funding AUC was a federal crime, the Individual Defendants continued to authorize payments to the convivir after September 10, 2001, with the knowledge that such payments were directly funding the AUC.

32. Specifically, in or about June 2002, after Chiquita emerged from bankruptcy and seated a new Board in April 2002, Chiquita continued its payments to AUC. Senior executives at Chiquita even developed a new system to make continued cash payments to AUC whereby checks drawn on Banadex's Colombian accounts were cashed by Chiquita executives and funds were hand delivered to AUC personnel in Santa Marta.

33. Moreover, the Board, which included the Individual Defendants, had direct knowledge of the illegal payments to AUC and, indeed, allowed such payments to continue until at least February 4, 2004 despite such knowledge.

34. On March 13, 2007, based upon Chiquita's illegal payments to AUC, the United States Government charged Chiquita with the federal crime of Engaging in Transactions with a

Specifically Designated Global Terrorist. Chiquita pled guilty to one count of knowingly Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204 that same day. A copy of the plea agreement between the United States Department of Justice and Chiquita (the "Plea Agreement") is attached hereto as Exhibit A. Pursuant to the terms of the Plea Agreement, Chiquita admitted as true all of the facts contained in a Factual Proffer prepared by the United States (the "Factual Proffer"), which is attached hereto as Exhibit B and incorporated by reference herein.

35. The Factual Proffer, and the subsequent Sentencing Memorandum filed by the United States Department of Justice in connection with the September 17, 2007 sentencing hearing (the "Sentencing Memorandum," attached hereto as Exhibit C and incorporated by reference herein), details not only the knowledge that the Board had of the illegal payments, but also the willful disregard by the Board of advice from Chiquita's counsel beginning on February 21, 2003 that the payments were improper, violated federal law and must stop immediately.

36. Specifically, the Sentencing Memorandum states that payments continued to flow from Chiquita to the AUC, with the knowledge and approval of the Individual Defendants, even after the following occurred:

- the new cash payment procedures for Chiquita's payments to AUC were reviewed at a meeting of the Audit Committee on April 23, 2002;

- senior officers at Chiquita had knowledge, as early as September 2002, that the AUC had been designated as an FTO;

- beginning on February 21, 2003, Chiquita's outside counsel repeatedly advised the Company to discontinue payment to AUC, as the payments were illegal, which advice outside counsel detailed in contemporaneous notes and memoranda;

- on April 24, 2003, officials at the United States Department of Justice advised the Company that the payments to AUC were illegal and could not continue;

- in a memorandum dated September 8, 2003 and sent to Chiquita's senior officers, Chiquita's outside counsel summarized the Company's contacts with the United States Department of Justice since April 2003 and noted that "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments;

- on December 22, 2003, a member of the Board noted in an internal email, in reference to the payments to AUC that "we appear [to] be committing a felony;"

37. Moreover, the Sentencing Memorandum details that Chiquita's "payments to the AUC *were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees*. No later than September 2000, defendant Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño." (Emphasis added).

38. Chiquita's payments to AUC continued until defendant Aguirre, one month after becoming the Company's Chief Executive Officer in January 2004, finally decided that the Company's funding of the terrorist organization had to come to an end. On January 24, 2004, Chiquita issued its last check to AUC, which cleared on February 4, 2004. In total, from 1997 through February 4, 2004, Chiquita's payments to AUC totaled over $1.7 million, including 50 payments totaling over $825,000 from September 10, 2001 through February 4, 2004.

39. Pursuant to the Plea Agreement, Chiquita agreed to plead guilty to one count of knowingly Engaging in Transactions with a Specifically Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204, pay a criminal fine of $25 million in five annual payments of $5 million (plus post-judgment interest) commencing upon the entry of judgment and serve a five-year term of corporate probation. In addition to the general conditions of probation, Chiquita also agreed to implement and maintain an effective compliance and ethics

165286 v1

11

program and refrain from committing any federal, state or local crimes during the probationary period.

