UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 08-01916-MD-MARRA/JOHNSON

IN RE: CHIQUITA BRANDS
INTERNATIONAL, INC. ALIEN
TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____

This Document Relates To:

ATA ACTION

_____ /

NO. 08-20641-CIV-KAM

TANIA JULIN, NANCY MARIE HAMM, PATRICIA
L. LABUTES, SANDRA K. WELSH, LORRAINE
VAN DYKE, ESTATE OF MARK RICH, ESTATE OF
CHARLES DAVID MANKINS, JR., ESTATE OF
RICHARD LEE TENENOFF, ESTATE OF STEPHEN
WELSH, ESTATE OF TIMOTHY VAN DYKE, TAMRA
RICH, JESSICA RICH, CHAD DAVID MANKINS,
SARAH ELIZABETH SKEES, CONNIE M. TENENOFF,
DORA TENENOFF POARCH, RICHARD LEE
TENENOFF II, GEORGE WELSH, JR., GEORGE
M. WELSH, SR., MILDRED J. WELSH, BETTY A.
WRETLING, KATRINA VAN DYKE, JACKIE VAN
DYKE, TRACEY WHIDDEN, TIMOTHY C. VAN DYKE
CLIFFORD C. VAN DYKE, NANCY D. JENSON,
MARY A. BOWENS AND NEW TRIBES MISSION,

Plaintiffs,

vs.

CHIQUITA BRANDS INTERNATIONAL, INC.

Defendant.

_____ /

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Tania Julin, Nancy Marie Hamm, Patricia L. Labutes, Sandra K. Welsh, Lorraine Van Dyke, Tania Julin as Personal Representative of the Estate of Mark Rich, deceased, on behalf of the Estate and all potential beneficiaries and/or survivors, Nancy M. Hamm as Personal Representative of the Estate of Charles David Mankins, Jr., deceased, on behalf of the Estate and all potential beneficiaries and/or survivors, Patricia L. Labutes as Personal Representative of the Estate of Richard Lee Tenenoff, deceased, on behalf of the Estate and all potential beneficiaries and/or survivors, Sandra K. Welsh, as Personal Representative of the Estate of Stephen Welsh, deceased, on behalf of the Estate and all potential beneficiaries and/or survivors, Lorraine Van Dyke as Personal Representative of the Estate of Timothy Van Dyke, deceased, on behalf of the Estate and all potential beneficiaries and/or survivors, Tamra Rich, Jessica Rich, Chad David Mankins, Sarah Elizabeth Skees, Connie M. Tenenoff, Dora Tenenoff Poarch, Richard Lee Tenenoff II, George Welsh, Jr., George M. Welsh, Sr., Mildred J. Welsh, Betty A. Wretling, Katrina Van Dyke, Jackie Van Dyke, Tracey Whidden, Timothy C. Van Dyke, Clifford C. Van Dyke, Nancy D. Jenson, Mary A. Bowens and New Tribes Mission ("Plaintiffs") allege the following upon information and belief, except as to allegations concerning Plaintiffs, which allegations are made upon Plaintiffs' personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation undertaken by their attorneys and publicly available documents.

## I.    **NATURE OF THE ACTION**

1.      This is a complaint brought on behalf of American citizens, all survivors of American nationals who were kidnapped, held hostage, and murdered by the Colombian terrorist organization known as Fuerzas Armadas Revolucionarias de Colombia ("FARC"). The

2

complaint seeks damages and other relief arising out of the conduct of Defendant Chiquita Brands International, Inc. ("Chiquita"), a leading international marketer and distributor of fresh produce and one of the largest banana producers in the world, for its role in bankrolling, arming and otherwise providing material support to FARC that aided and abetted FARC's felonious, tortious conduct.

2.    Chiquita knowingly provided currency or monetary instruments, weapons (including arms and ammunition), and other forms of material support and resources (including facilitating the transport of munitions) to FARC, a Foreign Terrorist Organization ("FTO") that has killed, maimed, injured and kidnapped thousands of civilians, including the relatives of the individual Plaintiffs herein.

3.    Defendant's substantial payments and provision of weapons to FARC aided and abetted the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331, including the terrorist acts that injured Plaintiffs.  Defendant is therefore civilly liable under 18 U.S.C. § 2333(a) of the Antiterrorism Act ("ATA") to Plaintiffs.

4.    Defendant knew or consciously avoided knowing that FARC was a terrorist organization and that it kidnapped, killed and terrorized thousands of people in Colombia.

5.    Defendant aided and abetted the murder of Plaintiffs' relatives by providing material support to FARC in the form of large sums of money and weapons knowing or consciously avoiding knowing that its substantial assistance to FARC would result in FARC continuing to commit further acts of international terrorism in violation of 18 U.S.C. § 2332(a)(1)(A).

6.    Defendant's conduct also constituted a violation of 18 U.S.C. § 2339A, and applicable state laws.

3

## II.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as a civil action arising under the laws of the United States, and 18 U.S.C. §§ 2333(a) and 2334, as a civil action brought by nationals of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.

8.      This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(b).

10.     This Court has personal jurisdiction over Defendant because Defendant, its agents and affiliates conducted or transacted substantial business in Florida.

## III.    THE PARTIES

### A.      The Plaintiffs

11.     Plaintiff New Tribes Mission ("NTM") is a not-for-profit corporation, incorporated in the State of Florida and headquartered in Sanford, Florida. NTM is an international Christian missionary organization established in 1942 that dispatches approximately 3,200 Missionaries to more than 18 nations.

12.     NTM's goal is "to evangelize groups who have had no access to the Gospel, translate the Scriptures into their language, and plant a church."

13.     NTM accomplishes this objective by sending missionaries to impoverished locations, where, among other things, they translate the Bible into the language of the indigenous people with whom they are working.

4

14.     Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Stephen Welsh, and Timothy Van Dyke, all NTM missionaries, exemplified NTM's objective: they lived selflessly with their families among impoverished peoples in remote parts of the world and provided them access to the Bible and education in their mother tongue.

15.     All five NTM missionaries were kidnapped, held hostage, and ultimately murdered by FARC. A detailed discussion of FARC's background, activities, and designation by the United States Government as a Foreign Terrorist Organization is set forth below.

16.     As alleged further below, NTM undertook considerable effort and expense to secure the release of these five hostages. Those efforts and expenses were ultimately fruitless.

### The Rich Family

17.     Plaintiff Tania Julin is a United States citizen and a resident of the state of Florida and brings this action in her personal capacity and as Personal Representative of the Estate of Mark Rich, deceased, who was kidnapped, held hostage and ultimately killed by FARC terrorists.

18.     As Personal Representative of decedent's estate, Ms. Julin brings the action for decedent's wrongful death in a representative capacity (a) on behalf of his Estate, for the recovery of all damages recoverable by his Estate under applicable law, including without limitation damages for the conscious pain and suffering of decedent; and (b) on behalf of all potential survivors and/or beneficiaries, including but not limited to the following:

        A.     Tania Julin, wife of decedent;

        B.     Tamra Rich, minor daughter of decedent;

        C.     Jessica Rich, minor daughter of decedent; and

        D.     Any other individual entitled to recover under applicable law.

5

19.     Plaintiff Tamra Rich is a United States citizen and a resident of the state of Florida. Until she attains the age of majority, Plaintiff Tamra Rich's parent and legal guardian, Tania Julin, asserts Tamra Rich's claims on her behalf.

20.     Plaintiff Jessica Rich is a United States citizen and a resident of the state of Florida. Until she attains the age of majority, Plaintiff Jessica Rich's parent and legal guardian, Tania Julin, asserts Jessica Rich's claims on her behalf.

### The Mankins Family

21.     Plaintiff Nancy Marie Hamm is a United States citizen and a resident of the state of Florida and brings this action in her personal capacity and as Personal Representative of the Estate of Charles David Mankins, deceased, who was kidnapped, held hostage and ultimately killed by FARC terrorists.

22.     As Personal Representative of decedent's estate, Ms. Hamm brings the action for decedent's wrongful death in a representative capacity (a) on behalf of his Estate, for the recovery of all damages recoverable by his Estate under applicable law, including without limitation damages for the conscious pain and suffering of decedent; and (b) on behalf of all potential survivors and/or beneficiaries, including but not limited to the following:

> A.     Nancy Marie Hamm, wife of decedent Charles David Mankins, Jr. (hereinafter referred to also as "Dave Mankins");
>
> B.     Chad David Mankins, son of decedent;
>
> C.     Elizabeth Skees, daughter of decedent; and
>
> D.     Any other individual entitled to recover under applicable law.

23.     Plaintiff Chad David Mankins is a United States citizen and a resident of the state of Florida.

6

24.     Plaintiff Sarah Elizabeth Skees is a United States citizen and a resident of the state of Montana.

## **The Tenenoff Family**

25.     Plaintiff Patricia L. Labutes is a United States citizen and is a resident of the state of Missouri and brings this action in her individual capacity and as Personal Representative of the Florida Estate of Richard Lee Tenenoff, deceased, who was kidnapped, held hostage and ultimately killed by FARC terrorists.

26.     As Personal Representative of decedent's estate, Ms. Labutes brings the action for decedent's wrongful death in a representative capacity (a) on behalf of his Estate, for the recovery of all damages recoverable by his Estate under applicable law, including without limitation damages for the conscious pain and suffering of decedent; and (b) on behalf of all potential survivors and/or beneficiaries, including but not limited to the following:

      A.      Patti (Tenenoff) Labutes, wife of decedent Richard Lee Tenenoff (hereinafter referred to also as "Rick Tenenoff");

      B.      Dora Tenenoff Poarch, daughter of decedent;

      C.      Connie M. Tenenoff, daughter of decedent;

      D.      Richard Lee Tenenoff II, minor son of decedent; and

      E.      Any other individual entitled to recover under applicable law.

27.     Plaintiff Dora Tenenoff Poarch is a United States citizen and a resident of the state of Missouri.

28.     Plaintiff Connie M. Tenenoff is a United States citizen and a resident of the state of Missouri.

7

29.     Plaintiff Richard Lee Tenenoff II is a United States citizen and a resident of the state of Missouri.  Until he attains the age of majority, Plaintiff Richard Lee Tenenoff II's parent and legal guardian, Patricia L. Labutes, asserts Richard Lee Tenenoff II's claims on his behalf.

### The Welsh Family

30.     Plaintiff Sandra K. Welsh is a United States citizen and is a resident of the state of Kansas and brings this action in her individual capacity and as Personal Representative of the Estate of Stephen Welsh, deceased, who was kidnapped, held hostage and ultimately killed by FARC terrorists.

