UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-01916-MD-MARRA/JOHNSON

IN RE: CHIQUITA BRANDS
INTERNATIONAL, INC. ALIEN
TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____

This Document Relates to:


                                    CASE NO.:  08-808508-CIV-MARRA/JOHNSON

JOSE LEONARDO LOPEZ
VALENCIA; SOFONIAS CHAVERRA
CORDOBA; LUZ ESTELLA DURANGO;
and  REV. H. FRANCIS
O'LOUGHLIN, AS PERSONAL
REPRESENTATIVE OF THE ESTATES
OF JOSE GEHIENER ARIAS RAMIREZ;
ERNELIO MOSQUERA; IVAN DARIO
VELASQUEZ GRAJALES; JOHN FREDY
QUINTERO SERNA; JHONY WILMAR
MORENO GARCIA; GUSTAVO DE
JESUS CARDENAS HERNANDEZ;
LUIS FERNANDO MONROY VELASQUEZ;
LEONEL DE JESUS SANCHEZ
OSPINA; GUILLERMO GARCIA
MONZON; ARIEL JOSE VERGARA
ALARCON; EVER ANTONIO ACEVEDO
 POLO; CESAR EMILIO HINESTROZA;
LUIS HERNANDO HERRERA MORALES;
TORCUATO DE JESUS HERRERA MORALES;
LUIS EDILBERTO VARELA CANO;
JORGE ELIECER AREIZA ESPINOZA;
JORGE AUGUSTO VIANA CASTANO;
EDIS LEONEL ALARCON PEYARES;
DANIEL ANGEL GIL BAHOS;
MANUEL RICARDO GEORGES VILLA;
TONYS ALFREDO PEREZ HUMANEZ;
KAROOL ELIANA MARTINEZ GONZALEZ;
WILLIAM OSWALDO PRECIADO VERGARA;
OVER MANUEL COGOLLO TIRADO;
CESAR AUGUSTO SANCHEZ CAMPINO;
JAIME LUIS DIAZ MARQUEZ;
EDGAR FRANCISCO MESA MONTOYA;

- 1 -

JOSE MIGUEL HERRERA; SANTIAGO
SANTA CRUZ RAMBAY;
LUIS NELSON FLOREZ TABORDA;
LUIS LOZANO QUEJADA; JUAN DE JESUS
CAÑAS ROJAS; CLARA ROSA HERNANDEZ;
NUBIA CAÑAS HERNANDEZ; HERIBERTO
ANTONIO CAÑAS HERNANDEZ;
NELVEDIN DE JESUS MONTOYA SERNA;
GUSTAVO ALONSO CASTAÑEDA
MARULANDA; NODIER ALEXANDER MESA
CORREA; SANDRA MILENA OQUENDO BRAND;
YOVANY DE JESUS CAÑAS MORALES;
JESUS ALIRIO CORDOBA HERNANDEZ;
FERNEY DE JESUS LEON; HENRY DE JESUS
TUBERQUIA LONDOÑO; and
DONNY CUESTA BELLO,

        Plaintiffs,

vs.

CHIQUITA BRANDS INTERNATIONAL,
INC., a New Jersey corporation;
MOE CORPORATIONS 1–10;
MOES 11–25,

        Defendants.

_____/

## PLAINTIFFS' FIRST AMENDED COMPLAINT
## (ADDING ADDITIONAL PLAINTIFFS ONLY)

Plaintiffs, through counsel, sue Defendants and allege:

## INTRODUCTION

1.     This case arises as a result of the actions of Defendant Chiquita Brands International, Inc., and its subsidiaries and affiliates (collectively, "Chiquita"), in funding, arming, and otherwise supporting terrorist organizations in Colombia, in order to maintain its profitable control of Colombia's banana-growing regions. Plaintiffs are family members of trade unionists, banana workers, political organizers, social activists, and others targeted and killed by terrorists, notably the paramilitary organization United Self-Defense Committees of Colombia (*Autodefensorias Unidas de Colombia*, or AUC), during the 1990s through 2004. In order to operate its banana production in an environment free of labor opposition and social disturbances,

Chiquita funded, armed, and otherwise supported the AUC and other terrorist groups during this period. The harm to Plaintiffs and the deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious actions. Chiquita's actions violated not only Colombian law and U.S. law, but also international law prohibiting crimes against humanity, extrajudicial killing, torture, war crimes, and other abuses.

## JURISDICTION

2.      The Court has jurisdiction over this case under 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. §1350 (Alien Tort Claims Act); 18 U.S.C. § 1964(c) (Racketeer Influenced and Corrupt Organizations Act); and 28 U.S.C. §1332 (diversity jurisdiction). Plaintiffs and Defendants are citizens of different states and the damages sought by this Complaint exceed the jurisdictional minimum for this Court.

3.      In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to claims based upon laws of the States of Ohio, New Jersey, Florida or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

## PARTIES

4.      The term "Plaintiffs" herein includes the named plaintiffs and the decedent on behalf of whom they bring this action.

5.      Plaintiff, Jose Leonardo Lopez Valencia, is a resident and citizen of Colombia. He brings this action individually.

6.      Plaintiff, Sofonias Chaverra Cordoba, is a resident and citizen of Colombia. He brings this action individually.

7.      Plaintiff, Luz Estella Durango, is a resident and citizen of Colombia. She brings this action individually.

8.      Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Jose Gehiener Arias Ramirez.

9.      Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Ernelio Mosquera.

10.      Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Ivan Dario Velasquez Grajales.

11.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of John Fredy Quintero Serna.

12.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Jhony Wilmar Moreno Garcia.

13.      Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Gustavo de Jesus Cardenas Hernandez.

14.      Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Luis Fernando Monroy Velasquez.

15.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Leonel de Jesus Sanchez Ospin.

16.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Guillermo Garcia Monzon.

17.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of  Ariel Jose Vergara Alarcon.

18.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Ever Antonio Acevedo Polo.

19.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Cesar Emilio Hinestroza.

20.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of  Luis Hernando Herrera Morales.

21.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Torcuato de Jesus Herrera Morales.

22.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Luis Edilberto Varela Cano.

23.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Jorge Eliecer Areiza Espinosa.

24.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Jorge Augusto Viana Castano.

25.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Edis leonel Alarcon Peyares.

26.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of  Daniel Angel Gil Bahos.

27.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Manuel Ricardo George Villa.

28.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Tonys Alfredo Perez Humanez.

29.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Karool Eliana Martinez Gonzalez.

30.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of  William Oswaldo Preciado Vergara.

31.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Over Manuel Cogollo Tirado.

32.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Cesar Augusto Sanchez Campino.

33.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Jaime Luis Diaz Marquez.

34.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Edgar Francisco Mesa Montoya.

35.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Jose Miguel Herrera.

36.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Santiago Santa Cruz Rambay.

37.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Luis Nelson Florez Taborda.

38.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Luis Lozano Quejada.

39.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Juan de Jesus Cañas Rojas.

40.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Clara Rosa Hernandez.

41.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Nubia Cañas Hernandez.

42.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Heriberto Antonio Cañas Hernandez.

43.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Nelvedin de Jesus Montoya Serna.

44.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Gustavo Alonso Castañeda Marulanda.

45.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Nodier Alexander Mesa Correa.

46.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Sandra Milena Oquendo Brand.

47.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Yovany de Jesus Cañas Morales.

48.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Jesus Alirio Cordoba Hernandez.

49.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Ferney de Jesus Leon.

50.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Henry de Jesus Tuberquia Londoño.

51.     Plaintiff, Rev. H. Francis O'Loughlin, brings this action as Personal Representative of the Estate of Donny Cuesta Bello.

52.     Defendant Chiquita Brands International, Inc. ("CBI"), is a United States-based corporation organized under the laws of the State of New Jersey.  Its corporate headquarters are located in Cincinnati, Ohio.  CBI is a leading international producer, distributor, and marketer of

- 6 -

bananas and other produce; it is one of the largest banana producers in the world and a major supplier of bananas in Europe and North America.  The company was founded in 1899 as the United Fruit Company, became the United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

53.   On information and belief, at all times relevant herein, CBI wholly owned, dominated and controlled C.I. Bananos de Exportación, S.A. ("Banadex"), headquartered in Medellín, Colombia. Banadex produced bananas in the Urabá and Santa Marta regions of Colombia and, by 2003, was Chiquita's most profitable banana-producing operation.  At all times material herein, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise.

