**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 08-MD-01916 (Marra/Johnson)**

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC. ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION

_____/

This Document Relates to:

ATS ACTIONS

_____/

JOHN DOE 1 et al. v. CHIQUITA
    BRANDS INTERNATIONAL, INC.

Case No. 08-cv-80421

_____/

JUAN/JUANA DOES 1-619 v. CHIQUITA
    BRANDS INTERNATIONAL, INC.

Case No. 08-cv:80480

_____/

JOSE LEONARDO LOPEZ VALENCIA et al.
    v. CHIQUITA BRANDS INTERNATIONAL, INC.

Case No. 08-cv-80508

_____/

**<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF</u>**
**<u>CONSOLIDATED MOTION TO DISMISS COMPLAINTS</u>**

## <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................ 2

     A.    Allegations in the Complaints............................................................... 2

     B.    The Alien Tort Statute and Standard of Review ..................................... 7

          1.    The Alien Tort Statute ............................................................. 7

          2.    Pleading Standard .................................................................. 12

ARGUMENT.................................................................................................................... 13

I.     CONGRESS'S CONSIDERATION OF THE PROPER SCOPE OF CIVIL REMEDIES
      FOR TERRORISM-RELATED CONDUCT PRECLUDES PLAINTIFFS' ATTEMPT
      TO HOLD CHIQUITA LIABLE BY APPEAL TO INTERNATIONAL LAW. ............ 15

II.    PLAINTIFFS' CLAIMS ARE NOT BASED ON ANY "CLEARLY DEFINED"
      AND "UNIVERSALLY ACCEPTED" RULE OF INTERNATIONAL LAW............... 18

     A.    Federal Courts Have Repeatedly Rejected ATS Claims Similar to Those
           Advanced By the Plaintiffs Here. ......................................................... 18

     B.    None of the International Law Sources Asserted By Plaintiffs In Support of
           Their Claims Meets the Demanding Requirements of *Sosa*. ................................ 21

          1.    Domestic Statutes Cannot Establish a Rule of International Law. ........... 22

          2.    The International Sources Cited By Plaintiffs Do Not Establish An
              Actionable Rule of International Law Supporting Their Claims.............. 22

          3.    Even If These Sources Establish A Rule of International Law, At Best the
              Rule Is Limited To A Criminal Prohibition And Does Not Support
              Imposition Of Civil Liability. .................................................... 31

III.   UNDER *SOSA*, WIDE RANGING AND DELETERIOUS PRACTICAL
      CONSEQUENCES PROHIBIT THE EXPANSION OF LIABILITY THAT
      PLAINTIFFS PROPOSE............................................................................... 33

IV.   PLAINTIFFS CANNOT CIRCUMVENT THE ABSENCE OF DIRECT LIABILITY
      UNDER INTERNATIONAL LAW BY ATTEMPTING TO PLEAD THEIR CLAIMS
      USING THE RUBRIC OF INDIRECT LIABILITY. ...................................... 37

     A.    Plaintiffs' "General Support" Theory of Aiding and Abetting Liability Is Not
           Recognized by Courts as Accepted Under International Law. ............................ 38

     B.    Conspiracy and Agency Theories Are Not Available Under International Law
           for Plaintiffs' Claims............................................................................... 42

V.  EVEN IF PLAINTIFFS' CLAIM WERE COGNIZABLE UNDER THE ATS, PLAINTIFFS' CONCLUSORY ALLEGATIONS — WHETHER PLED IN THE LANGUAGE OF DIRECT OR INDIRECT LIABILITY — FALL FAR SHORT OF SATISFYING THE HEIGHTENED PLEADING STANDARD FOR ATS CLAIMS... 43

    A.  Plaintiffs Do Not Allege What Would Necessarily be the Required Elements of a Direct Material Support Claim, If Such a Claim Existed. ............................ 44

        1.  Plaintiffs' Allegations Do Not Demonstrate "Material" Support. ............ 44

        2.  Plaintiffs' Conclusory Allegations Do Not Establish that Chiquita Caused the Alleged Harm. ........................................................................ 45

        3.  Plaintiffs' Allegations Do Not Establish That Chiquita Had The Requisite Intent. ........................................................................................ 48

        4.  Plaintiffs' Allegations Do Not Establish That The Alleged Injuries Resulted From An Act of Terrorism. ....................................................... 49

    B.  Likewise, Plaintiffs Fail to Allege Particularized Facts Sufficient to  Establish That Chiquita "Aided and Abetted" the AUC in Committing the Alleged Torts. 50

        1.  The Allegations Do Not Establish That Chiquita Provided Substantial Assistance to the AUC in Committing Any of the Alleged Torts. ........... 51

        2.  The Allegations Do Not Show that Chiquita Had the Requisite *Mens Rea* in Connection with Any of the Alleged Torts. ........................ 53

    C.  The Complaints Do Not Support Plaintiffs' Invocation of "Conspiracy" or "Agency." ...................................................................................... 54

        1.  Plaintiffs Fail to Allege the Basic Elements of Conspiracy..................... 54

        2.  Plaintiffs' Agency Theory Is Likewise Insufficiently Pled. .................... 56

    D.  Plaintiffs' Indirect Theories of Liability Also Fail Because Plaintiffs Do Not Plead A Primary Violation of the Law of Nations by the AUC. ........................ 57

        1.  Plaintiffs Do Not Plead the Requisite State Action With Respect to Any of the Alleged Murders. .................................................................. 58

        2.  Plaintiffs' Allegations Do Not Establish That Any of the Alleged Murders Constituted "War Crimes."......................................................... 62

        3.  Plaintiffs' Allegations Do Not Establish That Any of the Alleged Murders Constituted "Crimes Against Humanity" or "Genocide.".......... 65

VI. PLAINTIFFS DO NOT STATE A CLAIM UNDER THE TORTURE VICTIM PROTECTION ACT........................................................................................ 66

VII.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED FOR
       FAILURE TO STATE A CLAIM. ................................................................... 68

       A.   Plaintiffs Have Not Adequately Alleged Any Common Law Tort....................... 68

            1.   Plaintiffs Fail To State the Requisite Elements of Derivative Liability. ... 68

            2.   Plaintiffs Fail to State Elements Sufficient to Hold Chiquita Directly
                 Liable for a Common Law Tort. ................................................................ 70

            3.   Plaintiffs Do Not State a Claim for Wrongful Death or  Loss of
                 Consortium. ............................................................................................... 71

       B.   Plaintiffs' State Law Claims Are Largely Time-Barred. ...................................... 71

CONCLUSION ................................................................................................................. 74

iii

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Aetna Casualty & Surety Co. v. Leahey Construction. Co., Inc.*,
219 F.3d 519 (6th Cir. 2000) ......................................................................51

*Aldana v. Del Monte Fresh Produce, N.A.*,
416 F.3d 1242 (11th Cir. 2005) (per curiam).............................................. *passim*

*Aldana v. Fresh Del Monte Produce, Inc.*,
No. 01-3399-CIV, 2007 WL 3054986 (S.D. Fla. Oct. 16, 2007) ...........................................39

*Almog v. Arab Bank*,
471 F. Supp. 2d 257 (E.D.N.Y. 2007) ............................................................... *passim*

*American Isuzu Motors, Inc. v. Ntsebeza*,
No. 07-919, 2008 WL 117862 (U.S. May 12, 2008) ......................................................33, 41

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)...........................................................................47

*Beanal v. Freeport-McMoran, Inc.*,
197 F.3d 161 (5th Cir. 1999) ......................................................................55

*Beanal v. Freeport-McMoran, Inc.*,
969 F. Supp. 362 (E.D. La. 1997)..................................................................66

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007)...................................................................12, 13, 55

*Bigio v. Coca-Cola Co.*,
239 F.3d 440 (2d Cir. 2000)......................................................................45

*Bowoto v. Chevron Texaco Corp.*,
No. C 99-02506 SI, 2006 WL 2455752 (N.D. Cal. Aug. 22, 2006) ..................................40, 59

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) ...............................................................3, 6

*Cabello v. Fernandez-Larios*,
402 F.3d 1148 (11th Cir. 2005) (per curiam)................................................... *passim*

*Carmichael v. United Technologies Corp.*,
835 F.2d 109 (5th Cir. 1988) ....................................................................45

*Cavitat Medical Technologies, Inc. v. Aetna, Inc.*,
No. 04-CV-01849-MSK-OES, 2006 WL 218018 (D. Colo. Jan. 27, 2006)......................55, 56

*Cleveland v. Caplaw Enterprises*,
448 F.3d 518 (2d Cir. 2006)......................................................................................57

*Corrie v. Caterpillar, Inc.*,
403 F. Supp. 2d 1019 (W.D. Wash. 2005)................................................36, 40, 68

*Cromer Finance v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001).......................................................................51

*Doe I v. Exxon Mobil Corp.*,
393 F. Supp. 2d 20 (D.D.C. 2005) ............................................................. *passim*

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938).....................................................................................................10

*Estate of Rodriquez v. Drummond Co.*,
256 F. Supp. 2d 1250 (N.D. Ala. 2003)..............................................................39, 40

*Filartiga v. Pena-Irala*,
630 F.3d 876 (2d Cir. 1980)..................................................................................8, 12

*Flores v. Southern Peru Copper Corp.*,
414 F.3d 233 (2d Cir. 2003)................................................................................22, 27

*Hamdan v. Rumsfeld*,
126 S.Ct. 2749 (2006)................................................................................................42

*Holmes v. Securities Investor Protection Corp.*,
503 U.S. 528 (1992)..............................................................................................47, 48

*In re Sinaltrainal Litigation*,
474 F. Supp. 2d 1273 (S.D. Fla. 2006) ...................................................... *passim*

*Iwanowa v. Ford Motor Co.*,
67 F. Supp. 2d 424 (D.N.J. 1999) ...........................................................................25

*Jackson v. BellSouth Telecomm.*,
372 F.3d 1250 (11th Cir. 2004) ....................................................13, 43, 48, 57

*Jackson v. Okaloosa County, Florida*,
21 F.3d 1531 (11th Cir. 1994) .................................................................................13

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995).............................................................12, 59, 63, 67

v

*Khulumani v. Barclay National Bank Ltd.*,
    504 F.3d 254 (2d Cir. 2007)..................................................................... *passim*

*Kiobel v. Royal Dutch Petroleum Co.*,
    456 F. Supp. 2d 457 (S.D.N.Y. 2006) ...............................................41, 58

*Medellin v. Texas*,
    128 S.Ct. 1346 (2008)....................................................................................25

*Mujica v. Occidental Petroleum Corp.*,
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) ........................................25, 68

*Mwani v. Bin Laden*,
    No. Civ. A 99-125, 2006 WL 3422208 (D.D.C. Sept. 28, 2006) ............20

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    374 F. Supp. 2d 331 (S.D.N.Y. 2005)...........................................................40

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633 (S.D.N.Y. 2006).......................................43, 50, 51

*Rayburn ex. rel. Rayburn v. Hogue*,
    241 F.3d 1341 (11th Cir. 2001) ....................................................................61

*Rosario v. Miami-Dade County*,
    490 F. Supp. 2d 1213 (S.D. Fla. 2007) .........................................................2

*Saleh v. Titan Corp.*,
    436 F. Supp. 2d 55 (D.D.C. 2006) ..............................................................36

*Saperstein v. Palestinian Auth.*,
    No. 1:04-cv-20225-PAS, 2006 WL 3804718 (S.D. Fla. Dec. 22, 2006)........................ *passim*

*Sarei v. Rio Tinto PLC*,
    221 F. Supp. 2d 1116 (C.D. Cal. 2002) ......................................................58

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004).......................................................................... *passim*

*Strauss v. Credit Lyonnais*,
    No. 06-0702, 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)......................47

*Stutts v. De Dietrich Group*,
    No. 03-cv-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006)................53

*Swift v. Tyson*,
    41 U.S. (16 Pet.) 1 (1842) ...............................................................................10

*Taliferro v. Augle,*
   757 F.2d 157 (7th Cir. 1985) ........................................................................45

*Tel-Oren v. Libyan Arab Republic,*
   726 F.2d 774 (D.C. Cir. 1984) ..........................................................19, 20, 33, 58

*Textile Workers v. Lincoln Mills of Alabama,*
   353 U.S. 448 (1957) ........................................................................10

*United States v. Kimbell Foods, Inc.,*
   440 U.S. 715 (1979) ........................................................................10

*United States v. Smith,*
   18 U.S. (5 Wheat) 153 (1820) ..........................................................9, 10, 11, 27

*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003) ........................................................................20

*Van Dusen v. Barrack,*
   376 U.S. 612 (1964) ........................................................................72

*Vietnam Association for Victims of Agent Orange v. Dow Chemical Co.,*
   517 F.3d 104 (2d Cir. 2008) ........................................................................26

*Village of Bensenville v. Federal Aviation Administration,*
   457 F.3d 52 (D.C. Cir. 2006) ........................................................................61

*Weiss v. National Westminster Bank PLC,*
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ........................................................................47

## STATE CASES

*4139 Management., Inc. v. Department of Labor & Employment,*
   763 So.2d 514 (Fla. Dist. Ct. App. 2000) ........................................................................69

*ACandS, Inc. v. Redd,*
   703 So.2d 492 (Fla. Dist. Ct. App. 1997 ) ........................................................................71

*Bennett v. Godfather's Pizza, Inc.,*
   570 So. 2d 1351 (Fla. Dist. Ct. App. 1990) ........................................................................70

*Carter v. Reynolds,*
   815 A.2d 460 (N.J. 2003) ........................................................................69

*Garcia v. Duffy,*
   492 So. 2d 435 (Fla. Dist. Ct. App. 1986) ........................................................................70, 71

*Groob v. KeyBank*,
    843 N.E.2d 1170 (Ohio 2006) ........................................................................................69

*Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*,
    783 So. 2d 353 (Fla. Dist. Ct. App. 2001) ....................................................................69

*Johnson v. Usdin Louis Co.*,
    591 A.2d 959 (N.J. Super. Ct. A.D. 1991)....................................................................70

*LaFage v. Jani*,
    766 A.2d 1066 (N.J. 2001)............................................................................................72

*Lipton v. Lockheed Aircraft Corp.*,
    125 N.Y.S.2d 58 (N.Y. Sup. Ct. 1953) .........................................................................72

*Marcinkiewicz v. Marrero*,
    870 A.2d 753 (N.J. Super. 2005) ..................................................................................70

*Mayor v. Ford Motor Co.*,
    No. 83297, 2004 WL 1402692 (Ohio Ct. App. Jun. 24, 2004)................................71

*Morgan v. Union County Bd. of Chosen Freeholders*,
    633 A.2d 985 (N.J. Super. Ct. 1993) ...........................................................................68

*N.J. Department of Treasury v. Qwest Communications International, Inc.*,
    904 A.2d 775 (N.J. Super. Ct. 2006) ...........................................................................68

*O'Brien v. Olmstead Falls*,
    No. 89966, 90336, 2008 WL 2252527 (Ohio Ct. App. June 2, 2008)..............68, 69

*O'Keefe v. Snyder*,
    416 A.2d 862 (N.J. 1980)..............................................................................................72

*Portee v. Jaffee*,
    417 A.2d 521 (N.J. 1980)..............................................................................................69

*Raimi v. Furlong*,
    702 So.2d 1273 (Fla. Dist. Ct. App. 1997) .................................................................69

*Skubovious v. Clough*,
    670 N.E.2d 578 (Ohio Ct. App. 1966).........................................................................70

*Tackling v. Chrysler Corp.*,
    185 A.2d 238 (N.J. Super. Ct. 1962) ...........................................................................72

*Tichenor v. Santillo*,
    527 A.2d 78 (N.J. Super. Ct. A.D. 1987)......................................................................71

*Tschantz v. Ferguson,*
    647 N.E.2d 507 (Ohio Ct. App. 1994) ..................................................................69

*Uddin v. Embassy Suites Hotel,*
    848 N.E.2d 519 (Ohio Ct. App. 2005) ..................................................................70

*Urban v. Goodyear Tire & Rubber Co.,*
    Nos. 77162, 77776, 76703, 2000 WL 1800679 (Ohio Ct. App. Dec. 7, 2000) .....................71

*Williams v. Davis,*
    No. SC05-1817, -- So.2d --, 2007 WL 4124479 (Fla. Nov. 21, 2007) ...................................70

*Willis v. Gami Golden Glades, LLC,*
    967 So.2d 846 (Fla. 2007) ..................................................................69

*Wright v. State,*
    778 A.2d 443 (N.J. 2001) ..................................................................69

*ZP No. 54 Ltd. Partnership v. Fidelity and Deposit Co. of Maryland,*
    917 So.2d 368 (Fla. Dist. Ct. App. 2005) ..................................................................69

## DOCKETED CASES

*Barboza v. Drummond Co.,*
    No. 1:06-cv-61527 (S.D. Fla. July, 17, 2007) ................................................. *passim*

*Kiobel v. Royal Dutch Petroleum Co.,*
    Nos. 06-4800 & 06-4876 (2d Cir.) ..................................................................41

*Mujica v. Occidental Petroleum,*
    No. 05-56175 (9th Cir.) ..................................................................41

*Presbyterian Church of Sudan v. Talisman,*
    No. 07-0016 (2d Cir.) ..................................................................41

*Romero v. Drummond Co., Inc.,*
    No. 07-14090-DD/07-14356-D (11th Cir.) ..................................................................41

*Sinaltrainal v. Coca-Cola Co.,*
    No. 06-15811-HH (11th Cir.) ..................................................................41

*United States v. Chiquita Brands International, Inc.,*
    No. 07-CR-055 (D.D.C. Mar. 13, 2007) ..................................................................2

## FEDERAL STATUTES

18 U.S.C. Ch. 113B ....................................................................................................22

18 U.S.C. § 2331 .......................................................................................................16

18 U.S.C § 2333 ....................................................................................................14, 16

18 U.S.C. § 2335 .......................................................................................................16

28 U.S.C. § 1331 ....................................................................................................7, 12

28 U.S.C. § 1332 .........................................................................................................7

28 U.S.C. § 1350 ...................................................................................................1, 7, 8

28 U.S.C. § 1350 note ........................................................................................13, 66, 67

50 U.S.C. § 1705 .........................................................................................................2

Pub. L. No. 99-399, 100 Stat. 853 (1986).......................................................................16

Pub. L. No. 104-132, 110 Stat. 1214 (1996).....................................................................22

Pub. L. No. 102-572, 106 Stat. 4506 (1992).....................................................................16

Pub. L. No. 107-56, 115 Stat. 272 (2001).........................................................................22

Pub. L. No. 107-197, 116 Stat. 721 (2002).............................................................17, 25, 32

1 Stat. 76 (1789)..........................................................................................................7

59 Stat. 1055 (1945).....................................................................................................9

## STATE STATUTES

N.Y. C.P.L.R. § 202 ....................................................................................................72

N.Y. C.P.L.R. § 214 ....................................................................................................72

N.Y. C.P.L.R. § 215 ....................................................................................................72

Fla. Stat. Ann. § 95.11 .................................................................................................73

Fla. Stat. Ann. § 768.19 ...............................................................................................71

Fla. Stat. Ann. § 768.20 ...............................................................................................73

N.J. Stat. Ann. § 2A:14-2..................................................................................................72

N.J. Stat. Ann. § 2A:31-1..................................................................................................71

N.J. Stat. Ann. § 2A31-3...................................................................................................72

Ohio Rev. Code § 2125.01.................................................................................................71

Ohio Rev. Code § 2125.02.................................................................................................72

Ohio Rev. Code § 2305.10.................................................................................................73

## INTERNATIONAL CONVENTIONS

Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation,
     Sept. 23, 1971, 24 U.S.T. 565, 974 U.N.T.S. 177 ...................................................24

Convention for the Suppression of Unlawful Acts against the Safety of Maritime
     Navigation, Mar. 10, 1988, 27 I.L.M. 668, 1678 U.N.T.S. 221 ..............................25

Convention for the Suppression of Unlawful Seizure of Aircraft,
     Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105 .................................................24

Convention on the Physical Protection of Nuclear Material,
     Mar. 3, 1980, T.I.A.S. No. 11,080, 1456 U.N.T.S. 124...........................................25

Convention on the Prevention and Punishment of Crimes against Internationally
     Protected Persons, including Diplomatic Agents,
     Dec. 14, 1973, 28 U.S.T. 1975, 1035 U.N.T.S. 167 ...............................................24

Convention on the Prevention and Punishment of the Crime of Genocide,
     Dec. 9, 1948, 78 U.N.T.S. 277..................................................................................66

International Convention for the Suppression of the Financing of Terrorism,
     G.A. Res. 54/109, 1, U.S. Doc A/RES/54/109 (Dec. 9, 1999) .......................... *passim*

International Convention against the Taking of Hostages,
     Dec. 17, 1979, T.I.A.S. No. 11,081, 1316 U.N.T.S. 205 .........................................24

International Convention for the Suppression of Terrorist Bombings,
     G.A. Res. 52/164, 1 U.N. Doc. A/RES52/163 (Dec. 15, 1997).......................... *passim*

International Covenant on Civil and Political Rights,
     F.A. Res. 2220A(xxi), 21 U.S. Doc., GAOR Supp. (No. 16) at 52,
     U.S. Doc. A/6316 (1966) ..........................................................................................11

Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms
  Located on the Continental Shelf, Mar. 10, 1988, 27 I.L.M. 685, 1678 U.N.T.S. 304 ..........25

Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving
  International Civil Aviation, supplementary to the Convention for the Suppression of
  Unlawful Acts against the Safety of Civil Aviation,
  Feb. 24, 1988, S. Treaty Doc. No. 100-19, 1589 U.N.T.S. 474................................................25

Universal Declaration on Human Rights,
  G.A. Res. 217A(iii), U.N. Doc. A/810 (1948)........................................................................11

Vienna Convention on the Law of Treaties,
  May 23, 1969, 1115 U.N.T.S. 331 .........................................................................................28

## MISCELLANEOUS

Curtis A. Bradley *et al*, Sosa*, Customary International Law, and the Continuing
  Relevance of Erie*, 120 Harv. L. Rev. 869 (2007) ........................................................8, 10, 36

Cong. Record-Senate at S17254 (Oct. 7, 1992)...........................................................................16

Antonio Cassese, International Criminal Law (2003) ..................................................................42

Joshua Dressler, Understanding Criminal Law 475 (3d ed. 2001) ..............................................53

W. Page Keeton, Prosser & Keeton on the Law of Torts (5th ed. 1984)...........................46, 47, 48

Robert Kolb, *The Exercise of Criminal Jurisdiction Over International Terrorists* (2004) .........21

Stephen Marks, *Branding the "War on Terrorism": Is There a "New Paradigm" of
  International Law?* 14 Mich. St. J. Int'l L. 71 (2006) .....................................................20, 21

John F. Murphy, *Quivering Gulliver: U.S. Views on a Permanent International Criminal
  Court*, 34 Int'l L. 45 (2000) ...........................................................................................65

Cecilia Orozco Tascón, *Si quiere sobrevivir, Chiquita Brands tiene que negociar*, El
  Espectador, June 15, 2008, at 21..........................................................................................36

Diane F. Orentlicher, *Settling Accounts: The Duty to Prosecute Human Rights Violations
  of a Prior Regime*, 100 Yale L.J. 2537 (1991)........................................................................65

Restatement (Third) of Torts: Liability for Physical & Emotional Harm (2007) ..........................46

Restatement (Third) of Foreign Relations Law of the United States (1987) ...........................8, 28

Plaintiffs in these three related complaints[1] assert claims on behalf of more than 700 Colombian nationals who were allegedly killed or injured between 1988 and 2007 by persons associated with an organization of loosely-affiliated, private right-wing paramilitary groups in Colombia known as the Autodefensas Unidas de Colombia (the United Self-Defense Forces of Colombia or "AUC").  Plaintiffs seek to hold an American corporation, Chiquita Brands International, Inc. ("Chiquita"), liable for these deaths because Chiquita's former Colombian subsidiary was forced to make extortion payments to the AUC between 1997 and 2004, when the AUC controlled the remote, rural areas of Colombia in which Chiquita's subsidiary operated.[2] There is no allegation that anyone from Chiquita or its Colombian subsidiary participated in, facilitated, or even knew about the particular murders alleged.

