**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 08-01916-MD-MARRA/JOHNSON**

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC. ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____

This Document Relates To:

ATA ACTION

_____/

     Case No. 08-20641-CIV-KAM

TANIA JULIN, *et al.*,

                  Plaintiffs,

       v.

CHIQUITA BRANDS INTERNATIONAL, INC.,

                  Defendant.

_____/

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS AMENDED COMPLAINT**

## Table of Contents

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    A.    The FARC ............................................................................................. 2

    B.    The Kidnapping And Murder Of The Five Missionaries ....................... 3

    C.    Allegations Against Chiquita .............................................................. 4

ARGUMENT ................................................................................................................ 6

I.     PLAINTIFFS' CLAIMS ARE TIME-BARRED ................................................. 7

    A.    The Four-Year Statute Of Limitations On Plaintiffs' ATA Claims (Counts 1-3) Has Expired. ................................................................................ 7

          1.    The ATA's statutory tolling provision does not apply. ............... 9

          2.    There is no equitable tolling under the ATA. ........................... 10

          3.    Even if equitable tolling were available under the ATA, plaintiffs do not and cannot allege the "extraordinary circumstances" necessary to invoke the doctrine. ............................................. 12

    B.    The Statutes Of Limitations Applicable To The State Law Claims  (Counts 4-24) Have All Expired. ........................................................................ 17

II.    PLAINTIFFS' ATA CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM. ........................................................................................ 19

    A.    Plaintiffs Do Not And Cannot Plead That Chiquita Committed "An Act Of International Terrorism." .................................................................... 19

          1.    There are no allegations that Chiquita's payment of money to the FARC was intended to "intimidate or coerce" any identifiable civilian population or to "affect the conduct" of the Colombian government. ................................................................................ 20

          2.    Chiquita did not engage in any activities "that involve violent acts." ......................................................................................... 24

               a)    Plaintiffs do not and cannot plead sufficient facts to establish that Chiquita aided and abetted, or materially supported, the kidnapping and murder of the decedents by the FARC. .................................................................. 25

b)     Plaintiffs' conspiracy claim is baseless..........................................28

B.    Plaintiffs Do Not And Cannot Plead That Their Injuries Were "By Reason of" Chiquita's Payments. ......................................................................................30

1.    The Complaint does not allege that the kidnapping and murder of decedents would not have occurred "but for" Chiquita's payments to the FARC, and in any event such a connection would be too speculative to survive a motion to dismiss. ................................................31

2.    On the facts alleged, Chiquita's payments to the FARC cannot be the proximate cause of the kidnapping and murder of decedents.............32

III.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM. .....................................................................................35

A.    Plaintiffs Fail To State A Claim For Any Indirect Liability Tort. ........................35

B.    Plaintiffs Fail To State A Claim For Any Direct Liability Tort. ..........................37

C.    Plaintiffs Fail to State A Claim For Wrongful Death. ..........................................37

CONCLUSION...................................................................................................................38

**Table of Authorities**

**FEDERAL CASES**

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)............................................................30, 34

*Badillo v. Playboy Entertainment Group, Inc.,* No. 8:04-cv-591T30, 2006 WL 785707
 (M.D. Fla. 2006) ......................................................................................................................36

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ............................................................... *passim*

*Berwick v. New World Network Int'l, Ltd.*, No. 06-2641, 2007 WL 949767 (S.D.N.Y.
 Mar. 28, 2007).........................................................................................................................31

*Boim v. Holy Land Found. for Relief & Dev.*, 291 F.3d 1000 (7th Cir. 2002) ..................... *passim*

*Boim v. Holy Land Found. for Relief & Dev.*, 511 F.3d 707 (7th Cir. 2007), *vacated for
 reh'g en banc*, No. 00 C 2905 (7th Cir. June 16, 2008)..........................................................24

*Boim v. Quranic Literacy Inst.*, 127 F. Supp. 2d 1002 (N.D. Ill. 2001) ........................................23

*Brotherhood of Locomotive Engineers & Trainmen General Committee of Adjustment
 CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190 (11th Cir. 2008) ..............6, 12, 17

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999) ............................................3

*Cavitat Med. Techs., Inc. v. Aetna, Inc.*, No.04-CV-01849-MSK-OES,
 2006 WL 218018 (D. Colo. Jan. 27, 2006)............................................................................29

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ....................................................................30

*Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986 (8th Cir. 2007) ....................14, 15

*Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 264 F. Supp. 2d 1064 (S.D.
 Fla. 2003) ................................................................................................................................14

*Hill v. Texaco, Inc.*, 825 F.2d 333 (11th Cir. 1987)........................................................11, 15, 16

*Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258 (1992) ................................................................33

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188 (E.D.N.Y. 2003) .........31

*In re Int'l Admin. Servs. Inc.*, 408 F.3d 689 (11th Cir. 2005)...............................................10, 12

*In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273 (S.D. Fla. 2006)..................................................29

*Jackson v. BellSouth Telecomm.*, 372 F.3d 1250 (11th Cir. 2004)......................................6, 21, 33

*Klingler v. Yamaha Motor Corp., U.S.A.*, 738 F. Supp. 898 (E.D. Pa. 1990) ...............................33

iii

*Litle v. Arab Bank*, 507 F. Supp. 2d 267 (E.D.N.Y. 2007) ................................................... *passim*

*Mest v. Cabot Corp.*, 449 F.3d 502 (3d Cir. 2006) ...............................................13, 14

*New Castle County v. Halliburton Nus Corp.*, 111 F.3d 1116 (3d Cir. 1997)..............................15

*Perdomo-Padilla v. Ashcroft*, 333 F.3d 964 (9th Cir. 2003) ........................................19

*Rotella v. Wood*, 528 U.S. 549 (2000) ......................................................................7

*Sisso v. Islamic Republic of Iran*, No. 05-0394, 2007 WL 2007582 (D.D.C. July 5, 2007) ........23

*Strauss v. Credit Lyonnais*, No. 06-0702, 2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007)...... *passim*

*Streeter v. City of Pensacola*, No. 05-286, 2007 WL 4468705 (N.D. Fla. Dec. 18, 2007) ..........31

*Stutts v. De Dietrich Group*, No. 034058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ......26, 27

*United States v. Beggerly*, 524 U.S. 38 (1998) ............................................................11

*United States v. Brockamp,* 519 U.S. 347 (1997) .........................................................11

## STATE CASES

*Aguila v. Hilton, Inc.*, 878 So.2d 392 (Fla. Dist. Ct. App. 2004) ...................................36

*City of Hollywood v. Petrosino*, 864 So.2d 1175 (Fla. Dist. Ct. App. 2004)................................18

*Florida Dep't of Corrections v. Abril*, 969 So.2d 201 (Fla. 2007) ................................37

*Freeman v. First Union Nat. Bank*, 865 So.2d 1272 (Fla. 2004)................................................37

*Hearndon v. Graham*, 767 So.2d 1179 (Fla. 2000) ......................................................18

*Healy v. Langdon*, 511 N.W.2d 498 (Neb. 1994) .......................................................17

*Kilgus v. Kilgus*, 495 So.2d 1230 (Fla. Dist. Ct. App. 1986) ......................................36

*Lee v. CSX Transp., Inc.*, 958 So.2d 578 (Fla. Dist. Ct. App. 2007) ...........................17

*Lee v. Simon*, 885 So.2d 939 (Fla. Dist. Ct. App. 2004)................................................18

*Putnam Berkley Group, Inc. v. Dinin*, 734 So.2d 532 (Fla. Dist. Ct. App. 1999) ........................18

*Watson v. City of Hialeah*, 552 So. 2d 1146 (Fla. Dist. Ct. App. 1989)........................................37

*ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Maryland*, 917 So.2d 368 (Fla. Dist.
    Ct. App. 2005)................................................................................................37

## FEDERAL STATUTES

18 U.S.C. § 2331 ..................................................................................................... *passim*

18 U.S.C. § 2332 ...............................................................................................24, 28, 29, 31

18 U.S.C. § 2333 ...........................................................................................................19, 30

18 U.S.C. § 2335 ..................................................................................................... *passim*

28 U.S.C. § 2409a(a) .........................................................................................................11

## STATE STATUTES

Fla. Stat. § 95.11(4)(d) .....................................................................................................17

Fla. Stat. § 768.19 ............................................................................................................38

Fla. Stat. § 768.20 ............................................................................................................35

Fla. Stat. § 95.11(3) ..........................................................................................................18

Neb. Rev. Stat. § 30-809 ...................................................................................................38

Neb. Rev. Stat. § 30-810 ...................................................................................................17

## MISCELLANEOUS

138 Cong. Rec. S17254 (daily ed. Oct. 7, 1992) ............................................................25

Dinitia Smith, *Family Works to Free a Kidnapped Colombian Author and Senator*, N.Y.
   TIMES, Mar. 11, 2002 ...................................................................................................22

Edgar Trujillo Ciro & Martha Elena Badel Rueda, Departamento Nacional de Planeación,
   *Los costos económicos de la criminalidad y la violencia en Colombia: 1991-1996*
   [*The Economic Costs of Criminality and Violence in Colombia: 1991-1996*] .........3

H.R. Rep. No. 102-1040 (1992) ........................................................................................25

*Colombia Hostage Betancourt Freed*, BBC, July 3, 2008, http://news.bbc.co.uk/2/hi/
   Americas/7486552.stm ..................................................................................................22

*Prosser & Keeton on Torts* (Dan B. Dobbs et al. eds., 5th ed. 1984) ......................31, 34

Restatement (Second) of Torts § 431 (1965) ...................................................................33

Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 37 (2007) .....34

Webster's II New College Dictionary 880 (3d ed. 2005) ..................................................22

## <u>INTRODUCTION</u>

Plaintiffs in this action are relatives of five American missionaries who were abducted for ransom and tragically murdered in the mid-1990s by a communist guerrilla group in Colombia, known as the Fuerzas Armadas Revolucionarias de Colombia ("FARC").  Now, more than a decade later, they seek to hold Chiquita Brands International, Inc. ("Chiquita") liable for those deaths under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, and Florida and Nebraska tort law.  There is no allegation, however, that Chiquita was involved in the kidnapping and murder of the decedents, that Chiquita intended that these despicable acts occur, or that Chiquita even knew about them until plaintiffs brought this lawsuit.  Instead, plaintiffs allege that Chiquita is liable for the decedents' deaths solely because Chiquita's former Colombian subsidiary made payments extorted by the FARC when this radical Marxist group controlled the remote banana-growing regions of Colombia in which Chiquita's subsidiary operated.

