UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 08-01916-MD-MARRA/JOHNSON

IN RE: CHIQUITA BRANDS
INTERNATIONAL, INC. ALIEN
TORT STATUTE AND SHAREHOLDER
DERIVATIVE ACTION
_____/

This Document Relates to:

    DERIVATIVE ACTIONS.
_____/

### THE SPECIAL LITIGATION COMMITTEE OF CHIQUITA BRANDS INTERNATIONAL, INC.'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed.R.Civ.P. 23.1, the Special Litigation Committee (the "SLC") of nominal defendant Chiquita Brands International, Inc. ("Chiquita" or the "Company") moves to dismiss the claims asserted in the Verified Consolidated Shareholder Derivative Complaint (the "Amended Complaint"). The SLC submits the Joint Declaration of Howard W. Barker, Jr., William H. Camp, and Dr. Clare M. Hasler (the "SLC Decl.") in support of this motion to dismiss.

### PRELIMINARY STATEMENT

By resolution dated April 3, 2008, the Board of Directors of Chiquita (the "Board") formed the SLC in response to the filing of six derivative complaints between October 12, 2007 and January 15, 2008 in federal and state courts throughout the country. In March and April 2008, the four federal derivative actions were transferred to this Court by the multi-district litigation panel, and, on September 11, 2008, plaintiffs filed the Amended Complaint, which alleges claims on behalf of Chiquita for different forms of breach of fiduciary duty against twenty-six current and former Chiquita officers and directors.

The claims in the Amended Complaint arise principally out of payments made by Chiquita's former Colombian subsidiary, Banadex, from approximately 1989 through January 2004, to left-wing guerrilla and right-wing paramilitary groups in Colombia, including the Fuerzas Armadas Revolucionarias de Colombia, or the Revolutionary Armed Forces of Colombia, known as the "FARC," and the Autodefensas Unidas de Colombia, or the United Self-Defense Forces of Colombia, known as the "AUC." As a result of certain of those payments to the AUC, Chiquita pled guilty in March 2007 to violating U.S. anti-terrorism laws and agreed to pay a $25 million criminal fine.

In its April 3 resolution, as permitted under New Jersey law, the Board authorized the SLC to investigate the claims made in the Amended Complaint and to determine the Company's response to those claims. The SLC conducted an extensive and independent investigation of the facts underlying the claims made in the Amended Complaint. The purpose of the SLC's investigation was to determine the role and relative culpability, if any, of each of the defendants in the events that form the basis of the claims alleged in the Amended Complaint. The SLC's investigation is now complete. Attached to the Joint Declaration of Howard W. Barker, Jr., William H. Camp, and Dr. Clare M. Hasler – the three members of the SLC – is a detailed written report (the "SLC Report") of the SLC's investigation, its findings, and its determination as to whether the claims alleged in the Amended Complaint should be pursued, dismissed, or otherwise resolved.[1]

In the SLC Report, the SLC has concluded that the Amended Complaint should be dismissed in its entirety. Accordingly, the SLC respectfully submits that dismissal is appropriate because all of the standards set forth under New Jersey law that govern this motion have been met. *First*, the independence of the three members of the SLC – each prominent in his or her respective field and who joined the Board after the Company had ceased making the payments at

---

[1]    The publicly-filed version of the SLC Report was redacted to remove information that could potentially jeopardize the safety and security of individuals (or members of their families) who remain in, or have significant ties to, Colombia. By separate motion, the SLC is seeking to file the unredacted portions of the SLC Report with the Court under seal.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

issue – cannot reasonably be questioned.  **Second**, the scope and extent of the SLC's investigation demonstrates that the SLC investigated the claims alleged in the Amended Complaint in good faith and with due care.  The SLC's investigation was searching and comprehensive.  Among other things, the SLC and its counsel conducted approximately 70 interviews of 53 individuals and reviewed over 750,000 pages of documents.  **Third,** the factual record, set forth at length in the SLC Report, demonstrates that the SLC's conclusions are reasonable, as required by New Jersey law.

The SLC seeks dismissal of the Amended Complaint in its entirety because it has determined that, in the exercise of its business judgment under New Jersey law, this course of action is in the Company's best interests.  In reaching this conclusion, as set forth in detail in the SLC Report, the SLC has considered: (i) the factual and legal merits of each claim, including possible defenses to those claims, and (ii) additional factors relevant to determining whether litigation should be brought on behalf of the Company.  Accordingly, the SLC respectfully requests that the Court grant its motion to dismiss, as it is in the manifest best interests of Chiquita and all of its shareholders.

## STATEMENT OF FACTS

The SLC respectfully refers this Court to the SLC Report for a full and complete statement of the facts relating to the payments in Colombia, and other relevant factual and legal issues, as well as the SLC's findings and determinations.  The SLC Report and the SLC Declaration are incorporated herein by reference, and the findings described in this motion are cross-referenced with the SLC Report for the Court's convenience, as appropriate.

