UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-01916-MD-MARRA/JOHNSON

IN RE: CHIQUITA BRANDS
INTERNATIONAL, INC. ALIEN
TORT STATUTE AND SHAREHOLDER
 DERIVATIVE LITIGATION

This Document Relates to:

                              CASE NO.: 08-808508-CIV-MARRA/JOHNSON

JOSE AND JOSEFA LOPEZ NOS. 1 THROUGH 116,
(commonly referred to as the *Valencia* action)

Plaintiffs,

vs.

CHIQUITA BRANDS INTERNATIONAL, INC.,
a New Jersey corporation; MOE CORPORATIONS 1-10;
 MOES 11-25,

Defendants.

_____/

**PLAINTIFFS' SECOND AMENDED COMPLAINT**
(Replacing Proper Names with Aliases, Eliminating Name of Personal
Representative, and Adding Additional Plaintiffs and Facts to *Valencia* action)

Plaintiffs, through counsel, sue Defendants and allege:

**INTRODUCTION**

1.      This case arises as a result of the actions of Defendant Chiquita Brands

International, Inc., and its subsidiaries and affiliates (collectively, "Chiquita"), in funding,

arming, and otherwise supporting terrorist organizations in Colombia in their campaign of terror

against the civilian population of the Urabá region, in order to maintain its profitable control of

Colombia's banana growing regions. Plaintiffs are family members of trade unionists, banana

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

workers, political organizers, social activists, and others targeted and killed by terrorists, most notably the paramilitary organization United Self-Defense Committees of Colombia (*Autodefensorias Unidas de Colombia*, or AUC), throughout the 1990s and until at least 2004. In order to produce bananas in an environment free from labor opposition and social disturbances, Chiquita funded, armed, and otherwise supported the AUC. The deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious support of terrorist organizations. Chiquita's actions violated not only Colombian law and U.S. law, but also international law prohibiting crimes against humanity, extrajudicial killing, torture, war crimes, and other abuses.

## JURISDICTION

2.    The Court has jurisdiction over this case under 28 U.S.C. §1331 (federal question jurisdiction); 28 U.S.C. § 1350 (Alien Tort Claims Act); 18 U.S.C. § 1964(c) (Racketeer Influenced and Corrupt Organizations Act); and 28 U.S.C. §1332 (diversity jurisdiction). Plaintiffs and Defendants are citizens of different states and the damages sought by this Complaint exceed the jurisdictional minimum for this Court.

3.    In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to claims based upon laws of Colombia, the United States, the States of Ohio, New Jersey, Florida or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

## PARTIES

4.    The term "Plaintiffs" herein includes the named plaintiffs and the decedent on behalf of whom they bring this action.

2

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
<u>This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON</u>

5.      Plaintiff, Rev. H. Francis O'Loughlin brings this action on behalf of the Estate of Jose Lopez No. 1.

6.      Plaintiff, Rev. H. Francis O'Loughlin brings this action on behalf of the Estate of Jose Lopez No. 2.

7.      Plaintiff, Rev. H. Francis O'Loughlin brings this action on behalf of the Estate of Jose Lopez No. 3.

8.      Plaintiff, Rev. H. Francis O'Loughlin  brings this action on behalf of the Estate of Jose Lopez No. 4.

9.      Plaintiff, Rev. H. Francis O'Loughlin  brings this action on behalf of  the Estate of Jose Lopez No. 5.

10.     Plaintiff, Rev. H. Francis O'Loughlin brings this action on behalf of the Estate of Jose Lopez No. 6.

11.      Plaintiff, Rev. H. Francis O'Loughlin brings this action on behalf of the Estate of Jose Lopez No. 7.

12.     Plaintiff, Rev. H. Francis O'Loughlin brings this action on behalf of the Estate of Jose Lopez No. 8.

13.     Josefa Lopez No. 9  is a resident and  citizen of Colombia and brings this action individually.

14.      Jose Lopez No. 10 is a resident and citizen of Colombia. He brings his action individually.

16.     Jose Lopez No. 11 is a resident and citizen of Colombia. He brings his action individually.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

17.     Father Frank O'Loughlin is not acting as  personal representative of the estates of

the following Decedents.  One or more of the next of kin referenced  in the subsequent

paragraphs assert their claims herein, or alternatively, a third party will be appointed the personal

representative of the estates of the decedents.

18.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 12.

19.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 13.

20.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 14.

21.     Next of kin brings this action on behalf of  the Estate of Jose Lopez No.15.

22.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 16.

23.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 17.

24.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 18.

25.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 19.

26.     Next of kin  brings this action on behalf of the Estate of Jose Lopez No. 20.

27.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 21.

28.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 22.

29.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 23.

30.     Next of kin brings this action on behalf of the Estate of Josefa Lopez No. 24.

31.     Next of kin brings this action on behalf of the Estate of Josefa Lopez No. 25.

32.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 26.

33.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 27.

34.     Next of kin brings this action on behalf of the Estate of Jose Lopez No.  28.

35.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 29.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

36.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 30.

37.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 31.

38.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 32.

39.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 33.

40.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 34.

41.     Next of kin brings this action on behalf of the Estate of Josefa Lopez No. 35.

42.     Next of kin brings this action on behalf of the Estate of Josefa Lopez No.36.

43.     Next of kin brings this action on behalf of the Estate of Josefa Lopez No.37.

44.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 38.

45.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 39.

46.     Next of kin brings this action on behalf of the Jose Lopez No. 40.

47.     Next of kin brings this action on behalf of the Estate of Josefa Lopez No. 41.

48.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 42.

49.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 43.

50.     Next of kin brings this action on behalf of the Estate of Josefa Lopez No. 44.

51.     Next of kin brings this action on behalf of the Estate of Jose Lopez No.45.

52.     Next of kin brings this action on behalf of the Estate of Jose Lopez No.  46.

53.     Next of kin brings this action on behalf of the Estate of Jose Lopez No. 47.

54.      Each of the aforementioned decedents were at all material times citizens of

Colombia.

55.     In addition to the foregoing, this action is brought  on behalf of Jose Lopez and

Josefa Lopez numbers 48 through 115; by the next of kin of those who were murdered and/or

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

disappeared under the circumstances set forth below and on their own behalf by those who have survived the circumstances set forth below. Each of the next of kin, the decedents, and those plaintiffs who are alive, were at all material times citizens of Colombia.  One or more of the next of kin referenced  in the subsequent paragraphs, or Father Frank O'Loughlin will be appointed he personal representative of the estates of the decedents if required by law.

56.     The plaintiffs referenced in the preceding and following paragraphs bring their claims anonymously because the disclosure of their identities and those of the decedents would expose them to a high risk of violent reprisals, intimidation and death at the hands of the paramilitaries still operating in Colombia.

57.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 48.

58.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 49.

59.     Next of kin bring this action on behalf of the Estate of Josefa Lopez  No. 50

60.      Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 51.

61.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 52.

62.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 53.

63.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 54.

64.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 55.

65.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 56.

66.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 57.

67.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 58.

68.     Plaintiff Josefa Lopez  No. 59 brings this action on her own behalf.

69.     Plaintiff Jose Lopez No. 60 brings this action on his own behalf.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

70.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 61.

71.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 62.

72.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 63.

73.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 64.

74.    Next of kin bring this action on behalf of the Estate of Jose Lopez No. 65.

75.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 66.

76.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 67.

77.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  68.

78.    Next of kin bring this action on behalf of the Estate of Josefa Lopez  No.  69.

79.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  70.

80.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 71.

81.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 72.

82.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  73.

83.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 74.

84.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 75.

85.    Next of kin brings this action on behalf of the Estate of Jose Lopez No. 76.

86.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  77.

87.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 78.

88.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 79.

89.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 80.

90.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 81.

91.    Jose Lopez  No.  82 brings this action on behalf of himself.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

92.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  83.

93.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 84.

94.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 85.

95.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  86.

96.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 87.

97.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  88.

98.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 89.

99.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 90.

100.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 91.

101.    Josefa Lopez  No.  92  brings this action on her own behalf.

102.    Next of kin bring this action on behalf of the Estate of Josefa Lopez  No.  93.

103.    Josefa Lopez  No.  94  brings this action on her own behalf.

104.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 95.

105.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  96.

106.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  97.

107.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 98.

105.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  99.

106.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  100.

107.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  101.

108.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  102.

109.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  103.

110.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  104.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

111.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  105.

112.     Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  106.

113.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  107.

114.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No.  108.

115.    Next of kin bring this action on behalf of the Estate of Jose Lopez  No. 109.

116.    Jose Lopez No. 110 brings this action on his own behalf.

117.    Next of kin bring this action on behalf of  the Estate of Jose Lopez No. 111.

118.    Next of kin bring this action on behalf of  the Estate of Jose Lopez No. 112.

119.    Jose Lopez No.113 brings this action on his own behalf.

120.    Next of kin bring this action on behalf of  the Estate of Jose Lopez No.114.

121.    Next of kin bring this action on behalf of  the Estate of Josefa Lopez No. 115.

121-A. Next of kin bring this action on behalf of  the Estate of Jose Lopez No.116.

122.    Defendant Chiquita Brands International, Inc. ("CBI"),  is a United States-based

corporation organized under the laws of the State of New Jersey. Its corporate headquarters are

located in Cincinnati, Ohio. CBI is a leading international producer, distributor, and marketer of

bananas and other produce; it is one of the largest banana producers in the world and a major

supplier of bananas in Europe and North America. The company was founded in 1899 as the

United Fruit Company, became the United Brands Company in 1970, and changed its name to

Chiquita Brands International in 1990.

123.     On information and belief, at all times relevant herein, CBI wholly owned,

dominated and controlled C.I. Bananos de Exportacion, S.A. ("Banadex"), headquartered in

Medellin, Colombia. Banadex produced bananas in the Urabá and Santa Marta regions of

9

Colombia and, by 2003, was Chiquita's most profitable banana-producing operation. At all times material herein, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise.

124.    Plaintiffs are ignorant of the true names and capacities of the Defendants who are sued herein as Moe Corporations 1-5 and Moes 6-25, and Plaintiffs sue these Defendants by such fictitious names and capacities. Plaintiffs will amend this Complaint to allege the Moes' true names and capacities when ascertained. Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such Defendants, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries. Whenever and wherever reference is made in this Complaint to any conduct committed by CBI, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the benefit of CBI and Banadex.

125.    At all times herein material, with respect to the events at issue, CBI, Banadex, Moe Corporations 1-5 and Moes 6-25 conspired with each other, and/or participated in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As described herein, "agency" includes agency by ratification. Whenever reference is made in this complaint to any conduct by a defendant, such allegations and references shall be construed to mean the conduct of each of the defendants, acting individually, jointly, and severally.

126.    At all times herein material, with respect to the events at issue, Chiquita conspired with, worked in concert with, participated in a joint criminal enterprise with, acted as the principal of, employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs' injuries, including but not limited to the AUC, and the terrorist organizations were acting within the course and scope of such agency, employment, and/or concerted activity. The wrongful conduct alleged herein was perpetrated by Chiquita management and personnel both in Colombia and the United States.

127.    On  information and belief, CBI management and other personnel in the United States and in Colombia were informed of the ongoing events complained of herein and personally participated in the decision making, planning, preparation, ratification, and/or execution of the acts complained of.

## STATEMENT OF FACTS

### A.  The Colombian Conflict and Paramilitary Terrorist Organizations

128.    In the early 1980s, Colombia saw a vast expansion in trade in illegal drugs, particularly cocaine. An emerging class of drug barons, with the cooperation and facilitation of the Colombian government, began to create private armies to combat left-wing guerrilla forces, including the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

Colombia, or FARC) and the National Liberation Army (Ejercito Nacional de Liberacion, or

ELN), who were engaged in terrorist activities such as extortion, kidnappings, and

assassinations.  Despite their ties to private individuals, the paramilitaries were a key part of the

Colombian state strategy to combat the guerrilla insurgency from their inception.

129.    In 1981, the Medellin cartel created a death squad, Muerte a Secuestradores

("Death to Kidnappers"), which targeted guerrillas for elimination and adopted brutal, terrorist

tactics. As the 1980s progressed, paramilitaries maintained links with drug barons, large

landowners, industrialists, and bankers who funded them, although in some cases they achieved

some autonomy in their violent activities. This drug war and the escalation of violence provoked

President Barco to issue the Decree 1194 of 1989 (adopted as permanent legislation by Decree

2266 of 1991), which criminalized membership in a paramilitary group or the provision of any

support to such groups, including funding, training, or providing them with arms.

130.    By the mid 1990's, paramilitary groups had achieved a substantial degree of

independence from their creators due to their increased participation in, and benefit from, drug

trafficking, and had become a major force in the fight against the guerrillas. The largest and most

well-organized paramilitary group in Colombia was the Rural Self-Defense Group of Córdoba

and Urabá (Autodefensas Campesinas de Córdoba and Urabá, or ACCU). The organization

featured a central command that coordinated the activities of local fronts. Both mobile and

stationary units existed, and fighters received a base salary plus food, a uniform, weapons, and

munitions. The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary

fighter with family ties to the drug trade. In 1994, Castaño and the ACCU sponsored a summit of

the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

country. This summit led to the formation of the AUC, a national federation uniting Colombia's

regional paramilitaries under Castaño's leadership. At all times relevant to this Complaint,

Castaño remained the leader of the AUC.

131.    The efforts of the AUC were directed toward elimination of anyone considered

close to the guerrillas or who opposed or complicated the paramilitaries' control of territory or

population in the area in which they exerted their power. The AUC's primary method was

terrorism against individuals or communities. To this end, the AUC, like the ACCU before it,

routinely engaged in death threats, extrajudicial killings, massacres, torture, rape, kidnapping,

forced disappearances, and looting. While the AUC periodically engaged in direct combat with

armed guerrilla forces, the vast majority of its victims were civilians targeted by a policy of

political and social cleansing, typically rural workers, trade unionists, community activists,

human rights defenders, leftist politicians, judicial investigators, indigenous persons, and anyone

considered socially undesirable (including suspected petty criminals). Inhabitants of small towns

in contested rural areas were particularly vulnerable. AUC violence has often caused entire

communities to disperse, either due to threats of an impending massacre or in the wake of such

massacres and the looting and destruction that commonly accompanied them.

132.    The AUC grew rapidly in size during the late 1990s and into the twenty-first

century. In 1997, it comprised roughly 4,000 combatants. By 2001, Castaño claimed to have

11,000 members, though government estimates put the number somewhere between 8,000 and

9,000. By 2002, AUC forces were present in nearly the whole of Colombia. AUC leaders have

claimed before the demobilization process beginning in 2004, the organization comprised as

many as 17,000 armed fighters and 10,000 other associates, including informants, cooks, drivers, and computer technicians.

133.     Despite their officially illegal status, the AUC and other paramilitary groups in fact collaborated closely with the Colombian government and were used by the government to oppose anti-government guerrilla groups like the FARC.  *See* ¶¶ 128-177.  The efforts of the AUC were directed toward the elimination of any alleged guerrilla sympathizer who opposed or complicated the paramilitaries' control of territory or population in the area in which they exerted their power, or threatened their allies - including the government and the banana companies. The AUC's primary method was terrorism against individuals or communities. To this end, the AUC, like the ACCU before it, routinely engaged in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnapping, forced disappearances, and looting.

134.     While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians.  The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. They sought to intimidate and coerce the civilians from providing any support to the guerrillas. Inhabitants of small towns in contested rural areas were particularly vulnerable to AUC attack. AUC violence has often caused entire communities to disperse, either due to threats of an impending massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

135.     The AUC also targeted anyone considered to share the guerrillas' leftist ideology, such as teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians.  These groups were also seen as problem groups by the banana companies.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

The AUC also eliminated anyone considered socially undesirable, including indigenous persons, people with psychological problems and other disabilities, drug addicts, prostitutes, and suspected petty criminals.

136.    The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out according to a systematic and well-coordinated plan between the government, the paramilitaries, and the companies that financed them.  The ACCU operated throughout the banana-growing region of Urabá, as well as in other parts of Colombia.  On many occasions from at least 1994 through 2004 they carried out multiple executions or mass-killings of civilians; by 1997, the ACCU and other AUC groups were already responsible for at least 150 such atrocities. From its founding, the AUC's activities and abuses have been carried out under the direction of a central command.

137.    The AUC and its constituent groups, including the ACCU, have, at least since 1994, been participating in an internal armed conflict in Colombia - a conflict in which the paramilitaries are fighting on behalf of the government against guerrilla forces.

138.    The AUC operated two blocs in Urabá, the Banana Bloc and the Elmer Cardenas Bloc. While there had been paramilitaries under the control of the Castaño family in Urabá since the 1980s, the Banana Bloc was formally created in Urabá in 1994. Ever Veloza García - a/k/a "H.H." - was selected as one of the first commanders.  In later years, the Banana Bloc operated through two fronts: the Turbo Front in Northern Urabá under the command of H.H., and the Banana Front in the south, led by Raúl Hasbún.  The Elmer Cardenas Bloc began as a private defense group that united with the AUC in 1995.  It was commanded by Freddy Rendón Herrera - a/k/a "El Alemán" - and Elmer Cárdenas until Cárdenas was killed by the guerrillas in 1997.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

The Elmer Cardenas Bloc also received men, training, and assistance from the Banana Bloc.

Both blocs received funding from the banana companies directly or through the Convivir

Papagayo, which is more fully described in ¶¶ 144-5 and 185.

### B. The Creation of Convivir to Legitimize the Paramilitaries

139.    Although paramilitarism had been declared illegal in Colombia, the Colombian

government created a new legal mechanism to provide cover and a legitimate avenue of funding

for fund the AUC in 1994 through Chapter 5 of Decree 356.  Paramilitaries could easily

reorganize and continue operating under this Chapter, which allowed private groups to provide

for "Special Vigilance and Private Security Services."   These security groups, known commonly

by their Spanish-language acronym "CONVIVIR," were comprised of civilians who received

permission from the government for a license to "provide their own security. . . in areas of high

risk or in the public interest, which requires a high level of security."  Convivir were permitted to

use arms that were otherwise restricted to use by the military.  Defense Ministry, Decree 356,

República de Colombia, February 11, 1994, pp. 19- 20; and Resolution 368 of the

Superintendencia de Vigilancia y Seguridad Privada, April 27, 1995 (giving the name "convivir"

to the security groups).

140.    The convivir units in Urabá were fronts for the AUC from their inception.  Many

were directed and populated by known paramilitaries; this was common knowledge in the region.

As H.H. remarked publicly, "Let us not deceive ourselves: all the convivir were ours." The 17th

Brigade of the Colombian Armed Forces, which was infamous for its close collaboration with

the paramilitaries in Urabá, was given the authority to select members of the convivir in Urabá.

*See* ¶¶ 157-165, below.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

141.    Álvaro Uribe, current President of Colombia, was governor of Antioquia at the time of the creation of the convivir. Uribe authorized the funding, arming, and funneling of information to the convivir, thereby facilitating the sharing of such funds, arms, and information with the AUC.  Uribe expected the convivir groups to fight the guerrillas – both alongside the military and on their own, since they were often in a position to engage their opponents before troops could arrive.  He justified arming these groups with long-range weapons after noting that their revolvers and smaller weapons were insufficient to combat the guerrillas.

142.    On information and belief, the impetus to organize *convivir* groups in Urabá came from Raúl Hasbún, a banana plantation owner who served as an intermediary between the banana companies and the AUC, and who eventually became commander of the AUC's Banana Bloc. Hasbún approached Uribe in 1997 with the intention of creating a *convivir* in Urabá.  The paramilitaries, the government, and the banana companies saw the *convivir* as an ideal means of legalizing the companies' payments to the paramilitaries.  In just a few months, Urabá had twelve *convivir* units.

143.    The convivir units in Urabá facilitated communication and collaboration between the government and paramilitaries.  The twelve units functioned as a network and sent intelligence information to both the military and paramilitary commanders such as Hasbún.   The military and paramilitaries would both respond to information detailing the location of guerrillas, but often the military would allow the paramilitaries to execute the operations, as they had better resources.

144.    One unit, the Convivir Papagayo, received payments from Chiquita and other banana companies and passed the money on to the AUC.  The banana companies characterized

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

the payments as security services, but all the banana companies knew that these payments were

going to the AUC in order to kill workers and other civilians.

145.    In 1997, the Colombian Constitutional Court affirmed the legality of the convivir

system but prohibited them from carrying restricted arms or conducting intelligence work.  Many

convivir units were dismantled as they did not have a function once these measures were

implemented.  The Convivir Papagayo was one of only two convivir units that remained,

allowing it to continue facilitating the payments from the banana companies to the AUC. Arnulfo

Peñuela, the former director of the Convivir Papagayo and former mayor of Carepa, is being

prosecuted for ties to the AUC.

### C.  The AUC Acted Under Color of Authority of the Colombian Government in Committing the Acts Alleged Herein

146.    The AUC and other paramilitary groups were founded with the cooperation of the

Colombian Government, and were assigned by the Government to combat left-wing guerrillas

through methods including using criminal violence against civilians and unions.

147.    The Colombian security forces tolerated and collaborated with the AUC in

committing attacks on civilian populations, extra-judicial killings, murders, disappearances,

forced displacements, threats and intimidation, including but not limited to the deaths and

injuries of the plaintiff sued for herein. As part of the Colombian government's strategy for

defeating the left-wing insurgency, high officials in the Colombian civilian government and the

Colombian military collaborated with and orchestrated attacks on civilian populations, extra-

judicial killings, murders, disappearances, forced displacements, threats and intimidation against

persons including the plaintiffs' decedents.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

148. Paramilitarism was State policy in the Republic of Colombia. The Colombian military was not able to effectively address the uprising of the FARC, so the Colombian government facilitated the creation and funding of the AUC with the aim of using this unofficial force to defeat the FARC. As one high commander of the AUC said, "the Colombian military felt itself bound to the Geneva Conventions. The AUC was not." This policy of strengthening the paramilitaries was first developed in Urabá in 1995 to 1997, and then exported to the rest of the country.

149. As a result of this interdependence, longstanding and pervasive ties have existed between the paramilitaries and official Colombian security forces, which include the Colombian Armed Forces and the Colombian National Police, since the inception of the paramilitaries in the 1980s. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in campaigns of the official armed forces against guerrilla insurgents. Paramilitary forces included active-duty and retired army and police personnel among their members. Although a 1989 government decree established criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner for Human Rights, and the Colombian Attorney General's office. Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division," in addition to the five official divisions of the Colombian Army.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

150.    To date, Colombian authorities have charged some members of Colombia's

Congress, seven former lawmakers, the head of the secret police, mayors and former governors

with illegally collaborating with paramilitaries. According to testimony of Salvatore Mancuso,

two current ministers in the present Uribe government, Vice President Francisco Santos and

Defense Minister Juan Manuel Santos, met and collaborated with paramilitaries like Salvatore

Mancuso, and plotted to extend the paramilitary model to Bogotá . Senior officers in the

Colombian military, including but not limited to former Military Forces Commanders Major

General Manuel Bonett,  General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime

Uscategui, Gen. Rito Alejo Del Rio, General Mario Montoya, Colonel Danilo Gonzalez, Major

Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, aided

and abetted the AUC in the commission of various attacks on civilian populations, extrajudicial

killings and other atrocities against civilians, including the plaintiffs, and/or gave tacit support to

and acquiescence in their activities.  General Montoya was linked to Diego Murillo, the former

leader of an AUC affiliated paramilitary group in Medellin. The presence in the military of high

ranking staff officers known to have close ties to the AUC and other paramilitaries was widely

regarded within the army as tolerance for the paramilitaries.

