# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-MD-01916 (Marra/Johnson)

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC. ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION

_____/

This Document Relates to:

ATS ACTIONS

_____/

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## CONSOLIDATED MOTION TO DISMISS AMENDED COMPLAINTS

Gregg H. Levy
John E. Hall
Jonathan L. Marcus
Ann O'Connell
José E. Arvelo
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Fax: (202) 662-6291

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000
Fax: (212) 841-1010

Sidney A. Stubbs (Fla. Bar No. 095596)
Robert W. Wilkins (Fla. Bar No. 578721)
Christopher S. Rapp (Fla. Bar No. 0863211)
rwilkins@jones-foster.com
JONES, FOSTER, JOHNSTON & STUBBS, P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, Florida 33401
Telephone: (561) 659-3000
Fax: (561) 650-0412

*Counsel for Chiquita Brands International, Inc.
and Chiquita Fresh North America LLC*

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 4

    A.    Procedural History ................................................................................. 4

    B.    Recent Developments In ATS Case Law ............................................. 6

        1.    *Sinaltrainal v. Coca-Cola* ........................................................ 6

        2.    *Ashcroft v. Iqbal* ..................................................................... 7

        3.    *Presbyterian Church of Sudan v. Talisman Energy* ................... 8

        4.    *Doe v. Drummond Co.* ............................................................ 10

        5.    *Doe VIII v. Exxon Mobil Corp.* .............................................. 12

    C.    The Amended Complaints ................................................................... 13

        1.    Plaintiffs Have Not Changed Their Fundamental Premise That Chiquita Is Liable for Any Injury Allegedly Inflicted By Colombian Armed Groups. ........................................................ 13

        2.    Plaintiffs Merely Add To Their Roster of Insufficient and Inaptly Generalized State-Action and War-Crimes Allegations. .............. 15

        3.    The Amended Complaints Add Insufficient, Conclusory, and Contradictory Allegations That Chiquita Shared the Violent Purposes of Diametrically Opposed Colombian Armed Groups. ............ 16

ARGUMENT ..................................................................................................... 18

I.    PLAINTIFFS' CORE LEGAL THEORY REMAINS "TERRORISM SUPPORT," YET THEY DO NOT ALLEGE ANY SOURCE OF INTERNATIONAL LAW SHOWING THAT SUCH A CLAIM IS CLEARLY DEFINED OR UNIVERSALLY RECOGNIZED AS REQUIRED BY *SOSA*............................................................................................... 18

II.    EVEN IF THE COURT WERE TO ANALYZE THE COMPLAINTS AS PRESENTING 1,200 CLAIMS OF ACCESSORIAL LIABILITY FOR 1,200 SEPARATE VIOLATIONS OF INTERNATIONAL LAW, THE COMPLAINTS DO NOT PLEAD THE ELEMENTS OF THOSE CLAIMS. .............. 22

## TABLE OF CONTENTS

Page(s)

A. The Amended Complaints Fail to Plead That Any of The Vaguely Alleged Murders By Private Armed Groups in Colombia Constitutes An Actionable International-Law Violation. ........................................................ 23

　　1. *Sinaltrainal* Forecloses Plaintiffs' Reliance Upon Generalized Allegations of a Cooperative Relationship Between the Colombian Government and the Paramilitaries to Plead State Action. ..................................................................................................... 23

　　2. This Court Is Precluded Under *Sosa* From Entertaining Plaintiffs' Extraordinary Claim That the Government of Colombia—An Ally of the United States—Was Complicit in the Murders of Thousands of Its Own Citizens. ...................................... 25

　　3. Plaintiffs Cannot Evade the State-Action Requirement By Characterizing All Murders by Private Armed Groups as "War Crimes." ...................................................................................................... 25

B. Even If Each of the Murders and Injuries Constituted An International-Law Violation By the AUC Or the FARC, Plaintiffs Have Not Pled Facts Sufficient To Establish Chiquita's Liability For Any of the 1,200 Deaths and Injuries. ........................................................................................ 28

III. THE AMENDED COMPLAINTS FAIL TO ALLEGE STATE-LAW CAUSES OF ACTION. ................................................................................ 32

CONCLUSION ...................................................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES

*Abagninin v. Amvac Chem. Corp.*,
  545 F.3d 733 (9th Cir. 2008) ................................................23

*Aldana v. Del Monte Fresh Produce, N.A. Inc.*,
  416 F.3d 1242 (11th Cir. 2005) (per curiam).................................. 27-28

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .............................................. *passim*

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................30

*Berlin Democratic Club v. Rumsfeld*,
  410 F. Supp. 144 (D.D.C. 1976) .....................................13, 34

*Cabello v. Fernandez-Larios*,
  402 F.3d 1148 (11th Cir. 2005) .........................................11

*Cardenas v. Smith*,
  733 F.2d 909 (D.C. Cir. 1984) .........................................34

*Doe v. Drummond Co.*,
  No. 7:09-CV-01041-RDP (N.D. Ala. Nov. 9, 2009) ...................... *passim*

*Doe I v. Exxon Mobil Corp.*,
  No. 01-1357 (D.D.C. Sept. 30, 2009) ....................................12

*Doe I v. Exxon Mobil Corp.*,
  393 F. Supp. 2d 20 (D.D.C. 2005) ......................................13

*Doe VIII v. Exxon Mobil Corp.*,
  658 F. Supp. 2d 131 (D.D.C. 2009) ...............................12, 13, 33, 34

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .........................................30

*Higgins v. Washington Metropolitan Area Transit Authority*,
  507 F. Supp. 984 (D.D.C. 1981) .......................................32

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950)................................................13, 34

## <u>TABLE OF AUTHORITIES</u>

Page(s)

*Julin v. Chiquita Brands International, Inc.*,
    Nos. 08-01916-MD, 08-20641-CIV-KAM,
    2010 WL 432426 (S.D. Fla. Feb. 4, 2010) ................................................................. 1-2, 30

*Parker v. Grand Hyatt Hotel*,
    124 F. Supp. 2d 79 (D.D.C. 2000) ........................................................................32

*Pinkerton v. United States*,
    328 U.S. 640 (1946)........................................................................9

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633 (S.D.N.Y. 2006)........................................................................10

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009)........................................................................ *passim*

*Romero v. Drummond Co.*,
    552 F.3d 1303 (11th Cir. 2008) ........................................................................24

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009) ........................................................................ *passim*

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)........................................................................ *passim*


### STATE CASES

*Lipton v. Lockheed Aircraft Corp.*,
    125 N.Y.S.2d 58 (N.Y. Sup. Ct. 1953) ........................................................................33

*Tackling v. Chrysler Corp.*,
    185 A.2d 238 (N.J. Super. Ct. 1962) ........................................................................33


### DOCKETED CASES

*Does 1 through 976 v. Chiquita Brands International, Inc.*,
    No. 1:10-cv-00404 (D.D.C.)........................................................................5, 14

*United States v. Chiquita Brands International Inc.*,
    Crim. No. 07-055, (Mar. 19, 2007)........................................................................17

iv

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### FEDERAL STATUTES

18 U.S.C. § 2333(a) ..........................................................................................................1

18 U.S.C. § 2335(a) ........................................................................................................35

### STATE STATUTES

D.C. Code § 12-301(4)......................................................................................................32

D.C. Code § 12-301(8)......................................................................................................32

Fla. Stat. Ann. § 95.11(4)(d)............................................................................................33

N.J. Stat. Ann. § 2A:14-2(a)............................................................................................33

N.J. Stat. Ann. § 2A:31-3.................................................................................................33

N.Y. C.P.L.R. § 202..........................................................................................................33

N.Y. C.P.L.R. § 214(5).....................................................................................................33

N.Y. C.P.L.R. § 215..........................................................................................................33

Ohio Rev. Code § 2125.02(D)(1) ....................................................................................33

Ohio Rev. Code § 2305.10(A) .........................................................................................33

## INTRODUCTION

In moving to dismiss plaintiffs' original Alien Tort Statute ("ATS") claims, Chiquita made two principal arguments: (1) that there is no well-defined and broadly accepted rule of international law providing a civil claim for terrorism support, the indisputable gravamen of plaintiffs' ATS claims; and (2) that even if the Court were to analyze plaintiffs' complaints under the ill-fitting rubric of "secondary liability" for purported "extrajudicial killings," "war crimes," or "crimes against humanity," the complaints would still fail to plead facts supporting the essential elements of such claims for *any* of the hundreds of acts of violence alleged.  Nothing in plaintiffs' amended complaints bolsters their position against either argument.  To the contrary, their additional allegations reinforce the grounds upon which Chiquita sought dismissal and confirm that the complaints should be dismissed with prejudice.

As to the first argument, plaintiffs have reordered their causes of action to downplay their claims of terrorism support, but there can be no doubt that terrorism support remains precisely what the lawsuits allege.  In the amended complaints, plaintiffs continue to assert, through long strings of vague, repetitive paragraphs, that Chiquita's alleged "material support" of armed groups on the left and the right renders it liable for every injury perpetrated by both sides of the civil unrest in Colombia during the past 20 years.  The amended complaints reaffirm this extraordinary theory, adding rote claims on behalf of scores of new alleged victims of Colombian violence, including persons killed after Chiquita left the country, without pleading a single fact linking Chiquita to any of it apart from the generalized assertion of material support.

To be sure, this Court recently held that a claim of terrorism support may proceed when brought *by Americans* under the Antiterrorism Act (ATA), 18 U.S.C. § 2333(a), which expressly creates a civil remedy for American victims of acts of international terrorism, *see Julin v. Chiquita Brands Int'l, Inc.*, Nos. 08-01916-MD, 08-20641-CIV-KAM, 2010 WL 432426 (S.D.

Fla. Feb. 4, 2010) (D.E. #278).  But a far different standard applies to claims brought by aliens under the ATS.  The ATS provides jurisdiction only if aliens can show that their claims are based upon *clearly defined* and *universally recognized* norms of international law.  *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).   The earlier briefing and argument demonstrated that generalized terrorism support—a claim that no U.S. court has *ever* recognized in an ATS case, and several have expressly rejected—does not come close to satisfying the *Sosa* standard, neither today nor at any time during the past two decades when these torts were allegedly committed.  Because the amended complaints do not allege any new or previously undisclosed source of international law supporting plaintiffs' claims, they should be dismissed in their entirety.

