**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 08-MD-01916 (Marra/Johnson)**

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC. ALIEN TORT STATUTE AND SHAREHOLDER DERIVATIVE LITIGATION
_____________________________________/

This Document Relates to:

ATS ACTIONS
_____________________________________/

ANGELA MARIA HENAO MONTES et al. v. CHIQUITA BRANDS INTERNATIONAL, INC.

Case No. 10-cv-60573
_____________________________________/

DOES 1-976 v. CHIQUITA BRANDS INTERNATIONAL, INC.

Case No. 10-cv-00404-RJL (D.D.C)
_____________________________________/

**DEFENDANT'S MEMORANDUM**
**IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS**
**MONTES & DOES 1-976 COMPLAINTS**

# TABLE OF CONTENTS

**Page**

BACKGROUND ..... 1

A. Procedural History ..... 1

B. Allegations in the Does 1-976 and Montes Complaints ..... 2

ARGUMENT ..... 7

I. TERRORISM SUPPORT IS NOT CLEARLY DEFINED OR UNIVERSALLY RECOGNIZED AS REQUIRED BY *SOSA*. ..... 7

II. EVEN IF THE COURT WERE TO ANALYZE THE COMPLAINTS AS PRESENTING 1,220 CLAIMS OF ACCESSORIAL LIABILITY FOR 1,220 SEPARATE VIOLATIONS OF INTERNATIONAL LAW, THE COMPLAINTS DO NOT PLEAD THE ELEMENTS OF THOSE CLAIMS. ..... 8

III. THE COMPLAINTS FAIL TO ALLEGE STATE-LAW CAUSES OF ACTION. ..... 11

CONCLUSION ..... 12

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abagninin v. Amvac Chem. Corp.*,
545 F.3d 733 (9th Cir. 2008) ....................9

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)....................6, 10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................6

*Casper v. Barber & Ross Co.*,
288 F.2d 379 (D.C. Cir. 1961)....................12

*Doe v. Drummond Co.*,
No. 2:09-cv-01041-RDP, slip op. (N.D. Ala. Nov. 9, 2009)....................4

*Doe v. Drummond Co.*,
No. 2:09-cv-01041-RDP, slip op. (N.D. Ala. Apr. 30, 2010)....................5

*Higgins v. Wash. Metro. Area Transit Auth.*,
507 F. Supp. 984 (D.D.C. 1981)....................12

*Julin v. Chiquita Brands Int'l, Inc.*,
__ F. Supp. 2d __, 2010 WL 432426 (S.D. Fla. Feb. 4, 2010)....................10

*Parker v. Grand Hyatt Hotel*,
124 F. Supp. 2d 79 (D.D.C. 2000)....................12

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
453 F.3d 244 (2d Cir. 2009)....................9

*Sinaltrainal v. Coca-Cola Co.*,
578 F.3d 1252 (11th Cir. 2009)....................4, 8, 9

*Sosa v. Alvarez-Machain*,
542 U.S. 592 (2004)....................7, 8, 9

**STATE CASES**

*Williams v. Baker*,
572 A.2d 1062, 1073 (D.C. 1990)....................11

## DOCKETED CASES

*United States v. Chiquita Brands Int'l, Inc.*,
No. 07-cr-00055 (D.D.C. Mar. 19, 2007) ....................6

## STATUTES

28 U.S.C. § 1350 note ....................2

D.C. Code § 12-301(4) ....................12

D.C. Code § 12-301(8) ....................12

Fla. Stat. Ann. § 95.11(4)(d) ....................12

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 8 ....................6

On April 19, 2010, Chiquita Brands International, Inc. ("Chiquita") was served with two new Alien Tort Statute ("ATS") actions brought on behalf of 1,220 additional alleged victims of the Colombian conflict. Almost doubling the number of plaintiffs asserting ATS claims against Chiquita, these complaints further reinforce the grounds on which Chiquita has sought dismissal of the five existing ATS complaints. For all of the reasons stated in Chiquita's prior briefs supporting its motions to dismiss the existing ATS complaints, the new complaints should also be dismissed with prejudice.

## BACKGROUND

### A. Procedural History

Pursuant to the Court-ordered coordinated briefing schedule (D.E. #286), Chiquita filed a consolidated motion to dismiss the amended complaints in the five existing ATS actions on April 9, 2010 (D.E. #295).[1] On April 19, 2010, Chiquita was served with two new ATS complaints.

