**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 08-01916-MD-MARRA/JOHNSON**

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.,
ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATS ACTIONS
_____/

NO. 08-80421-cv-MARRA/JOHNSON

JOHN DOE 1 *et al.*,
                           Plaintiffs,
        v.
CHIQUITA BRANDS INTERNATIONAL, INC., *et al.,*
                           Defendants.
_____/

NO. 08-80480-cv-MARRA/JOHNSON

DOES 1-747,
                           Plaintiffs,
        v.
CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*,
                           Defendants.
_____/

NO. 08-80508-cv-MARRA/JOHNSON

JOSE LEONARDO LOPEZ VALENCIA *et al.*
                           Plaintiffs,
        v.
CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*,
                           Defendants.
_____/

805122.1 1

NO. 9:08-cv-80465-KAM

DOES (1-144) and PEREZES (1-95)
                    Plaintiffs,
        v.
CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*
                    Defendants.
_____/


NO: 07-cv-60821-KAM

ANTONIO GONZALEZ CARRIZOSA, *et. al.*
                    Plaintiffs,
        v.
CHIQUITA BRANDS INTERNATIONAL, INC., *et. al.*
                    Defendants.
_____/


NO. 10-cv-60573-MARRA/JOHNSON

ANGELA MARIA HENAO MONTES, *et al.*
                    Plaintiffs,
        v.
CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*,
                    Defendants.
_____/


NO. 1:10-cv-00404 – RJL (D.D.C.)

DOES 1-976,
                    Plaintiffs,
        v.
CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*,
                    Defendants.
_____/


## PLAINTIFFS' SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S CONSOLIDATED MOTION TO DISMISS THE COMPLAINTS

## TABLE OF CONTENTS

Page(s)

I.    **INTRODUCTION** ................................................................................ 1

II.   **ARGUMENT** ....................................................................................

    A.  **The Complaints Contain Sufficient Factual Matter to State Claims for Relief that Are Plausible on their Face.** ...............................................

    B.  **Chiquita Makes No Attempt to Argue Any Applicable Doctrine of Case-Specific Deference.** ...............................................................................

    C.  **The Amended Complaints Properly State Facts Establishing Chiquita's Responsibility for Paramilitary Violence.** ....................................

    D.  **Plaintiffs Have Properly Alleged Violations of International Law.** ........................

    E.  **Plaintiffs Have Standing To Assert State-Law Claims.** ...............................................

III.  **CONCLUSION** ...................................................................................

805122.1 1

## TABLE OF AUTHORITIES

### U.S. FEDERAL CASES AND OPINIONS

*Abagninin v. Amvac Chemical Corp.*, 545 F.3d 733 (9th Cir. 2008)

*Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009)

*Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996)

*Adhikari v. Daoud & Partners*, No. 09-cv-1237 2009 WL 6067064 (S.D. Tex. Nov. 3, 2009)

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005)

*Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007)

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964)

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004)

*Bd. of Water & Sewer Comm'rs v. Ala. Dep't of Trans.*, No. 08-0718-WS-C, 2009 U.S. Dist. LEXIS 61956, at *3-5 (S.D. Ala. July 20, 2009)

*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 152 (D.D.C. 1976)

*Bigio v. Coca-Cola*, 239 F.3d 440 (2d Cir. 2001)

*Bowoto v. Chevron*, No. 99-02506 SI (N.D. Cal.)

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005)

*CFTC v. Gibraltar Monetary Corp.*, 575 F.3d 1180 (11th Cir. 2009)

*Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009)

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)

*Dennick v. Railroad Co.*, 103 U.S. 11 (1880)

*DeVries v. Starr*, 393 F.2d 9 (10th Cir. 1968)

*Doe v. Drummond Co.*, No. 2:09-cv-01041, slip op. (N.D. Ala. Nov. 9, 2009)

*Doe v. Drummond Co.*, No. 2:09-cv-01041, slip op. (N.D. Ala. April 30, 2010)

*Doe VIII v. Exxon Mobil Corp.*, 658 F. Supp. 2d 131 (D.D.C. 2009)

*Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961)

*Fanin v. United States Dep't of Veterans Affairs*, 572 F.3d 868 (11th Cir. 2009)

*Filartiga v. Pena Irala*, 630 F.2d 876 (2d Cir. 1980)

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998)

*Flores v. Southern Pern Copper Corp.*, 414 F.3d 223 (2nd Cir. 2003)

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)

*In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994)

*In re Armored Car Antitrust Litig.*, 645 F.2d 488, 493 (5th Cir. 1981)

*In re South African Apartheid Litig.*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009)

*In re XE Services Alien Tort Litig.*, 665 F.Supp.2d 569 (E.D.Va. 2009)

*Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854 (11th Cir. 2000)

*Janovic v. Int'l Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007)

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)

*Julin v. Chiquita Brands International, Inc.*, Nos. 08-MD-01916, 08-cv-20641, 2010 WL 432462 (S.D. Fla. Feb. 4, 2010)

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1996)

*Khulumani v. Barclay Nat'l Bank, Ltd.*, 504 F.3d 254 (2d Cir. 2007)

*Kontoulas v. A.H. Robins Co.*, 745 F.2d 312 (4th Cir. 1984)

*Linder v. Portocarrero*, 963 F.2d 332, 337 (11th Cir. 1992)

*Lony v. DuPont de Nemours & Co.*, 935 F.2d 604 (3d Cir. 1991)

*Military Commissions*, 11 Op. Att'y Gen. 297 (1865)

*McKenna v. Fisk*, 42 U.S. 241, 248 (1843)

*Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496 (7th Cir. 1980)

*People of Saipan v. U.S. Dep't of Interior*, 356 F. Supp. 645 (D. Haw. 1973)

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009)

*Rasul v. Bush*, 542 U.S. 466 (2004)

*Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008)

*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009)

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992)

*Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242 (2d Cir. 1996)

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)

*Talbot v. Janson*, 3 U.S. 133 (1795)

*Taxier v. Sweet*, 2. U.S. (2 Dall.) 81 (Pa. 1766)

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984)

*The Discontro Gesellschaft v. Umbreit*, 208 U.S. 570 (1908)

*The Sapphire*, 78 U.S. 164 (1870)

*United States v. Demanett,* 629 F.2d 862 (3d Cir. 1980)

*Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480 (1983)

*Wilchombe v. TeeVee Toons, Inc.*, 333 F.3d 949 (11th Cir.2009)

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000)

*Woods v. Barnett Bank*, 765 F.2d 1004 (11th Cir. 1985)

*Young v. Sedgwick County*, 660 F. Supp. 918 (D. Kan. 1987)

*Yousuf v. Samantar*, 552 F.3d 371 (4th Cir. 2009)

## U.S. FEDERAL STATUTES

18 U.S.C. §§ 2339A

18 U.S.C. 2339B

18 U.S.C. 2339C

Alien Tort Statute, 28 U.S.C. § 1350

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996)

Military Commissions Act of 2009, Pub. L. No. 111-84, 123 Stat. 2190 (2009)

## U.S. STATE CASES

*White v. Pepsico*, 568 So. 2d. 886 (Sup. Ct. Fla. 1990)

## TREATISES AND OTHER SECONDARY LEGAL SOURCES

Antonio Cassese, International Law (2001)

Dag Ytreberg, 3 C.J.S. Aliens § 168 (Supp. 2007)

Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts*, 6 Nw. U.J. Int'l Hum. Rts. 304, 311 (2008)

Restatement (Second) of Agency (1958)

Restatement (Second) of Torts (1977)

## FOREIGN AND INTERNATIONAL CASES

*Barcelona Traction, Light and Power Co., Ltd.* (Belg. v. Spain), 1970 I.C.J. 3 (Feb. 5)

*In re Tesch (The Zyklon B Case)*,13 Int'l L. Rep. 250 (1947) (Brit. Mil. Ct., Hamburg, Mar. 1-8, 1946)

*Mapiripan Massacre v. Colombia*, Inter-Am. Ct. H.R. (ser. C) No. 134 (Sept. 15, 2005)

*Mostyn v. Fabrigas*, 1 Cowp. 161 (1774)

*Prefecture of Voiotia v. Fed. Republic of Germany*, Areios Pagos [AP] [Supreme Court] 11/2000 (Greece)

*Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Judgment (Sept. 2, 1998)

*Prosecutor v. Blagojević*, Case No. IT-02-60-A, Appeal Judgment (May 9, 2007)

*Prosecutor v. Blaskic*, Case No. IT-95-14-T, Judgment (Mar. 3, 2000)

*Prosecutor v. Brima et al.*, Case No. SCSL-04-16-A, Appeal Judgment (Feb. 22, 2008)

*Prosecutor v. Fofana*, Case No. SCSL-04-14-T, Judgment (Aug. 2, 2007)

*Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Judgment (Dec. 10, 1998)

*Prosecutor v. Joni Marques*, Case No. 09/2000 (Dec. 11, 2001) (E. Timor)

*Prosecutor v. Katanga*, Situation in the Democratic Republic of Congo, ICC-01/04-01/07, ICC Pre-Trial Chamber I, Decision on the Confirmation of Charges (Sep. 30, 2008)

*Prosecutor v. Kunarac et al.*, Case Nos. IT-96-23-T & IT-96-23/1-T, Judgment (Feb. 22, 2001)

*Prosectuor v. Kunarac et al.*, Case No. IT-96-23-A & IT-96-23/1-A, Appeal Judgment (June 12, 2002)

*Prosecutor v. Ntakirutimana*, Case No. ICTR-96-10-A & ICTR-96-17-A, Appeal Judgment (Dec. 13, 2004)

*Prosecutor v. Stakic,* Case No. IT-97-24-T, Judgment (July 31, 2003)

*Prosecutor v. Tadić*, Case No. IT-94-1-T, Judgment (May 7, 1997)

*Prosecutor v. Tadić*, Case No. IT-94-1-A, Appeal Judgment (July 15, 1999)

*United States v. Flick*, 6 Tr. War. Crim. 1217 (1952)

*United States v. Ohlendorf (The Einsatzgruppen Case)*, 4 Tr. War Crim. 569

*United States v. Von Weizsaecker (The Ministries Case)*, 14 Tr. War Crim.

## FOREIGN AND INTERNATIONAL STATUTES AND REGULATIONS

Ugolovnyi Kodeks [UK] [Criminal Code] art. 205.1 (Russ.)

U.N. Trans. Admin. in East Timor Reg. 2000/15, UNTAET/REG/2000/15 (6 June 2000), on the establishment of panels with exclusive jurisdiction over serious crimes, §§14 & 18

## INTERNATIONAL TREATIES AND OTHER INTERNATIONAL SOURCES

Arab Convention on the Suppression of Terrorism, art. 2(a), Apr. 22, 1998, *available at* http://www.unchr.org/refworld/docid/3dc4984.html

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85

Convention on the Prevention and Punishment of the Crime of Genocide art. 4, Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277

Decl. on Measures to Eliminate Int'l Terrorism, G.A. Res. 49/60, Annex, U.N. Doc. A/RES/49/60 (Dec. 9, 1994)

Inter-American Convention Against Terrorism, AG Res. 1840, OAS AG, 32nd Sess., AG/RES. 1852 (XXXI1-O/02) (June 4, 2000)

International Convention for the Suppression of Terrorist Bombings, Jan. 9, 1998, S. Treaty Doc. No. 106-6, 2149 U.N.T.S. 284.

International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, Jan. 10, 2000 S. Treaty Doc. No. 106-49, 2178 U.N.T.S. 229

Measures to Eliminate International Terrorism, G.A. Res. 51/210, U.N. Doc. A/RES/51/210 (Dec. 17, 1996)

National report of the Republic of Italy pursuant to paragraph 6 of U.N. Security Council resolution 1373, U.N. Doc. S/2002/8 (2002)

*Note verbale* dated 13 December 2001 from the Permanent Mission of the Syrian Arab Republic to the U.N. addressed to the Security Council Committee established pursuant to resolution 1373 concerning counter-terrorism, U.N. Doc. S/2001/1204 (2001)

OAU Convention on the Prevention and Combating of Terrorism, art. 3.1, July 14, 1999, 2219 U.N.T.S. 179

Report submitted by France to the Counter-Terrorism Committee pursuant to paragraph 6 of Security Council resolution 1373, U.N. Doc. S/2001/1274 (2001)

Report submitted to the Counter-Terrorism Committee pursuant to paragraph 6 of Security Council resolution 1373, U.N. Doc. S/2001/1254 (2001)

Report to the Security Council Committee established pursuant to Resolution 1373 (2001) concerning Counter-Terrorism (Counter-Terrorism Committee, CTC) - Germany, U.N. Doc. S/2002/11 (2002)

Rome Statute of the International Criminal Court, *adopted* July 17, 1998, 2187 U.N.T.S. 3S.C. Res. 1189, U.N. SCOR, 3915th mtg., U.N. Doc. S/RES/1189 (1998)

Supplementary report pursuant to paragraph 6 of Security Council resolution 1373 (2001) – Jordan, S/2003/16 (2003)

Survey of the Implementation of Security Council Resolution 1373, U.N. Doc. S/2008/379 (2008)

The United Kingdom of Great Britain and Northern Ireland - Report to the Counter-Terrorism Committee pursuant to paragraph 6 of Security Council resolution 1373 (2001) of 28 September 2001, S/2001/1232 (2001)

U.N. GAOR, Sixth Committee, *Measures to eliminate international terrorism: Report of the Working Group*, Annex III, B ¶6, U.N. Doc. A/C.6/54/L.2 (Oct. 26, 1999)

U.N. GAOR, Report of the Ad Hoc Committee established by General Assembly resolution 51/210 of 17 December 1996 at 3, U.N. Doc. A/54/37 (May 5, 1999)

