**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 08-MD-01916 (Marra/Johnson)**

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC. ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION

_____/

This Document Relates to:

ATS ACTIONS

_____/

**DEFENDANTS' REPLY IN SUPPORT OF CONSOLIDATED**
**MOTION TO DISMISS AMENDED COMPLAINTS**

Gregg H. Levy
John E. Hall
Jonathan L. Marcus
Ann O'Connell
José E. Arvelo
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone: (202) 662-6000
Fax: (202) 662-6291

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Telephone:  (212) 841-1000
Fax:  (212) 841-1010

Sidney A. Stubbs (Fla. Bar No. 095596)
Robert W. Wilkins (Fla. Bar No. 578721)
Christopher S. Rapp (Fla. Bar No. 0863211)
rwilkins@jones-foster.com
JONES, FOSTER, JOHNSTON & STUBBS, P.A.
505 South Flagler Drive, Suite 1100
West Palm Beach, Florida 33401
Telephone: (561) 659-3000
Fax: (561) 650-0412

_Counsel for Chiquita Brands International, Inc._
_and Chiquita Fresh North America LLC_

## <u>TABLE OF CONTENTS</u>

Page(s)

INTRODUCTION ................................................................................................ 1

I.    CONTROLLING ELEVENTH CIRCUIT AUTHORITY COMPELS
DISMISSAL OF PLAINTIFFS' SECONDARY-LIABILITY CLAIMS. ........................ 3

    A.    *Drummond II* Endorses The Legal Standards Urged By Chiquita From The
Outset. .................................................................................................... 4

    B.    *Drummond II*'s Application of The Governing Legal Principles Supports
Dismissal Here. ...................................................................................... 7

II.    THE ONLY THEORY BROAD ENOUGH TO SUPPORT PLAINTIFFS' 2,425
CLAIMS IS MATERIAL SUPPORT OF TERRORISM, WHICH IS NOT A
SPECIFICALLY DEFINED AND UNIVERSALLY RECOGNIZED
VIOLATION OF INTERNATIONAL LAW. ................................................... 20

    A.    The Financing Convention And Plaintiffs' Other International Law
Sources Do Not Come Close To Satisfying *Sosa*'s Exacting Standard............... 20

    B.    The Practical Consequences of Recognizing Plaintiffs' Claims Are
Directly Contrary to *Sosa*'s Clear Instruction........................................ 22

III.    PLAINTIFFS' STATE-LAW CLAIMS MUST BE DISMISSED................................. 24

    A.    Plaintiffs Lack Standing To Bring State Law Claims In United States
Courts..................................................................................................... 24

    B.    Plaintiffs' Arguments for Preserving Their Time-Barred Claims Are
Without Merit......................................................................................... 25

    C.    Even Under Their Best Case Scenario, The Vast Majority of Plaintiffs'
Claims Are Time-Barred........................................................................ 29

    D.    Plaintiffs Fail To Plead The Elements of Their Asserted State Law Claims........ 30

CONCLUSION ................................................................................................ 32

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### FEDERAL CASES

*Abecassis v. Wyatt*,
Civ. No. H-09-3884, 2010 WL 1286871 (S.D. Tex. Mar. 31, 2010) ........................................5

*American Dental Association v. Cigna Corp.*,
No. 09-12033, 2010 WL 1930128 (11th Cir. May 14, 2020)............................................14, 18

*Arce v. Garcia*,
434 F.3d 1254 (11th Cir. 2006) ........................................................................................26

*Aziz v. Republic of Iraq*,
No. 1:09-cv-00869-MJG (D. Md. June 9, 2010) ...............................................................5

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009).................................................................................................2, 17

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964)........................................................................................................24

*Berlin Democratic Club v. Rumsfeld*,
410 F. Supp. 144 (D.D.C. 1976) ......................................................................................24

*Byers v. Burleson*,
713 F.2d 856 (D.C. Cir. 1983) .........................................................................................27

*Cabello v. Fernandez-Larios*,
402 F.3d 1148 (11th Cir. 2005) .........................................................................................6

*Cardillo v. Mockabee*,
102 F.2d 620 (D.C. Cir. 1939) .........................................................................................31

*Doe v. Drummond Co.*,
No. 2:09-CV-01041-RDP (N.D. Ala. Apr. 30, 2010)...................................................*passim*

*Doe VIII v. Exxon Mobil Corp.*,
658 F. Supp. 2d 131 (D.D.C. 2009) .............................................................................24, 25

*Flores v. Southern Peru Copper Corp.*,
414 F.3d 233 (2d Cir. 2003)...........................................................................................7, 21

*In re Estate of Ferdinand Marcos Human Rights Litigation*,
25 F.3d 1467 (9th Cir. 1994) ...........................................................................................23

## <u>TABLE OF AUTHORITIES</u>

Page(s)

*In re Sinaltrainal Litigation*,
 474 F. Supp. 2d 1273 (S.D. Fla. 2006) ................................................................12

*Julin v. Chiquita Brands International, Inc.*,
 No. 08-20641-CIV-KAM, 2010 WL 432426 (S.D. Fla. Feb. 4, 2010) ................................26

*Kadic v. Karadzic*,
 70 F.3d 232 (2d Cir. 1995)................................................................11, 23

*Kukatush Mining Corp. v. SEC*,
 309 F.2d 647 (D.C. Cir. 1962) ................................................................24

*Levy v. Ohl*,
 477 F.3d 988 (8th Cir. 2007) ................................................................15, 19

*Lewis v. Casey*,
 518 U.S. 343 (1996)................................................................25

*McKenna v. Fisk*,
 42 U.S. 241 (1843)................................................................24

*Parker v. Grand Hyatt Hotel*,
 124 F. Supp. 2d 79 (D.D.C. 2000) ................................................................30

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
 582 F.3d 244 (2d Cir. 2009)................................................................5, 7

*Rasul v. Bush*,
 542 U.S. 466 (2004)................................................................24

*Roe I v. Bridgestone Corp.*,
 492 F. Supp. 2d 988 (S.D. Ind. 2007) ................................................................25

*Romero v. Drummond Co.*,
 No. CV-03-BE-0575-W (N.D. Ala. Mar. 5, 2007) ................................................................25

*Romero v. Drummond Co.*,
 552 F.3d 1303, 1317 (11th Cir. 2008) ................................................................4

*Sinaltrainal v. Coca-Cola Co.*,
 578 F.3d 1252 (11th Cir. 2009) ................................................................ *passim*

*Sosa v. Alvarez-Machain*,
 542 U.S. 692 (2004)................................................................ *passim*

# <u>TABLE OF AUTHORITIES</u>

Page(s)

*The Discontro Gesellschaft v. Umbreit*,
208 U.S. 570 (1908)....................................................................................................................24

*The Sapphire*,
78 U.S. 164 (1870)......................................................................................................................24

*United States v. Seher*,
562 F.3d 1344 (11th Cir. 2009) ...................................................................................................6

## STATE CASES

*Berisford v. Jack Eckerd Corp.*,
667 So. 2d 809 (Fla. Dist. Ct. App. 1995) .................................................................................26

*Cevenini v. Archbishop of Washington*,
707 A.2d 768 (D.C. 1998) ..........................................................................................................26

*Collins v. Sotka*,
692 N.E.2d 581 (Ohio 1988) .......................................................................................................27

*Elmoghazi v. Aviles*,
2008 N.J. Super. Unpub. LEXIS 2786 (App. Div. Sept. 2, 2008)...............................................28

*Ginsberg v. Granados*,
963 A.2d 1134 (D.C. 2009) .........................................................................................................32

*Lynch v. Rubacky*,
424 A.2d 1169 (N.J. 1981)..........................................................................................................26

*Mayor v. Ford Motor Co.*,
No. 83297, 2004 WL 1402692 (Ohio App. June 24, 2004)........................................................26

*O'Keefe v. Snyder*,
416 A.2d 862 (N.J. 1980).............................................................................................................28

*Pfenninger v. Hunterdon Central Regional High School*,
770 A.2d 1126 (N.J. 2001)..........................................................................................................31

*Sosa v. Meyers*,
831 N.Y.S.2d 356 (Sup. Ct. 2006)...............................................................................................26

*Tackling v. Chrysler Corp.*,
185 A.2d 238 (N.J. Super Ct. 1962) ............................................................................................30

# TABLE OF AUTHORITIES

Page(s)

*Walker v. Bunch,*
No. 05-MA-144, 2006 WL 2590508 (Ohio App. Sept. 5, 2006)...........................................29

*Washington v. System Maintenance Corp.,*
616 A.2d 1352 (N.J. Super Ct. 1992) ......................................................................28

## DOCKETED CASES

*United States v. Chiquita Brands International, Inc.,*
No. 07-CR-00055-RCL (D.D.C. Mar. 14, 2007).................................................9, 19

## FEDERAL STATUTES

18 U.S.C. § 2339B(A)(1).............................................................................19

18 U.S.C. § 2339C ...................................................................................23

50 U.S.C. § 1701 *et seq.*............................................................................19

## STATE STATUTES

D.C. Code § 12-301(4)..............................................................................30

Fla. Stat. Ann. § 95.11(4)(d) ....................................................................29

N.J. Stat. Ann. § 2A:14-2(a) .....................................................................30

N.J. Stat. Ann. § 2A:31-3..........................................................................30

Ohio Rev. Code § 2125.01.....................................................................25, 28

Ohio Rev. Code § 2125.02(D)(1) ............................................................28, 29

Ohio Rev. Code § 2305.03(B) ....................................................................28

Ohio Rev. Code § 2305.10(A) ....................................................................29

Ohio Rev. Code § 2305.111(B) ...................................................................29

## OTHER AUTHORITIES

Restatement (Third) of Agency § 4.03 cmt. b (2006)................................................18

## INTRODUCTION

This case stands in stark contrast to *Doe v. Drummond Co.*, No. 2:09-CV-01041-RDP (N.D. Ala. Apr. 30, 2010) (*Drummond II*), on which plaintiffs rely.  There, plaintiffs alleged (i) claims on behalf of 67, not several thousand, victims; (ii) specific facts showing that these 67 deaths or injuries occurred in particular AUC attacks directly associated with Drummond; (iii) specific facts showing that a particular Drummond employee instructed the AUC to engage in those particular attacks; and (iv) specific facts regarding the Colombian military's interaction with Drummond and the AUC in connection with those attacks.

