UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

No. 08-01916-MD-MARRA/JOHNSON

IN RE: CHIQUITA BRANDS
INTERNATIONAL, INC., ALIEN TORT
STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____

This Document Relates To:

    DERIVATIVE ACTIONS.

_____ /


NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF PROPOSED
DERIVATIVE SETTLEMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 23.1
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

No. 08-01916-MD-MARRA/JOHNSON

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ...............................................................................................1

II.  FACTUAL BACKGROUND OF THIS LITIGATION ....................................3

III.  THE SETTLEMENT SHOULD BE GIVEN FINAL APPROVAL BECAUSE IT
      IS IN THE BEST INTERESTS OF CHIQUITA AND IS FAIR AND
      REASONABLE UNDER ELEVENTH CIRCUIT LAW ..................................7

      A.    Courts Favor Settlement of Complex Litigation......................................7

      B.    The Settlement Is Presumptively Fair, Adequate, and Reasonable .......................8

IV.  PLAINTIFFS' COUNSEL ARE ENTITLED TO THE ATTORNEYS' FEES
      AND EXPENSES REQUESTED BECAUSE THEIR EFFORTS CONFERRED
      A SUBSTANTIAL BENEFIT ON CHIQUITA AND ITS SHAREHOLDERS..............22

      A.    The Fee Requested Is Fair and Reasonable Under an Analysis of the
            *Johnson* Factors .................................................................................23

            1.    Time and Labor Involved.........................................................23

            2.    The Novelty and Difficulty of Questions Raised by the Action...............24

            3.    The Skill Required to Perform the Legal Services Properly......................26

            4.    The Preclusion of Other Employment by Attorneys Due to
                  Acceptance of the Case...........................................................27

            5.    The Customary Fee and Awards in Similar Cases...................................27

            6.    Whether the Fee Is Contingent or Fixed ....................................28

            7.    The Results Achieved ...........................................................29

            8.    The Experience, Reputations, and Ability of the Attorneys .....................29

V.  CONCLUSION...............................................................................................30

575210_2

No. 08-01916-MD-MARRA/JOHNSON

## TABLE OF AUTHORITIES

Page

**CASES**

*Armstrong v. Bd. of Sch. Dirs.*,
  616 F.2d 305 (7th Cir. 1980) ........................................................21

*Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002) ....................................................9

*Behrens v. Wometco Enters., Inc.*,
  118 F.R.D. 534 (S.D. Fla. 1988),
  *aff'd*, 899 F.2d 21 (11th Cir. 1990) ..............................................9

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) ..............................................*passim*

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ....................................................................22

*Bonner v. City of Prichard*,
  611 F.2d 1206 (11th Cir. 1981) ....................................................23

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005) ........................................8, 14

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ....................................................9, 21

*David, et al. v. Wolfen, et al.*,
  No. 01-CC-03930, slip op.
  (Orange County Cal. Super. Ct. Nov. 1, 2004) ..............................27

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
  630 F. Supp. 482 (E.D. Pa. 1985) ................................................21

*Fresco v. Auto. Directions, Inc.*,
  No. 03-CIV-61063, 2009 U.S. Dist. LEXIS 125233
  (S.D. Fla. Jan. 16, 2009) ............................................................13

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)....................................................................29

575210_2

No. 08-01916-MD-MARRA/JOHNSON

**Page**

*In re Apple Computer Sec. Litig.*,
No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608
(N.D. Cal. Sept. 6, 1991)..................................................................12

*In re BP P.L.C. Derivative Litig.*,
No. 3AN-06-11929CI, slip op.
(Super. Ct. Alaska, 3d Judicial District of Anchorage) ........................27

*In re Dynegy, Inc. Derivative Litig.*,
No. 2002-25250, slip op.
(Harris County Tex. July 8, 2005) ......................................................27

*In re King Res. Co. Sec. Litig.*,
420 F. Supp. 610 (D. Colo. 1976)......................................................26

*In re Lloyd's Am. Trust Fund Litig.*,
No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663
(S.D.N.Y. Nov. 26, 2002) ..................................................................13

*In re Painewebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y.),
*aff'd*, 117 F.3d 721 (2d Cir. 1997) ......................................................14

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
No. 888, 1994 U.S. Dist. LEXIS 6621
(E.D. La. May 18, 1994)....................................................................28

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
No. 01-1412 (KSH), slip op.
(D.N.J. Jan. 14, 2008) ......................................................................27

*In re U.S. Oil & Gas Litig.*,
967 F.2d 489 (11th Cir. 1992) ............................................................8

*In re Walt Disney Co. Derivative Litig.*,
907 A.2d 693 (Del. Ch. 2005),
*aff'd*, 906 A.2d 27 (Del. 2006)..........................................................11

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985),
*aff'd*, 798 F.2d 35 (2d Cir. 1986) ..............................................18, 26

*Johnson v. Ga. Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) ....................................................*passim*

No. 08-01916-MD-MARRA/JOHNSON

**Page**

*Lyons v. Marrud, Inc.*,
    No. 66 Civ. 415, 1972 U.S. Dist. LEXIS 13401
    (S.D.N.Y. June 6, 1972) ..................................................................................21

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ....................................................................8, 15

*Malchman v. Davis*,
    706 F.2d 426 (2d Cir. 1983) ........................................................................21

*Maul v. Kirkman*,
    637 A.2d 928 (N.J. Super. Ct. App. Div. 1994) ....................................11, 25

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ....................................................................12

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ....................................................................................22

*Perez v. Asurion Corp.*,
    501 F. Supp. 2d 1360 (S.D. Fla. 2007) ....................................................9, 19

*Reed v. GMC*,
    703 F.2d 170 (5th Cir. 1983) ......................................................................21

*Robbins v. Koger Props.*,
    116 F.3d 1441 (11th Cir. 1997) ..................................................................12

*Rowe, et al. v. Fishman, et al.*,
    No. 04-4576 (JRT/FLN), slip op.
    (D. Minn. Sept. 6, 2007) ..............................................................................27

*Sterling v. Stewart*,
    158 F.3d 1199 (11th Cir. 1998) ....................................................................9

*Strang v. JHM Mortgage Sec. Ltd. P'ship*,
    890 F. Supp. 499 (E.D. Va. 1995) ..............................................................19

*Unite Nat'l Ret. Fund v. Watts*,
    No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246
    (D.N.J. Oct. 28, 2005) ........................................................................8, 14, 27

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) ..........................................................................21

No. 08-01916-MD-MARRA/JOHNSON

**Page**

*Williams v. First Nat'l Bank,*
    216 U.S. 582 (1910)......................................................................................................7

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 23.1 ...........................................................................................................1, 3

**SECONDARY AUTHORITY**

Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler,
*Shareholder Derivative Litigation: Besieging the Board*
§14.06 (Law Journal Press 2003) ................................................................................22

575210_2

No. 08-01916-MD-MARRA/JOHNSON

NOW come Plaintiffs, through their counsel of record, and make this Motion for Final Approval of Proposed Derivative Settlement ("Motion") under the terms set forth in the Stipulation and Agreement of Settlement (the "Stipulation")[1] dated as of April 19, 2010 and pursuant to Federal Rule of Civil Procedure 23.1, and in support thereof state as follows:

1.      These actions are derivative actions (the "Derivative Litigation") brought on behalf of Chiquita Brands International, Inc. ("Chiquita" or the "Company").

2.      On April 19, 2010, the parties in the Derivative Litigation entered into the Stipulation, which was filed on August 5, 2010 and preliminarily approved by the Court the same day.

3.      By this Motion, Plaintiffs seek entry of the [Proposed] Final Judgment and Order of Dismissal ("Judgment").

4.      The Individual Defendants and the SLC do not oppose this Motion.

WHEREFORE, based upon the foregoing, Plaintiffs request that this Court grant this Motion and enter the Judgment.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

The parties, subject to Court approval, have agreed to the settlement of the Derivative Litigation. Accordingly, Plaintiffs submit this memorandum in support of their motion for final approval of the Settlement pursuant to Federal Rule of Civil Procedure 23.1. The terms of the

---

[1]      Unless otherwise defined herein, all capitalized terms shall have the same meaning as designated to them in the Stipulation.

