Sierra Nevada de Santa Marta mountains of Magdalena, but in September 1995, on one of Pablo Perez 85's trips into the mountains, members of the FARC , fearing that Pablo Perez 85 would photograph them, warned him not to return. Nonetheless, Pablo Perez 85, who took his work seriously, did return to the mountains in October 1995, in order to give copies of photographs he had taken of a family there. On the evening of October 21, 1995, after returning from his trip into the mountains, Pablo Perez 85 was in a canteen in Fundacion when two members of the FARC guerrillas arrived and, without saying a word, executed Pablo Perez 85 with seven gunshots.

371. At the time when Pablo Perez 85 was murdered, the FARC guerrillas were receiving substantial from Chiquita. Pablo Perez 85 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena.

372. Juana Perez 86 is the sister and legal heir of Pablo Perez 86, a merchant who lived in Fundacion, Magdalena. Pablo Perez 86 was murdered on July 29, 1995 by FARC guerrillas who were attempting to establish control over the banana zone and surrounding areas of Magdalena, in furtherance of the internal armed conflict. On the evening of July 29, 1995, Pablo Perez 86 was arriving at his home in Fundacion when he was intercepted by three members of the FARC guerrillas. The Farc guerrillas executed Pablo Perez 87 with multiple gunshots to the head and body.

151

373. At the time when Pablo Perez 86 was murdered, the FARC guerrillas were receiving substantial from Chiquita. Pablo Perez 86 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena.

374. Juana Perez 87 is the mother and legal heir of Pablo Perez 87, a driver's helper who lived in Fundacion, Magdalena. Pablo Perez 87 was murdered on January 20, 1995 by FARC guerrillas who were attempting to establish control over the banana zone and surrounding areas of Magdalena, in furtherance of the internal armed conflict. Pablo Perez 87 worked as a helper on a truck that transported passengers and cargo between Fundacion and the Sierra Nevada de Santa Marta mountains in Magdalena. On his last trip up into the mountains as a helper, Pablo Perez 87 was confronted by a member of the FARC guerrillas, who warned him that the guerrillas did not want to see Pablo Perez 87 up in the mountains again, because they considered him to be a spy who was collecting information on the FARC to give to the Colombian army. As a result of the warning, Pablo Perez 87 stopped going up into the mountains. Nevertheless, he continued to work for his employer, who offered Pablo Perez 87 work unloading the truck when it arrived with cargo to Fundacion. At approximately midnight on January 19, 1995, Pablo Perez 87 was unloading his employer's truck in Fundacion when a FARC guerrilla approached him and stated,

"We warned you" before executing Pablo Perez 87 with two gunshots to the head and one to the body.

375. At the time when Pablo Perez 87 was murdered, the FARC guerrillas were receiving substantial from Chiquita. Pablo Perez 87 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena.

376. Juana Perez 88 is the sister and legal heir of Pablo Perez 88, who lived in Santa Marta, Magdalena, and worked at a coffee-processing plant. Pablo Perez 88 was murdered on or around August 15, 1994 by FARC guerrillas who were attempting to establish control over the banana zone and surrounding areas of Magdalena, in furtherance of the internal armed conflict. On or around August 12, 1994, Pablo Perez 88 went to his job at the coffee-processing plant, but did not return home that night, causing his family to worry. Pablo Perez 88 had received threats from the FARC guerrillas previously. On August 15, 1994, Pablo Perez 88's decomposing body was found near the road east of Santa Marta. Pablo Perez 88 had been shot to death.

377. At the time when Pablo Perez 88 was murdered, the FARC guerrillas were receiving substantial from Chiquita. Pablo Perez 88 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena.

378.   Juana Perez 89A and Juana Perez 89B are two daughters and the legal heirs of Pablo Perez 89, a cattle rancher in San Angel, Magdalena. Pablo Perez 89 was murdered on November 8, 1995 by ELN guerrillas who were attempting to establish control in the banana zone and surrounding areas of Magdalena, in furtherance of the internal armed conflict. On November 7, 1995, members of the Ejercito de Liberación Nacional (ELN) guerrilla organization arrived at the ranch of Pablo Perez 89 and asked for him by name. His daughter informed them that he was not at home. They detained his daughter and his brother while they robbed the farm. At approximately 2:00 PM, they exchanged Pablo Perez 89's daughter for his son, and told the family that if Pablo Perez 89 did not appear at a certain time and place the following day, they would murder his son. They left with Pablo Perez 89's son and brother. The following morning Pablo Perez 89 left his house at approximately 4:00 AM and arrived at his meeting with the ELN at approximately 7:00 AM. His son was released. According to an ELN public notice, Pablo Perez 89 and his brother were murdered supposedly for collaborating with paramilitaries.

379.   At the time when Pablo Perez 89 was murdered, the ELN was receiving substantial support from Chiquita. Pablo Perez 89 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the ELN guerrillas in the banana zone and surrounding areas of Magdalena.

154

380.   Juana Perez 90 is the mother and legal heir of Pablo Perez 90, a construction worker who lived in Valledupar, Cesar. Pablo Perez 90 was murdered on July 27, 1996 by guerrillas who were attempting to establish control in the banana zone and surrounding areas of Magdalena, as well as adjacent provinces, in furtherance of the internal armed conflict. On July 27, 1996, Pablo Perez 90 was traveling by bus from Valledupar, Cesar to Riohacha, La Guajira, in order to visit the Plaintiff. Pablo Perez 90 was traveling in the company of two cousins. When the bus Pablo Perez 90 and his two cousins were traveling in got to a small town within the municipality of Riohacha, La Guajira, it was detained at a guerrilla roadblock. The guerrillas made several passengers get off the bus, including Pablo Perez 90 and his two cousins, but eventually the guerrillas let the other passengers go. The guerrillas then led Pablo Perez 90 and his two cousins to a nearby farm. There, the guerrillas executed Pablo Perez 90 and his two cousins with gunshots.

381.   At the time when Pablo Perez 90 was murdered, the guerrillas were receiving substantial support from Chiquita. Pablo Perez 90 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in Magdalena and adjacent provinces.

382.   Juana Perez 91 is the sister and legal heir of Pablo Perez 91, a soldier in the Colombian military in Santa Marta, Magdalena. Pablo Perez 91 was kidnapped

and disappeared on or about November 24, 1996 by FARC guerrillas who were attempting to establish control over the banana zone and surrounding areas of Magdalena, in furtherance of the internal armed conflict. Pablo Perez 91 was a soldier in the Cordova Battalion. On November 23, 1996, Pablo Perez 91 left the military base and went toward Finca Tequendama, a farm in Minca, Magdalena belonging to his family, after receiving a false report that something had happened to his family. Along the way, he stopped his truck to sleep for the night. During the night, he was kidnapped and disappeared by FARC guerrillas. Pablo Perez 91 was never seen again. The Plaintiff and her family believe that the FARC guerrillas murdered Pablo Perez 91 and buried his body somewhere in the Sierra Nevada de Santa Marta mountains of Magdalena.

