effectively confront and defeat the FARC. The FARC was likewise designated a terrorist organization and itself used brutal tactics.

517. Article 3 of the Geneva Convention, which applies to "an armed conflict not of an international character," applies to the civil conflict in Colombia. Thus, noncombatants to the Colombian civil war, including the Plaintiffs' decedents, are covered, and the war crimes committed by any parties to the conflict, including the AUC and FARC, are actionable under the ATS. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

518. In the Eleventh Circuit, a claim for war crimes under the ATS has four elements: 1) an armed conflict was ongoing; 2) the AUC and FARC were parties to the conflict; 3) Plaintiffs, their decedents, and countless other victims of the civil conflict did not take active part in the hostilities; and 4) the acts were committed in the course of armed conflict. *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1266 (11th Cir. 2009) The acts alleged herein are war crimes regardless of whether the AUC or FARC acted under color of state authority.

**As to the first element, the civil war in Colombia is an armed conflict within the meaning of the laws of war.**

519. The Colombian civil war is an "armed conflict not of an international

201

character," as specified in Common Article 3 of the Geneva Conventions, which hold that in such cases, specific acts such as torture and "carrying out of executions without previous judgment pronounced by a regularly constituted court" constitute war crimes.

520.    There is no dispute that Colombia has been devastated by a long-standing civil conflict. This has been widely documented and has never been disputed in this or any other case. For example, the 1997 State Department Human Rights Report notes that the Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *Id.* at 1.

521.    During all times relevant to this complaint, the civil war in Colombia pitted the Colombian government – along with its paramilitary allies, including the AUC – against the FARC and other left-wing guerrilla insurgents.   As AUC Commander Carlos Tijeras described the nature of the conflict in a sworn statement, "at the time I was acting as Commander of the William Rivas Front I was a major participant in a civil war that was being fought over the future direction of my country. I was on the side of democracy and capitalism and we were fighting communists and guerillas."

522.    The Colombian civil war has continued uninterrupted since at least 1946, and claimed the lives of over 300,000 people.   Both Venezuela and Ecuador´s

202

presidents have referred to the FARC as a belligerent force. The Colombian government has engaged in prisoner exchanges with the FARC in the past. It held extensive negotiations with the FARC during the 1998-2002 time period, with involvement of the United Nations, and ceded a large portion of its territory to FARC control, referred to as the 'zona de despeje," or cleared zone. During that time, the FARC assumed the powers of government, including judicial and police powers.

**As to the second element, the AUC and FARC (along with other leftist guerrilla groups) were parties to the armed conflict in Colombia.**

523. Once the AUC consolidated the various paramilitary groups in late 1996 under the leadership of Carlos Castaño, the AUC became the most visible armed opposition to the FARC, which, by late 1996, had become the prominent leftist rebel group. From that time on, the AUC became a major combatant in Colombia's civil conflict with the FARC and other leftist guerrilla groups, like the ELN. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the leftist guerrillas had become a notorious exchange of atrocities.

524. Plaintiffs further incorporate by reference ¶¶ 429-37 of this Complaint, explaining how the AUC became party to the Colombian civil war as a tool of the Colombian government, and its campaign of violence against civilians and union

members in furtherance of the war against the FARC and other leftist guerrilla groups.

**As to the third element, Plaintiffs did not take part in the hostilities.**

525.     Civilians are entitled to the protections of Common Article 3 of the Geneva Conventions if they are "[p]ersons taking no active part in the hostilities". Neither Plaintiffs nor their decedents were party to the armed conflict in Colombia, as they were not members of the FARC, the AUC, or, indeed, any armed group that participated in the conflict.  Plaintiffs incorporate by reference ¶¶ 20-393 of this Complaint, describing the individual decedents in this case.

526.     Plaintiffs' decedents were not killed because they or anyone related to them had taken part in the hostilities in any way.  Rather, they were victims of the campaign conducted against civilians by the AUC in an effort to discourage support of the FARC.  The AUC, using tactics of terror on civilians living in and around areas that had been under FARC control, assumed that these innocents were sympathetic to the FARC and systematically murdered thousands of them. The AUC became known for using chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerillas in their villages. *See generally* R. Kirk, *More Terrible Than Death: Massacres, Drugs, and America's War in Colombia* (2003); S. Dudley, *Walking Ghosts: Murder and Guerilla Politics in Colombia* (2006).

