UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 08-01916-MD-MARRA**

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC. ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION
_____

This Document Relates To:

ATA ACTIONS
_____/
Case No. 09-80683-CIV-MARRA

OLIVIA PESCATORE, ESTATE OF FRANK
THOMAS PESCATORE JR., JOSH PESCATORE,
JADA PESCATORE, JARROD PESCATORE,
JORDAN PESCATORE, FRANK PESCATORE,
CAROL PESCATORE HARPSTER,
RICHARD PESCATORE, AND
JOHN PESCATORE

       Plaintiffs,

 - against -

CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*,

       Defendants.
_____/
Case No. 11-80402-CIV-MARRA

GREGORY SPARROW, ON BEHALF OF THE
ESTATE OF JANE PESCATORE SPARROW

       Plaintiff,

 - against -

CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*,

       Defendants.
_____/

**CONSOLIDATED AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Olivia Pescatore, individually and on behalf of the Estate of Frank Thomas Pescatore, Jr., Josh Pescatore, Jada Pescatore, Jarrod Pescatore, Jordan Pescatore, Frank Pescatore, Carol Pescatore Harpster, Richard Pescatore, John Pescatore, and the Estate of Jane Pescatore Sparrow, by and through the administrator of her estate, Gregory Sparrow, bring this action against the Defendants and respectfully allege based on information and belief as follows:

## INTRODUCTION

1.　　This action is brought pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333 *et seq.*, by the wife, children, father, siblings, and estates of decedents Frank Thomas Pescatore, Jr. ("Pescatore") and his sister Jane Pescatore Sparrow ("Jane"). Pescatore was an American geologist who was kidnapped and murdered in the Republic of Colombia by the FARC terrorist organization, an organization that the Defendants willfully and materially supported, in violation of 18 U.S.C. § 2339A and other relevant laws, prior to Pescatore's death. This material support included funds, weapons, and other critical support that enabled and facilitated FARC's ability to maintain an ongoing terror campaign against American and Colombian interests and which resulted in the kidnapping and murder of Pescatore.

2.　　The Defendants willfully provided this material support to FARC even though as early as the 1980s the Department of State publically listed FARC as a terrorist organization, including in all of its subsequent annual terrorism reports. For instance, in its publically available terrorism report titled "Patterns of Global Terrorism: 1987," the Department of State noted that FARC was "anti-US" and engaged in "[a]rmed attacks against Colombian targets, bombings of US businesses, kidnappings of Colombians and foreigners for ransom, and assassinations."

3. Defendants knew that FARC engaged in acts of terrorism against US interests in Colombia and knew the danger that providing material support to FARC would pose to the safety of other individuals and entities working within Colombia, but the Defendants recklessly ignored these risks. As such, Defendants are liable to the Plaintiffs for all damages arising from Defendants' provision of material support to FARC.

## I.
## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2333(a), as a civil action brought by nationals of the United States who were harmed by reason of acts of international terrorism.

5. Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(b).

6. This Court has personal jurisdiction because the Defendants maintain a nation-wide business with distribution networks all over the country, including in the District of Colombia and the State of Florida.

## II.
## THE PARTIES

7. Plaintiff Olivia Pescatore is the surviving spouse of decedent Frank Thomas Pescatore, Jr. She also brings claims on behalf of the Estate of Frank Thomas Pescatore, Jr.

8. Plaintiff Josh Pescatore is the son of Frank Thomas Pescatore, Jr.

9. Plaintiff Jada Pescatore is the daughter of Frank Thomas Pescatore, Jr.

10. Plaintiff Jarrod Pescatore is the son of Frank Thomas Pescatore, Jr.

11. Plaintiff Jordan Pescatore is the daughter of Frank Thomas Pescatore, Jr.

12. Plaintiff Frank Pescatore is the father of Frank Thomas Pescatore, Jr.

13. Plaintiff Carol Pescatore Harpster is the sister of Frank Thomas Pescatore, Jr.

14. Plaintiff Richard Pescatore is the brother of Frank Thomas Pescatore, Jr.

15. Plaintiff John Pescatore is the brother of Frank Thomas Pescatore, Jr.

16. Jane Pescatore Sparrow is the deceased sister of Frank Thomas Pescatore, Jr. Her husband, Gregory Sparrow, brings claims on her behalf as the administrator of her estate.

