UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
NO. 08-01916-MD-MARRA

IN RE: CHIQUITA BRANDS
INTERNATIONAL, INC. ALIEN
TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATA ACTION
_____/

  NO. 08-20641-CIV-KAM

TANIA JULIN, *et al.*,

   Plaintiffs,

v.

CHIQUITA BRANDS INTERNATIONAL, INC.,
_____/

## ORDER AND OPINION

This cause is before the Court on Defendants' Motion for Reconsideration of the Court's Order Denying Defendants' Motion to Dismiss (DE 627) ("Motion"). The Motion has been briefed, the Court held a hearing, and additional briefing was submitted. Thus, the Motion is ripe for review. For the reasons stated below, Defendants' Motion (DE 627) is GRANTED IN PART and DENIED IN PART.

### I. Background

**1. Procedural background**

Plaintiffs are United States citizens and the estates, survivors, and heirs of deceased

United States citizens who allegedly were kidnaped, held hostage, and murdered by the Colombian terrorist organization known as Fuerzas Armadas Revolucionarias de Colombia ("FARC"). Plaintiffs bring this action against defendant, Chiquita Brands International, Inc., ("Chiquita"), alleging that defendant is civilly liable to the plaintiffs for damages, pursuant to 18 U.S.C. § 2332[1] because it (1) aided and abetted the homicide and serious bodily injury of American Nationals located outside the United States in violation of 18 U.S.C. §§ 2332 and 2333[2] (Count I); (2) conspired to violate 18 U.S.C. § 2332 in violation of 18 U.S.C. § 2333

---

[1] The statute reads, in relevant part:
(a) Homicide.--Whoever kills a national of the United States, while such national is outside the United States, shall--
    (1) if the killing is murder (as defined in section 1111(a)), be fined under this title, punished by death or imprisonment for any term of years or for life, or both;
    (2) if the killing is a voluntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than ten years, or both; and
    (3) if the killing is an involuntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than three years, or both.
(b) Attempt or conspiracy with respect to homicide.--Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall--
    (1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and
    (2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.
(c) Other conduct.--Whoever outside the United States engages in physical violence--
    (1) with intent to cause serious bodily injury to a national of the United States; or
    (2) with the result that serious bodily injury is caused to a national of the United States;
shall be fined under this title or imprisoned not more than ten years, or both.

[2] The statute reads, in relevant part: (a) Action and jurisdiction.--Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

(Count II); provided material support or resources to terrorists in violation of 18 U.S.C. § 2339A[3] and in violation of 18 U.S.C. § 2333(a) (Count III).  Plaintiffs also alleged causes of action against Chiquita for wrongful death, aiding and abetting wrongful death, false imprisonment, aiding and abetting false imprisonment, intentional infliction of emotional distress, aiding and abetting intentional infliction of emotional distress, negligent infliction of emotional distress, assault, and aiding and abetting assault under various state tort laws (Counts IV-XXIV).  On February 4, 2010, this Court issued an order granting in part and denying in part Plaintiff Tania Julin's Motion to Dismiss ("Julin Order").  (DE 278).  In that Order, the Court held the following with regard to the Julin Complaint:

- The ATA claims are not subject to statutory tolling.  Julin Order at 10-11.
- Plaintiffs had sufficiently pled the doctrine of fraudulent concealment to avoid application of the statute of limitations to their ATA claims.  Id. at 12-15.
- Plaintiffs allegations are sufficient to state predicate acts of international terrorism pursuant to section 2331(1) of the ATA.  Id. at 16-18.
- Plaintiffs had sufficiently alleged aiding and abetting liability under the ATA.  Id. at 20-22.
- Plaintiffs had adequately pled conspiracy liability under the ATA.  Id. at 22-24.
- Plaintiffs had alleged a sufficient level of *mens rea* on Chiquita's part in providing currency and weapons to the FARC to establish primary liability under section 2339A of the ATA.  Id. at 24-26.

