# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-MD-01916 (Marra/Johnson)

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC. ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION

—————————————————————————/

This Document Relates to:

ATS ACTIONS

—————————————————————————/


## DEFENDANT CHIQUITA'S MOTION TO DISMISS
## UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6) AND FOR
## *FORUM NON CONVENIENS* AND INCORPORATED MEMORANDUM OF LAW

<u>**TABLE OF CONTENTS**</u>

**Page(s)**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    A.    Plaintiffs' Lawsuits. ...................................................................... 2

    B.    Developments in Colombia During the Pendency of the ATS Actions................. 7

ARGUMENT ......................................................................................................... 8

I.    Nearly All Claims Asserted By New Plaintiffs Against Chiquita In The District Of Columbia And New York Cases Are Barred By The Statutes Of Limitations. ........... 8

    A.    The Colombian Law Claims in the District of Columbia and New York Cases Are Subject to the Forum State's Statute of Limitations............................ 8

    B.    D.C. Law Bars Nearly All Claims Asserted By Plaintiffs Joined For The First Time In The *Does 1-144* Third Amended Complaint. ................................ 10

    C.    New York Law Bars All Claims By New Plaintiffs In The *Does 1-888* Complaint.......................................................................................... 11

    D.    The "Relation Back" Rule Does Not Apply To These Claims. ........................... 12

II.    Any And All Remaining Claims Against Chiquita In The ATS Actions Should Be Dismissed For *Forum Non Conveniens*. ................................................................. 16

    A.    Colombian Courts Are Both Available and Adequate......................................... 18

    B.    The Private Interest Factors Support Dismissal.................................................... 21

        1.    Relevant Evidence Will Be Far More Accessible if Plaintiffs' Claims Are Litigated in Colombia............................................................ 22

            a.    The Sources of Key Evidence Are Physically Located in Colombia.............................................................................. 24

            b.    It Would Be Substantially More Difficult—Perhaps Impossible—to Access Key Evidence if Plaintiffs' Claims Were Litigated in the United States Rather Than in Colombia.............................................................................. 28

        2.    Litigating These Claims in a Single Forum Will Promote Efficiency and Ensure Consistency. ........................................................ 32

i

3.      Chiquita's Inability to Implead Third Party Defendants in the
United States Strongly Favors Dismissal.................................................. 33

4.      Questions Concerning the Enforceability of Judgment Supports
Dismissal in Favor of the Colombian Forum............................................. 35

C.      The Public Interest Factors—To The Extent Even Relevant—Also Support
Dismissal in Favor of a Colombian Forum........................................................... 36

1.      Colombia Has a Far Greater Interest in This Litigation. ......................... 36

2.      This Litigation Will Impose a Greater Burden on the U.S. Judicial
System Than on Colombian Courts. ......................................................... 37

3.      Principles of International Comity Weigh in Favor of Dismissal............. 38

4.      Plaintiffs' Assertion of Colombian Law Claims Favors Dismissal .......... 40

D.      No Plaintiff Can Make a Particularized Showing of a Specific Risk to His
or Her Personal Safety From Litigating These Claims in Colombia.................... 41

CONCLUSION.................................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*,
    62 F.3d 1454 (D.C. Cir. 1995) ........................................................................9

*In re Alcon S'holder Litig.*,
    719 F. Supp. 2d 263 (S.D.N.Y. 2010)...........................................................33

*Aldana v.Del Monte Fresh Produce, N.A.*,
    578 F.3d 1283 (11th Cir. 2009) ..............................................................*passim*

*Allarcom Pay Television, LTD v. Home Box Office, Inc.*,
    210 F.3d 381, 2000 WL 6058 (9th Cir. 2000) (unpublished)........................17

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
    994 F.2d 996 (2d Cir. 1993)...........................................................................33

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974)........................................................................................10

*Aracruz Trading Ltd. v. Japaul Oil & Maritime Servs. PLC.*,
    No. 08 Civ. 3511, 2009 WL 667298 (S.D.N.Y. Mar. 16, 2009) ..................41

*Asher v. Unarco Material Handling, Inc.*,
    596 F.3d 313 (6th Cir. 2010) .........................................................................14

*In re Banco Santander Secs.–Optimal Litig.*,
    732 F. Supp. 2d 1305 (S.D. Fla. 2010) .....................................................*passim*

*Barboza v. Drummond Co.*
    No. 0:06-cv-61527, slip op. (S.D. Fla. July 17, 2007)...................41, 45, 46

*Bautista v. Cruise Ships Catering & Serv. Int'l, N.V.*,
    350 F. Supp. 2d 987 (S.D. Fla. 2003) .......................................................21, 28

*In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*,
    995 F. Supp. 2d 291 (S.D.N.Y. 2014)...........................................................10

*BFI Grp. Divino Corp. v. JSC Russian Aluminum*,
    247 F.R.D. 427 (S.D.N.Y. 2007) ..................................................................41

*Bloom v. Alvereze*,
    498 F. App'x 867 (11th Cir. 2012) ................................................................15

*Cardona v. Chiquita Brands Int'l, Inc.*,
760 F.3d 1185 (11th Cir. 2014) .......................................................................6, 7, 8

*Cliff v. Payco Gen. Am. Credits, Inc.*,
363 F.3d 1113 (11th Cir. 2004) ............................................................................14, 15

*Diaz v. Aerovias Nacionales de Colombia, S.A.*,
No. 90 Civ. 1215, 1991 WL 35855 (S.D.N.Y. Mar. 12, 1991) ............................................21

*Doe v. Drummond Co., Inc.*,
No. 2:09-cv-01041, slip op. (N.D. Ala. Apr. 30, 2010)..........................................................43

*Doe v. Drummond Co., Inc.*,
No. 2:09-cv-01041, slip op. (N.D. Ala. Nov. 9, 2009) ................................................41, 43, 44

*DTEX, LLC v. BBVA Bancomer, S.A.*,
508 F.3d 785 (5th Cir. 2007) .................................................................................30

*Ford v. Brown*,
319 F.3d 1302 (11th Cir. 2003) ..................................................................... *passim*

*Gaudreau v. Am. Promotional Events, Inc.*,
511 F. Supp. 2d 152 (D.D.C. 2007)..........................................................................10

*Grp. GC Builders v. Cahaba Disaster Recovery, LLC*,
534 F. App'x 826 (11th Cir. 2013) ............................................................................25

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947)...................................................................................22, 31, 38

*Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*,
704 F.3d 927 (11th Cir. 2013) ..................................................................................9

*Iragorri v. Int'l Elevator, Inc.*,
203 F.3d 8 (1st Cir. 2000)...................................................................................21, 30

*King v. Cessna Aircraft Co.*,
562 F.3d 1374 (11th Cir. 2009) ...............................................................................36

*Kiobel v. Royal Dutch Petroleum Co.*,
133 S. Ct. 1659 (2013)..........................................................................................6

*La Seguridad v. Transytur Line*,
707 F.2d 1304 (11th Cir. 1983) ...............................................................................36

*Lelieve v. Orosa*,
No. 10-23677-CIV, 2011 WL 5103949 (S.D. Fla. Oct. 27, 2011) ....................................14, 15

iv

*Leon v. Millon Air, Inc.*,
   251 F.3d 1305 (11th Cir. 2001) ...............................................................................17, 19, 20

*Lisa, S.A. v. Gutierrez Mayorga*,
   441 F. Supp. 2d 1233 (S.D. Fla. 2006) ...............................................................................28, 38

*Makro Capital of Am., Inc. v. UBS AG*,
   543 F.3d 1254 (11th Cir. 2008) ...............................................................................13, 14

*Manders v. Lee*,
   *338* F.3d 1304 (11th Cir. 2003) ...............................................................................14

*Martinez v. Nalco Chem. Co., Ins.*,
   No. 88 C 7828, 1989 WL 75439 (N.D. Ill. June 27, 1989) ...................................................21

*Mohamad v. Palestinian Auth.*,
   ___ U.S. ___, 132 S. Ct. 1702 (2012) ...............................................................................6

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014) ...............................................................................41

*Mujica v. Occidental Petroleum Corp.*,
   564 F.3d 1190 (9th Cir. 2009) ...............................................................................25

*Mujica v. Occidental Petroleum Corp.*,
   381 F. Supp. 2d 1134 (C.D. Cal. 2005) ...............................................................................25, 40, 41

*Nelson v. Cnty. of Allegheny*,
   60 F.3d 1010 (3d Cir. 1995) ...............................................................................15

*One Beacon Ins. Co. v. Electrolux*,
   223 F.R.D. 21 (D. Mass. 2004) ...............................................................................15

*Page v. Pension Ben. Guar. Corp.*,
   130 F.R.D. 510 (D.D.C. 1990) ...............................................................................15

*Paolicelli v. Ford Motor Co.*,
   289 F. App'x 387 (11th Cir. 2008) ............................................................................... *passim*

*Pappion v. Dow Chem. Co.*,
   627 F. Supp. 1576 (W.D. La. 1986) ...............................................................................15

*Penn Millers Ins. Co. v. United States*,
   472 F. Supp. 2d 705 (E.D.N.C. 2007) ...............................................................................14

*Perez-Lang v. Corporacion De Hoteles, S.A.*,
   575 F. Supp. 2d 1345 (S.D. Fla. 2008) ...............................................................................20

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ..................................................................................19, 20, 26

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  226 F.R.D. 456 (S.D.N.Y. 2005) ......................................................................35

*Republic of Colombia v. Diageo N. Am. Inc.*,
  531 F. Supp. 2d 365 (E.D.N.Y. 2007) ..............................................................21

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
  119 F.3d 935 (11th Cir. 1997) ..........................................................................17

*Satz v. McDonnell Douglas Corp.*,
  244 F.3d 1279 (11th Cir. 2001) ...................................................................28, 35

*Scottish Air Int'l, Inc. v. British Caledonan Grp., PLC*,
  81 F.3d 1224 (2d Cir. 1996)...............................................................................17

*Seguros Universales, S.A. v. Microsoft*,
  32 F. Supp. 3d 1242 (S.D. Fla. 2014) ...............................................16, 20, 23, 29

*Senger Bros. Nursery, Inc. v. E.I. du Pont de Nemours & Co.*,
  184 F.R.D. 674 (M.D. Fla. 1999)......................................................................10

*Senterfitt v. SunTrust Mortg., Inc.*,
  385 F. Supp. 2d 1377 (S.D. Ga. 2005)..............................................................14

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
  887 F. Supp. 1469 (N.D. Ala. 1995) .................................................................38

*Singletary v. Grupo Pinero*,
  No. 13–21124, 2014 WL 4471387 (S.D. Fla. Sept. 11, 2014)) ...................17, 35

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*,
  382 F.3d 1097 (11th Cir. 2004) ........................................................................22

*Snee v. Sunrise Props. Ltd.*,
  No. 06–80614, 2009 WL 2163179 (S.D. Fla. July 17, 2009)...........................20

*Son v. Kerzner Int'l Resorts Inc.*,
  No. 07-61171, 2008 WL 4186979 (S.D. Fla. Sept. 5, 2008) ...................35, 38, 40

*Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*,
  589 F.3d 417 (7th Cir. 2009) ............................................................................30

*Tazoe v. Airbus S.A.S.*,
  631 F.3d 1321 (11th Cir. 2011) ................................................................ *passim*

*TermoRio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*,
    421 F. Supp. 2d 87 (D.D.C. 2006) .......................................................................21

*Turedi v. Coca Cola Co.*,
    460 F. Supp. 2d 507 (S.D.N.Y. 2006).................................................................24

*Turedi v. Coca-Cola Co.*,
    343 F. App'x 623 (2d Cir. 2009) ........................................................................25

*Turner Entm't Co. v. Degeto Film GmbH*,
    25 F.3d 1512 (11th Cir. 1994) ............................................................................39

*U.S.O. Corp. v. Mizuho Holding Co.*,
    547 F.3d 749 (7th Cir. 2008) ..............................................................................39

*United States v. Chiquita Brands Int'l, Inc.*,
    No. 1:07-cr-055 (D.D.C. Sept. 24, 2007)...........................................................37

*United States v. Fernandez*,
    353 F. App'x 363 (11th Cir. 2009) .....................................................................31

*United States v. Llinas*,
    603 F.2d 506 (5th Cir.1979) ...............................................................................31

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964) ..............................................................................................9

*Vincent v. Money Store*,
    915 F. Supp. 2d 553 (S.D.N.Y. 2013).................................................................9

*In re W. Caribbean Crew Members*,
    632 F. Supp. 2d 1193 (S.D. Fla. 2009) ...................................................19, 21, 41

*Wayne v. Jarvis*,
    197 F.3d 1098 (11th Cir. 1999) ..........................................................................14

*Young v. Lepone*,
    305 F.3d 1 (1st Cir. 2002).....................................................................................15

**State Cases**

*Arrington v. Dist. of Columbia*,
    673 A.2d 674 (D.C. 1996) ...................................................................................13

*Carroll v. Motola*,
    109 A.D.3d 629 (N.Y. App. Div. 2013) .............................................................11

*Curtis v. Aluminum Ass'n*,
    607 A.2d 509 (D.C. 1992) (per curiam)..............................................................10

*Fazio Masonry, Inc. v. Barry, Bette & Led Duke, Inc.*,
    23 A.D.3d 748 (N.Y. App. Div. 2005) ...................................................................13

*Ins. Co. of N. Am. v. Hellmer*,
    212 A.D.2d 665 (N.Y. App. Div. 1995) .................................................................13

*Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*,
    142 A.D.2d 448 (N.Y. App. Div. 1988) .................................................................13

*Martin v. Julius Dierck Equip. Co.*,
    374 N.E.2d 97 (N.Y. 1978).....................................................................................9

*Perez v. Dole Food Co.*,
    No. BC412620, slip op. (S. Ct. Cal. Feb. 23, 2010) ............................................44

*Playford v. Phelps Mem'l Hosp. Ctr.*,
    254 A.D.2d 471 (N.Y. App. Div. 1998) .................................................................11

*Portfolio Recovery Assocs., LLC v. King*,
    927 N.E.2d 1059 (N.Y. 2010)..................................................................................9

*Rodriguez v. Cent. Parking Sys. of New York, Inc.*,
    848 N.Y.S.2d 807 (N.Y. App. Div. 2007) .............................................................11

*Schrank v. Lederman*,
    860 N.Y.S.2d 556 (N.Y. App. Div. 2008) .............................................................11

*Stewart-Veal v. Dist. of Columbia*,
    896 A.2d 232 (D.C. 2006) .....................................................................................13

**Statutes**

D.C. Code § 12–301.....................................................................................................10

D.C. Code § 16–2702...................................................................................................10

N.Y. Est. Powers & Trusts Law § 5-4.1 .....................................................................11

Torture Victims Protection Act (TVPA), 28 U.S.C. § 1350 note .......................... *passim*

**Rules**

D.C. Super. Ct. R. 15(C) .............................................................................................13

Fed. R. Civ. P. 12(b)(6)...............................................................................................17

Fed. R. Civ. P. 15(c) ............................................................................................ *passim*

Fed. R. Civ. P. 44(a)(2)...............................................................................................31

Fed. R. Evid. 902(3)................................................................................................................31

N.Y. C.P.L.R. § 214(5)...........................................................................................................11

N.Y. C.P.L.R. § 215................................................................................................................11

## <u>INTRODUCTION</u>

In November 2011, Chiquita moved to dismiss these cases for *forum non conveniens*. Before filing their response, plaintiffs in several of the ATS cases amended their complaints to name individual defendants for the first time. They also added thousands of new Colombian plaintiffs. The Court then stayed these cases and denied Chiquita's *forum non conveniens* motion as moot in light of the amended complaints, without prejudice to renewal following the disposition of Chiquita's interlocutory appeal. Having prevailed on that appeal, Chiquita now (i) moves to dismiss certain claims asserted by the new plaintiffs in two of the amended complaints as time-barred, and (ii) renews its *forum non conveniens* motion with respect to any and all remaining claims in all of the cases.