40. In addition to criminal liability, Chiquita also faces additional civil liability for its illegal funding of terrorist activity. Three separate civil actions, unrelated to the instant action, have been brought on behalf of victims of AUC's violent terrorist activities, including family members of those killed and tortured by AUC members, under the Alien Tort Claims Act and other federal statutes against Chiquita for, among other things, the Company's sponsorship of terrorism. The lawsuits seek billions of dollars in damages from Chiquita.

41. The Colombian government also may take independent action against the Company. A criminal investigation remains ongoing, and Columbia may seek to extradite certain Chiquita executives to stand trial in that country.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

42. In a misguided effort to protect the Company's interests in Colombia, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by knowingly permitting and approving illegal payments by Chiquita to an identified terrorist organization, despite knowledge that such actions were illegal. The Individual Defendants' unlawful misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.

43. The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, their actions were patently illegal and exposed the Company to substantial criminal and civil liability.

44. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Chiquita has sustained significant damages, including, but not limited to, the

165286 v1

12

costs incurred in the Company's defense of the DOJ Action and the criminal penalty the Company has agreed to pay as part of its plea bargain.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

45. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

46. Plaintiff is an owner of Chiquita common stock and was an owner of Chiquita common stock at all times relevant hereto.

47. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

48. As a result of the facts set forth herein, Plaintiff has not made any demand on the Chiquita Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

49. The Board currently consists of eight directors: defendants Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook, and director Howard W. Barker, Jr. Aguirre, Arntzen, Fisher, Hasler, Jager, Serra and Stanbrook are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action because, as members of the Board during the relevant period, they were knowing participants in the criminal conspiracy and are therefore substantially likely to be held liable for the misconduct complained of herein. As alleged in detail herein (*see, supra*, ¶¶ 24, 31-38), these directors knowingly directed and approved the Company's illegal conduct, which resulted in the Company's guilty plea and criminal fine. Accordingly, Aguirre, Arntzen, Fisher, Hasler, Jager,

165286 v1

13

Serra and Stanbrook are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants.

50. Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. The actions of the Board were patently illegal and exposed the Company to substantial civil and criminal liability. As the Board knowingly entered into a criminal conspiracy and directed the Company to engage in criminal conduct, their actions cannot be afforded the protections of the business judgment rule. Accordingly, demand is excused.

## COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

51. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

52. The Individual Defendants owed and owe Chiquita fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Chiquita the highest obligation of good faith and loyalty.

53. The Individual Defendants, and each of them, violated and breached their fiduciary duties of loyalty and good faith, as alleged herein.

54. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Chiquita has sustained significant damages, as alleged herein.

55. Plaintiff, on behalf of Chiquita, has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

  A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

165286 v1

14

B. Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: December 17, 2007

**LITE DEPALMA GREENBERG & RIVAS, LLC**

By: /s/ Joseph J. DePalma
Joseph L. DePalma
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile: 973-623-0858

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Eric L. Zagar
Alison K. Clark
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

165286 v1

15

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is not related to the following actions:

*Hawaii Annuity Trust Fund v. Hills, et al.*, Docket No. 2007-C379, filed October 30, 2007 in New Jersey state court, Bergen County, Chancery Division;

*City of Philadelphia Public Employees Retirement System v. Aguirre et al.*, Civil Action No. 1:07-cv-00851-SJD, filed October 12, 2007 in the United States District Court for the Southern District of Ohio (Hon. Susan J. Dlott presiding)

*Sheet Metal Workers Local #218(S) Pension Fund v. Hills et al.*, Civil Action No. 1:07-cv-01957-PLF, filed October 31, 2007 in the United States District Court for the District of Columbia (Hon. Paul L. Friedman presiding)

Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: December 17, 2007        **LITE DEPALMA GREENBERG & RIVAS, LLC**

                       By:    /s/ Joseph J. DePalma
                             Joseph J. DePalma
                             Katrina Blumenkrants
                             Two Gateway Center, 12th Floor
                             Newark, New Jersey 07102
                             (973) 623-3000

                             Attorneys for Plaintiff

## VERIFICATION

I, Henry Taylor, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: *Dec 5, 2007*

*[signature]*
HENRY TAYLOR