31.     As Personal Representative of decedent's estate, Ms. Welsh brings the action for decedent's wrongful death in a representative capacity (a) on behalf of his Estate, for the recovery of all damages recoverable by his Estate under applicable law, including without limitation damages for the conscious pain and suffering of decedent; and (b) on behalf of all potential survivors and/or beneficiaries, including but not limited to the following:

    F.      Sandra K. Welsh, wife of decedent Stephen Welsh;

    G.      George Welsh, Jr., brother of decedent;

    H.      George Welsh, Sr. father of decedent;

    I.      Mildred Welsh, mother of decedent;

    J.      Betty A. Wretling, sister of decedent; and

    K.      Any other individual entitled to recover under applicable law.

32.     George Welsh, Jr. is a resident of the state of Nebraska.

33.     George M. Welsh, Sr. is a resident of the state of Nebraska.

34.     Mildred J. Welsh is a resident of the state of Nebraska.

35.     Betty A. Wretling is a resident of the state of Colorado.

8

**The Van Dyke Family**

36.     Plaintiff Lorraine Van Dyke is a United States citizen and is a resident of the state of Florida and brings this action in her individual capacity and as Personal Representative of the Estate of Timothy Van Dyke, deceased, who was kidnapped, held hostage and ultimately killed by FARC terrorists.

37.     As Personal Representative of decedent's estate, Ms. Van Dyke brings the action for decedent's wrongful death in a representative capacity (a) on behalf of his Estate, for the recovery of all damages recoverable by his Estate under applicable law, including without limitation damages for the conscious pain and suffering of decedent; and (b) on behalf of all potential survivors and/or beneficiaries, including but not limited to the following:

    A.     Lorraine Van Dyke, wife of decedent Timothy Van Dyke;

    B.     Timothy C. Van Dyke, son of decedent;

    C.     Tracey Whidden, daughter of decedent;

    D.     Katrina Van Dyke, daughter of decedent;

    E.     Jackie Van Dyke, daughter of decedent;

    F.     Nancy D. Jensen, sister of decedent;

    G.     Mary A. Bowens, sister of decedent; and

    H.     Any other individual entitled to recover under applicable law.

38.     Plaintiff Katrina Van Dyke is a United States citizen and a resident of the state of Florida.

39.     Plaintiff Jackie Van Dyke is a United States citizen and a resident of the state of Missouri.

40.     Plaintiff Tracey Whidden is a United States citizen and a resident of the state of

9

Missouri.

41.    Plaintiff Timothy C. Van Dyke is a United States citizen and a resident of the state of Arkansas.

42.    Plaintiff Nancy D. Jensen is a United States citizen and a resident of the state of New Jersey.

43.    Plaintiff Mary A. Bowens is a United States citizen and a resident of the state of New Jersey.

### B.    The Defendant

44.    Chiquita is a multinational corporation incorporated in New Jersey and headquartered in Cincinnati, Ohio.  It has operations throughout the world, including in the Republic of Colombia where, until approximately May 2004, it operated through its wholly-owned subsidiary, C.I. Bananos de Exportación, S.A. ("Banadex").

45.    At all times relevant hereto, Banadex was Chiquita's controlled subsidiary, agent and/or alter ego.

46.    Chiquita produces, markets, and distributes bananas and other fresh produce.  It is one of the largest banana producers in the world and is a major supplier of bananas throughout North America and Europe.

47.    Chiquita has approximately 25,000 full-time employees worldwide and reported $4.7 billion in net sales in 2007.

48.    At all times relevant hereto, Chiquita had over 200 farms in Colombia dedicated to banana production.

## IV.    FACTUAL ALLEGATIONS

### A.    Kidnapping and Murder of Plaintiffs' Relatives

10

### 1.   January 31, 1993 Kidnappings in Púcuro

49.   The Panamanian village of Púcuro is located approximately fifteen (15) miles from the Colombian border.  Its population was approximately 350 in 1993, and the village consisted of thirty-five to forty (35-40) separate houses.

50.   As part of NTM missionary outreach programs, in February 1986, Dave and Nancy Mankins, and their children, Chad and Sarah, moved to Púcuro.

51.   In January 1988, Rick and Patti Tenenoff, and their daughter Dora, followed the Mankins to Púcuro.  Patti gave birth to two children in Panama City, Panama: Connie, born in 1989, and Lee, born in 1991.

52.   In August 1992, Mark and Tania Rich, and their two young daughters, Tamra and Jessica, joined the Mankins and Tenenoff families in Púcuro.

53.   All three families were NTM members who moved to Púcuro to learn the Kuna language and culture, and to translate Bible lessons into the Kuna language.  The adult members wanted to teach the Kuna residents to start a church together with Kuna leaders.

### a.   The Rich Family

54.   At approximately 7:00 p.m. on January 31, 1993, Tania and Mark Rich were in their home in Púcuro with their children.  Tania had put Jessica to sleep, and Mark was in his hammock with their daughter Tamra.  A few Kuna residents were visiting their home at the time.

55.   As Tania came out of her daughter's bedroom after putting Tamra to bed, she heard yelling and boots stomping. Tania looked out the window and saw people were running.

56.   Tania ran into her daughters' bedroom.  Peering from the bedroom into the living room, she saw gunmen instructing Mark in Spanish to sit down on the floor and put his hands up.

11

57.     In the ensuing chaos, Tania heard a gunshot inside the house and thought Mark had been shot.

58.     Moments later Tania heard footsteps coming to the back of her home. A FARC terrorist pushed the curtained door open, leveled a gun at her, and demanded money and other household items.

59.     Tania observed four terrorists in her home: two were pointing guns at Mark's head and back; one was posted at the front door; and one followed Tania.

60.     Tania went to retrieve the items demanded by the terrorist as the terrorist followed her with his gun barrel thrust in her back. Tania saw Mark lying face down on the floor with his hands tied behind his back.

61.     As Tania walked behind the dividing wall in her bedroom, she heard Mark struggling with his captors, and the terrorists violently subduing him.

62.     Tania gave the terrorist money, coffee, sugar and flashlights.

63.     She was then ordered to pack Mark's clothes; she grabbed a gym bag and went to the back of the house to do so when she heard another gun shot coming from outside her home.

64.     Tania took the packed bag to the front of the house. The FARC terrorists told Mark that they were taking him with them and instructed Tania to come with them.

65.     The terrorists led Mark and Tania outside and through the village. When they arrived at the Mankins' home, Tania looked through the window and saw Dave sitting on the floor tied up; Nancy was standing beside him.

66.     The terrorists ordered Tania to go into the Mankins' home. Tania heard a gun being cocked and ran back to Mark. Tania was again ordered to go into the Mankins' home but she refused.

12

### b.    The Mankins Family

67.    Shortly after the initial attack on the Rich's home, three armed FARC terrorists dressed in camouflage burst into the Mankins' home and pointed their guns at Dave Mankins.

68.    The terrorists yelled orders at Dave and Nancy in Spanish.  When Dave stood up from his hammock, the terrorists struck him with the butts of their guns.

69.    One terrorist tied Dave's hands behind his back and forced him to kneel on the ground.  The terrorists pointed their guns at Dave at all times.

70.    While one terrorist held Nancy captive, another terrorist ransacked the Mankins' home, stealing electronics and accessories, including batteries, a laptop computer, radio, tape recorders and flashlights.  The terrorists also stole $300.00 in cash.

71.    One of the terrorists fired a machine gun out the door.

72.    A fourth terrorist burst into the Mankins' home, ordered Nancy to supply him with NTM's phone number and demanded money from her.  The terrorist ordered Nancy to go upstairs to the loft, but Nancy refused, fearing she would be raped if she did so.  Instead, Nancy grabbed her purse on the landing and gave it to the terrorist.

73.    The terrorists ordered Nancy to pack a bag containing three sets of warm clothing and medication for Dave.  Nancy complied.

74.    She heard more gunshots.

75.    The terrorists told Nancy to say goodbye to Dave; Nancy did so.  That was the last time she saw her husband alive.

76.    After the terrorists left with Dave, Nancy looked outside and saw Tania Julin. Nancy pulled Tania into Nancy's home.  Tania informed Nancy that terrorists had just invaded her home and kidnapped Mark.

13

77.     Nancy and Tania left the Mankins' home and walked toward the Tenenoff house. They heard the local village men saying there were *"bad men of the jungle"* up in the trees and in the shadows.

78.     Tania and Nancy were terrified and clung to each other as they walked past the first Kuna house. They heard a gun being cocked. A terrorist yelled at them to halt. Tania ran and Nancy froze.

79.     Nancy was terrified the terrorist would shoot Tania. Nancy turned toward the gun and said that she and Tania were going to the other missionaries' house because they all wanted to be together.

80.     The Kuna men stepped in between Nancy and the terrorists. Nancy ran toward Tania and they went into an empty Kuna house and saw terrorists in the Tenenoff's home.

### c.     The Tenenoff Family

81.     At almost the same time that the Rich's and Mankins' homes were invaded, Patti Tenenoff was getting her children, Connie and Lee, ready for bed, while her husband, Rick, was in the living room in a hammock talking to a villager.

82.     Patti was tucking the kids into their beds when she heard scuffling in the living room. Rick yelled that his wife was in the back of the home.

83.     Patti heard more scuffling and noted panic in Rick's voice. Rick yelled a second, and then a third time, that his wife was in the back of the home.

84.     Patti peeked through a curtain down the hall and saw Rick lying facedown on the floor. She saw one terrorist pointing a gun at Rick's head and another terrorist tying Rick's hands behind his back.

14

85.     Patti heard footsteps leaving through the door and the door slam shut.  She heard a gunshot outside her home, and two other gunshots farther away in the village coming from different locations.

86.     Patti was holding Lee, and Connie was holding onto Patti's skirt.  They walked into the living room, which soon filled with local Kuna men, who told Patti that the terrorists had also kidnapped Mark and Dave.

87.     Patti decided to stay in a Kuna home for the night for safety reasons and began to gather sheets and food.

88.     While Patti was packing, the Kuna men quietly left the Tenenoff home because two armed terrorists had entered the front room.  One terrorist systematically ransacked the home, taking batteries, flashlights, and food.  The other terrorist said they would be taking Rick captive and Patti needed to pack a suitcase for him.

89.     Patti went to the bedroom and began packing a bag.

d.      **Aftermath of the Kidnappings**

90.     Nancy and Tania arrived at Patti's house immediately after the terrorists left.  After Tania was escorted back to her home to retrieve her children, the three women and their families stayed in Patti's house for the night.

91.     Nancy, Tania and Patti learned the terrorists wanted to meet with them at 10:00 p.m.  However, the terrorists changed their minds and instead decided to meet with the Kuna chief at midnight.

92.     The Kuna men returned saying the terrorists did not want to meet with the chief, but told Nancy, Tania, and Patti that the terrorists had mandated that the women were not allowed to leave the village or Mark, Dave and Rick would be killed.

15

93.     Nevertheless, the next morning Nancy, Tania and Patti decided they had to leave the village.  Because the terrorists had taken their two-way radio, the women could not contact NTM.  Therefore, the women decided to leave Púcuro by canoe.

94.     Nancy, Tania and Patti packed only what they could carry; all other belongings, furniture, and household goods had to be left behind.