54.   Plaintiffs are ignorant of the true names and capacities of the Defendants who are sued herein as Moe Corporations 1–5 and Moes 6–25, and Plaintiffs sue these Defendants by such fictitious names and capacities.  Plaintiffs will amend this Complaint to allege the Moes' true names and capacities when ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such Defendants, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries.  Whenever and wherever reference is made in this Complaint to any conduct committed by CBI, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the benefit of CBI and Banadex.

55.   At all times herein material, with respect to the events at issue, CBI, Banadex, Moe Corporations 1–5 and Moes 6–25 conspired with each other, and/or participated in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting

within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As described herein, "agency" includes agency by ratification. Whenever reference is made in this Complaint to any conduct by a defendant, such allegations and references shall be construed to mean the conduct of each of the defendants, acting individually, jointly, and severally.

56.     At all times herein material, with respect to the events at issue, Chiquita conspired with, worked in concert with, participated in a joint criminal enterprise with, acted as the principal of, employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs' injuries, including but not limited to the AUC, and the terrorist organizations were acting within the course and scope of such agency, employment, and/or concerted activity.  The wrongful conduct alleged herein was perpetrated by Chiquita management and personnel both in Colombia and the United States.

57.     Plaintiffs are informed and believe and based upon such information and belief allege that CBI management and other personnel in the United States and in Colombia were informed of the ongoing events complained of herein and personally participated in the decision making, planning, preparation, ratification, and/or execution of the acts complained of.

## STATEMENT OF FACTS

### The Colombian Conflict and Paramilitary Terrorist Organizations

58.     In the early 1980s, Colombia saw a vast expansion in trade in illegal drugs, particularly cocaine.  An emerging class of drug barons began to create private armies to combat left-wing guerrilla forces, including the Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarios de Colombia*, or FARC) and the National Liberation Army (*Ejercito Nacional de Liberacion*, or ELN), who were engaged in terrorist activities such as extortion, kidnappings, and assassinations.  These paramilitaries acted autonomously and were dispersed, and their influence was reduced to the local scale.

59.     In 1981, the Medellín cartel created a death squad, *Muerte a Secuestradores* ("Death to Kidnappers"), which targeted guerillas for elimination and adopted brutal, terrorist tactics.  As the 1980s progressed, paramilitaries maintained links with drug barons, large

landowners, industrialists, and bankers who funded them, although in some cases they achieved some autonomy in their violent activities.

60.     By the mid 1990s, paramilitary groups had achieved a substantial degree of independence due to their increased participation in, and benefit from, drug trafficking.  The largest and most well-organized paramilitary group in Colombia was the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and Urabá*, or  ACCU). The organization featured a central command that coordinated the activities of local fronts. Both mobile and stationary units existed, and fighters received a base salary plus food, a uniform, weapons, and munitions. The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade.  In 1994, Castaño and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership.  At all times relevant to this Complaint, Castaño remained the leader of the AUC.

61.     The AUC grew rapidly in size during the late 1990s and into the twenty-first century. In 1997, it comprised roughly 4,000 combatants.  By 2001, Castaño claimed to have 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000.  By 2002, AUC forces were present in nearly the whole of Colombia. AUC leaders have claimed that the organization comprised as many as 17,000 armed fighters and 10,000 associates at its peak before a demobilization process that began in 2004.

62.     The efforts of the AUC were directed toward elimination of anyone considered close to the guerrillas or who opposed or complicated the paramilitaries' control of territory or population in the area in which they exerted their power.  The AUC's primary method was terrorism against individuals or communities.  To this end, the AUC, like the ACCU before it, routinely engaged in death threats, extrajudicial killings, massacres, torture, rape, kidnapping, forced disappearances, and looting. While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians targeted by a policy of

political and social cleansing, typically rural workers, trade unionists, community activists, human rights defenders, leftist politicians, judicial investigators, indigenous persons, and anyone considered socially undesirable (including suspected petty criminals). Inhabitants of small towns in contested rural areas were particularly vulnerable. AUC violence has often caused entire communities to disperse, either due to threats of an impending massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

63.     The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out systematically. The ACCU operated throughout the banana-growing region of Urabá, as well as in other parts of Colombia, and on many occasions from at least 1994 through 2004 carried out multiple executions or massacres; the ACCU and other AUC groups were responsible for at least 150 massacres by 1997. From its founding, its activities and abuses have been carried out under the direction of a central command.

64.     The AUC and its constituent groups, including the ACCU, have, at least since 1994, been participating in an internal armed conflict in Colombia, at times engaging in direct conflict with guerrilla armies. The AUC itself has accepted that it is subject to the laws of war, with the limited exception that it believes it has the privilege to execute guerrillas *hors de combat*, and has accepted training in the laws of war from the International Committee of the Red Cross.

65.     Longstanding and pervasive ties exist between the AUC and official Colombian security forces, which include the Colombian Armed Forces and the Colombian National Police. Collusion with government forces has been a feature of Colombian paramilitaries since their inception. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in campaigns of the official armed forces against guerilla insurgents.

Paramilitary forces included active-duty and retired army and police personnel among their members. Although a 1989 government decree established criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner for Human Rights, and the Colombian Attorney General's office. Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division," in addition to the five official divisions of the Colombian Army.

66.     This cooperation included the provision of weapons, training, and logistical support as well as assistance in the selection of civilian targets for massacres perpetrated by the AUC. U.S. government records indicate that in September 2000, there were 285 members of the police and military under investigation for links with paramilitaries.

67.     The 17th Brigade of the Colombian Army, located in the Urabá region, and the 4th Brigade, the sister unit to the 17th Brigade operating in the Medellin region, were especially active in their support of and involvement in paramilitary activities, which included engaging in joint operations.  One high-ranking commander of the 17th Brigade, General Rito Alejo (Del Rio) Rojas, was notorious for collaboration and collusion with paramilitaries in the region and as a result, was arrested and charged for his involvement.  Additionally, a former deputy commander of the 17th Brigade even denounced the Army generally and the 17th Brigade specifically for its willful failure in combating paramilitary violence. In October 1997, for example, members of the Army's Fourth Brigade reportedly established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the

village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed the pipes that fed the homes potable water.  Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee." In 1998, numerous members of Colombia's security forces, including members of the 17th Brigade and local police forces, were arrested and charged with various crimes related to their involvement with certain AUC activities,  including the sponsorship and formation of illegal paramilitary groups, conspiracy and homicide.  On February 19, 2000, the ACCU selectively assassinated five banana workers in the "peace community" of San Jose de Apartadó, in Urabá, and reports indicated that members of the 17th Brigade were direct participants in the massacre.  On March 27, 2008, arrest warrants were issued for fifteen soldiers for their participation in a February 21, 2005 massacre, also in San Jose de Apartadó, during which eight people, including three children, were hacked to death by machetes.  Despite the Colombian government's suggestions that the killings were committed by the FARC, a former paramilitary member present at the massacre confirmed long-standing suspicions of army-paramilitary collusion when he recently described that the groups conducted joint patrols around the region and that Colombian soldiers played a direct role in the brutal massacre.

68.     *Convivirs* were government-sponsored rural surveillance and security cooperatives made up of local civilians. The Colombian government established the *convivirs* under Ministry of Defense Decree No. 356/94 to aid in counter-insurgency operations through the collection of information about guerrilla activities and issued licenses for the *convivirs* to operate in remote areas. While originally they were unarmed, numerous *convivirs* subsequently acquired weapons that were legally restricted to exclusive use by the military and police.  Notably, a high-ranking Ministry of Defense official authorized illegal arms sales to *convivirs* with links to the paramilitaries.  By March 1997, there were approximately 500 *convivirs* operating in Colombia.