Plaintiffs assert that the 200 year-old Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, supplies federal court jurisdiction for their novel claims, but this position fundamentally misapprehends the ATS and ignores recent Supreme Court precedent that compels dismissal of their complaints.  Plaintiffs' extraordinary theory — which would extend a cause of action not merely to these plaintiffs but potentially to tens of thousands of additional victims of the longstanding violence in Colombia — would require this Court to engage in a dangerous and unprecedented form of activist lawmaking, far beyond anything permitted by the limited common law authority of federal courts.

---

[1]    As provided for in Section III of the CMO, this consolidated motion to dismiss is addressed to *John Doe 1, et al. v. Chiquita*, No. 08-cv-80421 (filed in D.N.J.) ("NJ Compl."); *Does 1-619 v. Chiquita*, No. 08-cv-80480 (filed in S.D.N.Y.) ("NY Compl."); and *Jose Lopez Valencia v. Chiquita*, No. 08-cv-80508 (filed in S.D. Fla.) ("Fla. Compl.").

[2]    By filing this motion, Chiquita does not waive, and hereby expressly reserves, the right to challenge plaintiffs' designation of Chiquita as the proper party defendant in this action.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004), the Supreme Court made clear that federal courts "have no congressional mandate" in ATS cases "to seek out and define new and debatable violations of the law of nations," and insisted that federal courts "exercise great caution in adapting the law of nations to private rights."  Plaintiffs ask this Court to defy these principles.  They seek the judicial creation of an expansive private damages remedy for foreign nationals based upon contested and imprecise international law instruments that do not come close to satisfying the demanding requirements of *Sosa*, and they assert claims that are directly at odds with Congress's explicit determination that no such cause of action should exist in these circumstances.  Accepting plaintiffs' theory would have wide-ranging and deleterious practical consequences, effectively converting the federal courts into roving international civil claims tribunals adjudicating violent conflicts around the globe as mass torts with no limiting principle in sight.  No court has ever recognized the causes of action asserted in this case, and several, including courts in this District, have rejected it.  This Court should follow *Sosa* and do the same.

## BACKGROUND

### A.      Allegations in the Complaints

These complaints are based upon a federal criminal Information charging Chiquita with a single-count violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(b).[3]  IEEPA prohibits a United States person from transacting with a foreign

---

[3]      Plaintiffs expressly reference Chiquita's March 19, 2007 plea, (NJ Compl. ¶ 37; NY Compl. ¶ 856; Fla. Compl. ¶ 79), and their allegations regarding Chiquita's conduct are derived almost entirely, sometimes verbatim, from the criminal Information filed in *United States v. Chiquita Brands International, Inc.*, No. 07-CR-055 (D.D.C. Mar. 13, 2007), a copy of which is attached hereto as Exhibit A.  In deciding a motion to dismiss, the Court may consider documents referred to in the complaint and central to the plaintiffs' claims.  *See Rosario v. Miami-Dade County*, 490 F. Supp. 2d 1213, 1219 (S.D. Fla. 2007) (citing *Brooks v. Blue Cross & Blue Shield of Florida, Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997)).  In addition, "matters of (continued…)

organization determined by the U.S. Secretary of State to be a "Specially Designated Global Terrorist" ("SDGT") without having first obtained a license from the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC").  The Information charging Chiquita with this offense was filed with the U.S. District Court for the District of Columbia on March 13, 2007, and Chiquita entered its plea of guilty on March 19, 2007.

As set forth in the Information and alleged in the complaints, Chiquita is headquartered in Cincinnati, Ohio, and is a producer, marketer, and distributor of bananas.  (NJ Compl. ¶¶ 12-13; NY Compl. ¶¶ 11-12; Fla. Compl. ¶¶ 52-53; Information ¶¶ 1-2.)  Until 2004, Chiquita's former Colombian subsidiary, C.I. Bananos de Exportación, S.A. ("Banadex"), owned and operated banana farms in Urabá and Santa Marta, two remote regions of Colombia.  *Id.*  From approximately 1989 to 1997, when left-wing guerrilla groups known as the Revolutionary Armed Forces of Colombia ("FARC") and the Ejército de Liberación Nacional ("ELN") controlled Urabá and Santa Marta, Chiquita paid money to these groups.  (NY Compl. ¶ 774; Information ¶ 20.)

In or about 1997, the AUC took control of these regions from the guerrilla groups.  (NY Compl. ¶ 775; Information ¶ 21.)  At this time, Banadex's General Manager was summoned to a meeting with the then-leader of the AUC, Carlos Castaño, and told by Castaño that Banadex must begin making payments to the AUC.  (NY Compl. ¶ 775; Information ¶ 21.)  Castaño instructed Banadex to make the payments through a "convivir," a type of private security company used by the AUC as a front to collect money from businesses.  (NY Compl. ¶ 775; Fla. Compl. ¶ 68; Information ¶ 21.)  As plaintiffs acknowledge in their complaints, the AUC was "a

---

public record . . . may be taken into account."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).

violent, right-wing" paramilitary organization that "routinely engaged in death threats, extrajudicial killings, massacres, torture, rape, kidnapping, forced disappearances, and looting." (NY Compl. ¶¶ 705, 757; *see also* NJ Compl. ¶ 22; Fla. Compl. ¶ 62.)  In the meeting with Banadex, Castaño "sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property."  (Information ¶ 21.)

Confronted with this threat, beginning in late 1997 Chiquita was forced to begin making semi-monthly payments to the AUC.  (*Id.*)  At the time, these payments were entirely legal under U.S. law.  On October 31, 2001, however, the AUC was designated a SDGT by the Secretary of State, thus prohibiting any U.S. person from engaging in transactions with the AUC without first obtaining a license or other authorization from OFAC.  (Information ¶ 8.)  On or about February 20, 2003, a Chiquita employee discovered that the AUC had been designated a foreign terrorist organization.  (NY Compl. ¶ 811; Information ¶ 55.)  Chiquita consulted its outside counsel, who advised the company that the payments had become illegal following the AUC's designation. (NY Compl. ¶ 812; NJ Compl. ¶ 35; Fla. Compl. ¶ 77; Information ¶ 56.)  In April 2003, following a report to Chiquita's Board of Directors, the Board directed that the payments be promptly disclosed to the Department of Justice.  (NY Compl. ¶ 815; NJ Compl. ¶ 36; Fla. Compl. ¶ 78; Information ¶ 59.)

On or about April 24, 2003, representatives of Chiquita and its counsel met with officials of the Justice Department and voluntarily disclosed the payments.  (NY Compl. ¶ 818; NJ Compl. ¶ 36; Fla. Compl. ¶ 78; Information ¶ 62.)  The Justice Department officials told Chiquita that "the payments were illegal and could not continue," but at the same time acknowledged "that the issue of continued payments was complicated."  (NY Compl. ¶ 818; Information ¶ 62.)  The precise content of the communications between Chiquita and the Justice

Department in the April 24th meeting and thereafter, including in particular the question of how Chiquita should resolve the dilemma created by the AUC's threats of violence against Chiquita's employees if the payments were discontinued, is a subject of dispute, but is immaterial to the present motion.  Chiquita discontinued the payments in February 2004 and sold its Colombian operations.  (NY Compl. ¶¶ 756, 773; NJ Compl. ¶ 32; Fla. Compl. ¶ 74; Information ¶ 2.)

On March 19, 2007, Chiquita entered its plea of guilty to the Information charging the violation of IEEPA.  From the time of the Castaño meeting in 1997 to Chiquita's departure from Colombia in 2004, Chiquita made approximately 100 payments to the AUC totaling $1.7 million, although many of these payments predated the designation of the AUC as a SDGT.  (NY Compl. ¶ 854; NJ Compl. ¶ 33; Fla. Compl. ¶ 75; Information ¶ 19.)

Aside from the facts taken from the Information, the complaints contain two additional sets of allegations regarding supposed wrongful conduct by Chiquita.  Plaintiffs allege that, in 2001, weapons and ammunition were transported from Central America, unloaded at a Colombian port operated by Banadex, and "transferred to the AUC."  (NY Compl. ¶¶ 859-860; NJ Compl. ¶¶ 39-40; Fla. Compl. ¶¶ 81-82.)  Plaintiffs then speculate "[o]n information and belief," that Chiquita "facilitated" this transfer of weapons, as well as "at least four other[s]," and "intended to provide such support and assistance to the AUC."  (NY Compl. ¶¶ 865-866; NJ Compl. ¶¶ 41-42; Fla. Compl. ¶¶ 83-84.)  These information-and-belief assertions are contradicted by two public reports[4] that assign responsibility for the 2001 shipment to persons

---

[4]    *See* Permanent Council, Organization of American States [O.A.S.], *Report of the General Secretariat of the Organization of American States on the Diversion of Nicaraguan Arms to the United Defense Forces of Colombia*, at 23, O.A.S. Doc. OEA/Ser.G/CP/doc. 3687/03 (Jan. 29, 2003) ("O.A.S. Report") (attached as Exhibit B); Report of the Colombian Prosecutor's Office, Prosecutor Delegated Before the Criminal Courts, Special Circuit, National Unit Against Terrorism, Office 18, File No. 59.516, dated July 23, 2004 (attached as Exhibit C, with English (continued…)

unrelated to Chiquita or to Banadex.  Notably, the report of the Colombian Prosecutor who investigated the 2001 arms shipment explicitly exonerates the only Banadex employee investigated in connection with the affair.  (Prosecutor Report at 28-29.)  Plaintiffs also allege that "Chiquita . . . assisted the AUC by allowing the use of its private port facilities . . . for the illegal exportation of large amounts of illegal drugs . . . ." but this allegation is likewise made "[o]n information and belief" with no supporting facts of any kind.  (NY Compl. ¶ 869; NJ Compl. ¶ 43; Fla. Compl. ¶ 85.)  Thus, the only *facts* alleged about Chiquita's behavior supporting plaintiffs' far-reaching claims are those admitted by Chiquita in the Information.

Despite seeking damages from Chiquita in tort for over 700 separate deaths, the complaints are largely bereft of any facts about those deaths.  In the New York Complaint, the alleged victims and their family member-plaintiffs are identified by pseudonyms in a string of short, largely verbatim paragraphs that assert only that each victim "was killed," "was disappeared," or "was injured" on a particular date "by AUC Paramilitaries."  (NY Compl. ¶¶ 27-686.)  While the Florida plaintiffs identify the alleged victims by name, and both the New Jersey and Florida plaintiffs provide some cryptic facts regarding the circumstances of the alleged death or injury, there is nothing to link Chiquita to any of the incidents beyond the rote assertion that the murder was committed "by the AUC" and that Chiquita "support[ed] . . . the AUC."  (*See* NJ Compl. ¶¶ 44-62; Fla. Compl. ¶¶ 87-250.)  None of the complaints alleges that there was a meaningful relationship between any victim and Chiquita, let alone that Chiquita had any involvement in, or even knowledge of, any of the victims' alleged deaths.  Moreover, while

translation and Affidavit of Accuracy) ("Prosecutor Report").  Both the OAS Report and the Prosecutor Report are matters of public record, which may be taken into account on a motion to dismiss.  *See Bryant*, 187 F.3d at 1280.

apparently seeking to base liability and causation entirely upon the assertion that Chiquita "financed" the AUC, plaintiffs allege no facts regarding the relative significance of the $1.7 million extorted from Chiquita over seven years to the overall resources of the AUC (an organization estimated to have *annual* income of $286 million[5]) or that otherwise connect these funds to the particular acts of violence for which they seek to hold Chiquita liable.

On the basis of these allegations, plaintiffs assert multiple causes of action under international law and domestic tort law, all grounded on the theory that Chiquita's "support" of the AUC renders it liable for all acts of violence perpetrated by that group.

### B.      The Alien Tort Statute and Standard of Review

#### 1.      The Alien Tort Statute

Like the federal question (28 U.S.C. § 1331) and diversity jurisdiction (28 U.S.C. § 1332) statutes, the ATS simply provides a basis for asserting federal subject matter jurisdiction but does not itself create any right to relief.  The law was passed by the First Congress as part of the Judiciary Act of 1789, which established the original structure and jurisdiction of the federal judiciary.  *See* Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 76.  As presently codified, the one-sentence statute states:  "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

The ATS went largely unused for nearly 200 years.  Then, in 1980, the Second Circuit held that the ATS provided jurisdiction for a cause of action alleging the torture and summary

---

[5]      *See* United Nations Dev. Programme, El conflicto, callejón con salida:  Informe nacional de desarrollo humano para Colombia [National Report on Human Development for Colombia] 285 (2003) ("UN Report") (attached as Exhibit D, with English translation and Affidavit of Accuracy).

execution of a Paraguayan citizen by a Paraguayan public official in violation of the law of

nations.  *Filartiga v. Pena-Irala*, 630 F.3d 876 (2d Cir. 1980).  This holding initiated a new era

of litigation under the ATS.  Since *Filartiga*, ATS litigation has proceeded in two distinct

phases:  an initial wave of lawsuits against state officials alleged to have engaged in gross

violations of international law, and, more recently, a series of largely unsuccessful suits targeting

U.S. corporations alleged to be indirectly liable for human rights abuses committed by others.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court considered these

novel ATS claims for the first time.  While affirming that "the ATS is a jurisdictional statute

creating no new causes of action," the Supreme Court nevertheless held that the first Congress

enacted the ATS "understanding that the common law would provide a cause of action for the

modest number of international law violations with a potential for personal liability at the time."

542 U.S. at 724.  The Court identified only three offenses against the law of nations that were

actionable in 1789:  violations of safe conducts, infringement of the rights of ambassadors, and

piracy.  *Id*. at 715, 720.  Although the Court did not exclude the possibility that additional

international law violations besides these few 18th century paradigms might be recognized, the

Court called for extreme caution, explaining that "federal courts should not recognize private

claims under federal common law for violations of any international law norm with less definite

content and acceptance among civilized nations than the historical paradigms familiar when

§ 1350 was enacted."  542 U.S. at 732.[6]

---

[6]    Violations of the law of nations might be based on treaties or on what is known as
customary international law.  Customary international law refers to the law of the international
community that "results from a general and consistent practice of states followed by them from a
sense of legal obligation."  *See* Curtis A. Bradley *et al*, Sosa, *Customary International Law, and
the Continuing Relevance of Erie*, 120 Harv. L. Rev. 869, 870 n.1 (2007) (attached as Exhibit E)
(citing Restatement (Third) of Foreign Relations Law of the United States § 102(2) (1987)); *see*
(continued…)

Building on this historical analysis, *Sosa* imposes two strict requirements:  *First*, the rule of international law in question must be unmistakably "accepted by the civilized world" to the same demanding degree as these eighteenth-century paradigms.  *Id.* at 725.  *Second*, the rule must be dependably "defined with a specificity" comparable to these historical paradigms.  *Id.* The Court viewed these requirements as establishing a standard that would be extremely difficult to meet, repeatedly emphasizing that the requirements would be satisfied for only "a narrow class of international norms today."  *Id.* at 729.[7]  By citing Justice Story's opinion in *United States v. Smith* as an exemplar, *see Sosa*, 542 U.S. at 732, the Supreme Court highlighted the demanding nature of *Sosa*'s requirements of definite content and universal acceptance.  *See United States v. Smith*, 18 U.S. (5 Wheat) 153, 161 (1820) ("There is scarcely a writer on the law of nations, who does not allude to piracy as a crime of settled and determinate nature . . ."); *id.* at 162 ("[T]he general practice of ***all*** nations in punishing ***all*** persons, whether natives or foreigners, who have committed this offence against any persons whatsoever.") (emphases

---

*also* State of the International Court of Justice art. 38(1)(b), June 26, 1945, 59 Stat. 1055, 1060 (stating that international custom is a source of law that can be applied by the International Court of Justice "as evidence of a general practice accepted as law.").  Whichever form of international law the violation rests on, it must still meet *Sosa*'s requirements.

[7]      *See also Sosa*, 542 U.S. at 712 (ATS enabled federal courts to "hear claims in a ***very limited category***") (emphasis added); *id.* (ATS originally gave "***limited***, implicit sanction to entertain the ***handful*** of international law *cum* common law claims understood in 1789") (emphases added); *id.* at 715 (a "***narrow*** set of violations of the law of nations" were on the minds of the men who drafted the ATS) (emphasis added); *id.* at 720 (Congress intended the ATS to furnish jurisdiction "for a ***relatively modest*** set of actions alleging violations of the law of nations") (emphasis added); *id.* ("***some, but few***, torts in violation of the law of nations were understood to be within the common law" at the time of the ATS) (emphasis added); *id.* (common law "assumed ***only a very limited set of claims***" were definite and actionable under international law) (emphasis added); *id.* at 721 ("ATS was meant to underwrite litigation of a ***narrow set*** of common law actions derived from the law of nations") (emphasis added); *id.* at 724 (ATS enacted on understanding that "the common law would provide a cause of action for the ***modest number*** of international law violations with a potential for personal liability" in 1789) (emphasis added).

9

added); *id.* at 163-180 (illustrating through seventeen pages of citations the specificity with

which the law of nations defined piracy).

In addition to these historical requirements, the Court instructed federal courts to weigh a

number of prudential considerations that "argue for judicial caution when considering the kinds

of individual claims that might implement the jurisdiction conferred by the [ATS]."  542 U.S. at

725:

- *First*, the Court emphasized the post-*Erie* rule that federal courts generally do not
  have the power to create substantive law:  "[T]he general practice has been to look for
  legislative guidance before exercising innovative authority over substantive law.  It
  would be remarkable to take a more aggressive role in exercising a jurisdiction that
  remained largely in the shadow for much of the prior two centuries."  *Id.* at 726.[8]

- *Second,* the Court also instructed federal courts to set "a high bar" for recognizing
  private causes of action for violations of international law because of "the potential
  implications for the foreign relations of the United States" and the risk of "impinging
  on the discretion of the Legislative and Executive Branches in managing foreign
  affairs."  *Id.* at 727.

- *Third*, in light of both of these separation-of-powers concerns, the Court noted that
  Congress may "shut the door" entirely to recognizing such causes of action — not
  only explicitly, but "implicitly by treaties or statutes that occupy the field."  *Id.* at
  731; *see also id.* at 760 ("Congress can make clear that courts should not recognize
  any such norm, through a direct or indirect command or by occupying the field.")
  (Breyer, J., concurring).

- *Fourth* and finally, the Supreme Court directed courts to weigh practical
  consequences in assessing whether to craft a judicially-recognized cause of action to
  enforce a rule of international law: "the determination whether a norm is sufficiently
  definite to support a cause of action should (and, indeed, inevitably must) involve an

---

[8]      Prior to *Erie*, the federal courts were understood to possess authority to recognize and
develop general common law.  *See, e.g., Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842) (applying
principles established in the general commercial law).  *See generally* Bradley, *supra*, 120 Harv.
L. Rev. at 881-85.  However, with *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), the federal
courts got out of the business of creating new federal common law, except in unique
circumstances such as when expressly authorized by Congress, *e.g.*, *Textile Workers v. Lincoln
Mills of Ala.*, 353 U.S. 448 (1957), or where federal common law rules were essential to
interstitial areas of particular federal interest, *e.g.*, *United States v. Kimbell Foods, Inc.*, 440 U.S.
715, 726-27 (1979).

element of judgment about the practical consequences of making that cause available to litigants in the courts." *Id.* at 732-33.

With respect to devising new common law causes of action based on international law, therefore, the Court stressed that, while "the door is still ajar," it must be "subject to vigilant doorkeeping." *Id.* at 729.