As explained in Parts II and III below, plaintiffs' ATA and state law causes of action fail to state claims for relief.  Although the Amended Complaint (hereinafter "Complaint" or "Compl.") describes at length the harrowing details surrounding the kidnappings of the decedents, these allegations have nothing to do with Chiquita and do not support a cause of action against the company.  To the contrary, the facts pled in the Complaint establish that the alleged payments, which pre-date the U.S. government's designation of the FARC as a foreign terrorist organization, do not constitute acts of "international terrorism" as that term is defined in the ATA.  As such, there can be no claim against Chiquita under the statute.  Even the actions of the FARC — which, as the Complaint concedes, kidnapped plaintiffs' American relatives for the purpose of collecting ransom, not to intimidate or coerce the Colombian government or its people — were not acts of "international terrorism" within the meaning of the statute, and thus are not actionable.  More fundamentally, the Complaint makes no attempt even to suggest a

causal relationship between the payments and the kidnapping and murder of plaintiffs' relatives, let alone support it with facts.   Nor does the Complaint allege facts sufficient to hold Chiquita liable as an accessory to the FARC's violent conduct under theories of aiding and abetting or conspiracy.  The state law claims are similarly deficient.

Ultimately, however, it is unnecessary for the Court even to address the legal sufficiency of plaintiffs' claims in order to dispose of this Complaint.  Regardless of the merits, plaintiffs' claims are barred by the applicable statutes of limitations.  We begin with this straightforward point in Part I below and demonstrate that the Complaint must be dismissed in its entirety with prejudice.

## BACKGROUND

### A.    The FARC

According to the Complaint, the FARC was established in 1964 by the "Colombian Communist Party as its 'military' wing, to defend what were then Communist-controlled rural areas in Colombia."  (Compl. ¶ 173.)  As the largest rebel group in Colombia, the FARC is composed of 15,000 to 18,000 fighters organized into approximately 64 regional "frentes" or fronts.  (*Id.* ¶ 174.)  The FARC operates primarily in "sparsely populated areas in Colombia."  (*Id.*)  The FARC represents the "rural poor against Colombia's wealthy classes" and opposes multinational corporations, the privatization of natural resources, and U.S. influence in Colombia.  (*Id.* ¶ 175.)

As the Complaint alleges, the FARC finances itself through drug trafficking, kidnapping for ransom, and extortion, among other activities.  (*Id.* ¶¶ 177-178.)  One publicly available source estimates that the FARC derived nearly $400 million *per year* from its various

2

illicit activities during the period of the early- to mid-1990's, when the events alleged in this

Complaint occurred.[1]

### B.    The Kidnapping And Murder Of The Five Missionaries

The Complaint alleges that the FARC is responsible for "most of the ransom

kidnappings in Colombia," a country which has recorded an "estimated 6,500 kidnappings."  (*Id.*

¶ 176.)  The Complaint further alleges that the FARC targets "wealthy landowners, foreign

tourists, prominent international and domestic officials, and ordinary civilians" and that

"hundreds of millions" of dollars have been paid in ransom to the FARC.  (*Id.*)  Among the

thousands of kidnappings perpetrated by the FARC, the kidnapping of five U.S. missionaries —

Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Stephen Welsh, and Timothy

Van Dyke — in the early 1990s are at issue here.  All five men were missionaries of plaintiff

New Tribes Mission ("NTM"), an international Christian missionary organization.  (*Id.* ¶¶ 11-

14.)

Three of the five missionaries — Mark Rich, Charles David Mankins, and

Richard Tenenoff — were kidnapped in Púcuro, Panamá, on January 31, 1993, allegedly by

FARC guerrillas.  (*Id.* ¶¶ 49, 54-89.)  The Complaint alleges that the guerrillas entered Púcuro, a

remote village about 15 miles away from the Panamá-Colombia border, in search of money and

other goods, which they stole from certain plaintiffs under threat of force.  (*Id.* ¶¶ 49, 58, 70, 72,

---

[1]      *See* Edgar Trujillo Ciro & Martha Elena Badel Rueda, Departamento Nacional de
Planeación, *Los costos económicos de la criminalidad y la violencia en Colombia: 1991-1996*
[*The Economic Costs of Criminality and Violence in Colombia: 1991-1996*], ARCHIVOS DE
MACROECONOMÍA, Mar. 10, 1998, at 32, tbl.10 (during the period 1991-1996, the FARC derived
approximately *$390 million* per year on average, most of it from drug trafficking, based on
conversion of 390.6 billion 1995 Colombian pesos to U.S. dollars at the average exchange rate in
1995) (attached hereto as Exhibit A, with English translation and Affidavit of Accuracy).  In
deciding a motion to dismiss, "matters of public record . . . may be taken into account."  *Bryant
v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).

88.)  A week after they kidnapped the three men, the FARC guerrillas demanded a $5,000,000 ransom for their safe release.  (*Id.* ¶ 100.)  Negotiations ensued, with the FARC threatening that the men would be harmed if the ransom were not paid, but plaintiffs did not pay.  (*Id.* ¶¶ 102-105.)  After years of efforts from plaintiffs to learn the whereabouts of the men, plaintiffs learned that the men had been killed in June 1996, allegedly by members of the FARC's 57th Front near the Colombia-Panamá border, in Acandí, Chocó, Colombia.  (*Id.* ¶¶ 110-111, 163.)

Nearly a year after these three missionaries were kidnapped, Stephen Welsh and Timothy Van Dyke were also abducted by FARC guerrillas, in a remote region of central Colombia hundreds of miles away from the site of the first kidnapping.  (*Id.* ¶¶ 112-141.)  Within a month, the FARC guerrillas demanded a $3,000,000 ransom for Mr. Welsh's and Mr. Van Dyke's safe release.  (*Id.* ¶ 144.)  Again, no ransom was paid.  (*Id*. ¶ 146.)  On June 19, 1995, the men were killed, allegedly by the FARC's 53rd Front near Cundinamarca, Colombia, during a firefight with the Colombian army.  (*Id*. ¶¶ 147-148.)

### C.      Allegations Against Chiquita

The Complaint does not allege that Chiquita was involved in any way with the kidnapping and murder of the five missionaries; that Chiquita intended that the FARC kidnap and murder the five missionaries; or that Chiquita even knew about these horrible events until plaintiffs filed the instant suit more than a decade after the kidnappings.  Rather, the basis upon which it is alleged that Chiquita should be held liable for the kidnapping and murder of the five decedents is that Chiquita's Colombian subsidiary, C.I. Bananos de Exportación, S.A. ("Banadex"), made payments to the FARC between 1989 and 1997, when the FARC controlled

the banana growing regions of Colombia in which Banadex operated.[2]  (*Id.* ¶¶ 172, 190-191.)

The Complaint alleges that Banadex "initially . . . made cash payments" to the FARC, at the

FARC's "specific request."  (*Id.* ¶ 192.)  The Complaint further alleges that Banadex's payments

"gradually escalated and became regularized as monthly payments ranging from $20,000 to as

much as $100,000 per payment" and were eventually "fixed to a percentage of Banadex's gross

revenues."  (*Id.*)  However, plaintiffs do not allege that the payments made by Banadex to the

FARC were illegal under U.S. law at the time they were made.  To the contrary, as the

Complaint acknowledges, it was not until October 8, 1997 that the FARC was designated a

foreign terrorist organization by the U.S. government, *after* Banadex's payments to the FARC

had ceased.  (*Id.* ¶¶ 184, 191.)

   The Complaint acknowledges that the FARC collects "war taxes" from residents,

landowners, and businesses in the regions it controls (*id.* ¶ 178), and that during the time period

in question, the FARC controlled the banana growing regions of Colombia in which Banadex

operated, including the Urabá region of Colombia (*id.* ¶¶ 44, 48, 187).  Plaintiffs contend,

however, that "[i]t was not until March 19, 2007" that plaintiffs learned of Banadex's payments

to the FARC by reading public filings in which Chiquita acknowledged the fact of the payments.

(*Id.* ¶ 201.)

   On the basis of these allegations, plaintiffs assert twenty-four causes of action

against Chiquita.  The first three counts assert claims under the ATA for aiding and abetting,

conspiring with, and materially supporting the FARC in carrying out the murders of the five

decedents.  (*See id.* ¶¶ 216-235 (Counts 1-3).)  The remaining counts assert various tort claims

---

[2]  The Complaint also makes the conclusory claim that Chiquita provided weapons to the
FARC, but it alleges no factual support for this incendiary allegation.  (*Id.* ¶¶ 2, 3, 5, 191, 202.)

— wrongful death, aiding and abetting wrongful death, false imprisonment, aiding and abetting false imprisonment, intentional infliction of emotional distress, aiding and abetting intentional infliction of emotional distress, negligent infliction of emotional distress, assault, and aiding and abetting assault — under the laws of Florida and Nebraska.  (*See id.* ¶¶ 236-386 (Counts 4-24).)

## ARGUMENT

Chiquita moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that plaintiffs' ATA and state law claims are time-barred and legally deficient.[3]  To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim for relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007); *see Litle v. Arab Bank*, 507 F. Supp. 2d 267, 272 (E.D.N.Y. 2007) (applying *Twombly*'s plausibility standard to ATA claims).

Thus, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 127 S.Ct. at 1964-65 (citations and quotations omitted); *see also Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.").  Where "it is apparent from the face of the complaint that the claim is time-barred," dismissal is appropriate under Rule 12(b)(6).  *Brotherhood of Locomotive Engineers & Trainmen General Committee of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1194 (11th Cir. 2008) (citations and quotations omitted).

---

[3]     By filing this Motion to Dismiss, Chiquita does not waive, and hereby expressly reserves, the right to challenge plaintiffs' designation of Chiquita Brands International, Inc. as proper party defendant in this action.