## LEGAL BACKGROUND

Under New Jersey law,[2] upon the filing of a derivative complaint that purports to be

---

[2]        Chiquita is incorporated in New Jersey, and thus New Jersey law governs the conduct of Chiquita's directors and officers.  *See Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989).  However, New Jersey courts seek guidance from the Delaware courts, which are the nation's preeminent courts in analyzing and interpreting corporate law.  *See, e.g., IBS Financial Corp. v. Seidman & Assocs., L.L.C.*, 136 F.3d 940, 949-50 (3d Cir. 1998) ("When faced with novel issues of corporate law, New Jersey courts have often looked to Delaware's rich abundance of corporate law for guidance").  New Jersey courts look to New York law as well.  *See Francis v.*

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

brought on behalf of a New Jersey corporation, the board of directors may empower a special litigation committee of disinterested directors to determine whether pursuit of the claims is in the best interests of the Company. In *In re: PSE&G Shareholder Litig.*, the only New Jersey decision that addresses SLCs, the New Jersey Supreme Court reviewed New Jersey corporation law and "[found] nothing . . . that would preclude the use of a special litigation committee in this setting." 801 A.2d 295, 310 (N.J. 2002) (internal citations omitted) (discussing standards for review of SLC's conclusions).

This conclusion is consistent with Delaware law, on which New Jersey courts generally rely where New Jersey law is un- or under-developed, as it is with respect to special litigation committees. Under Delaware law, it is well-settled that "an independent committee possesses the corporate power to seek the termination of a derivative suit." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 785 (Del. 1981); *id* at 786 ("The committee can properly act for the corporation to move to dismiss derivative litigation that is believed to be detrimental to the corporation's best interest"); *see also Agostino v. Hicks*, 845 A.2d 1110, 1116 (Del. Ch. 2004) (the "board may appoint a special litigation committee of disinterested directors that may recommend dismissal of the derivative action after a reasonable investigation").

An SLC comprised of independent members has the authority to seek dismissal of a derivative complaint even where a majority of the board that appointed the SLC is "tainted by self-interest." *Zapata*, 430 A.2d at 786. That is because "a stockholder cannot be permitted . . . to invade the discretionary field committed to the judgment of the directors and sue in the corporation's behalf when the managing body refuses." *Id.* at 783 (quotation omitted); *see also Johnson v. Glassman*, 950 A.2d 215, 219 (N.J. Super. Ct. App. Div. 2008) (recognizing the "cardinal precept" that "directors, rather than shareholders, manage the business and affairs of a corporation"); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (the "decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation . . . are part of the

*United Jersey Bank,* 432 A.2d 814, 821 (N.J. 1981).

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

responsibility of the board of directors") (citations omitted).

In *Zapata*, the Delaware Supreme Court set forth the process by which an SLC may seek dismissal of claims asserted in a derivative complaint if it determines that pursuit of those claims would be contrary to the best interests of the corporation. The Court held:

> After an objective and thorough investigation of a derivative suit, an independent committee may cause its corporation to file a pretrial motion to dismiss . . . . The basis of the motion is the best interests of the corporation, as determined by the committee. The motion should include a thorough written record of the investigation and its findings and recommendations.

430 A.2d at 788. Similarly, under New Jersey law, an SLC has the burden of demonstrating that its members "(1) were independent and disinterested, (2) acted in good faith and with due care in their investigation of the shareholder's allegations, and that (3) the [] decision was reasonable. All three elements must be satisfied." *PSE&G*, 801 A.2d at 312 (citations omitted). However, this standard "[does] not permit the court to substitute its own business judgment for that of management." *Id.* (citation omitted).

Where the reviewing court finds that an SLC has shown independence, good faith and due care in its investigation, and the reasonableness of its conclusions, the motion to dismiss should be granted. *See PSE&G*, 801 A.2d at 312 ("Courts would have to dismiss a shareholder derivative suit in accordance with [the Company's] recommendation so long as the corporation could establish the decision maker acted reasonably, in good faith, and in a disinterested fashion") (citation omitted); see *also Kaplan v. Wyatt*, 499 A.2d 1184, 1191-92 (Del. 1985) (affirming dismissal of suit on motion of SLC); *St. Clair Shores Gen. Emples. Ret. Sys. v. Eibeler*, 2008 WL 2941174, at *7 (S.D.N.Y. July 30, 2008) (dismissing derivative claims where "the SLC has carried its burden of showing the absence of a triable issue regarding the Committee's independence and good faith, and the reasonableness of its conclusions").

For the reasons discussed below, the SLC respectfully submits that it has engaged in an independent, good faith, and reasonable investigation, and that the conclusions it has reached, in

the exercise of its business judgment, are likewise reasonable.   Thus, the SLC's motion to dismiss all claims as against all defendants should be granted.