151.    Boundaries between the AUC and the military at times were amorphous, as some

paramilitary members were former police or army members, while some active-duty military

members moonlighted as paramilitary members and became thoroughly integrated into the

groups.  Paramilitary leaders noted that Colombian security forces in Urabá allowed members of

the AUC to serve as proxies in their pursuit of guerrilla forces, largely due to the military's

operative incapacity to defeat the guerrillas on its own.  As outside organizations placed

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

increasing pressure and scrutiny upon the military to improve its human rights record, military

leaders decided to leave much of their "dirty work" - brutal violence against civilians and

suspected paramilitaries in violation of Colombian and international law - to the paramilitaries.

152.    Colombian security forces in Urabá - with the knowledge and collaboration of

high-level officials in the national government - have therefore habitually tolerated the presence

of the AUC, willfully failed to prevent or interrupt their crimes, actively conspired with them,

and coordinated activities with them. Documented examples in Urabá include:

A.  Allowing paramilitaries to establish permanent bases and checkpoints without
    interference, often within short distance of military bases for mutual support;

B.  Failing to carry out arrest warrants for paramilitary leaders, who move about the
    country freely;

C.  Withdrawing security forces from villages deemed sympathetic to guerrillas,
    leaving them vulnerable to attack by paramilitaries;

D.  Failing to intervene to stop ongoing attacks on civilian populations occurring over
    a period of days;

E.  Sharing intelligence, including the names of suspect guerrilla collaborators;

F.  Sharing vehicles, including army trucks used to transport paramilitary fighters;

G.  Supplying weapons and munitions;

H.  Allowing passage through roadblocks;

I.  Providing support with helicopters and medical aid;

J.  Communicating via radio, cellular telephones, and beepers;

K.  Sharing members, including active-duty soldiers serving in paramilitary units and
    paramilitary commanders lodging on military bases; and

L.  Planning and carrying out joint operations.

153.    Accordingly, from late 1996 on, the AUC became a major combatant in

Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the

conflict between the AUC and the FARC had become a notorious exchange of atrocities. The

AUC, using tactics of terror on civilians living in and around areas that had been under FARC

control, assumed that these innocents were sympathetic to the FARC and systematically

murdered thousands of them.

> **D.    The AUC Consistently Operated in Urabá with the Cooperation, Coordination, and Assistance of the Colombian Government When Attacking Civilians**

154.    The paramilitary and the government developed and perfected a model of

collaboration in Urabá.  Politicians, active military units, multinational companies, businessmen,

and paramilitaries formed an alliance in order to impose a regime of terror and consolidate a new

form of governance, which would wrest control of the countryside back from the leftist guerrillas

who had captured many municipalities and were extorting businessmen and landowners. The

first paramilitary groups to operate in Urabá in a systematic and continuous manner received

special military training.

155.    When the government or the military was not able to legally arrest or attack

civilians, they would delegate the task to the AUC or to convivir associated with the

paramilitaries to act on their behalf.  According to both H.H. and Raúl Hasbún, a paramilitary

commander in Urabá, the military gave the AUC lists of people to kill when they felt impotent to

fight the guerrillas themselves legally and constitutionally, or when they could not arrest and try

them for any crime.

156.    In addition to violently attacking civilians, the paramilitary performed other

functions for the military in its war against the guerrillas.  For example, at times, the military

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

would arrive in advance of the paramilitaries to tell people to abandon their land; paramilitaries would soon follow to enforce the orders. In 2001, the paramilitaries carried out a food blockade in Urabá that severely affected the civilian population in an effort to "decrease the military capacity of the enemy."

157.    The AUC in Urabá consistently ran joint operations with the military. The 17th Brigade of the Colombian Army, located in the Urabá region, and the 4th Brigade, sister unit to the 17th Brigade operating in the Medellin region, were especially active in their support of and involvement in paramilitaries, which include engaging in joint operations. For example, the Elmer Cardenas Bloc of the AUC received logistical support and transportation from the 17th Brigade and other units of the Colombian army and conducted joint operations.

158.    General Rito Alejo del Río Rojas, the commander of the 17th Brigade from 1995-96 who was responsible for military operations in Urabá, was notorious for his collaboration and collusion with paramilitaries in the region. H.H. has described General Del Río as one of the most important factors in allowing the expansion of paramilitarism in Urabá, because of the cooperation and support he gave the AUC in the regions where the 17th Brigade operated and elsewhere. General del Río was known as the "father of the paramilitaries" because he gave them uniforms and military training.

159.    General del Río is currently in custody on a military base in Bogota and is on trial for his collaboration with the AUC. He is accused of conspiracy to murder and perjury in relation to a previous investigation of General del Río in which he was accused of ordering his men to patrol alongside the AUC, and for presenting civilians murdered by the AUC as guerrillas killed in combat. The prior investigation was dismissed. H.H. has testified that he twice

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

witnessed Del Río meeting with the founder and national commander of the AUC, Carlos

Castaño.  Salvatore Mancuso, who succeeded Castaño as national commander, testified that Del

Río met with him and other commanders to coordinate the paramilitaries' expansion throughout

northern Colombia.

160.    AUC paramilitaries could enter and leave the 17th Brigade's headquarters at will,

with the knowledge and permission of General del Río.  In one instance, H.H. discovered that a

criminal the AUC was searching for was being held at the Brigade headquarters; he and others

from the AUC went to the 17th Brigade, picked up the prisoner, transported him to the port at

Turbo using a military van, and murdered him. Salvatore Mancuso reported a similar story.

Furthermore, on his visits to the 17th Brigade - during which he often planned joint operations

with General del Río and then-Captain Bayron Carvajal, H.H. was consistently allowed to recruit

soldiers for the AUC.

161.    General del Río's role in promoting and supporting paramilitarism was not merely

the work of a single rogue military officer; rather it was part of the Colombian government's

strategy to fight the guerrillas.  Many other army brigades had similar relationships with

paramilitaries, including the 11th Brigade. Gloria Cuartas, then the mayor of Apartadó, and

others, complained repeatedly and provided evidence to the General's superiors about his

collusion with paramilitaries, but their complaints were ignored.  Colonel Carlos Alfonso

Velasquez Romero, a 17th Brigade officer, was investigated and discharged in January 1997 on

the order of Army Commander Harold Bedoya when he tried to report on the General and the

17th Brigade's close association with the AUC.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

162.    In October 1997 members of the Army's 4th Brigade reportedly established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.

163.    Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.  In 1998, numerous members of Colombia's security forces, including members of the 17th Brigade and local police forces, were arrested and charged with various crimes related to their involvement with certain AUC activities, including the sponsorship and formation of illegal paramilitary groups, conspiracy and homicide.

164.    On February 19, 2000, the AUC selectively assassinated five banana workers in the "peace community" of San Jose de Apartadó, in Urabá, and reports indicated that members of the 17th Brigade were direct participants in the attack.

165.    When asked to rank their collaboration between the AUC and the Colombian military on a scale of one to 10, H.H. rated it as a 10, with 10 being maximum collaboration, specifically citing the helpfulness of  General del Río and Colonel Carvajal.

166.    This model of collaboration between the paramilitaries, the companies, and the government was so successful in Urabá that Raúl Hasbún explained it to Jorge 40, commander of the AUC in Magdalena, so he could implement it in that region. Thereafter, the model spread to many other regions of Colombia.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

167.     The AUC took on numerous state functions in Urabá, including the maintenance of security and order, the disposition of personal and commercial disputes, the provision and regulation of social services, and the imposition of social rules.

168.     The AUC was the *de facto* government of Urabá, Santa Marta and other regions of Colombia.

169.     The paramilitaries were like a state in the area, so the companies paid taxes in order to assure their protection and their investments. This reality generated the adage common to the Urabá region that "here paramilitaries and the State are the same thing." It was the paramilitaries who would receive complaints from the locals regarding criminal activity or conflicts with neighbors; and it was they who dispensed their brutal brand of justice in response.

170.     The AUC was not only in charge of order and tax collection in Urabá.  Similarly to an established government, they dispensed justice in disputes between individuals, punished criminals, and became involved in social issues.  The paramilitary organization's involvement in residents' daily lives reached the extent of intervention in domestic issues, disputes between neighbors, collection of debts, and truancy from school.

171.     The AUC was even able to control the roads; on information and belief they shut down stretches of the Pan-American Highway in order to use it as a runway for planes arriving with weapons and ammunition and exporting drugs.

172.     Urabá is a region located in the northeast corner of Colombia and South America. Before the 1960s, the region was lightly populated, mostly by indigenous communities, and remained isolated from the central government.  The banana-growing area of Urabá is located within the Department of Antioquia.  The United Fruit Company, the predecessor to Chiquita,

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

expanded to the Urabá region in the early 1960s and created a Colombian subsidiary, Banadex, which produced about ten percent of the region's bananas.  Many workers migrated to the region as the banana industry grew.

173.    Workers faced harsh living and working conditions on the banana farms in the 1960s and 1970s.  Urabá's first unions, Sintrabanano and Sintagro, were founded in the 1960s and 1970s.  However, the banana growers maintained control by killing and firing any organized workers.  The army occupied banana plantations and assisted banana growers by arresting union leaders or forcing laborers to work during strikes.

174.    Two anti-government guerrilla groups, the FARC and the EPL, became active in Urabá as a result of the labor struggles in the 1980s.  The FARC took control of Sintrabanano and EPL infiltrated Sintagro.  The guerrillas forced the banana companies to accept unions and negotiate with the workers.  By 1985, the two guerrilla groups began competing for workers to join their unions in order to gain more territorial control, forming mutually opposed "EPL farms" and "FARC farms."  In 1988, however, they agreed to unite under the combined Sintrainagro union in 1988; by the end of 1989, they had achieved wage increases and managed to call attention to the problem of poor housing conditions.

175.    The success of the unions was accompanied by increased paramilitary violence, and many unionists were murdered during strikes and attempted negotiations.  Sintrainagro lost many members in the violence, including some of its most active and radical leaders.  This precipitated a new split in Sintrainagro.  EPL leaders in the union believed that the only way to save the union was to associate with the paramilitaries.  Many EPL guerrillas demobilized in 1991, forming a new EPL party and signing a "social pact" with the banana growers and

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

Sintrainagro to collaborate on regional development.  Banana growers provided 23 million pesos

for the reinsertion process.  The paramilitaries encouraged Sintrainagro's alignment with the

banana growers and paramilitaries by killing any outspoken leaders advocating for workers'

rights. The FARC, in turn, massacred many of the demobilized EPL guerrillas to discourage their

alignment with the banana growers.

176.    After the formation of the ACCU's Banana Bloc in 1994, the intra-union violence

increased.  The paramilitaries took advantage of the internal battle between guerrilla forces,

working with the government in the final EPL reinsertions and in the process convincing many

demobilized EPL guerrillas to join their side and continue fighting the FARC. The war

intensified, as government forces and their paramilitary allies used increased violence against the

FARC and any suspected guerrilla sympathizers.  As Carlos Castaño boasted, by the late 1990s

the AUC achieved their goals of expelling the FARC from Urabá and suppressing the unions,

such that no strikes occurred on the banana plantations.

177.    Urabá was also used by the paramilitaries and guerrillas for their drug and arms

trade. The location of Urabá and its isolation from the central government made Urabá a strategic

location for such illicit markets, and therefore Urabá was an important location for the success of

both the guerrillas and paramilitaries, both of whom participated in the illicit trade in drugs and

arms.

### E. Chiquita's Support of the AUC

178.    Chiquita, as the successor to the United Fruit Company and the United Brands

Company, has been involved in the production and exportation of produce from Central and

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

South American nations, including Colombia, for over a century. At all relevant times, Chiquita

produced bananas in the Urabá and Santa Marta regions of Colombia.

179.    On information and belief, from not later than 1995 until at least 2004, Chiquita

provided material support, including money and services to the AUC and its predecessors.

180.    Chiquita's assistance helped the paramilitaries to consolidate as a decisive actor in

the political, military, and social terrain of the banana region. In exchange for its financial

support to the AUC, Chiquita was able to operate in an environment in which labor and

community opposition to their operations and policies was suppressed.

181.    From 1995 until at least February 2004, Chiquita provided material support to the

AUC in Urabá and Santa Marta. By 1997, the AUC effectively controlled large swathes of

territory - particularly in the towns and urban areas - as well as exerting influence in institutions

such as labor organizations and local governments in these regions.

182.    In 1995 and 1996, Chiquita made payments to the ACCU's Banana Bloc.

183.    Chiquita paid the AUC nearly every month during the period 1997-2004, making

over one hundred payments to the AUC totaling over $1.7 million. During those years, the AUC

killed 3,778 people and displaced approximately 60,000 in its war on the guerrillas.

184.    Chiquita's payments to the AUC were reviewed and approved by senior

executives of the corporation, including high-ranking officers, directors, and employees.

Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC

was a violent, paramilitary organization led by Carlos Castaño.

185.    Some of Chiquita's payments were made directly to the AUC or to front

organizations like the Convivir Papagayo.  The majority of direct payments were made in the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

form of checks written to the *convivir*, drawn on Banadex's Colombian bank account.  Chiquita

concealed the nature of these payments by recording them in corporate books and records as

"security payments" or payments for "security" or "security services."

186.    In September 2000, the results of an investigation into Chiquita's payments to the

AUC, which had been carried out by in-house Chiquita attorneys, were reported to the

company's Audit Committee.  By March 2002, individuals who had been present at the

presentation of the investigation implemented new procedures with regard to Chiquita's

payments to the AUC.  Under the new procedures, Banadex executives received checks with the

intent that they would be withdrawn as cash and handed directly to the AUC.  The individuals

who received the checks withheld the corresponding tax liability and reported and paid income

tax as if the payments were actually being made to them.  Chiquita made payments in this way in

order to conceal the fact that they were paying the AUC; it recorded these payments simply as

income contributions.

187.    Chiquita formed an agreement with the AUC, paying them in exchange for their

services in pacifying the banana plantations and suppressing union activity.  This agreement

specified that Chiquita would pay the paramilitaries a fixed amount for each box of bananas

exported.

188.    At all relevant times, Chiquita knew that the AUC was a violent, terrorist

paramilitary organization, as its brutal aims and tactics were a well-known feature of the

Colombian civil war. On September 10, 2001, the United States government designated the AUC

as a Foreign Terrorist Organization ("FTO"). That designation was well-publicized in the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

American public media, including in the Cincinnati Post on October 6, 2001, and in the

Cincinnati Enquirer on October 17, 2001, as well as in the Colombian media.

189.    In 2003, Chiquita consulted with attorneys from the District of Columbia office of

a national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC. Outside

counsel advised Chiquita that the payments were illegal under United States law and that

Chiquita should immediately stop paying the AUC directly or indirectly. Among other things,

outside counsel advised Chiquita:

> "Must stop payments."
> (notes, dated February 21, 2003)
>
> "Bottom Line: CANNOT MAKE THE PAYMENT"
> "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
> "General Rule: Cannot do indirectly what you cannot do directly"
> "Concluded with: CANNOT MAKE THE PAYMENT"
> (memo, dated February 26, 2003)
>
> "You voluntarily put yourself in this position. Duress defense can wear out through
> repetition. Buz [business] decision to stay in harm's way. CHIQUITA should leave
> Colombia."
> (notes, dated March 10, 2003)
>
> "[T]he company should not continue to make the Santa Marta payments, given the
> AUC's designation as a foreign terrorist organization[.]"
> (memo, dated March 11, 2003)
>
> [T]he company should not make the payment."
> (memo, dated March 27, 2003)

190.    Although CBI's Board of Directors agreed to disclose its payments to the AUC to

the U.S. Department of Justice on or about April 3, 2003, on April 8, 2003, CBI instructed

Banadex to continue making the payments to the AUC. On April 24, 2003, CBI met with Justice

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

Department officials, who told CBI the payments were illegal. Nonetheless, Chiquita continued to make the payments until at least February 2004.

191.    On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially designated global terrorist. The company's sentence included a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

**1.    Chiquita' facilitation of the AUC's arms shipments**

192.    In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

193.    The Nicaraguan National Police and Army were involved in a deal that provided 3,000 AK-47 assault rifles and 5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto the Otterloo, a Panamanian-registered ship, with Panama as its declared destination.

194.    Instead of docking in Panama, the Otterloo instead went to Turbo, Colombia, where  Chiquita, through Banadex, operated a private port facility for the transport of bananas and other cargo.

195.    After the Otterloo docked at Chiquita's port in Turbo, Banadex employees unloaded crates containing the assault rifles and ammunition. On information and belief, the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

AUC, which had free access to the port, then loaded these rifles onto AUC vehicles and took possession of them.

196. Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC. The documents accompanying the shipment declared that the crates that in fact contained arms were filled with plastic and/or rubber balls. However, in unloading the crates, the Banadex employees used heavy lifting machinery that would not have been necessary to move the crates' declared cargo. After being off-loaded, the crates then remained at Chiquita's facilities for at least two additional days before fourteen AUC vehicles arrived to take possession of the arms. At least some of the arms were received by Freddy Rendón Herrera, the commander of the Elmer Cárdenas Block of the AUC in Urabá.

197. A highly-placed Chiquita employee from the port Turbo, Giovanny Hurtado Torres, as well as several Colombian customs officials, have been prosecuted for their purposeful involvement in the Otterloo transaction.

198. On information and belief, Chiquita facilitated at least four other arms shipments to the AUC. One of these shipments of arms through Chiquita's port involved the entry of 4,200 assault rifles.

199. On at least one occasion, José Leonardo Lopez Valencia, an electrical mechanic at Turbo, witnessed uniformed AUC members offloading crates directly from a Chiquita ship. On information and belief, those crates contained smuggled firearms.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

200.    In an interview with the Colombian newspaper El Tiempo, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

201.    The arms that Chiquita knowingly and intentionally aided the AUC to procure have been of substantial assistance to the AUC in its commission of untold crimes, including the killings and other conduct alleged herein.  Many of these guns have not been turned in to the government and are still in use by the AUC.  In 2008, some were seized in Urabá from the Daniel Rendón Herrera's 'Heroes de Castaño' Front - another AUC subunit.  The raid, executed by Colombian authorities, netted hand grenades, mortar rounds, Claymore mines, electrical detonators, and 47 AK-47 assault rifles; the assault rifles were traced to the 2001 Otterloo shipment.

## 2. Chiquita's Facilitation of the AUC's Drug Shipments

202.    Chiquita also assisted the AUC by allowing the use of its private port facilities for the illegal exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a major source of income for the AUC, and Chiquita allowed the AUC uncontrolled access to its port facilities and ships for the purpose of smuggling drugs.

203.    Colombian prosecutors have charged that the AUC shipped drugs on Chiquita's boats carrying bananas to Europe. According to H.H., the AUC would tie drugs to the hulls of banana ships at high sea to evade the control points of the security agencies.

204.    Cocaine hidden in Defendant's banana shipments has been seized by the Colombian government on seven separate occasions.  More than one and a half tons of cocaine

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

have been found hidden in Defendant's produce, valued at over 33 million dollars.  Two of the ships on which drugs were found were named the Chiquita Bremen and the Chiquita Belgie.

205.   On information and belief, drug shipments could not have been attached to Chiquita's banana boats without the active collusion or willful ignorance of Chiquita employees. Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly and purposely allowed use of its port and banana transportation boats for this purpose.

**F. Chiquita's Conduct Aided and Abetted the AUC's Conduct Alleged Herein**

206.   Chiquita's  conduct aided and abetted the killings and other conduct alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, Ohio, Florida New Jersey, United States, and international law. Chiquita substantially assisted the AUC paramilitaries who personally undertook the wrongful acts alleged herein, and knew that its actions would assist in the wrongful acts at the time it provided the assistance.

207.   As to the first element of aiding and abetting, Plaintiffs incorporate by reference ¶¶ 251-833 of this complaint, setting forth in detail that the killings alleged in this complaint constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the right to life; and terrorism, among other violations of Colombian, New Jersey, Florida, Ohio, United States, and international law.

208.   Chiquita's payments and facilitation of drug shipments contributed significantly to the perpetration of the crimes committed by the AUC by improving its financial situation and enabling it to purchase weapons and other war materiel.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

209.   Payments from Chiquita and other banana companies constituted a significant

portion of the AUC's budget in some areas.

210.   In addition to Chiquita's payments and facilitation of drug shipments, its

assistance to the AUC in smuggling arms substantially and directly increased the paramilitaries'

capacity to carry out atrocities.

211.   Most of the firearms that were transferred to the AUC from the Otterloo shipment

have never been recovered and, on information and belief, are still in the hands of the AUC,

where they and other similarly obtained firearms have been used in the commission of the war

crimes, crimes against humanity, and other violations alleged in this complaint.

212.   Chiquita knew that its actions would assist in the illegal or wrongful activity and

other conduct alleged herein at the time it provided the assistance. Chiquita knew that its actions

would assist in the killings.  The AUC's use of violent tactics, including extrajudicial killings, to

terrorize innocent civilians living in areas under FARC control was well known in Colombia and

was widely reported in the press in Colombia and the United States.  In 1997, for example, the

State Department noted:

> [t]he many paramilitary groups took the offensive against the guerrillas, often
> perpetrating **targeted killings, massacres, and forced displacements of the
> guerrillas' perceived or alleged civilian support base . . . An active policy
> of depopulation, pursued by some paramilitary groups against
> communities suspected of guerrilla support,** was the primary cause of the
> growing internal displacement problem.

United States Department of State, *1997 Human Rights Report: Colombia*, at 2 (emphasis

added).

213.   In 1999, the State Department noted:

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

> Paramilitary groups and guerrillas were responsible for the vast
> majority of political and extrajudicial killings during the year. Throughout the
> country, paramilitary groups **killed, tortured and threatened civilians
> suspected of sympathizing with guerrillas in an orchestrated campaign to
> terrorize them into fleeing their homes, thereby depriving guerrillas of
> civilian support**. The AUC paramilitary umbrella organization . . . exercised
> increasing influence during the year, extending its presence through violence
> and intimidation into areas previously under guerrilla control.

*Id.* at 2. (emphasis added).

214.    The United States government designated the AUC as a Foreign Terrorist

Organization on September 10, 2001, and that designation was well-publicized in the American

public media. *See* ¶188 above. The AUC's designation was even more widely reported in the

public media in Colombia, where Chiquita had its substantial banana-producing operations.

215.    Chiquita had information about the AUC's designation as an FTO specifically and

global security threats generally through an Internet-based, password-protected subscription

service that Chiquita paid money to receive. On or about September 30, 2002, a Chiquita

employee, from a computer within defendant Chiquita's Cincinnati headquarters, accessed this

service's "Colombia - Update page," which contained the following reporting on the AUC:

> "US terrorist designation. International condemnation of the AUC human rights
> abuses culminated in 2001 with the US State Department's decision to include the
> paramilitaries in its annual list of foreign terrorist organizations. This designation
> permits the US authorities to implement a range of measures against the AUC,
> including denying AUC members US entry visas; freezing AUC bank accounts in
> the US; and barring US companies from contact with the personnel accused of
> AUC connections."

216.    From on or about September 10, 2001, through on or about February 4, 2004,

Chiquita made 50 payments to the AUC totaling over $825,000.  Chiquita never applied for nor

37

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

obtained any license from the Department of the Treasury's Office of Foreign Assets Control

with respect to any of its payments to the AUC.

217.     On or about February 20, 2003, two Chiquita officials had a conversation about

one official's discovery that the AUC had been designated by the United States government as a

Foreign Terrorist Organization. Shortly thereafter, the two officials spoke with outside counsel

about Chiquita's ongoing payments to the AUC.

218.     Outside counsel advised Chiquita, through the two officials, that the payments

were illegal under United States law and that Chiquita should immediately stop paying the AUC

directly or indirectly.  Plaintiffs incorporate by reference ¶¶ 189-190, above.

219.     Despite the February 26, 2003 communication from counsel advising Defendants

against making payments to the AUC, on or about February 27, 2003, two Chiquita employees in

Colombia paid the AUC in Urabá by check in an amount equivalent to $17,434.