But even if the Court were to overlook the absence of a specific, clear, and widely accepted international-law norm supporting plaintiffs' core theory of terrorism support, recent precedent of this Circuit requires that plaintiffs' secondary liability claims be rejected as inadequately pled.  Since the motions to dismiss were argued, the Eleventh Circuit decided *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009), which held that under the federal pleading standard established by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), ATS claims indistinguishable from those presented here were properly dismissed.  The *Sinaltrainal* court held that alleged acts of violence by Colombian paramilitaries were not acts of the state, nor did they qualify under the very limited state-action exception for war crimes.  578 F.3d at 1265-67.  That ruling is dispositive here.

In addition to *Sinaltrainal*'s holdings on state action and war crimes, other recent case law establishes that plaintiffs' theories of secondary liability are deficient.  In *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009), the Second Circuit held that the *mens rea* standard for secondary liability under international law is "purpose rather

2

than knowledge alone"—*i.e.*, that the secondary actor must assist the principal violator with the *intent* of facilitating the primary violation, not merely with *knowledge* that its assistance may have that effect.  Last fall, a district court in the Eleventh Circuit adopted the *Talisman* standard in rejecting similar claims for aiding and abetting and/or conspiring with Colombian paramilitaries.  *Doe v. Drummond Co.*, No. 7:09-CV-01041-RDP, slip op. at 16-17 (N.D. Ala. Nov. 9, 2009) (attached as Ex. A).

This standard is fatal to plaintiffs' secondary liability claims.  Plaintiffs lard their amended complaints with conclusory allegations in an effort to suggest that Chiquita was not an extortion victim of these violent groups, but a willing collaborator.  Such conclusory allegations are entitled to no weight under *Iqbal* and *Sinaltrainal*; moreover, they are illogical and contradictory in that they implausibly assert that Chiquita shared the violent aims and objectives of *both* the guerillas and their sworn enemy, the paramilitaries.

The harmful "practical consequences" of allowing plaintiffs' expansive claims to proceed—which *Sosa* commanded lower courts to consider in deciding whether to recognize the cause of action, 542 U.S. at 732-33—are even more stark today than when Chiquita filed its original motion.  The amended complaints add nearly 300 new plaintiffs, and according to the public statements of plaintiffs' counsel, thousands more will be added if the motions to dismiss are denied.  Indeed, a new ATS action on behalf of nearly 1,000 plaintiffs was filed last month in the District of Columbia (*see* p. 5, *infra*), and will soon be transferred here.

Moreover, given the armed groups' notorious practice of demanding payment of the "vacuna" or extortive levy from businesses and landowners throughout Colombia, many new defendants will likely be added to the MDL if plaintiffs' expansive theory of liability is recognized.  The Court will find itself in the perilous position of attempting to decide, through

3

litigation, sensitive matters of foreign policy that the Constitution properly entrusts to the political branches.  This includes, among other things, resolving plaintiffs' blithe accusation that the Government of Colombia—America's closest ally in South America—was complicit in the murder of thousands of its own people.  And once started, the process of adjudicating "the entire Colombian conflict as a single large-scale mass tort" (*see* Chiquita's Reply Br. 32), which continues to describe accurately what plaintiffs seek to do here, will be impossible to administer and impossible to settle.  The Eleventh Circuit, speaking specifically about this Colombian conflict, warned in *Sinaltrainal* that federal courts cannot "be open to lawsuits occurring during any period of civil unrest in a foreign country."  578 F.3d at 1267.  This Court should heed that instruction and dismiss these ATS lawsuits.

## BACKGROUND

### A.    Procedural History

Chiquita moved to dismiss the five ATS actions currently pending in the MDL; the Court heard argument on Chiquita's motion on February 27, 2009.  (D.E. #209.)[1]  On December 23,

---

[1]    Before the MDL Panel transferred these cases, Chiquita filed motions to dismiss the D.C. Complaint and the Carrizosa Complaint.  After the MDL Panel's transfer order, Chiquita filed a consolidated motion to dismiss the New Jersey, New York, and Valencia Complaints pursuant to this Court's First Case Management Order.  The briefs as well as the supplemental submissions of all parties relevant to the pending motions to dismiss are docketed as follows: D.C. Complaint, No. 08-md-1916-KAM: Chiquita's Motion to Dismiss (D.E. #163), Plaintiffs' Opposition (D.E. #119), Chiquita's Reply (D.E. #164); Carrizosa Complaint, No. 1:07-cv-60821-KAM: Chiquita's Motion to Dismiss (D.E. #33), Plaintiffs' Opposition (D.E. #39), Chiquita's Reply (D.E. #45); New Jersey, New York, and Valencia Complaints, No. 08-md-1916-KAM: Chiquita's Consolidated Motion to Dismiss (D.E. #93) ("Chiquita's Opening Br."), Plaintiffs' Consolidated Opposition (D.E. #111), New York Plaintiffs' Opposition (D.E. #109), New Jersey Plaintiffs' Opposition (D.E. #109), Valencia Plaintiffs' Opposition (D.E. #110), Chiquita's Consolidated Reply (D.E. #148) ("Reply Br."); Supplemental Briefs on *Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008): Plaintiffs' Notice of Supplemental Authority (D.E. #183), Chiquita's Response (D.E. #187); Supplemental Briefs on *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009): Plaintiffs' Notice of Supplemental Authority (D.E. #192), Chiquita's Response (D.E. #198); Supplemental Briefs on *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009): (continued…)

2009, this Court issued an order granting plaintiffs permission to amend their complaints as a matter of course.  (D.E. #275.)  Chiquita thereafter consented to amended complaints in all of the actions, including the two ATS actions in which amended complaints had previously been filed. (D.E. #282.)  On February 26, 2010, plaintiffs in all five ATS actions filed amended complaints.[2]

In addition, on March 9, 2010—nearly two weeks after the deadline for filing amended complaints—Paul Wolf, co-counsel in the D.C. action for Does 1-144 (and now Perezes 1-95), filed a new ATS action in the U.S. District Court for the District of Columbia on behalf of 976 anonymous plaintiffs.  *See Does 1 through 976 v. Chiquita Brands Int'l, Inc.*, No. 1:10-cv-00404 (D.D.C.).  Like the plaintiffs in the other ATS actions, these 976 new plaintiffs allege that they are survivors of Colombian nationals murdered by the AUC in Colombia and seek to collect damages from Chiquita under the ATS, the Torture Victims Protection Act ("TVPA"), and state tort law.  On April 7, 2010, the MDL Panel issued a conditional order transferring *Does 1-976* to this Court and stayed the order for 14 days pursuant to MDL Rule 7.4 to determine whether any party opposes transfer.  If no party opposes transfer, the MDL Panel will transfer *Does 1-976* to this Court on April 21, 2010.

---

Plaintiffs' Supplemental Brief (D.E. #247), Chiquita's Supplemental Brief (D.E. #248); Supplemental Briefs on *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009): Chiquita's Notice of Supplemental Authority (D.E. #261), Plaintiffs' Response (D.E. #265), Chiquita's Response and Motion to Strike (D.E. #266), Plaintiffs' Response to Motion to Strike (D.E. #267); Supplemental Briefs on *Doe v. Drummond Co.*, No. 7:09-CV-01041-RDP (N.D. Ala. Nov. 9, 2009): Chiquita's Notice of Supplemental Authority (D.E. #268). Chiquita hereby incorporates all of its prior submissions.

[2]      D.E. #283 (Fifth Amended NY Complaint) ("NY Compl."); D.E. #284 (Second Amended Valencia Complaint) ("Valencia Compl."); D.E. #285 (First Amended NJ Complaint) ("NJ Compl."); D.E. #287 (First Amended DC Complaint) ("DC Compl."); D.E. #84, No. 1:08-cv-20641-KAM (First Amended Carrizosa Complaint) ("Carrizosa Compl.").

**B.      Recent Developments In ATS Case Law**

Important developments in ATS case law since the original briefing both provide important context for plaintiffs' amendments and strongly support Chiquita's motion to dismiss.

**1.      *Sinaltrainal v. Coca-Cola***

In *Sinaltrainal*, the Eleventh Circuit affirmed the dismissal of ATS and TVPA claims brought by Colombian trade union leaders who alleged that their employers had not only financed, but collaborated with, Colombian paramilitaries to commit specific acts of murder and torture.  578 F.3d at 1257.  Like plaintiffs here, the *Sinaltrainal* plaintiffs relied on theories of accessorial liability under the ATS and TVPA in an effort to establish a corporation's liability for alleged criminal acts of the paramilitaries.  *Id.* at 1265.  Also like plaintiffs here, the *Sinaltrainal* plaintiffs sought to satisfy their obligation to plead state action by alleging that the paramilitaries and the Colombian government had a generally cooperative relationship.  *Id.* at 1266.  Finally, like plaintiffs here, the *Sinaltrainal* plaintiffs asserted ATS claims for war crimes, which do not require state action.  They alleged that the plaintiffs were "targeted for violence to further [the] Defendants' business interests in becoming union-free" and that the defendants "use[d] open violence to accomplish this end."  *Id.* at 1267.

The Eleventh Circuit unanimously affirmed the district court's dismissal of the plaintiffs' claims.  The court first discussed *Sosa*'s admonition that the ATS "empowers federal courts to entertain 'a very limited category' of claims," *id.* at 1262 (quoting *Sosa*, 542 U.S. at 712), subject to—as the court emphasized with italics—"*vigilant doorkeeping*," *id.* at 1263 (quoting *Sosa*, 542 U.S. at 729).  Guided by *Sosa*'s admonition and the pleading requirements of *Iqbal*, the court dismissed the plaintiffs' state-action-based claims, holding—consistent with the case law cited in Chiquita's original motion to dismiss—that, to survive a motion to dismiss a state-action-based claim under the ATS, a plaintiff must set forth "allegations of a symbiotic relationship [between

a private tortfeasor and the state] that *involves the torture or killing alleged in the complaint*."
*Id.* at 1266 (emphasis added) (quotation marks and citation omitted).  Reviewing the allegations
in the *Sinaltrainal* complaints, the Eleventh Circuit concluded that "[t]here is no suggestion
[that] the Colombian government was involved in, much less aware of, the murder and torture
alleged in the complaints."  *Id.* at 1266.