---

[1] Chiquita hereby incorporates its Consolidated Motion to Dismiss the Amended Complaints filed on April 9, 2010 (D.E. #295) ("Chiquita's Mot. to Dismiss Am. Compls."). That motion incorporated all of Chiquita's prior submissions relevant to the pending motions to dismiss the ATS complaints. (*Id.* at 4-5 n.1.) Those prior submissions, which Chiquita also incorporates here, are docketed as follows:

- D.C. Complaint, No. 08-md-1916-KAM: Chiquita's Motion to Dismiss (D.E. #163), Chiquita's Reply (D.E. #164);
- Carrizosa Complaint, No. 1:07-cv-60821-KAM: Chiquita's Motion to Dismiss (D.E. #33), Chiquita's Reply (D.E. #45);
- New Jersey, New York, and Valencia Complaints, No. 08-md-1916-KAM: Chiquita's Consolidated Motion to Dismiss (D.E. #93) ("Chiquita's Opening Br."), Chiquita's Consolidated Reply (D.E. #148) ("Reply Br.");
- Supplemental Briefs on *Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008): Chiquita's Response to Plaintiffs' Notice of Supplemental Authority (D.E. #187);
- Supplemental Briefs on *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009): Chiquita's Response to Plaintiffs' Notice of Supplemental Authority (D.E. #198);
- Supplemental Briefs on *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009): Chiquita's Supplemental Brief (D.E. #248);

(continued…)

One complaint was filed in the U.S. District Court for the District of Columbia and was transferred to this Court by order of the Judicial Panel on Multidistrict Litigation effective on April 22, 2010. (*See Does 1-976 v. Chiquita Brands International, Inc.*, No. 10-cv-00404-RJL (D.D.C.)) ("Does 1-976 Complaint"); *see also* Conditional Transfer Order (CTO-3) (D.E. #307).) The other complaint was filed in this Court. (*See Montes v. Chiquita Brands International, Inc.*, No. 10-cv-60573-KAM) ("Montes Complaint").) On April 26, 2010, the Court issued an Order (D.E. #310) permitting Chiquita to file the instant motion to dismiss and directing plaintiffs to coordinate with the plaintiffs in the other ATS actions to oppose the motion in accordance with the Court-ordered briefing schedule.

**B. Allegations in the Does 1-976 and Montes Complaints**

Like the plaintiffs in the existing ATS actions, these 1,220 new plaintiffs (976 in the Does 1-976 Complaint, and 244 in the Montes Complaint) allege that they are either survivors of Colombian nationals who were murdered by the AUC, or were themselves injured by the AUC in Colombia, and seek to collect damages from Chiquita under the ATS, the Torture Victim Protection Act, 28 U.S.C. § 1350 note, and state tort law.

The individual claims are set out in now-familiar long strings of short, conclusory paragraphs with virtually no detail about any of the alleged incidents and no facts purporting to tie Chiquita to any asserted death or injury.[2] These paragraphs allege only that on a certain date a victim was "killed," "disappeared," or otherwise injured, and that the tortious acts were

---

- Supplemental Briefs on *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009): Chiquita's Notice of Supplemental Authority (D.E. #261), Chiquita's Response and Motion to Strike (D.E. #266);
- Supplemental Briefs on *Doe v. Drummond Co.*, No. 2:09-cv-01041-RDP (N.D. Ala. Nov. 9, 2009): Chiquita's Notice of Supplemental Authority (D.E. #268).

[2] *See* Does 1-976 Compl. ¶¶ 14-989; Montes Compl. ¶¶ 9-251.

committed "by the AUC."[3] Combined, these two complaints bring the total number of individual ATS claims pending before this Court to more than 2,400.