U.N. Security Council Res. 1955 Establishing the Int'l Tribunal for Rwanda, art. 4(d), Nov. 8, 1994, 33 I.L.M. 1598

## OTHER SOURCES

Deutsche Presse-Agentur, *Uribe Se Declara A Favor De Extradición De Directivos Dese declara a favor de extradición de directivos de Chiquita*, Mar. 17, 2007

Deutsche Presse-Agentur, *Gobierno Colombiano Pide Perdón A Víctimas De Masacre De 'Paras,'* Mar. 5, 2009

U.S. State Department, 1998 Colombia Country Report

U.S. State Department, 1999 Colombia Country Report

U.S. State Department, 2000 Colombia Country Report

U.S. State Department, 2001 Colombia Country Report

## CITATION CONVENTIONS COMPLAINTS

### MDL COMPLAINTS

"BSF" Compl., *Henao Montes v. Chiquita Brands Int'l, Inc.*, Case No. 10-cv-60573, Dkt. 1 (Apr. 14, 2010)

"Carrizosa" : First Am. Compl, *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-cv-60821, Dkt. 84 (Feb. 26, 2010)

"DCAC" : First Am. Compl. *Does (1-144) v. Chiquita Brands Int'l, Inc.*, Case Nos. 08-cv-80465, 08-md-01916, MDL Dkt. 287 (Mar. 1, 2010)

"NJ FAC" : First Am. Compl., *Doe I v. Chiquita Brands Int'l Inc.*, Case Nos. 08-cv-80421, 08-md-01916, MDL Dkt. 285 (Feb. 26, 2010)

"NYC" : Fifth Am. Compl., *Does v. Chiquita Brands Int'l, Inc.*, Case Nos. 08-cv-80480, 08-cv-01916, MDL Dkt. 283 (Feb. 26, 2010)

"VC" : *Jose Leonardo Lopez Valencia v. Chiquita Brands Int'l, Inc.* Case Nos. 08-cv-80508, 08-md-01916, MDL Dkt. 284 (Feb. 26, 2010)

"Wolf" : Compl., *Does 1-976 v. Chiquita Brands Int'l, Inc.*, Case No. 08-md-01916, MDL Dkt. 291-1 (Mar. 15, 2010)

### BRIEFS AND OTHER COURT SUBMISSIONS

"DCM" : Def's. Mem. in Support of Consolidated Mot. to Dismiss Am. Compls., Case No. 08-md-01916, Dkt. 295-1 (Apr. 9, 2010)

"2008 Def's. Mem." : Def's. Mem. in Support of Consolidated Mot. to Dismiss the Compls., Case No. 08-md-01916, MDL Dkt. 93 (July 11, 2008)

"Pls.' Resp. to Aug. 11, 2009 Order" : Pls.' Consolidated Resp. to the Court's Aug. 11, 2009 Order, Case No. 08-md-01916, MDL Dkt. 247 (Aug. 26, 2009)

"PO" : Pls.' Resp. in Opp'n to Def's. Consolidated Mot. to Dismiss the Compls., Case No. 08-md-01916, Dkt. 111 (Aug. 19, 2008)

"Posner Decl." : Decl. of Eric A. Posner, dated Sept. 18, 2008, Case No. 08-md-01916, Dkt. 148-2 (Sept. 19, 2008)

"Proffer" : Factual Proffer, *United Stated v. Chiquita Brands Int'l*, Case No. 07-cr-055 (D.D.C. Mar. 19, 2007)

"Reply" :  Reply in Support of Def's. Consolidated Mot. to Dismiss the Compls., Case No. 08-md-01916, Dkt. 148 (Sept. 19, 2008)

"Response to Supp. Authority" :  Resp. to Notice of Supplemental Authority by Jose Leonardo Lopez Valencia, Case No. 08-md-01916, Dkt. 265 (Oct. 10, 2009)

### MISCELLANEOUS

"AUC" :  the *Autodefensas Unidas de Colombia* (AUC), *Autodefensas Campesinas de Córdoba and Urabá* (ACCU), and any other predecessor or constituent part of the AUC.

## I.    **INTRODUCTION**

Pursuant to this Court's order, Plaintiffs filed amended complaints to allege additional facts supporting their claims.  Although some causes of action were added to some complaints, none were new; all had previously been alleged in other complaints.  Despite the lack of new legal claims, Chiquita's brief focuses primarily on legal arguments rather than the new factual allegations—including arguments repeated from earlier briefing, and others based on recent caselaw about which the parties have already submitted supplemental briefing.

If there were any uncertainty as to whether Plaintiffs' complaints adequately alleged their claims, the amended complaints have cleared up such doubts.  Plaintiffs' allegations easily meet even the inapplicable liability standard of *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009); unlike *Talisman*, Chiquita's actions in funding and arming a federally designated terrorist organization were inherently criminal, and abundant allegations confirm that Chiquita's assistance was given with the intent the AUC carry out its violent, terroristic campaign.  Likewise, the complaints establish that the AUC acted under color of law pursuant to *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009).  Plaintiffs allege that the Colombian government helped create the paramilitaries as well as their funding mechanism and that the military relied on the AUC, assisted them, and actively collaborated with them.

War crimes and crimes against humanity, which require no state action, are equally well-pled.  Plaintiffs allege that the AUC used violence against civilians, including Plaintiffs, as a war strategy, distinguishing this case from *Sinaltrainal* where the abuses merely occurred during the war.  As for crimes against humanity, there is no question that the AUC committed widespread attacks targeted against a civilian population.  And Chiquita fails even to dispute that terrorism and material support for terrorism are well-pled.

Nor does any of the recent caselaw assist Chiquita's legal arguments.  *Talisman* is not the law in the Eleventh Circuit and directly conflicts with *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), which applied common-law standards for aiding and abetting and conspiracy.  Chiquita relies heavily on *Doe v. Drummond Co.*, No. 2:09-cv-01041, slip op. (N.D.

1

Ala. Nov. 9, 2009) ("*Drummond I*"), but the same court recently allowed the plaintiffs' amended complaints to proceed, based on allegations similar to those at bar, *see Doe v. Drummond Co.*, No. 2:09-cv-01041, slip op. (N.D. Ala. April 30, 2010) ("*Drummond II*"), and acknowledged that *Talisman* conflicts with *Cabello. Id.* at 30 n.29. *Sinaltrainal* does not support Chiquita's argument that war crimes must be committed in furtherance of military objectives; it requires only that the abuses be committed in the course of the war. 578 F.3d at 1267. Finally, *Doe VIII v. Exxon Mobil Corp.*, 658 F. Supp. 2d 131 (D.D.C. 2009), is a bizarre outlier that in no way undermines the Supreme Court caselaw authorizing Plaintiffs' state law claims, and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), did not change the pleading standard that has already been briefed.

Although Chiquita reargues the point, none of the recent caselaw casts doubt on the evidence that both terrorism and financing terrorism are actionable claims. Regardless of the standard for aiding and abetting other ATS violations, the international community has agreed that *knowingly* providing material support to terrorists is prohibited. As this Court found in *Julin v. Chiquita Brands International, Inc.*, Nos. 08-MD-01916, 08-cv-20641, 2010 WL 432462 (S.D. Fla. Feb. 4, 2010), Chiquita's support of terrorist groups renders it liable for their acts; the conclusion is the same under international law as under the U.S. antiterrorism statutes, which reflect Congress's judgment that international law prohibits material support.

When its arguments fail on the law and the facts, Chiquita falls back on politics and a general argument that this case is "too big to litigate." No legal doctrine suggests that a defendant can be immunized from its torts when they injure too many people. And while Chiquita suggest possible harm to U.S.-Colombia relations, Chiquita does not to seek dismissal under the political question, act of state, or any related doctrine and ignores the facts that the U.S. has prosecuted it for its illegal acts and that Colombia still seeks to prosecute its executives.

As a general matter, this brief addresses only the claims and issues common to Plaintiffs' complaints; other issues are addressed in the side briefs relevant to each complaint. These core claims concern Chiquita's responsibility for acts of violence by the AUC through 2004, rather than violence by other groups or unidentified perpetrators, or violence subsequent to 2004.

## II.    ARGUMENT

### A.    The Complaints Contain Sufficient Factual Matter to State Claims for Relief that Are Plausible on their Face. [1]

This Court set out the applicable pleading standard in *Julin*, 2010 WL 432426, at *4. Contrary to this standard, Chiquita asks the Court to determine whether facts that must be accepted as true are really true. [2]  For example, Chiquita suggests it is "implausible" to imagine "that Chiquita purposefully chose *both* sides of this internal Colombian conflict," in paying both the FARC and the AUC.  DCM at 17.  But Plaintiffs adequately alleged that Chiquita paid the AUC and provided it with arms, and was not under duress in doing so. [3]  Chiquita's argument suffers from another flaw—it uses allegations found only in one complaint, such as allegations related to FARC or for conduct after 2004, to argue that other complaints are implausible. Chiquita may not rewrite the complaints, which must be judged by the matters actually alleged. *See, e.g., Wilchombe v. TeeVee Toons, Inc.*, 333 F.3d 949, 959 (11th Cir.2009).  Nothing in the MDL procedures allows an allegation in one complaint to justify dismissal of another complaint.

---

[1] While Plaintiffs' allegations are more detailed than required to state a claim, Plaintiffs must be granted leave to amend if the Court disagrees. *Bd. of Water & Sewer Comm'rs v. Ala. Dep't of Trans.*, No. 08-0718-WS-C, 2009 WL 2210648, at *1 (S.D. Ala. July 20, 2009) (leave to amend appropriate after motion to dismiss ruling); *See* PO at 74-75.  Similarly, no complaint can be dismissed for failure to plead matters that appear in any other complaint, as the deficient complaint could be corrected. *E.g., In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 276 (S.D.N.Y. 2009) (allowing amendment where related case successfully pled claims).

[2] These facts must be accepted as true, because "plausibility" applies only to inferences and conclusions, not well-pled facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

[3] Chiquita also misstates the facts.  By its own admission, Chiquita made regular payments to the FARC and its allies during the period from 1989 to 1997, "when the FARC and the ELN controlled areas where defendant CHIQUITA had its banana-producing operations."  Proffer ¶20.  In 1997, when power shifted to the AUC, an entity aligned with business interests, Chiquita claims to have ceased payments to the FARC and admits commencing regular payments to the AUC, which continued until 2004.  *Id.* ¶19.  The fact that Chiquita sequentially allied with and supported two designated Foreign Terrorist Organizations, shifting its allegiance to an organization more sympathetic to its interests as the power balance in the region changed, shows that Chiquita was a savvy and opportunistic player in the conflict.  Far from insulating Chiquita from liability, such behavior creates a strong inference that Chiquita was a knowing and willing collaborator that sought to use the AUC for its own gains.

3

**B.     Chiquita Makes No Attempt to Argue Any Applicable Doctrine of Case-Specific Deference.**

Chiquita suggests, without authority, that this case simply cannot be litigated because it involves "sensitive matters of foreign policy" and it will be "impossible to administer and impossible to settle." DCM at 4. However, while "case-specific deference to the political branches" might apply in some cases, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), this is not such a case. Case-specific deference refers to either the political question or international comity doctrine. *Khulumani v. Barclay Nat'l Bank, Ltd.*, 504 F.3d 254, 262 n.10 (2d Cir. 2007) (per curiam). Chiquita does not even argue that either doctrine applies here, presumably because courts generally do not dismiss ATS cases on such grounds absent a request from the Executive. Here, neither Colombia nor the U.S. has suggested this case would harm bilateral relations. Indeed, courts have declined to dismiss even where the U.S. or a foreign government *has* objected, *e.g. Apartheid Litig.*, 617 F.Supp.2d at 283-85, and have otherwise rejected arguments like Chiquita's in ATS cases raising more "sensitive" foreign policy issues and more administrative difficulties than present here.

For example, in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1996), the Second Circuit considered a putative class action including all victims of Serb atrocities in the Bosnia War against the President of the self-proclaimed "Republika Srpska," who was served while in the U.S. as a United Nations invitee. The Court held the case justiciable, noting, "The doctrine is one of 'political questions,' not one of 'political cases.'" *Id.* at 249. Similarly, the Ninth Circuit affirmed a judgment involving "up to 10,000" victims of the Marcos regime in the Philippines, with a class verdict of over a billion dollars. *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1469 (9th Cir. 1994). Although Marcos was a former head of state and U.S. ally, the suit was not nonjusticiable on foreign policy grounds. *Id.* at 1471-72. *Sosa* cited these decisions favorably, noting that their approach to the ATS was "consistent" with the Court's own rule. *Sosa*, 542 U.S. at 732. If the courts could handle those cases, they can surely handle this one.

Chiquita erroneously suggests that this case cannot be litigated because it involves

allegations that various levels of the U.S.-allied Colombian government were involved in the abuses perpetrated by the AUC. DCM at 25. Chiquita's argument amounts to little more than gossamer, as it attempts to hide behind the interests of the U.S.—which prosecuted the company for supporting terrorism—and Colombia—which wants to extradite the company's officers and directors for the same crime. Similarly, Chiquita claims to defend Colombian President Álvaro Uribe and Defense Minister Juan Manuel Santos, but Uribe himself has voiced support for extradition, and Santos has publicly acknowledged government complicity in paramilitary massacres.[4] Chiquita voices outrage at the well-documented fact that Colombian officials supported the AUC, as if it were impossible to believe that anyone would have supported such terrorists. Yet Chiquita has already pled guilty to having done so. Moreover, State Department reports have regularly asserted that Colombian officials collaborated with the AUC;[5] the Colombian government is actively investigating and prosecuting a number of such officials for this collaboration. Chiquita has not presented any grounds for dismissing these claims.