Here, plaintiffs allege nothing of the sort:  no facts, apart from conclusory assertions of counsel, to suggest that most of the 2,425 alleged murders or injuries at issue were even committed by the paramilitaries or the guerillas; no facts concerning the involvement of state actors in any of these incidents; and, most importantly, no facts linking Chiquita's former Colombian subsidiary, Banadex—let alone Chiquita itself—to any of the incidents alleged.  If *Drummond II* demonstrates anything, it is that the expansive secondary-liability claims pled here lack the basic, plaintiff-specific allegations necessary to survive a motion to dismiss.

Plaintiffs wish to have it both ways:  to demand damages on behalf of thousands of disparate alleged victims of Colombian violence through a broad and unprecedented terrorism-support theory that does not depend on the specific circumstances of any death or injury, but to do so in the language of established secondary-liability causes of action.  Their goal is to create the *appearance* that their claims satisfy the requirements of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  But examination of their allegations demonstrates that such appearances are illusory.

To survive a motion to dismiss, plaintiffs' secondary-liability claims—that Chiquita "aided and abetted," "conspired with," or "hired" the AUC and the FARC to violate established

norms of international law—must include allegations of *specific facts regarding each and every* one of the 2,425 killings or injuries of which they complain.  Joining the claims of thousands of plaintiffs together does not relieve any one of them of that burden.

Despite the opportunity to amend, plaintiffs do not come close to making the required, individualized allegations here.  To be sure, plaintiffs have bulked up their pleadings with pages of general facts about the history of armed violence in Colombia.  But with respect to the *individual claims* arising from these 2,425 separate violent incidents, the complaints remain essentially bereft of detail.  They repeatedly assert little more than that a Colombian, typically identified only by pseudonym, was killed or injured "by the AUC" or "by the FARC," and that Chiquita bears responsibility because it "supported" the alleged perpetrator.  This is woefully insufficient to plead cognizable ATS claims under this Circuit's law established in *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009), or the rules of federal pleading established by the Supreme Court's landmark decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

This lack of detail, together with the sheer number of plaintiffs, confirms that while plaintiffs invoke the language of secondary liability, at bottom their true theory of liability is a sweeping "terrorism support" claim.  That claim takes a backseat in both the amended complaints and plaintiffs' consolidated opposition precisely because neither the Financing Convention nor the hodgepodge of other sources on which plaintiffs rely establishes a universal and clearly defined norm sufficient to give rise to subject matter jurisdiction under *Sosa*, a point that was thoroughly briefed in the original motions to dismiss.

Under *Sosa*, the astounding practical difficulties that would result from recognizing either a material-support claim, or the ability to plead 2,425 separate secondary-liability claims without the specifics required by *Sinaltrainal*, also counsel in favor of dismissal.  Plaintiffs'

efforts to minimize these difficulties are superficial and unpersuasive.  This unprecedented ATS suit effectively seeks reparations from a U.S. corporation for all the murders and injuries aliens have suffered at the hands of various armed actors during decades of civil strife in Colombia.  If allowed to proceed, these 2,425 claims—and the tens of thousands more that would be sure to follow—would be impossible to litigate fairly.  Doing so would be intrusive and disruptive to the foreign relations of the United States, as this Court would be called upon to adjudicate plaintiffs' assertions that the current president and the president-elect of the Republic of Colombia, a close ally of the United States, are complicit in mass murder.  These are exactly the considerations the Supreme Court had in mind when it commanded the lower courts to exercise great caution in recognizing new causes of action under the ATS.  The Court should heed that warning and dismiss the complaints.

## I.  CONTROLLING ELEVENTH CIRCUIT AUTHORITY COMPELS DISMISSAL OF PLAINTIFFS' SECONDARY-LIABILITY CLAIMS.

Plaintiffs struggle to distinguish their case from recent, controlling Eleventh Circuit precedent dismissing ATS claims based on AUC violence in Colombia.  *See Sinaltrainal*, 578 F.3d at 1257-59.  In doing so, they rely heavily on *Drummond II*, in which the district court recognized allegations of specific facts sufficient to satisfy *Sinaltrainal* with respect to some claims.  (Opp'n 2, 6, 8-9, 14, 16-23.)  But *Drummond II* is of no help to plaintiffs.

First, on all of the key issues in this case, *Drummond II* adopts and endorses the legal standards that Chiquita has advocated and plaintiffs have opposed from the outset of this litigation, including application of the international-law *mens rea* standard of "shared purpose" for claims of secondary liability.

Second, although the court permitted some claims against Drummond to proceed, plaintiffs there pled an entirely different case than what plaintiffs plead here.  The *Drummond II*

plaintiffs asserted claims on behalf of 67 victims, each living in the immediate vicinity of Drummond's rail line and each allegedly attacked at Drummond's instruction, with the Colombian military allegedly involved directly in each attack.  No. 2:09-CV-01041-RDP, slip op. 12-13, 22-23, 29-30.  Thus, far from supporting plaintiffs' position here, *Drummond II* demonstrates exactly why plaintiffs' claims against Chiquita must be dismissed.

### A.    *Drummond II* Endorses The Legal Standards Urged By Chiquita From The Outset.[1]

Plaintiffs contend that they have adequately alleged, with sufficient detail, a general relationship between the AUC and the Colombian government; on this basis, they argue that they have satisfied *Sinaltrainal*'s formulation of what is necessary to plead state-action claims under the ATS and TVPA.  (Opp'n 15-21.)  *Drummond II* expressly rejects this argument.

The *Drummond II* court noted that "allegations of a symbiotic relationship" between the AUC and the Colombian army "do not end the inquiry of whether Plaintiffs can survive the pending motion to dismiss on state action grounds."   No. 2:09-01041-RDP, slip op. 11.  Rather, the court required, as the Eleventh Circuit held in *Sinaltrainal*, that in order to satisfy the state-action requirement and to survive a motion to dismiss, the complaint must allege "a symbiotic relationship that '*involves the torture or killing alleged in the complaint*.'"  *Id.* at 11 (citing *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008).  *Drummond II* thus makes clear, contrary to plaintiffs' assertion (Opp'n 18 n.40), that *Sinaltrainal*'s holding was not limited to any particular state-action test; *the* test is simply whether a state or state official participated in the *particular ATS or TVPA violation at issue*.  *Sinaltrainal*, 578 F.3d at 1266.

---

[1]    As a threshold matter, *Drummond II* reaffirms that ATS plaintiffs must meet a heightened pleading standard and, thus, make specific factual allegations to support their claims.  No. 2:09-01041-RDP, slip op. 7 n.10; (*see also* Opening Br. 12, 43).

Similarly, the *Drummond II* court followed the narrow construction of "war crimes" adopted in *Sinaltrainal*, refusing to allow claims based solely on allegations that "the conduct occurred while an armed conflict was ongoing" and insisting that the "killings referenced in the Amended Complaint [be] committed in the course of hostilities."  No. 2:09-01041-RDP, slip op. 14-15; (*see* Mot. to Dismiss Am. Compls. 25-27 (D.E. #295-1)).

Finally, the *Drummond II* court rejected plaintiffs' argument that a domestic law standard of "knowing substantial assistance" to the primary tortfeasor is sufficient to establish accomplice liability under the ATS.  (Opp'n 8-10.)[2]  Instead, the *Drummond II* court followed the Second Circuit's decision in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258-60 (2d Cir. 2009)—as have courts in other recent cases[3]—to apply the international law standard requiring a "shared purpose" with the primary tortfeasor for aiding and abetting and conspiracy liability under the ATS.  No. 2:09-01041-RDP, slip op. 21-22, 30; (*see* Mot. to Dismiss Am. Compls. 9-10, 28-29).  As the court explained, "expanding the standard as suggested by Plaintiffs 'would violate *Sosa*'s command' that liability be limited to violations of international

[2]   Chiquita has not "concede[d]" that plaintiffs "have met the knowing substantial assistance standard."  (Opp'n 5, 9.)  Chiquita of course acknowledges that the AUC and the FARC were violent organizations (Opening Br. 54 (D.E. #93); Mot. to Dismiss Am. Compls. 23), but Chiquita never knew, and plaintiffs have not alleged a plausible basis to infer, that Chiquita's extortion payments—which constituted a miniscule fraction of the hundreds of millions of dollars these extremely wealthy criminal groups took in each year from their various illicit activities—would substantially assist the AUC or the FARC in committing any act of violence that would not have otherwise occurred.  (Opening Br. 7, 45, 51-53.)

[3]   *See, e.g., Aziz v. Republic of Iraq*, No. 1:09-cv-00869-MJG, D.E. #51, slip op. 11-12 (D. Md. June 9, 2010) (adopting international law standard for aiding and abetting liability and dismissing plaintiffs' claims against chemical manufacturer on grounds that allegations were "[in]sufficient to establish that [defendant] provided [chemicals] to Iraq with the purpose of facilitating genocide against Kurdish people"); *Abecassis v. Wyatt*, Civ. No. H-09-3884, 2010 WL 1286871, at **27-28 (S.D. Tex. Mar. 31, 2010) ("*Talisman*'s reasoning is persuasive. *Sosa* establishes international law as the touchstone of the ATS analysis.  The footnote discussing private actors' liability makes clear that international law plays a role beyond defining whether there is a sufficiently definite norm to create ATS jurisdiction.").

law with definite content and acceptance among civilized nations . . . ."  *Drummond II*, No. 2:09-01041-RDP, slip op. 21 n.22 (citations omitted).

In the process, *Drummond II* rejected plaintiffs' argument that the Eleventh Circuit's decision in *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), mandates application of a domestic common law "knowledge" standard for accomplice liability.  No. 2:09-01041-RDP, slip op. 20-21 & n.22.  The jury instructions relating to that issue were not challenged on appeal in *Cabello*; the Eleventh Circuit accordingly had no opportunity to consider and did not decide whether the instructions were correct.  Thus, *Cabello*'s articulation of the standards of aiding and abetting and conspiracy are not binding on this Court.  *See, e.g.*, *United States v. Seher*, 562 F.3d 1344, 1361 (11th Cir. 2009) (concluding that language from a previous Eleventh Circuit opinion relating to an issue not "raised or addressed" on appeal is not binding).