575210_2

Settlement, which are set forth in the Stipulation, were reached after extensive investigative efforts and arm's-length and mediator-assisted negotiations.

The terms contained in the Stipulation provide substantial benefits to Chiquita, on whose behalf the Derivative Litigation was brought. On behalf of Chiquita, Plaintiffs secured numerous changes to the Company's corporate governance and compliance programs that Chiquita has agreed to adopt and implement, many of which Plaintiffs specifically negotiated to prevent the reoccurrence of the conduct alleged in the Amended Complaint – namely, payments to terrorist groups. Plaintiffs, the Special Litigation Committee ("SLC") to Chiquita, and corporate governance expert Robert A.G. Monks ("Monks") agree the corporate governance changes set forth in the Stipulation provide a substantial benefit to Chiquita. *See* Stipulation, ¶2.1; *see also* Declaration of Robert A.G. Monks, filed concurrently herewith ("Monks Decl."), ¶¶5, 6.

In addition to corporate governance and compliance changes that increase the independence of each member of Chiquita's Board of Directors, place additional emphasis on corporate ethics and compliance, and amplify shareholder participation at annual shareholder meetings, Chiquita has agreed to adopt and implement changes that include policies specifically designed to prevent the reoccurrence of the conduct alleged in the Amended Complaint. These tailored changes and enhancements include:

- Chiquita will implement mandatory training programs for members of its Board of Directors, among other Company personnel, that focuses on, among other topics, the requirements of the Foreign Corrupt Practices Act of 1977 ("FCPA");

- Chiquita will amend the Audit Committee charter to explicitly require annual risk assessments;

- Chiquita will enhance its whistleblower policies and ensure a written copy is available to employees, independent contracts, and vendors;

575210_2

No. 08-01916-MD-MARRA/JOHNSON

- Chiquita will formalize in writing its process for screening transactions with third parties to prevent any payments to Foreign Terrorist Organizations;

- Chiquita will formalize and enhance the process by which developments in United States law pertaining to the FCPA and the Alien Tort Claims Act, among other statutes, are monitored and reported to the Board of Directors by the Company's Chief Legal Officer; and

- Chiquita's Chief Compliance Officer ("CCO") will present to the Audit Committee on a quarterly basis a report addressing any updates to Chiquita's compliance and ethics policies, including its FCPA Policy, International Trade Compliance Policy, Code of Conduct, and Antitrust Policy.[2]

As explained below, and in further detail in the Joint Declaration of Arthur C. Leahy and Stewart L. Cohen in Support of Motion for Final Approval of Proposed Derivative Settlement Under Federal Rule of Civil Procedure 23.1 ("Joint Decl.") and in the Monks Declaration, both filed concurrently herewith, the Settlement provides substantial benefits to Chiquita, constitutes an excellent resolution of the issues, is eminently fair and reasonable to Chiquita and its shareholders, and as such, warrants this Court's final approval.

## II.    FACTUAL BACKGROUND OF THIS LITIGATION

In October and December of 2007 and January of 2008, certain shareholders of Chiquita filed four derivative lawsuits in various U.S. District Courts, captioned (i) *City of Philadelphia Public Employees Retirement System, derivatively on behalf of Chiquita Brands International, Inc. v. Aguirre, et al.*, Case No. 1:07-cv-851 (S.D. Ohio), (ii) *Sheet Metal Workers Local #218(S) Pension Fund, derivatively on behalf of Chiquita Brands International, Inc. v. Hills, et al.*, Case No. 1:07-cv-01957 (D.D.C.), (iii) *Henry Taylor, derivatively on behalf of Chiquita Brands International, Inc. v.*

---

[2]    The details of the corporate governance and compliance changes set forth in the Stipulation are further discussed herein at §III.B.b.

575210_2

No. 08-01916-MD-MARRA/JOHNSON

*Aguirre, et al.*, Case No. 3:07-cv-06002-FLW-JJH (D.N.J.), and (iv) *Hawaii Annuity Trust Fund for Operating Engineers, derivatively on behalf of Chiquita Brands International, Inc. v. Hills, et al.*, Civil No. 1:08-cv-00081-PLF (D.D.C.).

By orders dated February 20 and 27, 2008, the U.S. Judicial Panel on Multidistrict Litigation transferred the above-described shareholder derivative lawsuits (together with certain other lawsuits that are not the subject of the Stipulation) to the U.S. District Court for the Southern District of Florida (the "Court") for pre-trial purposes. These cases are currently centralized for pre-trial purposes before the Court and captioned *In re: Chiquita Brands International, Inc., Alien Tort Statute and Shareholder Derivative Litigation*, No. 08-01916-MD-MARRA/JOHNSON.

In December of 2007, the Service Employees International Union filed a shareholder derivative lawsuit in the Ohio Court of Common Pleas captioned *Serv. Employees Int'l Union, derivatively on behalf of Chiquita Brands International, Inc. v. Hills, et al.*, No. A07-11383 (Ct. of Common Pleas, Hamilton County Ohio) (the "Ohio Action"). By order entered February 26, 2008, the court in the Ohio Action stayed the Ohio Action pending resolution of the Derivative Litigation.

By order dated August 12, 2008, the Court appointed the law firms of Coughlin Stoia Geller Rudman & Robbins LLP[3] and Cohen, Placitella & Roth, P.C. as co-lead counsel in the Derivative Litigation ("Co-Lead Counsel").

On September 11, 2008, Plaintiffs filed a verified consolidated shareholder derivative complaint (the "Amended Complaint") in the Derivative Litigation. The Amended Complaint asserts two causes of action on behalf of Chiquita, breach of fiduciary duty and corporate waste,

_____

[3]     Now known as Robbins Geller Rudman & Dowd LLP.

- 4 -

against twenty-six current and former Chiquita directors and officers (the "Individual Defendants"). There are no wrongful acts alleged, claims asserted, or defendants named in the Ohio Action that are not alleged, asserted, and named, respectively, in the Amended Complaint.

The allegations in the Amended Complaint arise principally out of payments made by Chiquita's Colombian subsidiary, C.I. Bananos de Exportación S.A. ("Banadex"), to left-wing guerrilla and right-wing paramilitary groups, including the Fuerzas Armadas Revolucionarias de Colombia, or the Revolutionary Armed Forces of Colombia, known as the "FARC," and the Autodefensas Unidas de Colombia, or the United Self-Defenses of Colombia, known as the "AUC," from approximately 1989 through January 2004 (the "Colombia Payments"). As a result of certain Columbia Payments, Chiquita pled guilty in March 2007 to violating United States anti-terrorism laws and agreed to pay a $25 million criminal fine.

On April 3, 2008, the Chiquita Board of Directors adopted a resolution (the "Resolution") establishing the SLC, which delegated to the SLC the full and exclusive authority to consider and determine whether or not the Derivative Litigation was in the best interests of the Company and its shareholders, and what action the Company should take with respect to the case. Non-management Chiquita directors Howard W. Barker, Jr., William H. Camp, and Clare M. Hasler were designated as SLC members.

From May 2008 through February 2009, the SLC, with the assistance of its independent counsel Fried, Frank, Harris, Shriver & Jacobson LLP, conducted a detailed and thorough factual and legal investigation in order to determine whether the Company should pursue, settle, or dismiss any or all of the claims asserted in the Amended Complaint. During that investigation, the SLC and its counsel conducted seventy interviews of relevant witnesses and reviewed more than 750,000

- 5 -

575210_2

No. 08-01916-MD-MARRA/JOHNSON

pages of documents.  Co-Lead Counsel provided meaningful input concerning the scope and direction of the SLC investigation and was periodically updated by the SLC with respect to its factual findings through in-person and telephonic meetings.

Following the conclusion of its investigation, on February 25, 2009, the SLC, in the exercise of its business judgment, filed a motion to dismiss the Amended Complaint.  The SLC's motion to dismiss was accompanied by a detailed written report discussing its investigation and conclusions (the "SLC Report").  The SLC's motion to dismiss remains pending before the Court.  On or before March 31, 2009, Plaintiffs in the Derivative Litigation and the SLC served certain discovery requests and agreed to a briefing schedule with respect to the SLC's motion to dismiss.