383.    At the time when Pablo Perez 91 was kidnapped and disappeared, the FARC guerrillas were receiving substantial from Chiquita. Pablo Perez 91 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the FARC in the banana zone and surrounding areas of Magdalena.

384.    Juan Perez 92 is the brother and legal heir of Pablo Perez 92, an agricultural worker in Santa Marta, Magdalena. Pablo Perez 92 was murdered on October 8, 1995 by guerrillas who were operating in Santa Marta and other parts of

Magdalena, in furtherance of the internal armed conflict. Pablo Perez 92 returned from working in the foothills of the Sierra Nevada three days prior to his murder. On October 8, 1995, at approximately 5:30 PM, Pablo Perez 92 was in his house in Santa Marta when two men and a woman arrived. Pablo Perez 92 sat down on the porch with the visitors and talked for two hours. At approximately 7:30 PM, the four of them left the house, saying that they were not going to go far. After they left, the three visitors shot Pablo Perez 92 multiple times, killing him. Based on information and belief, the guerrillas suspected Pablo Perez 92 of anti-guerrilla activity, leading to his murder.

385. At the time when Pablo Perez 92 was killed, the guerrillas were receiving substantial from Chiquita. Pablo Perez 92 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena.

386. Juana Perez 93 is the wife and legal heir of Pablo Perez 93, with whom she had a family. Pablo Perez 93, a rancher who owned a banana plantation in the village of Orihueca, in the banana zone of Magdalena, was murdered on April 12, 1994 by guerrillas who were attempting to establish control over the banana zone of Magdalena and surrounding areas. On April 12, 1994, Pablo Perez 93 was leaving Orihueca, heading toward Aracataca in his pickup truck, when a group of guerrillas

157

on bicycles tried to block his way. Pablo Perez 93 hit one of the guerrillas, knocking him and his bicycle over. Another guerrilla fired a gunshot at Pablo Perez 93, striking him in the arm and the abdomen, causing him to run off the road and crash into a tree. Immediately, a guerrilla approached and fired an assault rifle at Pablo Perez 93, striking him in the head and killing him.

387. At the time when Pablo Perez 93 was killed, the guerrillas were receiving substantial from Chiquita. Pablo Perez 93 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena.

388. Juana Perez 94 is the wife and legal heir of Pablo Perez 94, an agricultural worker in San Pedro La Sierra, Cienaga, Magdalena. Pablo Perez 94 was murdered on September 28, 1994 by FARC guerillas who were attempting to establish control over the banana zone and surrounding areas of Magdalena, in furtherance of the internal armed conflict. On September 28, 1994, Pablo Perez 94 was alone on his farm when two FARC guerrillas arrived. They shot Pablo Perez 94 once in the head and once in the chest, killing him. Prior to the murder, Pablo Perez 94 had received threats from the FARC. They had demanded that he abandon his land, but he had refused.

389. At the time when Pablo Perez 94 was murdered, the FARC was receiving

158

substantial support from Chiquita. Pablo Perez 94 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the FARC in Magdalena.

390.   Juana Perez 95 is the wife and legal heir of Pablo Perez 95A, an agricultural worker who lived and worked in the mountains of the Sierra Nevada de Santa Marta, in Magdalena. Pablo Perez 95A was kidnapped and disappeared on October 10, 1995 by FARC guerrillas who were attempting to establish control of the banana zone and surrounding areas of Magdalena. Pablo Perez 95A was working as an employee of a farm located in the hamlet of Las Delicias when, on October 10, 1995, he was kidnapped by FARC guerrillas. Pablo Perez 95A was never seen again.

391.   At the time when Pablo Perez 95A was kidnapped and disappeared, the FARC was receiving substantial support from Chiquita. Pablo Perez 95A was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the FARC in Magdalena.

392.   Juana Perez 95 is also the mother and legal heir of Pablo Perez 95B, an agricultural worker who lived in Santa Rosalia, in the banana zone of Magdalena. Pablo Perez 95B was kidnapped and disappeared on August 10, 1997 by FARC guerrillas who were attempting to establish control in the banana zone and surrounding areas of Magdalena. Pablo Perez 95B left his home in Santa Rosalia in

order to work in the Sierra Nevada de Santa Marta mountains. On August 10, 1997, Pablo Perez 95B was kidnapped by FARC guerillas, and was never seen again.

393. At the time when Pablo Perez 95B was kidnapped and disappeared, the FARC was receiving substantial support from Chiquita. Pablo Perez 95B was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the FARC in Magdalena.

### Defendants

394. Defendant Chiquita is a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio. Defendant Chiquita engages in the business of producing, marketing, and distributing bananas and other fresh produce. Defendant Chiquita is one of the largest banana producers in the world and a major supplier of bananas throughout Europe and North America, including within the District of Colombia. Defendant Chiquita reported over $2.6 billion in revenue for calendar year 2003.

395. Banadex was defendant Chiquita's wholly-owned subsidiary and alter ego in the Republic of Colombia. Banadex produced bananas in the Urabá (Antioquia department) and Santa Marta (Magdalena department) regions of Colombia. By 2003, Banadex was defendant Chiquita's most profitable banana-producing operation in the

world. In June of 2004, defendant Chiquita sold Banadex, in response to irrefutable evidence that it had been making payments, on behalf of Chiquita, to terrorist groups in Colombia.

396. Although it no longer has a Colombian subsidiary, Chiquita remains one of the largest buyers of bananas in Colombia, purchasing bananas from Colombian companies at sea in the Gulf of Uraba and elsewhere. Chiquita, and its predecessor the United Fruit Company, has had a presence in Colombia for more than one hundred years.

397. David Doe 1 was a high-ranking officer of Defendant Chiquita, described as "Individual A" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

398. David Doe 2 was a member of the board of directors of Defendant Chiquita, described as "Individual B" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

399. David Doe 3 was a high-ranking officer of Defendant Chiquita, described as "Individual C" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

400. David Doe 4 was a high-ranking officer of Defendant Chiquita, described as "Individual D" in Criminal Case 07-CR-0555 (RCL) in the United States District

Court for the District of Columbia.