**As to the fourth element,** Plaintiffs were killed in the course of the armed conflict.

527.   Plaintiffs were not killed simply against the background of war; rather, the use of criminal violence and intimidation against civilians – particularly union members – was part of the war strategy against the FARC agreed on by the AUC and the Colombian Government, in which Chiquita was intentionally complicit.

528.   The AUC used extremely violent means to take back areas held by the FARC and used tactics of violence and terror to depopulate areas of innocent civilians merely because the AUC presumed that civilians in areas previously held by the FARC were sympathetic to the leftist guerillas. This military tactic is documented by the U.S. Department of State. For example, the 1997 State Department Report noted that "[t]he many paramilitary groups took the offensive against the guerillas, often perpetrating **targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base** . . . An active policy of depopulation, **pursued by some paramilitary groups against communities suspected of guerilla support**, was the primary cause of the growing internal displacement problem." *Id.* at 2 (emphasis added).

529.   As the U.S. Department of State reported in 1999:

Paramilitary groups and guerillas were responsible for the vast majority of

political and extrajudicial killings during the year. **Throughout the country, paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerillas of civilian support.** The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerilla control.

1999 State Department Report at 2 (emphasis added).

530.    While this strategy was developed in Urabá, the model of collaboration between government and paramilitary was so successful that it was exported to the rest of the country and became part of the national war strategy. This was especially true in the banana zone of Magdalena. In these areas, the AUC pursued a scorched earth policy of first driving the FARC out and then brutally murdering and torturing people who lived in these areas and were assumed by the AUC to be sympathetic to the FARC.

531.    As Carlos Tijeras, the AUC commander in Magdalena stated, "we not only drove the guerilla groups out of the area, but our tactics made sure the local people would never entertain the idea of supporting or joining the guerillas. We made clear with our actions that anyone who supported the FARC was our enemy and would be dealt with accordingly."

532.    Decedents killed by the AUC were members of particular social groups that were particularly targeted by the AUC as part of its war strategy. Plaintiffs

206

incorporate by reference ¶¶20, 437-39. All of the Plaintiffs' decedents were merely innocent civilians executed in the course of the conflict between the AUC and the FARC. There has never been any evidence or credible assertion after any of their deaths that any of Plaintiffs' decedents were members or supporters of the FARC or AUC.

533.    In fact, all of Plaintiffs' decedents who were executed by the AUC were victims of its tactics of terror and violence, particularly in the areas that the FARC had a stronghold. They were not merely incidental victims during a time of war; rather they were victims of the AUC's war strategies and goals.

534.    The Plaintiffs executed by FARC were likewise innocent bystanders to the civil conflict as FARC used its own brutal tactics to take territory in Colombia.

### Chiquita Aided and Abetted the War Crimes

535.    Plaintiffs have maintained that the Eleventh Circuit has held that a person is liable for aiding and abetting conduct that is actionable under the Alien Tort Statute if (1) one or more of the wrongful acts that comprise the claim were committed, (2) the person substantially assisted some person or persons who personally committed or caused one or more of the wrongful acts that comprise the claim, and (3) the person knew that his actions would assist in the illegal or wrongful activity at the time he provided the assistance. *Cabello v. Fernandez-Larios*, 402 F.3d

1148, 1158 (11th Cir. 2005).

536.    Plaintiffs note that the Court has adopted the Second Circuit's standard for aiding and abetting from *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258 (2d Cir. 2009). The *Talisman* rule attributes aiding and abetting liability to a person who (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime.

537.    Plaintiffs' allegations are sufficient under both articulations of the aiding and abetting standard.

538.    Plaintiffs have established in ¶¶ 515-534, *supra*, that the AUC and the FARC (along with other leftist guerrilla groups) violated international law by engaging in war crimes.

539.    Chiquita's payments and other assistance contributed significantly to the perpetration of the crimes committed by the AUC and leftist guerrilla groups. As the Justice Department noted in concluding its prosecution of Chiquita for providing material assistance to terrorist groups, **"Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. . . . The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) . . . helped to buy weapons and ammunition used to kill innocent victims of terrorism."** *U.S.*

*v. Chiquita Brands International*, 07-CR-0555 (RCL), Sentencing Memo at 13 (emphasis added).

540.   As Chiquita admitted in its criminal case, it provided substantial funding to the FARC and other leftist guerrilla groups until Chiquita switched sides and funded the AUC to drive the leftist guerrillas out of the banana areas of Colombia.

541.   As Chiquita agreed to finance the AUC from its very first days in operation, Chiquita was one of the financial founders of the AUC, and made it possible for the AUC to consolidate its forces and become the major combatant in the civil conflict with FARC. Plaintiffs incorporate by reference ¶¶ 486-499.