17. All Plaintiffs are citizens of the United States.

18. Frank Thomas Pescatore, Jr. grew up in a close-knit Italian-American family in New Jersey. He attended high school in Caldwell, New Jersey and was an extremely gifted student and athlete. Afterwards, he attended Lafayette College in Easton, Pennsylvania on an academic scholarship. Although he had originally planned to study medicine, while at college he quickly developed a lifelong passion in geology after taking a few classes. After college, he attended graduate studies in geology at the University of Southern Mississippi.

19. It was while he was at University of Southern Mississippi that he met his wife Olivia, and they eventually married and started a family, which included their four children Josh, Jada, Jarrod, and Jordan.

20. As a result of Pescatore's work as a geologist, he and his family relocated to Birmingham, Alabama where he began working on energy related projects that required travel to Colombia.

21. All of Pescatore's other siblings except one continued to live near their parents in New Jersey, and Pescatore continued to call and visit them in New Jersey on a regular basis.

22. Pescatore also maintained a close relationship with his sister Jane Pescatore Sparrow who had moved to Texas in the 1970s and obtained a D.D.S. from the University of

Texas Dental School. After obtaining her degree, she established a solid reputation as a skilled and caring dentist in Houston.

23. Jane and her husband, Gregory Sparrow, were well liked within their community in Houston, and Jane was known as a dedicated volunteer at the Holy Spirit School and a caring mother to her daughter, M. Sparrow, who was born in 1994.

24. Even after she moved away from home, Jane maintained a very close relationship with her brother Frank and the rest of her family, and she tried to visit and speak on the phone with all of them as often as possible.

25. After Pescatore was kidnapped and murdered by the FARC in 1997, his family experienced severe emotional distress that interfered with their personal, academic or professional lives.

26. No one in Pescatore's family fully recovered from the emotional trauma they experienced as a result of Pescatore's kidnapping and murder.

27. In late 2004 Jane suffered a severe brain infection and eventually died from the resulting complications on May 12, 2005. Jane is survived by her daughter, M. Sparrow, and her husband, Gregory Sparrow, who brings this lawsuit on her behalf.

28. Defendant Chiquita Brands International, Inc., and its subsidiaries and affiliates (collectively, "Chiquita"), is a multinational corporation incorporated in New Jersey and headquartered in Cincinnati, Ohio.

29. Chiquita is a leading producer and distributor of bananas and other types of produce. It is one of the largest banana producers in the world and is a major supplier of bananas throughout North America and Europe.

30. Chiquita Brands International, Inc. was originally founded in 1899, as the United Fruit Company, following the merger of several other companies.

31. Until the mid-1960s, United Fruit's Colombian operations were located exclusively in the city of Santa Marta, but beginning in 1966, it began operating out of the Urabá region in the city of Turbo.

32. In March 1989, Chiquita – then known as United Brands – formed C.I. Bananos de Exportación, S.A. ("Banadex"), an export company that consolidated all of the company's Colombian operating divisions and centralized its headquarters in Medellian, Colombia. At all relevant times hereto, Banadex was Chiquita's controlled subsidiary, agent and/or alter ego, which it used to conduct and manage its business operations within Colombia.

33. Plaintiffs also bring claims against other defendants who are sued herein as Moe Corporations 1-5 and Moes 6-25. Plaintiffs need further investigation and discovery to learn or confirm the true names and capacities of these defendants, and Plaintiffs sue these defendants by such fictitious names and capacities. Plaintiffs will amend this complaint to allege the Moes' true names and capacities when ascertained.

34. Plaintiffs reasonably believe that each fictitious named defendant is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such defendants, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries.

35. At all times herein material, with respect to the events at issue Chiquita, Moe Corporations 1-5, and Moes 6-25 conspired with each other, and/or participated in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted each other's actions, and/or were in an agency or alter ego or joint venture relationship, and were acting within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship.

36. Whenever reference is made in this Complaint to any conduct by a Defendant, such allegations and references shall be construed to mean the conduct of each of the Defendants, acting individually, jointly, and severally.

### III.
### FACTUAL ALLEGATIONS

A. **Background on FARC**

37. In the 1960s, the Colombian Communist Party established FARC (a.k.a. Fuerzas Armadas Revolucionarias de Colombia, or the Revolutionary Armed Forces of Colombia) to protect and control the autonomous Communist-controlled rural areas of Colombia. Over time, FARC became one of Latin America's oldest, largest, and most ruthless Marxist orientated organizations.