---

[3] The statute reads, in relevant part:  (a) Offense.--Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (I), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, or 2340A of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

- Plaintiffs <u>have</u> sufficiently alleged proximate causation for purposes of their claims under the ATA. <u>Id.</u> at 27-30.
- Plaintiffs <u>had not</u> alleged sufficient facts which would allow the application of equitable estoppel to their Florida-law claims. <u>Id.</u> at 30-32.
- Plaintiffs <u>had</u> sufficiently pled the doctrine of fraudulent concealment to avoid application of the statute of limitations to their Nebraska-law claims. <u>Id</u>. at 32.
- Plaintiffs <u>had</u> sufficiently pled wrongful death under Nebraska law. <u>Id.</u> at 32-34.

Based on these findings, the Court dismissed each of the Florida-based claims, but denied Defendant's motion with regard to the ATA and Nebraska-based claims. <u>Id.</u> at 34. Defendant now moves for reconsideration on this Order arguing that the ATA counts should be dismissed pursuant to the intervening case law. In particular, Defendant asserts that (1) the authority upon which the Court relied in allowing the aiding and abetting claim to proceed has now been overruled, and (2) intervening Supreme Court cases interpreting the causation language of other federal statutes mandate dismissal of the primary liability claims under the ATA. Plaintiffs oppose the Motion for Reconsideration, and ask to be allowed to be proceed with discovery.

**2. Factual background**

The following facts that Plaintiffs allege in the Amended Complaint are relevant. The FARC, established in 1964 by the Colombia Communist Party as its "military wing," is Colombia's largest rebel group and has committed thousands of ransom kidnapings in Colombia, often targeting innocent civilians. Compl. ¶¶ 173, 174, 176, 180. FARC supports its operations through kidnapings, extortion, drug trafficking and "war taxes" it collects from residents, businesses and landowners. Compl. ¶¶ 177-78. In addition to kidnaping twenty-three Americans between 1994 and 1997 alone, FARC has also committed many murders, including killing Americans. Compl. ¶¶ 180-82. During the period relevant to this action, FARC held significant influence over, controlled, or was fighting other terrorist organizations for control of labor unions

in Colombia's banana growing regions. Compl. ¶¶ 179, 198. On October 8, 1997, the U.S. Secretary of State designated FARC a Foreign Terrorist Organization ("FTO"), a designation that still remains today. This designation was based in part on the U.S. Department of State's conclusion that FARC committed "bombings, murder, kidnaping, extortion, hijacking, as well as terrorist and conventional military action against Colombian political, military and economic targets." Compl. ¶ 185. At the same time, the European Union and Colombian governments also designated FARC as a terrorist organization. Compl. ¶ 183-85.

FARC kidnaped, held hostage, demanded ransom for, and ultimately murdered Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Stephen Welsh and Timothy Van Dyke, American citizens who were members of Plaintiff New Tribes Mission ("NTM"), an international Christian missionary organization. Compl. ¶¶ 1, 11-14. Within a month of the kidnapings, FARC terrorists contacted NTM and demanded a $3,000,000.00 ransom for the men's safe return. Compl. ¶ 144. The families did not pay the ransom, nor did they agree or negotiate to pay any ransom. Compl. ¶ 146. On June 19, 1995, the men were killed by the FARC's 53rd Front near Cundinamarca, Colombia, during a firefight with a Colombian army unit. Compl. ¶ 147. Evidence, including eyewitness testimonies collected by the Colombian National Prosecutor and the U.S. Attorney General's Office, confirmed that FARC had executed the men. Compl. ¶¶ 147-48. On February 7, 2007, the Colombian National Prosecutor's Office released a report concluding that all five missionaries were kidnaped, held hostage, and eventually murdered by FARC. Compl. ¶ 171.