This Court noted long ago that these cases are about "foreign conduct against foreign citizens in the course of a foreign war." (Op. & Order at 89 (June 3, 2011) (D.E. 412) (hereinafter "MTD Order").)[1] All of the plaintiffs are Colombian, as are all of the perpetrators of the acts of violence alleged in the complaints. And now that all of plaintiffs' Alien Tort Statute ("ATS") and Torture Victim Protection Act ("TVPA") claims against Chiquita have been dismissed (*see* Order & Final Partial Judgment (Feb. 3, 2015) (D.E. 700)), the claims against Chiquita also involve solely the application of foreign law—the law of Colombia. There can be no real question that plaintiffs' claims that are not barred by the statute of limitations should be heard in Colombia.

As noted, after the Court observed at oral argument that the lack of any claims arising under domestic law would strengthen Chiquita's *forum non conveniens* motion, plaintiffs quickly

---

[1]      Unless otherwise specified, all docket-entry citations herein are to the MDL master docket in 0:08-md-01916-KAM (S.D. Fla.).

added individual defendants and asserted claims against them under U.S. law.  As set forth in the motions to dismiss filed by the individual defendants, however, the claims against them fail to state a cause of action.

Regardless of whether the complaints state a claim, however, and regardless of the jurisdiction under whose law the claims are asserted, it is an abuse of discretion under Eleventh Circuit precedent for a district court not to grant a *forum non conveniens* motion where, as here, the claims assert secondary liability for primary torts committed abroad.  *See Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003).  Colombia is the forum where essentially all of the key undiscovered evidence is physically located; Colombia is the only jurisdiction where other liable third parties can be held to account; and Colombia is the jurisdiction in which both the government and the public have a far greater interest in the subject of these lawsuits.  Chiquita therefore respectfully requests that this Court (i) dismiss certain claims described below on statute of limitations grounds and (ii) dismiss any and all of plaintiffs' remaining claims for *forum non conveniens.*

## BACKGROUND

### A.  Plaintiffs' Lawsuits.

Plaintiffs filed their first of the ATS Actions against Chiquita in the District of Columbia on June 7, 2007.  (*See* Compl., *Does 1-144 v. Chiquita Brands Int'l., Inc.*, No. 1:07-cv-1048 (D.D.C. June 7, 2007).)  Plaintiffs' claims against Chiquita arose out of payments by the company's Colombian subsidiary, Banadex, to the FARC and the AUC.  Plaintiffs alleged that they or their relatives were the victims of violence committed by the FARC or AUC, for which they sought damages from Chiquita under the ATS, the TVPA, state tort law, and Colombian tort law.

A week later, additional plaintiffs filed a second ATS Action against Chiquita in this Court.  (*See* Compl., *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-cv-60821 (S.D. Fla. June 14, 2007).)  Chiquita promptly moved to transfer the *Carrizosa* case to the District of Columbia.  (*See* Defs.' Mot. to Transfer Venue to the District of Columbia, No. 0:07-cv-60821 (S.D. Fla. July 24, 2007) (D.E. 9).)  The Court denied Chiquita's motion, finding, *inter alia*, that "[m]any witnesses and sources of proof relating to Plaintiffs' individual claims can and will only be found in Colombia," such that, from the standpoint of convenience, there was little difference among venues in the United States.  (*See* Op. & Order, No. 0:07-cv-60821, at 6-7 (Nov. 14, 2007) (D.E. 26).)  This Court also found that the facts relating to the proof of each individual claim would be more significant than any common issues relating to Chiquita's conduct, observing that as the case proceeds, "the specific factual claims of these Plaintiffs will predominate, and individual issues of causation will pervade the litigation."  (*Id*. at 7.)

By that point, plaintiffs had filed a class-action ATS Action against Chiquita in the District of New Jersey (*see* Class Action Compl., *Jane/John Does 1-7 v. Chiquita Brands Int'l., Inc.*, No. 2:07-cv-03406 (D.N.J. July 19, 2007)), and shortly thereafter filed another ATS Action against the company in the Southern District of New York (*see* Compl., *Juan/Juana Does 1-377 v. Chiquita Brands Int'l, Inc.*, No. 1:07-cv-10300 (S.D.N.Y. Nov. 14, 2007)).  Chiquita moved to centralize all of the ATS Actions for pre-trial proceedings under the MDL statute in November 2007.  The motion was granted on February 20, 2008, and all of the ATS Actions were transferred to this Court.  (Transfer Order at 2 (Feb. 20, 2008) (D.E. 1).)  A fifth ATS Action was then filed against Chiquita in this Court in May 2008.  (*See* Compl., *López Valencia v. Chiquita Brands Int'l, Inc.*, No. 9:08-cv-80508 (S.D. Fla. May 14, 2008).)

Since then, the number of plaintiffs in the ATS Actions has ballooned through a series of additional complaints and *seriatim* amendments to preexisting complaints, in response to each of which Chiquita challenged this Court's subject matter jurisdiction.  Chiquita moved to dismiss the first two ATS Actions before the MDL transfer.  In June 2008, after the cases were centralized, Chiquita filed a consolidated motion to dismiss the other three ATS Actions.  That motion was fully briefed by September 2008, and this Court heard oral argument on all of the pending motions to dismiss in February 2009.  In February 2010, however—two and one-half years after the initial complaints in each action were filed, and before the Court could rule on Chiquita's motions to dismiss—plaintiffs in all five cases amended their complaints.[2]  Over the next two months, hundreds more plaintiffs joined together to file two more ATS Actions against Chiquita.  (*See* Compl., *Does 1-976 v. Chiquita Brands Int'l, Inc.*, No. 1:10-cv-00404 (D.D.C. Mar. 9, 2010) (D.E. 3); Compl., *Montes v. Chiquita Brands Int'l, Inc.*, No. 0:10-cv-60573 (S.D. Fla. Apr. 14, 2010) (D.E. 1).)  This raised the total number of ATS Actions to seven.

Chiquita again moved to dismiss all of the lawsuits then pending for lack of subject matter jurisdiction and for failure to state a claim.[3]  While the Court considered this new round of briefing, hundreds more plaintiffs joined together in yet two more ATS Actions in March 2011, bringing the total number of lawsuits to nine and the total number of plaintiffs to over 4,000.  (*See* Compl., *Does 1-677 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80404 (S.D. Fla.

---

[2]   First Am. Compl., *Does 1-144 v. Chiquita Brands Int'l., Inc.*, No. 9:08-cv-80465 (Mar. 2, 2010) (D.E. 58); First Am. Compl., *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 0:07-cv-60821 (Feb. 26, 2010) (D.E. 84); First Am. Class Action Compl., *Does 1-11 v. Chiquita Brands Int'l., Inc.*, No. 9:08-cv-80421 (Feb. 26, 2010) (D.E. 63); Fifth Am. Compl., *Does 1-747 v. Chiquita Brands Int'l, Inc.*, No. 9:08-cv-80480 (Feb. 26, 2010) (D.E. 64); Second Am. Compl., *Valencia v. Chiquita Brands Int'l*, No. 9:08-cv-80508 (Feb. 26, 2010) (D.E. 59).

[3]   Defs.' Consolidated Mot. to Dismiss Am. Compls. (Apr. 9, 2010) (D.E. 295); Defs.' Consolidated Mot. to Dismiss Compls. (May 4, 2010) (D.E. 313).

Mar. 22, 2011) (D.E. 3); Compl., *Does 1-254 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80405
(S.D. Fla. Mar. 22, 2011) (D.E. 3).)

On June 3, 2011, the Court ruled on Chiquita's consolidated motions to dismiss the first
seven ATS Actions.  The Court dismissed plaintiffs' U.S. state law and Colombian law claims.
(MTD Order at 94-95.)  The Court also dismissed plaintiffs' ATS claims for material support to
a terrorist organization—the only claim premised on a theory of direct liability.  (*Id.* at 94.)  The
Court declined to dismiss the remaining ATS and TVPA claims, which asserted claims for
indirect liability.  (*Id.* at 95.)

In July 2011, Chiquita moved to certify the June 3rd Order for interlocutory appeal.
Plaintiffs cross-moved, among other things, for reconsideration of the Court's dismissal of the
Colombian law claims.  (Defs.' Mot. for Certification for Interlocutory Appeal (July 20, 2011)
(D.E. 454); Pls.' Mot. for Reconsideration (July 22, 2011) (D.E. 457).)  Chiquita then filed its
original *forum non conveniens* motion and asked the Court to rule on that motion before ruling
on Chiquita's certification motion.  (Defs.' Mot. to Dismiss for *Forum Non Conveniens* at 1
(Nov. 5, 2011) (D.E. 502).)  After suggesting at oral argument that it might be more inclined to
grant a motion to dismiss on *forum non conveniens* if only Colombian law claims remained in
the case, the Court granted Chiquita's certification motion.  (Hrg. Transcript 65:18-23 (Sept. 23,
2011) (D.E. 696-3, at 68, 72); Order Granting Defs.' Mot. for Certification of Interlocutory
Appeal (Mar. 27, 2012) (D.E. 518).)

In response to the Court's comment, plaintiffs filed yet another series of amended
complaints in five of the cases, adding individual defendants against whom they asserted TVPA

claims.[4]  The amended complaints also added thousands of new Colombian plaintiffs, bringing the total number of Colombian plaintiffs to over 6,000.  (*E.g.*, Seventh Am. Compl., *Does 1-888 v. Chiquita Brands Int'l, Inc.* ¶¶ 959-85 (Sept. 20, 2012) (D.E. 557) (hereinafter "*Does 1-888* Seventh Am. Compl."); *Does 1-144* TAC ¶¶ 391-2031 (D.E. 575).)  The Court then stayed the cases and denied Chiquita's *forum non conveniens* motion without prejudice pending Eleventh Circuit review.  (Order (Nov. 13, 2012) (D.E. 587); Endorsed Order (Aug. 20, 2013) (D.E. 635).)

On July 24, 2014, the Eleventh Circuit dismissed all of the ATS and TVPA claims against Chiquita.  *Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185 (11th Cir. 2014).  The Eleventh Circuit ruled that under the Supreme Court's intervening decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), the district court lacked jurisdiction over the ATS claims against Chiquita because "[a]ll the relevant conduct in our case took place outside the United States."  *Cardona*, 760 F.3d at 1189.  The court dismissed the TVPA claims in light of the Supreme Court's holding that a corporation cannot be liable under the TVPA.  *See Mohamad v. Palestinian Auth.*, ___ U.S. ___, 132 S. Ct. 1702 (2012).  Plaintiffs' subsequent petitions for a panel rehearing and for rehearing *en banc* were denied.  On January 6, 2015, the Eleventh Circuit issued its mandate directing dismissal of the ATS and TVPA claims against Chiquita and leaving plaintiffs' Colombian law claims as the only claims remaining against Chiquita.  *Cardona*, 760 F.3d at 1187; (Mandate of the Eleventh Cir. (Jan. 7, 2015) (D.E. 693)).

---

[4]     *See* Pls.' Mots. to Amend Compls. (May 2012) (D.E. 535-38, 541-42); Third Am. Compl., *Montes v. Chiquita Brands Int'l, Inc.*, at 27 (Sept. 20, 2012) (D.E. 558) (hereinafter "*Montes* TAC"); Third Am. Compl., *Does 1-144 v. Chiquita Brands Int'l, Inc.*, ¶ 1 (Sept. 24, 2012) (D.E. 575) (hereinafter "*Does 1-144* TAC"); Third Am. Compl., *Valencia v. Chiquita Brands Int'l, Inc.*, at 1 (Sept. 26, 2012) (D.E. 576) (hereinafter "*Valencia* TAC"); Second Am. Compl., *Does 1-11 v. Chiquita Brands Int'l, Inc.*, at 1 (Nov. 16, 2012) (D.E. 589) (hereinafter "*Does 1-11* SAC"); Third Am. Compl., *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-cv-60821, at 1 (S.D. Fla. Dec. 10, 2012) (D.E. 186) (hereinafter "*Carrizosa* TAC").

**B.      Developments in Colombia During the Pendency of the ATS Actions.**

During the course of these proceedings in the United States, there have been simultaneous developments in Colombia that underscore why plaintiffs' claims that are not otherwise time-barred should be heard in Colombia.