95.     The three women and their children traveled by canoe toward Boca de Cupe so they could arrange for a plane to meet them in El Real.  The trip was extremely traumatic.  The women were distraught about leaving their husbands and the life they had built behind, but realized that they had to do so to save their children and themselves.

96.     Once in Boca de Cupe, Nancy and Tania went to the telegraph office, while Patti stayed with the children.  Tania spoke with Nancy's daughter, because Nancy was too distraught to communicate.

97.     Nancy and Tania called the NTM base to ask for the airplane to pick them up in El Real. A man at the office said that it was too dangerous to send an airplane.  He patched the call through to the U.S. Embassy, so that a helicopter could be sent.  Unfortunately, the Embassy kept advising the women to call back later.  Therefore, the women called NTM, again, and requested that NTM send a plane to El Real.  The NTM agreed to do so, although this necessitated the women taking another 3 hour canoe trip.

98.     Because the river was low, the women and their children had to get out of the canoe and walk part of the way to El Real.  It was close to dusk, which troubled the women because small planes in Panama cannot fly in the area in the dark.  Nancy, Tania, Patti and their children reached El Real just in time to make the one hour flight and landed in Panama City just as the sun disappeared below the horizon.

16

42743_1

99.     The plane took the three families to Panama City, where they were debriefed by the F.B.I., U.S. Embassy and Panamanian Police. Approximately ten days later, they were flown home to the United States.

100.    Approximately one week after the kidnappings, the terrorists radioed NTM in Panama and demanded a $5,000,000.00 ransom for the men's return.

101.    NTM's official policy is to refuse to pay ransom to terrorists. NTM maintains that policy because NTM believes paying ransom imperils all of NTM's missionaries worldwide.

102.    Within 30 days of the kidnappings, FARC terrorists sent a "Proof of Life" audio tape demonstrating the three men were still alive. Throughout 1993, the terrorists repeatedly demanded a ransom be paid, and issued threats that the men would be harmed if FARC's demands were not complied with.

103.    On April 17, 1993, FARC terrorists radioed NTM and demanded to speak with Tania. The terrorists said if they were not allowed to talk to Tania they would kill Mark.

104.    The women and NTM's crisis management team decided that Nancy, not Tania, would speak with the terrorists. Nancy flew to Panama to engage in the discussions.

105.    One week later, FARC terrorists radioed NTM and asked Nancy how much money she could pay for the three men's safe return. Nancy explained that she and the other wives and their husbands were only missionaries who subsisted on donations. When the terrorist again asked how much money the three families had, Nancy said they only had about $6,000.00 between them. The terrorist responded to Nancy that she, and the other hostages' wives, should start crying for their dead husbands.

106.    During the week of Christmas, 1993, FARC terrorists proved the hostages were still alive by allowing Mark, Dave, and Rick to send a pre-recorded radio message to their wives.

17

107.    In 1994, FARC terrorists ceased all radio communications with the NTM field office and Nancy, Tania and Patti regarding the captive missionaries.

108.    In late 1995, high ranking leaders of FARC confirmed to the President of Costa Rica that they were still holding the three missionaries hostage.

109.    In early 1996, contact between NTM and FARC was re-established.  However, by mid-year all contact again ceased.

110.    In December 2000, the three women learned from NTM officials that FARC had murdered their husbands in 1996.

111.    In February 2007, official investigative efforts by the Colombian National Prosecutor confirmed that Mark, Dave and Rick were murdered in mid-1996 by FARC's 57th Front in Acandí, Choco, Colombia.


       **2.**     **January 16, 1994 Kidnapping in Villavicencio**

112.    From 1984-1994, an NTM missionary school ("the Finca") was situated near Villavicencio, Meta in Colombia, in the foothills of the Andes mountains.

113.    The Finca's grounds included three dormitories housing second to eighth grade boys, second to eighth grade girls, and high school students.

114.    The school grounds also contained a racquetball building, a corral, modest houses and a small airstrip.

115.    The Finca housed over 100 people, consisting of approximately 15 families and dorm children.

116.    Stephen and Sandy Welsh, and their three children - Shad, Scott, and April - moved to the Finca in 1984. Stephen was the base coordinator in charge of building construction; Sandy taught home economics at the NTM school.

117.    Timothy and Lorraine Van Dyke, and their four children, moved to Colombia in 1988 and moved to the Finca in 1989. Timothy was the Finca pastor. He and Lorraine served as dormitory parents.

118.    The Finca had telephone signals in place for general announcements and emergencies: one long ring was a general announcement; five short two-ring couplets signaled a security breach.

119.    January 16, 1994 was a Sunday. Many of the Finca's children were spending the weekend away from the Finca in Villavicencio. Church services were scheduled to start at 9:30 a.m.

### a.    The Welsh Family

120.    At approximately 8:00 a.m. that Sunday, Sandy and Stephen Welsh were lying in bed talking when they heard banging on their front door. Stephen went to the door. After a short while, Sandy got out of bed, feeling that something was not right.

121.    Sandy went out her front door and was met by an armed FARC terrorist.

122.    Sandy saw Stephen in the corral kneeling with a leash around his neck. One terrorist tied Stephen's hands behind his back while another held a machine gun to his head.

123.    A terrorist pushed Sandy's chest, demanding that she go back inside her home.

124.    Sandy ran inside and sent an emergency phone signal to the other residents in the Finca, as the terrorist, brandishing his weapon, yelled commands at her. Sandy did not obey the terrorist and ran into the corral to her husband.

19

125.    Eventually Sandy was allowed to return to her house to pack a bag of clothes for Stephen and retrieve mud boots and his Bible.

126.    Stephen told Sandy to tell their children that he loved them and recited a quotation from the Scriptures.  Sandy saw the terrorists put Stephen in a Jeep.

### b.    The Van Dyke Family

127.    A few minutes after the Welsh family was attacked, the Van Dykes were getting ready for church services.

128.    Suddenly, the emergency phone signal rang at the dormitory.  Lorraine looked out the window and saw men, later determined to be FARC terrorists, dressed in military clothing. Lorraine observed that the men's boots were not standard Colombian military issue and concluded the approaching men were, in fact, terrorists.

129.    Lorraine saw Stephen Welsh in the corral with terrorists pointing weapons at his head.  Stephen was kneeling down, and one terrorist was tying Stephen's hands behind his back.

130.    Timothy instructed Lorraine to lock all the children in the bedroom.

131.    Lorraine gathered all of the children and hid with them in her bedroom.  Timothy remained by the kitchen.

132.    FARC terrorists, fully armed with machine guns and grenades, stormed into Timothy and Lorraine's residence through the back door patio.

133.    Timothy spoke with the terrorists and went into the bedroom.  The terrorists saw Lorraine and the children, pointed their guns at them, and brought them into the main room of the dormitory.

20

134.    The terrorists led the missionaries, including Timothy, Lorraine, Tim, Katrina and Tracey Van Dyke to a racquetball building on the Finca's campus.  Sandy ran toward them but FARC terrorists prevented her from entering the building.

135.    Approximately 50 people from all of the residences were rounded up by the terrorists at gunpoint.

136.    They were all brought into the racquetball building, and lined up against the wall.

137.    One terrorist expounded on FARC's philosophy and tried to recruit the terrified people into FARC's ranks.

138.    The terrorists, who already had Stephen Welsh as a hostage, were about to take another male missionary as a second hostage.  But Sandy Welsh told the terrorists that they couldn't take that man because his wife was eight months pregnant.

139.    Timothy and Lorraine were kneeling on the floor comforting a young child who was scared and crying.  Timothy stood up and began comforting the other children when the terrorists pointed at Timothy, who stuck out with his 6'5" height.  Timothy looked at Lorraine and said "*This is it.*"  That was the last time Lorraine and her children ever saw Timothy alive.

140.    Timothy was led to the Jeep and placed next to Stephen Welsh before the Jeep was driven off into the hills.

141.    The terrorists had identified themselves as FARC by leaving behind a handwritten note.

### c.    Aftermath of the Kidnappings

142.    Later that day, Sandy Welsh and the remaining Van Dyke family members were flown to Villavicencio with only the personal belongings they could carry.  All other property had been taken by FARC terrorists or had to be left behind.

21

143.    In Villavicencio, Sandy Welsh and the Van Dyke family met up with other NTM

families and Jackie Van Dyke.  After a few days, Sandy and the Van Dykes were flown to

Bogota and debriefed.  Within ten days the families were flown back to a NTM medical facility

in Missouri.

144.    Within a month of Stephen Welsh's and Timothy Van Dyke's kidnappings,

FARC terrorists contacted the NTM by radio and demanded $3,000,000.00 for the two men's

safe return.

145.    In March 1994, the terrorists sent a "Proof of Life" audio tape confirming that the

two men were still alive.

146.    The families did not pay FARC's demanded ransom, nor did they agree or

negotiate to pay any ransom.

147.    On June 19, 1995, as members of FARC's 53rd Front were taking Stephen and

Timothy to a release point near Medina, Cundinamarca, they encountered a Colombian army

unit.  Fighting broke out.  When soldiers reached the spot where FARC terrorists had been, they

found the bodies of Stephen Welsh and Timothy Van Dyke.

148.    According to autopsies carried out in the United States, both men were shot

several times at point-blank range.  Evidence, including eyewitness testimonies collected by the

Colombian National Prosecutor and U.S. Attorney General's Office, confirmed FARC as the

executioners.  Thirteen FARC members, among them Henry Castellanos Garzón, alias

"Romaña," leader of the 53rd Front, have outstanding arrest warrants for the killings.

**B.    New Tribes Mission's Investigation**

149.    Immediately after the kidnappings of Mark Rich, Charles David Mankins, Jr. and

Rick Tenenoff on January 31, 1993, NTM assembled a Crisis Management Team ("CMT") in

22

Panama to negotiate for the release of the hostages and to maintain a central communications and information gathering hub until the resolution of the kidnapping crisis.

150.     The team consisted mainly of NTM members who had been stationed in Panama and Colombia for many years.  Operations were set up and included radio monitoring, information gathering, and regular meetings with the American Embassy, Panamanian police and Panamanian military.  Outside consultants were also retained by NTM and flown into Panama. The FBI was contacted by the American Embassy and special agents from Puerto Rico and Florida were assigned to assist the CMT's negotiations with the terrorists.  Communications with the terrorists commenced in February 1993 and continued through December 1993.

151.     Throughout 1993, any and all leads were investigated by the CMT, which met regularly with the Panamanian police and the Panamanian security service for assistance, to discuss strategies necessary to facilitate the missionaries' release and to receive investigation updates.

152.     Members of the CMT met with local doctors who provided information about the missionaries and FARC's financial requirements for payoffs.  CMT members also met regularly with representatives from the FBI's field office in Miami to discuss reasons for the abductions and to identify the group responsible for the kidnappings.  By the year's end a FARC leader was identified by the FBI as one of the missionaries' captors.