Antioquia Department, where Urabá is located, became the heartland of the *convivir* movement. In 1997, the Colombian government revoked the army's legal authority to work with *convivirs* because it had become apparent that these groups were operating as fronts for the paramilitary. In 1998, the government revoked the legal status of *convivirs* and thereby ordered that they dismantle. In reality, however, *convivirs* continued to exist under the auspices of paramilitary groups. The AUC used *convivirs* as fronts to collect money from foreign and local businesses that operated in the region. In or about 1997, the leader of the AUC, Carlos Castaño, instructed the General Manager of Chiquita's wholly-owned subsidiary, Banadex, to make payments to a *convivir*. For several years thereafter, Chiquita made payments to the AUC by check through various *convivirs* in the Urabá and Santa Marta regions of Colombia. The checks were nearly always made out to the *convivirs*. No *convivir*, however, ever provided Chiquita or Banadex with any actual security services or equipment in exchange for the payments. Beginning in or about June 2002, Chiquita began paying the AUC directly.

69.    Government security forces have habitually tolerated the presence of paramilitaries, willfully failed to prevent or interrupt their crimes, actively conspired with them, and coordinated activities with them. The cooperation between Colombian security forces and the AUC arose from their common interest in fighting the guerrillas. Boundaries between the two groups at times were amorphous, as some paramilitary members were former police or army members, while some active-duty military members moonlighted as paramilitary members and became thoroughly integrated into the groups. Paramilitary leaders noted that security forces allowed members of the AUC to serve as proxies in their pursuit of guerrilla forces, largely due to the military's operative incapacity to defeat the guerrillas on its own. As outside organizations placed increasing pressure and scrutiny upon the military to improve its human rights record, some local military units were content to allow the paramilitaries to perform their dirty work.

Documented examples include:

> • Allowing paramilitaries to establish permanent bases and checkpoints without interference;
> • Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;
> • Withdrawing security forces from villages deemed sympathetic to guerrillas, leaving them vulnerable to attack by paramilitaries;
> • Failing to intervene to stop ongoing massacres occurring over a period of days;
> • Sharing intelligence, including the names of suspect guerilla collaborators;
> • Sharing vehicles, including army trucks used to transport paramilitary fighters;
> • Supplying weapons and munitions;
> • Allowing passage through roadblocks;
> • Providing support with helicopters and medical aid;
> • Communicating via radio, cellular telephones, and beepers;
> • Sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and
> • Planning and carrying out joint operations.

In a recurring pattern, paramilitaries have taken over villages and assaulted inhabitants while nearby security forces have either not intervened or have intervened to facilitate the violence. The Mapiripán Massacre, one of the most notorious incidents of collaboration by members of the armed forces with the paramilitary, illustrates egregious acts and omissions by security forces. On July 12, 1997, approximately 100 AUC members departed in chartered planes from Urabá, in close proximity to the 17th Brigade headquarters. The planes were permitted by the army to land at the San José de Guaviare civilian airport in Meta.  On that day, the Colombian Army maintained control of the airport, which also had a large police presence. Notably, the airport was regularly used by the United States Embassy and the Colombian Directorate of Anti-Narcotics Operations.  In two military vehicles provided by the army, the AUC traveled through military training areas without being stopped on their way to Mapiripán. The military also provided munitions and communications. Troops of the Joaquín Paris Battalion were unjustifiably mobilized to a different location, leaving the Mapiripán population unprotected. The paramilitary remained in the region from July 15 through July 21and wreaked havoc on the town, torturing and killing approximately 49 individuals. Security forces failed to

arrive in Mapiripán until July 22, despite repeated requests for help from local residents. Following the attacks, army helicopters extricated the AUC.  As the Inter-American Court of Human Rights found in 2005, the incursion of the paramilitary into Mapiripán, which took months of coordination and planning, was "carried out with logistic preparatory work and with the collaboration, acquiescence and omissions by members of the Army."  Approximately 100 members of the AUC could not have traveled from Urabá to Meta, committed a massacre, and returned to Urabá with impunity without the knowledge and assistance of security forces in the region.

70.    The violent and terroristic activities of the AUC and its constituent groups, including the ACCU, have at all times been well-known throughout Colombia and the world.

## Chiquita's Support of the AUC and Other Terrorists

71.    Chiquita, as the successor to the United Fruit Company and the United Brands Company, has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century.  At all relevant times, Chiquita has produced bananas in the Urabá and Santa Marta regions of Colombia.

72.    On information and belief, from the early 1990s until at least 1997, Chiquita provided material support, including money, to terrorist organizations such as the ACCU and other predecessors of the AUC.

73.    On information and belief, in the years prior to Chiquita's provision of support to the paramilitaries, these armed groups did not control the territory of the banana-producing regions of Colombia.  The collaboration with Chiquita allowed the paramilitaries to consolidate as the decisive actor in the political, military, and social terrain of the banana region.  In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition was suppressed.

*Payments to the AUC*

74.    From 1997 until at least February 2004, Chiquita provided material support to the AUC in Urabá and Santa Marta.  By 1997, the AUC effectively controlled large swathes of

territory, as well as exerting influence in institutions such as labor organizations and local governments, in these regions.  On information and belief, the stability and social control provided by the AUC was to Chiquita's benefit, in allowing exportation of bananas without interruption due to conflict.  The influence of the AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced labor strife.  The AUC also provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities and social program.

75.     Chiquita paid the AUC, directly or indirectly, nearly every month during the period 1997–2004, making over one hundred payments to the AUC totaling over $1.7 million. Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees.  Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.  Payments made to the AUC or to front organizations were recorded in Chiquita's corporate books and records as "security payments" or payments for "security" or "security services."  Other payments, made to Banadex executives with the intent that they would be withdrawn as cash and handed directly to the AUC, were recorded as income contributions.

76.     At all relevant times, Chiquita knew that the AUC was a violent, terrorist paramilitary organization.  On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO"), and that designation was well-publicized in the American public media, including in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001, as well as in the Colombian media.

77.     In 2003, Chiquita consulted with attorneys from the District of Columbia office of a national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC.  Outside counsel advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Among other things, outside counsel advised Chiquita:

•      "Must stop payments."

- "Bottom Line: CANNOT MAKE THE PAYMENT"

- "General Rule: Cannot do indirectly what you cannot do directly"

- "Concluded with: CANNOT MAKE THE PAYMENT"

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

- "[T]he company should not make the payment."

78.     Although CBI's Board of Directors agreed to disclose its payments to the AUC to the U.S. Department of Justice on or about April 3, 2003, on April 8, 2003, CBI instructed Banadex to continue making the payments to the AUC.  On April 24, 2003, CBI met with Justice Department officials, who told CBI the payments were illegal.  Nonetheless, Chiquita continued to make the payments until at least February 2004.

79.     On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially designated global terrorist. The company's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

*Other Support of the AUC*

80.     In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

81.     The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work.  GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama.  In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.

82.     Chiquita, through Banadex, operates a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo.  The arms ship docked at the Chiquita port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 million rounds of ammunition.  These arms and ammunition were then transferred to the AUC.

83.     On information and belief, Chiquita facilitated at least four other arms shipments to the AUC.  In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

84.     On information and belief, Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.

85.     On information and belief, Chiquita also assisted the AUC by allowing the use of its private port facilities not only for the illegal importation of arms, but also for the illegal exportation of large amounts of illegal drugs, especially cocaine.  The drug trade was a major source of income for the AUC.  Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly allowed use of its port and banana transportation boats for this purpose.

86.     On information and belief, the monetary payment made by Chiquita and the other support and assistance provided by Chiquita to the AUC contributed to the AUC's ability to flourish and consolidate its power in the regions impacted by the AUC's acts of terror and mayhem. The assistance, financial and otherwise, provided by Chiquita to the AUC, facilitated the AUC's ability to carry out such acts with impunity. The acts of terror and violence were designed to instill fear and control in the regions affected. Such acts of terror, violence, and mayhem included the actions set forth in paragraphs 51-90 below.