Applying these principles in *Sosa*, the Court illustrated the demanding degree to which a customary international law rule must be "accepted" and "well-defined" to be actionable under the ATS.  In *Sosa*, the plaintiff sought to bring suit under the ATS for "arbitrary detention" in violation of the law of nations, but the Court rejected all of the plaintiff's proposed sources of international law as insufficient to establish an actionable norm.  The Court first determined that the Universal Declaration on Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948) ("Declaration"), and the International Covenant on Civil and Political Rights, F.A. Res. 2220A(xxi), 21 U.S. Doc., GAOR Supp. (No. 16) at 52, U.S. Doc. A/6316 (1966) ("ICCPR"), two pertinent international treaties that plaintiff alleged were central to his claim, had "little utility under the standard set out in this opinion."  542 U.S. at 734.  As the Court stated, the Declaration "does not of its own force impose obligations as a matter of international law."  *Id.*

The Court likewise rejected reliance on the ICCPR because it was not self-executing and thus was not enforceable in U.S. courts.  *Id.* at 735.  The Court easily rejected the remaining sources of customary international law cited — including the Restatement (Third) of Foreign Relations Law of the United States, a survey of national constitutions on the topic of arbitrary detention, and a case from the International Court of Justice — reasoning that the sources suffered from too "high [a] level of generality," *id.* at 737 n.27, lacked "the certainty afforded by [the] three [paradigmatic] common law offenses," *id.* at 737, and were, in any event, insufficient

11

to support "the creation by judges of a private cause of action," *id.* at 738 n.29.  In the absence of sufficient support, *Sosa* found no jurisdiction for plaintiff's "arbitrary detention" claim.

### 2.   Pleading Standard

Chiquita moves to dismiss the ATS claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and to dismiss all claims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

Based on the significant foreign policy consequences of ATS litigation, claims brought under the ATS must satisfy a heightened pleading standard in order to survive a motion to dismiss.  *See In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1287 (S.D. Fla. 2006) (applying "heightened pleading standard when determining whether the complaints . . . sufficiently plead facts showing that Defendants violated the law of nations").  Likewise, because plaintiffs must allege an actual "violation of the law of nations" to establish subject matter jurisdiction under the ATS, courts must "engage[] in a more searching preliminary review of the merits [at the motion to dismiss stage] than is required, for example, under the more flexible 'arising under' formulation" of the federal-question statute, 28 U.S.C. § 1331.  *Filartiga*, 630 F. 2d at 887-88; *see also Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 (D.D.C. 2005) (citations omitted) ("In assessing whether plaintiffs have stated a claim under the Alien Tort Statute, courts must conduct a more searching merits-based inquiry than is required in a less sensitive arena."). Plaintiffs cannot survive a motion to dismiss in an ATS case by "plead[ing] merely a colorable violation of the law of nations."  *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995).

For all other claims in these complaints, plaintiffs must still plead allegations sufficient to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim.  Conclusory allegations and unwarranted inferences are not sufficient.  A complaint must plead "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).

12

While plaintiffs' allegations are presumed to be true, and all reasonable inferences are drawn in their favor, *Jackson v. Okaloosa County, Florida*, 21 F.3d 1531, 1534 (11th Cir. 1994), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do.[9]  Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S.Ct. at 1964-65 (citations omitted).  Moreover, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004).

## ARGUMENT

The complaints assert (i) that Chiquita may be held civilly liable under the law of nations for providing material support to a terrorist organization; (ii) that Chiquita, based on the same generic allegations of "support," is indirectly liable as a purported "aider and abettor" or "conspirator" of the unknown paramilitary actors who committed each of the individual "extrajudicial killings" or other supposed international law violations alleged in the complaints; and (iii) that Chiquita is liable under domestic law provisions such as the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, or state tort law.  However, the complaints fail to establish jurisdiction under the ATS or to state any cause of action.  The purported

---

[9]      "'Bald assertions' will not overcome a Rule 12(b)(6) motion."  *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting *DM Research, Inc. v. College of Am. Pathologists*, 170 F.2d 53, 55, 56 (1st Cir. 1999) (affirming dismissal for failure to state a claim when complaint failed to allege "a factual predicate concrete enough to warrant further proceedings" and provided mere "speculations.")).  Likewise, "[p]leadings must be something more than an ingenious academic exercise in the conceivable."  *Aldana*, 416 F.3d at 1248 (quoting *Wagner v. Daewoo Heave Indus. Am. Corp.*, 289 F.3d 1268, 1270 (11th Cir. 2002), *rev'd en banc on other grounds*, 314 F.3d 541 (11th Cir. 2002)).  Finally, "'unwarranted deductions of fact' are not admitted as true in a motion to dismiss."  *Aldana*, 416 F.3d at 1248 (quoting *Fla. Water Dist. Mgmt. Dist. v. Montalvo*, 84 F.2d 402, 408 n.10 (11th Cir. 1996)).

international law claims are not cognizable under the ATS, and plaintiffs do not adequately plead the elements of any of their claims.

**Plaintiffs Have No Cognizable ATS Claim.**  Neither plaintiffs' material support claim, nor their claim for indirect liability for hundreds of separate extrajudicial killings or other violations, meets the stringent conditions of *Sosa* necessary to fall within the "narrow class" of offenses actionable under the ATS:

*As explained in **Part I***, federal courts have no jurisdiction over terrorism-related claims based in international law because Congress has already "occupied the field."  In the Anti-Terrorism Act ("ATA"), 18 U.S.C § 2333, Congress chose to limit private rights of action for terrorism to U.S. nationals, and imposed a host of restrictions on such claims, including a four-year statute of limitations.  This congressional action forecloses recognition of a parallel and broader cause of action for foreign nationals under the auspices of the ATS.

In any event, *as shown in **Part II***, there simply is no "clearly defined" and "universally accepted" rule of international law establishing civil liability for providing material support to terrorism.  The international law sources cited by plaintiffs do not support such a claim, nor has any federal court recognized it.

Moreover, *as described in **Part III***, the profound foreign relations and practical consequences of recognizing a cause of action under international law for these novel claims — consequences which *Sosa* directs this Court to consider — militate strongly against lowering the ATS bar and allowing these claims to proceed, whatever their purported support.  A contrary result would open the federal courthouse door to mass tort claims by foreign nationals attempting to adjudicate violent conflicts across the globe, and would impose the costs of such strike suits on every American corporation that does business in unsafe or unstable locales around the world.

14

*As demonstrated in **Part IV***, plaintiffs cannot evade these limitations of the law of nations by recasting their material support claim as claims that Chiquita should be held indirectly liable for hundreds of "extrajudicial killings" or other supposed international law violations allegedly committed by the AUC.  The Supreme Court has acknowledged that there is no rule of civil liability for conspiracy under international law.  And while this Circuit has accepted a claim of civil aiding and abetting under international law in certain limited instances, it has done so only where the plaintiff alleges that the defendant had the specific intent to cause — and provided substantial assistance to cause — a precise tort.  Plaintiffs make no such allegations here, nor can they; their theory is that Chiquita is liable solely because it provided an immaterial portion of the financial resources of a group it knew to be violent.  Their attempt to plead material support as an indirect claim can, and must, fare no better than their attempt to plead it directly.

**Plaintiffs Have Failed Adequately to Plead the Elements of Their Claims.**  Even were plaintiffs' claims cognizable, plaintiffs fail to allege the fundamental elements that would be necessary to support such a  claim:

*As explained in **Part V***, plaintiffs make no particularized allegations establishing the elements of each of the more than 700 individual claims asserted, each of which must be adequately pled no differently than if they were asserted in 700 different lawsuits.  *As **Parts VI and VII** show*, plaintiffs similarly fail to plead sufficiently the elements of their domestic law claims.  In light of these many and insuperable deficiencies, the complaints should be dismissed in their entirety with prejudice.

I.  **Congress's Consideration Of The Proper Scope Of Civil Remedies For Terrorism-Related Conduct Precludes Plaintiffs' Attempt To Hold Chiquita Liable By Appeal To International Law.**

Congress and the Executive have, on several occasions, expressly considered the issue of terrorist activity and financial support for terrorism, and declined to extend a civil action in

federal courts to foreign victims of terrorist attacks.  This express congressional action "occupies the field" and thus precludes recognizing broader civil liability through federal common lawmaking under the auspices of the ATS.  *See Sosa*, 542 U.S. at 731 (Congress can "shut the door" entirely to recognizing such causes of action through "statutes that occupy the field").

When Congress enacted the ATA in 1986, it made participation in acts of international terrorism that harmed U.S. nationals a criminal offense.  *See* Pub. L. No. 99-399, Title XII, § 1202(a), 100 Stat. 853 (1986).  In 1992, Congress amended the statute to create a civil remedy for certain victims of terrorist attacks.  Pub. L. No. 102-572, § 1003, 106 Stat. 4506, 4521-24 (1992) (codified, as amended, at 18 U.S.C § 2333).  In doing so, however, Congress chose to impose a number of limitations on the scope of the cause of action that are inconsistent with, and would be impinged upon by, plaintiffs' proposed material-support claim:

- Congress made the civil remedy available only to ***U.S. nationals*** injured by acts of international terrorism.  18 U.S.C. § 2333(a).[10]

- Congress imposed a ***four-year statute of limitations*** on claims under the ATA.  18 U.S.C. § 2335(a).

- Congress required plaintiffs to establish ***a causal connection*** between their injuries and the acts of the defendant.  18 U.S.C. § 2333(a) (remedy available only for injuries suffered "by reason of" an act of international terrorism).

- Congress limited the civil remedy to ***intentional acts***.  18 U.S.C. § 2331(1)(B) (remedy availably only for acts "intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping").

---

[10] The ATA's particular focus on American victims is reinforced by its legislative history. *See, e.g.*, Senate Floor Debate on Fed. Courts Admin. Act of 1992, Cong. Record-Senate at S17254 (Oct. 7, 1992) (Sen. Grassley:  "***American victims*** will be able to bring a claim against a terrorist group for money damages.") (emphasis added).

Congress's determination not to extend access to the federal courts to foreign victims of terrorism for civil damages actions was reiterated in 2002, when Congress enacted implementing legislation for the International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, 1, U.S. Doc A/RES/54/109 (Dec. 9, 1999) ("Financing Convention").  As discussed below in Part II.B.2.a, the Financing Convention requires states to prohibit the financing of certain specified politically or ideologically motivated crimes.  The implementing legislation again provided for criminal liability for the provision of funding for certain terrorist acts, but did not create a private cause of action.  *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. No. 107-197, Title II, 116 Stat. 721, 724.

Congress's deliberate decisions not to provide a private right of action to foreign victims of terrorism are fatal to plaintiffs' attempt to impose liability on Chiquita in this case.  As *Sosa* explained, courts should generally "look for legislative guidance before exercising innovative authority under substantive law," 542 U.S. at 726, and "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases," *id.* at 727.  The force of this warning is most compelling where, as here, a court would be acting not merely against a backdrop of congressional silence, but in the teeth of a clear indication that the prohibition of material support of terrorism is not to be enforced through a private damages action by foreign plaintiffs.  *Cf. id.* at 749 (Scalia, J., concurring).  For a federal court to expand civil liability through federal common lawmaking — whether by creating direct liability for providing material support to terrorists or indirect liability for aiding and abetting the acts of terrorists — in an area where Congress has already "occupied the field" and provided a carefully-limited private right of action would be a direct affront to the primacy of Congress.

II.  **Plaintiffs' Claims Are Not Based On Any "Clearly Defined" and "Universally Accepted" Rule of International Law.**

The gravamen of plaintiffs' complaints is that Chiquita made payments to private paramilitary organizations in Colombia that committed tortious acts for which Chiquita should be held responsible.  Even if Congress had not foreclosed such claims, they would not be cognizable because they do not meet the stringent requirements of *Sosa*.

*First,* federal courts, including two judges in this District, have rejected precisely such claims.  As these courts recognize, there is no clearly defined rule of international law prohibiting material support of terrorism — indeed, there is not even consensus on the definition of terrorism or the proscription of it.  *See infra* Section A.

*Second*, none of the sources relied upon by plaintiffs begin to establish a widely-accepted and well-defined rule of customary international law that would permit a court to recognize a cause of action under the ATS for material support of terrorism.  *See infra* Section B.

*Third*, even if such a norm existed, it would be limited to a criminal prohibition and could not support imposition of civil liability.  *See infra* Section C.

A.  **Federal Courts Have Repeatedly Rejected ATS Claims Similar to Those Advanced By the Plaintiffs Here.**

No federal court has ever found a terrorism-based claim based on the theory asserted here cognizable under the ATS.  To the contrary, courts, including two judges in this District, have rejected the argument that material support for terrorism is a cognizable cause of action under the ATS.  *See Barboza v. Drummond Co.*, No. 1:06-cv-61527, slip op. at 3 (S.D. Fla. July, 17, 2007) (attached as Exhibit F); *Saperstein v. Palestinian Auth.*, No. 1:04-cv-20225-PAS, 2006 WL 3804718, at *7 (S.D. Fla. Dec. 22, 2006) (attached as Exhibit G).  This Court should do the same.

In *Saperstein*, plaintiffs brought suit under the ATS against the Palestinian Authority and the Palestine Liberation Organization, alleging that the defendants sponsored terrorist acts against Jewish civilians as well as provided financial support to terrorist entities.  2006 WL 3804718, at *2, *7 n.15.  The court, after emphasizing that *Sosa* "admonished the lower federal courts to be extremely cautious about discovering new offenses among the law of nations," engaged in a careful analysis of prior ATS decisions and international agreements to determine whether terrorism-related allegations, including the provision of financial support, constituted a violation of the law of nations.  *Id.* at *4, *7.  Based on its analysis, the court concluded that "it [is] abundantly clear that politically motivated terrorism has not reached the status of a violation of the law of nations."  *Id.* at *7 (citation omitted).

*Saperstein* is consistent with *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), a leading pre-*Sosa* decision addressing whether terrorism-related allegations state a claim under the ATS.  In *Tel Oren*, the victims of a 1978 terrorist attack in Israel sued several defendants, including private organizations accused of sponsoring terrorism.  The D.C. Circuit rejected plaintiffs' attempt to bring terrorism-based claims under the ATS.  *Id.* at 795-96.  In a concurring opinion, Judge Edwards considered whether terrorism was a violation of the law of nations and stated:

> While this nation unequivocally condemns all terrorist attacks, that sentiment is not universal.  Indeed, the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus . . . . Given such disharmony, I cannot conclude that the law of nations — which, we must recall, is defined as the principles and rules that states feel themselves bound to observe, and do commonly observe — outlaws politically motivated terrorism, no matter how repugnant it might be to our own legal system.

*Id.*; *see also id.* at 806 (Bork, J., concurring) (agreeing that plaintiffs' "principal claim, that [defendants] violated customary principles of international law against terrorism, concerns an area of international law in which there is little or no consensus").

The lack of consensus on a general definition of terrorism observed in *Tel-Oren* continues today. "We regrettably are no closer now than eighteen years ago to an international consensus on the definition of terrorism or even its proscription," the Second Circuit recently concluded in a non-ATS case, adding that "the mere existence of the phrase 'state-sponsored terrorism' proves the absence of agreement on basic terms among a large number of States that terrorism violates public international law," and that "there continues to be strenuous disagreement among States about what actions do or do not constitute terrorism." *United States v. Yousef*, 327 F.3d 56, 106-08 (2d Cir. 2003); *see also Mwani v. Bin Laden*, No. Civ. A 99-125, 2006 WL 3422208, at *3 n.2 (D.D.C. Sept. 28, 2006) (stating that "[t]he law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations").

The continuing disagreement regarding the definition of "terrorism" is amply illustrated by the fact that an ad hoc committee of the U.N. General Assembly has been laboring over a draft Comprehensive Convention on International Terrorism *since 1996*, but has been "stymied by the inability to agree on a definition of terrorism." *See* Stephen Marks, *Branding the "War on Terrorism": Is There a "New Paradigm" of International Law?* 14 Mich. St. J. Int'l L. 71, 77 (2006). As recently as March 6, 2008, this ad hoc committee met, but again failed to reach a consensus definition of terrorism.[11] Consequently, there is presently no consensus in the

---

[11] *See* Report of the Ad Hoc Committee established by General Assembly Resolution 51/210 of 17 December 1996, at Annex I.B at para. 3-5 (Twelfth Session — 25 and 26 Feb. and 6 Mar. 2008) (discussing the different delegations' competing considerations) (attached as Exhibit H); *see also* Report of the Ad Hoc Committee established by General Assembly (continued...)

international community regarding the definition of terrorism.  *See, e.g.*, Robert Kolb, *The Exercise of Criminal Jurisdiction Over International Terrorists* 227-245 (2004) (discussing the wide array of differing definitions proposed or employed for terrorism) (attached as Exhibit J); Marks, *supra*, at 75-80 (discussing international debates regarding the definition of terrorism). These continuing debates regarding the definition of terrorism underscore the difference between plaintiffs' controversial and unsettled claim, on the one hand, and the settled, uncontroversial, clearly-defined, and universally-recognized paradigmatic claims cited by *Sosa*, on the other.[12]

**B.    None of the International Law Sources Asserted By Plaintiffs In Support of Their Claims Meets the Demanding Requirements of *Sosa*.**

Plaintiffs cite to a mishmash of sources in an effort to cobble together the appearance of support for their theory that courts can recognize material support of terrorism as a cause of action under the law of nations.  (*See* N.Y. Compl. ¶882; Fla. Compl. ¶ 257; N.J. Compl. ¶ 69.) This effort is to no avail:  the sources cited by plaintiffs make clear that there is no rule of customary international law proscribing material support for terrorism that has the same "definite

---

resolution 51/210 of 17 December 1996 at Annex I, para. 16-23 (Ninth Session — 28 Mar. - 1 Apr. 2005) (same) (attached as Exhibit I).

[12]    Plaintiffs may argue that *Almog v. Arab Bank*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007) ("*Arab Bank*") is contrary to this line of cases and supports their position.  However, that case differs from the claims here in two material respects.  First, plaintiffs there made specific allegations establishing that the defendant bank provided knowing assistance as well as financial incentive to the perpetrators of particular suicide bombings committed as part of an organized, systematic campaign of suicide bombings by Hamas intended to intimidate the Israeli civilian population by targeting innocent Israeli civilians.  *Id.*  Second, because *Arab Bank* relates to active assistance of suicide bombing of civilian targets, it concerns a much more narrow, clearly defined, and widely-adopted norm than the rule of customary international law asserted here.  *Id.* Insofar as *Arab Bank* primarily rests on particular allegations of the bank's direct facilitation and encouragement of these bombings, and thus concerns the scope of indirect liability, it is addressed more fully in Part V.B.  In any event, the court in *Arab Bank* failed to weigh the preclusive effect of Congress's enactment of a more limited civil remedy for terrorism-related claims and misapplied *Sosa* in assessing plaintiffs' cited sources of international law.

content and acceptance among civilized nations [as] the historical paradigms familiar when [the ATS] was enacted."  *Sosa*, 542 U.S. at 732.

> 1.     **Domestic Statutes Cannot Establish a Rule of International Law.**

Plaintiffs rely on several U.S. statutes to support their contention that "material support of a terrorist organization" violates a clearly-defined and universally-recognized international norm cognizable under the ATS.[13]  As numerous courts have recognized, however, a violation of customary international law cannot be established by reference to U.S. law.  *See, e.g.*, *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 257 n.33 (2d Cir. 2003) ("[I]t is not possible to claim that the practice or policies of any one country, including the United States, has such authority that the contours of customary international law may be determined by reference only to that country . . . ."); *see also Barboza*, slip op. at 18 (rejecting plaintiffs' reliance on AEDPA and the USA PATRIOT Act as evidence of a customary international law norm prohibiting the "material support to terrorists").  If anything, as explained in Part I above, these domestic statutes preclude recognition of a cause of action under international law by occupying the field.

> 2.     **The International Sources Cited By Plaintiffs Do Not Establish An Actionable Rule of International Law Supporting Their Claims.**

Plaintiffs also cite to a plethora of purported international law sources in order to give the appearance that their ostensible cause of action for material support of terrorism is well-founded. Many of these sources were expressly rejected as the basis for an ATS claim in *Sosa*, however,

---

[13]     These statutes include the "Anti-Terror Act," 18 U.S.C. Ch. 113B; provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001).  (*See, e.g.*, NY Compl. ¶ 882.)

and the others do not come close to establishing a cause of action for material support for terrorism within the strictures of *Sosa*.

> As discussed above, plaintiffs cite to the Universal Declaration of Human Rights and other U.N. General Assembly Resolutions as support for their ATS claim. The Universal Declaration says not a word about terrorism or material support for terrorism. More fundamentally, *Sosa* expressly held that the Declaration, like any pronouncement of the General Assembly, a body that has no lawmaking power, does not suffice to establish a cognizable norm. 542 U.S. at 734.

> Plaintiffs also point to the ICCPR as support for their ATS claim, even though the ICCPR makes no mention of terrorism. *Sosa* also expressly rejected reliance on the ICCPR as a source of actionable international norms. It did so because, "although the Covenant does bind the United States as a matter of international law, the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." 542 U.S. at 734.

Of the remaining sources, only two are conceivably relevant: (a) the Financing Convention and (b) the International Convention for the Suppression of Terrorist Bombings, G.A. Res. 52/164, 1 U.N. Doc. A/RES52/163 (Dec. 15, 1997) ("Bombing Convention"). (NY Compl. ¶ 882).[14] As explained below, however neither of these conventions supports the

---

[14]     Plaintiffs cite a number of other international instruments that have no direct bearing on the facts alleged here. For instance, despite making no allegation that Chiquita bribed a foreign public official or that such bribery was the proximate cause of plaintiffs' injuries, plaintiffs cite the Convention on Combating Bribery of Foreign Public Officials in International Business (continued…)

existence of a rule of customary international law prohibiting the provision of material support to

terrorists, and certainly not one supporting a cause of action cognizable within the stringent

parameters set out in *Sosa*.[15]

> **a)** **The Financing Convention Demonstrates That Chiquita's Conduct Did Not Violate Any Existing Rule of International Law At The Time It Occurred, and Cannot Support Finding A Cause of Action for Material Support of Terrorism.**

The Financing Convention makes it an international crime to provide or collect funds

with the intention or knowledge that they be used to carry out an offense either under one of nine

specified treaties, or any other act intended to cause death or serious injury to a civilian for

certain purposes.  Financing Convention, art 2(1).[16]   The main obligation that the Convention

---

Transactions, 37 I.L.M. 1 (Dec. 18, 1997).  They also cite the Genocide Convention, the Torture Convention, and common Article 3 of the Geneva Conventions.  These agreements say nothing about material support for terrorism, and thus have no relevance to the theory that Chiquita should be held liable under the law of nations for allegedly providing such support.  To the extent that these agreements are cited in support of indirect theories of liability, they are addressed in Parts IV-V below.