## I.     PLAINTIFFS' CLAIMS ARE TIME-BARRED.

It is clear from the face of the Complaint that plaintiffs' claims are time-barred. The four-year limitations period applicable to plaintiffs' ATA claims, which are based on alleged events that occurred more than a decade ago, has long since expired.  While the ATA contains a provision that tolls the running of the limitations period in certain limited circumstances, none of those circumstances is, by plaintiffs' own admissions, applicable here.  In view of the ATA's express statutory tolling provision, plaintiffs are precluded from relying upon any other tolling theory, including the "fraudulent concealment" theory implied by the allegations in their Complaint.  Even if "fraudulent concealment" could be used to toll ATA claims, plaintiffs do not allege the facts necessary to invoke this extraordinary remedy.  Plaintiffs' assorted state law claims also fail, as the statutes of limitations applicable to those claims have likewise long since expired.

### A.     The Four-Year Statute Of Limitations On Plaintiffs' ATA Claims (Counts 1-3) Has Expired.

The ATA provides that a suit for damages must be commenced "within 4 years after the date the cause of action accrued."  18 U.S.C. § 2335(a).  In determining when a cause of action accrues for purposes of the ATA, courts have held that the four-year limitations period runs from the *date of the injury* perpetrated by the purported terrorist or terrorist group.  *See Litle*, 507 F. Supp. 2d at 273-74 ("[P]laintiffs' [ATA] claims accrued at the time they were injured, *i.e.*, on the date of the terrorist attacks giving rise to their respective claims."); *Strauss v. Credit Lyonnais*, No. 06-0702, 2007 WL 2296832, at *7 (E.D.N.Y. Aug. 6, 2007) (plaintiffs' ATA claims accrued after terrorist attacks as plaintiffs knew "the facts of their injuries and the role of HAMAS as the organization responsible for such injuries"); *see also Rotella v. Wood*,

528 U.S. 549, 555 (2000) (noting that "in applying a discovery accrual rule . . . discovery of the *injury*, not discovery of the other elements of a claim is what starts the clock") (emphasis added).

Here, plaintiffs' claims accrued no later than the date when they learned that the decedents had been killed by the FARC.  The Complaint alleges that at least three sets of plaintiffs — the Rich Family, the Mankins Family, and the Tenenoff Family — learned in December 2000 that the FARC had murdered Mark Rich, David Mankins, and Richard Tenenoff in June 1996.  (*See* Compl. ¶ 110.)  With respect to the remaining two sets of plaintiffs — the Welsh Family and Van Dyke Family — the Complaint does not specify a precise date when they learned of the murders.  But it does allege that after the bodies of decedents Stephen Welsh and Timothy Van Dyke were discovered in 1995, the bodies were flown back to the United States for autopsies, and that evidence collected confirmed that the FARC was culpable for their deaths. (*See* Compl. ¶¶ 147-48.)  Because plaintiffs' claims accrued no later than when they learned of the deaths of the decedents at the hands of the FARC, and because they did not file suit against Chiquita within four years of that time, their ATA claims are barred.

That plaintiffs allege they were unaware until recently that Chiquita had paid money to the FARC does not affect the date of accrual of their ATA claims.  (*See, e.g.,* Compl. ¶ 172 (alleging that plaintiffs were unaware of "Chiquita or its connection to FARC . . . during the years between the kidnappings and Chiquita's guilty plea in March 2007").)  It is well-established that accrual of an ATA claim against *any* potential defendant is measured by the "date of the terrorist attacks giving rise to [plaintiffs'] claims."  *Litle*, 507 F. Supp. 2d at 274; *see also Strauss*, 2007 WL 2296832, at *7.  In both *Litle* and *Strauss*, plaintiffs, who sought to hold defendant corporations liable for attacks carried out by terrorist groups, sought to delay the accrual of their ATA claims on the grounds that they did not learn until much later that the

8

defendant corporations had been supporting the culpable terrorist groups.  *See Litle*, 507 F. Supp. 2d at 274; *Strauss*, 2007 WL 2296832, at \*6-7.  The courts rejected this argument, finding that plaintiffs' ATA claims accrued when they "knew of their injuries," *i.e.*, on the dates of the alleged terrorist attacks.  *Litle*, 507 F. Supp. 2d at 274 ("[T]he fact that [plaintiffs] were not aware of all possible defendants is not determinative of plaintiffs' awareness of their potential cause of action and does not delay the date of accrual, even if identification of other defendants was not immediately knowable.") (quoting *Strauss*, 2007 WL 2296832, at \*7).

As in *Litle* and *Strauss*, plaintiffs' ATA claims against the FARC and other potential defendants, including Chiquita, accrued on the date they discovered that the decedents had been murdered by the FARC, which was no later than 2000.  Plaintiffs' allegation that they were not aware of Chiquita's alleged "support" of the FARC until March 2007 (Compl. ¶ 172.), is immaterial to the issue of when the claims accrued for purposes of the ATA's statute of limitations.  Because it is undisputed that plaintiffs did not bring their ATA claims within four years of the date their claims accrued, their claims must be dismissed absent a proper basis upon which to toll the limitations period.

### 1.    *The ATA's statutory tolling provision does not apply.*

The ATA specifies a limited set of circumstances whereby the limitations period shall be tolled.  After setting forth the four-year limitations period in section 2335(a), the very next subsection of the statute, section 2335(b), states as follows:

> (b)  *Calculation of Period*.  The time of the absence of the defendant from the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff, or of any concealment of the defendant's whereabouts, shall not be included in the 4-year period set forth in subsection (a).

18 U.S.C. § 2335(b).

This provision is clearly inapplicable, as the Complaint contains no allegations — nor could plaintiffs make any — that Chiquita was "absen[t]" from the jurisdiction of the United States or Colombia or that Chiquita concealed its "whereabouts." *See Litle*, 507 F. Supp. 2d at 273 (finding that § 2335(b) did not toll four-year statute of limitations where there were no allegations that "Arab Bank concealed its whereabouts or that it was absent from the jurisdiction"); *see also Strauss*, 2007 WL 2296832, at *3-5 ("[S]ince plaintiffs make no allegation that Credit Lyonnais concealed its whereabouts, . . . § 2335(b) is unavailable.").

To the contrary, the Complaint alleges that Chiquita was located in the jurisdiction of both the United States and Colombia during the time period in question.  (*See* Compl. ¶¶ 44, 48 (noting that Chiquita "operated [in Colombia] through its wholly-owned subsidiary [Banadex]," owned "over 200 farms in Colombia dedicated to banana production," and was "incorporated in New Jersey and headquartered in Cincinnati, Ohio").)  Moreover, there can be no allegation that Chiquita's "whereabouts" were concealed, as Chiquita is and was at all times a public American corporation whose wholly-owned subsidiary, Banadex, did business in Colombia during the relevant time period.  In these circumstances, the ATA's statutory tolling provision is clearly inapplicable.

### 2.       *There is no equitable tolling under the ATA.*

The Complaint contends that the running of the limitations period was tolled by Chiquita's alleged "fraudulent concealment" of "its illegal activities."  (*Id.* ¶¶ 212, 215.) Plaintiffs' argument fails as a matter of law, however, because the equitable tolling doctrine is not applicable to ATA claims.

Although the general rule is that equitable tolling applies to all federal causes of action with an applicable statute of limitations, *see In re Int'l Admin. Servs. Inc.*, 408 F.3d 689, 701 (11th Cir. 2005), the Supreme Court has made clear that equitable tolling is unavailable

where it would conflict with the text or structure of the statute.  *See United States v. Beggerly*,
524 U.S. 38, 48-49 (1998) (statutory limitations periods are not subject to equitable tolling
doctrines where tolling would be "inconsistent with the text of the relevant statute"); *United
States v. Brockamp*, 519 U.S. 347, 351-52 (1997) (holding that equitable tolling does not apply to
tax filing statute that "sets forth explicit exceptions to its basic time limits, and those very
specific exceptions do not include equitable tolling"); *see also Hill v. Texaco, Inc.*, 825 F.2d 333,
334-34 (11th Cir. 1987) (finding that no equitable tolling was available under the Petroleum
Marketing Practices Act where the "plain words" of the statute indicated that Congress "did not
intend for [the limitations period] to be enlarged by the courts").

In *Beggerly*, the Supreme Court rejected plaintiffs' reliance on equitable tolling in
the context of the Quiet Title Act ("QTA"), which allows a plaintiff to name the United States as
a party to a civil dispute over certain types of real property.  *See* 28 U.S.C. § 2409a(a).  The
Supreme Court noted that Congress had already built a tolling provision into the QTA's statute
of limitations by providing that the limitations period does not begin to run until "plaintiff knew
or should have known of the claim of the United States."  *Beggerly*, 524 U.S. at 48-49.  Because
Congress had spoken on the issue, the Supreme Court concluded that "extension of the statutory
period by additional equitable tolling would be unwarranted."  *Id.* at 49.

In the ATA, Congress has gone one step further than the QTA by including an
*express* statutory tolling provision, 18 U.S.C. § 2335(b).  Section 2335(b) carefully identifies the
narrow situations — the "absence" of the defendant from the United States or other relevant
jurisdiction or the "concealment" of the defendant's whereabouts — in which a plaintiff can
extend the ATA's four-year limitations period.  Moreover, section 2335(a), which specifies the
four-year period, could not be more explicit in stating that it is "subject to subsection (b)," which

provision then goes on to describe the "calculation of the period," leaving no room for further embellishment. Any attempt to circumvent or expand the narrow exception to the limitation period created by Congress in section 2335 would be inappropriate. As in *Beggerly*, because Congress has already defined the bases upon which the ATA's limitations period may be tolled, this Court should not permit plaintiffs to evade the requirements of the plain language of the statute through the doctrine of equitable tolling.

> **3.     *Even if equitable tolling were available under the ATA, plaintiffs do not and cannot allege the "extraordinary circumstances" necessary to invoke the doctrine.***

Even if this Court were to hold that there is an additional exception to the ATA's four-year limitations period based on equitable tolling, plaintiffs still could not salvage their otherwise time-barred claims. To invoke equitable tolling based on fraudulent concealment, plaintiffs must establish that "(1) the defendant wrongfully concealed material facts relating to its wrongdoing; (2) the concealment prevented plaintiffs' discovery of the nature of the claim within the limitations period; and (3) the plaintiffs exercised due diligence in pursuing the discovery of the claim during the period they seek to have tolled." *Litle*, 507 F. Supp. 2d at 276-77. Plaintiffs bear the burden of demonstrating that "extraordinary circumstances" exist so as to warrant the application of equitable tolling, which the Eleventh Circuit has advised should be used "only sparingly." *CSX Transp.*, 522 F.3d at 1197 (equitable tolling is a "form of extraordinary relief") (citations and quotations omitted).