## DISCUSSION

### I. THE CHIQUITA SLC IS INDEPENDENT AND CONDUCTED A GOOD FAITH INVESTIGATION

#### A. The SLC Is Wholly Disinterested and Independent

As set forth in detail in Section II.C. of the SLC Report, SLC members Barker, Camp, and Hasler are disinterested in the claims alleged in the Amended Complaint and independent of all of the defendants.   Camp, who joined the Board on April 3, 2008, spent 22 years at Archer Daniels Midland Company, Inc., a leading agricultural processing company, where he rose to serve as one of its most senior executives.   *See id.* at Section II.B.2.   Barker, who joined the Board on September 21, 2007, is a former partner at KPMG LLP, where he worked for 30 years. *See id.* at Section II.B.1.   Hasler, who joined the Board on October 11, 2005, is currently Executive Director of the Robert Mondavi Institute for Wine and Food Science (the "Mondavi Institute") at the University of California, Davis ("UC Davis"), and is a leading expert in food and nutritional issues.   *See id.* at Section II.B.3.   Barker, Camp, and Hasler are independent, non-management directors, and did not serve on the Board during the period when the Company was making the payments to the FARC and AUC that are at issue in the Amended Complaint.

***The SLC is Disinterested.***   The SLC members are plainly disinterested in the claims made in the Amended Complaint.   Under New Jersey law, "directorial interest exists when divided loyalties are present, or where the director stands to receive a personal financial gain [from a decision] not equally shared by the shareholders." *PSE&G*, 801 A.2d at 314 (citations omitted); *see also Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (test for director interest is whether the director "will receive a personal financial benefit [from a decision] that is not equally shared by the stockholders" or the decision "will have a materially detrimental impact on a director, but not on the corporation and the stockholders").

Although all three SLC members joined the Board after the Company had stopped

making the payments in Colombia, plaintiffs have named Barker and Hasler (but not Camp) as defendants. The Amended Complaint does not actually mention Barker by name in any substantive allegation, but the SLC inferred his inclusion as a defendant to relate to its claim that certain severance decisions made by the Board were improper, a claim that is subordinate to the primary claim, which is that the payments themselves were a breach of duty.[3] Likewise, the only two potential claims against Hasler arise from her role in approving (i) the Company's entry into the plea agreement in March 2007,[4] and (ii) the severance terms of two former Chiquita officers. As set forth in the SLC Report (*see* Sections II.C.1, II.C.3), although both Barker and Hasler concluded that they could fairly and impartially consider those claims, they nonetheless recused themselves from deliberations and decision-making with respect to those claims.

In any event, the fact that Barker and Hasler sat on the Board at the time these decisions were made does not render them interested under the law. *See, e.g., Kaplan*, 499 A.2d at 1189 ("The mere fact that a director was on the Board at the time of the acts alleged in the complaint does not make the director interested or dependent so as to infringe on his ability to exercise his independent business judgment of whether to proceed with the litigation"); *Kindt v. Lund*, 2003 WL 21453879, at *3 (Del. Ch. May 30, 2003) (upholding the SLC's independence even though one of its two members "was on the board, approved the challenged transactions, and is a defendant" because that member "had no financial interest in any of the transactions").[5]

Here, it is beyond dispute that, with respect to each claim they evaluated, the members of

---

[3]      The Amended Complaint alleges, in general, that the Board improperly agreed to severance terms with Chiquita executives who were involved in making, or aware of, the payments to the AUC. *See* Am. Compl ¶¶ 16, 119. The only severance decision in which Barker participated was for Robert Kistinger, which was made at the October 25, 2007 Board meeting, the first meeting Barker attended as a Chiquita director.

[4]      The Amended Complaint alleges in general that the Board breached their fiduciary duties by causing the Company to enter into the plea agreement in March 2007, pursuant to which the Company agreed to pay a $25 million fine, solely in order to protect individual officers and directors from prosecution. *See* Am. Compl. ¶¶ 16, 119.

[5]      *See also Katell v. Morgan Stanley Group, Inc.*, 1995 WL 376952, at *7 (Del. Ch. June 15, 1995) (affirming the SLC's independence even though its sole member was "not only a defendant in this lawsuit, but is the very general partner who approved the disputed transactions" because the undisputed facts demonstrated that the SLC member had no financial interest in the underlying transaction).

TEW CARDENAS LLP

Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

the SLC (i) have no personal financial stake in the disposition of those claims and (ii) face no personal liability as a result of those claims because they were not on the Board at the time of the conduct at issue.

*The SLC is Independent.*  The members of the SLC are clearly independent.  Whether an SLC member is independent is a question of "impartiality and objectivity" (*In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 920 (Del. Ch. 2003)), and requires a determination whether any of the members are, "*for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind."  *Id.* (emphasis in original).  Accordingly, "[a] director is independent when he is in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences."  *Kaplan*, 499 A.2d at 1189; *see also PSE&G*, 801 A.2d at 314 ("Directorial independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous consideration or influences") (citation and quotations omitted).

As set forth in detail in the SLC Report (*see* Section II.C.), the members of the SLC are independent.  Before beginning its investigation, the SLC and its counsel considered any and all factors that would "weigh on the mind of a reasonable special litigation committee member . . . in a way that generates an unacceptable risk of bias."  *Oracle,* 824 A.2d at 947; *id.* at 938-39 ("[A] director may be compromised if he is beholden to an interested person.  Beholden in this sense does not mean just owing in the financial sense, it can also flow out of 'personal or other relationships' to the interested party"); *Katell*, 1995 WL 376952, at *8 ("When a special committee's members have no personal interest in the disputed transactions, this Court scrutinizes the members' relationship with the interested directors").  No such matters exist here.