220.     Despite the March 27, 2003 communication from counsel advising Defendants

against making payments to the AUC, on or about March 27, 2003, the same two employees paid

the AUC in Urabá by check in an amount equivalent to $19,437.

221.     Chiquita intended that its actions would assist the AUC in committing the specific

acts alleged in the complaints - to target and kill civilians and union members in Urabá.

222.     Chiquita's acts of assistance to the AUC were made with the intent that the AUC

carry out the acts of killing and other conduct alleged herein.  In exchange for its financial

support to the AUC, Chiquita was able to operate in an environment in which labor and

community opposition was suppressed.  Chiquita's assistance was not given out of duress; rather

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC in the Urabá region.

223. Chiquita, along with other banana companies in Colombia, sought a meeting with the paramilitaries in late 1996 or early 1997. The meeting took place in Medellín, and a high-level U.S. Chiquita employee was present. It was decided at this meeting that the banana companies would pay the paramilitaries. Carlos and Vicente Castaño led the negotiations with the companies; as a result of the negotiations, H.H. was ordered to patrol the entire banana-growing region.

224. On information and belief, in order to operate its banana production in an environment free of labor opposition and social disturbances, Chiquita agreed to a business arrangement whereby the company would pay the AUC a certain amount per box of banana exported, and would help to arm and otherwise support the AUC and other terrorist groups during the period of the killings and other conduct alleged herein. (Testimony of Salvatore Mancuso and H.H. in the Commission of Justice and Peace)

225. The arrangement between Chiquita and the AUC was not one of duress; in fact, it was the banana companies that approached the AUC to initiate their relationship. Mario Iguaran, the Attorney-General of Colombia, has charged that there was a criminal relationship between Chiquita and the AUC in which Chiquita supplied money and arms to the AUC in return for the "bloody pacification of Urabá."

226. As part of its deal with Chiquita, the AUC provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities or social program.

227.    By arming and financing the AUC, Chiquita intended to benefit from the AUC's systematic killings of civilians. After its agreement with Chiquita, the AUC understood that one goal of its campaign of terror was to force laborers to work in the plantations.  Anyone who disobeyed the order knew what would happen to them. For example, one individual who worked in Chiquita's offices at a plantation in Urabá, was present when paramilitaries arrived at the plantation and summarily executed a banana worker who had been seen as a troublemaker because his slow work held up the production line.  Another individual saw paramilitaries arrive to threaten banana workers after a salary dispute.  Chiquita's assistance also helped the AUC to gain access to its perceived opponents who worked for the company.  José Gehiener Arias Ramirez, a Chiquita employee who was later killed by the AUC, repeatedly witnessed AUC members entering the Chiquita packing house to threaten workers from the Barrio Policarpa, whose residents were viewed as hostile to the AUC.

228.    Carlos Castaño wrote in Mi Confesión that the unions were strong and "terrifying" before the paramilitaries arrived in Urabá, and that they had turned to crime as well as starting extensive worker strikes.  In concert with the army, which assisted banana growers by occupying banana plantations and arresting union leaders or forcing laborers to work during strikes, the AUC undertook an extensive campaign of murdering civilians in order to break the back of the unions.   According to Gloria Cuartas, "They pulled out a map where they said which plantations allegedly had a FARC presence and started killing workers and union members, until the organizational structures of the union and the board of Sintrainagro were left totally in the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

hands of the 'Esperanzados' [the ELN]," a former insurgent group that had been coopted by the paramilitaries.

229.    The stability and social control provided by the AUC was to Chiquita's benefit, in that it minimized the expenses incurred and eliminated disruptions in the exportation of bananas. As a result of the AUC's actions, Chiquita was able to dismantle the social assistance programs to which the banana companies had agreed through negotiations with the unions in the 1980s, thereby lowering costs.  The influence of the AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced labor strife.

230.    As a result of the paramilitaries' intervention, Castaño was able to brag in 2001 that "in the past three years there have been no strikes in the banana-growing region, and the *Sintrainagro unions work shoulder-to-shoulder with the employers to promote the [economy of the] zone*." (emphasis added).

231.    In addition to directly suppressing labor activity, the paramilitaries regulated the banana-growing population and protected Chiquita's profitability by controlling the provision of medical services in the towns of Urabá.  Residents of Apartadó reported that they feared seeing doctors because they believed that medical personnel were under the control of the AUC.  On information and belief, this arrangement benefited Chiquita because it allowed the paramilitaries to inform the company of its employees' medical issues that could potentially affect labor productivity, including pregnancy.  It also allowed the paramilitaries to prevent doctors from certifying worksite injuries or providing medical excuses to workers, which would have raised costs for the company.

**G.  Chiquita Joined the AUC's Conspiracy to Commit the Acts Alleged Herein**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

232.    By its conduct, Chiquita joined the AUC's conspiracy to eliminate the FARC through violent attacks on guerrillas and suspected guerrilla sympathizers and terrorization of the civilian population.  The killings alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, New Jersey, United States, and international law, were committed by members of the AUC in furtherance of the conspiracy.  Chiquita's actions constituted conspiracy in that (1) two or more members of the AUC agreed to carry out their terrorist campaign against civilians, (2) Chiquita joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations alleged herein was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.

233.    Members of the AUC agreed to fight the FARC by means of illegal violence against particular classes of civilians, thereby constituting a conspiracy of two or more persons who agreed to commit a wrongful act

234.    The AUC was formed based on agreement between its leaders, government backers, and private supporters, to eliminate the FARC through extermination of guerrillas and suspected guerrilla sympathizers and the systematic terrorization of the civilian population.  The AUC purposely targeted civilians, even those with no known ties to the guerrillas.  Thus the use of illegal, violent means, including war crimes and extrajudicial killings, was always central to the group's mission and strategies. Chiquita joined the conspiracy knowing that the AUC

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal.

235.    Chiquita began conspiring with the paramilitaries in 1995 or earlier; its first direct payments to the Banana Bloc of the ACCU were made no later than 1995. Chiquita sought a meeting with the paramilitaries in late 1996 or early 1997, and concluded an agreement with the AUC whereby Chiquita paid the paramilitaries for their services supporting their banana plantations.  These services consisted of threatening or killing civilians, including workers who attempted to strike, union leaders, alleged criminals, and small banana farmers who refused to sell or abandon their land. Chiquita knew of the AUC's goal of eliminating the FARC through the killing of suspected sympathizers and innocent civilians.

236.    Plaintiffs incorporate by reference ¶¶ 131-137, 178-205, 214-226, above. They also knew of their primary tactic of targeting civilians in order to intimidate this population from supporting the FARC.

237.    Chiquita joined the conspiracy intending to benefit from this strategy; the AUC's methods would reduce Chiquita's costs and risk exposure by suppressing labor unrest through the elimination of those who opposed the banana plantations or threatened their profitability.

238.    Chiquita, as a co-conspirator, arranged illegal money payments, smuggled drugs and arms, and facilitated and condoned murders in furtherance of the conspiracy.

239.    The AUC's conduct alleged herein were committed by members of the AUC in furtherance of the conspiracy's goal of fighting the FARC by means of illegal violence against particular classes of civilians

43

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

240.    All of Plaintiffs' decedents were killed by the AUC in furtherance of the conspiracy.  Their status as social activists, unionists, alleged criminals, or victims of FARC extortion led to their being suspected by the AUC as FARC supporters or otherwise threats to public order and ultimately to their murders. Plaintiffs incorporate by reference ¶¶ 131-137, 251-833, below, detailing the threats Plaintiffs' decedents posed to the AUC and why they were characterized as FARC sympathizers.

**H. The AUC Acted as Chiquita's Agent in Committing the Acts Alleged Herein**

241.    Chiquita formed an agreement with the AUC, paying them in exchange for their suppression of union activity and elimination of alleged FARC supporters and other undesirables.  This agreement specified, among other things, that Chiquita would pay the paramilitaries a fixed dollar amount for each box of bananas exported.

242.    Plaintiffs incorporate by reference ¶¶ 178-191, 214-226, above, detailing the payments made to the AUC from 1995 through February of 2004.

243.    Chiquita intended that the AUC commit the killings and acts alleged herein when it made an agreement with the AUC.  In providing the AUC with money and assistance with their arms and drug trafficking, Defendants intended that the AUC obtain arms and continue their practice of killing civilians, especially those civilians who were perceived as threats to the profitability of the banana industry.

244.    The leadership of the AUC did, in fact, carry out killings of union members, social organizers and other undesirable groups knowing that Chiquita expected and intended that they do so using the arms and money provided by Chiquita

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

245.    The AUC's conduct alleged herein was committed in furtherance of Chiquita's business.

246.    The AUC solved Chiquita's labor problems and kept down operational costs by killing and/or intimidating any worker that attempted to strike. Plaintiffs incorporate by reference ¶¶ 131, 135, 146-7, 173-5, 187, 221, 228-30, above.  The paramilitaries also dealt out reprisals against real or suspected thieves and social undesirables, and targeted suspected guerrilla sympathizers or supporters who could have threatened Chiquita's operations, including anyone espousing views that could be characterized as leftist, such as vocal union and community leaders.

247.    Plaintiffs incorporate by reference ¶¶ 251-833, below, detailing the threats Plaintiffs' decedents posed to the AUC and their characterization as FARC sympathizers.

248.    The AUC's conduct alleged herein was authorized or subsequently acquiesced in by Chiquita. Chiquita authorized the killings and other conduct alleged herein in advance.  The AUC's agreement with Chiquita involved forcing people to work using threats and illegal violence, as well as the quelling of labor and social unrest through the systematic terrorization of the population of Urabá.  Plaintiffs incorporate by reference  ¶¶ 127, 145, 178-191, above.

249.    Furthermore, Chiquita acquiesced in the AUC's conduct after the fact by continuing to pay them despite full knowledge that their support was being used to carry out the crimes alleged herein.  Plaintiffs incorporate by reference ¶¶ 188-191, above

250.    On information and belief, the monetary payment made by Chiquita and the other support and assistance provided by Chiquita to the AUC contributed to the AUC's ability to flourish and consolidate its power in the regions impacted by the AUC's acts of terror and

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

mayhem. The assistance, financial and otherwise, provided by Chiquita to the AUC, facilitated the AUC's ability to carry out such acts with impunity. The acts of terror and violence were designed to instill fear and control in the regions affected. Such acts of terror, violence, and mayhem included the actions set forth in ¶¶ 251-833 below.

**Plaintiffs' Injuries**

**Jose Lopez No. 1**

251.    Jose Lopez No. 1 worked for 15 years in packing houses owned or operated by Chiquita.

252.    Beginning in 1997 or 1998, armed and uniformed AUC members would enter the Chiquita packing house where he worked and threaten workers from the Barrio Policarpa, whose residents were viewed generally to be hostile to the AUC.

253.    In 1999, AUC members kidnapped Lopez No. 1 by forcing him into a taxicab and later executed him, leaving behind his wife and their daughter and retarded son. His wife later received death threats warning her not to speak of her husband's death or report it to the authorities.

254.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 1's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a senior worker who threatened the stability of Chiquita's operations.

255.    Next of kin of Jose Lopez No. 1 are his wife and two children.

**Jose Lopez No. 2**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

256.    Jose Lopez No. 2 operated a transportation business with a partner, who was perceived by the AUC to be hostile to the AUC.

257.    In 1999, AUC paramilitaries came to Lopez No. 2's house and executed him in the presence of his family. They then ran out and fled in a black car that was known in town as the "Trip to Heaven."

258.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 2's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

259.    Next of kin of Jose Lopez No. 2 are his wife and four children.

**Jose Lopez No. 3**

260.    Jose Lopez No. 3  was a businessman who operated a cantina at Vereda La Balsa, Finca El Eden in Apartador.

261.    In 2001, Lopez No. 3   was investigated by the AUC because he was identified as being hostile to the AUC.

262.    Two weeks later they came back, forcibly removed him, gagged him, tied him to a truck, dragged him behind the truck and eventually executed him.

263.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 3's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message to local residents that anyone hostile to the AUC would be tortured and executed.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

264.    Next of kin of Jose Lopez No. 3 are his common-law wife and a child from a former union.

### Jose Lopez No.4

265.    Jose Lopez No. 4  managed a gas station.

266.    In late 1998, he purchased a small motorcycle for his sister which the AUC stole in Apartdo.

267.    Because the AUC acted with impunity, it did not hide where it took the motorcycle.

268.    Lopez No. 4  then went to the building where the AUC kept it and single-handedly took it back. He then began criticizing the AUC and was warned by the local AUC commander that if he continued doing so he would be dealt with appropriately.

269.    In November, 1988, he found the tires on his motorcycle flattened. He then took a cab to his place of work where he saw 10 to 12 known AUC members who had surrounded the gas station and later four additional AUC arrived on motorcycles and began firing their weapons, killing him.

270.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 4 's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who challenged the AUC's impunity would be dealt with harshly.

271.    Next of kin of Jose Lopez No. 4 is his common-law wife.

### Jose Lopez No. 5

48

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

272.    In 2000, Jose Lopez No. 5 had received threats in his home in by members of AUC who told him to leave the area or they would kill him.

273.    Lopez No. 5 left and went to Medellin, but came back a month later whereupon he was executed two weeks after by the same men who had threatened him before.

274.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the Lopez No. 5's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who disobeyed the AUC would be dealt with harshly.

275.    Next of kin of Jose Lopez No. 5 are his wife and a minor son.

**Jose Lopez No. 6**

276.    Jose Lopez No.6 was shot in the presence of his wife at home by an AUC member named "El Sargento."

277.    The AUC had earlier listed Cardenas on a death list as part of a broader effort to purge and cleanse certain individuals perceived by it to be undesirable.

278.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Lopez No. 6 through its support of the AUC.

279.    On information and belief, Chiquita benefited in part from Lopez No. 6's murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

280.    Next of kin of Jose Lopez No. 6 are his wife and four children.

**Jose Lopez No. 7**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

281.    Jose Lopez No. 7, who was disabled from an automobile accident, lived in Apartado.

282.    In 2002. AUC paramilitaries, perceiving Lopez No. 7 to be hostile to the AUC, forced him into a white car and tortured him by pouring acid on his face and pulling out his fingernails, and later executed him.

283.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 7's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing an individual it deemed undesirable and who it felt threatened the stability of Chiquita's operations and the generally established social order.

284.    Next of kin of Lopez No.7 are his mother and numerous siblings whom he helped to support.

### Jose Lopez No. 8

285.    Jose Lopez No. 8 lived with his wife Josefa Lopez No. 9 in Barrio Policarpa whose residents were viewed generally to be hostile to the AUC.

286.    In 2004, Jose Lopez No.8 was executed by an AUC assassin named "El Mono." and Josefa Lopez No. 8-A was later threatened by the AUC, causing her to close her business and flee the area.

287.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 8's murder through its support of the AUC in 2004. On information and belief, Chiquita benefited in part from his murder by removing a perceived opponent of the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

AUC and who threatened the stability of Chiquita's operations and the generally established social order.

288.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and forcing Josefa  Lopez No. 8-A's to leave the area and lose her business  through its support of the AUC in 2004. On information and belief, Chiquita benefited in part from his murder by removing a perceived opponent of the AUC and who threatened the stability of Chiquita's operations and the generally established social order.

289.    Next of kin of Jose Lopez No. 8 is his wife, Josefa Lopez No. 8-A.

**Josefa Lopez No. 9**

290.    Josefa  Lopez No. 9 lived with her husband Jose Lopez No. 8  in Barrio Policarpa whose residents were viewed generally to be hostile to the AUC.

291.    In 2004, Jose Lopez No.8 was executed by an AUC assassin named "El Mono." and Josefa Lopez No. 9 was later threatened by the AUC, causing her to close her business and flee the area.

292.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and forcing Josefa  Lopez No. 9 to leave the area and lose her business  through its support of the AUC in 2004. On information and belief, Chiquita benefited in part from her displacement by removing a perceived opponent of the AUC  who threatened the stability of Chiquita's operations and the generally established social order.

293.    Josefa Lopez No. 9 brings this claim on her own behalf.

**Jose Lopez No. 10**

294.    Jose Lopez No. 10  was an electrical mechanic in Turbo for many years.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

295.    Beginning around 1998, he witnessed numerous human bodies killed during massacres by the AUC, the offloading by uniformed AUC members from a ship with Chiquita written on its side of large wooden crates believed to contain firearms into smaller boats, and the forced kidnapping of his employer by AUC members in a white vehicle which later became known as the "Vehicle to Heaven" because anyone seen getting into that vehicle, including his employer, was never seen again.

296.    Later Lopez No. 10 was confronted at a gas station and shot five times by an AUC member.

297.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the shooting of Lopez No. 10 through its support of the AUC. On information and belief, Chiquita benefited in part from shooting Lopez No. 10 by intimidating a witness who threatened the stability of Chiquita's operations.

### Jose Lopez No. 11

298.    Jose Lopez No. 11 lived in a village in Antioquia with his family. He was a prosperous businessman with many business interests.

299.    In 1998, a 180-man battalion of AUC forces commanded by a man called "El Lobo," arrived and summoned his village to the village square where they were promised amnesty if they renounced the guerrillas who had previously been active in the area. When no one stepped forward to renounce the guerrillas, the AUC began seizing villagers and taking them to the area near the warehouse where Lopez No. 11 milled his rice, hanged them, cut their tongues out, cut off their testicles, otherwise mutilated them, shot them, and then dumped their

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

bodies on the outskirts of the village in an attempt to terrorize Lopez No. 11 and fellow villagers.
Mr. Lopez No. 11 witnessed these events.

300.    In 2000, because he was opposed to the AUC, the AUC detonated an explosive
device in his home, causing a cement pillar to crush his right foot, which was later amputated.
Subsequently his son Winston was executed by the AUC. He fled his village, losing all of his
assets.

301.    On information and belief, Chiquita caused, intended, conspired in, and/or aided
and abetted the bombing of Mr. Lopez No. 11's home through its support of the AUC in
Antioquia.

302.    On information and belief, Chiquita benefited in part from the shooting of Lopez
No. 11 by intimidating a witness who threatened the stability of Chiquita's operations.

**Jose Lopez No. 12**

303.    Jose Lopez No. 12 worked as a contract laborer loading and unloading cargo
trucks including bananas and fertilizer in or near Chigorodo.

304.    On June 3, 1997, he was in a truck that was stopped at an AUC road block, was
identified and accused of being a supporter of the FARC and was killed with one shot to the right
eye.

305.    In addition to the pain caused to his surviving parents by the murder of their son,
his brother  received death threats from the AUC because he knew who had killed Jose Lopez
No. 12, which forced him to leave the area and relocate in Medellin.

306.    On information and belief, Chiquita caused, intended, conspired in, and/or aided
and abetted the execution of who had killed Jose Lopez No. 12  through its support of the AUC

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

in or near Chigorodo. On information and belief, Chiquita benefited in part from killing who had

killed Lopez No. 12  by sending a message to local residents that anyone hostile to the AUC

would be executed and by removing a person perceived to be hostile to the AUC which

threatened the stability of Chiquita's operations and the generally established social order.

307.    Next of kin are his mother and father.

## Jose Lopez No. 13

308.    Jose Lopez No. 13 sold bananas that were rejected by Chiquita and other growers

because their quality was not good enough for export.

309.    Lopez No. 13 was in competition with the AUC, which wanted to be the exclusive

seller of such bananas.

310.    On May 17, 2002, Lopez No. 13 was forced by the AUC into a white vehicle in or

near San Pedro de Urabá, kidnapped, and later shot four times and killed.

311.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the kidnapping and execution of Lopez No. 13 through its support of the AUC. On

information and belief, Chiquita benefited in part from kidnapping and execution of Lopez No.

13 by sending a message that those challenged the AUC's impunity would be dealt with harshly

and by removing a person perceived to be hostile to the AUC which threatened the stability of

Chiquita's operations and the generally established social order.

312.    Next of kin is his mother and a sister.

## Jose Lopez No.14

313.    On January 17, 2000, Jose Lopez No. 14 was executed by the AUC in front of his

stepdaughter near Zunguito.

54

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

314.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 14's murder through its support of the AUC in Zunguito. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

315.    Next of kin is his wife.

### Jose Lopez No. 15 and Jose Lopez No.16

316.    Jose Lopez No. 15 and Jose Lopez No. 16 were brothers.

317.    Lopez No. 15 worked in a factory in Apartado that made the boxes in which bananas are packed, and was sympathetic to efforts to organize workers.

318.    On March 9, 1997, both brothers were attending a wedding reception when four motorcycles pulled up to the hall, identified themselves as AUC, and went in and shot Jose Lopez No. 15.  On their way out, Lopez No. 16 hit one of the AUC paramilitaries and brought him to the ground; the paramilitary put his gun against his chin and pulled the trigger.

319.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted these killings through its support of the AUC. On information and belief, Chiquita benefited in part from the Lopez No. 15 and Lopez No. 16 murders by sending a message to local residents that anyone hostile to the AUC would be executed, that those who challenged the AUC's impunity would be dealt with harshly, and by removing individuals perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

320.    Next of kin are their parents, one sister and three brothers.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

## Jose Lopez No. 17

321.    On December 16, 1999, Jose Lopez No. 17 was drinking a soda in or near Apartado when an AUC member on a motorcycle pulled up, told him to get on his motorcycle, and drove him away, whereupon he was executed.

322.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 17's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

323.    Next of kin are his wife and three daughters.

## Jose Lopez No. 18

324.    Jose Lopez No.18  had served in the Colombian military and was perceived by the AUC as hostile to them.

325.    On August 26, 2001, Jose Lopez No. 18 opened the door to his apartment in Turbo and was stabbed numerous times and left for dead.

326.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 18's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

327.    Next of kin is his father.

## Jose Lopez No. 19

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

328.     On December 27, 2004, Jose Lopez No. 19 was at a small grocery store in the Policarpa neighborhood, which the AUC perceived to be sympathetic to FARC.

329.     In addition to being in the Policarpa neighborhood, Jose Lopez No. 19 had reported an AUC member named "Cepillo" to the government authorities.

330.     On that date, two AUC members shot and killed Jose Lopez No. 19.

331.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 19's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by intimidating a witness who threatened the stability of Chiquita's operations, by sending a message to local residents that anyone hostile to the AUC would be executed, and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

332.     Next of kin are his wife and two children.

**Jose Lopez No. 20**

333.     Jose Lopez No. 20 worked in a banana plantation near Apartado which was perceived by the AUC to be sympathetic to labor unions and/or FARC.

334.     On November 5, 2001, three AUC men came to Lopez No. 20's home and told him to go with them. His mother begged "Please don't take him," whereupon they pointed a gun at her and said: "We were told to get one, but if you get in the way, we'll take two."

335.     They walked Lopez No. 20 about 30 feet from the house where he was executed.

336.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 20's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

AUC which threatened the stability of Chiquita's operations and the generally established social order.

### Jose Lopez No. 21

337.     Jose Lopez No. 21 worked as a vegetable vendor in or near Chigorodo. He would routinely take vegetables to kitchens located on various farms or ranches.

338.     On several occasions Lopez No. 21 was recruited by AUC members to join them, but he refused, saying all he wanted was for them to give him permission to visit the kitchens on the banana plantations so that he could sell his vegetables. They told Lopez no. 21 he needed to go see a certain AUC commander at a particular farm.

339.     On December 18, 1998, Lopez No. 21 visited that location where he was shot once in his right eye and killed. His body was later found with all of his fingers broken.

340.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 21's torture and murder through its support of the AUC in Chigorodo. On information and belief, Chiquita benefited in part from his torture and murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

341.     Next of kin is his mother.

### Jose Lopez No. 22

342.     Jose Lopez No. 22 was a manager of a cattle ranch, but was unable to continue in that employment after the AUC became active in the area. He started buying piglets and raising them to full size, then he would sell them. He also ran a small store café.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

343.    On May 24, 1999, eight men arrived at his home in two vehicles. They knocked the door down, said they were AUC, and took Lopez No. 22 with them. The next day his body was found with five shots to the head.