The Eleventh Circuit also held that the plaintiffs could not recast their claims as "war
crimes."  In so holding, the court squarely "reject[ed] the plaintiffs' argument that it is sufficient
for the purposes of ATS jurisdiction that the violation perpetrated by a non-state actor merely
occur during an armed civil conflict."  *Id.* at 1267.  Rather, in light of "[t]he Supreme Court's
reminder to exercise 'vigilant doorkeeping,'" the court held that "the war crimes exception
applies only to claims of non-state torture that were perpetrated in the course of hostilities"—*i.e.*,
"in the course of civil war clashes."  *Id.*  The court noted that, although Colombia's civil strife
provided "the background for the[se] unfortunate events," it "did not precipitate the violence that
befell the plaintiffs."  *Id.*  In so holding, the court warned against the practical consequences of a
broader rule:  "If the war crimes exception to the state action requirement permitted all non-state
torture claims occurring during a period of civil disorder, federal courts would be open to
lawsuits occurring during any period of civil unrest in a foreign country."  *Id.*

### 2.   *Ashcroft v. Iqbal*

In *Sinaltrainal*, the Eleventh Circuit made clear that *Ashcroft v. Iqbal*, 129 S. Ct. at 1937,
applies with full force to ATS claims.  Under *Iqbal*, also decided after the briefing on Chiquita's
motion to dismiss, plaintiffs must plead *facts* in support of each of their theories of liability;
conclusory allegations in support of novel international-law theories "do not suffice."  *Iqbal*, 129
S.Ct. at 1949; *accord Sinaltrainal*, 578 F.3d at 1260 (citing *Iqbal*, 129 S.Ct. at 1949).  Plaintiffs'
factual allegations must also show a *plausible* claim for relief in light of the Court's "judicial

experience and common sense." *Iqbal*, 129 S.Ct. at 1950; *accord Sinaltrainal*, 578 F.3d at 1260 (citing *Iqbal*, 129 S.Ct. at 1950). Factual allegations that are "merely consistent" with a defendant's liability or that "do not permit the court to infer more than the mere possibility of misconduct" are insufficient to state a claim. *Iqbal*, 129 S.Ct. at 1949-50; *accord Sinaltrainal*, 578 F.3d at 1260-61 (paraphrasing the quoted text and citing *Iqbal*).

Applying the pleading rules of *Iqbal*, the Eleventh Circuit in *Sinaltrainal* rejected as conclusory and insufficient plaintiffs' claims of conspiracy. 578 F.3d at 1268-69. The allegations related to injuries sustained by three union leaders who were falsely accused by a plant manager of planting a bomb in the defendant's bottling facility and then arrested, beaten, and threatened at gunpoint by the police, allegedly in retaliation for participation in a strike. *Id.* at 1267-68. The plaintiffs alleged that the plant manager's plan "necessarily required the cooperation and complicity of the arresting police officers" who "had to be willing to arrest and imprison the union leaders without any evidence of the non-existent bomb." *Id.* at 1268. The court noted that, under *Iqbal,* it was "not required to admit as true [the] unwarranted deduction of fact" that the plant manager's plan necessarily required cooperation of the arresting police officers. *Id.* The court also observed that "[t]he premise for the conspiracy is alleged to be either payment of money or a shared ideology" and that those allegations "fail to provide any factual content that allow[ed the court] 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949).

### 3. *Presbyterian Church of Sudan v. Talisman Energy*

In *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, the Second Circuit rejected ATS claims brought by Sudanese nationals alleging that Talisman had aided and abetted or conspired with the Sudanese government to commit human rights abuses. 582 F.3d at 247. Because the underlying acts were committed by state actors, *Talisman* focused on the secondary

liability theories that the plaintiffs asserted in an effort to hold a corporate defendant responsible for those acts.

The Second Circuit adopted the standard for pleading the elements of aiding and abetting liability under international law that Chiquita had advanced in its prior briefs.  (*E.g.*, Chiquita's Opening Br. 50-51, 53-54.)  Under this standard, a defendant may be liable for aiding and abetting a violation of international law only when he "'(1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the *purpose* of facilitating the commission of that crime.'"  *Talisman*, 582 F.3d at 258 (emphasis added and citation omitted).  Knowledge alone does not suffice.  *Id.* at 259 ("[T]he *mens rea* standard for aiding and abetting liability in ATS actions is *purpose rather than knowledge alone*.") (emphasis added).  The court held that *Sosa* compelled application of this more exacting requirement because "[o]nly a purpose standard . . . has the requisite 'acceptance among civilized nations' for application in an action under the ATS."  *Id.* at 259 (quoting *Sosa*, 542 U.S. at 732).

The Second Circuit similarly held that the plaintiffs' conspiracy theory was governed by international law, and that, to the extent such a theory was cognizable under international law and thus the ATS, "an essential element" is the alleged conspirator's "'criminal intention to participate in a common criminal design.'"  *Id.* at 260 (citation omitted).  The court thus concluded that "plaintiffs' conspiracy claims would require the same proof of *mens rea* as their claims for aiding and abetting."  *Id.*  The court also held that there was no international-law consensus recognizing the *Pinkerton* doctrine, under which conspirators may be liable for reasonably foreseeable acts of co-conspirators that they did not intend, and that therefore the doctrine does not apply in ATS cases.  *Id.*; *see Pinkerton v. United States*, 328 U.S. 640 (1946).

The Second Circuit reviewed the plaintiffs' evidence to determine whether it supported an inference that Talisman acted *with the purpose* to advance the Sudanese government's human rights abuses. *Talisman*, 582 F.3d at 260. The plaintiffs had presented evidence showing that Talisman made payments to the Sudanese government knowing that the government would use the funds "to buy weapons and fund militias to further . . . 'genocidal policies'" and provided critical resources, including upgraded airstrips, roads, fuel, and logistical support, that it knew would allow Sudanese forces to launch attacks on civilians. *Id.* at 262-63; *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 648 (S.D.N.Y. 2006). Despite Talisman's clear *knowledge* of the effect of its assistance, the court held these facts were insufficient because they did not "support[] an inference that Talisman acted with the '*purpose*' to advance the Government's human rights abuses" or that Talisman was "a partisan in regional, religious, or ethnic hostilities." *Id.* at 260, 263 (emphasis added).

### 4. *Doe v. Drummond Co.*

In *Doe v. Drummond Co.*, the Northern District of Alabama rejected ATS and TVPA claims brought by Colombian nationals alleging that Drummond was responsible for their relatives' murders based on payments made to paramilitaries. No. 7:09-CV-01041-RDP, slip op. at 1-2. The *Drummond* court found deficient plaintiffs' allegations relating to both the underlying primary violations *and* the secondary liability theories. Although the *Sinaltrainal* court had declined to decide whether a heightened pleading standard applies to ATS cases, 578 F.3d at 1265 n.14, the *Drummond* court held that the high bar set by *Sosa* and *Iqbal* is raised even higher in ATS cases: "claims brought under the ATS are subject to a heightened pleading standard" under which "[j]urisdictional concerns are not satisfied by merely alleging a colorable violation of the law of nations." No. 7:09-CV-01041-RDP, slip op. at 6 n.5.

10

Applying *Sinaltrainal*'s standard for state action, the *Drummond* court noted that, despite their length and detail, the plaintiffs' state-action allegations established only "a *general* relationship between the paramilitaries and the Colombian government." *Id.* at 8. The court concluded that the allegations "wholly failed to meet the standard required by the Eleventh Circuit," by failing to allege "that the paramilitaries acted as an arm of the state *when they murdered the decedents presented by the Complaint.*" *Id.* at 10-11 (emphasis added).

The court also found deficient plaintiffs' war-crimes allegations. *Id.* at 13. The court held that it was insufficient to allege that Drummond had agreed to provide financial support to the AUC in order to "pacify the local population" and "drive the FARC out of Drummond's areas"; instead, the court held that, under *Sinaltrainal*, in order to survive a motion to dismiss, the plaintiffs had to allege that "Drummond intentionally 'took a side' in the political unrest in Colombia in order to advance one side of those interests as opposed to the other." *Id.* at 13. The court heeded *Sinaltrainal*'s practical concern about recognizing the plaintiffs' claims as war crimes, noting that "[i]f Plaintiffs' claims as set out in the current Complaint were sufficient to allow subject matter jurisdiction to attach under the ATS, then whenever an innocent person was murdered during an 'armed conflict' anywhere in the world . . . the federal courts would have subject matter jurisdiction over the dispute," which would contravene *Sosa*'s narrow concept of ATS jurisdiction. *Id.* at 14-15.

The court also rejected the plaintiffs' secondary liability theories on the ground that they did not satisfy the purpose standard set forth in *Talisman*. The court noted that, because the ATS standard for aiding and abetting was not contested (and therefore not decided) in *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), the court should decide what standard to apply "on a clean slate." *Drummond*, No. 7:09-CV-01041-RDP, slip op. at 16. The court

11

adopted the *Talisman* purpose standard, finding it "consistent with *Sosa*'s command that courts act as 'vigilant door keepers' and exercise restraint in recognizing new causes of action under the ATS." *Id.* at 21 (brackets omitted) (quoting *Sosa*, 542 U.S. at 729).  Applying that standard, the court concluded that the facts alleged were insufficient to support an inference of purpose, because while "Drummond allegedly served, however inadvertently, to shore up forces of the AUC such that they would be a formidable force against the FARC," "there are no allegations even purporting to establish that Drummond 'was a *partisan* in regional, religious, or ethnic hostilities' or that Drummond 'acted with the purpose to assist persecution.'" *Id.* (emphasis added).