Plaintiffs allege that Chiquita is responsible for these injuries and deaths because it provided "money and services" to the AUC.[4] In support of this "material support" theory, the Montes plaintiffs cite a few additional sources purporting to establish an international-law norm prohibiting terrorism support that were not identified by the existing ATS plaintiffs or their expert.[5] Those sources include the League of Nations Convention (a treaty that never entered into force),[6] three additional U.N. General Assembly resolutions that contain a generalized condemnation of terrorism without defining what "terrorism" is,[7] and several additional U.N. Security Council resolutions that call for States to freeze funds of certain terrorist organizations and to adopt or implement existing terrorism conventions, including the International Convention for the Suppression of the Financing of Terrorism ("Financing Convention").[8]

With respect to their claims requiring state action, plaintiffs do not allege the direct involvement of a government actor in any of the alleged killings. Instead, like the existing ATS plaintiffs, they make only generalized allegations that Colombian government officials collaborated with the paramilitaries as part of the government's strategy for defeating leftist

---

3 *See* Does 1-976 Compl. ¶¶ 14-989; Montes Compl. ¶¶ 9-251.

4 Does 1-976 Compl. ¶1046; Montes Compl. ¶¶ 1, 398.

5 *See* Pls' Consolidated Opp'n 22-32 (D.E. #111); Ex. 3 (Decl. of William J. Aceves).

6 Montes Compl. ¶ 257.

7 *Id.* (citing U.N. General Assembly Res. 2625 (XXV) (1970); U.N. General Assembly Res. 3034 (XXVII) (1972); U.N. General Assembly Res. 48/122 (1993); U.N. General Assembly Res. 50/53 (1994)).

8 *Id.* ¶ 259 (citing U.N. Security Council Resolutions 1267, 1269, 1333, 1363, 1377, 1390, 1455, 1456, 1526, 1535).

guerillas,[9] and that paramilitarism was "state policy" in Colombia,[10] while acknowledging that Colombian law has long considered paramilitarism illegal.[11] Plaintiffs also allege (and ask this Court to decide) that the current President of Colombia and other top officials were involved in funding, arming, and supplying information to the AUC.[12]

The war-crimes allegations are just as generalized and conclusory as the allegations in the five existing ATS complaints. In response to the Eleventh Circuit's holding in *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009), that killings do *not* become war crimes by virtue of being perpetrated against the background of a civil war, plaintiffs assert, without any supporting facts or explanation, that the alleged AUC victims "were not killed simply against the background of war; rather the use of criminal violence and intimidation against civilians . . . was part of the war strategy against FARC."[13] And in response to the court's statement in *Doe v. Drummond Co.*, No. 2:09-cv-01041-RDP, slip op. at 13 (N.D. Ala. Nov. 9, 2009), that plaintiffs must allege that the defendant "intentionally 'took a side' in the political unrest in Colombia" to state a claim for war crimes, the Montes plaintiffs allege in conclusory fashion that "[a]t the Castaño meeting, and at all relevant times thereafter, Chiquita took sides with the AUC in the War against the leftist guerillas."[14] No facts are alleged to support such assertion, such as, for example, specific allegations that particular company officials affirmatively urged and directed

---

9 Does 1-976 Compl. ¶¶ 1016-1044; Montes Compl. ¶¶ 303-343.

10 Does 1-976 Compl. ¶¶ 1018; Montes Compl. ¶¶ 344.

11 Does 1-976 Compl. ¶¶ 1009; Montes Compl. ¶¶ 316.

12 Does 1-976 Compl. ¶¶ 1011, 1020; Montes Compl. ¶¶ 351-354.

13 Does 1-976 Compl. ¶ 1176.

14 Montes Compl. ¶ 393; *but see* NY Compl., Ex. A ¶ 21 (D.E. #290-1) (noting that Castaño "*instructed*" Banadex to pay the AUC and suggested that failure to do so "could result in physical harm to Banadex personnel and property") (emphasis added).

paramilitary attacks against guerrillas or their sympathizers, and rewarded such attacks on the basis of the number of people killed. *See Doe v. Drummond Co.*, No. 2:09-cv-01041-RDP, slip op. at 22-23, 25-28 (N.D. Ala. Apr. 30, 2010). Plaintiffs do not—and cannot in good faith—make such allegations.