### C. The Amended Complaints Properly State Facts Establishing Chiquita's Responsibility for Paramilitary Violence.

Plaintiffs have properly alleged Chiquita's responsibility for the AUC's abuses under a variety of theories, including aiding and abetting, conspiracy, and agency. *See* PO at 38-54. Chiquita does not dispute that Plaintiffs have pled facts sufficient to satisfy the federal common law standards used in this circuit, DCM at 23; this Court has already held, on similar facts, that financial support and the provision of weapons "are well within the mainstream of aiding and

---

[4] *See, e.g.*, Deutsche Presse-Agentur, *Uribe Se Declara A Favor De Extradición De Directivos Dese declara a favor de extradición de directivos de Chiquita*, Mar. 17, 2007; Deutsche Presse-Agentur, *Gobierno Colombiano Pide Perdón A Víctimas De Masacre De 'Paras'*, Mar. 5, 2009.
[5] *See, e.g.*, U.S. State Dep't 2001 Colombia Country Report ("Members of the security forces collaborated with paramilitary groups that committed abuses . . ."); U.S. State Dep't 2000 Colombia Country Report (same); U.S. State Dep't 1999 Colombia Country Report ("Credible allegations of cooperation with paramilitary groups, including . . . direct collaboration by members of the armed forces, in particular the army, continued."); U.S. State Dep't 1998 Colombia Country Report (same). All Colombia Country Reports are available at http://www.state.gov/g/drl/rls/hrrpt/index.htm.

abetting liability." *See Julin*, 2010 WL 432426, at *11 n. 8. Instead, Chiquita contends that *Talisman* compels dismissal because Chiquita lacked the requisite "purpose." But *Talisman* explicitly acknowledged its divergence from the Eleventh Circuit. Resp. to Supp. Authority at 2. *Talisman* is therefore neither binding nor persuasive here. Regardless, this Court need not decide whether the Eleventh Circuit is likely to retreat from *Cabello*, 402 F.3d at 1159, and *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996), at some future date. As in *Drummond II*, Plaintiffs satisfy the *Talisman* "purpose" standard. Moreover, as this Court has explained, "the question of Chiquita's intent is one of fact, and cannot be determined as a matter of law on a motion to dismiss." *Julin*, 2010 WL 432426, at *13; *see also* PO at 42 n.53. Thus, dismissal is inappropriate.

        **1.**      **Under any standard, aiding and abetting liability is properly alleged.**

           **a.**      **Plaintiffs have met even the erroneous *Talisman* standard.**

      Chiquita argues, based on *Talisman*, that Plaintiffs must plead "facts giving rise to a plausible inference that Chiquita shared the murderous intent of" the AUC. DCM at 23. In *Talisman*, which upheld summary judgment after discovery, the Second Circuit found that plaintiffs had demonstrated "insufficient facts or circumstances suggesting that Talisman acted with the purpose to advance violations of international humanitarian law" because employees of Talisman's subsidiaries had attempted to relieve the plight of victims. 582 F.3d at 264. *Talisman* concluded that knowledge of the abuses "coupled only with such commercial activities as resource development" was not sufficient to give rise to an inference of intent. *Id.*[6] Significantly, the court observed that none of the conduct in that case "was inherently criminal or wrongful." *Id.* at 261.

---

[6] The allegations in *Talisman* consisted of: upgrading airstrips; designating certain areas for oil exploration; payment of royalties to the government; and general logistical support to the Sudanese military. For all these allegations, the court either found no evidence of Talisman's involvement or, in the case of the royalties payment, considered them insufficient for liability. *See Talisman*, 582 F.3d at 253.

This case is not like *Talisma*n. Here, Plaintiffs allege "inherently criminal" acts: Chiquita made over 100 furtive, illegal cash payments on a near-monthly basis to the AUC and assisted the AUC in smuggling arms and ammunition into Colombia. PO at 7-10.[7] The AUC, of course, had been designated a "Foreign Terrorist Organization" and a "Global Terrorist Organization" by the U.S. NJ ¶¶81, 84; BSF ¶¶298-99. Chiquita made the payments against the advice of its own counsel; concealed the nature and ultimate recipient of the payments; and pled guilty to willfully providing substantial support to a federally designated terrorist organization. PO at 8-12; NJ ¶84; BSF ¶420, *see also* 50 U.S.C. §1705(b) (criminal penalty for willful violations). *Talisman* itself observed that "intent must often be demonstrated by the circumstances" and can, even at summary judgment, be inferred. 582 F.3d at 264. The inherently wrongful character of Chiquita's alleged acts, unlike *Talisman*, raises a plausible inference of shared purpose. Notwithstanding Chiquita's argument, it is perfectly plausible to infer from Chiquita's arms smuggling and its decision to make and conceal illegal payments to a federally-designated global terrorist organization that Chiquita intended that the terrorist organization continue its activities. *See* PO at 42 n.53.

Nonetheless, the Court need not rely on inference; Plaintiffs allege precisely what was missing in *Talisman*. For example, Plaintiffs allege that the banana companies approached the AUC to initiate the relationship and that Chiquita assisted in setting up the *convivir* system[8]; that upon request, the AUC provided protection services to plantations, dealing out reprisals against thieves, workers who attempted to strike, and small farmers who refused to give up their land[9];

---

[7] Chiquita also tries to capitalize on the *Talisman* plaintiffs' failure to prove that Talisman, rather than other consortium partners, undertook the relevant acts. *See Talisman*, 582 F.3d at 265. But Plaintiffs here allege "Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise." NJ ¶16. Plaintiffs further allege that Chiquita executives approved the payments, Chiquita's Board of Directors discussed the payments, and Chiquita instructed Banadex to continue making the payments. PO at 7-8, 40 n.51. Chiquita—not Banadex—pled guilty to making the payments, paid a $25 million fine, and was placed on five years' probation. NJ ¶84.

[8] NJ ¶¶111, 114; DC ¶¶25, 517, 528; NY ¶969; BSF ¶¶387-97.

[9] NJ ¶¶80, 115-116, 124; DC ¶¶545-46; NY ¶¶970-73; BSF ¶¶447-52.

7

and that Chiquita and the AUC had a shared purpose in pacifying the banana region.[10]  Plaintiffs allege that Chiquita identified persons such as union leaders for the AUC to assassinate, in order to revoke benefits negotiated by the slain leaders.[11]  Chiquita and the AUC thus shared the common purpose of eliminating union leadership through murder.  On similar facts, *Drummond II*, slip op. at 23, held the *Talisman* standard was satisfied as the "allegations go beyond merely asserting" that Drummond had knowledge of the attacks.[12]  At this stage of litigation, dismissal on the grounds that Chiquita lacked the requisite intent when it provided substantial, material support to a federally-designated terrorist organization is not warranted.

        **b.**       **Federal common law rules apply to ATS claims in this circuit.**

The Eleventh Circuit (*contra Talisman*) adopts federal common law liability rules in ATS cases. *Cabello*, 402 F.3d at 1159; *Abebe-Jira*, 72 F.3d at 848 (courts "may fashion domestic common law remedies to give effect to" ATS violations). *Cabello* adopted domestic law standards for conspiracy liability, relying on *Halberstam v. Welch*, 705 F.2d 472, 481, 487 (D.C. Cir. 1983), undermining Chiquita argument that *Cabello's* aiding and abetting standard is not really a holding.  In adopting the federal common law of conspiracy, the Eleventh Circuit necessarily found that federal common law governs complicity liability.  There is no basis to conclude the court would not also adopt the federal common law of aiding and abetting.  The applicable common law rule is stated in *Cabello*, 402 F.3d at 1158-59, and the Restatement (Second) of Torts § 876(b) (1977), as well as by this Court in *Julin*, 2010 WL 432426, at *11 (quoting *Halberstam*, 705 F.2d at 477); that standard requires only knowing substantial assistance to the primary tortfeasor.

Ignoring this controlling precedent, Chiquita claims that Plaintiffs must prove "elements of secondary liability under international law," DCM at 28, relying primarily on *Talisman* and

---

[10] NJ ¶¶73, 115, 119; NY ¶¶970; DC ¶543; BSF ¶¶395-97, 447-52.
[11] BSF ¶¶448-49; NJ ¶¶80, 117-118, 119, 120; DC ¶462; NY ¶970.
[12] *Drummond II* also found that defendant need not have known the identities of or ordered the deaths of specific victims to meet the *Talisman* standard.  *Drummond II*, slip op. at 22, n.24.

*Drummond I.* In *Talisman*, the Second Circuit acknowledged that its rule conflicted with *Cabello*, 582 F.3d at 260 n.11, as did the court in *Drummond II*, slip op. at 30 n.29. To the extent that *Drummond I* followed *Talisman* and applied international law to ATS liability standards, it is inconsistent with the law of this circuit and may not be followed. *See Fanin v. United States Dep't of Veterans Affairs*, 572 F.3d 868, 874 (11th Cir. 2009) ("[A]ny number of assaults from other circuits cannot overrun one binding precedent from our own circuit.").

Even if the Eleventh Circuit had not settled the question, *Cabello*, not *Talisman*, is consistent with *Sosa*. The ATS grants jurisdiction to federal courts to recognize federal common law causes of action for violations of the law of nations. *Sosa*, 542 U.S. at 724, 732. Thus, the only question for which *Sosa* requires reference to international law is whether plaintiff has suffered a "violation[] of [an] international law norm." *Id.* Accomplice liability standards do not affect whether a plaintiff's international law rights have been violated; rather, they involve the remedy available, a matter for federal common law. *Abebe-Jira*, 72 F.3d at 848; *see also Talbot v. Janson*, 3 U.S. 133, 156 (1795) (holding defendant liable for violation of international law of neutrality, and applying common law principles of aiding and abetting and conspiracy).

International law, too, directs the Court to domestic law as the proper source for remedies and thus for accomplice liability standards.[13] Moreover, customary international law contains gaps that make it inappropriate as the primary source for civil tort liability rules; civil liability is generally a concern for domestic enforcement, not international tribunals.[14]

Chiquita concedes that Plaintiffs have met the knowing substantial assistance standard, by pleading "facts sufficient to trigger the inference that Chiquita made payments to the AUC . . . knowing that these armed groups would engage in violent conduct." DCM at 23.

---

[13] *See Kadic*, 70 F.3d at 246 (international law leaves to domestic law "the task of defining the remedies . . . for international law violations"); *accord Marcos*, 25 F.3d at 1475 (9th Cir. 1994); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 778 (D.C. Cir. 1984) (Edwards, J., concurring).
[14] *E.g., Barcelona Traction, Light & Power Co., Ltd.* (Belg. v. Spain), 1970 I.C.J. 3 (Feb. 5) (municipal law determines questions of corporation personality and liability).

     **c.**    *Talisman* **is incorrect as a matter of international law.**

Even if an international criminal law aiding and abetting standard applies under the ATS, *Talisman* erred in concluding that this standard requires purpose. The customary international law *mens rea* standard is knowledge.

All tribunals governed by customary international law have consistently applied a *mens rea* of knowledge, beginning with the International Military Tribunal (IMT) at Nuremberg and other postwar military courts.[15] Even in the sole international case on which *Talisman* relied, the IMT convicted defendant Puhl of abetting crimes against humanity by *knowingly* disposing of concentration camp prisoners' property. *United States v. Von Weizsaecker (The Ministries Case)*, 14 Tr. War Crim. at 620-21 (1949); *see also id.* at 478 (asking if defendants "knew of the program and whether in any substantial manner they" abetted it).[16] Every subsequent tribunal has applied a knowledge standard, including the International Criminal Tribunal for Yugoslavia,[17] which only applies rules that are "beyond any doubt customary law," *Prosecutor v. Tadić*, Opinion and Judgment, Case No. IT-94-1-T, ¶662 (May 7, 1997); the International Criminal Tribunal for Rwanda[18]; and the Special Court for Sierra Leone.[19]

---

[15] *E.g., United States v. Flick*, 6 Tr. War Crim. 1217 (1952) ("[o]ne who knowingly by his influence and money contributes to the support [of a violation of the law of nations] thereof must, under settled legal principles, be deemed to be, if not a principal, certainly an accessory"); *United States v. Ohlendorf (The Einsatzgruppen Case)*, 4 Tr. War Crim. 569, 572-73 (1949) (convicting one defendant for giving names to Nazis knowing those people would be killed, and another for not intervening when he "knew that [summary] executions were taking place"); *In re Tesch (The Zyklon B Case)*,13 Int'l L. Rep. 250 (1947) (Brit. Mil. Ct., Hamburg, Mar. 1-8, 1946) (convicting two industrialists who sold poison gas to Nazis, despite lack of intent to murder).

[16] As for defendant Rasche, the Tribunal found that he met the *mens rea* requirement; he was acquitted because his conduct did not satisfy the *actus reus*. 14 Tr. War Crim. at 622.

[17] *See, e.g., Prosecutor v. Tadić*, Case No. IT-94-1-A, Appeal Judgment, ¶229 (July 15, 1999); *Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Judgment, ¶245 (Dec. 10, 1998); *Prosecutor v. Blagojević*, Case No. IT-02-60-A, Appeal Judgment, ¶127 (May 9, 2007).

[18] *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Judgment, ¶545 (Sept. 2, 1998); *Prosecutor v. Ntakirutimana*, Case No. ICTR-96-10-A & ICTR-96-17-A, Appeal Judgment, ¶501 (Dec. 13, 2004).