*Sosa* and clear Eleventh Circuit law compel the application of the "shared purpose" standard derived from international law because "[f]ederal jurisdiction under the ATS exists only when a *defendant's* alleged conduct violates 'well-established, universally recognized norms of international law.'"  *Sinaltrainal*, 578 F.3d at 1263 n.11 (citation omitted) (emphasis added). Plaintiffs' argument that they may impose ATS and TVPA liability against Chiquita under a less-demanding domestic standard of accomplice liability because which standard applies is a question of "remedy" (Opp'n 9) is flatly at odds with this directive.  Under *Sinaltrainal*, plaintiffs' claims must be premised on *Chiquita's* violation of the *law of nations*:  their secondary-liability claims must therefore be based on well-established and universally recognized norms of *international law* regarding secondary liability.  *See* 578 F.3d at 1263 n.11; *Sosa*, 542 U.S. at 732 n.20 (holding that courts must determine "whether *international law* extends *the scope of liability* for a violation of a given norm *to the perpetrator being sued*")

(emphasis added).  As *Talisman* correctly held, only those who provide substantial assistance with the *purpose* of advancing the primary international-law violation may be said to have violated well-established and universally recognized international law and thereby held secondarily liable under the ATS.  *See* 582 F.3d at 258-59.[4]

B.   ***Drummond II*'s Application of The Governing Legal Principles Supports Dismissal Here.**

After the Eleventh Circuit rejected ATS claims brought on behalf of victims of Colombian paramilitary violence in *Sinaltrainal*, 578 F.2d at 1257-59, 1270, it is not surprising that plaintiffs fixate on *Drummond II*, which denied a motion to dismiss ATS claims based on alleged corporate complicity with Colombian paramilitaries.  But the similarity of that case to this one goes no further than that both involve assertion of such claims against an American corporation.

In fundamental contrast to plaintiffs here, the plaintiffs in *Drummond II* did not attempt to foist on Drummond responsibility for every criminal act of armed groups throughout Colombia.  Rather, the amended complaint in *Drummond II* alleged a narrow set of claims on behalf of 67 victims, all living in the immediate vicinity of Drummond's rail line, where named Drummond employees allegedly directed the AUC to focus their war effort on stopping FARC attacks.  The amended complaint alleged specific facts demonstrating that the Colombian military was intimately involved in this specific plan, approached Drummond about making payments to the AUC, and divvied up Drummond's payments to AUC leaders based on

---

[4]   Plaintiffs argue that *Talisman*'s "purpose" standard is wrong as a matter of international law (Opp'n 10-11), but they have utterly failed to show that this is the case:  the contradictory international case law plaintiffs rely on cannot rebut the primary sources of international law that clearly endorse the "purpose" standard.  *See Talisman*, 582 F.3d at 255, 259; *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 250 (2d Cir. 2003).

confirmed executions of specific Drummond-identified targets.  No. 2:09-CV-01041-RDP, slip op. 12-13, 22-23, 29-30.  These *specific* allegations are the fundamental difference between the amended complaint in *Drummond II* and the amended complaints here.  Nowhere in the amended complaints here are there specific allegations of a similar nexus between Banadex or Chiquita, the AUC, the Colombian military, and *each* of the 2,425 deaths or injuries alleged.

> *Drummond II* **confirms plaintiffs' failure to plead state action.**  Contrary to plaintiffs' assertion, the *Drummond II* court did not allow state action-based claims to "proceed [] based on allegations similar to those" alleged here.  (Opp'n 2.)  *Drummond II* expressly turned on specific factual allegations of the involvement of a state actor in each and every one of the *67 killings at issue*.  The plaintiffs in *Drummond II* alleged that:

- Drummond's coal mine was protected by a detachment of the Colombian military; 300 soldiers from the Popa Battalion were stationed on Drummond's property to protect Drummond's facilities from attacks by the FARC.  *Drummond II*, No. 2:09-01041-RDP, slip op. 13.

- It was a Colombian military commander who first approached Drummond about funding a paramilitary group to pursue guerillas in the area of Drummond's operations.  *Id.* at 12.

- Although Drummond made some payments directly to the AUC, Drummond also made payments to Colonel Mejía, the military commander of the troops stationed on Drummond's property.  Colonial Mejía distributed the funds to AUC leaders based on confirmed executions of suspected guerilla supporters along Drummond's rail line.  *Id.*

- The Colombian government and the AUC cooperated to protect Drummond: the Colombian military provided guards on Drummond's property, and the AUC hunted and destroyed FARC sympathizers *as instructed by Drummond*.  *Id.* at 23.

It was *these* allegations that led the *Drummond II* court to conclude that the plaintiffs had alleged "enough . . . to connect the murders along Drummond's rail lines to the paramilitaries as state actors."  *Id.* at 12; *see also id.* at 11 ("[M]ore concrete factual allegations of a symbiotic relationship do not end the inquiry . . . . The symbiotic relationship *must* involve the torture or killing alleged in the complaint.") (emphasis added) (internal quotations and citation omitted).

The only reason the court in *Drummond II* attached *any* weight to the more general allegations of state action is that *each* of the deaths was specifically linked to Drummond and to the very close involvement of the military with both Drummond and the particular AUC front alleged to have committed *these* murders.  *Id.* at 12-13.

There are no analogous allegations of state action involving *any* of the 2,425 incidents at issue here.  The amended complaints make no allegation that a Colombian military battalion was stationed on Banadex property; nor do they allege that the Colombian military approached Banadex or Chiquita with a proposal to fund the formation of a paramilitary group to defeat the FARC.  And there are no allegations that Chiquita instructed the AUC to carry out any attack or that the Colombian army "distributed [Chiquita] funds . . . to AUC leaders based on confirmed executions of suspected guerilla supporters."  *Id.* at 12.[5]

Because the amended complaints fail to allege with specificity the state's involvement in any one of the 2,425 disparate and vaguely described acts of violence asserted here, the state action-based claims are deficient under *Sinaltrainal*.  (Mot. to Dismiss Am. Compls. 23-24; *see* Opening Br. 58-62.)

***Drummond II* confirms plaintiffs' failure to plead war crimes.**  Similarly, the *Drummond II* court's conclusion about allegations of war crimes offers plaintiffs no support.  The *Drummond II* court identified three specific factual allegations that connected the *particular*

---

[5]      To the contrary, the amended complaints and the criminal Information on which plaintiffs rely make clear that it was Carlos Castaño, the then-leader of the AUC, who "instructed" Banadex's general manager that Banadex "had to" make payments to the AUC and "sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property."  Information, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-CR-00055-RCL, D.E. #1, ¶ 21 (D.D.C. Mar. 14, 2007); (NY Compl., Ex. A ¶ 21 (D.E. #65-1) (Factual Proffer filed in the criminal case); (*see also* Pls.' Consolidated Opp'n 11 (D.E. #111) (Aug. 19, 2008) (citing to Factual Proffer)).

*murders* alleged in the amended complaint to a "civil war clash" along Drummond's rail line and

found them sufficient to allow the "war crimes" claims to move forward:

- AUC leaders were on record as saying that they attacked the specific towns along Drummond's rail line because named Drummond officials instructed them to do so to further their war with the FARC. *Drummond II*, No. 2:09-01041-RDP, slip op. 15.

- AUC commanders confirmed that *these 67 decedents* were executed in the manner, time frame, and locations that would have been in furtherance of the AUC's war on the FARC to protect Drummond's rail line from FARC attacks. *Id.*

- All of plaintiffs' decedents were allegedly killed in the area near Drummond's rail line. *Id.*

 In contrast, here over 90 percent of the plaintiffs plead *no facts whatsoever* about the

circumstances of their relatives' deaths or their injuries other than that these deaths or injuries

occurred.[6]  Where facts are supplied, many allegations on their face establish that the alleged

murders or injuries were *not* perpetrated as part of any AUC effort to drive the FARC out of

particular areas, but instead to settle a personal grievance or vendetta between AUC members

---

[6]     *See* Carrizosa Compl. ¶¶ 51-67, 69-72, 76-81, 83, 87; DC Compl. ¶¶ 23-195, 268-269, 314-315, 318-319 (Juana Perez 61), 338-339, 342-343; NY Comp. ¶¶ 31-808; Valencia Compl. ¶¶ 256-264, 272-293, 298-302, 313-314, 321-327, 342-349, 356-365, 380-384, 391-394, 401-413, 431-444, 459-462, 476-494, 503-506, 517-525, 544-547, 558-566, 589-604, 628-631, 649-652, 675-679, 707-722, 736-739, 750-753, 766-770, 797-802; Does 1-976 Compl. ¶¶ 14-989; Montes Compl. ¶¶ 9-251.

     Plaintiffs representing 88 of these victims plead some minimal additional facts about the incidents and many include a boilerplate conclusory assertion that "[o]n information and belief" they benefited Chiquita "by removing a person perceived to be hostile to the AUC," but none of these allegations include any facts describing why the victim was perceived as hostile. (*See, e.g.*, Valencia Compl. ¶¶ 321-23 ("Jose Lopez No. 17 was drinking a soda in or near Apartado when an AUC member on a motorcycle pulled up, told him to get on his motorcycle, and drove him away, whereupon he was executed . . . . On information and belief, Chiquita benefited from his murder by removing a person perceived to be hostile to the AUC."); *see also id.* ¶¶ 256-264, 272-293, 298-302, 313-314, 321-327, 342-349, 356-365, 380-384, 391-394, 401-413, 431-444, 459-462, 476-494, 503-506, 517-525, 544-547, 558-566, 589-604, 628-631, 649-652, 707-722, 736-739, 750-753, 766-770, 797-802; Carrizosa Compl. ¶¶ 51-67, 69-72, 76-81, 83, 87; DC Compl. ¶¶ 268-269, 314-315, 318-319 (Juana Perez 61), 338-339, 342-343 (Pablo Perez 71C); Montes Compl. ¶¶ 66, 114.).  Such allegations based on "information and belief" are patently insufficient to state a claim.  *See* p. 17-18, *infra*.

and the victim.[7]  Nothing in *Sinaltrainal*, *Drummond II*, or any other ATS decision permits

allegations such as these to state a claim for "war crimes."[8]  (*See* Mot. to Dismiss Am. Compls.

25-27.)