Following the filing of the SLC's motion to dismiss and the SLC Report, Plaintiffs and the SLC engaged in extensive discussions regarding a potential resolution of the Derivative Litigation and the Ohio Action.  On October 5, 2009, the Plaintiffs and the SLC participated in a mediation before the Honorable Layn R. Phillips, a former United States District Judge, in an attempt to reach a settlement.  Although the parties did not reach an agreement at the mediation, Plaintiffs and the SLC continued to engage in good faith negotiations regarding a potential resolution of the Derivative Litigation and the Ohio Action.

On December 23, 2009, Plaintiffs and the SLC entered into a Memorandum of Understanding pursuant to which they agreed to settle the Derivative Litigation and the Ohio Action, subject to execution of the Stipulation.  On August 5, 2010, Plaintiffs filed an agreed motion for preliminary approval of the Settlement governed by the terms of the Stipulation, which was filed

- 6 -

with the motion.[4]  On that same day, August 5, 2010, the Court granted Plaintiffs' motion for preliminary approval of the Settlement.

Plaintiffs and the SLC agree that it is in the best interests of Chiquita and its shareholders to settle the Derivative Litigation and the Ohio Action on the terms described in the Stipulation. The parties also agree – as does corporate governance expert Monks – that the corporate governance and compliance changes confer a substantial benefit upon Chiquita. Furthermore, the SLC believes that the Settlement, taken as a whole and including the payment of up to $4 million in attorneys' fees and expenses to Plaintiffs' counsel, is fair and reasonable to Chiquita and its shareholders.

The parties did not reach an agreement of settlement of the Derivative Litigation until after Plaintiffs: (a) investigated and prepared a detailed initial complaint; (b) prepared a comprehensive and highly fact-intensive amended complaint; (c) reviewed hundreds of thousands of pages of documents related to the SLC's extensive investigation produced by the SLC following Plaintiffs' request for documents; and (d) engaged in lengthy settlement discussions and negotiations with the Individual Defendants, with the substantial assistance of respected mediator Honorable Layn R. Phillips (Ret.).

## III.  THE SETTLEMENT SHOULD BE GIVEN FINAL APPROVAL BECAUSE IT IS IN THE BEST INTERESTS OF CHIQUITA AND IS FAIR AND REASONABLE UNDER ELEVENTH CIRCUIT LAW

### A.  Courts Favor Settlement of Complex Litigation

Compromises of disputed claims have long been favored by courts. *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910). In the Eleventh Circuit, there exists a "strong judicial policy

---

[4]     The SLC did not oppose Plaintiffs' motion for preliminary approval.

No. 08-01916-MD-MARRA/JOHNSON

favoring settlement as well as by the realization that compromise is the essence of settlement." *See*

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).[5]  Courts have consistently recognized

"[t]he law favors settlement, particularly in class actions and other complex cases where substantial

judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d

844, 852 (E.D. Mo. 2005).  This is particularly true in shareholder derivative actions, which are

"notoriously difficult and unpredictable." *Id.*; *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th

Cir. 1992) ("Complex litigation – like the instant case – can occupy a court's docket for years on

end, depleting the resources of the parties and the taxpayers while rendering meaningful relief

increasingly elusive.").

A proposed settlement of a shareholder derivative action should be given final approval when

there has been no fraud or collusion in arriving at the settlement agreement, and when it is fair,

reasonable, and adequate. *Bennett*, 737 F.2d at 986; *see also  Maher v. Zapata Corp.*, 714 F.2d 436,

455 (5th Cir. 1983).  In such cases, "the most important factor in evaluating the fairness of the

settlement agreement is the benefit to the corporation." *Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-

3603 (DMC), 2005 U.S. Dist. LEXIS 26246, at *8 (D.N.J. Oct. 28, 2005).

**B.      The Settlement Is Presumptively Fair, Adequate, and Reasonable**

In determining whether a settlement is fair, adequate, and reasonable – and thus whether the

settlement should receive final approval – courts in the Eleventh Circuit follow the *Bennett* case and

consider all relevant factors, including: (1) the likelihood of success at trial; (2) the range of possible

recovery; (3) the point on or below the range of possible recovery at which a settlement would be

---

[5]      Internal citations omitted unless otherwise indicated.

deemed fair, adequate, and reasonable; (4) the complexity, expense, and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett*, 737 F.2d at 986; *see also Sterling v. Stewart*, 158 F.3d 1199, 1204 (11th Cir. 1998). Settlement of a derivative action should be approved when it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 537 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990). In evaluating the fairness of a settlement, the court is not required to try the case on the merits. *Ass'n for Disabled Americans*, 211 F.R.D. at 467 (citing *Cotton*, 559 F.2d at 1330). Rather, the court "must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Id*. An analysis of the *Bennett* factors confirms the Settlement is fair, adequate, reasonable, and not the product of collusion, and thus it should receive final approval.

### a.  Plaintiffs' Likelihood of Success at Trial

The first *Bennett* factor supporting final approval of the proposed Settlement is Plaintiffs' likelihood of success at trial. *Bennett*, 737 F.2d at 986. "Where a substantial question exists regarding the likelihood of success at trial, this factor weighs in favor of approving a proposed . . . settlement." *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1380 (S.D. Fla. 2007). Any litigation poses the risk of an uncertain outcome, especially in complex actions such as the Derivative Litigation. *Sterling*, 158 F.3d at 1204. Here, Plaintiffs' victory at trial was far from certain. In fact, the SLC's motion to dismiss and the accompanying SLC Report recommending dismissal were pending when the Settlement was reached. There was a substantial risk to Plaintiffs and Chiquita

- 9 -

that the SLC's motion would succeed, terminating the litigation with no relief obtained for the Company. Furthermore, even if Plaintiffs were successful defeating the SLC's motion, to proceed on the merits the parties, including Chiquita, would have incurred great expense and engaged in lengthy proceedings, including the completion of a comprehensive discovery process, the preparation of or opposition to summary judgment motions, trial, and appeals.

While Plaintiffs believe the claims asserted in the Amended Complaint have merit, they also recognize they would have faced considerable difficulty in establishing liability. The SLC's Report and its motion to dismiss were based on 10 months of investigation, including 70 interviews of relevant witnesses and the review of more than 750,000 pages of documents. The motion raised numerous complex and potentially dispositive issues that would have required the parties to expend extensive time and resources in a relatively short period of time. In its motion to dismiss, the SLC argued it was independent and conducted a good faith investigation into the merits of the Derivative Litigation with due care, and that the Individual Defendants' conduct was protected by the business judgment rule. Despite Plaintiffs' compelling allegations regarding the payments from Chiquita's Columbian subsidiary, Banadex, to the FARC and AUC groups from approximately 1989 through January 2004, the business judgment rule would afford the Individual Defendants a strong liability defense. This was a particularly evident risk because certain Individual Defendants received advice regarding the Columbia Payments from the Company's legal department and outside counsel, and because the SLC Report concluded the Individual Defendants received no personal benefit from the Columbia Payments and believed in good faith the payments were necessary to prevent harm to the Company's employees and infrastructure.

- 10 -

No. 08-01916-MD-MARRA/JOHNSON

Under New Jersey substantive law, which governs the Derivative Litigation, the business judgment rule presumes that directors acted properly and in good faith unless there is evidence of fraud, self-dealing, or unconscionable conduct. *Maul v. Kirkman*, 637 A.2d 928, 937 (N.J. Super. Ct. App. Div. 1994). While the business judgment rule and the protections it affords directors has been set forth in slightly varied forms, its essence is the presumption that, in making a disinterested business decision, the directors of a corporation acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation. *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).[6] Although Plaintiffs are confident they had valid arguments rebutting the protections afforded by the rule with respect to the conduct alleged, the prospect that the Individual Defendants could have been shielded by this protective umbrella made establishing liability uncertain. Plaintiffs faced the risk that discovery would show, and the Court or a jury might ultimately find, that the Individual Defendants' conduct was in fact protected by the business judgment rule.