401. David Doe 5 was a high-ranking officer of Defendant Chiquita, described as "Individual E" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

402. David Doe 6 was a high-ranking officer of Banadex, described as "Individual F" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

403. David Doe 7 was an employee of Banadex, described as "Individual G" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

404. David Doe 8 was an employee of Defendant Chiquita, described as "Individual H" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

405. David Doe 9 was an employee of Defendant Chiquita, described as "Individual I" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

406. David Doe 10 was a high-ranking officer of Defendant Chiquita, described as "Individual J" in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia.

## IV. **FACTUAL ALLEGATIONS**

### A. The Colombian Conflict and Paramilitary Terrorist Organizations

407.   In the early 1980s, Colombia saw a vast expansion in trade in illegal drugs, particularly cocaine. An emerging class of drug barons, with the cooperation and facilitation of the Colombian government, began to create private armies to combat left-wing guerrilla forces, including the FARC and the ELN, who were engaged in terrorist activities such as extortion, kidnappings, and assassinations. Despite their ties to private individuals, the paramilitaries were a key part of the Colombian state strategy to combat the guerilla insurgency from their inception.

408.   In 1981, the Medellin drug cartel created a death squad, *Muerte a Secuestradores* ("Death to Kidnappers") that targeted guerillas for elimination and adopted brutal, terrorist tactics. As the 1980s progressed, paramilitaries maintained links with drug barons, large landowners, industrialists, and bankers who funded them, although in some cases they achieved some autonomy in their violent activities. This drug war and the escalation of violence provoked President Barco to issue the Decree 1194 of 1989 (adopted as permanent legislation by Decree 2266 of 1991), which criminalized membership in a paramilitary group or the provision of any support to such groups, including funding, training, or providing them with arms.

409.   By the mid 1990s, paramilitary groups had achieved a substantial degree

163

of independence from their creators due to their increased participation in, and benefit from, drug trafficking, and had become a major force in the fight against the guerillas. The largest and most well-organized paramilitary group in Colombia was the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and Urabá*, or ACCU). The organization featured a central command that coordinated the activities of local fronts. Both mobile and stationary units existed, and fighters received a base salary plus food, uniforms, weapons, and munitions. The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade. In 1994, Castaño and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership.

410.    The AUC grew rapidly in size during the late 1990s and into the twenty-first century. In 1997, it comprised roughly 4,000 combatants. By 2001, Castaño claimed to have 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000. By 2002, AUC forces were present in nearly the whole of Colombia. AUC leaders claimed before the demobilization process beginning in 2004, the organization comprised as many as 17,000 armed fighters and 10,000 other associates, including informants, cooks, drivers, and computer

164

technicians.

411. Despite their officially illegal status, the AUC and other paramilitary groups in fact collaborated closely with the Colombian government and were used by the government to oppose anti-government guerilla groups like the FARC. See *infra* ¶¶429-55. The efforts of the AUC were directed toward the elimination of any alleged guerrilla sympathizer who opposed or complicated the paramilitaries' control of territory or population in the area in which they exerted their power, or threatened their allies – including the government and the banana companies. The AUC's primary method was terrorism against individuals or communities. To this end, the AUC, like the ACCU before it, routinely engaged in death threats, extrajudicial killings, attacks on civilan populations, torture, rape, kidnapping, forced disappearances, and looting.

412. While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians. The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. They sought to intimidate and coerce the civilians from providing any support to the guerrillas. Inhabitants of small towns in contested rural areas were particularly vulnerable to AUC attack. AUC violence has often caused entire communities to

165

disperse, either due to threats of an impending massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

413.    The AUC also targeted anyone considered to share the guerrillas' leftist ideology, such as teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians.  These groups were also seen as problem groups by the banana companies.   The AUC also eliminated anyone considered socially undesirable, including indigenous persons, people with psychological problems, drug addicts, prostitutes, and suspected petty criminals. (HRW, *War Without Quarter: Colombia and International Humanitarian Law*).

414.    The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out according to a systematic and well-coordinated plan between the government, the paramilitaries, and the companies that financed them.   The ACCU operated throughout the banana-growing region of Urabá, as well as in other parts of Colombia.   On many occasions from at least 1994 through 2004 they carried out multiple executions or mass-killings of civilians. From its founding, the AUC's activities and abuses have been carried out under the direction of a central command.

415.    The AUC and its constituent groups, including the ACCU, have, at least since 1994, been participating in an internal armed conflict in Colombia – a conflict

in which the paramilitaries are fighting on behalf of the government against guerilla forces.

416.   The AUC operated two blocs in Urabá, the Banana Bloc and the Elmer Cardenas Bloc. While there had been paramilitaries under the control of the Castaño family in Urabá since the 1980s, the Banana Bloc was formally created in Urabá in 1994. Ever Veloza García – a.k.a. "H.H. " – was selected as one of the first commanders. In later years, the Banana Bloc operated through two fronts: the Turbo Front in Northern Urabá under the command of H.H., and the Banana Front in the south, led by Raúl Hasbún. The Elmer Cardenas Bloc began as a private defense group that united with the AUC in 1995. It was commanded by Freddy Rendón Herrera – a.k.a. "El Alemán" – and Elmer Cárdenas until Cárdenas was killed by the guerrillas in 1997. The Elmer Cardenas Bloc also received men, training, and assistance from the Banana Bloc. Both blocs received funding from the banana companies directly or through the Convivir Papagayo, which is more fully described *infra* ¶¶421-28.

417.   The AUC also set up a force in the banana zone of Magdalena, the William Rivas Front, which was part of the AUC's Northern Bloc under the command of Rodrigo Tovar Pupo, alias "Jorge 40." For most of the relevant time periods of this case, the William Rivas Front was under the command of Jose Gregorio Mangones

Lugo, alias "Carlos Tijeras."

418. The "banana zone" that was under the control of the William Rivas Front in Magdalena included the municipalities of Pueblo Viejo, Cienaga, Zona Bananera, Aracataca, El Reten, and Fundacion, all in the northern part of the province.

419. Mangones is now in the custody of the Colombian government and is in the process of testifying in the Justice and Peace process. He has stated that the main industry in the banana zone of Magdalena was banana production, and, accordingly, one of the main functions of the William Rivas Front was to work with the banana plantations to drive the FARC and other guerillas out of the banana region and to pacify the towns where the FARC had been successful.

420. According to Mangones, the two primary supporters of the William Rivas Front were Chiquita and Dole Foods. These companies alone provided on a monthly basis 80-90% of the operating funds for the William Rivas Front, and both companies generally provided about an equal amount.