542.   From at least 1996 through 2004, Defendant Chiquita, through Banadex, paid money to the AUC in the two regions of Colombia where it had banana-growing operations: Uraba and Magdalena. Defendant Chiquita paid the AUC directly or indirectly, nearly every month, and made at least 100 payments to the AUC totaling over $1.7 million.

543.   The amount of money Chiquita paid to the AUC was different every month. According to the testimony of AUC commander Salvatore Mancuso, the AUC was paid a commission based on the number of boxes of bananas shipped by Defendant Chiquita each month. The AUC was paid to ensure that Chiquita's business ran smoothly.

544. Payments from Chiquita and other banana companies constituted a significant portion of the AUC's budget. As the former paramilitary commander for the banana-growing zone in Uraba, H.H. testified, the AUC used the companies' money to buy arms. "It's clear that with the money that they paid the AUC, many crimes against workers were committed."

545. Carlos Tijeras, the commander of the William Rivas Front, which worked with Chiquita in Magdalena, stated that Chiquita was a major source of support for his Front, along with Dole supplying 80-90% of the operating funds for the Front.

546. Carlos Castaño and other AUC leaders co-mingled this money with other funds used to finance the AUC.'s activities throughout Colombia.

547. Prior to the creation of the AUC in 1997, Chiquita had paid money to other terrorist organizations operating in Colombia, including FARC, which also murdered thousands of people, including some of the Plaintiffs' decedents.

548. Most of the firearms that were transferred to the AUC from the Otterloo shipment have never been recovered and, on information and belief, are still in the hands of the AUC, where they and other similarly obtained firearms have been used in the commission of the war crimes alleged in this Complaint. Plaintiffs incorporate by reference ¶¶500-509.

549.    In addition to Chiquita's payments, its assistance to the AUC in smuggling arms substantially increased the paramilitaries' capacity to carry out atrocities. AUC leader Carlos Castaño boasted in an interview, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles." Chiquita also provided major support to the AUC's drug-smuggling. *See* ¶¶ 510-13, *supra.*

550.    Chiquita knew and intended that its actions would assist in the killings and other violent conduct alleged herein.

551.    Defendants have pled guilty in the pending criminal case, 07-CR-0555 (RCL), of knowingly providing material assistance to terrorist groups operating in and around their banana plantations in Colombia. This assistance included cash payments to FARC and AUC, and arms, supplies and other assistance to the AUC. Defendants are precluded from disputing this admission in the criminal case.

552.    Chiquita, along with other banana companies in Colombia, sought a meeting with the paramilitaries in late 1996 or early 1997. The meeting took place in Medellin, and a high-level U.S. Chiquita employee, most likely Charles Kaiser, was present. It was decided at this meeting that the banana companies would pay the paramilitaries. ("Colombian paramilitary tells how he financed his own Murder Inc.: bananas," by Steven Dudley, *The Miami Herald*, 3/21/2009; El Tiempo, "Todas las

211

bananeras nos pagaban"). Carlos and Vicente Castaño led the negotiations with the companies; as a result of the negotiations, H.H. was ordered to patrol the entire banana-growing region.

553. In order to operate its banana production in an environment free of labor opposition and social disturbances, Chiquita agreed to a business arrangement whereby the company would pay the AUC a certain amount per box of banana exported, and would help to arm and otherwise support the AUC and other terrorist groups during the period of the killings and other conduct alleged herein.

554. Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors and employees, described herein as David Does 1-10. Chiquita recorded these payments in its corporate books and records as "security payments."

555. Chiquita made payments and shipped weapons to the AUC with knowledge of the AUC's purpose and activities, and against the advice of its own legal counsel. According to notes taken by Chiquita's counsel, on or about April 4, 2003, David Doe 3 said "His and [David Doe 2's] opinion is just let them sue us, come after us. This is also [David Doe 1's] opinion."

556. The AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent civilians living in areas under FARC control was well known in

Colombia and was widely reported in the press in Colombia and the United States. In 1997, for example, the State Department Report noted that "[t]he many paramilitary groups took the offensive against the guerillas, often perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base . . . **An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerilla support**, was the primary cause of the growing internal displacement problem."*Id.* at 2 (emphasis added).

557.   In 1999, the State Department Report stated:

> Paramilitary groups and guerillas were responsible for the vast majority of political and extrajudicial killings during the year. Throughout the country, paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerillas of civilian support. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerilla control.