38. As a result of FARC's violent insurgency activities, the CIA openly classified FARC as a terrorist supporting organization in a report titled "International Terrorism in 1979."

39. Thereafter, in the 1980s, the Department of State publically listed FARC as a terrorist organization in its annual public reports where it cautioned that FARC was "anti-US" and engaged in "[a]rmed attacks against Colombian targets, bombings of US businesses, kidnappings of Colombians and foreigners for ransom, and assassinations." The Department of

State has since the 1980s continued to list FARC as a terrorist organization in every one of its annual public reports on terrorism.

40. As a result of FARC's continued acts of terrorism, the U.S. Secretary of State designated FARC as a Foreign Terrorist Organization ("FTO") in 1997 pursuant to Title 8, United States Code, Section 1189. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997).

41. The governing structure of FARC includes a body known as the Secretariat, which is a ruling council of FARC. The seven highest ranking members of FARC comprise the Secretariat. The members of the Secretariat make policy and ideological decisions for the organization.

42. FARC's strategic decisions are made by a group of individuals known as the Estado Mayor Central or the Central High Command. The Estado Mayor Central is comprised of approximately thirty members, the seven members of the Secretariat and the most senior commanders of FARC, i.e., the Bloc Commanders, Mini-Bloc Commanders and Mobile Column Commanders.

43. To further FARC's strategic goals, the Estado Mayor Central have consistently endorsed the use of kidnappings and murder to influence the policy and affect the conduct of the governments of the Republic of Colombia and the United States.

44. FARC is organized along military lines to implement its strategic goals. FARC fronts control certain areas of Colombia, and these fronts are organized into different blocs that consist of five or more fronts. Currently, there are seven FARC blocs that are responsible for attempting to implement FARC's policy goals throughout all of Colombia.

45. These blocs consist of the Eastern Bloc, Western Bloc, Sothern Bloc, Central Bloc, Middle Magdalena Bloc, Northwestern Bloc, and Caribbean Bloc.

**B. The Kidnapping and Murder of Frank Thomas Pescatore, Jr.**

46. In December 1996 decedent Frank Thomas Pescatore, Jr. was working as a geologist at the Cerrejon coal complex in La Guajira Department, Colombia.

47. On or about December 10, 1996, members of FARC's Caribbean Bloc attacked the coal complex while under the command and control of FARC commander Juvenal Ovidio Ricardo Palmera Pineda, also known as Simon Trinidad or Ricardo Palmera (hereinafter, "Palmera Pineda.")

48. None of the Colombian workers at the coal complex were injured, but FARC attempted to capture the Americans who were working there. Although one American at the site managed to avoid capture, members of FARC were able to capture Frank Thomas Pescatore, Jr. and to take him into the Colombian jungle.

49. As detailed in subsequent Colombian police reports, the FARC members directly responsible for the kidnapping of Frank Thomas Pescatore, Jr. were Moses Rafael Vega Gámez (a.k.a Chiqui Estrada) and Jorge Luis Alvarez. Furthermore, according to the Colombian Departamento Administrativo de Seguridad or Administrative Security Department ("DAS") (the equivalent of Colombia's FBI), "the kidnapping had been ordered by the leadership of the Caribbean Bloc, of which at the time was [commanded by] the rebel Ricardo Palmera, alias Simon Trinidad."

50. After the kidnapping, members of FARC conspired to make ransom demands on the family of Frank Thomas Pescatore, Jr. As noted by *El Espectador*, one of Colombia's most respected newspapers, the testimony of a former FARC rebel confirmed that Palmera Pineda was directly responsible for setting the amount of ransom demanded for the release of Frank Thomas Pescatore, Jr.

9

51. While in captivity, Frank Thomas Pescatore, Jr. was permitted to write his family a letter as proof that he was alive. His family received this letter shortly before Christmas; it would be the last letter they ever received from him.

52. Shortly thereafter, Frank Thomas Pescatore, Jr. attempted to escape from his captors, but he was shot to death when members of FARC discovered his plan. Without a living hostage, members of FARC panicked when they realized they may not be able to successfully obtain a ransom.

53. According to Colombian investigators, to solve their problem members of FARC contacted Dr. Santander Sanchez who worked nearby and made frequent visits to FARC camps to take care of the guerrillas. They instructed him to fix and preserve the body and to make it as lifelike as possible because they were in the middle of negotiations and were still trying to obtain a ransom payment.