Chiquita is a multinational corporation incorporated in New Jersey and headquartered in Cincinnati, Ohio. Compl. ¶ 44. Chiquita produces, markets, and distributes bananas and other

5

fresh produce. Compl. ¶ 46.  Chiquita is one of the largest banana producers in the world and is a major supplier of bananas throughout North America and Europe. Compl. ¶ 46.  It has operations throughout the world, including in Colombia, where it operated through its wholly-owned subsidiary, C.I. Bannanos de Exportacion, S.A. ("Banadex") until approximately May 2004. Compl. ¶ 44.  At all times relevant hereto, Banadex was Chiquita's controlled subsidiary, agent and/or alter ego. Compl. ¶ 45. At all relevant times, Chiquita had over 200 farms in Colombia dedicated to banana production. Compl. ¶ 48.

From 1989 through at least 1997, Chiquita knowingly and intentionally made numerous and substantial secret payments to FARC, and also provided FARC with weapons, ammunition and other supplies through its transportation contractors.  Chiquita did so knowing, or consciously avoiding, the fact that FARC was a violent terrorist organization. Compl. ¶ 191. Chiquita's payments to FARC, which began as cash at FARC's request, escalated into regular monthly payments ranging from $20,000.00 to $100,000.00.  Over time, the payments were fixed to a percentage of Banadex's gross revenues, with as much as ten percent being diverted to FARC. Compl. ¶ 192.

Chiquita went to great lengths to hide its relationship with FARC.  Compl. ¶¶ 191-96. The payments were often delivered by a former American military pilot known as "Kaiser," who held a management position with Chiquita in Colombia. Compl. ¶ 193.  In order to conceal the payments, Chiquita placed false names and non-existent employees on its payroll, providing the funds on local paydays to regional FARC commanders. Compl. ¶ 194.  Chiquita also assisted and/or advised FARC terrorists on how to create front organizations, enabling Chiquita to continue to channel funds to FARC and to mislead law enforcement, regulators, auditors, and

6

anyone else who might examine Chiquita and Banadex's books and records. Compl. ¶ 195. Chiquita also drew up fictitious contracts with legitimate operating organizations or, alternatively, overvalued existing contracts it maintained with such organizations. This was done for the express purpose of hiding its secret payments to FARC. Compl. ¶ 194-96.

Chiquita also worked with FARC-controlled labor unions, such as Sintrabanano, as another means of channeling payments to FARC. Compl. ¶ 197. Chiquita also collaborated with FARC and assisted FARC in subverting many local labor unions, and wresting control of local labor unions from other terrorist organizations. Compl. ¶¶ 198. In doing so, Chiquita anticipated and strived to obtain a competitive advantage over other banana growers facing less accommodating unions. Compl. ¶ 198. FARC also helped Chiquita by harassing its competitors in the region. Compl. ¶ 199. In addition, Chiquita funneled weapons to FARC (and assisted FARC in the transport of weapons) through Chiquita's local transportation contractors. Compl. ¶ 202.

On March 19, 2007, Chiquita pled guilty to violating U.S. anti-terrorism laws by funding another Colombian terrorist organization, the AUC. In so doing, Chiquita acknowledged that it had for years made payments to FARC as well. Compl. ¶¶ 201, 205. Chiquita admitted to using many tactics similar to those alleged above as a means of disguising and hiding its AUC payments. Later, in 2007, as part of the sentence imposed on it pursuant to the guilty plea, Chiquita agreed to pay a $25 million fine to the U.S. government. Compl. ¶ 206.

## II.  Legal Standard

A party may be relieved from a final judgment or order for a number of enumerated reasons, or for "any other reason that justified relief." Fed. R. Civ. P. 60(b). Relief under Rule

60(b)(6) is only available in extraordinary circumstances. Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1316 (11th Cir. 2000). Borrowing from a standard employed under Rule 59(e), which allows a court to alter or amend a judgment, a motion for reconsideration is appropriate where (1) an intervening change in controlling law has occurred, (2) new evidence has been discovered, or (3) there is a need to correct clear error or prevent a manifest injustice. Burger King Corp. v. Ashland Equities, Inc., 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002); Williams v. Cruise Ships Catering & Serv. Int'l, N.V., 320 F. Supp. 2d 1347, 1357-58 (S.D. Fla. 2004); Sussman v. Salem, Saxon & Nielsen, P.A., 153 F.R.D. 689, 694 (M.D. Fla. 1994). The moving party must set forth facts or law of a "strongly convincing nature" to induce the court to reverse a prior decision. Williams, 320 F. Supp. 2d at 1358.