*First*, *tens of thousands* of Colombian citizens have registered with Colombian authorities as victims and are demanding redress from former AUC members through the government-sponsored Justice & Peace process.  These victims are participating in this process in their own names.  (*See* Decl. of Francisco Javier Tamayo Jaramillo ¶¶ 54-61 (hereinafter "Tamayo Decl.") (attached hereto as Exhibit 1).)  The significant progress that has been made in Colombia toward justice for victims of Colombia's past violence—progress that has continued apace since Chiquita's last *forum non conveniens* motion more than three years ago—is discussed extensively in the accompanying Declaration of Michael Shifter (hereinafter "Shifter Decl."), a nationally-recognized expert on the Colombian conflict, the current President of the Inter-American Dialogue (the leading center in the United States for policy analysis, exchange, and communication on Western Hemisphere affairs), and a member of the advisory board of Human Rights Watch/Americas.  The Justice & Peace process—praised by the U.S. State Department—exists precisely so the victims of paramilitary violence can seek answers and reparations directly from the perpetrators in Colombia and so that the Colombian people can move towards national reconciliation.  (*See* Shifter Decl. ¶¶ 24, 34 (attached hereto as Exhibit 2).)

*Second*, approximately 1,700 alleged victims of the AUC have now taken steps to commence civil litigation against Chiquita in Colombia based on Banadex's payments to the AUC—nearly 700 more alleged victims than when Chiquita filed its original *forum non conveniens* motion in November 2011.  These legal proceedings against Chiquita are described

in the attached Declarations of (i) José Miguel De la Calle Restrepo, Chiquita's civil litigation counsel in Colombia, and (ii) Francisco Javier Tamayo Jaramillo, a prominent Colombian lawyer and author of the leading treatise on Colombian civil practice.  Notably, and like the victims seeking redress through the Justice & Peace process, each and every potential claimant against Chiquita who has initiated these proceedings in Colombia has identified him or herself by name and by personal identification number (Tamayo Decl. ¶¶ 50-52; Decl. of José Miguel de la Calle Restrepo ¶¶ 9-11 (hereinafter "De la Calle Decl.") (attached as Exhibit 3)), and Chiquita is unaware that any of these claimants has suffered any repercussions as a result.  Chiquita has retained Colombian counsel and made its initial appearance in Colombia in response to these demands.  (De la Calle Decl. ¶¶ 9-11.)  In addition, certain plaintiffs have also filed civil claims as part of an ongoing criminal investigation in Colombia of certain former Banadex employees concerning Banadex's payments to the AUC.  (*See* De la Calle Decl. ¶ 11; Tamayo Decl. ¶ 53.)

## ARGUMENT

I.   **NEARLY ALL CLAIMS ASSERTED BY NEW PLAINTIFFS AGAINST CHIQUITA IN THE DISTRICT OF COLUMBIA AND NEW YORK CASES ARE BARRED BY THE STATUTES OF LIMITATIONS.**

    A.   **The Colombian Law Claims in the District of Columbia and New York Cases Are Subject to the Forum State's Statute of Limitations.**

The Eleventh Circuit has effectively held that the only potentially viable claims remaining against Chiquita in the ATS Actions are those asserted under Colombian law.  *See Cardona*, 760 F.3d at 1189-92.  As explained below, the claims asserted in lawsuits filed in the District of Columbia and New York are subject to those jurisdictions' statutes of limitations. Under the District of Columbia and New York statues of limitations, the new plaintiffs' Colombian law claims are time-barred, even if the running of the limitations period was tolled

until Chiquita's criminal plea was publicly announced.  The vast majority of the new plaintiffs'
claims in these cases must therefore be dismissed.

Where a federal court's jurisdiction sounds in diversity, "the choice-of-law rules of the
forum state determine what law governs."  *Interface Kanner, LLC v. JPMorgan Chase Bank,
N.A.*, 704 F.3d 927, 932 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 175 (2013).  In an MDL action,
the forum state is the state from which the case was transferred.  *See Van Dusen v. Barrack*, 376
U.S. 612, 639 (1964) (transferee court is "obligated to apply the state law that would have been
applied if there had been no change of venue").  Thus, in determining the law that applies to
plaintiffs' Colombia law claims in the District of Columbia and New York cases, this Court must
look to choice-of-law rules in those jurisdictions.

Both D.C. and New York treat statutes of limitations as procedural, rather than
substantive.  Both jurisdictions therefore apply their own statute of limitations, regardless of
which jurisdiction's law governs the substantive cause of action.  *See A.I. Trade Fin., Inc. v.
Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) ("Looking to the D.C. choice-of-
law rules, we see that they treat statutes of limitations as procedural, and therefore almost always
mandate application of the District's own statute of limitations."); *Vincent v. Money Store*, 915 F.
Supp. 2d 553, 568-69 (S.D.N.Y. 2013) ("Under New York law, 'statutes of limitations are
considered procedural,' and 'it has generally been held that the [s]tatute of [l]imitations of the
forum rather than that of the jurisdiction where the cause of action accrued governs the
timeliness of a cause of action[.]'") (quoting *Portfolio Recovery Assocs., LLC v. King*, 927
N.E.2d 1059, 1061 (N.Y. 2010) and *Martin v. Julius Dierck Equip. Co.*, 374 N.E.2d 97, 99 (N.Y.
1978)).

**B.**     **D.C. Law Bars Nearly All Claims Asserted By Plaintiffs Joined For The First Time In The *Does 1-144* Third Amended Complaint.**

Under D.C. law, Plaintiffs' claims for assault and battery are subject to a one-year statute of limitations.[5]  D.C. Code § 12–301(4).  Plaintiffs' claims for wrongful death are subject to a two-year statute of limitations.[6]  D.C. Code § 16–2702.  The limitations period for their remaining claims of negligence, negligent hiring, negligent supervision, and intentional infliction of emotional distress are not specifically prescribed by statute and are therefore subject to D.C.'s general three-year statute of limitations.[7]  *See* D.C. Code § 12–301(8); *Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152, 157 (D.D.C. 2007) ("[T]he D.C. Code provides for a three-year limitations period for all causes of action 'for which a limitation is not otherwise specially prescribed' by statute.") (citations omitted).

Because three years is the longest limitations period available under D.C. law for any of plaintiffs' remaining claims—and even if the limitations period for plaintiffs' claims was tolled until March 19, 2007, as the D.C. plaintiffs have alleged in their complaint[8]—all of those plaintiffs' Colombian law claims were time-barred by March 19, 2010.  Thus, all claims asserted

---

[5]     *Does 1-144* TAC ¶¶ 2314–21 (D.E. 575).

[6]     *Id.* at ¶¶ 2275–84.

[7]     *Id.* at ¶¶ 2285–2313.

[8]     *Id.* at ¶ 10 (D.E. 575) ("Plaintiffs were unaware of Chiquita's support of the FARC, other leftist guerrilla groups, and AUC until shortly after Chiquita's guilty plea in March of 2007."). We note that "cross-jurisdictional" tolling, under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), is not permitted in the ATS Actions simply because the New Jersey lawsuit is a purported class action.  *Doe 1-11* SAC ¶¶ 230-43 (D.E. 589).  The *American Pipe* doctrine does not apply to state law claims (or here, Colombian law claims) "brought in federal court on diversity of citizenship."  *Senger Bros. Nursery, Inc. v. E.I. du Pont de Nemours & Co.*, 184 F.R.D. 674, 682 (M.D. Fla. 1999).  In any event, even if the cross-jurisdictional tolling were governed by state law and not by federal law, neither District of Columbia nor New York courts have recognized the doctrine.  *Curtis v. Aluminum Ass'n*, 607 A.2d 509, 509–10 (D.C. 1992) (per curiam); *In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 311-12 (S.D.N.Y. 2014).

by the additional 1,970 plaintiffs who joined Plaintiffs' Third Amended Complaint in *Does 1-144*, filed on September 24, 2012, must be dismissed.

In addition, all Colombian law claims alleging assault and battery and wrongful death that were asserted by the 102 plaintiffs first joined in the First Amended Complaint in *Does 1-144* are also time-barred.[9]  These claims are subject to one- and two-year statutes of limitations, which expired no later than March 19, 2008 and March 19, 2009, respectively—well before the First Amended Complaint was filed on March 2, 2010.

### C.  New York Law Bars All Claims By New Plaintiffs In The *Does 1-888* Complaint.

Under New York law, plaintiffs' battery claims are subject to a one-year statute of limitations.[10]  N.Y. C.P.L.R. § 215.  Plaintiffs' wrongful death claims are subject to a two-year statute of limitations.[11]  N.Y. Est. Powers & Trusts Law § 5-4.1; *Carroll v. Motola*, 109 A.D.3d 629, 630 (N.Y. App. Div. 2013).  Plaintiffs' personal injury and loss of consortium claims are subject to a three-year statute of limitations.[12]  N.Y. C.P.L.R. § 214(5); *Schrank v. Lederman*, 860 N.Y.S.2d 556, 559 (N.Y. App. Div. 2008).  Plaintiffs' claims based on negligence are also subject to a three-year statute of limitations.[13]  *Rodriguez v. Cent. Parking Sys. of New York, Inc.*, 848 N.Y.S.2d 807, 809 (N.Y. App. Div. 2007); *Playford v. Phelps Mem'l Hosp. Ctr.*, 254 A.D.2d 471, 471 (N.Y. App. Div. 1998).

---

[9]     First Am. Compl., *Does 1-144 v. Chiquita Brands Int'l, Inc.*, ¶¶ 196-393 (Mar. 2, 2010) (D.E. 287).  Plaintiffs' Second Amended Complaint did not add plaintiffs.

[10]     *Does 1-888* Seventh Am. Compl. ¶¶ 1266–76 (D.E. 557).

[11]     *Id.* at ¶¶ 1258–65.

[12]     *Id.* at ¶¶ 1256–57, 1266–76.

[13]     *Id.* at ¶¶ 1251–55.

Because three years is the longest limitations period available under New York law for any of plaintiffs' claims, all claims brought after March 19, 2010 are time-barred.  Here, as of March 19, 2010, plaintiffs' operative complaint in *Does 1-888* was their Fifth Amended Complaint, filed on February 26, 2010, which named 747 plaintiffs.  (Fifth Am. Compl., *Does 1-747 v. Chiquita Brands Int'l, Inc.* (D.E. 283).)  Accordingly—and again accepting without conceding plaintiffs' tolling theory—all the claims asserted by the 159 plaintiffs added in the Sixth and Seventh Amended Complaints are time-barred.

In addition, all Colombian law claims alleging battery that were asserted by the 361 plaintiffs joined in the Second through Fifth Amended Complaints in *Does 1-888* are also time-barred.  These claims are subject to a one-year statute of limitations, which expired no later than March 19, 2008, and the Second through Fifth Amended Complaints were filed after that date.[14] Further, all Colombian law claims alleging wrongful death that were asserted by the 82 plaintiffs added in the Fifth Amended Complaint are also time-barred because these claims are subject to a two-year statutes of limitations, which expired no later than March 19, 2009, and the Fifth Amended Complaint was filed on February 26, 2010 (D.E. 283).

**D.    The "Relation Back" Rule Does Not Apply To These Claims.**

For the following reasons, none of the new plaintiffs in either *Does 1-144* or *Does 1-888* can invoke Federal Rule of Civil Procedure 15(c) to maintain their claims.

**Rule 15(c)(1)(A).**  Under this section of the rule, newly added plaintiffs can relate back to the filing of an earlier complaint only when allowed by the "law that provides the applicable statute of limitations."  Under New York law, "[a] new party plaintiff may relate its claim back

---

[14]    Second Am. Compl. (Mar. 27, 2008) (D.E. 35); Third Am. Compl. (June 6, 2008) (D.E. 72); Fourth Am. Compl. (Feb. 18, 2009) (D.E. 195); Fifth Am. Compl. (Feb. 26, 2010) (D.E. 283).

to an original complaint for statute of limitations purposes only if both claims arise out of the same transaction or occurrence and the new plaintiff and original plaintiff are so closely related or united in interest that the original claim would have given the defendant notice of the potential liability for the subsequent claim." *Fazio Masonry, Inc. v. Barry, Bette & Led Duke, Inc.*, 23 A.D.3d 748, 750 (N.Y. App. Div. 2005) (permitting relation back where "a parent or spouse has [amended] a complaint to add a derivative claim to a personal injury action"). The rule does not permit "'an entirely separate plaintiff [to] join[] in a pending action, in order to assert an otherwise time-barred claim . . . where to do so would increase the measure of liability to which the defendants are exposed.'" *Ins. Co. of N. Am. v. Hellmer*, 212 A.D.2d 665, 666 (N.Y. App. Div. 1995) (quoting *Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448, 459 (N.Y. App. Div. 1988)).

Here, the new plaintiffs in the New York case—*Does 1-888*—are not "closely related or united in interest" with the other plaintiffs. Their claims arise from separate tortious incidents, and would necessarily "increase the measure of liability" to which Chiquita is exposed.

**Rule 15(c)(1)(C)**. This section of the rule bars the new plaintiffs' claims from relating back in both the District of Columbia and New York.[15] Under *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254 (11th Cir. 2008), plaintiffs' claims may relate back to the filing of earlier complaints only if plaintiffs meet three conjunctive requirements: (i) the claims "meet the common transaction or occurrence test of Rule 15(c)(1)(B)," (ii) the defendant "received such

---

[15] The District of Columbia rule, D.C. Super. Ct. R. 15(C), is "identical to Rule 15(c) of the Federal Rules of Civil Procedure." *Stewart-Veal v. Dist. of Columbia*, 896 A.2d 232, 237 (D.C. 2006). "Since they are 'an adoption without modification of the corresponding federal rule, [they are] to be given the same meaning.'" *Id.* (quoting *Arrington v. Dist. of Columbia*, 673 A.2d 674, 680 n.6 (D.C. 1996))). Accordingly, the relation back analysis in the District of Columbia is the same as the federal rule.

13

notice of the action that it will not be prejudiced in defending on the merits," and (iii) the

defendant "knew or should have known that the action would have been brought against it, but

for a mistake" concerning the identity of a proper party. *Makro*, 543 F.3d at 1258.