153.     Immediately following the kidnappings, CMT members developed relationships with local residents in Panama, and later in Colombia, to acquire more information about those involved with the kidnappings.  NTM employed numerous local couriers in Panama to gather information in the mountains necessary to ascertain the whereabouts of the missionaries as well as establish direct communications with FARC commanders.  One courier actually spoke with a

23

FARC leader known as "Antonio," who the FBI believed to be responsible for the kidnappings. Regular radio communications were maintained between the terrorists and the CMT field office in Panama, and the FBI tracked radio signals in an attempt to locate the missionaries and FARC camps. NTM prepared tens of thousands of leaflets, and dropped them by plane over areas believed to be FARC's territories and in nearby towns asking for information about the missionaries.

154.    NTM employees traveled back and forth between Colombia and Panama and regularly met with consular affairs and U.S. Embassy officials in Bogota for updates and assistance. After the cessation of radio communications by the terrorists in December 1993, from 1994 through much of 1995 the CMT continued its unsuccessful attempts to re-establish contact with the terrorists by monitoring local radio traffic and making blind radio broadcasts to raise the kidnappers on the radio.

155.    From 1993-1994, NTM requested assistance from many humanitarian groups who had a presence in Colombia including the International Red Cross and the Catholic Church. At the CMT's initiative, leaflets and posters about the missionaries were distributed throughout the region.

156.    Immediately after the abduction of Timothy Van Dyke and Stephen Welsh in Colombia on January 16, 1994, the CMT relocated its entire operations from Panama to Bogota, Colombia, where radio monitoring, regular contacts with the U.S. Embassy, Colombian and Panamanian Police, and information gathering continued. Members of the CMT even attempted to debrief FARC defectors when the opportunities arose. In February 1994, the CMT unsuccessfully attempted to meet with members of FARC's 1st Front near Puerto Inrida.

24

157.   In August 1994, NTM representatives interviewed "Judith", an ex-guerilla from FARC's 54th Front. "Judith" had guarded hostages Stephen Welsh and Timothy Van Dyke. She was debriefed but had only general information about how FARC planned kidnappings and how the men were treated.

158.   To date, NTM has spent substantial sums of money investigating these kidnappings/murders, and taking care of the decedents' families.

### C.   Survivors' Investigations

159.   From the initial kidnapping in 1993 and in the years that followed, Plaintiffs were relentless in their attempts to gather facts and gain assistance from local and domestic governments to discover the whereabouts of the missionaries and bring national and international attention to FARC kidnapping operations, and gain the release of the missionaries. These efforts include, but were not limited to, the following:

160.   In May 1995, NTM representatives debriefed an ex-hostage who had been in a FARC camp with Stephen Welsh and Timothy Van Dyke. This man relayed the condition of the men, how they lived and how the camp was maintained.

161.   In January and June 1995, Plaintiffs Tania Rich, Nancy Mankins and Patti Tenenoff met with U.S. Ambassador to Colombia Myles Frechette in Washington, D.C. to discuss the efforts of the U.S. government to learn about the welfare of their husbands.

162.   NTM representatives maintained continuous contact with television and radio stations in Columbia while traveling from Bogota to Medillin and Apartado. Regular broadcasts resulted from these efforts. During these trips, NTM representatives also met with local residents and government officials for information. In March 1997, OIA, a local Indian rights organization, arranged for NTM representatives to speak with refugees in Turbo who were

25

fleeing the Chocó area of Urabá. A NTM representative also spoke with hotel owners, local doctors and the head of the Chamber of Commerce – to no avail.

163.    In September 1997, a NTM representative traveled to Medillin to interview "Hector," a FARC defector who informed NTM that Mark Rich, Charles David Mankins, Jr. and Rick Tenenoff had been killed in June 1996. Since this was not verified from any other independent source, NTM and Plaintiffs continued their investigation.

164.    In February 1996, Plaintiffs Tania Julin, Nancy Mankins, Patti Tenenoff and NTM representatives traveled to Colombia to meet with Ambassador Frechette. The meeting prompted Colombia's largest newspaper, "El Tiempo" to run a full-page story appealing for the release of the hostages.

165.    In December 1996, the CMT traveled to Costa Rica to request the Costa Rican government's assistance in securing the release of the missionaries.

166.    In November 1997, NTM representatives attended the Ibero-American summit in Venezuela with the assistance of the U.S. Embassy. NTM representatives met with Colombian President Samper, Colombian Foreign Minister Maria Emma Mejia, Queen Sofia of Spain, and six foreign ministers from other Latin American countries to request support for efforts to obtain the missionaries' release.

167.    On March 31, 1998, Plaintiffs Tania Julin, Nancy Hamm and Patti Labutes testified before Congress and asked the U.S. government to petition countries with any influence over FARC to take all possible steps to advocate for the immediate return of the missionaries.

168.    In April 1998, Plaintiffs Tania Julin, Nancy Hamm and Patti Labutes traveled together to Bogota for meetings, interviews and public appeals.

26

169.   In 1999, Plaintiffs Tania Julin, Nancy Hamm, and Patti Labutes again traveled to Colombia and met with President Pestrana. It was their hope to procure the Colombian government's assistance in locating their husbands.

170.   In April 2000, NTM representatives flew to Panama to interview Alberto Torres, a local man who had information on the kidnappings and the possible location of three of the missing missionaries. After the interview they flew to Colombia in an unsuccessful attempt to locate the missionaries' graves.

171.   At the request of Plaintiffs, on February 7, 2007 the Colombian National Prosecutor's Office released a report concluding that all five missionaries were kidnapped, held hostage and eventually murdered by FARC.

172.   No mention of Chiquita or its connection to FARC was referenced in the report of the Colombian National Prosecutor's Office or by any other source during the years between the kidnappings and Chiquita's guilty plea in March 2007.

## V.   CHIQUITA PROVIDES MATERIAL SUPPORT TO FARC

### A.   FARC – Background

173.   FARC was established in 1964 by the Colombian Communist Party as its "military" wing, to defend what were then Communist-controlled rural areas in Colombia.

174.   A union of communist militants and peasant self-defense groups, FARC is Colombia's largest rebel group, comprised of 15,000 to 18,000 members, organized into approximately 64 "frentes" or fronts, and operating primarily in sparsely populated areas in Colombia.

175.   FARC claims that it represents the rural poor against Colombia's wealthy classes, and opposes United States influence in Colombia, the privatization of natural resources and

27

multinational corporations.

176.    FARC has been responsible for most of the ransom kidnappings in Colombia, targeting wealthy landowners, foreign tourists, prominent international and domestic officials and ordinary civilians.  Colombia has recorded an estimated 6,500 kidnappings, with hundreds of millions in ransom money paid.

177.    FARC finances itself through kidnapping ransoms, extortion, and drug trafficking.

178.    FARC also financially supports its "revolutionary" operations by collecting "war taxes" from residents, businesses and landowners in the regions where FARC operates.

179.    FARC held significant influence over and/or controlled labor unions in, among other places, Colombia's banana growing regions.  Such unions included Sintrobanano, which provided one of the avenues through which Chiquita secretly funneled money to FARC.

180.    FARC repeatedly engages in egregious conduct, including kidnapping and murder.  Typically, FARC's victims have been civilians, rather than members of the military or competing or opposing guerilla or paramilitary groups.

181.    In addition to the five kidnappings and murders described above, examples of FARC's brutality against Americans include, without limitation, the following:

a.      On December 10, 1996, Frank Pescatore, an American geologist working in the department of La Guajira, was kidnapped and held for ransom by FARC's 59th Front.  After FARC notified authorities, Pescatore was found shot to death on February 23, 1997.  He had been killed with a shot through his left arm that penetrated his chest.

b.      On February 25, 1999, three Americans working with the Pacific Cultural Conservation group were abducted by FARC terrorists on a road between the towns of Cubara

28

and Saravena in the department of Arauca. The victims were part of a contingent of

nongovernmental organizations working with the indigenous U'wa tribe in Colombia.

       c.     On March 4, 1999, three Americans were found murdered execution-style

in a remote area of southeastern Venezuela, near the Arauca River.

       d.     On June 29, 1999, six FARC terrorists kidnapped a U.S. citizen from his

home in the Antioquia Department near Medellin. FARC terrorists gained access to the

American's residence by masquerading as Colombian army soldiers. He was released one month

later 80 miles west of Medellin.

       e.     In total, FARC kidnapped 23 Americans in the period between 1994 and

1997. During that time Defendant regularly and systematically funded FARC's activities as

alleged in greater detail *infra.*

    182.    FARC carried out at least twelve massacres of civilians in 1997 alone.

    **B.**    **FARC – Designation by the United States Government as a Foreign Terrorist Organization**

    183.    Pursuant to 8 U.S.C. § 1189, the United States Secretary of State has the authority

to designate a foreign organization an FTO if that organization is engaging in terrorist activity or

terrorism threatening the national security of the United States, or the safety of U.S. nationals.

    184.    On October 8, 1997, as a result of FARC's terrorist actions and conduct, the

Secretary of State designated FARC an FTO. FARC's designation was renewed on October 2,

2003, and October 11, 2005. As of the date of the filing of this Action, FARC remains a

designated FTO. Around the same time the United States issued its designation, the European

Union and Colombian governments also designated FARC as a terrorist organization.

    185.    When the Secretary of State issued FARC's FTO designation, the U.S. State

Department concluded that FARC committed "bombings, murder, kidnapping, extortion,

29

hijacking, as well as terrorist and conventional military action against Colombian political, military and economic targets."

### C.     Chiquita's Illegal Payments To FARC

186.    As noted above, Chiquita was and remains one of the world's largest suppliers of bananas and other fresh produce.

187.    Banadex, Chiquita's former wholly-owned Colombian subsidiary, produced bananas in the Urabá and Santa Marta regions of Colombia from 1989-2004.  By 2003, Banadex was Chiquita's most profitable banana-producing operation.

188.    In the early 1980s, Chiquita ceased operating in the Urabá region of Colombia. At the time, there was escalating violence by Marxists in the region, including FARC.  In addition, the European common market had imposed trade sanctions favoring Caribbean banana growing regions over those in, among other places, Colombia.

189.    Chiquita returned to Urabá, Colombia in 1989, concluding a seven year absence from the region.  Chiquita was enticed to return to the region by the promise of expanding international fruit markets, including the possible erosion of trade sanction obstacles to exporting Colombian-grown bananas to Europe.

190.    In 1989, FARC controlled the areas where Chiquita's Banadex had its commercial banana-producing operations, including Urabá.

191.    From 1989 through at least 1997, Chiquita made numerous and substantial secret payments to FARC, and also provided FARC with weapons, ammunition and other supplies through its transportation contractors.  Chiquita did so knowing, or consciously avoiding, the fact that FARC was a violent terrorist organization.