### Plaintiffs' Injuries

*Jose Leonardo Lopez Valencia*

87.     Jose Leonardo Lopez Valencia was an electrical mechanic in Turbo for many years.

88.     Beginning around 1998, he witnessed numerous human bodies killed during massacres by the AUC, the offloading by uniformed AUC members from a ship with Chiquita written on its side of large wooden crates believed to contain firearms into smaller boats, and the forced kidnapping of his employer by AUC members in a white vehicle which later became known as the "Vehicle to Heaven" because anyone seen getting into that vehicle, including his employer, was never seen again.

89.     Later Lopez was confronted at a gas station and shot five times by an AUC member.

90.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the shooting of Lopez through its support of the AUC. On information and belief, Chiquita benefited in part from shooting Lopez by intimidating a witness who threatened the stability of Chiquita's operations.

*Sofonias Chaverra Cordoba*

91.     Sofonias Chaverra Cordoba lived in a village in Antioquia with his family. He was a prosperous businessman with many business interests.

92.     In 1998, a 180-man battalion of AUC forces commanded by a man called "El Lobo," arrived and summoned his village to the village square where they were promised amnesty if they renounced the guerillas who had previously been active in the area. When no one stepped forward to renounce the guerillas, the AUC began seizing villagers and taking them to the area near the warehouse where Chaverra milled his rice, hanged them, cut their tongues out, cut off their testicles, otherwise mutilated them, shot them, and then dumped their bodies on the outskirts of the village in an attempt to terrorize Chaverra and fellow villagers. Mr. Chaverra witnessed these events.

93.     In 2000, because he was opposed to the AUC, the AUC detonated an explosive device in his home, causing a cement pillar to crush his right foot, which was later amputated. Subsequently his son Winston was executed by the AUC. He fled his village, losing all of his assets.

94.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the bombing of Mr. Chaverra's home through its support of the AUC in Antioquia.

On information and belief, Chiquita benefited in part from the shooting of Chaverra by intimidating a witness who threatened the stability of Chiquita's operations.

### Jose Gehiener Arias Ramirez

95.     Jose Gehiener Arias Ramirez worked for 15 years in packing houses owned or operated by Chiquita.

96.     Beginning in 1997 or 1998, armed and uniformed AUC members would enter the Chiquita packing house where he worked and threaten workers from the Barrio Policarpa, whose residents were viewed generally to be hostile to the AUC.

97.     In 1999, AUC members kidnapped Arias by forcing him into a taxicab and later executed him, leaving behind his wife and their daughter and retarded son. His wife, Marina de Maria Ramirez later received death threats warning her not to speak of her husband's death or report it to the authorities.

98.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Arias' murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a senior worker who threatened the stability of Chiquita's operations.

### Ernelio Mosquera

99.     Ernelio Mosquera operated a transportation business with a partner, who was perceived by the AUC to be hostile to the AUC.

100.    In 1999, AUC paramilitaries came to Mosquera's house and executed him in the presence of his family.  They then ran out and fled in a black car that was known in town as the "Trip to Heaven."

101.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Mosquera's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

### Ivan Dario Velasquez Grajales

102.    Ivan Dario Velasquez Grajales was a businessman who operated a cantina at Verada La Balsa Finca El Eden in Apartador.

103.    In 2001, Velasquez was investigated by the AUC because he was identified as being hostile to the AUC.

104.    Two weeks later they came back, forcibly removed him, gagged him, tied him to a truck, dragged him behind the truck and eventually executed him.

105.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Velasquez' murder through its support of the AUC.   On information and belief, Chiquita benefited in part from his murder by sending a message to local residents that anyone hostile to the AUC would be tortured and executed.

*John Fredy Quintero Sernas*

106.    John Fredy Quintero Serna managed a gas station.

107.    In late 1998, he purchased a small motorcycle for his sister which the AUC stole in Apartdor.

108.    Because the AUC acted with impunity, it did not hide where it took the motorcycle.

109.    Quintero then went to the building where the AUC kept it and single-handedly took it back. He then began criticizing the AUC and was warned by the local AUC commander that if he continued doing so he would be dealt with appropriately.

110.    In November, 1988, he found the tires on his motorcycle flattened. He then took a cab to his place of work where he saw 10 to 12 known AUC members who surrounded the gas station and later four additional AUC arrived on motorcycles and began firing their weapons, killing him.

111.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Quintero's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly.

*Jhony Moreno Garcia*

112.    In 2000, Jhony Moreno Garcia had received threats in his home in by members of AUC who told him to leave the area or they would kill him.

113.    Moreno left and went to Medellin, but came back a month later whereupon he was executed two weeks after by the same men who had threatened him before.

114.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the Quintero's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who disobeyed the AUC would be dealt with harshly.

<em>Gustavo de Jesus Cardenas Hernandez</em>

115.    Gustavo de Jesus Cardenas Hernandez was shot in the presence of his wife at home by an AUC member named "El Sargento."

116.    The AUC had earlier listed Cardenas on a death list as part of a broader effort to purge and cleanse certain individuals perceived by it to be undesirable.

117.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Cardenas through its support of the AUC.

118.    On information and belief, Chiquita benefited in part from Cardenas' murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

<em>Luis Fernando Monroy Velasquez</em>

119.    Luis Fernando Monroy Velasquez, who was disabled from an automobile accident, lived in Apartador.

120.    In 2002, AUC paramilitaries, perceiving Monroy to be hostile to the AUC, forced him into a white car and tortured him by pouring acid on his face and pulling out his fingernails, and later executed him.

121.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Monroy's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing an individual it deemed undesirable and

- 22 -

who it felt threatened the stability of Chiquita's operations and the generally established social order.

### Leonel de Jesus Sanchez Ospina and Luz Estella Durango

122.    Leonel de Jesus Sanchez Ospina and Luz Estella Durango lived as common law spouses in the Barrio Policarpa, whose residents were viewed generally to be hostile to the AUC.

123.    In 2004, Sanchez was executed by an AUC assassin named "El Mono" and Estella was later threatened by the AUC, causing her to close her business and flee the area.

124.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Sanchez' murder through its support of the AUC in 2004.  On information and belief, Chiquita benefited in part from his murder by removing a perceived opponent of the AUC and who threatened the stability of Chiquita's operations and the generally established social order.

### Guillermo Garcia Monzon

125.    In May, 1999, two members of the AUC named "El Indio" and "El Diablo" executed Garcia one half block from his home in an act of impunity.

126.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Garcia's murder through its support of the AUC in. On information and belief, Chiquita benefited in part from his murder by a person who challenged the impunity of the AUC and who threatened the stability of Chiquita's operations and the generally established social order.

### Ariel Jose Vergara Alarcon

127.    Ariel Jose Vergara Alarcon worked as a contract laborer loading and unloading cargo trucks including bananas and fertilizer in or near Chigorodo.

128.    On June 3, 1997, he was in a truck that was stopped at an AUC road block, was identified and accused of being a supporter of the FARC and was killed with one shot to the right eye.

129.    In addition to the pain caused to his surviving parents by the murder of their son, Vergara's brother, Jhon Jairo Vergara Alarcon, received death threats from the AUC, forcing

him to leave the area and relocate in Medellin.  Jhon knew who had killed his brother and received death threats by the paramilitaries.

130.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the execution of Vergara through its support of the AUC in or near Chigorodo.  On information and belief, Chiquita benefited in part from killing Vergara  by sending a message to local residents that anyone hostile to the AUC would be executed and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Ever Antonio Acevedo Polo*

131.    Ever Antonio Acevedo Polo sold bananas that were rejected by Chiquita and other growers because their quality was not good enough for export.

132.    Acevedo was in competition with the AUC, which wanted to be the exclusive seller of such bananas.

133.    On May 17, 2002, Acevedo was forced by the AUC into a white vehicle in or near San Pedro de Uraba, kidnapped, and later shot four times and killed.