[15]   Perhaps recognizing the inapplicability of these conventions to the facts here, the Florida and New Jersey Plaintiffs do not rely upon them.  (*See* Fla. Compl. ¶ 257; NJ Compl. ¶ 69.)

[16]   As the court in *Barboza* explained, an offense is committed within the meaning of the Financing Convention if a person "by any means, directly or indirectly, unlawfully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out" (a) a violation of one of nine treaties listed in the annex to the Financing Convention, or (b) "[a]ny other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any act."  *Barboza*, slip op. at 21-22 n.4 (quoting Financing Convention, Dec. 9, 1999, S. Treaty Doc. No. 106-49 (2000)).

The treaties cross-referenced in the Financing Convention are (1) the Bombing Convention; (2) the Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105; (3) the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Sept. 23, 1971, 24 U.S.T. 565, 974 U.N.T.S. 177; (4) the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, Dec. 14, 1973, 28 U.S.T. 1975, 1035 U.N.T.S. 167; (5) the International Convention against the Taking of Hostages, Dec. 17, 1979, T.I.A.S. No. 11,081, (continued…)

24

imposes on states is a requirement to "adopt such measures as may be necessary . . . to establish

as **_criminal offences_** under its domestic law the offences set forth in article 2 . . . ." *Id.* art 4

(emphasis added).  The United States fulfilled this obligation when it enacted a criminal law to

implement the treaty.  *See* Suppression of the Financing of Terrorism Convention

Implementation Act of 2002, Title II of Public Law 107-197.

   The Financing Convention cannot support a civil cause of action for terror financing

under the ATS for four separate reasons.

   *First*, it is not a self-executing treaty.  A self-executing treaty "operates of itself without

the aid of any legislative provision," while a non-self-executing treaty "can only be enforced

pursuant to legislation to carry them into effect."  *Medellin v. Texas*, 128 S.Ct. 1346, 1356 (2008)

(internal citations omitted).  Because the Financing Convention obligates participating states to

implement its provisions through legislation, but creates no directly enforceable rights, it is

plainly a non-self-executing treaty.  Hence, as with the ICCPR considered in *Sosa*, the

Convention cannot itself form the basis for a cause of action under the ATS.[17]

---

1316 U.N.T.S. 205; (6) the Convention on the Physical Protection of Nuclear Material, Mar. 3, 1980, T.I.A.S. No. 11,080, 1456 U.N.T.S. 124; (7) the Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Feb. 24, 1988, S. Treaty Doc. No. 100-19, 1589 U.N.T.S. 474; (8) the Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, Mar. 10, 1988, 27 I.L.M. 668, 1678 U.N.T.S. 221 ("Safety of Maritime Navigation Convention"); and (9) Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms Located on the Continental Shelf, Mar. 10, 1988, 27 I.L.M. 685, 1678 U.N.T.S. 304 ("Fixed Platform Convention").

[17]  *See also Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1178 (C.D. Cal. 2005) ("The Court holds that treaties that fail to 'impose obligations' because they are 'not self-executing' do not 'themselves establish the relevant and applicable rule of international law.'"); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 439 n.16 (D.N.J. 1999) ("[O]nly self-executing treaties, *i.e.*, those that do not require legislation to make them operative, confer rights enforceable by private parties.  Since neither the Hague nor Geneva Conventions provide a (continued…)

*Second*, the Financing Convention does not establish a ***widely-accepted*** rule of customary international law regarding terrorist financing, particularly as of the time of Chiquita's alleged payments.  *See Barboza*, slip op. at 3 (rejecting the Convention as basis for cause of action under ATS).  Plaintiffs must establish that Chiquita violated international law as it stood at the time of Chiquita's challenged conduct.  *See Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 123 (2d Cir. 2008) (ATS claims must rest on a rule of international law "that was universally accepted at the time of the events giving rise to the injuries alleged"); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 326 (2d Cir. 2007) (Korman, J., concurring in part and dissenting in part) (courts "must apply customary international law as it stood at the time of the offences") (internal citation and quotation omitted).

But the Financing Convention — which did not enter into force as a matter of international law until April 10, 2002[18] — was premised on the fact that there was no pre-existing rule of international law addressing the financing of terrorist acts.  The Convention's preamble observes that prior international laws "do not expressly address" terrorist financing, and its drafting history establishes that the Convention was designed to fill a "gap in international law" on the subject of financing of terrorism.  *See* Report of the Ad Hoc Committee established by General Assembly resolution 51/210 of 17 December 1996, at 3.  The Convention thus conclusively establishes that there was no binding international law applicable to terrorist financing prior to April 2002.

---

private right of action, they cannot provide a basis for suit under the AT[S].") (internal citations omitted).

[18]     Multinational Treaties Deposited With The Secretary General, Financing Convention, at 1, http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterXVIII/treaty12.asp ("Financing Convention Decl.") (attached as Exhibit K).

And even after the treaty came into force, the Convention was not evidence of a well-accepted rule of customary international law.[19]  "A treaty will only constitute sufficient proof of a norm of customary international law if an ***overwhelming majority*** of States have ratified the treaty, ***and*** those States uniformly and consistently act in accordance with its principles."  *Flores*, 414 F.3d at 256-57 (emphases added).  But plaintiffs cannot show universal ratification or uniform application:

- When the Financing Convention came into force in April 2002, only 26 of the 192 nations in the world[20] — or roughly fourteen percent — had ratified it.  And only 111 nations — or 58 percent (*i.e.*, a bare majority) of the nations in the world — had ratified the Financing Convention by the end of February 2004, when Chiquita's alleged payments to the AUC stopped.[21]  These figures contrast with treaties like the Torture Convention and the Geneva Conventions, which are thought to reflect customary international law, and which have near-universal adherence.

- Nor have plaintiffs met their burden of showing that state practices reflect either consistent implementation of a rule against providing material support to terrorism, or, in particular, the consistent and universal application of such a rule by states to circumstances similar to those alleged here.  *Cf. Smith*, 18 U.S. (5 Wheat) at 162 (noting "the general practice of all nations in punishing all persons . . . who have committed [the offense of piracy] against any persons whatsoever"), *cited with approval by Sosa*, 542 U.S. at 732.

---

[19]     As discussed in note 6 *supra*, an international law violation can be either a treaty violation or a violation of an accepted rule of customary international law.  Of course, not all international law violations meet *Sosa*'s strict requirements.  But the fact that the Financing Convention is not self-executing means that the treaty itself cannot form the basis of an enforceable violation of international law.  For the reasons that follow, the existence of the Financing Convention also does not support the conclusion that there is any rule of customary international law regarding terrorist financing that would be actionable under the ATS.

[20]     See Appendix (listing dates of ratification of the Financing Convention) (citing Ex. K (Financing Convention Decl.)).  There are 192 member nations in the United Nations.  *See* United Nations, List of Member States, http://www.un.org/members/list.shtml (last visited July 11, 2008).

[21]     In fact, Colombia itself did not ratify the Financing Convention until September 14, 2004, seven months after Chiquita's last alleged payment to the AUC.  *See* Ex. K at 3.

Accordingly, there was neither widespread ratification of the Financing Convention nor widespread state practices evincing a pervasive recognition and enforcement of any rule of customary international law prohibiting financial support for terrorism at the time of Chiquita's purported wrongful acts.

*Third*, the Financing Convention cannot provide support for a cognizable rule of customary international law under the ATS because it does not provide ***a clear and well established definition*** that precludes Chiquita's conduct.  The norms in the Financing Convention are contested, not well-settled.  This is best illustrated by the confusing pack of reservations and declarations[22] that *forty-eight* nations (30 percent of all current ratifiers) have taken with respect to the Convention in their ratification instruments.  *See* Ex. K (Financing Convention Decl.) at 8-82.  Many of these reservations reflect limitations on nations' agreement to be bound by the full obligations outlined in the Financing Convention, as such, where a nation had not ratified one or more of the listed treaties identifying specific terrorism-related conduct that delimit the Financing Convention's funding proscriptions.  As a result of such reservations, the obligations of various ratifying nations under the Convention are a veritable swiss-cheese of loopholes.  *Id.*[23]  Even more relevant here are the reservations by Syria, Jordan, and Egypt,

---

[22]     A reservation is non-consent to particular treaty terms.  Vienna Convention on the Law of Treaties, art. 2(1)(d), May 23, 1969, 1115 U.N.T.S. 331; Restatement (Third) of Foreign Relations Law of the United States § 313 cmt. a (1986).  The terms to which nations take a reservation are not binding on that nation.  A declaration in the context of the Financing Convention specifies how a nation ratifying the Convention interprets particular terms in the Convention.  *Id.*

[23]     A review of the declarations and reservations filed upon ratification of the Convention reveals that a substantial number of nations declared that they were not bound with respect to a number of the listed treaties.  *See* Ex. K (Financing Convention Decl.).  For example, Bahrain, Thailand, and Venezuela each declare that six of the nine treaties listed in the Annex will not apply to it under Article 2; the Bahamas, the Cook Islands, Indonesia, and Luxembourg declare the same with regard to five of the Annex treaties; Belgium, Croatia, Jordan, Latvia, Nicaragua, (continued…)

which specify that armed national resistance movements are ***not*** terrorist acts within the meaning of Article 2 of the Convention. *Id.* These reservations brought strenuous objections from at least 23 other nations that argued the reservations frustrate the purpose of the Convention. *Id.* Such disputes demonstrate that the central prohibitions of the Financing Convention remain controversial and are simply not settled and well-defined in a manner that has general acceptance, including, importantly, in contexts directly related to the allegations in the case — the financing of private parties involved in insurgent conflicts.

*Fourth*, the Financing Convention cannot support plaintiffs' asserted cause of action, because, as in *Barboza*, plaintiffs here fail to allege any conduct that falls within the specifically enumerated acts prohibited by the Convention. *See Barboza*, slip op. at 22 (noting that the Financing Convention applies only to "enumerated prohibited acts," none of which were applicable). While the Convention proscribes the funding of a number of specified acts, such as hijacking airplanes or taking diplomats hostage, none of the specifically enumerated acts proscribed by the Convention is clearly alleged here.[24] Thus there is no fit between the ostensible rule of customary international law and Chiquita's alleged conduct. By contrast, *Sosa* rejected the "arbitrary detention" claim at issue there — despite a much closer fit between the alleged conduct and supporting sources of international law — because of very slight differences

---

and the Philippines declare the same with regard to four of the Annex treaties; Brazil, China, Guatemala, Syria, and Vietnam declare the same with regard to three of the Annex treaties; St. Vincent and the Grenadines, and the Former Yugoslav Republic declare the same with regard to two of the Annex treaties; El Salvador, France, Lithuania, Mauritius, Myanmar, New Zealand, Romania, Saudi Arabia, and Singapore declare the same with regard to one of the Annex treaties; and Egypt, Georgia, Israel, Malaysia, and Moldova declare the same with regard to an unspecified number of the Annex treaties to which they are not parties. *Id.*

[24]    The one allegation that involved the use of an explosive device is addressed in Part II.B.2.b below.

between the facts alleged and the rules reflected in the sources of international law upon which the *Sosa* plaintiff relied.  542 U.S. at 734-38.

Such reasoning led the court in *Barboza* to the same conclusion in a context virtually identical to this case.  The plaintiffs there alleged that an American corporation, Drummond Co., was liable for murders committed by the AUC in Colombia.  *Barboza*, slip op. at 3.  As in this case, the *Barboza* plaintiffs alleged that Drummond provided material support to terrorists in violation of a purported rule of customary international law.  *Id.*  The *Barboza* plaintiffs relied on the very same sources of law, both domestic and international, cited by plaintiffs here in support of their theory that a well-established and well-defined rule of international law prohibited the provision of "material support to terrorists."  Recognizing that *Sosa* places constraints on federal courts' power to recognize new actions under the ATS, the *Barboza* court concluded that an international law prohibition against providing material support to terrorists was too "general" and that the defendant's conduct did not violate any specifically defined norm of customary international law.  *Id.* at 17, 22.

> **b)**      **The Bombing Convention Suffers From Many of the Same Infirmities as the Financing Convention, And Is, In Any Event, Simply Not Pertinent to Plaintiffs' Claims.**

The Bombing Convention provides no additional support for, and is largely irrelevant to, plaintiffs' asserted rule of customary international law, as it simply does not address material support for terrorists.  Any reliance on the Convention as support for the judicial creation of a cause of action for material support of terrorism is entirely misplaced and just the sort of freehand extrapolation that *Sosa* prohibits.  Indeed, out of more than 700 alleged deaths, only one plaintiff here even alleges the use of an explosive device, and even his allegations do not fall

squarely within the Convention's prohibitions.[25]  For these reasons, this Court should follow the

*Barboza* court in rejecting the proposition that the Bombing Convention could give rise to a rule

of international law prohibiting material support for terrorism.  *Barboza*, slip op. at 20-22.[26]

> **3.     Even If These Sources Establish A Rule of International Law, At Best the Rule Is Limited To A Criminal Prohibition And Does Not Support Imposition Of Civil Liability.**

The Financing and Bombing Conventions are also inapplicable because they require

states to develop ***criminal, not civil*** prohibitions.  As the Supreme Court recognized in *Sosa*, the

fact that international law recognizes a criminal violation does not mean, *a fortiori*, that federal

courts should exercise their discretion and expand the violation to encompass potential civil

claims:  "The creation of a private right of action raises issues beyond the mere consideration

whether the underlying primary conduct should be allowed or not, entailing, for example, a

decision to permit enforcement without the check imposed by prosecutorial discretion."  542

U.S. at 727.  Plaintiffs have not pointed to any cognizable source of international law that

---

[25]     *See* Fla. Compl. ¶ 93 (alleging the use of an explosive device).  This allegation does not state a violation of the Bombing Convention's proscription, insofar as (i) it fails to establish that the perpetrator (or Chiquita) had the requisite intent (that the alleged contribution was "intentional" and made "with the aim of furthering . . . the purpose of the group" or with knowledge of "the intention of the group to commit the offence"), *see* Bombing Convention, Art. 2, and (ii) the Bombing Convention does not apply when the offense occurs within a single state, and the bomber and the victim are both nationals of that state.  *See id.* Art. 3.

[26]     The Bombing Convention must also be rejected as a foundation for a rule of customary international law prohibiting material support for terrorism for many of the same reasons as the Financing Convention.  Like the Financing Convention, the Bombing Convention establishes international *criminal* norms in a treaty that is not self-executing and thus cannot supply the basis for a cause of action under *Sosa*.  Also like the Financing Convention, the ratification history of the Bombing Convention exhibits numerous reservations and declarations that render its central norms contested, as does the inconsistent implementation of its proscriptions.  *See* Multinational Treaties Deposited With The Secretary General, Bombing Convention, Declarations, at 7 - 51, http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterXVIII/treaty10.asp (attached as Exhibit L).  Nor is there evidence of consistent state practice with regard to the Bombing Convention reflecting a settled and well-defined rule that is widely observed and applied out of a sense of legal obligation, particularly on facts similar to those alleged here.

suggests that the law of nations imposes *civil liability* on parties who provide material support to terrorism,[27] let alone sufficient authority to conclude that such civil liability is clearly defined and widely accepted, as required by *Sosa*.

Nor can plaintiffs show that the law of nations has a clearly-defined and widely-accepted rule that provides for the imposition of liability on corporations — or, for that matter, on any private actors — for providing financial support to terrorism. The Supreme Court made clear in *Sosa* that, before crafting a new cause of action cognizable under the ATS, federal courts must determine that the law of nations holds ***private actors*** like the defendant liable for violations of the asserted norm: "The norm must extend liability to the type of perpetrator (*e.g.*, a private actor) the plaintiffs seeks to sue." 542 U.S. at 761 (Breyer, J. concurring). The international law sources cited by plaintiffs, however, do not evidence a rule of customary international law providing that *corporations* should be held liable for providing financial support to terrorism. Indeed, there is not even consensus in international law that non-state actors of any kind should be held liable for support of terrorism. Many states specifically limit their efforts to combat the financing of terrorism to state sponsors of terrorism.[28] In the absence of a well-established and clearly-defined rule of customary international law and consistent state practice of imposing

---

[27]     By contrast, as discussed above, the United States provided for criminal liability but did not create a civil cause of action when implementing the Financing Convention. *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Title II of Public Law 107-197.

[28]     *See*, *e.g.*, Organization of the African Union Convention on the Prevention and Combating of Terrorism (July 14, 1999) (committing *States* "to refrain from acts aimed at organizing, supporting, financing, committing, or inciting to commit terrorist acts," but not prohibiting or penalizing private actors who provide financial support to terrorism); Arab Convention for the Suppression of Terrorism (Apr. 22, 1998) (same); Convention of the Organization of Islamic Conference on Combating International Terrorism (July 1, 1999) (same).

liability on corporations that provide material support for terrorism, *Sosa* precludes federal courts from creating such liability pursuant to the ATS.

III. **Under *Sosa*, Wide Ranging and Deleterious Practical Consequences Prohibit The Expansion of Liability That Plaintiffs Propose.**

At least three practical consequences of extending potential civil liability — which this Court *must* consider under *Sosa* — provide additional, compelling reasons why the Court, in exercising the gatekeeper function assigned to it by *Sosa*, should reject plaintiffs' attenuated theory of liability under the ATS.

**1. Recognizing plaintiffs' proposed cause of action logically would give rise to literally thousands of new claims.** The concerns expressed by Judge Robb in his concurring opinion in *Tel-Oren* — that recognizing such a cause of action would open U.S. courts to the claims of "every alleged victim of violence" of counter-revolutionaries across the globe, 726 F.2d at 826-27 — are as valid today as when the decision was issued. The purported cause of action under international law advanced by plaintiffs would establish the U.S. federal courts as a forum to arbitrate claims against any state, foreign official, organization, or person who provided resources to any organization alleged to be a terrorist organization, or who in any way participated in, facilitated, or otherwise encouraged the acts of that organization.[29] Like the cause of action proposed by the plaintiff in *Sosa*, "its implications would be breathtaking," 542

---

[29] The United States has strongly opposed the recognition of aiding and abetting liability under the ATS on just these grounds. *See* Br. of United States as Amicus Curiae in *Am. Isuzu Motors Inc. v. Ntsebeza* at 14, No. 07-919 (U.S.) (stating that "'no nation has ever yet pretended to be the *custos morum* of the whole world,'" . . . [b]ut that is exactly the result created by the Second Circuit decision below, which virtually invites an ATS action in New York whenever there are allegations of human rights violations anywhere in the world.") (citing *United States v. La Eugenie*, 26 F. Cas. 832 (D. Mass. 1822) (Story, J.)).

U.S. at 736, and would extend, in Judge Robb's words, without any "obvious or subtle limiting principle in sight."

In the present case alone, the logic of the theory of liability advanced by plaintiffs would result in a universe of thousands of potential plaintiffs and defendants. On the plaintiff side, plaintiffs' theory would logically extend a potential cause of action in federal court to every one of the tens of thousands of people allegedly injured or killed by the AUC or the FARC over the course of more than two decades. The New Jersey plaintiffs acknowledge as much in their complaint, which seeks to certify a class of "all persons . . . subjected to abuses" by the AUC, which "may exceed ***ten thousand***." (*See* NJ Compl. ¶¶ 73-74.) (emphasis added).

On the defendant side, similar claims could logically be asserted against (i) any one of the 17,000 militants in the AUC and the 10,000 associates of the AUC described by plaintiffs (including any AUC members extradited to the U.S.), (ii) any other defendants that allegedly provided financial or other support or assistance to the AUC, including (except where barred by sovereign immunity) the Colombian government, any current or former Colombian government officials or military personnel who aided the AUC (including, according to the complaints, the current president of Colombia), or any other Colombian citizen who aided the AUC; (iii) anyone who helped to train or supply the AUC (including, according to the complaints, the U.S. government and its current and former military officers who worked at the School of the Americas); (iv) any other country or foreign official that provided material, financial, or geographic support to the AUC; (v) any local or multinational corporation doing business in an AUC- or FARC-controlled area of Colombia that was therefore required to pay the *vacuna*, or

extortion, payments[30] required by the AUC; (vi) any other person or organization who paid

ransom or extortion payments to the AUC, whether Colombian or foreign nationals; and (vii)

anyone who purchased narcotics from the AUC, thereby providing the AUC with financial

support.

    **2.  Recognizing plaintiffs' proposed cause of action would result in unmanageable litigation.**  Even without additional claims, meaningful discovery of plaintiffs' allegations would

require fact-finding in foreign and dangerous lands regarding the specific circumstances

surrounding the alleged role of the Colombian government and military in connection with the

AUC's actions, as well as the specific facts and circumstances of each of the AUC's alleged

wrongful acts.  Resolution of the claims would force the federal courts to adjudicate those facts,

including the role of the Colombian government, and possibly other foreign governments, in the

conflicts in Colombia.  In attempting to fulfill this role, this Court would likely be called upon to

make determinations on a host of procedural issues associated with civil liability for which there

is no clear guidance in the law of nations, such as the statute of limitations or the operation of

doctrines like comparative negligence and joint and several liability.  As another federal court in

this District observed, the logical conclusion of extending liability in this fashion is to render the

federal courts, in effect, international civil claims tribunals, albeit ones that impose

disproportionate burdens on persons or companies subject to personal jurisdiction in the United

---

[30]    In Colombia, the extortive levy or "war tax" imposed by the guerrillas and the paramilitaries is commonly called the *vacuna* or "vaccine" because it "inoculates" the taxpayer against violent attacks by these armed groups.  As reported by the United Nations, the *vacuna* has commonly been charged to companies in the "agricultural sector" in the affected areas and "its amount is fixed in accordance with the size and productivity of the estate as a result of a census carried out by the armed group." *See* United Nations Dev. Programme, El conflicto, callejón con salida:  Informe nacional de desarrollo humano para Colombia [National Report on Human Development for Colombia] 290 (2003) (attached as Exhibit M, with English translation and Affidavit of Accuracy).

States.  *See Saperstein*, 2006 WL 3804718, at *8.[31]  This is a role to which U.S. courts are

wholly unsuited, and it is plainly not what the First Congress intended when it enacted the ATS

in 1789.