Here, it is clear from the face of the Complaint that plaintiffs cannot satisfy their heavy burden, as plaintiffs do not and cannot allege either that (i) Chiquita breached a legal duty to them by not disclosing the FARC payments or (ii) that Chiquita engaged in any affirmative acts or statements that deceived them about the FARC payments. *See In re Int'l Admin. Servs., Inc.*, 408 F.3d at 701 (to establish fraudulent concealment, plaintiff must establish that defendant

engaged in "affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action"); *Mest v. Cabot Corp.*, 449 F.3d 502, 517 (3d Cir. 2006) (noting that fraudulent concealment requires "an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury" or, in the absence of such affirmative acts, a "duty to disclose because of a fiduciary relationship between the parties"); *see also Strauss*, 2007 WL 2296832, at *5 (noting that concealment for tolling purposes arises when the defendant "affirmatively [hides] information" or "[fails] to disclose information which one had some obligation to reveal") (citation omitted).

It is self-evident that Chiquita, a private business with no relationship of any kind to plaintiffs or the decedents, owed no duty — fiduciary or otherwise — to reveal to plaintiffs the fact of Banadex's extortion payments to the FARC. Nor can plaintiffs point to any legal duty that required Chiquita publicly to disclose the FARC payments. As plaintiffs are aware, the payments were legal under U.S. law, because the U.S. State Department designated the FARC a foreign terrorist organization only *after* Chiquita's payments had ceased.

Nor does the Complaint allege that Chiquita engaged in any affirmative acts or misstatements to mislead *plaintiffs* about its subsidiary's payments to the FARC. To be sure, the Complaint attempts to portray a purported scheme (in conclusory fashion, as noted below) by which Chiquita elaborately sought to conceal its payments to the FARC. (*See* Compl. ¶¶ 202-204.) To plead equitable tolling, however, plaintiffs must allege that these supposed acts of concealment constituted affirmative misrepresentations to *them*. *E.g., Mest*, 449 F.3d at 517.

In *Mest*, two sets of dairy farmers, the Hallowells and Mests, brought suit against a factory owner for assorted state law tort claims for injuries caused to their cows as a result of the defendant's operations. 449 F.3d at 506-507. The Third Circuit found that the Hallowells

had adequately established, for purposes of summary judgment, that the defendant had engaged in affirmative acts and misstatements toward them, which could have prevented the Hallowells from discovering a potential claim for the injuries to their cows.  *Id.* at 516-17.  By contrast, the Court found that the Mests could not rely on the doctrine of fraudulent concealment, as there was no evidence that the defendant had made any statements or communications to *them* that could have misled them as to the nature of their claims or injuries.  *Id.* at 517 (noting that plaintiffs must establish "an affirmative and independent act of concealment that would divert or mislead [them] from discovering the injury").

As in *Mest*, plaintiffs do not allege that Chiquita made affirmative misstatements or misrepresentations to them, or otherwise engaged in acts which deceived them.  The Complaint alleges that Chiquita engaged in a generalized scheme to conceal its payments to the FARC, but absent allegations that link those purported acts of concealment to plaintiffs, plaintiffs cannot invoke fraudulent concealment as a matter of law.

Moreover, plaintiffs' claims concerning Chiquita's purported fraudulent conduct are so generalized as to be meaningless in establishing a fraud as to anyone, let alone these plaintiffs.  Allegations of fraudulent concealment must be pled with the particularity required by Federal Rule of Civil Procedure 9(b).  *See Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 264 F. Supp. 2d 1064, 1073 (S.D. Fla. 2003) (noting that fraudulent concealment "is subject to Fed. R. Civ. P. 9(b)'s requirement that the circumstances constituting fraud shall be stated with particularity"); *see also Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007) (noting that "federal procedural law requires that allegations of fraud, including fraudulent concealment for tolling purposes, be pleaded with particularity," *i.e.*, "the who, what, when, where, and how: the first paragraph of any newspaper story") (citations omitted).

14

The allegations made by plaintiffs here fall woefully short of Rule 9(b)'s heightened pleading standard.  The Complaint, for instance, alleges that Chiquita "used existing contracts with legitimate organizations" or "drew up phony contracts with legitimate vendors" to disguise its payments to the FARC, but never identifies who the legitimate organizations or vendors were, what the contracts entailed, or the dates of the contracts.  (*See* Compl. ¶ 202.)  The Complaint further alleges that Chiquita made payments to "FARC-established fronts and dummy companies," but never identifies a single "front" or "dummy company" that received any payment from Chiquita.  (*Id.* ¶ 203.)  Such boilerplate, conclusory allegations — devoid of the "who, what, when, where, and how" — are insufficient to establish fraudulent concealment.  *See Great Plains Trust Co.*, 492 F.3d at 995.

Moreover, the Complaint does not contain a *single* allegation demonstrating that plaintiffs exercised diligence in pursuing discovery of a potential claim against Chiquita during the applicable limitations period.  *See Litle*, 507 F. Supp. 2d at 277 (ATA plaintiffs must demonstrate that they "exercised due diligence in pursuing the discovery of the claim during the period they seek to have tolled") (citation omitted); *see also Hill*, 825 F.2d at 335 (in order to invoke equitable tolling, plaintiff must demonstrate "that he exercised diligence to discover his cause of action within the limitations period"); *New Castle County v. Halliburton Nus Corp.*, 111 F.3d 1116, 1126 (3d Cir. 1997) (plaintiff could not rely on equitable tolling where it "did not exercise due diligence in . . . investigating potential claims [against defendant]").

The Complaint documents in great detail the investigation undertaken by the decedents' family members (*see* Compl. ¶¶ 159-172) and by plaintiff New Tribes Mission (*see id*. ¶¶ 149-158), describing their efforts as "relentless" and noting that "substantial sums of money" were spent on the investigation.  However, each and every such allegation relates *only* to

plaintiffs' investigation of the FARC's role in the kidnappings and murders, *not* to the role of others who supported or financed the FARC. Indeed, other than the sole conclusory allegation that plaintiffs have "been engaged in diligent efforts to discover the identities of all parties who might have been responsible for [the murders of the decedents]" (*id*. ¶ 200), the Complaint demonstrates not just a lack of adequate diligence but rather that plaintiffs failed to take *any* step "to discover [their] cause of action [against Chiquita] within the limitations period." *Hill*, 825 F.2d at 35. In these circumstances, plaintiffs cannot now invoke the doctrine of equitable tolling to save their claims against Chiquita.

Plaintiffs also cannot invoke equitable tolling because the allegations of the Complaint demonstrate that they had sufficient information to suspect that they may have claims against other parties. *See Hill*, 825 F.3d at 335 ("The standard for a discovered wrong is a minimal one: Any fact that should excite his suspicion is the same as actual knowledge of his entire claim.") (citations omitted). For instance, the Complaint alleges that the FARC financed its operations "by collecting 'war taxes' from residents, businesses and landowners in the regions where FARC operates." (Compl. ¶ 178.) The Complaint further alleges that the FARC "held significant influence over . . . Colombia's banana growing regions" and specifically "controlled the areas where [Banadex] had its commercial banana-producing operations." (*Id.* ¶¶ 179, 190.) These facts alone "should [have] excite[d] [plaintiffs'] suspicion" regarding possible financial linkages between Chiquita and the FARC and, at a minimum, required plaintiffs to investigate the sources of the FARC's income. *Hill*, 825 F.3d at 335.[4]

---

[4]    Plaintiffs clearly had adequate resources at their disposal. As the Complaint makes clear, plaintiffs had extensive access to, and communications with, senior Colombian government officials, the Colombian police, the Colombian National Prosecutor's Office, the Colombian media, private Colombian interest groups, local Colombian residents, and two ex-FARC (continued…)

Thus, even if equitable tolling were applicable, plaintiffs have failed to carry their heavy burden to entitle them to such "extraordinary relief." *See CSX Transp.*, 522 F.3d at 1197. Because it is plain from the face of the Complaint that the applicable limitations period has expired, the ATA claims must be dismissed.

B.    **The Statutes Of Limitations Applicable To The State Law Claims (Counts 4-24) Have All Expired.**

Plaintiffs' claims arising under the tort laws of Florida and Nebraska are also time-barred under the applicable statutes of limitations.  As an initial matter, plaintiffs' wrongful death claims are governed by a two-year statute of limitations.  *See* Fla. Stat. § 95.11(4)(d) (2008) (two-year statute of limitations on wrongful death claim); Neb. Rev. Stat. § 30-810 (2008) (two-year statute of limitations on wrongful death claim).  Under well-established Florida and Nebraska law, a wrongful death claim accrues on the date of the decedent's death.  *See Lee v. CSX Transp., Inc.*, 958 So.2d 578, 580 (Fla. Dist. Ct. App. 2007); *Healy v. Langdon*, 511 N.W.2d 498, 500 (Neb. 1994).  Accordingly, plaintiffs' wrongful death claims accrued in 1995 (as to the Welsh Plaintiffs and Van Dyke Plaintiffs) and in 1996 (as to the Rich Plaintiffs, Mankins Plaintiffs, and Tenenoff Plaintiffs).  (*See* Compl. ¶¶ 110-11, 147.)  Plaintiffs, however, did not file suit until 2008, well after the limitations period expired on any wrongful death claim.