The SLC members had no relationship or personal contacts with the defendants prior to joining the Board.  Camp had no prior personal or business interactions with any of the defendants, and the Amended Complaint alleges none.  The plaintiffs raise several frivolous issues concerning Barker and Hasler, none of which has merit.

The plaintiffs allege that Barker is a close personal friend of Fernando Aguirre,

Chiquita's CEO and a defendant (*see* Am. Compl. ¶ 137); but this is simply untrue. Barker's only interactions with Aguirre relate to his service on the Board, which he joined in late September 2007; they had no prior relationship of any kind. *See* SLC Report at Section II.C.1. They also allege that Barker lacks independence because thirty years ago, from 1972 to 1977, he and defendant Gregory C. Thomas, a Chiquita director from late 2000 to early 2002, both worked for KPMG. *See* Am. Compl. ¶ 137 n.8. However, Barker did not know Thomas during that time, and has never met Thomas. *See* SLC Report at Section II.C.1. Finally, even if these allegations were true, "[a]llegations of mere personal friendship . . . standing alone [ ] are insufficient to raise a reasonable doubt about a director's independence." *Beam v. Stewart,* 845 A.2d 1040, 1050 (Del. 2004).[6]

The plaintiffs also allege that Hasler, like Barker, is a close personal friend of Aguirre (*see* Am. Compl. ¶ 137); but this is also untrue. Hasler's only contacts wither Aguirre relate to her service on the Board, which she joined in late 2005; they had no prior relationship of any kind. *See* SLC Report at Section II.C.3. In addition, as part of its independence review (before the Amended Complaint was filed), and as detailed at length in the SLC Report, the SLC and its counsel independently and carefully considered the relationship between Chiquita (and its subsidiary Fresh Express) and UC Davis, where Hasler is the Executive Director of the Mondavi Institute within the College of Agricultural and Environmental Sciences.

Fresh Express, which was acquired by Chiquita in June 2005, had a long history of giving to UC Davis, which is a leader in agricultural research. Following the acquisition, in January 2007 and February 2008, Chiquita made two $25,000 donations to UC Davis to establish the Fresh Express Graduate Student Fund. However, although Hasler briefly attended a portion of a

---

[6]    Other frivolous allegations are also made challenging Barker's independence, including that since he worked for a large accounting firm, he has "an ingrained hostility to shareholder suits" (Am. Compl. ¶ 141(g)); that he was a member of the AICPA, a 338,000-member national professional organization for CPAs, along with one of the defendants (*see id.* ¶ 137 n.8); and that KPMG audits several companies on whose boards some of the defendants serve (*see id.* ¶ 137). These allegations are frivolous, illogical, and unsupported by fact or law. *See* SLC Report at Section II.C.1.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

meeting with Fresh Express executives in June 2006, she (i) played no further role in soliciting or encouraging the contributions, (ii) was not contacted by anyone at Chiquita regarding the ultimate decision to contribute to UC Davis, and (iii) does not have any involvement in or influence over the independent committee responsible for selecting the students who will receive these scholarship funds.[7]  Moreover, these donations -- which amount to a very small percentage of both UC Davis's and Chiquita's overall corporate donations -- were made entirely at the discretion of a long-time Fresh Express executive not named as a defendant.  *See* SLC Report at Section II.C.3.[8]

These contributions -- with which Hasler was minimally involved, over which she had no control, which involve none of the individual defendants, and from which she did not personally benefit -- do not approach the pervasive social and institutional entanglements that courts have held necessary to create an independence issue.  *See* SLC Report at Section II.C.3; *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 822-23 (Del. Ch. 2005) (rejecting challenge to the independence of two directors who were the President and a trustee of the American Museum of Natural History, because plaintiffs "never state how JPMC's contributions [to the museum] could, or did, affect the decision-making process of the [directors]," and in fact did not "even go so far as to indicate what percentage of the museum's overall contributions are made by [the corporation]"); *c.f. Oracle*, 824 A.2d at 947 (rejecting SLC's motion to dismiss where the two SLC members were professors at a university that received significant financial support from the individual defendants personally (including donations of $24 million and a publicly

---

[7]     The plaintiffs allege that director defendant Robert Fisher personally visited the Mondavi Institute and donated $25,000 on behalf of Chiquita to provide financial support to graduate students. *See* Am. Compl. ¶ 137. This did not happen.  In fact, Fisher was not involved in any way in establishing the Fresh Express Graduate Student Fund. *See* SLC Report at Section II.C.3.