344.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the Lopez No. 22  kidnapping and murder through its support of the AUC in Apartado. On information and belief, Chiquita benefited from his kidnapping and murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

345.    Next of kin are his wife and three children.

**Jose Lopez No.  23**

346.    Jose Lopez No. 23 and his immediate family all lived and worked on cattle ranches near Chigorodo throughout their lifetime.

347.    On August 12, 1997, 10 uniformed and fully armed AUC members came to their home and took Jose Lopez No. 23's brother and nephew) to a farm. When Jose Lopez No.  23 arrived there, both he and his brother were killed.

348.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 23's killing through its support of the AUC. On information and belief, Chiquita benefited in part from his killing by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

349.    Next of kin are his son and one brother.

**Josefa Lopez No.24**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

350.     On December 4. 2000, Josefa Lopez No. 24  was forcibly taken from a dance by a known FARC member whose name was "El Cortico" and forced to live with him, bearing a child from this union. She remained with the FARC forces until that particular FARC group decided to turn in their arms and try to re-socialize.

351.     Amin Ramos, an AUC commander, then told Josefa Lopez No. 24 that she must live with him or he would kill her. He told Lopez No. 24 that he knew she was a former FARC. Lopez No. 24 complied, bearing him a daughter. Josefa Lopez No. 24   eventually called her mother, reporting that she was being held against her will and mistreated. She also reported that Ramos had killed the father of her older child and that she feared for her own life.

352.     On December 4, 2000, Amin Ramos murdered Josefa Lopez No. 24. Her body was sent to her mother. An autopsy showed that she had been tortured and shot in the back of the head.

353.     Josefa Lopez No. 24's mother then contacted Ramos, pleading with him to let her have her grandchildren. Ramos responded that if she wanted them he could send them in a coffin as he had done with her daughter. Josefa Lopez No. 24's mother traveled to a location where she had been summoned by the AUC to get her grandchildren. Once there she was kidnapped and brutally mistreated in front of her grandson.

354.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Josefa Lopez No. 24's torture and murder. Chiquita benefited in part from Lopez No. 24's torture and murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

355.    Next of kin are her mother and her son.

## Jose Lopez No.  25

356.    Jose Lopez No. 25 worked on a banana plantation near Turbo.

357.    On October 22, 2003, Lopez No. 25 stopped to eat lunch when five AUC men approached him on motorcycles, tied him up, and took him to another plantation where he was shot eight times in the head.

358.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 25's killing through its support of the AUC in Turbo. On information and belief, Chiquita benefited in part from his killing by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

359.    Next of kin are his mother and four minor children.

## Jose Lopez No.  26

360.    Jose Lopez No.  26 was a farm worker.

361.    Lopez No. 26 also assisted the local "Medicine Man," thereby making him a target for the AUC.

362.    The AUC had issued a flyer identifying certain occupations such as carnival workers, former FARCs, FARC sympathizers, medicine men, and anyone assisting medicine men as individuals that they planned to eradicate.

363.    On April 28, 2002, Jose Lopez No.  26 was taken by AUC members on motorcycles to a location where he was later found tortured and his neck broken.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

364.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 26's killing through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

365.    Next of kin is his father.

**Jose Lopez No.  27**

366.    Jose Lopez No.  27 was a farm worker who worked in an area considered "FARC land."

367.    On February 22, 2001, Lopez No. 27's daughter was to be married. She and her father went to her uncle's village to invite him and his family to her wedding later that day.

368.    While there, two known AUC members on motorcycles arrived and shot Jose Lopez No.  27 three times in the leg, chest, and head. His daughter witnessed her father die at the scene.

369.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 27's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

370.    Next of kin are three daughters and one son.

**Jose Lopez No. 28**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

371.    On July 4, 2002, Jose Lopez No. 28, an 8th grade student, 15 years of age, was standing in the front yard with friends when two AUC members who had threatened him two days earlier shot and killed him,

372.    Jose Lopez No. 28 was killed for dating a girl who ran away from her home because her mother opposed the relationship, and the mother's relatives were AUC members.

373.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 28's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

374.    Next of kin are his mother and two siblings.

**Jose Lopez No. 29**

375.    Jose Lopez No. 29 worked in the banana plantations near Chigorodo.

376.    On January 23, 1997, three AUC men knocked on the door of Lopez No. 29's home on the plantation, instructed him to report to the packing house where apparently all of the other men from the various houses surrounding the packing house were being held. They were all forced to lie on the floor, and witnesses later heard shots from the home.

377.    The next day Jose Lopez No. 29's body was found badly beaten and shot. The AUC took his motorcycle and told his family that this happened because he was a union organizer.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

378.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 29's murder through its support of the AUC in Chigorodo. On information and belief, Chiquita benefited in part from his murder by sending a message to local residents that anyone hostile to the AUC would be tortured and executed and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

379.     Next of kin are his wife, his two children and an uncle who had raised him after the death of his father.

**Jose Lopez No. 30**

380.     Jose Lopez No. 30 worked on a banana plantation near Apartado whose workers were perceived to be sympathetic to unions.

381.     AUC members threatened Lopez No. 30 and he moved away but subsequently returned to Apartado and got a job at a gas station.

382.     On December 12, 2002, Lopez No. 30's wife was told that he had been killed, and his body was found in a small park in the town center with a gunshot wound to the head.

383.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 30's murder through its support of the AUC. On information and belief,  Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

384.     Next of kin are his wife and three minor sons.

64

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

## Jose Lopez No. 31

385.    Jose Lopez No. 31 was a school teacher in Apartado. He also managed a juvenile program involving sports and education. He was an elected member of the City Council, one of 15 members.

386.    The juvenile program owned a small cattle ranch, the proceeds of which were used to support the organization. The AUC demanded that Lopez No. 31 give the AUC one head of cattle every 8-10 days. Jose Lopez No. 31 told them he could not do that since that was the only source of income for the organization.

387.    On February 18, 2001, Jose Lopez No. 31 went to a barbecue at the ranch.

388.    Five masked AUC members came to the barbecue masked and shot him 27 times.

389.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 31's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

390.    Next of kin is his mother.

## Jose Lopez No. 32

391.    Jose Lopez No. 32 was a taxi driver in and around Chigorodo, whose residents were perceived by the AUC to be hostile to it.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

392.    On December 12, 1997, two AUC men came to his taxi terminal, got in Lopez No. 32's taxi and told him to drive off. His taxi cab was found one week later; neither he nor his body has ever been recovered.

393.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 32's disappearance and presumed murder through its support of the AUC. On information and belief, Chiquita benefited in part from his disappearance and presumed murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

394.    Next of kin are his wife and his daughter.

**Jose Lopez No. 33**

395.    Jose Lopez No. 33 worked as a carpenter assistant in Apartado. He was a deaf mute.

396.    On his way to a medical examination at the Clinica Leon XIII in the hope that his ability to speak could be surgically corrected, Lopez No. 33 and his physician were abducted by members of the AUC.

397.    On June 22, 2003, Lopez No. 33's physician was found dead, shot in the head and exhibiting signs of torture. (His physician had previously been recruited to run for mayor of his town, but was forced by the AUC to withdraw so that it could run its own candidate.)

398.    Lopez No. 33's body was found four days later in a farm 65 kilometers from where his doctor was found. Lopez No. 33's left ear and his lower lip were cut off, and he had been suffocated using a plastic bag containing a powder detergent.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

399.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 33's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message to local residents that those who associated with people who challenged the AUC's political control would be dealt with harshly and by removing a person perceived to threaten the stability of Chiquita's operations and the generally established social order.

400.    Next of kin is his mother.

**Jose Lopez No. 34, Josefa Lopez No. 35, and Josefa Lopez No. 36**

401.    Jose Lopez No. 34, Josefa Lopez No. 35, and Josefa Lopez No. 36 were husband, wife, and daughter, respectively.

402.    On or about June 17, 1997, they and their son/brother, were riding the bus that transported workers to a farm in Vereda Arcuas Central when it was stopped by a group, some of which were in civilian clothes and others in uniform. One of them got on the bus and identified themselves as AUC. They forced everyone out of the bus and demanded that they show identification. The AUC had a list, checked the identifications and those whose names were on the list were taken aside.

403.    The AUC then took Jose Lopez No. 34, Josefa Lopez No. 35, and Josefa Lopez No. 36 away.

404.    After this, their son/brother got word that his father was dead. Later, he learned that his mother and sister were taken back to Currulao where the AUC had a base, and never heard from them again.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

405.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 34, Josefa Lopez No. 35, and Josefa Lopez No. 36's murders, abductions and disappearances through its support of the AUC. On information and belief, Chiquita benefited in part from their murder(s), abductions and disappearances by sending a message to local residents that anyone hostile to the AUC would be tortured and executed, and by removing persons perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

406.    Next of kin is the son of Jose Lopez No. 34 and Josefa Lopez No. 35, and brother of Josefa Lopez No. 36.

## Jose Lopez No. 37

407.    Jose Lopez No. 37 was related by marriage to, Jose Lopez No. 34, Josefa Lopez No. 35, and Josefa Lopez No. 36 described above.

408.    Jose Lopez No. 37 worked as a time keeper in a banana plantation near Apartado.

409.    After Lopez No. 34, Lopez No. 35 and Lopez No. 36 were abducted and killed, he and his family fled to Cartagena, but he could not find work that would support them. He then decided to return to Apartado and found work putting up tracks on which bananas would move to the packing house.

410.    On April 29, 1999-eight days after returning to Apartado, he was at work and two motorcycles with four AUC members came to the farm.

411.    Jose Lopez No. 37 saw them coming, fled but was captured, and taken away. Later same day he was found with his hands and feet tied behind him, stabbed many times, with acid poured over his body.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

412.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez no. 37's abduction, torture and murder through its support of the AUC. On information and belief, Chiquita benefited in part from his abduction, torture and murder by sending a message to local residents that anyone hostile to the AUC would be tortured and executed, and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

413.    Next of kin are his wife and three daughters.

### Jose Lopez No. 38

414.    Jose Lopez No. 38 worked primarily as a farm worker, was the sole supporter of his father and siblings. He was working in an area near San Jose which at the time was perceived as sympathetic to FARC.

415.    On or about March 16, 1997, Lopez No. 38 went to town to buy some groceries, he was seized by three armed AUC men and accused of being a suspected member of FARC.

416.    Lopez No. 38  attempted to fight the men but one of them, alias "El Burro," shot him four times in the head. His brother witnessed his murder.

417.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 38's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

418.    Next of kin is his father.

### Jose Lopez No. 39

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

419.     In 1996, Jose Lopez No. 39 worked with the Dioceses of Apartado as an outreach worker for indigenous people.

420.     The FARC had a significant presence in the area where he worked as an outreach worker. In 2000 Castaneda got a job as a Government Forrest Ranger, working near Turbo.

421.     On or about September 6, 2001, he was killed by AUC members allegedly on orders of Commander "Mario," also known as "La Cabeza de Pollo."

422.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 39's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

423.     Next of kin are his wife and three daughters.

**Jose Lopez No. 40**

424.     In or about November, 1998, Jose Lopez No. 40 was robbed and stabbed. He later identified the perpetrator, who was then arrested by the local police.

425.     The perpetrator reportedly had AUC connections, and on or about December 5, 1998, Jose Lopez No. 40 was stopped on his way home by two AUC, they forced him to get on a motorcycle, and drove off. He was subsequently found shot twice.

426.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 40's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to

70

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

the AUC which threatened the stability of Chiquita's operations and the generally established social order.

427.    Next of kin are his parents and three siblings.

## Josefa Lopez No. 41

428.    On April 27, 1997, Josefa Lopez No. 41's  father sent her to a store to pick up some items. On the way back from the store she was stopped by a motorcycle with two men, four shots were heard and she was found dead.

429.    Josefa Lopez No. 41  had previously told the wife of an AUC commander that she had seen the commander with his mistress.

430.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Josefa Lopez No. 41's murder through its support of the AUC. On information and belief, Chiquita benefited in part from her murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

431.    Next of kin are her parents and seven siblings.

## Jose Lopez No. 42

432.    Jose Lopez No. 42 was a bus driver who transported workers in and around Apartado.

433.    On February 1, 1997, Lopez No. 42 was transporting 22 workers when his bus was stopped by the AUC, which forced everyone off the bus. They took Canas 120 meters away and shot him three times and then seized the bus.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

434.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 42's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

435.    Next of kin are his wife and son.

**Jose Lopez No. 43**

436.    Jose Lopez No. 43 worked as a cargo truck driver in and around Apartado.

437.    On July 19, 1997, Lopez No. 43 was at home playing the guitar when four AUC members in plain clothes with long arms over shoulders took him 50 feet from his home, made him kneel and shot him twice, once in each eye, all of which occurred in front of his wife and three children.

438.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Lopez No. 43's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

439.    Next of kin are his wife and three daughters.

**Josefa Lopez No. 44**

440.    On April 26, 2002,  Josefa Lopez No. 44  and her husband were both at work, in the Packing Department of  a banana farm in Apartado.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

441.     A group of AUC members went into the work area and killed a lot of workers. Lopez No. 44's sister and brother heard the shots and immediately went to the scene where they saw many bodies lying around.

442.     Josefa Lopez no. 44's husband was also killed in the same massacre.

443.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 44's murder through its support of the AUC.

444.     On information and belief, the AUC used terror tactics to impose fear among workers and Chiquita benefited in part from his murder by sending a message that the AUC was and in control to ensure that the stability of Chiquita's operations was not disrupted.

**Jose Lopez No. 45**

445.     Jose Lopez No. 45 worked on a banana plantation near Apartado.

446.     In late 1997, Lopez No. 45 was asked by AUC commander Zulei Antonio Guerra, alias "Juancho," to get rid of some firearms that the AUC had used in homicides. Lopez No. 45 refused and the AUC told him he had 24 hours to leave the area.

447.     Jose Lopez No. 45 fled to Medellin where he stayed for over a year. He then returned to Apartado.

448.     After Lopez No. 45 returned, an AUC member known as "El Mono" asked him for a loan, which he provided.

449.     Several months later, Lopez no. 45 asked for his money back and was told to go to a billiard hall where he would get paid.

450.     Lopez No. 45's sister followed him to the billiard hall where she saw three men abduct him. The next day Leon was found on the side of the road shot two times.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

451.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 45's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly and by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

452.    Next of kin are his mother and his sister.

**Jose Lopez No. 46**

453.    Jose Lopez No. 46 owned a convenience store in San Jose, Apartado, a neighborhood which was reputed to contain FARC sympathizers.

454.    Because Lopez No. 46 occasionally sold groceries to FARC members, he became a target of the AUC.

455.    In 2001, the AUC began burning down the homes of suspected FARC sympathizers in his neighborhood, and it attempted to burn down his house, which Lopez No. 46 interrupted and prevented.

456.    Approximately six months later, on December 15, 2001, two AUC members came into Lopez no. 46's store and shot him three times in the head, killing him.

457.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 46's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

458.    Next of kin are his mother and sister.

### Jose Lopez No. 47

459.    Jose Lopez No. 47  lived in Turbo.

460.    On January 16, 2000, AUC members knocked on the door of Lopez No. 47's

mother's house asking for him. She stated he was not at home, and later a white car, known as

the "white car to heaven," stopped Lopez No. 47 when he was walking home. She heard shots

and Lopez No. 47's body was found shot seven times.

461.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted Jose Lopez No. 47's  murder through its support of the AUC. On information and

belief, Chiquita benefited in part from his murder by removing a person perceived to be hostile

to the AUC which threatened the stability of Chiquita's operations and the generally established

social order.

462.    Next of kin are his mother and three siblings.

### Jose Lopez No. 48

463.    Jose Lopez No. 48 was the Administrator of a banana plantation known as El

Tirol in Turbo owned by his sister-in-law.

464.    On April 22, 2001, as was his custom, he went by motorcycle from his home to

the banana plantation to make preliminary preparations for Monday, which  is considered the

busiest day of the week in the banana business. Previously he had discovered that  the  farm

manager had stolen from the company and he had confronted the individual about it.  Little did

he know that the farm manager had connections to the AUC.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

465.    The AUC  wrote  a note to the owner of the farm, advising her to get him out from the business as they did not want him there.

466.    On the day in question, he was not seen following his arrival at the banana farm, his motorcycle was found with two flat tires at the farm, there was no ransom requested and the family filed a complaint of a missing person.  Workers had begged the wife to leave things alone and not file a complaint, as he would not be found.  Information was subsequently given to the family that he had been taken on orders of H.H. also known as "Mono Veloza" a high ranking commander of the AUC. He has never been seen alive again.

467.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted  Lopez No. 48's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by removing a person who could reveal the criminal activity  of someone connected to the AUC, and who threatened the stability of Chiquita's operations.

468.    The next of kin of Jose Lopez No. 48 are his  wife and four daughters.

**Jose Lopez No. 49**

469.    Jose Lopez No. 49 lived with an uncle who had been threatened by the AUC because his good financial situation was attributed to him collaborating with  the FARC.  Three years prior the family had had to leave their house wearing only their pajamas and they were able to go back to the house with the local authorities to rescue some of their belongings but had to abandon everything and relocate in Medellin.  They subsequently returned  because they were advised by the paramilitaries  that there would be no problems.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

470.    On January 11, 2000, at approximately 3:00 p.m., Lopez  No. 49 and his uncle

went to a meeting called by the paramilitaries purportedly to discuss  them reclaiming  their

house. It was a set up, when they got there, they were murdered. Lopez  No. 49 was shot seven

times in the back of the head.

471.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted  Lopez  No. 49's murder through its support of the AUC. On information and belief,

Chiquita benefited in part from his murder by removing a person perceived to be hostile to the

AUC which threatened the stability of Chiquita's operations.

472.    The next of kin of Jose Lopez No.49 are his wife and two minor sons.

**Josefa Lopez No. 50**

473.    On July 26, 2002 Josefa Lopez No. 50 was killed by paramilitaries as retaliation

for her brother Jose Lopez No. 91 having refused to join them.  The AUC had threatened him

that if he did not comply they would kill his sister.

474.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted  Josefa Lopez No. 50's murder through its support of the AUC. On information and

belief, Chiquita benefited in part from her murder by sending a message that those who

challenged the AUC and who refused their demands would be dealt with harshly.

475.    The next of kin of Josefa Lopez No.  50. are her mother and one minor son.

**Jose Lopez No. 51**

476.    Jose Lopez No. 51 worked both as a farm worker and construction worker.  He

and his family had been displaced after the massacre of almost an entire village in the area in

1996.  They moved to Bogota where in 1997 they filed  Displaced Person Reports.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

477.    His death  occurred outside of Bogota where he was working at a construction site.  His daughter had taken  dinner to him and after she left, she heard shots, turned around and saw her father on the ground, shot to death.

478.    In the previous week they had seen a number of AUC known members from Apartado in the neighborhood  where they were living in  Bogota.

479.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted  Jose Lopez No. 51's murder through its support of the AUC. On information and belief, the AUC was known to have threatened those who reported damages resulting from AUC activities and Chiquita benefited in part from his murder by sending a message that those who challenged the AUC would be punished.

480.    The next of kin of Jose Lopez No. 51 are his wife, two sons and a daughter.

**Jose Lopez No. 52**

481.    Jose Lopez No. 52  worked on a farm owned by the family.

482.    On February 1, 2001,  Jose Lopez No. 52  and two of his friends were 15 minutes out of the town when a roadblock with 8 - 10 AUC members stopped them.  They took him and told the other two to get out of there.  The family then went looking for him and found him shot once in the head.

483.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted  Jose Lopez No. 52's murder through its support of the AUC. On information and belief, the AUC used indiscriminate terror tactics to impose fear among the population and Chiquita benefited in part from his murder by sending a message that the AUC was powerful and would ensure that Chiquita's stability of operations was not disrupted.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

484. The next of kin of Jose Lopez No. 52 are his mother and his sister.

### Jose Lopez No. 53

485. Jose Lopez No. 53 was a nurse at the local hospital; at the time of his death he was 33 years of age.

486. On October 16, 1997 there was a going away party thrown for one of the hospital doctors. Lopez No. 53 was attending that party when an acquaintance of his came to the party and told him that his girlfriend wanted him to go to her house. As soon as he left the party he was confronted by AUC members and was shot several times, allegedly by "El Lobo" under the orders of "El Aleman." The murder was witnessed by his mother, his father, employees of the hospital, and a friend. The killers were heavily armed and wearing AUC uniforms.

487. When the paramilitaries took control of the area they forced his mother to cook using logs, which caused her to lose an eye because she had just had eye surgery.

488. On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 53's murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

489. The next of kin of Jose Lopez No. 53 are his mother and his minor daughter.

### Jose Lopez No. 54

490. Jose Lopez No. 54 had been raised by his sister as if he was her own son. He worked in a local banana plantation.

491. On October 16, 2001 at 7:00 p.m. a group of paramilitaries arrived at their home in Vereda Coldesa and told Jose Lopez No. 54's sister that they needed to talk to her brother. He

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

was not home and they left.  She went out looking for him and advised him that the

paramilitaries were looking for him and he said that he did not owe them anything and that both

he and his sister should go and see what they wanted.  They met the paramilitaries who told him

he had to talk to alias "Jorge" and he got on their motorcycle.  Later on the men passed by

without her brother; she went out looking for him and found him dead at the entrance to the

Sinai.

492.     The murderer turned himself in under the Law of Justice and Peace and

confessed to the crime saying that he had been ordered to do it by his commander.  Nobody in

the family  had ever been threatened.

493.     On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted Jose Lopez No. 54's murder by removing a person perceived to be hostile to the

AUC which threatened the stability of Chiquita's operations and the generally established social

order.

494.     The next of kin of Jose Lopez No.54  are his three siblings.

**Jose Lopez No. 55**

495.     Jose Lopez No. 55 worked as a lottery salesman on the street, which in the eyes of

the AUC made anyone a suspect of being a FARC member or collaborator.

496.     He was home with his mother and his daughter on the night of December 16,

1999. He was standing outside the door when two  AUC members came up to him, told him to

let go of his daughter, who then ran into the house, and he was shot three times in the head right

there on the street.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

497.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 55's murder by removing a person perceived to be hostile to the AUC which threatened the stability of Chiquita's operations and the generally established social order.

498.     The next of kin of Jose Lopez No. 55 are his mother, and his two minor children.

**Jose Lopez No. 56**

499.     Jose Lopez No. 56, then 23 years of age, had been out of the Colombian army for approximately one year.  Service in the Colombian army is mandatory.  He had gotten a job selling fried chicken out of a kiosk located at  the entrance of the Banacol banana plantation.

500.     On January  24, 2000, an AUC member alias "El Gomelo"  came up to the food cart and ordered two plates of food.  When the AUC member was asked for payment he refused and threatened to kill Jose Lopez No. 56.  The AUC member came back the next day holding a gun in his hand and forced the decedent to get on a motorcycle.   Jose Lopez No. 56 was killed on the road from Nueva Colonia to Rio Grande, close to  the soccer stadium of Palo Blanco and the body was left there.  The paramilitary was wearing an army uniform with AUC badge. The murder was witnessed by the Decedent's father and by a  second witness.

501.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted  Jose Lopez No. 56's murder through its support of the AUC. On information and belief,  Chiquita benefited in part from his murder by sending a message that those who antagonized the AUC would be dealt with in a harsh way.