The *Drummond* court also followed *Talisman* in determining that a conspiracy claim under the ATS requires the same proof of *mens rea* as an aiding and abetting claim.  *Id.* at 22-23. The court concluded under that framework that the plaintiffs' conspiracy claims "fail several times over" because the complaint did not allege that Drummond had entered into an agreement with the AUC to violate the law of nations, much less with the *intent* to murder plaintiffs' relatives, as opposed to mere knowledge of such potential violations.  *Id.* at 25.

### 5.   *Doe VIII v. Exxon Mobil Corp.*

In *Doe VIII v. Exxon Mobil Corp.*, the District Court for the District of Columbia dismissed state common law claims brought by Indonesian plaintiffs against Exxon Mobil.  *Doe VIII v. Exxon Mobil Corp.*, 658 F. Supp. 2d 131, 132 (D.D.C. 2009); *see also Doe I v. Exxon Mobil Corp.*, No. 01-1357 (D.D.C. Sept. 30, 2009) (adopting order issued in *Doe VIII*).  The plaintiffs alleged that Exxon Mobil had hired members of the Indonesian military to provide security for a natural gas field in Indonesia, and that the hired soldiers had committed a variety of offenses against the plaintiffs at the direction of Exxon Mobil.  *Doe VIII v. Exxon Mobil*, 658 F.

Supp. 2d at 132.  In *Doe I v. Exxon Mobil*, the court had previously dismissed the plaintiffs' ATS and TVPA claims for failure to state a claim.  *See* 393 F. Supp. 2d 20, 24-28 (D.D.C. 2005).

The court dismissed the plaintiffs' state-law claims for lack of standing, adopting as a limitation on Article III standing "'the general rule that non-resident aliens have no standing to sue in United States courts.'"  *Doe VIII*, 658 F. Supp. 2d at 134 (citing *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 152 (D.D.C. 1976) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 776 (1950))).  The court noted three exceptions to this general rule, when (1) the *res* is in the United States; (2) the statutory scheme allows suits by non-resident aliens; or (3) the alien is seized abroad and transported back to the United States for prosecution.  *Id.*  Concluding that none of those exceptions applied, the court dismissed the plaintiffs' state-law claims, holding that "where a non-resident alien 'is harmed in his own country, he cannot and should not expect entitlement to the advantages of a United States court.'"  *Id.* at 135 (quoting *Berlin Democratic Club*, 410 F. Supp. at 152).

**C.     The Amended Complaints**

These recent decisions—which clearly reflect a pronounced movement in the courts toward a more restrained view of the permissible scope of ATS claims—undoubtedly motivated plaintiffs' amendments.  But aside from adding more paragraphs, pages, and plaintiffs to their already massive complaints, plaintiffs do nothing to address the fundamental deficiencies addressed in Chiquita's original motion to dismiss.

**1.      *Plaintiffs Have Not Changed Their Fundamental Premise That Chiquita Is Liable for Any Injury Allegedly Inflicted By Colombian Armed Groups.***

Notwithstanding their effort to re-characterize their terrorism-support claims as aiding and abetting or conspiring to commit hundreds of specific torts, plaintiffs still allege few or no facts to support *any* of those torts.  The individual claims continue to be laid out in long strings

13

of relatively short, mostly conclusory paragraphs with virtually no detail about the killings and no facts tying Chiquita to the asserted death or injury.  In general, these paragraphs allege only that on a certain date an anonymous victim was "killed," "disappeared," or otherwise injured; that the tortious act was done "by the AUC," "by the FARC," by some other named group, or even more vaguely, by unnamed "paramilitaries" or "guerillas"; and that these groups "received support from Chiquita."  This follows the pattern of the original complaints, but now there are nearly 300 additional anonymous victims,[3] bringing to nearly 1,200 the total number of claims that plaintiffs ask this Court to manage and resolve.  (After the MDL Panel transfers the *Does 1 through 976* complaint to this Court, the total number of alleged victims will exceed 2,150 Colombian nationals.)  Many of these victims were killed *after* Chiquita left Colombia,[4] further demonstrating that plaintiffs' theory is not that Chiquita has any link to these murders, but that its alleged past support renders it liable for all subsequent acts of violence committed by these armed groups.

---

[3]     *See* DC Compl. ¶¶ 196-390 (105 new alleged victims of paramilitary and guerrilla violence); Carrizosa Compl. ¶¶ 72-87 (18 new alleged victims of AUC violence); NJ Compl. ¶¶ 12-14, 153-162 (three new alleged victims of AUC violence); NY Compl. ¶¶ 716-807 (roughly 91 new alleged victims of AUC violence); Valencia Compl. ¶¶ 463-833 (roughly 67 new alleged victims of AUC violence).

[4]     *See, e.g.*, NY Compl. ¶ 875 ("In June 2004, defendant CHIQUITA sold Banadex."); *id.* ¶¶ 50, 68, 73, 75, 84, 120, 135-37, 141, 143, 146, 148, 153-54, 162-64, 168-71, 183, 187, 191, 199, 201, 203, 206, 209-10, 213, 216, 234, 238, 244, 246, 251, 261, 281, 287, 290, 296, 301, 303, 306, 309, 314, 329-30, 335, 3441, 345, 350-51, 355, 365-68, 370-71, 373, 375, 378, 381-82, 388-90; 396, 399, 401, 407, 409, 423, 425, 431, 450, 455, 456, 462, 465, 476-77, 479-80, 482, 487, 489. 493, 496, 506, 513, 517-19, 523, 529-30, 535, 537, 549, 551-52, 557, 559, 563, 565, 573-75, 577, 587, 600, 604, 608, 642, 658, 661, 663, 669-70, 678-80, 686-87, 695, 699-700, 704, 707, 709, 711-12, 715, 718-21, 725, 732-33, 741-42, 748, 750, 772, 777, 782, 788, 790, 792-93, 795.

## 2. *Plaintiffs Merely Add To Their Roster of Insufficient and Inaptly Generalized State-Action and War-Crimes Allegations.*

With respect to state action, plaintiffs do not even attempt to allege the involvement of a government actor in any of the alleged killings.  Instead, ignoring the instruction of *Sinaltrainal*, plaintiffs' amended complaints simply add more generalized and conclusory allegations that Colombian government officials collaborated with the paramilitaries as part of the government's strategy for defeating the leftist guerillas[5] and that paramilitarism was "state policy" in Colombia,[6] even while acknowledging that Colombian law has long considered paramilitarism illegal.[7]  In an attempt to support their legally insufficient but extraordinary claim that every killing they label an "AUC murder" was, in fact, a state-sponsored execution carried out by the Colombian government, the plaintiffs go so far as to allege—and thus apparently expect this Court to decide—that the current president of Colombia and other top officials were involved in the funding, arming, and supplying of information to the AUC.[8]

Apparently recognizing the weakness of such generalized state-action allegations, plaintiffs have revised their claims to characterize these disparate violent acts as "war crimes" or "crimes against humanity" that assertedly do not require state action.  The D.C. plaintiffs—who previously alleged only the state-action tort of extrajudicial killing under the ATS and the TVPA—added war-crimes and crimes-against-humanity claims as their first and second causes

---

[5]    *See* DC Compl. ¶¶ 429-432; Carrizosa Compl. ¶¶32-36; NJ Compl. ¶¶ 27, 45-70; Valencia Compl. ¶¶ 146-177.

[6]    *See* DC Compl ¶ 407; Carrizosa Compl. ¶ 28; NJ Compl. ¶ 26; Valencia Compl. ¶ 128.

[7]    *See* DC Compl. ¶¶ 408, 411; Valencia Compl. ¶¶ 129, 133; NJ Compl. ¶ 27 (acknowledging the "official criminalization of paramilitaries").

[8]    DC Compl. ¶ 423; NJ Compl. ¶ 39; Valencia Compl. ¶ 141.

of action.[9]  The Carrizosa plaintiffs—who previously alleged only ATS claims for material support and extrajudicial killing—similarly added claims for war crimes and crimes against humanity, as well as state-law claims for wrongful death and loss of consortium.[10]  The New Jersey plaintiffs reorganized their claims to make war crimes their first cause of action.[11]

But the new allegations are no less generalized and conclusory than the original allegations.  In response to *Sinaltrainal*'s holding that killings perpetrated against the background of a civil war are *not* war crimes, plaintiffs simply assert, without any supporting fact or explanation, that the alleged AUC victims "were not killed simply against the background of war; rather the use of criminal violence and intimidation against civilians . . . was part of the war strategy against FARC."[12]  Similarly, plaintiffs' new crimes-against-humanity allegations are transparently conclusory, alleging that decedents' murders—carried out over more than a decade—were a "systematic attack."[13]  Plaintiffs plead no new allegations supporting these claims apart from those related to their war-crimes claims.  In fact, the D.C. plaintiffs state that crimes against humanity are "inherent in" war crimes.[14]

### 3.   *The Amended Complaints Add Insufficient, Conclusory, and Contradictory Allegations That Chiquita Shared the Violent Purposes of Diametrically Opposed Colombian Armed Groups.*

Plaintiffs have embellished their allegations of Chiquita's "support" of the AUC in an attempt to satisfy the *mens rea* standard required by *Talisman* and *Drummond*:  they *say* that

---

[9]    DC Compl. ¶¶ 491-579.

[10]   Carrizosa Compl. ¶¶ 106-109, 119-121, 122-124.

[11]   NJ Compl. ¶¶ 191-214.

[12]   DC Compl. ¶ 504; NJ Compl. ¶ 202; Valencia Compl. ¶ 893.

[13]   Carrizosa Compl. ¶ 91, 107; DC Compl. ¶ 414; NJ Compl. ¶ 33; Valencia Compl. ¶ 136.

[14]   DC Compl. ¶¶ 574, 578; *see also* NJ Compl. ¶¶ 211-213; Valencia Compl. ¶¶ 866-868.

Chiquita's support to Colombian armed groups was not extorted, but rather *intended* to assist the FARC guerrillas and AUC paramilitaries (among other groups) in committing the 1,200 killings and injuries alleged in the complaints.  But the allegations still lack any factual content to support this far-fetched inference.  *Sinaltrainal*'s jurisdictional requirements are not an exercise in uttering magic words; there must be substance to the allegations that permits a reasonable inference.  Plaintiffs fail that test at every turn.