Plaintiffs' crimes-against-humanity allegations are similarly conclusory. They mechanically allege that decedents' murders—carried out over more than a decade—were a "systematic attack."[15]

As to Chiquita's role in these purported offenses, the Montes plaintiffs allege that Chiquita was extorted by the FARC, which motivated Chiquita to pay the AUC.[16] This allegation contradicts the theory set forth by other ATS plaintiffs that Chiquita paid the FARC to assist FARC guerillas in killing and injuring Colombian nationals.[17] In other respects, however, the new plaintiffs' allegations are no different from those of the other plaintiffs. For example, the new plaintiffs do not explain why Chiquita would want to have its own workers killed or why Chiquita was not equally prone to extortion from the ruthless and violent AUC, which was notorious for attacking those who resisted its demands.[18] Nor do they acknowledge the statement in the plea agreement, on which all the plaintiffs rely, that Chiquita was "instructed" to make payments to the AUC and that "failure to make the payments could result in physical harm

---

15 Does 1-976 Compl. ¶¶ 1005, 1147, 1152; Montes Compl. ¶¶ 454, 491.

16 Montes Compl. ¶¶ 275-276.

17 *See* DC Compl. ¶ 5 ("Some of the Plaintiffs allege herein that their decedents were killed by the FARC during the time Chiquita was providing material support to that terrorist organization); *id.* ¶ 464 ("Chiquita also provided material support to the FARC in this time frame.").

18 *See, e.g.*, Does 1-976 Compl. ¶ 1000 ("The efforts of the AUC were directed toward elimination of anyone . . . who opposed or complicated the paramilitaries' control of territory or population in the area in which they exerted their power.").

to Banadex personnel and property." *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055, Factual Proffer ¶ 21 (D.D.C. Mar. 19, 2007); (NY Compl., Ex. A ¶ 21 (D.E. #290-1)). Instead, in direct contravention of the facts recited in the plea agreement on which they rely, plaintiffs ask the Court to accept as plausible their unsupported theory that Chiquita paid the AUC in exchange for the AUC's violent "services" in "pacifying" the banana-growing regions.[19]

Finally, plaintiffs repeat the sensational, and entirely conclusory, allegations that Chiquita engaged in weapons and drug trafficking.[20] Here too, apart from misstatements or speculation, no *facts* are alleged to support the bald assertion that Chiquita—a U.S. public corporation that was thoroughly investigated by the U.S. Department of Justice for its extorted monetary payments to these armed groups—engaged in gun running and drug trafficking. If the Supreme Court's directives in *Twombly* and *Iqbal* mean anything, Federal Rule of Civil Procedure 8 requires more than a plaintiff's say-so that a public company engaged in a side business of arms and narcotics smuggling, and that the U.S. Department of Justice chose to overlook it.

As explained below, because the new complaints are not meaningfully different from the other five, they are subject to dismissal for all of the reasons set forth in Chiquita's prior briefs.

---

19 Does 1-976 Compl. ¶¶ 1047; Montes Compl. ¶¶ 449.

20 Does 1-976 Compl. ¶¶ 1062-1075; Montes Compl. ¶¶ 427-443.

## ARGUMENT

### I. TERRORISM SUPPORT IS NOT CLEARLY DEFINED OR UNIVERSALLY RECOGNIZED AS REQUIRED BY *SOSA*.

The gravamen of the Does 1-976 and Montes Complaints is precisely the same as that of the existing ATS complaints: Chiquita provided material support to terrorists.[21] That theory is untenable and contrary to the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 592 (2004), for the reasons stated in Chiquita's consolidated motion to dismiss and its prior briefs. (*See* Chiquita's Opening Br. 15-37; Reply Br. 2-34; Chiquita's Mot. to Dismiss Am. Compls. 18-22.)

The few additional sources the Montes plaintiffs identify as purporting to establish an international-law norm prohibiting terrorism support fail to demonstrate that this norm is universally recognized and well defined, as required by *Sosa*.

- The League of Nations Convention (*see* Montes Compl. ¶ 257) never entered into force—having been ratified by merely *one* state—and thus does not provide evidence of a widely accepted rule of customary international law. In any event, it shows the indeterminacy of terrorism under international law; the Convention defines "terrorism" as criminal acts "directed against a State," something that plaintiffs here do not allege.

- The additional U.N. General Assembly resolutions (*see id.* (citing U.N. General Assembly Res. 2625 (XXV) (1970); U.N. General Assembly Res. 3034 (XXVII) (1972); U.N. General Assembly Res. 48/122 (1993); U.N. General Assembly Res. 50/53 (1994)), are aspirational or hortatory documents that impose no legal obligations under international law. (*See* Chiquita's Opening Br. 23; Reply Br. 12-13.) They contain a generalized condemnation of terrorism by U.N. member nations, without defining what "terrorism" is, and they do not demonstrate universal recognition of a civil cause of action for terrorism support.