[19] *Prosecutor v. Brima et al.*, Case No. SCSL-04-16-A, Appeal Judgment, ¶242-43 (Feb. 22, 2008).

The Rome Statute of the International Criminal Court, *adopted* July 17, 1998, 2187 U.N.T.S. 3, was not intended to alter customary international law, nor has it done so.[20] *Talisman* focused only on article 25(3)(c) of the Statute, which holds liable those who provide assistance "[f]or the purpose of facilitating the commission of such a crime," but ignored article 25(3)(d)(ii), which provides liability for assistance of a "crime by a group of persons acting with a common purpose. . . in the *knowledge* of the intention of the group to commit the crime." (Emphasis added.) Thus where, as here, a defendant has aided group crimes, the Rome Statute prescribes a knowledge standard.

Finally, even if shared purpose is required, that purpose can be shown by knowledge alone. The ICC has yet to consider this question, but the Special Panels for Serious Crimes in East Timor, which adopted the Rome Statute's provisions on liability,[21] concluded that one who assisted in building a roadblock "[s]har[ed] a common purpose" with other perpetrators because he "was aware of the plan." *Prosecutor v. Joni Marques*, Case No. 09/2000, ¶¶955-57 (Dec. 11, 2001); *see also id.* at ¶¶935, 940, 963, 968-69, 975. Even under a "purpose" standard, Chiquita's knowledge of the AUC's unlawful aims suffices to infer that it shared the unlawful purpose.

2.     **Chiquita's liability for civil conspiracy is properly alleged.**

As noted above, *Cabello* expressly adopts the *Halberstam* conspiracy standard for ATS claims. That standard was recently reiterated by this Court in *Julin*. The elements required are:

---

[20] The ICC, unlike the *ad hoc* tribunals, is not constrained to apply customary international law; its Statute is a product of political negotiation and compromise rather than previously binding international law principles. *See, e.g.*, Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts*, 6 Nw. U.J. Int'l Hum. Rts. 304, 311 (2008); *see also Prosecutor v. Katanga*, Situation in the Democratic Republic of Congo, ICC-01/04-01/07, ICC Pre-Trial Chamber I, Decision on the Confirmation of Charges, ¶508 (Sep. 30, 2008) (with respect to modes of liability under the Rome Statute, "the question as to whether customary law admits or discards [that liability] is not relevant for this Court"). The drafters twice inserted language specifying that the Statute does not limit or otherwise prejudice the development and definition of international law outside of the Statute. Rome Statute, arts. 10 & 22(3).

[21] *See* U.N. Trans. Admin. in East Timor Reg. 2000/15, UNTAET/REG/2000/15 (6 June 2000), on the establishment of panels with exclusive jurisdiction over serious crimes, §§14 & 18.

11

(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

2010 WL 432426, at *12. This Court also concluded that, in *Sinaltrainal*, the Eleventh Circuit was not "retreating from its adoption of *Halberstam* for the necessary elements" of conspiracy. *Id.* at *12; *see Drummond II*, slip op. at 29-30 (*Cabello* is binding law on conspiracy standard).[22]

A civil conspiracy claim should allege the scope of the conspiracy, its participants, and when the agreement was entered into. *Sinaltrainal*, 578 F.3d at 1268. Plaintiffs have done so here. Plaintiffs allege that Chiquita met with AUC leaders and agreed to give payments and other support for their mutual benefit.[23] Plaintiffs provide names and dates, alleging the manager of Banadex, Chiquita's wholly-owned subsidiary, met with the AUC's Carlos Castaño in 1997 to develop a plan for payment and for paramilitary operations in Urabá.[24] Chiquita's manager then worked with AUC Commander Raul Hasbún to establish the *convivir* as front organizations to receive Chiquita's payments to the AUC.[25] Plaintiffs provide details on the amounts of each payment.[26] Plaintiffs specify the mechanisms by which the payments were made.[27]

Chiquita's assertion that conspiracy "requires that the accessory share the wrongful 'purpose' of the primary violator," DCM at 23, ignores Eleventh Circuit law and this Court's ruling in *Julin*. Under the correct standard, Chiquita must have agreed with the AUC to perform at least one unlawful act, and the individual abuses must have arisen out of the AUC's actions in furtherance of that shared goal. But Chiquita need not have intended or even known about each murder, so long as these killings were committed "pursuant to or in furtherance of the conspiracy." *Halberstam*, 705 F.2d at 481. Plaintiffs have amply alleged that Chiquita and the

---

[22] *Drummond II* recognizes that *Talisman* and *Cabello* apply different bodies of law but errs by applying *Talisman* to interpret the *Cabello* standard. Slip op. at 30 & n.29.
[23] NY ¶¶968-94; DC ¶¶4, 517, 528-29, 543-45; BSF ¶¶388-97. VC ¶¶232-40.
[24] *E.g.*, NY ¶¶894, 969; VC ¶68.
[25] DC ¶¶425, 528; NY ¶969.
[26] NJ ¶¶76-78; NY ¶892; VC ¶¶72, 75; DC ¶¶466-75; 518; 521; BSF ¶¶398-426.
[27] NY ¶¶859-60, 779; NJ ¶¶78-79; VC ¶¶68, 75; DC ¶¶425, 528, 534; BSF ¶¶398-443.

AUC agreed to pursue an illegal goal through illegal means: Chiquita supplied money and arms in return for the pacification of the banana-growing region, knowing that its actions were illegal.[28]  In furtherance of their joint aims, the AUC murdered Plaintiffs' relatives, villagers who were also trade unionists, banana workers, political organizers or social activists.[29]  By design, the AUC's violence inured to the mutual benefit of Chiquita and the AUC.[30]  Moreover, as noted above, Plaintiffs have alleged that Chiquita shared the AUC's purpose in committing the killings. *See Drummond II*, slip op. at 30 (similar allegations demonstrated requisite intent).

### 3.    Agency liability is adequately pled.

The federal common law of agency is well-settled, PO at 53-54, and Chiquita does not suggest that any other body of law applies.  Agency requires "(1) consent to the agency by both principal and agent; and (2) the control of the agent by the principal." *CFTC v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1189 (11th Cir. 2009).  Plaintiffs allege that Chiquita formed an agreement with the AUC, authorizing them to kill union leaders, social organizers, guerrilla sympathizers, and others deemed undesirable,[31] and exercised control over the AUC like any employer, by trading payment for performance.[32]  These allegations are well within the mainstream of agency liability.

Alternatively, a principal ratifies his agent's unauthorized act when he (1) knows of the unauthorized act carried out on his behalf and (2) affirms the act, including by failure to repudiate it.  Restatement (Second) of Agency (1958) §§ 91 & 94;[33] *Drummond II*, slip op. at 31-32.  Chiquita errs in disclaiming agency liability unless the murders "were committed at the

---

[28] NJ ¶¶30-41; NY ¶¶853, 858-61, 892, 894, 898, 969, 979; VC ¶¶68, 75, 80-88; DC ¶¶534, 543, 545-46.

[29] NJ ¶¶2, 20-22; NY ¶10; VC ¶1; DC ¶¶462, 520, 543; VC ¶240.

[30] *E.g.*, NJ ¶¶31, 32; NY ¶¶853, 969-94; VC ¶¶1, 74, 90, 94, 232-40; DC ¶¶542-551; BSF ¶¶395-97, 444-52.

[31] NJ ¶¶111-21; 128-33; DC ¶¶463-72, 527-29, 534, 542-44; NY ¶968-70; BSF ¶¶446-50.

[32] DC ¶¶463-72, 517, 520, 561; NY ¶975; VC ¶¶241-50.

[33] This Circuit has accepted the Restatement as authority for the agency theory of ratification. *E.g.*, *In re Armored Car Antitrust Litig.*, 645 F.2d 488, 493 (5th Cir. 1981).

13

behest of Chiquita," DCM at 32 n.32, as ratification by definition occurs after the tort. *See* PO at 54. Here, Plaintiffs allege that Chiquita continued to make payments and accept the benefits of the AUC's violence against the civilian population well after Chiquita had specific knowledge of the violent results of its payments to the AUC.[34] Similar allegations were held adequate to allege ratification in *Drummond II*, slip op. at 32.[35]

### 4. To the extent required, causation is adequately alleged.

For most of their claims, Plaintiffs need not show a causal link between Chiquita's acts and Plaintiffs' injuries, as causation is not an element of any theory of liability.[36] Regardless, this court in *Julin* found sufficient causation in financial and logistical support that could help fund the AUC's terrorist activities. 2010 WL 432426, at *16. Moreover, as in *Julin*, "'a reasonably prudent person could foresee that a harm like the one that the plaintiff suffered might result from'" Chiquita's actions.[37] *Id.* (quoting *Zivojinovich v. Barner*, 525 F.3d 1059, 1069 (11th Cir. 2008)).

### 5. Chiquita is directly liable for financing terrorism.

As noted below, material support for terrorism is a primary violation of international law.

---

[34] DC ¶¶427,473,534-43; NY ¶¶977-78; NJ ¶¶111-21, 128-33; VC ¶¶189-90; BSF ¶¶389, 397, 444-52; *see also supra* Part II.C.1.a.

[35] Even if the AUC were merely an independent contractor, Chiquita is still liable. Where an independent contractor is performing "abnormally dangerous activity," the employer is liable for all "physical harm" resulting therefrom. Restatement (Second) of Torts § 427A. Clearly, hiring the AUC for "security services" of any kind was abnormally dangerous. *See Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 30 (D.D.C. 2008) ("This work--providing armed security in a warlike environment--might fairly be deemed "inherently dangerous" as a matter of law").

[36] Chiquita's assertion of a "substantial assistance" requirement for aiding and abetting liability that subsumes "proximate causation," Reply at 37, is unavailing in this Circuit, which holds only that "[s]ubstantiality is based upon all the circumstances." *Woods v. Barnett Bank*, 765 F.2d 1004, 1013 (11th Cir. 1985). Causation is not required for aiding and abetting under international law. *Prosecutor v. Kunarac et al.*, Case Nos. IT-96-23-T & IT-96-23/1-T, Judgment, ¶391 (Feb. 22, 2001) ("The act of assistance need not have caused the act of the principal.").

[37] *E.g.*, NJ ¶103-05; "by 1997, the [paramilitary] groups were already responsible for at least 150 . . . instances of mass-killings," *id.* ¶33; the AUC was responsible for at least 3,700 murders in the banana-growing region alone, *id.* ¶76; BSF ¶¶297, 389.

14

*See infra* Part II.D.6. Thus Chiquita is *directly* liable for the abuses proximately caused by its conduct in financing the paramilitaries, regardless of whether this conduct also renders it *indirectly* liable for other abuses based on one or more of the above theories.

**D.     Plaintiffs Have Properly Alleged Violations of International Law.**

**1.     Plaintiffs bring claims for six independent ATS violations.**

Plaintiffs have separately alleged that Chiquita is liable for extrajudicial killings, torture, crimes against humanity, and war crimes, as well as terrorism and material support. Chiquita, however, erroneously suggests that all of these distinct claims are part of the material support claim and cannot be considered separately, such that determination of the latter claim is "dispositive" of all. DCM at 22. The suggestion is specious. Each of Plaintiffs' claims must be assessed independently. The failure of even a closely related claim does not bar other valid claims. *E.g., Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1252 (11th Cir. 2005) (ATS torture claims might survive but not distinctly defined TVPA torture claims).

The position in which a claim appears in a complaint is irrelevant. While some complaints have added or reorganized allegations, this was an effort to make the complaints more uniform to aid the Court. Plaintiffs neither "deemphasize their direct claims of material support," DCM at 18, nor rely exclusively or primarily on this claim. Chiquita's conduct violated numerous legal prohibitions, giving rise to multiple causes of action under international and local law. Chiquita only challenges the actionability of material support (and, in a footnote, crimes against humanity). As to other claims, Chiquita challenges only whether they are adequately pled. Thus, where claims such as extrajudicial killing and torture are adequately pled, they may proceed regardless of whether material support for terrorism is also actionable.

**2.     Plaintiffs have alleged sufficient facts to establish that the paramilitary violence was committed under color of state law.**

To establish their extrajudicial killing claims under the ATS, Plaintiffs must plead "state

action," *i.e.*, that the AUC was acting "under color of state law" in committing the killings.[38] Plaintiffs previously explained in detail how their allegations satisfied each of the four well-established color-of-law tests. *See* PO at 56-65. Plaintiffs' amended complaints include still more concrete allegations of state action,[39] and amply satisfy their burden. Indeed, Plaintiffs' allegations are more detailed than those recently held sufficient in *Drummond II*, slip op. at 9-13.

Chiquita's renewed briefing again mischaracterizes Plaintiffs' claims as alleging merely "general" ties between the government and private actors, DCM at 15–16, 23–24, ignoring the detailed allegations establishing the breadth and depth of the factual nexus between the AUC, the Colombian State, and Plaintiffs' claims, and the significance of that nexus under firmly-established federal law. PO at 56-65; Pls.' Resp. to Aug. 11, 2009 Order. In addition, Chiquita now argues that *Sinaltrainal* establishes a new, higher bar requiring that pleadings detail the government's active involvement in each of the specific acts of murder or torture at issue. DCM at 24. *Sinaltrainal*, however, did not rewrite the legal standard for state action as Chiquita asserts; it merely held, following *Iqbal*, 129 S. Ct. at 1951, that plaintiffs cannot satisfy the state action requirement by pleading the "conclusory allegation that the paramilitary security forces acted under color of law." *Sinaltrainal*, 578 F.3d at 1266. Because the plaintiffs in *Sinaltrainal* failed to support their "'formulaic recitation'" with adequate factual allegations, the complaint was insufficient. *Sinaltrainal*, 578 F.3d at 1266 (quoting *Twombly*, 550 U.S. at 555). The legal standard for the symbiotic relationship test remains intact, and can be satisfied, as the Eleventh Circuit explicitly reiterated, by detailed factual allegations. *Id.*

These cases plead precisely the sort of concrete detail missing in *Sinaltrainal*. Indeed, the allegations in the amended complaints are very similar to the allegations recently found to

---

[38] *Aldana*, 416 F.3d at 1247; *Drummond II*, slip op. at 9 n.12. Because Chiquita's liability for any state action claims is derivative, Plaintiffs only need to show that the AUC, as the primary violator, acted under color of law, not that Chiquita itself did. *See, e.g., Bowoto v. Chevron Corp.*, No. C 99 02506, 2007 WL 2349341, at *2-7 (N.D. Cal. Aug. 14, 2007).