Plaintiffs contend that all 2,425 murders or injuries alleged in the amended complaints

were "war crimes" because the AUC's "war strategy" was to "murder[] civilians to terrorize the

population."  (Opp'n 22.)  But this is no different than alleging that every AUC murder of a

civilian that occurred during the course of the Colombian conflict is a war crime; and

*Sinaltrainal* squarely deemed such allegations insufficient.  578 F.3d at 1267.  In any event, even

in the handful of cases where plaintiffs allege any facts concerning the deaths of or injuries to

their loved ones, they fail to allege that their relatives were knowingly targeted as civilians in the

---

[7]     *See* Valencia Compl. ¶¶ 265-271 (victim confronted AUC to take back motorcycle stolen
from his sister); *id.* ¶¶ 350-355 ("Ramos, an AUC commander, told Martinez she must live with
him or he would kill her."); *id.* ¶¶ 371-374 ("Jose Lopez No. 28 was killed for dating a girl who
ran away from home because her mother opposed the relationship, and the mother's relatives
were AUC members."); *id.* ¶¶ 385-390 (victim refused to pay extortion); *id.* ¶¶ 424-427 (victim
indicated to police that person with AUC connections had mugged him); *id* ¶¶ 428-430 (victim
told AUC commander's wife about his mistress); ¶¶ 615-620 (victim had reported AUC member
for rape); *see also id.* ¶¶ 294-297; 316-320; 328-333, 337-341, 395-400, 445-452, 463-468, 473-
475, 499-502, 507-511, 526-531, 540-543, 553-557, 572-577, 583-588, 605-614, 621-627, 632-
642, 653-658, 664-668, 684-691, 697-702, 727-735, 754-765, 783-796, 815-828; Carrizosa
Compl. ¶ 86; DC Compl. ¶¶ 312-313, 324-325.

[8]     There are only four incidents alleged in any of the complaints that might conceivably be
described as having occurred during a "civil war clash."  (*See* Carrizosa Compl. ¶ 68 (child killed
by stray bullet); Valencia Compl. ¶¶ 512-516 (woman shot in abdomen while walking out of
house during fight between "different forces and the paramilitaries"); *id.* ¶¶ 810-814 (priest
injured by homemade bomb thrown by FARC during standoff with AUC); DC Compl. ¶ 244
(student killed by guerillas during confrontation between "guerillas and paramilitaries").)  These
incidents still cannot support a claim of liability based on war crimes, however, because
plaintiffs have not alleged that these victims were targeted with the requisite *mens rea* (*i.e.*, killed
*intentionally* and *knowing* that the victim took no part in hostilities).  *See Kadic v. Karadzic*, 70
F.3d 232, 243 & n.7 (2d Cir. 1995); (Opening Br. 62-63).  Moreover, as discussed below, these
incidents bear *no* connection to Chiquita, and no alleged fact plausibly supports the inference
that Chiquita wanted them to occur.

course of hostilities and, thus, fail to state a claim.  *See id.*; (Opening Br. 62-63 (listing elements of war crimes)).[9]

   ***Drummond II* confirms plaintiffs' failure to plead Chiquita's accomplice liability in the concerted commission of 2,425 purported violations of international law.**  Appropriately refusing to entertain the many "conclusory allegations" in the amended complaint, the *Drummond II* court focused on specific factual allegations that Drummond "*urged* the attacks" that led to the 67 specific extrajudicial killings and war crimes at issue.  No. 2:09-CV-01041-RDP, slip op. 28 (emphasis added).  Such allegations included:

- In order to secure approval for payments to the AUC from Drummond's U.S. headquarters, Alfredo Araújo, Vice President of Drummond Ltd., convinced the AUC to stage a major attack on Drummond's rail line and then make the incident look like a FARC attack.  Am. Compl. ¶¶ 156-158, *Drummond II*, No. 2:09-CV-01041-RDP, D.E. #35 (N.D. Ala. Dec. 4, 2009) [hereinafter *Drummond II* Am. Compl.].

- These payments were "earmarked" for recruiting 165 AUC members to the Juan Andrés Álvarez Front of the AUC and providing them with arms and supplies.  *Id.* ¶¶ 160, 171-173.  With Drummond's payments, this front grew from 20 to 200 men, which enabled them to engage and attack the FARC along Drummond's rail line.  *Id.* ¶ 161-162.

- Araújo instructed the AUC that "'the areas along the Drummond rail line that had a FARC presence had to be attacked and pacified.'"  *Drummond II*, No. 2:09-CV-01041-RDP, slip op. 23 (citation omitted).

- Araújo provided the AUC with specific targets for the AUC's attacks on towns along the Drummond rail corridor, and names of specific suspected FARC guerillas to be executed.  *Drummond II* Am. Compl. ¶¶ 177-178, 200.

---

[9]     As to "crimes against humanity," the *Drummond II* court found it unnecessary to decide whether this claim is actionable under *Sosa* because it held that plaintiffs' theory that their relatives were targeted because they were "members of a civilian population" was incompatible with their theory that the victims were targeted for being FARC sympathizers.  *Drummond II*, 2:09-CV-01041-RDP, slip op. 18.  The same is true here.  Additionally, this Court is not bound to recognize a cause of action for "crimes against humanity" any more than the district court in *Sinaltrainal*, which concluded—after *Cabello*—that crimes against humanity is not sufficiently definite to be actionable under the ATS.  *See In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1290 n.20 (S.D. Fla. 2006); (*see also* Opening Br. 65 n.60).

- ▪ Based on Drummond's directions, provided through Araújo, the AUC prioritized its operations to focus on the towns along Drummond's rail line where it had information that the FARC was operating or had supporters.  *Drummond II*, No. 2:09-01041-RDP, slip op. 22-23; *Drummond II* Am. Compl. ¶¶ 132, 134, 168.

- ▪ The AUC gave Drummond progress reports on its efforts to destroy the FARC, after which Drummond would pay more money.  *Drummond II* Am. Compl. ¶ 175.

Based on *these* allegations, the court in *Drummond II* concluded that the plaintiffs' amended complaint had "cross[ed] an important line" by sufficiently alleging that "Defendants *precipitated* and *orchestrated* the violence as opposed to merely capitalizing on the hostile environment."  No. 2:09-01041-RDP, slip op. 27 (emphasis added) (internal quotation marks and citation omitted).  The only reason that the general allegations of Drummond's shared purpose with the AUC were credited is that the 67 deaths were *specifically linked* to Drummond and its specific recruitment of an AUC front to target *these very people*.  *Id.* at 15, 21-29.  Moreover, it was only the alleged facts that Drummond directed the AUC to attack the areas near its rail lines and made payments based on the number of suspected guerillas executed in these attacks that led the court to conclude the plaintiffs had sufficiently pled that Drummond ratified the AUC's acts and thus was secondarily liable as a principal.  *Id.* 32.

No allegation regarding *any* of the 2,425 victims in this case comes close to the specific facts supporting secondary liability alleged in *Drummond II*.  No one in Banadex's offices in Colombia—let alone Chiquita's offices in Cincinnati—is alleged anywhere in the amended complaints to have urged or ordered the AUC to attack specific areas to rid them of FARC guerillas or sympathizers; to the contrary, the only meeting between Banadex officials and the AUC that plaintiffs identify is the Castaño meeting, where Banadex's general manager was "instructed" that Banadex "had to make payments" or suffer the consequences.  *See* p. 9 n.5, *supra*.  Nor do plaintiffs allege specific facts indicating that Chiquita's payments were conditioned on the location or success of particular attacks or that Chiquita redirected AUC

operations to specific areas that the group would not have otherwise targeted.  To the contrary, plaintiffs allege that Chiquita's payments to paramilitaries were calculated based on the number of boxes of bananas that Chiquita exported—confirming that the payments were an extorted "tax," not a "reward" for executing innocent civilians.  (*See* DC Compl. ¶ 422; NJ Compl. ¶ 80; Valencia Compl. ¶ 187; Does 1-976 Compl. ¶ 1054.)

Indeed, one can derive no reasonable inference from the little factual detail there is in the amended complaints of either a Banadex or Chiquita shared "purpose" with the AUC to target plaintiffs or their relatives.  *See Am. Dental Ass'n v. Cigna Corp.*, No. 09-12033, 2010 WL 1930128, at *8 (11th Cir. May 14, 2010) (citing *Sinaltrainal* in refusing to accept as true unwarranted deductions of fact spelled out in a complaint).  Some of the alleged victims were Chiquita *allies*, including security guards and business partners, whom it would have been *against* Chiquita's interest to target.[10]  This group also includes employees of Banadex or of farms that supplied fruit to Banadex, none of whom are alleged to have left-wing sympathies.[11]  Some of the claims appear, on the face of the complaints, to involve accidental deaths or injuries.[12]  And, of course, some of the decedents are alleged to have been killed by the FARC or other guerillas, with no explanation of why Banadex or Chiquita would want the FARC's victims

---

[10]     *See* D.C. Compl. ¶ 300 (Banadex security guard); *id.* ¶ 334 (vendor who bought bananas from Chiquita that had been rejected for export); *see also id.* ¶ 224, 246, 248, 250-253, 252, 274-275, 288-289, 302-303, 336-337, 340-341, 358-359; Valencia Compl. ¶¶ 308-312.

[11]     *See* DC Compl. ¶¶ 196, 198, 202, 204, 206, 212, 214, 218, 222, 228, 230, 240, 242, 254, 256, 258, 260, 262, 266, 270, 272, 278, 280, 282, 294, 304, 306, 308, 316, 318, 320, 326, 330, 332, 342, 344, 346, 348, 350, 352, 354, 356; Valencia Compl. ¶¶ 251-255.

[12]     *See* Carrizosa Compl. ¶ 68 (child killed by stray bullet); Valencia Compl. ¶¶ 803-809 (victim killed in speedboat collision with boat driven by AUC members); *see also id.* ¶¶ 512-516; 810-814.

killed.[13]  Without a connection to Chiquita or any plausible reason why Chiquita would want to kill or injure these victims, plaintiffs' allegations do not "cross [the] important line" that the district court recognized in *Drummond II*.  Again, plaintiffs cannot overcome these obvious pleading deficiencies by aggregating so many claims so as to deter the Court from the plaintiff-by-plaintiff analysis that is no less necessary here than in a single-plaintiff lawsuit.

Nor is there a parallel here to the geographic proximity of the 67 alleged deaths in *Drummond II* to Drummond's rail line.  In *Drummond II*, each of the 67 victims lived in the immediate vicinity of Drummond's rail line.  *Drummond II* Am. Compl. ¶¶ 2, 18-84, 131-132.  Each decedent was expressly alleged to have been "executed because Drummond specifically directed the AUC to these areas" in an effort to put an end to FARC attacks against Drummond's facilities.  *Id.* ¶ 174.