Plaintiffs also faced noteworthy statute of limitations defenses,[7] issues related to the releases given to certain individuals in connection with Chiquita's bankruptcy reorganization in 2002, as well

---

[6]     Countless courts and commentators have discussed the concept of the business judgment rule and its implications, particularly in the wake of the well-publicized *Disney* decision. A discussion of all of the iterations of the rule is superfluous in this context, but Plaintiffs respectfully refer the Court to Chancellor Chandler's *Disney* decision for an extensive explanation of the rule's development and teachings. *See Disney*, 907 A.2d at 762. In *Disney*, judgment was entered for defendants on all claims after a ten week bench trial despite the court's recognition that defendants' "actions fall far short of what shareholders expect and demand from those entrusted with a fiduciary position." *Id.* at 763.

[7]     As noted above, the Columbia Payments commenced over twenty years ago.

as questions concerning whether Chiquita would be obligated to indemnify the Individual Defendants if Plaintiffs obtained a jury verdict.

Given the Individual Defendants' significant defenses and the other complexities of the case, the outcome of a trial on the merits and any subsequent appeal remain uncertain. Plaintiffs and Co-Lead Counsel all recognize there was substantial risk in continued litigation. Even a victory at trial would not guarantee the judgment would ultimately be sustained on appeal. Substantial judgments awarded at the trial court level are susceptible to reversal on appeal.[8] Add to these appellate risks the difficulty and unpredictability of a lengthy and complex trial regarding events occurring as long as two decades ago – where witnesses could fail to remember facts, become unavailable, or the fact finder could react to the evidence in unforeseen ways – and the substantial benefit of the Settlement becomes even more apparent.

While Plaintiffs believe they would have prevailed on the SLC's motion to dismiss, Plaintiffs have also concluded that, as explained in further detail below, the proposed Settlement provides meaningful and substantial benefits to, and is fair, reasonable, and in the best interests of, Chiquita and its shareholders, while at the same time avoiding the expense and risk of continued litigation.

---

[8]    *See, e.g.*, *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (Eleventh Circuit found no loss causation and overturned $81 million jury verdict in favor of plaintiff); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v. entered in favor of defendant); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) (remanding $1.8 billion antitrust judgment for a new trial on damages which ultimately produced dramatically smaller award).

- 12 -

No. 08-01916-MD-MARRA/JOHNSON

b.     **The Settlement Is Within the Range of Possible Recovery**

The second and third *Bennett* factors supporting final approval of the proposed Settlement

relate to the range of possible recovery and the point at or below the range of possible recovery at

which a settlement would be deemed fair, adequate, and reasonable. *Bennett*, 737 F.2d at 986. "The

second and third considerations of the *Bennett* test are combined." *Fresco v. Auto. Directions, Inc.*,

No. 03-CIV-61063, 2009 U.S. Dist. LEXIS 125233, at *17 (S.D. Fla. Jan. 16, 2009). It was possible

the Derivative Litigation could have been dismissed in response to the SLC Report and motion.

Plaintiffs also could have lost at summary judgment or trial if this Court or a jury concluded the

Individual Defendants' actions were protected by the business judgment rule, precluding recovery

against some or all of the Individual Defendants. Thus, the lowest amount of recovery or relief was

potentially zero.

Moreover, even if Plaintiffs successfully established liability, to prove damages at trial they

would have had to show, *inter alia*, that the conduct which formed the basis for the claims in the

Amended Complaint actually caused Chiquita to suffer damages and that the Individual Defendants

should be held liable for those damages. The issue of damages to Chiquita would have been hotly

disputed and the subject of expert testimony proffered by all parties.[9] The damage assessment

prepared by the parties' respective experts would have undoubtedly varied substantially, and at trial,

this crucial element of Plaintiffs' claims may have been reduced to a "battle of the experts." It is far

---

[9]     *See In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages . . . is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable.").

from certain that the finder of fact would have disregarded the Individual Defendants' experts' opinions.  Indeed, the finder of fact could have been swayed by defense experts' opinions that damages were caused by factors other than the Individual Defendants' alleged wrongdoing, or, alternatively, minimizing the magnitude of the damages to Chiquita.  *See, e.g., In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  It was entirely possible that the finder of fact could have concluded that Chiquita suffered no damages or that damages to the Company were only a fraction of the amount Plaintiffs contended.

By contrast, the corporate governance and compliance changes set forth in the Stipulation provide the certainty of a known, substantial benefit.  "Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *Cohn*, 375 F. Supp. 2d at 853.  Indeed, "despite the difficulties they pose to measurement, non-pecuniary benefits to the corporation may support a settlement.  This is particularly true when the relief is intended to prevent future harm." *Unite Nat'l*, 2005 U.S. Dist. LEXIS 26246, at *8-*9.  As the *Cohn* court noted:

> In the context of the alleged wrongdoing, ***the Settlement provides lasting remedial terms that are specifically designed to protect and preserve [the Company] for the benefit of its shareholders, and preserves valuable assets of the Company***.  The Settlement's corporate governance reforms are specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws in the future.  As a result of the implementation of the Settlement's corporate governance changes, [the Company] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors.

375 F. Supp. 2d at 853 (emphasis added).  Many of the corporate governance and compliance changes Chiquita has agreed to adopt and implement as part of the Stipulation have been tailored to

- 14 -

address the alleged wrongful conduct in the Amended Complaint and are specifically designed to

prevent a reoccurrence of this conduct.  As the court cogently observed in *Maher*:

> [W]here, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in the class action damage suit, is not the sole, and may well not be the most important, matter to be considered, *for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long-and short-term, than the dollar amount of any likely judgment in its favor in the particular action.*

714 F.2d at 461.  "The evaluation of such an economic impact is necessarily judgmental and

imprecise and normally does not lend itself to meaningful quantification." *Id.*

Although the economic impact of the corporate governance and compliance changes set forth

in the Stipulation cannot be precisely quantified, Plaintiffs and the SLC agree that these corporate

governance and compliance provisions constitute a substantial benefit to Chiquita.[10]  Corporate

governance expert Monks further concurs with the SLC's and Plaintiffs' beliefs that the terms of the

Stipulation provide a substantial benefit to Chiquita and its shareholders. *See* Monks Decl., ¶¶5, 6.

In addition to corporate governance and compliance changes that increase the independence of each

member of Chiquita's Board of Directors, place additional emphasis on corporate ethics and

compliance, and amplify shareholder participation at annual shareholder meetings, the changes also

include new Company policies specifically designed to prevent any reoccurrence of the type of

conduct alleged in the Amended Complaint.  These specifically tailored enhancements and changes,

negotiated by Co-Lead Counsel, include:

---

[10]     *See* Stipulation, ¶2.1 ("The SLC acknowledges . . . that the Governance and Compliance Changes constitute a substantial benefit to Chiquita.").

(1)     the Company will implement training programs regarding "Working with Agents and Intermediaries," with a focus on the FCPA, "US Trade Regulations," with a focus on the Office of Foreign Assets Control (the "OFAC"), "Chiquita's Code of Conduct," and "Antitrust Policies";

(2)     Chiquita will make training on topics such as FCPA rules, OFAC requirements, antitrust policies, and best practices in corporate governance mandatory for members of the Company's Board of Directors on an annual basis;

(3)     Chiquita's CCO will formulate and implement reasonable criteria governing which personnel shall receive the training set forth in (1), based upon, among other things, role at the Company, access to Company information and resources, and the ability to disperse or receive funds on behalf of the Company;

(4)     Chiquita will amend the Audit Committee Charter to make explicit the requirement that the Audit Committee perform a risk assessment on an annual basis, or as needed to promptly address potentially unlawful activities;

(5)     the Company will ensure its written policies that are available to employees, independent contractors, and vendors state that Chiquita will not adopt measures to prevent whistleblowers from coming forward, will not retaliate against any whistleblower that does come forward, and will not discourage employees, independent contractors, and vendors from exercising their rights to contact governmental authorities or consulting legal counsel;

(6)     the Board of Directors will be responsible for notifying employees and vendors annually of Chiquita's confidential whistleblower program;

(7)     Chiquita will include in its whistleblower notice to employees, independent contractors, and vendors that an illegal act can be considered material to the Company's financials and that Chiquita requests any suspected illegal act be promptly identified and handled consistent with whistleblower protocol;

(8)     Chiquita will formalize in writing its system for screening transactions with third parties to prevent the making of any payments to Foreign Terrorist Organizations in connection with Company transactions with those third parties;