## B. The Creation of *Convivir* to Legitimize the Paramilitaries

421. Although paramilitarism had been declared illegal in Colombia, the Colombian government created a new legal mechanism to provide cover and a legitimate avenue of funding for fund the AUC in 1994 through Chapter 5 of Decree

356. Paramilitaries could easily reorganize and continue operating under this Chapter, which allowed private groups to provide for "Special Vigilance and Private Security Services." These security groups, known commonly by their Spanish-language acronym "CONVIVIR," were comprised of civilians who received permission from the government for a license to "provide their own security... in areas of high risk or in the public interest, which requires a high level of security." *Convivir* were permitted to use arms that were otherwise restricted to use by the military. Defense Ministry, Decree 356, República de Colombia, February 11, 1994, pp. 19- 20; and Resolution 368 of the Superintendencia de Vigilancia y Seguridad Privada, April 27, 1995 (giving the name *convivir* to the security groups).

422. The *convivir* units in Urabá were fronts for the AUC from their inception. Many were directed and populated by known paramilitaries; this was common knowledge in the region. H.H. has remarked, "Let us not deceive ourselves: all the *convivir* were ours." The 17th Brigade of the Colombian Armed Forces, which was infamous for its close collaboration with the paramilitaries in Urabá, was given the authority to select members of the *convivir* in Urabá. *See infra* ¶¶435-36, 441-49 (describing the close collaboration between the 17th Brigade and the paramilitaries).

423. Álvaro Uribe, who is now the President of Colombia, but who was governor of Antioquia at the time of the creation of the *convivir*, provided for the

funding, arming, and funneling of information to the *convivir*, thereby facilitating the sharing of such funds, arms, and information with the AUC.  Uribe saw the *convivir* units as "an actor that collaborates with the military and the prosecutor, with very serious and effective security units in the banana plantations."  Uribe expected the *convivir* groups to fight the guerrillas alongside the military or sometimes on their own before the troops could arrive.  He justified arming these groups with long-range weapons after noting that their revolvers and smaller weapons were insufficient to combat the guerrillas.

424.    The main architect of the *convivir* system in Urabá was Raúl Hasbún, a banana plantation owner, who approached Uribe in 1997 with the intention of creating a *convivir* in Urabá.  Hasbún became an intermediary between the companies and the AUC, and eventually became commander of the AUC's Banana Bloc.  The paramilitaries saw the *convivir* as the perfect opportunity to legalize the payments of the banana companies to the paramilitaries.  Urabá eventually had twelve *convivir* units.

425.    Raúl Hasbún's main collaborator with the banana companies was Charles Kaiser, the manager for Chiquita in Colombia. Kaiser provided direct advice, assistance and support to the creation of the *convivir* system.

426.    The *convivir* units in Urabá facilitated communication and collaboration

between the government and paramilitaries. The twelve units functioned as a network and sent intelligence information to both the military and paramilitary commanders such as Hasbún. The military and paramilitaries would both respond to information detailing the location of guerrillas, but often the military would allow the paramilitaries to execute the operations, as they had better resources.

427.    One unit, the *Convivir* Papagayo, received payments from Chiquita and other banana companies and passed the money on to the AUC. The banana companies characterized the payments as security services, but all the banana companies knew that these payments were going to the AUC in order to kill workers and other civilians.

428.    In 1997, the Colombian Constitutional Court affirmed the legality of the *convivir* system but prohibited them from carrying restricted arms or conducting intelligence work. Many *convivir* units were dismantled as they did not have a function once these measures were implemented. The *Convivir* Papagayo was one of only two *convivir* units that remained, allowing it to continue facilitating the payments from the banana companies to the AUC. Arnulfo Peñuela, the former director of the *Convivir* Papagayo and former mayor of Carepa, is being prosecuted for ties to the AUC.

**C. The AUC Acted Under Color of Authority of the Colombian Government in Committing the Acts Alleged Herein.**

*The AUC and other paramilitary groups were founded with the cooperation of the Colombian Government, and were assigned by the Government to combat left-wing guerillas through methods including using criminal violence against civilians and unions.*

429.    The Colombian security forces tolerated and collaborated with the AUC in committing attacks on civilian populations, extra-judicial killings, murders, disappearances, forced displacements, threats and intimidation, including but not limited to the deaths and injuries of the plaintiff sued for herein. As part of the Colombian government's strategy for defeating the left-wing insurgency, high officials in the Colombian civilian government and the Colombian military collaborated with and orchestrated attacks on civilian populations, extra-judicial killings, murders, disappearances, forced displacements, threats and intimidation against persons including the plaintiffs' decedents.

430.    According to AUC leader Salvatore Mancuso, in testimony provided on May 15-17, 2007, paramilitarism was State policy in the Republic of Colombia. The Colombian military was not able to effectively address the uprising of the FARC, so the Colombian government facilitated the creation and funding of the AUC with the aim of using this unofficial force to defeat the FARC. As Colonel Mejía, former commander of the Colombian Army's Popa Battalion, said, "the Colombian military felt itself bound to the Geneva Conventions. The AUC was not."

431.    Colonel Mejia is now facing charges in Colombia of collaborating with the AUC, and most famously, for dressing up civilians murdered by the AUC in military clothing so that they could be passed off as guerilla fighters, rather than innocent victims of AUC brutality. This practice, called "legalizing," was commonly done by the Colombian military.

432.    The overall   policy of strengthening the paramilitaries was first developed in Urabá in 1995 to 1997, and then exported to the rest of the country, particularly to the banana regions of Magdalena.

433.    As a result of this interdependence, longstanding and pervasive ties have existed between the paramilitaries and official Colombian security forces, which include the Colombian Armed Forces and the Colombian National Police, since the inception of the paramilitaries in the 1980s. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in campaigns of the official armed forces against guerilla insurgents. Paramilitary forces included active-duty and retired army and police personnel among their members. Although a 1989 government decree established criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner

for Human Rights, and the Colombian Attorney General's office. Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division," in addition to the five official divisions of the Colombian Army.

434.    To date, based on outside political pressure, Colombian authorities have charged numerous members of Colombia's Congress, seven former Senators, the head of the secret police, mayors and former governors with illegally collaborating with paramilitaries. According to testimony of Salvatore Mancuso, two current ministers in the present Uribe government, Vice President Francisco Santos and Defense Minister Juan Manuel Santos, met and collaborated with paramilitaries like Salvatore Mancuso, and plotted to extend the paramilitary model to Bogotá. Senior officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett, General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del Rio, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, aided and abetted the AUC in the commission of various attacks on civilian populations, extrajudicial killings and other atrocities against civilians, including the Plaintiffs, and/or gave tacit support to and

174

acquiescence in their activities. General Montoya was linked to Diego Murillo, the former leader of an AUC affiliated paramilitary group in Medellin. The presence in the military of high ranking staff officers known to have close ties to the AUC and other paramilitaries was widely regarded within the army as official tolerance for the paramilitaries.