1999 State Department Report at 2.

558.   At the outset, as alleged in ¶¶ 489-99, *supra*, Chiquita understood that the role of the AUC was to use its brutal tactics to defeat the FARC, and use brutal methods to terrorize the innocent civilians in towns where the FARC had been strong. The manager of Chiquita's Colombia operations, Charles Kaiser, worked with the AUC to set up the *convivir* system to get funds to the AUC to defeat the FARC.

559.   The United States government designated the AUC as a Foreign

213

Terrorist Organization on September 10, 2001, and that designation was well-publicized in the American public media. The AUC's designation was even more widely reported in the public media in Colombia, where Chiquita had its substantial banana-producing operations.

560.    Chiquita had information about the AUC's designation as an FTO specifically and global security threats generally through an Internet-based, password-protected subscription service that Chiquita paid money to receive. On or about September 30, 2002, Individual H, from a computer within defendant Chiquita's Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the following reporting on the AUC: "US terrorist designation. International condemnation of the AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

561.    From on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000. Chiquita never applied for nor obtained any license from the Department of the Treasury's Office of

Foreign Assets Control with respect to any of its payments to the AUC.

562.     On or about February 20, 2003, two Chiquita officials had a conversation to the effect that one had discovered that the AUC had been designated by the United States government as a Foreign Terrorist Organization. Shortly thereafter, the two officials spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about defendant Chiquita's ongoing payments to the AUC.

563.     Beginning on or about February 21, 2003, outside counsel advised defendant Chiquita, through the two officials, that the payments were illegal under United States law and that defendant Chiquita should immediately stop paying the AUC directly or indirectly. Plaintiffs incorporate by reference ¶¶497 (advice of counsel about payments to the AUC):

564.     Despite the February 26, 2003 communication from counsel advising Defendants against making payments to the AUC, on or about February 27, 2003, two Chiquita employees in Colombia paid the AUC in Urabá by check in an amount equivalent to $17,434.

565.     Despite the March 27, 2003 communication from counsel advising Defendants against making payments to the AUC, on or about March 27, 2003, the same two employees paid the AUC in Urabá by check in an amount equivalent to

$19,437.

566. Chiquita's acts of assistance to the AUC were made with the intent that the AUC carry out the acts of killing and other conduct alleged herein. In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition was suppressed.

567. Chiquita aided and abetted the AUC with the shared purpose of defeating the FARC in the civil conflict and pacifying the local populations with terror.

568. The arrangement between Chiquita and the AUC was not one of duress; in fact, it was the banana companies that approached the AUC to initiate their relationship. Mario Iguaran, the Attorney-General of Colombia, has charged that there was a criminal relationship between Chiquita and the AUC in which Chiquita supplied money and arms to the AUC in return for the "bloody pacification of Urabá."

569. Likewise, in Magdalena, Carlos Tijeras, the commander of the AUC's William Rivas Front, stated that the AUC took direction from Chiquita and worked to provide Chiquita with security, labor pacification, and, most of all, the defeat of the FARC in the banana-producing areas.

570. As part of its deal with Chiquita, the AUC provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social undesirables, suspected guerilla sympathizers or supporters, and

216

anyone who was suspected of opposing the AUC's activities or social program.

571.   By arming and financing the AUC to fulfill its mission of suppressing labor unions, Chiquita intentionally assisted the AUC to carry out systematic killings of civilians. The AUC understood that one goal of its assistance to Chiquita was to force laborers to work in the plantations. Anyone who disobeyed the order knew what would happen to them.  Carlos Tijeras stated that his Front used brutality in killing people to ensure that the witnesses to this understood what would happen if they crossed the AUC.

572.   Carlos Castaño wrote in *Mi Confesión* that the unions were strong and "terrifying" before the paramilitaries arrived in Urabá, and that they had turned to crime as well as starting extensive worker strikes. The AUC undertook an extensive campaign of murder against civilians in order to break the back of the unions. "They pulled out a map where they said which plantations allegedly had a FARC presence and started killing workers and union members, until the organizational structures of the union and the board of Sintrainagro [the local union that included banana workers] were left totally in the hands of the 'Esperanzados' [the ELN]," a former insurgent group that had been coopted by the paramilitaries.

573.   The stability and social control provided by the AUC was to Chiquita's benefit, in that it minimized the expenses incurred and eliminated disruptions in the

217

exportation of bananas. As a result of the AUC's actions, Chiquita was able to dismantle the social assistance programs to which the banana companies had agreed through negotiations with the unions in the 1980s, thereby lowering costs. The influence of the AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced labor strife.