54. To facilitate FARC's ransom negations, Dr. Santander Sanchez eviscerated the body's intestines and other organs and filled the body with formaldehyde and lime. Moreover, as reported in *El Tiempo*, one of Colombia's other well known newspapers, Dr. Santander Sanchez shaved the body and applied makeup so it could be placed sitting on a cot and photographed holding a current daily newspaper in its hands as proof-of-life.

55. FARC kept the body of Frank Thomas Pescatore, Jr. for two months, but when his family failed to pay any ransom, FARC dumped the body in an isolated rural area of San Juan del Cesar where it was not found until several days later on or about February 23, 1997.

56. This kidnapping and murder was subsequently documented in a U.S. Department of State report, "Patterns in Global Terrorism: 1997," which noted:

>Frank Pescatore, a US geologist and mining consultant, was kidnapped by the FARC in December 1996 and later killed by his captors; his body was discovered 23 February 1997.

C. **Events After the Murder of Frank Thomas Pescatore, Jr.**

57. After learning of the kidnapping and murder of Frank Thomas Pescatore, Jr. his family suffered extreme emotional distress and has remained emotionally devastated ever since.

58. Frank Thomas Pescatore, Jr. left behind his parents, siblings, and wife, who was forced to raise their four children without the love, support, and assistance that Frank Thomas Pescatore, Jr. previously provided.

59. Additionally, without their father's companionship, guidance, and advice the children of Frank Thomas Pescatore, Jr. suffered greatly and have felt a constant void in their life ever since they first learned of their father's murder and realized he would no longer be able to play the vital role in their lives that he had once assumed.

60. The family of Frank Thomas Pescatore, Jr. also concluded that despite their best efforts and despite the diligent efforts of the FBI and U.S. Department of State, which were working on their behalf, there was probably very little they could do to assist in trying to obtain justice and a sense of closure.

61. In fact, the family was informed of the serious risks and danger involved in traveling to Colombia and told by the FBI that the U.S. government would work tirelessly on their behalf to bring to justice anyone involved in the murder of Frank Thomas Pescatore, Jr.

62. In December 2004, FARC commander Palmera Pineda who was responsible for the kidnapping and murder of Frank Thomas Pescatore, Jr. was captured in Ecuador while attempting to obtain false Ecuadorian identification documents.

63. About the same time, Jane Pescatore Sparrow began to experience severe headaches and other symptoms related to a brain infection that became fully obvious to everyone in her family by Christmas day in 2004 and greatly concerned them.

64. On December 31, 2004, Palmera Pineda was extradited to the United States and arrived to face criminal charges for his activities connected to FARC.

65. Shortly after the arrest of Palmera Pineda, Pescatore's family was contacted by the Department of State and informed that as a result of the efforts of the U.S. government, the man responsible for the murder of Frank Thomas Pescatore, Jr. was finally in custody.

66. On May 12, 2005, Jane Pescatore Sparrow died from her illness, leaving behind her husband, daughter, and other members of her family.

67. On January 28, 2008, Palmera Pineda was sentenced to sixty-years in prison for hostage taking pursuant to 18 U.S.C. § 1203.

68. After Palmera Pineda's conviction, Pescatore's family filed related civil charges against him pursuant to 18 U.S.C. § 2333 and within the time period specified by 18 U.S.C. § 2335, which tolls the statute-of-limitations during the "time of the absence of the defendant from the United States."

### D. Chiquita's Provision of Material Support to FARC

69. In March 2007, the Department of Justice and Chiquita submitted a joint factual proffer in which Chiquita admitted that it had knowingly provided financial support to FARC during the period that preceded the kidnapping and murder of Frank Thomas Pescatore, Jr.

70. In particular, the factual proffer stated that Chiquita had willfully provided funding to FARC "from in or about 1989 through in or about 1997, when the FARC … controlled areas where defendant CHIQUITA had its banana-producing operations."

71. On February 25, 2009, Chiquita completed a Special Litigation Committee ("SLC") report to address several shareholder derivative suits that were filed after Chiquita's admissions to the Department of Justice.[1]

72. The SLC report documented Chiquita's decision to place its own interests above the safety of others in Colombia and the manner it used its wholly-owned subsidiary, Banadex, to make illicit payments to FARC with the direct knowledge and authorization of Chiquita's officers in Colombia and at its Cincinnati, Ohio headquarters.