### III.  Discussion

**1. Aiding and abetting under the ATA**

Chiquita argues that the decision of the Second Circuit in Rothstein v. UBS AG, 708 F.3d 82 (2d Cir. 2013) warrants reconsideration of this Court's decision to allow the claim for aiding and abetting violations of the ATA to proceed. The Court agrees.

In reaching the conclusion that aiding and abetting liability is recognized under the ATA, this Court primarily relied on several decisions of district courts within the Second Circuit in Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 583 (E.D.N.Y. 2005); Stutts v. De Dietrich Group, 03-CV-4058 (ILG), 2006 WL 1867060, at *5 (E.D.N.Y. 2006); Weiss v. Nat'l Westminster Bank PLC, 453 F. Supp. 2d 609, 621-22 (E.D.N.Y. 2006); and Strauss v. Credit Lyonnais, S.A., CV-06-0702 (CPS), 2006 WL 2862704, at *9 (E.D.N.Y. 2006). However, the Second Circuit overruled these cases by its decision in Rothstein. 708 F.3d at 97.

8

The Rothstein panel relied in part on the Supreme Court's decision in Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994). 708 F.3d at 97. In Central Bank, a decision in the Securities Exchange Act context, the Supreme Court held that no general presumption that a private cause of action for damages on a theory of aiding and abetting a statutory violation exists. 511 U.S. at 182. Additionally, the Rothstein panel noted that criminal sections of the ATA contain several express aiding and abetting provisions, but that section 2333 is silent in this respect. Therefore, the Second Circuit concluded that aiding and abetting liability was not available under section 2333 of the ATA. See also In re Terrorist Attacks on September 11, 2001, 714 F.3d 118, 123 (2d Cir. 2013) cert. denied, 134 S. Ct. 2870 (U.S. 2014).

Further, the only other Circuit Court to consider this issue seems to agree with the Second Circuit. In Boim v. Quranic Literacy Inst. and Holy Land Foundation For Relief And Development, 291 F.3d 1000 (7th Cir. 2002) (Boim I), a panel of the Seventh Circuit found that aiding and abetting civil liability was available under the ATA. 291 F. 3d at 1021. However, on *en banc* review the Seventh Circuit overturned this holding. Boim v. Holy Land Foundation for Relief and Development, 549 F.3d 685, 689 (7th Cir. 2008) (Boim III).[4]

Here, Plaintiffs are claiming civil aiding and abetting liability in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c),[5] and 2333(a). None of these provisions expressly provide for aiding and abetting liability. The Second Circuit's reasoning in Rothstein v. UBS AG, 708 F.3d 82, 97

---

[4]Boim III, nonetheless held that liability under the ATA can be extended to *secondary actors* by adopting a "chain of explicit statutory incorporations by reference" from §§ 2333(a) to 2331(1) to 2339A to 2332. See id. at 690-92.

[5]This section has been repealed.

(2d Cir. 2013) convinces this Court that Plaintiffs in this case may not recover on the theory of aiding and abetting violations of the ATA.[6] See also Abecassis v. Wyatt, CIV.A. H-09-3884, – F. Supp. 2d –, 2014 WL 988846, at *8 (S.D. Tex. 2014) (reconsidering a prior ruling regarding aiding and abetting liability under the ATA on the basis of Rothstein).

**2. Primary liability under the ATA**

Defendant argues that the intervening decisions of the Supreme Court in Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013) and Burrage v. United States, 134 S. Ct. 881 (2014) mandate dismissal of Plaintiffs' primary liability claims under the ATA. These decisions examine and interpret causation language of various federal statutes.