For plaintiffs to satisfy the second prong, "the original complaint must have provided,"

within the limitations period, "adequate notice to the defendant 'not only of the substantive

claims being brought against [it], but also of the number and generic identities of the potential

plaintiffs who may participate in the judgment.'" *Senterfitt v. SunTrust Mortg., Inc.*, 385 F.

Supp. 2d 1377, 1380 (S.D. Ga. 2005) (quoting *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d

1113, 1133 (11th Cir. 2004)).  Finally, under Eleventh Circuit law, a "mistake" for purposes of

the third prong of Rule 15(c)(1)(C) is limited to amendments seeking "'to correct a formal defect

such as a misnomer or misidentification.'" *Wayne v. Jarvis*, 197 F.3d 1098, 1103 (11th Cir.

1999) (quoting Fed. R. Civ. P. 15(c)(3)), *overruled on other grounds by Manders v. Lee 338* F.3d

1304 (11th Cir. 2003); *Lelieve v. Orosa*, No. 10-23677-CIV, 2011 WL 5103949, at *4 (S.D. Fla.

Oct. 27, 2011) ("Lack of knowledge is not an 'error, a misnomer, or a misidentification' that

allows an amendment to fall within Rule 15(c)(1)(C)'s ambit.") (quoting *Wayne*, 197 F.3d at

1103).

None of the new plaintiffs in *Does 1-144* or *Does 1-888* can satisfy either the "mistake"

or "notice" requirement.  These plaintiffs' belated decisions to join the ATS Actions were not

due to a "mistake concerning the identity of the proper plaintiff." *Makro*, 543 F.3d at 1260; *see

also Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 319 (6th Cir. 2010) ("[T]he new

plaintiffs did not seek to correct a misnomer or misdescription of a proper party plaintiff already

in court."); *Penn Millers Ins. Co. v. United States*, 472 F. Supp. 2d 705, 716 (E.D.N.C. 2007)

(same).  "Nothing prevented [the new plaintiffs] from seeking" to timely join this action after

Chiquita entered its plea on March 19, 2007.  *Cliff*, 363 F.3d at 1132.  Indeed, the new plaintiffs "had ample time—the time dictated by the relevant statute plus the . . . period of time during which the statute was tolled—in which to file their claims" against Chiquita, yet "they failed to add their names to the complaint until after expiration of the statute of limitations" on March 19, 2010, and "[t]hey [cannot] demonstrate[] that this failure was due to mistake." *Nelson v. Cnty. of Allegheny*, 60 F.3d 1010, 1015 (3d Cir. 1995).  Because plaintiffs cannot show a Rule 15(c) mistake, there is no relation back.  *Lelieve*, 2011 WL 5103949, at *4.

As to the notice requirement, that other plaintiffs had sued Chiquita for other acts of violence committed by the FARC or the AUC is patently insufficient to put Chiquita on notice of the new plaintiffs' claims.  In fact, even if the relevant incident for these purposes was *not* the separate act of violence for which each plaintiff seeks relief, but instead was Chiquita's alleged approval of payments, Chiquita's "[k]nowledge of the underlying events that establish" the new plaintiffs' claims "is not the equivalent to knowledge" of the new plaintiffs' action.  *Bloom v. Alvereze*, 498 F. App'x 867, 874 (11th Cir. 2012).  As courts repeatedly have held, relation back is not available "'merely because [the] new plaintiff's claims arise from the same transaction or occurrence as the original plaintiff's claims.'"  *One Beacon Ins. Co. v. Electrolux*, 223 F.R.D. 21, 25 n.4 (D. Mass. 2004) (quoting *Young v. Lepone*, 305 F.3d 1, 15 (1st Cir. 2002)); *see also Page v. Pension Ben. Guar. Corp.*, 130 F.R.D. 510, 513 (D.D.C. 1990) ("[Plaintiffs'] argument is really another way of saying that where a new plaintiff's claims arise from the same transaction or occurrence, and nothing more, relation back should obtain.").  That is true even when the defendant knew of the additional plaintiffs' existence, which is nowhere alleged here.  *See Pappion v. Dow Chem. Co.*, 627 F. Supp. 1576, 1581 (W.D. La. 1986) ("Rule 15(c) will not allow a plaintiff to . . . add another prospective plaintiff, whose claim arises out of the same

transaction or occurrence . . . and whose claim would otherwise be time-barred, merely because the defendant had prior notice of the additional plaintiff's existence.").

Thus, because the new plaintiffs in the District of Columbia and New York cases cannot satisfy Rule 15(c), the following claims at a minimum are barred in those cases under the governing statutes of limitation:

(1) all Colombian law claims asserted by the 1,970 plaintiffs who were first named in the Third Amended Complaint in *Does 1-144*;

(2) the Colombian law claims alleging assault and battery and wrongful death that are asserted by the 102 plaintiffs who were first named in the First Amended Complaint in *Does 1-144*;

(3) all Colombian law claims asserted by the 159 plaintiffs in *Does 1-888* who were first named in the Sixth and Seventh Amended Complaints; and

(4) the Colombian law claims (i) for battery asserted by the 361 plaintiffs added in the Second through Fifth Amended Complaints in *Does 1-888*, and (ii) for wrongful death asserted by the 82 plaintiffs added in the Fifth Amended Complaint in that case.

A list of all such plaintiffs is attached hereto as Exhibit 4.

## II. ANY AND ALL REMAINING CLAIMS AGAINST CHIQUITA IN THE ATS ACTIONS SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS*.

Any remaining claims against Chiquita should be dismissed on *forum non conveniens* grounds.[16] Dismissal on *forum non conveniens* grounds is proper where, as here, "the

---

[16] As a threshold matter, a *forum non conveniens* motion can be brought at any time and is not waived by a defendant's decision not to raise the issue in its first responsive pleading. *See, e.g.*, *Seguros Universales, S.A. v. Microsoft*, 32 F. Supp. 3d 1242, 1248 n.4 (S.D. Fla. 2014) (granting defendant's *forum non conveniens* motion in favor of a Guatemalan court and noting that the Eleventh Circuit has affirmed *forum non conveniens* dismissals even when granted at "extremely late stages of litigation"). It is also well within this Court's discretion and entirely (continued...)

convenience of the parties and the court, and the interests of justice indicate that the action should be tried in another forum." *Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir. 2003) (citation and internal quotation marks omitted).

In determining whether to dismiss these cases for *forum non conveniens*, the Court must consider whether: "'(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice.'" *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1330 (11th Cir. 2011) (quoting *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1310-11 (11th Cir. 2001)); *see also Singletary v. Grupo Pinero*, No. 13–21124, 2014 WL 4471387, at *3 (S.D. Fla. Sept. 11, 2014) (Marra, J.) (dismissing on *forum non conveniens* grounds in favor of a Jamaican forum).

All of these factors overwhelmingly support dismissing plaintiffs' remaining claims in favor of litigating them in Colombia. *First*, as many other federal courts have held, Colombian courts without question provide an available and adequate forum. *Second*, Eleventh Circuit precedent compels a finding that the private interest factors favor litigating in Colombia, because the vast majority of relevant and undiscovered evidence is clearly located *in Colombia*. Litigating in Colombia will also promote efficiency and convenience by ensuring that all related

---

appropriate under the circumstances of these cases for this Court to dismiss some of plaintiffs' claims under Rule 12(b)(6) as time-barred before dismissing the remaining claims for *forum non conveniens*. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997) (dismissing RICO claims against certain defendants under Rule 12(b)(6) before dismissing remaining claims for *forum non conveniens*); *Scottish Air Int'l, Inc. v. British Caledonan Grp., PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996) ("[W]e reject plaintiffs' contention that a district court is precluded from ruling on one substantive issue and subsequently dismissing the action. *Forum non conveniens* is a doctrine that necessarily requires great flexibility. Depending upon the facts of the particular case, a district court may dismiss part of a lawsuit while deciding the merits of other issues.") (citations omitted); *Allarcom Pay Television, LTD v. Home Box Office, Inc.*, 210 F.3d 381, 2000 WL 6058, at *1 (9th Cir. 2000) (unpublished) ("Case law in this circuit and others holds that district courts have discretion to enter final judgment on some claims and dismiss the remainder for *forum non conveniens*.").

civil claims proceed in a single forum and allowing Chiquita to implead other responsible parties. *Third*, from a public interest standpoint, (i) Colombia has a far greater interest than does the United States in redressing, and its courts are far better equipped to resolve, grievances arising out of the past conduct of Colombian paramilitaries and guerillas, and (ii) in light of the Eleventh Circuit's decision, dismissal would relieve this and other U.S. courts of the burden of interpreting and applying substantive Colombian law. *Finally*, while some of these lawsuits generally assert that plaintiffs would face a security risk from prosecuting their claims in Colombia, none of the plaintiffs can make the particularized showing of a specific risk to his or her personal safety that would be necessary to outweigh the private and public interest factors that overwhelmingly support dismissal.

In fact, under *Ford*, it is an abuse of discretion to deny a *forum non conveniens* motion where, as here, the plaintiffs assert only secondary liability claims based on primary torts committed abroad. *Ford*, 319 F.3d at 1308. For the reasons set forth below, Chiquita's *forum non conveniens* motion should be granted as to all claims not otherwise dismissed as time-barred.

### A.   Colombian Courts Are Both Available and Adequate.

As the Eleventh Circuit has previously held, the alternative Colombian forum easily meets the requirements of "availability" and "adequacy." *See, e.g.*, *Paolicelli v. Ford Motor Co.*, 289 F. App'x 387, 391 (11th Cir. 2008) (affirming district court's finding that Colombia was an adequate and available forum, and was better suited than a U.S. court to entertain an action against the U.S. manufacturer and designer of allegedly defective automobile that crashed in Colombia, injuring Colombians).

Foreign courts are "available" as long as they "can assert jurisdiction over the litigation sought to be transferred," *Leon*, 251 F.3d at 1311, a requirement that is "[o]rdinarily   . . .

satisfied when the defendant is 'amenable to process' in the other jurisdiction," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981) (citation omitted). Here, as courts in this district previously have held, Colombian courts have personal jurisdiction over a foreign defendant for any allegedly wrongful act committed in Colombia or committed abroad if the acts have effects in Colombia. *See In re W. Caribbean Crew Members*, 632 F. Supp. 2d 1193, 1199-1200 (S.D. Fla. 2009) (concluding that Colombian law allows a Colombian "court situated where a tortious act [allegedly] occurred to exercise jurisdiction, regardless of the domicile or residence of the defendant" and noting that "Plaintiffs and their expert fail to produce any cases, articles or excerpts from treatises identifying instances where Colombian courts have denied jurisdiction to their own citizens who have suffered damages as a result of extra-territorial wrongful conduct"); (Tamayo Decl., ¶¶ 25-27, 67).

Furthermore, although not necessary to a finding that the Colombian courts are "available," Chiquita and all other defendants in these cases will (i) stipulate that they will not contest a Colombian court's jurisdiction to hear these claims by the plaintiffs, and (ii) as to each plaintiff whose claims are not barred by the applicable U.S. statute of limitations, toll any applicable Colombian statute of limitation from the date such plaintiff's claims were filed in the United States.[17] Chiquita will also agree to make witness testimony and documents located in the United States and under Chiquita's control available to a Colombian civil court. (Hall Decl. ¶ 2.) These stipulations would be sufficient to ensure the availability of the Colombian forum

---

[17]    Declaration of John E. Hall ¶ 2 (hereinafter "Hall Decl.") (attached hereto as Exhibit 5); *see also* Decl. of Fernando Aguirre ¶ 2 (attached hereto as Exhibit 6); Decl. of Cyrus Freidheim ¶ 2 (attached hereto as Exhibit 7); Decl. of Ann Wiles, Esq. ¶ 2, Ex. A (attached hereto as Exhibit 8); Decl. of Robert Kistinger ¶ 2 (attached hereto as Exhibit 9); Decl. of Keith Lindner ¶ 2 (attached hereto as Exhibit 10); Decl. of Robert Olson ¶ 2 (attached hereto as Exhibit 11); Decl. of William Tsacalis ¶ 2 (attached hereto as Exhibit 12); Decl. of Steven Warshaw ¶ 2 (attached hereto as Exhibit 13).

19

even if the defendants were not otherwise amenable to service of process there.  *See, e.g.*,

*Seguros Universales*, 32 F. Supp. 3d at 1249 ("The 'availability' prong is easily satisfied in this

case because Defendant has agreed to stipulate to the jurisdiction of the Guatemalan courts for

the purpose of defending itself against any claim for relief Plaintiffs may assert in that forum.");

*Snee v. Sunrise Props. Ltd.*, No. 06–80614, 2009 WL 2163179, at *5 (S.D. Fla. July 17, 2009);

*Perez-Lang v. Corporacion De Hoteles, S.A.*, 575 F. Supp. 2d 1345, 1349-1350 (S.D. Fla. 2008),

*aff'd*, 325 F. App'x 900 (11th Cir. 2009).

The Colombian courts are also an "adequate" forum.  In order to deem a foreign forum

adequate, courts require only that the forum "offer[] at least *some* relief."  *Leon*, 251 F.3d at

1311 (emphasis added); *see also Seguros Universales*, 32 F. Supp. 3d at 1249 ("The only

requirement for a forum to be 'adequate' is that it be able to grant *some* meaningful remedy.").

A forum is deemed inadequate only when the remedy it provides "'is so clearly inadequate or

unsatisfactory that it is *no remedy at all*.'"  *Tazoe*, 631 F.3d at 1330-31 (quoting *Piper Aircraft*,

454 U.S. at 254) (emphasis added); *see also Leon*, 251 F.3d at 1311.  Here, Colombian civil law

authorizes claimants to recover compensatory damages—including both economic damages and

"moral" damages, such as pain and suffering and emotional distress—from parties deemed to be

at fault for wrongful death and personal injuries inflicted by others.  (Tamayo Decl. ¶¶ 29-35.)