192.    Initially, Chiquita made cash payments to FARC at FARC's specific request.

30

Chiquita's secret payments gradually escalated and became regularized as monthly payments ranging from $20,000.00 to as much as $100,000.00 per payment. Over time, these payments from Chiquita were fixed to a percentage of Banadex's gross revenues, with as much as ten percent being diverted to FARC.

193.     These payments, at times, were delivered furtively on Chiquita's behalf to members of FARC's 5th Frente by a former American military pilot, who held a management position with Chiquita in Colombia. Known in the region as "Kaiser," he would travel through the Urabá region with his bodyguards to deliver the cash to FARC, often in places such as Chogorodo and Carepa. Kaiser continues to work for Chiquita in Latin America, although he is now based in another country.

194.     In order to disguise the payments, and ensure their continued and undetected flow to FARC, Chiquita and/or Banadex at times placed false names and non-existent employees on their payroll, providing those funds on local paydays to regional FARC commanders.

195.     Later, when increased Colombian government controls made continuing the phony payroll scheme too risky and threatened exposure, Chiquita assisted and/or advised FARC terrorists on how to create front organizations, including purported "community support initiatives," agricultural and development programs, service companies, social organizations, peasant groups, unions and/or NGOs. Through this deception, Chiquita was not only able to continue its secret practice of covertly channeling funds to FARC, but was also able to mislead regulators, auditors, or anyone else examining Chiquita and Banadex's books-and-records; Defendant could point to the false front organizations to (falsely) record its payments to FARC as legitimate business expenses.

196.     In addition, Chiquita also drew up fictitious contracts with legitimate, operating

31

organizations, or alternatively overvalued existing contracts it maintained with such organizations, for the express purpose of burying (in its bookkeeping) its secret payments to FARC.

197.    Chiquita also cooperated with FARC-controlled labor unions, such as Sintrabanano, as another means of channeling payments to FARC.

198.    Indeed, for Chiquita, using Sintrabanano as a conduit to FARC was not simply a matter of convenience.  FARC was, at the time, attempting to wrest control over various labor unions from other terrorist groups including Colombia's Popular Liberation Army, the Ejército Popular de Liberación ("EPL") and National Liberation Army, the Ejército de Liberación Nacional de Colombia ("ELN").  Thus, in collaborating with FARC and assisting its subversion of many local labor unions, including EPL and ELN controlled unions, Chiquita anticipated and strived to obtain a competitive advantage over other banana growers facing less accommodating unions.  Accordingly, Chiquita's relationship with Sintrabanano as a means of channeling funds to FARC demonstrates that Chiquita's payments to FARC were not merely made knowingly, but with the specific intent to leverage its secret payments to FARC as a means of furthering Chiquita's pecuniary objectives, squashing competition, and assuring Defendant of an accommodating labor force.

199.    Chiquita's relationship with FARC was also put in the service of harassing at least one of Chiquita's competitors in Colombia, UNIBAN.  This harassment included soliciting FARC terrorists to carry out operations that damaged UNIBAN's production, blocking UNIBAN's exports, and burning supplies of boxes just as the UNIBAN was preparing to pack its harvested fruit.

## VI.    CHIQUITA'S FRAUDULENT CONCEALMENT

32

200.    Until March 14, 2007, none of the Plaintiffs had any knowledge of Defendant's violations alleged herein.  Further, until recently, Plaintiffs could not have discovered, by the exercise of reasonable diligence, that Chiquita engaged in the violations alleged herein because, as alleged above, Defendant actively and fraudulently concealed these violations to cloak its illegal activities.  Plaintiffs have, from the time of the kidnappings and murders alleged herein, been engaged in diligent efforts to discover the identities of all parties who might have been responsible for these heinous acts.  Plaintiffs have devoted considerable time and resources to such efforts.

201.    Despite all such efforts, although Plaintiffs confirmed years ago that FARC was the entity or organization that carried out the kidnappings and murders, Plaintiffs did not learn until recently about Chiquita's involvement in funding and providing other material support to FARC.  Indeed, to this day, the full scope, including dollar amounts, timing, mechanisms, and anti-detection methods employed by Chiquita in connection with its FARC-related conduct is murky, and demands document and testimonial discovery.  It was not until March 19, 2007 that Plaintiffs learned, through filings made public by the DOJ, in regard to Chiquita's illegal payments to another Colombian FTO, that Chiquita had, in prior periods, made illegal and secret payments to FARC as well.

202.    To conceal its unlawful conduct from both Colombian and U.S. authorities and prevent disclosure of the facts to Plaintiffs, Defendant funneled weapons to FARC (and assisted FARC in the transport of weapons) through Defendant's local transportation contractors.  As alleged above, Chiquita also falsified payroll records used to divert funds from non-existent employees to FARC, used existing contracts with legitimate organizations to bury and disguise payments, or drew up phony contracts with legitimate vendors as a means of falsifying the

33

payments and booking them as legitimate expenses.

203.    As alleged *supra*, Chiquita also secretly concealed payments to local labor unions that it knew, or consciously avoided knowing, were controlled by FARC and made other clandestine payments through FARC-established fronts and dummy companies.

204.    Moreover, as also alleged above, in an effort to avoid detection and disclosure of its illegal conduct, a senior Chiquita employee personally transported and delivered large sums of cash for Chiquita to FARC on a regular basis.

205.    On March 19, 2007, Chiquita pled guilty to violating U.S. anti-terrorism laws by funding another Colombian FTO, a violent right-wing paramilitary group named Autodefensas Unidas de Colombia (United Self-Defense of Colombia) or "AUC." Some additional details concerning AUC are alleged below.

206.    Chiquita admitted to using many tactics similar to those alleged *infra* as a means of disguising and hiding its AUC payments. Chiquita ultimately agreed to pay a $25 million fine to the U.S. government as part of its guilty plea.

207.    Established in 1997, AUC is an organization of purportedly pro-business paramilitary groups that engaged in combat with left-wing terrorist groups such as FARC and ELN over control of vast swaths of Colombian territory.

208.    In or around 1997, Banadex's General Manager met with Carlos Castaño, AUC's founder and "supreme leader." AUC had been battling FARC for several years for control of the banana growing regions. Castaño informed the Banadex manager that AUC was on the verge of ousting FARC from the Urabá region and, therefore, from then on Chiquita had to make payments to AUC, through intermediaries known as "convivirs." The convivirs were ostensibly security companies, but in reality functioned as AUC fronts, in order to disguise the illegal

34

payments. Chiquita agreed to AUC's demand, and over approximately a seven-year period Defendant funneled at least $1.7 million to AUC. In its guilty plea Chiquita admitted that its payments to AUC continued after AUC had been designated an FTO by the State Department on September 10, 2001.

209.   Unbeknownst to the general public, in 2003, Chiquita self-reported its unlawful support of Colombian terrorists to the DOJ in an attempt to convince the DOJ that it should not be held legally responsible under U.S. criminal laws. The DOJ refused to grant Defendant any form of immunity and, in fact, eventually brought criminal charges against Chiquita for this conduct.

210.   In 2004, in an attempt to contain the legal damage from its fifteen or more years of supporting violent terrorists in Colombia, Chiquita sold its Banadex subsidiary at a substantial loss. At the same time that Chiquita sold the company, it entered into a long-term contract with the purchaser entitling Chiquita to purchase large quantities of bananas. In this way, Chiquita managed to ensure a continued supply of Colombian bananas, while attempting to insulate itself from liability arising out of its decade and a half of significant support of terrorist activities that led to thousands of individuals being killed, maimed, injured and kidnapped.

211.   Further, as alleged above, in March 2007, Chiquita pleaded guilty to one count of providing material support to a terrorist organization – AUC.

212.   Defendant fraudulently concealed its illegal activities, as alleged herein, by *inter alia* making false and misleading entries on its books and records, filing false and/or misleading documents with the Colombian and United States governments, and advising, aiding, assisting and/or conspiring with FARC to set up phony front entities for the purpose of further disguising and concealing Chiquita's payments to FARC.

35

213.    On May 11, 2008, CBS News broadcast a segment of its long-running news show, 60 Minutes, reporting on Chiquita's payments to terrorists in Colombia.  In that segment, Chiquita's current Chief Executive Officer, Fernando Aguirre, admitted that Chiquita hid its payments to the terrorists so well that if it had not admitted the conduct nobody would have ever discovered it: "if we hadn't gone to the Justice Department, we probably would not be here talking about this whole issue.  No one would have known. No one would know about this."

214.    Chiquita's affirmative actions as alleged herein were wrongfully concealed and carried out in a manner that was intended to, and did, preclude detection.

215.    By virtue of Defendant's fraudulent concealment, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs have as a result of the unlawful conduct alleged in this complaint.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE
### Civil Aiding and Abetting of Homicide and Serious Bodily Injuries to United States Nationals in Violation of 18 U.S.C. §§ 2332(a); 2332(b); 2332(c) and 2333(a)

216.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

217.    Plaintiffs have been injured in their person, property or business by reason of acts of international terrorism committed by FARC that involved violence, were dangerous to human life, and violated the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

36

218.    FARC's killing of U.S. nationals and other persons were and are intended to: (a) intimidate or coerce the civilian population of Colombia; (b) influence the policy of the governments of Colombia and the United States by intimidation or coercion; and (c) affect the conduct of the governments of Colombia and the United States by mass destruction, assassination, or kidnapping.

219.    The acts of terrorism set forth herein were extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to the victims, and extreme emotional distress to the family members of those who were kidnapped and ultimately murdered by reason of these acts of international terrorism.

220.    The monetary instruments and weapons which Chiquita knowingly, or with conscious avoidance, provided to FARC, substantially facilitated FARC's acts of terrorism which caused Plaintiffs' injuries in violation of 18 U.S.C. § 2332.

221.    Defendant knowingly, or with conscious avoidance, provided money and weapons to FARC, an FTO.  Defendant also knew, at all relevant times, that FARC regularly committed horrific terrorist attacks, including kidnapping, holding hostages, maiming and murdering American citizens such as Plaintiffs.

222.    Throughout the period in which Defendant provided funds and weapons for the benefit of FARC, Defendant knew or consciously avoided the fact that its activities substantially assisted and encouraged FARC to commit the dangerous and criminal acts set forth herein.

223.    By aiding and abetting violations of 18 U.S.C. § 2332 that have injured each Plaintiffs' respective person, property, or business, Chiquita is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiffs have sustained as a result of such injuries.

**COUNT TWO**
**Conspiracy to Violate 18 U.S.C. §§ 2332(a), 2332(b),**

37

42743_1

**and 2332(c) in Violation of 18 U.S.C. § 2333(a)**

224.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

225.    Plaintiffs have been injured in their person, property or business by reason of acts of international terrorism committed by FARC that involved murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

226.    FARC's acts in killing or attempting to kill U.S. citizens and other persons were intended to: (a) intimidate or coerce the civilian population of Colombia and the United States; (b) influence the policy of the governments of Colombia and the United States by intimidation or coercion; and (c) affect the conduct of the governments of Colombia and the United States by mass destruction, assassination, or kidnapping.