134.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the kidnapping and execution of Acevado through its support of the AUC. On information and belief, Chiquita benefited in part from kidnapping and execution of Acevedo Polo by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Cesar Emilio Hinestroza*

135.    On January 17, 2000, Cesar Emilio Hinestroza was executed by the AUC in front of his stepdaughter near Zunguito.

136.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Hinestroza's murder through its support of the AUC in Zunguito.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Luis Hernando  and  Torcuato de Jesus Herrera Morales*

137.    Luis Hernando and  Torcuato de Jesus Herrera Morales were brothers.

138.    Luis worked in a factory in Apartado that made the boxes in which bananas are packed, and was sympathetic to efforts to organize workers.

139.    On March 9, 1997, both  brothers were attending a wedding reception  when  four motorcycles pulled up to the hall, identified themselves as AUC, and  went in  and shot Luis.  On their way out, Torcuato hit one of the AUC paramilitaries and brought him to the ground; the paramilitary put his gun against Torcuato's chin and pulled the trigger.

140.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted these killings through its support of the AUC.  On information and belief, Chiquita benefited in part from the Herrera brothers' murders by sending a message to local residents that anyone hostile to the AUC would be executed, that those who challenged the AUC's impunity would be dealt with harshly, and by removing individuals perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Luis Edilberto Varela Cano*

141.    On December 16, 1999, Luis Edilberto Varela Cano was drinking a soda in or near Apartado when an AUC member on a motorcycle pulled up, told him to get on his motorcycle, and drove him away, whereupon he was executed.

142.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Varela's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Jorge Eliecer Areiza Espinosa*

143.    Jorge Eliecer Areiza Espinoza had served in the Colombian military and was perceived by the AUC to be hostile to it.

144.    On August 26, 2001, Areiza opened the door to his apartment in Turbo and was stabbed numerous times and left for dead.

145.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Areiza's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Jorge Augusto Viana Castano*

146.    On December 27, 2004, Jorge Augusto Viana Castano was at a small grocery store in the Policarpa neighborhood, which the AUC perceived to be sympathetic to FARC.

147.    In addition to being in the Policarpa neighborhood, Viana Castano had reported an AUC member named "Cepillo" to the government authorities.

148.    On that date, two AUC members shot and killed Viana Castano.

149.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Viana's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by intimidating a witness who threatened the stability of Chiquita's operations, by sending a message to local residents that anyone hostile to the AUC

would be executed, and by removing a person perceived to be hostile to the AUC which

threatened the stability of Chiquita's operations and the generally established social order.

*Edis Leonel Alarcon Peyares*

150.    Edis Leonel Alarcon Peyares worked in a banana plantation near Apartado which

was  perceived by the AUC to be sympathetic to labor unions and/or FARC.

151.    On November 5, 2001, three AUC men came to Alarcon's home and told him to

go with them.  His mother begged "Please don't take him," whereupon they pointed a gun at her

and said: "We were told to get one, but if you get in the way, we'll take two."

152.    They walked Alarcon about 30 feet from the house where he was executed.

153.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted Alarcon's murder through its support of the AUC.  On information and belief,

Chiquita benefited in part from his murder by removing a person perceived to be hostile to the

AUC which threatened the stability of Chiquita's operations and the generally established social

order.

*Daniel Angel Gil Bahos*

154.    Daniel Angel Gil Bahos worked as a vegetable vendor in or near Chigorodo.  He

would routinely take vegetables to kitchens located on various farms or ranches.

155.    On several occasions Gil was recruited by AUC members to join them, but he

refused, saying all he wanted was for them to give him permission to visit the kitchens on the

banana plantations so that he could sell his vegetables.  They told Gil he needed to go see a

certain AUC commander at a particular farm.

156.    On December 18, 1998, Gil visited that location where he was shot once in his

right eye and killed. His body was later found with all of his fingers broken.

157.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted Gil's torture and murder through its support of the AUC in Chigorodo.  On information and belief, Chiquita benefited in part from his torture and murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Manuel Ricardo Georges Villa*

158.    Manuel Ricardo Georges Villa was a manager of a cattle ranch, but was unable to continue in that employment after the AUC became active in the area.   He started buying piglets and raising them to full size, then he would sell them.  He also ran a small store cafe.

159.    On May 24, 1999, eight men arrived at his home in two vehicles.  They knocked the door down, said they were AUC, and took Georges with them.  The next day his body was found with five shots to the head.

160.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the Georges' kidnapping and murder through its support of the AUC in Apartado. On information and belief, Chiquita benefited from his kidnapping and murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Tonys Alfredo Perez Humanez*

161.    Tonys Alfredo Perez Humanez and his immediate family all lived and worked on cattle ranches near Chigorodo throughout their lifetime.

162.    On August 12, 1997, 10 uniformed and fully armed AUC members came to their home and took Jose Reinerio Perez (Tonys' brother) and Jose Hernandez Perez (Tonys' nephew) to the farm Azalon.  When Tonys arrived there, he and his brother were killed.

163.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Tonys' killing through its support of the AUC.  On information and belief, Chiquita

benefited in part from his killing by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Karool Eliana Martinez Gonzalez*

164.    On December 4. 2000, Karool Eliana Martinez Gonzalez  was forcibly taken from a dance by a known FARC member whose name was "El Cortico" and forced to live with him, bearing his child, Christian Camilo Martinez Gonzalez.  She remained with the FARC forces until that particular FARC group decided to turn in their arms and try to re-socialize.

165.    Amin Ramos, an AUC commander, then told Martinez that she must live with him or he would kill her.  He told Martinez that he knew she was a former FARC.  Martinez complied, bearing him a daughter, Ana Maria Ramos.   Martinez eventually called her mother, reporting that she was being held against her will and mistreated. Martinez also reported that Ramos had killed the father of her older child and that she feared for her own life.

166.    On December 4, 2000, Amin Ramos murdered Martinez.  Her body was sent to her mother. An autopsy showed that she had been tortured and shot in the back of the head.

167.    Martinez' mother then contacted Ramos, pleading with him to let her have her grandchildren. Ramos responded that if she wanted them he could send them in a coffin as he had done with her daughter.  Martinez' mother traveled to Sabana in San Angel (Magdalena) where she had been summoned by the AUC to get her grandchildren.  Once there she was kidnapped and brutally mistreated in front of her grandson Christian.

168.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Martinez' torture and murder. Chiquita benefited in part from Martinez' torture and murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and  by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*William Oswaldo Preciado Vergara*

169.   William Oswaldo Preciado Vergara worked on a banana plantation near Turbo.

170.   On October 22, 2003, Preciado stopped to eat lunch when five AUC men approached him on motorcycles, tied him up, and took him to another plantation where he was shot eight times in the head.

171.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Preciado's killing through its support of the AUC in Turbo.  On information and belief, Chiquita benefited in part from his killing by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Over Manuel Cogollo Tirado*

172.   Over Manuel Cogollo Tirado was a farm worker at or near Arboletes.

173.   Cogollo also assisted the local "Medicine Man," thereby making him a target for the AUC.

174.   The AUC had issued a flyer identifying certain occupations such as carnival workers, former FARCs, FARC sympathizers, medicine men, and anyone assisting medicine men as individuals that they planned to eradicate.

175.    On April 28, 2002, Cogollo was taken by AUC members on motorcycles to a location where he was later found tortured and his neck broken.

176.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Cogollo's killing through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Cesar Augusto Sanchez Campino*

177.    Cesar Augusto Sanchez Campino was a farm worker who worked in an area considered "FARC land."

178.    On February 22, 2001, Sanchez' daughter, Liliana, was to be married.  She and her father went to her uncle's village to invite him and his family to her wedding later that day.

179.    While there two known AUC members on motorcycles arrived and shot Sanchez three times in the leg, chest, and head.  Liliana witnessed her father die at the scene.

180.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Sanchez' murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Jaime Luis Diaz Marquez*

181.    On July 4, 2002, Jaime Luis Diaz Marquez, an 8th grade student, 15 years of age, was standing in the front yard with friends when two AUC members who had threatened him two days earlier shot and killed him.