   **3.  Recognizing plaintiffs' proposed cause of action would "imping[e] on the**

**discretion of the Legislative and Executive Branches in managing foreign affairs."**  *Sosa*,

542 U.S. at 727.  Evaluating plaintiffs' extrajudicial killing and torture claims, among others (*see*

Part V.D.1 *infra*), would also compel the Court to make determinations concerning whether the

Colombian government was complicit in the summary executions of its own citizens by terrorist

organizations.  Indeed, the complaints are replete with such allegations.  (*See, e.g.*, NY Compl.

¶ 741 ("The [Colombian] Ministry of Defense was providing legal cover for the paramilitaries.");

*id.* ¶ 745 ("[School of the Americas'] graduates are currently involved in the dirty war now being

waged in Colombia with US support.").)  Adjudication of these claims would "challenge[ ] the

official acts of an existing government in a region where diplomacy is delicate and U.S. interests

are great," *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2005),[32] and

---

[31]     More broadly, by greatly expanding the scope of potential targets for ATS claims,
acceptance of plaintiffs' expansive theory of liability would also encourage a renewed interest by
the plaintiffs' bar in pursuing strike suits based on international conflict.  *See* Bradley, *supra* note
6, 120 Harv. L. Rev. at 924 ("[T]he number of ATS defendants subject to personal jurisdiction in
the U.S. would expand; corporations typically have more assets than individual defendants and
thus are likely to be a more attractive target for plaintiffs and their lawyers; and private
corporations, unlike foreign governments, are not protected by sovereign immunity.").  Indeed,
plaintiffs' counsel in this matter have made clear that they view the present suit as just such a
strike suit — Paul Wolf, counsel in the D.C. action, told the Colombian media that the threat of
large damages findings should force Chiquita to reach a lucrative settlement with the plaintiffs
quickly.  *See* "If it wishes to survive, Chiquita Brands has to negotiate," Cecilia Orozco Tascón,
*Si quiere sobrevivir, Chiquita Brands tiene que negociar*, El Espectador, June 15, 2008, at 21
(attached as Exhibit N, with English translation and Affidavit of Accuracy) ("That's why I think
that Chiquita's only choice is to negotiate, if it wants to survive.").

[32]     *See also Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 58 (D.D.C. 2006) ("[T]he more
plaintiffs assert official complicity with the acts of which they complain, the closer they sail to
(continued…)

thereby impinge on the prerogatives of the Executive and Legislative Branches.  A finding of state action — *i.e.*, of "complicity" between Colombia and the AUC — would contradict official U.S. foreign policy and risk unwarranted judicial interference in U.S. foreign relations, and would require adjudication of the lawfulness of official Colombian conduct that is otherwise entitled to sovereign immunity.  Moreover, as a practical matter, the meaningful adjudication by this Court of whether Colombia was complicit in these acts would be essentially impossible.  It would exceed the capacity of a U.S. court to determine reliably the extent of official involvement in particular acts committed by unnamed and unknown paramilitaries in a foreign country where the ordinary tools of civil discovery are unavailable and where certain of the paramilitary groups at issue continue to operate.

IV.   **Plaintiffs Cannot Circumvent the Absence of Direct Liability Under International Law By Attempting to Plead Their Claims Using the Rubric of Indirect Liability.**

As an alternative to their material support claim, plaintiffs attempt to recast their claims in the language of indirect or secondary liability.  They assert that Chiquita "aided and abetted" or "conspired" with the AUC in committing each of the alleged individual acts of murder, which they characterize as extrajudicial killings, war crimes, or other supposed international law violations.  The central premise of these claims, however, is that Chiquita's conduct in providing material support to the AUC, by itself, provides the basis for imposing indirect liability for each of the alleged wrongful acts.  (NJ Compl. ¶¶ 30, 32; Fla. Compl. ¶¶ 72, 74.)  Plaintiffs cannot circumvent the absence of a direct claim for providing material support for terrorism simply by re-pleading their claims in the language of indirect liability.

----

the jurisdictional limitation of the political question doctrine."); *Exxon*, 393 F. Supp. 2d at 26-28 (dismissing ATS claim against a corporation because, among other reasons, a state action inquiry by the court "would create a significant risk of interfering in [a foreign government's] affairs and thus U.S. foreign policy concerns").

A.    **Plaintiffs' "General Support" Theory of Aiding and Abetting Liability Is Not Recognized by Courts as Accepted Under International Law.**

Plaintiffs' theory of aiding and abetting liability rests on the simplistic but erroneous premise that, because Chiquita made payments to some members of the AUC knowing that the AUC was violent, Chiquita is properly held liable for aiding and abetting all of the wrongful acts of any member of any of the loosely organized groups that compose the AUC. No U.S. court has ever recognized such an expansive theory of aiding and abetting liability under international law. Although two *per curiam* opinions of the Eleventh Circuit have previously acknowledged aiding and abetting liability under the ATS, *see Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005) (per curiam); *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (per curiam), these precedents in no way support the far-reaching theory of aiding and abetting presented in plaintiffs' complaints. Rather, each of these cases involved allegations that the defendant provided ***specific*** assistance in the commission of a ***specific*** tort.

In *Cabello*, plaintiffs alleged that a Chilean military officer, Armando Fernandez-Larios, engaged in specific conduct to assist in the killing of a Chilean economist, Winston Cabello, at the hands of the Chilean military. 402 F.3d at 1151. The complaint alleged that Fernandez and five other officers arrived at a military garrison and instructed local officers to provide them with prisoners' files from which the squad selected thirteen prisoners, including Cabello, for execution, following which Fernandez and the rest of the unit drove these prisoners ten minutes outside the garrison, ordered them out of the truck, and executed them. *Id.* The complaint also alleged specific statements by Fernandez suggesting complicity in these crimes. *Id.*

Likewise, *Aldana* involved seven plaintiffs, all of whom were officers in a national trade union of plantation workers called SITRABI, and all of whom represented workers on a banana plantation owned by Bandegua (a Del Monte subsidiary). *Id.* The plaintiffs alleged that after

38

these individuals had filed a labor complaint against Bandegua, Bandegua hired and met with a private security force "'to plan violent action against the Plaintiffs and other SITRABI leaders.'" *Id.* at 1245.  The security force arrived at SITRABI's headquarters, held the plaintiffs hostage, and threatened to kill them.  *Id.*  A member of the security force explained to the plaintiffs that their union activities were responsible for the area's economic decline, and explained that their union activity could cause Del Monte to abandon their plantation.  *Id.*  Plaintiffs were then forced at gunpoint — by the security force and the Mayor — to a radio station to announce that the labor dispute was over and that they were resigning.  *Id.*  Plaintiffs were released after eight hours and told they would be killed if they did not leave Guatemala.  *Id.*[33]

In the only ATS case where plaintiffs proceeded to trial on claims that a U.S. corporation aided and abetted international law violations, *Estate of Rodriquez v. Drummond Co.*, 256 F. Supp. 2d 1250 (N.D. Ala. 2003), plaintiffs likewise alleged that the defendant provided specific assistance to the commission of a specific tort.  In *Drummond*, the plaintiffs at trial were family members of three Colombian trade union leaders for SINTRAMIENERGETICA who represented workers at Drummond's mines in Colombia.  The plaintiffs alleged that at the time of the victims' deaths, two of them were in the midst of contract negotiations with Drummond on behalf of Drummond employees.  *Id.* at 1254.  AUC paramilitaries entered a Drummond mine, stated that "they were there to settle a dispute that Locarno and Orcasita had with Drummond," and then killed them.  *Id.*  The third plaintiff became the union president after Locarno and Orcasita were killed, and at the time of his death he was actively engaged in negotiations with

---

[33]    The *Aldana* court reinstated only one of plaintiffs' twelve causes of action against Del Monte:  torture based on mentally inflicted pain and suffering.  416 F.3d at 1253.  On remand, the district court dismissed the case on grounds of *forum non conveniens*.  *See Aldana v. Fresh Del Monte Produce, Inc.*, No. 01-3399-CIV, 2007 WL 3054986 (S.D. Fla. Oct. 16, 2007).

Drummond for new security agreements for the mine workers. *Id.* He was removed from a bus on his way home from a Drummond mine and then killed by AUC paramilitaries. *Id.* The district court determined that plaintiffs' allegations of Drummond's specific assistance with these specific torts were sufficient to survive a motion to dismiss. *Id.* A jury subsequently found in Drummond's favor.

While in all of these cases the plaintiffs' theory was that defendants provided specific assistance in the commission of specific torts, plaintiffs here, by contrast, take the stunning position that, so long as Banadex made payments to the AUC in ***any*** amount for ***any*** reason, Chiquita should be held liable for ***any*** violent act committed by ***any*** member of the AUC in ***any*** place at ***any*** time for ***any*** reason. This approach does not comport with the particularized showing of participation, involvement, or facilitation of particular tortious acts that is a requirement of aiding and abetting in the Eleventh Circuit. Plaintiffs' generic and conclusory assertions are particularly inadequate given the "heightened pleading standard" applicable to ATS claims. *See Sinaltrainal*, 474 F. Supp. 2d at 1287. Their generalized theory of aiding and abetting liability, if sustained, would represent a radical reformulation of the scope of aiding and abetting liability under even U.S. domestic law, and would drastically expand the scope of ATS jurisdiction beyond anything previously recognized.

Moreover, the continuing viability of aiding and abetting claims under the ATS after *Sosa* has been a subject of considerable debate.[34] Although *Cabello* and *Aldana* were issued after the

---

[34]     *Compare Exxon*, 393 F. Supp. 2d at 24 (rejecting claims of aiding and abetting liability post-*Sosa*); *Corrie v. Caterpillar*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005) (same), *aff'd*, 503 F.3d 974 (9th Cir. 2007), *with Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 337-38 (S.D.N.Y. 2005) (allowing claims of aiding and abetting liability); *Almog v. Arab Bank PLC*, 471 F. Supp. 2d 257, 287-88 (E.D.N.Y. 2007) (same); *Bowoto v. Chevron Texaco Corp.*, No. C 99-02506 SI, 2006 WL 2455752, at *3-4 (N.D. Cal. Aug. 22, 2006) (same); (continued…)

Supreme Court's decision in *Sosa*, they fail even to mention *Sosa* in their discussion of aiding

and abetting, and instead rely on pre-*Sosa* cases holding that the ATS "reaches conspiracies and

accomplice liability."[35]  Insofar as *Cabello* and *Aldana* simply fail to consider the impact of *Sosa*

on whether aiding and abetting theories are cognizable under the ATS, the precedential value of

these decisions is questionable.[36]  But this Court need not reach the question of whether the

recognition of derivative liability in those decisions survives *Sosa*.  Whatever the future viability

of such claims under the ATS, it is clear that the aiding and abetting theory recognized in the

---

*Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 464 (S.D.N.Y. 2006) (same);
*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) (same); *Cabello*, 402 F.3d at
1157.

[35]     The *Aldana* court did not independently analyze whether aiding and abetting claims are
cognizable under the ATS after *Sosa*; the court merely cited *Cabello* for the proposition that "[a]
claim for state-sponsored torture under the Alien Tort Act or the Torture Victim Protection Act
may be based on indirect as well as direct liability."  416 F.3d at 1248.  The *Cabello* court failed
to mention *Sosa* at all.

[36]     The Eleventh Circuit may soon have opportunity to reconsider the viability of civil aiding
and abetting liability under international law under *Sosa*, even in the limited circumstances
recognized in *Cabello* and *Aldana*.  *See* Br. for Appellees/Cross-Appellants at 67, *Romero v.
Drummond Co., Inc.*, No. 07-14090-DD/07-14356-D (11th. Cir.) (appellee requesting that
Eleventh Circuit reconsider its ATS precedent on aiding and abetting); Br. for Defendants-
Appellees at 35 n.13, *Sinaltrainal v. Coca-Cola Co.*, No. 06-15811-HH (11th Cir.) (noting that
"there is reason to doubt that secondary aiding and abetting liability exists under ATS and
TVPA" and "reserv[ing] the right to raise this argument with this Court *en banc* or in the
Supreme Court").

        Although a recusal of four justices precluded Supreme Court review of the sharply-
divided panel of the Second Circuit on this issue in *Khulumani*, *see Am. Isuzu Motors, Inc. v.
Ntsebeza*, No. 07-919, 2008 WL 117862 (U.S. May 12, 2008), the Solicitor General has
consistently advocated in favor of Supreme Court review of this issue and rejection of aiding and
abetting liability.  *See* Br. of United States as Amicus Curiae at 5, 10, *Am. Isuzu Motors*, 2008
WL 117862 (May 12, 2008) (No. 07-919) (arguing that recognizing a claim for aiding and
abetting liability under the ATS "allows [ ] unprecedented and sprawling lawsuit[s] to move
forward," and "misapplie[s] *Central Bank* and veer[s] far off course under the ATS.").  The
Supreme Court will have other opportunities to consider whether aiding and abetting liability is
cognizable under the ATS after *Sosa*.  *See Mujica v. Occidental Petroleum*, No. 05-56175 (9th
Cir.) (argued Apr. 2007); *Presbyterian Church of Sudan v. Talisman*, No. 07-0016 (2d Cir.)
(briefing complete); *Kiobel v. Royal Dutch Petroleum Co.*, Nos. 06-4800 & 06-4876 (2d Cir.)
(briefing complete).

Eleventh Circuit — specific assistance to the commission of a specific tort — does not support recognition of the unprecedented and far-reaching theory of indirect liability presented in plaintiffs' complaints.

      **B.**     **Conspiracy and Agency Theories Are Not Available Under International Law for Plaintiffs' Claims.**

Plaintiffs also allege that Chiquita "conspired" and/or "worked in concert" and/or participated in a "joint criminal enterprise" with the paramilitaries to carry out the more than 700 murders at issue in these three cases.  (See NJ Compl. ¶ 16; NY Compl. 24-25; Fla. Compl. ¶ 56.)  These conclusory allegations do not support ATS jurisdiction.

Although the Eleventh Circuit has recognized conspiracy liability under the ATS, *Cabello*, 402 F.3d at 1159, there is no broad international norm of conspiracy liability that meets *Sosa*'s stringent standard of settled "definite content" and unambiguous "acceptance among civilized nations." 542 U.S. at 732.  As the Supreme Court has made clear since the Eleventh Circuit decided *Cabello* and *Aldana*, only a very small category of conspiracy violations are recognized under the law of nations.[37]  *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2784 (2006) (plurality) ("[I]nternational sources confirm that the crime charged here [conspiracy] is not a recognized violation of the law of war. . . . And the only 'conspiracy' crimes that have been recognized by international war crimes tribunals . . . are conspiracy to commit genocide and common plan to wage aggressive war.").  These narrow categories are not applicable here.[38]

---

[37]     This is in part because many national legal systems do not recognize conspiracy.  *See* Antonio Cassese, International Criminal Law 197 (2003) ("[I]n international law no customary rule has evolved on conspiracy on account of the lack of support from civil law countries for this category of crime.").

[38]     Only the New York Complaint even attempts to allege a cause of action for genocide (*see* NY Compl. ¶¶ 907-911), but this claim fails for the reasons set forth below in Part V.D.3.

Consequently, plaintiffs' conspiracy claim is not cognizable under the ATS. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 665-66 (S.D.N.Y. 2006) (dismissing ATS conspiracy claim because only conspiracy to commit genocide and to wage aggressive war are recognized under international law).

Plaintiffs alternatively allege that Chiquita is vicariously liable for the acts of the paramilitaries because they purportedly acted as the "employees" or "agents" of Chiquita in Colombia. (*See* NJ Compl. ¶ 16; NY Compl. ¶ 26; Fla. Compl. ¶ 56.) This attempt to allege claims using the rubric of U.S. domestic common law agency principles is similarly unavailing. There is no support for the proposition that civil agency theories are clearly defined and widely accepted under international law, and plaintiffs' complaints cite none.

**V.     Even If Plaintiffs' Claim Were Cognizable Under the ATS, Plaintiffs' Conclusory Allegations — Whether Pled In The Language Of Direct or Indirect Liability — Fall Far Short Of Satisfying The Heightened Pleading Standard For ATS Claims.**

To state a cognizable claim under the ATS, plaintiffs must plead facts sufficient to meet a "heightened pleading standard." *Sinaltrainal*, 474 F. Supp. 2d at 1287. These facts must be pled by each plaintiff with respect to each element of each individual claim for each separate tort. That plaintiffs' counsel have chosen to amalgamate the separate claims of hundreds of plaintiffs into a single complaint does not relieve them of this basic pleading obligation.

Whether Chiquita's purported liability is characterized as direct or indirect, however, plaintiffs' conclusory allegations are insufficient to meet even the Rule 12(b)(6) standard. *See Jackson*, 372 F.3d at 1262-63 ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). Plaintiffs do not plead the elements of any of their claims, whether for material support (*see infra* Section A), aiding and abetting (*see infra* Section B), or conspiracy and agency (*see infra* Section C). And with respect to the derivative liability claims, plaintiffs fail even to plead the elements of a primary violation

43

of international law by the AUC (*see infra* Section D).  Instead, plaintiffs content themselves with attributing the torts at issue to the AUC, and then ascribing them to Chiquita by extension in light of Chiquita's payments.  Even if the causes of action asserted here were cognizable under the ATS, plaintiffs have still failed to state a claim with respect to any of them.

> **A.      Plaintiffs Do Not Allege What Would Necessarily be the Required Elements of a Direct Material Support Claim, If Such a Claim Existed.**

The absence of a clearly-defined international law norm prohibiting material support to terrorism hinders any assessment of whether plaintiffs have adequately alleged the specific facts necessary to establish the requisite elements of such a claim.  Nonetheless, at a minimum, a private cause of action for material support of terrorism would necessarily require:

1. That the defendant provided "material support" to a terrorist organization;

2. That the plaintiff was injured by reason of the defendant's conduct;

3. That the defendant intended to cause the plaintiff's injury or to support the wrongful purposes of the purported terrorist organization; and

4. That plaintiff's injury occurred as a result of an act of terrorism.

As delineated below, plaintiffs have failed to plead sufficient facts to establish any of these four elements.  The complaints contain no specific allegations about the particular murders alleged, or that connect Chiquita to them in any way.  Instead, they rely on a combination of conclusory allegations and the generic assertion that Chiquita made payments to the AUC.  Especially in view of the heightened pleading standard in ATS cases, these generic assertions are inadequate.

> **1.      Plaintiffs' Allegations Do Not Demonstrate "Material" Support.**

First, plaintiffs' allegations do not support the notion that the extortion payments made by Chiquita were material to the AUC.  Plaintiffs allege that Banadex supported the AUC by making "over 100 payments to the AUC totaling over $1.7 million" over a seven-year period from 1997 to 2004, or an average of less than $250,000 per year.  (NJ Compl. ¶ 33; NY Compl.

¶ 854; Fla. Compl. ¶ 75.)  The allegations in the complaints fail to account for the relative

significance of these payments to the overall resources of the AUC, an organization estimated to

have *annual* income of $286 million, 70 percent of which is derived from drug trafficking.[39]

Based on those estimates, Chiquita's extortion payments account for less than one-tenth of one

percent of the AUC's annual budget.  Nor do plaintiffs provide any additional detail to establish

that Chiquita's payments were material in any way to the particular acts of alleged wrongdoing

by the AUC.  Consequently, plaintiffs have failed to meet their pleading burden to establish that

any support allegedly provided by Chiquita was material.

> ### 2.   Plaintiffs' Conclusory Allegations Do Not Establish that Chiquita Caused the Alleged Harm.

Likewise, plaintiffs' claims fail because the complaints do not allege any facts

establishing a causal connection between Chiquita's purported financial support of the AUC and

the particular alleged murders of plaintiffs' relatives.  As with any other tort claim, where courts

have recognized a basis in international law to consider civil tort claims pursuant to the ATS,

they have recognized that causation remains an essential element of such torts.[40]  Consequently,

in order to establish the requisite element of causation, plaintiffs must allege specific facts

regarding each alleged tort to establish that Chiquita's conduct is the factual cause (*i.e.*, cause-in-

---

[39]    *See* Exhibit D (UN Report) at 285, cited in note 5 *supra*.

[40]    *See, e.g., Carmichael v. United Technologies Corp.*, 835 F.2d 109, 115 (5th Cir. 1988) (dismissing ATS claim in part because the plaintiff "simply cannot demonstrate any causal connection between [the alleged tortious] conduct and his prolonged imprisonment or torture"); *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 449 (2d Cir. 2000) (dismissing ATS claim where "[t]he causal chain between the Egyptian government's [allegedly unlawful act] and Coca-Cola's benefit is not articulated"); *Exxon*, 393 F. Supp. 2d at 27 ("[The] allegations fall short of establishing proximate cause here, because [plaintiffs] did not sufficiently allege that defendants controlled the Indonesian military's actions.").  *See also Taliferro v. Augle*, 757 F.2d 157, 161-62 (7th Cir. 1985) (noting that "federal tort statutes . . . are enacted against a background of common law tort principles governing causation and damages").

45

fact or "but-for" causation) and the legal cause (*i.e.*, proximate cause) of the injuries for which they seek damages from Chiquita.

Plaintiffs have not adequately pled that Chiquita's support *in fact* caused the alleged murders and injuries.  "The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it."  W. Page Keeton, Prosser & Keeton on the Law of Torts 266 (5th ed. 1984); *see also* Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 26 cmt. b (2007) ("[A] factual cause can also be described as ***a necessary condition*** for the outcome.").

Nowhere in the complaints do plaintiffs plead that, but for Chiquita's alleged assistance, the AUC would not have killed plaintiffs' relatives or injured plaintiffs.  To be sure, plaintiffs formulaically recite the legal conclusion that Chiquita's payments "caused" every injury alleged in the complaints.[41]  But to state a cause of action, plaintiffs must make specific allegations that are sufficient to demonstrate that Banadex's payments to the AUC were a necessary condition to bringing about the alleged injuries.  Without that, there is *no* connection whatsoever between Banadex's payments and the torts at issue.