Plaintiffs' remaining state law claims, arising under Florida law, are governed by a four-year statute of limitations.  *See* Fla. Stat. § 95.11(3)(o) (false imprisonment, assault, and intentional infliction of emotional distress); Fla. Stat. § 95.11(3)(a) (negligent infliction of

---

members named "Judith" and "Hector."  (*Id.* ¶¶ 153-154, 157, 162-163, 166, 171.)  Plaintiffs also had significant access to senior government officials in the United States, and Panamá, as well as international relief organizations.  (*Id.* ¶¶ 150-152, 154-155) (describing contacts with the U.S. Embassies in Colombia and Panamá, the Panamanian military and police, the U.S. Federal Bureau of Investigation, the International Red Cross, and the Catholic Church).)

emotional distress); Fla. Stat. § 95.11(3)(p) (governing "action[s] not specifically provided for in these statutes," such as aiding and abetting (if such a civil cause of action existed)).  Under Florida law, the four-year limitations period runs from the date of accrual, which is defined as the date "when the last element constituting the cause of action occur[red]."  *Hearndon v. Graham*, 767 So.2d 1179, 1184-85 (Fla. 2000); *see also City of Hollywood v. Petrosino*, 864 So.2d 1175, 1178 (Fla. Dist. Ct. App. 2004) (under Florida law, a claim accrues when the elements of the claim are present).  Here, the elements of all of plaintiffs' state law claims (*i.e.*, assault, false imprisonment, negligent infliction of emotional distress, and intentional infliction of emotional distress) were present — and thus accrued — no later than 2000, the latest date by which all plaintiffs knew that the five missionaries had been kidnapped and murdered by the FARC.  Plaintiffs did not bring suit, however, until 2008.

   As with their ATA claims, plaintiffs cannot salvage their otherwise time barred claims on the ground that Chiquita fraudulently concealed its involvement in causing their injuries.  (*See* Compl. ¶ 215.)  It is well-established under Florida law that the fraudulent concealment of the *identity* of a potential defendant cannot serve as a basis to toll a statute of limitations.  *See Lee v. Simon*, 885 So.2d 939, 942-43 (Fla. Dist. Ct. App. 2004) ("In this case, plaintiff plainly knew that it had a cause of action in tort as soon as [the injury occurred].  [Plaintiff's] ignorance as to the identity of the potential defendant does not affect this fact . . . nor, as all the authorities say, bring it within this limited exception to the statutory rule.") (quotations omitted); *Putnam Berkley Group, Inc. v. Dinin*, 734 So.2d 532 (Fla. Dist. Ct. App. 1999) (holding that concealment of wrongdoer's identity did not toll the statute of limitations because Florida's tolling statute does not contain such a provision).

Because it is clear that plaintiffs' state law claims are time barred, they must be dismissed.

## II.   PLAINTIFFS' ATA CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Plaintiffs' ATA claims against Chiquita are also legally defective on the merits.[5] The ATA creates the following cause of action:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a).  Hence, to sustain their ATA claims against Chiquita, plaintiffs must provide "plausible grounds to infer," *Twombly*, 127 S.Ct. at 1965, that Chiquita (i) committed "an act of international terrorism" (ii) "by reason of" which a U.S. national was injured. Plaintiffs have failed to do so and, indeed, cannot do so based on the facts pled in the Complaint.

### A.   Plaintiffs Do Not And Cannot Plead That Chiquita Committed "An Act Of International Terrorism."

Not every criminal or tortious act committed against Americans around the world gives rise to a claim under the ATA.  The plain language of the statute makes only "an act of international terrorism" actionable.  18 U.S.C. § 2333(a).  "International terrorism" is a specifically defined term in the ATA, which states in part:

---

[5]      In addition to the reasons discussed below, plaintiff NTM, an organization, cannot assert claims under the ATA for the added reason that it is not a "national of the United States" within the meaning of the statute.  *See* 18 U.S.C. § 2331(2) (noting that the phrase "national of the United States" has the same meaning given to such term in section 101(a)(22) of the Immigration and Nationality Act ("INA")); *see also Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 968 (9th Cir. 2003) (noting that a person is a "national" of the United States for purposes of the INA either through birth or the naturalization process).

(1)  the term "international terrorism" means activities that—
(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any state, or that would be a criminal violation if committed within the jurisdiction of the United States or of any state; [and]
(B) appear to be intended—
(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion; or
(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping . . . .

18 U.S.C. §§ 2331(1)(A)-(B).

To be liable under the ATA, therefore, Chiquita must have engaged in activities that (1) involved violent or dangerous criminal acts (2) with an apparent intent to "intimidate or coerce" a civilian population or foreign government, or to "affect the conduct of a government." Plaintiffs do not and cannot satisfy these requirements.

**1.      *There are no allegations that Chiquita's payment of money to the FARC was intended to "intimidate or coerce" any identifiable civilian population or to "affect the conduct" of the Colombian government.***

Plaintiffs have not alleged, and cannot allege, that *Chiquita's* activities in Colombia, and specifically its subsidiary's payments to the FARC, were intended to "intimidate or coerce" a civilian population or "affect the conduct" of a government.  18 U.S.C. § 2331(1)(B).  Rather, the Complaint alleges that Chiquita is a U.S. company engaged in the business of producing and distributing bananas and other fresh produce around the world (*see* Compl. ¶¶ 44, 46-48, 186), and that Chiquita's activities in Colombia were limited to this business purpose (*see id.* ¶¶ 44, 48, 187).

In light of these facts, the most plaintiffs can allege is that the payments of Chiquita's Colombian subsidiary to the FARC were made to benefit Chiquita's business.  (*Id.* ¶ 198 ("Chiquita's payments to FARC were not merely made knowingly, but with the specific intent to leverage its secret payments to FARC as a means of furthering Chiquita's pecuniary

objectives, squashing competition, and assuring Defendant of an accommodating labor force.").).)
But this alleged intent plainly does not meet the ATA's intent requirement.

   In this unusual case, it cannot even be said that the kidnappings and murders
perpetrated by the FARC guerrillas reflect the requisite intent required by the statute.[6]  To the
contrary, as condemnable as these criminal acts were, plaintiffs acknowledge that the FARC
carried out the kidnappings for the purpose of collecting ransom.  For instance, the Complaint
alleges that "one week after the kidnappings [of Mark Rich, Charles David Mankins, and
Richard Tenenoff], the terrorists radioed NTM in Panamá and demanded a $5,000,000.00
ransom for the men's return."  (Compl. ¶ 100.)  Likewise, "[w]ithin a month of Stephen Welsh's
and Timothy Van Dyke's kidnappings, FARC terrorists contacted the NTM by radio and
demanded $3,000,000.00 for the two men's safe return."  (*Id.* ¶ 144.)  Demands for money
continued while the victims remained captive.  (*Id.* ¶¶ 102, 105; *see also id.* ¶ 152 ("Members of
the CMT met with local doctors who provided information about the missionaries and FARC's
financial requirements for payoffs.").)  It was only after demands for ransom were refused (*see
id.* ¶¶ 101, 146), that the FARC murdered the missionaries (*see id.* ¶¶ 111, 147-48).

   The Complaint itself thus demonstrates that the FARC's capture and killing of
these five U.S. missionaries was *not* intended to "influence the policy" or to "affect the conduct

---

[6]  Plaintiffs' reliance on generic and conclusory statements in the Complaint which repeat
verbatim the statutory intent requirement of the ATA are clearly inadequate.  (*See* Compl. ¶ 218
("FARC's killing of U.S. nationals and other persons were and are intended to: (a) intimidate or
coerce the civilian population of Colombia; (b) influence the policy of the governments of
Colombia and the United States by intimidation or coercion; and (c) affect the conduct of the
governments of Colombia and the United States by mass destruction, assassination, or
kidnapping."); *see also id.* ¶ 226.)  "[C]onclusory allegations, unwarranted deductions of facts or
legal conclusions masquerading as facts will not prevent dismissal."  *Jackson*, 372 F.3d at 1262-
63; *see also Twombly*, 127 S.Ct. at 1964-65 ("[A] plaintiffs' obligation to provide the 'grounds'
of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do.").

of a government."  18 U.S.C. §§ 2331(1)(B)(ii)-(iii).  To be sure, the FARC has engaged in

political kidnappings and currently holds dozens of hostages in an effort to pressure the U.S. and

Colombian governments to, among other things, free imprisoned guerrillas.[7]  Unlike such

political hostage situations, however, the kidnappings at issue here were, by plaintiffs' own

allegations, motivated by a desire to extort money.  Such criminal acts do not fall within the

scope of the ATA.

It is also clear from the face of the Complaint that the FARC's capture and killing

of the missionaries was *not* intended "to intimidate or coerce a civilian population."  18 U.S.C.

§ 2331(1)(B)(i).  A "population" refers to a "number of inhabitants of a particular group, class,

or race in a given area" or to those "inhabiting a specific area," such as a country or a state.  *See*

Webster's II New College Dictionary 880 (3d ed. 2005).  Here, there is no allegation that the

FARC targeted the U.S. missionaries for kidnapping and murder based on their common

membership in a "particular group, class, or race" or their common inhabitation of "a specific

area."  To the contrary, the Complaint makes clear that kidnapping of individuals for ransom by

the FARC is not targeted at any particular segment of the civilian population.  (*See* Compl. ¶ 176

(noting that the FARC targets "wealthy landowners, foreign tourists, prominent international and

---

[7]        Indeed, several such hostages, including former Colombian presidential candidate Ingrid
Betancourt, were freed just this past week in a daring rescue mission by the Colombian army.
*See, e.g.*, *Colombia Hostage Betancourt Freed*, BBC, July 3, 2008, http://news.bbc.co.uk/2/hi/
Americas/7486552.stm (noting that the recent rescue of Mrs. Betancourt, among others, was "a
major blow to the FARC, which had hoped to exchange some 60 *political hostages* for hundreds
of rebels held by the Colombian government") (emphasis added); *see also* Dinitia Smith, *Family
Works to Free a Kidnapped Colombian Author and Senator*, N.Y. TIMES, Mar. 11, 2002
("[Ingrid] Betancourt[, a former Colombian senator and presidential candidate,] was taken [by
the FARC] while trying to enter a former rebel enclave just as the army moved in to reclaim it.
Shortly afterward a spokesman for the . . . FARC . . . , told CNN that the guerrillas would hold
her hostage *until the government passed a law permitting prisoner exchanges between guerrillas
and the military*.") (emphasis added).

domestic officials and ordinary civilians").)  Moreover, three of the five U.S. missionaries were kidnapped in Púcuro, Panamá, a remote village about 15 miles away from the Panamá-Colombia border.  (*Id*. ¶¶ 49, 54-89.)  The other two U.S. missionaries were kidnapped hundreds of miles away in a remote region of central Colombia, near Villavicencio, Meta, Colombia.  (*Id.* ¶¶ 112-141.)  In these circumstances, the kidnapping of the five American nationals, located in two different countries, by a Colombian guerrilla group that made no political demands, but sought only the payment of ransom, cannot be said to have been for the purpose of " intimidat[ing] or coerc[ing] a civilian population" within the meaning of the ATA.