[8]     In addition, in April 2007, Fresh Express awarded $2 million to fund nine research projects designed to further the understanding of contamination by E. Coli in lettuce and leafy greens, and thus help the fresh-cut produce industry avoid future E. Coli outbreaks.  These projects were chosen by an independent panel of scientific advisors from a total field of 65 proposals.  One of the proposals selected came from a research team at the Western Institute for Food Safety and Security at UC Davis.  Hasler (i) played no role in donating the funds or awarding the grants, (ii) had no influence over the committee, and (iii) does not benefit from this grant in any way. *See* SLC Report at Section II.C.3.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

discussed potential pledge of $150 million) and one defendant was a professor at the same university as the two members of the SLC); *Lewis v. Fuqua,* 502 A.2d 962, 966-67 (Del. Ch. 1985) (rejecting SLC's motion to dismiss where sole member of the SLC was president of a university that had recently received a $10 million pledge from the individual defendant).[9]

Because none of the SLC members have, or had, any personal, professional or other relationship to any interested party that would compromise their independence, there can be no credible challenge to the SLC's independence.

**B.      The SLC Acted in Good Faith and with Due Care in Investigating the Merits of the Litigation**

Under New Jersey law, the SLC must also demonstrate that it "acted in good faith and with due care in investigating the merits of the litigation." *PSE&G,* 801 A.2d at 315-16; *see also Kindt,* 2003 WL 21453879, at *3 ("the Court must determine if . . . the special committee acted in good faith and conducted a thorough investigation"). Stated differently, "the inquiry is whether the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or a sham." *PSE&G,* 801 A.2d at 315 (internal quotations and citation omitted). Here, the SLC's investigation far exceeds the standard set forth by the New Jersey Supreme Court.

With the assistance of counsel, the SLC conducted a detailed and thorough factual and legal investigation to determine whether it is in the best interests of the Company to pursue the claims asserted in the Amended Complaint. The SLC and its counsel reviewed over 750,000 pages of documents and conducted 70 interviews of 53 witnesses, including interviews of (i) every named defendant except Oliver Waddell (who suffers from a debilitating mental illness),[10] (ii) other current and former Chiquita officers and employees; and (iii) certain of

---

[9]      Nor do any other factors that have been found to disable SLCs, such as prejudgment of the issue, exist here. *See, e.g., Biondi v. Scrushy,* 820 A.2d 1148, 1166 (Del. Ch. 2003) (rejecting independence where the HealthSouth SLC Chairman "publicly and prematurely issued statements exculpating one of the key company insiders whose conduct [was] supposed to be impartially investigated by the SLC"), *aff'd,* 847 A.2d 1121 (Del. 2004).

[10]      The SLC also determined that it was unnecessary to interview SLC member Barker, since he only joined the Board in late September 2007, after Chiquita had already pled guilty.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

Chiquita's outside legal, auditing, and compensation advisors. *See* SLC Report at Sections III.A., III.D.; *PSE&G*, 801 A.2d at 316 ("One of a board's prerogatives in [the derivative] context is to entrust its investigation to a law firm") (internal quotations omitted); *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1997 WL 305829, at *12 (Del. Ch. May 30, 1997) ("While the directors bear ultimate responsibility for making informed judgments, good faith reliance by a SLC on independent, competent counsel to assist the SLC in investigating claims is legally acceptable, practical and often necessary").

Even though it is perfectly appropriate for the SLC members to rely on counsel to lead the investigation, the SLC members (i) personally participated in many interviews of current and former Chiquita directors, officers, employees, and advisors, (ii) reviewed key documents, (iii) participated in nine formal in-person meetings and teleconferences, including two days of deliberations concerning the claims, and (iv) reviewed and revised the more than 250 single-spaced pages of the SLC Report. The SLC members directed the scope and depth of the investigation in all respects. *See* SLC Report at Section III.

The SLC investigated every claim set forth in the Amended Complaint and directed the interviews of all available witnesses that it concluded were appropriate. *See Kindt*, 2003 WL 21453879, at *3 (good faith and thorough investigation found on the basis of five month investigation by SLC during which "twenty-six persons were interviewed and 50,000 pages of documents were reviewed"); *St. Clair*, 2008 WL 2941174, at *14-15 (finding good faith where SLC conducted "extensive interviews of key witnesses" and "thoroughly evaluate[d] [plaintiff's] substantive claims"); *Strougo v. Bassini*, 112 F.Supp.2d 355, 366 (S.D.N.Y. 2000) (finding "SLC pursued its investigation in a thorough and diligent manner. From June through December 1998, the SLC interviewed 11 witnesses and conducted a comprehensive review of approximately 36,000 pages of documents").[11]

---

[11] *Cf. Electra Inv. Trust, PLC v. Crews*, 1999 WL 135239, at *4-5 (Del. Ch. Feb. 24, 1999) (rejecting motion of SLC that declined to investigate certain claims set forth in the derivative complaint or interview the most pertinent witnesses as to other claims).

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

The good faith of the SLC is further demonstrated by the thoroughness of its investigation, which explored facts and claims far beyond those alleged in the Amended Complaint, and by the SLC Report itself. *See Kaplan v. Wyatt*, 484 A.2d 501, 519-20 (Del. Ch. 1984) (finding that the SLC "acted in good faith" where "report of the Committee appears to be comprehensive and well documented and gives indication of a reasonable and thorough investigation of plaintiff's allegations"), *aff'd*, 499 A.2d 1184 (Del. 1985); *Kindt*, 2003 WL 21453879, at *4 (good faith demonstrated where SLC's investigation was "thoughtful and thorough" and "rooted out additional facts not even alleged by plaintiff"); *Kaplan*, 499 A.2d at 1191 ("a detailed report which was over 150 pages in length" and "examined all of the allegations set forth in [the derivative] complaint" constituted an ample basis to grant the motion to dismiss).