502.     The next of kin of Jose Lopez No. 56  is his father.

**Jose Lopez No. 57**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

503.    Jose Lopez N. 57 worked  as a water taxi operator and transported persons and goods among towns.

504.    On  August 2, 2002 he was transporting 12 people up the river when the AUC had a blockade across the river (waterway) and stopped him.  Four men wearing  uniforms and heavy weapons told him that the "Big Boss" wanted to talk to him, had him get out of  the boat and took him away.  The decedent handed over his suitcase  to his sister-in-law.  The paramilitaries came back to take the boat with  the merchandise, took the Jose Lopez No. 57's suitcase from his sister-in-law and told the passengers (among them was a sister of his wife) not to  look or wait for him because they had killed him.  He was found 16 days later shot in the head and the chest.

505.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 57's murder through its support of the AUC.  Chiquita benefitted from his murder by removing a person engaged in an activity that the AUC perceived to be suspicious and which threatened the stability of Chiquita's operations.

506.    The next of kin of Jose Lopez No. 57 are his wife and two children.

**Jose Lopez No. 58**

507.    Jose Lopez No. 58  had loaned money to paramilitaries, they did not want to pay him back and he had told them that he would talk to their leader who at the time was "Cepillo." He had received threats for that reason.

508.    The Decedent was employed by a banana farm owned by with the Manati Group. He was helping a friend to find a job and for that purpose,  he took his friend to the farm every day so that he could learn the farm work.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

509. On 8/16/04 they finished early and started walking home instead of waiting for the bus that transported the workers. They were met by a group of men riding in a vehicle that was called "Trip to Heaven" who took them to a ranch in Comunal Palos Blancos and murdered them. Jose Lopez No. 58's body was lying at some distance; apparently he had attempted to escape and was shot in the back.

510. On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 58's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those challenged the AUC's impunity would be dealt with harshly.

511. Next of kin of Jose Lopez No. 58 are his wife and a minor daughter.

**Josefa Lopez No. 59**

512. In July, 2001 FARC had taken control of the area of Choco, near Alto Baudo and had allegedly killed over 3,000 people. Josefa Lopez No. 59 left the area and lived away from her home for 3 months. Later she was told she could come back and in August 2004, once again, she had to leave her home and was registered as a Displaced Person, going to live in Medellin. She lived at the home of an aunt.

513. The AUC came to Medellin and took over that particular section in the outskirts. All persons who were living in areas that had been under the control of FARC were perceived as collaborators.

514. On September 18, 2004 Josefa Lopez No. 59 was coming out of her aunt's home when fighting broke out between different forces and the paramilitaries, at which time she was shot in the abdomen. A projectile is still lodged adjacent to her spine. There was extensive

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

abdominal surgery that had to be performed as well.  The Plaintiff recognized the people

responsible for her injury as the same men who had forced them to leave their hometown, where

the paramilitaries used to hold meetings and were well known to the locals.  They were wearing

uniforms with the AUC badge.

515.     On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted Josefa Lopez No. 59's attempted murder through its support of the AUC. On

information and belief, Chiquita attempted to benefited from the elimination of a person

perceived as an opponent of the AUC and who therefore could threaten the stability of Chiquita's

operations.

516.     Josefa Lopez No. 59 brings this claim on her own behalf.

**Jose Lopez No. 60**

517.     Jose Lopez No. 60 had worked most of his life on various jobs dealing with farm

work.  He had actually owned his own piece of land in Choco before been been arrested on what

he claims were false charges.

518.     On September 18, 1998 he was attacked by five AUC members, one had a

machete and cut his right arm off.  He spent three months in the hospital and came out only to be

accused by the AUC, once again on false charges.  He was arrested, did six months and then

released.

519.     He is currently maintaining himself and his family by selling fruit in the street.

520.     On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the attempted murder of Jose Lopez No. 60's through its support of the AUC. On

information and belief, Chiquita attempted to benefited from the elimination of a person

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

perceived as opponent of the AUC and who therefore could threaten the stability of Chiquita's operations.

521.    Jose Lopez No. 60 brings this claim on his own behalf.

**Jose Lopez No. 61**

522.    Jose Lopez No. 61 and his family were residents of Policarpa which was considered a neighborhood inhabited by collaborators of the FARC. The Decedent worked as a television and electronics repair person and he had been working in a home three weeks before his death fixing a television when two men came in and took one of the male occupants of the house away and threatened him on the way out telling him that he should not get involved.

523.    On November 11, 2000, at around 9:00 a.m., Jose Lopez No. 61 had been visiting with his daughter and after leaving her home he walked to the road, at that time his daughter heard gun shots and went out to find her father dead and the killers leaving the scene on a motorcycle, those men were known to the town as paramilitaries from the AUC.

524.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 61 through its support of the AUC. On information and belief, Chiquita to benefitted from the attempt to eliminate a person perceived as opponent of the AUC and who could therefore threaten the stability of Chiquita's operations.

525.    The next of kin of Jose Lopez No. 61 are his wife and nine children.

**Jose Lopez No. 62**

526.    The paramilitaries had picked up a group of young men and taken them to their camp. They notified the parents to go and pick up their children. Jose Lopez No. 62's father was in Medellin and his mother was at her work in a local banana plantation. Jose Lopez No.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

62's grandmother, who was taking care of the other children, received the notification but she

was afraid and did not go to the camp.

527.    The parents of other youngsters claimed their children.  Because nobody went for

Lopez No. 62, they decided to kill him.

528.    Three or four days later it was announced on a radio station that there had been

found an  undocumented decedent.  Friends from the neighborhood suggested to his mother that

to go to the hospital, which she did, to find out that it was her son.  The mother, who was

pregnant at the time,  had several verbal altercations with the AUC and in October 1997 they

killed her too.

529.    Both murders were carried out by the AUC.

530.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted Jose Lopez No. 62's murder through its support of the AUC. On information and

belief,  the AUC used terror tactics to impose fear among workers and Chiquita benefited in part

from his murder by sending a message that those who opposed the AUC's impunity would be

dealt with harshly and that the AUC was in control to ensure the stability of Chiquita's

operations.

531.    Next of kin of Jose Lopez No. 62 are his father and three siblings.

**Jose Lopez No. 63**

532.    Jose Lopez No. 63 could not find work in Medellin and he and his family

relocated in Remedios, Antioquia  where they bought a farm.

533.    On May 8, 2002 Jose Lopez No. 63  left the home riding a horse to buy

medication for their son and other items that they needed in the home.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

534.    By accounts of  people in the town, he was confronted by AUC members,  pulled off the horse, his hands tied in the back  and forced to walk to the woods while they were kicking him, hitting him and knocking him on the ground as if he was a ball.  All this was witnessed by people living in the town.  The AUC killed and buried him.

535.    Later on the AUC realized that  they had made a mistake because he was no guerrilla member but only a family man who was new in town, had no acquaintances and nobody to speak for him.  They dug him up,  used what was left of his underwear to tie his hands and feet and hung him from a stick by the wrists and ankles to transport him.

536.    His wife was directed to an AUC  member to request her husband's body, she described him and the AUC member responded  that he, himself, had killed the decedent because nobody in town knew Jose Lopez No. 63.

537.    She finally found the body with his elbows and knees tied;  he had been heavily tortured, his genitalia had been cut off, his teeth had been knocked in, clearly by a blunt instrument such as the butt of a rifle, he had been shot in the head,  and the front of the torso had been cut from his throat straight through his abdomen down almost to the pubic area.

538.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 63 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person perceived to be an opponent of the AUC and who could therefore  threaten the stability of Chiquita's operations.

539.    The next of kin of Jose Lopez No. 63  are his wife and three children.

**Jose Lopez No. 64**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

540.    Jose Lopez no. 64 lived with his grandmother and had received threats by the paramilitaries.  His father asked him to come and live with him in Barrio El Salvador.

541.    On July 30, 1998 at 11:00 a.m. AUC members came looking for him.  They told him to take a shower and get ready to go out to look for a job.  They took him to a banana farm and the young man who had taken him out of the house told him to stay there and wait for him. When Lopez No. 64 found himself alone he started running, was confronted by a group of heavily armed men who shot him in the foot so that he could not get away and then gagged him and tortured him to death.

542.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the  torture and murder of Jose Lopez No. 64 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person perceived to be an opponent of the AUC and who could therefore  threaten the stability of Chiquita's operations.

543.    The next of kin of Jose Lopez No.  64 is his father.

**Jose Lopez No. 65**

544.    On April 16, 2002,  Jose Lopez No. 65 left the house of his parents indicating that he would be right back  to have breakfast.  He never returned.  His parents reported the disappearance and looked for him untiringly, some of his friends had seen him  that morning in the company of paramilitaries but nobody knew his whereabouts.

545.    Three years later, on March 5, 2005,  his body was found in a common grave with 150 bodies of persons murdered by the AUC.  The documents were buried with the bodies and the identity confirmed by DNA testing.  This grave was discovered pursuant to information provided by the AUC.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

546.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 65 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person perceived to be an opponent of the AUC and who could therefore  threaten the stability of Chiquita's operations.

547.    The next of kin of Jose Lopez No.  65 are his mother and his father.

**Jose Lopez No. 66**

548.    Jose Lopez No. 66 lived in Saiza with his family and the paramilitaries had labelled him as a collaborator of the FARC.

549.    On July 14, 1999 the AUC set the town on fire.  Jose Lopez No. 66 was away looking for someone from whom to rent  pasture land for a few animals he had.

550.    At approximately 3:00 p.m. he ran into the paramilitaries  in a location named La Miranda when he was on  his way back home.    He was cruelly tortured, his tongue was cut out, his eyeballs and viscera pulled out and he was finally decapitated.  This was apparently related to a public statement  made by a member of the paramilitaries,  that "he ate their victims' viscera" and that "he could eat up to 20 in a day."

551.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the torture and murder of Jose Lopez No. 66 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person perceived to be a sympathizer of the FARC and who could therefore  threaten the stability of Chiquita's operations.

552.    Next of kin of Jose Lopez No.  66 are his wife and eleven children.

**Jose Lopez No. 67**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

553.    Jose Lopez No. 67 and his business partner, Jose Lopez No. 78, had signed a contract with a member of the banana growers named Group 20, to buy the rejected fruit from the whole group.

554.    The paramilitaries owned a cooperative named Coomulban, also in the business of buying rejected fruit.  The paramilitaries had warned everybody that those who attempted to buy rejected fruit would be punished.

555.    Jose Lopez No. 67 and his partner disregarded the threat; they had been working for  15 days when they were killed by the AUC.

556.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 67's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who challenged the AUC's impunity would be dealt with harshly.

557.    The next of kin of Jose Lopez No. 67 are his wife and a minor son.

**Jose Lopez No. 68**

558.    On December 19, 1999, at 9:00 p.m.  Jose Lopez No. 68 left his home with a cousin to go out for a drink.

559.    After a while they met  a group of paramilitaries,  who invited them  to a cockfight.  When the decedent and his cousin were somewhat drunk, they got them into the vehicle that was called "Trip to Heaven" and took them away.

560.    He was found on December  20, 1999,  his hands and feet were tied behind him, had been tortured and  then  shot once in the right side of the head. The body was located near a banana farm which  belonged to the Banadex group.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

561.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the torture and murder of Jose Lopez No. 68 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person suspected of being an opponent of the AUC and who could therefore threaten the stability of Chiquita's operations.

562.    The next of kin of Jose Lopez No. 68 is his mother.

**Josefa Lopez No. 69**

563.    Josefa Lopez No. 69 worked as a cook in a restaurant and lived in an apartment in Apartado.

564.    On April 29, 1998 at 10:00 pm, two AUC members arrived in a motorcycle and took her in her pajamas out of town. This was witnessed by her landlady. The next morning her body was found at the entrance of the Palos Blancos community by a group of workers going into work. She had been shot in the head.

565.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Josefa Lopez No. 69 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person suspected of being an opponent of the AUC and who could therefore threaten the stability of Chiquita's operations and the generally established social order.

566.    The next of kin of Josefa Lopez is one minor daughter.

**Jose Lopez No. 70**

567.    Jose Lopez No. 70 lived in an area where at the time of these events, many old grudges were settled by accusing a person on having been a guerrilla sympathizer. This is one of such cases.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

568.    On September 29, 1998, uniformed men of the AUC came to Jose Lopez No. 70's home in the pre-dawn hours.  They called out to them that he should come out or they would throw a grenade into the house.

569.    Lopez No. 70's wife and daughters were in the house and he came out.  He was shot many times with rifles.

570.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 70 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person perceived to be a sympathizer of the FARC and who could therefore  threaten the stability of Chiquita's operations.

571.    The next of kin of Jose Lopez No. 70  are his wife and five daughters.

**Jose Lopez No. 71**

572.    Jose Lopez No. 71 had worked for Banadex in the Venecia packing plant getting boxes ready for loading.

573.    He also ran, in partnership with alias "Cepillo" (the paramilitary commander in the Urabá region), a canteen which is considered a prize job on the banana farms inasmuch as it is extra income for the person running the canteen.  They supply the food for the workers and in turn, get paid.

574.    This is a job that the AUC often wants to get their hands on.   He had not received threats but he suspected that he was going to get killed because of the canteen.

575.    On April 26, 1997,  the paramilitaries  arrived in the farm at 6:15 a.m. Two individuals in motorcycles started to chase him and shooting in his direction.  They ultimately

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

caught up with him, shot him seven times and emptied his pockets.  The family has been told that Carlos Vasquez, also known as "El Cepillo" had wanted that job for his men.

576.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 71 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who challenged the authority of the AUC and who could therefore  threaten the stability of Chiquita's operations and also benefitted by the exercise of control and domination by the AUC in the region.

577.    The next of kin of Jose Lopez No. 71 are his wife and four daughters.

**Jose Lopez No. 72**

578.    Jose Lopez No. 72 had been incarcerated on charges of carrying a concealed weapon.

579.    After he was released in 1996, he had been warned by the AUC to be careful because of his business running a canteen at a school which was in the FARC area.  That, and the prior conviction for carrying a weapon made him a suspect of collaboration with FARC.

580.    On  April of 1997, two black  men came to the canteen where Jose Lopez No. 72 was with his daughter  and asked him to go with them.  He did not resist out of fear that they would harm his daughter.  Three days later his body was found with two shots to the head.

581.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 72 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who was perceived to be hostile to the AUC and who could therefore  threaten the stability of Chiquita's operations.

582.    The next of kin of Jose Lopez No. 72 are his wife and four children.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

### Jose Lopez No. 73

583.    Jose Lopez No. 73 worked for banana farms as a heavy equipment operator. He was working at a ranch where he was a supervisor.

584.    The owner of the ranch refused to pay bribes to the AUC and they retaliated by killing his workers.

585.    The day before the date of his death, Jose Lopez No. 73 had fired a helper who happened to be the son of an individual who was in favor with the paramilitaries.

586.    On January 24, 1997, Lopez No. 73 needed a piece of equipment, bought it and returned to work when two men arrived in a motorcycle, forced him to get on the motorcycle between the two of them, took him to the farm La Tolloza where they tortured him and shot him in both eyes.

587.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the torture and murder of Jose Lopez No. 73 through its support of the AUC. On information and belief, the AUC perpetrated this killing to terrorize those who would refuse to cooperate with the AUC and Chiquita benefitted from the torture and murder of a person suspected of being an opponent of the AUC, and who could therefore threaten the stability of Chiquita's operations.

588.    The next of kin of Jose Lopez No. 73 are his wife and a son.

### Jose Lopez No. 74

589.    Jose Lopez No. 74 earned a living by selling lotto tickets and soft drinks.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

590.    Two of his brothers had been killed previously by the AUC and he had been given a warning that he should leave as he too was in danger. In 1997 he went with his family to Medellin and other areas.

591.    Work was difficult and he went back to look for work in the area that he knew. His wife stayed in Medellin. Six months later he was found dead with four gunshot wounds.

592.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 74 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person who challenged the AUC and who could therefore threaten the stability of Chiquita's operations.

593.    The next of kin of Jose Lopez No. 74 are his wife and three sons.

**Jose Lopez No. 75**

594.    In the very early hours of August 20, 2000, Jose Lopez No. 75 was in bed with his wife when he got up, said he was very thirsty, and that he was going to the store to get a beer because they did not have anything in the house.

595.    He had arrived at the store when a heavily armed group of around 30 AUC arrived and took over the neighborhood. They also took all of the men that they found in the streets to the bridge between Barrio Santa Lucia and Barrio Juan Pablo Segundo, and made them form a line. Some managed to escape, and those who did not were killed immediately. They started shooting with their rifles at anything that moved. After they had killed the men they threw a grenade to cause even more panic among the population of Barrio Juan Pablo Segundo, then they finished off those who were still alive to leave no witnesses. As soon as they left the people in the houses went outside.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

596.    Mrs. Jose Lopez  No. 75 found her husband still alive, took him to Clinica del Sagrado Corazon where he died about an hour later.

597.    The paramilitaries were dressed all in black, with an arm band on the right arm and AUC insignias.  One of the paramilitaries was identified as Edison, who has since been killed.

598.    These events were covered by the press and  TV news.

599.    Jose Lopez No. 75's wife did not report her husband's death because of threats, and it was a well-known fact that the police were on the side of the paramilitaries who had infiltrated most official law enforcement agencies.

600.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted  Jose Lopez No. 75's murder through its support of the AUC.  On information and belief, the AUC used indiscriminate terror tactics to impose fear among the population and Chiquita benefited in part from his murder by sending a message that the AUC was powerful and was in control.

601.    The next of kin of Jose Lopez No. 75 are his wife and a minor daughter.

**Jose Lopez No. 76**

602.    In May, 1999, two members of the AUC named "El Indio" and "El Diablo" executed Jose Lopez No. 76 one-half block from his home in an act of impunity.

603.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No.76's murder through its support of the AUC in. On information and belief, Chiquita benefited in part from his murder by a person who challenged the impunity of

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

the AUC and who threatened the stability of Chiquita's operations and the generally established social order.

604.    Next of kin of Jose Lopez No76 are his wife and a minor daughter.

**Jose Lopez No. 77**

605.    Jose Lopez No. 77 had borrowed  money from alias "Camacho", a paramilitary leader,  and was unable to repay him.  A few months before he had received threats from Camacho.

606.    On  September 25, 2000 at 9:00 a.m. Jose Lopez No. 77 was at his work in a farm when a group of heavily armed paramilitaries took him away in the presence of coworkers, gagged him and transported him to the Farm El Eden where he was killed;  the body was left there.

607.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 77 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who dared to challenge the AUC and who could therefore  threaten the stability of Chiquita's operations.

608.    The next of kin of Jose Lopez No. 77 are two minor sons.

**Jose Lopez No. 78**

609.    Jose Lopez No. 78, with his partner and brother-in-law Jose Lopez No.  67, had signed a contract with a member of the banana growers named Group 20, to buy the rejected fruit from the whole group.

610.    The paramilitaries owned a cooperative named Coomulban, also in the business of buying rejected fruit.  The paramilitaries had warned everybody that those who attempted to buy

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

rejected fruit would be punished.  The Decedent and his partner disregarded the threat.  They

worked in their business for 15 days.

611.    On March 26, 2001, at 1:30 p.m., Jose Lopez No. 78 left his home in the company

of his partner  to run errands and pay their workers. They were sitting in a canteen in Apartado,

when they received word that they had to go to a banana farm named in Carepa, to discuss

business matters.  When they got there, they were taken inside and  his partner was shot in the

back of the head.

612.    Jose Lopez No. 78  attempted to resist but he was overpowered  and  tortured

because the abductors wanted the pin number for the credit cards so that they could withdraw

the money that  the partners had deposited earlier, using an ATM.

613.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted Jose Lopez No. 67's torture and murder through its support of the AUC. On

information and belief, Chiquita benefited in part from his murder by sending a message that

those who challenged the AUC's impunity would be dealt with harshly.

614.    The next of kin of Jose Lopez No. 78 are a wife and two minor children.

**Jose Lopez No. 79**

615.    Jose Lopez No. 79 worked as a fisherman.

616.    On March 3, 2003 he was at home when  two black SUV's arrived. Three men got

out and told him:  "If you are Jose Lopez No. 79 you will not save yourself."  They tied him up

and took him away.

617.    At 11 a.m. on the same day they found him on the side of a road.  He had been

tortured; his testicles cut off and had one shot in the forehead.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

618.    The family believes that he was killed because a relative had accused him to the

AUC of having raped her daughter. At the time of these events, many old grudges were settled

by accusing a person to the AUC.

619.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the torture and murder of Jose Lopez No. 77 through its support of the AUC. On

information and belief, Chiquita  benefitted from the murder of a person who antagonized the

AUC and who could therefore  threaten the stability of Chiquita's operations.

620.    The next of kin of Jose Lopez No. 79 are his mother and father

**Jose Lopez No. 80**

621.    Both Jose Lopez No. 80 and his wife were in business as independent operators

registered with the Chamber of Commerce.

622.    Jose Lopez No. 80  was abducted  in Turbo, in a location named El Guaje.  They

forced him into a vehicle that had the words "Trip to Heaven" written in the back and took him to

a farm.

623.    They cruelly tortured him: threw acid on his body, cut his face, took the skin off

his arms, pulled out his finger nails, shot him in one eye and in his mouth.

624.    The men who committed this atrocity were known AUC paramilitaries, wearing

civilian clothes, commanded by H.H.

625.    After Jose Lopez No. 80 was killed all of the merchandise that he and his wife

were expecting in a ship was stolen.

626.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the torture and murder of Jose Lopez No. 80 through its support of the AUC. On

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

information and belief, Chiquita benefitted from the torture and murder of a person who

antagonized the AUC by doing business against their interests and who could therefore threaten

the stability of Chiquita's operations.

627.     Next of kin are his wife and five children.

**Jose Lopez No. 81**

628.     Jose Lopez No. 81 was spending time with a classmate in the front of Anibal

Gallego College.   The classmate was being sought by the paramilitaries and at that time two

AUC members wearing civilian clothes arrived and started shooting at  Jose Lopez No. 81's

classmate.  He grabbed Jose Lopez No. 81 and used him as a shield to protect himself.  Jose

Lopez No. 81 was shot in the face and the classmate was wounded but he got away.  He has not

been seen since then.

629.     The Decedent's mother  was told by other classmates what had just happened and

she  went to the scene with her younger son; they were able to get Jose Lopez No. 81 to the

hospital, but when they arrived he was already dead.

630.     On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the murder of Jose Lopez No. 81 through its support of the AUC. On information

and belief, Chiquita  benefitted from the murder of a person who was perceived as opponent of

the AUC and who could therefore  threaten the stability of Chiquita's operations.

631.     Next of kin are his mother, father, and two brothers.

**Jose Lopez No. 82**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

632.    Jose Lopez No. 82  is a 37 years old man, who has worked as martial arts instructor, industrial machinery operator, and private security guard.

633.    The Plaintiff is a testifying witness in the case of his uncle who was taken out of his home by 14 AUC members, forced into a car, tied up and murdered.

634.    The Plaintiff also has knowledge of another case where the AUC murdered the father, husband and two brothers of a woman who is the mother of 4 children.

635.    In 1997 Jose Lopez No. 82 was ordered by the paramilitaries to work for them as Martial Arts Instructors which he refused to do.  They labeled him an enemy and from then on he started being threatened and  harassed.

636.    In 2000 Lopez No. 82 had  to leave his home town, his family, his friends, all of his belongings and everything that had constituted his life, including a good job.  He went to Bogota where he remained for two years.  In December of 1999 he went back to his home town, assuming that by then the paramilitaries would have forgotten about him and he would have no problems.  He registered to finish  high school.

637.    On January 1,  2000, at 3:00 a.m. he was celebrating with friends;  there were four well-known paramilitaries who were looking  at them with no apparent ulterior motives.  A while later he went out to urinate (there was no restroom inside).  The four paramilitaries followed him and reminded him that he had refused to cooperate as karate instructor in 1997, making it clear that they had not forgotten that offense.  He told them to "please refresh his memory because he had no enemies and did not remember the incident."  One of the men hit him in the jaw and he attempted to defend himself but he froze when he saw the weapons that they were carrying.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

While the first paramilitary hit him the other three just observed.  He got a broken nose, eyebrow, mouth, forehead and  part of his tongue cut off.