The amended complaints allege that Chiquita paid the AUC in exchange for the AUC's services in "pacifying" the banana growing regions,[15] but the new allegations are implausible in suggesting that Chiquita would want to have its own workers killed and incoherent in advancing the contradictory and inherently absurd theory that Chiquita purposefully chose *both* sides of this internal Colombian conflict, willingly supporting both the paramilitaries as well as their guerilla enemies.[16]  In making these allegations, plaintiffs simply ignore the fact recited in Chiquita's plea—the document that has always been the touchstone of their claims—that the company was "instructed" to make the payments and that "failure to make the payments could result in physical harm to Banadex personnel and property."  *United States v. Chiquita Brands Int'l. Inc.*, Crim. No. 07-055, Factual Proffer ¶ 21 (Mar. 19, 2007).[17]  Indeed, as the ultimate example of

---

[15]    DC Compl. ¶ 472; NJ Compl. ¶ 80; Valencia Compl. ¶ 187; *see also* DC Compl. ¶ 528; NJ Compl. ¶ 112; Valencia Compl. ¶ 223 (alleging that Chiquita "sought a meeting" with the paramilitaries, and at this meeting "[i]t was decided . . . that the banana companies would pay the paramilitaries").

[16]    *See, e.g.*, DC Compl. ¶ 5 ("Some of the Plaintiffs allege herein that their decedents were killed by the FARC during the time Chiquita was providing substantial support to that terrorist organization."); *id.* ¶ 464 ("Chiquita also provided material support to the FARC in this time frame.").

[17]    NY Compl. Ex. A. ¶ 21 (D.E. #65-1); *compare* Carrizosa Am. Compl. ¶ 35 (alleging that the AUC "requested" Chiquita's payments) *with* Carrizosa Original Compl. ¶ 31) (alleging that the AUC "instructed" Chiquita to start making payments).

this pick-and-choose strategy, one amended complaint goes so far as to incorporate by reference the Factual Proffer filed in Chiquita's criminal case to "the extent that such allegations inculpate Chiquita," while disclaiming reliance on anything within it "tending to excuse or mitigate defendants' acts."[18]

Similarly, plaintiffs strive to beef up their sensational, but entirely conclusory, allegations that Chiquita engaged in weapons and drug trafficking.  When stripped to the actual facts alleged, however, plaintiffs assert only that (1) a Chiquita subsidiary operated a port in a remote region of Colombia, a country that for decades has been a hub of violence and narcotics cultivation and distribution; and (2) rather unsurprisingly, at various times, narcotics and weapons were smuggled by third parties through that port.[19]  Apart from misstatements or speculation, no *facts* are alleged to support the conclusory allegation that Chiquita—a U.S. public corporation that was thoroughly investigated by the U.S. Department of Justice for its extorted monetary payments to these armed groups—engaged in gun running or drug trafficking.

## ARGUMENT

## I.   PLAINTIFFS' CORE LEGAL THEORY REMAINS "TERRORISM SUPPORT," YET THEY DO NOT ALLEGE ANY SOURCE OF INTERNATIONAL LAW SHOWING THAT SUCH A CLAIM IS CLEARLY DEFINED OR UNIVERSALLY RECOGNIZED AS REQUIRED BY *SOSA*.

Despite the telling reshuffling of their causes of action to deemphasize their direct claims of material support, plaintiffs cannot plead their way around the fact that, as they previously

---

[18]   (NY Compl. ¶ 873.)  The Court may consider the full Factual Proffer, however.  (*See* Chiquita's Op. Br. 2 n.3); *see also*, *e.g.*, *Gross v. White*, 340 F. App'x 527, 533, 2009 WL 2074234 (11th Cir. July 17, 2009) ("[I]n ruling on a motion to dismiss, [the court] may consider not only the complaint but also the exhibits attached to it.").

[19]   *See* DC Compl. ¶¶ 480, 488; NJ Compl. ¶¶ 87, 96; Valencia Compl. ¶¶ 194, 203; NY Compl. ¶¶ 983, 994; Carrizosa Compl. ¶ 48.

conceded, their complaints "squarely raise the issue of whether terrorism and material support of terrorism of this kind are actionable under the ATS." (*See* Pls.' Consolidated Opp'n 2.)  As the above summary makes clear, plaintiffs have not retreated one inch from their expansive theory that Chiquita's extortion payments to terrorist groups supports a civil cause of action under international law by Colombian victims of alleged terrorist violence.  To the contrary, they have added hundreds more anonymous alleged victims to the litigation on the basis of the same expansive theory.  But however pled, that theory is unsustainable and contrary to *Sosa* for the reasons that Chiquita argued in its original motion to dismiss.

First, Chiquita demonstrated that its alleged conduct cannot provide plaintiffs a basis for a cause of action under the ATS because Congress expressly addressed the claim of terrorism support and refused to extend a cause of action to foreign victims.  (*See* Chiquita Opening Br. 15-17 (discussing the civil remedy under the ATA for American victims of terrorism); Reply Br. 4-5.)  Nothing has changed on the legislative front since the briefing and argument of Chiquita's original motion to dismiss.  Congress's deliberate decision to provide only American victims of terrorism with a statutory private right of action continues to be fatal to plaintiffs' claims.

Second, Chiquita demonstrated that the conduct for which plaintiffs seek to hold Chiquita liable is not governed by a well-defined and universally accepted rule of international law, as *Sosa* requires.  The earlier briefing focused principally on the one international convention that most closely "fits" the conduct of which plaintiffs complain—the International Convention for the Suppression of the Financing of Terrorism ("Financing Convention")—but Chiquita showed that the Financing Convention does not reflect the existence of a clearly defined and widely accepted customary-international-law norm supporting plaintiffs' claims.  Indeed, it proves *the opposite*:

- The Financing Convention did not even come into force until 2002 or enjoy widespread international acceptance when Chiquita's payments stopped in 2004, let alone during the whole period when Chiquita made payments to guerrillas or paramilitaries.

- The Financing Convention's text and drafting history conclusively show that it did not "codify" an existing norm of customary international law.

- The Financing Convention is accompanied by a confusing conglomerate of reservations that provide no clear and well-established definition of terrorism.

- The Financing Convention does not proscribe the general funding of terrorist groups unrelated to specific delineated terrorist acts.

- The Financing Convention requires states to develop *criminal*, *not civil* prohibitions of terrorism financing.

- The Financing Convention is not self-executing.

In their amended complaints, plaintiffs offer no source of international law that more closely parallels the substance of their claims than the Financing Convention, the obvious limitations of which—on timing, clarity, and acceptance—compel the conclusion that the claims asserted here, however plaintiffs may label them, are not cognizable under the ATS.

Finally, the astounding "practical consequences" of permitting these claims to go forward overwhelmingly counsel against recognizing plaintiffs' theory of liability. *See Sosa*, 542 U.S. at 732-33 ("[T]he determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.").  With the new D.C. action, the number of deaths and injuries alleged has more than doubled since the last round of briefing.  Plaintiffs' theory of liability remains so broad that claims conceivably could be asserted on behalf of every victim of Colombian violence going back decades and conceivably extending daily into the future.  (*See* Chiquita's Opening Br. 33-35.)  Indeed, the addition of hundreds of plaintiffs to these proceedings highlights the obvious problems with litigating

Colombia's decades-old civil strife in a U.S. court, as plaintiffs here seek to do.  (*Id.* at 35-36.)

Discovery would be required for thousands of separate killings in a foreign country plaintiffs

deem so dangerous that they refuse to reveal their real names.[20]  And the extraordinary "facts" to

be discovered and adjudicated would include, *inter alia*, whether Colombian government

officials (Colombia's sitting President among them) fostered and conspired with paramilitaries to

kill their fellow citizens.[21]  Such claims would likely be brought not only against Chiquita but

also against other alleged "supporters" of these extremely well-financed Colombian armed

groups widely known for their extortionate practices.[22]  The result would be an unmanageable

and unresolvable lawsuit.

In *Sinaltrainal*, the Eleventh Circuit refused to recognize a broad war-crimes claim based

on paramilitary violence in Colombia precisely because, contrary to the limitations *Sosa*

imposed, such a course would "open [federal courts] to lawsuits occurring during any period of

civil unrest in a foreign country."  578 F.3d at 1267.  In *Sinaltrainal*, the plaintiffs were

employees of the defendant bottling companies.  Here, by contrast, plaintiffs have no meaningful

connection to Chiquita beyond their claim that they were the victims of violence committed by

armed groups to which Chiquita allegedly provided material support.  Recognizing plaintiffs'

claims would therefore open the courthouse doors not merely to foreign plaintiffs injured in

foreign lands during periods of unrest, but to a *broader* category of plaintiffs than that which the

---

[20]    *Compare* Valencia Am. Compl. 1 (naming the plaintiffs by name) *with* Valencia Second Am. Compl. 1 ("[r]eplacing [p]roper [n]ames with [a]liases").

[21]    *See* DC Compl. ¶¶ 411, 421-51; Carrizosa Compl. ¶¶ 32-36, NJ Compl. ¶¶ 27, 37-70; Valencia Compl. ¶¶ 133, 139-77; NY Compl. ¶¶ 838-51, 854-72.

[22]    Since the first round of briefing, for example, counsel for the D.C. plaintiffs have filed claims on behalf of Colombians in courts within the United States against two other companies—Drummond and Dole—for alleged support of paramilitaries.  *See Doe v. Drummond*, No. 7:09-CV-01041-RDP; (Notice of Pendency of Other Action (D.E.#230)).

Eleventh Circuit shut out in *Sinaltrainal*. *Sosa* and *Sinaltrainal* accordingly compel the dismissal of these lawsuits regardless of how plaintiffs cast their claims.

## II. EVEN IF THE COURT WERE TO ANALYZE THE COMPLAINTS AS PRESENTING 1,200 CLAIMS OF ACCESSORIAL LIABILITY FOR 1,200 SEPARATE VIOLATIONS OF INTERNATIONAL LAW, THE COMPLAINTS DO NOT PLEAD THE ELEMENTS OF THOSE CLAIMS.