- The additional Security Council resolutions (*see* Montes Compl. ¶ 259 (citing Resolutions 1267, 1269, 1333, 1363, 1377, 1390, 1455, 1456, 1526, 1535)) reflect

---

[21] *See* Does 1-976 Compl. ¶¶ 1181-1186 ("terrorism"), 1187-1194 ("material support to terrorist organizations"); Montes Compl. ¶¶ 466-477 ("financing terrorism"), 478-488 ("aiding and abetting terrorism").

votes of fifteen members of the Security Council and do not show the "widespread acceptance" or "consistent state practice" required by *Sosa*. These resolutions call for States to freeze funds of certain terrorist organizations and to adopt or implement existing terrorism conventions, including the Financing Convention. The Security Council's exhortation reinforces the conclusion that there was no such pre-existing prohibition on terrorism support, and that the appropriate mechanism to address this legal vacuum was through treaty ratification. (Reply Br. 13-14.)

Finally, that these complaints bring the number of ATS plaintiffs in this MDL to more than 2,400 (and plaintiffs' counsel in these new lawsuits, like their predecessors, have indicated that they plan to add over 1,000 more plaintiffs) further highlights the obvious problems with litigating Colombia's decades-old civil strife in a U.S. court. As these cases demonstrate, recognizing the cause of action for terrorism support that plaintiffs here advance would "open [federal courts] to lawsuits occurring during any period of civil unrest in a foreign country," *Sinaltrainal*, 578 F.3d at 1267, a result the Supreme Court specifically warned against in *Sosa*. For all of the reasons stated in Chiquita's prior papers, terrorism support is not a recognized cause of action under the ATS. Because plaintiffs' ATS claims fundamentally rest on this theory, they must be dismissed.

**II. EVEN IF THE COURT WERE TO ANALYZE THE COMPLAINTS AS PRESENTING 1,220 CLAIMS OF ACCESSORIAL LIABILITY FOR 1,220 SEPARATE VIOLATIONS OF INTERNATIONAL LAW, THE COMPLAINTS DO NOT PLEAD THE ELEMENTS OF THOSE CLAIMS.**

A. Even if the Court accepts as true that these 1,220 vaguely alleged acts of Colombian violence were committed by the AUC, none is properly pled as an actionable violation of international law.

- As *Sinaltrainal* makes clear, a violation of international law ordinarily requires state action, *i.e.*, allegations establishing the direct participation of a government or public official *in each of the particular killings or injuries alleged*. 578 F.3d at 1266. Like the existing ATS complaints, the Does 1-976 and Montes Complaints are devoid of

such allegations and are therefore deficient under *Sinaltrainal*.[22] (*See* Chiquita's Opening Br. 58-62; Reply Br. 39; Chiquita's Mot. to Dismiss Am. Compls. 23-24.)

- *Sosa* precludes this Court from adjudicating plaintiffs' incendiary claim that the President of Colombia and his government conspired with terrorists to murder thousands of their countrymen. (*See* Chiquita's Opening Br. 36-37; Reply Br. 32-34; Chiquita's Mot. to Dismiss Am. Compls. 25.)

- Any attempt to characterize these murders as "war crimes" or otherwise evade the state-action requirement is also foreclosed by *Sinaltrainal*, which held that courts in this Circuit may not entertain claims for war crimes against corporations "accused of capitalizing on the hostile environment [in Colombia] and conspiring with [the] paramilitaries." 578 F.3d at 1265. (*See* Chiquita's Opening Br. 62-63; Reply Br. 39; Chiquita's Mot. to Dismiss Am. Compls. 25-27.)

- "Crimes against humanity" continues to be unrecognized as an actionable violation of international law, and in any event plaintiffs do not allege any facts tying the alleged killings to an "attack" on a civilian population. (Chiquita's Opening Br. 65 n.20; Chiquita's Mot. to Dismiss Am. Compls. 27-28 n.28.)