[39] *E.g.*, NJ ¶¶37-41, 44-47, 49-50, 53-62, 64-70; DC ¶¶421-55, 581; NY ¶838-72; VC ¶¶139-43; 146-171; BSF ¶¶301-51.

allege "a direct, symbiotic relationship between the Colombian government and the paramilitaries" under *Sinaltrainal*. *See Drummond II*, slip op. at 9–11. Such allegations include:

- The Colombian military and civil government authorities "tolerated the paramilitaries, allowed them to operate, and often cooperated with them." *Drummond II*, slip op. at 9; *see* NJ ¶51, 53–56; DC ¶429; VC ¶¶147-63; NY ¶¶844-5, 861-3; BSF ¶¶294-96, 301; Carrizosa ¶¶28, 32, 34, 36, 89-90; Wolf ¶¶1019, 1082–84; NY ¶869.

- "Many current and former political leaders in Colombia were directly involved in establishing the right-wing paramilitary groups in Colombia which later joined under the one umbrella of the AUC." *Drummond II*, slip op. at 9; *see* NJ ¶¶26, 39–40, 45–46; DC ¶¶429; 433; VC ¶¶133, 141, 142, 834; NY ¶¶838–44, 861–63; BSF ¶¶302–14, 351–54; Carrizosa ¶36; Wolf ¶¶1011–12, 1020.

- The Colombian military was unable to defeat the guerrilla uprising on its own, and so relied on the AUC to assist in defeating the FARC. *Drummond II*, slip op. at 11; *see* NJ ¶¶26–27, 34, 45–46, 50; DC ¶¶429-30; VC ¶¶146-48; NY ¶¶844, 848-50; BSF ¶¶303–06, 317-18, 335-36, 356; Carrizosa ¶¶28, 32; Wolf ¶1025.

- The AUC, including units such as the Elmer Cárdenas Bloc directly involved in the wrongful conduct at issue, were "created based on official sanction of the government of Colombia." *Drummond II*, slip op. at 10; *see* NJ ¶¶26–27, 37–38, 56; DC ¶¶421, 430, 432; VC ¶¶157, 196, 789; BSF ¶¶303-12.

- The government established the Convivir system as "a legal mechanism to fund the AUC." *Drummond II*, slip op. at 10; *see* NJ ¶¶37–44, 54; DC ¶¶421-28; VC ¶¶128, 139–46; NY ¶¶854–61, 894; BSF ¶¶322–24; Carrizosa ¶¶35, 89; Wolf ¶¶1009, 1010.

- The Convivirs "served as fronts for the AUC"; they funneled money to the AUC and were led by AUC commanders who coordinated AUC operations with the Colombian military. *Drummond II*, slip op. at 10; *see* NJ ¶¶36–39, 78; DC ¶¶421-28; VC ¶¶139–40; NY ¶¶854-861, 894; BSF ¶¶322–24; Carrizosa ¶¶35, 89; Wolf ¶¶1012–13, 1022, 1024.

- Active and retired military set up paramilitary units, moonlighted as paramilitary members, and were thoroughly integrated into the paramilitary groups. *Drummond II*, slip op. at 10; *see* DC ¶¶433; 435; VC ¶¶149-152; NJ ¶¶48–51; NY ¶¶839-847; BSF ¶¶307-08; Carrizosa ¶¶36, 90; Wolf ¶1021.

- The Colombian military provided the paramilitaries with weapons, intelligence, and supplies and the AUC in turn conducted missions at the request of the military. *Drummond II*, slip op. at 10; *see* DC ¶¶436; VC ¶¶146-166; NJ ¶¶45–66; NY ¶¶839-847; BSF ¶¶296, 309-13; Carrizosa ¶¶36, 90.

- The U.S. State Department and other independent investigators have found that the Colombian security forces "collaborated with paramilitary groups that committed serious abuses." *Drummond II*, slip op. at 11; *see* NJ ¶48; VC ¶149; NY ¶869; DC ¶¶433, 506, 532, 533; BSF ¶¶332; Wolf ¶¶1019, 1082–84.

*Drummond II* concluded that these similarly "concrete allegations" were "more than a 'formulaic

17

recitation'" and satisfied the requirements of *Sinaltrainal*. Slip op. at 11.

Plaintiffs have likewise connected the murders alleged in these actions to the symbiotic relationship as required under *Sinaltrainal*. See *Drummond II*, slip op. at 12.[40] In *Drummond II*, the court found a sufficient nexus to the killings by the AUC where plaintiffs alleged that the Colombian military and government were involved in Drummond's provision of funds to the AUC; that Drummond intended to assist the AUC; that Drummond decided to join with the AUC for the same reason as the Colombian State—to pursue the FARC using terrorist tactics; and that FARC attacks against Drummond's rail lines may have affected Drummond's willingness to fund the AUC. *Drummond II*, slip op. at 12–13. Plaintiffs' allegations here exceed the nexus found sufficient in *Drummond II*. Like the *Drummond* plaintiffs, Plaintiffs here allege that the Colombian military and government were involved in Chiquita's provision of funds to the AUC,[41] that Chiquita intended to assist the AUC,[42] and that Chiquita decided to join with the AUC for the same reason as the Colombian State—to pursue perceived FARC sympathizers using terrorist tactics.[43] In addition, Plaintiffs allege that:

- The AUC conducted missions in Chiquita's area of operations at the behest of the Colombian State and with State support and collaboration. NJ ¶¶47–66; DC ¶¶439-51; VC ¶¶151-53; NY ¶¶869-71; BSF ¶¶303-43; Carrizosa ¶¶36, 90; Wolf ¶¶1025-1027.
- The State specifically used the AUC in and around Chiquita's facilities to target perceived guerrilla sympathizers including teachers, community leaders, social activists, trade unionists, human rights defenders, religious workers, leftist politicians, and social undesirables. NJ ¶¶27, 127, 165, 212; DC ¶¶411; 433; 459-60; 462; 465; VC ¶¶226, 242, 246; Carrizosa ¶¶2, 33; Wolf ¶1000.

---

[40] Not all tests for state action require this nexus. *See* PO at 56–65. For example, Plaintiffs allege that the AUC took on state functions including police and military functions, receiving and resolving complaints of criminal activity, resolving disputes, collecting debts, and commandeering stretches of highway to assist in importing weapons and exporting drugs. NJ ¶¶67–70; DC ¶¶452-55; VC ¶¶167-71; BSF ¶¶335-43. *Sinaltrainal* did not address this test.

[41] NJ ¶¶37–44, 78, 164; DC ¶¶421-28; VC ¶¶141-45, 186, 834; BSF ¶¶322-24; Wolf ¶¶1010–15.

[42] NJ ¶¶27, 45–49, 61–65, 164–65, 212; DC ¶¶438;VC ¶¶176, 232-35, 240, 246-47, 363, 453-55; BSF ¶¶393-97; Wolf ¶1000.

[43] NJ ¶¶21, 26–27, 32, 34, 116, 119; DC ¶¶465; 492-94; 504-11; VC ¶¶212-16; BSF ¶¶365-87, 395-97, 444-46; Wolf ¶1000.

- The State worked to create the AUC as an "informal special unit of the military for the purpose of using brutal tactics that the regular military was not permitted to use." *Drummond II*, slip op. at 9; *see* DC ¶¶430; 435; NJ ¶¶26, 41, 47, 54, 63; VC ¶¶151–52; NY ¶¶840-41; BSF ¶¶295-96, 304-13, 318-20, 324, 325-30; Carrizosa ¶¶28, 32, 34, 36, 89-90; Wolf ¶¶997, 1003, 1011, 1013, 1016-1036, 1038, 1043, 1103-1110, 1208, 1038.

- The Colombian government used the AUC to "out guerilla the guerillas" and defeat the FARC through terrorist tactics. *Drummond II*, slip op. at 10; *see* DC ¶¶429-30; 435; 439; NJ ¶¶30–31, 45–46, 49; VC ¶131, 133; NY 846–49; Conrad & Scherer ¶¶411–12; BSF ¶¶295-96, 303-13; Carrizosa ¶28; Wolf ¶¶1003–06.

- Plaintiffs are members of the groups targeted by the State through the AUC in Chiquita's area of operations, including labor organizers, community activists and suspected FARC sympathizers. NJ ¶¶134, 137, 140, 143, 146, 150, 153, 157, 161, 179; DC ¶¶413; 439; 459; 462; VC ¶¶252, 258, 274, 279, 296, 299-300, 304; Carrizosa ¶¶50-87; NY ¶10.

- The Colombian State sanctioned the AUC's violent conduct that caused Plaintiffs' deaths. NJ ¶¶45–49, 61–65, 164–65; DC ¶¶429-30; VC ¶¶146-51, 154-71, 834-5; BSF ¶¶295-96, 301-13, 318-20, 322-24, 335-43; Wolf ¶1025.

Plaintiffs' pleadings are neither generalized nor formulaic. Among their detailed factual allegations, Plaintiffs show that General Rito Alejo del Río Rojas, commander of the 17th Brigade of the Colombian Army, was a key co-conspirator with the specific blocs of the AUC that Chiquita funded and helped arm.[44] The Colombian government created the legal structure for Chiquita's payments to the AUC, which was essential to establishing and maintaining Chiquita's arrangement with the AUC.[45] Using this structure, *Papagayo* Convivir, Chiquita's primary link to the AUC, provided legal cover to the State, the company, and the paramilitary.[46] Indeed, the AUC's intertwinement with the Colombian State and its status as a for-hire "sixth division" of the Colombian armed forces was an enticement to Chiquita to enter the agreement with the AUC.[47] Chiquita perceived a benefit from the AUC's violent acts and continued to fund and otherwise facilitate the violence for nearly a decade in the name of continued profitable

---

[44] NJ ¶¶49, 56–60, 64–65; DC ¶¶442-47; VC ¶¶158-61; BSF ¶353; Wolf ¶¶1027–31, 1033; NY ¶844.

[45] NJ ¶¶37–44, 78, 164; DC ¶¶421-28; VC ¶¶139-45; BSF ¶¶322-24, 399-400.

[46] NJ ¶¶36–38, 42, 44, 78; DC ¶¶427-28; VC ¶¶138, 144-5; 185; NY ¶¶859-61; BSF ¶¶399-400, 453; Carrizosa ¶¶35, 42; Wolf ¶1052.

[47] NJ ¶¶27,53,73–74,114; DC ¶433; VC ¶149.

operations.[48] These allegations are even more robust than those found sufficient in *Drummond II* and are far more concrete than the "formulaic recitations" dismissed in *Sinaltrainal*.[49]

Chiquita argues that the paramilitaries could not have acted under color of law because Colombian statutes purported to outlaw such activity. DCM at 15. However, as Plaintiffs explained in the previous briefing, numerous courts, the U.S. State Department, the United Nations, and the Colombian Attorney General's office have repeatedly found the Colombian State responsible for the acts of paramilitary groups, including the AUC, *after those groups were declared illegal under Colombian law*, when the State acted in concert, aided, knowingly failed to stop, or otherwise assisted abuses committed by the groups.[50] High-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including fourteen current members of the Colombian Congress, seven former lawmakers, the head of the secret police, mayors, and former governors.[51] Indeed, *Drummond II* found plausible plaintiffs' allegations that the Colombian government "encourages, supports, and relies on" the paramilitaries, slip op. at 11, despite passing statutes ostensibly banning such organizations. Plaintiffs' allegations that the AUC committed these murders while acting under color of law are consistent with the Colombian State's widespread custom of collaborating with the paramilitaries to combat the leftist guerrillas and are entirely plausible as a matter of fact.

To evaluate color of law and state action, this circuit relies on general principles of 42 U.S.C. § 1983 jurisprudence. *Aldana*, 416 F.3d at 1247. These principles firmly establish that an official or delegate acts under color of law when he acts pursuant to a state custom or practice,

---

[48] NJ ¶¶27, 116, 119; VC ¶¶1, 123; DC ¶¶463-73; VC ¶¶1, 123, 222, 231, 237, 243; BSF ¶¶444-52; Carrizosa ¶¶1, 2, 26; Wolf ¶1091.

[49] *Drummond II* rejected the proposition that the defendant "must have known of specific *identities* of those murdered, and have ordered the deaths of those specific individuals" to be liable for aiding and abetting extrajudicial killings, finding "no authority" for that proposition. Slip op. at 22 n.24. State action requires that the AUC was acting under color of law; it does not require that the State and the company specifically selected each victim.

[50] *See, e.g., Mapiripan Massacre v. Colombia*, Inter-Am. Ct. H.R. (ser. C) No. 134 (Sept. 15, 2005), ¶¶118-23; NJ ¶48; VC ¶¶147, 834; BSF ¶¶315-33.