In contrast, the 2,425 victims here are alleged to have been killed or injured in geographically disparate regions of Colombia over the course of decades, including *before* Chiquita's alleged payments began and *after* Chiquita had left Colombia.[14]  For more than 80

---

[13]    *See* DC Compl. ¶¶ 64, 69, 70, 92, 97, 108-112, 114, 116-121, 123, 124, 126-131, 136, 138, 140, 142, 146-148, 150-153, 157, 160, 167, 169, 172, 176, 178, 181, 182, 189, 208, 210, 226, 232, 238, 244, 360, 364, 366, 368, 370, 372, 374, 376, 378, 380, 382, 384, 386, 388, 390, 392).  Plaintiffs cannot feign ignorance (*see* Opp'n 3) of the admitted fact that Chiquita made payments to both guerillas and paramilitaries; a fact that further undermines their unwarranted inference that Chiquita took the AUC's side in Colombia's civil strife.  *See, e.g.*, (NY Compl., Ex. A ¶ 20 (containing admission of guerilla payments)); *Levy v. Ohl*, 477 F.3d 988, 991-92 (8th Cir. 2007) (matters of public record, such as court filings, may be judicially noticed); (*see also* Mot. to Dismiss Am. Compls. 30-31).

[14]    47 of the incidents alleged in the complaints occurred prior to 1995, the earliest date alleged by some plaintiffs when Chiquita purportedly began making payments to paramilitaries. (*See* NJ Compl. ¶ 72 (alleging 1995 date); Does 1-976 Compl. ¶ 1046 (same); DC Compl. ¶ 466 (same); Valencia Compl. ¶¶ 179, 181 (same); DC Compl. ¶¶ 31, 39-41, 79, 93, 163, 177, 184, 362; NY Compl. ¶¶ 96, 106, 196, 212, 236, 393, 398, 416, 421, 432, 449, 452, 463-464, 485, 491, 503, 505, 516, 520-522, 533, 543, 554, 566, 569, 605, 702, 740, 755, 759, 764, 778-779, 781.)

(continued…)

percent of the victims, plaintiffs' complaints do not even identify a region where the incidents of violence occurred.[15]  To the extent that certain plaintiffs do allege a geographic location of the violence, they demonstrate that the murders and injuries at issue here span the vast Colombian territory.  Some incidents allegedly occurred in the northeastern Colombian state of Cesar (bordering Venezuela)[16] while others allegedly occurred in the southwestern state of Valle del Cauca (bordering the Pacific Ocean).[17]  Unlike the *Drummond II* plaintiffs, for the vast majority of the victims here there is no alleged nexus between where they lived and a region where Banadex had or sought to have operations.

To be sure, plaintiffs do assert in conclusory fashion that Chiquita "identified persons such as union leaders for the AUC to assassinate, in order to revoke benefits negotiated by the slain leaders."  (Opp'n 8; *see* DC Compl. ¶ 561.)  Even assuming that this conclusory allegation could support the inference that Chiquita aided the AUC with the purpose of harming union

---

180 of the incidents alleged in the complaints occurred after Chiquita left Colombia on June 28, 2004.  (*See* NY Compl. ¶¶ 50, 68, 73, 75, 84, 120, 135-137, 141, 143, 146, 148, 153-154, 162-164, 168-171, 183, 187, 191, 199-201, 203-204, 206, 209, 210, 213, 216-217, 234, 238, 244, 246, 251, 261, 281, 287, 290, 296, 301, 303, 306, 309, 314, 329-330, 335, 341, 345, 350-351, 355, 365-366, 368, 370-373, 375, 378, 381-382, 388-390, 396, 399, 401, 407, 409, 423, 425, 431, 450, 455-456, 462, 465-466, 476-477, 479-480, 482, 487, 489, 493, 496, 506, 513, 517, 518-519, 523, 529, 530, 535, 537, 549, 551-552, 557, 559, 563, 565, 573-575, 577, 587, 600, 604, 608, 642, 658, 661, 663, 669-670, 678-680, 686-687, 695, 699-700, 704, 707, 709, 711-712, 719, 720, 725, 732-733, 741-742, 748, 750, 772, 777, 782, 788, 790, 792-793, 795; Does 1-976 Compl. ¶¶ 49, 86-87, 116, 122-123, 751, 764, 839; DC Compl. ¶¶ 48, 66, 180, 202-203, 220-221, 224-225, 242-243, 282-283, 292-293, 314-315, 326-327, 368-369; Valencia Compl. ¶¶ 328-332, 507-516, 829-833; Carrizosa Compl. ¶ 62; Montes Compl. ¶ 34.)

[15]   *See* DC Compl. ¶¶ 23-195; NY Compl. ¶¶ 31-808; Carrizosa Compl. ¶¶ 55, 69-71; Valencia Compl. ¶¶ 256-259, 272-275, 276-280, 313-314, 342-345, 350-355, 360-374, 424-430, 469-475, 481-488, 495-498, 503-506, 526-531, 544-547, 553-562, 567-571, 578-593, 603-604, 615-620, 632-648, 653-663, 692-706, 712-722, 727-731, 736-739, 783-796; Does 1-976 Compl. ¶¶ 14-989.

[16]   *See, e.g.*, Montes Compl. ¶ 237.

[17]   *See, e.g.*, Montes Compl. ¶¶ 249-51.

leaders, less than one percent of the decedents are even *alleged* to have been active union members targeted as such.[18]   And even if conclusory allegations that Chiquita wanted to harm union members or leaders through the AUC were accepted as true, they would support only the type of ATS claim that the Eleventh Circuit has already held insufficient.  *Sinaltrainal*, 578 F.3d at 1257, 1265, 1267 (dismissing ATS claims against Coca-Cola bottlers premised on their alleged support of paramilitaries in order to kill union leaders and "becom[e] union-free").

In the final analysis, out of more than 2,425 victims, only *one* is allegedly linked in any specific way to Banadex—and even with respect to him, plaintiffs have utterly failed to state an ATS claim sufficient to survive a motion to dismiss.  One amended complaint alleges that Mr. Lopez No. 99, a union leader employed on a farm, wanted to give a "kiosk in the farm . . . to the workers," but that an "Administrator of banana farms owned by Banadex" and "the paramilitaries wanted the kiosk to go to the paramilitaries."  (Valencia Compl. ¶¶ 727.)  During a meeting between Mr. Lopez No. 99 and the Administrator held "to resolve the kiosk issue," it is further alleged, paramilitaries snatched Mr. Lopez No. 99 and later tortured and killed him.  (*Id.* ¶ 729.)  These acts are "*believed* to have been carried out with the consent of the Administrator." (*Id.* (emphasis added).)

As the Eleventh Circuit made clear in *Sinaltrainal*, allegations that "are 'based on information and belief,' and [that] fail to provide any factual content that allows [the court] to 'draw the reasonable inference that the defendant is liable for the misconduct alleged'" are insufficient to state a cognizable ATS claim.  *Sinaltrainal*, 578 F.3d at 1268 (quoting *Iqbal*, 129

---

[18]     *See* DC Compl. ¶ 200 (employee of Sintrainagro trade union representing banana workers); NJ Compl. ¶ 161 (union leader that negotiated working conditions on a banana farm); *see also* NJ Compl. ¶¶ 134-136, 140-142, 153-156; DC Compl. ¶¶ 216, 286, 296-298, 328, 362; Valencia Compl. ¶¶ 375-379.

S.Ct. at 1949); *see also Am. Dental Ass'n*, 2010 WL 1930128, at **3-5, 8-9 (further endorsing

and applying *Iqbal* as the law of this Circuit).  The claim relating to Mr. Lopez No. 99, which is

pled on belief, fails for this reason alone.  More critically, however, even if this highly attenuated

link *were* somehow sufficient to state a claim that *Banadex* made payments to the AUC with the

purpose of having this particular employee killed, there are no allegations to support the

conclusion that *Chiquita* authorized the payments to be made for this purpose, and it is Chiquita

that plaintiffs have chosen to sue.[19]  For the remaining 2,424 victims, the complaints do not even

begin to assert facts sufficient to "draw the reasonable inference" that Chiquita's payments

reflect an intent to help the AUC target each and every one of the remaining 2,424 victims.[20]

Finally, plaintiffs' conclusory and irresponsible allegations that Chiquita smuggled arms

or drugs on behalf of the AUC and the FARC do not change the analysis.  For one thing,

plaintiffs plead no specific facts concerning Chiquita's supposed complicity in such activities.[21]

---

[19]   In addition to falling short for making allegations on "information and belief" without facts sufficient to permit the court to draw a reasonable inference of Chiquita's intent to have this decedent killed, the plaintiffs fail to allege state involvement in the case of Mr. Lopez No. 99 or that Chiquita had the requisite purpose to further a war crime because this alleged victim was clearly *not* killed in the course of any hostilities.  *See Sinaltrainal*, 578 F.3d at 1257, 1265, 1267; *see Drummond II*, No. 2:09-CV-01041-RDP, slip op. 24.

[20]   Similarly, the specific facts that led the *Drummond II* court to conclude that the AUC acted as Drummond's agent are completely absent here.  *See* No. 2:09-CV-01041-RDP, slip op. 32.  In the absence of pleading Chiquita's control over the AUC, *see id.* at 31; (Mot. to Dismiss Am. Compls. 32 n.32), there was no act of an agent that Chiquita could ratify, and—unlike the *Drummond* plaintiffs—plaintiffs here have failed to allege facts plausibly showing that, in committing 2,425 separate violent acts, the AUC purported to act on Chiquita's behalf rather than its own.  *See, e.g.*, Restatement (Third) of Agency § 4.03 cmt. b (2006) ("A person may ratify the act of an agent or the act of a person who purported to be an agent but was not.").

[21] Plaintiffs misleadingly allege that a "highly-placed Chiquita employee" was "prosecuted for [his] purposeful involvement" in an arms-smuggling incident (DC Compl. ¶ 482; NJ Compl. ¶ 90; Valencia Compl. ¶ 197), but plaintiffs know full well that this employee was acquitted.  (Pls.' Mot. to Strike ¶ 8 (D.E. #108) (acknowledging the employee's acquittal); *see also* Opening Br. Ex. C, at 4, 28-29 (D.E. #93-3) (Colombian prosecutor's formal order acquitting the only individual then-employed by Banadex who was suspected of involvement in the incident)); (continued…)

Their allegations thus are entitled to no weight, especially in light of the heightened pleading standard applicable to ATS claims.  *See* p. 4 n.1, *infra*.  In addition, the allegation that arms or drugs were smuggled successfully on vessels or through a port operated by Chiquita does not give rise to an inference that Chiquita acquiesced in such activity, any more than the successful smuggling of drugs through the Port of Miami gives rise to an inference of complicity by the Port.  In all events, it remains the case that plaintiffs plead no facts to tie this alleged smuggling activity to any one of the specific injuries alleged here.  The allegations are inflammatory, of course—that is their purpose—but they add nothing to the sufficiency of any plaintiff's claim.