(9)     Chiquita will formalize its system for screening prospective payments against a database of individuals and entities listed on the Specially Designated Nationals & Blocked Persons List and the procedure for handling any potential matches identified in the screening process;

(10)     Chiquita will create a written policy requiring the entire Audit Committee be promptly advised when a potential payment described in (9) is confirmed;

(11)    the Audit Committee will establish a written policy formalizing the practice of the Vice President of the Internal Audit Department reporting directly to the Audit Committee regarding, among other things, any sensitive or irregular payments to third parties on a quarterly basis;

(12)    Chiquita will provide the Internal Audit Department with documentation specifying the FCPA's record keeping and accounting requirements;

(13)    the Board of Directors will adopt a resolution confirming illegal payments to terrorist organizations, bribes to foreign officials and governments, and other similar payments, are considered illegal and not authorized by Chiquita;

(14)    the Company will formalize and enhance the process by which changes or developments in United States law pertaining to the FCPA, the U.S. Anti-Bribery Act, the Alien Tort Claims Act, the U.S. securities laws, and the U.S. antitrust laws are monitored and reported to the Board of Directors by Chiquita's Chief Legal Officer; and

(15)    the CCO will, on a quarterly basis, present to the Audit Committee a report concerning the status of and/or updates to Chiquita's compliance and ethics programs and policies, including the Company's FCPA Policy, International Trade Compliance Policy, Code of Conduct, and Antitrust Policy.

Finally, the benefits of the proposed Settlement must be evaluated with the recognition that any compromise involves concessions by all settling parties. Indeed, "compromise is the essence of settlement." *Bennett*, 737 F.2d at 986. It is important to note that in negotiating the proposed Settlement with the SLC, Plaintiffs have obtained certain types of relief in the form of corporate governance and compliance changes that likely exceed what could have been obtained even if judgment was entered in their favor.

      c.    **The Complexity, Expense, and Likely Duration of the Litigation Would Be Considerable Were the Derivative Action to Proceed**

Another *Bennett* factor supporting final approval of the Settlement is the complexity, expense, and likely duration of the Derivative Litigation. Shareholder derivative actions are notoriously complicated and involve sophisticated legal and factual issues that can be litigated to a

- 17 -

conclusion on the merits only at great expense over an extended period of time. The Derivative Litigation would have been no exception to this general rule. Even Chiquita, the intended beneficiary of Plaintiffs' work, would have incurred substantial costs and disruption of its business activities in connection with producing documents and witnesses, for both depositions and trial, and advancing significant defense costs to each of the twenty-six Individual Defendants. Chiquita also would have suffered the detrimental effects of the distraction the Derivative Litigation would be to Chiquita's executives, directors, and employees, as well as potential reputational harm. Assuming Plaintiffs were successful in upholding the Amended Complaint despite the SLC Report and the SLC's motion to dismiss (which was by no means guaranteed), a lengthy and expensive discovery process would occupy many months, if not years, and would include numerous depositions of fact witnesses and testifying experts. If Plaintiffs were successful in opposing the Individual Defendants' anticipated motions for summary judgment – which would also necessarily expend considerable costs and resources – a trial could occupy the parties, their attorneys, and the Court for weeks, at least. The expense of such a trial to the parties and the consumption of the Court's resources would have been significant. Furthermore, any substantial judgment in favor of Plaintiffs would undoubtedly be the subject of post-trial motions and appeals, which would further prolong the Derivative Litigation for years. *See, e.g., In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986). This prolonged period of pretrial proceedings, a lengthy and uncertain trial, and potential appeals would not serve the best interests of the Company and its shareholders when compared to the immediate, certain, and substantial benefits provided by the proposed Settlement of the Derivative Litigation.

575210_2

No. 08-01916-MD-MARRA/JOHNSON

**d.     The Stage of the Proceedings and the Amount of
         Discovery Completed**

The final *Bennett* factor supporting final approval of the proposed Settlement is the stage of

litigation at the time an agreement among the parties is reached.  While the Settlement comes at a

relatively early stage in the litigation (foreclosing the extraordinary expense of a lengthy discovery

period and trial preparation, as well as the burden on the Court of protracted and complex litigation),

Co-Lead Counsel and counsel for the SLC have had the opportunity to examine a significant amount

of information and intelligently evaluate the Derivative Litigation and the propriety of the proposed

Settlement.  No minimum amount of formal discovery must be undertaken to appropriately consider

the merits of the parties' respective claims and defenses, and courts regularly approve settlements

where the parties have adequate information to assess the settlement's worth.  *See Perez*, 501 F.

Supp. 2d at 1383; *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995).

Furthermore, Co-Lead Counsel have extensive experience representing shareholders in derivative

litigation, and, as a result, have a unique insight into the factual and legal issues presented.

Plaintiffs and Co-Lead Counsel have carefully investigated this case since its inception and

have diligently prosecuted this case since the filing of their initial complaint in October 2007.

Plaintiffs and Co-Lead Counsel have tirelessly sought from the SLC and Chiquita the corporate

governance and compliance changes encompassed in the Stipulation since before April 2009, when

Plaintiffs and the SLC filed an agreed motion adjourning the briefing schedule for the SLC's motion

to dismiss and discovery deadlines and informed the Court they were engaging in negotiations

regarding potential settlement of the Derivative Litigation.  In connection with those discussions,

counsel for the SLC produced thousands of pages of documents for Plaintiffs' and Co-Lead

Counsel's review.  In addition, Plaintiffs and Co-Lead Counsel were provided with an opportunity to

- 19 -

review a draft of the SLC Report.  As provided in ¶2.3 of the Stipulation, in connection with the proposed Settlement, counsel for the SLC produced hundreds of documents to Co-Lead Counsel relevant to the SLC's investigation and on June 10, 2010, Co-Lead Counsel deposed SLC member Howard W. Barker, Jr.  Plaintiffs also received and reviewed the Company's insurance policies and coverage correspondence related thereto.

Having obtained sufficient information upon which to properly evaluate the claims and defenses asserted in the case, Plaintiffs and the SLC have proposed a Settlement of the Derivative Litigation that confers a substantial benefit upon Chiquita and its shareholders without the considerable expense, risk, and uncertainty of continued litigation.

**e.     The Settlement Is the Result of Arm's-Length Negotiations**

Finally, in determining whether a proposed settlement is fair, courts examine whether the settlement was a result of good faith bargaining at arm's length and without collusion.  *See Bennett*, 737 F.2d at 986.  The Settlement negotiations that took place during the course of the Derivative Litigation were extensive, at arm's length, and occurred with the substantial assistance of a highly respected mediator, Honorable Layn R. Phillips (Ret.).[11]  These discussions also included telephone and in-person conferences among Co-Lead Counsel and members of the SLC and its counsel.

Furthermore, both Co-Lead Counsel and the SLC's counsel have substantial expertise and experience in litigating complex shareholder derivative cases.  As discussed above, the Settlement negotiations were conducted by highly experienced counsel with a thorough understanding of the

---

[11]     Judge Phillips agrees that the Settlement is fair, reasonable, and adequate.  *See* Declaration of Layn R. Phillips in Support of Motion for Approval of Settlement, submitted herewith.

strengths and weaknesses of the claims and defenses asserted by the parties.  Courts have recognized

that the opinion of experienced counsel who litigated the case, negotiated the compromise, and

support the settlement is entitled to considerable weight.  *Reed v. GMC*, 703 F.2d 170, 175 (5th Cir.

1983); *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *Armstrong v. Bd. of Sch. Dirs.*, 616

F.2d 305, 325 (7th Cir. 1980); *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 489

(E.D. Pa. 1985).[12]  Furthermore, in considering the fairness of the proposed settlement, the trial court

is entitled to rely upon the judgment of experienced counsel for the parties.  The trial judge, absent

fraud or collusion, should be hesitant to substitute its own judgment for that counsel.  *Cotton*, 559

F.2d at 1330.  In *Lyons v. Marrud, Inc.*, No. 66 Civ. 415, 1972 U.S. Dist. LEXIS 13401 (S.D.N.Y.