435. Boundaries between the AUC and the military at times were amorphous, as some paramilitary members were former police or army members, while some active-duty military members moonlighted as paramilitary members and became thoroughly integrated into the groups. Paramilitary leaders noted that Colombian security forces in Urabá allowed members of the AUC to serve as proxies in their pursuit of guerrilla forces, largely due to the military's operative incapacity to defeat the guerrillas on its own. As outside organizations placed increasing pressure and scrutiny upon the military to improve its human rights record, military leaders decided to leave much of their "dirty work" – brutal violence against civilians and suspected paramilitaries in violation of Colombian and international law – to the paramilitaries.

436. Colombian security forces in Urabá and Magdalena – with the knowledge and collaboration of high-level officials in the national government – have therefore habitually tolerated the presence of the AUC, willfully failed to prevent or interrupt their crimes, actively conspired with them, and coordinated activities with

them. Documented examples include:

- Allowing paramilitaries to establish permanent bases and checkpoints without interference, often within short distance of military bases for mutual support;

- Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;

- Withdrawing security forces from villages deemed sympathetic to guerrillas, leaving them vulnerable to attack by paramilitaries;

- Failing to intervene to stop ongoing attacks on civilian populations occurring over a period of days;

- Sharing intelligence, including the names of suspect guerilla collaborators;

- Sharing vehicles, including army trucks used to transport paramilitary fighters;

- Supplying weapons and munitions;

- Allowing passage through roadblocks;

- Providing support with helicopters and medical aid;

- Communicating via radio, cellular telephones, and beepers;

- Sharing members, including active-duty soldiers serving in paramilitary units

176

and paramilitary commanders lodging on military bases; and

•    Planning and carrying out joint operations.

437.    Accordingly, from late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC, using tactics of terror on civilians living in and around areas that had been under FARC control, assumed that these innocents were sympathetic to the FARC and systematically murdered thousands of them.

***The AUC consistently operated in Urabá and Magdalena with the cooperation, coordination, and assistance of the Colombian Government when attacking civilians.***

438.    It was in Urabá that a model of collaboration between the paramilitary and the government was developed and perfected. An alliance was formed between politicians, active military units, multinational companies, businessmen, and paramilitaries in order to impose a regime of terror and consolidate a new form of governance, which would wrest control of the countryside back from the leftist guerillas who had captured many municipalities and were extorting businessmen and landowners. The first paramilitary groups to operate in Urabá in a systematic and continuous manner received special military training.

439. When the government or the military was not able to legally arrest or attack civilians, they would delegate the task to the AUC or to *convivir* associated with the paramilitaries to act on their behalf. According to both H.H. and Raúl Hasbún, both paramilitary commanders in Urabá, the military gave the AUC lists of people to kill when they felt impotent to fight the guerillas themselves legally and constitutionally, or when they could not arrest and try them for any crime.

440. In addition to violently attacking civilians, the paramilitary performed other functions for the military in its war against the guerillas. For example, according to a report of the Inter-American Commission, the military would arrive in advance of the paramilitaries to tell people to abandon their land; paramilitaries would soon follow to enforce the orders. In 2001, the paramilitaries carried out a food blockade in Urabá that severely affected the civilian population in an effort to "decrease the military capacity of the enemy."

441. The AUC in Urabá consistently ran joint operations with the military. The 17th Brigade of the Colombian Army, located in the Urabá region, and the 4th Brigade, sister unit to the 17th Brigade operating in the Medellin region, were especially active in their support of and involvement in paramilitaries, which include engaging in joint operations. For example, the Elmer Cardenas Bloc of the AUC received logistical support and transportation from the 17th Brigade and other units

178

of the Colombian army and conducted joint operations.

442.    General Rito Alejo del Río Rojas, the commander of the 17th Brigade from 1995-96 who was responsible for military operations in Urabá, was notorious for his collaboration and collusion with paramilitaries in the region. H.H. has described General Del Río as one of the most important factors in allowing the expansion of paramilitarism in Urabá, because of the cooperation and support he gave the AUC in the regions where the 17th Brigade operated and elsewhere. General del Río was known as the "father of the paramilitaries" because he gave them uniforms and military training.

443.    General del Río is currently in custody on a military base in Bogota and is on trial for his collaboration with the AUC. He is accused of conspiracy to murder and perjury in relation to a previous investigation of General del Río in which he was accused of ordering his men to patrol alongside the AUC, and for presenting civilians murdered by the AUC as guerrillas killed in combat. The prior investigation was dismissed. H.H. has testified that he twice witnessed Del Río meeting with the founder and national commander of the AUC, Carlos Castaño. Salvatore Mancuso, who succeeded Castaño as national commander, testified that Del Río met with him and other commanders to coordinate the paramilitaries' expansion throughout northern Colombia.

179

444. AUC paramilitaries could enter and leave the 17th Brigade's headquarters at will, with the knowledge and permission of General del Río. In one instance, H.H. discovered that a criminal the AUC was searching for was being held at the Brigade headquarters; he and others from the AUC went to the 17th Brigade, picked up the prisoner, transported him to the port at Turbo using a military van, and murdered him. Salvatore Mancuso reported a similar story. Furthermore, on his visits to the 17th Brigade – during which he often planned joint operations with General del Río and then-Captain Bayron Carvajal, H.H. was consistently allowed to recruit soldiers for the AUC.

445. General del Río's role in promoting and supporting paramilitarism was not merely the work of a single rogue military officer; rather it was part of the Colombian government's strategy to fight the guerillas. Many other army brigades had similar relationships with paramilitaries, including the 11th Brigade. Gloria Cuartas, then the mayor of Apartadó, and others complained repeatedly to the General's superiors about his collusion with paramilitaries, but their complaints were ignored. Colonel Carlos Alfonso Velasquez Romero, a 17th Brigade officer, was investigated and discharged on the order of Army Commander Harold Bedoya when he tried to report on the close paramilitary association of the General and the 17th Brigade. And when a former soldier in the 17th Brigade's Battalion Voltigeros

supplied license plate numbers and photographs of paramilitaries, as well as a description of the base most frequented by Carlos Castaño, the information was ignored. The collusion of the Urabá Police under the command of Colonel Anatolio Correa Figueroa and Colonel Santiago Parra Rubiano ensured that no complaints against the AUC or their military collaborators ever resulted in investigations or prosecution.

446.    In October 1997 members of the Army's Fourth Brigade reportedly established a perimeter around the village of El Aro, in Antioquia. While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water. Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee. In 1998, numerous members of Colombia's security forces, including members of the 17th Brigade and local police forces, were arrested and charged with various crimes related to their involvement with certain AUC activities, including the sponsorship and formation of illegal paramilitary groups, conspiracy and homicide.