574.    As a result of the paramilitaries' intervention, Castaño was able to brag in 2001 that "in the past three years there have been *no strikes* in the banana-growing region, and the Sintrainagro unions work shoulder-to-shoulder with the employers to promote the [economy of the] zone."

575.    In addition to directly suppressing labor activity, the paramilitaries regulated the banana-growing population and protected Chiquita's profitability by controlling the provision of medical services in the towns of Urabá. Residents of Apartadó reported that they feared seeing doctors because they believed that medical personnel were under the control of the AUC. On information and belief, this arrangement benefitted Chiquita because it allowed the paramilitaries to inform the company of its employees' medical issues that could potentially affect labor productivity, including pregnancy. It also allowed the paramilitaries to prevent doctors from certifying worksite injuries or providing medical excuses to workers, which would have raised costs for the company.

576.    As a result of its collaboration with the AUC, Chiquita's banana-growing operation in Colombia became its most profitable in the world.

### Chiquita Joined the AUC's Conspiracy to Commit War Crimes.

577.    Plaintiffs incorporate by reference paragraphs 1 through 576 of this Complaint as is set forth herein.

578.    In *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005), the Eleventh Circuit held that the three elements for conspiracy are: (1) "two or more persons agreed to commit a wrongful act," (2) Defendants "joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it," and (3) "one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy."

579.    *As to the first element*, based on ¶¶ 486-496, 552-553, *supra*, which are incorporated herein by reference, the AUC was formed based on agreement between its leaders, government backers, and private supporters, to attack areas where the FARC had strongholds. The express purpose of the AUC's mission was to use violent means, including war crimes and extrajudicial killings, to accomplish its mission.

580.    *As to the second element*, based on ¶¶ 486-95, 541, *supra*, which are incorporated herein by reference, Chiquita began funding the AUC at its very outset, becoming a financial founder, and embraced the AUC's mission of eradicating the

FARC using violence that amounted to war crimes, including extrajudicial killings.

581.   *As to the third element*, based on ¶¶ 486-95, 551-53, 558, 566-69, *supra*, which are incorporated herein by reference, both the AUC and Chiquita committed acts in furtherance of the conspiracy. The agreement was that Chiquita would fund and direct the AUC's activities in the areas in and around the Chiquita banana plantations. The AUC would use its scorched earth tactics to defeat the FARC in the areas in and around the Chiquita plantations. Both parties fulfilled their obligations under the agreement.

582.   There were coordination and funding meetings between the AUC and Chiquita to monitor, renew, refine and otherwise ensure that the parties continued to meet their obligations under the agreement. These meetings and the ongoing funding provided by Chiquita demonstrates that Chiquita was satisfied that the AUC was meeting its specific obligations under the agreement made between the parties. This arrangement continued, according to documents related to the prosecution of Chiquita for the felony of providing substantial assistance to terrorist organizations, from 1996 until 2004.

### The AUC Acted as Chiquita's Agent When it Committed War Crimes

583.   Plaintiffs incorporate by reference paragraphs 1 through 582 of this Complaint as if set forth herein. Plaintiffs acknowledge that the June 3, 2011 Opinion

and Order rejected Plaintiffs' agency theory of secondary liability, but are not removing the agency allegations because they contain factual allegations supporting Plaintiffs' causes of action and theories of secondary liability.

584. The elements of agency are that (1) Chiquita had a relationship with the AUC; (2) in committing the acts alleged, the AUC was acting on Chiquita's behalf and under its control; and (3) the executions of Plaintiffs' decedents were within the scope of the relationship.

585. *As to the first element*, based on ¶¶ 486-95, 551-53, 558, 566-69, *supra*, which are incorporated herein by reference, Chiquita entered into a specific agreement with the AUC that Chiquita would provide substantial support to the AUC to purchase weapons and supplies to patrol the banana areas of Uraba and Magdalena. In exchange, the AUC would pursue the FARC and destroy its strongholds in these areas, pacify the unions on the banana plantations and eliminate all support or potential support for FARC among the civilians in these areas. The agreement included that Chiquita would pay the paramilitaries a fixed dollar amount for each box of bananas exported.

586. *As to the second element*, based on ¶¶ 486-95, 541, *supra*, which are incorporated herein by reference, Chiquita provided direction to the AUC as to priorities for the company. According to Carlos Tijeras, plantation managers for

Chiquita regularly contacted the AUC to request a range of "services" in accordance with the overall agreement, including requests to execute specific individuals. With respect to the hundreds of innocent civilians who were executed by the AUC in the banana areas, including Plaintiffs' decedents, all of them were killed in the course of the AUC's attacks on the towns that were attacked and pacified to drive the FARC out of the banana areas.