73. Chiquita also worked with Sintrabanano and other FARC-controlled labor unions to channel payments to FARC. This was done not only to undermine less accommodating labor unions, but to ensure a steady stream of income that FARC could use to plan attacks on Chiquita's business competitors, undermine their operations, and intimidate or coerce the civilian population that did not cooperate with Chiquita or its allies. For example, Chiquita apparently used its relationship with FARC to interfere with the business operations of UNIBAN, a banana company in Colombia that exports under the TURBANA brand. Thus, shortly before UNIBAN was ready to export bananas, its packing supplies were burned to ensure that Chiquita maintained its competitive advantage in the region. By agreeing to pay FARC with the understanding that FARC would undermine the business operations of other corporations in Colombia, Chiquita could ensure that it was the dominant banana exporting company in Colombia.

74. The SLC estimated that Chiquita paid FARC through its Banadex subsidiary amounts that "ranged from $100,000 to $200,000 per year," even though, as the SLC report

---

[1] Plaintiffs' limited reference hereinafter to the report is not intended to incorporate Defendant's self-serving explanations regarding its conduct, which were rejected by the Department of Justice, nor should it be construed as an adoption of Chiquita's factual findings to the extent any such findings directly or indirectly contradict the allegations made herein, which are based on other sources of information independent of the SLC report.

noted, "Chiquita personnel based in Central America and Colombia were well aware of the guerrilla groups' violent acts."

75. Over time, the payments to FARC became fixed as a percentage of Banadex's gross revenues with as much as ten percent being diverted to FARC.

76. Moreover, Chiquita's SLC report documented several instances where Chiquita or its Banadex subsidiary permitted Chiquita's transportation network to be used to ship arms and ammunition to Colombian guerilla groups, and there are other credible reports (not including the SLC report) that FARC was one of the groups that were able to obtain weapons as a result of Defendants' actions and failures to reasonably protect others from harm who were living and working in Colombia.

77. Additionally, Chiquita and its Banadex subsidiary used numerous methods to fraudulently conceal their activities and to prevent U.S. investigators, the public, and other guerilla groups from learning of their illicit payments.

78. Indeed, the SLC report confirms that Chiquita personnel used special accounting procedures to fraudulently conceal Chiquita's illicit payments:

> ***Payment Procedures.*** Guerrilla payments were initiated within the Company by completing a document called a "1016," which was required by Chiquita's accounting procedures for virtually every disbursement. *See, e.g.*, Banadex Form 1016. Each 1016 was approved by [a Banadex employee] and typically included the following information: (i) the purpose of the payment, (ii) an accounting code, (iii) the date, (iv) the person requesting payment, and (v) an authorizing signature. **For guerrilla payments, the description on the 1016 was coded (for example, as a payment for "military transport") in order to conceal the nature of the payments from local staff in Colombia**. [(Emphasis added.)]

79. According to the SLC report, payments to FARC were authorized by Chiquita's senior officers, and the funds were disbursed in cash and delivered through an intermediary to members of FARC.

80. Furthermore, based on information and belief, Chiquita and/or Banadex used false names and non-existent employees to pad their payrolls so they could fund local FARC commanders without detection. The Defendants also assisted FARC in creating supposedly legitimate community organizations that allowed Chiquita and/or Banadex to indirectly fund FARC.

81. Similarly, the Defendants also created fictitious contracts for apparently legitimate purchases or overvalued real contracts so payments to FARC could be buried in a series of undetectable accounting transactions.

82. These methods allowed Chiquita to fraudulently conceal its payments to FARC for many years until these payments were revealed in documents connected to the criminal case against Chiquita for financing international terrorism.

83. In fact, Chiquita's efforts at concealing its payments to Colombian terrorist organizations were so successful that Chiquita's CEO, Fernando Aguirre, boasted to a CBS reporter on May 11, 2008: "if we hadn't gone to the Justice Department, we probably would not be here talking about this whole issue. No one would know about this."

84. Consequently, as a result of Chiquita's fraudulent concealment, the Plaintiffs, even through reasonable due diligence, were unable to learn of the Defendants' wrongful activities until after Chiquita's admissions to the Department of Justice in March 2007. This fraudulent concealment, therefore, tolled any applicable statute of limitations.