Under the ATA Plaintiffs have to show that they were injured "by reason of an act of international terrorism." 18 U.S.C.A. § 2333(a) (West). Chiquita argues that the aforementioned decisions demonstrate that Plaintiffs have to establish "but-for" causation, which Plaintiffs have not adequately pled. Plaintiffs assert that the Supreme Court's decision in Paroline v. United States, 134 S. Ct. 1710 (2014) demonstrates that "but-for" causation should not be required under the ATA. Also, Plaintiffs argue that a showing of proximate cause satisfies the causation element. The Court agrees with Plaintiffs.

---

[6]This Court also relied on Morris v. Khadr, 415 F.Supp.2d 1323, 1330 (D. Utah 2006). The issue before the Utah district court was whether a default judgment should be granted on the ATA claim against an individual who assisted al Qaeda financially as well as by encouraging his son to carry out the organization's terrorist purpose and whose son ultimately participated in a terrorist act which injured the plaintiffs. 415 F.Supp.2d at 1326, 1330. The court decided this in the affirmative. Id. at 1339. The decision of the Utah court, of course, is unaffected by Rothstein. However, the court in Morris relied on Boim I, which, subsequently to the Morris decision, was overturned on the issue of aiding and abetting liability under the ATA by the *en banc* decision of the Seventh Circuit in Boim III. Thus, the persuasiveness of the Morris decision is insufficient to provide sole support for the conclusion that aiding and abetting liability is available under the ATA.

In <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517 (2013), the Supreme Court held that Title VII's antiretaliation provision, which makes it unlawful for an employer to take adverse employment action against an employee "because" of certain criteria, requires proof that the desire to retaliate was the "but-for" cause of the challenged employment action. 133 S.Ct. at 2528. "In the usual course, this standard requires the plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." <u>Id.</u> at 2525 (quoting Restatement of Torts § 9 (1934)). In reaching the conclusion that a showing of "but-for" causation is required of Title VII retaliation plaintiffs the Supreme Court relied in large part on the fact that when Congress amended Title VII to clarify that plaintiffs only had to show that race, color, religion, sex or nationality was a motivating factor in the employment action, Congress did not similarly amend the antiretaliation provision. <u>Id.</u> at 2528.

In <u>Burrage v. United States</u>, 134 S. Ct. 881 (2014), the Supreme Court was interpreting section 841 of Title 21, a sentence enhancement provision of the Controlled Substances Act, which applied when death or serious injury to the victim "result[ed] from" the use of the substance unlawfully distributed by the defendant. 134 S.Ct. at 885. The Supreme Court rejected the government's position that the sentencing enhancement applied even when the illegally distributed substance was a contributing cause of the death, and held that the language "results from" imposed a requirement of "but-for" causation. <u>Id.</u> at 891-92.

In <u>Paroline v. United States</u>, 134 S. Ct. 1710 (2014), the issue before the Supreme Court was whether 18 U.S.C. § 2259, a criminal statute, limits restitution to those losses proximately cause by the defendant's offense conduct. 134 S.Ct. at 1719. The Supreme Court interpreted the following language: "[t]he burden of demonstrating the amount of the loss sustained by a victim

as a result of the offense shall be on the attorney for the Government." 134 S.Ct. at 1719 (quoting 28 U.S.C. § 3664(e)). The Supreme Court found that the government had to show proximate causation. Id. at 1722. Paroline involved criminal defendants found guilty of possessing child pornography, and the child victim who sought restitution for the substantial injuries she had suffered as a result of being depicted in the pornographic images. Id. at 1717. Defendants were possessors of the images that were widely available on the internet, and the victim had no knowledge of the defendants. Id. at 1722-23. Accordingly, a showing of "but-for" causation, which is the traditional method of proving causation, could not have been made. Id. The Supreme Court rejected the argument that a different multiple causation standard developed in tort law may be imported into the criminal arena. Id. at 1723-24. However, denying restitution would have been contrary to the penological purpose of § 2259, and the Paroline Court held that adopting a causal standard so strict as to undermine congressional intent would be unacceptable. Id. at 1727. In light of the competing interests, the Supreme Court said that restitution should be ordered "in an amount that comports with the defendant's relative role in the causal process that underlines the victim's general losses." Id.