Plaintiffs will be able to obtain relief in Colombian courts if they are able to prove that Chiquita

bears responsibility or fault for the killings and injuries alleged in the ATS Actions.  Indeed,

Colombians are already asserting such claims against Chiquita in Colombia.  Approximately

1,700 Colombians have filed mediation demands against the company in Colombia for its

alleged role in aiding the violent acts of Colombian paramilitaries, as they are procedurally

required to do before commencing litigation under Colombian law.  (*Id.* at  ¶¶ 50-52; De la Calle

Decl. ¶¶ 9-10.)

For these reasons, there can be no serious question that the Colombian forum meets the

requirements of availability and adequacy, as *Paolicelli* and many other courts in this Circuit and

throughout the country have held.[18]

### B.     The Private Interest Factors Support Dismissal.

The Court must next weigh the "private" factors that address the parties' interests in

ensuring that the litigation is "easy, expeditious, and inexpensive" and does not create undue

"obstacles to fair trial."  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (superseded by

statute on other grounds, as explained in *American Dredging Co. v. Miller*, 510 U.S. 443, 449

n.2 (1994)).  The specific practical considerations that the Court should consider include (i) ease

of access to sources of proof and, relatedly, the availability of compulsory process for unwilling

---

[18]     *See, e.g.*, *Paolicelli v. Ford Motor Co.*, 289 F. App'x  387, 391 (11th Cir. 2008); *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 14 (1st Cir. 2000) (affirming the adequacy of a Colombian forum where "Colombian courts entertain wrongful death actions . . .  grant both pecuniary and moral damages in such suits  . . . and [the defendant] [i]s amenable to service of process"); *In re W. Caribbean Crew Members*, 632 F. Supp. 2d at 1201 (concluding that "Colombia [was] an available and adequate forum in which Plaintiffs [could] pursue their claims"); *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 405 (E.D.N.Y. 2007) ("As a preliminary matter, the court notes that, where Colombian courts have subject-matter jurisdiction over a matter and personal jurisdiction over the parties to a dispute, the Colombian courts have the procedures required to constitute an adequate alternative forum."); *TermoRio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87, 103 (D.D.C. 2006) (finding Colombian courts to be adequate fora), *aff'd*, 487 F.3d 928 (D.C. Cir. 2007); *Bautista v. Cruise Ships Catering & Serv. Int'l, N.V.*, 350 F. Supp. 2d 987, 991 (S.D. Fla. 2003) (holding that Colombian courts would provide a remedy and that "[t]he Court does not conclude that Colombian courts are incapable of providing their citizens with justice"), *aff'd*, 120 F. App'x 786 (11th Cir. 2004); *Diaz v. Aerovias Nacionales de Colombia, S.A.*, No. 90 Civ. 1215, 1991 WL 35855, at *1 (S.D.N.Y. Mar. 12, 1991) (rejecting arguments that "civil unrest" made Colombia an inadequate forum), *aff'd*, 948 F.2d 1276 (2d Cir. 1991) (table decision); *Martinez v. Nalco Chem. Co., Ins.*, No. 88 C 7828, 1989 WL 75439, at *4 (N.D. Ill. June 27, 1989) (dismissing on grounds of *forum non conveniens* and finding that "litigation of this matter in Colombia is appropriate").

witnesses and the costs of obtaining the attendance of willing witnesses, *id*.; (ii) any

inefficiencies caused by conducting parallel litigation in two forums, *In re Banco Santander*

*Secs.–Optimal Litig.*, 732 F. Supp. 2d 1305, 1338-39 (S.D. Fla. 2010), *aff'd sub nom. Inversiones*

*Mar Octava Limitada v. Banco Santander S.A.*, 439 F. App'x 840 (11th Cir. 2011) (per curiam);

(iii) a defendant's ability to implead third-party defendants, *Tazoe*, 631 F.3d at 1332; and (iv)

questions as to the enforceability of a judgment if one is obtained, *SME Racks, Inc. v. Sistemas*

*Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1100 (11th Cir. 2004).[19]

    As discussed below, these factors not only support, but require, dismissal of these cases.

       1.    *Relevant Evidence Will Be Far More Accessible if Plaintiffs' Claims Are*
            *Litigated in Colombia.*

    Access to evidence is "[p]erhaps the most important 'private interest' of the litigants."

*Ford*, 319 F.3d at 1308. Thus, "[a] correct 'private interest' analysis begins with the elements of

the plaintiff's causes of action. The court must then consider the necessary evidence required to

prove and disprove each element. Lastly, the court should make a reasoned assessment as to the

likely location of such proof." *Id.*

    In *Ford*, the plaintiff alleged that the defendants, an American corporation and its U.S.-

based in-house counsel, had conspired to injure the plaintiff through a series of defamatory

statements made by the defendants' agents and co-conspirators in Hong Kong. *See id*. at 1304-

---

[19]    Plaintiffs are not entitled to a presumption that the courts of Florida, New York, New
Jersey, and the District of Columbia are convenient simply because they chose to bring suit
there. When U.S. citizens bring a suit in U.S. courts, their choice of forum is accorded some
deference because it is assumed that the choice is based on considerations of convenience. *See
In re Banco Santander*, 732 F. Supp. 2d at 1335-36. However, "[a] foreign plaintiff who brings
suit in the United States does not enjoy the strong presumption that his choice is based on
convenience," rather than some other strategic concern. *Id*. at 1336. Plaintiffs' choice of forum
is "ultimately only a proxy for determining the convenience of litigating in one forum instead of
another," *Aldana v.Del Monte Fresh Produce, N.A.*, 578 F.3d 1283, 1294 (11th Cir. 2009), and
where plaintiffs are foreign nationals, no inference of convenience can be drawn.

05.  The court acknowledged that evidence regarding the U.S.-based defendants' involvement in the alleged conspiracy would be found in the United States.  Nonetheless, the court emphasized that, because the defendants' alleged liability was derivative of the primary tortious conduct which occurred in Hong Kong, the "vast majority" of evidence would be found in Hong Kong:

> [A] conspiracy is simply a means of creating vicarious liability. That is, a tort must actually be committed by someone in the conspiracy.  If Defendants are liable, it is because the principal defamers made the defamatory comments pursuant to an agreement with Defendants. Thus, Plaintiff must first prove that acts of defamation actually took place. And that is why the vast majority of evidence is in Hong Kong.

*Id*. at 1309, n.21.  Accordingly, the Eleventh Circuit reversed the district court's denial of the *forum non conveniens* motion as an abuse of discretion.  *See also Seguros Universales*, 32 F. Supp. 3d at 1250 (following *Ford* in dismissing for *forum non conveniens* claims allegedly centered on a "conspiracy fomented in, and executed from, the United States"  because the "alleged harm  . . . was inflicted [in] Guatemala[] . . . [and] the vast bulk of the evidence related to the alleged fraud and extortion is located in Guatemala").

As in *Ford*, the only remaining claims against any of the defendants in these cases are indirect-liability claims relating to primary torts committed by others abroad.  And, as in *Ford,* the vast majority of evidence would undoubtedly be more accessible if the cases were litigated where those primary torts were committed, because (a) the key evidence that must be gathered is physically located in Colombia; and (b) procedural and logistical obstacles will make it far more difficult to access this evidence if these cases are litigated in the United States rather than in Colombia.  *Ford* thus mandates that these cases be dismissed.

      a.    *The Sources of Key Evidence Are Physically Located in Colombia.*

Plaintiffs' remaining claims are Colombian law claims against Chiquita, and Colombian law and TVPA claims against the individual defendants.  For the reasons set forth in their separately filed motions to dismiss, plaintiffs' TVPA claims against the individual defendants fail to state a claim.  Even if they are not dismissed on the merits, however, *all* of plaintiffs' claims allege only that Chiquita and the other defendants are indirectly liable for each of the acts of violence that the complaints allege were committed by armed groups in Colombia.

The key evidence about those events—who, what, when, where, why, whether there is a sufficient causal connection to the payments made by Chiquita's former subsidiary, and damages—is in Colombia.  Thus, the bulk of the evidence relevant to plaintiffs' claims is found abroad.  *See Ford*, 319 F.3d at 1309 (holding that executives in the United States may have acted "behind the scenes" to join or create a conspiracy did not alter the greater weight to be afforded to the location of where the central acts underlying the litigation occurred).[20]  Dismissal is therefore appropriate, regardless of whether plaintiffs' claims are pled under Colombian law or the TVPA.  *See, e.g.*, *Aldana*, 578 F.3d at 1286 (affirming dismissal of TVPA claims for *forum non conveniens*); *Turedi v. Coca-Cola Co.*, 343 F. App'x 623, 624-26 (2d Cir. 2009) (same); *see*

---

[20]    Consistent with *Ford*, two other *forum non conveniens* decisions by the Eleventh Circuit have found that, even where relevant corporate decisions were made by defendants in the United States, the greater and more relevant evidence was located elsewhere.  *See, e.g.*, *Aldana*, 578 F.3d at 1292 (granting motion where a Guatemalan subsidiary of Del Monte allegedly hired security forces to target banana workers, and noting "that the alleged misconduct occurred in Guatemala", and therefore "the vast majority" of evidence would be located in Guatemala); *Paolicelli*, 289 F. App'x at 390 (granting motion and concluding that the foreign location of the accidents outweighed the fact that evidence relating to the design, manufacture, and testing of the vehicles involved took place in the U.S.); *see also Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 526-27 (S.D.N.Y. 2006) (granting motion where plaintiffs alleged that defendant corporations were liable for making decisions from their offices in the United States to support violent attacks against union leaders in Turkey, in light of the "overwhelming and fundamental contacts of this litigation with Turkey"), *aff'd*, 343 F. App'x 623 (2d Cir. 2009).

*also Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1142 (C.D. Cal. 2005)

("[T]he Court holds that it may address the applicability of *forum non conveniens* despite the

presence of Plaintiffs' ATS and TVPA claims in the instant case."), *abrogated on other grounds*

*by Mujica v. Occidental Petroleum Corp*., 564 F.3d 1190, 1192 (9th Cir. 2009).

In fact, this Court reached essentially the same conclusion in 2007, when it denied

Chiquita's Section 1404 motion to transfer the *Carrizosa* case to the District of Columbia.  (*See*

Op. & Order, No. 0:07-cv-60821 (S.D. Fla. Nov. 14, 2007) (D.E. 26).)  Based upon its review of

the complaint, the Court found that while there are some issues of fact common to the various

claims, "once the common issues are decided, the specific factual claims of these Plaintiffs will

predominate, and individual issues of causation will pervade the litigation," noting that "[m]any

witnesses and sources of proof relating to Plaintiffs' individual claims can and will only be found

in Colombia."  (*Id.* at 6-7.)

Under *Ford*, this Court need not go beyond the pleadings to conclude that access to

sources of proof weighs heavily in favor of litigating these claims in Colombia.  *See also Grp.*

*GC Builders v. Cahaba Disaster Recovery, LLC*, 534 F. App'x 826, 829 (11th Cir. 2013) (noting

that the Supreme Court has "rejected the idea that defendants must submit affidavits identifying

the witnesses they would call and the testimony the witnesses would give, saying that '[s]uch

detail is not necessary.' . . .  so long as enough information is provided "'to enable the [d]istrict

[c]ourt to balance the parties' interests'") (quoting *Piper Aircraft*, 454 U.S. at 258).  Even if the

Court chooses to look beyond the complaints, however, it is clear from the attached Hall and De

la Calle declarations that the evidence that Chiquita and the individual defendants will need to

refute such claims—whether in these lawsuits or in the threatened lawsuits in Colombia—is

overwhelmingly located in Colombia:

- **Facts Surrounding the Death of Each Victim:**  Consistent with the Court's June 3rd Order, each plaintiff must show not only that Chiquita conspired to assist illegal armed groups generally but must also "prove sufficient facts surrounding the deaths of *each* victim" in order to substantiate their individual claims for damages.  (MTD Order at 6 n.4 (emphasis added).)   This is a clear requirement under Colombian law as well.  Even after dismissing from these cases the thousands of plaintiffs whose claims are clearly time-barred, thousands more plaintiffs will still remain, each alleging a separate death or injury.  Investigating each of the thousands of separate incidents of violence—which allegedly occurred throughout Colombia over a period of about 20 years—will require the parties to pursue discovery of numerous Colombian records, including decedent-specific medical records, death certificates, police reports, government investigative reports, legal filings and rulings (including those in Justice and Peace proceedings), military reports, and contemporaneous eyewitness statements.  Further, the parties will need to examine each Colombian plaintiff, eyewitnesses, government officials, military officials, former Banadex employees located in Colombia, and former paramilitaries in Colombia with knowledge concerning *each* separately alleged death or injury.  (*See* De la Calle Decl. ¶¶ 12-13; Hall Decl. ¶ 6.)

- **Extortion Payments:**  At the heart of plaintiffs' theory is their allegation that Banadex officials in Colombia actively funded illegal armed groups with the specific intent that they would protect Banadex's business interests by torturing and killing civilians in Colombia's banana-growing regions.  (*See* MTD Order at 69.)  In fact, as has been publicly reported, Banadex, like thousands of other businesses and individuals, was forced to make extortion payments under the threat of violence against its employees.  To show that Banadex was extorted as part of a widespread practice, Chiquita will need access to evidence located only in Colombia, such as:  (i) the testimony of former Banadex employees, former paramilitaries, and other witnesses who can confirm that the threat of violence against Banadex and its Colombian employees was genuine and was the cause of Banadex's extortion payments; (ii) the testimony of former paramilitaries indicted or convicted for extortion in Colombia; (iii) the testimony of former paramilitaries who have publicly admitted that they extorted businesses and individuals; (iv) court and other government records regarding extortion by members of illegal armed groups, including judgments, transcripts of testimony in government proceedings, and official records from the National Police's anti-extortion directorate; (v) the testimony of at least some of the thousands of individuals who have been extorted by illegal armed groups in Colombia; (vi) the testimony of officers of other companies in Colombia that were forced to make extortion payments to illegal armed groups; and (vii) the testimony of Colombian military, police, and other government officials that the government was not able to protect Banadex's dispersed operations from paramilitary and guerilla violence and extortion.  (*See* Hall Decl. ¶¶ 3-4; De la Calle Decl. ¶¶ 12-13.)