227.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to the murder victims and extreme emotional distress to the family members of those who were kidnapped, held hostage, and murdered by reason of those acts.

228.    Chiquita agreed to conspire with FARC to act unlawfully, in the manner set forth in this complaint, and committed overt acts in furtherance of the conspiracy.  At all relevant times, Chiquita knew of the conspiracy and knew of FARC's role and the role of its operatives in furtherance of that conspiracy.

38

229.    Defendant intentionally, knowingly, or with conscious avoidance committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein, to effectuate Chiquita's and FARC's objectives.

230.    Chiquita knowingly and purposefully or with conscious avoidance agreed to provide funding and weapons to FARC as part of a common plan to subvert local trade unions, protect Chiquita's farms and shipments, harm Chiquita's competitors and strengthen FARC's military capabilities.

231.    The illicit assistance provided by Chiquita included, without limitation: (i) providing FARC with weapons and ammunition; (ii) paying, for FARC's benefit, illegal and disguised payments to FARC; (iii) creating false documentation and creating or advising FARC about the creation of false front companies in order to deliver and disguise the payments; and (iv) coordinating and arranging with FARC-controlled organizations (including labor unions) to facilitate the illegal payments and strengthen Chiquita and FARC's advantages and position relative to both entities' respective competitors.

232.    By conspiring to act with FARC to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each Plaintiffs' respective person, property, or business, Chiquita is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiffs have sustained as a result of such injuries.

## COUNT THREE
### Providing Material Support to Terrorists in Violation of
### 18 U.S.C. § 2339A and in Violation of 18 U.S.C. § 2333(a)

233.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

234.   By knowingly, or with conscious avoidance, providing material support to FARC, including currency or monetary instruments, and weapons, Chiquita assisted FARC in the preparation and carrying out of numerous acts of international terrorism, which have caused direct injury to Plaintiffs.

235.   By violating 18 U.S.C. § 2339A, Chiquita has injured each Plaintiffs' respective person, property, or business, and is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiffs have sustained as a result of such injuries.

## COUNT FOUR
### Wrongful Death of Mark Rich

236.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

237.   Plaintiff Tania Julin has been duly appointed personal representative of the Estate of Mark Rich.

238.   This action is the result of the death of Mark Rich in 1996.

239.   This action is brought on behalf of the Plaintiff Estate of Mark Rich by Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

240.   At the time of Decedent's death, Decedent was survived by Plaintiffs Tania Julin, Tamra Rich, and Jessica Rich.

241.   Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages.  Defendant's conduct in providing financial and other material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

40

242.    As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

243.    Defendant is liable to Plaintiff's Estate for the wrongful death of Mark Rich pursuant to the Florida Wrongful Death Act, Fla. St. Title XLV, Sections 768.16 – 768.26.

### COUNT FIVE
### Wrongful Death of Charles David Mankins, Jr.

244.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

245.    Plaintiff Nancy Marie Hamm has been duly appointed personal representative of the Estate of Charles David Mankins, Jr.

246.    This action is the result of the death of Charles David Mankins, Jr. in 1996.

247.    This action is brought on behalf of Plaintiff Estate of Charles David Mankins by Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

248.    At the time of decedent's death, Decedent was survived by Plaintiffs Nancy Hamm, Chad David Mankins and Sarah Elizabeth Skees.

249.    Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages. Defendant's conduct in providing financial and other material assistance to FARC, the organization responsible for Decedent's

41

kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

250.    As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

251.    Defendant is liable to Plaintiff's Estate for the wrongful death of Charles David Mankins, Jr. pursuant to the Florida Wrongful Death Act, Fla. St. Title XLV, Sections 768.16 – 768.26.

## COUNT SIX
### Wrongful Death of Richard Lee Tenenoff

252.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

253.    Plaintiff Patricia L. Labutes has been duly appointed personal representative of the Estate of Richard Lee Tenenoff.

254.    This action is the result of the death of Richard Lee Tenenoff in 1996.

255.    This action is brought on behalf of Plaintiff Estate of Richard Lee Tenenoff by Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

256.    At the time of Decedent's death Decedent was survived by Plaintiffs Patricia L. Labutes, Connie M. Tenenoff, Dora Tenenoff Poarch, and Richard Lee Tenenoff II.

42

257.    Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages.  Defendant's conduct in providing financial and material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

258.    As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

259.    Defendant is liable to Plaintiff's Estate for the wrongful death of Richard Lee Tenenoff pursuant to the Florida Wrongful Death Act, Fla. St. Title XLV, Sections 768.16 – 768.26.


## COUNT SEVEN
### Wrongful Death of Stephen Welsh

260.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

261.    Plaintiff Sandra K. Welsh has been duly appointed personal representative of the Estate of Stephen Welsh.

262.    This action is the result of the death of Stephen Welsh in 1995.

263.    This action is brought on behalf of Plaintiff Estate of Stephen Welsh by Sandra k. Welsh as personal representative pursuant to applicable statutory laws pertaining to

compensation of heirs, survivors, and estates for wrongful death.

264.    At the time of decedent's death, Decedent was survived by Plaintiffs Sandra K.

Welsh, George Welsh, Jr., George M. Welsh, Sr., Mildred Welsh, and Betty A. Wretling.

265.    Defendant gave substantial assistance to FARC and thereby breached its duty to

Plaintiffs, proximately resulting in Plaintiffs' damages. Defendant's conduct in providing

financial and material assistance to FARC, the organization responsible for Decedent's

kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

266.    As a direct and proximate result of Defendant Chiquita's conduct, Decedent's

estate has sustained substantial damages and is entitled to recover damages for the value of

Decedent's life, loss of Decedent's earnings, financial support, services, society, love,

consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of

the decedent, survivors' grief and anguish, and Decedent's mental and physical pain and

suffering and fear of impending death, funeral and burial expenses, and all damages available

under the applicable law.

267.    Defendant is liable to Plaintiff's Estate for the wrongful death of Stephen Welsh

pursuant to Nebraska Revised Statutes, Chapter 30, Article 8, Section 30-809.

### COUNT EIGHT
### Wrongful Death of Timothy Van Dyke

268.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set

forth herein.

269.    Plaintiff Lorraine Van Dyke has been duly appointed personal representative of

the Estate of Timothy Van Dyke.

270.    This action is the result of the death of Timothy Van Dyke in 1995.

271.    This action is brought on behalf of Plaintiff Estate of Timothy Van Dyke by

44

Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

272.    At the time of Decedent's death Decedent was survived by Plaintiffs Lorraine Van Dyke, Katrina Van Dyke, Jackie Van Dyke, Tracy Whidden, Timothy C. Van Dyke, Clifford C. Van Dyke, Nancy D. Jenson and Mary A. Bowens.

273.    Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages.  Defendant's conduct in providing financial and material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

274.    As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

275.    Defendant is liable to Plaintiff's Estate for the wrongful death of Timothy Van Dyke pursuant to the Florida Wrongful Death Act, Title XLV, Sections 768.16 – 768.26.

## COUNT NINE
### Aiding and Abetting Wrongful Death of Mark Rich

276.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

277.    Plaintiff Tania Julin has been duly appointed personal representative of the Estate of Mark Rich.

278.   This action is the result of the death of Mark Rich in 1996.

279.   This action is brought on behalf of the Plaintiff Estate of Mark Rich by Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

280.   At the time of Decedent's death, Decedent was survived by Plaintiffs Tania Julin, Tamra Rich, and Jessica Rich.

281.   Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages.  Defendant's conduct in providing financial and other material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

282.   Defendant Chiquita aided and abetted the conduct of FARC which culminated in the murder of the Decedent Mark Rich.

283.   As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

284.   Defendant is liable to Decedent's estate for aiding and abetting the wrongful death of Mark Rich pursuant to the Florida Wrongful Death Act, Fla. St. Title XLV, Sections 768.16 – 768.26.

## COUNT TEN
### Aiding and Abetting Wrongful Death of Charles David Mankins, Jr.

46

285.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

286.     Plaintiff Nancy Marie Hamm has been duly appointed personal representative of the Estate of Charles David Mankins, Jr.

287.     This action is the result of the death of Charles David Mankins, Jr. in 1996.

288.     This action is brought on behalf of Plaintiff Estate of Charles David Mankins, Jr. by Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

289.     At the time of Decedent's death, Decedent was survived by Plaintiffs Nancy Hamm, Chad David Mankins and Sarah Elizabeth Skees.

290.     Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages.  Defendant's conduct in providing financial and other material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

291.     Defendant Chiquita aided and abetted the conduct of FARC which culminated in the murder of the Decedent Charles David Mankins, Jr.

292.     As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

47

293.    Defendant is liable to Decedent's estate for aiding and abetting the wrongful death of Charles David Mankins, Jr. pursuant to the Florida Wrongful Death Act, Fla. St. Title XLV, Sections 768.16 – 768.26.

## COUNT ELEVEN
### Aiding and Abetting Wrongful Death of Richard Lee Tenenoff

294.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

295.    Plaintiff Patricia L. Labutes has been duly appointed personal representative of the Estate of Richard Lee Tenenoff.

296.    This action is the result of the death of Richard Lee Tenenoff in 1996.

297.    This action is brought on behalf of Plaintiff Estate of Richard Lee Tenenoff by Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

298.    At the time of Decedent's death Decedent was survived by Plaintiffs Patricia L. Labutes, Connie M. Tenenoff, Dora Tenenoff Poarch, and Richard Lee Tenenoff II.

299.    Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages. Defendant's conduct in providing financial and material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

300.    Defendant Chiquita aided and abetted the conduct of FARC which culminated in the murder of the Decedent Richard Lee Tenenoff.

301.    As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love,

48

consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

302.    Defendant is liable to Decedent's estate for aiding and abetting the wrongful death of Richard Lee Tenenoff pursuant to the Florida Wrongful Death Act, Fla. St. Title XLV, Sections 768.16 – 768.26.

**COUNT TWELVE**
**Aiding and Abetting Wrongful Death of Stephen Welsh**

303.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

304.    Plaintiff Sandra K. Welsh has been duly appointed personal representative of the Estate of Stephen Welsh.

305.    This action is the result of the death of Stephen Welsh in 1995.

306.    This action is brought on behalf of Plaintiff Estate of Stephen Welsh by Sandra K. Welsh as personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

307.    At the time of Decedent's death, Decedent was survived by Plaintiffs Sandra K. Welsh, George Welsh, Jr., George M. Welsh, Sr., Mildred Welsh and Betty A. Wretling.

308.    Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages. Defendant's conduct in providing financial and material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

49

309.    Defendant Chiquita aided and abetted the conduct of FARC which culminated in the murder of the Decedent Stephen Welsh.

310.    As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

311.    Defendant is liable to Decedent's estate for aiding and abetting the wrongful death of Stephen Welsh pursuant to Nebraska Revised Statutes, Chapter 30, Article 8, Section 30-809.