182.    Diaz was killed for dating a girl who ran away from her home because her mother opposed the relationship, and the mother's relatives were AUC members.

183.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Diaz' murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Edgar Francisco Mesa Montoya*

184.    Edgar Francisco Mesa Montoya worked in the banana plantations near Chigorodo.

185.    On January 23, 1997, three AUC men knocked on the door of Mesa's home on the plantation, instructed him to report to the packing house where apparently all of the other men from the various houses surrounding the packing house were being held.  They were all forced to lie on the floor, and witnesses later heard shots from the home.

186.    The next day Mesa's body was found badly beaten and shot.  The AUC took his motorcycle and told his family that this happened because he was a union organizer.

187.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Mesa's murder through its support of the AUC in Chigorodo.  On information and belief, Chiquita benefited in part from his murder by sending a message to local residents that anyone hostile to the AUC would be tortured and executed and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Jose Miguel Herrera*

188.    Jose Miguel Herrera worked on a banana plantation near Apartado whose workers were perceived to be sympathetic to unions.

189.    AUC members threatened Herrera and he moved away but subsequently returned to Apartado and got a job at a gas station.

190.    On December 12, 2002, Herrera's wife was told that he had been killed, and his body was found in a small park in the town center with a gunshot wound to the head.

191.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Herrera's murder through its support of the AUC. On information and belief,

Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

### Santiago Santa Cruz Rambay

192.    Santago Santa Cruz Rambay was a school teacher in Apartado.  He also managed a juvenile program involving sports and education.  He was an elected member of the City Council, one of 15 members.

193.    The juvenile program owned a small cattle ranch, the proceeds of which were used to support the organization.  The AUC demanded that Santa Cruz give the AUC one head of cattle every 8-10 days.  Santa Cruz told them he could not do that since that was the only source of income for the organization.

194.    On February 18, 2001, Santa Cruz went to a barbecue at the ranch.

195.    Five masked AUC members came to the barbecue masked and shot him 27 times.

196.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Santa Cruz's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

### Luis Nelson Florez Taborda

197.    Luis Nelson Florez Taborda was a taxi driver in and around Chigorodo, whose residents were perceived by the AUC to be hostile to it.

- 33 -

198.    On December 12, 1997, two AUC men came to his taxi terminal, got in Florez' taxi and told him to drive off.  His taxi cab was found one week later; neither he nor his body has ever been recovered.

199. On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Florez' disappearance and presumed murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his disappearance and presumed murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Luis Lozano Quejada*

200.    Luis Lozano Quejada worked as a carpenter assistant in Aparatado.  He was a deaf mute.

201.    On his way to a medical examination at the Clinica Leon XIII in the hope that his ability to speak could be surgically corrected, Lozano and his physician were abducted by members of the AUC.

202.    On June 22, 2003, Lozano's physician was found dead, shot in the head and exhibiting signs of torture.  (His physician had previously been recruited to run for mayor of his town, but was forced by the AUC to withdraw so that it could run its own candidate.)

203.    Lozano's body was found four days later in a farm 65 kilometers from where his doctor was found.  Lozano Quejada's left ear and his lower lip were cut off, and he had been suffocated using a plastic bag containing a powder detergent.

204.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lozano's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by sending a message to local residents that those who associated with people who challenged the AUC's political control would be dealt with

harshly and by removing a person perceived to threaten the stability of Chiquita's operations and the generally established social order.

*Juan de Jesús Cañas Rojas, Clara Rosa Hernandez, and Nubia Cañas Hernandez*

205.   Juan de Jesús Cañas Rojas, Clara Rosa Hernandez, and Nubia Cañas Hernandez were husband, wife, and daughter, respectively.

206.   On or about June 17, 1997, they and their son/brother, Ruben Dario Cañas Hernandez, were riding the bus that transported workers to the Farm Florida in Vereda Arcuas Central when it was stopped by a group, some of which were in civilian clothes and others in uniform.  One of them got on the bus and identified themselves as AUC.  They forced everyone out of the bus and demanded that they show identification. The AUC had a list, checked the identifications and those whose names were on the list were taken aside.

207.   The AUC then took Juan, Clara and Nubia away.

208.   After this, Ruben got word that his father was dead.  Later, he learned that his mother and sister were taken back to Currulao on a "vereda" called La Arenera where the AUC had a base, and never heard from them again.

209.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Juan, Clara and Nubia's murder(s), abductions and disappearances through its support of the AUC.  On information and belief, Chiquita benefited in part from their murder(s), abductions and disappearances by sending a message to local residents that anyone hostile to the AUC would be tortured and executed, and by removing persons perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Heriberto Antonio Cañas Hernandez*

210.    Heriberto Antonio Cañas Hernandez was related by marriage to Juan, Clara, and Nubia Cañas Hernandez, described above.

211.    Heriberto worked as a time keeper in a banana plantation near Apartado.

212.    After Juan, Clara, and Nubia were abducted and killed, he and his family fled to Cartagena, but he could not find work that would support them.  He then decided to return to Apartado and found work putting up tracks on which bananas would move to the packing house.

213.    On April 29, 1999-- eight days after returning to Apartado work-- two motorcycles with four AUC members came to the farm.

214.    Heriberto saw them coming, fled but was captured, and taken away. Later same day he found with his hands and feet tied behind him, stabbed many times, with acid poured over his body.

215.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Heriberto's abduction, torture and murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his abduction, torture and murder by sending a message to local residents that anyone hostile to the AUC would be tortured and executed, and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Nelvedin de Jesús Montoya Serna*

216.    Nelvedin de Jesús Montoya Serna worked primarily as a farm worker, was the sole supporter of his father and siblings. He was working in an area near San Jose which at the time was perceived as sympathetic to FARC.

217.    On or about March 16, 1997, Montoya went to town to buy some groceries, he was seized by three armed AUC men and accused of being a suspected member of FARC.

218.    Montoya attempted to fight the men but one of them, alias "El Burro," shot him four times in the head.  His brother witnessed his murder.

219.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Montoya's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Gustavo Alonso Castañeda Marulanda*

220.    In 1996, Gustavo Alonso Castañeda Marulanda worked with the Dioceses of Apartado as an outreach worker for indigenous people.

221.    The FARC had a significant presence in the area where he worked as an outreach worker. In 2000 Castañeda got a job as a Government Forrest Ranger, working near  Turbo in the Unguia Reserve.

222.    On or about September 6, 2001, he was killed by AUC members allegedly on orders of Commander "Mario," also known as "La Cabeza de Pollo."

223.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Castañeda's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Nodier Alexander Mesa Correa*

224.    In or about November, 1998, Nodier Alexander Mesa Correa was robbed and stabbed. He later identified the perpetrator, who was then arrested by the local police.

225.    The perpetrator reportedly had AUC connections, and on or about December 5, 1998, Mesa was stopped on his way home by two AUC, forced to get on a motorcycle, and they drove off.  He was subsequently found shot twice.

226.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Mesa's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Sandra Milena Oquendo Brand*

227.    On April 27, 1997, Sandra Milena Oquendo Brand's father sent her to a store to pick up some items.  On the way back from the store she was stopped by a motorcycle with two men, four shots were heard and she was found dead.

228.    Oquendo had previously told the wife of an AUC commander that she had seen the commander with his mistress.

229.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Oquendo's murder through its support of the AUC. On information and belief, Chiquita benefited in part from her murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Yovany de Jesus Cañas Morales*

230.    Yovany de Jesus Cañas Morales was a bus driver who transported workers in and around Apartado.

- 38 -

231.   On February 1, 1997, Cañas was transporting 22 workers when his bus was stopped by the AUC, which forced everyone off the bus.  They took Cañas 120 meters away and shot him three times and then seized the bus.

232.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Cañas' murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Jesus Alirio Cordoba Hernandez*

233.   Jesus Alirio Cordoba Hernandez worked as a cargo truck driver in and around Apartado.

234.   On July 19, 1997, Cordoba was at home playing the guitar when four AUC members in plain clothes with long arms over shoulders took him 50 feet from his home, made him kneel and shot him twice, once in each eye, all of which occurred in front of his wife and three children.