Plaintiffs do not allege such a connection because they cannot.  As the complaints acknowledge, the AUC had numerous sources of financial support, including extensive

---

[41]     *See* NY Compl. ¶ 22 (Chiquita "proximately caused the death of the plaintiff's decedents, and/or injuries to plaintiff(s)."); *id.* at ¶ 883 (Plaintiffs' injuries "were a direct and proximate result of Chiquita's conspiring with and providing aid to" the AUC); Fla. Compl. ¶¶ 87 – 250 (boilerplate language that Chiquita "caused" the alleged murders though its support of the AUC); NJ Compl. ¶¶ 44 – 62 (same).

involvement in the illegal drug business and use of kidnapping-for-ransom schemes.[42]

Moreover, the complaints make clear that the AUC has been engaged in a widespread violent

and criminal endeavor that would have proceeded regardless of whether it received any

payments from Chiquita.  In the face of these facts acknowledged in their own pleadings,

plaintiffs offer nothing to suggest that the AUC would not have killed plaintiffs' relatives or

injured plaintiffs but for Chiquita's alleged payments.

     *A fortiori,* plaintiffs have not adequately pled that Banadex's payments to the AUC were

the *proximate* cause of any plaintiff's or decedent's injury.  Proximate cause demands "some

**direct relation** between the injury asserted and the injurious conduct alleged."  *Holmes v. Secs.*

*Investor Protection Corp.*, 503 U.S. 528, 268-69 (1992) (emphasis added) (internal citation

omitted).[43]  Hence, liability typically extends only to those actions that "were **a substantial**

**factor** in the sequence of responsible causation" which led to plaintiff's injury.  *See Weiss v. Nat.*

*Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) (assessing proximate cause in

the context of the ATA) (emphasis added); *Strauss v. Credit Lyonnais*, No. 06-0702, 2006 WL

2862704, at *17 (E.D.N.Y. Oct. 5, 2006) (same).  Indirect, remote, or insubstantial causes are not

---

[42]    *See* NY Compl. ¶ 696 (the AUC "financed itself from a variety of sources, including but not limited to the drug trade and by monetary payments from American corporations"); Fla. Compl. ¶¶ 58, 60 (paramilitaries had achieved financial independence based on participation in the drug trade); NJ Compl. ¶¶ 18-20 (same).

[43]    *See also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); W. Page Keeton, Prosser & Keeton on the Law of Torts 293-94 (5th ed. 1984) ("A distinction is made . . . between consequences which may be regarded as 'directly traceable' from the defendant's act, or as caused 'directly' by defendant's act, and those which result from intervention of other causes at a later time.").

proximate causes.  *See, e.g.*, *Holmes*, 503 U.S. at 271 (dismissing RICO claim because "the link is too remote between the stock manipulation alleged and the customers' harm . . .").[44]

As with plaintiffs' *pro forma* recitation of causation in fact, however, their conclusory allegations that they suffered injuries "as a direct and proximate result" of Chiquita's conduct (NJ Compl. ¶ 68; *see also* NY Compl. ¶¶ 22-25; Fla. Compl. ¶ 256) are not sufficient to establish the requisite direct relationship.  *See Jackson*, 372 F.3d at 1262-63.  Unable to demonstrate even but-for causation, plaintiffs certainly do not plead, as they must, specific facts demonstrating how the alleged financial support Banadex provided to the paramilitaries proximately caused or had a substantial effect on each of the murders at issue here.[45]  In the absence of any allegations tying the particular wrongful acts of the AUC to the specific payments made by Banadex, the complaints fail to state a claim.

### 3.   Plaintiffs' Allegations Do Not Establish That Chiquita Had The Requisite Intent.

Moreover, the complaints do not allege at all, let alone plead specific facts showing, that Chiquita had the requisite intent to facilitate the specific, violent acts of the AUC for which the plaintiffs seek to recover, or even that Chiquita provided the funds to the AUC with a purpose to

---

[44]   *See also* W. Page Keeton, Prosser & Keeton on the Law of Torts 264 (5th ed. 1984) ("As a practical matter, *legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability*. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.  This limitation is to some extent associated with the *nature and degree of the connection in fact* between the defendant's acts and the events of which the plaintiff complains.") (emphasis added).

[45]   The stunning reach of plaintiffs' theory of liability is highlighted by the fact that more than 60 of the alleged wrongful acts for which plaintiffs seek to hold Chiquita liable occurred in 2005 or later, despite the fact that plaintiffs allege Chiquita stopped making payments in February 2004.  Perhaps even more astonishing, more than 60 of the alleged wrongful acts of the AUC for which plaintiffs seek to hold Chiquita liable occurred between 1988 and 1996, despite the fact that the complaints allege that the AUC was not formed until April 1997.

promote the AUC's mission.  In the absence of such intent, the complaints cannot state a

violation of international law.  Plaintiffs make the conclusory allegations that Chiquita "knew or

should have known" that the funds paid to the AUC would be used to carry out unspecified

violent acts by the AUC.  This conclusory assertion of recklessness does not establish the

requisite specific intent, and in any event such conclusory pleading would not be sufficient.

> **4.    Plaintiffs' Allegations Do Not Establish That The Alleged Injuries Resulted From An Act of Terrorism.**

Finally, the complaints fail to allege specific facts indicating that each of the more than

700 murders or assaults at issue occurred during an act of terrorism.  To the extent that there is

any international claim for providing material support for terrorism, liability would, by

definition, be limited to damages that occur as a result of a terrorist act.  That would require, at a

minimum, that the act was undertaken for political or ideological purposes to intimidate a

population or to compel a government to do or to abstain from doing any act — and not, for

example, based on personal motives or as part of general criminal activity.

But the complaints do not contain any particularized facts that would permit one to

determine that the particular murders or assaults at issue had such a ***political*** purpose.  To the

contrary, the complaints indicate that the AUC is a wide-ranging criminal enterprise — one

deeply involved in illegal drug trafficking, extortion, and kidnapping-for-ransom schemes — that

may well engage in violent conduct wholly unrelated to any terroristic purpose.  Indeed, to the

extent that the Florida Complaint provides some additional information relating to certain alleged

murders, those allegations often evince personal motives inconsistent with the pursuit of political

or ideological ends that must motivate terrorism — suggesting that the murders were carried out

for purposes entirely unrelated to terrorism.[46]  In the absence of specific allegations sufficient to establish that each alleged murder or assault was an act of terrorism, the complaints fail to state a claim in violation of the law of nations.

    **B.**    **Likewise, Plaintiffs Fail to Allege Particularized Facts Sufficient to Establish That Chiquita "Aided and Abetted" the AUC in Committing the Alleged Torts.**

Plaintiffs' indirect liability claims fail for many of the same reasons.  To the extent that aiding and abetting liability is even available under the ATS, plaintiffs at a minimum must plead — with respect to each alleged murder — sufficient facts to show that Chiquita "(1) provide[d] practical assistance to the principal which has a substantial effect on the perpetration of the crime; and (2) [did] so with the purpose of facilitating the commission of that crime." *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring); *id.* at 332-33 (Korman, J., concurring, in part, and dissenting, in part) (joining Judge Katzmann's discussion of the requisite elements of an aiding and abetting claim under the ATS).[47]  The complaints, however, do not allege specific facts sufficient to show that Chiquita's payments to the paramilitaries substantially assisted the

---

[46]    *See*, *e.g.*, Fla. Compl. ¶ 165 ("Ramos, an AUC commander, told Martinez she must live with him or he would kill her."); ¶ 182 ("Diaz was killed for dating a girl who ran away from home because her mother opposed the relationship, and the mother's relatives were AUC members."); ¶ 192 (victim refused to pay extortion); ¶ 224 (victim indicated to police that person with AUC connections had mugged him); ¶ 228 (victim told wife of AUC commander about husband's mistress).

[47]    The *per curiam* Eleventh Circuit opinions discussing the possibility of indirect theories of liability in ATS litigation do not define the requisite elements to such aiding and abetting claims. *See Cabello*, 402 F.3d at 1157-59; *Aldana*, 416 F.3d at 1248.  Other federal courts that have recognized such aiding and abetting liability under the ATS, however, have employed standards similar to the one set forth by the Second Circuit. *See, e.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 668 (S.D.N.Y. 2006); *Arab Bank*, 471 F. Supp. 2d at 291-92 (aiding and abetting requires that defendant's actions have a "substantial effect" on the crime's perpetration and be carried out "intentionally and with knowledge").

particular murders alleged by plaintiffs, or that Chiquita made the payments with the purpose of facilitating those wrongful acts.

### 1.    The Allegations Do Not Establish That Chiquita Provided Substantial Assistance to the AUC in Committing Any of the Alleged Torts.

To satisfy the "substantial effect" element of an aiding and abetting claim, plaintiffs must allege facts sufficient to show that Chiquita assisted the murders allegedly committed by the AUC, and that the murders most probably would not have occurred in the same way without Chiquita's assistance.  *See Presbyterian Church*, 453 F. Supp. 2d at 667; *see also Khulumani*, 504 F.3d at 277 ("actus reus component" of aiding and abetting liability requires "'practical assistance, encouragement, or moral support which has a *substantial effect* on the perpetration of the crime'") (citation omitted) (emphasis in original).

At a minimum, demonstrating this substantial effect requires a showing of causation. *See, e.g., Aetna Cas. & Surety Co. v. Leahey Constr. Co., Inc.*, 219 F.3d 519, 537 (6th Cir. 2000) ("Establishing [substantial assistance] requires the plaintiff to show that the secondary party proximately caused the violation."); *Cromer Fin. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) ("[s]ubstantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated"; "'but-for' causation is insufficient").  Plaintiffs must therefore plead facts sufficient to show that Chiquita's purported assistance to the AUC proximately caused the murders alleged in the complaints.  As explained in Part V.A.2, however, plaintiffs have not adequately alleged causation, and their aiding and abetting claims therefore must also fail.

The gross deficiencies in plaintiffs' aiding and abetting allegations are demonstrated by comparison to other ATS cases where defendants were alleged to have aided and abetted murders committed by third parties.  In *Arab Bank*, for example, in sustaining plaintiffs' aiding

and abetting claims, the court emphasized that plaintiffs had alleged Arab Bank's services

provided particular assistance *directly related to* the particular suicide bombings at issue,

including, for instance, that the defendant administered benefits paid to the families of suicide

bombers, that the defendant assisted in the preparation of lists of beneficiaries of individual

suicide bombers, and that the defendant set up individual bank accounts in the names of those

beneficiaries.  471 F. Supp. 2d at 291-92; *see also id.* at 261-64 (summarizing the extensive

factual allegations by the plaintiffs).  Because plaintiffs had "delineate[d] a *direct correlation*

between the number of attacks, including suicide bombings, and the amount of Mujahideen

Committee and Saudi Committee funds, some of which were eventually paid to the beneficiaries

through Arab Bank," the motion to dismiss was denied.  *Id.* at 292 (emphasis added).

By contrast, where plaintiffs fail to allege specific facts establishing such a direct

correlation between defendant's conduct and the particular torts committed, courts have refused

to find aiding and abetting liability.  For instance, in *Sinaltrainal*, 474 F. Supp. 2d 1273, Judge

Martinez considered and rejected a theory of liability substantially similar to the one advanced

here.  The plaintiffs in *Sinaltrainal*, in an attempt to link the defendants to the particular torts

alleged, asserted that "[defendants] hired or conspired with paramilitaries . . . to 'rid' four

Colombian bottling plants of the . . . union," *id.* at 1274.  The plaintiff also made numerous

specific allegations regarding the defendants' purported complicity in the AUC's violent conduct

in an attempt to connect the violence to particular labor organizing activities relating to the

defendant.  *See id.* at 1278-81 (detailing specific factual allegations and specific statements tying

the particular acts of violence to particular union activities).  Nonetheless, the court dismissed the

complaint, concluding that plaintiffs failed to provide sufficiently particular facts linking the

defendants to the alleged wrongdoing to impose liability on the defendants for the acts of the

AUC: "Plaintiffs' allegations in the instant cases are too conclusory, too vague, and too attenuated to adequately plead a violation of the law of nations to support subject matter jurisdiction" under the ATS.  *Id.* at 1276.

Here, of course, there are no allegations whatsoever "delineating a direct correlation" between the murders and the Banadex payments.  Plaintiffs therefore have failed to plead the requisite substantial effect or causal link between the Banadex payments and each of the alleged injuries.

> **2.     The Allegations Do Not Show that Chiquita Had the Requisite *Mens Rea* in Connection with Any of the Alleged Torts.**

Plaintiffs likewise fail to plead facts demonstrating that Chiquita intended to facilitate the commission of the alleged murders, or even knew that Banadex's alleged assistance to the AUC would result in the murder of plaintiffs' relatives.  *See Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring) (noting that aiding and abetting claims require showing that the defendant acted "with the purpose of facilitating the commission of [the alleged] crime").[48] Such a *mens rea* requirement is a quintessential element of aiding and abetting.  *Cf.* Joshua Dressler, Understanding Criminal Law 475 (3d ed. 2001) ("Most [U.S.] courts . . . hold that a person is not an accomplice in the commission of an offense unless he 'share[s] the criminal intent of the principal; there must be a community of purpose in the unlawful undertaking.'").

---

[48]     *See also Arab Bank*, 471 F. Supp. 2d at 291 (noting that standards of aiding and abetting liability require a showing that defendant "acted intentionally and with knowledge that its conduct would . . . facilitate the underlying violations when it engaged in the acts alleged"); *Stutts v. De Dietrich Group*, No. 03-cv-4058, 2006 WL 1867060, at *2-3 (E.D.N.Y. June 30, 2006) (dismissing civil terrorism claim where plaintiffs failed to plead that defendant banks had knowledge that their financial credits would further terrorist activities committed by Saddam Hussein or that they had the requisite intent to further such terrorist activities).

The only allegations concerning Chiquita's purported culpable mental state are entirely conclusory and devoid of any actual facts.[49]  Plaintiffs do not allege a single incident or event demonstrating that any Chiquita employee knew that the alleged payments made to the AUC had been or would be used to carry out murders as a general matter, let alone facilitate any of the more than 700 specific murders alleged in these complaints.  To be sure, Chiquita knew that the AUC was a dangerous organization, but this does not establish that Chiquita provided support to the AUC with the intent of facilitating the commission of murders or had knowledge that the payments would be used for that purpose.  Plaintiffs must plead specific facts demonstrating Chiquita's requisite state of mind, and their failure to do so requires dismissal of their aiding and abetting claims.

       **C.**       **The Complaints Do Not Support Plaintiffs' Invocation of "Conspiracy" or "Agency."**

       **1.**       **Plaintiffs Fail to Allege the Basic Elements of Conspiracy.**

Plaintiffs also have failed to plead sufficient facts in support of their conspiracy theory. A claim of civil conspiracy requires a showing that: "(1) two or more persons agreed to commit a wrongful act, (2) [the defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intended to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy."  *Cabello*, 402 F.3d at 1159 (internal citation omitted).

---

[49]    *See, e.g.*, NJ Compl. ¶ 2 ("The deaths of plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious actions."); NY Compl. ¶ 22 ("The defendants . . . tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly, and negligently murdered and/or otherwise proximately caused the death of the plaintiff's decedents. . . ."); Fla. Compl. ¶ 1 ("The harm to Plaintiffs and the deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious actions.").

Plaintiffs' complaints fall far short of establishing these required elements with specific factual allegations:

- Plaintiffs fail to allege the identities of the purported conspirators, the dates or location of the formation of the conspiracy, or its terms. *See Sinaltrainal*, 474 F. Supp. 2d at 1293-94, 1298 (finding allegations of conspiracy to be insufficient where plaintiffs failed to identify paramilitaries by name or by affiliation and failed to plead dates or locations regarding the formation of the conspiracy).[50]

- The complaints fail to provide the terms of the alleged agreement between Chiquita and the AUC, to identify who at Chiquita reached such an agreement, or to indicate the specific goals of objectives of the purported conspiracy.[51]

- The complaints fail to allege any specific facts connecting the alleged tortious acts for which plaintiffs seek to hold Chiquita liable to the conspiracy or its purported goals. *See id.* at 1295-96.[52]

Rather than provide any specific details about the conspiracy, the complaints simply assert that "Chiquita" conspired with the "AUC."  Such conclusory allegations are so generic that they would fail pleading requirements applicable outside of the ATS context.  *See Cavitat*

---

[50]     *Cf. Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 165 (5th Cir. 1999) (dismissing plaintiff's ATS claim where complaint was "devoid of names, dates, locations, times or any facts that would put [defendant] on notice as to what conduct supports the nature of [the] claims").

[51]     The New York plaintiffs generic and unfounded information-and-belief allegation that the Banadex general manager "met with leaders of the AUC . . . *to devise a plan for the financing and coordinating paramilitary operations in the Zona Bananera*" (*See* NY Compl. ¶ 847) is not sufficiently particular to meet *Sinaltrainal*'s standard, nor does it provide a basis to conclude that there was such a conspiracy that is "plausible on its face," *cf. Twombly*, 127 S. Ct. at 1974, particularly given that the allegations are presumably based solely on paragraph 775 of their complaint, which is taken from the Factual Proffer, and indicates that Carlos Castaño "instructed [Banadex's] General Manager that [Banadex] *had to* make payments."  (NY Compl. ¶ 775 (emphasis added).

[52]     Plaintiffs' generic assertions that Chiquita sought to eliminate labor opposition and social activists and otherwise "benefited" in some unspecified fashion from the various deaths alleged in the complaints does not suffice.  (*See* NJ Compl. ¶¶ 2, 31, 32, 66; NY Compl. ¶ 848; Fla. Compl. ¶¶ 1, 73-74, 254.)  As the *Sinaltrainal* court noted, in alleging murders occurring in a country beset by violence, such attenuated, generic assertions are simply not enough: "[I]n the context of what the Plaintiffs themselves describe as a country torn by a long-standing civil war, *where the murder of trade unionists and civilians at large is common*, some level of specificity is required to link the explicit agreement between [defendant] and the [AUC] to the horrible acts that occurred."  474 F. Supp. 2d at 1295-96 (quotations omitted) (emphasis added).

*Med. Tech., Inc. v. Aetna, Inc.*, No. 04-CV-01849-MSK-OES, 2006 WL 218018, at *5-6 (D. Colo. Jan. 27, 2006) (dismissing civil conspiracy claim where plaintiff failed to "identify the speakers, the statements made, when the statements were made, or to whom they were made"). They are certainly insufficient to meet the heightened pleading standards applicable in ATS litigation. *Sinaltrainal*, 474 F. Supp. 2d at 1295-96 ("[M]urky allegations of a vague conspiracy between Mosquera [defendant's plant manager] and unspecified paramilitaries *to use threats and violence to 'drive away' union leaders and 'destroy the union'* are not sufficient. . . . While the Complaint details a number of horrific acts, it is scant on the details about the formation and orchestration of the conspiracy which links these acts together.") (emphasis added).[53]  Indeed, plaintiffs' conspiracy allegations here are far less specific and detailed than those rejected by the court in *Sinaltrainal*, which also alleged a conspiracy between a U.S. corporation and the AUC. *See* 474 F. Supp. 2d at 1278, 1293-94 (alleging particular details regarding purported meetings between employees of the defendant and the AUC as well as the nature of the purported agreement reached between the defendant and the AUC).

## 2. Plaintiffs' Agency Theory Is Likewise Insufficiently Pled.

Even assuming that the law of nations provided that Chiquita could be vicariously liable for the conduct of paramilitaries acting as "employees" or "agents" of Chiquita, this allegation is frivolous.  To establish an agency relationship, plaintiffs must plead at a minimum facts demonstrating that the paramilitaries acted on Chiquita's behalf and under Chiquita's control in

---

[53]    The New York plaintiffs' outlandish allegations — for which they allege no specific factual support whatsoever — that Chiquita formed a conspiracy with the AUC for various purposes including obtaining "political, military, and economic control of the Republic of Colombia"; to "seiz[e] . . . banana growing land from the peasants"; and to acquire "monopolistic control over commerce in bananas" are similarly conclusory, unspecific, unsupported, and inadequate as a matter of law.  (NY Compl. ¶ 848.)

carrying out the murders at issue here, and that those acts were within the scope of the alleged agency relationship.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (noting that adequate pleading of an agency relationship requires showing of three elements: (1) "the manifestation by the principal that the agent shall act for him"; (2) "the agent's acceptance of the undertaking"; and (3) "the understanding of the parties that the principal is to be in control of the undertaking").  Not surprisingly, plaintiffs make no attempt to plead facts establishing that Chiquita controlled the AUC, let alone that the AUC was acting under Chiquita's control or on its behalf with respect to any of the more than 700 murders alleged here.  Plaintiffs cannot survive a motion to dismiss based on conclusory legal assertions that the AUC acted as Chiquita's "agent."  *See Jackson*, 372 F.3d at 1262-63 ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.").

> ### D.   Plaintiffs' Indirect Theories of Liability Also Fail Because Plaintiffs Do Not Plead A Primary Violation of the Law of Nations by the AUC.

Assuming that they are cognizable at all, plaintiffs' derivative theories of liability also require plaintiffs to establish an underlying violation of the law of nations by the primary actor, the AUC.  Virtually all norms of international law apply only to state actors — not private citizens — and plaintiffs have not adequately pled any state action here.  The few international law violations asserted by plaintiffs that do not require state action — *i.e.*, war crimes, genocide, and crimes against humanity[54] — are patently inapplicable to the facts alleged here.  Plaintiffs' failure to state a primary violation of the law of nations by the AUC, particularly one that meets *Sosa*'s stringent standards, provides an additional basis to reject plaintiffs' indirect claims.

---

[54]    *See* NJ Compl. ¶¶ 98-102 ("war crimes"); NY Compl. ¶¶ 892-899 (same); Fla. Compl. ¶¶ 274-278 (same); NJ Compl. ¶¶ 89-93 ("crimes against humanity"); NY Compl. ¶¶ 900-906 (same); Fla. Compl. ¶¶ 265-269 (same); NY Compl. ¶¶ 907-911 ("genocide").