Other ATA cases, in which it is either undisputed or easily established that the act at issue was animated by a political purpose, highlight the deficiencies in plaintiffs' claims here. *E.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1002 (7th Cir. 2002) (noting that "HAMAS seeks to advance its political objectives through acts of terrorism and works to undermine the Middle East peace process through violent attacks on civilians," including the attack on David Boim); *Boim v. Quranic Literacy Inst.*, 127 F. Supp. 2d 1002, 1012 n.7 (N.D. Ill. 2001) ("The defendants do not dispute plaintiffs' assertion that the activities alleged in the complaint meet [the intent prong] of the definition of 'international terrorism' under § 2331."). In a recent ATA case, for example, the court concluded that a suicide bombing in a public bus in Tel Aviv, Israel, perpetrated by a HAMAS terrorist in 2002, constituted an act of "international terrorism" because "it was intended to intimidate the civilian population of Israel and thereby to influence Israeli government policy."  *Sisso v. Islamic Republic of Iran*, No. 05-0394, 2007 WL 2007582, at *11 (D.D.C. July 5, 2007).  Plaintiffs here allege no facts that would demonstrate how the kidnapping and murder of the five missionaries *for the purpose of obtaining ransom payments* similarly satisfies the statutory requirements of the ATA.

Because the allegations in the Complaint make clear that the kidnappings and murders at issue were not acts of "international terrorism," *a fortiori*, Chiquita's alleged participation in these acts was not an act of "international terrorism" actionable under the ATA.

### 2.     *Chiquita did not engage in any activities "that involve violent acts."*

Neither do the allegations in the Complaint demonstrate that Chiquita's alleged payments to the FARC constituted "activities that [] involve violent acts or acts dangerous to human life that are a violation of [U.S.] criminal laws . . . or that would be a criminal violation if committed within the jurisdiction of the United States or of any State."  18 U.S.C. § 2331(1)(A).  Chiquita did not kidnap or kill the decedents; the FARC allegedly did.  At most, plaintiffs can assert that Chiquita was *complicit* in the FARC's kidnapping and murder of the decedents in violation of section 2332 (*see* Compl. ¶¶ 216-232), which criminalizes homicide and conspiracy to commit homicide of U.S. nationals abroad.  18 U.S.C. § 2332.  However, plaintiffs allege no fact — nor could they — to suggest that Chiquita sought or intended the killing of any U.S. national abroad, let alone the five U.S. nationals in this case.

Because plaintiffs do not and cannot allege that Chiquita engaged in an "act of international terrorism" actionable under the ATA, they rest their claims instead on the theory that Chiquita "knowingly" aided and abetted, conspired with, and materially supported the FARC in kidnapping and murdering the U.S. missionaries.  (Compl. ¶¶ 223, 232, 235.)  In *Boim*, the Seventh Circuit held that a defendant who aids and abets or materially supports "international terrorism" could itself be considered to have engaged in an "act of international terrorism" actionable under the ATA.  291 F.3d at 1016, 1021; *see also Boim v. Holy Land Found. for Relief & Dev.*, 511 F.3d 707, 738 (7th Cir. 2007), *vacated for reh'g en banc*, No. 00 C 2905 (7th

24

Cir. June 16, 2008).  But as explained in detail below, it is clear that plaintiffs here cannot satisfy

the *Boim* court's standards for secondary liability under the ATA.[8]

> a)  **Plaintiffs do not and cannot plead sufficient facts to establish that Chiquita aided and abetted, or materially supported, the kidnapping and murder of the decedents by the FARC.**

Plaintiffs have failed to plead facts to support their theory that Chiquita should be

liable under the ATA because it aided and abetted and materially supported the FARC's

kidnapping and murder of decedents.  In *Boim*, the Seventh Circuit articulated an exacting

standard for claims of aiding and abetting and material support under the ATA: plaintiffs must

show that the defendant "knew of [the terrorist's] illegal activities, that the defendant[] desired to

help those activities succeed, and [the defendant] engaged in some act of helping the illegal

activities." 291 F.3d at 1023.  Thus, mere knowledge of a terrorist's illegal activities is not

sufficient; to state a claim, plaintiffs must *plausibly* allege that Chiquita *intended* "to help those

activities succeed."  *See also id.* at 1015 ("If the plaintiffs could show that HLF and QLI violated

. . . section 2339A, that conduct . . . would give rise to civil liability under section 2333 so long

as knowledge *and intent* are also shown.") (emphasis added); *id.* at 1024 (aiding and abetting

---

[8]     The Seventh Circuit is the only federal circuit court of appeals to have recognized the liability of secondary actors under the ATA.  To the extent the *Boim* court extended civil liability under the ATA to secondary actors who cannot properly be categorized as "terrorists," Chiquita respectfully submits that the Seventh Circuit erred in doing so, as the plain language of the statute and the ATA's legislative history preclude such a result.  *E.g.*, H.R. Rep. No. 102-1040, at 5 (1992) ("In order to facilitate civil actions *against . . . terrorists* [such as those who committed the attack on the *Achille Lauro* in 1985] the Committee recommends H.R. 2222.") (emphasis added); 138 Cong. Rec. S17254 (daily ed. Oct. 7, 1992) (statement of Sen. Grassley, principal sponsor of the civil provisions of the ATA) ("American victims will be able to bring a claim *against a terrorist group* for money damages.") (emphasis added).  Although the Eleventh Circuit has yet to consider the issue, and although *Boim* is not binding precedent, the court need not determine whether secondary liability may extend to American companies under the ATA, as the Complaint makes clear that plaintiffs cannot plead a claim for aiding and abetting or material support against Chiquita under the standards articulated by the Seventh Circuit.

requires showing that defendant "provided aid to HAMAS *with the intent* to facilitate [its] illegal activities") (emphasis added); *Stutts v. De Dietrich Group*, No. 034058, 2006 WL 1867060, at *6 (E.D.N.Y. June 30, 2006) (dismissing ATA suit where plaintiffs "allege no facts to suggest that the Bank Defendants intended to further Saddam Hussein's activities").

There is no such allegation here.  The only allegations in the Complaint concerning Chiquita's *mens rea* are that Chiquita *knew* that the FARC was a dangerous and violent organization.  (*See, e.g.*, Compl. ¶ 221 ("Defendant also knew, at all relevant times, that FARC regularly committed horrific terrorist attacks, including kidnapping, holding hostages, maiming and murdering American citizens such as Plaintiffs.").)  Even accepting such wholly conclusory allegations as true for purposes of this motion to dismiss, plaintiffs do not allege — nor could they — that Chiquita "desired to help" the FARC succeed in its criminal activities as a general matter, let alone that Chiquita "desired to help" the FARC succeed in carrying out the kidnapping and murder of American citizens, including the five decedents.  *Boim*, 291 F.3d at 1023.

Not only do plaintiffs fail to allege that Chiquita acted with the requisite *mens rea*, the Complaint itself belies any suggestion that Chiquita desired to help the FARC carry out its criminal activities.  Notably, the Complaint alleges that the FARC "opposes *United States influence in Colombia . . . and multinational corporations.*"  (Compl. ¶ 175) (emphasis added). In light of this allegation, it defies common sense that Chiquita, a U.S. multinational corporation, would then provide assistance to the FARC with the requisite "desire to help" the FARC succeed in its activities.  Similarly, the Complaint alleges that the "FARC finances itself through . . . extortion" and that the "FARC . . . financially supports its 'revolutionary' operations by collecting *'war taxes'* from . . . businesses and landowners in the regions where FARC operates."

(Compl. ¶¶ 177-178) (emphasis added).  This allegation rebuts any notion that Chiquita voluntarily paid the FARC because it "desired to help" the FARC succeed; rather, Chiquita's subsidiary, like other "businesses and landowners," had no choice but to pay the "war taxes" demanded by the FARC.

Plaintiffs' aiding and abetting claims also fail because they do not satisfy the substantial assistance prong of aiding and abetting.  As discussed in Part II.B *infra*, the Complaint is devoid of any facts establishing a causal link between the alleged deaths and Banadex's payments to the FARC.  *See also Stutts*, 2006 WL 1867060, at *6 ("[W]here a plaintiff fails to show a causal link between the alleged unlawful act and the defendant's participation in the commission of that act, it is more difficult to demonstrate that the defendants knowingly and substantially assisted in the unlawful activity").  The Complaint makes no attempt to establish the significance of the payments made by Banadex to the FARC over an eight-year period relative to the overall resources of the FARC.  Indeed, the Complaint concedes that the FARC earned "hundreds of millions" of dollars from its kidnapping activities, which says nothing of the additional millions that the FARC has earned through drug trafficking, robberies, and other criminal activities.  (*See* Compl. ¶ 176.)

The deficiencies in plaintiffs' claims are obvious when compared to the allegations made by the plaintiffs in *Boim*.  In *Boim*, the plaintiffs alleged that defendants Quranic Literacy Institute ("QLI") and the Holy Land Foundation for Relief and Development ("HLF") aided and abetted HAMAS' terrorist activities which resulted in the death of plaintiffs' son.  *See* 291 F.3d at 1023-24.  In support of their aiding and abetting and material support claims, plaintiffs made detailed factual allegations that supported a finding that QLI and HLF had the requisite *mens rea* and that their financial support of HAMAS assisted its terrorist

activities.  For instance, plaintiffs alleged that QLI and HLF were the main fronts for HAMAS in

the United States and that their core mission was raising and funneling money and other

resources to HAMAS operatives in support of terrorist activities.  *Id.* at 1003.  Moreover, QLI

and HLF were linked by interlocking directorates and ties to the U.S. leader of the military

branch of HAMAS.  *Id.*  There were also allegations that QLI and HLF laundered money for

HAMAS, raised funds to finance terrorist activities in Israel, and commingled money for terrorist

causes with funds from legitimate dealings to avoid laws against financially supporting terrorists.

*Id.* at 1024-25.  On the basis of these allegations, the court found that plaintiffs had sufficiently

pled aiding and abetting and material support claims under the ATA.  *Id.* at 1025.  The

allegations here — which claim only that Chiquita knew of the FARC's violent criminal

activities, but which otherwise directly undercut any suggestion that Chiquita somehow shared

the FARC's murderous objectives — do not come close to the detailed allegations made in *Boim*.