Finally, during the course of its investigation, the SLC made a good faith effort to consult with Lead Counsel, appointed by Court Order dated August 13, 2008. SLC counsel met with Lead Counsel on three separate occasions, and the SLC members also met directly with Lead Counsel. The SLC granted Lead Counsel access to certain documents collected and reviewed by the SLC, and sought Lead Counsel's views on the scope of the inquiry conducted by the SLC. During these meetings, Lead Counsel confirmed that they were comfortable with both the scope of the SLC's inquiry and its work plan. *See* SLC Report at Section III.E.

The wide-ranging and thorough investigation conducted by the SLC is more than reasonable under New Jersey law. *See PSE&G*, 801 A.2d at 316-18 (affirming dismissal in demand refused case where law firm employed by Board reviewed "over 43,000 pages of documentation" and "interviewed dozens of witnesses"). Accordingly, there can be no credible challenge to the scope, depth, and reasonableness of the SLC's investigation.

## II.   THE CHIQUITA SLC'S CONCLUSIONS ARE REASONABLE

Finally, the SLC must demonstrate that its conclusions are reasonable, taking into account "all relevant justifications for . . . [the] determination, including the seriousness and

weight of the plaintiff[s]' allegations." *PSE&G*, 801 A.2d at 318.  Those justifications include not only the relative factual and legal merits of the claims asserted, but also whether pursuing litigation is in the best interests of the Company, taking into account, among other things, "the possible financial burden on the corporation compared with the litigation costs . . . the extent to which dismissal will permit the defendants to retain improper benefits [] and . . . the effect continuing the litigation will have on the corporation's business reputation and good will." *In re PSE & G S'holder Litig.*, 718 A.2d 254, 258 (N.J. Super. Ct. Ch. Div. 1998) (quoting *Lewis v. Boyd*, 838 S.W.2d 215, 224 (Tenn. Ct. App. 1992) and citing *Houle v. Low*, 556 N.E.2d 51, 58 (Mass. 1990) (although review of an SLC's conclusions is necessary, "courts must be careful not to usurp the committee's valuable role in exercising business judgment")), *aff'd* 801 A.2d at 318.[12]

    In conducting its review, the Court may not substitute its own business judgment for the SLC's, but rather examines the SLC's substantive findings only "to the minimal extent necessary [to establish that] the corporation [has met] its burden." *PSE&G*, 718 A.2d. at 261; *see also Houle*, 556 N.E.2d at 59 (judicial inquiry into the reasonableness of an SLC's conclusions is limited because "courts are better able to determine the merits of a law suit than whether a decision is correct based on a subjective evaluation of the business policies involved").  The SLC respectfully submits that its conclusions are reasonable and should be affirmed.

    *Overview.*  As described at length in the SLC Report, the claims alleged in the Amended Complaint arise principally out of payments made by Chiquita's Colombian subsidiary, Banadex, to left-wing guerrilla and right-wing paramilitary groups from approximately 1989 through January 2004.  On September 10, 2001, one such paramilitary group – the AUC – was designated by the U.S. Department of State as a Foreign Terrorist Organization ("FTO"), and

---

[12]     *See also Houle*, 556 N.E.2d at 59 (citing the following factors: "(1) the likelihood of a judgment in plaintiff's favor; (2) the expected recovery as compared to out-of-pocket costs; (3) whether the corporation itself took corrective action; (4) whether the balance of corporate interests warrants dismissal; and (5) whether dismissal would allow any defendant who has control of the corporation to retain a significant improper benefit") (citation omitted).

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

thereafter the knowing making of such payments became a violation of U.S. anti-terrorism laws. The SLC's investigation found that neither senior Chiquita management nor the Board became aware of the FTO designation until early 2003. The SLC also found that, shortly after discovery of the designation, the Board's Audit Committee disclosed the payments to the Department of Justice ("DOJ") and allowed the payments to continue for good faith reasons while awaiting further guidance from DOJ. Ultimately, in March 2007, Chiquita pled guilty to one felony count of engaging in transactions with a Specially Designated Global Terrorist without a license (50 U.S.C. § 1705) for all payments – both before and after the disclosure to DOJ – and agreed to pay a $25 million fine.

At its core, the Amended Complaint alleges that the defendants breached their fiduciary duties, and committed corporate waste, by causing Chiquita to make, or failing to be aware of, the payments to the FARC, and later the AUC, for the entire time the payments were made (from 1989 through January 2004). *See* Am. Compl. ¶¶ 58-65; 166-169. In addition, the Amended Complaint sets forth several ancillary claims, which allege that the defendants breached their duties in connection with matters that (according to plaintiffs) flow from the fact of the payments, including, among others, the decision to sell Banadex in June 2004 and to plead guilty in March 2007. *See* Am. Compl. ¶¶ 118-119, 129, 141(b), 159.[13]

As discussed above, the SLC vigorously and exhaustively investigated all of these claims. Because there is no adequate way, in this Memorandum, to convey the range of conduct it examined, the SLC respectfully refers the Court to the factual findings and analysis found in its Report (*see* SLC Report Sections IV-V). However, we provide here a brief overview of the most salient facts and conclusions supporting the SLC's determination, in the exercise of its business judgment, to seek dismissal of the Amended Complaint in its entirety.