638.    Meanwhile his friends (around 30),  had realized what was happening and started running towards them.  The paramilitaries started backing off and left leaving him unconscious and half-dead.  His friends picked up the piece of tongue and took him to a Clinic. He was disabled for several months.

639.    Jose Lopez No. 82  reported the attack  to the authorities and when he requested a copy of the report  the official told him that if he gave him the report he would be signing his own death sentence.

640.    There was a new group, "Aguilas Negras,"  that was replacing the paramilitaries and that group had infiltrated  public offices and entities in the whole region.  They operate in the whole country and when Jose Lopez No. 82 arrived in Medellin they were  following him closely.  They found him, hit him with the butt of a revolver, and told him to stop running and to cooperate.

641.    He has received psychological support from his Martial Arts Instructor , psychological assistance from the clergy, and emotional support from friends.

642.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the attempted murder of Jose Lopez No. 82 through its support of the AUC. On information and belief, Chiquita  would benefit from the murder of a person who dared to challenge the AUC and who could therefore  threaten the stability of Chiquita's operations.

**Jose Lopez No. 83**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

643.    Jose Lopez No. 83's  father worked in a banana farm which belonged to Grupo 20 and was involved in supporting the political party UP (Patriotic Union).  He was persecuted and killed on July 6, 1995 by Leonidas Zapata Rojas and Esau Garcia Lara, paramilitaries under the order of Mancuso who was the highest commander  in the area.  Lopez No. 83 witnessed the murder.

644.    Caraballo, commander of the EPL, a leftist insurgent group, started persecuting his former  militants  who had  joined the paramilitaries and in retaliation, the AUC was persecuting and eliminating family members  of UP militants and  Jose Lopez No. 83  happened to be one of the targets.

645.    Jose Lopez No. 83 worked in a recreational facility named Confamiliar Camacol. He also served as an altar boy at the Sunday mass,  and as a community leader helped in organizing events at the Main Seminary.  On April 29, 2000 the mass was to be celebrated in town so that day Jose Lopez No. 83 did not go to the Seminary, instead he went to visit a former seminary classmate.  He was having lunch with that priest when two AUC members, Arley Torres Palencia, alias "Comemuerto," and alias "Muelon," showed up and told him to go with them.  Jose Lopez No. 83 refused and told them that if they were going to kill him, to do it right there.  The paramilitaries shot him three times.

646.    The paramilitaries warned the priest that the Lopez No. 83's mother could not attend the burial because if she did she would be declared military target, but she attended anyway.  Immediately after she had to flee, and went to Apartado and later on to Medellin.

647.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 83 through its support of the AUC. On information

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

and belief, Chiquita  benefitted from the murder of a person who was perceived as opponent of

the AUC and who could therefore  threaten the stability of Chiquita's operations.

648.    Next of kin is his mother.

## Jose Lopez No. 84

649.    Jose Lopez No. 84 worked  for Comunal San Jorge as a driver transporting

workers to a farm.   As such, he had to pick up workers in Barrio Policarpa and had received

threats forbidding him from going to Barrio Policarpa or he would be killed.

650.    On  January 4, 1997 at 8:00 p.m. the decedent was at a neighbor's home in Barrio

Diana Cardona when three men arrived and told him they needed a ride.  He refused because he

had a commitment already; he was ordered to go with them and was killed shortly thereafter.

His brother witnessed the murder, he later  received threats and had to leave the area.

651.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the murder of Jose Lopez No. 84 through its support of the AUC. On information

and belief, Chiquita  benefitted from the murder of a person who dared to challenge the AUC and

who could therefore  threaten the stability of Chiquita's operations.

652.    Next of kin are his wife, two sons and a brother.

## Jose Lopez No. 85

653.    Jose Lopez No. 85 had been a member of a leftist  militant group named EPL

 (stands for HOPE, PEACE, AND FREEDOM in Spanish).   The group later demobilized and its

members became paramilitaries.

654.    Jose Lopez No. 85  made the decision to separate from the group.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

655.    Some months prior to his death a group of heavily armed men came to the Lopez No. 85's house and ordered him to go with them.  He said that he was not going with them and that if they were going to kill him, to do it in his house.  They left without harming him.

656.    On August 10, 1997 Jose Lopez No. 85  was at work in the farm, the tasks for the day had already been assigned to the workers, a former comrade and friend of his named Orlando Blanco alias El Pollo, took him away and later tortured him to death.

657.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the torture and murder of Jose Lopez No. 85 through its support of the AUC. On information and belief, Chiquita  benefitted from the torture and murder of a person who dared to challenge the AUC and who could therefore  threaten the stability of Chiquita's operations.

658.    Next of kin are his wife and three children.

### Jose Lopez No. 86

659.    Jose Lopez No. 86 earned a living selling vitamins door to door.

660.    There was a time when the paramilitaries were killing all door-to-door salespersons because that was a disguise used by the guerrilla to gather intelligence in the towns.

661.    On April 4, 2004 at 8:00 a.m. Jose Lopez No. 86  left his home riding his bicycle for the purpose of going to  collect his salary.  He was intercepted by armed men who took him to a location 2 hours away where they killed him with three shots and left him there.

662.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 86 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who appeared suspicious to the AUC and who could therefore  threaten the stability of Chiquita's operations.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

663.    Next of kin is his daughter.

## Jose Lopez No. 87

664.    On January 26, 2003  at 7:30 p.m. Jose Lopez No. 87's sister-in-law was at  his home located in Barrio El Jardin, Corregimiento de Currulao, when a group of men arrived.  One of them was a known paramilitary who is currently in prison but there was no fear on the part of the sister-in-law since he was known to them.

665.    Jose Lopez No. 87 returned home and his sister-in-law went to sit in the living room and left them alone.  She heard loud voices, went to look and saw  Jose Lopez No. 87 struggling with one of the men.  The other man grabbed her and knocked her down unconscious.  When she came to she found Jose Lopez No. 87  lying  close to her, agonizing.  He was able to tell her who had shot him.  He was taken to the hospital where he died.

666.    The family had not received any threats.  It is believed that there were persons who were  envious of their good financial situation and  had given false information to the AUC to harm the family.

667.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 87 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who appeared suspicious to the AUC and who could therefore  threaten the stability of Chiquita's operations.

668.    Next of kin is his wife and three minor daughters.

## Jose Lopez No. 88

669.    Jose Lopez No. 88 and his mother had been displaced  from the town of Pedroza and  he had gotten a job in Policarpa.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

670.    At that time anyone living in Policarpa was viewed as being a collaborator of the FARC and likely to be killed by the AUC.

671.    On  December 2, 1997 at 7:00 p.m. Jose Lopez No. 88 left the home where he lived with his mother to go for a ride.  A young woman who lived with them came in and told her that a group of men that she described  had passed by with her son .  She scolded her for not letting her know  right away because "if they were going to kill her son it would have to be over her dead body."  The woman said that she did not believe they were trying to kill him and that the mother knew the paramilitaries.

672.    The AUC took Jose Lopez No. 88 to a location named Los Pisitos.  Before they gagged him he pleaded with them asking why would they want to kill him, that he was a very hard worker and to call his employer and find out, immediately they shot him in the face and took off.  Jose Lopez No. 88  was still alive asking for his mother until he was picked up and taken to the hospital where he died and where,  in the beginning, his mother was not allowed to see him.

673.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 88 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who appeared suspicious to the AUC and who could therefore  threaten the stability of Chiquita's operations.

674.    Next of kin are his mother and siblings.

**Jose Lopez No. 89**

675.    Jose Lopez No. 89's employer had heard that he was in trouble and the Saturday before his death paid him and told him not to travel from San Jose to Apartado because it was

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

dangerous, that apparently the AUC had been misinformed about him and not to go there for any reason. Jose Lopez No. 89 had not been threatened but he was aware that if he went to Apartado his life would be in danger.

676. A few days prior to June 16, 2002, a man who purportedly was a fortune teller had gone up to San Jose de Apartado and told Jose Lopez No. 89 that he was very ill but he could be cured, that he did not have the medicine with him but that if he wanted to meet him at the terminal station in Apartado on June 16, 2002 at 11:00 a.m. his life would change.

677. On that date Jose Lopez No. 89 went to Apartado against his mother's wishes, arrived at the terminal and sat in a canteen to wait for the man who had promised to solve his health problem. A group of armed men arrived and killed him.

678. On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 89 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person who appeared suspicious to the AUC and who could therefore threaten the stability of Chiquita's operations.

679. Next of kin is his mother.

**Jose Lopez No. 90**

680. On April 5, 1997 at 8:00 a.m. Jose Lopez No. 90 was at work in a farm located in Piedras Blancas in the company of a friend, when a heavily armed group wearing uniforms showed up and took them away. About a kilometer away they killed them, dressed them in camouflage uniforms and left them there holding rifles so that they would be mistaken for guerrilla members who had died in combat.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

681.    It is believed that the AUC targeted the Jose Lopez No. 90  because they believed he might be connected to the FARC.

682.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 90 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who appeared suspicious to the AUC and who could therefore  threaten the stability of Chiquita's operations.

683.    Next of kin is his mother and brother.

**Jose Lopez No. 91**

684.    This is a case related to that of Josefa Lopez No. 50 who is believed to have been murdered because her brother, the Decedent in this case, refused to join the AUC.

685.    The paramilitary leader alias El Brujo lived in the same neighborhood Jose Lopez No. 91.  The paramilitaries chose poor neighborhoods because the young men lived in poverty and had no jobs, which facilitated their recruiting them.

686.    El Brujo was constantly harassing Jose Lopez No. 91 attempting to persuade him to enlist in their group.  Finally El Brujo told him that if he didn't join them  he would kill his sister.

687.    Jose Lopez No. 91 did not believe that the paramilitary would commit such atrocity.  His sister, who was 15 years old, was killed shortly after.

688.    Jose Lopez No. 91 called El Brujo and let him know that he knew  that he had killed his sister and that he would report him to the authorities.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

689.    On August 27, 2002 Jose Lopez No. 91 was at home with his mother when he received a call purportedly about a job.  He left the house and never came back.  He had been killed.

690.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 91 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person who challenged the AUC and who could therefore  threaten the stability of Chiquita's operations.

691.    Next of kin is his mother.

**Josefa Lopez No. 92**

692.    On  December 14, 2001, one week after giving birth to their son,  Josefa Lopez No. 92 was riding a motorcycle with her husband going back to their house.  When they approached a location named Las Partidas, there was an explosion from a device detonated by the AUC which left them almost deaf.

693.    This was an AUC tactic that they carried out on an almost  daily  basis to cause panic among the population and be able to make an incursion and take over the neighborhood.

694.    Josefa Lopez No. 92 and her husband continued on the motorcycle for a few more blocks trying to get away when they realized that her leg was severely wounded.  They escaped the area and took a cab to get to Unidad de Buenos Aires.  She stayed there overnight and the following day she was transferred to Hospital San Vicente de Paul Hospital where they did a scraping and  removed  the tissue  burned by the gunpowder to prevent an infection.  She was told that should she get an infection they would have to amputate the leg.  They did a graft and she was in intensive therapy with an external fixator.

110

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

695.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the attempted murder of Josefa Lopez No. 92 through its support of the AUC. On information and belief, Chiquita benefitted from the AUC murdering persons and using bombings as a terror tactic indiscriminately to affirm their power and control over the population and discourage attempts to threaten the stability of Chiquita's operations.

696.    Josefa Lopez No. 92 brings this claim on her own behalf.

**Josefa Lopez No. 93**

697.    Josefa Lopez No. 93 had served as Secretary of a local community association and had voiced her feelings that the earlier death of her son, Jose Lopez No. 74 was a homicide attributable to the AUC.

698.    Josefa Lopez No. 93 had been placed on notice by the paramilitaries that they were investigating her and that as soon as they found out the truth they would kill her.

699.    On April 27, 1999 Josefa Lopez No. 93's husband left at 3:00 p.m. to go to town. She  was  at home in the company of her children when at 10:00 p.m. there was a knock on the door.  She opened the door to find a group of armed men who asked if she was Josefa Lopez No. 93.

700.    Josefa Lopez No. 93 did not answer and they shot her eight times.

701.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Josefa Lopez No. 93 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person who challenged the AUC and who could therefore  threaten the stability of Chiquita's operations.

702.    Next of kin are her husband and three sons.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

### Josefa Lopez No. 94

703.    Josefa Lopez No. 94's family enjoyed a good financial situation earned with hard work.  Her mother lived in an area under the power of the FARC and because the Plaintiff and her family visited her often the AUC attributed their affluence  to connections with FARC. Between 1998 and 2001 the AUC extorted money from them through threats to the point that they lost almost everything.

704.    On May 6, 1999 a group of paramilitaries led by "Pavilo" showed up at the Plaintiff's flower shop where she was in the company of her husband and daughters, apparently for the purpose of attacking her husband.  Before they could accomplish their mission, they were confronted by a group of men in civilian clothes who started firing at them.  The paramilitaries escaped but upon passing in front of the store they fired at them and she was shot in the leg.  She has scars where the bullet went in and out.  She worked as  a decorator for the armed forces and the police in the Urabá region and had to continue working because she could not  afford to lose the contract she had with them.

705.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the attempted murder on Josefa Lopez No. 94 through its support of the AUC. On information and belief, Chiquita  benefitted from the elimination of persons who appeared suspicious to the AUC and who could therefore  threaten the stability of Chiquita's operations.

706.    Josefa Lopez brings this claim on her own behalf.  Next of kin are her husband and three daughters.

### Jose Lopez No. 95

707.    Jose Lopez No. 95 worked as a farm worker.

112

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

708.    On 6/26/99 at 9:00 a.m. a mandatory meeting was called by around 100 AUC members wearing uniforms and insignias for the town people to gather.

709.    Jose Lopez attended with his wife and approximately 200 other people.   After many hours of all being gathered, Jose Lopez No. 95 and one other man were taken 100 meters away and  murdered.  The AUC prohibited people from moving the body which had to be buried right there in the Vereda.  He was believed to have been shot three times with rifles:  once in the head and twice in the trunk.  The body was washed away before it could be recovered.

710.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 95 through its support of the AUC. On information and belief, Chiquita  benefitted from the terror tactics used by the AUC to impose fear on the population to eliminate  any  threat to  the stability of Chiquita's operations.

711.    Next of kin are his wife and seven children.

## Jose Lopez No. 96

712.    Jose Lopez No. 96 was employed by  the power company of Antioquia, and had been transferred to an area under the control of the AUC.

713.    On 3/18/03 Jose Lopez No. 96  and a friend and co-worker  had been sent  to an assigned location to fix a power problem.

714.    Each of them drove their motorcycles to the location. and upon arrival they  found out that there was no problem at all;  it was a set up.  There was a group of heavily armed men who identified themselves as AUC and they murdered Jose Lopez No. 96.  They took a chain, a ring and the documents from him and told his co-worker to report the death and to tell that "that dog had been killed by the AUC."

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

715.    On information and belief Jose Lopez No. 96 was killed because he was not known in the area and the paramilitaries did not take chances.

716.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of  Jose Lopez No. 96 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of persons who appeared suspicious to the AUC and who might therefore  threaten the stability of Chiquita's operations.

717.    Next of kin are his wife and three children.

**Jose Lopez No. 97**

718.    Jose Lopez No. 97 was a Police Inspector.

719.    On 6/4/04 he had been working on the land with his mother and was ready to go to work.  He got on the  boat  and five paramilitaries showed up dressed in black camouflaged uniforms with AUC insignias.

720.    They told him to get out of the boat and get back on the shore.  He did that and they shot him many times. The murder was witnessed by his mother and his daughter who was 9 years old at the time as well as by a third witness.

721.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of  Jose Lopez No. 97 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of persons who were perceived as non-cooperative by the AUC and who might therefore  threaten the stability of Chiquita's operations.

722.    Next of kin are his mother and ten children.

**Jose Lopez No. 98**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

723.    Jose Lopez No. 98 had been an army employee.  He had left the area because he had received threats by the paramilitaries and went to Bogota.  Two months later he was arrested under an alleged charge of rebellion and conspiracy to commit a crime (as an alleged  member of the FARC).

724.    He had been in jail for two months without his legal status having being resolved when on 7/27/98 he was taken to the area where the AUC members were lodged and murdered there.

725.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of  Jose Lopez No. 98 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of persons that appeared to be suspicious to the AUC and who might therefore  threaten the stability of Chiquita's operations.

726.    Next of kin are his wife and two sons.

### Jose Lopez No. 99

727.    Jose Lopez No. 99 was employed in a farm where he was a union leader. Four days before he was killed he had a problem with the Administrator of  banana farms owned by Banadex.  There was a kiosk in the farm which Jose Lopez No. 99 wanted to give to the workers, and as a member of the Management/Workers committee he had the authority to do so, and the Administrator and the paramilitaries wanted the kiosk to go to the paramilitaries.

728.    On 3/3/97 Jose Lopez No. 99 was running late and rode a motorcycle to go to work because he had missed the bus that transported the workers.  According to passengers on the bus, it was stopped by the paramilitaries on its way to the farm and searched looking for Jose Lopez No. 99.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

729.    A few hours later when Jose Lopez No. 99 was at work, a group of paramilitaries arrived and held a meeting with the Administrator.  Jose Lopez No. 99 was called into the meeting to resolve the kiosk issue and as soon as he walked in, a paramilitary called "Cheche" and 5 other men tied him up and took him to the Palos Blancos entrance.  First they started hitting him about his body and he later on he was found  tortured, his front teeth knocked down, his legs broken  and shot 6 times.  This atrocity is believed to have been carried out with the consent the Administrator.

730.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the torture and murder of  Jose Lopez No. 99 through its support of the AUC. On information and belief, Chiquita  benefitted from the AUC murder of union leaders and activists who might threaten the stability of Chiquita's operations.

731.    Next of kin are his mother, his wife,  and two minor daughters.

**Jose Lopez No. 100**

732.    Jose Lopez No. 100 had been invited to join the AUC, which he did not accept, and he was subsequently threatened.  He left the area and went to Santa Marta.

733.    On 2/2/97 he was home when a group of armed men arrived, took him out of the house in his underwear and a few meters away they forced him to open his mouth, shot him in the mouth and stabbed him in the stomach.

734.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 100's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who challenged the AUC's impunity would be dealt with harshly.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

735.    Next of kin is his sister.

## Jose Lopez No. 101

736.    Jose Lopez No. 101 had been threatened by the AUC several times, the last time eight days prior to this death; he did not leave because he was waiting to receive some money from the banana farm where he worked.  He had been told  before that he had to leave, but he could not because he had no money and no place to go to.

737.    On 10/3/03 the Jose Lopez No. 101 left his house to wait for the bus that transported him to work; shortly  after a group of men arrived and killed him shooting him in the face.

738.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 101's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who challenged the AUC's impunity would be dealt with harshly.

739.    Next of kin are his mother and minor daughters.

## Jose Lopez No. 102

740.    Jose Lopez No. 102 and his wife owned a business and a house in Saiza which had been a strong fort for the FARC.  When the paramilitaries took power over that area they retaliated against the population, killing people that they believed to be collaborators of the FARC and burning their property.

741.    Jose Lopez No. 102's business and house were burned and his wife suffered injuries as a result of the attack that caused her to be temporarily blind.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

742.   They relocated in San Jose attempting to start over.  The AUC also raided San Jose, going door to door looking for the persons they had in a list, when they got to his store they killed Jose Lopez No. 102;  that day they killed four other persons in the town.

743.   On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 102 and the attempted murder of his wife, through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person perceived as an opponent to  the AUC and who could therefore  threaten the stability of Chiquita's operations.

744.   Next of kin is his wife, Josefa Lopez No. 103.

### Josefa Lopez No. 103

745.   Josefa  Lopez No. 103 and her husband owned a business and a house in Saiza which had been a strong fort for the FARC.  When the paramilitaries took power over that area they retaliated against the population, killing people that they believed to be collaborators of the FARC and burning their property.

746.   Josefa Lopez No. 103's business and house were burned and she suffered injuries as a result of the attack that caused her to be temporarily blind.

747.   Josefa Lopez No. 103 and her husband relocated in San Jose attempting to start over.  The AUC also raided San Jose, going door to door looking for the persons they had in a list, when they got to his store they killed Jose Lopez No. 102.

748.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the attempted murder of Josefa Lopez No. 103, through its support of the AUC. On

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

information and belief, Chiquita benefitted from removing a person perceived as an opponent to the AUC and who could therefore threaten the stability of Chiquita's operations.

749.    Josefa Lopez No. 103 brings this claim on her own behalf.

**Jose Lopez No. 104**

750.    Jose Lopez No. 104 had been a professional soldier, which turned out to be a source of problems for him.

751.    On 1/29/02 Jose Lopez No. 104 was riding a motorcycle home from Medellin with a friend. Before reaching the Municipality of Dabeida, they were stopped at an AUC checkpoint, searched and taken to the woods where they were killed. Their bodies were found days later near Rio Sucio, in the Municipality of Dabeida.

752.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 104 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person perceived as an opponent to the AUC and who could therefore threaten the stability of Chiquita's operations.

753.    Next of kin is his mother.

**Jose Lopez No. 105**

754.    Jose Lopez No. 105 earned a living buying rejected banana fruit from the farms and selling it. He had been warned by the AUC to either stop doing that on his own, or join COOMULBAN, a cooperative owned by the AUC, now known as ASOBANANA, but he did not pay attention.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

755.    On 7/4/01 Lopez No. 105  had bought a truck load of reject banana from a farm and arrived at a canteen in downtown Apartado,  where it was customary for him to rest for a while before continuing on his way home.

756.    Some men approached him and told him to get on their motorcycle, he resisted and they slit his throat.

757.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 105's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who challenged the AUC's impunity would be dealt with harshly.

758.    Next of kin are his mother and father.

**Jose Lopez No. 106**

759.    Jose Lopez No. 106 worked as a peon in cattle ranches.  He did some work on a ranch owned by a paramilitary leader who was under the orders of H.H. or Mono Veloza who was the General Commander, a fact  unknown to Jose Lopez No. 106.

760.    The owner of the ranch owed Jose Lopez No. 106 for the work done and he decided to take an electric saw and keep it until he was paid.

761.    Two individuals went to the house where he lived with his uncle looking for him. Once there they caught four young men and hit them asking which of them was Jose Lopez No. 106.

762.    Jose Lopez No. 106 identified himself, the men forced him into a cab and took him away.  The following day his body was found  in Chigorodo.  He had been shot many times.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

763.    Two of his brothers received threats and had to leave the area to avoid being killed.

764.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted Jose Lopez No. 106's murder through its support of the AUC. On information and belief, Chiquita benefited in part from his murder by sending a message that those who challenged the AUC's impunity would be dealt with harshly.

765.    Next of kin are his mother, his brother and his aunt.

**Jose Lopez No. 107**

766.    On October 19, 1997, Jose Lopez No. 107 and his mother were in downtown of Currulao, when someone called out at Lopez No. 107. His mother told him not to go and to stay with her, but he said he would be right back and went away.

767.    She stayed there waiting for him when she heard shots and someone told her son was being killed. She ran in the direction where her son had gone and was stopped by regular army soldiers. One of them hit her with his rifle, and when they allowed her to leave. Her son was no longer there.

768.    The AUC had taken Jose Lopez No. 107 to a location named Coldeza where 7 months earlier AUC members had killed her other son, and left him there.

769.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 107 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person perceived as an opponent to the AUC and who could therefore threaten the stability of Chiquita's operations.