The new allegations in plaintiffs' amended complaints reflect a frenzied effort to shoehorn their unavailing material-support claims into ill-fitting theories of, *inter alia*, extrajudicial killing and war crimes through equally inapt theories of accomplice liability. Chiquita respectfully submits that the Court need not even address these "alternative pleading" theories, since, under *Sosa*, the absence of a clearly defined and universally accepted international-law norm for terrorist support is dispositive. But even if the Court chooses to consider accomplice liability for more than one thousand separately alleged international-law violations, the claims are inadequately pled and should be dismissed.

*First*, even if the Court accepts as true that these 1,200 vaguely alleged acts of Colombian violence were committed by the AUC or the FARC, none is properly pled as an actionable violation of international law.

- As *Sinaltrainal* makes clear, murder is not a violation of international law: a violation of international law ordinarily requires state action, *i.e.*, allegations establishing the direct participation of a government or public official *in each of the particular killings or injuries alleged*. 578 F.3d at 1266. Like their predecessors, the amended complaints are devoid of such allegations and are therefore deficient under *Sinaltrainal*.

- *Sosa* also precludes this Court from adjudicating plaintiffs' broad claim that the President of Colombia and his government conspired with terrorists to murder thousands of their countrymen.

- Finally, any attempt to characterize these murders as "war crimes" or otherwise evade the state-action requirement is also foreclosed by *Sinaltrainal*, which held that courts in this Circuit may not entertain claims for war crimes against corporations "accused of capitalizing on the hostile environment [in Colombia] and conspiring with [the] paramilitaries." 578 F.3d at 1265.

*Second*, even if plaintiffs had properly alleged 1,200 international-law violations by the AUC or the FARC, the amended complaints would still adequately fail to plead that *Chiquita* is derivatively responsible for any of those purported violations.  As the Second Circuit held in *Talisman*, accessory claims under the ATS are governed by international-law standards, not by U.S. common law.  582 F.3d at 259.  And under international law, the *mens rea* standard for aiding and abetting and conspiracy claims requires that the accessory share the wrongful "purpose" of the primary violator.  *Id.*  This is a bridge too far for plaintiffs.  While they may have pled facts sufficient to trigger an inference that Chiquita made payments to the AUC and guerrillas knowing that these armed groups would engage in violent conduct, the amended complaints lack any facts giving rise to a plausible inference that Chiquita shared the murderous intent of these armed groups.

A.   **The Amended Complaints Fail to Plead That Any of The Vaguely Alleged Murders By Private Armed Groups in Colombia Constitutes An Actionable International-Law Violation.**

1.   *Sinaltrainal Forecloses Plaintiffs' Reliance Upon Generalized Allegations of a Cooperative Relationship Between the Colombian Government and the Paramilitaries to Plead State Action.*

In order to survive a motion to dismiss, most of plaintiffs' federal-law claims require adequate allegations of state action.[23]  (*See* Chiquita's Opening Br. 58-59.)  Thus, plaintiffs must

---

[23]   These claims include "extrajudicial killing," (NY Compl. ¶¶ 1045-57; NJ Compl. ¶¶ 230-37; DC Compl. ¶¶ 580-99; Valencia Compl. ¶¶ 850-60; Carrizosa Compl. ¶¶ 95-98); "torture," NY Compl. ¶¶ 1045-57; NJ Compl. ¶¶ 238-45; Valencia Compl. ¶¶ 870-79; and, to the extent they would be cognizable at all (*see* Chiquita Opening Br. 58 n.56, 65 n.60)), "cruel, inhuman or degrading treatment," (NJ Compl. ¶¶ 246-50; Valencia Compl. ¶¶ 912-19); "violation of the rights to life, liberty, and security of person and peaceful assembly and association," (NJ Compl. ¶¶ 251-58; Valencia Compl. ¶¶ 920-28); "consistent pattern of gross violations of internationally recognized human rights," (NJ Compl. ¶¶ 259-63; Valencia Compl. ¶¶ 929-34) and "crimes against humanity" (NY Compl. ¶¶ 1035-44; NJ Compl. ¶¶ 207-14; DC Compl. ¶¶ 565-79; Valencia Compl. ¶¶ 861-69; Carrizosa Compl. ¶¶ 107-109); *see Abagninin v. Amvac Chem. Corp.*, 545 F.3d 733, 741-42 (9th Cir. 2008) (concluding that claims for crimes against humanity (continued…)

make "allegations of a symbiotic relationship [between a private actor and the government] that 'involves the torture or killing alleged in the complaint.'"  *Sinaltrainal*, 578 F.3d at 1266 (quoting *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008)) (emphasis added).

Rather than rise to *Sinaltrainal*'s challenge, plaintiffs continue to rely upon generalized allegations of collusion between Colombian authorities and paramilitaries that the Eleventh Circuit expressly held insufficient in *Sinaltrainal*.  They allege, *inter alia*, that the Colombian government helped create, promote and finance paramilitaries, was complicit in paramilitary operations, participated in certain paramilitary massacres, and delegated certain government functions to the paramilitaries.[24]  But these allegations are not meaningfully distinguishable from the allegations of government-paramilitary collusion that the *Sinaltrainal* court rejected for failing to plead facts "[that] the Colombian government was involved in, much less aware of, *the murder and torture alleged in the complaints*."  578 F.3d at 1266 (emphasis added); *see also Drummond*, No. 7:09-CV-01041-RDP, slip op. at 8 (rejecting comparable allegations of a "*general* relationship between the paramilitaries and the Colombian government" as insufficient under Eleventh Circuit jurisprudence).  Plaintiffs do not allege government involvement in any of the more than one thousand violent acts at issue here, and as such their ATS claims requiring a showing of state action and their TVPA claims must be dismissed with prejudice.

_____

must meet a state-action requirement); *cf. Sinaltrainal*, 578 F.3d at 1263 (mentioning only "genocide or war crimes" as exceptions to the state-action requirement).

[24]    *See* DC Compl. ¶¶ 411, 421-51; Carrizosa Compl. ¶¶ 32-36, NJ Compl. ¶¶ 27, 37-70; Valencia Compl. ¶¶ 133, 139-77; NY Compl. ¶¶ 838-51, 854-72.

### 2. This Court Is Precluded Under Sosa From Entertaining Plaintiffs' Extraordinary Claim That the Government of Colombia—An Ally of the United States—Was Complicit in the Murders of Thousands of Its Own Citizens.

Plaintiffs' sweeping allegations of Colombian government complicity in the paramilitaries' crimes—even assuming they were properly supported—also run headlong into *Sosa*'s admonition against recognition of ATS claims that pose potentially adverse foreign-policy consequences. *See* 542 U.S. at 727 (cautioning against recognizing claims that would require courts to "consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits"); (*see also* Chiquita's Opening Br. 36-37).

Plaintiffs ask this Court to determine that the official government policy of a key U.S. ally was to collaborate with terrorists in killing its own people; among other things, they allege in effect that the current President of Colombia, Álvaro Uribe, and a leading candidate for this year's presidential election in Colombia, Juan Manuel Santos, among other government officials, actively collaborated with these terrorists.[25]  It is difficult to imagine how entertaining these claims would not "imping[e] on the discretion of the [political] [b]ranches in managing foreign affairs." *Sosa*, 542 U.S. at 727.

### 3. Plaintiffs Cannot Evade the State-Action Requirement By Characterizing All Murders by Private Armed Groups as "War Crimes."

*Sinaltrainal* also forecloses plaintiffs' attempt to evade dismissal of their terrorism-based claims by recasting them as claims for "war crimes" exempt from the state-action requirement.

---

[25]    *See, e.g.*, NJ Compl. ¶ 46 ("Paramilitarism was state policy in the Republic of Colombia."); Valencia Compl. ¶ 148 (same); DC Compl. ¶ 430 (similar); NY Compl. ¶ 872 (similar); DC Compl. ¶ 423; NJ Compl. ¶ 39; Valencia Compl. ¶ 141 (allegations involving President Uribe); DC Compl. ¶434; NY Compl. ¶¶ 841, 844; NJ Compl. ¶ 99; Valencia Compl. ¶ 150 (allegations involving Santos).

*Sinaltrainal* rejected war-crimes claims against corporate defendants alleged to have "capitaliz[ed] on the hostile environment [in Colombia] and conspir[ed] with paramilitaries . . . to rid their respective bottling facilities of unions." 578 F.3d at 1265. The Eleventh Circuit reasoned that permitting such allegations to go forward as war crimes would "open [the federal courts] to lawsuits occurring during any period of civil unrest in a foreign country," contrary to the limits *Sosa* placed on the federal courts' common-law-making authority under the ATS. *Id*. at 1267.

The generalized allegations in the amended complaints are precisely the type of allegation that the Eleventh Circuit deemed insufficient in *Sinaltrainal*. Plaintiffs allege that Chiquita purchased "security" or "protection services" from paramilitaries, who then allegedly targeted unionists and other civilians (*e.g.*, thieves) deemed adverse to Chiquita's business interests, including plaintiffs and their relatives.[26] Even accepting these speculative allegations as true, they merely posit general paramilitary violence carried out "to further Defendants' business interests"; *not* the "civil war clashes" required by the Eleventh Circuit. *Sinaltrainal*, 578 F.3d at 1267; *see also Drummond*, No. 7:09-CV-01041-RDP, slip op. at 11-15 (concluding that the dozens of paramilitary murders alleged in that case did not state a claim for war crimes because they were committed "as a means to further Drummond's security objectives"; *not* "'in the course of hostilities' between the AUC and the FARC").

---

[26]     *See, e.g.*, DC Compl. ¶¶ 22, 465, 545; Carrizosa Compl. ¶¶ 2, 38 (alleging that Chiquita paid the AUC "[i]n order to operate its banana production in an environment free of labor opposition and social disturbances"); NJ Compl. ¶¶ 73, 111, 113, 116; Valencia Compl. ¶ 222 (alleging that, "[i]n exchange for . . . financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition to their operations and policies was suppressed").