B. Moreover, even if plaintiffs had properly alleged 1,220 international-law violations by the AUC, the Does 1-976 and Montes Complaints would still fail to plead adequately that *Chiquita* is derivatively responsible for any of those purported violations. As the Second Circuit held in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.3d 244 (2d Cir. 2009), accessory claims under the ATS require that the accessory share the wrongful "purpose" of the primary violator. *Id.* at 259. While they may have pled facts sufficient to

---

[22] Plaintiffs' state-action based claims include "extrajudicial killing" (Does 1-976 Compl. ¶¶ 1135-1145; Montes Compl. ¶¶ 511-522, 534-545); "torture" (Does 1-976 Compl. ¶¶ 1154-1162; Montes Compl. ¶¶ 523-533, 546-557); and, to the extent they would be cognizable at all (*see* Chiquita Opening Br. 58 n.56, 65 n.60)), "cruel, inhuman or degrading treatment" (Does 1-976 Compl. ¶¶ 1195-1199); "violation of the rights to life, liberty, and security of person and peaceful assembly and association" (Does 1-976 Compl. ¶¶ 1201-1209); "consistent pattern of gross violations of internationally recognized human rights" (Does 1-976 Compl. ¶¶ 1210-1215) and "crimes against humanity" (Does 1-976 Compl. ¶¶ 1146-1153; Montes Compl. ¶¶ 489-499); *see Abagninin v. Amvac Chem. Corp.*, 545 F.3d 733, 741-42 (9th Cir. 2008) (concluding that claims of crimes against humanity contain a state-action requirement); *cf. Sinaltrainal*, 578 F.3d at 1263 (mentioning only "genocide or war crimes" as exceptions to the state-action requirement).

trigger an inference that Chiquita made payments to the AUC knowing that the AUC would engage in violent conduct, the Complaints lack any facts giving rise to a *plausible* inference that Chiquita shared the murderous intent of the paramilitaries. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); (*see* Chiquita's Opening Br. 37-43, 50-57; Reply Br. 24-31, 38-39; Chiquita's Mot. to Dismiss Am. Compls. 28-32.)

Nothing better illustrates the fundamental pleading failure of all of the plaintiffs' *mens rea* allegations than the Montes plaintiffs' allegations that Chiquita was motivated to pay the AUC to free itself from the extortive threats of the FARC.[23] These allegations entirely contradict the theory advanced by other ATS plaintiffs that Chiquita intended to assist—and should be responsible for injuries perpetrated by—*both* groups.[24] That neither set of plaintiffs pleads a single fact that would allow the Court to credit their *ipse dixit* assertions over the others' demonstrates the implausibility of both. This is especially so when Chiquita's payments to both sides—coupled with plaintiffs' ready admission that both of these notoriously violent, armed groups routinely extorted private business[25] and that the AUC sought the "elimination of *anyone* . . . who opposed or complicated [its] control"[26]—support the "obvious alternative explanation," *Iqbal*, 129 S. Ct. at 1951, that Chiquita was extorted by both when they controlled the areas where Banadex operated. (Chiquita's Opening Br. 34-35 n.30.)

---

23 Montes Compl. ¶¶ 275-276.

24 DC Compl. ¶¶ 5, 464; *see also Julin v. Chiquita Brands Int'l, Inc.*, __ F. Supp. 2d __, 2010 WL 432426, at *11 (S.D. Fla. Feb. 4, 2010) (recognizing cause of action based on Chiquita's alleged support of the FARC).

25 *See, e.g.*, Valencia Compl. ¶¶ 584, 703, 787-92 (providing examples of the AUC's extortionate practices); Carrizosa Compl. ¶ 101 (alleging that the AUC was "known for its violent activities, including . . . extortion"); Montes Compl. ¶ 280 (alleging that "leftist guerrillas" extorted "Colombia's citizens, landowners, and businessmen").

26 *E.g.*, Does 1-976 Compl. ¶ 1000 (emphasis added).

Plaintiffs also allege no facts to support their outlandish theory that members of the AUC acted as Chiquita's agents when they carried out the 1,220 murders alleged in these complaints. (Chiquita's Opening Br. 43, 56-57; Reply Br. 27, 37-38; Chiquita's Mot. to Dismiss Am. Compls. 32 n.32.) Plaintiffs' federal claims against Chiquita must therefore be dismissed.