[51] NJ ¶164; DC ¶434; VC ¶¶150, 834; BSF ¶¶344-54; Wolf ¶1020; NY ¶¶838-44.

even if contrary to written law or policy. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130-31 (1988) (plurality); *id.* at 145 n.7 (Brennan, J., concurring); *accord Young v. Sedgwick County*, 660 F. Supp. 918, 925 (D. Kan. 1987) ("Indeed the actual practices of officials often constitute the official policy of a municipality, while an ordinance, regulation or manual may be routinely ignored."). Thus, in *Praprotnik*, for example, seven Justices agreed that "a municipal charter's precatory admonition against discrimination" would not insulate the municipality from liability for acts inconsistent with the written policy. 485 U.S. at 130; *id.* at 145 n.7 (Brennan, J., concurring). Plaintiffs' claims cannot be dismissed simply because Plaintiffs' allegations imply significant violations of Colombian law by state actors—especially where the plausibility of those allegations is bolstered by the unanimous conclusions of Colombian and international fact-finders.

3.      **War crimes, which do not require state action, are properly pled.**

Application of *Sinaltrainal* to the facts of this case supports, not forecloses, Plaintiffs' claims, as *Drummond II* illustrates. *Sinaltrainal* confirmed, as Plaintiffs contend, that war crimes do not require state action and that in order to qualify as war crimes, the alleged abuses must be "committed in the course of a civil war." 578 F.3d at 1267. The circuit affirmed dismissal in that case because the plaintiffs had alleged only that the crimes "merely occur[ed] during an armed civil conflict." *Id.*[52] *See also Drummond II*, slip op. at 15 (more must be alleged than "mere fact that the conduct occurred while an armed conflict was ongoing"). Plaintiffs do not allege that all crimes that occurred in Colombia during the civil war are "war crimes" actionable under the ATS. Rather, because plaintiffs' injuries were precipitated by the conflict and occurred in the course of hostilities, plaintiffs' claims are properly pled here.

*Drummond II* applied *Sinaltrainal* to facts very similar to those alleged here and found

---

[52] *Sinaltrainal* observed that opening the door to lawsuits alleging *any* non-state murder claim (including garden variety crimes) that occurred during any period of civil unrest would be contrary to *Sosa. Id.* The decision did not hold, as Chiquita implies, that recognition of properly alleged war crimes would raise such concerns.

21

that they sufficiently stated a war crimes claim. Slip op. at 15, 25. There, as here, plaintiffs alleged that the murders were committed in the course of the AUC's attacks on areas where the guerrillas had a foothold, that the AUC pursued a policy of murdering perceived guerrilla sympathizers, and that the decedents were among those killed as the AUC pursued its war strategy of murdering civilians to terrorize the population. Slip op. at 15; *e.g.* NJ ¶¶30–34, 55, 76, 201–06; BSF ¶¶295, 436; NY ¶¶826-37, 970, 973, 974. Specifically, Plaintiffs allege that the AUC sought to terrorize civilians and discourage them from supporting the guerrillas, especially in areas where FARC had a stronghold.[53] The AUC targeted persons they considered to share their opponents' ideology, such as teachers, community leaders and activists, trade unionists, human rights defenders, religious workers, and leftist politicians.[54] Plaintiffs' relatives were killed as part of the AUC's war effort for precisely these reasons.[55] The allegations here are at least as concrete as those *Drummond II* found sufficient to allege that "the unrest in Colombia did not merely provide the 'background for the unfortunate events that unfolded' but that the civil war precipitated the violence that befell Plaintiffs." Slip op. at 15; PO at 66–70. *Sinaltrainal*, which affirms the legal standard Plaintiffs asserted, PO at 66, and *Drummond I*, which addressed a less-developed complaint, thus provide no basis for dismissal.[56]

---

[53] NJ ¶¶30-31, 52, 54, 104, 111, 123, 203, 206; VC ¶¶143, 152, 183, 901-03, 925-28, 932; DC ¶¶4, 410, 438, 492-93, 504-05; BSF ¶¶295-96, 446; NY¶827.

[54] NJ ¶¶32, 54, 165; NY ¶¶835-36.

[55] *E.g.,* NJ ¶¶127, 134-63, 165, 205; VC ¶¶131-37, 240, 251-833. Indeed these allegations satisfy even Chiquita's erroneous "in furtherance" standard. Chiquita originally claimed that "it is not enough" that Plaintiffs were "innocent civilians killed in the *course* of an armed conflict," and that abuses must be committed "in furtherance" of a conflict. 2008 Def's. Mem. at 63-64, MDL Dkt. 93 (July 11, 2009) (emphasis added). *Sinaltrainal*, however, held, as Plaintiffs here argued, that abuses need only be committed "in the course" of hostilities. 578 F.3d at 1276; *see* PO at 66-69. Nonetheless, Plaintiffs' allegations satisfy even Chiquita's erroneous standard.

[56] Plaintiffs' detailed allegations belie Chiquita's claim that the complaints make only conclusory assertions regarding the nexus between the atrocities and the war. DCM at 16, 27. Plaintiffs have adequately alleged that the violence they suffered was part of, and committed in furtherance of, the AUC's war effort. Paradoxically, Chiquita does not specifically challenge the allegations of any particular plaintiff, and therefore has not provided any basis to dismiss the claims of any particular plaintiff. Some Plaintiffs are proceeding under pseudonyms and have not provided additional details about their injuries because to do so in a public document would be dangerous.

These allegations also refute Chiquita's claim that Plaintiffs have merely alleged that the violence was carried out "to further Defendants' business interests" during wartime. DCM at 7, 26. Chiquita seems to suggest, without authority, that its *own* motives for supporting abuses are relevant to whether the abuses constitute war crimes. DCM at 26, n.26. But the fact that Chiquita supported the AUC's goals in order to maintain its own profits does not transform these atrocities into something other than war crimes. *See Drummond II*, slip op. at 26 (plaintiffs "sufficiently alleged that Drummond chose a side in the Colombian political unrest. It is immaterial that the company may not have chosen the side of the AUC to further a military objective"). Chiquita's suggestion that violence that furthers a business interest can never be a war crime misstates the law. War crimes may be "perpetrated because of the ongoing civil war *or* in the course of civil war clashes." *Sinaltrainal*, 578 F.3d at 1267 (emphasis added). The use of the disjunctive confirms that the conflict need not "cause" the crime. Courts reject the notion that abuses must be perpetrated in furtherance of a military objective in order to constitute war crimes. *Drummond II*, slip op. at 15; *In re XE Services Alien Tort Litig.*, 665 F.Supp.2d 569, 585-87 (E.D.Va. 2009) (such a standard would be "so narrow . . . that it would exclude murders of civilians committed by soldiers where there was no legitimate 'military objective' for committing the murders" such that "nobody who receives a paycheck would ever be liable for war crimes"). Indeed, in *Drummond II*, plaintiffs alleged the defendants paid the AUC for security, but the court found war crimes adequately alleged because "[t]he AUC had intentions of fighting FARC" in that location, even though Drummond's assistance allowed the AUC to make that area a new priority. Slip op. at 15-16. Thus, abuses committed as part of war but that also serve commercial interests are war crimes. The *Sinaltrainal* plaintiffs did not allege, as Plaintiffs do here, that they were victims of a pattern of atrocities committed as part of a military strategy in a war in which Chiquita picked and financed a side. Thus, war crimes are properly alleged here.

### 4.   Crimes against humanity, which do not require state action, are properly pled.

Chiquita's claim that crimes against humanity (CAH) is not actionable is wrong, *see* PO at 65–66 & n.70, and presumably included only to preserve the issue in case the circuit reverses its precedent finding CAH actionable under the ATS. *See Cabello*, 402 F.3d at 1161.[57] Chiquita's suggestion that Plaintiffs have not alleged an "attack" is also mistaken. An attack "is not limited to the use of armed force; it encompasses any mistreatment of the civilian population." *Prosecutor v. Kunarac et al.*, Case No. IT-96-23-A & IT-96-23/1-A, Appeal Judgment, ¶86 (June 12, 2002); *see also Prosecutor v. Stakic,* Case No. IT-97-24-T, Judgment, ¶623 (July 31, 2003); *Prosecutor v. Fofana*, Case No. SCSL-04-14-T, Judgment, ¶111 (Aug. 2, 2007). An attack may take place during an armed conflict, but need not be part of the conflict. *Kunarac* Appeal Judgment ¶86; *Fofana* ¶111.

Plaintiffs allege that the AUC systematically murdered and terrorized civilians across Chiquita's area of operations pursuant to its strategy of intimidating the civilian population "to discourage people from supporting the guerrilla insurgency." NJ ¶214; BSF ¶295.[58]  Repetition

_____

[57] Despite previously conceding that CAH claims "do not require state action," 2008 Def's. Mem. at 57, Chiquita now takes the opposite position. DCM at 23 n.23. Chiquita was correct the first time: CAH does not require state action. *See, e.g., Kadic* , 70 F.3d, 236; *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 293 (E.D.N.Y. 2007). Chiquita's authority, *Abagninin v. Amvac Chemical Corp.*, holds that CAH requires "State *or organization* action" and confirms that CAH can be committed by "non-State entities" including "militias and criminal syndicates." 545 F.3d 733, 741 (9th Cir. 2008) (emphasis added). The cases relied on in *Abagninin* likewise hold that CAH can be committed "by a terrorist group or organization," *Prosecutor v. Tadic*, Case No. IT-94-1-T, Judgment ¶¶654–65 (May 7, 1997); or by "individuals 'with de facto power or organized in criminal gangs.'" *Prosecutor v. Blaskic*, Case No. IT-95-14-T, Judgment ¶205 (Mar. 3, 2000). Plaintiffs easily make this showing—the AUC was an organized militia, and indeed it was tightly affiliated with the State (*see supra* Part II.D.2). Plaintiffs have even shown the AUC exercised de facto control over territory. NJ ¶¶51, 68-70, 74; BSF ¶¶444-51.
[58] This allegation distinguishes this case from *Drummond II*, where the plaintiffs alleged only that the victims "were targeted *because* of their suspected" collaboration with the guerrillas, and not as part of a generalized attack on a civilian population. *Drummond II*, slip op. at 18. In contrast, Plaintiffs here allege that the AUC killed civilians "in order to intimidate the population from providing any support to the guerrillas." NJ ¶212; VC ¶134; BSF ¶¶295, 446. While the AUC focused in part on groups generally associated with guerrilla sympathies, "such as teachers, community leaders, social activists, trade unionists, human rights defenders, religious workers, and leftist politicians," Plaintiffs make clear that the attack was generalized, such that "[m]any others not belonging to these groups were killed as well." NJ ¶212.

24

of such attacks over many years supports Plaintiffs' CAH claims.

> **5.**   **Terrorism is a well-defined and established violation of customary international law that is actionable under the ATS.**

Chiquita now appears to have largely abandoned its untenable argument that terrorism is not a violation of the law of nations. The core prohibition against murder with the intent to intimidate a civilian population is well-defined and universally accepted.[59] *See Almog*, 471 F. Supp. 2d at 284 (noting that "murderous attacks on innocent civilians intended to intimidate or coerce a civilian population—are universally condemned")[60]; *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 23 (D.D.C. 1998) ("the terrorist is the modern era's hosti humani generis—an enemy of all mankind"); *see also, e.g.*, U.N. Security Council Res. 1955 Establishing the Int'l Tribunal for Rwanda, art. 4(d), Nov. 8, 1994, 33 I.L.M. 1598 (listing "acts of terrorism" among the violations punishable by the tribunal); PO at 22-29.[61] This suffices under *Sosa*.

Here, where Chiquita pled guilty in a criminal proceeding to willfully providing substantial support to the AUC and where the AUC is designated, along with Al-Qaida, Hamas, the REAL IRA, and Islamic Jihad, as a Foreign Terrorist Organization, there can be no doubt

---

[59] As reports to the U.N. Counter-Terrorism Committee (UNCTC) show, almost every country prohibited the intimidation of civilian populations through murder as terrorism before 1997; Chiquita notes that Security Council Resolution 1373, cited by Plaintiffs, was passed in 2001, Reply at 13-14, but that resolution merely led countries to refine enforcement mechanisms. This is confirmed by the reports submitted under resolution 1373 by, for example, France, U.N. Doc. S/2001/1274 (2001) at 3 (noting 1986 French terrorism law); Italy, U.N. Doc. S/2002/8 (2002) at 5 (Italy criminalized terrorism before September 11, 2001); Syria, U.N. Doc. S/2001/1204 (2001) at 4 (long-standing terrorism provision of Syrian Criminal Code); and Mexico, U.N. Doc. S/2001/1254 (2001) at 5 (Codigo Penal Federal [C.P.F.] [Federal Criminal Code] (Mex.) art. 139). *See also* PO at 25–26 (U.S. and Colombia). Although some regional conventions omit cases of national liberation struggles from the offenses designated as terrorist acts, they only do so when such acts are carried out "in accordance with the principles of international law," which would exclude the war crimes, extrajudicial killings, and CAH alleged here. *See* Arab Convention on the Suppression of Terrorism, art. 2(a), Apr. 22, 1998, available at http://www.unchr.org/refworld/docid/3dc4984.html; OAU Convention on the Prevention and Combating of Terrorism, art. 3.1, July 14, 1999, 2219 U.N.T.S. 179.

[60] This language refutes the claim, Reply at 16, that *Almog* concerned only suicide bombings.

[61] Chiquita can be held liable for, e.g., aiding and abetting terrorism, regardless of the actionability of material support, and the elements of each are not necessarily coextensive.

that Chiquita can be held indirectly liable for, *e.g.*, aiding and abetting terrorism.