*     *     *

With the benefit of the Eleventh Circuit's decision in *Sinaltrainal* and the Second Circuit's decision in *Talisman*, plaintiffs had ample opportunity in amending their complaints to narrow their theory and make this case like *Drummond II*.  They did not attempt to do so, and cannot do so because they do not have any facts sufficient to allege Chiquita's purposeful complicity in the murder of Colombian nationals.  The only facts concerning *Chiquita* that plaintiffs have are drawn from Chiquita's plea, which they stubbornly continue to mischaracterize as an admission that Chiquita provided "material support" to the AUC.  (*See* Opp'n 7, 25.)[22]  That plaintiffs feel the need to blatantly mischaracterize the plea is telling of the

---

*Levy*, 477 F.3d at 991-92 (matters of public record, such as court filings, may be judicially noticed).

[22]     The federal government did not even *charge* Chiquita with providing material support to a foreign terrorist organization, s*ee* 18 U.S.C. § 2339B(a)(1) (prohibiting knowing provision of "material support or resources to a foreign terrorist organization"), and, indeed, affirmatively disclaimed that Chiquita shared the violent aims of the AUC.  *E.g.*, Information, *Chiquita*, No. 07-CR-00055-RCL, 1; *cf. id.* ¶ 21 (noting that Chiquita's payments to the AUC began after the AUC "instructed" Chiquita's subsidiary that it "had to" make payments or else).  Instead, the United States charged Chiquita with a single-count violation of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, essentially a strict-liability offense that (continued…)

paucity of non-conclusory facts to support their claims.  This Court cannot allow any plaintiff's

claims to proceed in the absence of specific facts supporting a link between Banadex or Chiquita

and the specific death or injury for which he or she seeks redress.

## II.     THE ONLY THEORY BROAD ENOUGH TO SUPPORT PLAINTIFFS' 2,425 CLAIMS IS MATERIAL SUPPORT OF TERRORISM, WHICH IS NOT A SPECIFICALLY DEFINED AND UNIVERSALLY RECOGNIZED VIOLATION OF INTERNATIONAL LAW.

In light of plaintiffs' failure to plead specific facts supporting their secondary-liability

claims on behalf of any individual plaintiff, the only asserted cause of action broad enough to

support plaintiffs' sweeping theory—that Chiquita essentially is liable for any AUC act of

violence in Colombia—is material support of terrorism.  But plaintiffs' opposition does nothing

to establish that such a claim is cognizable under *Sosa*, and as a result the claim must be

dismissed.

### A.     The Financing Convention And Plaintiffs' Other International Law Sources Do Not Come Close To Satisfying Sosa's Exacting Standard.

Plaintiffs' argument in support of recognizing a material support claim starts from a false

assumption:  that "[i]t suffices that all major countries have taken steps for over a decade to

implement [a] norm" against financing terrorism.  (Opp'n 30.)  That is manifestly wrong.  *Sosa*

holds that the ATS provides subject matter jurisdiction only over claims for violations of

international prohibitions so universally recognized and clearly defined that they are *beyond*

*debate*.  *See* 542 U.S. at 732, 737-38; (*see also* Opening Br. 8-12).

Plaintiffs principally rely on the Financing Convention in an effort to meet that

---

prohibits engaging in any transaction, even an extortion payment, with a designated terrorist
organization without first obtaining a license from the Treasury Department's Office of Foreign
Assets Control.  Similarly, contrary to plaintiffs' assertions (Opp'n 5), Colombian authorities
have *never* requested the extradition of any Chiquita officials or charged any with a crime.

demanding standard. But the Convention's text and the history of its drafting and ratification

conclusively show that it did not "codify" any such norm. (Opening Br. 26; Reply Br. 17-24

(D.E. #148); Mot. to Dismiss Am. Compls. 20.)

- The drafters of the Financing Convention said that their goal was to fill a "gap in international law"—which refutes any contention that the treaty codified an existing norm. Plaintiffs try to minimize the effect of that statement by contending that the drafters were referring not to the law itself, but to a gap in its enforcement. (Opp'n 27-28.) But that admission itself confirms that a material support claim fails to meet the *Sosa* standard. For terrorism support to become an actionable norm of customary international law, states must *uniformly and consistently enforce* the prohibition out of a sense of legal obligation. *See, e.g.*, *Flores*, 414 F.3d at 256; (Opening Br. 26).

- Plaintiffs attempt to explain away the Financing Convention's pack of confusing reservations by characterizing them as "on the margins." (Opp'n 28 n.64.) That states have unilaterally limited their obligations under the treaty through reservations, however, demonstrates that a definite norm against terrorist financing is not universally accepted. (Opening Br. 28-29; Reply Br. 19.)[23]

- The hodgepodge of other sources on which plaintiffs rely—the supposed "constellation of international instruments establishing the norm on material support" (Opp'n 28)—are patently insufficient to establish an international law norm meeting *Sosa*'s high bar for all of the reasons stated in our prior briefing. (Opening Br. 21-33; Reply Br. 7-17; Mot. to Dismiss Am. Compls. 18-20; Mot. to Dismiss Montes and Does 1-976 Compls. 7-8 (D.E. #314).) Particularly bizarre is plaintiffs' contention that enactment of the ATA somehow "confirms the norm against material support" because some courts have found that some domestic statutes do not *preclude* the possibility of there being an actionable international norm. (Opp'n 26-27.) The argument is simply a non sequiter. If anything, the ATA precludes recognition of the cause of action plaintiffs want this Court to create. (*E.g.*, Opening Br. 15-17.)

Finally, notwithstanding the fact that the injuries alleged here span a period of twenty

years, plaintiffs make no effort to identify when a rule of customary international law had formed

---

[23]     In any event, the reservations 48 states have taken to the Financing Convention are decidedly *not* "on the margins." (Opp'n 28 n.64.) The reservations of Syria, Egypt, and Jordan, which specify that attacks by armed national resistance movements are *not* terrorist acts within the meaning of the Convention, challenged the core definition of terrorism in the Convention and drew strenuous objections from 23 other nations. (*See* Opening Br. 28-29.) And the prevailing lack of consensus regarding this key definition conclusively demonstrates that "terrorism" is not actionable under *Sosa*. (*Id.* at 18-21; Reply Br. 7 n.3.)

with such widespread acceptance and clear definition that its violation would be actionable under the ATS.  This Court can sustain a material support claim *only* if it determines precisely *when* such a norm came into existence, because all claims for earlier injuries must be dismissed. (Reply Br. 7 n.3.)  Plaintiffs' failure to identify such a date demonstrates that they have not met their burden.

>    **B.**     **The Practical Consequences of Recognizing Plaintiffs' Claims Are Directly Contrary to *Sosa*'s Clear Instruction.**

With respect to practical consequences, the issue is not, as plaintiffs characterize it, whether this particular case is complex or whether material support is "too grave" an offense to recognize.  (Opp'n 32.)  The point is that recognition of a cause of action of such extraordinary breadth, with essentially limitless scope and liability, would open the federal courts to every victim of armed conflicts around the world (and, of more immediate concern, every victim of armed violence in Colombia for the past 30 years and into the future).  *Sosa* specifically instructs that such consequences be considered in determining whether a norm should be deemed actionable.  542 U.S. at 732-33.

It is indisputable that the Eleventh Circuit weighed these precise consequences in determining the scope of an actionable war-crimes claim arising from the civil conflict in Colombia.  *See Sinaltrainal*, 578 F.3d at 1267 (rejecting plaintiffs' broad war crimes theory because doing so would "open [U.S. federal courts] to lawsuits occurring during any period of civil unrest in a foreign country").  The unprecedented scope of the ATS lawsuits in this MDL proceeding and the tremendous administrative difficulties that would result from allowing them to proceed illustrate the consequences of recognizing plaintiffs' material support claim.

Plaintiffs' arguments in opposition miss the point:

- Plaintiffs assert that "Chiquita's logistical argument is weakened by the Court's ruling in *Julin*."  (Opp'n 32.)  That a handful of *American* plaintiffs will take

discovery in connection with statutory claims against Chiquita under the ATA, however, is irrelevant to the practical consequences for federal courts of opening the courthouse doors to any foreign victim of terrorism around the globe; that would be the unavoidable practical consequence of recognizing plaintiffs' material-support claim.  In any event, it is absurd to assert that the limited scope of discovery necessary to probe the circumstances of the few *Julin* plaintiffs is equivalent to the discovery that would be necessary to probe the deaths of thousands of Colombians, most of whom remain anonymous, many of whom lived in remote areas, and all of whose claims depend on establishing facts concerning, *inter alia,* who perpetrated each killing alleged in the complaint, the circumstances bearing upon how and why it happened, and the role of the Colombian government officials in the incident.

- Plaintiffs contend that there have been other mass tort actions under the ATS for human rights abuses suffered abroad, but the two pre-*Sosa* cases that they cite (Opp'n 4 (citing *Kadic*, 70 F.3d 232 and *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1469 (9th Cir. 1994))) were largely symbolic actions against absent heads of state who allegedly ordered, directed, or carried out atrocities; both resulted in default judgments in whole or in part.  Neither case had the effect of "open[ing the federal courts] to lawsuits occurring during any period of civil unrest in a foreign country." *Sinaltrainal*, 578 F.3d at 1267.  *Sosa* cited them precisely because the torts asserted— torture in *Marcos* and genocide in *Kadic*—had the same "definite content and acceptance among civilized nations [as] the historical paradigms familiar when § 1350 was enacted."  *Sosa*, 542 U.S. at 732.

Plaintiffs also argue that failure to recognize a cause of action for material support would "suggest[] to the world that our nation is not serious about our international obligation to combat terrorism."  (Opp'n 32.)  But the Financing Convention calls only for states to impose *criminal* sanctions for material support of terrorism.  The United States certainly has such prohibitions, and it chose not to enforce them against Chiquita.[24]  Plaintiffs' argument that there must also be a civil remedy for aliens to sue in U.S. courts to send a message to the world is entirely political and decidedly contrary to *Sosa*.