June 6, 1972), the court noted that:

> Experienced and competent counsel have assessed these problems and the probability
> of success on the merits.  They have concluded that compromise is well-advised and
> necessary.  ***The parties' decision regarding the respective merits of their positions***
> ***has an important bearing on this case.***

*Id.* at *5 (emphasis added).

Here, Plaintiffs and Co-Lead Counsel, after substantial arm's-length settlement negotiations

with counsel for the SLC and the assistance of an experienced and well respected mediator, have

concluded that the Settlement is fair, reasonable, and adequate.  Before agreeing to the Settlement,

Co-Lead Counsel acquired a thorough understanding of this case through independent investigation

---

[12]     Courts have considered as a factor the "negotiating process by which the settlement was
reached."  *Weinberger*, 698 F.2d at 74; *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983).  In so
doing, courts have focused on whether the settlement was achieved through "arm's-length
negotiations" by counsel who have "the experience and ability . . . necessary to effective
representation of the class's interests."  *Weinberger*, 698 F.2d at 74.  These criteria are satisfied here.

- 21 -

575210_2

No. 08-01916-MD-MARRA/JOHNSON

and the extensive negotiation process. *See* Joint Decl., ¶¶20-29, 36. The Settlement is also a product

of significant concessions by Plaintiffs and the SLC. Accordingly, there is no reason to question the

fairness of the Settlement, or to otherwise doubt the good faith nature of the parties' Settlement

negotiations.

IV.   **PLAINTIFFS' COUNSEL ARE ENTITLED TO THE ATTORNEYS' FEES AND EXPENSES REQUESTED BECAUSE THEIR EFFORTS CONFERRED A SUBSTANTIAL BENEFIT ON CHIQUITA AND ITS SHAREHOLDERS**

Under the "substantial benefit" doctrine, counsel that prosecutes a shareholders' derivative

case resulting in meaningful benefits being conferred on a corporation are entitled to attorneys' fees

and costs. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The Supreme Court has held

that the payment of attorneys' fees is appropriate under the substantial benefit rule when the

litigation indirectly confers substantial benefits on an ascertainable group. *Mills v. Elec. Auto-Lite*

*Co.*, 396 U.S. 375, 393 (1970). It is important to note the substantial benefit obtained for the

company need not be monetary:

> In class action litigation, attorneys' fees are normally premised on the existence of a "common fund" awarded to the class from which the plaintiffs' attorneys' fees may be deducted. However, in shareholder derivative actions, *monetary recovery is not a required predicate to an award of attorneys' fees as long as a "substantial benefit" of some form has been rendered to the corporation as a result of the plaintiff's attorneys' efforts*. The substantial benefit may take the form of remedial corporate action to rectify the alleged wrongdoing . . . .

Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler, *Shareholder Derivative Litigation:*

*Besieging the Board* §14.06, at 14-25 to 14-26 (Law Journal Press 2003) (emphasis added).

Payment of attorneys' fees under the substantial benefit theory is appropriate because

Plaintiffs were able to negotiate numerous, beneficial changes to Chiquita's corporate governance

and compliance provisions, including changes specifically tailored to prevent the reoccurrence of the

- 22 -

No. 08-01916-MD-MARRA/JOHNSON

conduct alleged in the Amended Complaint – that the parties and a corporate governance expert

agree confer a substantial benefit upon the Company. *See* Stipulation, ¶2.1; *see also* Monks Decl.,

¶¶5, 6. Furthermore, under the governing factors set forth in *Johnson v. Ga. Highway Express, Inc.*,

488 F.2d 714, 717-19 (5th Cir. 1974), the requested attorneys' fees are fair and reasonable.

> **A.      The Fee Requested Is Fair and Reasonable Under an Analysis of the**
> ***Johnson* Factors**

In order to determine whether a requested fee is reasonable, courts in the Eleventh Circuit

apply the *Johnson* factors.[13]  The twelve *Johnson* factors are:

> (1) The time and labor required. . . . (2) The novelty and difficulty of the
> questions. . . . (3) The skill requisite to perform the legal service properly. . . . (4)
> The preclusion of other employment by the attorney due to acceptance of the
> case. . . . (5) The customary fee [for similar work in the community]. . . . (6) Whether
> the fee is fixed or contingent. . . . (7) Time limitations imposed by the client or the
> circumstances. . . . (8) The amount involved and the results obtained. . . . (9) The
> experience, reputation, and ability of the attorneys. . . . (10) The "undesirability" of
> the case. . . . (11) The nature and length of the professional relationship with the
> client. . . . [and] (12) Awards in similar cases.

488 F.2d at 717-19.  The relevance of each of the *Johnson* factors vary on a case-by-case basis, and

it is left to the trial court's discretion to apply those factors in view of the circumstances of a

particular case. *Id.* at 717.

> **1.      Time and Labor Involved**

As detailed in the Joint Declaration, Co-Lead Counsel expended significant time and effort

throughout the Derivative Litigation thoroughly investigating the case, assessing the strengths and

---

[13]      As the Eleventh Circuit confirmed in *Bennett*, "In *Bonner v. City of Prichard*, 611 F.2d 1206,
1209 (11th Cir. 1981) (*en banc*), [the Eleventh Circuit] adopted as binding precedent all of the
decisions of the former Fifth Circuit handed down prior to October 1, 1981." *Bennett*, 737 F.2d at
986 n.7.

- 23 -

No. 08-01916-MD-MARRA/JOHNSON

weaknesses of the claims and defenses, and effectively settling the litigation on terms highly favorable to Chiquita and its shareholders.  Co-Lead Counsel requested and reviewed thousands of pages of documents produced by the SLC as well as Chiquita's public filings, press releases, and other public statements.  Co-Lead Counsel also conducted a pre-filing investigation and worked with corporate governance experts to determine what settlement demands should be made.  In addition, Co-Lead Counsel and counsel for the SLC participated in protracted settlement negotiations for over a year where the terms of the Stipulation were extensively debated and negotiated.

In total, Co-Lead Counsel (as well as other counsel who worked with them) expended 5,797.75 hours in attorney and para-professional time litigating this case, amounting to a lodestar of $3,218,122.50.  *See* Declarations of Keith F. Park, Stewart L. Cohen, Robin Winchester, and Seth D. Rigrodsky, submitted herewith.  Furthermore, the grant of any award, in the amount of up to $4 million, will be the sole source from which Co-Lead Counsel can be paid for the substantial expenses incurred in investigating and prosecuting the Derivative Litigation.  To date, Co-Lead Counsel (as well as other counsel who worked with them) have incurred $210,783.04 in expenses. *Id*.  Considering the time and labor expended by counsel during the Derivative Litigation, this *Johnson* factor supports approval of the fee requested.

### 2.      The Novelty and Difficulty of Questions Raised by the Action

The complexity of the issues presented in the Derivative Litigation – that have been resolved (subject to Court approval) by Co-Lead Counsel and the SLC via the proposed Settlement – further supports the reasonableness of the fee requested.  As discussed above, under New Jersey substantive law, which governs the Derivative Litigation, the business judgment rule presumes that directors acted properly and in good faith unless there is evidence of fraud, self-dealing, or unconscionable

- 24 -

No. 08-01916-MD-MARRA/JOHNSON

conduct. *Maul*, 637 A.2d at 937. This is an extremely fact intensive query. The SLC has continued to vigorously deny the claims alleged in the Amended Complaint and argue the Individual Defendants acted properly, exercised sound business judgment, and acted in good faith and in a manner they reasonably believed to be in the best interests of Chiquita at all times. The detailed SLC Report and the SLC's motion to dismiss have asserted the conduct alleged in the Amended Complaint was proper and consistent with the Individual Defendants' duties under applicable law. Adding to the difficulty of the case, certain Individual Defendants even consulted with in-house and outside counsel regarding the propriety of the Columbia Payments. Given the potential protection of the business judgment rule, the task of establishing liability in this case would be great.