447.    In September 2000, General del Río met with Carlos Castaño, Salvatore Mancuso, and several other AUC leaders at a hacienda in Necocli, north of Apartadó.

Only a few days later, a group of sixty paramilitaries left the same ranch for Tierraltas, where they killed a large number of peasants who had been identified as guerrilla sympathizers by an "informant."

448.    On February 19, 2000, the AUC selectively assassinated five banana workers in the "peace community" of San Jose de Apartadó, in Urabá, and reports indicated that members of the 17th Brigade were direct participants in the attack.

449.    When asked to rank their collaboration between the AUC and the Colombian military on a scale of one to 10, H.H. rated it as a 10, specifically citing the helpfulness of General del Río and Colonel Carvajal.

450.    This model of collaboration between the paramilitaries, the companies, and the government was so successful in Urabá that Raúl Hasbún explained it to Jorge 40, commander of the AUC in Magdalena, so he could implement it in that region.

451.    Following the collaboration of Raúl Hasbún with Jorge 40, the AUC first created and then strengthened the William Rivas Front in Magdalena, which by 2002, was fully operational in Magdalena and was functioning precisely along the lines of the AUC model in Urabá. Prior to this, the AUC in Urabá dealt with the banana companies in Magdalena. Once Carlos Tijeras was in full charge of the William Rivas Front, the AUC's responsibilities in the banana zone of Magdalena were transferred to him.

***The AUC took on numerous State functions in Urabá and Magdalena, including the maintenance of security and order, the disposition of personal and commercial disputes, the provision and regulation of social services, and the imposition of social rules.***

452.    The AUC was the *de facto* government of Uraba and Magdalena, as well as other regions of Colombia. It was particularly strong in the areas where banana were grown.

453.    The paramilitaries were like a state in these areas, so the companies paid taxes in order to assure their protection and their investments. This reality generated the adage common to the areas where the paramilitaries operated, particularly in the banana areas of Urabá and Magdalena that "here paramilitaries and the State are the same thing." It was the paramilitaries who would receive complaints from the locals regarding criminal activity or conflicts with neighbors; and it was they who dispensed their brutal brand of justice in response.

454.    The AUC was not only in charge of order and tax collections in Urabá and Magdalena. Similarly to an established government, they dispensed justice in disputes between individuals, punished criminals, and became involved in social issues. The paramilitary organization's involvement in residents' daily lives reached the extent of intervention in domestic issues, disputes between neighbors, collection of debts, and truancy from school.

455. The AUC was even able to control the roads; they shut down five kilometers of the Pan-American Highway several times in order to use it as a runway for planes arriving with weapons and ammunition and exporting drugs.

## D. The Banana Industry and in Urabá and Magdalena.

456. Urabá is a region located in the northeast corner of Colombia and South America. Before the 1960s, the region was lightly populated, mostly by indigenous communities, and remained isolated from the central government. The banana-growing area of Urabá is located within the Department of Antioquia. The United Fruit Company, the predecessor to Chiquita, expanded to the Urabá region in the early 1960s and created a Colombian subsidiary, Banadex, which produced about ten percent of the region's bananas. On a parallel track, the banana industry also began production in the coastal areas of Magdalena near the towns of Santa Marta and Cienaga. Many workers migrated to these areas as the banana industry grew.

457. Workers faced harsh living and working conditions on the banana farms in the 1960s and 1970s. The industry's first unions, Sintrabanano and Sintagro, were founded in the 1960s and 1970s. However, the banana growers maintained control by killing and firing any organized workers. The army occupied banana plantations and assisted banana growers by arresting union leaders or forcing laborers to work

184

during strikes.

458.     Two anti-government guerilla groups, the FARC and the EPL, became active in the banana areas as a result of the labor struggles in the 1980s. The FARC took control of Sintrabanano and EPL infiltrated Sintagro. The guerrillas forced the banana companies to accept unions and negotiate with the workers. By 1985, the two guerrilla groups began competing for workers to join their unions in order to gain more territorial control, forming mutually opposed "EPL farms" and "FARC farms." In 1988, however, they agreed to unite under the combined Sintrainagro union in 1988; by the end of 1989, they had achieved wage increases and managed to call attention to the problem of poor housing conditions.

459.     The success of the unions was accompanied by increased paramilitary violence, and many unionists were murdered during strikes and attempted negotiations. Sintrainagro lost many members in the violence, including some of its most active and radical leaders. This precipitated a new split in Sintrainagro. EPL leaders in the union believed that the only way to save the union was to associate with the paramilitaries. Many EPL guerrillas demobilized in 1991, forming a new EPL party and signing a "social pact" with the banana growers and Sintrainagro to collaborate on regional development. Banana growers provided 23 million pesos for the reinsertion process. The paramilitaries encouraged Sintrainagro's alignment with

185

the banana growers and paramilitaries by killing any outspoken leaders advocating for workers' rights. FARC, in turn, massacred many of the demobilized EPL guerrillas to discourage their alignment with the banana growers.

460.   After the formation of the ACCU's Banana Bloc in 1994, the intra-union violence increased. The paramilitaries took advantage of the internal battle between guerilla forces, working with the government in the final EPL reinsertions and in the process convincing many demobilized EPL guerrillas to join their side and continue fighting the FARC. The war intensified, as government forces and their paramilitary allies used increased violence against the FARC and any suspected guerrilla sympathizers. As Carlos Castaño boasted, by the late 1990s the AUC achieved their goals of expelling the FARC from Urabá and suppressing the unions, such that no strikes occurred on the banana plantations.

461.   Urabá was also used by the paramilitaries and guerrillas for their drug and arms trade. The location of Urabá and its isolation from the central government made Urabá a strategic location for such illicit markets, and therefore Urabá was an important location for the success of both the guerrillas and paramilitaries, both of whom participated in the illicit trade in drugs and arms.

462.   A similar process of the AUC taking over the banana unions in Magdalena occurred in the early 2000's. Carlos Tijeras testified in the Justice and

186

Peace process that Sintranagro, the main union for banana workers in Magdalena, was an aggressive, leftist union that he believed was sympathetic to the FARC. He personally directed the execution of Sintranagro's President, Jose Guette Montero. On January 24, 2001, in Cienaga, near the Olympic supermarket, between 17th Street and 18th Street, men working with Carlos Tijeras shot Jose Guette Montero and killed him. Tijeras then installed Robinson Olivero as President of the union, and to this day, the leaders of Sintranagro are people the AUC has approved.