587. *As to the third element*, based on ¶¶ 456-62, *supra*, which are incorporated herein by reference, the Plaintiffs' decedents who were killed by the AUC were killed because they were union members who created problems for Chiquita, they resided on land that Chiquita wanted, or they resided in areas where FARC had a presence and the AUC attacked these areas to drive the FARC out for the benefit of Chiquita. The AUC solved Chiquita's labor problems and kept down operational costs by killing and/or intimidating any worker that attempted to strike. The paramilitaries also dealt out reprisals against real or suspected thieves and social undesirables, and targeted suspected guerrilla sympathizers or supporters who could have threatened Chiquita's operations, including anyone espousing views that could be characterized as leftist, such as vocal union and community leaders.

588. Chiquita authorized the killings and other conduct alleged herein in advance. The AUC's agreement with Chiquita involved forcing people to work using

222

threats and illegal violence, as well as the quelling of labor and social unrest through the systematic terrorization of the populations of Urabá and Magdalena.

589. Furthermore, Chiquita acquiesced in the AUC's conduct after the fact by continuing to pay them despite full knowledge that their support was being used to carry out the crimes alleged herein.

## Second Cause of Action

### The Alien Tort Claims Act, 28 U.S.C. § 1350,

### Crimes Against Humanity

### The Mass Executions of Innocent Civilians, Including Plaintiffs' Decedents, Constitute Crimes Against Humanity, and Chiquita Aided and Abetted Left-Wing Guerrilla Groups and the AUC, Conspired With the AUC, or the AUC Was Chiquita's Agent

590. Plaintiffs incorporate by reference paragraphs 1 through 589 of this Complaint as is set forth herein.

591. The conduct alleged in this complaint includes willful killing, torture, and arbitrary arrest and detention, constituting crimes against humanity in that the AUC and leftist guerrilla groups carried out these acts 1) as part of a widespread or systematic attack 2) against a civilian population. *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005). Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by

223

any person in execution of such plan. The acts of the AUC and leftist guerrilla groups constitute crimes against humanity, regardless of whether they acted under color of state authority.

592. **As to the first element, the killings alleged herein were part of a widespread and systematic attack**. From late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC, using tactics of terror on civilians living in and around areas that had been under FARC control, assumed that these innocents were sympathetic to the FARC and systematically murdered thousands of them. The AUC became known for using chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerillas in their villages.

593. The AUC killed thousands of civilians in Urabá and Magdalena. Their war strategy involved targeting civilians in towns near guerrilla groups in order to intimidate the population from providing any support to the guerrillas. This included anyone supporting the guerrillas' ideology, such as teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians. Based on

224

reports from the U.S. State Department, Human Rights Watch, and Amnesty International, thousands of civilians were executed, and countless others injured, by AUC attacks on the civilian population in Uraba and Magdalena within the 1996-2004 time frame that Chiquita was providing substantial support to the AUC. This was both a widespread and a systematic attack, and crimes against humanity requires one or the other.

594.    Decedents were all killed as part of a systematic attack on particular societal groups. In fact, all of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold. They were not merely incidental victims during a time of war; rather they were victims of the AUC's war strategies and goals in furtherance of the conspiracy.

595.    **As to the second element**, based on ¶¶ 20-393, 456-62, *supra*, which are incorporated herein by reference, the killings alleged herein were part of an attack that was directed against a civilian population. The entire method of operation of the AUC was to direct their violence in a targeted way upon the civilian residents of towns where the FARC had a foothold. According to the U.S. Department of State, "paramilitary groups took the offensive against the guerillas, often perpetrating **targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base** . . . An active policy of depopulation,

225

pursued by some paramilitary groups against **communities suspected of guerilla support**, was the primary cause of the growing internal displacement problem." (emphasis added). 1997 State Department Human Rights Report at 2.

596.    The U.S. State Department described the overall practice of targeted attacks by the AUC:

> Paramilitary groups and guerillas were responsible for the vast majority of political and extrajudicial killings during the year. **Throughout the country, paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerilas in an** orchestrated campaign **to terrorize them into fleeing their homes, thereby depriving guerilas of civilian support. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerila control.**

1999 State Department Report at 2 (emphasis added).

597.    The Plaintiffs' decedents killed by the AUC were among the thousands of innocent civilians targeted for execution in the banana areas of Uraba and Magdalena.