85. As the Department of Justice noted in its sentencing memorandum in 2007:

> This is a very serious matter. Defendant Chiquita has admitted to paying terrorist organizations in Colombia for about fifteen years from 1989 through February 2004. Defendant Chiquita paid all three major terrorist organizations in Colombia: the AUC, the FARC, and the ELN. Those terrorist organizations are responsible for a staggering loss of life in that country.
> …

>The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism. *Simply put, defendant Chiquita funded terrorism.*

## IV.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### INTERNATIONAL TERRORISM
### PURSUANT TO 18 U.S.C. § 2333(a)

86. The allegations set forth in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

87. Plaintiffs were injured in their person, property or business by reason of acts of international terrorism committed by FARC with the support of the Defendants that involved violence, were dangerous to human life, and violated the criminal laws of the United States, including the prohibitions against providing material support to terrorists, kidnapping, and killing a U.S. citizen as set forth in 18 U.S.C. §§ 1203, 2332, & 2339A.

88. The conduct alleged herein also satisfied the requirements of 18 U.S.C. § 2331(1)(A) because it involved violent acts or acts dangerous to human life that are a violation of U.S. State laws, or would be a criminal violation of such laws if the conduct were committed within such States, and these laws include, but are not limited to, State statutes prohibiting reckless endangerment or criminal negligence as set forth in Ala. Code § 13A-6-24; Conn. Gen. Stat. § 53a-64; Del. Code Ann. tit. 11, § 604; Fla. Stat. § 784.05; N.Y. Penal Law § 120.25; and, Vt. Stat. Ann. tit. 13 § 1025.

89. FARC's activities were intended to: (a) intimidate or coerce the civilian population of Colombia; (b) influence the policy of the governments of Colombia and the United

States by intimidation or coercion; and (c) affect the conduct of the governments of Colombia and the United States by mass destruction, assassination, or kidnapping.

90.     The acts of terrorism set forth herein were extreme and outrageous and were committed with the intention of causing extreme physical pain and suffering to Pescatore and extreme emotional distress to his family by reason of Defendants' acts.

91.     The material support that the Defendants knowingly provided FARC substantially facilitated FARC's acts of terrorism which caused Plaintiffs' injuries.

92.     Throughout the period in which the Defendants provided material support for the benefit of FARC, the Defendants knew or consciously avoided knowing that their activities substantially assisted and encouraged FARC to commit the criminal acts alleged herein.

93.     By willfully providing material support to FARC, the Defendants conspired with FARC and otherwise aided and abetted its acts of international terrorism and other violations of law that have injured Plaintiffs' person, property, or business.

94.     Defendants conspired with FARC in that they knowingly entered into an agreement or understanding with it that if the Defendants continued to pay FARC and strengthen its military capabilities, FARC would undermine the business operations of other companies in Colombia and subvert any local trade unions that interfered with Chiquita's profit margins.

95.     Defendants aided and abetted acts of international terrorism in that they knowingly provided money and weapons to FARC while being aware that they were substantially assisting FARC's illegal terrorist activity.

96.     The Defendants are therefore liable for both primary and secondary liability under 18 U.S.C. § 2333(a) for any and all damages that the Plaintiffs have sustained as a result of such injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against the Defendants for compensatory damages, including for solatium, in amounts to be determined at trial by the jury;

(c) Enter judgment against the Defendants and in favor of the Plaintiffs for punitive damages and for treble damages pursuant to 18 U.S.C. § 2333(a);

(d) Enter judgment against the Defendants and in favor of the Plaintiffs for any and all costs and reasonable expenses sustained in connection with the prosecution of this action, including attorneys' fees and pre & post-judgment interest, pursuant to 18 U.S.C. § 2333(a); and

(e) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  July 15, 2011                                  Respectfully submitted,

   */s/ Christopher S. Polaszek*
Christopher S. Polaszek
Florida State Bar 0116866
**MILBERG LLP**
201 North Franklin Street, Suite 3200
Tampa, FL 33602
T: 813.367.5713
F: 813.221.7335
cpolaszek@milberg.com

Peter Safirstein
Nathaniel A. Tarnor
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY  10119
T: 212.594.5300
F: 212.868.1229
psafirstein@milberg.com
ntarnor@milberg.com

                Nitsana Darshan-Leitner, Esq.
                (International co-counsel)
                10 Hata'as Street
                Ramat Gan, 52512 Israel

                *Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

  I hereby certify that on July 15, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day via transmission of Notice of Filing generated by CM/ECF on all counsel of record who are authorized to receive Notice of Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                */s/ Christopher S. Polaszek*
                Christopher S. Polaszek
                Florida State Bar 0116866