With respect to the causation element of the ATA, the Rothstein panel found that a causation standard less than proximate cause will not satisfy the requirement, and implied that "but-for" causation is also required. Rothstein v. UBS AG, 708 F.3d 82, 95-96 (2d Cir. 2013). In a subsequent decision the Second Circuit re-affirmed that proximate causation is required. In re Terrorist Attacks on September 11, 2001, 714 F.3d 118, 124 (2d Cir. 2013) cert. denied, 134 S. Ct. 2870 (U.S. 2014). The Second Circuit also stated that provision of routine banking services to organizations and individuals said to be affiliated with al Qaeda, which was alleged

12

by plaintiffs in In re Terrorist Attacks on September 11, 2001, did not proximately cause the September 11, 2001 attacks or plaintiffs' injuries.  Id.

In contrast here, Plaintiffs allege that FARC, established in 1964 by the Colombia Communist Party as its "military wing," is Colombia's largest rebel group and has committed thousands of ransom kidnapings in Colombia.  Compl. ¶¶ 173, 174, 176, 180.  In addition to kidnaping twenty-three Americans between 1994 and 1997 alone, FARC has also committed many murders, including killing Americans.  Compl. ¶¶ 180-82.  Further, Plaintiffs allege that Chiquita knowingly and intentionally supplied secret monthly payments of between $20,000 and $100,000 to FARC over an eight-year period beginning in 1989 (four years before the first kidnaping at issue), and continuing through at least 1997, knowing, or consciously avoiding, the fact that FARC was a violent terrorist organization. Compl. ¶ 191-92.  Over time, the payments were fixed to a percentage of Banadex's gross revenues, with as much as ten percent of its gross revenue being diverted to FARC. Compl. ¶ 192.  Plaintiffs also allege that Chiquita supplied FARC with weapons, ammunition and other supplies through its transportation contractors. Compl. ¶ 191.  Plaintiffs agree that they have to show proximate causation.  This Court has already ruled that the aforementioned allegations of the Amended Complaint are sufficient for this purpose.

Neither Nassar nor Burrage mandate reconsideration of this ruling.  Neither case interpreted the ATA.  Also, in Burrage the Supreme Court noted that statutory language "results from" is regularly read to require "but-for" causation *"where there is no textual or contextual indication to the contrary*." 134 S. Ct. at 888 (emphasis added).  By enacting the ATA Congress criminalized providing material support to terrorists and provided a cause of action for any

person injured by reason of an act of international terrorism. 18 U.S.C.A. §§ 2333, 2339A (West). If Plaintiffs in this case, who allege that Chiquita supplied a group that had been known to harm Americans and that was designated as a terrorist organization by the State Department with funds and weapons, cannot state a claim, it is absolutely unclear what fact pattern would ever satisfy the requirements. Additionally, Plaintiffs have sufficiently alleged proximate cause. Therefore, no reconsideration of this Court's prior ruling on the issue of causation is warranted. See Paroline v. United States, 134 S. Ct. 1710, 1727 (2014) ("It would be unacceptable to adopt a causal standard so strict that it would undermine congressional intent where neither the plain text of the statute nor legal tradition demands such an approach").

The ATA Plaintiffs may proceed with discovery. Within 30 days from the date of this Order, the ATA Plaintiffs and Defendant shall confer and file a proposed discovery schedule.

### IV. Conclusion

Accordingly, Defendants' Motion for Reconsideration of the Court's Order Denying Defendants' Motion to Dismiss (DE 627) is **GRANTED IN PART AND DENIED IN PART**. Count I of the Amended Complaint is **DISMISSED**. The Motion for Reconsideration is denied in all other respects.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 6th day of January, 2015.

Copies furnished to:  
all counsel of record

KENNETH A. MARRA  
United States District Judge