- **Alleged Arms and Drugs Smuggling:**  Plaintiffs attempt to support their theory
  further by alleging that Chiquita, through Banadex, willingly facilitated the
  smuggling of drugs and arms to assist the paramilitaries with their campaign of
  terror.[21]  Evidence that can be found only in Colombia will show that these
  accusations are lies, including:  (i) the testimony of former Banadex employees
  who worked at the port facilities through which the alleged smuggling occurred;
  (ii) official government and judicial records regarding the criminal investigation
  into an alleged smuggling incident referenced in the complaints, for which no
  Banadex employee was among those convicted; (iii) the testimony of those
  actually convicted for this illegal smuggling, including Colombian customs
  officers; and (iv) the testimony of former paramilitaries actually responsible for
  illegal arms smuggling, including individuals who have publicly confessed their
  responsibility.  (*See* Hall Decl. ¶ 5.)

- **State Action:**  Should the Court allow any TVPA claims to proceed, then "state
  action" will remain an issue in these cases.  Any evidence needed to refute
  plaintiffs' claims that the Colombian government sponsored the torture and mass
  murder of Colombian civilians by paramilitaries is necessarily located in
  Colombia, including:  (i) the testimony of government officials at all levels of
  Colombian government; (ii) the testimony of current and former military and law
  enforcement officials, including those who served in the banana-growing regions
  of Colombia where the paramilitaries operated; (iii) government and judicial
  records from criminal investigations against paramilitaries; (iv) government
  officials alleged to have collaborated with paramilitaries; and (v) government and
  judicial records regarding "*convivirs*," entities which plaintiffs allege were created
  by the government to legitimize or assist paramilitaries.  (*See* De la Calle Decl. ¶¶
  12-13; Hall Decl. ¶ 7; *see also* Tamayo Decl. ¶ 43.)

To be sure, as in *Ford*, there is *some* evidence relating to plaintiffs' claims—specifically,

evidence of the decision-making by Chiquita executives—located in the United States.  But it is

the far more extensive evidence and factual record *in Colombia* on which plaintiffs' claims will

turn.  Under *Ford*, therefore, there is no question that dismissal for *forum non conveniens* is

required.  *See also Aldana*, 578 F.3d at 1292-93, n.4 (holding, in a case brought under the ATS

---

[21]      *See, e.g.*, *Does 1-11* SAC ¶¶ 138-51 (D.E. 589); *Valencia* TAC ¶¶ 81-94 (D.E. 576);
Compl., *Does 1-976 v. Chiquita Brands Int'l, Inc.*, No. 9:10-cv-80652, ¶¶ 1062-1075 (D.D.C.
Mar. 12, 2010) (D.E. 3); Compl., *Does 1-677 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80404,
¶¶ 773-786 (D.D.C. Mar. 22, 2011) (D.E. 3); *Montes* TAC ¶¶ 1796-1812 (D.E. 558); *Carrizosa*
TAC ¶¶ 52-55, 98-99; *Does 1-144* TAC ¶¶ 2150-2163 (D.E. 575); *Does 1-888* Seventh Am.
Compl. ¶¶ 1160-73 (D.E. 557).

and TVPA for violence against banana workers in Guatemala, that "the location of the evidence and the witnesses . . . point[ed] *decisively* in favor of litigating in Guatemala") (emphasis added); *Tazoe*, 631 F.3d at 1331 (noting the importance of access to foreign-governmental investigation reports); *Paolicelli*, 289 F. App'x at 390 (weighing heavily in favor of dismissal the fact that "[a]ccident-specific evidence, such as witnesses and police and medical reports, relevant to both the damages incurred by the plaintiffs and the defenses available to [defendant], [were] concentrated in" foreign forums); *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283-84 (11th Cir. 2001) (same); *Lisa, S.A. v. Gutierrez Mayorga.*, 441 F. Supp. 2d 1233, 1239-40 (S.D. Fla. 2006) (same), *aff'd,* 240 F. App'x 822 (11th Cir. 2007); *Bautista*, 350 F. Supp. 2d at 991 (same).

> b. *It Would Be Substantially More Difficult—Perhaps Impossible—to Access Key Evidence if Plaintiffs' Claims Were Litigated in the United States Rather Than in Colombia.*

Were plaintiffs' claims litigated in the United States, procedural and logistical impediments would make it extraordinarily cumbersome and costly to obtain the foreign evidence on which plaintiffs' claims turn. In fact, it is virtually certain that at least some material evidence will not be available at all if the cases are litigated here.

**The Plaintiffs' Testimony.** It is doubtful that many of the thousands of foreign plaintiffs who have filed these lawsuits will even be able to secure visas to travel to the United States for deposition and/or trial. In any event, the cost of intercontinental travel to the United States—not to mention the cost of having each plaintiff's testimony translated into English—would be enormous. *See Paolicelli*, 289 F. App'x at 390 ("The plaintiffs and foreign witnesses also face potentially inconvenient and expensive travel."); *see also Seguros Universales*, 32 F. Supp. 3d at 1250-51 ("[T]he vast bulk of the evidence . . .  is located in Guatemala, including witnesses over

whom the Court lacks jurisdiction to compel attendance at trial (and whose presence would come with the steep costs of international travel, in any event) . . . [T]he language barrier in this case [also] favors dismissal.").  Even if the plaintiffs were able to persuade this Court to allow them to appear for depositions in Colombia, this would serve only to transfer the cost and burden of travel for pretrial proceedings from plaintiffs to Chiquita and its U.S. counsel.  It would also substantially disadvantage Chiquita by disabling the company from cross-examining the plaintiffs live at trial.

**Third-Party Discovery.**  While Colombia has recently signed on to the Hague Convention, not even plaintiffs deny that the current process for obtaining third-party discovery in Colombia for use in U.S. lawsuits remains unpredictable, tedious, and time-consuming.  As plaintiffs noted in a recent motion, "[w]hile Plaintiffs have been unable to learn the average time that the Colombian Central Authority for the Hague Evidence Convention takes to process [] Requests for Judicial Assistance, Plaintiffs are advised that in many countries, such requests often take months."  (Pls.' Emergency Mot. at 9 (Dec. 26, 2014) (D.E. 688).)   Were these cases to remain in the United States, not only would this Court be forced to review an unfathomable number of such requests from all parties moving forward—there are thousands of plaintiffs involved in these cases, and third-party discovery will be necessary with respect to each of them—but the Court would need to certify to Colombian judicial authorities in each instance that the requested testimony and other evidence is necessary for judicial proceedings in the United States.  Moreover, Colombia's adoption of the procedures set forth in the Hague Convention for the taking of evidence still do not and cannot compel third parties to travel to the United States to testify at trial.

By contrast, if plaintiffs' claims were litigated in Colombia, the Colombian courts could readily compel third parties located in Colombia, including Colombian government officials, to provide testimony and produce documents.  (Tamayo Decl. ¶ 43); *see Tazoe*, 631 F.3d at 1331-32 (weighing in favor of dismissal the fact that the defendants may "reasonably [desire to] call [foreign] witnesses in their defense," including eyewitnesses, government employees, investigators, or those indicted in related criminal investigations, none of whom a U.S. court could compel to appear); *see also In re Banco Santander*, 732 F. Supp. 2d at 1337 (noting that "[s]everal courts have considered the inability to subpoena live testimony from non-party witnesses as a factor that weighs heavily towards dismissal").

**Translation and Authentication Burdens.**  All testimony taken from the literally thousands of Colombian witnesses and documents produced in Colombia will need to be translated to English for use in American courts, a task that will impose substantial additional costs and hinder the jury's ability to assess witness credibility.  *See Aldana*, 578 F.3d at 1292-93 (citing with approval that the district court "took account of additional practical and logistical difficulties—for example, the need to translate documents written in Spanish, and the linguistic barriers resulting from the fact that few of the witnesses were able to speak English"); *Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 425 (7th Cir. 2009) (citing cost of translating documents in dismissing case on *forum non conveniens* grounds); *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 799 (5th Cir. 2007) (noting that obtaining and translating Spanish documents from foreign country "would be burdensome, time-consuming, and costly"); *Iragorri*, 203 F.3d at 16-17 (upholding the district court's conclusion that a "language barrier would prevent an American jury from evaluating [key witness] credibility effectively").

30

The parties will also incur the costs and inefficiencies of authenticating Spanish-language documents produced from Colombian sources for use in U.S. courts.  Much of the key documentary evidence in these cases will consist of Colombian government records, which require certifications by government officials to establish authenticity for use in American courts.  *See* Fed. R. Evid. 902(3); Fed. R. Civ. P. 44(a)(2).  If such certification is unavailable or the foreign document at issue is not a governmental record, then it must be authenticated by extrinsic evidence.  This will be a uniquely cumbersome and difficult process given that the custodians of such documents are foreign citizens and/or government officials.  In addition to the need to authenticate these Spanish-language documents, the parties may also be required to put forward a qualified witness to authenticate the English *translation* of any Spanish-language document or testimony.  *See United States v. Fernandez*, 353 F. App'x 363, 375 (11th Cir. 2009) (citing *United States v. Llinas*, 603 F.2d 506, 509-10 (5th Cir.1979)) ("When a transcript contains a translation of conversations spoken in a foreign language, a qualified witness must authenticate and verify the translation.").

**Chiquita's Critical Need for this Evidence.**  Given the difficulty of obtaining the evidence needed to fully refute plaintiffs' allegations, litigating these actions in the United States would pose the very "obstacles to [a] fair trial" that the Supreme Court has directed courts to consider in weighing the private interest factors.  *Gilbert*, 330 U.S. at 508.  In their public statements, plaintiffs' counsel have threatened to bankrupt Chiquita with this litigation, based on inflammatory allegations that Chiquita conspired to terrorize and kill thousands of civilians.[22]

---

[22]     *See, e.g.*, Curt Anderson, *Chiquita Sued Over Colombian Paramilitary Payments*, Associated Press, May 30, 2011, at 1 (attached hereto as Exhibit A to Hall Decl.) (quoting plaintiffs' attorney Terry Collingsworth as stating "[a] company that pays a terrorist organization that kills thousands of people should . . . be put out of business by punitive damages"); Scott (continued…)

To handicap Chiquita's ability to develop a full record to defend itself against these grave and baseless charges would be grossly unfair.

**The U.S. Evidence.**  Finally, plaintiffs can mount no serious argument that it would be anywhere as difficult for them to obtain necessary U.S.-based evidence if their claims were litigated in Colombia.  The only relevant event alleged to have occurred in the United States is the decision by Chiquita executives to approve Banadex's conduct.  Chiquita has agreed to and can easily make the relevant evidence available to plaintiffs if these lawsuits proceed in Colombia.  (*See* Hall Decl. ¶¶ 2-3); *Paolicelli*, 289 F. App'x at 390 (finding that defendants' willingness to make U.S.-based evidence available to plaintiffs undermined plaintiffs' position that this evidence weighed in favor of retaining the lawsuit in the U.S.).  A Colombian court can then readily admit this evidence.  (*See* Tamayo Decl. ¶¶ 40-41, 44.)  Chiquita has also committed to make available voluntarily all U.S.-based witnesses under its control to provide testimony for use in the Colombian court.  (Hall Decl. ¶ 2; *see* Tamayo Decl. ¶¶ 44-45.)  Finally, any U.S. witness not under Chiquita's control and unwilling to testify voluntarily could be summoned through the Hague Convention (which, given the vastly fewer number of American versus Colombian witnesses relevant to these cases, would impose a tiny fraction of the burden that would result from litigating plaintiffs' claims in the United States).  (*See* Tamayo Decl. ¶ 44.)

> 2. *Litigating These Claims in a Single Forum Will Promote Efficiency and Ensure Consistency.*

The "ability to try this case in a single location" is "an extremely important factor in the private factors  analysis."  *In re Banco Santander Secs. Litig.*, 732 F. Supp. 2d at 1338.  As

---

Dalton, *The Banana War*, Condé Nast Portfolio, Oct. 2007, at 169 (attached hereto as Exhibit B to Hall Decl.) (quoting Mr. Collingsworth as stating "I would be delighted to get a punitive-damage award that would put Chiquita out of business").

explained above, since these lawsuits were first filed, approximately 1,700 claimants have filed

mediation demands against Chiquita in Colombia—a mandatory prerequisite to commencing

litigation in Colombia—seeking redress based on substantially the same allegations that give rise

to plaintiffs' claims.  (*See* De la Calle Decl. ¶¶ 9-10; Tamayo Decl. ¶¶ 51-52.)  Chiquita cannot

predict when the Colombian claims asserted against it will proceed to full-fledged litigation, but

it can happen at any time—and when it does, it would be grossly inefficient to litigate thousands

of claims in Colombia *and* the United States simultaneously.  The parties would have to gather

and develop the same evidence under two different sets of procedural rules and in two different

languages for use in two completely different courts.  This would inevitably lead to needless

duplication of effort and a wasteful expenditure of the parties' resources.  Furthermore, litigating

in two countries simultaneously "not only represents a waste of judicial resources, but also

creates a risk of inconsistent judgments." *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996,

1002 (2d Cir. 1993); *see also In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 279 (S.D.N.Y.

2010) (noting that the "substantial risk [of] inconsistent judgments regarding the same

underlying transaction . . . weighs strongly in favor of dismissal").  This prospect of dual and

potentially conflicting litigation renders Colombia "a significantly more convenient forum than

the United States and weighs heavily in favor of *forum non conveniens* dismissal."  *In re Banco

Santander*, 732 F. Supp. 2d at 1338.