### COUNT THIRTEEN
### Aiding and Abetting Wrongful Death of Timothy Van Dyke

312.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

313.    Plaintiff Lorraine Van Dyke has been duly appointed personal representative of the Estate of Timothy Van Dyke.

314.    This action is the result of the death of Timothy Van Dyke in 1995.

315.    This action is brought on behalf of Plaintiff Estate of Timothy Van Dyke by Plaintiff's personal representative pursuant to applicable statutory laws pertaining to compensation of heirs, survivors, and estates for wrongful death.

316.    At the time of Decedent's death Decedent was survived by Plaintiffs Lorraine Van Dyke, Katrina Van Dyke, Jackie Van Dyke, Tracy Whidden, Timothy C. Van Dyke, Clifford C. Van Dyke, Nancy D. Jenson and Mary A. Bowens.

50

317.     Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages.  Defendant's conduct in providing financial and material assistance to FARC, the organization responsible for Decedent's kidnapping and murder, was a substantial contributing factor in causing Decedent's death.

318.     Defendant Chiquita aided and abetted the conduct of FARC which culminated in the murder of the Decedent Timothy Van Dyke.

319.     As a direct and proximate result of Defendant Chiquita's conduct, Decedent's estate has sustained substantial damages and is entitled to recover damages for the value of Decedent's life, loss of Decedent's earnings, financial support, services, society, love, consortium, companionship, comfort, care, advice, inheritance and/or net estate accumulations of the Decedent, survivors' grief and anguish, and Decedent's mental and physical pain and suffering and fear of impending death, funeral and burial expenses, and all damages available under the applicable law.

320.     Defendant is liable to Decedent's estate, and Plaintiff's Decedent's survivors for aiding and abetting the wrongful death of Timothy Van Dyke pursuant to the Florida Wrongful Death Act, Fla. St. Title XLV, Sections 768.16 – 768.26.

### COUNT FOURTEEN
**False Imprisonment of Mark Rich, Charles David Mankins, Jr.,
Richard Lee Tenenoff, Stephen Welsh and Timothy Van Dyke**

321.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

322.     On or about January 31, 1993, members of FARC, a terrorist organization supported and financed by Defendant, unlawfully, forcibly, and maliciously imprisoned and restrained and deprived Mark Rich , Charles David Mankins, Jr. and Richard Lee Tenenoff of

their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at Mark Rich, Charles David Mankins, Jr. and Richard Lee Tenenoff, threatening to shoot and kill them, placing them in guarded facilities, and binding their arms.

323.    On or about January 16, 1994, members of FARC, a terrorist organization supported and financed by Defendant, unlawfully, forcibly, and maliciously imprisoned and restrained and deprived Stephen Welsh and Timothy Van Dyke of their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at Stephen Welsh and Timothy Van Dyke, threatening to shoot and kill them, placing them in guarded facilities, and binding their arms.

324.    As a direct result of conduct and threats of FARC members, Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Stephen Welsh and Timothy Van Dyke were placed in apprehension of an immediate harmful contact and thereby caused to submit against their will to the imprisonment and to the restrictions imposed upon Decedents' freedom by the actions of FARC members.

325.    By reason of their imprisonment, Decedents were caused to suffer great humiliation, pain, and mental anguish.

326.    The claims for false imprisonment survive each Decedent's death by operation of applicable law.

327.    Defendant gave substantial assistance to FARC and thereby breached its duty to Decedents, proximately resulting in their damages.

### COUNT FIFTEEN
**Aiding and Abetting False Imprisonment of Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Stephen Welsh and Timothy Van Dyke**

328.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set

forth herein.

329.    On or about January 31, 1993, members of FARC, a terrorist organization supported and financed by Defendant, unlawfully, forcibly, and maliciously imprisoned and restrained and deprived Mark Rich, Charles David Mankins, Jr. and Richard Lee Tenenoff of their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at Mark Rich, Charles David Mankins, Jr. and Richard Lee Tenenoff, threatening to shoot and kill them, placing them in guarded facilities, and binding their arms.

330.    On or about January 16, 1994, members of FARC, a terrorist organization supported and financed by Defendant, unlawfully, forcibly, and maliciously imprisoned and restrained and deprived Stephen Welsh and Timothy Van Dyke of their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at Stephen Welsh and Timothy Van Dyke, threatening to shoot and kill them, placing them in guarded facilities, and binding their arms.

331.    As a direct result of conduct and threats of FARC members, Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Stephen Welsh and Timothy Van Dyke were placed in apprehension of an immediate harmful contact and thereby caused to submit against their will to the imprisonment and to the restrictions imposed upon Decedents' freedom by the actions of FARC members.

332.    By reason of their imprisonment, Decedents were caused to suffer great humiliation, pain, and mental anguish.

333.    Defendant aided and abetted the conduct of FARC alleged herein.  Defendant gave substantial assistance to FARC and thereby breached its duty to Decedents, proximately resulting in their damages.  The claims for false imprisonment survive each Decedent's death by

53

operation of applicable law.

## COUNT SIXTEEN
### Intentional Infliction of Emotional Distress of
### Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff,
### Stephen Welsh, and Timothy Van Dyke

334.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

335.    In doing the acts alleged above, Defendant and members of FARC acted with willful, wonton, reckless, and deliberate disregard for the likelihood that each Decedent would suffer severe emotional distress as a direct and proximate result of FARC's treatment of them.

336.    The conduct toward each Decedent was extreme and outrageous and beyond all bounds of decency.

337.    As a direct and proximate result of this extreme and outrageous conduct, each Decedent suffered severe emotional distress.

338.    The claim asserted herein survives each Decedent's death by operation of applicable law.

339.    Defendant gave substantial assistance to FARC and thereby breached its duty to Decedents, proximately resulting in their damages.  Because Defendant provided financial assistance and support to the perpetrators of the conduct described herein, Defendant Chiquita is liable to each Decedent's estate for intentional infliction of emotional distress.

## COUNT SEVENTEEN
### Aiding and Abetting Intentional Infliction of Emotional Distress of
### Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff,
### Stephen Welsh, and Timothy Van Dyke

340.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

54

341.    In doing the acts alleged above, Defendant and members of FARC acted with willful, wonton, reckless, and deliberate disregard for the likelihood that each Decedent would suffer severe emotional distress as a direct and proximate result of FARC's treatment of them.

342.    The conduct toward each Decedent was extreme and outrageous and beyond all bounds of decency.

343.    As a direct and proximate result of this extreme and outrageous conduct, each Decedent suffered severe emotional distress.

344.    The claim asserted herein survives each Decedent's death by operation of applicable law.

345.    Defendant Chiquita aided and abetted the conduct of FARC alleged herein. Defendant gave substantial assistance to FARC and thereby breached its duty to Decedents, proximately resulting in their damages.  Because Defendant Chiquita provided financial assistance and support to the perpetrators of the conduct described herein, Defendant Chiquita is liable to each Decedent's estate for intentional infliction of emotional distress.

## COUNT EIGHTEEN
### Negligent Infliction of Emotional Distress of
### Mark Rich , Charles David Mankins,Jr., Richard Lee Tenenoff,
### Stephen Welsh, and Timothy Van Dyke

346.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

347.    Defendant knew, or in the exercise of reasonable care should have known, that the conduct alleged above would result in serious emotional distress to each Decedent.

348.    Defendant negligently and carelessly breached the duty described above by engaging in conduct in disregard for the likelihood that each Decedent would suffer severe emotional distress as a direct and proximate result of the conduct.

55

349.    The conduct of Defendant was extreme and outrageous and beyond all bounds of decency.

350.    Defendant owed a legal duty to protect Plaintiffs from injury, and breached that duty, proximately causing injury to Plaintiffs.  Defendant should have realized that its conduct involved an unreasonable risk of causing distress.  Plaintiffs' emotional distress and/or mental injuries are medically diagnosable and of sufficient severity to be medically significant.  The emotional distress suffered by Plaintiffs was so severe that no reasonable person could have been expected to endure it.

351.    Each of the Decedents personally suffered: (1) physical impact from an external force or suffered physical injury, which was caused by psychological trauma; (2) were involved in the event causing negligent injury to another; and (3) had a close personal relationship to one or more directly injured persons.

352.    As a direct and proximate result of Defendant's negligence and carelessness, Decedents suffered severe emotional distress.

353.    The claim asserted herein survives each Decedent's death by operation of applicable law.

354.    Defendant aided and abetted the conduct of FARC alleged herein.  Defendant gave substantial assistance to FARC and thereby breached its duty to Decedents, proximately resulting in their damages.  Because Defendant provided financial assistance and support to the perpetrators of the conduct described herein, Defendant is liable to each Decedent and each Decedent's estate for negligent infliction of emotional distress.

## COUNT NINETEEN
### Intentional Infliction of Emotional Distress of
**Tania Julin, Nancy Hamm, Patricia Labutes, Sandra Welsh, Lorraine Van Dyke,
Connie M. Tenenoff, Dora Tenenoff Poarch, Richard Lee Tenenoff II, Katrina Van Dyke,
Jackie Van Dyke, Tracey Whidden, Timothy Van Dyke, Clifford Van Dyke,
Nancy D. Jenson, Mary A. Bowens, Tamra Rich, Jessica Rich, Chad David Mankins,
Sarah Elizabeth Skees, George Welsh, Jr., George Welsh, Sr., Mildred Welsh,
and Betty A. Wretling**

355. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

356. Defendant knew, or in the exercise of reasonable care should have known, that the conduct in question would result in serious emotional distress to Plaintiffs Tania Julin, Nancy Hamm, Patricia Labutes, Sandra Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Dora Tenenoff Poarch, Richard Lee Tenenoff II, Katrina Van Dyke, Jackie Van Dyke, Tracey Whidden, Timothy Van Dyke, Clifford Van Dyke, Nancy D. Jenson, Mary A. Bowens, Tamra Rich, Jessica Rich, Chad David Mankins, Sarah Elizabeth Skees, George Welsh, Jr., George Welsh, Sr., Mildred Welsh and Betty A. Wretling.

357. Defendant acted willfully, wantonly, recklessly and with deliberate disregard in breaching the duty described above by engaging in conduct in disregard for the likelihood that Plaintiffs would suffer severe emotional distress as a direct and proximate result of the conduct.

358. The conduct of the Defendant and members of FARC was outrageous and malicious and resulted in Plaintiffs experiencing severe emotional distress.

359. Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages. Because Defendant Chiquita provided financial assistance and support to the perpetrators of the conduct described herein, Defendant Chiquita is liable to Plaintiffs Tania Julin, Nancy Hamm, Patricia Labutes, Sandra Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Dora Tenenoff Poarch, Richard Lee Tenenoff II,

57

42743_1

Katrina Van Dyke, Jackie Van Dyke, Tracey Whidden, Timothy Van Dyke, Clifford Van Dyke,

Nancy D. Jenson, Mary A. Bowens, Tamra Rich, Jessica Rich, Chad David Mankins, Sarah

Elizabeth Skees, George Welsh, Jr., George Welsh, Sr., Mildred Welsh, and Betty A. Wretling

for intentional infliction of emotional distress.