235.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Cordoba's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Ferney de Jesus Leon*

236.   Ferney de Jesus Leon worked on a banana plantation near Apartado.

237.   In late 1997, Leon was asked by AUC commander Zulei Antonio Guerra, alias "Juancho," to get rid of some firearms that the AUC had used in homicides.  Leon refused and the AUC told him he had 24 hours to leave the area.

238. Leon fled to Medellin where he stayed for over a year. He then returned to Apartado.

239. After Leon returned, an AUC member known as "El Mono" asked Leon for a loan, which he provided.

240. Several months later, Leon asked for his money back and was told to go to a billiard hall where he would get paid.

241. Leon's sister followed him to the billiard hall where she saw three men abduct him. The next day Leon was found on the side of the road shot two times.

242. On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Leon's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Henry de Jesus Tuberquia Londoño*

243. Henry de Jesus Tuberquia Londoño owned a convenience store in San Jose, Apartado, a neighborhood which was reputed to contain FARC sympathizers.

244. Because Tuberquia occasionally sold groceries to FARC members, he became a target of the AUC.

245. In 2001, the AUC began burning down the homes of suspected FARC sympathizers in his neighborhood, and it attempted to burn down his house, which Tuberquia interrupted and prevented.

246. Approximately six months later, on December 15, 2001, two AUC members came into Tuberquia's store and shot him three times in the head, killing him.

247.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Tuberquia Londoño's murder through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

*Donny Cuesta Bello*

248.   Donny Cuesta Bello lived in Turbo.

249.   On January 16, 2000, AUC members knocked on the door of Cuesta's mother's house asking for Cuesta.  She stated he was not at home, and later a white car, known as the "white car to heaven," stopped Cuesta when he was walking home. She heard shots and Cuesta's body was found shot seven times.

250.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Cuesta's through its support of the AUC.  On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

## GENERAL ALLEGATIONS

251.   At all times, Defendants knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances.

252.   The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority.  The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces.  Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including 14 current members of Congress, seven former lawmakers, the head of the secret police, mayors, and former governors.

Furthermore, Chiquita's payments to the AUC were facilitated by CONVIVIRs, which are licensed by and operate with the express authority of the government.

253.    The acts described herein were conducted in the course of an internal armed conflict, in which the AUC and other paramilitaries were engaged in combat with guerrilla armies, and committed the abuses against Plaintiffs and decedents as part of their prosecution of this conflict. The AUC and other paramilitaries were also engaged in this conflict in partnership with the Colombian military.

254.    The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as against several discrete sub-populations, including leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally commanded paramilitary organization. On information and belief, at all relevant times Chiquita had knowledge of this attack.

255.    The acts and injuries to Plaintiffs and decedents described herein were part of a pattern and practice of systematic human rights violations requested, paid for, ordered, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

256.    As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damages, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

257.    Plaintiffs' causes of action arise under and violate the following laws, agreements, conventions, resolutions and treaties:

(a) Alien Tort Claims Act, 28 U.S.C. § 1350;

(b) Torture Victims Protection Act, 28 U.S.C. § 1350, note;

(c) Customary international law;

(d) United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

- 42 -

(e) Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f) International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. Doc. A/39/51 (1984);

(h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i) Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;

(j) Common law of the United States of America;

(k) Statutes and common law of the States of Ohio, New Jersey, Florida, including but not limited to wrongful death, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, negligent hiring, civil conspiracy, and loss of consortium; and the

(l) Laws of Colombia.

258.   Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary Banadex. On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there. Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them. The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities. Military officers accused of collaboration with paramilitaries are routinely exonerated or given token sentences by military courts. Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

259.    Legal action by Plaintiffs in Colombia would also result in serious reprisals. Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

260.    Plaintiffs were unable to bring suit in Colombia or the United States until the past year due to the poor security situation and the danger of reprisals, which Chiquita's support of the AUC contributed to.

## FIRST CLAIM FOR RELIEF

### (Extrajudicial Killing)

261.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

262.    The deliberate killings, under color of law, of Jose Gehiener Arias Ramirez, Ernelio Mosquera, Ivan Dario Velasquez Grajales, John Fredy Quintero Serna, Jhony Wilmar Moreno Garcia, Gustavo de Jesus Cardenas Hernandez, Luis Fernando Monroy Velasquez, Leonel de Jesus Sanchez Ospina, and Guillermo Garcia Monzon, Ariel Jose Vergara Alarcon, Ever Antonio Acevedo Polo, Cesar Emilio Hinestroza, Luis Hernando Herrera Morales, Torcuato De Jesus Herrera Morales, Luis Hernando Herrera Morales, Torcuato De Jesus Herra Morales, Luis Edilberto Varela Cano, Jorge Eliecer Areiza Espinoza, Jorge Augusto Vianc Castano, Edis Leonel Alarcon Peyares, Daniel Angel Gil Bahos, Manuel Ricardo Georges Villa, Tonys Alfredo Perez Humanez, Karool Eliana Martinez Gonzalez, William Oswaldo Prediado Vergara, Over Manuel Cogollo Tirado, Cesar Augusto Sanchez Campino, Jaime Luis Diaz Marquez, Edgar Francisco Mesa Montoya, Jose Miguel Herrera, Santiago Santa Cruz Rambay, Luis Nelson Florez Taborda, Luis Lozano Quejada, Juan De Jesus Canas Rojas, Clara Rosa Hernandez, Nubia Canas Hernandez, Heriberto Antonio Canas Hernandez, Nelvedin De Jesus Montoya Serna, Gustavo Alonso Castaneda Marulanda, Nodier Alexander Mesa Correa, Sandra Melena Oquendo Brand, Yovany De Jesus Canas Morales, Jesus Alirio Cordoba Hernandez, Ferney De Jesus Leon, Henry De Jesus Tuberquia Londono, and Donny Cuesta Bello, were not

authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people.

263.    The acts described herein constitute extrajudicial killing in violation of the Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

264.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the extrajudicial killings committed against Plaintiffs.

## SECOND CLAIM FOR RELIEF

### (Crimes Against Humanity)

265.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

266.    The acts described herein against Plaintiffs constitute crimes against humanity, in violation of customary international law which prohibits inhumane acts of a very serious nature such as willful killing, torture, and arbitrary arrest and detention and other inhumane acts committed as part of a widespread or systematic attack against any civilian population or persecutions on political, racial, ethnic, cultural, or religious grounds.  Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

267.    Defendants participated in the widespread and systematic attack by persecution, by threats, murder, and other means, of persons perceived to be opponents of the AUC or of its allies, including Chiquita; of indigenous peoples; and of persons considered by Defendants and the AUC to be politically, culturally, socially, or ethnically undesirable.

268.    The acts described herein constitute crimes against humanity in violation of the Alien Tort Statute, customary international law, the common law of the United States, the statutes and common law of the States of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

269.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the crimes against humanity committed against Plaintiffs.

**THIRD CLAIM FOR RELIEF**

(Torture)

270.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

271.    Plaintiffs and their relatives were caused by the AUC to suffer severe mental or physical pain, inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons.

272.    The acts described herein against Plaintiffs and decedents constitute torture, in violation of the Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

273.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to torture Plaintiffs.

## FOURTH CLAIM FOR RELIEF

### (War Crimes)

274.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

275.    Colombia has been engaged in an ongoing civil conflict with active hostilities, including during the time of the events alleged in this Complaint. These ongoing hostilities constitute an armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, as defined in Common Article 3 of the 1949 Geneva Conventions. Defendants, through their actions conspiring with the AUC, its actions in support of the AUC, and/or its actions carried out through the AUC, are liable for war crimes perpetrated with their participation and/or ratification.

276.    Plaintiffs were civilians that took no part in the hostilities. Defendants made Plaintiffs the object of attack and threats in violation of the laws of war. The acts described herein constitute violence to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying out of executions without previous judgment pronounced by a regularly constituted court, incidents of outrages upon human dignity, forced movement, pillage, and denial of medical treatment.