1.     **Plaintiffs Do Not Plead the Requisite State Action With Respect to Any of the Alleged Murders.**

The complaints include claims for "extrajudicial killing"; "torture"; "cruel, inhuman or degrading treatment"; "violation of the rights to life, liberty, and security of person and peaceful assembly and association"; and "consistent pattern of gross violations of internationally recognized human rights." [55]  Even assuming these causes of action met *Sosa*'s stringent standards, which they do not,[56] pleading them requires plaintiffs to allege facts establishing that the alleged killings constituted state action, and not merely conduct carried out solely by a

---

[55]     *See* NJ Compl. ¶¶ 85-88; NY Compl. ¶¶ 912-921; Fla. Compl. ¶¶ 261-264 ("extrajudicial killings"); NJ Compl. ¶¶ 94-97; Fla. Compl. ¶¶ 270-273 ("torture"); NJ Compl. ¶¶ 113-117; Fla. Compl. ¶¶ 289-293 ("cruel, inhuman, or degrading treatment"); NJ Compl. ¶¶ 118-121; Fla. Compl. ¶¶ 294-297 ("violation of the rights to life, liberty, and security of person and peaceful assembly and association"); NJ Compl. ¶¶122-125; Fla. Compl. ¶¶ 298-301 ("consistent pattern of gross violations of internationally recognized human rights").

[56]     Aside from extrajudicial killing and torture, these causes of action are insufficiently definite under international law to meet *Sosa*'s requirements for recognition under the ATS. Courts, including the Eleventh Circuit, have recognized that "cruel, inhuman, or degrading treatment" does not meet this standard.  *See Aldana*, 416 F.3d at 1247 (affirming dismissal of ATS claim of cruel, inhuman, and degrading treatment or punishment in accordance with *Sosa*); *Tel-Oren*, 726 F.2d 774 (dismissing ATS claims premised on, among other things, cruel, inhuman, and degrading treatment); *In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273 (same); *Mujica*, 381 F. Supp. 2d at 1183 (concluding that, even though there is a customary international law norm prohibiting "cruel, inhuman, and degrading treatment or punishment," it would be impractical to recognize such claims as actionable under the ATS).

Plaintiffs' claim for "violation of the rights to life, liberty, and security of person and peaceful assembly and association" also fails to meet *Sosa*'s standard.  *See Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 467 (S.D.N.Y. 2006) (dismissing claims premised on the international right to life, liberty, security, and association because there is no particular or universal understanding of the civil and political rights covered by such claims).

The same is true of plaintiffs' claim for "consistent pattern of gross violations of human rights."  *See Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1163 (C.D. Cal. 2002), *rev'd in part on other grounds*, *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193 (9th Cir. 2007) (concluding that "plaintiffs have not demonstrated that prohibitions against . . . gross violations of human rights constitute established norms of customary international law").

private party.[57]  *See Exxon*, 393 F. Supp. at 25-26 ("Traditionally only states (and not persons)

could be liable under the Alien Tort Statute for . . . extrajudicial killing.") (citing *Sanchez-*

*Espinoza v. Reagan*, 770 F.2d 202, 206-07 (D.C. Cir. 1985)); *Kadic*, 70 F.3d at 343 (holding that

torture claims require showing of state action); *Bowoto v. Chevron Texaco Corp.*, No. C 99-

02506, 2006 WL 2455752, at *5 (N.D. Cal. Aug. 22, 2006) (holding that state action is a

requirement of claims for "cruel, inhuman, or degrading treatment"; "violation of the rights to

life, liberty, and security of person and peaceful assembly and association"; and "consistent

pattern of gross violations of human rights").

There is no such allegation here, however.  Plaintiffs do not contend that the armed

groups purportedly responsible for their relatives' deaths are Colombian government officials or

entities.  Instead, they specifically contend that the torts at issue were committed by what they

concede are private groups.  In an apparent attempt to imbue the conduct of private paramilitaries

with state action, plaintiffs vaguely allege various connections between officials of the

Colombian government and military and the AUC that are entirely unrelated to the specific

tortious acts alleged.  (*See* NJ Compl. ¶¶ 25-27; NY Compl. ¶¶ 718-731, 743-753; Fla. Compl.

¶¶ 65-67, 69.)  But this effort to shoehorn private conduct into principles applicable only to state

actors fails for three reasons.

First, there is no well-established, clearly-defined, and widely-accepted standard under

the law of nations for extending liability normally limited to state actors to those merely acting

under color of law.  Thus, while some courts relied on domestic "color of law" precedent in ATS

cases before *Sosa* was decided, this extension of liability cannot be supported after *Sosa*.

---

[57]     Extrajudicial killing is, by its very definition, a summary execution perpetrated by a ***state***,
not a private party.

Second, Plaintiffs make no allegations that Chiquita had such a relationship with the Colombian government or its officials that Chiquita's actions could be considered state action, as they must to hold it liable for these violations. Moreover, even assuming *arguendo* the AUC was equivalent to an arm of the Colombian government, Plaintiffs still would need to plead facts specific facts sufficient to establish that Chiquita controlled or had such involvement in the AUC's conduct to render Chiquita's involvement equivalent to state action, which they have not.

Third, plaintiffs' allegations are not even sufficient to establish that the AUC was acting under color of law even if such a claim were cognizable. As a threshold matter, plaintiffs acknowledge that Colombian law prohibits providing assistance to paramilitaries, and that the Colombian government is actively *investigating* and *prosecuting* government officials for ties to the AUC — a strong indication that paramilitary groups are not officially condoned or sanctioned by the Colombian government. (NJ Compl. ¶ 25; NY Compl. ¶¶ 719-722, ¶ 747; Fla. Compl. ¶ 65.) These admitted facts are inconsistent with the notion that the AUC (or Chiquita) was acting at the behest of the Colombian government in connection with the specific alleged torts.

Moreover, even if it were appropriate to rely on U.S. domestic "color of law" precedent in the absence of clearly defined international standards, generalized allegations of a general relationship or links between the AUC and certain members of the Colombian government or military would not suffice. Rather, the Eleventh Circuit holds that a private actor can be deemed to act under color of law only when the state plays some role in the particular conduct at issue:

> If a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that attribution is not fair when bottomed solely on a ***generalized relation with the state***. Rather, private conduct is fairly attributable only when the state has had some affirmative

> role . . . in the ***particular conduct*** underlying a claimant's civil
> rights grievance.

*Rayburn ex. rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (citing *Am. Mfrs. Mut.*

*Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)) (emphases added).  *See also Village of Bensenville*

*v. Fed. Aviation Admin.*, 457 F.3d 52, 62 (D.C. Cir. 2006) (there must be a "close nexus"

between the state actor and the private entity such that the state could be held "***responsible*** for

the ***specific conduct*** of which the plaintiff complains.") (emphases added).

      Thus, to plead action under the color of law, plaintiffs must allege that Colombian

officials had active involvement or played an affirmative role in the particular misconduct.  In

*Aldana*, for example, the Eleventh Circuit rejected the notion that an allegation that government

officials knew of and deliberately ignored the tortious acts of private militias is sufficient to

establish state action.  416 F.3d 1242.  As the *Aldana* court held, the state's "registration and

toleration of private security forces does not transform those forces' acts into state acts."  *Id.* at

1248.  The court in *Aldana* premised its finding of state action on specific allegations that a

specific public official (the Mayor) was himself an active participant — an "armed aggressor, not

a mere observer" — in the violent conduct.  *Id.* at 1249 (quotations omitted).[58]  There is no such

allegation concerning any of the torts alleged here.  As a result, plaintiffs' attempt to transform

the conduct of private paramilitaries into actions of the Colombian government fails.

---

[58]    Plaintiffs attempt to demonstrate state action by alleging that the payments to the AUC were collected through private *convivir* organizations, which were created to assist local police and the military in providing security, fails for the same reason.  (*See* NJ Compl. ¶¶ 64; NY Compl. ¶¶ 732-739, 775; Fla. Compl. ¶¶ 68.)  The pertinent actor for purposes of a "color of law" analysis is the defendant, Chiquita, or, at a minimum, the party that allegedly committed the murder — *i.e.*, the AUC, not the *convivir*.  There are no allegations that the *convivirs* carried out the murders and assaults alleged here.  Nor would licensing alone be sufficient to convert the acts of the *convivirs* into state action.

Finally, even if plaintiffs could satisfy the state action requirement for these claims by pleading facts showing the complicity of the Colombian government in each of these alleged murders, a factual inquiry to test such allegations would necessarily intrude on the foreign affairs function of the political branches, and is therefore nonjusticiable, as discussed in Part III above.

> ### 2.   Plaintiffs' Allegations Do Not Establish That Any of the Alleged Murders Constituted "War Crimes."

Through their claim of war crimes, plaintiffs invite the Court to find that, because they have alleged that there was an armed conflict in Colombia (*see* NY Compl. ¶¶ 687, 707-715; NJ Compl. ¶ 65; Fla. Compl. ¶ 253), they have effectively pled a claim against Chiquita on behalf of Colombians who have been injured by one of the purported parties to the conflict.  This sweeping proposition is untenable, is at odds with *Sosa*'s restrained interpretation of the ATS, *see Sinaltrainal*, 474 F. Supp. 2d at 1289, and is wholly inconsistent with plaintiffs' claims regarding the purported business motive underlying Chiquita's "support" of the AUC.

To establish a cognizable war-crimes claim under the ATS, plaintiffs must do more than allege "the murder of an innocent civilian during an armed conflict."  *Saperstein*, 2006 WL 3804718, at *8.  Rather, plaintiffs seeking to avoid a state action requirement by alleging war crimes must plead facts sufficient to establish (i) that their alleged injury was caused by a party to an armed conflict; (ii) that the victim was taking no active part in hostilities (*i.e.*, was a noncombatant); (iii) that the injury was caused in the course of hostilities (not due to some reason unrelated to the war (*e.g.*, a personal vendetta)); and (iv) that the perpetrator had the requisite *mens rea* (*i.e.*, carried out the act *intentionally* and *knowing* that the victim took no

active part in hostilities).  *See, e.g.*, *Kadic*, 70 F.3d at 243 n.7; *see also* Rome Statute arts. 8(2)(c), 8(2)(e), 30(1).[59]

Accordingly, courts have required plaintiffs advancing war crimes claims under the ATS to allege atrocities directly tied to, and committed in furtherance of, an armed conflict.  In *Kadic*, for example, the Second Circuit found that ATS jurisdiction existed over plaintiffs' war crimes claims where plaintiffs alleged that the defendant, a Bosnian-Serb general, "possess[ed] ultimate command authority over the Bosnian-Serb military forces, and the injuries perpetrated upon plaintiffs were committed as part of a pattern of systematic human rights violations that was directed by [defendant] and carried out by the military forces under his command."  70 F.3d at 237.  By contrast, in *Saperstein*, the court rejected plaintiffs' bare assertion that defendants' alleged "'murder of [a] civilian[ ] in the course of an armed conflict'" was actionable as a war crime under the ATS.  2006 WL 3804718, at *8; *see also id.* ("Essentially, Plaintiffs are saying that if they allege a murder of an innocent person during an armed conflict, then they have alleged a per se violation of the law of nations and federal courts have subject matter jurisdiction over the dispute under the ATS.  No court has so held.").

As in *Saperstein*, plaintiffs' artful "war crimes" allegations fail to demonstrate any connection between armed conflict, on the one hand, and any of the more than 700 murders and injuries alleged here, on the other.  As the court in *Saperstein* explained, it is not enough for plaintiffs to allege merely that their relatives were innocent civilians killed in the course of an armed conflict:

---

[59]    Chiquita clearly has not been alleged to have such an intent, and even assuming it could be imputed to Chiquita, the feasibility of assessing the intent of unnamed and unknown perpetrators who are not subject to the Court's jurisdiction raises additional questions about this claim's justiciability.

> [I]f Plaintiffs' specific allegation, i.e., the murder of an innocent
> civilian during an armed conflict, was sufficient for purposes of the
> ATS, then whenever an innocent person was murdered during an
> 'armed conflict' anywhere in the world, whether it be Bosnia, the
> Middle East or Darfur, Sudan, the federal courts would have
> jurisdiction over the dispute.  Clearly, such an interpretation would
> not only make district courts international courts of civil justice, it
> would be in direct contravention of the Supreme Court's specific
> prudential guidance admonishing lower courts to be cautious in
> creating new offenses under the law of nations.

2006 WL 3804718, at *8.  Plaintiffs' war crimes allegation is all the more futile when the

indirect nature of plaintiffs' claims is taken into account.  Plaintiffs have not sued the AUC or it

members or commanders; rather, plaintiffs seek to hold Chiquita derivatively responsible for the

alleged torts committed by those groups.  But there are simply no facts asserted (and none exist)

that establish that Chiquita engaged in actions — or acted jointly with the AUC to engage in

actions — in furtherance of war hostilities.  *See Sinaltrainal*, 474 F. Supp. 2d at 1289 (rejecting

war crimes claim under ATS based on corporate defendant's alleged secondary responsibility for

the AUC's tortious conduct; "[S]ome modicum of specificity regarding the details of *affirmative*

action, whether it be in the form of a conspiracy or joint action to orchestrate hostilities, is

required to adequately plead a violation of the law of nations on the basis of war crimes.").

At bottom, the gravamen of plaintiffs' allegations is that Chiquita made payments to the

AUC to further its own Colombian business interests, and thus should be liable for all crimes

allegedly perpetrated by the AUC.  (*See* NJ Compl. ¶ 2; NY Compl. ¶ 848; Fla. Compl. ¶ 1.)  But

this purported "business motive" is *inconsistent* with any alleged war crimes violation.  As the

court in *Sinaltrainal* observed in rejecting a similar (though more specifically pled) theory of war

crimes liability:  "Alleging that the Defendants 'affirmatively acted to benefit from the civil war

by making arrangements to have the paramilitaries target their union leaders' is a far cry from

alleging that Defendants actually conspired with the paramilitaries to orchestrate hostilities."

64

474 F. Supp. 2d at 1289 (citation omitted).  "[I]ndirect economic benefit from unlawful state action is not sufficient to support jurisdiction over a private party under the [ATS]."  *Id.* (citing *Bigio*, 239 F.3d at 449).  For these reasons, plaintiffs' war crimes claim must be dismissed.

> **3.**     **Plaintiffs' Allegations Do Not Establish That Any of the Alleged Murders Constituted "Crimes Against Humanity" or "Genocide."**

Plaintiffs' claims of crimes against humanity are even more deficient.  Tracking the legal definition of this ambiguous term in conclusory fashion, plaintiffs assert that the AUC, with Chiquita's financial support, "engaged in a widespread and systematic attack on and persecution of large segments of the civilian populations of the banana growing regions of Colombia, including but not limited to the areas where plaintiffs resided, and including plaintiffs' decedents."  (NY Compl. ¶ 901; *see also* NJ Compl. ¶ 90; Fla. Compl. ¶ 267.)  Yet, none of the specific examples of widespread AUC violence that are alleged appear to bear any relation to the specific murders and injuries suffered by plaintiffs or their decedents.  As the Eleventh Circuit has held, mere allegations of "systematic and widespread efforts" against a class of persons (in that case, "organized labor in Guatemala") are "too tenuous to establish a prima facie case" for crimes against humanity.  *See Aldana*, 416 F.3d at 1247.  For the same reason, plaintiffs' conclusory and tenuous claim of crimes against humanity in this case should be dismissed.[60]

---

[60]     Plaintiffs' claim for "crimes against humanity" is also insufficiently definite to be recognized as a violation of the law of nations.  There is no international consensus on a specific definition of the term.  As one prominent human rights scholar put it, "the law of crimes against humanity is difficult to apply, in part because the meaning of the term is shrouded in ambiguity."  Diane F. Orentlicher, *Settling Accounts: The Duty to Prosecute Human Rights Violations of a Prior Regime*, 100 Yale L.J. 2537, 2585 (1991) (emphasis added); *see also* John F. Murphy, *Quivering Gulliver: U.S. Views on a Permanent International Criminal Court*, 34 Int'l L. 45, 54 (2000) ("[T]here is no generally accepted definition of crimes against humanity, either as a matter of treaty or customary international law.  On the contrary, of the several versions that had been promulgated, no two were alike.").  Although it is sometimes recognized under customary international law, crimes against humanity is thus the type of ambiguous norm that does not provide a basis for ATS jurisdiction under *Sosa*'s cautious approach.

The New York Plaintiffs even go so far as to allege that Chiquita assisted the AUC in committing genocide.  Dismissal is similarly warranted for this frivolous claim.  Again, tracking the legal definition of genocide in conclusory fashion,[61] the New York Plaintiffs assert that "defendants, their agents servants [sic] and employees committed [a list of atrocities] with the intent to destroy, in whole or in part, the national, ethnical, political or cultural group of which the plaintiff's decedents were a part . . . ."  (NY Compl. ¶ 908.)  But the complaint is devoid of facts about the decedents' "ethnical, political or cultural" affiliation.  It contains information only about their nationality, alleging that all of them were Colombian (NY Compl. ¶¶ 2-3), and it contains nothing to support the sweeping and absurd proposition that the Colombians who made up the ranks of the AUC intended to destroy Colombians as a national group.  "[T]his Court need not accept [p]laintiffs' legal conclusions as well-pleaded."  *Sinaltrainal*, 474 F. Supp. 2d at 1289; *accord Beanal v. Freeport-McMoran, Inc.*, 969 F. Supp. 362, 373 (E.D. La. 1997) ("The court is unwilling to make leaps of logic necessary to support a claim for genocide based on unplead facts.").  It should therefore dismiss the New York plaintiffs' genocide claim.

## VI.    Plaintiffs Do Not State a Claim under the Torture Victim Protection Act.

Plaintiffs also seek to hold Chiquita liable for extrajudicial killing and torture under the TVPA, 28 U.S.C. § 1350 note.  (*See* NJ Compl. ¶¶ 85-88, 94-97; NY Compl. ¶¶ 912-921; Fla. Compl. ¶¶ 261-264, 270-273.)  The TVPA provides a civil cause of action against (1) "[a]n individual who" (2) acting "under actual or apparent authority, or color of law, of any foreign nation" (3) "subjects an individual to" torture or extrajudicial killing.  Plaintiffs' TVPA claims fail for several reasons.

---

[61]    *See* Convention on the Prevention and Punishment of the Crime of Genocide art. 2, Dec. 9, 1948, 78 U.N.T.S. 277.

First, "[b]y the clear language of the [TVPA], a party must act 'under actual or apparent authority, or color of law[, of [a] foreign nation]' to be liable under the statute." *Exxon*, 393 F. Supp. 2d at 28; *see also* 28 U.S.C. § 1350 note § 2(a)(1)-(2); *see also Kadic*, 70 F.3d at 245 (TVPA "does not attempt to deal with torture or killing by purely private groups"). For the reasons set forth above in Part V.D.1, plaintiffs do not adequately allege state action and hence these claims should be dismissed.[62] *See Khulumani*, 504 F.2d at 260 (per curiam) (affirming dismissal of TVPA claims because plaintiffs "failed to link any defendants to state aid or the conduct of state officials"). The absence of state action (or any other defect with plaintiffs' ATS claims for torture and extrajudicial killing) would also leave this Court without subject matter jurisdiction over plaintiffs' TVPA claims. *See Sinaltrainal*, 474 F. Supp. 2d at 1301 (stating that "[a]lthough the TVPA creates a private cause of action . . . , it does not confer jurisdiction standing alone," and that TVPA claims "may be entertained only if they fall within the jurisdiction conferred by the [ATS]") (citing *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996)).

Second, although the Eleventh Circuit has recognized aiding and abetting liability under the TVPA, *see Cabello*, 402 F.3d at 1157-58; *Aldana*, 416 F.3d at 1248, it has done so only where defendants were alleged to have provided particular assistance to a particular tort, not on the "generic support" theory advanced here. *See supra* Part IV.A. Moreover, even if there were authority to support plaintiffs' expansive theory of aiding and abetting under the TVPA, plaintiffs have failed to allege the basic elements of aiding and abetting liability — substantial assistance and *mens rea. See supra* Part V.B.

---

[62]    As explained in above Part III, the need to find state action would also "impermissibly require[ ] adjudication of another country's actions." *Exxon*, 393 F. Supp. 2d at 28.

Third, "[t]he plain reading of the [TVPA] strongly suggests that it only covers human beings, and not corporations." *Exxon*, 393 F. Supp. 2d at 28 (citing *Clinton v. New York*, 524 U.S. 417, 428-29 nn.13-14 (1998)); *see also Mujica*, 381 F. Supp. 2d at 1176 ("The Court holds that corporations are not 'individuals' under the TVPA based on its reading of the plain language of the statute."); *Corrie*, 403 F. Supp. 2d at 1026 (holding that the TVPA does not apply to corporations because "the statute speaks in terms of individuals").  The limitation of the TVPA to claims against "individuals" bars plaintiffs' TVPA claim against Chiquita.

**VII.    Plaintiffs' State Law Claims Should Be Dismissed For Failure To State A Claim.**

Plaintiffs assert various state common law and statutory claims based on tortious conduct by unspecified people allegedly working for Chiquita or the AUC.  These state law claims should be dismissed because (1) plaintiffs have not adequately alleged the claims under any applicable law, and (2) most of these claims are time-barred under applicable statutes of limitations.

**A.    Plaintiffs Have Not Adequately Alleged Any Common Law Tort.**

**1.    Plaintiffs Fail To State the Requisite Elements of Derivative Liability.**

To the extent plaintiffs allege state law torts based on the conduct of the AUC,[63] plaintiffs' allegations are inadequate to hold Chiquita derivatively liable for those torts.  Any reliance on state law concepts of aiding and abetting or conspiracy fail for the same reasons addressed above.[64]  Nor are plaintiffs' allegations sufficient to support any other common law

---

[63]    *See* NY Compl. ¶¶ 926-929 (battery (Count 7)); NJ Compl. ¶¶ 130-148 (assault and battery (Count 11), intentional infliction of emotional distress ("IIED") (Count 12), negligent infliction of emotional distress ("NIED") (Count 13); Fla. Compl. ¶¶ 306-324 (assault and battery (Count 11), IIED (Count 12), NIED (Count 13).

[64]    *See N.J. Dep't of Treasury v. Qwest Communications Int'l, Inc.*, 904 A.2d 775 (N.J. Super. Ct. 2006) (discussing elements of civil aiding and abetting liability); *O'Brien v. Olmstead Falls*, No. 89966, 90336, 2008 WL 2252527, at *6 (Ohio Ct. App. June 2, 2008) (same); *Morgan v. Union County Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. 1993) (continued…)

theories of derivative liability.  For instance, plaintiffs do not and cannot allege any facts

demonstrating the required elements of respondeat superior liability:  (1) a master-servant

relationship and (2) tortious conduct occurring within the scope of employment.  *Carter v.