### b)      Plaintiffs' conspiracy claim is baseless.

Plaintiffs' alternative theory of derivative liability, civil conspiracy, is equally

defective, as it seeks to repackage in different legal jargon the same, and ultimately unavailing,

allegations underlying plaintiffs' aiding and abetting theory.  (*See* Compl. ¶¶ 224-232 (Count

Two).)  Plaintiffs assert that "Chiquita agreed to conspire with FARC to act unlawfully" and that

"[b]y conspiring to act with FARC to support, encourage and facilitate violations of 18 U.S.C.

§ 2332 that have injured [plaintiffs]," Chiquita is liable for the FARC's violent conduct.[9]  (*See*

---

[9]      Section 2332 makes the following criminal acts subject to prosecution when they are
"intended to coerce, intimidate, or retaliate against a government or a civilian population," 18
U.S.C. § 2332(d): (1) killing of a U.S. national, while such national is outside the United States;
(2) conspiracy to kill a national of the United States, while such national is outside the United
States; and (3) engaging in physical violence outside the United States intending to cause serious
bodily injury to a U.S. national and actually causing such injury.  18 U.S.C. §§ 2332(a)-(c).

Compl. ¶¶ 228, 232.)  Plaintiffs further allege that Chiquita and the FARC had a "common plan to subvert local trade unions, protect Chiquita's farms and shipments, harm Chiquita's competitors and strengthen FARC's military capabilities."  (Compl. ¶ 230.)  These allegations are specious.

Although plaintiffs formulaically allege that Chiquita conspired with the FARC to violate 18 U.S.C. § 2332 (*see* Compl. ¶¶ 224-232 (Count 2)), which criminalizes violent attacks against Americans with the purpose "to coerce, intimidate, or retaliate against a government or a civilian population," plaintiffs do not make a single allegation that Chiquita desired to kidnap or murder Americans in Colombia, much less that Chiquita entered into an agreement with the FARC to achieve this result.  Plaintiffs do not even allege the most basic elements of a conspiracy claim, such as the identities of the purported conspirators, the dates or location of the formation of the conspiracy, or the terms of the conspiracy.  *See In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1298, 1300 (S.D. Fla. 2006) (dismissing conspiracy claims under the ATS because plaintiffs' "conspiracy allegations [were] devoid of names, dates, or locations regarding a conspiracy . . . [and] are not plead with sufficient particularity to show the necessary meeting of the minds between the alleged conspirators"); *Cavitat Med. Techs., Inc. v. Aetna, Inc.*, No.04-cv-01849, 2006 WL 218018, at *5-6 (D. Colo. Jan. 27, 2006) (dismissing civil conspiracy claim where plaintiff failed to "identify the speakers, the statements made, when the statements were made, or to whom they were made").

Moreover, the allegations in the Complaint actually contradict any claim of a conspiracy between Chiquita and the FARC.  *See Twombly*, 127 S. Ct. at 1970-74, n.14 (holding that dismissal of an antitrust conspiracy claim was proper because the allegations in the complaint failed "in toto to render plaintiffs' entitlement to relief plausible").  According to the

Complaint, the FARC opposes "multinational corporations" and "United States influence in Colombia." (Compl. ¶ 175.) The Complaint further alleges that the FARC opposes private ownership of Colombia's "natural resources." (*Id.*) Notwithstanding these allegations, plaintiffs claim that the FARC entered into an agreement with an American multinational corporation that owned and operated more than 200 banana farms in Colombia. Plaintiffs cannot assert a conspiracy claim when the very allegations in the Complaint demonstrate the claim's implausibility.

**B. Plaintiffs Do Not And Cannot Plead That Their Injuries Were "By Reason of" Chiquita's Payments.**

Even if Chiquita's alleged acts are deemed to be tortious under the ATA, plaintiffs' claims still fail because the Complaint alleges no plausible causal connection between Chiquita's purported support of the FARC and the kidnapping and murder of the five decedents. The causation requirement arises from the plain language of the statute, which creates liability only for injuries suffered "*by reason of*" an act of international terrorism.[10] 18 U.S.C. § 2333(a) (emphasis added). Here, plaintiffs do not and cannot allege that Chiquita's payments to the FARC were the "cause in fact," let alone the "proximate cause," of their injuries.

---

[10] When Congress explicitly makes causation an element of a federal cause of action, courts must review the pleadings carefully to evaluate whether causation has been alleged adequately. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453-55, 461 (2006) (holding that plaintiffs failed to plead causation — an element premised on RICO's "by reason of" language — after a careful analysis of the factual allegations in the complaint); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 339, 345-48 (2005) (holding that plaintiffs failed adequately to allege causation, as required by the securities fraud statute); *see also Twombly*, 127 S.Ct. at 1966 (quoting *Dura Pharms.* for the proposition that "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value") (citations omitted).

1.       *The Complaint does not allege that the kidnapping and murder of decedents would not have occurred "but for" Chiquita's payments to the FARC, and in any event such a connection would be too speculative to survive a motion to dismiss.*

Plaintiffs' allegations concerning causation are limited to a single conclusory assertion that Chiquita's alleged assistance "substantially facilitated FARC's acts of terrorism which *caused* Plaintiffs' injuries in violation of 18 U.S.C. § 2332." (Compl. ¶ 220) (emphasis added). Nowhere does the Complaint allege a single *fact* establishing that, *but for* Chiquita's assistance, the FARC would not have kidnapped and murdered the U.S. missionaries. *See Prosser & Keeton on Torts* § 266 (Dan B. Dobbs et al. eds., 5th ed. 1984) ("The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.").

Moreover, the allegations in the Complaint make clear that any inference that Chiquita's payments to the FARC were the "cause in fact" of the kidnapping and murder of the decedents would be too speculative to survive a motion to dismiss. *See, e.g.*, *Streeter v. City of Pensacola*, No. 05-286, 2007 WL 4468705, at *6 (N.D. Fla. Dec. 18, 2007) (dismissing certain federal discrimination claims because the allegations were "far too speculative and implicate[d] a causative relationship far too attenuated and implausible to state a claim of promotion discrimination based on plaintiffs' race"); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 200-02 (E.D.N.Y. 2003) (holding that speculative theories of causation in support of a federal antitrust claim are inadequate to survive a motion to dismiss); *Berwick v. New World Network Int'l, Ltd.*, No. 06-2641, 2007 WL 949767, at *15 (S.D.N.Y. Mar. 28, 2007) (dismissing a claim of tortious interference partly because "the Complaint d[id] not contain sufficient factual allegations to support the requirement of pleading 'but-for' causation").

31

For instance, the Complaint alleges that the FARC collected a "war tax" from "businesses and landowners in the regions where FARC operates" and that Chiquita owned banana farms in the regions "controlled" by the FARC during the time period in question. (Compl. ¶¶ 178, 187, 190.)  But, the Complaint alleges no facts demonstrating how the "war tax" extracted from Chiquita — as opposed to the payments extracted from countless other "businesses and landowners" — contributed to the kidnappings and murders of the decedents, leaving the court to speculate as to whether these injuries would not have occurred but for Chiquita's payments to the FARC.

Moreover, the Complaint alleges that the FARC routinely engaged in kidnappings for ransom and "has been responsible for most of the ransom kidnappings in Colombia." (Compl. ¶ 176; *see also id.* (alleging that "an estimated 6,500 kidnappings" have been recorded in Colombia).)  Yet, the Complaint is silent as to how Chiquita's payments to the FARC caused the FARC to commit kidnappings, much less the kidnapping and murder of the decedents.  If anything, Chiquita's payments of "war taxes" to the FARC should have *reduced* the financial need for the FARC to engage in kidnappings for ransom.  Plaintiffs instead ask this Court to draw the opposite, purely speculative inference that the money Chiquita paid the FARC caused it not only to engage in kidnappings for ransom, but to kidnap and murder these particular victims.

Plaintiffs have failed to plead any allegations that support a plausible "but for" connection between Chiquita's payments and the kidnapping and murder of the five missionaries.

> **2.      *On the facts alleged, Chiquita's payments to the FARC cannot be the proximate cause of the kidnapping and murder of decedents.***

Plaintiffs certainly cannot establish that Chiquita's purported assistance to the FARC was the *proximate* cause of plaintiffs' injury, a prerequisite owing to the ATA's

requirement that plaintiffs' injury be "by reason of" the defendant's purported "act of international terrorism."  *See Boim*, 291 F.3d at 1011 (noting, in the context of the ATA, that "[t]he Supreme Court [in *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)] interpreted identical language [(*i.e.*, "by reason of")] to require a showing of proximate cause").  Plaintiffs' apparent theory of causation does not pass muster under any of the various tests that courts have used to assess proximate causation.

For instance, the Complaint fails to allege any *facts* demonstrating that Banadex's payments were a "substantial factor" in the kidnapping and murder of the missionaries.  *See Klingler v. Yamaha Motor Corp., U.S.A.*, 738 F. Supp. 898, 907-09 (E.D. Pa. 1990) (interpreting the phrase "by reason of" within the civil provision of the Consumer Product Safety Act to require application of the "substantial factor" test of legal causation); *see also* Restatement (Second) of Torts § 431 (1965) ("The actor's negligent conduct is a legal cause of harm to another if [] his conduct is a *substantial factor* in bringing about the harm.") (emphasis added). While plaintiffs repeatedly assert that Chiquita's payments and "assistance" to the FARC were "substantial" (Compl. ¶¶ 3, 5, 191), and that such support "substantially" facilitated or assisted the FARC's terrorist acts (*id.* ¶¶ 220, 222), these conclusory assertions are no substitute for well-pled factual allegations.  *See Twombly*, 127 S.Ct. at 1964-65; *Jackson*, 372 F.3d at 1262-63. Plaintiffs make no attempt to demonstrate the significance of Banadex's payments to the FARC in light of the overall resources of that group, whose *annual* income alone is in the hundreds of millions of dollars.[11]  In the absence of such allegations, plaintiffs cannot demonstrate how Banadex's payments were a "substantial factor" in the kidnapping and murder of decedents.