---

[13]    The ancillary claims are that Chiquita's Board improperly authorized or caused (i) the sale of Banadex in May 2004, (ii) entry into the March 2007 plea agreement, (iii) the acquisition of a German fruit distribution company, Atlanta A.G., in March 2003, (iv) various compensation and severance payments for Chiquita officers, and (v) Chiquita to make false statements in its public filings. The SLC also reviewed allegations, incorporated from the ATA/ATS cases, that the defendants caused or allowed the Company to provide or facilitate the provision of weapons and drugs to the AUC and FARC.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

*Payments Pre-FTO Designation*.  The SLC found no evidence that the decision of the management defendants to make, or allow, the payments to the FARC and the paramilitaries when they were not illegal under U.S. law was tainted by bad faith or gross negligence such that the protections of the business judgment rule would not apply.  *See Maul v. Kirkman*, 637 A.2d 928, 937 (N.J. Super. Ct. App. Div. 1994) (business judgment rule applies when there is no evidence of "fraud, self-dealing, or unconscionable conduct").  To the contrary, the SLC found that, given the security situation that existed in Colombia during this period, management reasonably and in good faith believed that the payments were necessary to prevent serious harm to the Company's employees and infrastructure.  In general, senior Chiquita management was informed about the payments, had a monitoring system in place to track the payments, and obtained legal opinions, which uniformly concluded that the payments – both to the FARC and to the AUC – were legally justified under Colombian law.  In addition, as part of an inquiry conducted by the SEC into Banadex's books and records in the late 1990s, the Company disclosed the FARC payments to federal prosecutors and regulators and they took no action and made no suggestion that the payments were unlawful.  *See* SLC Report at Sections V.B., V.C.1.

The SLC also found that any claim that the director defendants failed to provide adequate oversight during this period would fail for two reasons.  First, because there was no violation of law, there could be no failure of oversight by the directors.  *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).[14]   Second, the SLC concluded that the director defendants engaged in legally adequate oversight, including having a fully functioning Audit Committee that met regularly, a robust FCPA reporting system, and an independent accounting firm, Ernst & Young ("E&Y"), which audited the Company.  *See* SLC Report at Section V.B., V.C.1.

*AUC Payments Post-FTO Designation*.  The legal landscape changed substantially on

---

[14]    To establish a so-called *Caremark* claim for breach of the duty of oversight "plaintiffs would have to show either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of."  698 A.2d at 971.

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

September 10, 2001, when the State Department designated the AUC as an FTO. As noted above, the SLC found that, prior to February 20, 2003 (when senior management discovered the designation), no senior member of Chiquita management knew that the AUC had been designated an FTO, and therefore management continued to believe that the payments were permissible under the law. The SLC did not find that the senior management defendants made, or allowed, the payments between September 11, 2001 and February 20, 2003 as a result of gross negligence or other self-dealing. The SLC found that senior management was not grossly negligent in failing to learn of the designation because it (and the Board) appropriately relied upon the Company's Legal department to advise it regarding relevant changes in the law.[15] Finally, during this period, the management defendants continued to hold the reasonable, good faith belief that the payments were necessary to ensure the safety and security of the Company's employees and infrastructure. *See* SLC Report at V.C.2.[16]

*AUC Payments Post-FTO Discovery.* The SLC's analysis was different with respect to the payments made after early May 2003, when they resumed, after a brief hiatus, following a meeting with senior DOJ officials on April 24, 2003. At that point, the payments were known to be violations of law, and as a result, this raised the possibility that the defendants breached their duty of loyalty to the Company. *See, e.g., Desimone v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007) ("[B]y consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused . . . The knowing use of illegal means to pursue profit for the corporation is director misconduct"); SLC Report at V.D. Thus, the SLC extensively examined the conduct and motivations of senior management and the Board to determine whether a breach of the duty of loyalty occurred.

---

[15]    The SLC separately considered the conduct of Robert Olson, the Company's General Counsel, as it was the Legal department's responsibility to monitor changes in the law that could affect Chiquita's business. For reasons explained in detail in the SLC Report, while the SLC concluded that Olson could have done more in this regard, he did not act in bad faith nor was he grossly negligent such that he breached his duty of care to the Company during this period. *See* SLC Report at Section V.E.

[16]    Likewise, the SLC found that the director defendants continued to engage in legally adequate oversight during this period. The Board continued to have a fully functioning Audit Committee that met regularly, maintained its comprehensive FCPA reporting system, and continued to be audited by E&Y. *See* SLC Report at Section V.C.2.