770.    Next of kin are his mother and father.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

### Jose Lopez No. 108

771.    On 4/17/97 at 9:00 a.m. Jose Lopez No. 108  was leaving La Galleta in the company of his mother; when they got to the central bridge of Currulao two paramilitaries, "Barbao" and "Valentin" arrived in a motorcycle and forced him to get on it with them.  His mother pleaded with them not to take him, unsuccessfully.

772.    They took him to a location named Coldeza and killed him.

773.    On information and belief  Jose Lopez no. 108 was killed because the family lived in an area where the population was viewed by the AUC as collaborators of the Guerrilla.

774.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 108 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a person perceived as a guerrilla sympathizer and who could therefore  threaten the stability of Chiquita's operations.

775.    Next of kin are his mother and father.

### Josefa Lopez No. 109

776.    Two brothers of Josefa Lopez No. 109  had previously  been killed by the AUC.

777.    On the day when  the family was gathered for her brother's wake the men who had killed him arrived looking for her.  Her mother had her hidden and they didn't find her.

778.    Very early on the next day her mother took her to Arboteles where she stayed for a year.  She returned when they thought that there were no more problems with the paramilitaries.  That was 5 months prior to her murder.

779.    On 5/29/99 Josefa Lopez No. 109  had left her home to run some errands in Apartado.  When she arrived in Currulao an acquaintance who was sitting in a canteen called out

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

to her to invite her with a refreshment.  A moment later the man got up and left the canteen.  At

the same time 3 paramilitaries alias El Barbado, Valentin and Gallina arrived, forced her to get

on a motorcycle and took her to a location named Coldesa and killed her, leaving the body there.

This was the same location where her two brothers had been murdered previously.

780.    On information and belief  Josefa Lopez  No. 109 was killed because the family

lived in an area (Galleta, Nuevo Antioquia) where the population was viewed by the AUC as

collaborators of the Guerrilla.

781.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the murder of Josefa Lopez No. 109 through its support of the AUC. On information

and belief, Chiquita  benefitted from the murder of a person perceived as a guerrilla sympathizer

and who could therefore  threaten the stability of Chiquita's operations.

782.    Next of kin are his mother and father.

**Jose Lopez No. 110**

783.    Jose Lopez No. 110 was in the business of buying big lots of land, dividing it into

parcels and reselling it for profit.

784.    Jose Lopez No. 110 also was in the business of developing the coastal area for

touristic purposes.

785.    Jose Lopez No. 110 was also a man who cared deeply for his country and worked

very hard with indigenous and Afro-Colombian communities to improve their lives by meeting

with them to organize events and teach them how their craft skills could be used to earn a living.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

786.    One day at the end of July/beginning of August 1996 he received a phone call from a man calling himself Pedro who told him he was the second in command of the AUC in the Urabá region.  He ordered him to go to Medellin to meet with the AUC commanders.

787.    Once in Medellin he was kidnapped and questioned for several hours about his education, his life in the U.S., what connections he had in Choco and how he would cooperate with them.

788.    Jose Lopez No. 110 could not agree to the AUC's request to cooperate with them, so they ordered him to not return to the region where there was going to be an all-out war and if he wasn't on their side, they were going to take his land.

789.    The AUC Elmer Cardenas Block established their  military headquarters base on the land owned by  Jose Lopez No. 110.

790.    The AUC continued to threat Jose Lopez No. 100 to keep quiet or they would kill him and this family.

791.    Jose Lopez No. 110 was forced to suspend all economic activities, was deprived of the means to earn money and, nevertheless,  two years later he managed to make mortgage payments on the land.

792.    The AUC caused the forced constant displacement of Jose Lopez No. 110.  Due to the continued threats he had to continuously move from one place to another, alternating among the shelter that family and friends were able to provide him.

793.    Jose Lopez No. 110 struggled for 7 seven years not to lose his land  but his financial situation was unsustainable and on November 27, 2003, he watched powerless as the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

730,000 square meters of land in Santa Cruz de Pino Roa, the resort that was his most precious

project, was auctioned off.

794.    AUC Commander Fredy Rendon Herrera alias "El Aleman" acknowledged

responsibility for the damages inflicted on Jose Lopez No. 110.

795.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the losses suffered by  Jose Lopez No. 110 through its support of the AUC. The

looting, conversion and continued withholding of assets which rightfully belonged to Jose Lopez

No. 110 by the AUC was part of the larger scheme of crimes against humanity in which the AUC

engaged for the purpose of achieving its goals.

796.    On information and belief, Chiquita  benefitted from seizing the property of Jose

Lopez No. 110 who was perceived as opponent of the AUC  and who could therefore  threaten

the stability of Chiquita's operations.

**Jose Lopez No. 111**

797.    Jose Lopez No. 111 had been appointed Police Chief in San Francisco, Acandi,

in January 2001.   He lived and worked in San Francisco and his wife lived and worked in

Balboa.  He used to visit his family every two weeks.

798.    In 1999 Jose Lopez No. 111's wife  abandoned  their house and possessions and

fled with her two children because a female AUC member had advised her that their lives were

in danger. She relocated in Quibdo.  Jose Lopez No. 111 did not take the warning seriously and

did not leave.

799.    On April 17, 2001 (one year and 7 months after they had moved)  Jose Lopez No.

111's wife received a telephone call from someone with  the Hospital Secretariat  who told her

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

that her husband had been killed the day before.  Alias Aleman and members of the AUC

wearing camouflage uniforms had taken him from the house and  he was found dead the same

day.

800.    Jose Lopez No. 111's wife  was prevented from  paying her respects to her

murdered husband because she could also be killed and then her children would have lost both

the mother and the father.

801.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted the murder of Jose Lopez No. 111 through its support of the AUC. On information

and belief, Chiquita  benefitted from the murder of a person perceived as an opponent to  the

AUC and who could therefore  threaten the stability of Chiquita's operations.

802.    Next of kin are his wife and son.

**Jose Lopez No. 112**

803.    Jose Lopez No. 112 was a Catholic priest exercising his minister in the Diocese of

Quibdo.

804.    On November 18, 1999 at approximately 9:30 p.m., a boat owned by the

International NGO (Non-governmental  organization) "Peace and Third World" was getting close

to the city of Quibdo coming from Murindo, in the course of a humanitarian mission.  They were

assessing the damage caused by the strong winds and evaluating the needs of the communities of

Murindo, to provide aid.  This mission was being carried out by a Spanish assistant; a member of

the Quibdo Diocese, the legal counsel of the Diocese,  accompanied by the driver of the boat.

Also travelling in the boat were   also were Jose Lopez No. 112, a priest,  and a lady with three

children who had been picked up in Bella Vista.

126

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

805.    The boat was approaching the City of Quibdo and the driver was looking for a place to dock when it was hit on the side by a fiber glass "panga" (speed boat), travelling at high speed.  The persons who were standing were immediately propelled into the river and dragged by the strong current.  The Spanish assistant and Jose Lopez No. 112 died from mechanical anoxia.

806.    The AUC acknowledged  responsibility for the incident in a  communication  sent to the Bishop of the Diocese of Quibdo even though it claimed it had been an accident.

807.    The Diocese of Quibdo stated that the characteristics of the incident clearly proved that it was no accident but a premeditated, well planned, act.

808.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 112 through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a member of the clergy, who was as  such perceived as an opponent to  the AUC,  and who could therefore threaten the stability of Chiquita's operations.

809.    Next of kin are his parents and eleven siblings.

**Jose Lopez No. 113**

810.    Jose Lopez No. 113 was born in  Choco.  He was ordained as a priest in 2000. In 2002, he became the Parish Priest of Bojaya.  As such he did evangelical work, as well as work tending to find solutions to the social problems of the community.  At the time the Municipality of Bojaya had 2,700 residents and the greater municipality 12,000: 6,000 of indigenous descent and 6,000 African descendants.

811.    The FARC  had had control of  the area  since 2000 and a few  days before the incident  the AUC forces had arrived in Bojaya to  seize control  of the city and had been fighting

127

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

with FARC.  The AUC found itself cornered by  FARC and took positions  behind the church.

On April 30 Father Ramos Cuesta met with the paramilitaries and begged them to leave the

populated area; his pleas were ignored.  The FARC forces were on one side, the AUC on the

other and the church and the population were in the middle.

812.    On May 2, 2002 at 6:00 a.m. the combat broke out.  The terrified population ran

to take refuge in the church and approximately 700 persons were able to get in and stayed there

for 2 days.  In the course of the battle a gas cylinder bomb (homemade mortar) was shot by the

FARC to the AUC but it felt on the Church and went through the roof.

813.    As a result of the AUC refusing to move away from the populated area and the

battle that followed, there were 119 dead and hundreds of wounded.  Jose Lopez No. 113

sustained  a wound to his face, a fractured foot and a wound on the instep of the foot.  He was in

a resting home for almost 3 months undergoing  medical, psychiatric and psychological

treatment.

814.    On information and belief, Chiquita caused, intended, conspired in, and/or aided

and abetted  Jose Lopez No. 113 's attempted murder through its support of the AUC. On

information and belief, the AUC did nothing to preserve the wellbeing of the population when

combating the FARC and Chiquita benefited in part from his attempted murder by enforcing the

message that  the  AUC would stop at nothing to ensure that Chiquita's stability of operations

was not disrupted.

### Jose Lopez No. 114

815.    Jose Lopez No. 114 was a Catholic priest of the Marianist Order who was serving

as a parish priest in the Department of Choco.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

816.    At 9:00 a.m. on Sept. 18, 1998 a group of individuals were going to celebrate a mass.  The group, which included  several priests, left Lloro traveling  by canoe.  Around ten minutes into the trip, two paramilitaries wearing camouflage army-like uniforms boarded the canoe and told them to drive it in the direction of a group of persons on the shore.  They made them get out of the canoe, identified themselves as Paramilitaries, started searching  them and asking for identification papers.  Jose Lopez No. 114, another priest and the majority of the members of the group had  their ID cards with them had their papers in order, with the exception of 3 farmers who had forgotten to bring them.  One of the Paramilitaries ordered that  the three farmers who had no ID had to stay, that they would be killed, and that the rest could leave.

817.    Jose Lopez No. 114  went to one of the paramilitaries and  said: "It is unfair to take the life of a person for the only reason that he doesn't' have his ID." One of the paramilitaries aimed his rifle at the priest's heart  and said:  "You die, son of a bitch"  killing him on the spot.  They took the canoe with the body and the rest of the people up the river and travelled for around an hour.  The other priest asked the paramilitaries  to deliver the body to them, since they had already killed him, and they said to stay there for an hour and if somebody moved they would kill everybody. Around an hour later they allowed everybody to leave.

818.    The paramilitaries took  the body of the Jose Lopez no. 114 to Lloro.  The Marianist  Order  transported the body to his home town of Bogota. The crime was covered by the news.

819.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 114  through its support of the AUC. On information and belief, Chiquita  benefitted from the murder of a member of the clergy, who was as such

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

perceived as an opponent to the AUC, and who could therefore threaten the stability of Chiquita's operations.

820.   Next of kin are his mother, father and four siblings.

**Josefa Lopez No. 115**

821.   Josefa Lopez No. 115 lived in Apartado with her family.

822.   On June 6, 1997, her son, Jose Lopez No. 62, was killed by the AUC.

823.   Josefa Lopez No. 115 was devastated by the murder and was continuously having verbal altercations with the murderers of her son: alias Luis, Nilo and Niche, who lived in the same neighborhood. She was constantly berating them about the death of her son.

824.   The paramilitaries gave them an ultimatum: the whole family had to immediately leave the area or they would be killed, so they left. Later on Josefa Lopez No. 115 went back to pack some items that had been left behind and that they needed.

825.   On October 2, 1997 at 8:00 p.m. Josefa Lopez No. 115 was watching TV at the house. The above mentioned paramilitaries had sent some youngsters who lived in the neighborhood to tell her that they wanted to see her. She went to meet them and they told her she had to accompany them. They took her to Santa Maria (an adjoining neighborhood) and shot her to death. Her body was found on the main road. At the time of her murder Josefa Lopez No. 115 was four months pregnant.

826.   The murder was committed by AUC paramilitary members alias Luis, Nilo and Niche, under the orders of Aleman as the top commander in the area, other local high ranking leaders at the time were Alias El Lobo, H.H./Mono Veloza. Middle rank local leaders were alias Patica, Milicia, El Flaco, El Viejo, Cepillo, Balsudito, and Rivilla, among others.

130

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

827.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Josefa Lopez No. 115 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person perceived as hostile to the AUC and who could therefore threaten the stability of Chiquita's operations.

828.     Next of kin are her husband, a daughter, and a son who disappeared in 2006 and whose whereabouts are unknown at this time.

### Jose Lopez No. 116

829.     Jose Lopez No. 116 was employed in a teak plantation, he was allowed to pick up the seed and sell it.  He was doing very well, some weeks he would make C$300,000, which allowed him to comfortably support his family.

830.     The plantation where he worked was located in Nuevo Antioquia, which was labeled as a guerrilla area and the AUC perceived him as a collaborator of the guerrilla.

831.     On September 15, 2004,  at around 3:00 a.m. Jose Lopez No. 116 was taken from his home, transported to a placed named La Mica and killed there.   Some friends of his were on their way from Nuevo Antioquia when they saw the body of Jose Lopez No. 116 in the location where the  paramilitaries were stationed.

832.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the murder of Jose Lopez No. 116 through its support of the AUC. On information and belief, Chiquita benefitted from the murder of a person perceived as a collaborator of the guerrilla   and who could therefore  threaten the stability of Chiquita's operations.

833.     Next of kin are his father and mother.

## VI.    GENERAL ALLEGATIONS

131

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

834.    At all times, Defendants knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances. The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority. The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces  pursuant to the overall war strategy of the Colombian government. Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including at least fourteen current members of Congress, seven former lawmakers, the head of the secret police, mayors, and former governors. Furthermore, Chiquita's payments to the AUC were facilitated by Convivir, which are licensed by and operate with the express authority of the government.

835.    The acts described herein were conducted in the course of an internal armed conflict as part of the Colombian government's war strategy.  The AUC and other paramilitaries were par-ties to this armed conflict who engaged in combat with guerrilla armies on behalf of the government; they committed the abuses against Plaintiffs and decedents as part of their prosecution of this conflict. The AUC and other paramilitaries were also engaged in this conflict in partnership with the Colombian military. The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as against several discrete sub-populations, including but not limited to leftist politicians, labor organizers, community activists, persons considered socially undesirable, and

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally-commanded paramilitary organization. On information and belief, at all relevant times Chiquita had knowledge of this attack..

836.    The  defendants' acts had a substantial effect upon the success of the violations of international law.

837.    The defendants were aware that their acts and omissions assisted in the violations of international law.

838.    The defendants acted willfully, wantonly and recklessly, with the intent to aid the terrorist acts of the AUC, with deliberate and conscious disregard of the fact that its actions would aid, abet and further the terrorist activities of the AUC.

839.    The acts and injuries to Plaintiffs and decedents described herein were part of a pattern and practice of systematic human rights violations requested, paid for, ordered, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

840.    As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damages, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

841.    Plaintiffs' causes of action arise under and constitute torts under the following laws, agreements, conventions, resolutions and treaties:

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

a)  Alien Tort Claims Act, 28 U.S.C. § 1350;

b)  Torture Victims Protection Act, 28 U.S.C. § 1350, note;

c)  Customary international law;

d)  Common law of the United States of America;

e)  Statutes and common law of the States of New Jersey, Florida, Ohio or any other applicable jurisdiction, including but not limited to wrongful death, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress,   negligence, negligent hiring, civil conspiracy, and loss of consortium; and the

f)  Laws of Colombia.

842.  Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary Banadex. On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there. Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them. The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities. Military officers accused of collaboration with paramilitaries are routinely exonerated or given token sentences by military courts. Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

843.   Legal action by Plaintiffs in Colombia would also result in serious reprisals. Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

844.   Chiquita took actively concealed its payments and other forms of support to the AUC.

845.   This concealment had the effect of preventing plaintiffs from learning that Chiquita was responsible for their injuries.  Plaintiffs were unaware of Chiquita's support of the AUC until shortly after Chiquita's guilty plea in March of 2007.

846.   Chiquita's concealment of its role in Plaintiffs' injuries prevented Plaintiffs from filing their claims at an earlier date.

847.   Plaintiffs were additionally unable to bring suit in Colombia or the United States until 2007 due to the poor security situation and the danger of reprisals, to which Chiquita's support of the AUC contributed.

848.   Several of the AUC paramilitary units active in the banana-growing region, including Bloque Norte and the Bloque Elmer Cárdenas, did not demobilize until 2006.

849.   Throughout this period, paramilitaries continued to kill and make threats against civilians in the banana-growing region.  In 2006, several human rights workers received death threats, including lawyers challenging paramilitary violence.

## FIRST CLAIM FOR RELIEF

### (Extrajudicial Killing)

850.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

851.    The deliberate killings, under color of law, of Jose Lopez No. 1 through 116, were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people.

852.    The conduct alleged herein constitute extrajudicial killings in violation of the Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey, Florida, Ohio, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

853.    The AUC committed acts of extrajudicial killing in that they carried out deliberate killing of Plaintiffs' decedents 2) not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

854.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the extrajudicial killings committed against Plaintiffs.

855.    The AUC's killings were carried out deliberately as part of the role assigned to them by the Colombian State to repress support of the FARC, but unauthorized by a judgment pronounced by any court

856.    As alleged above, AUC acted as a government in and of itself and its relationship with the government made it a state actor in Colombia.

136

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

857.    The AUC killed Plaintiffs' decedents as part of the Colombian state policy of intimidating civilians from supporting the FARC.  The AUC committed many of these murders in the presence of family members or other community members, or they subsequently reported to the family that they were responsible for the killings.  They openly killed civilians and discussed such killings in public in order to intimidate and threaten others.

858.    While the state supported the AUC in these efforts, they did not authorize them to commit these killings through a court judgment.  In fact, AUC leaders have stated that the military would give them names of alleged guerrillas to kill when the state did not have enough evidence to prosecute the individuals through Colombian courts.

859.    None of decedents was killed pursuant to any judicial process at all.

860.    Plaintiffs incorporate by reference  ¶¶ 129-138, 146-147, 154-156, 180, 222-231, 135, 146-7, 173-5, 183, 182, 221, 226-31, 251-833 of this complaint, detailing why Plaintiffs' decedents were killed by the AUC and characterized as FARC sympathizers. Killing plaintiffs' decedents was part of the general strategy of the AUC.  Through these murders, the AUC intended to deter others from expressing views that could be construed as supporting the FARC or their ideology.

## SECOND CLAIM FOR RELIEF

## (Crimes Against Humanity)

861.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

862.    The conduct alleged in this complaint includes willful killing, torture, and arbitrary arrest and detention, constituting crimes against humanity in that the AUC carried out

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

these acts as part of a widespread or systematic attack against a civilian population.  Leaders,

organizers, instigators, and accomplices participating in the formulation of these acts are

responsible for all acts performed by any person in execution of such plan. The acts of the AUC

constitute crimes against humanity, regardless of whether the AUC acted under color of state

authority.

864.    The crimes against humanity described herein constitute  torts that give rise to

federal jurisdiction under the Alien Tort Statute,  (28 U.S.C. § 1350), as well as violations of

customary international law,  and the common law of the United States, the statutes and common

law of New Jersey, Ohio, and Florida, and the laws of Colombia.

865.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the

crimes against humanity committed against Plaintiffs.

866.    From late 1996 on, the AUC became a major combatant in Colombia's civil

conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the

Colombian military had ceded military operations to the AUC. By 2001, the conflict between the

AUC and the FARC had become a notorious exchange of atrocities. The AUC, using tactics of

terror on civilians living in and around areas that had been under FARC control, assumed that

these innocents were sympathetic to the FARC and systematically murdered thousands of them.

The AUC became known for using chain saws and machetes to dismember its victims in order to

ensure that witnesses to this violence would never harbor or assist FARC guerrillas in their

villages.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

867.    The AUC killed thousands of civilians in Urabá.  Their war strategy involved targeting civilians in towns near guerrilla groups in order to intimidate the population from providing any support to the guerrillas. This included anyone supporting the guerrillas' ideology, such as teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians.

868.    Decedents were all killed as part of a systematic attack on particular societal groups.  Plaintiffs incorporate by reference ¶¶ 129-138, 146-147, 154-156, 180, 222-231, 135, 146-7, 173-5, 183, 182, 221, 226-31.  In fact, all of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold.  They were not merely incidental victims during a time of war; rather they were victims of the AUC's war strategies and goals in furtherance of the conspiracy.

869.    According to the U.S. Department of State, "paramilitary groups took the offensive against the guerrillas, often perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base . . . An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerrilla support, was the primary cause of the growing internal displacement problem." (emphasis added).

## THIRD CLAIM FOR RELIEF

### (Torture)

870.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

871.    The conduct alleged herein constitute extrajudicial killings in violation of the

Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350

note), customary international law, the common law of the United States, the statutes and

common law of New Jersey, Florida, Ohio, the laws of Colombia, and the international treaties,

agreements, conventions and resolutions described in the paragraphs above.

872.    The AUC committed acts of torture in that they intentionally caused Plaintiffs and

their decedents to suffer severe mental or physical pain or suffering  for the purpose of

punishing, intimidating or coercing Plaintiffs and their decedents.

873.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

confirmed, ratified, were the principals of,  and/or conspired with the AUC, which was acting

under color of law by collaboration with the Colombian military, to bring about the extrajudicial

killings committed against Plaintiffs.

874.    Plaintiffs incorporate by reference  ¶¶ 251-833, above, describing the capture and

executions of Plaintiffs' decedents.

875.    Plaintiffs' decedents were in the custody of the AUC when they were tortured and

killed. The family members of  various next of kin witnessed AUC members seeking out their

relatives and executing them.  AUC paramilitaries removed Josefa Lopez No. 36 from a bus in

the presence of her family others and executed her.  Others were removed from the banana farms

and executed by the AUC, who later told their family members about the killings.  The AUC had

effective control of Plaintiffs' decedents by use of their weapons.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

876.     The AUC caused the decedents severe mental and physical pain in their torture and execution.

877.     The AUC caused the Plaintiffs severe mental and physical pain in witnessing or learning of the murders of their family members.  Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the death, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them.

878.     Plaintiffs incorporate by reference ¶¶ 128-177 of this complaint, detailing the AUC's relationship with the government and the AUC's role as a state actor in Colombia.

879.     The AUC used torture against civilians to intimidate them from providing support to guerrillas.  The AUC would often force its victims to disclose names of other potential guerrilla supporters.  They took workers from the plantations and tortured them to the point that many would invent stories and names in the hope that the paramilitaries would let them go.  Two union leaders reported that the paramilitaries would use tactics such as tying the worker's hands and feet, using chainsaws or pliers to break them to pieces, and pulling out their nails. On information and belief, the torture of Plaintiffs and decedents was intended to accomplish this goal.

## FOURTH CLAIM FOR RELIEF

### (War Crimes)

880.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

881.     The AUC's conduct alleged in this complaint constitutes violence to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying out

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

of executions without previous judgment pronounced by a regularly constituted court, incidents

of outrages upon human dignity, forced movement, pillage, and denial of medical treatment.

882.    The AUC's acts violate the law of nations in that they were committed in the

course of war crimes, because 1) an armed conflict was ongoing; 2) the AUC was a party to the

conflict; 3) Plaintiffs, decedents, and countless other victims of the AUC's acts did not take

active part in the hostilities; and 4) the acts were committed in the course of armed conflict.

These acts are thus war crimes, regardless of whether the AUC acted under color of state

authority.

883.    The war crimes described herein constitute torts that give rise to federal

jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary

international law and the common law of the United States, the statutes and common law of New

Jersey, Ohio, Florida,  and the laws of Colombia. Leaders, organizers, instigators, and

accomplices participating in the formulation of these acts are responsible for all acts performed

by any person in execution of such plan.