Far from making their war-crimes claims viable, plaintiffs' amended allegations highlight the concern that led the Eleventh Circuit to refuse to permit war-crimes claims based on a corporate defendant's alleged collaboration with Colombian paramilitaries. The amended complaints add hundreds of new plaintiffs on the theory that the paramilitary killing of *any* civilian in Colombia was a war crime because one of the "war strategies" of the paramilitaries was to send "a warning to any potential guerilla supporters" by targeting civilians.[27]

But the teaching of *Sinaltrainal* is that the sufficiency of war-crimes and like allegations consists not in finding the right formulation of words (such as baldly reciting that "all murders were part of a war strategy") but in pleading facts indicating *how* a specific killing was committed in the course of hostilities—lest U.S. courts be converted into international war-crimes tribunals, a result flatly contrary to *Sosa*'s insistence that ATS jurisdiction be exercised with great restraint. *See Sinaltrainal*, 578 F.3d at 1267; *see also Drummond*, No. 7:09-cv-01041-RDP, slip op. at 15 ("[S]uch an interpretation would not only tend to convert district courts into international courts of civil justice, it would be in direct contravention of the Supreme Court's specific prudential guidance admonishing lower courts to be cautious in creating new offenses under the law of nations."). Because plaintiffs' war-crimes allegations are not meaningfully distinguishable from—and present precisely the concerns presented by—those rejected in *Sinaltrainal*, they should be dismissed with prejudice.[28]

---

[27]    *E.g.*, NJ Compl. ¶ 63; Valencia Compl. ¶ 892; DC Compl. ¶ 504.

[28]    As for "crimes against humanity," the concept continues to be unrecognized as an actionable violation of the law of nations under the ATS.  (*See* Chiquita's Opening Br. 65 n.20.) Even if "crimes against humanity" were actionable under the ATS and constituted yet another exception to this Circuit's strict state-action requirement, plaintiffs' amended complaints do nothing to change the conclusory nature of these allegations.  "Crimes against humanity," a concept tied to the monumental atrocities of the Holocaust, requires that the alleged injury be part of a "widespread or systematic attack" against a civilian population.  *See Aldana v. Del* (continued…)

**B.     Even If Each of the Murders and Injuries Constituted An International-Law Violation By the AUC Or the FARC, Plaintiffs Have Not Pled Facts Sufficient To Establish Chiquita's Liability For Any of the 1,200 Deaths and Injuries.**

Plaintiffs' failure to adequately plead state action or private violations of the law of nations warrants dismissal of all of their federal claims.  But even if plaintiffs could overcome that failure, their ATS claims still should be dismissed because they are not supported by facts pleading the elements of secondary liability under international law (Chiquita's Opening Br. 50-57)—in particular that Chiquita acted *with the purpose* to assist the commission of the underlying violation of the law of nations.  This "purpose" standard is fatal to plaintiffs' secondary liability claims.

Plaintiffs' amended complaints, like their initial complaints, do not contain the "*factual content* that [would] allow[] the court to draw the *reasonable inference* that" Chiquita, a longstanding American public company, intended to assist the AUC and its archenemies, the leftist guerrillas, in killing or injuring any, let alone all, of these 1,200 alleged victims.  *Iqbal*, 129 S. Ct. at 1949 (emphasis added); *see Sinaltrainal*, 578 F.3d at 1260.

In the initial briefing, Chiquita explained why plaintiffs' allegations were insufficient to establish any secondary liability theories.  (*See* Chiquita's Opening Br. 50-57; Reply Br. 24-32.) The only relevant new development since then is the Second Circuit's decision in *Talisman*, which confirms that plaintiffs' secondary liability theories are wholly deficient.  In *Talisman*,

---

*Monte Fresh Produce, N.A. Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (per curiam).  But plaintiffs do not plead facts tying the alleged killings and injuries to such an "attack"; rather, they simply repeat their deficient war-crimes allegations, purporting to show that any particular killing of a civilian that took place over the course of more than a decade was part of an "attack." (*See, e.g.*, DC Compl. ¶¶ 567-572; NJ Compl. ¶¶ 211-213; Valencia Compl. ¶¶ 866-869; *see also* DC Compl. ¶¶ 574, 576.)  These conclusory allegations are not entitled to a presumption of truth, *see Iqbal*, 129 S. Ct. at 1949, and are too tenuous to establish that each, let alone all, of the alleged killings and injuries constituted "crimes against humanity," *see Aldana*, 416 F.3d at 1247.

notwithstanding clear evidence that the defendant provided support to Sudanese forces that it knew would permit the government to engage in human-rights abuses, the facts were insufficient to support the inference that Talisman "acted with the purpose that this support—*e.g.*, money, fuel for military equipment—be used for human rights abuses."  582 F.3d at 261-64; *id.* at 263 (finding that Talisman was not "a partisan in regional, religious, or ethnic hostilities"); *see also Drummond*, No. 7:09-CV-01041-RDP, slip op. at 17-19 (refusing to infer the defendant's purpose of assisting in the AUC's murder of dozens despite allegations that the defendant's officers and employees were involved in the planning and financing of other AUC killings).

An inference of Chiquita's intent to assist the paramilitaries and guerillas in committing the 1,200 murders and injuries alleged in the amended complaints is just as unwarranted as an inference of Talisman's intent to assist the Sudanese government in committing human rights violations.  First, like the evidence in *Talisman*, the amended complaints here do not plead *any* facts linking Chiquita to *any* of the 1,200 murders and injuries carried out by armed groups beyond Chiquita's provision of general support to those groups.  In the absence of such facts, the inference that Chiquita, a well-established, public American company, intended to assist Colombian armed groups in committing hundreds of murders is facially implausible.  Plaintiffs must offer, at a minimum, some facts specifically linking Chiquita—not Banadex, its Colombian subsidiary—to the alleged killings to bring their theory into the realm of the plausible.  *See Sinaltrainal*, 578 F.3d at 1261 ("The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss.") (citing *Iqbal*, 129 S.Ct. at 1949); *Talisman*, 578 F.3d at 261-62 (refusing to infer Talisman's intent from evidence regarding its foreign affiliate's acts).  The allegations here fail even to establish a meaningful link between *Banadex* and all the murders or injuries at issue.

Second, even if plaintiffs had pled facts supporting an inference that *Chiquita* intended to assist in the killing of at least some of the victims, such facts still would be insufficient because, as *Talisman* makes clear, 582 F.3d at 263, plaintiffs must show that Chiquita intended to assist in the commission of a *particular violation of the law of nations*.  For example, plaintiffs' claim for war crimes requires proof of Chiquita's intent to assist in non-combatant killings in the course of hostilities.  *See Sinaltrainal*, 578 F.3d at 1267.  Plaintiffs not only fail to plead any facts supporting an inference of such intent, but they allege facts that actually contradict their theory. Plaintiffs allege that Chiquita provided support *both* to the AUC *and* to the AUC's guerilla enemies.  (*See, e.g.*, DC Compl. ¶¶ 5, 464.)  Those allegations, and this Court's recognition of a cause of action based on Chiquita's alleged support of the FARC in *Julin*, *see* 2010 WL 432426, at \*11, make even more implausible the inference that Chiquita acted *with the purpose* to assist the AUC's killing of innocent civilians in hostilities as an anti-FARC partisan.[29]

The allegations that Chiquita supported both sides provides an "obvious alternative explanation" for Chiquita's payments, *Iqbal*, 129 S.Ct. at 1951 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007))—that Chiquita was extorted by these notoriously violent, armed groups when they controlled the areas where Banadex operated.  (*See* Chiquita's Opening Br. 34-35 & n.30.)  Plaintiffs brush aside this alternative explanation, proposing instead the

---

[29]    In *Julin*, this Court held that Chiquita's *knowledge* of the FARC's violent conduct could be inferred based on plaintiffs' allegations that Chiquita engaged in "atypical business practices" surrounding its alleged payments to the FARC.  2010 WL 432426, at \*11.  Even if such "atypical" business practices are sufficient to infer *knowledge* to support a *domestic* standard of aiding and abetting liability, *see id.* (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)), they do not give rise to any inference of *purpose* to support the 1,200 war crimes, or even the AUC's goals.

fanciful inference that Chiquita wanted to assist the commission of mass murder.[30]  On a motion

to dismiss, this Court must make only "*reasonable* inferences" in plaintiffs' favor; it is "not

required to draw *plaintiff[s']* inference" or to make "unwarranted deductions of fact."

*Sinaltrainal*, 578 F.3d at 1260 (emphasis added) (internal quotation marks and citations omitted).

Perhaps recognizing that the bare fact of Chiquita's payments to these armed groups is

insufficient to support an inference of purpose, plaintiffs renew and embellish their assertions

that Chiquita purposefully assisted the AUC with arms and drug smuggling.  Yet, beyond

conclusory allegations and unwarranted deductions,[31] plaintiffs offer no factual allegations that

would make it reasonable to infer that Banadex—let alone Chiquita—intentionally participated

in the AUC's weapons and drug trafficking.  *See* p. 18, *supra*; *see also Sinaltrainal*, 578 F.3d at

1268-69 (refusing to infer a conspiracy from allegations made "on information and belief" and

lacking in facts); *Talisman*, 578 F.3d at 262-63 (concluding, *inter alia*, that "there [was] no

showing that Talisman was involved in such routine day-to-day . . . operations [of its foreign

affiliate] as refueling aircraft").  Even if plaintiffs had pled sufficient facts to support that

inference, it still would not be sufficient to establish the further, necessary inference that

Banadex—let alone Chiquita—engaged in this activity with the purpose of furthering the 1,200

war crimes, crimes against humanity, and other purported international-law violations alleged in

the amended complaints.  *See Talisman*, 582 F.3d at 262-63 (refusing to infer Talisman's

---

[30]     DC Compl. ¶ 472; NJ Compl. ¶ 80; Valencia Compl. ¶ 187; *see also* DC Compl. ¶ 528;
NJ Compl. ¶ 112; Valencia Compl. ¶ 223 (alleging that Chiquita "sought a meeting" with the
paramilitaries, and at this meeting "[i]t was decided . . . that the banana companies would pay the
paramilitaries"); *but see* NY Compl. Ex. A. ¶ 21 (D.E. #65-1).