**III. THE COMPLAINTS FAIL TO ALLEGE STATE-LAW CAUSES OF ACTION.**

Plaintiffs' state-law claims should be dismissed for the reasons Chiquita has set forth with respect to the other plaintiffs' state-law claims. *First*, they suffer from the same substantive deficiencies. Chiquita has already explained why the Does 1-976 plaintiffs' claims for wrongful death, assault and battery, intentional infliction of emotional distress, and negligence/negligent hiring/negligence per se fail under the laws of the relevant jurisdictions. (*See* Does 1-976 Compl. ¶ 3 (state law claims alleged under Ohio, New Jersey, District of Columbia, and Florida law); Chiquita's Opening Br. 68-71; Reply Br. 45-46; DC Mot. to Dismiss 41-45; DC Reply Br. 20-25.) And Chiquita already has explained why the Montes plaintiffs' claims—wrongful death, and assault and battery—fail under Ohio law. (*See* Montes Compl. ¶ 4 (state-law claims alleged under Ohio law); Chiquita's Opening Br. 68-71; Reply Br. 45-46.)

The Does 1-976 plaintiffs do allege two torts that the D.C. plaintiffs did not: negligent infliction of emotional distress (Does 1-976 Compl. ¶¶ 1238-1251), and loss of consortium (*id.* ¶¶ 1271-1275). But the claims for negligent infliction of emotional distress ("NIED") should be dismissed for the same reasons the other derivative-liability claims should be dismissed (*see* Chiquita's Opening Br. 68-69; Reply. Br. 45-46; DC Mot. to Dismiss 41-45; DC Reply Br. 20-25), and also because plaintiffs have not alleged that they observed the alleged injuries to their relatives. *See Williams v. Baker*, 572 A.2d 1062, 1073 (D.C. 1990) (NIED or "bystander claim" requires observation of death or injury). The claim for loss of consortium under D.C. law should be dismissed because, like similar claims in other jurisdictions, it depends on the existence of an

underlying tort, which has not been sufficiently alleged. *See Casper v. Barber & Ross Co.*, 288 F.2d 379, 380 n.1 (D.C. Cir. 1961).

*Second*, the Does 1-976 plaintiffs' state-law claims are time-barred by D.C.'s applicable limitations periods because they did not file their complaint until March 9, 2010. *See* D.C. Code § 12-301(4) (1 year for assault and battery); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 87 (D.D.C. 2000) (1 year for IIED); D.C. Code § 12-301(8) (3 years for negligence-based claims and loss of consortium); *Higgins v. Wash. Metro. Area Transit Auth.*, 507 F. Supp. 984, 986 (D.D.C. 1981) (3 years for wrongful death action under another jurisdiction's substantive law). The Montes plaintiffs' state-law claims are time-barred by Florida's 2-year statute of limitations for wrongful-death actions because they were not filed until April 14, 2010. *See* Fla. Stat. Ann. § 95.11(4)(d).

*Finally*, all plaintiffs lack standing to sue for state-law torts under the prudential limitation on Article III standing that non-resident aliens cannot sue in U.S. courts absent compelling circumstances. (*See* Chiquita's Mot. to Dismiss. Am. Compls. 33-34 (citing *Doe VIII v. Exxon Mobil*, 658 F. Supp. 2d 131 (D.D.C. 2009).)

**CONCLUSION**

For the foregoing reasons and for the reasons stated in Chiquita's prior brief supporting its motions to dismiss the ATS complaint, Chiquita respectfully requests that the Does 1-976 and Montes Complaints be dismissed with prejudice.

Dated: May 4, 2010 Respectfully submitted,

/s/ Robert W. Wilkins
Sidney A. Stubbs (Fla. Bar No. 095596)
Robert W. Wilkins (Fla. Bar No. 578721)
Christopher S. Rapp (Fla. Bar No. 0863211)
rwilkins@jones-foster.com
JONES, FOSTER, JOHNSTON & STUBBS, P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, Florida 33401
Telephone: (561) 659-3000
Fax: (561) 650-0412

Gregg H. Levy
John E. Hall
Jonathan L. Marcus
Ann O'Connell
José E. Arvelo
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Fax: (202) 662-6291

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000
Fax: (212) 841-1010

*Counsel for Chiquita Brands International, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on this 4th day of May, 2010. I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's First Case Management Order ("CMO") and the June 10, 2008 Joint Counsel List filed in accordance with the CMO.

By: /s/ Robert W. Wilkins
Fla. Bar No. 578721
rwilkins@jones-foster.com