> **6.      Providing material support for terrorism, including financial support, is a well-defined and established violation of customary international law that is actionable under the ATS.**

The prohibition on knowingly providing resources for the murder of civilians in order to intimidate a population is a related, but distinct, violation of international law from aiding and abetting violations of the norm prohibiting terrorism.  Regardless of the standards for aiding and abetting, the *mens rea* for material support is intentional provision of substantial assistance, with the knowledge that it will be used to carry out terrorist acts, and the *actus reus* includes the provision of any financial support.  *See* Int'l Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, S. Treaty Doc. No. 106-49, 2178 U.N.T.S. 229 ["Financing Convention"]; 18 U.S.C. 2339A(a) and (b)(1); 18 U.S.C. 2339C(a)(1).  Chiquita does not address Plaintiffs' new factual allegations but reiterates three arguments from its prior briefing: that the ATA precludes recognition of the material support norm, despite contrary circuit precedent; that the prohibition against material support for terrorism is not well-defined and universally accepted, focusing on only one of the myriad examples cited by Plaintiffs; and finally that "practical consequences" counsel against recognizing liability here, even though the *Julin* case, which contains similar allegations and will entail similar discovery, will proceed.

> **a.      The ATA confirms the norm against material support, rather than precluding it.**

First, arguing that "nothing has changed on the legislative front," Chiquita reiterates its argument that passage of the ATA precludes recognition of a cause of action for foreign victims under the ATS. DCM at 19.  Since the original briefs were filed, two additional Eleventh Circuit decisions, as well as decisions in at least one other Circuit, have rejected Chiquita's argument and confirmed, as Plaintiffs argued, PO at 19-22, that the enactment of a statute providing a remedy for U.S. citizens for the same or similar conduct supports—not precludes—Plaintiffs' claims under the ATS. *See Sinaltrainal*, 578 F.3d at 1264; *Romero v. Drummond Co.*, 552 F.3d

1303, 1316 (11th Cir. 2008) (enactment of torture statute does not preclude remedy under ATS); *Adhikari v. Daoud & Partners*, No. 09-cv-1237 2009 WL 6067064, at *9 (S.D. Tex. Nov. 3, 2009) (following Eleventh Circuit to hold enactment of Trafficking Statute does not preempt ATS claim for human trafficking).  Chiquita cites no authority for its position.

> ### b.      The Financing Convention is strong evidence of the universal state practice supporting the norm against material support.

Chiquita next argues that the Financing Convention does not establish a clearly defined international law norm or "fit" the conduct here.  But the Financing Convention manifestly encompasses Chiquita's alleged conduct, and is just one of many sources of support for the norm.  In addition to this Convention, material support is banned by universal state practice pursuant to international legal obligations, including that of the United States.

In general, Chiquita's singling out of the Financing Convention for criticism is unwarranted.  The Convention did not *create* the norm; it is based on norms that were well-settled and universally accepted long before 1999, when the Convention was submitted for ratification.[62]  It also references numerous treaties which, taken together, evince the development of a comprehensive international legal scheme to prevent and prohibit material support for terrorism.  *E.g.*, International Convention for the Suppression of Terrorist Bombings art. 15(a), Jan. 9, 1998, S. Treaty Doc. No. 106-6, 2149 U.N.T.S. 284 (prohibition on financing).  The *travaux preparatoires* of the Financing Convention, which Chiquita misleadingly quotes for the unfounded proposition that financing fell into a "gap in international law," Reply at 18, show that the Convention was enacted to bolster enforcement mechanisms for a pre-existing norm; the

---

[62] *E.g.*, Decl. on Measures to Eliminate Int'l Terrorism, G.A. Res. 49/60, Annex, U.N. Doc. A/RES/49/60 (Dec. 9, 1994) (measures designed to assist terrorism are "criminal", and states are obliged under international law to prevent their territory from being used to support terrorism); Measures to Eliminate Int'l Terrorism, G.A. Res. 51/210, U.N. Doc. A/RES/51/210 (Dec. 17, 1996), (designating acts of terrorism as criminal and calling upon states to prevent the financing of terrorism); and S.C. Res. 1189, U.N. SCOR, 3915th mtg., U.N. Doc. S/RES/1189 (1998), (states have a duty not to acquiesce in the use of their territory for "organized activities within . . . [their] territory directed towards the commission of . . . [terrorist acts]").

805122.1 1

gap was in fact in the "means of countering the acts of those who supplied funds" to terrorists, not the prohibition itself.  U.N. GAOR, Report of the Ad Hoc Committee established by General Assembly resolution 51/210 of 17 December 1996 at 3, U.N. Doc. A/54/37 (May 5, 1999) ("Ad Hoc Committee Report"). Similarly, the existence of terrorism conventions and the many U.N. resolutions urging their ratification confirms the norm by setting out the measures required of states to implement international law obligations.[63]   Thus, the Financing Convention is merely one of a constellation of international instruments establishing the norm against material support.[64]

Moreover, Chiquita's argument that the Financing Convention fails to prohibit Chiquita's conduct, DCM at 20, is baffling.  Article 2(b) of the Convention states that anyone who provides funds with the *knowledge* or intent that they will be used to cause death or severe bodily injury to a civilian in order to intimidate a population has committed an offense.  This is clearly alleged. Furthermore, the Financing Convention was meant to cover the "financing of murder" in addition to offenses that were covered specifically by the prior treaties.  Ad Hoc Committee Report ¶29.  It is also untrue that the Convention does not create civil penalties.  Article 5 of the Convention calls on States to establish civil remedies, specifically for offenses committed by

---

[63] *See also* U.N. GAOR, Sixth Committee, *Measures to eliminate international terrorism: Report of the Working Group*, Annex III, B ¶6, U.N. Doc. A/C.6/54/L.2 (Oct. 26, 1999) (Convention was aimed at preventing "the crime of terrorism" and punishing its financing).

[64] The fact that States Parties commonly issue reservations to international conventions, such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85 ["Torture Convention"], and the Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277, does not negate the fact that these conventions codify international norms.  Moreover, apart from reservations disclaiming obligations pursuant to treaties they have not yet ratified, only four countries decline to be bound by substantive provisions of the Financing Convention; none has objected to art. 1(b), which reflects the core definition of terrorism. Two of the countries exclude from their reservations acts inconsistent with international law.  These few reservations on the margins hardly negate the core prohibition on the murder of civilians in order to intimidate a population. Also, the reservations of Syria, Egypt, and Jordan do not apply to the Colombian civil war, as that conflict is by no means one of liberation, self-determination, or resistance to foreign aggression.

legal entities like corporations.  Regardless, *Sosa* recognized that the common law, not international law, provides for civil liability under the ATS.  *Sosa*, 524 U.S. at 724.

In any case, Plaintiffs do not bring claims under the Financing Convention pursuant to the "treaty prong" of the ATS, but rather for conduct "in violation of the law of nations." *See* 28 U.S.C. § 1350.  Moreover, Plaintiffs allege not only financial support, but also arms and drugs smuggling to the AUC.  *E.g.*, NJ ¶¶85–98; BSF ¶¶427-43; NY ¶¶972-76.  The Financing Convention does not purport to define and limit the entire category of material support; it is merely important evidence of the norm's existence.  Conduct in violation of the law of nations need not be prohibited by a binding treaty, let alone a self-executing one.  For example, in the seminal case of *Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980), the Second Circuit held torture was a violation of the law of nations several years prior to the promulgation of the Torture Convention.[65]  In fact, the law of nations is formed by the "actual customs and practices" of states.  *See Sosa*, 542 U.S. at 734.  Treaties, whether self-executing or not, "provide *some* evidence of the custom and practice of nations."  *Flores v. Southern Pern Copper Corp.*, 414 F.3d 223, 256 (2nd Cir. 2003).[66]  Other sources are also relevant evidence, including non-binding U.N. documents such as General Assembly resolutions, *see Flores*, 414 F.3d at 261.  Security Council resolutions, which are "legally binding" as actions "'on behalf of all'" U.N. members, carry even more weight, *id.* at 261.  These sources plainly demonstrate that the prohibition on material support was part of the law of nations since before 1997.  PO at 29-32.

State practice is a lynchpin in the creation of customary international law, and material

---

[65] As another example, Chiquita's own authority, *Talisman,* relies on the Rome Statute, a treaty that the U.S. has not even ratified. 582 F.3d at 259.

[66] Regional conventions provide strong evidence of how widespread the norm is; Chiquita misinterprets them in order to conjure a gap that does not exist.  Article 5 of the Inter-American Convention Against Terrorism, for example, which Chiquita says only requires mutual cooperation, calls on states to ratify international terrorism conventions and implement their principles fully. AG Res. 1840, OAS AG, 32nd Sess., AG/RES. 1852 (XXX11-O/02) (June 4, 2000). It also recognizes that the Convention contributes to the "codification of international law"—that is, that it is built on pre-existing norms.

29

support for terrorism is universally condemned by states.[67] Plaintiffs' research has not identified a single country that does not have a legal mechanism for prosecuting those who finance terrorism. Furthermore, the numerous General Assembly resolutions cited previously, PO at 24-25, make clear that terrorism is of universal, mutual concern, and that the international legal obligation of collective security requires all States to suppress support of terrorism. Chiquita's citation, Reply at 21, to the Report by the Chair of the U.N. Counter-Terrorism Committee is selective and misleading. The Chair did report "serious problems" —not because States Parties rejected the norm, but because weak capacity on the part of States and disagreements over the adequacy of States' measures hindered implementation.[68] Regardless, that a norm is "often honored in the breach" is not enough to undermine its status under the law of nations. *Sosa*, 524 U.S. at 757 n.29. It suffices that all major countries have taken steps for over a decade to implement the norm.

For example, the United States Congress has explicitly drawn on its Constitutional power to define and punish offenses against the law of nations in order to impose penalties on the provision of material support to terrorist organizations. *E.g.*, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(2), 110 Stat. 1214, 1247 (1996) ("AEDPA")

---

[67] This is shown by, for example, the UNCTC country reports of Germany, U.N. Doc. S/2002/11 (Jan 2, 2002) at 5 ("financing of terrorist activities can constitute a separate criminal offence" (citing section 129a of German Criminal Code)) (citing Strafprozen Bordnung [STPO] [Criminal Code] sec. 129a); Jordan, U.N. Doc. S/2003/16 (Jan. 8, 2003) at 5–6 ("the use of funds for criminal or terrorist purposes is . . . considered among the material acts pertaining to the punishable crime of terrorism"); and the United Kingdom, U.N. Doc. S/2001/1232 (Dec. 24, 2001) at 6 ("it is an offence to invite anyone to provide money or property . . . for the purposes of terrorism" (citing Terrorism Act of 2000)). *See also* Ugolovnyi Kodeks [UK] [Criminal Code] art. 205.1(a) (Russ.) ("financing of an act of terrorism" is "criminal involvement" in terrorism).
[68] The 2008 Survey of the Implementation of Security Council Resolution 1373, U.N. Doc. S/2008/379 (June 10, 2008), cited in Prof. Posner's declaration, supports this conclusion, contrary to his contention. Prof. Posner claims the report shows that "very few countries" have put in place adequate laws and institutions. Posner Decl. ¶63. However, the excerpt cited in his declaration does not cite any major countries that fail to prosecute material support. Rather, the reference to "very few countries" describes the failure of countries to freeze terrorist assets.

(relying on "define and punish" clause to enact penalties for material support);[69] *see also* Military Commissions Act of 2009, Pub. L. No. 111-84, 123 Stat. 2190 (2009) (designating material support for terrorism as a violation of international law triable by a military commission).[70]  AEDPA also amended the Foreign Sovereign Immunities Act in 1996 to abrogate immunity for state sponsors of terrorism in suits involving extrajudicial killing, torture, terrorism, and material support. 110 Stat. 1241, § 221.  Congress thus made clear that terrorism and material support are violations of the law of nations by grouping them with two other recognized violations of the law of nations.  *See Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242 (2d Cir. 1996).[71]  The U.S., like other states, took these steps to meet its international legal obligations to ban material support.

c.   **"Practical consequences" do not preclude recognition of material support.**

Finally, Chiquita mistakenly argues that the Court should not recognize a material support for terrorism claim due to the "practical consequences" of doing so, DCM at 20, and then leaps to the conclusion that the Court can somehow dismiss these suits in their entirety. *Id.* at 21-22. Chiquita fundamentally misconstrues *Sosa*'s reference to "practical consequences."

"Practical consequences" are only relevant to whether the contours of a particular norm are sufficiently definite to be actionable, *Sosa*, 542 U.S. at 732, not in determining whether

---

[69] The same clause also authorizes Congress to carry out treaty obligations, but if, as Defendants contend, no pre-2002 treaty required the U.S. to criminalize material support, this can only reflect Congress' judgment that material support violates the law of nations.

[70] Although the current Military Commission Act was passed recently, the concept of material support is not new. *See, e.g,* Miliary Commissions, 11 Op. Att'y Gen. 297 (1865) (to unite with banditti, guerrillas or any other unauthorized marauders is a high offence against the laws of war and the law of nations and may be tried by military commission).

[71] The abrogation of sovereign immunity for acts with no connection to the U.S. is itself a violation of international law unless such acts are violations of the law of nations. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 718 (9th Cir. 1992) (*jus cogens* violations waive states' immunity under international law but not under the FSIA); *see also* Antonio Cassese, International Law 145 (2001); *Prefecture of Voiotia v. Fed. Republic of Germany*, Areios Pagos [AP] [Supreme Court] 11/2000, p. 10 (Greece).