Moreover, Congress has already addressed plaintiffs' argument by choosing to establish a cause of action only for *American* victims of terrorism.  To be sure, there are cases holding that

---

[24]     Congress enacted 18 U.S.C. § 2339C to implement the Financing Convention's requirement of domestic criminal penalties for the acts proscribed by the treaty, but Chiquita was never charged or convicted for violating this statute.  *See* p. 19 n.22, *supra*.

statutes such as the TVPA and the Trafficking Victims Protection Reauthorization Act, which provide remedies for victims of *all* nationalities, did not *displace* an already-recognized ATS claim.  (Opp'n 26-27.)  But the ATA is different, in that it occupies the field for civil claims of terrorism support and limits those claims to American victims.  This Court must respect Congress's deliberate choice to limit the civil remedy for terrorism injuries to American victims and reject plaintiffs' invitation to encroach on the congressional prerogative to "shut the door" to new causes of action under the ATS.  *Sosa*, 542 U.S. at 731; (Opening Br. 15-17; Reply Br. 4-5).

## III.   PLAINTIFFS' STATE-LAW CLAIMS MUST BE DISMISSED.

### A.      Plaintiffs Lack Standing To Bring State Law Claims In United States Courts.

"[T]he general rule [is] that non-resident aliens have no standing to sue in United States courts."  *See Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 152 (D.D.C. 1976); *see also Doe VIII v. Exxon Mobil Corp.*, 658 F. Supp. 2d 131, 134 (D.D.C. 2009); *Kukatush Mining Corp. v. SEC*, 309 F.2d 647, 649 (D.C. Cir. 1962) (dismissing for lack of standing claims brought by non-resident aliens).

Plaintiffs dispute the general rule, but all the authorities on which they rely fit within one of the rule's three narrow exceptions, none of which applies here.[25]  Nor is plaintiffs' position supported by cases holding that a suit by non-resident aliens satisfies the requirements of

---

[25]      The three exceptions are:  (1) where the *res* is in the United States; (2) where the statutory scheme allows suits by non-resident aliens, and (3) where a nonresident alien is seized abroad and transported back to the United States for prosecution.  *Doe VIII*, 658 F. Supp. 2d at 134.  Each case cited by plaintiffs (Opp'n 33-34 & n.72) falls within one of these categories. *See Rasul v. Bush*, 542 U.S. 466, 484 (2004) (aliens suing under specific federal statutory provisions that extend standing to them); *The Discontro Gesellschaft v. Umbreit*, 208 U.S. 570, 578 (1908) (money in bank located in Milwaukee); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 406 (1964) (suit seeking to enjoin any action that would remove assets from New York); *The Sapphire*, 78 U.S. 164, 167 (1870) (suit involving collision of ships in San Francisco harbor); *McKenna v. Fisk*, 42 U.S. 241, 248 (1843) (case involving property stolen in Maryland).

diversity jurisdiction or otherwise presents an Article III case or controversy.  (*See* Opp'n 34 & n.74).  Chiquita does not dispute that, absent a prudential limitation, plaintiffs would have Article III standing.  But there is such a prudential limitation here:  the general rule that non-resident aliens cannot sue in U.S. courts for injuries abroad.  *Doe VIII,* 658 F. Supp. 2d at 134.

To be sure, some courts have exercised jurisdiction over state-law claims without considering this prudential limitation (Opp'n 34), but that fact is immaterial.  *See Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) ("[T]he existence of unaddressed jurisdictional defects has no precedential effect.").  Far more persuasive are the many ATS cases in which courts, following the general prudential rule, have declined to exercise jurisdiction over non-resident aliens' state-law claims.  *See Doe VIII*, 658 F. Supp. 2d at 135; *Romero v. Drummond Co.*, No. CV-03-BE-0575-W, slip op. 2 (N.D. Ala. Mar. 5, 2007) (dismissing Alabama common law claims for torts that "occurred extraterritorially in Colombia"); *Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1024 (S.D. Ind. 2007) (dismissing state law claims because "[p]laintiffs have not yet articulated a viable basis for applying California law or Indiana law to the management of [a] Plantation in Liberia").  This Court should do the same.[26]

### B.     Plaintiffs' Arguments for Preserving Their Time-Barred Claims Are Without Merit.

Plaintiffs offer a variety of tolling and other arguments in an effort to trump the fact that their claims—some for injuries dating back as far as 1975 (*see* DC Compl. ¶ 39)—were filed far outside the applicable limitations periods.  None has merit.

---

[26]     The Montes plaintiffs claim (Montes Opp'n 5) standing to bring state-law claims because the Ohio wrongful death statute contemplates suits by non-resident aliens.  *See* Ohio Rev. Code § 2125.01.  But, unlike the ATS, the Ohio statute does not specifically authorize suits by *foreign nationals*, as opposed to *U.S. residents* who were killed in another state or a foreign country.  In any event, as explained *infra* Part III.C, the Montes plaintiffs' claims are time-barred.

Fear of reprisal from the AUC cannot be deemed an "extraordinary circumstance" that prevented plaintiffs from timely bringing their claims.  (*See* NJ Opp'n 2-3; Does 1-976 Opp'n 2-3; Valencia Opp'n 4.)  The vast majority of plaintiffs are using pseudonyms, an option that has always been available.  Under plaintiffs' construction of what constitutes "extraordinary circumstances," all applicable limitations periods would be tolled indefinitely, gutting the statutes and the purposes that they are designed to serve.  In any event, in order to satisfy the "extraordinary circumstances" basis for tolling, the obstacle to filing must be both "beyond [plaintiff's] control *and unavoidable even with diligence*."  *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006) (emphasis added) (internal quotation marks and citation omitted).  The amended complaints do not allege *any* diligence, much less due diligence, until U.S. plaintiffs' lawyers traveled to Colombia and solicited plaintiffs' belated participation in these lawsuits.

The failure to allege diligence also invalidates plaintiffs' attempt to invoke "fraudulent concealment" as a basis for tolling.  (NJ Opp'n 3; Does 1-976 Opp'n 2; Valencia Opp'n 5; Montes Opp'n 4.)  "An act of fraudulent concealment by a defendant does not relieve a plaintiff from his independent duty to pursue his cause of action diligently."  *Cevenini v. Archbishop of Washington*, 707 A.2d 768, 773 (D.C. 1998); *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 812 (Fla. Dist. Ct. App. 1995) (same); *Lynch v. Rubacky*, 424 A.2d 1169, 1174 (N.J. 1981); *Sosa v. Meyers*, 831 N.Y.S.2d 356, at *6 (Sup. Ct. 2006) (same); *Mayor v. Ford Motor Co.*, No. 83297, 2004 WL 1402692, at *4 (Ohio App. June 24, 2004) (same).

*Julin*, on which plaintiffs rely, proves the point.  *Julin v. Chiquita Brands Int'l, Inc.*, No. 08-20641-CIV-KAM, 2010 WL 432426, **7, 17 (S.D. Fla. Feb. 4, 2010).  The *Julin* plaintiffs alleged numerous steps they had taken to pursue their claims up until the time they filed their lawsuit.  (*See* Julin Compl. ¶¶ 159-172 (D.E. #74) (describing plaintiffs' "relentless[] . . . attempt

26

to gather facts and gain assistance" in determining what happened to decedents).)  While this Court held that the *Julin* plaintiffs had adequately alleged fraudulent concealment for claims brought pursuant to the ATA and Nebraska law, here, in contrast, the ATS plaintiffs allege no facts whatsoever to show diligence.

Plaintiffs' assertion that they "had no way to know" (Does 1-976 Opp'n 1) that Chiquita made payments to the AUC until a criminal Information was filed in March 2007 is demonstrably incorrect.  On May 14, 2004—nearly three years earlier—Chiquita publicly disclosed that it had made payments to Colombian armed groups, and that disclosure was widely publicized in Colombia.  (*See* Reply Br. 43 n.29.)  Moreover, it was well known that businesses and landowners operating in Colombia were compelled to pay the guerillas or paramilitaries the *vacuna* (*see* Opening Br. Ex. M (2003 U.N. Report)); plaintiffs themselves assert that it "was common knowledge in the region" that the convivirs were "directed and populated by known paramilitaries."  (D.C. Compl. ¶ 422; N.J. Compl. ¶ 38; Valencia Compl. ¶ 140; Does 1-976 Compl. ¶ 1010.)  This allegation defeats plaintiffs' contradictory and conclusory assertions of fraudulent concealment.

Nor does the doctrine of "delayed discovery," which applies to a plaintiff's delayed discovery that *a tort has occurred*, support plaintiffs' position.  (Does 1-976 Opp'n 1-2; Valencia Opp'n 4-5; Montes Opp'n 4); *see Byers v. Burleson*, 713 F.2d 856, 861 (D.C. Cir. 1983) (stating that D.C. applies the discovery rule only "where a legal or medical injury is not readily apparent"); *Collins v. Sotka*, 692 N.E.2d 581, 583 (Ohio 1988).  Because plaintiffs' injuries resulted, according to their own allegations, from self-evident tortious conduct, the doctrine of delayed discovery does not help them.

As an alternative to tolling, the Montes and New Jersey plaintiffs try to invoke a 20-year Colombian statute of limitations. The Montes plaintiffs rely on a provision of Ohio statutory law to do so (Montes Opp'n 5 (citing Ohio Rev. Code § 2125.01)), but they ignore another Ohio limitations statute that bars their claims.[27]

The New Jersey plaintiffs ignore the fact that the choice of law provision on which they rely is designed to "discourage forum shopping litigants with slender ties to New Jersey *who desire the benefit of New Jersey's more favorable limitation period*," and to encourage the application of the foreign state's limitation period *when that statute has run. Wash. v. Sys. Maint. Corp.*, 616 A.2d 1352, 1355 (N.J. Super Ct. 1992) (emphasis added). As the New Jersey Supreme Court has explained repeatedly, "the traditional rule to determine which of two statutes of limitations is applicable is that *the statute of the forum governs* unless the limitation is a condition of the cause of action." *O'Keefe v. Snyder*, 416 A.2d 862, 868 (N.J. 1980) (emphasis added). Under the five-part test prescribed by *O'Keefe*, New Jersey courts would apply the limitations period of another jurisdiction only if that period had expired. *Id.*[28]

---

[27]    Under Ohio law, not only must the claim be timely under foreign law, *see* Ohio Rev. Code § 2125.01, *it must also be timely under Ohio law. See* Ohio Rev. Code § 2305.03(B) ("No civil action that is based upon a cause of action that accrued in any other state, . . . or foreign jurisdiction may be commenced . . . in this state if the period of limitation that applies to that action under the laws of that other state, . . . or foreign jurisdiction has expired *or the period of limitation that applies to that action under the laws of this state has expired.*") (emphasis added). Ohio law prescribes a 2-year limitations period for wrongful death claims. Ohio Rev. Code § 2125.02(D)(1).