Furthermore, the difficulty of establishing liability given the anticipated conflicting testimony and evidence would be exacerbated by the risks inherent in this type of litigation – including the unpredictability of a lengthy and complex trial, competing expert testimony regarding the appropriateness of the Columbia Payments, the unavailability of witnesses, or an unforeseen reaction to the evidence by the trier of fact. In cases of this complexity, success at trial is never certain. As discussed above, even if Plaintiffs were ultimately successful at trial, the Derivative Litigation would likely be subject to appellate review. In complex and substantial cases such as the Derivative Litigation, it must be recognized that a victory at trial does not guarantee ultimate success. Appellate review is unpredictable and could seriously and adversely affect the scope of an ultimate recovery, if not the entire recovery itself. Indeed, as one court has observed:

> Even a victory at trial is not a guarantee of ultimate success. If plaintiffs were successful at trial and obtained a judgment for substantially more than the amount of the proposed settlement, the defendants would appeal such judgment. An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself.

575210_2

No. 08-01916-MD-MARRA/JOHNSON

*Warner Commc'ns*, 618 F. Supp. at 747-48 (citing numerous examples).

Despite the difficulty of the issues raised, Co-Lead Counsel secured an excellent result for Chiquita and its shareholders, and thus this *Johnson* factor supports the reasonableness of the requested award.

### 3. The Skill Required to Perform the Legal Services Properly

A great deal of skill on the part of Co-Lead Counsel was required to negotiate the meaningful corporate governance and compliance changes embodied in the Stipulation. Co-Lead Counsel utilized their expertise in this type of complex litigation, as discussed above, to analyze the strengths and weaknesses of the parties' claims and defenses and ultimately secure the Settlement terms that provide a tangible, substantial benefit to Chiquita and its shareholders.

The stature and experience of opposing counsel can also be important in evaluating the quality of plaintiffs' counsel's work. *See In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976). The SLC and the Individual Defendants were represented by capable law firms with national reputations for vigorous advocacy in the defense of complex actions such as the Derivative Litigation. The ability of Co-Lead Counsel to obtain such a favorable result for Chiquita in the face of formidable opposition confirms the superior quality of Co-Lead Counsel's skills. Although much of Co-Lead Counsel's work took place outside the courtroom, the efforts taken on behalf of Chiquita and its shareholders were of the highest quality and could only have been rendered by attorneys as experienced as Co-Lead Counsel, who have dedicated their careers to the vigorous advancement of shareholder rights and interests.

- 26 -

**4.      The Preclusion of Other Employment by Attorneys Due to Acceptance of the Case**

The time spent by Co-Lead Counsel on investigating and prosecuting this case was at the expense of time that counsel could have devoted to other matters. Accordingly, to the extent applicable, this *Johnson* factor supports the requested attorneys' fees and expenses.

**5.      The Customary Fee and Awards in Similar Cases**

The amount of the requested award as part of the Settlement is similar to awards customarily made throughout the country in derivative actions involving corporate governance changes. *See, e.g.*, *Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) (awarding $9.2 million in attorneys' fees and expenses for corporate governance changes); *David, et al. v. Wolfen, et al.*, No. 01-CC-03930, slip op. (Orange County Cal. Super. Ct. Nov. 1, 2004) (awarding $5.3 million in attorneys' fees and expenses for corporate governance changes), attached as Exhibit 1 to the Declaration of Julie A. Kearns in Support of an Award of Attorneys' Fees and Expenses ("Kearns Decl."), submitted herewith; *Rowe, et al. v. Fishman, et al.*, No. 04-4576 (JRT/FLN), slip op. (D. Minn. Sept. 6, 2007) (awarding $5.25 million in attorneys' fees and expenses for corporate governance changes), Kearns Decl., Ex. 2; *In re Dynegy, Inc. Derivative Litig.*, No. 2002-25250, slip op. (Harris County Tex. July 8, 2005) (awarding $4.9 million in attorneys' fees and expenses for corporate governance changes), Kearns Decl., Ex. 3; *In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01-1412 (KSH), slip op. (D.N.J. Jan. 14, 2008) (awarding $9.8 million in attorneys' fees and expenses for corporate governance changes), Kearns Decl., Ex. 4; and *In re BP P.L.C. Derivative Litig.*, No. 3AN-06-11929CI, slip op. (Super. Ct. Alaska, 3d Judicial District of Anchorage) (awarding $9.75 million in attorneys' fees and expenses for corporate governance changes), Kearns Decl., Ex. 5.

575210_2

No. 08-01916-MD-MARRA/JOHNSON

### 6.      Whether the Fee Is Contingent or Fixed

Co-Lead Counsel undertook the representation of Chiquita and its shareholders on a contingent basis, assuming a substantial risk that the litigation would yield no recovery and leave them entirely uncompensated.  Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in awarding attorneys' fees.  For example, in determining attorneys' fees in *Prudential*, the court noted the risks plaintiffs' counsel had taken in representing the client on a contingent basis:

> Although today it might appear that risk was not great based on Prudential Securities' global settlement with the Securities and Exchange Commission, such was not the case when the action was commenced and throughout most of the litigation. ***Counsel's contingent fee risk is an important factor in determining the fee award.  Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable.***  Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*, No. 888, 1994 U.S. Dist. LEXIS 6621, at *16 (E.D. La. May 18, 1994).

As discussed above, the risk of obtaining no recovery in a complex case such as the Derivative Litigation is significant.  There have been numerous derivative actions in which plaintiffs' counsel expended thousands of hours, yet received no remuneration whatsoever despite their diligence and expertise.  To encourage highly capable attorneys to undertake the representation of plaintiffs on a contingent basis in this type of socially significant litigation, the attorneys' fees and expenses awarded should reflect the contingent nature of payment to counsel for their expert services.

Co-Lead Counsel have not received any compensation during the course of the Derivative Litigation and have incurred significant expenses in prosecuting the case for the benefit of Chiquita

- 28 -

No. 08-01916-MD-MARRA/JOHNSON

and its shareholders.  Any award of fees and expenses has always been completely contingent on the result achieved.  Thus, this *Johnson* factor also supports the reasonableness of the requested fee.

### 7.    The Results Achieved

Courts have consistently recognized that the result achieved is a major factor to be considered in awarding attorneys' fees and expenses.  The United States Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983), recognized that in making a fee award the "most critical factor is the degree of success obtained."  The results achieved are entitled to even greater weight in this case due to the efforts of Co-Lead Counsel being instrumental in negotiating the Settlement terms.  Plaintiffs, Co-Lead Counsel, the SLC, and corporate governance expert Monks all agree the corporate governance changes negotiated by Co-Lead Counsel and set forth in the Stipulation – including those specifically designed to prevent the reoccurrence of the wrongful conduct alleged in the Amended Complaint – confer a significant benefit on Chiquita and its shareholders.  *See* Stipulation, ¶2.1; Monks Decl., ¶¶5, 6.

### 8.    The Experience, Reputations, and Ability of the Attorneys

The experience and ability of plaintiffs' counsel in this field of representative litigation is substantial.   The background, experience, and accomplishments of plaintiffs' counsel are summarized in the resumes attached to the Declarations of Keith F. Park, Stewart L. Cohen, Robin Winchester, and Seth D. Rigrodsky, submitted herewith.  These resumes confirm plaintiffs' counsel have extensive experience and expertise in the field of securities and other complex litigation.  As such, this *Johnson* factor further supports the reasonableness of the attorneys' fees and expenses requested.

575210_2

No. 08-01916-MD-MARRA/JOHNSON

## V.      CONCLUSION

For all the reasons set forth in the Joint Declaration and Monks Declaration, this Settlement is fair, reasonable, and in the best interest of Chiquita and its shareholders.  Thus, Plaintiffs respectfully request that the Court grant the motion for final approval of the proposed derivative Settlement and approve the Settlement in its entirety and award $4 million in attorneys' fees and expenses.[14]

DATED:  August 20, 2010                    Respectfully submitted,

                                                              ROBBINS GELLER RUDMAN
                                                                 & DOWD LLP


                                                                        s/ David J. George
                                                              _____
                                                                     DAVID J. GEORGE

                                                              PAUL J. GELLER
                                                              Florida Bar No. 984795
                                                              pgeller@rgrdlaw.com
                                                              DAVID J. GEORGE
                                                              Florida Bar No. 0898570
                                                              dgeorge@rgrdlaw.com
                                                              120 East Palmetto Park Road, Suite 500
                                                              Boca Raton, FL  33432
                                                              Telephone:  561/750-3000
                                                              561/750-3364 (fax)

---

[14]      Any objections to the proposed Settlement and fee/expense award are due September 20, 2010.  Accordingly, we will address objections, if any, in our reply brief, which is scheduled to be filed on October 8, 2010.