### E. Chiquita's Support of the FARC, the ELN, and other guerrilla groups

463.    Chiquita provided material support, including money, to the FARC, ELN, and other left-wing Colombian guerrilla groups (collectively, "Left-Wing Guerrilla Groups"). This section describes "when these payments were made, the size, frequency, or form of the payments, how the [Left-Wing Guerrilla Groups] used the funds [and how] the payments were related in any way to the offenses alleged in the complaint." June 3, 2011 Opinion and Order at 92.

464.    As to "when these payments were made," Chiquita made payments to Left-Wing Guerrilla Groups beginning as early as 1987 (but no later than 1989) and continuing until at least 1997. Chiquita thus made payments to Left-Wing Guerrilla Groups during at least a 9-year period.

187

465. As to the "size" of the payments, it has been confirmed that Chiquita made payments to Left-Wing Guerrilla Groups totaling approximately $100,000 to $200,000 annually. Given the extraordinary measures Chiquita took to conceal those payments, the true annual totals may be significantly higher.

466. As to the "frequency" of the payments, Chiquita made regular payments, often on a monthly basis, to Left-Wing Guerrilla Groups. The Special Litigation Committee of Chiquita's Board of Directors concluded that Chiquita made such payments on a "more or less regular basis."

467. As to the "form" of the payments, Chiquita made most, if not all, payments to Left-Wing Guerrilla Groups in cash. Most, if not all, payments were made through intermediaries, such as outside lawyers, so-called security consultants like Rene Osorio, or industry groups like AUGURA. Many payments were the result of formal, negotiated agreements with Left-Wing Guerrilla Groups. Those agreements specified terms such as the amount of each payment and the duration of the agreement. Chiquita also designed special accounting procedures for the payments to conceal their true nature.

468. As to "how the [Left-Wing Guerrilla Groups] used the funds," the funds were used to arm and equip Left-Wing Guerrilla Groups. As the United States has stated, "Chiquita's money [to terrorists, including Left-Wing Guerrilla Groups,]

188

helped buy weapons and ammunition used to kill innocent victims of terrorism."

469.　As to how "the payments were related in any way to the offenses alleged in the complaint," Chiquita's payments to Left-Wing Guerrilla Groups relate to the offenses in several ways.

470.　First, Chiquita's financial support was, in the words of the United States, converted into "weapons and ammunition used to kill innocent victims of terrorism."

471.　Second, Chiquita paid Left-Wing Guerrilla Groups for their violent security services.

472.　As one internal Chiquita document states, "the Guerilla Groups are used to supply security personnel at the various farms."

473.　Even before beginning to pay Left-Wing Guerrilla Groups for security, Chiquita was well aware of those groups' violent tactics. As the Special Litigation Committee concluded, before beginning to make payments to Left-Wing Guerrilla Groups, "Banadex and Chiquita personnel were already well aware of the widespread violence committed by guerrilla groups such as the FARC and the ELN."

474.　Chiquita thus hired Left-Wing Guerrilla Groups as security for its farms knowing that its security would engage in "widespread violence."

475.　Third, Chiquita paid Left-Wing Guerrilla Groups for their violent assistance in suppressing labor unions.

476.    As discussed in paragraphs 458 to 460, banana companies in Colombia worked with the paramilitaries and one of the Left-Wing Guerrilla Groups, the EPL, to violently suppress union activity.

477.    An internal Chiquita document acknowledged this collaboration, stating that the "EPL helped us out a lot with labor union issue."

478.    Fourth, Chiquita, year after year, voluntarily decided to remain in Colombia and continue its collaborative relationship with Left-Wing Guerrilla Groups.

479.    Chiquita's payments were not the result of duress.

480.    At all relevant times, Chiquita could have left Colombia, ending its relationship with Left-Wing Guerrilla Groups, but instead made the conscious decision to stay in Colombia.

481.    Alternatively, at all relevant times, Chiquita could have stopped making the payments to Left-Wing Guerrilla Groups and still continue its operations in Colombia, as it did in or around 1997.

482.    In summary, Chiquita paid Left-Wing Guerrilla Groups substantial sums on a regular basis over the course of at least 9 years, enabling those groups to arm and equip themselves and resulting in the murders of innocent civilians. Chiquita made its payments intending that Left-Wing Guerrilla Groups would continue in their violent

190

ways, thereby improving the security of Chiquita's operations and suppressing the union activity, both of which protected Chiquita's profits.

483.    Taken together, the allegations in paragraphs 463 to 482 demonstrate that Chiquita paid Left-Wing Guerrilla Groups with the purpose or intent to further their violence, including the widespread torture and murder of innocent civilians.

484.    Chiquita's payments to Left-Wing Guerrilla Groups stopped and its payments to the AUC began around the same time.

485.    Chiquita switched sides in the Colombian armed conflict once it had assisted the AUC in its formation and financing, and once the AUC could mount a successful attack on the Left-Wing Guerilla Groups and drive them out of the banana region. This made business sense for Chiquita, as the AUC could provide Chiquita with the same violent services that Left-Wing Guerrilla Groups previously provided while at the same time attack the FARC, which, once an ally, was becoming a growing threat to Chiquita's profitability. It also made business sense because Chiquita had lost its ability to control and direct the Left-Wing Guerilla Groups. Further, once the AUC provided an alternative, Chiquita switched sides because it was ideologically aligned with the leaders of the AUC.

**F. Chiquita's Support of the AUC**

486.    Chiquita, as the successor to the United Fruit Company and the United Brands Company, has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century. At all relevant times, Chiquita produced bananas in the Urabá and Magdalena regions of Colombia.

487.    From the early 1990s until at least 1997, Chiquita provided material support, including money, to terrorist organizations such as the ACCU and other predecessors of the AUC. Chiquita also provided material support to the FARC and other Left-Wing Guerrilla Groups in this time frame.

488.    Chiquita's assistance helped the paramilitaries to consolidate as a decisive actor in the political, military, and social terrain of the banana region. In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition to their operations and policies was suppressed.

*Chiquita's Payments to the AUC*

489.    From 1995 until at least February 2004, Chiquita provided material support to the AUC in Urabá and Magdalena. By 1997, the AUC effectively controlled large swathes of territory – particularly in the towns and urban areas – as

well as exerting influence in institutions such as labor organizations and local governments in these regions.

490.    In 1995 and 1996, Chiquita made payments to the ACCU's Banana Bloc.

491.    Chiquita paid the AUC nearly every month during the period 1997–2004, making over one hundred payments to the AUC totaling over $1.7 million. During those years, the AUC killed 3,778 people in the banana areas and displaced approximately 60,000 in its war on the guerillas.

492.    Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees. Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.