## Chiquita Aided and Abetted the AUC and Left-Wing Guerrilla Groups' Crimes Against Humanity

598.    As previously alleged in ¶¶535-576, *supra*, which are incorporated herein by reference, Chiquita met the elements of aiding and abetting the war crimes by the AUC and Left-Wing Guerrilla Groups.

599.    The essential nature of the war crimes that Chiquita aided and abetted

226

was the massive killings of innocent civilians by the AUC and Left-Wing Guerrilla Groups, including Plaintiffs' decedents. In aiding and abetting these war crimes, Chiquita also aided and abetted the crimes against humanity inherent in these widespread and systematic killings of innocent civilians.

## Chiquita Conspired With the AUC to Commit Crimes Against Humanity

600.    As previously alleged in ¶¶ 577-582, *supra*, which are incorporated herein by reference, Chiquita met the three elements of conspiracy with the AUC to commit war crimes.

601.    The essential nature of the war crimes that Chiquita conspired with the AUC to commit was the massive killings of innocent civilians by the AUC, including Plaintiffs' decedents. In conspiring to commit these war crimes, Chiquita also conspired to commit the crimes against humanity inherent in these widespread and systematic killings of innocent civilians.

## The AUC Was Acting as Chiquita's Agent in Committing Crimes Against Humanity

602.    As previously alleged in ¶¶583-589, *supra*, which are incorporated herein by reference, the AUC acted as Chiquita's agent in committing war crimes.

603.    The essential nature of the war crimes that the AUC committed while

227

acting as Chiquita's agent was the massive killings of innocent civilians by the AUC, including Plaintiffs' decedents. In committing these war crimes while acting as Chiquita's agent, the AUC also committed the crimes against humanity inherent in these widespread and systematic killings of innocent civilians.

604.   Chiquita's ongoing regular payments to the AUC from 1996 to 2004, with full knowledge by Chiquita of the specific acts of violence and terror committed each month by the AUC in the areas in and around Chiquita's banana plantations, constitutes ratification of these acts.

## Third Cause of Action

### The Alien Tort Claims Act, 28 U.S.C. § 1350 – Extrajudicial Killings

### The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed Under Color of the Authority of the Colombian Government, and Chiquita Aided and Abetted or Conspired With the AUC, or the AUC Was Chiquita's Agent

605.   Plaintiffs incorporate by reference paragraphs 1 through 604 of this Complaint as is set forth herein.

### The AUC Was Acting Under Color of the Authority of the Colombian Government

606.   Plaintiffs incorporate by reference paragraphs 421 through 455 of this

228

Complaint, which demonstrate that the AUC was operating under color of authority of the Government of Colombia. The Colombian government helped establish the AUC, provided a legal funding mechanism for the AUC, closely cooperated with the AUC, and ceded government powers to the AUC, particularly in the Uraba and Magdalena.

### The Executions of Plaintiffs' Decedents Were Extrajudicial Killings

607.    Plaintiffs' decedents who were executed by the AUC were killed when the AUC was acting under color of authority of the Colombian government. None of those executed had committed a crime, had been charged with a crime, or had been provided with any form of judicial process prior to their executions. Each of these executions were thus extrajudicial killings under the law of nations.

### Chiquita Aided and Abetted the AUC's Extrajudicial Killings

608.    As previously alleged in ¶¶ 535-576, *supra*, which are incorporated herein by reference, Chiquita met the elements of aiding and abetting the AUC's war crimes.

609.    The primary war crime by the AUC that Chiquita aided and abetted was the killings of innocent civilians, including Plaintiffs' decedents. In aiding and abetting these war crimes, Chiquita also aided and abetted the killings themselves,

which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

### Chiquita Conspired With the AUC to Commit Extrajudicial Killings

610. As previously alleged in ¶¶ 577-82, *supra*, which are incorporated herein by reference, Chiquita met the three elements of conspiracy with the AUC to commit war crimes.

611. The primary war crime that Chiquita conspired with the AUC to commit was the killings of innocent civilians, including Plaintiffs' decedents. In conspiring to commit these war crimes, Chiquita also conspired to commit the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

### The AUC Was Acting as Chiquita's Agent in Committing Extrajudicial Killings

612. As previously alleged in ¶¶ 583-89, *supra*, which are incorporated herein by reference, the AUC acted as Chiquita's agent in committing war crimes.