3.     *Chiquita's Inability to Implead Third Party Defendants in the United
States Strongly Favors Dismissal.*

Another key "private interest factor" strongly supporting dismissal is Chiquita's inability

to implead potentially-liable third parties due to lack of personal jurisdiction.  Plaintiffs'

complaints assert that many individuals and organizations going well beyond Chiquita funded

33

and actively supported the paramilitaries who allegedly caused their injuries.[23]  Indeed, there is no real dispute that the extortion payments that Chiquita's former subsidiary made to these groups constituted a tiny fraction of the groups' overall funding.  Chiquita is entitled to implead some or all of the many other actors identified in plaintiffs' complaints, just as some of the approximately 1,700 Colombian plaintiffs already have done in their Colombian mediation demands against Chiquita.  (*See* De la Calle Decl. ¶ 9 (noting that some plaintiffs have named the Colombian government as a defendant in their mediation requests).)  Yet Chiquita is effectively barred from doing so if these cases remain in the United States, because many if not all of the third parties identified in plaintiffs' complaints are likely not subject to personal jurisdiction in the United States.  No such problem would exist if these claims were brought in Colombia.  (*See* Tamayo Decl. ¶¶ 48-49.)

As this Court has pointed out—and more than once—"it has been widely recognized that the inability to implead other parties directly involved in a controversy is a factor weighing heavily against the plaintiff's choice of forum."  *Son v. Kerzner Int'l Resorts Inc.*, No. 07-61171, 2008 WL 4186979, at *9 (S.D. Fla. Sept. 5, 2008) (Marra, J.); *Singletary*, No. 13–21124, 2014 WL 4471387, at *4 ("[e]qually problematic is the inability of Defendants to implead"); *see also Tazoe*, 631 F.3d at 1332 (reasoning that "a defense of this nature 'is surely less persuasive when aimed at a set of empty chairs' because '[i]f a Southern District of Florida jury ultimately looked to place blame at the defense table, it would have available only one, rather than several,

---

[23]     *See, e.g.*, *Does 1-144* TAC ¶ 2058 (D.E. 575) ("As the 1980s progressed, paramilitaries maintained links with drug barons, large landowners, industrialists, and bankers who funded them…"); *Montes* TAC ¶ 1661 (D.E. 558) (noting that the sponsors of the AUC included "wealthy landowners, businessmen, and multinational corporations").

defendants to bear the brunt of its verdict and damage award'") (quoting *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1284 n.4 (11th Cir. 2001).

4.      *Questions Concerning the Enforceability of Judgment Supports Dismissal in Favor of the Colombian Forum.*

The New Jersey plaintiffs seek to certify a class of "all persons who were the victims (or who are the relatives and/or legal representatives of decedent victims) of extrajudicial killing; forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced displacement; crimes against humanity; or crimes against civilians constituting war crimes committed by the AUC in the banana-growing region of Urabá from 1995 through 2004." (*Does 1-11* SAC ¶ 230 (D.E. 589).)  For this Court to certify such a broad class of personal injury victims would be inappropriate and wholly unsupported by law.  *See, e.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 482-85 (S.D.N.Y. 2005) (denying class certification in an ATS case based on the defendant's alleged role in human rights atrocities in Sudan because plaintiffs failed to satisfy the "predominance requirement").  Nonetheless, should such a class ever be certified and Chiquita prevail on the merits, there is no question under Colombian law that the judgment in Chiquita's favor would *not* be recognized by a Colombian court against any Colombian citizen who did not actively participate in the proceedings.  (*See* Tamayo Decl. ¶ 36.)  This, of course, would encompass essentially every member of the purported class, each of whom would remain free to pursue individual claims against Chiquita in Colombian courts.  The inability to enforce any U.S. class judgment in Chiquita's favor is yet another private interest factor strongly supporting dismissal.  *See, e.g.*, *In re Banco Santander*, 732 F. Supp. 2d at 1339 ("A final private factor the Court considers is the reality that many European courts do not recognize the class action mechanism and may, if a class judgment is rendered, decline to enforce a judgment in favor of absent class members.").

35

**C.      The Public Interest Factors—To The Extent Even Relevant—Also Support Dismissal in Favor of a Colombian Forum.**

Under Eleventh Circuit law, because the private interest factors so decisively favor dismissal, there is no basis to consider the public interest factors at all.  *See, e.g.*, *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009) ("A trial court will look at the private interests first and then, *if* the balance of the private interests are found 'to be in equipoise or near equipoise,' it will 'determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum.'") (emphasis added) (quoting *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir. 1983)).  Nonetheless, the public interest factors set forth in *Tazoe*—which emphasize the countries' relative interests in the subject matter of the litigation and the burdens that would be imposed on the respective court systems, including administrative difficulties, the difficulty of applying foreign law, and the unfairness of burdening potential jurors in a forum unrelated to the claim—strongly favor dismissal as well.  *See Tazoe*, 631 F.3d at 1333.

1.      *Colombia Has a Far Greater Interest in This Litigation.*

Colombia without question has a substantially greater interest in these cases than does the United States.  "[I]t is clear that a sovereign has a very strong interest when its citizens are allegedly victims and the injury occurs on home soil." *Tazoe*, 631 F. 3d at 1334 (citation and internal quotation marks omitted).  That is especially true here, where promoting reconciliation and resolving disputes arising from Colombia's decades of civil conflict is perhaps the paramount national issue in Colombia today.  (*See* Shifter Decl. ¶ 34.)  The Colombian government has taken a series of significant and dramatic steps to facilitate the process of reconciliation and redress, from launching the "Justice and Peace" process in 2005, to setting up a National Commission for Reparation and Reconciliation, and to passing the Victims' Law of 2011.  (*See id.* ¶ 23; Tamayo Decl. ¶¶ 54-61.)  Tens of thousands of Colombian citizens are now

36

freely confronting former AUC members, the Colombian government, and others in Colombia about their alleged violent acts and wrongdoing during the height of the Colombian conflict and their alleged role in causing the claimants' injuries.  (*See* Shifter Decl. ¶ 24; Tamayo Decl. ¶¶ 58-61.)  Allowing plaintiffs' claims against Chiquita, too, to be litigated in Colombia will further Colombia's interest in achieving a comprehensive resolution of the grievances of victims of the conflict.  (*See* Shifter Decl. ¶ 35.)

By contrast, the United States has already vindicated any public interest it has in these matters by bringing a criminal proceeding against Chiquita that resulted in a $25 million fine. *See United States v. Chiquita Brands Int'l, Inc.*, No. 1:07-cr-055, at 4 (D.D.C. Sept. 24, 2007); *In re Banco Santander*, 732 F. Supp. 2d at 1342 (finding that "the United States' interest in preventing fraud has already been validated by [the defendant's] effective life sentence").

> 2.  *This Litigation Will Impose a Greater Burden on the U.S. Judicial System Than on Colombian Courts.*

Given Colombia's unquestionably greater interest in the subject of this litigation, it would inappropriately burden this Court—and, ultimately, potentially *thousands of local juries* in Florida, New York, New Jersey, and Washington, D.C.—to entertain these cases.  *See Aldana*, 578 F.3d at 1298; *see also In re Banco Santander*, 732 F. Supp. 2d at 1330-31 (finding that a court should weigh "the possibility of imposing jury duty upon the people of a community which has no relation to the litigation") (citation and internal quotation marks omitted); *Lisa, S.A.*, 441 F. Supp. 2d at 1240 (noting that "the scope of this case is massive, and the administrative

burden . . . should be on the jurisdiction with the most significant contacts with the alleged

occurrences") (citation and internal quotation marks omitted).[24]  As this Court has explained:

> Administrative difficulties follow for courts when litigation is piled
> up in congested centers instead of being handled at its origin.  Jury
> duty is a burden that ought not to be imposed upon the people of a
> community which has no relation to the litigation.  In cases which
> touch the affairs of many persons, there is reason for holding the
> trial in their view and reach rather than in remote parts of the
> country where they can learn of it by report only.  There is a local
> interest in having localized controversies decided at home.

*Son*, 2008 WL 4186979, at *10 (quoting *Gilbert*, 330 U.S. at 508-09).

If these claims were to proceed in Colombia, by contrast, they would impose no unusual

burden on the Colombian courts.  (*See* Tamayo Decl. ¶ 50.)  Furthermore, a Colombian fact-

finder would have a far deeper understanding of the context of the Colombian civil conflict and

of the involved parties.  *Cf. Paolicelli*, 289 F. App'x at 391 (reasoning that foreign fact-finders

had "a greater interest in and connection to the [involved] accidents" and that their

"[f]amiliarity" with relevant local conditions would aid their fact-finding).

  3.  *Principles of International Comity Weigh in Favor of Dismissal.*

Comity is also an appropriate consideration in analyzing a *forum non conveniens* motion.

*See Ford*, 319 F.3d at 1309, n.22 (noting that it is "appropriate to include comity as a factor in

---

[24]  *See also In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 887 F. Supp. 1469, 1477
(N.D. Ala. 1995) (where Judge Pointer, in granting the defendants' motion to dismiss foreign
claimants in the silicon breast litigation on the basis of *forum non conveniens* reasoned—in
language that squarely applies to the Chiquita cases—"[i]n just these few actions, more than
1,000 foreign claimants are joined as named plaintiffs, and more than 100,000 others are
included as members of a putative class . . . While courts in this country will be searching for
ways to avoid the necessity of a separate trial of each plaintiff's claim, it is clear that many, many
trials involving . . . 'common evidence' will be needed — with the time required for
presentation of such evidence at each trial consuming weeks or even months.  Moreover, even if
some aggregation of claims should be found acceptable for trial of some . . . common issues, the
special questions regarding . . . injuries[] and specific causation would add many days of trial for
each individual litigant.").

the *forum non conveniens* calculus"); *Aldana*, 578 F.3d at 1298 (noting the "policy interest in . . . protecting comity between the United States and other nations").  Specifically, "the prospect of 'dueling courts,' conflicting judgments, and attempts to enforce conflicting judgments raise major concerns of international comity."  *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1521 (11th Cir. 1994).  This is a significant concern in this case because approximately 1,700 Colombian plaintiffs have already filed mediation demands in Colombia and thus may pursue civil claims against Chiquita there at any time.[25]  As the district court noted in *In re Banco Santander*, "it makes little sense to try an expensive and time-consuming case in Florida while another court, in a virtually duplicative proceeding over four thousand miles away, potentially adjudicates the same legal and factual issues."  732 F. Supp. 2d at 1313-14.

    In addition, courts should give due weight to the fact that a foreign forum "might regard trying [a] case in an American court as a tacit acceptance of" assertions that the foreign judiciary is not capable of justly resolving the dispute.  *Aldana*, 578 F.3d at 1299.  Where the Colombian legal system is already entertaining claims similar to the ATS Actions and the private and public interest factors tilt heavily in favor of a Colombian forum, failure to dismiss would show

---

[25]    That the Colombian mediation demands were filed against Chiquita after these lawsuits were filed in the United States is irrelevant.  In *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 750 (7th Cir. 2008), the court upheld dismissal of a domestic suit in favor of Japanese courts even though a parallel Japanese suit was not filed until eight months after the initiation of the U.S. suit.  The court stated that where most of the relevant bad acts occurred in Japan and most of the evidence and witnesses were in Japan, "[t]here is no reason for identical suits to be proceeding in different courts in different countries thousands of miles apart."  *Id*.  The Court added that "[d]ragging all those witnesses and documents from Japan to Chicago, supplying interpreters for the witnesses and translators for the documents, and conducting a trial largely on the basis of testimony given through interpreters and of documents translated from their original language, would impose unreasonable burdens not only on the defendants but also on the district court."  *Id.* at 751.

disrespect for the Colombian state and judiciary.  As the U.S. State Department has stated,

specifically with respect to Colombia:

> [F]oreign courts generally should resolve disputes arising in
> foreign countries, where such courts reasonably have jurisdiction
> and are capable of resolving them fairly.  An important part of our
> foreign policy is to encourage other countries to establish
> responsible legal mechanisms for addressing and resolving alleged
> human rights abuses.  Duplicative proceedings in U.S. courts
> second-guessing the actions of the Colombian government and its
> military officials and the findings of Colombian courts, and which
> have at least the potential for reaching disparate conclusions, may
> be seen as unwarranted and intrusive to the Colombian
> government.  Moreover, it may also be perceived that the U.S.
> Government does not recognize the legitimacy of Colombian
> judicial institutions.  These perceptions could potentially have
> negative consequences for our bilateral relationship with the
> Colombian government.

*Mujica*, 381 F. Supp. 2d at 1161.

### 4. *Plaintiffs' Assertion of Colombian Law Claims Favors Dismissal*

Finally, plaintiffs are asserting claims against Chiquita and the individual defendants

under Colombian law.  This strongly supports dismissal.

As this Court has previously reasoned, applying foreign law would require U.S. courts to

"rely on expert testimony and evidence provided by the parties as to the substance of [foreign]

law, which would add substantially to the administrative burden of having trial in this forum."

*Son*, 2008 WL 4186979, at \*11; *see also In re Banco Santander*, 732 F. Supp. 2d at 1339 ("The

Court's own experience applying foreign law is that, given the cost and time of obtaining expert

testimony and proving foreign law, this is a substantial convenience factor that weighs in favor

of *forum non conveniens* dismissal."); *Tazoe*, 631 F.3d at 1334 ("The need to apply foreign

law . . . also favors dismissal.").  Indeed, the Court has already expressed its reluctance to rule

upon issues of Colombian law in these cases, rightfully questioning whether it is "competent to

interpret and rule upon a foreign nation's common law" and noting "the novel and complex

issues inherent in such an endeavor."  (MTD Order at 90 (citing and quoting from the district

court's decision in *Doe v. Drummond Co., Inc.*, No. 2:09-cv-01041, slip op. at 35 (N.D. Ala.

Nov. 9, 2009) ("*Drummond I*"), that a "wrongful death claim raises a novel and complex issue

under the law of Colombia" and that "it would be impossible for this court to navigate the

Colombian law requisites" of such a claim).)  The proper forum for litigating claims based on

Colombian law is Colombia.