## COUNT TWENTY
### Aiding and Abetting Intentional Infliction of Emotional Distress on
### Tania Julin, Nancy Hamm, Patricia Labutes, Sandra Welsh, Lorraine Van Dyke,
### Connie M. Tenenoff, Dora Tenenoff Poarch, Richard Lee Tenenoff II, Katrina Van Dyke,
### Jackie Van Dyke, Tracey Whidden, Timothy Van Dyke, Clifford Van Dyke,
### Nancy D. Jenson, Mary A. Bowens, Tamra Rich, Jessica Rich, Chad David Mankins,
### Sarah Elizabeth Skees, George Welsh, Jr., George Welsh, Sr., Mildred Welsh,
### and Betty A. Wretling

360. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set

forth herein.

361. Defendant knew, or in the exercise of reasonable care should have known, that the

conduct in question would result in serious emotional distress to Plaintiffs Nancy Hamm, Tania

Julin, Sandra Welsh, Lorraine Van Dyke, Patricia Labutes, Connie M. Tenenoff, Dora Tenenoff

Poarch, Richard Lee Tenenoff II, Katrina Van Dyke, Jackie Van Dyke, Tracey Whidden,

Timothy Van Dyke, Clifford Van Dyke, Nancy D. Jenson, Mary A. Bowens, Tamra Rich,

Jessica Rich, Chad David Mankins, Sarah Elizabeth Skees, George Welsh, Jr., George Welsh,

Sr., Mildred Welsh and Betty A. Wretling.

362. Defendant acted willfully, wantonly, recklessly and with deliberate disregard in

breaching the duty described above by engaging in conduct in disregard for the likelihood that

Plaintiffs would suffer severe emotional distress as a direct and proximate result of the conduct

363. The conduct of Defendant and members of FARC was outrageous and malicious

and resulted in Plaintiffs experiencing severe emotional distress.

58

364.    Defendant Chiquita aided and abetted the conduct of FARC alleged herein. Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in Plaintiffs' damages.  Because Defendant Chiquita provided financial assistance and support to the perpetrators of the conduct described herein, Defendant Chiquita is liable to Plaintiffs Tania Julin, Nancy Marie Hamm, Patricia Labutes, Sandra Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Dora Tenenoff Poarch, Richard Lee Tenenoff II, Katrina Van Dyke, Jackie Van Dyke, Tracey Whidden, Timothy Van Dyke, Clifford Van Dyke, Nancy D. Jenson, Mary A. Bowens, Tamra Rich, Jessica Rich, Chad David Mankins, Sarah Elizabeth Skees, George Welsh, Jr., George Welsh, Sr., Mildred Welsh, and Betty A. Wretling for intentional infliction of emotional distress.

## COUNT TWENTY ONE
**Assault on Plaintiffs Tania Julin, Nancy Marie Hamm, Patricia Labutes, Sandra K. Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Richard Lee Tenenoff II, Katrina Van Dyke, Tracey Whidden and Timothy Van Dyke**

365.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

366.    Plaintiffs Tania Julin, Nancy Marie Hamm, Patricia Labutes, Sandra K. Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Richard Lee Tenenoff II, Katrina Van Dyke, Tracey Whidden and Timothy Van Dyke were physically present when Decedents were kidnapped by members of FARC to be held for ransom.

367.    Plaintiffs were physically present when members of FARC brandished firearms in a threatening manner.

368.    Plaintiffs were placed in apprehension of offensive physical contact during these events.

369.    Defendant gave substantial assistance to FARC and thereby breached its duty to

59

Plaintiffs, proximately resulting in Plaintiffs' damages. Because Defendant provided financial assistance and support to FARC, Defendant is liable to Plaintiffs for assault.

## COUNT TWENTY TWO
### Aiding and Abetting Assault on Plaintiffs Tania Julin, Nancy Marie Hamm, Patricia Labutes, Sandra K. Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Richard Lee Tenenoff II, Katrina Van Dyke, Tracey Whidden and Timothy Van Dyke

370.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

371.    Plaintiffs Tania Julin, Nancy Marie Hamm, Patricia Labutes, Sandra K. Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Richard Lee Tenenoff II, Katrina Van Dyke, Tracey Whidden and Timothy Van Dyke were physically present when Decedents were taken hostage by members of FARC to be held for ransom.

372.    Plaintiffs were physically present when members of FARC brandished firearms in a threatening manner.

373.    Plaintiffs were placed in apprehension of offensive physical contact during these events.

374.    Defendant aided and abetted the conduct of FARC alleged herein. Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiff, proximately resulting in Plaintiff's damages. Because Defendant provided financial assistance and support to FARC, Defendant is liable to Plaintiffs Tania Julin, Nancy Marie Hamm, Patricia Labutes, Sandra K. Welsh, Lorraine Van Dyke, Tamra Rich, Jessica Rich, Connie M. Tenenoff, Richard Lee Tenenoff II, Katrina Van Dyke, Tracey Whidden and Timothy Van Dyke for assault.

## COUNT TWENTY THREE
### False Imprisonment of Tania Julin, Nancy Marie Hamm, Patricia L. Labutes, Sandra K. Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Richard Lee Tenenoff II, Katrina Van Dyke, Tracey Whidden, and Timothy C. Van Dyke

60

375.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

376.    On or about January 31, 1993, members of FARC, a terrorist organization supported and financed by Defendant, unlawfully, forcibly, and maliciously imprisoned, restrained and deprived Tania Julin, Nancy Marie Hamm, Patricia L. Labutes, Connie M. Tenenoff, and Richard Lee Tenenoff II (collectively "the Panama Plaintiffs") of their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at the Panama Plaintiffs, threatening to shoot and kill them and placing them in guarded facilities.

377.    On or about January 16, 1994, members of FARC, a terrorist organization supported and financed by Defendant, unlawfully, forcibly, and maliciously imprisoned, restrained and deprived Sandra K. Welsh, Lorraine Van Dyke, Katrina Van Dyke, Tracey Whidden, and Timothy C. Van Dyke (collectively "the Colombia Plaintiffs") of their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at the Colombia Plaintiffs, threatening to shoot and kill them and placing them in guarded facilities.

378.    As a direct result of conduct and threats of FARC members, the Panama Plaintiffs and the Colombia Plaintiffs were placed in apprehension of an immediate harmful contact and thereby caused to submit against their will to the imprisonment and to the restrictions imposed upon Plaintiffs' freedom by the actions of FARC members.

379.    By reason of their imprisonment, Plaintiffs were caused to suffer great humiliation, pain, and mental anguish.

61

380.    Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in their damages.

## COUNT TWENTY FOUR
**Aiding and Abetting False Imprisonment of Tania Julin, Nancy Marie Hamm, Patricia L. Labutes, Sandra K. Welsh, Lorraine Van Dyke, Connie M. Tenenoff, Richard Lee Tenenoff II, Katrina Van Dyke, Tracey Whidden and Timothy C. Van Dyke**

381.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

382.    On or about January 31, 1993 members of FARC, a terrorist organization supported and financed by Defendant Chiquita, unlawfully, forcibly, and maliciously imprisoned, restrained and deprived the Panama Plaintiffs of their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at the Panama Plaintiffs, threatening to shoot and kill them and placing them in guarded facilities.

383.    On or about January 16, 1994 members of FARC, a terrorist organization supported and financed by Defendant Chiquita, unlawfully, forcibly, and maliciously imprisoned, restrained and deprived the Colombia Plaintiffs of their liberty against their will, without legal authority to do so by willfully and maliciously aiming loaded firearms at the Colombia Plaintiffs, threatening to shoot and kill them and placing them in guarded facilities.

384.    As a direct result of conduct and threats of FARC members, the Panama Plaintiffs and the Colombia Plaintiffs were placed in apprehension of an immediate harmful contact and thereby caused to submit against their will to the imprisonment and to the restrictions imposed upon Plaintiffs' freedom by the actions of FARC members.

385.    By reason of their imprisonment, Plaintiffs were caused to suffer great humiliation, pain, and mental anguish.

386.    Defendant Chiquita aided and abetted the conduct of FARC alleged herein.

Defendant gave substantial assistance to FARC and thereby breached its duty to Plaintiffs, proximately resulting in their damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

     (a)    Accept jurisdiction over this action;

     (b)    Enter judgment against Chiquita and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial by the jury;

     (c)    Enter judgment against Chiquita and in favor of each Plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

     (d)    Enter judgment against Chiquita and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

     (e)    Enter an Order declaring that Chiquita has violated the Antiterrorism Act, 18 U.S.C. § 2331 et seq.;

     (f)    Enter judgment against Chiquita and in favor of each Plaintiff for punitive damages in amounts to be determined at trial by the jury; and

     (g)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated this 9th June, 2008.

Respectfully submitted,

PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone (305) 358-2800
Facsimile: (305) 358-2382


By:    s/Ramon A. Rasco
        ROBERT C. JOSEFSBERG
        Fla. Bar No. 040856
        rjosephsberg@podhurst.com
        RAMON A. RASCO
        Fla. Bar No. 0617334
        rrasco@podhurst.com

*Counsel for Plaintiffs*


KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard (ssteingard@kohnswift.com)
Neil L. Glazer
Stephen H. Schwartz
One South Broad Street
Philadelphia, PA 19107
(215) 238-1700

PRETI FLAHERTY BELIVEAU & PACHIOS LLP
Gregory P. Hansel, Fla. Bar No. 607101 (ghansel@preti.com)
Jeffrey T. Edwards
Carrie M. Logan
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000

64

OSEN LLC
Gary M. Osen (gmo@osen.us)
Joshua D. Glatter
Aaron Schlanger
Peter Raven-Hansen, of counsel
Samuel Meirowitz
700 Kinderkamack Road
Oradell, New Jersey 07649
(201) 265-6400

VON BRIESEN & ROPER, S.C.
Beth J. Kushner (bkushner@vonbriesen.com)
411 East Wisconsin Avenue
Suite 700
Milwaukee, WI 53202
(414) 287-1373

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2008, I electronically filed the foregoing document with the clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record listed below and all counsel in the MDL proceedings either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Eric H. Holder, Jr., Esq.
John E. Hall, Esq.
Jonathan M. Sperling, Esq.
James M. Garland, Esq.
COVINGTON & BURLING LLP
1201 Pennsylvania Ave. N.W.
Washington, D.C. 20004
Phone: 202-662-6000
Fax: 202-662-6291

Sidney A. Stubbs, Esq.
Robert W. Wilkins, Esq.
Christopher S. Rapp, Esq.
JONES, FOSTER, JOHNSTON &
    STUBBS, P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401
Phone: 561-659-3000
Fax: 561-650-0412

*Counsel for Defendant Chiquita Brands International, Inc.*

By: s/Ramon A. Rasco
        Ramon A. Rasco

65

42743_1