277.    The crimes described herein are war crimes in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above, including Common Article 3 of the Geneva Conventions and Protocol II to those Conventions. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

278.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the war crimes committed against Plaintiffs.

## FIFTH CLAIM FOR RELIEF

### (Terrorism)

279.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

280.    The abuses described above were premeditated, politically-motivated acts of violence committed against noncombatant civilians for the purpose of instilling fear, targeting political opponents, and generally terrorizing a civilian population.

281.    The abuses described herein constitute terrorism in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the statutes and common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

282.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the acts of terrorism against Plaintiffs.

## SIXTH CLAIM FOR RELIEF

### (Material Support to Terrorist Organizations)

283.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

284.    At all times relevant to this Complaint, the AUC has been an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets. The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Defendants were aware of such activities. From September 10, 2001, until the present, the AUC has been designated by the United States government as a Foreign Terrorist Organization.

285.     As detailed above, Defendants provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons.

286.     Defendants knew, or should have known, that providing such support would cause Plaintiffs' injuries, and this support did in fact proximately cause Plaintiffs' injuries by giving the AUC the means to carry out acts of terrorism and violence.

287.     The acts of providing assistance to the AUC described herein constitute material support to a terrorist organization in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the statutes and common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.  Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan

288.     Defendants are liable to Plaintiffs for said conduct in that Defendants directed, ordered, confirmed, ratified, aided and abetted, recklessly allowed, and/or conspired to accomplish the provision of material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

## SEVENTH CLAIM FOR RELIEF

### (Cruel, Inhuman, or Degrading Treatment)

289.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

290.     The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.

291.     The acts described herein against Plaintiffs and decedents constitute cruel, inhuman, and degrading treatment or punishment, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of

Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

292.    Defendants' acts alleged herein caused Plaintiffs to be placed in great fear for their lives and forced them to suffer severe physical and psychological abuse and agony.

293.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

## EIGHTH CLAIM FOR RELIEF

### (Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Association)

294.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

295.    The execution of the decedents as a result of their or others' opposing the activities of the AUC, Chiquita, or other interests allied with the AUC violated and deprived them of their rights to life, liberty and security of person, and their rights to peaceful assembly and association for which each defendant may be held liable.

296.    The wrongful acts described herein violated and deprived Plaintiffs of their rights to life, liberty and security of person, and to peaceful assembly and association, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

297.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the violations and deprivations of the rights to life, liberty and security of person and peaceful assembly and association.

## NINTH CLAIM FOR RELIEF

(Consistent Pattern of Gross Violations of Internationally Recognized Human Rights)

298.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

299.   The above-described abuses against Plaintiffs and decedent occurred within the context of numerous similar abuses and killings, comprising a consistent pattern of gross violations of human rights.

300.   The wrongful acts described herein violated and deprived Plaintiffs of their rights to life, liberty and security of person, to peaceful assembly and association, and to be free from torture, extrajudicial killing, and cruel, inhuman and degrading treatment, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of Ohio, New Jersey, Florida or any other applicable jurisdiction, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

301.   Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the violations and deprivations of these rights.

## TENTH CLAIM FOR RELIEF

(Wrongful Death)

302.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

303.   As a direct result of Defendants' acts and omissions and as a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

304.   Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

confirmed, ratified, and/or conspired with the AUC in bringing about the wrongful deaths of the decedents.

305.    The acts described herein constitute wrongful death, actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## ELEVENTH CLAIM FOR RELIEF
### (Assault and Battery)

306.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

307.    Defendants' actions constituted offensive and harmful touching of Plaintiffs' persons without the consent of Plaintiffs, and/or the creation of a reasonable apprehension that such touching would result.

308.    As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.

309.    Defendants' acts were willful, intentional, wanton, malicious, and oppressive.

310.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and decedents.

311.    The acts described herein constitute assault and battery, actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## TWELFTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

312.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

313.    The acts described herein constitute extreme and outrageous conduct in violation of all normal standards of decency and were without privilege or justification.

314.    These outrageous acts were intentional and malicious and done for the purposes of causing Plaintiffs to suffer humiliation, mental anguish, and extreme emotional and physical distress.

315.    As a direct and proximate result of Defendants' acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony. The distress suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure.

316.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress of Plaintiffs and decedents.

317.    Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## THIRTEENTH CLAIM FOR RELIEF

### (Negligent Infliction of Emotional Distress)

318.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

319.    At all relevant times, Defendants owed Plaintiffs a duty to act with reasonable care, and/or injury to Plaintiffs was reasonably foreseeable.

320.    At all relevant times, Defendants had the power, ability, authority, and duty to stop engaging in the wrongful conduct herein and to intervene to prevent or prohibit such conduct.

321.    At all relevant times, Defendants knew, or should have known, that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiffs.  Despite said power, knowledge, and duty, Defendants breached its duty to Plaintiffs and negligently failed to act so as to stop engaging in the conduct described herein and to prevent or prohibit such conduct or otherwise to protect Plaintiffs.

322.    As a direct and legal result of Defendants' wrongful acts, Plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering, and extreme and severe mental anguish and emotional distress. The distress suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure.

323.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the negligent infliction of emotional distress of Plaintiffs and decedents.

324.    Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## FOURTEENTH CLAIM FOR RELIEF

(Negligence/Negligent Hiring/Negligence Per Se)

325.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

326.    Despite having the duty to do so, Defendants failed to use ordinary or reasonable care in order to avoid injury to Plaintiffs, including but not limited to through their negligent financial support of the AUC and their participation in the transfer of arms and ammunition to the AUC. Defendants' conduct failed to protect Plaintiffs from an unreasonably great risk of harm. Defendants' negligence was a cause of injury, damage, loss, or harm to Plaintiffs and their next of kin.

327.    Defendants' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

328.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## FIFTEENTH CLAIM FOR RELIEF

### (Loss of Consortium)

329.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

330.    At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses and parents to the Plaintiffs who are their spouses and children.

331.    As a result of the acts of Defendants, those Plaintiffs who are the spouses and children of the decedents have been deprived of the decedents' society, comfort, attention, services, and support, all to their damage, in an amount to be proved at trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

332.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.

333.    Defendants' conduct constitutes loss of consortium and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

### PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in excess of $75,000, as follows:

(a)    for compensatory damages, including general and special damages;

(b)    for punitive damages;

(c)    for injunctive and declaratory relief as this Court deems appropriate;

(d)    for disgorgement of profits;

(e)    for treble damages;

(f)    for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

Respectfully submitted,


<u>s/ James K. Green, Esq</u>.
**JAMES K. GREEN, P.A**.
Florida Bar No. 229466
Esperanté, Suite 1650
222 Lakeview Avenue
West Palm Beach, Florida 33401
Telephone: 561.659.2029
Facsimile:  561.655.1357
jameskgreen@bellsouth.net

and

Jack Scarola, Esq.
Florida Bar No: 169440
William B. King, Esq.
Florida Bar No: 0181773
**SEARCY DENNEY SCAROLA
BARNHART & SHIPLEY, P.A.**
2139 Palm Beach Lakes Blvd.
P.O. Drawer 3626
West Palm Beach, FL 33402
(800) 780-8607 (toll free)
(561) 686-6300 Telephone
(561) 478-0754 Facsimile

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 9, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record listed below and all counsel in the MDL proceedings either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are authorized to receive electronically Notices of Electronic Filing.

Eric H. Holder, Jr., Esq.
John E. Hall, Esq.
Jenny Mosier, Esq.
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
202-662-6000 (telephone)
202-662-6291 (facsimile)

Sidney S. Stubbs, Esq.
Robert W. Wilkins, Esq.
Christopher S. Rapp, Esq.
JONES FOSTER JOHNSTON
   & STUBBS, P.A.
505 South Flagler Dr. Ste. 1100
West Palm Beach, FL 33401
561-659-3000 (telephone)
561-650-0412 (facsimile)

*Counsel for Defendant Chiquita Brands International, Inc.*

By:  s/James K. Green, Esq.
     James K. Green, Esq.