Reynolds*, 815 A.2d 460, 463 (N.J. 2003); *Groob v. KeyBank*, 843 N.E.2d 1170, 1177 (Ohio

2006); *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356-57 (Fla. Dist. Ct.

App. 2001); attached Declaration of Eduardo A. Wiesner ¶¶ 2, 4 (describing elements of extra-

contractual (*i.e.*, tort) liability under Colombian law).  Plaintiffs' conclusory references to the

paramilitaries as Chiquita's "employees" or "agents"[65] do not suffice, as they have not pled a

single fact demonstrating that Chiquita controlled their activities or the manner in which they

employee completed their tasks.  *Wright v. State*, 778 A.2d 443, 452 (N.J. 2001); *Groob*, 843

N.E.2d at 1177; *4139 Mgmt., Inc. v. Dep't of Labor & Employment*, 763 So.2d 514, 517 (Fla.

Dist. Ct. App. 2000); Wiesner Decl. ¶ 4.  If anything, the facts contained in the criminal

Information incorporated in the complaints show exactly the opposite.  Likewise, plaintiffs have

completely failed to allege specific facts sufficient to show that "the particular tortious conduct

took place within the scope of [the] employment relationship."  *Carter*, 815 A.2d at 464-65;

*Groob*, 843 N.E.2d at 1177; *Iglesia Cristiana*, 783 So. 2d at 357; Wiesner Decl. ¶ 4.[66]

---

(discussing elements of civil conspiracy); *O'Brien*, 2008 WL 2252527, at *6 (same); *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla. Dist. Ct. App. 1997) (same).  There is no case law in Florida establishing general civil liability for aiding and abetting.  *See ZP No. 54 Ltd. Partnership v. Fidelity and Deposit Co. of Maryland*, 917 So.2d 368, 371 (Fla. Dist. Ct. App. 2005) (noting a "dearth of authority" supporting litigant's claim that aiding and abetting constitutes a cause of action).

[65]       *See* NJ Compl. ¶¶ 16, 128, 134, 140, 147; NY Compl. p.1 & ¶¶ 923, 931; Fla. Compl. ¶¶ 56, 304, 310, 316, 323.

[66]       Plaintiffs' allegations are also missing an essential element of a NIED claim — that they witnessed the alleged injuries to their family members.  *See Portee v. Jaffee*, 417 A.2d 521, 528 (N.J. 1980) (NIED or "bystander claim" requires observation of death or injury by plaintiff); *Tschantz v. Ferguson*, 647 N.E.2d 507, 521 (Ohio Ct. App. 1994); *Willis v. Gami Golden* (continued…)

2.     **Plaintiffs Fail to State Elements Sufficient to Hold Chiquita Directly Liable for a Common Law Tort.**

Plaintiffs also allege that Chiquita directly engaged in tortious conduct by negligently "hiring" and "supervising" the paramilitaries, and by negligently paying money to the AUC.[67] Like plaintiffs' derivative liability claims, these direct liability claims presume that Chiquita "employed" members of the paramilitaries, an utterly absurd notion that plaintiffs do not and could not support with specific factual allegations.

Additionally, to establish liability for these negligence-based torts, plaintiffs must allege that Chiquita: (1) had a duty to plaintiffs; (2) breached that duty; and (3) proximately caused the alleged injuries.  *Williams v. Davis*, No. SC05-1817, -- So.2d --, 2007 WL 4124479, at *2 (Fla. Nov. 21, 2007); *Johnson v. Usdin Louis Co.*, 591 A.2d 959, 961 (N.J. Super. Ct. A.D. 1991); *Uddin v. Embassy Suites Hotel*, 848 N.E.2d 519, 522 (Ohio Ct. App. 2005); Wiesner Decl. ¶¶ 5-6.  To establish duty, plaintiffs must allege that Chiquita "has somehow been responsible for bringing a third person into contact with an employee."  *Garcia v. Duffy*, 492 So. 2d 435, 439 (Fla. Dist. Ct. App. 1986); *Marcinkiewicz v. Marrero*, 870 A.2d 753, 757 (N.J. Super. 2005); *Skubovious v. Clough*, 670 N.E.2d 578, 581 (Ohio Ct. App. 1966).  To make these showings, plaintiffs cannot simply assert legal conclusions; they must "plead[] sufficient facts to establish that the employer owes a duty to the injured person."  *Bennett v. Godfather's Pizza, Inc.*, 570 So.

---

*Glades, LLC*, 967 So.2d 846, 850 (Fla. 2007).  The New Jersey plaintiffs allege (or intimate) that Jane Doe 2, John Doe 4, and Jane Doe 4 were injured in the presence of family members, but the associated plaintiffs (Jane Doe 1, John Doe 3, and Minor Does 1-4) do not allege that they personally observed the alleged injuries.  (*See* NJ Compl. ¶¶ 48, 51, 57.)  The Florida Complaint alleges that seven of the victims were injured in the presence of family members, (*see* Fla. Compl. ¶¶ 100, 115, 135, 152, 179, 218, 234), but those family members are not plaintiffs in this case (*see id.* ¶¶ 9, 13, 19, 25, 32, 43, 48 (claims brought by Rev. H. Francis O'Loughlin)).

[67]     *See* NY Compl. ¶¶ 930-934 (negligence (Count 8)); NJ Compl. ¶¶ 149-152 (negligence/negligent hiring/negligence per se (Count 14)); Fla. Compl. ¶¶ 325-328 (same).

2d 1351, 1353 (Fla. Dist. Ct. App. 1990); *Garcia*, 492 So. 2d at 440.  Plaintiffs offer no such

allegations; evidently, they contend that Chiquita owed a legal duty to the entire population of

Colombia.  Their allegations fail to state a claim, and their common law tort claims must be

dismissed.

### 3. Plaintiffs Do Not State a Claim for Wrongful Death or Loss of Consortium.

Finally, plaintiffs allege causes of action for wrongful death and loss of consortium.[68]

Under New Jersey, Florida, and Colombian law,[69] plaintiffs' wrongful death claims assume that

Chiquita is responsible for some underlying tortious conduct.[70]  Plaintiffs' failure to allege any

underlying tortious conduct by Chiquita adequately, as discussed above, therefore precludes

plaintiffs' wrongful death and loss of consortium claims.

### B. Plaintiffs' State Law Claims Are Largely Time-Barred.

In addition to plaintiffs' failure to plead adequately their state law claims on the merits,

most of plaintiffs' claims are also time-barred under the applicable statute of limitations.

---

[68]     *See* NY Compl. ¶¶ 922-925, 935-936 (wrongful death (Count 6), loss of consortium (Count 9); NJ Compl. ¶¶ 126-129, 153-157 (wrongful death (Count 10), loss of consortium (Count 15); Fla. Compl. ¶¶ 302-305, 329-333 (wrongful death (Count 10), loss of consortium (Count 15).

[69]     The New York Plaintiffs plead their wrongful death claim under Ohio law.  Under Ohio law, if an injury occurs outside of Ohio, the wrongful death statute requires that a cause of action lie in the state where the injury occurred.  Ohio Rev. Code § 2125.01; *Mayor v. Ford Motor Co.*, No. 83297, 2004 WL 1402692, at *3 (Ohio Ct. App. Jun. 24, 2004).  Because plaintiffs allege that their family members were injured in Colombia, Ohio law would incorporate Colombian wrongful death law.

[70]     *See* N.J. Stat. Ann. § 2A:31-1 (providing wrongful death cause of action against "the person who would have been liable in damages for the injury"); Fla. Stat. Ann. § 768.19 (same); Wiesner Decl. ¶¶ 2-6.  The same is true of plaintiffs' claims for loss of consortium.  *See Tichenor v. Santillo*, 527 A.2d 78, 83 (N.J. Super. Ct. A.D. 1987) ("A claim for loss of consortium is a wholly derivative cause of action contingent upon a third party's tortious injury to a spouse."); *Urban v. Goodyear Tire & Rubber Co.*, Nos. 77162, 77776, 76703, 2000 WL 1800679, at *5 (Ohio Ct. App. Dec. 7, 2000) (same); *ACandS, Inc. v. Redd*, 703 So.2d 492, 494 (Fla. Dist. Ct. App. 1997 ) (same); Wiesner Decl. ¶¶ 2-6.

**New Jersey.**  The New Jersey Complaint is governed by New Jersey statutes of limitations.[71]  New Jersey law provides a two-year limitations period for personal injury actions, *see* N.J. Stat. Ann. § 2A:14-2(a), for wrongful death claims, *see id.* § 2A:31-3, and for loss of consortium claims, *see Tackling v. Chrysler Corp.*, 185 A.2d 238, 239 (N.J. Super. Ct. 1962) (2-year limitation for underlying personal injury claim also applies to corresponding loss of consortium claim).  Each New Jersey Plaintiff's claims are time-barred under these provisions.[72]

**New York.**  The New York Complaint is governed by New York statutes of limitation. New York courts will apply the statute of the place where the cause of action accrued, or the New York statute, whichever is shorter.  N.Y. C.P.L.R. § 202.  New York law provides a one-year limitation period for battery claims, *see* N.Y. C.P.L.R. § 215, and a three-year limitation period for other personal injury claims, *see id.* § 214(5).  The New York plaintiffs allege their wrongful death claims under the Ohio wrongful death statute, and those claims therefore are subject to a two-year statute of limitations.  *See* Ohio Rev. Code § 2125.02(D)(1) (two-year limitations period for wrongful death claims); *Lipton v. Lockheed Aircraft Corp.*, 125 N.Y.S.2d 58, 59-60 (N.Y. Sup. Ct. 1953) (stating that New York's statute of limitations does not apply to actions brought under wrongful death statute of another jurisdiction).  If the claims accrued in Ohio, then under New York law Ohio's shorter two-year limitation period for bodily injury

---

[71]     With regard state law claims, "the transferee district court [is] obligated to apply the state law that would have been applied if there had been no change of venue."  *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).

[72]     Even if another jurisdiction's substantive law applied to the New Jersey plaintiffs' claims, the claims would remain barred by New Jersey's two-year limitation period.  *See O'Keefe v. Snyder*, 416 A.2d 862, 868 (N.J. 1980) (limitation period for common law tort claim is procedural, so "the statute of the forum governs"); *LaFage v. Jani*, 766 A.2d 1066, 1079 (N.J. 2001) (holding that two-year limitation applies when New Jersey court applies another jurisdiction's wrongful death statute).

claims would apply.  *See* Ohio Rev. Code § 2305.10(A).  Only 25 plaintiffs' claims would survive under New York's one-year statute of limitations; 30 additional claims would survive under Ohio's two-year statute of limitations.[73]  In the unlikely event that New York's three-year personal injury statute of limitations applied, an additional 44 claims might survive.[74]  All of the remaining New York plaintiffs' state law claims are time-barred.

    **Florida.**  The Florida plaintiffs' claims are governed by Florida statutes of limitation. Under Florida law, a personal injury action does not survive the decedent's death, and such actions must be brought by the decedent's personal representative under Florida's wrongful death statute.  *See* Fla. Stat. Ann. § 768.20.  As a result, all of plaintiffs' tort claims would be barred by Florida's two-year statute of limitations for wrongful death actions, *see id.* § 95.11(4)(d).

---

[73]     *See* NY Compl. ¶¶ 64, 133, 139, 167, 187, 196, 308, 361, 366, 368, 375, 382, 459, 486, 488, 505, 509-510, 515, 521, 527, 529, 544, 566, 596 (25 claims arising within one year of the filing of the complaint); *id* ¶¶ 69, 131, 137, 144, 150, 159-160, 165-166, 284, 295, 334, 371, 383, 389, 392, 394, 400, 424, 450, 456, 469-470, 475, 522, 543, 565, 569, 600, 653 (additional 30 claims within two years of the filing of the complaint).

[74]     *See id.* ¶¶ 46, 80, 142, 158, 179, 183, 201, 208, 211, 228, 232, 238, 240, 245, 255, 275, 281, 290, 303, 323, 338, 344, 359, 364-365, 374, 402, 416, 444, 449, 482, 511, 541, 549, 557, 579, 592, 634, 650, 655, 662, 671, 678 (additional 44 claims within three years of the filing of the complaint).

**CONCLUSION**

For the foregoing reasons, Chiquita respectfully requests that the complaints be

dismissed with prejudice.

Dated: July 11, 2008                              Respectfully submitted,

                                                  _____/s/ Robert W. Wilkins_____
Eric H. Holder, Jr.                               Sidney A. Stubbs (Fla. Bar No. 095596)
John E. Hall                                      Robert W. Wilkins (Fla. Bar No. 578721)
James M. Garland                                  Christopher S. Rapp (Fla. Bar No. 0863211)
Jenny R. Mosier                                   rwilkins@jones-foster.com
COVINGTON & BURLING LLP                           JONES, FOSTER, JOHNSTON & STUBBS,
1201 Pennsylvania Avenue, N.W.                    P.A.
Washington, D.C.  20004                           505 South Flagler Drive, Suite 1100
Telephone: (202) 662-6000                         West Palm Beach, Florida 33401
Fax: (202) 662-6291                               Telephone: (561) 659-3000
                                                  Fax: (561) 650-0412

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Telephone:  (212) 841-1000
Fax:  (212) 841-1010                              *Counsel for Chiquita Brands International, Inc.*

# APPENDIX

## International Convention for the Suppression of the Financing of Terrorism
## Countries Ratifying Resolution by Date

[Data from Multinational Treaties Deposited With The Secretary General,
Financing Convention 2-8, http://untreaty.un.org/ENGLISH/bible/
englishinternetbible/partI/chapterXVIII/treaty12.asp (Exhibit K).]

| | Ratification Before April 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Botswana | 9/8/2000 | 10 | Malta | 11/11/2001 | 19 | Netherlands | 2/7/2002 |
| 2 | Sri Lanka | 9/9/2000 | 11 | Lesotho | 11/12/2001 | 20 | Guatemala | 2/12/2002 |
| 3 | United Kingdom | 3/7/2001 | 12 | Palau | 11/14/2001 | 20 | Canada | 2/19/2002 |
| 4 | Uzbekistan | 7/9/2001 | 13 | Cuba | 11/15/2001 | 22 | Antigua & Barbuda | 3/11/2002 |
| 5 | Azerbaijan | 10/26/2001 | 14 | St. Kitts & Nevis | 11/16/2001 | 23 | San Marino | 3/12/2002 |
| 6 | Algeria | 11/8/2001 | 15 | Cyprus | 11/30/2001 | 24 | Cote d'Ivoire | 3/13/2002 |
| 7 | Peru | 11/10/2001 | 16 | Grenada | 12/13/2001 | 25 | St. Vincent and the Grenadines | 3/28/2002 |
| 8 | Monaco | 11/10/2001 | 17 | France | 1/7/2002 | 26 | Mali | 3/28/2002 |
| 9 | Chile | 11/10/2001 | 18 | Bolivia | 1/7/2002 | | | |

| | Ratification Before March 2004 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 27 | Spain | 4/9/2002 | 56 | Portugal | 10/18/2002 | 85 | Tunisia | 6/10/2003 |
| 28 | Albania | 4/10/2002 | 57 | New Zealand | 11/4/2002 | 86 | Bosnia and Herzegovina | 6/10/2003 |
| 29 | Iceland | 4/15/2002 | 58 | Nicaragua | 11/14/2002 | 87 | Nigeria | 6/16/2003 |
| 30 | Bulgaria | 4/15/2002 | 59 | Latvia | 11/14/2002 | 88 | Kenya | 6/27/2003 |
| 31 | Austria | 4/15/2002 | 60 | Russian Federation | 11/27/2002 | 89 | Liechtenstein | 7/9/2003 |
| 32 | Cape Verde | 5/10/2002 | 61 | Brunei Darussalam | 12/4/2002 | 90 | Guinea | 7/14/2003 |
| 33 | Rwanda | 5/13/2002 | 62 | Ukraine | 12/6/2002 | 91 | Malawi | 8/11/2003 |
| 34 | Estonia | 5/22/2002 | 63 | Tonga | 12/9/2002 | 92 | Jordan | 8/28/2003 |
| 35 | Sweden | 6/6/2002 | 64 | Singapore | 12/30/2002 | 93 | Venezuela | 9/23/2003 |
| 36 | Japan | 6/11/2002 | 65 | Romania | 1/9/2003 | 94 | Switzerland | 9/23/2003 |
| 37 | USA | 6/26/2002 | 66 | Mozambique | 1/14/2003 | 95 | Madagascar | 9/24/2003 |
| 38 | Turkey | 6/28/2002 | 67 | Mexico | 1/20/2003 | 96 | Afghanistan | 9/24/2003 |
| 39 | Finland | 6/28/2002 | 68 | United Republic of Tanzania | 1/22/2003 | 97 | Comoros | 9/25/2003 |
| 40 | Panama | 7/3/2002 | 69 | Costa Rica | 1/24/2003 | 98 | Siera Leone | 9/25/2003 |
| 41 | Libyan Arab Jamahiriya | 7/9/2002 | 70 | Marshal Islands | 1/27/2003 | 99 | Poland | 9/26/2003 |
| 42 | Norway | 7/15/2002 | 71 | Equatorial Guinea | 2/7/2003 | 100 | Papua New Guinea | 9/30/2003 |
| 43 | Denmark | 8/27/2002 | 72 | Israel | 2/10/2003 | 101 | Burkina Faso | 10/1/2003 |
| 44 | Ghana | 9/6/2002 | 73 | Lithuania | 2/21/2003 | 102 | Kyrgzstan | 10/1/2003 |
| 45 | Slovakia | 9/13/2002 | 74 | Kazakhstan | 2/24/2003 | 103 | Uganda | 11/5/2003 |
| 46 | Barbados | 9/18/2002 | 75 | Liberia | 3/5/2003 | 104 | Luxembourg | 11/5/2003 |
| 47 | Morocco | 9/19/2002 | 76 | Togo | 3/10/2003 | 105 | Croatia | 12/1/2003 |
| 48 | Micronesia | 9/23/2002 | 77 | Honduras | 3/25/2003 | 106 | Belize | 12/1/2003 |
| 49 | Viet Nam | 9/25/2002 | 78 | Italy | 3/27/2003 | 107 | Ecuador | 12/9/2003 |
| 50 | Australia | 9/26/2002 | 79 | Swaziland | 4/4/2003 | 108 | Philippines | 1/7/2004 |
| 51 | Samoa | 9/27/2002 | 80 | India | 4/22/2003 | 109 | Uruguay | 1/8/2004 |
| 52 | Georgia | 9/27/2002 | 81 | Mauritania | 4/3/2003 | 110 | Republic of Korea | 2/17/2004 |
| 53 | Serbia | 10/10/2002 | 82 | South Africa | 5/1/2003 | 111 | Mongolia | 2/25/2004 |
| 54 | Moldova | 10/10/2002 | 83 | Sudan | 5/5/2003 | | | |
| 55 | Hungary | 10/14/2002 | 84 | El Salvador | 5/15/2003 | | | |

| Ratification Before NJ Complaint Filed (July 18, 2007) | | | | | | | |
|---|---|---|---|---|---|---|---|
| 112 | Cook Islands | 3/4/2004 | 128 | Thailand | 9/29/2004 | 144 | United Arab Emirates | 9/23/2005 |
| 113 | Armenia | 3/16/2004 | 129 | Niger | 9/30/2004 | 145 | DR Congo | 10/28/2005 |
| 114 | Bhutan | 3/22/2004 | 130 | Belarus | 10/6/2004 | 146 | Vanuatu | 10/31/2005 |
| 115 | Seychelles | 3/30/2004 | 131 | Paraguay | 11/30/2004 | 147 | Bahamas | 11/1/2005 |
| 116 | Greece | 4/16/2004 | 132 | Mauritius | 12/14/2004 | 148 | Cambodia | 12/12/2005 |
| 117 | Maldives | 4/20/2004 | 133 | Turkmenistan | 1/7/2005 | 149 | Czech Republic | 12/27/2005 |
| 118 | Belgium | 5/17/2004 | 134 | Egypt | 3/1/2005 | 150 | Cameroon | 2/6/2006 |
| 119 | Germany | 6/17/2004 | 135 | Gabon | 3/10/2005 | 151 | Djibouti | 3/13/2006 |
| 120 | Tajikistan | 7/16/2004 | 136 | Syrian Arab Republic | 4/24/2005 | 152 | Sao Tome and Principe | 4/12/2006 |
| 121 | Former Yugoslav Republic of Macedonia | 8/30/2004 | 137 | Nauru | 5/24/2005 | 153 | China | 4/19/2006 |
| 122 | Benin | 8/30/2004 | 138 | Ireland | 6/30/2005 | 154 | Indonesia | 6/29/2006 |
| 123 | Colombia | 9/14/2004 | 139 | Argentina | 8/22/2005 | 155 | Myanmar | 8/16/2006 |
| 124 | Bahrain | 9/21/2004 | 140 | Bangladesh | 8/26/2005 | 156 | Montenegro | 10/23/2006 |
| 125 | Slovenia | 9/23/2004 | 141 | Kiribati | 9/15/2005 | 157 | Congo | 4/20/2007 |
| 126 | Senegal | 9/24/2004 | 142 | Jamaica | 9/16/2005 | 158 | Malaysia | 5/29/2007 |
| 127 | Dominica | 9/24/2004 | 143 | Brazil | 9/16/2005 | | | |

| Ratification July 18, 2007 through Present | | |
|---|---|---|
| 159 | Saudi Arabia | 8/23/2007 |
| 160 | Guyana | 9/12/2007 |

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the

Clerk of the Court using CM/ECF on this 11th day of July, 2008.  I also certify that the foregoing

document is being served this day on all counsel of record registered to receive electronic

Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's First

Case Management Order ("CMO") and the June 10, 2008 Joint Counsel List filed in accordance

with the CMO.

By:      /s/ Robert W. Wilkins
Fla. Bar No. 578721
rwilkins@jones-foster.com