---

[11]     Plaintiffs allege that Banadex paid the FARC "$20,000.00 to as much as $100,000.00 per payment."  (Compl. ¶ 192.)  Assuming this allegation to be true for purposes of this motion, (continued…)

Nor do plaintiffs allege any facts to support the conclusion that the murder of decedents was a "directly traceable consequence" of Banadex's payments to the FARC. *See Prosser & Keeton on Torts*, *supra*, §§ 293-94 ("A distinction is made . . . between consequences which may be regarded as 'directly traceable' from the defendant's act, or as caused 'directly' by defendant's act, and those which result from intervention of other causes at a later time."); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation *led directly* to the plaintiff's injuries.") (emphasis added). To the contrary, the allegations in the Complaint indicate that decedents died as a direct consequence of their having been kidnapped for ransom by FARC guerrillas and the plaintiffs' subsequent decision not to pay the ransom demands. The Complaint further indicates that two of the decedents (Stephen Welsh and Timothy Van Dyke) were killed in armed combat between their captors and the Colombian army. In these circumstances, the Complaint fails to allege any direct relation between Chiquita's conduct and plaintiffs' injuries.

Similarly, the Complaint makes clear that the kidnapping and murder of plaintiffs' relatives was not the "reasonably foreseeable" or "natural" consequence of Banadex's payments. "[A] defendant will be held liable only for those injuries that might have been reasonably anticipated as a natural consequence of the defendant's actions." *Boim*, 201 F.3d at 1012; *see also Prosser & Keeton on Torts*, *supra*, § 282 (noting that "natural" in the context of this test

_____

Banadex still would have provided only a very small fraction of the FARC's income, *see* p.3 n.1 *supra*, making any finding of proximate causation too speculative to survive a motion to dismiss. *See* Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 36 (2007) ("When an actor's negligent conduct constitutes *only a trivial contribution* to a causal set that is a factual cause of physical harm . . ., the harm is not within the scope of the actor's liability.") (emphasis added); *see also id.* cmt. a (noting that § 36 derives from the "substantial-factor" test).

34

refers "to consequences which are normal, not extraordinary, not surprising in the light of ordinary experience"). Here, it cannot be said that a reasonably foreseeable consequence of Banadex's payments to the FARC in Urabá and Santa Marta, Colombia, would be the FARC's kidnapping for ransom of American citizens in Panamá or their murder near the Colombia-Panamá border. Nor can it be said that it was a reasonably foreseeable consequence of Banadex's payments to the FARC that American citizens would be kidnapped near Villavicencio, Colombia, and killed during a gun fight between the FARC and the Colombian military. There is nothing reasonable or natural about this attenuated chain of events.

## III.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Plaintiffs assert several common law and statutory claims under the tort laws of Florida and Nebraska. These claims should be dismissed because they are time-barred, *see* Part I.B *supra*, but even if they are not, plaintiffs have failed to allege facts to support these claims under applicable law.

### A.    Plaintiffs Fail To State A Claim For Any Indirect Liability Tort.

Plaintiffs allege that Chiquita is indirectly liable for a variety of torts committed by FARC guerrillas in Colombia. (*See* Compl. ¶¶ 321-27, 334-39, 355-59, 365-69, 375-80 (false imprisonment of decedents (Count 14), intentional infliction of emotional distress ("IIED") of decedents (Count 16), IIED of family members (Count 19), assault of family members (Count 21), and false imprisonment of family members (Count 23).)[12] Plaintiffs' bare-bones assertion

---

[12]    Under the law of the forum, "[w]hen a personal injury to the decedent results in death, no action for the personal injury shall survive." *See* Fla. Stat. § 768.20 (2008). Thus, Count 14 to 18, which allege personal injury claims on behalf of decedents Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Steven Welsh, and Timothy Van Dyke, must be dismissed. (continued…)

that Chiquita "gave substantial assistance to FARC and thereby breached its duty" to plaintiffs, however, is insufficient to maintain a claim against Chiquita. (*E.g.*, Compl. ¶ 327.)

First, it is questionable whether Florida courts recognize "substantial assistance" as a valid theory of third-party tort liability. *See Kilgus v. Kilgus*, 495 So.2d 1230, 1231 (Fla. Dist. Ct. App. 1986) (commenting that defendant's conduct did not constitute substantial assistance "even if that theory of liability is viable in Florida").

Even assuming Florida recognizes such a theory of derivative liability, plaintiffs have not pled facts demonstrating that Chiquita provided "substantial assistance" to the FARC in committing these torts, nor have they identified a duty owed by Chiquita to plaintiffs. Chiquita had no legal duty to control the conduct of a third-party Marxist guerrilla group to prevent them from harming others. *See Aguila v. Hilton, Inc.*, 878 So.2d 392, 400 (Fla. Dist. Ct. App. 2004) (noting that finding otherwise would "be the equivalent of concluding that [defendants] are strictly liable for all injuries"). To establish a duty, plaintiffs are required to plead facts establishing that Chiquita "created or controlled the risk" to plaintiffs. *See Badillo v. Playboy Entertainment Group, Inc.* No. 8:04-cv-591T30, 2006 WL 785707, *4 (M.D. Fla. 2006) (quotations omitted). Plaintiffs fail entirely to allege any such facts.

For all of the derivative liability torts described above, plaintiffs also allege separate causes of action for aiding and abetting the tortious conduct of the FARC. (Compl. ¶¶ 328-33, 340-45, 360-64, 370-74, 381-86 (Count 15 (aiding and abetting false imprisonment of decedents), Count 17 (aiding and abetting IIED of decedents), Count 20 (aiding and abetting IIED of family), Count 22 (aiding and abetting assault of family), Count 24 (aiding and abetting

---

To the extent plaintiffs allege these claims on behalf of decedents to establish an underlying tort for their wrongful death actions, the merits of these claims are addressed in this section.

false imprisonment of family).)  There is no case law in Florida, however, establishing general civil liability for aiding and abetting.  *See ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Maryland*, 917 So.2d 368, 371 (Fla. Dist. Ct. App. 2005) (noting a "dearth of authority" supporting litigant's claim that aiding and abetting constitutes a cause of action); *see also Freeman v. First Union Nat. Bank*, 865 So.2d 1272, 1274-75 (Fla. 2004) (same).  Even if Florida recognized such a civil cause of action, these claims would fail because plaintiffs have not pled sufficient facts to establish "substantial assistance" by Chiquita.  *See* Part II.A.2.a *supra*.

**B.       Plaintiffs Fail To State A Claim For Any Direct Liability Tort.**

Plaintiffs allege that Chiquita is directly liable for negligent infliction of emotional distress on decedents.  (*See* Compl. ¶¶ 346-54 (Count 18).)  To establish liability for this negligence-based tort, plaintiffs must allege: "[1] that the defendant owed a duty, [2] that the defendant breached that duty, and [3] that this breach caused the plaintiff damages."  *Florida Dep't of Corrections v. Abril*, 969 So.2d 201, 204 (Fla. 2007).  As noted above, plaintiffs have failed to plead facts identifying a duty owed by Chiquita to the decedents.  Likewise, plaintiffs have not adequately alleged causation.  Under Florida law, causation is established only where "it can be reasonably said that but for the [negligent] act [or omission] the injury would not have occurred."  *Watson v. City of Hialeah*, 552 So. 2d 1146, 1149 (Fla. Dist. Ct. App. 1989).  Plaintiffs have not alleged that their injuries would not have occurred but for Chiquita's alleged payments.  *See* Part II.B.1 *supra*.  As such, their claim for negligent infliction of emotional distress must be dismissed.

**C.       Plaintiffs Fail to State A Claim For Wrongful Death.**

Plaintiffs allege causes of action for wrongful death under Florida law (Compl. ¶¶ 236-59, 268-75 (Counts 4-6, 8)) and Nebraska law (Compl. ¶¶ 260-67 (Count 7)).  These claims, however, assume that Chiquita is responsible for some underlying tortious conduct.  *See*

Fla. Stat. § 768.19 (providing wrongful death action against "the person . . . that would have been liable in damages if death had not ensued"); Neb. Rev. Stat. § 30-809 (same). Plaintiffs' failure to allege adequately any underlying tortious conduct by Chiquita, as discussed above, therefore precludes plaintiffs' wrongful death claims.

Plaintiffs also allege that Chiquita aided and abetted the wrongful death of decedents. (Compl. ¶¶ 276-320 (Counts 9-13).) However, "wrongful death" is not itself a tort. Rather, the Florida and Nebraska wrongful death statutes create a cause of action for family members of decedents to recover damages for some underlying tort that resulted in death. It is therefore impossible to "aid or abet" wrongful death.

## CONCLUSION

For the foregoing reasons, Chiquita respectfully requests that the Court dismiss plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

Dated: July 11, 2008

Respectfully submitted,

_____/s/ Robert W. Wilkins_____

| | |
|---|---|
| Eric H. Holder, Jr. | Sidney A. Stubbs (Fla. Bar No. 095596) |
| John E. Hall | Robert W. Wilkins (Fla. Bar No. 578721) |
| James M. Garland | Christopher S. Rapp (Fla. Bar No. 0863211) |
| Jenny R. Mosier | rwilkins@jones-foster.com |
| COVINGTON & BURLING LLP | JONES, FOSTER, JOHNSTON & STUBBS, |
| 1201 Pennsylvania Avenue, N.W. | P.A. |
| Washington, D.C. 20004 | 505 South Flagler Drive, Suite 1100 |
| Telephone: (202) 662-6000 | West Palm Beach, Florida 33401 |
| Fax: (202) 662-6291 | Telephone: (561) 659-3000 |
| | Fax: (561) 650-0412 |
| Jonathan M. Sperling | |
| COVINGTON & BURLING LLP | |
| The New York Times Building | |
| 620 Eighth Avenue | |
| New York, NY 10018 | |
| Telephone: (212) 841-1000 | |
| Fax: (212) 841-1010 | *Counsel for Chiquita Brands International, Inc.* |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing document with the

Clerk of the Court using CM/ECF on this 11th day of July, 2008.  I also certify that the foregoing

document is being served this day on all counsel of record registered to receive electronic

Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's First

Case Management Order ("CMO") and the June 10, 2008 Joint Counsel List filed in accordance

with the CMO.

By:      /s/ Robert W. Wilkins
Fla. Bar No. 578721
rwilkins@jones-foster.com