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

After careful analysis, the SLC was not able to conclude that such a breach occurred. The SLC found that each of the defendants at all times acted in the good faith belief that the payments were necessary to protect Chiquita's employees, and that they would not create any additional criminal exposure for the Company (beyond that caused by the payments made after the FTO designation but before it was discovered). *First*, upon being informed of the FTO designation, the Audit Committee promptly disclosed the payments to senior DOJ officials. *Second*, the defendants believed, reasonably in the SLC's view, based on multiple communications with senior DOJ officials, that the Company could continue to make the payments (and protect its employees) without exposing the Company to additional risk of prosecution. *Third*, the Company promptly began exploring the possibility of leaving Colombia, and ultimately sold Banadex in June 2004.

While the SLC was critical of several judgments made by both management and the Board during this time, the SLC found that the defendants' actions were motivated by the desire to protect the Company's employees. For these reasons (and others), the SLC concluded that, despite the knowing violation of the law by the defendants, their good faith conduct and motivation render it highly uncertain whether a breach of the duty of loyalty occurred. *See* SLC Report at V.D.[17]

*Other Legal Considerations*. In considering the claims in the Amended Complaint, the SLC also identified several issues which raise substantial uncertainty about the viability of certain claims. First, the Company has not, to date, suffered any harm as a result of the payments made prior to the FTO designation on September 2001, which were never the basis for any

---

[17]     The SLC also examined each of the ancillary claims alleged in the Amended Complaint and concluded that there was no breach of duty. The SLC found that each challenged decision was made in good faith, on an informed basis, and for a rational business purpose. For example, plaintiffs allege that the Board authorized the Company to plead guilty *solely* to protect individual officers and directors from criminal prosecution (*see* Am. Compl. ¶ 119); but the Company's plea agreement with DOJ explicitly required it to continue to cooperate with DOJ's investigation of those individuals, which it did. *See* SLC Report at V.H. Thus, the SLC found no basis to conclude that the defendants breached their duties in connection with these claims. *See* SLC Report at Section V.G., (sale of Banadex), V.H., (guilty plea), Section V.I., (acquisition of Atlanta A.G.), V.J., (public disclosures), V.K., (compensation/severance), Section V.F., (weapons and drug smuggling).

governmental sanction and were not implicated in the Company's guilty plea. Second, the Order confirming Chiquita's Chapter 11 bankruptcy plan contains a release which bars claims based on conduct that occurred prior to March 19, 2002, absent a showing of bad faith (which the SLC did not find). Third, as authorized by New Jersey law, Chiquita's Certificate of Incorporation contains an exculpatory provision that bars any claim for monetary damages arising from a breach of the duty of care. Fourth, the applicable statute of limitations may bar claims based on conduct that occurred prior to October 12, 2001, absent the uncertain application of a tolling doctrine. The SLC considered each of these issues in the course of reaching its determinations, and examined each in depth in the SLC Report. *See* SLC Report at Section V.B.

*Business Judgment Considerations.* Finally, in exercising its business judgment, the SLC also took into account additional factors and found that those factors strongly support dismissal of the Amended Complaint. Specifically, the SLC concluded that (i) no defendant, at any time, acted in bad faith or was motivated by self interest; (ii) the reputational harm associated with prolonging what has already been six continuous years of investigation and litigation, with continued emphasis on the Company's actions in Colombia, would inflict substantial further damage on the Company; (iii) the costs that will be incurred in connection with these claims (both to prosecute and for likely defense costs, which the Company may be required to advance) outweigh any potential recovery that may be obtained in the future, especially given the weaknesses of the claims; (iv) management and the Board appropriately focused on the adequacy of the Company's compliance measures and remedial actions following this episode; and (v) continuing with this litigation would serve to further divert management from its core mission, which is to increase shareholder value by expanding the Company's profits through the sale of bananas, tropical fruit, and other value-added produce. *See* SLC Report at Section V.L.

Accordingly, the SLC, in the exercise of its business judgment, taking all of the above-described factors into account, seeks dismissal of the Amended Complaint in its entirety. The SLC respectfully submits that this conclusion is more than reasonable, and requests that its

Tew Cardenas LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

motion to dismiss be granted in all respects.

## CONCLUSION

For all the foregoing reasons, and the reasons set forth in the SLC Report, the SLC respectfully requests that the Court grant the SLC's motion to dismiss, pursuant to Rule 23.1.

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**
*Attorneys for the Special Litigation Committee of Chiquita Brands International, Inc.*
William G. McGuinness
David B. Hennes
Rachel L. Braunstein
Dianna Walsh Lamb
One New York Plaza
New York, NY 10004
Phone: 212.859.8000
Fax: 212.859.4000

Michael R. Bromwich
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Phone: 202.639.7000
Fax: 202.639.7003

**TEW CARDENAS LLP**
*Attorneys for the Special Litigation Committee of Chiquita Brands International, Inc.*
Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, Florida 33131
Phone: 305/536-1112
Fax: 305/536-1116

By:     s/Joseph A. DeMaria
Joseph A. DeMaria, Esq.
Fla. Bar No. 0764711
Email: jad@tewlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on February 25, 2009. I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's First Case Management Order ("CMO") and the June 10, 2008 Joint Counsel List filed in accordance with the CMO.

By:   s/Joseph A. DeMaria
Counsel