884.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the

war crimes committed against Plaintiffs.

885.    The Colombian civil war is an "armed conflict not of an international character,"

as specified in Common Article 3 of the Geneva Conventions, which hold that in such cases,

specific acts such as torture and "carrying out of executions without previous judgment

142

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

pronounced by a regularly constituted court" constitute war crimes when committed against non-combatants.

886.    There is no dispute that at all relevant times, and up until the present, Colombia has been devastated by a long-standing civil conflict. This has been widely documented and, to Plaintiffs' knowledge, has never been disputed in this or any other case. For example, the 1997 State Department Human Rights Report notes that the Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *Id*. at 1.

887.    During all times relevant to this complaint, the civil war in Colombia pitted the Colombian government - along with its paramilitary allies, including the AUC - against the FARC and other left-wing guerrilla insurgents.

888.    The Colombian civil war has continued uninterrupted since at least 1946, and claimed the lives of over 300,000 people.  Both Venezuela and Ecuador´s presidents have referred to the FARC as a belligerent force.  The Colombian government has engaged in prisoner exchanges with the FARC in the past.  It held extensive negotiations with the FARC during the 1998-2002 time period, with involvement of the United Nations, and ceded a large portion of its territory to FARC control, referred to as the "zona de despeje," or cleared zone.  During that time, the FARC assumed the powers of government, including judicial and police powers.

889.    Once Colombia's various paramilitary groups consolidated in 1997 under the leadership of Carlos Castaño, the AUC became the most visible armed opposition to the FARC, which, by late 1996, had become Colombia's most prominent leftist rebel group. From that time until its demobilization, the AUC was a major combatant in Colombia's civil conflict with the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

FARC.  In most of the rural areas where the FARC had its strongholds, the Colombian military

ceded military operations to the AUC.  By 2001, the conflict between the AUC and the FARC

had become a notorious exchange of atrocities.

890.    Plaintiffs further incorporate by reference ¶¶ 128, 133, 148, 153, 174-5, 212, 222,

232, 262,304, 366, 415, 420, 454, above of this complaint, explaining how the AUC became

party to the Colombian civil war as a tool of the Colombian government, and its campaign of

violence against civilians and union members in furtherance of the war against the FARC.

891.    Civilians are entitled to the protections of Common Article 3 of the Geneva

Conventions if they are "[p]ersons taking no active part in the hostilities."  Neither surviving

Plaintiffs nor decedents were party to the armed conflict in Colombia, as they were not members

of the FARC, the AUC, or, indeed, any armed group that participated in the conflict.

892.    Decedents were not killed because they or anyone related to them had taken part

in the hostilities in any way.  Rather, they were victims of the campaign conducted against

civilians by the AUC in an effort to discourage support of the FARC.  The AUC systematically

murdered thousands of them without regard to whether they were actual participants in the civil

war, as a warning to any potential guerrilla supporters.

893.    Decedents were not killed simply against the background of war; rather, the use of

criminal violence and intimidation against civilians was part of the war strategy against the

FARC agreed on by the AUC and the Colombian Government, in which Chiquita was

intentionally complicit.

894.    The AUC used extremely violent means to take back areas held by the FARC and

used tactics of violence and terror to depopulate areas of innocent civilians merely because the

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

AUC presumed that civilians in areas previously held by the FARC were sympathetic to the leftist guerrillas. This military tactic is documented by the U.S. Department of State.

895.    While this strategy was developed in Urabá, the model of collaboration between government and paramilitary was so successful that it was exported to the rest of the country and became part of the national war strategy.

896.    Decedents were all members of particular social groups that were particularly targeted by the AUC as part of its war strategy. Plaintiffs incorporate by reference ¶¶ 129-138, 146-147, 154-156, 180, 222-231, 135, 146-7, 173-5, 183, 182, 221, 226-31, 251-833, above.

897.    In fact, all of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold.  They were not merely incidental victims during a time of war; rather they were victims of the AUC's war strategies and goals.

## FIFTH CLAIM FOR RELIEF

### (Terrorism)

898.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

899.    The acts of terrorism described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, Ohio, Florida, and the laws of Colombia.

900.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the

acts of terrorism committed against Plaintiffs.

901.    Plaintiffs' decedents, as well as the vast majority of AUC targets in Urabá, were

civilians.  Plaintiffs incorporate by reference ¶¶ 251-833 of this complaint (describing individual

Plaintiffs and decedents).

902.    The AUC targeted not only guerrilla sympathizers but anyone suspected of

supporting their leftist ideology, such as teachers, community leaders, trade unionists, human

rights defenders, religious workers, and leftist politicians.  The AUC targeted civilians in towns

near known guerrilla groups because they claimed guerrilla groups could only operate in the

region with the logistical support of local towns.

903.    Plaintiffs incorporate by reference  ¶¶ 129-138, 146-147, 154-156, 180, 222-231,

135, 146-7, 173-5, 183, 182, 221, 226-31, 251-833, above, detailing why Plaintiffs' decedents

were characterized as FARC sympathizers and the threats they posed to the AUC and banana

growers.  Killing plaintiffs' decedents was part of the general strategy of the AUC.  Through

these murders, the AUC intended to deter others from expressing views that could be construed

as supporting the FARC or their ideology.

## SIXTH CLAIM FOR RELIEF

### (Material Support to Terrorist Organizations)

904.    The allegations set forth in the above paragraphs are realleged and incorporated

by reference as if fully set forth herein.

905.    Defendants' conduct alleged herein constitutes a violation of the international law

prohibition against providing material support to terrorist organizations, in that Defendants

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

provided assets to a terrorist organization with the knowledge or intent that they would be used to carry out attacks on civilians for the purpose of intimidating or coercing a civilian population. Defendants' conduct constitutes material support to terrorist organizations, regardless of whether Defendants acted under color of state authority.

906.    The acts of providing assistance to the AUC described herein constitute material support to a terrorist organization in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the statutes and common law of the United States, the statutes and common laws of New Jersey, Ohio, Florida, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan

907.    Defendants are liable to Plaintiffs in that they directly participated in the provision of material support to the AUC, and/or they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with others, including members of the AUC, to provide material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

908.    As detailed above, Defendants provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons and drugs.

909.    The support that Chiquita provided was crucial to the AUC's success against the FARC in the area and ability to continue killing civilians. Payments from Chiquita and other banana companies constituted a significant portion of the AUC's budget in some areas.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

910.   At all times relevant to this Complaint, the AUC has been an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets. The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Defendants were aware of such activities. From September 10, 2001, until the present, the AUC has been designated by the United States government as a Foreign Terrorist Organization.

911.   As detailed above, Chiquita knew of and intentionally supported the AUC's strategy of targeting civilians in order to intimidate the population of Urabá from supporting the FARC.  Chiquita provided this support in exchange for security and stability on the banana plantations, which it achieved through the murder or disappearance of civilians such as union leaders, community activists, and suspected criminals.

## SEVENTH CLAIM FOR RELIEF

### (Cruel, Inhuman, or Degrading Treatment)

912.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

913.   The conduct alleged herein constitute cruel, inhuman, or degrading treatment in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of New Jersey, Florida, Ohio, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

914.   The AUC committed acts of cruel, inhuman, or degrading treatment in that they inflicted mental or physical suffering, anguish, humiliation, fear and debasement upon Plaintiffs

148

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

and their decedents.  The acts described herein had the intent and the effect of grossly

humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience,

inciting fear and anguish, and/or breaking their physical or moral resistance.  Plaintiffs were

placed in great fear for their lives and were forced to suffer severe physical and psychological

abuse and agony.

915.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

confirmed, ratified, were the principals of,  and/or conspired with the AUC, which was acting

under color of law by collaboration with the Colombian military, to bring about the cruel,

inhuman, and degrading treatment committed against Plaintiffs.

916.    The AUC inflicted mental and physical suffering, anguish, humiliation, fear and

debasement on Plaintiffs and their decedents as part of the role assigned to them by the

Colombian State, to intimidate and coerce them from supporting the FARC

917.    Plaintiffs incorporate by reference  ¶¶ 128-177 of this complaint, detailing the

AUC's relationship with the government and the AUC's role as a state actor in Colombia.

918.    Plaintiffs incorporate by reference  ¶¶ 251-833 of this complaint, describing the

capture and executions of Plaintiffs' decedents.  The AUC targeted Plaintiffs' decedents because

their actions and positions in the community were seen as supporting the FARC.

919.    Plaintiffs incorporate by reference 251-833 of this complaint, describing how the

physical and emotional punishment inflicted on Plaintiffs and decedents caused severe mental

and physical suffering and anguish, as well as fear.

**EIGHTH CLAIM FOR RELIEF**

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

## (Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Association)

920.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

921.     The conduct alleged herein constitute violation of the rights to life, liberty and security of person and peaceful assembly and association in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of New Jersey, Florida, Ohio, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

922.     The AUC violated Plaintiffs' and their decedents' rights to life, liberty and security of person and peaceful assembly and association in that they carried out 1) a systematic campaign of terror and violence 2) conceived and arbitrarily waged by state agents 3) hatched and calculated to suppress political opinion and expression.

923.     Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of,  and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

924.     Plaintiffs incorporate by reference  of this complaint, detailing the relationship between the AUC and the government and the AUC's role as a state actor in Colombia.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

925.     Based on ¶¶ 129-138, 146-147, 154-156, 180, 222-231, 135, 146-7, 173-5, 183, 182, 221, 226-31, 251-833, above, which are incorporated herein by reference, the AUC carried out the role assigned it by the Colombian government by waging a systemic campaign of terror and violence against civilians in the name of defeating the guerrillas.

926.     Decedents were killed in the course of the AUC's campaign against the FARC.

927.     One of the overriding purposes of the AUC's campaign of terror against civilians, including Plaintiffs and decedents, was to intimidate and coerce civilians in Urabá against supporting the FARC or, indeed, any political ideology that could be associated with the FARC. This could and often did include the violent suppression of any form of political or social organization activity outside of those forms specifically endorsed by the paramilitaries and the government.  Plaintiffs incorporate by reference ¶¶ 128, 133, 148, 153, 174-5, 212, 222, 232, 262,304, 366, 415, 420, 454, above.

928.     Decedents were killed to suppress their political expression and to prevent them and others from giving political to support to the leftist ideologies associated with the FARC. Plaintiffs incorporate by reference  ¶¶ 251-833, above.

## NINTH CLAIM FOR RELIEF

### (Consistent Pattern of Gross Violations of Internationally Recognized Human Rights)

929.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

930.     The conduct alleged herein constitute a consistent pattern of gross violations of internationally recognized human rights in violation of the Alien Tort Statute (28 U.S.C. § 1350),

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

customary international law, the common law of the United States, the statutes and common law of New Jersey, Florida, Ohio, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

931.    The AUC carried out a consistent pattern of gross violations of internationally recognized human rights against Plaintiffs, their decedents, and others in that the above-described abuses against Plaintiffs and decedent occurred within the context of numerous similar abuses and killings.

932.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

933.    The torture, murder, and other abuses committed against decedents, surviving Plaintiffs, and their family members was committed as part of and in the context of a consistent pattern of abuses that constitute gross violations of internationally recognized human rights. These abuses include violations of the right to life, right to security of person, right to security of property, right to privacy, right to freedom of political expression and social organization, and many others.

934.    The specific acts constituting these violations include thousands of murders and incidents of torture and cruel, inhuman and degrading treatment, forced displacement, unwarranted intrusions into the private medical information and decisions of banana workers, suppression of union activity and peaceful political dissidence.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

## TENTH CLAIM FOR RELIEF

### (Wrongful Death)

935.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

936.    As a direct result of Defendants' acts and omissions and as a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

937.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of,  and/or conspired with the AUC in bringing about the wrongful deaths of the decedents.

938.    The acts described herein constitute wrongful death, actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## ELEVENTH CLAIM FOR RELIEF

### (Assault and Battery)

939.    Defendants' actions alleged herein constitute assault and battery in that they acted with the intention of causing offensive and harmful touching of Plaintiffs' persons without the consent of Plaintiffs, and/or they acted with the intention of creating the imminent apprehension that such touching would result, and such touching or apprehension of touching resulted.

940.    As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

941.    Defendants' acts were willful, intentional, wanton, malicious, and oppressive.

942.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of,  and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and decedents.

943.    The AUC abducted and killed decedents, in some cases in front of Plaintiffs and their family members.  In so doing, the AUC intended to cause decedents to suffer dangerous, harmful, and offensive physical contact without their consent, and also to frighten them with the imminent apprehension of such contact, and they also intended to frighten surviving Plaintiffs with the imminent apprehension of such contact.

944.    The AUC's acts of kidnapping, killing, and torture alleged herein included harmful physical contact that caused injury and death to decedents without their consent, and acts of physical and emotional intimidation that caused decedents and surviving Plaintiffs to suffer the fright and apprehension of immediate harmful physical contact.

945.    The acts described herein constitute assault and battery, actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## TWELFTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

946.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

947.    Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

948.    Defendants' conduct alleged herein constitutes international infliction of emotion distress in that it was intentional and/or reckless, was extreme and outrageous, and caused severe distress to Plaintiffs and decedents.

949.    As a direct and proximate result of Defendants' acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

950.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress of Plaintiffs and decedents.

951.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as directing, colluding with, and jointly planning with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Defendants intentionally acted, with the intent and/or deliberate disregard of the high possibility that their conduct would lead to the abduction, torture, and killing of decedents, causing severe humiliation, mental anguish, and emotional distress to decedents, surviving Plaintiffs, and their families.

952.    At all relevant times, it was in Defendants' power to cease their assistance, support, direction, collusion, and joint planning with the AUC or to prevent or prohibit such

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

conduct, but instead the continued in their course of conduct continuously from 1995 until at least 2004.

953.    Defendants' conduct alleged herein violated the laws of Colombia, Florida, New Jersey, the United States, the law of nations, and any other applicable jurisdiction.  War crimes, crimes against humanity, torture, extrajudicial killing, cruel, inhuman and degrading treatment, violations of the right to life, liberty, security of person, and peaceful assembly and expression, terrorism, material support of terrorism, and consistent patterns gross violations of internationally recognized human rights are acts that are so heinous that they are considered to be of universal and mutual concern to all nations of the world, such that nations have a legally binding obligation to punish and prevent them.  Defendants' complicity in such acts is therefore so extreme and outrageous in character as to be completely unjustifiable and intolerable in a civilized community.

954.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as directing, colluding with, and jointly planning with AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Defendants proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities - including providing arms and money, and sending names to the paramilitaries to be included on execution lists - formed a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.

955.    As a result of Defendants' actions and the killings and other abuses carried out by the AUC, decedents were severely frightened and traumatized before being killed.  The AUC caused the Plaintiffs severe mental and physical pain in witnessing or learning of the murders of

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

their family members.  Individual Plaintiffs also experienced suffering in being threatened

against pursuing an investigation of the death, being forced to flee the area, and feeling

threatened and frightened that the AUC would also target them.  These, fears, disturbances, and

traumas constitute genuine and substantial distress, of a sort so severe that no person could

reasonably be expected to withstand it.

956.    Defendants' outrageous conduct constitutes the intentional infliction of emotional

distress and is actionable under the laws of the United States, Colombia or the common law of

Ohio. New Jersey, Florida or any other applicable jurisdiction.

### THIRTEENTH CLAIM FOR RELIEF

### (Negligent Infliction of Emotional Distress)

957.    The allegations set forth in the above paragraphs are realleged and incorporated

by reference as if fully set forth herein.

958.    Defendants' conduct constitutes the negligent infliction of emotional distress and

is actionable under the laws of the United States, Colombia or the common law of  New Jersey,

Florida, Ohio, or any other applicable jurisdiction.

959.    Defendants' conduct constitutes negligent infliction of emotion distress in that

Defendants owed Plaintiffs and decedents a duty to act with reasonable care,  they breached that

duty, emotional distress was reasonably foreseeable, Defendants' conduct proximately caused the

distress, and the distress was genuine and substantial.

960.    As a direct and legal result of Defendants' wrongful acts, Plaintiffs have suffered

and will continue to suffer significant physical injury, pain and suffering, and extreme and severe

mental anguish and emotional distress.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

961.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of,  and/or conspired with the AUC in bringing about the negligent infliction of emotional distress of Plaintiffs and decedents.

962.    Defendants breached their duty to Plaintiffs by failing to act so as to stop engaging the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct

963.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as directing, colluding with, and jointly planning with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Defendants breached their duty to Plaintiffs to act with reasonable care so as not to cause injury to them.

964.    At all relevant times, it was in Defendants' power to cease their assistance, support, direction, collusion, and joint planning with the AUC or to prevent or prohibit such conduct, but instead the continued in their course of conduct continuously from 1995 until at least 2004.

965.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as directing, colluding with, and jointly planning with AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Defendants proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities - including providing arms and money, and sending names to the paramilitaries to be included on execution lists - formed a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

966.    From the moment of their first involvement with paramilitary groups, Defendants

were aware that their assistance, collusion, direction, and support would result in the killing,

torture, and other abuses committed against Plaintiffs, decedents, and countless other civilians in

Urabá.

967.    As early as 1995, paramilitary groups like the ACCU were notorious for their

brutal methods and tactic of declining to discriminate between combatants and civilians.

968.    The massacres committed by the nascent AUC beginning in 1997 were also well

known and were the subject of any number of newspaper articles and investigations both in

Colombia and abroad.

969.    Despite their general knowledge about the paramilitaries' tactics and specific

understanding of the paramilitaries' activities in Urabá, Defendants specifically engaged, paid,

directed, colluded, and otherwise supported them to suppress union activity and discourage

support of the FARC - the very activities for which their brutal tactics were notorious.

Defendants played this role with the knowledge and intent that the paramilitaries would

committed the abuses alleged herein, and they continued to play this role as it became clear that

their support was being used to torture, murder, and otherwise abuse Defendants' opponents.

970.    As a result of Defendants' actions and the killings and other abuses carried out by

the AUC, decedents were severely frightened and traumatized before being killed.  The AUC

caused the Plaintiffs severe mental and physical pain in witnessing or learning of the murders of

their family members.  Individual Plaintiffs also experienced suffering in being threatened

against pursuing an investigation of the death, being forced to flee the area, and feeling

threatened and frightened that the AUC would also target them.  These, fears, disturbances, and

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to withstand it.

## FOURTEENTH CLAIM FOR RELIEF

## (Negligence/Negligent Hiring/Negligence Per Se)

971.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

972.    Defendants' conduct constitutes negligence and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

973.    Defendants' conduct constitutes negligence in that  Defendants owed Plaintiffs and decedents a duty to act with reasonable care not to injure them, 2) they breached that duty, 3) it was reasonably foreseeable that Defendants' negligence would cause injury, damage, loss, or harm to Plaintiffs and their next of kin.

974.    Defendants' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

975.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, death, physical injury, and severe emotional distress.

976.    Defendants breached their duty to Plaintiffs by failing to act so as to stop engaging the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

977.     By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as directing, colluding with, and jointly planning with AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Defendants breached their duty to Plaintiffs to act with reasonable care so as not to cause injury to them.

978.     At all relevant times, it was in Defendants' power to cease their assistance, support, direction, collusion, and joint planning with the AUC or to prevent or prohibit such conduct, but instead the continued in their course of conduct continuously from 1995 until at least 2004.

979.     Defendants conduct alleged here in proximately caused Plaintiffs and decedents to suffer physical and emotional harm, including death

980.     By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as directing, colluding with, and jointly planning with AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Defendants proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities - including providing arms and money, and sending names to the paramilitaries to be included on execution lists - formed a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.

981.     At all relevant times, Defendants knew that their conduct would and did proximately result in physical and emotional harm to Plaintiffs

982.     From the moment of their first involvement with paramilitary groups, Defendants were aware that their assistance, collusion, direction, and support would and did result in the killing, torture, and other abuses committed against Plaintiffs, decedents, and countless other

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

civilians in Urabá.  Defendants continued in this course of conduct from no later than 1995 until at least 2004 with the knowledge and intention that the AUC carry out these crimes.

983.     At all relevant times, Defendants knew that the AUC was an organization dedicated to the use of terrorism and violence against civilians, and could have foreseen that this created a risk of harm to other persons

984.     Defendants concluded an agreement in late 1996 or early 1997 with the AUC - which was, on information and belief, a formalization of prior arrangements to provide financial support to the ACCU, the AUC's predecessor - under which the AUC would provide security, suppress union activity, and discourage FARC support in return for payment and other forms of support and cooperation.

985.     They engaged the AUC to provide these services despite their prior knowledge that the paramilitaries in general - and Carlos Castaño's group in particular - used terrorism and violence against civilians as a strategy to carry out those goals.  It was therefore foreseeable that the AUC's known tactics would create a risk of harm to others.

986.     The AUC's dedication to the use of terrorism and violence against civilians proximately caused Plaintiffs' and decedents' injuries

987.     It was the AUC's tactic of using terrorism and violence to intimidate civilians, suppress union activity, and discourage support of the FARC that proximately caused the deaths of decedents and the mental and physical injuries to Plaintiffs.

988.     Defendants' acts of material support to the AUC, along with its acts of assistance, support, direction, and collusion, violated laws designed to protect Plaintiffs and decedents, including the ATS, ATA, and TVPA, and Colombian law outlawing armed convivir activity.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

989.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

## FIFTEENTH CLAIM FOR RELIEF

### (Loss of Consortium)

990.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

991.    At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses and parents to the Plaintiffs who are their spouses and children.

992.    As a result of the acts of Defendants, those Plaintiffs who are the spouses and children of the decedents have been deprived of the decedents' society, comfort, attention, services, and support, all to their damage, in an amount to be proved at trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

993.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.

994.    Defendants' conduct constitutes loss of consortium and is actionable under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

## PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in

excess of $75,000, as follows:

for compensatory damages, including general and special damages;

for punitive damages;

for injunctive and declaratory relief as this Court deems appropriate;

for costs of suit; and

such other relief as the Court deems just and proper.

Respectfully submitted,

s/ James K. Green, Esq.
JAMES K. GREEN, P.A.
Florida Bar No. 229466
Esperantè, Suite 1650
222 Lakeview Avenue
West Palm Beach, Florida 33401
Telephone: 561.659.2029
Facsimile: 561.655.1357
jameskgreen@bellsouth.net

and

Jack Scarola, Esq.
Florida Bar No: 169440
William B. King, Esq.
Florida Bar No: 0181773
SEARCY DENNEY SCAROLA
          BARNHART & SHIPLEY, P.A.
2139 Palm Beach Lakes Blvd.
P.O. Drawer 3626
West Palm Beach, FL 33402
Telephone: 561.686.6300
Facsimile: 561.478.0754

CASE NO. 08-01916-MD-MARRA/JOHNSON
Plaintiffs' Second Amended Complaint
This document refers to Case No. 08-808508-CIV-MARRA/JOHNSON

COUNSEL FOR PLAINTIFFS


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 26, 2010, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record listed below and all counsel in the MDL

proceedings either via transmission of Notices of Electronic Filing generated by CM/ECF or in

some other authorized manner for those counsel or parties who are authorized to receive

electronically Notices of Electronic Filing.

John E. Hall, Esq.
Jenny Mosier, Esq.
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
202-662-6000 (telephone)
202-662-6291 (facsimile)

Sidney S. Stubbs, Esq.
Robert W. Wilkins, Esq.
Christopher S. Rapp, Esq.
JONES FOSTER JOHNSTON
& STUBBS, P.A.
505 South Flagler Dr.
Ste. 1100
West Palm Beach, FL 33401
561-659-3000 (telephone)
561-650-0412 (facsimile)

COUNSEL FOR DEFENDANT CHIQUITA BRANDS INTERNATIONAL, INC.


By:  s/James K. Green
James K. Green, Esq.

165