[31]     *E.g.*, DC Compl. ¶ 480 ("Chiquita was aware of the use of its facilities for the illegal
transshipment of arms to the AUC, and intended to provide such support and assistance to the
AUC."); Carrizosa Compl. ¶ 49; NJ Compl. ¶ 89; Valencia Compl. ¶ 196.

purpose to further Sudan's international-law violations from, *inter alia*, the fact that employees

of Talisman's operating affiliate in Sudan fueled "military aircraft taking off on bombing

missions").

Accordingly, plaintiffs' secondary liability claims under the ATS should be dismissed.[32]

## III. THE AMENDED COMPLAINTS FAIL TO ALLEGE STATE-LAW CAUSES OF ACTION.

Nothing in plaintiffs' amended complaints corrects the deficiencies in their state-law

claims identified in Chiquita's initial motions to dismiss.  (Chiquita's Opening Br. 68-73; Reply

Br. 40-46; D.C. Mot. to Dismiss 41-45; DC Reply Br. 20-25; Carrizosa Mot. to Dismiss 35-38;

Carrizosa Reply Br. 21-25.)[33]

---

[32]     Nothing in the amended complaints supports the far-fetched theory that the AUC acted as Chiquita's agent in committing the 1,200 murders and injuries for which plaintiffs seek to recover.  (*See* Chiquita's Opening Br. 43, 56-57; Reply Br. 27, 37-38; *see also Drummond*, No. 7:09-CV-01041-RDP, slip op. at 26 n.19 (reasoning that, if plaintiffs had not adequately pled aiding and abetting or conspiracy, they certainly had not pled that the AUC acted as the defendant's agents).  The facially implausible and contradicted allegations in the amended complaints that Chiquita controlled the AUC are devoid of factual content and are naked legal conclusions that this Court may not credit as true under *Iqbal*.  (*See, e.g.*, DC Compl. ¶ 543 (alleging that "the AUC took direction from Chiquita").)  The D.C. plaintiffs' new allegation that Chiquita "regularly contacted the AUC to request a range of 'services' in accordance with the overall agreement, including requests to execute specific individuals" (DC Compl. ¶ 561), is far too generalized to demonstrate that any of the 1,200 murders and injuries alleged in these complaints—much less all of them—were committed at the behest of Chiquita.  *See Drummond*, No. 7:09-CV-01041-RDP, slip op. at 26 n.19.

[33]     The new state-law claims added by the Carrizosa plaintiffs (*see* Carrizosa Compl. ¶¶ 119-121, 122-124), and all of the state-law claims brought by the plaintiffs first appearing in the latest round of amended complaints, were brought against Chiquita on February 26, 2010.

The new D.C. plaintiffs' claims are all time-barred by D.C.'s relevant limitations periods. *See* D.C. Code § 12-301(4) (1 year for assault and battery); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 87 (D.D.C. 2000) (1 year for IIED); D.C. Code § 12-301(8) (3 years for negligence-based claims); *Higgins v. Wash. Metro. Area Transit Auth.*, 507 F. Supp. 984, 986 (D.D.C. 1981) (3 years for wrongful death action under another jurisdiction's substantive law).

The new claims for wrongful death and loss of consortium added by the initial Carrizosa plaintiffs, all of the claims brought by the new Carrizosa plaintiffs, and all of the claims brought (continued…)

Although the Carrizosa plaintiffs formerly alleged their state-law claims only under Florida law, they now allege those claims under the laws of "Ohio, New Jersey, Florida, or any other applicable jurisdiction." (Carrizosa Compl. ¶ 4.) Chiquita has already addressed the Carrizosa plaintiffs' claims—negligent supervision, negligent hiring, wrongful death, and loss of consortium—under the laws of these alternative jurisdictions. (*See* Chiquita's Opening Br. 68-71; Reply Br. 45-46.) Chiquita incorporates those arguments in response to the Carrizosa plaintiffs' new state-law claims.

Moreover, all plaintiffs except for Luz López Sierra, who alleges that she resides in New York (*see* NY Compl. ¶ 807), lack standing to sue for state-law torts under the prudential limitation on Article III standing that non-resident aliens cannot sue in U.S. courts absent compelling circumstances. In *Doe VIII v. Exxon Mobil*, *supra* at 12-13—a decision issued after the last round of briefing on Chiquita's motion to dismiss—the court considered state-law claims brought by Indonesian citizens against an American corporation for abuses suffered in Indonesia,

---

by the new Valencia plaintiffs are barred by Florida's 2-year statute of limitations for wrongful-death actions. *See* Fla. Stat. Ann. § 95.11(4)(d).

All of the claims brought by the plaintiffs who have joined the New Jersey Complaint are time-barred by New Jersey limitations periods. *See* N.J. Stat. Ann. § 2A:14-2(a) (2 years for personal injury actions); *id.* § 2A:31-3 (2 years for wrongful death); *Tackling v. Chrysler Corp.*, 185 A.2d 238, 239 (N.J. Super. Ct. 1962) (2 years for loss of consortium).

Finally, the vast majority of claims brought by the plaintiffs who have joined the New York Complaint are barred by New York's relevant limitations periods. *See* N.Y. C.P.L.R. § 215 (1 year for battery); *Lipton v. Lockheed Aircraft Corp.*, 125 N.Y.S.2d 58, 59-60 (N.Y. Sup. Ct. 1953) (where plaintiff brings wrongful death claim under law of another jurisdiction—here, Ohio (*see* Ohio Rev. Code § 2125.02(D)(1) (2 years for wrongful death))—New York courts borrow the limitation period from that jurisdiction); N.Y. C.P.L.R. § 202 (shorter of New York's 3-year limit (*see id.* § 214(5)) or Ohio's 2-year limit (*see* Ohio Rev. Code § 2305.10(A)) applies to personal injury claims). There is only one plaintiff who could meet a 2-year statute of limitations. (*See* N.Y. Compl. ¶ 782.) There are only two additional plaintiffs who could meet a 3-year statute of limitations. (*See* N.Y. Compl. ¶¶ 750, 788.)

allegedly aided and abetted by Exxon Mobil.  658 F. Supp. 2d 131, 132 (D.D.C. 2009).  The court dismissed plaintiffs' state-law claims for lack of standing.  *Id.* at 135.

The court in *Exxon Mobil* noted the well-known prudential limitation on Article III standing that a plaintiff must assert claims that are "within the zone of interests of the statute or constitutional guarantee in question."  *Id.* at 133 (citing *Cardenas v. Smith*, 733 F.2d 909, 914 (D.C. Cir. 1984)).  The court then identified another prudential limitation on standing—"'the general rule that non-resident aliens have no standing to sue in United States courts.'"  *Id.* at 134 (citing *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 152 (D.D.C. 1976) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 776 (1950))).  Finding none of the exceptions to this general rule applicable, the court determined that there was "no reason to find that plaintiffs have standing in this unique factual context."  *Id.* at 135.  The court concluded that "where a non-resident alien 'is harmed in his own country, he cannot and should not expect entitlement to the advantages of a United States court.'"  *Id.* (quoting *Berlin Democratic Club*, 410 F. Supp. at 152).

Under the rationale of *Exxon Mobil*, plaintiffs' state-law claims should be dismissed. Plaintiffs are non-resident aliens who allege that they were injured at the hands of Colombian paramilitaries during a period of civil unrest in Colombia.  There is no justification for allowing these non-resident aliens to take advantage of the U.S. courts to sue for injuries allegedly perpetrated in their own country by their fellow citizens under the statutes or common law of various U.S. states that do not contemplate suits by non-resident aliens.

## CONCLUSION

For the foregoing reasons and for the reasons stated in Chiquita's prior briefs supporting its motions to dismiss the ATS complaints,[34] Chiquita respectfully requests that the amended complaints be dismissed with prejudice.


Dated: April 9, 2010                                    Respectfully submitted,

                                                        _____/s/ Robert W. Wilkins_____
Gregg H. Levy                                           Sidney A. Stubbs (Fla. Bar No. 095596)
John E. Hall                                            Robert W. Wilkins (Fla. Bar No. 578721)
Jonathan L. Marcus                                      Christopher S. Rapp (Fla. Bar No. 0863211)
Ann O'Connell                                           rwilkins@jones-foster.com
José E. Arvelo                                          JONES, FOSTER, JOHNSTON & STUBBS, P.A.
COVINGTON & BURLING LLP                                 505 South Flagler Drive, Suite 1100
1201 Pennsylvania Avenue, N.W.                          West Palm Beach, Florida 33401
Washington, D.C.  20004                                 Telephone: (561) 659-3000
Telephone: (202) 662-6000                               Fax: (561) 650-0412
Fax: (202) 662-6291

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Telephone:  (212) 841-1000
Fax:  (212) 841-1010                                    *Counsel for Chiquita Brands International, Inc.*
                                                        *and Chiquita Fresh North America LLC*

---

[34]     In addition to the arguments preserved in its prior motions to dismiss, Chiquita preserves the following arguments, which it understands are precluded by Eleventh Circuit precedent. First, plaintiffs' ATS claims for torture and extrajudicial killing must be dismissed because the TVPA provides the exclusive remedy for those claims.  Second, the TVPA provides an action for U.S. residents only, and all but one of the plaintiffs are aliens.  Third, the international law upon which plaintiffs' ATS claims are based does not extend liability to corporations, so plaintiffs have failed to plead a violation of the law of nations under the ATS.  Fourth, the ATS requires exhaustion of local remedies.  Finally, ATS claims are subject to a four-year statute of limitations because the ATA is the most analogous federal statute.  *See* 18 U.S.C. § 2335(a).

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on this 9th day of April, 2010.  I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's First Case Management Order ("CMO") and the June 10, 2008 Joint Counsel List filed in accordance with the CMO.

By:   /s/ Robert W. Wilkins
      Fla. Bar No. 578721
      rwilkins@jones-foster.com