31

actionable norms can be adjudicated in a particular case.  PO at 35-36.  Thus, Chiquita's

argument has no conceivable application to claims based on norms such as extrajudicial killing,

whose definition Chiquita does not even challenge.  *Id.*  Nor can it provide the missing authority

for Chiquita's argument that a case can be dismissed simply because it is complex.

      The practical consequences of recognizing a material support claim would simply be that

defendants already subject to severe criminal penalties could also be sued by foreign victims.  By

contrast, dismissal of claims against a U.S. company that has admitted to financing terrorism, on

grounds that the number of victims is too large, would have the effect of suggesting to the world

that our nation is not serious about our international obligation to combat terrorism and

undermine our efforts to encourage other nations to implement theirs.  *See id.* at 36 n.44.

      Chiquita's arguments are nothing like those in *Sosa*.  There, the Court found that the

practical consequences of allowing ATS suits for any "brief detention in excess of positive

authority" would be "breathtaking," because such a claim would cover minor and frequent

breaches.  542 U.S. at 736-37.  By contrast, material support for foreign terrorism is rare, has

severe international repercussions, and is so serious that it is a federal felony that carries a life

sentence if death results.  *See* 18 U.S.C. §§ 2339A(a)(1) & 2339B(a)(1).

      Given this, Chiquita turns *Sosa* on its head and argues that material support is too

grave—it results in too many seriously injured victims.  The same could be said for genocide.

None of the issues Chiquita raises—the number of victims, the duration of the violations, and the

logistics of discovery—is relevant to the *Sosa* practical consequences analysis or is grounds for

dismissal.  Regardless, these cases are not unmanageable.  *Supra* Part II.B; PO at 36–38.  Indeed,

Chiquita's logistical argument is weakened by the Court's ruling in *Julin*, as the discovery

sought from Chiquita will likely be similar to the discovery needed in *Julin*.

      Chiquita's reliance on *Sinaltrainal* is unavailing.  DCM at 21.  As a threshold matter, a

practical consequences argument cannot apply to war crimes, because *Sinaltrainal* has already

held that crimes committed in the course of hostilities are cognizable.  578 F.3d at 1267.

Regardless, *Sinaltrainal* did not conclude that practical consequences precluded claims for

abuses that merely occur "during" civil conflict.  DCM at 7, 11, 20–21.  Instead, it held that such

abuses were not war crimes because they were not perpetrated in the course of hostilities.  578

F.3d at 1267.  This provides no basis for dismissing Plaintiffs' war crimes claims, because the

abuses alleged here were committed in the course of hostilities.  *See supra* Part II.D.3.

But even if *Sinaltrainal* could be read to have conducted a "practical consequences"

analysis, and even if this Court were to find that Plaintiffs have not pled war crimes under

*Sinaltrainal*, that case still would not support Chiquita's extraordinary effort to dismiss this

entire litigation.  DCM at 21-22.  *Sinaltrainal* was crystal clear that its discussion was limited to

the parameters of a war crimes claim.  578 F.3d at 1267 (discussing "war crimes exception to the

state action requirement").  It did not purport to create a free-floating warrant to dismiss cases

involving large numbers of victims, especially where based upon undisputedly actionable norms

such as extrajudicial killing.  *See Linder v. Portocarrero*, 963 F.2d 332, 337 (11th Cir. 1992).

Finally, there is no evidence that, as Chiquita suggests, recognition of the norm would

open the courts to a myriad of similar charges.  The conduct at issue here is exceptional, *see* PO

at 38, and the severity of the allegations clearly merit the Court's attention.

**E.    Plaintiffs Have Standing To Assert State-Law Claims.**

Plaintiffs' state law claims are not subject to dismissal on standing grounds.  Chiquita

relies solely on one anomalous district court case currently on appeal, *Doe VIII v. Exxon Mobil

Corp.*, 658 F. Supp. 2d 131, 132 (D.D.C. 2009), to argue that non-resident aliens lack standing in

U.S. courts.  But the Supreme Court, far from recognizing a general rule barring suits by aliens,

has repeatedly emphasized that "[t]he courts of the United States have traditionally been open to

nonresident aliens."  *Rasul v. Bush*, 542 U.S. 466, 484 (2004).[72]  Indeed, well over 200 years

---

[72] *Accord The Discontro Gesellschaft v. Umbreit*, 208 U.S. 570, 578 (1908) ("alien citizens. . .
are ordinarily permitted to resort to the courts for the redress of wrongs . . ."); *Banco Nacional de
Cuba v. Sabbatino*, 376 U.S. 398, 409 (1964) ("the privilege of suit has been denied only to
governments at war with the United States, or to those not recognized by this country") (internal
citations omitted); *The Sapphire*, 78 U.S. 164, 167 (1870) (a "foreign person, who has a demand

ago, English common law recognized non-resident aliens had standing to sue for torts committed

outside the jurisdiction: "if A becomes indebted to B, or commits a tort upon his person or upon

his personal property in Paris, an action in either case may be maintained against A in England,

if he is there found." *McKenna v. Fisk*, 42 U.S. 241, 248 (1843) (citing *Mostyn v. Fabrigas*, 1

Cowp. 161 (1774)). Relying on *Mostyn*, the Supreme Court confirmed that U.S. courts would

likewise be open to foreigners as well as to subjects. *McKenna*, 42 U.S. at 248.[73] Consistent

with this precedent, the Eleventh Circuit has routinely allowed non-resident aliens to bring

common law tort claims, *e.g. Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854 (11th

Cir. 2000), as have the other circuits.[74] Indeed, state law claims are routinely considered along

with ATS claims. *E.g., Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009); *Wiwa v. Royal*

*Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000); *Hilao v. Estate of Marcos*, 103 F.3d 789, 793-

94 (9th Cir. 1996). Because courts have a duty to assure that plaintiffs have standing, *sua sponte*

if need be, *e.g., DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006), this further illustrates

that U.S. courts do not bar non-resident aliens on standing grounds from bringing state law

claims in federal court. In short, *Exxon Mobil* simply misstates the law.[75] This Court should

---

of a civil nature against any person here, may prosecute it in our courts."); *see also* Dag
Ytreberg, 3 C.J.S. Aliens § 168 (Supp. 2007).
[73] *See also Taxier v. Sweet*, 2 U.S. (2 Dall.) 81 (Pa. 1766); *Dennick v. Railroad Co.*, 103 U.S. 11
(1880); *White v. Pepsico*, 568 So. 2d. 886, 888 (Sup. Ct. Fla. 1990).
[74] *E.g., Janovic v. Int'l Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007); *Bano v. Union Carbide
Corp.*, 361 F.3d 696 (2d Cir. 2004); *Bigio v. Coca-Cola*, 239 F.3d 440 (2d Cir. 2001); *Pasco
Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496 (7th Cir. 1980); *Lony v. DuPont de
Nemours & Co.*, 935 F.2d 604 (3d Cir. 1991); *Kontoulas v. A.H. Robins Co.*, 745 F.2d 312 (4th
Cir. 1984); *DeVries v. Starr*, 393 F.2d 9 (10th Cir. 1968); *see also Verlinden B.V. v. Cent. Bank
of Nig.*, 461 U.S. 480, 491 (1983); *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961); *People of
Saipan v. U.S. Dep't of Interior*, 356 F. Supp. 645, 652 (D. Haw. 1973).
[75] *Exxon Mobil* based its holding on a misreading of two cases limiting access of aliens living
overseas to constitutional protections and *habeas corpus*: *Berlin Democratic Club v. Rumsfeld*,
410 F. Supp. 144, 152 (D.D.C. 1976), (Austrian citizen could not maintain a suit under Fourth
and Sixth Amendments for actions in Berlin, Germany); *Johnson v. Eisentrager*, 339 U.S. 763,
776 (1950) (German nationals held by U.S. Army in Germany following conviction by military
commission have no right to *habeas corpus*). Not only are these issues not present in this case,
but that precedent has since been limited, if not overturned. *See, e.g., Rasul*, 542 U.S. at 484

reject Chiquita's contention that the Plaintiffs lack standing to maintain their state law claims for an additional reason: as *Exxon Mobil* itself recognized, to the extent they even exist in the first instance, any concerns relating to "judicial self-governance" dissolve once jurisdiction has been established over the Plaintiffs' ATS and TVPA claims. *Exxon Mobil*, 658 F. Supp. 2d at 134 (recognizing standing exists where "statutory scheme allows suits by non-resident aliens").

## III.   **CONCLUSION**

For the above reasons, Chiquita's motion to dismiss must be denied.

Date:   May 21, 2010

Respectfully Submitted,
/s/ John DeLeon
John DeLeon, FL Bar No. 650390
jdeleon@chavez-deleon.com
**Law Offices of Chavez-DeLeon**
5975 Sunset Drive, Suite 605
South Miami, FL  33143
Tel:  305-740-5347
Fax:  305-740-5348

Agnieszka M. Fryszman
Benjamin D. Brown
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964
Tel:  202-408-4600
Fax:  202-408-4634

Paul L. Hoffman
**Schonbrun, Desimone, Seplow,**
  **Harris & Hoffman LLP**
723 Ocean Front Walk
Venice, CA  90291
Tel:  310-396-0731
Fax:  310-399-7040

Judith Brown Chomsky
**Law Offices of Judith Brown Chomsky**

---

(limiting *Eisentrager* to its facts and finding aliens at Guantanamo Bay entitled to utilize writ of *habeas corpus*); *United States v. Demanett*, 629 F.2d 862, 866 (3d Cir. 1980) (Fourth Amendment applies to both American citizens and Colombian nationals on high seas).

Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
Fax: 202-782-8368

Arturo Carrillo
**Colombian Institute of International Law**
5425 Connecticut Ave., N.W., #219
Washington, D.C. 20015
Tel: 202-365-7260

Richard Herz
Marco Simons
**Earthrights International**
1612 K Street N.W., Suite 401
Washington, D.C. 20006
Tel: 202-466-5188
Fax: 202-466-5189

*Counsel for John Doe Plaintiffs*

Jonathan C. Reiter
jcrlaw@hotmail.com
**Law Firm of Jonathan C. Reiter**
350 Fifth Avenue, Suite 2811
New York, NY 10118
Tel: 212-736-0979
Fax: 212-268-5297

Ronald S. Guralnick, FL Bar No. 111476
rgacquit@bellsouth.net
**Ronald Guralnick, P.A.**
Bank of America Tower at International Place
100 S.E. 2d Street, Suite 3300
Miami, FL 33131
Tel: 305-373-0066
Fax: 305-373-1387

*Counsel for Plaintiffs Juan/Juana Does 1-747*

James K. Green, FL Bar No. 229466
jameskgreen@bellsouth.net
**James K. Green, P.A.**
Esperanté, Suite 1650
222 Lakeview Ave.
West Palm Beach, FL 33401
Tel: 561-659-2029

36

Fax:  561-655-1357

Jack Scarola, FL Bar No. 169440
jsc@searcylaw.com
Wiliam B. King, FL Bar No. 181773
wbk@searceylaw.com
David Sales
**Searcy Denney Scarola Barnhart & Shipley, P.A.**
2139 Palm Beach Lakes Blvd.
P.O. Drawer 3626
West Palm Beach, FL  33402
Tel:  561-686-6300
Fax:  561-478-0754

*Counsel for Plaintiffs Jose Leonardo Lopez
Valencia, et al.*

Terrence P. Collingsworth
Tcollingsworth@conradscherer.com
**Conrad & Scherer, LLP**
1156 15th St. NW, Suite 502
Washington, D.C.  20009
Tel:  202-543-4001
Fax:  866-803-1125

*Counsel for Plaintiffs DOES 1-144
and PEREZES 1-95*

William J. Wichmann, FL Bar No. 313270
wwichmann@me.com
**William J. Wichmann, PA**
1600 West Commercial Blvd., Suite 200
Fort Lauderdale, FL  33309
Tel:  954-772.6552
Fax:  954-527-8663

*Counsel for Plaintiffs Antonio Gonzalez
    Carrizosa, et. al.*

James K. Green, FL Bar No. 229466
jameskgreen@bellsouth.net
**James K. Green, P.A.**
Esperantè, Suite 1650
222 Lakeview Avenue
West Palm Beach, FL  33401
Tel:  561-659.2029

Fax:  561-655.1357

Jack Scarola, FL Bar No. 169440
William B. King, FL Bar No. 0181773
**Searcy Denney Scarola**
   **Barnhart & Shipley, P.A.**
2139 Palm Beach Lakes Blvd.
P.O. Drawer 3626
West Palm Beach, FL  33402
Tel: 561-686.6300
Fax: 561-478.0754

*Counsel for Plaintiffs Jose and Josefa Lopez*
   *Nos. 1 through 116*

Sigrid S. McCawley
**Boies, Schiller & Flexner LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL  33301
Tel: 954-356-0011
Fax: 954-356-0022

Stephen N. Zack
**Boies, Schiller & Flexner LLP**
100 S.E. Second St., Suite 2800
Miami, FL  33131
Tel: (305) 539-8400
Fax: (305) 539-1307

Karen C. Dyer
**Boies, Schiller & Flexner LLP**
121 South Orange Ave., Suite 840
Orlando, FL  32801
Tel:  (407) 425-7118
Fax:  (407) 425-7047

Nicholas A. Gravante Jr.
Lee S. Wolosky
Magda M. Jimenez Train
**Boies, Schiller & Flexner LLP**
575 Lexington Ave., 7th Floor
New York, NY  10022
Tel:  212-446-2300
Fax:  212-446-2350

*Counsel for Plaintiffs Angela Maria*

38

*Henao Montes, et al.*

Paul Wolf
P.O. Box 11244
Washington, D.C. 20008-1244
Tel. (202) 674-9653

*Counsel for Plaintiffs Does 1-976*

805122.1 1