[28]    The New Jersey plaintiffs cite an unpublished case holding that a New Jersey court should have applied a longer New York statute of limitations to an action for personal injury. (NJ Opp'n 4 (citing *Elmoghazi v. Aviles*, 2008 N.J. Super. Unpub. LEXIS 2786 (App. Div. Sept. 2, 2008).) No New Jersey court has ever cited this case, and it is inconsistent with governing New Jersey Supreme Court authority. *See, e.g.*, *O'Keefe*, 416 A.2d at 868.

C.     **Even Under Their Best Case Scenario, The Vast Majority of Plaintiffs' Claims Are Time-Barred.**

Even if the applicable statutes of limitations were tolled until the criminal Information was filed against Chiquita on March 13, 2007, the vast majority of plaintiffs' claims would still be time-barred.

The Montes plaintiffs never come to terms with the fact that, even with tolling, *every single one of their claims is time-barred*.  On April 14, 2010, more than *three years* after the criminal Information was filed, the Montes plaintiffs asserted claims under Ohio law for assault, battery, and wrongful death.  Under both Florida and Ohio law, such claims are subject to either a 1- or 2-year limitations period.  Fla. Stat. Ann. § 95.11(4)(d) (2 years for all tort actions under wrongful death statute); Ohio Rev. Code § 2305.111(B) (1 year for assault & battery); Ohio Rev. Code § 2125.02(D)(1) (2 years for wrongful death).[29]

The Valencia plaintiffs incorrectly state that Ohio law provides a 4-year statute of limitations for "negligence, loss of consortium, and most torts."  (Valencia Opp'n 4.)  Under Ohio law, assault and battery claims are governed by a 1-year limitations period (Ohio Rev. Code § 2305.111(B)), and all other bodily injury claims, including negligence claims, are governed by a 2-year statute of limitations.  *See* Ohio Rev. Code § 2305.10(A); *see Walker v. Bunch*, No. 05-MA-144, 2006 WL 2590508, at *2 (Ohio App. Sept. 5, 2006) ("[T]he statute of limitations for a negligence action is two years) (citing Ohio Rev. Code § 2305.10(A)).  Thus, all of the state law claims alleged by plaintiffs who joined the Valencia complaint on February 26,

---

[29]     The Carrizosa plaintiffs do not dispute that their state law claims are governed by Florida's 2-year statute of limitations.  *See* Fla. Stat. Ann. § 95.11(4)(d).  They have presented no response to Chiquita's argument that the new claims for loss of consortium (Carrizosa Compl. ¶¶ 122-124), as well as all of the claims brought by the plaintiffs who joined the Carrizosa amended complaint on February 26, 2010 (*id.* ¶¶ 72-87), are time-barred.  (Mot. to Dismiss Am. Compls. 32-33 n.33.)

2010, save for their loss of consortium claims, are time-barred, even in their best-case tolling scenario.[30]

The Does 1-976 plaintiffs—who filed their complaint on March 9, 2010, just under three years after the criminal Information was filed—have no argument whatsoever that their claims for assault and battery or intentional infliction of emotional distress are timely.  *See* D.C. Code § 12-301(4) (1 year for assault and battery); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 87 (D.D.C. 2000) (1 year for IIED); (*see* Does 1-976 Opp'n 2 (admitting that assault, battery, and IIED claims are time-barred)).[31]

Finally, all of the claims of the New Jersey plaintiffs who appeared for the first time in the February 26, 2010 amended complaint are barred by New Jersey's 2-year limitations period for personal injury actions (N.J. Stat. Ann. § 2A:14-2(a)), wrongful death (*id.* § 2A:31-3), and loss of consortium (*Tackling v. Chrysler Corp.*, 185 A.2d 238, 239 (N.J. Super Ct. 1962)).[32]

### D.    Plaintiffs Fail To Plead The Elements of Their Asserted State Law Claims.

 Plaintiffs' state-law claims based on accessorial theories of liability fail for many of the same reasons that their ATS claims fail.  (*See* Opening Br. 68-70 & n.63.)  Plaintiffs have not adequately alleged facts establishing that *Banadex*, let alone Chiquita officers thousands of miles away in Cincinnati, aided and abetted the commission of 2,425 torts, or conspired to commit any of these torts, or could possibly be responsible for these torts under theories of state law *respondeat superior.*  (*Id.*)  Nor have they properly alleged the required elements of aiding and

---

[30]    Valencia Compl. ¶¶ 463-833.

[31]    The claims for assault, battery, and intentional infliction of emotional distress brought by the plaintiffs who joined the D.C. Complaint on February 26, 2010 (DC Compl. ¶¶ 196-393), are time-barred for the same reasons.  (Mot. to Dismiss Am. Compls. 32.)

[32]    NJ Compl. ¶¶ 153-163.

abetting or conspiracy.  Plaintiffs make only a limited effort to salvage these claims; none of their arguments is persuasive.

First, plaintiffs' reliance on theories of negligent retention and supervision (NJ Opp'n 4-5; Does 1-976 Opp'n 5) is misplaced because, even in a contractor-contractee relationship, to establish liability the employer must have control over the results of the contractor's work. *Pfenninger v. Hunterdon Cent. Regional High Sch.*, 770 A.2d 1126, 1138 (N.J. 2001) (independent contractor works without being subject to the control of his employer, "except as to the product or result of his work") (citation omitted); *Cardillo v. Mockabee*, 102 F.2d 620, 620 (D.C. Cir. 1939) (same).  Plaintiffs have not alleged that Chiquita controlled the results of the AUC's work.

Second, as plaintiffs acknowledge, claims for negligent infliction of emotional distress *require* that plaintiffs have observed the alleged injuries to their relatives.  (Mot. to Dismiss Does 1-976 and Montes Compls. 11.)  Plaintiffs here fail to allege any specific facts satisfying that requirement.  The Does 1-976 plaintiffs' general assertion that "some" or "many" of the alleged murders were carried out in the presence of family members is not sufficient.  (Does 1-976 Opp'n 4 n.2.)  These general allegations, which concede that some of the plaintiffs did *not* observe the murders, cannot justify allowing all 976 claims to survive a motion to dismiss.  If "some" or "many" of these plaintiffs can plead the elements of an NIED claim, they must do so individually.

Third, the Does 1-976 plaintiffs assert that they have adequately alleged negligence *per se* because Chiquita violated anti-terrorism statutes.  (Does 1-976 Opp'n 5.)  That allegation is not sufficient.  "Violation of a statute may give rise to a civil cause of action, and may constitute negligence *per se* [only] if the statute is meant to promote safety, if the plaintiff is a member of

the class to be protected by the statute, and if the defendant is a person upon whom the statute imposes specific duties." *Ginsberg v. Granados*, 963 A.2d 1134, 1140 (D.C. 2009) (internal quotation marks and citation omitted). The negligence *per se* claim fails for the same reasons that plaintiffs' other negligence-based claims fail, including that plaintiffs have alleged no relationship between Chiquita and any of the more than 2,425 alleged victims from which a "duty" could arise.

## **CONCLUSION**

This case is now at a crossroads. Plaintiffs' amended complaints do not resemble the amended complaint in *Drummond II*, which involved a narrow set of secondary-liability claims brought by a small number of plaintiffs. That complaint was allowed to proceed only because each plaintiff who sought to amend alleged (a) specific facts connecting the defendant to the particular tortious incident for which he or she seeks relief, (b) specific facts supporting the involvement of state actors in that incident or facts showing why the incident constituted a "war crime," and (c) specific facts demonstrating the defendant's "shared purpose" with the primary tortfeasor in inflicting the alleged injury.

Despite the opportunity to amend, plaintiffs' complaints have not changed in any material way. Unlike *Drummond II*, the amended complaints here do not reflect a narrower category of plaintiffs with specific facts to support his or her claim. The only reasonable conclusion here is that plaintiffs have not supplied these facts in their amended their complaints *because such specific facts do not exist*. In the end the only non-conclusory fact that plaintiffs offer to support their position is Chiquita's admission that it authorized its Colombian subsidiary to accede to the extortion demands of armed groups on the left and the right in order to save the lives of its employees.

That theory would extend a cause of action against Chiquita not only to the 2,425 alleged victims at issue in these cases, but to any other person who can allege in conclusory fashion a death or injury attributable to one of the armed groups in Colombia during the past several decades and into the future.  Such a theory—in substance, a terrorism-financing claim, regardless of whether it is pled in the vocabulary of secondary-liability claims—is unsustainable and flatly contrary to *Sosa*.  Accordingly, Chiquita respectfully submits that it is now time to dismiss the amended complaints with prejudice.

Dated: June 21, 2010                               Respectfully submitted,

                                                          _____/s/ Robert W. Wilkins_____
Gregg H. Levy                                      Sidney A. Stubbs (Fla. Bar No. 095596)
John E. Hall                                       Robert W. Wilkins (Fla. Bar No. 578721)
Jonathan L. Marcus                                 Christopher S. Rapp (Fla. Bar No. 0863211)
Ann O'Connell                                      rwilkins@jones-foster.com
José E. Arvelo                                     JONES, FOSTER, JOHNSTON & STUBBS, P.A.
COVINGTON & BURLING LLP                            505 South Flagler Drive, Suite 1100
1201 Pennsylvania Avenue, N.W.                     West Palm Beach, Florida 33401
Washington, D.C.  20004                            Telephone: (561) 659-3000
Telephone: (202) 662-6000                          Fax: (561) 650-0412
Fax: (202) 662-6291

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Telephone:  (212) 841-1000
Fax:  (212) 841-1010                               *Counsel for Chiquita Brands International, Inc.*
                                                   *and Chiquita Fresh North America LLC*

33

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the

Clerk of the Court using CM/ECF on this 21st day of June, 2010.  I also certify that the

foregoing document is being served this day on all counsel of record registered to receive

electronic Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's

First Case Management Order ("CMO") and the June 10, 2008 Joint Counsel List filed in

accordance with the CMO.


By:  _____/s/ Robert W. Wilkins_____
Fla. Bar No. 578721
rwilkins@jones-foster.com