575210_2

No. 08-01916-MD-MARRA/JOHNSON

ROBBINS GELLER RUDMAN
   & DOWD LLP
KEITH F. PARK
ARTHUR C. LEAHY
JULIE A. KEARNS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COHEN, PLACITELLA & ROTH, P.C.
STEWART L. COHEN
HARRY M. ROTH
Two Commerce Square, Suite 2900
2001 Market Street
Philadelphia, PA  19103
Telephone:  215/567-3500
215/567-6019 (fax)

Attorneys for Plaintiffs

- 31 -

No. 08-01916-MD-MARRA/JOHNSON

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 20, 2010.

s/ David J. George
DAVID J. GEORGE

ROBBINS GELLER RUDMAN
& DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
E-mail:DavidG@rgrdlaw.com

575210_2

# Mailing Information for a Case 0:08-md-01916-KAM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com

- **Jose E. Arvelo**
  jarvelo@cov.com

- **Kathleen Lee Barber**
  kbarber@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Rachel L. Braunstein**
  rachel.braunstein@friedfrank.com

- **Benjamin D. Brown**
  bbrown@cmht.com

- **Daniel Arthur Casey**
  dan.casey@klgates.com,alicia.cardona@klgates.com,miamidocketing@klgates.com

- **Judith Brown Chomsky**
  jchomsky@igc.org

- **Alison K. Clark**
  aclark@sbtklaw.com

- **Stewart L. Cohen**
  scohen@cprlaw.com

- **Terry Collingsworth**
  tc@conradscherer.com

- **Patrick J. Coughlin**
  patc@rgrdlaw.com

- **Jonathan W. Cuneo**
  jonc@cuneolaw.com

- **John De Leon**
  jlleon7@aol.com,apereyra@chavez-deleon.com,mvillareal@ffchavez.com,lizmachin@gmail.com,agreenstein@chavez-deleon.com

- **Joseph A. DeMaria**
  jad@tewlaw.com,mm@tewlaw.com

- **Matias Rafael Dorta**
  mrd@tewlaw.com

- **Jeffrey T. Edwards**
  jedwards@preti.com

- **Agnieszka M. Fryszman**
  afryszman@cmht.com

- **David J. George**
  dgeorge@rgrdlaw.com,karenc@csgrr.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Joshua D. Glatter**
  jdg@osen.us

- **Neil L. Glazer**
  nglazer@kohnswift.com

- **Nicholas A. Gravante , Jr**
  ngravante@bsfllp.com

- **James Kellogg Green**
  jameskgreen@bellsouth.net

- **Alan Graham Greer**
  agreer@richmangreer.com,isilva@richmangreer.com

- **Ronald Searle Guralnick**
  rgacquit@bellsouth.net

- **John E. Hall**
  jhall@cov.com

- **Gregory P. Hansel**
  ghansel@preti.com

- **Rene Devlin Harrod**
  rharrod@bergersingerman.com,bmoya@bergersingerman.com,drt@bergersingerman.com

- **David B. Hennes**
  david.hennes@friedfrank.com

- **Paul L. Hoffman**
  hoffpaul@aol.com

- **Jason Husgen**
  jhusgen@milberg.com

- **Robert C. Josefsberg**
  rjosefsberg@podhurst.com,mvalledor@podhurst.com

- **Julie A. Kearns**
  jkearns@rgrdlaw.com

- **William Bennett King**
  wbk@searcylaw.com,jxl@searcylaw.com,GRA@searcy aw.com

- **Beth J. Kushner**
  bkushner@vonbriesen.com

- **Dianna Walsh Lamb**
  dianna.lamb@friedfrank.com

- **Arthur Leahy**
  artl@csgrr.com

- **Gregg H. Levy**
  glevy@cov.com

- **Carrie M. Logan**
  clogan@preti.com

- **Brian D. Long**
  bdl@rigrodskylong.com

- **Jeffrey B. Maletta**
  jeffrey.maletta@klgates.com

- **Jonathan L. Marcus**
  jmarcus@cov.com

- **Eli R. Mattioli**
  eli.mattioli@klgates.com

- **Sigrid Stone McCawley**
  smccawley@bsfllp.com

- **William G. McGuinness**
  william.mcguinness@friedfrank.com

- **Gina R. Merrill**
  gmerrill@cov.com

- **Jenny R. Mosier**
  jmosier@cov.com

- **Ann O'Connell**
  aoconnell@cov.com

- **Gary M. Osen**
  gmo@osen.us

- **Keith F. Park**
  keithp@rgrdlaw.com

- **Christopher Stephen Polaszek**
  cpolaszek@milberg.com,ntamor@milberg.com,jhusgen@milberg.com,psafirstein@milberg.com,MAOffice@milberg.com

- **Elissa J. Preheim**
  elissa.preheim@aporter.com

- **Fuad Rana**
  frana@cov.com

- **Cristopher Stephen Rapp**
  csrapp@jones-foster.com

- **Ramon Alvaro Rasco**
  rrasco@podhurst.com

- **Peter Raven-Hansen**
  pravenhansen@gmail.com

- **Jonathan C. Reiter**
  jcrlaw@hotmail.com

- **Seth D. Rigrodsky**
  sdr@rigrodskylong.com

- **Robert Jeffrey Robbins**
  rrobbins@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Mark Anthony Romance**
  mromance@richmangreer.com,isilva@richmangreer.com

- **Harry M. Roth**
  hroth@cprlaw.com

- **Peter G.A. Safirstein**
  psafirstein@milberg.com

- **David Joseph Sales**
  djs@searcylaw.com

- **John Scarola**
  mep@searcylaw.com

- **Aaron Schlanger**
  as@osen.us

- **Stephen H. Schwartz**
  sschwartz@kohnswift.com

- **Marco Simons**
  marco@earthrights.org

- **Samantha A. Smith**
  ssmith@csgrr.com

- **Jonathan M. Sperling**
  jsperling@cov.com

- **Steven M. Steingard**
  ssteingard@kohnswift.com

- **Robert M. Stern**
  rstern@omm.com

- **Sidney Alton Stubbs , Jr**
  sstubbs@jones-foster.com,mkieta@jones-foster.com

- **Nathaniel A. Tarnor**
  ntarnor@milberg.com

- **Magda Jimenez Train**
  mjimenez@bsfllp.com

- **William J. Wichmann**
  wwichmann@me.com,wjwboss@yahoo.com

- **Robert William Wilkins**
  rwilkins@jones-foster.com,csrapp@jones-foster.com

- **Paul David Wolf**
  paulwolf@icdc.com

- **Lee S. Wolosky**
  lwolosky@bsfllp.com

- **Eric L. Zagar**
  ezagar@sbtklaw.com

## Manual Notice List

The following is the list of parties who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Arturo Carrillo
Colombian Institute of International Law
```

5425 Connecticut Avenue NW
Suite 219
Washington, DC 20015

**William K. Cavanagh**
Cavanagh & O'Hara
407 E Adams Street
Springfield, IL 62701

**Karen Caudill Dyer**
Boies Schiller & Flexner
390 North Orange Avenue
Suite 1890
Orlando, FL 32801

**Hawaii Annuity Trust Fund for Operating Engineers**
'

**Richard Herz**
Earth Rights International
1612 K Street NW
Suite 401
Washington, DC 20006

**Michael G. Lenett**
Cuneo Gilbert & Laduca LLP
507 C Street NE
Washington, DC 20002

**Molly McOwen**
Cohen Milstein Hausfeld & Toll
1100 New York Avenue NW
Suite 500 West Tower
Washington, DC 20005-3934

**Samuel Meirowitz**
Osen LLC
700 Kinderkamack Road
Orandell, NJ 07649

**John P. Pierce**
Pierce Law Group
4641 Montgomery Avenue
Suite 500
Bethesda, MD 20814

**Robin Winchester**
Barroway Topaz Kessler Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087

**Stephen N. Zack**
Boies Schiller & Flexner
100 SE 2nd Street
Suite 2800 Bank of America Tower
Miami, FL 33131-2144