493.    Some of Chiquita's payments were made directly to the AUC or to front organizations like the *Convivir* Papagayo. Chiquita concealed the nature of these payments by were recording them in corporate books and records as "security payments" or payments for "security" or "security services."

494.    Other payments were made indirectly to the AUC. On some occasions, Chiquita made payments to the accounts of Banadex executives with the intent that they would be withdrawn as cash and handed directly to the AUC. Chiquita made

payments in this way in order to conceal the fact that they were paying the AUC; it recorded these payments simply as income contributions.

495. Chiquita formed an agreement with the AUC, paying them in exchange for their services in pacifying the banana plantations and suppressing union activity. According to Salvatore Mancuso, H.H., and Carlos Tijeras, this agreement specified that Chiquita would pay the paramilitaries a fixed amount for each box of bananas exported.

496. At all relevant times, Chiquita knew that the AUC was a violent, terrorist paramilitary organization, as its brutal aims and tactics were a well-known feature of the Colombian civil war. On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO"), and that designation was well-publicized in the American public media, including in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001, as well as in the Colombian media.

497. In 2003, Chiquita consulted with attorneys from the District of Columbia office of a national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC. Outside counsel advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Among other things, outside counsel advised Chiquita:

"Must stop payments."

"Bottom Line: CANNOT MAKE THE PAYMENT"

"Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"

"General Rule: Cannot do indirectly what you cannot do directly"

"Concluded with: CANNOT MAKE THE PAYMENT"

"You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. CHIQUITA should leave Colombia."

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

[T]he company should not make the payment."

498.    Although Chiquita's Board of Directors agreed to disclose its payments to the AUC to the U.S. Department of Justice on or about April 3, 2003, on April 8, 2003, Chiquita instructed Banadex to continue making the payments to the AUC. On April 24, 2003, Chiquita met with Justice Department officials, who told Chiquita the payments were illegal. Nonetheless, Chiquita continued to make the payments until at least February 2004.

499.    On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially

designated global terrorist. The company's sentence included a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

### Chiquita' facilitation of the AUC's arms shipments.

500.    In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

501.    The Nicaraguan National Police and Army were involved in a deal that provided 3,000 AK-47 assault rifles and 5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto the Otterloo, a Panamanian-registered ship, with Panama as its declared destination.

502.    Instead of docking in Panama, the Otterloo instead went to Turbo, Colombia, where Chiquita, through Banadex, operates a private port facility for the transport of bananas and other cargo. Chiquita had bribed customs officials $30,000 so that they would authorize a special customs zone in Turbo where the company could unload its products.

503.    After the Otterloo docked at Chiquita's port in Turbo, Banadex

employees unloaded the cargo of 3,000 assault rifles and 5 millions rounds of ammunition. On information and belief, the AUC, which had free access to the port, then loaded these rifles onto AUC vehicles and took possession of them.

504.   Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC. The documents accompanying the shipment declared that the crates that in fact contained arms were filled with plastic and/or rubber balls. However, in unloading the crates, the Banadex employees used heavy lifting machinery that would not have been necessary to move the crates' declared cargo. After being off-loaded, the crates then remained at Chiquita's facilities for at least two additional days before fourteen AUC vehicles arrived to take possession of the arms. At least some of the arms were received by Freddy Rendón Herrera, the commander of the Elmer Cardenas Block of the AUC in Urabá.

505.   Furthermore, a highly-placed Chiquita employee from the port Turbo, Giovanny Hurtado Torres, as well as several Colombian customs officials, have been prosecuted for their purposeful involvement in this transaction.

506.   On information and belief, Chiquita facilitated at least four other arms shipments to the AUC. According to Raúl Hasbún, one of these shipments of arms through Chiquita's port involved the entry of 4,200 assault rifles.

197

507.    On at least one occasion, José Leonardo Lopez Valencia, an electrical mechanic at Turbo, witnessed uniformed AUC members offloading crates directly from a Chiquita ship.  On information and belief, those crates contained smuggled firearms.

508.    In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

509.    The arms that Chiquita knowingly and intentionally aided the AUC to procure have been of substantial assistance to the AUC in its commission of countless crimes, including the killings and other conduct alleged herein.  Many of these guns have not been turned in to the government and are still in use by the AUC.  In 2008, some were seized in Urabá from the Daniel Rendón Herrera's 'Heroes de Castaño' Front – another AUC subunit.  The raid, executed by Colombian authorities, netted hand granades, mortar rounds, Claymore mines, electrical detonators, and 47 AK-47 assault rifles; the assault rifles were traced to the 2001 Otterloo shipment.

### *Chiquita's facilitation of the AUC's drug shipments*.

510.    Chiquita also assisted the AUC by allowing the use of its private port facilities for the exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a major source of income for the AUC, and Chiquita allowed the AUC

uncontrolled access to its port facilities and ships for the purpose of smuggling drugs.

511. Colombian prosecutors have charged that the AUC shipped drugs on Chiquita's boats carrying bananas to Europe. According to H.H., the AUC would tie drugs to the hulls of banana ships at high sea to evade the control points of the security agencies.

512. Cocaine hidden in Defendant's banana shipments has been seized by the Colombian government on seven separate occasions. More than one and a half tons of cocaine have been found hidden in Defendant's produce, valued at over 33 million dollars. Two of the ships on which drugs were found were named the Chiquita Bremen and the Chiquita Belgie.

513. On information and belief, drug shipments could not have been attached to Chiquita's banana boats without the active collusion or willful ignorance of Chiquita employees. Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly and purposely allowed use of its port and banana transportation boats for this purpose.

## V. **CAUSES OF ACTION**

### First Cause of Action

### The Alien Tort Claims Act, 28 U.S.C. § 1350 – War Crimes

### The Executions of Plaintiffs' Decedents Were War Crimes, and Chiquita Aided and Abetted Left-Wing Guerrilla Groups and the AUC, Conspired With the AUC, or the AUC Was Chiquita's Agent

514. Plaintiffs incorporate by reference paragraphs 1 through 513 of this Complaint as is set forth herein.

### The Executions of Plaintiffs' Decedents Were War Crimes

515. The Colombian military was not able to effectively address the uprising of the FARC, so as previously alleged, the Colombian government facilitated the creation and funding of the AUC for the sole purpose of using this unofficial force to defeat the FARC. As one high commander of the AUC told Plaintiffs' representatives, "the Colombian military felt itself bound to the Geneva Conventions. The AUC was not." Further, Colonel Mejia, the commander of the Popa Battalian at all times material to this action agreed and stated the Colombian military needed to use the AUC in order to defeat the FARC.

516. The extreme brutality practiced by the AUC that earned it the terrorist moniker by the U.S. Department of State was from the outset a planned strategy to