613. The primary war crime that the AUC committed while acting as Chiquita's agent was the killings of innocent civilians, including Plaintiffs' decedents. In committing these war crimes acting as Chiquita's agent, the AUC also committed the killings themselves, which as alleged above, were extrajudicial killings because

230

they were committed by the AUC under color of the authority of the Government of Colombia.

614.    Chiquita's ongoing regular payments to the AUC from 1996 to 2004, with full knowledge by Chiquita of the specific acts of violence and terror committed each month by the AUC in the areas in and around Chiquita's banana plantations, constitutes ratification of these acts.

## Fourth Cause of Action

### The Torture Victims Protection Act, 28 U.S.C. § 1350 –

### Extrajudicial Killings

**The AUC's Extrajudicial Killings of Plaintiffs' Decedents Were Committed Under Color of the Authority of the Colombian Government, and Chiquita Aided and Abetted or Conspired With the AUC, or the AUC Was Chiquita's Agent**

615.    Plaintiffs incorporate by reference paragraphs 1 through 614 of this Complaint as is set forth herein.

### The AUC Was Acting Under Color of the Authority of the Colombian Government

616.    As previously alleged in ¶¶421-55, *supra*, which are incorporated herein by reference, as with Plaintiffs' Third Cause of Action for Extrajudicial Killings under

231

the Alien Tort Statute, the AUC, in committing the extrajudicial killings of Plaintiffs' decedents, was acting under color of authority of the Government of Colombia.

### The Executions of Plaintiffs' Decedents Were Extrajudicial Killings

617.   Plaintiffs' decedents who were executed by the AUC were killed when the AUC was acting under color of authority of the Colombian government. None of those executed had committed a crime, had been charged with a crime, or had been provided with any form of judicial process prior to their executions. Each of these executions were thus extrajudicial killings under the Torture Victims Protection Act.

### Chiquita Aided and Abetted the AUC's Extrajudicial Killings

618.   As previously alleged in ¶¶ 535-576, *supra*, which are incorporated herein by reference, Chiquita met the elements of aiding and abetting the AUC's war crimes.

619.   The primary war crime that Chiquita aided and abetted was the killings of innocent civilians, including Plaintiffs' decedents. In aiding and abetting these war crimes, Chiquita also aided and abetted the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

### Chiquita Conspired With the AUC to Commit Extrajudicial Killings

620.    As previously alleged in ¶¶ 577-82, *supra*, which are incorporated herein by reference, Chiquita met the elements of conspiracy with the AUC to commit war crimes.

621.    The primary war crime that Chiquita conspired with the AUC to commit was the killings of innocent civilians, including Plaintiffs' decedents. In conspiring to commit these war crimes, Chiquita also conspired to commit the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

### The AUC Was Acting as Chiquita's Agent in Committing Extrajudicial Killings

622.    As previously alleged in ¶¶ 583-89, *supra*, which are incorporated herein by reference, the AUC acted as Chiquita's agent in committing war crimes.

623.    The primary war crime that the AUC committed while acting as Chiquita's agent was the killings of innocent civilians, including Plaintiffs' decedents. In committing these war crimes acting as Chiquita's agent, the AUC also committed

233

the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the AUC under color of the authority of the Government of Colombia.

624. Chiquita's ongoing regular payments to the AUC from 1996 to 2004, with full knowledge by Chiquita of the specific acts of violence and terror committed each month by the AUC in the areas in and around Chiquita's banana plantations, constitutes ratification of these acts.

## VI. DEMAND FOR JURY TRIAL

625. Plaintiffs demand a trial by jury on all issues so triable.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)     enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)     declare that Defendants have violated Plaintiffs' human rights and the laws of the District of Columbia and the United States, as set forth herein;

(c)     award Plaintiffs compensatory and punitive damages;

(d)     grant Plaintiffs equitable relief, permanently enjoining Defendants from further

234

engaging in human rights abuses against Plaintiffs and other inhabitants of the Uraba

and Santa Marta regions of Colombia;

(e)    award Plaintiffs the costs of suit including reasonable attorneys' fees;

(f)    award Plaintiffs such other and further relief as the Court deems just under the

circumstances.

Respectfully submitted this 5th day of July, 2011

Terrence P. Collingsworth (DC Bar 471830)
Tcollingsworth@conradscherer.com
Conrad & Scherer, LLP
1156 15th St. NW, Suite 502
Washington, DC 20005
P: 202-543-4001
F: 1-866-803-1125

*Attorneys for Plaintiffs, DOES 1-144 and PEREZES 1-95*