> **D.   No Plaintiff Can Make a Particularized Showing of a Specific Risk to His or Her Personal Safety From Litigating These Claims in Colombia.**

Based on generalized language in some of the complaints, and plaintiffs' counsel's

strategy in other cases, Chiquita expects that plaintiffs will oppose this motion on the grounds

that it is too dangerous for plaintiffs to litigate their claims in Colombia.  But the law requires

*each* plaintiff to substantiate any such argument with *particularized facts* showing that suing

Chiquita in Colombia would subject *that* plaintiff personally to a heightened and specific safety

threat.[26]  Here, no plaintiff can meet this requirement.[27]   Nearly ten years have passed since the

---

[26]   *See Paolicelli*, 289 F. App'x at 391 (noting plaintiffs' failure to demonstrate "that the political instability in Colombia poses safety risks *for the parties*" in their litigation) (emphasis added);  *In re W. Caribbean Crew Members*, 632 F. Supp. 2d at 1200-01 (rejecting plaintiffs' contention that generalized and anecdotal evidence of a "lack of safety and security for witnesses and lawyers in Colombia makes" Colombian courts unsafe under a *forum non conveniens* analysis); *Mujica v. AirScan Inc.*, 771 F.3d 580, 612-13 (9th Cir. 2014) (affirming district court's finding that Colombia was an "adequate forum" for adjudicating claims that defendants were complicit with the Colombian military in illegally targeting civilians in a bombing raid because, among other things, plaintiffs had failed to make a "powerful showing" that they could not safely pursue their claims in Colombia); *Aracruz Trading Ltd. v. Japaul Oil & Maritime Servs. PLC.*, No. 08 Civ. 3511, 2009 WL 667298, at *5 (S.D.N.Y. Mar. 16, 2009) (noting that "generalized statements regarding instability in the region" and "conclusory allegations of general danger are insufficient"); *BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 247 F.R.D. 427, 432 (S.D.N.Y. 2007) (holding that plaintiffs needed to offer "evidence of a more meaningful connection" between the reported violence and the case at issue), *aff'd*, 298 F. App'x 87 (2d Cir. 2008).

demobilization of the AUC, and there have been dramatic changes in Colombian civil society since then.  (*See* Shifter Decl. ¶¶ 19-28, 31-35.)   Moreover, plaintiffs' counsel's own conduct belies any assertions that Colombians face a security risk in coming forward to assert their claims:

- The large majority of the plaintiffs in these cases—more than 3,600—are no longer suing pseudonymously and their identities are thus already public and have been for years;[28]

- Plaintiffs' counsel have held open, public meetings in Colombia to solicit new clients;[29] and

- Plaintiffs' counsel admit having met repeatedly with the same paramilitaries whom they claim pose a safety risk to their clients in an effort to obtain testimony that they hope they can use against Chiquita in this litigation.[30]

---

[27]   Courts have considered security concerns both in the context of determining the adequacy of a forum and in weighing the relevant private interest factors.  *Compare Paolicelli*, 289 F. App'x at 390-91 (analyzing generalized security concerns as a private interest factor) and *Mujica*, 381 F. Supp. 2d at 1147 (finding that security concerns related to paramilitary violence or government retaliation in Colombia "are more appropriately considered in the private interest factors analysis"), *with Barboza v. Drummond Co.* No. 0:06-cv-61527, slip op. at 6-8 (S.D. Fla. July 17, 2007) (considering security concerns in the context of whether the forum was adequate). Regardless of how this Court categorizes this issue, each plaintiff bears the burden of producing particularized evidence as to the specific security threat that he or she faces—and none of them can do that here.

[28]   *Does 1-144* TAC ¶¶ 1126-2031 (D.E. 575); *Carrizosa* TAC ¶¶ 5-25; *Does 1-888* Seventh Am. Compl. ¶¶ 31-987 (D.E. 557); *Montes* TAC ¶¶ 9-1614 (D.E. 558).

[29]   Declarations filed in *Perez v. Dole Food Co.*, No. BC412620 (Superior Court of California, Los Angeles County) (attached hereto as Exhibit C to Hall Decl.) (describing public meetings in Magdalena, Colombia, in which Mr. Collingsworth procured clients for this litigation); Declaration of Paul Wolf, *Does 1-98 v. Boies Schiller & Flexner*, No. 9:13-cv-80146, ¶ 3 (S.D. Fla.Nov. 21, 2012) (D.E. 3-1) (stating that Mr. Wolf "spent roughly a third of the past five years living in Apartadó, [Urabá], Colombia, working on th[e Chiquita] case" and "maintained a physical office in Apartadó," employing "three full time employees to act as [] paralegal assistants"); Advertisement on Chiquita Litigation, El Tiempo (Colo.), Aug. 12, 2007 (attached hereto as Exhibit D to Hall Decl.) (advertising plaintiffs' lawyer William Wichmann's lawsuit against Chiquita and a meeting in Bogotá to discuss it with potential clients).

[30]   *See, e.g.*, Declaration of Terrence Collingsworth ¶ 5 (Feb. 4, 2015) (D.E. 708-4) (admitting that he met with an imprisoned paramilitary in a Colombian jail "on multiple occasions").

The general declarations of third parties filed by some of the minority of plaintiffs who are continuing to proceed pseudonymously purporting to attest that all plaintiffs—as a group—would be at risk of retaliation for bringing their claims fall far short of making a particularized showing of a security threat on behalf of any individual plaintiff.  In fact, two courts have already denied attempts at pseudonymous pleading by Colombian plaintiffs who sought to rely upon such generalized declarations—and the current situation in Colombia is much more safe than when these decisions were issued.

In *Doe v. Drummond Co., Inc.*, which like these cases was based on alleged AUC atrocities, Colombian plaintiffs sought to proceed pseudonymously by arguing that their fear of reprisals was founded on "the well-documented culture of impunity and violence in Colombia" and on "the close symbiotic relationship between the military and the paramilitaries in Colombia."  *Doe v. Drummond Co., Inc.*, No. 2:09-cv-01041, slip op. at 5 (N.D. Ala. Apr. 30, 2010).  Just like the standard for avoiding *forum non conveniens* dismissal based on safety concerns, the standard for pseudonymous pleading required these plaintiffs to make a particularized showing that they *personally* were subject to a heightened and specific safety threat.  The *Drummond* court concluded that the plaintiffs could not make such a showing, noting that concerns of retaliation based on "generalized assertions of fear that apply . . . whether or not Plaintiffs proceed in prosecuting [the case under consideration] . . . do not outweigh the customary and constitutionally-embedded presumption of openness in judicial proceedings."  *Id.*  Similarly, in *Perez v. Dole Food Co.*, the court denied plaintiffs' motions to proceed pseudonymously partly because plaintiffs' "virtually identical" declarations did "little more than assert a vague subjective fear of retaliation," and failed to provide "specific, concrete and sufficient evidence to justify the extraordinary request to proceed anonymously."  *Perez v. Dole*

43

*Food Co.*, No. BC412620, slip op. at 4 (S. Ct. Cal. Feb. 23, 2010) (attached hereto as Exhibit E to Hall Decl.).

Like the plaintiffs in both *Doe* and *Perez*, some of the plaintiffs here rely on declarations that refer to the paramilitaries' "reign of terror" and "killing of persons suspected of sympathizing with opposing political factions." (Decl. of Paul David Wolf in Support of Pls.' *Ex Parte* Mot. to Commence & Proceed with Action Using Pseudonyms, *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 1:07-cv-01048, ¶ 3 (D.D.C. June 7, 2007) (D.E. 1-2).) But these years-old declarations fail to establish the specific safety threat required by *Doe* and *Perez*, and even if they did, they have been superseded by the substantial changes in Colombian civil society in the interim. If there were any doubt that it is safe *today* for Colombian citizens to file demands in their own country against Chiquita for allegedly supporting the violent conduct of illegal armed groups, it is erased by the fact that approximately *1,700 **named** Colombians have already done just that*, with no indication that any of them have been victims of any acts of retaliation as a result. These claimants' mediation demands follow the earlier—and equally public—attachment by civil plaintiffs to ongoing criminal proceedings against former Banadex employees, seeking redress on the basis of the same alleged misconduct. (*See* De la Calle Decl. ¶ 11.) Moreover, hundreds of formerly pseudonymous plaintiffs in these case have now disclosed their names in their most recent amended complaint. (*Compare Does 1-888* Seventh Am. Compl. at 1-20 (D.E. 557) (identifying plaintiffs' names) *with* Sixth Am. Compl. at 1 (July 18, 2011) (D.E. 449) (concealing plaintiffs' names).)

Beyond that, while this litigation has been pending in the United States an exponentially increasing number of Colombian citizens—now on the order of *tens of thousands*—have been confronting paramilitary members and their leaders, in their own country and in their own names

through the Justice and Peace process, to demand compensation for their injuries and loss of property. The Colombian government instituted this process to, among other things, provide reparations to the victims of illegal armed groups and move closer towards national reconciliation. (*See* Shifter Decl. ¶ 23; Tamayo Decl. ¶ 54.) Indeed, it would be surprising if none of the thousands of pseudonymous plaintiffs suing Chiquita in this Court is also among the tens of thousands of Colombian citizens currently participating in the Justice & Peace process or the remedial mechanisms Colombia has instituted for victims of violence. And there are certainly no indications of any kind that victims of paramilitary violence in Colombia cannot safely sue *Chiquita* in their home country. (*See* Shifter Decl. ¶¶ 29-30, 35-36.)

To be sure, one district court did hesitate—nearly 8 years ago—to grant a *forum non conveniens* motion in favor of a Colombian forum based on safety concerns. *See Barboza*, No. 0:06-cv-61527, slip op. at 6-8. In *Barboza*, three relatives of a single victim (a former Drummond union leader) sued Drummond under the ATS for allegedly collaborating with the AUC, the local police, and the Colombian military to execute the victim in retaliation for union activities. In denying Drummond's *forum non conveniens* motion, the court relied on (i) the U.S. State Department's now-outdated 2006 report on the general security environment in Colombia, and (ii) the continued presence in the region where the plaintiffs resided, as of early 2007, of both the accused paramilitaries and their alleged collaborators—including Drummond itself. *Barboza*, No. 0:06-cv-61527, at 2-3.

*Barboza* thus did not involve thousands of unnamed plaintiffs scattered throughout the country, as is the case here; instead, it only involved three plaintiffs who, under the particular circumstances relating to their claims, were uniquely positioned to make a personalized showing that suing in Colombia would expose them to an increased security risk. Moreover, *Barboza* was

45

decided well before Colombia's dramatic improvements in overall security, and while it could still be credibly argued that paramilitaries might remain a threat in the region where plaintiffs resided.

In contrast, no plaintiff can credibly assert that suing Chiquita in Colombia in 2015 or later poses a heightened security risk. Chiquita sold its Colombian operations and left the country well over a decade ago. The AUC itself disbanded ten years ago, and there are no allegations in any of the complaints that it maintains any sort of presence in the banana zone at this late date—or, for that matter, that the AUC can still be found *anywhere* in Colombia. (*See, e.g.*, *Does 1-11* SAC ¶ 228 (D.E. 589) (noting that paramilitaries in the banana-growing region demobilized by 2006).) More than 56,000 paramilitaries and guerillas have now demobilized and, in marked contrast to the 1990s and early 2000s, government security forces are now effectively policing *all* of Colombia's municipalities. (*See* Shifter Decl. ¶¶ 26-27.) The government's large-scale efforts have produced a dramatic decrease in violent crime, particularly by paramilitaries, whose former leaders are, for the most part, in jail. (*Id*. ¶ 27; Tamayo Decl. ¶ 57.)

Chiquita does not pretend that no former AUC member is currently committing any violent act in Colombia. But even plaintiffs concede that violent acts by former paramilitary groups in Colombia are no longer driven by ideological conflict. (*See* Compl., *Does 1-677 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80404, ¶ 832 (S.D. Fla. Mar. 22, 2011) (D.E. 3) (noting that "drug cartels . . . emerged in Colombia *following the demobilisation* [*sic*] of the paramilitary Self-Defence Forces of Colombia (AUC) in 2005" with the aim of becoming the largest in Colombia) (emphasis added)). Rather, organized criminal activity by remnants of these groups is now centered on drug trafficking, and violence is the result of fighting between rival drug

46

cartels.  (*See* Shifter Decl. ¶¶ 290-30.)  Such gang activity and drug-related violence is hardly unique to Colombia, and does not suggest that plaintiffs would be subject to any security threat for bringing claims against *Chiquita* for the politically-motivated violence of past years.

## CONCLUSION

For the foregoing reasons, the Court should (a) dismiss with prejudice any and all of plaintiffs' claims identified in Exhibit 4 on statute of limitations grounds and (b) dismiss all remaining claims for *forum non conveniens*.

## REQUEST FOR ORAL ARGUMENT

Pursuant to S.D. Fla. Local Rule 7.1(b)(2), Chiquita hereby requests oral argument on this motion.  As this Court has recognized, this case "is far from ordinary."  (Order at 4 (Mar. 27, 2012) (D.E. 518).)  Approximately 6,000 Colombian plaintiffs have asserted claims against Chiquita and several individual defendants.  Chiquita believes that oral argument would assist the Court in evaluating the instant *forum non conveniens* motion, which would terminate all remaining claims in the United States.  Chiquita respectfully requests 30 minutes per side for argument.

Dated: March 9, 2015        Respectfully submitted,

John E. Hall                      _____/s/ Robert W. Wilkins_____
Patrick S. Davies             Sidney A. Stubbs (Fla. Bar No. 095596)
Shankar Duraiswamy       Robert W. Wilkins (Fla. Bar No. 578721)
José E. Arvelo             rwilkins@jones-foster.com
COVINGTON & BURLING LLP   JONES, FOSTER, JOHNSTON & STUBBS,
One CityCenter             P.A.
850 Tenth Street, NW        505 South Flagler Drive, Suite 1100
Washington, D.C.  20001     West Palm Beach, Florida 33401
Telephone: (202) 662-6000    Telephone: (561) 659-3000
Fax: (202) 662-6291         Fax: (561) 650-0412

Jonathan M. Sperling      *Counsel for Chiquita Brands International, Inc.*
COVINGTON & BURLING LLP   *and Chiquita Fresh North America LLC*
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Telephone:  (212) 841-1000
Fax:  (212) 841-1010

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on this 9th day of March, 2015.  I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's First Case Management Order ("CMO") and the June 10, 2008 Joint Counsel List filed in accordance with the CMO.

By:       /s/ Robert W. Wilkins
Fla. Bar No. 578721
rwilkins@jones-foster.com