# EXHIBIT B

FILED

2015 Mar-27  PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DRUMMOND COMPANY, INC.; and DRUMMOND LTD., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| TERRENCE P. COLLINGSWORTH, individually and as agent of Conrad & Scherer, LLP, International Rights Advocates, Inc., and Albert van Bilderbeek; CONRAD & SCHERER, LLP; WILLIAM R. SCHERER, JR., individually and as agent of Conrad & Scherer, LLP; INTERNATIONAL RIGHTS ADVOCATES, INC.; IVAN ALFREDO OTERO MENDOZA; FRANCISCO RAMIREZ CUELLAR; and ALBERT VAN BILDERBEEK. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants . | ) |

CIVIL ACTION NO. _____

## **COMPLAINT**

## I.    NATURE OF THE ACTION

1.    This is a civil action brought by Drummond Company, Inc.  and

Drummond Ltd. (hereinafter sometimes collectively referred to as "Drummond")

pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961, *et seq*., concerning a pattern of racketeering

activity perpetrated by Defendants Terrence P. Collingsworth ("Collingsworth"),

Conrad & Scherer, LLP, International Rights Advocates, Inc. ("IRAdvocates"), William R. Scherer, Ivan Alfredo Otero Mendoza ("Otero"), Francisco Ramirez Cuellar ("Ramirez"), and Albert van Bilderbeek, as well as others known and unknown (sometimes collectively, the "RICO Defendants"). Since at least 2008, and continuing to present day, these Defendants and their co-conspirators have constituted an associated-in-fact enterprise (the "Enterprise") and have conspired to perpetrate, and have in fact perpetrated, a scheme to extort money from and otherwise damage Drummond through a litany of illegal acts, including bribery, mail fraud, wire fraud, obstruction of justice, witness tampering, and money laundering.

2.      Over the span of more than six years, Defendants have engaged in a multifaceted criminal campaign to exert pressure upon Drummond in an attempt to damage Drummond's reputation and business interests and obtain a fraudulent and extortionate financial windfall. This campaign includes three fraudulent lawsuits,[1] media campaigns in the United States, Colombia and Europe, attempting to influence and damage Drummond's union relations, as well as the use of "advocacy" groups to spread Defendants' false message that Drummond collaborated with a Colombian paramilitary organization, the United Self-Defense

---

[1] As discussed more fully below, these lawsuits are *Claudia Balcero, et al. v. Drummond Company, Inc., et al.*, 2:09-cv-1041-RDP (N.D. Ala.) (hereinafter "*Balcero*"); *Baloco, et al. v. Drummond Company, Inc.*, 7:09-cv-00557-RDP (N.D. Ala.) (hereinafter "*Baloco*"); and *Melo, et al. v. Drummond Company, Inc.*, 2:13-cv-00393-RDP (N.D. Ala.) (hereinafter "*Melo*").

Forces of Colombia ("AUC"), in the murders of hundreds of civilians. This false message is premised entirely on the "testimony" of "witnesses" who are admitted terrorists and murderers imprisoned in Colombia. It is now known that Defendants paid hundreds of thousands of dollars to these criminals, among other illegal inducements, in order to procure this "testimony." In the course of this scheme, Defendants fraudulently concealed the existence of these payments and inducements. Their attempts to hide this misconduct continue to this day. Indeed, in April of 2014, Collingsworth lied to a federal judge when he was directly questioned about the scope of the payments that were beginning to surface.

3. Once Defendants were caught concealing their witness payments, they attempted to excuse them by calling them "security" payments—needed to protect the witnesses and their families because the witnesses' testimony put their lives in danger. This is a ruse. As held by the Eleventh Circuit Court of Appeals, "A jury could find it strange that those who insist that their conduct was proper and their intent pure went to such great lengths to hide it all from the light of day. From such secrecy much may be inferred." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1402 (11th Cir. 1994). As explained further herein, the Enterprise had no concern for "security" when it broadcast to the public the identities and allegations of these "witnesses," even issuing a press release publicizing the precise date and location one of the witnesses would be providing testimony against Drummond.

Furthermore, despite repeated requests to do so, Defendants have yet to produce even so much as a police report where a threat to any of these witnesses' families has been reported or a single invoice for "security" services provided to anyone. Indeed, the only "evidence" Defendants can muster of any supposed "threats" is the claims of the paid witnesses themselves.

4.      The Enterprise has effected their payments to witnesses through various mechanisms.   For example, the Enterprise has been making monthly payments to witness Jairo Jesus Charris Castro since at least July 2009—███████████ ███████████████████████████.   The payments are made by a member of the Enterprise in the United States withdrawing cash from United States bank accounts, and taking that cash to places such as Publix or Wal-Mart in order to send an international wire transfer to Colombia via MoneyGram or Western Union. The money is then picked up by another member of the Enterprise in Colombia, who deposits it into the Colombian bank account of Charris's wife (Charris remains incarcerated in Colombia).   Payments have also been made via direct international bank wires from the United States bank account of Conrad & Scherer to the Colombian accounts of witnesses' family members and criminal lawyers.   In fact, the criminal lawyer for many of the witnesses, Ivan Otero, is a member of the Enterprise and has been promised a substantial contingency fee in the multiple civil cases the Enterprise has filed against Drummond in Alabama federal court.

One can search the annals of legal history and likely not find another instance of something like this: a plaintiff's lawyer promising a contingency fee to the criminal lawyer for a fact witness in a civil case that hinges on that witness's testimony.

5. The payments to Colombian witnesses, their lawyers, and their family members described in this Complaint must be viewed against the backdrop of the economic realities in Colombia. Ten dollars for someone in the United States is not the same as ten dollars for someone in Colombia, and is certainly not the same to the incarcerated witnesses at issue here, many of whom have little to no financial means. According to statistics compiled by DANE, Colombia's statistics agency, in 2009 almost half of Colombia's population lived below the poverty line, which is defined as earning *less than $143 per month*. The average Colombian household in 2009 earned $287 (or 560,409 Colombian pesos) per month. In the United States, by contrast, the average household income for 2009 according to the U.S. Census Bureau was $6,152 per month.[2] So, for example, when the Enterprise promised to pay Charris's family 1,500,000 Colombian pesos per month, it was the promise of a salary approximately 2.68 times that of the average household in Colombia. Offering the same deal to a witness in the United States would roughly equate to a tax-free salary of $16,487.36 per month (or almost $200,000 per year).

---

[2] *Available at* http://www.census.gov/content/dam/Census/library/publications/2014/demo/p60-249.pdf.

6. The full extent of Defendants' misconduct is continuing to unravel, and the true scope of the Enterprise's witness payment schemes may never be known. It has recently been discovered that ████████████████████

████████████████████████████████████████████████████

████████████████████████████

7. Drummond has never paid Colombian paramilitaries, or any other illegal group in Colombia. Over the course of the Enterprise's multiple fraudulent lawsuits against Drummond, Drummond has produced hundreds of thousands of documents and opened its bank records for inspection. There is no documentary evidence of a single payment to Colombian paramilitaries. Rather, the Enterprise premised their fraudulent lawsuits against Drummond entirely on the "testimony" of former terrorists and murderers. In fact, the *Balcero* case survived dismissal at the pleadings stage based almost exclusively on the false allegations of El Tigre. El Tigre and five other criminals provided trial testimony against Drummond███ ████████████████████████ To date, Drummond has spent more than $8.5 million defending itself in *Balcero* alone, and those costs continue to mount. The Enterprise has pursued three fraudulent lawsuits against Drummond premised on false testimony procured through fraud and bribery, forcing Drummond to expend more than $10 million in legal costs to date. Pursuant to 18 U.S.C. § 1964(c),

these damages are to be trebled, and Drummond is therefore entitled to more than $30 million in damages for the legal costs alone.

8.     In addition, the Enterprise has spread these false allegations throughout the world, spearheading media and public relations campaigns, and collaborating with activist groups to spread their fraudulent message.   The resulting damage to Drummond's business interests is enormous, and will have to be determined by a jury.  The damage to Drummond's goodwill and reputation is irreparable.

## II.     PARTIES

9.     Plaintiff Drummond Company, Inc. is a citizen of the state of Alabama because it is an Alabama corporation with its principal place of business in Birmingham, Alabama.   During the time relevant to this Complaint, Drummond's subsidiary, Drummond Ltd., has operated a coal mine in Colombia, South America (hereinafter "the Colombian Mine").

10.     Plaintiff Drummond Ltd. is a citizen of the state of Alabama because it is an Alabama limited partnership headquartered in Birmingham, Alabama.

11.     Defendant Collingsworth is an American plaintiffs' lawyer who is a citizen of the District of Columbia.  Collingsworth is sued both individually and as an agent of Conrad & Scherer, IRAdvocates, and Albert van Bilderbeek. Collingsworth is a partner at Conrad & Scherer, the Executive Director of

IRAdvocates, and an attorney for Albert van Bilderbeek. During the time relevant to this Complaint, Collingsworth has conducted business in Birmingham, Alabama.

12. Defendant Conrad & Scherer is a law firm organized as a limited liability partnership with its principal place of business in Fort Lauderdale, Florida. During the time relevant to this Complaint, Conrad & Scherer has conducted business by agent in Birmingham, Alabama. No partner of Conrad & Scherer, LLP is a citizen of Alabama, and, with the exception of Collingsworth (who is a citizen of the District of Columbia) and Eric Hager (who is domiciled in Quito, Ecuador), all are citizens of the state of Florida.

13. Defendant William R. ("Bill") Scherer, Jr., at all relevant times, was an officer, partner and/or agent of Conrad & Scherer, serving as its Managing Partner. Scherer is sued both individually and as an agent of Conrad & Scherer. Scherer is a U.S. citizen and a citizen of the state of Florida. During the time relevant to this Complaint, Scherer has conducted business in Birmingham, Alabama.

14. Defendant IRAdvocates is an organization based in Washington, D.C., claiming to be a non-profit advocacy group. IRAdvocates was founded by Collingsworth, who currently serves as its Executive Director, and its primary purpose is litigating for-profit plaintiffs' cases. Most, if not all, of IRAdvocates'

advocacy projects are related to cases litigated by Collingsworth.  In fact, the office for IRAdvocates, located at 1156 15th Street NW, Suite 502, Washington, DC 20005, also serves as Conrad & Scherer's Washington, DC office.  As a non-profit District of Columbia corporation with its principal place of business in the District of Columbia, IRAdvocates is a citizen of the District of Columbia.

15.    Defendant Ramirez is believed to be a citizen of Colombia.  Ramirez is sued both individually and as an agent of Conrad & Scherer and IRAdvocates. He is a Colombian lawyer, activist, and former President of a Colombian mineworkers' union.  In furtherance of the Enterprise's extortionate schemes, he has used his positions and influence with Colombian unions to damage Drummond's union relations.  He has contracted with U.S. citizens Collingsworth and Conrad & Scherer whereby he is promised a contingency fee in at least three U.S. civil cases pending in Birmingham, Alabama, and has paid witnesses for testimony to be used in those U.S. proceedings.  In connection with those U.S. proceedings, he has appeared as counsel during depositions in Birmingham, Alabama.  He has been represented to be a collaborating attorney with U.S.-based IRAdvocates.  Upon information and belief, he is married to a U.S. citizen, and resides at times in the U.S. at an apartment he maintains in Flushing, New York.

16.    Defendant Otero is a citizen of Colombia residing in Valledupar, Colombia.  Otero is sued both individually and as an agent of Conrad & Scherer

and IRAdvocates.  He is a Colombian criminal lawyer, who has represented nearly all of the incarcerated witnesses that claim Drummond had ties to the AUC, █████████ ████████████████████████████████████████████  He has contracted with U.S. citizens Collingsworth and Conrad & Scherer whereby he is promised a contingency fee in at least three U.S. civil cases pending in Birmingham, Alabama, ████████████████████████████████████████████.  In connection with those U.S. proceedings, he has appeared as counsel for witnesses providing trial testimony to be used in a lawsuit pending in Birmingham, Alabama.  He has also submitted two sworn declarations to federal court in Birmingham, Alabama, in furtherance of the conspiracy alleged herein.

17.     Defendant Albert van Bilderbeek is a citizen and resident of the Netherlands.  Albert van Bilderbeek and his brother, Hendrik van Bilderbeek, are the principals of Llanos Oil Exploration Ltd. ("Llanos Oil"), a Dutch entity that views Drummond as a competitor in Colombia.  Llanos Oil has made the wild accusation that Drummond conspired with the Colombian government to steal oil and gas rights from Llanos Oil.  Collingsworth has a contract with the van Bilderbeeks which entitles him to 33.3% of any recovery obtained by Llanos Oil in relation to these oil and gas rights.  In furtherance of the RICO Defendants' massive extortion campaign, Albert van Bilderbeek ████████████████████ ████████████████████████████████████████████



Albert van Bilderbeek has also conspired with and assisted the RICO Defendants in obtaining media exposure in Europe for the false allegations levied against Drummond by witnesses who have been paid in exchange for their testimony. During the times relevant to this Complaint, Albert van Bilderbeek has conducted business in Birmingham, Alabama through his agent, Collingsworth.

### III. NON-PARTY CO-CONSPIRATORS

18. Lorraine Leete ("Leete"), at all relevant times, was an employee and agent of IRAdvocates. Leete facilitated many of the illegal witness payments described in this Complaint, and did so with the purpose of obtaining false testimony against Drummond that the RICO Defendants utilized in their multifaceted and fraudulent scheme to extort money from Drummond. At the RICO Defendants' direction and with their full knowledge, Leete disseminated this false, paid-for testimony to members of the media and non-governmental "activist"

groups as part of a malicious campaign to destroy Drummond's reputation and fraudulently create public pressure on Drummond to pay money to the RICO Defendants so that they would cease their extortionate scheme. Upon information and belief, Leete is a U.S. citizen and a resident of Bogota, Colombia.

19. Rebecca Pendleton ("Pendleton"), at times relevant to this Complaint, was an employee and agent of Conrad & Scherer. Pendleton facilitated many of the illegal witness payments described in this Complaint, and did so with the purpose of obtaining false testimony against Drummond that the RICO Defendants utilized in their multifaceted and fraudulent scheme to extort money from Drummond. Upon information and belief, Pendleton is a U.S. citizen and a resident of Bogota, Colombia.

20. Christian Levesque ("Levesque"), at all relevant times, was an employee and agent of Conrad & Scherer and IRAdvocates, and an attorney of record in *Baloco*, *Balcero* and *Melo* for the plaintiffs in those cases. Levesque was aware of many of the illegal witness payments described in this Complaint, and she also knew that the purpose of those payments was to purchase false testimony against Drummond that the RICO Defendants then utilized in their multifaceted and fraudulent scheme to extort money from Drummond. Levesque has caused that false testimony to be submitted in judicial proceedings with the intent to further the RICO Defendants' multifaceted and fraudulent extortionate scheme. At

the RICO Defendants' direction and with their full knowledge, Levesque has also disseminated this false, paid-for testimony to members of the media and non-governmental "activist" groups as part of a malicious campaign to destroy Drummond's reputation and fraudulently create public pressure on Drummond to pay money to the RICO Defendants so that they would cease their extortionate scheme. Levesque also conspired with the RICO Defendants to fraudulently conceal the fact of the illegal witness payments described in this Complaint. Upon information and belief, Levesque is a U.S. citizen and a resident of Washington, D.C.

21. Richard Drath ("Drath"), at all relevant times, was an officer, employee and/or agent of Conrad & Scherer, serving as its Chief Financial Officer. Drath facilitated and assisted in structuring many of the illegal witness payments described in this Complaint, and did so with the purpose of obtaining false testimony against Drummond that the RICO Defendants utilized in their multifaceted and fraudulent scheme to extort money from Drummond. Drath also conspired with the RICO Defendants to fraudulently conceal the fact of the illegal witness payments described in this Complaint. Upon information and belief, Drath is a U.S. citizen and a resident of Florida.

22. PAX, The Netherlands ("PAX") is a non-governmental organization based in The Netherlands. PAX conspired with and assisted the RICO Defendants

in a malicious campaign to fraudulently create public pressure on Drummond to pay money to the RICO Defendants so that they would cease their extortionate scheme. PAX's assistance included the publishing and dissemination of a report titled "The Dark Side of Coal, Paramilitary Violence in the Mining Region of Cesar, Colombia" in approximately June of 2014, which was compiled with the substantial assistance of the RICO Defendants. That report is replete with falsehoods and accuses Drummond of collaborating with the AUC. As part of their scheme to fraudulently create public pressure on Drummond, the RICO Defendants provided PAX with the information for this report with full knowledge that said information was based on the false, paid-for testimony of imprisoned Colombian paramilitaries. PAX then published this report on its website, and disseminated the report to European governmental officials and European businesses, with the RICO Defendants' full knowledge, and despite Drummond's notification to PAX that the testimony of the witnesses upon whom the report relies for its malicious allegations was paid for. PAX's publishing and dissemination of this report was done in furtherance of the RICO Defendants' multifaceted and fraudulent scheme to extort money from Drummond.

23.  Ricardo Garzon ("Garzon") is a Colombian attorney and, at all relevant times, was a member of the RICO Defendants' litigation team in the *Balcero* case. Garzon facilitated some of the illegal witness payments described in

this Complaint, and did so with the purpose of obtaining false testimony against Drummond that the RICO Defendants utilized in their multifaceted and fraudulent scheme to extort money from Drummond. Upon information and belief, Garzon is a Colombian citizen and resides in Colombia.

24.     Carlos Toro ("Toro") is the Colombian criminal attorney for at least one of the witnesses paid by the Enterprise. Toro has also been retained as an "expert" for the Enterprise. Toro conspired with and assisted the RICO Defendants in obtaining false, paid-for testimony against Drummond that the RICO Defendants utilized in their multifaceted and fraudulent scheme to extort money from Drummond. Upon information and belief, Toro is a Colombian citizen and resides in Colombia.

25.     Secure Pointe Partners International, LLC ("Secure Pointe") is a private investigation and security firm located in Houston, Texas. Secure Pointe was retained by the Enterprise to provide "investigation" services in Colombia. Based on the testimony of at least one witness, Secure Pointe is believed to have acted as a conduit for the Enterprise's payments to incarcerated witnesses and their lawyers.

26.     Witness for Peace ("Witness for Peace") is a non-profit organization headquartered in Washington, D.C., which, according to its website, seeks to "chang[e] U.S. policies and corporate practices that contribute to poverty and

oppression in Latin America and the Caribbean." *See* http://witnessforpeace.org/section.php?id=89. In concert with and with the assistance of the RICO Defendants, Witness for Peace engaged in a public campaign in the United States, including speaking engagements in Alabama, disseminating false and misleading statements about Drummond that were premised on the false testimony of witnesses paid by the RICO Defendants in an effort to destroy Drummond's reputation and fraudulently create public pressure on Drummond to pay money to the RICO Defendants so that they would cease their extortionate scheme.

27.    At all relevant times, each of the non-party co-conspirators named in Paragraphs 18 through 26 acted in concert with, or as an agent for, the RICO Defendants and conspired with the RICO Defendants to perform the acts described above.

## IV.    SUBJECT MATTER JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964(c). Drummond's first claim for relief is a federal law claim arising under 18 U.S.C. § 1961, *et seq.*, and thus 28 U.S.C. § 1331 provides this Court with subject matter jurisdiction. There is also complete diversity of citizenship and the amount in controversy, including

compensatory and punitive damages, exceeds $75,000. Accordingly, this Court also possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

29. Drummond's state law claims arise out of the same case or controversy as its federal law claims and involve a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over Drummond's state law claims under 28 U.S.C. § 1367.

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Drummond's claim occurred in this District. Venue is also proper in this District under 18 U.S.C. § 1965.

## V.    PERSONAL JURISDICTION

31. Exercise of jurisdiction over Collingsworth is appropriate in this District because he conducts extensive business activities within this State. Collingsworth has systematically and purposefully availed himself of the Alabama forum by instituting and participating in litigation against Drummond in this District for over 10 years. Collingsworth is the mastermind and leader of a massive and multifaceted campaign to defraud and extort Drummond. The effects of this campaign were intended to be and were in fact felt, and continue to be felt, in the United States, and Alabama in particular, by Drummond, a known Alabama

resident.  Personal jurisdiction over Collingsworth is proper under 18 U.S.C. § 1965.

32.  Exercise of jurisdiction over Conrad & Scherer is appropriate in this District because Conrad & Scherer conducts extensive business activities within this State.  Conrad & Scherer has purposefully availed itself of the Alabama forum by instituting and participating in litigation against Drummond in this District from 2009 through the present as part of its scheme to defraud and extort money from Drummond, a known Alabama resident.  Through its agents and co-conspirators, Conrad & Scherer has transacted and continues to transact business in this State, and there is a substantial nexus between Conrad & Scherer's purposeful availment of the Alabama forum and Drummond's claims.  Conrad & Scherer's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama.  Conrad & Scherer was aware of the effects in Alabama of those acts, which were for the benefit of Conrad & Scherer, and its co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Conrad & Scherer in committing those acts.  Personal jurisdiction over Conrad & Scherer is proper under 18 U.S.C. § 1965.

33.  Exercise of jurisdiction over Bill Scherer is appropriate in this District because he conducts extensive business activities within this State.  Scherer has systematically and purposefully availed himself of the Alabama forum by

instituting and participating in litigation against Drummond in this District since 2009. He is presently admitted *pro hac vice* in the federal courts of Alabama as counsel of record in *Baloco* (since April 10, 2009) and in *Balcero* (since June 18, 2009). As Managing Partner of Conrad & Scherer and counsel of record in these fraudulent cases against Drummond, Scherer substantially directed and participated in a massive and multifaceted campaign of fraud and extortion, the effects of which were intended to be and were in fact felt, and continue to be felt, in the United States and Alabama in particular, by Drummond, a known Alabama resident. Through his agents and co-conspirators, Scherer has transacted and continues to transact business in this State, and there is a substantial nexus between Scherer's purposeful availment of the Alabama forum and Drummond's claims. Scherer's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. Scherer was aware of the effects in Alabama of those acts, which were for the benefit of Scherer, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Scherer in committing those acts. Personal jurisdiction over Scherer is proper under 18 U.S.C. § 1965.

34. Exercise of jurisdiction over IRAdvocates is appropriate in this District because IRAdvocates conducts extensive business activities within this State. Collingsworth, Levesque, and Leete are all agents of IRAdvocates and have

had extensive contacts with this State in connection with their litigation against Drummond, including numerous trips to Alabama in furtherance of their extortionate schemes. IRAdvocates has taken an active role in the litigation against Drummond in Alabama, including contacting witnesses, gathering evidence, providing "collaborating attorneys" to assist in the litigation and as the provider of email services to Collingsworth and others involved in developing the cases against Drummond. Additionally, IRAdvocates is part of a massive and multifaceted fraudulent campaign to extort money from Drummond, a known Alabama resident. Through its agents and co-conspirators, IRAdvocates has transacted and continues to transact business in this State, and there is a substantial nexus between IRAdvocates' purposeful availment of the Alabama forum and Drummond's claims. IRAdvocates' co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. IRAdvocates was aware of the effects in Alabama of those acts, which were for the benefit of IRAdvocates, and its co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of IRAdvocates in committing those acts. Many of Collingsworth's emails directing these witness payments related to the Alabama litigation were sent from Collingsworth's IRAdvocates email address and, upon information and belief, therefore through IRAdvocates'

email server.  Personal jurisdiction over IRAdvocates is proper under 18 U.S.C. § 1965.

35.    Exercise of jurisdiction over Ramirez is proper pursuant to 18 U.S.C. § 1965(b) & (d) and Ala. R. Civ. P. 4.2.  Upon information and belief, Ramirez maintains a residence in New York.  Ramirez has also transacted business and engaged in illegal acts in the United States and Alabama which give rise, in part, to Drummond's claims.  For example, Ramirez has (i) met with the co-defendants and co-conspirators in the United States, and in Alabama, to plan and execute their fraudulent scheme to extort Drummond; (ii) assisted the co-defendants in funneling money to witnesses in Colombia which was sent by the co-defendants from the United States to Ramirez, or his employees or agents, in Colombia; (iii) assisted the co-defendants in obtaining false testimony against Drummond, and did so with full knowledge that it would be submitted in court proceedings in Alabama; (iv) received thousands of dollars in payments from his co-defendants in the United States which he used to further their multifaceted and extortionate campaign against Drummond; (v) caused to be filed in the Northern District of Alabama three fraudulent actions against Drummond (*Baloco*, *Balcero* and *Melo*); (vi) entered into contractual agreements with co-defendants Collingsworth and Conrad & Scherer entitling Ramirez to contingency fees in at least *Baloco* and *Balcero*; (vii) participated in or directed numerous phone calls, emails and other forms of

communications with the other RICO defendants and co-conspirators in the United States for the purpose of planning and carrying out their conspiracy and extortionate scheme; (viii) participated in and orchestrated campaigns in the United States designed to fraudulently influence government officials and the media for the purpose of extorting money from Drummond. Ramirez committed his illegal and wrongful acts with the purposeful intent that the effects of his acts be felt in the United States, and Alabama in particular, by Drummond, a known Alabama resident. Ramirez's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. Ramirez was aware of the effects in Alabama of those acts, which were for the benefit of Ramirez, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Ramirez in committing those acts.

36. Exercise of jurisdiction over Ivan Otero is proper pursuant to 18 U.S.C. § 1965(b) & (d) and Ala. R. Civ. P. 4.2. Otero has transacted business and engaged in illegal acts in the United States and Alabama which give rise, in part, to Drummond's claims. For example, Otero has (i) ████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████ (ii) assisted the co-defendants in obtaining false testimony against Drummond, and did so with full knowledge that it would be submitted in court proceedings in

Alabama; (iii) received thousands of dollars in payments from his co-defendants in the United States which he used to further their multifaceted and extortionate campaign against Drummond; (iv) caused to be filed in the Northern District of Alabama three fraudulent actions against Drummond (*Baloco*, *Balcero* and *Melo*); (v) entered into contractual agreements with co-defendant Collingsworth and Conrad & Scherer entitling Otero to contingency fees in at least *Baloco* and *Balcero*; (vi) participated in or directed numerous phone calls, emails and other forms of communications with the other RICO defendants and co-conspirators in the United States for the purpose of planning and carrying out their conspiracy and extortionate scheme; (vii) appeared as counsel for witnesses in trial testimony taken for and submitted in *Balcero*, an action pending in federal court in Birmingham, Alabama; and (viii) on November 7, 2013 and March 5, 2015, submitted false declarations in judicial proceedings in the Northern District of Alabama in an effort to fraudulently conceal the scope and nature of the RICO Defendants' payments to witnesses. Otero committed his illegal and wrongful acts with the purposeful intent that the effects of his acts be felt in the United States, and Alabama in particular, by Drummond, a known Alabama resident. Otero's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. Otero was aware of the effects in Alabama of those acts, which were for the benefit of Otero, and his co-conspirators and agents were

working at the direction, under the control, at the request, and/or on behalf of Otero in committing those acts.

37.     Exercise of jurisdiction over Albert van Bilderbeek is proper pursuant to 18 U.S.C. § 1965(b) & (d) and Ala. R. Civ. P. 4.2.  Albert van Bilderbeek is a U.S. citizen and has transacted business and engaged in illegal acts, many of which occurred in the United States and which give rise, in part, to Drummond's claims. For example, Albert van Bilderbeek has (i) ███████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ (ii) assisted the co-defendants in obtaining false testimony against Drummond, and did so with full knowledge that it would be submitted in court proceedings in Alabama; (iii) entered into a contractual agreement with co-defendant Collingsworth to pursue fraudulent claims against Drummond, a known Alabama resident, relating to oil and gas rights in Colombia; (iv) participated in or directed numerous phone calls, emails and other forms of communications with the other RICO defendants and co-conspirators in the United States for the purpose of planning and carrying out their conspiracy and extortionate scheme; (v) participated in and orchestrated media campaigns in Europe designed to fraudulently influence government officials and the media for the purpose of extorting money from Drummond.  Albert van Bilderbeek committed his illegal and wrongful acts with the purposeful intent that

the effects of his acts be felt in the United States, and Alabama in particular, by Drummond, a known Alabama resident. Albert van Bilderbeek's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. Albert van Bilderbeek was aware of the effects in Alabama of those acts, which were for the benefit of van Bilderbeek, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of van Bilderbeek in committing those acts.

## VI.    FACTUAL ALLEGATIONS

### THE LITIGATION AGAINST DRUMMOND

#### *General Summary*

38.    Collingsworth is an American plaintiffs' attorney who, between 2002 and 2009, was admitted *pro hac vice* in Alabama in five lawsuits alleging Drummond had paid paramilitaries in Colombia to murder three Colombian union leaders. After consolidation, these lawsuits (hereinafter collectively referred to as "*Romero*") resulted in a dismissal in favor of Drummond Company and a jury verdict in favor of the remaining defendants, including Drummond Ltd., in 2007. The judgment in favor of Drummond was affirmed on appeal and became final on February 26, 2009. Less than 30 days later, Collingsworth filed another lawsuit against Drummond (*Baloco*), claiming yet again that Drummond paid paramilitaries in Colombia to murder the same three Colombian union leaders.

Two months after that, Collingsworth filed another lawsuit against Drummond (*Balcero*), this time claiming Drummond paid paramilitaries to murder scores of innocent Colombians living along the rail line that transports coal from the Colombian Mine to the coast where it is loaded for shipment to overseas customers. Collingsworth was admitted *pro hac vice* in Alabama for both *Baloco* and *Balcero*, and those admissions remain active today. Both *Baloco* and *Balcero* resulted in dismissals in favor of Drummond, and both were affirmed by the Eleventh Circuit Court of Appeals. Shortly before the last of the above-referenced cases was dismissed, Collingsworth filed yet another case (*Melo*), which awaits ruling on Drummond's motion to dismiss.

### ***Romero***

39.     On March 14, 2002, Collingsworth, who was then the general counsel for a group called the International Labor Rights Fund, filed a lawsuit against Drummond falsely alleging Drummond had paid Colombian paramilitaries to murder three leaders of the dominant labor union at the Colombian Mine: Valmore Locarno, Victor Hugo Orcasita and Gustavo Soler. In his attempts to prosecute these false claims, Collingsworth teamed up with Daniel Kovalik, general counsel of the United Steelworkers of America, and Francisco Ramirez, then the president of a Colombian mineworkers' union.

40.    Collingsworth and his team spent the next several years attempting, unsuccessfully, to substantiate their false claims against Drummond.  Drummond was ultimately dismissed at summary judgment on March 5, 2007.  The remaining claims against Drummond's Colombian subsidiary and its president were tried before an Alabama jury in July 2007, resulting in a complete defense verdict.

### *The Enterprise Begins to Take Shape*

41.    Shortly before the *Romero* verdict, Collingsworth formed IRAdvocates.  According to its website, IRAdvocates is supposedly a not-for-profit entity "focused on litigation against US corporations for human rights violations committed abroad, principally under the Alien Tort Statute (ATS)."  As Collingsworth once described his activities, he uses the ATS to "chase corporations around" and file claims on behalf of aliens for alleged human rights violations.  In June 2007, Collingsworth hosted a "launch party" for IRAdvocates in order to solicit funds for their "human rights" litigation.  The invitation stated that without donated funds, "IRAdvocates will not be able to continue their litigation work here and abroad."  This invitation was sent via email by Mr. Collingsworth to a list of "Friends," one of whom was Steven Donziger.  Mr. Donziger is another "human rights" lawyer who was recently found responsible for perpetrating what the Wall Street Journal described as "arguably the greatest legal

27

fraud in history"[3]—an Ecuadorian judgment against Chevron which a New York federal judge determined was procured by fraud and bribery. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014).

42.     The *Romero* verdict in July 2007 came as a crushing blow to Collingsworth and his Colombian union collaborators, including Francisco Ramirez.  Following the verdict, Ramirez told the Miami Herald, "We're just getting started. . . . We are going to multiply our efforts to start a boycott.  It's the only way to get justice in this case."

43.     Multiply their efforts they did.  After the vindication of Drummond by an Alabama court, Defendants began a multifaceted campaign to destroy Drummond, and procure a fraudulent financial windfall, using, *inter alia*, three fraudulent lawsuits, media campaigns in the U.S., Colombia and Europe, and multiple unions and activist groups, to spread the false message that Drummond was complicit with a terrorist organization in the murders of hundreds of Colombians.  In an effort to bolster these claims, the Enterprise funneled hundreds of thousands of dollars to Colombian criminals, their families, and their lawyers. Based on information uncovered to date, the payments exceed $███████

44.     But after the failure of *Romero*, Collingsworth and Ramirez needed to find new financial backing for their fraudulent and extortionate campaign.  Upon

---

[3] *Available at* http://www.wsj.com/articles/a-tort-mercenary-recants-1424220191.

information and belief, *Romero* was funded by the United Steelworkers and certain plaintiffs' attorneys, none of whom apparently desired or were able to fund additional baseless litigation against Drummond. Collingsworth found a willing partner in the Florida law firm of Conrad & Scherer and its managing partner, Bill Scherer. Collingsworth joined Conrad & Scherer as a partner at the beginning of 2008, and, with their financial support and funds from IRAdvocates, began manufacturing new cases to bring against Drummond. According to IRAdvocates' website:

> In February, 2008, IRAdvocates formed an important partnership with a private law firm, Conrad & Scherer. One of the founding partners of that firm, William Scherer, had collaborated on human rights cases with IRAdvocates and decided to become fully involved in the pursuit of justice in the global economy. The central component of the agreement is that Conrad & Scherer funds all U.S. litigation costs for the ATS cases, freeing IRAdvocates to use its resources to support fact finding in the countries where the violations occur and to train and support local lawyers who collaborate with us on the litigation. Based on this arrangement, 100% of any funds raised by IRAdvocates goes to the field to help local human rights advocates and lawyers perform their crucial role in these cases.

45. As discussed in more detail below, the Enterprise's members on the ground in Colombia did indeed play a "crucial role" – they served as conduits for hundreds of thousands of dollars to be paid to witnesses, their families, and their criminal lawyers.

46.     In 2008, the Enterprise's agents "in the field" in Colombia included: Francisco Ramirez; Conrad & Scherer employee Rebecca Pendleton (who at some point became Ramirez's wife); Yineth (a/k/a Yina or Gina) Baeza, assistant to Ramirez and secretary for Conrad & Scherer in Colombia; and Ricardo Garzon, Colombian "field attorney" for IRAdvocates and Conrad & Scherer.  As described more fully below, these individuals participated in recruiting plaintiffs for Defendants' fraudulent lawsuits, and facilitating payments to witnesses to support the lawsuits.

### *The Enterprise's Way of Doing "Business"*

47.     The Enterprise has pursued numerous multinational corporations in lawsuits premised on allegations of collaboration with Colombian paramilitaries. According to the IRAdvocates website, the Enterprise is currently pressing such claims against Dole Food Company, Inc., Occidental Petroleum Corporation, Chiquita Brands International, and BP, plc.  Evidence discovered to date suggests that the Enterprise's fraudulent practices and witness payment schemes permeate all of their cases in Colombia.  Indeed, Collingsworth and Conrad & Scherer have claimed that paying Colombian witnesses and their families to procure testimony is an integral part of their business plan and strategy.

48.     For example, according to testimony provided by Collingsworth, he made a cash payment to "a witness against Dole" to provide facts concerning

"Dole's presence and operations in Colombia's banana zone." The witness insisted the payment be made in cash so that there would be "no record of the transaction." After this payment was discovered by Drummond, Collingsworth claimed it was a "fee" for an "expert." Although the details of this payment and who it was made to are still being investigated, Collingsworth has recently revealed he has discussed an arrangement with Raul Hasbun—a paramilitary leader and one of the primary witnesses against both Dole and Chiquita—whereby Hasbun could be retained and paid as an "expert."

49. Furthermore, Drummond has discovered an email between Collingsworth and other lawyers pursuing claims against Chiquita wherein Collingsworth advocated for the payment of Colombian witnesses' criminal legal fees, stating it was ethical to do so but the "question is doing so in a way to minimize impact on credibility." Perhaps anticipating resistance from his fellow lawyers to the concept of providing such a financial benefit to fact witnesses, Collingsworth stated, "For those reluctant, tell me how else we get truthful evidence of an AUC-Chiquita discussion."

50. Accordingly, the Enterprise's schemes to corruptly influence Colombian witnesses are many. However, Drummond has been the most frequent target of the Enterprise's fraudulent and criminal methods.

### *The Manufacture and Filing of the Fraudulent Litigation Against Drummond Following the <u>Romero</u> Verdict*

51. After the jury verdict in *Romero*, Collingsworth and his "team" began preparing for new lawsuits. They began recruiting numerous Colombian villagers for what would become *Balcero*, a suit alleging Drummond collaborated with paramilitaries resulting in the murders of hundreds of innocent civilians along the Colombian rail line. They organized mass meetings (some including as many as 150 people), encouraging potential plaintiffs to join a lawsuit against Drummond that would be filed in the United States. Upon information and belief, most of these meetings were organized and conducted by, among others, Yineth Baeza and Ricardo Garzon. Many of these potential plaintiffs had never even heard of Drummond before being approached by members of the Enterprise, and had never considered Drummond to be responsible for the deaths or disappearances of their relatives.

52. The Enterprise also began manufacturing evidence for the new cases, scouring Colombian prisons for anyone willing to give false testimony against Drummond.

53. One of the first "witnesses" they found was Jairo Jesus Charris Castro ("Charris"). In April 2008, Drummond Ltd. received an extortionate email purportedly from Charris (Charris in later testimony denied writing the email). The email stated that Charris was wanted by Colombian authorities in connection

32

with the murders of the Drummond union leaders, and that "the union" was offering him money and relocation from Colombia if he would state that Drummond was complicit in the union leaders' murders. Drummond immediately turned this email over to the Colombian Fiscalia (Colombia's equivalent to the U.S. Attorney's Office), and upon information and belief this led to the ultimate arrest of Charris in or around July 2008.

54.     After his arrest, Charris gave a deposition to the Fiscalia on July 16 and 17, 2008, wherein he testified he had no knowledge of Drummond having collaborated with the AUC or having any involvement in the union leader killings.

55.     But in that same month, Collingsworth or a member of his "team" began meeting with Charris. After these meetings, the "testimony" of Charris began changing dramatically. At some point, an agreement was made to make monthly payments to the family of Charris. Based on information uncovered to date, the payments date back to at least July 2009, just before Charris signed a declaration for Collingsworth and his "team" claiming that Drummond was complicit in the murders of the union leaders. The payments to Charris ▮▮▮▮ ▮▮▮▮▮▮▮▮ and his shifting "testimony" are detailed more fully in paragraphs 67 through 77 below.

56.     Toward the end of 2008, in order to obtain additional fraudulent testimony, the Enterprise added another member: Ivan Alfredo Otero. Otero is a

Colombian criminal attorney based in Valledupar who at the time was representing numerous Colombian paramilitaries. Two of his paramilitary clients were Alcides Mattos Tabares ("Samario") and Jhon Jairo Esquivel Cuadrado ("El Tigre"). These two individuals were incarcerated in Colombia and participating in the Justice and Peace program, a peace agreement reached between the government of Colombia and the AUC whereby the AUC agreed to disband and turn themselves in to authorities in exchange for a substantially reduced prison sentence—a maximum of eight years. Eligibility for this reduced sentence was conditioned on the paramilitary member's admission of his crimes, reparations to victims, and provision of *truthful* testimony in the course of the Justice and Peace program, which included public hearings at which victims could attend.

57. As of the end of 2008, both El Tigre and Samario had testified numerous times in the Justice and Peace process and never once claimed to have any knowledge regarding Drummond. But in or around November of 2008, Collingsworth approached their lawyer, Otero, and promised him a contingency fee in any civil judgment against Drummond. ████████████████████ ████████████████████████████. Upon information and belief, Otero was also promised contingency fees in Collingsworth's other cases involving Colombian paramilitaries pending against Dole Foods and Chiquita Brands

International.  Collingsworth has testified Otero is a member of his "legal team" in those cases.

58.  After Otero joined the Enterprise, both El Tigre and Samario began promising "testimony" against Drummond.  Their "testimony" for Collingsworth, however, was irreconcilable with testimony they provided to Colombian authorities. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

59.  With new plaintiffs recruited, and the "testimony" of at least Charris, El Tigre and Samario arranged, Collingsworth and Conrad & Scherer filed the *Balcero* suit in May 2009, alleging that Drummond paid substantial sums of money to the AUC, characterized as "security" payments, and that Drummond was complicit in the murders of "hundreds, or even thousands," of Colombian civilians. Ironically, it is now known that Collingsworth and Conrad & Scherer (and their Enterprise) were the ones making substantial payments to paramilitary members, and they attempted to justify many of these payments as "security" payments.

60.  As stated above in paragraph 38, *Baloco*, a second case based on the murders of the three Drummond union leaders, was filed in March 2009, shortly after the *Romero* decision was affirmed on appeal.  The Enterprise filed this case

on behalf of the children of the union leaders, and attempted to avoid the application of res judicata by fraudulently contending the children were not parties to *Romero*. This was irrefutably false, as the children were identified as plaintiffs in one of the *Romero* complaints. Furthermore, in the email invitation to the IRAdvocates "launch party" referenced in paragraph 41 above, Collingsworth solicited funds to for use in the *Romero* trial, stating, "We represent the widows *and children* of the slain leaders." (Emphasis added). Nevertheless, Collingsworth obtained and submitted to the federal court in Alabama false declarations from the mothers of these children in which they testified that the children were never intended to be parties to *Romero*. Both the federal court in Alabama and the Eleventh Circuit Court of Appeals agreed that these declarations were a "sham."

### The Enterprise Secures Additional Financing

61. Despite IRAdvocates' representation on its website that "Conrad & Scherer funds all U.S. litigation costs" for its cases, the Enterprise, including its payments to witnesses, was not only funded by Conrad & Scherer. In or around late 2009, Collingsworth and Bill Scherer approached the law firm of Parker, Waichman and Alonso, LLP (now Parker Waichman, LLP) regarding providing financing for the fraudulent lawsuits against Drummond, as well as ATS cases against other corporations. Upon information and belief, Parker Waichman's

funds were used by the Enterprise to pay witnesses, their families, and/or their criminal lawyers.

62.     The Enterprise also solicited financial assistance from Albert van Bilderbeek, a principal of Llanos Oil.  Llanos Oil previously sued Drummond in 2005 claiming its oil rights in Colombia were "stolen" by Drummond, and that Drummond conspired with the Colombian government to have Hendrik van Bilderbeek—the brother of Albert and another principal of Llanos Oil—imprisoned in Colombia on suspicion of money laundering and involvement with Colombian drug-traffickers.   Llanos Oil's lawsuit against Drummond was dismissed approximately 6 months after it was filed.

63.     By at least early 2010, Collingsworth and Albert van Bilderbeek began working together on a plan to, in Collingsworth's words, "clos[e] down Drummond."  On May 3, 2010, Collingsworth and Albert van Bilderbeek entered into a contingency fee agreement which provided that Collingsworth would receive 33% of any recovery against Drummond in connection with oil and gas rights allegedly taken from Llanos Oil.  The agreement stated that Collingsworth had been providing legal advice on this issue for approximately four months prior to the date of the agreement.

64.     On June 29, 2010, Collingsworth and Albert van Bilderbeek discussed media coverage of Collingsworth's allegations against Drummond, and strategized

on ways to garner additional media coverage with the Dutch press.   During the course of these discussions, Collingsworth informed Albert van Bilderbeek, "I look forward to meeting and **together closing down Drummond**."  (Emphasis added).

65.    Over the next several months, Collingsworth worked with Albert van Bilderbeek in attempting to secure funding for the Enterprise's fraudulent litigation against Drummond, as well as spreading the false allegations of Drummond's complicity with the AUC throughout Europe.  As described in more detail below, █

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

### *The Payments and Other Unlawful Inducements to Witnesses*

66.    During the discovery process in the *Balcero* case—the only of the three fraudulent lawsuits following *Romero* to have made it through discovery—Collingsworth used the letters rogatory process to take trial testimony in Colombia of six incarcerated "witnesses" that claimed Drummond had ties to the AUC:  Jairo Jesus Charris Castro ("Charris"); Alcides Mattos Tabares ("Samario"); Jhon Jairo Esquivel Cuadrado ("El Tigre"); Libardo Duarte ("Duarte"); Jaime Blanco ("Blanco"); and Jose del Carmen Gelvez Albarracin ("Gelvez").  ██████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

*Charris*

67.     As stated above, Charris was arrested in July 2008, and testified before Colombian authorities that he knew of no connection between Drummond and any illegal groups.

68.     Shortly after his arrest, however, members of the Enterprise began meeting with Charris, and his testimony began to change.

69.     Based on information uncovered to date, Charris began receiving payments by at least July of 2009.  On July 30, 2009, Collingsworth authorized a wire transfer of 3,000,000 Colombian pesos for the benefit of Charris and his family.   That single payment was more than five times the average monthly household income in Colombia.  The payment was made by Ricardo Garzon (a Colombian "field attorney" for IRAdvocates and Conrad & Scherer) to a member or friend of Charris's family by making a deposit into her bank account. Collingsworth approved this payment, and upon information and belief the funds to make this payment originated in the United States bank account of Conrad & Scherer and were sent to Garzon using United States and international wires.  A few days after this payment was made, Charris signed a declaration typed for him by Collingsworth's team.

70.     In that declaration, Charris falsely alleged Drummond's involvement with the union leader killings.  But Charris made no claim that Drummond made

any sort of regular or ongoing payments to the AUC, or that Drummond had any collaboration with the AUC outside the specific context of the union leader killings. This testimony, too, would change after Charris and his family were provided tens of thousands of dollars in payments by the Enterprise.

71. After the first known payment, the remainder of the payments were made directly to Charris's wife, Claudia Elena Pinzon, on a monthly basis from September 2009 ████████████████████████████████████████████

████████████████████████████████████████████ The monthly payments discovered thus far are for approximately 1.5 million Colombian pesos each (more than 2.5 times the average monthly household income in Colombia for 2009), and to date have been ongoing for more than four years.

72. The first two deposits into the bank account of Charris's wife were made by Ricardo Garzon, but thereafter all such deposits were made by Yineth Baeza. Based on information known to date, virtually all, if not all, of these payments were made by a member of the Enterprise in the United States withdrawing cash from a United States bank account, and sending a wire through MoneyGram or Western Union to Baeza in Colombia who would then deposit the money into the account of Charris's wife.

73. From at least July 2009 to January 2012, the payments were effectuated by a cash withdrawal from the Conrad & Scherer bank account in

Florida, and a Conrad & Scherer employee taking that money to Western Union or MoneyGram to wire it down to Colombia, where Baeza would then deposit it into the account of Charris's wife.  In February 2012, however, the process changed. From then onward, ███████████████████████████████████████ ████████████████████████████ an employee of Conrad & Scherer's Washington, D.C. office would withdraw cash ███████████████████, wire it to Colombia via Western Union or MoneyGram, where the money could then be deposited by Baeza into the account of Charris's wife.

74.     On May 16 and 17, 2012, Charris gave his trial testimony in *Balcero* via the letters rogatory process.  Drummond and its counsel traveled to Colombia, and Charris was transferred by the authorities to a Colombian courthouse to give this testimony.  In the months leading up to this testimony Drummond had inquired in the discovery process about anything of value offered or given to Charris, and the federal district court in Alabama had ordered this information to be disclosed. Despite this, the Enterprise fraudulently concealed the payments, and Charris's trial testimony was taken without Drummond knowing or being able to question Charris about the thousands of dollars he had been paid.

75.     During his May 2012 trial testimony, Ivan Otero appeared as Charris's counsel, and, in addition to Collingsworth, Lorraine Leete (of IRAdvocates) appeared as counsel for the *Balcero* plaintiffs.  Between the time of

his false declaration in September 2009, and the taking of his trial testimony in May 2012, the Enterprise paid Charris and his family more than 51,000,000 pesos, which, depending on the exchange rate used, is anywhere from approximately $25,000 to $29,000.

76.     In May 2012, Charris's testimony changed once again.  At the time of Charris's initial false declaration, the Enterprise had not yet secured false declarations from El Tigre or Jaime Blanco, but such declarations *were* obtained prior to Charris's trial testimony, and Charris changed his testimony to coincide with that of El Tigre and Blanco.

77.     A detailed description of the payments to Charris and his family which have been discovered to date is provided in Appendix A, which is attached to this Complaint and incorporated herein by reference.  The funds originated from Conrad & Scherer's U.S. bank account, and Conrad & Scherer's managing partner, Bill Scherer, knew of and approved these payments.   The Enterprise sent, or caused to be sent, these payments by means of wire communication in interstate and/or foreign commerce.  The purpose of the payments was to corruptly secure Charris's false testimony against Drummond, which Charris provided in exchange for these payments.  The Enterprise utilized the resulting false, paid-for testimony in official proceedings against Drummond to corruptly influence, obstruct, and impede the due administration of justice in federal district court in Alabama and to

further their overarching fraudulent and multifaceted criminal campaign to extort money from Drummond and otherwise damage its business interests. Each one of these payments violates 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 201 (witness bribery), 18 U.S.C. § 1956(a)(2)(A) (money laundering), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 1512 (witness tampering).

### *El Tigre and Samario*

78.     El Tigre is a mass murdering paramilitary who was captured by Colombian authorities and imprisoned in July 2000. Ivan Otero served as El Tigre's criminal attorney. Otero also represented other paramilitaries, including Samario, who is also a mass murdering paramilitary who has been incarcerated in Colombia since 2005.

79.     Otero has been linked to bribery, corruption, and threats which are rampant throughout the proceedings involving Colombian paramilitaries. According to an article by *Cambio*, documents discovered on property owned by Jorge 40, a top leader of the AUC, implicated "attorneys Guillermo Rafael Luna Arroyo and Iván Otero, in the handling of payments of substantial 'extra attorney fees' to get six important members of the north block network [of the AUC] out of the Santa Marta prison." *Cambio* described it as a "bribe and corruption story."

80.     The Colombian media outlet *Verdad Abierta* reported in September 2009 that Ivan Otero was being accused of intimidating victims and pressuring

other paramilitaries at a Justice and Peace hearing to alter their testimony to conform with that of his clients, El Tigre and Samario. According to *Verdad Abierta*, it was said that Ivan Otero "pressured [two paramilitaries] to make their confessions . . . agree with those of 'El Tigre' and 'Samario.'" *Verdad Abierta* further reported that due to changing testimonies, "[t]he victims no longer have much trust in the voluntary declarations of 'El Tigre,'" and that:

> The contradictions could mean the exclusion of 'El Tigre' from Justice and Peace, since, according to the attorneys of the victims, the former leader of the Northern Block is not committed to the truth. In addition, Iván Otero, the defense attorney of the demobilized personnel of the Northern Block [of the AUC] could be accused of false testimony and procedural fraud . . . .

81. After the Justice and Peace Process began in Colombia, El Tigre testified numerous times in that process between 2007 and 2009, and never once mentioned anything about Drummond having involvement with paramilitaries. Similarly, leading up to 2009, Samario had never claimed to have knowledge of Drummond having any connection with the AUC.

82. But, as explained above, in late 2008 Collingsworth met with Otero and promised him a substantial contingency fee in the civil cases pending against Drummond in Alabama. ████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

83.   Sometime in late 2008 or early 2009, Otero and Collingsworth approached El Tigre and Samario about providing "testimony" against Drummond. Both El Tigre and Samario ultimately signed false declarations for Otero and Collingsworth in December 2009 claiming to have knowledge of Drummond's links to the AUC.

84.   In his declaration, Samario falsely claimed to have extensive knowledge regarding Drummond's complicity in the murders of the three union leaders.  But just eleven days prior to signing this false declaration, Samario testified at a Justice and Peace hearing regarding these very murders.  He was specifically asked whether he knew why the murders occurred, how they were planned, and who cooperated, and testified he was not aware of whether Drummond had anything to do with the killings.

85.   Just two months after El Tigre signed his declaration for the Enterprise, falsely claiming Drummond had ties to the AUC, he, too, provided testimony to the Colombian authorities.  He testified, under oath, that he had no knowledge whatsoever of Drummond having anything to do with paramilitaries:

> **ASKED:** Please state if you found out or if you realized about a possible infiltration, of members of the self-defenses from the Northern Block in DRUMMOND. In case it is affirmative, what do you know in this respect? **ANSWERED:** I never knew nor was I ever told to look for an approach with that company. Our objective was to fight subversion. **ASKED:** Please state if you found out about a possible indulgence, permissiveness, cooperation, liking or sympathy of the managers or workers

from DRUMMOND with members of the self-defenses of the Northern Block. In case it is affirmative, what do you know in this respect? **ANSWERED:** Never did I personally receive money or logistics from that company; on the contrary, we were financed by installments from the cattlemen[] and for that, there was a financier in charge, a retired captain from the SIPOL by the name of WILSON POSADA. He was the one who coordinated the actions and the coordinator who was at the head was Mr. SANTIAGO TOBON. I never had anything to do with the finance issues. My activity was the military action against the subversion. I never had any meeting with DRUMMOND nor do I know them. I know that such company exists because when I was at the head, they told me where it was located, and the military forces protected it. … **ASKED BY THE DEFENSE MR. AUGUSTO JIMENEZ:** Under oath, please say in simple and precise manner if during the time that you were in command of self-defense groups, was there any relation or link of any nature with DRUMMOND or its executives AUGUSTO JIMENEZ, GARRY DRUMMOND and ALFREDO ARAUJO? **ANSWERED:** At no moment have I heard or have I had any knowledge that there have been links of that company or of the persons mentioned in the question with the Self-Defenses. I have not heard about them whether outside or being in prison.

86. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

88.     In March 2012, both El Tigre and Samario gave their trial testimony in *Balcero* via the letters rogatory process.  Drummond and its counsel traveled to Colombia, and each paramilitary was transferred by the authorities from their respective prison to a Colombian courthouse to give this testimony.  Francisco Ramirez appeared as an attorney for the *Balcero* plaintiffs at the testimony of Samario.  Collingsworth and Lorraine Leete (of IRAdvocates) appeared as counsel for the plaintiffs at both paramilitaries' testimonies.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

89.     ██████████████████████████████████████████

████████████████████████████████████████████████



***Jaime Blanco***

90. Between 1996 and 2001, Blanco was an independent food services contractor for the Colombian Mine, providing meals to the workers. Leading up to the murders of the three union leaders, workers at the Colombian Mine were threatening to strike due to the poor quality of the food. After the murders, it was

widely speculated that Blanco was behind the murders. Blanco was terminated as a contractor following the murders.

91. Blanco was arrested in September 2010 in connection with the murders, and he provided testimony to the Colombian authorities. He testified, under oath, that Charris (who had been a bodyguard for Blanco and had told the authorities Blanco was involved in the murders) was an extortionist. He also testified that he never met anyone named El Tigre, he had no prior knowledge of the deaths of the union leaders, and he had no knowledge of Drummond being involved with the deaths of the union leaders. He was also asked specifically about claims that his food services company was used to funnel money to paramilitaries, and testified that this was "something that is absolutely false and accounting-wise impossible. It is what we call a numerical reality."

92. At the end of his testimony, Blanco informed the Colombian authorities that money was being offered to paramilitaries to give false testimony for a civil case against Drummond in the United States:

> I want to state before Mr. Prosecutor with all due respect that a lot of interests are moving with respect to this issue since the only objective of this moment is to link DRUMMOND to a civil proceeding so that a proceeding be reopened in the United States, the proceeding that had already been closed. It is merely a financial interest. It would be good that the Office of the Prosecutor would look into the labor unions, NGOs[4] and a large

---

[4] "NGO" stands for Non-Governmental Organization. For example, IRAdvocates is an NGO.

amount of lawyers who are offering money to these demobilized groups that are in precarious financial conditions so that they say what they want to hear or say.

93.    A few months later, in February 2011, Collingsworth—who is a lawyer affiliated with unions and is the executive director of the NGO IRAdvocates—began meeting with Blanco in prison.    Lorraine Leete of IRAdvocates was present for at least one meeting.    In order to gain access to Blanco in prison, both Leete and Collingsworth misrepresented to Colombian authorities that they were "amigos" (friends) of Blanco.    Otero was also involved in these meetings, and according to Blanco's testimony in *Balcero*, Otero began representing Blanco as his attorney.

94.    Collingsworth began ingratiating himself with Blanco, asking Blanco to provide testimony against Drummond while at the same time offering assistance with Collingsworth's "contacts with the people in Washington" (presumably the U.S. authorities).    Collingsworth told Blanco that Drummond was trying to pin the union murders on him, ███████████████████████████████ According to testimony by Collingsworth, at some point Blanco requested assistance with his criminal legal fees.    The federal court in Alabama has since described this discussion of a "$100,000 criminal defense fee" as "troubling."

95.    Desiring to meet Blanco's request, Collingsworth first turned to Parker Waichman—who was at that point providing significant funding for the

fraudulent lawsuits—asking for the money to pay to Blanco. According to testimony by Collingsworth, Blanco wanted money for his criminal legal fees, and Collingsworth informed Parker Waichman that if they did not provide assistance he was concerned that Blanco would continue to testify, as he had already, that Drummond had no role in the union leader killings. Collingsworth testified that Parker Waichman declined his request to provide assistance to Blanco.

96. 

97.

98.

99.          ▮▮▮▮▮▮▮▮▮▮▮▮ Blanco signed a declaration for the Enterprise falsely accusing Drummond of being complicit in the union leader killings, as well as providing regular payments to the AUC through Blanco's food services company. Blanco claimed that these regular payments were made by him directly to El Tigre from mid-1997 through the time of El Tigre's capture in July 2000. This is irreconcilable with El Tigre's testimony that the first time he ever met Blanco was in March 2000.

100.

101. In April and May 2012, Blanco gave his trial testimony in *Balcero* via the letters rogatory process. Drummond and its counsel traveled to Colombia, and Blanco was transferred by the authorities from prison to a Colombian courthouse to give this testimony. Otero appeared as counsel for Blanco. In addition to Collingsworth, Lorraine Leete (of IRAdvocates) appeared as counsel for the

*Balcero* plaintiffs. 

102.

Blanco testified falsely and evasively, selectively invoking his right against self-incrimination to avoid answering questions posed by Drummond's counsel.

103. Collingsworth, however, intentionally elicited perjured testimony from Blanco,

The Enterprise had spent time with Blanco preparing him for his testimony, and Collingsworth knew what the answer to the above question would be, and knew that it would be false. At no point has Collingsworth or any member of the Enterprise corrected Blanco's testimony for the record.



105. All members of the Enterprise present for Blanco's testimony (Collingsworth, Leete, and Otero) ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ knew his testimony was unequivocally false, but did nothing to correct the record. Instead, they submitted Blanco's false testimony to federal district court in Alabama in support of their fraudulent lawsuits and as part of their massive extortionate scheme.

106. 

107.

***El Canoso***

108. The Enterprise also corruptly secured the false testimony of paramilitary Jose del Carmen Gelvez Albarracin ("El Canoso"). Between 2006

and 2012, El Canoso testified at least six times in the Justice and Peace process, and never once claimed Drummond had any connections to paramilitaries.

109.   But sometime between December 2010 and February 2011, El Canoso met Charris when they were incarcerated in the same prison.   By that time, Charris's family had been receiving monthly payments from the Enterprise for approximately a year-and-a-half.

110.   Charris informed El Canoso that he had already provided a declaration to the Enterprise, and offered to introduce him to Francisco Ramirez to provide testimony against Drummond.   El Canoso met with Ramirez in approximately February 2011. ████████████████████████████████████████
████████████████████████████████████████   On November 21, 2011, El Canoso, too, signed a declaration typed for him by the Enterprise.

111.   In that declaration, El Canoso did not claim to have much knowledge about Drummond, given that during the relevant time period he was an employee of Prodeco, a Colombian mining operation owned by the multinational natural resources conglomerate Glencore plc.   But the limited knowledge El Canoso claimed to have regarding Drummond is objectively false.   El Canoso claimed that he attended a meeting with Drummond security officials during which Drummond and Prodeco allegedly agreed to provide support to the paramilitaries.   One of the employees of Drummond Ltd. supposedly present was Luis Carlos Rodriguez.

Although he did not specify the date of the meeting, El Canoso testified it was during the time he was employed by Prodeco and his employment ended in 1997. Luis Carlos Rodriguez did not begin working for Drummond Ltd. until November of 1999, some two years later.

112. Within seven days of El Canoso signing this declaration, a wire transfer in the amount of $2,084 was made from the Conrad & Scherer Operating Account in the United States to the Colombian bank account of El Canoso's wife.

113. In the months leading up to El Canoso's trial testimony in *Balcero*, which was taken in April 2012, Drummond inquired in the discovery process about anything of value offered or given to El Canoso, and the federal district court in Alabama ordered this information to be disclosed. Despite this, the Enterprise fraudulently concealed the payments, and El Canoso's trial testimony was taken without Drummond knowing or being able to question him about the thousands of dollars he had been paid.

114. In addition to Collingsworth, Lorraine Leete (of IRAdvocates) appeared as counsel for the *Balcero* plaintiffs during El Canoso's trial testimony. Also present for the Enterprise was Yineth Baeza, assistant to Francisco Ramirez. Collingsworth knowingly elicited perjured testimony from El Canoso, not only about his allegations against Drummond, but also regarding the fact that he had been paid. Collingsworth asked El Canoso what he hoped to gain by giving his

"testimony," and El Canoso falsely stated:  "I'm not receiving any benefits, financial benefits.  I don't need them.  Since I come from a good family, a good family of principles and it's not money what makes me talk about this."

115.  All members of the Enterprise present for El Canoso's testimony (Collingsworth, Leete, and Baeza) knew his testimony was unequivocally false, but did nothing to correct the record.  Instead, they submitted El Canoso's false testimony to federal district court in Alabama in support of their fraudulent lawsuits and as part of their massive extortionate scheme.

116.  As described above, the Enterprise sent, or caused to be sent, thousands of dollars of payments to El Canoso and his family by means of wire communication in interstate and/or foreign commerce.  The funds originated from Conrad & Scherer's U.S. bank account, and Conrad & Scherer's managing partner, Bill Scherer, knew of and approved these payments.  The purpose of the payments was to corruptly secure El Canoso's false testimony against Drummond, which El Canoso provided in exchange for these payments.  The Enterprise utilized the resulting false, paid-for testimony in official proceedings against Drummond to corruptly influence, obstruct, and impede the due administration of justice in federal district court in Alabama and to further their overarching fraudulent and multifaceted criminal campaign to extort money from Drummond and otherwise damage its business interests.  The Enterprise's conduct with respect to El Canoso

violates 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 201 (witness bribery), 18 U.S.C. § 1956(a)(2)(A) (money laundering), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 1512 (witness tampering).

### Libardo Duarte (a/k/a "Bam Bam")

117. Duarte has been in Colombian prison since April 2006, when he turned himself in claiming he was a member of the AUC and requesting the reduced sentencing benefits of the Justice and Peace law available only to paramilitaries. But the Head of the National Unit of Prosecutor Offices for Justice and Peace has expressed doubt as to whether Duarte was ever a paramilitary. It is known that numerous criminals have falsely claimed to be paramilitaries in an effort to obtain the benefits of the Justice and Peace law. In fact, Otero recently submitted a declaration to federal district court in Alabama in which he testified that "a lot of drug dealers, seeing a chance to get reduced sentences, also took advantage of the Justice and Peace program by claiming they too were AUC members, even though they were not."

118. On numerous occasions between 1997 through 2007, Duarte was treated for drug addiction and alcoholism. One of the treatment centers that treated Duarte has stated that he presented "behavior of a pathological liar and duplicity." The Supreme Court of Colombia, Criminal Appeals Panel has dismissed his testimony as not credible, holding: "The declarer Libardo Duarte is not

creditworthy, because nobody knows him and many of his statements are unsustainable . . . ."

119.  Collingsworth first began meeting with Duarte in January or February 2010, and was accompanied by Duarte's Colombian criminal lawyer, Carlos Toro. As of that time, although he had testified several times in connection with the Justice and Peace process, Duarte had never claimed to have any knowledge regarding Drummond.

120.  The Enterprise communicated both with Duarte and Toro on numerous occasions regarding obtaining "testimony" against Drummond.

121.  ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

122.  In February 2011, Duarte signed a declaration for the Enterprise.  The contents of this declaration are demonstrably false.  For example, he claimed to have arrived in the area of the Colombian Mine in 1998 or 1998, and that his "main job was to patrol the roads of the area to make sure that the trucks carrying Drummond's coal to [the dock of] Prodeco, where it was loaded onto ships, was safe."  But during the time period Duarte claimed to have been providing services to Drummond protecting coal trucks, Drummond Ltd. transported its coal exclusively by train.   There were no Drummond coal trucks for Duarte to protect.

Furthermore, Drummond has never used Prodeco's port to ship coal or for any other purpose.

123.   Shortly after finalizing his false declaration, Duarte emailed Lorraine Leete of IRAdvocates to provide the names and bank account information of two women, who are apparently Duarte's wives (it is unknown whether these two women are all, or only some, of Duarte's wives).  On April 18, 2011, international bank wires were sent from Conrad & Scherer's bank account in the U.S. to the Colombian bank accounts of Duarte's wives ($2,500 for one, $5,000 for the other).  On April 29, 2011, another international bank wire was sent from Conrad & Scherer's bank account in the U.S. to the Colombian bank account of one of Duarte's wives in the amount of $2,500.

124.   It is unknown what amount the Enterprise initially promised Duarte. But after the transfers referenced in the above paragraph,

125.

126.   On April 16 and May 23, 2012, Duarte gave his trial testimony in *Balcero* via the letters rogatory process.  Drummond and its counsel traveled to

Colombia, and Duarte was transferred by the authorities from prison to a Colombian courthouse to give this testimony. During this trial testimony, Carlos Toro appeared as Duarte's counsel, and, in addition to Collingsworth, Lorraine Leete (of IRAdvocates) appeared as counsel for the *Balcero* plaintiffs. In the months leading up to this testimony Drummond inquired in the discovery process about anything of value offered or given to Duarte, and the federal district court in Alabama ordered this information to be disclosed. Despite this, the Enterprise fraudulently concealed the payments, and Duarte's trial testimony was taken without Drummond knowing or being able to question Duarte about the thousands of dollars he had been paid.

127. As described above, the Enterprise sent, or caused to be sent, thousands of dollars of payments to Duarte and his family by means of wire communication in interstate and/or foreign commerce. The funds originated from Conrad & Scherer's U.S. bank account, and Conrad & Scherer's managing partner, Bill Scherer, knew of and approved these payments. The purpose of the payments was to corruptly secure Duarte's false testimony against Drummond, which Duarte provided in exchange for these payments. The Enterprise utilized the resulting false, paid-for testimony in official proceedings against Drummond to corruptly influence, obstruct, and impede the due administration of justice in federal district court in Alabama and to further their overarching fraudulent and multifaceted

criminal campaign to extort money from Drummond and otherwise damage its business interests. The Enterprise's conduct with respect to Duarte violates 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 201 (witness bribery), 18 U.S.C. § 1956(a)(2)(A) (money laundering), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 1512 (witness tampering).

### *Payments to a man named Jose Joaquin Pinzon Perez*

128.   The Enterprise has also made substantial payments to a man named Jose Joaquin Pinzon Perez.   According to testimony provided by Collingsworth, these payments were for a paramilitary known as alias "Halcon."   "Halcon" was identified by Mr. Collingsworth as a witness with relevant knowledge in *Balcero*, but his testimony was never taken.

129.   Collingsworth has testified inconsistently regarding who Halcon actually is, at times claiming Pinzon was an intermediary for Halcon and at other times claiming Pinzon *was* Halcon.   The most recent version of Collingsworth's testimony on this subject is that he does not know Halcon's true identity and has never met the man.

130.   Based on information uncovered to date, the Enterprise made monthly payments to Pinzon from at least September 2007 through October 2012, totaling more than $73,000.   For the first few years, most of the payments—approximately $1,250 per month—were effected by Conrad & Scherer employees withdrawing

cash from Conrad & Scherer's bank account in the United States and taking it to places such as Publix, Walmart and the Island Meat & Fish Supermarket, where it could then be sent to Jose Pinzon in Colombia via MoneyGram or Western Union international wires. In January 2012, this process changed. From then until October 2012, ███████████████████████████████████████████

███████████████████████████████████████████

an employee or agent of both Conrad & Scherer and IRAdvocates would withdraw cash ████████████████████████ in Washington, D.C., and wire it to Pinzon in Colombia via MoneyGram. A detailed description of the payments to Pinzon which have been discovered to date is provided in Appendix C, which is attached to this Complaint and incorporated herein by reference.

131.  Collingsworth has now claimed that the payments to Pinzon have ceased, and that he made the decision to stop sending monthly payments because he did not believe Pinzon could secure for him credible testimony against Drummond.

132.  The Enterprise sent, or caused to be sent, the payments to Pinzon by means of wire communication in interstate and/or foreign commerce. The vast majority of the funds originated from Conrad & Scherer's U.S. bank account, and Conrad & Scherer's managing partner, Bill Scherer, knew of and approved these payments. The purpose of the payments was to corruptly secure false testimony

against Drummond. The Enterprise intended to use the resulting false, paid-for testimony in official proceedings against Drummond to corruptly influence, obstruct, and impede the due administration of justice in federal district court in Alabama and to further their overarching fraudulent and multifaceted criminal campaign to extort money from Drummond and otherwise damage its business interests. Each one of these payments violates 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 201 (witness bribery), 18 U.S.C. § 1956(a)(2)(A) (money laundering), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 1512 (witness tampering).

### THE ENTERPRISE'S FRAUDULENT CONCEALMENT OF THEIR DEALINGS WITH WITNESSES AND THEIR LAWYERS

133. Drummond endeavored to discover whether and to what extent the Enterprise had offered or given anything of value to any of the above-described witnesses, or any other witnesses identified in the fraudulent lawsuits. But the Enterprise fraudulently concealed their payments and other improper arrangements with witnesses and their criminal lawyers, and this concealment has continued to the present.

134. Although filed in May 2009, due to extensive motion to dismiss practice, discovery in *Balcero* did not begin in earnest until the end of 2010. On June 3, 2011, Drummond served a discovery request seeking "[a]ll documents reflecting or relating to anything of value offered or given to any [disclosed witness], any current or former Colombian paramilitary or any other potential

witness in this litigation, whether offered or given by Plaintiffs, Plaintiffs' counsel, or any other person or entity." Drummond also served an interrogatory requesting written disclosure of the same information.

135. Collingsworth signed the responses to these requests on July 5, 2011. By that date, the Enterprise had been paying Charris every month for almost two years, thousands of dollars had been offered and given to Duarte, ████████

████████████████████████████████████████████████████████████

████████████████████████ But none of the documents evidencing these payments or offers of payment were disclosed. Collingsworth responded to the interrogatory representing that the only benefits offered or provided were relocation costs for the lead *Balcero* plaintiff, "reasonable transportation, food, and lodging costs" for the *Balcero* plaintiffs who were being deposed in Alabama, and "hamburgers and other food" for Duarte during meetings discussing his false allegations against Drummond. The Enterprise transmitted these false discovery responses to Drummond's counsel through the United States wires, in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1512(c)(2) (obstruction of justice).

136. On July 26, 2011, Drummond served an interrogatory seeking disclosure of any attorney-client relationship between any lawyer representing the *Balcero* plaintiffs and any paramilitary or other witness. Collingsworth signed the response on September 9, 2011, stating that other than a relationship between him

and a witness named Rafael Garcia, "there are no other attorney-client relationships between Terrence Collingsworth, or anyone acting on Plaintiffs' behalf, and any" paramilitary or other witness. Of course, it is now known this was false, as Ivan Otero was a member of the *Balcero* plaintiffs' legal team who represented El Tigre, Samario, Blanco, and numerous other paramilitaries. The Enterprise transmitted this false discovery response to Drummond's counsel through the United States wires, in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1512(c)(2) (obstruction of justice).

137. On October 25, 2011, Drummond moved to compel a full response to the interrogatory regarding anything of value offered by the Enterprise to witnesses, seeking to ensure witness payments were not concealed based on some inappropriate claim of privilege or other objection. Collingsworth filed a response to this motion on November 8, 2011, falsely representing to the federal court in Alabama that he had disclosed all responsive information as to all identified witnesses. At the time Collingsworth and Conrad & Scherer filed this document into court, Charris had been receiving monthly payments for more than two years, Halcon had been paid monthly for more than four years, Duarte had been paid thousands of dollars, ████████████████████████████████████████ ████████████████████████████████████████ The Enterprise transmitted this false document to both the federal court in Alabama and

Drummond's counsel through the United States wires, in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1503 (obstruction of justice).

138.  On March 8, 2012, the Northern District of Alabama ordered Collingsworth and Conrad & Scherer to disclose witness payment information relating to identified witnesses or any paramilitary.  The court raised its concern over "the apparent fact that Colombian jailed paramilitaries are not willing to talk to anyone unless offered or given something of value," and that full disclosure on this issue "would serve a legitimate discovery (and litigation) purpose here: to ensure that the testimony of paramilitaries is not put up for sale and discover if, in fact, it has been."

139.  Timely compliance with this order was crucial, as none of the witnesses who would offer trial testimony against Drummond had yet been deposed (in fact, no oral testimony had been taken in the case at all).  However, the letters rogatory testimony of the incarcerated Colombian witnesses was scheduled to take place over the next few months.  Nevertheless, the fraudulent concealment continued, and all of the incarcerated witnesses provided their trial testimony without Drummond knowing the Enterprise had made any payments to witnesses.

140.  Also on March 8, 2012, the same day the above order was entered, the court held a hearing at which Collingsworth made further misrepresentations to Drummond and the court.  Drummond had requested that the letters rogatory

testimony of Samario be postponed because the Enterprise had issued a press release, which was published on Llanos Oil's website, disclosing the precise date, time and location that the testimony of Samario was to be taken, which raised security concerns for Drummond and its counsel who would be appearing at this testimony. At the hearing discussing this issue, the court questioned Collingsworth on why this information would be published on Llanos Oil's website, and expressed serious misgivings about Collingsworth's attorney-client relationship with the principals of Llanos Oil:

> THE COURT: [...] First, what is the relationship between Llanos and Drummond?

> MR. COLLINGSWORTH: There is no – they are competitors in Drummond – excuse me – in Colombia. I believe that Llanos has a claim in the World Court against the Government of Colombia that relates to a disputed title to some oil rights that Drummond holds.

> THE COURT: Okay.

> MR. COLLINGSWORTH: **There is no relationship to this case, Your Honor.**

> [...]

> THE COURT: [...] **Mr. Collingsworth, I'm going to say one more thing: I am concerned about this whole business with Llanos. Can't put my finger on it, but at a minimum I could say this to you: I don't know that your client's best interests includes that type of an association with a competitor of Drummond because you're going to open yourself up at a minimum to questions about your approach to this case and what your interests are.** Are they pro-plaintiff or anti-

Drummond; or are they anti-Drummond plus pro-competitor of Drummond. . . .

(Emphasis added). Of course, Collingsworth's representation that Llanos Oil had "no relationship to this case" was a lie. ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

141. As described in paragraphs 66 through 140 above and in Appendix D, due to the Enterprise's fraudulent concealment, all of the trial testimony in *Balcero* accusing Drummond of heinous crimes was taken without Drummond knowing about a single witness payment described in this Complaint.

### THE ASK

142. The trial testimony of the incarcerated paramilitaries was concluded in May 2012. With this false testimony in hand, and knowing that not a single witness payment had been disclosed, the Enterprise decided it was time to inquire whether Drummond would be willing to settle the fraudulent lawsuit. In June 2012, Bill Scherer sent word through a friend in Washington, D.C. to Drummond's counsel in Washington, D.C. to ask whether, now, Drummond would be willing to settle. Drummond rejected this extortionate overture. Nevertheless, the Enterprise's conduct constitutes extortion in violation of 18 U.S.C. § 1951 (Hobbs Act – extortion).

## SOME OF THE PAYMENTS ARE DISCOVERED

143.   Discovery in *Balcero* closed at the end of June 2012.  In August 2012, when Drummond no longer had the means available to seek further discovery on the issue in *Balcero*, Collingsworth and Conrad & Scherer produced a batch of documents reflecting monthly transfers to a man named Jose Pinzon, who at that time was unknown to Drummond.

144.   In January 2013, Collingsworth and Conrad & Scherer produced another batch of documents, this one including various deposit slips showing deposits into the account of a Claudia Pinzon by a woman named Yineth Baeza. At the time, Drummond did not know that the payments were for Charris.  Also included was a wire confirmation to a woman named Celina Lombardi Nieves.  At the time, Drummond did not know that this woman was the wife of El Canoso. The production also included an email from Duarte providing the names of two women, and wire confirmations of monetary transfers to these women.

145.   No documents were produced reflecting



As explained below, it was not until November 2014 that Drummond first learned

was not until January 2015 that

## THE FURTHER FRAUDULENT CONCEALMENT

146. Between January and September 2011, Collingsworth wrote three letters—two to the Government of the Netherlands and one to Itochu Corporation, a company in negotiations to purchase an interest in Drummond's Colombian subsidiary—stating as "objective facts" that Drummond was complicit with the AUC in the murders of hundreds of Colombians, and urging the recipients of the letters to cease all business ties with Drummond. Drummond filed a defamation suit against Collingsworth and Conrad & Scherer in October 2011.

147. Due to Collingsworth and Conrad & Scherer's dispute of personal jurisdiction, which resulted in an interlocutory appeal to the Eleventh Circuit Court of Appeals, discovery in that case did not begin until early 2013. Drummond began inquiring into the purpose of the payment documents produced in August 2012 and January 2013, and sought discovery of all of the Enterprise's expenditures in *Balcero* in an effort to discover whether and to what extent witnesses in that case were paid.

148. As it started becoming clear that Charris, Duarte, and El Canoso were paid, Collingsworth and Conrad & Scherer defended these payments by claiming they were for "security" for these witnesses and their families. Collingsworth and Conrad & Scherer also repeatedly misrepresented, in pleadings, sworn testimony, and statements to the federal court in Alabama, that these were the only payments that were made. These representations, numerous examples of which are included

in Appendix D which is attached and incorporated herein by reference, were unequivocally false. █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████ These misrepresentations were made to corruptly influence, obstruct, and impede the due administration of justice in federal district court in Alabama and to further the Enterprise's overarching fraudulent and multifaceted criminal campaign to extort money from Drummond and otherwise damage its business interests, and violate 18 U.S.C. § 1503 (obstruction of justice).

149.  Nevertheless, Drummond continued pressing for information on other witness payments.  During a hearing in April 2014 in Birmingham, Alabama, the federal court specifically asked Collingsworth and Conrad & Scherer whether all payments to witnesses in *Balcero* had been disclosed, and Collingsworth knowingly lied to the court:

> [DRUMMOND'S COUNSEL]: …So the basis of their defense is these paramilitaries were telling the truth; and not only that, I reasonably believe that they were telling the truth. And if he was paying them and it looks like we're starting to build a record that almost everyone has been paid and I think we are going to be able to build a record that everyone was paid at some point, then that is very, very relevant to whether or not he reasonably believed –
>
> JUDGE PROCTOR: Let me ask that question to Mr. Smith

[counsel for Collingsworth and Conrad & Scherer]. Mr. Smith, consult with Mr. Collingsworth and let me know this. **Is there a witness that I have received testimony from south of the Equator that didn't receive a security payment?**

MR. SMITH: Can he answer that?

JUDGE PROCTOR: Sure. I'm trying not to put him on trial. I'm going through counsel.

MR. SMITH: I appreciate that, Your Honor.

MR. COLLINGSWORTH: **Your Honor, <u>the shortest way to the truth is to ask me the question.</u>** Thank you. Our papers have made it clear and I will say that a lot of the new ambush allegations that they've made, each time they make one if we get a chance to show you the facts, the facts clear up any misunderstanding of what happened. **There were exactly in this case three witnesses whose family members were moved because they received death threats, and those were Charris, Helvez [Gelvez], Guartay [Duarte]. Those are the witnesses whose family members were moved. There was an additional person named Halcon who was participating in Drummond 1 way out there and I had little to do with. I never met the guy.**

JUDGE PROCTOR: Drummond 1 in front of Judge Bowdre?

MR. COLLINGSWORTH: That's correct. He was relocated and at some point we began also helping him with his relocation assistance, but our interrogatory responses to them made clear we took him off the table, I found him not to be credible, and he is not a witness. **So the three witnesses that I've mentioned, Charris, Guartay, and Helvez, are the family members of those people who were relocated.**

JUDGE PROCTOR: **Are those the only three besides Halcon who received security payments?**

MR. COLLINGSWORTH: **That's correct.**

(Emphasis added).

150. Collingsworth's statements to the court in April 2014 were a total fabrication. It was not until almost a year later that Drummond discovered and brought to the court's attention that Collingsworth had lied in open court. Only after being caught in this lie did Collingsworth admit via affidavit that these statements were "wrong" and "inaccurate," and he promised to "be very careful not to let this happen again." Presumably in attempt to excuse his failure to tell the Court for almost a year that he had lied, Collingsworth testified in this affidavit that following the April 2014 hearing, he "was swamped with work."

151. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ These misrepresentations were made to corruptly influence, obstruct, and impede the due administration of justice in federal district court in Alabama and to further the Enterprise's overarching fraudulent and multifaceted criminal campaign to extort money from Drummond and otherwise damage its business interests, and violate 18 U.S.C. § 1503 (obstruction of justice).

152. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



### THE EXTRAJUDICIAL CAMPAIGNS

153. The Enterprise's criminal and fraudulent acts are not limited to misrepresentations in court and to Drummond in discovery processes. Indeed, it is part of the Enterprise's ordinary business practice to utilize public campaigns as a way to exert additional pressure on corporations they target. For example, during the course of his unsuccessful pursuit of the Coca Cola Company for alleged complicity with Colombian paramilitaries in the murder of union leaders, Collingsworth urged activist Ray Rogers to start a public campaign against Coke, which he did. This became known as the "Campaign to Stop Killer Coke," which remains active and is still run by Rogers today. IRAdvocates even describes on its website some of its activities against multinational corporations as "public shaming" and "political advocacy."

154. Consistent with this business practice, and consistent with Francisco Ramirez's promise after the failed *Romero* case that they would "multiply [their]

efforts to start a boycott" of Drummond, the Enterprise engaged in a worldwide public relations campaign, spreading their false allegations and the "testimony" of their witnesses to anyone who would listen. Noticeably absent from these communications is any mention that the Enterprise was paying these witnesses or their families, or that the criminal lawyer for many of the witnesses had been ███ ████████ promised a contingency fee in the cases against Drummond before his clients provided their "testimony." A detailed listing of many of the Enterprise's fraudulent communications with media outlets, the U.S. Department of Justice, and activist groups is attached hereto as Appendix E, and is incorporated herein by reference. A large number of these communications were via email, and therefore used the United States and international wires to further the Enterprise's fraudulent and multifaceted criminal campaign to extort money from Drummond and otherwise damage its business interests, in violation of 18 U.S.C. § 1343 (wire fraud).

155. And contrary to the claims by Collingsworth and Conrad & Scherer of concern for the "security" of their paramilitary witnesses, the Enterprise broadcasted the identities and "testimony" of these witnesses as soon as they possibly could. For example, within a few weeks of Charris signing the first declaration the Enterprise was able to obtain in *Balcero*, they publicly filed it, disclosing Charris's full name, identification number, and testimony. El Tigre

signed his first declaration on December 3, 2009, and Samario signed his the following day. The same day Samario signed his declaration, Collingsworth and Conrad & Scherer filed an amended complaint in *Balcero*, publicly disclosing El Tigre and Samario's identities and the substance of their testimony. On February 27, 2011, Duarte's declaration was signed. The Enterprise publicly filed it five days later, disclosing his identity, testimony, and the jail in which he was housed. Jaime Blanco's declaration was signed on October 14, 2011. Predictably, the Enterprise publicly filed it in less than fourteen days.

156. In fact, the declarations and letters rogatory testimony of every *Balcero* witness to give testimony against Drummond was published to the world at large on IRAdvocates' website. It is curious indeed for the Enterprise to claim concern for the security of these "witnesses" while at the same time plastering the internet with their identities, their allegations, and, in most instances, their locations. In reality, "security" is simply a cover for what the Enterprise's payments actually are: payments for testimony.

157. Much of the Enterprise's public campaign efforts have been aimed at damaging Drummond's business interests in Europe, where much of the coal from the Colombian Mine is exported. The Netherlands is a key component to the Enterprise's strategy, as most of the coal imported into Europe travels through the ports of Rotterdam and Amsterdam.

158.  As referenced above, in 2010, Collingsworth began meeting with Albert van Bilderbeek in the Netherlands, not only to discuss financing the fraudulent litigation against Drummond, but also to garner media attention in the Netherlands.  In an email from June 2010 discussing their efforts with the Dutch press, Collingsworth revealed his shared goal with van Bilderbeek of "closing down Drummond."  Collingsworth has at times described the subject of his communications with van Bilderbeek as "campaign case strategy."

159.  In December 2010, while again discussing drawing attention to the Enterprise's false allegations against Drummond, Albert van Bilderbeek requested that Collingsworth send him a letter addressed to members of the Dutch Parliament repeating the Enterprise's false claims.  Collingsworth suggested waiting until after the New Year, voicing concern that a letter during the holidays may "get ignored in the midst of the celebrations."  Consistent with this suggestion, Collingsworth finalized the letter on January 18, 2011, and emailed it to Albert van Bilderbeek to be hand-delivered to government officials in Amsterdam.  Van Bilderbeek also immediately published the letter on the Llanos Oil website.  After characterizing as "objective facts" the Enterprise's false allegations of Drummond's complicity in human rights violations and mass murder, Collingsworth concluded the letter by telling the Dutch Prime Minister, "I hope that you will urge your government to

terminate any business relationship with Drummond until it makes full amends for the atrocities it committed in Colombia."

160.    In February 2011, Collingsworth, with the editorial assistance of Albert van Bilderbeek, prepared and sent another letter to Dutch government officials, repeating the false claims that Drummond was complicit in murder.  This letter, too, was immediately published on the Llanos Oil website.

161.    

Upon information and belief, up to this point PAX, The Netherlands had never published anything about Drummond.  This all changed when the Enterprise started feeding PAX their false and fraudulent allegations.

162.    According to PAX, in the Spring of 2011, PAX representatives made a trip to Cesar, Colombia to begin investigating a report on Drummond's alleged links to paramilitaries.  During the course of their "investigation," they met with Francisco Ramirez, as well as some of Collingsworth and Conrad & Scherer's clients in the fraudulent litigation against Drummond.

163.    By May 2011, PAX was not very far into its "investigation,"

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

164.    What is known is that the Enterprise fed PAX with the false, paid-for testimony it was able to acquire.  According to billing records produced to date, in August 2012 a Conrad & Scherer employee was gathering paramilitary declarations to be provided to PAX.  Upon information and belief, PAX was not informed of the substantial payments to the paramilitaries that signed these declarations.  Collingsworth's billing records reflect that in November 2012, he emailed with PAX regarding "facts in [the] Drummond case fore [sic] report to be published in [the] Netherlands." █████████████████████████████████████

███████████████████████████these emails by Collingsworth have not been produced.

165.    Over the next several months, the Enterprise continued feeding PAX false information.  █████████████████████████████████████

███████████████████████████

████████████████████████ And on January 23, 2013, Collingsworth and Leete

met with Marianne Moor—PAX's Senior Programme Officer for Latin America—

to, in Collingsworth's words, "develop [Drummond] campaign in [the] European

Union."

166. With the urging and assistance of the Enterprise, and in reliance on

the false "testimony" criminally procured by the Enterprise, PAX has indeed

developed a campaign to stop the import of Drummond's coal to Europe. In June

2014, PAX published a false "report" entitled *The Dark Side of Coal: Paramilitary*

*Violence in the Mining Region of Cesar, Colombia*, with Marianne Moor serving

as the lead author. The "report" is essentially a catalogue of the false testimony

procured by the Enterprise, and provided by the Enterprise to PAX. The "report"

concludes by calling for European Union governments to "[u]rge electricity

utilities to refrain from buying coal from Drummond" until it provides a remedy to

the victims of paramilitary violence, many of whom not coincidentally would be

the Enterprise's clients in the fraudulent litigation against Drummond.

167. The Enterprise also assisted PAX in drawing attention to the PAX

"report." Very soon after the "report" was finalized, IRAdvocates published it on

its website. In October 2014, Marianne Moor and Francisco Ramirez publicly

presented the "report" in Valledupar, Colombia.

168.  PAX has formulated a "Stop Blood Coal" campaign, stating as its goal:  "We are appealing to the Dutch public through the 'Stop Blood Coal' campaign to find out whether their energy company uses blood coal and, if so, to urge the company's management to stop importing this coal."

169.  Drummond has spent inordinate amounts of time and expense dealing with the European response (both by customers and European Union governments) to PAX's anti-Drummond campaign, which is a direct result of the Enterprise's efforts as described above.

170.  The Enterprise has even attempted to fraudulently induce the authorities in the U.S. and Colombia to criminally investigate Drummond.

███████        In November 2011, Collingsworth emailed with Dan Kovalik about the possibility of an FBI investigation, and Collingsworth stated: "Well, they have been talking to me for about 2 years and I keep feeding them new stuff. Once I showed them Jaime Blanco's declaration (you saw that right?), they did go down and interview several of the key people." Collingsworth has also testified he met with Colombian authorities to share his "evidence." Upon information and belief, Collingsworth has never informed the authorities of his illicit payments to paramilitary witnesses.

## IV.    CLAIMS FOR RELIEF

### COUNT I
### Violations of RICO, 18 U.S.C. § 1962(c)

171.    Drummond realleges and incorporates herein by reference paragraphs 1 through 170 of this Complaint and Appendices A through E, as if set forth in full.

172.    At all relevant times, Drummond was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

173.    At all relevant times, each RICO Defendant was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

174.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint. The RICO Defendants and their co-conspirators have perpetrated, and continue to

perpetrate, a massive and multifaceted campaign of lies, fraud, corruption and bribery to extort Drummond to settle spurious lawsuits, to damage Drummond's reputation and business interests and to obtain a fraudulent and extortionate financial windfall, either through settlement or a judgment procured by fraud. The RICO Defendants and their co-conspirators have organized their operation into a transnational unit, operating in the United States, Colombia and Europe, with Mr. Collingsworth serving as the ringleader. This criminal enterprise has been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

    a.    Defendants Collingsworth, Conrad & Scherer, Bill Scherer and IRAdvocates have been responsible for the coordination of the scheme to defraud, extort and "close down" Drummond, and have directed their agents and co-conspirators to take actions necessary to accomplish the goals of the criminal enterprise – namely, bribing imprisoned Colombian criminals to give false testimony against Drummond, utilizing false evidence in judicial proceedings and in a massive international media campaign designed to spread false and misleading information about Drummond, and obstructing Drummond's efforts to uncover their misconduct in various U.S. court proceedings.

b.      Defendant Francisco Ramirez has been responsible for facilitating many of the payments to, and procuring the false testimony of, Colombian criminals who testified against Drummond. Ramirez has been intimately involved in recruiting imprisoned Colombian criminals willing to offer false testimony in exchange for money. He has also been instrumental in fabricating the substance of that false testimony. Ramirez has also served as one of the most active members of the criminal enterprise in disseminating false and fraudulent testimony and lies about Drummond in the Colombian and U.S. media. Ramirez has also participated in the fraudulent concealment of the Enterprise's illegal activity.

c.      Defendant Ivan Otero has been responsible for ███████ ████████████████████ procuring the false testimony of, Colombian criminals who testified against Drummond, many (if not all) of whom are his clients. Otero has been intimately involved in fabricating the substance of that false testimony. Otero has also participated in the fraudulent concealment of the Enterprise's illegal activity, and has submitted false

declarations in judicial proceedings in Alabama in an effort to

hide the truth and further the Enterprise's extortionate scheme.

d. Defendant Albert van Bilderbeek ████████████

████████████████████████████

████████████████████████████

████████. Van Bilderbeek has also been intimately involved

in orchestrating media coverage in Europe for the false

testimony of these witnesses. Van Bilderbeek orchestrated this

media coverage in an effort to pressure Drummond's European

customers to cease doing business with Drummond, to damage

Drummond's business interests, and to seek to have

Drummond implicated in criminal activity for his own financial

benefit.

175. The RICO Defendants and their co-conspirators constitute an

association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and

1962(c). Each of the RICO Defendants participated in the operation or

management of the Enterprise.

176. At all relevant times, the Enterprise was engaged in, and its activities

affected interstate and foreign commerce within the meaning of 18 U.S.C. §

1962(c).

177. The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

*Pattern of Racketeering Activity:*
*Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

178. The RICO Defendants engaged in a multifaceted and massive scheme to extort and defraud Drummond, deceive the U.S. and Colombian judicial systems, and corruptly influence and deceive the media and general public concerning Drummond's purported responsibility for the murders of scores of Colombian citizens by bribing witnesses for false testimony, spreading fraudulent and false statements regarding Drummond to the U.S. and international media, and advocating for the criminal indictment of Drummond in Colombia and the U.S. The objective of the RICO Defendants' scheme is to reap a fraudulent financial windfall, either by coercing Drummond into paying money to the RICO Defendants or by procuring a judgment from federal court in Alabama through fraud. Such a windfall would directly benefit the individual and organizational RICO Defendants, as well as their co-conspirators.

179. In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire

communication in interstate or foreign commerce, writings, signs, signals, pictures and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

a.   Emails and website postings incorporating false and misleading statements regarding Drummond and the false testimony of the Colombian criminals the RICO Defendants had paid;

b.   Writings and/or mailings between and among the RICO Defendants concerning the procurement, fabrication and purchase of the false testimony ███████████████████████████████████ ██████ that was submitted to Alabama federal courts by the RICO Defendants;

c.   Communications directed towards U.S. federal government officials and regulators incorporating false and misleading statements regarding Drummond's complicity with Colombian paramilitaries;

d.   Communications directed towards Colombian government officials and regulators incorporating false and misleading statements regarding Drummond's complicity with Colombian paramilitaries;

    e.     Funds transferred amongst the RICO Defendants, with the intent that those funds be used to promote the carrying on of the RICO Defendants' criminal activities;

    f.     Funds transferred to witnesses ███████████████████ ████████████████████████████████████ ██████████ with the intent that those funds be used to obtain false testimony against Drummond for use in the RICO Defendants' multifaceted scheme to extort and defraud Drummond;

    g.    Electronic filing and service of court papers containing false and misleading statements intended to defraud Drummond and impede the operation of courts in both the United States and Colombia.

180. Drummond incorporates by reference the attached Appendices A through E, which set forth the particular uses of wire and mail communications in furtherance of the RICO Defendants' scheme to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1443, including which individual RICO Defendant or co-conspirator caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

181. The RICO Defendants participated in the scheme knowingly, willfully and with the intent to extort and defraud Drummond into paying the RICO Defendants and their co-conspirators, and/or to defraud federal courts in Alabama

to award them a substantial monetary judgment that would be paid by Drummond. The RICO Defendants knowingly and intentionally paid money to imprisoned Colombian paramilitaries to obtain false testimony against Drummond, and then knowingly, and with the intent to defraud Drummond and otherwise damage Drummond by deceiving the U.S. and Colombian authorities and judicial systems, Drummond's customers, the media, and the general public, caused that testimony to be filed and disseminated under the pretense that it was true. The RICO Defendants disseminated this testimony, knowing it was false, with the intent that those statements and testimony would be believed and form the basis for further public attacks on Drummond, investigations of Drummond, and destruction of Drummond's business. The RICO Defendants also utilized this false testimony in a knowing attempt to initiate criminal proceedings against Drummond by U.S. federal law enforcement authorities and the Colombian government. The RICO Defendants knowingly engaged in the aforementioned conduct with the intent to generate fear in Drummond such that Drummond would pay the RICO Defendants to cease their conduct, under the guise of settlement or judgment in the litigation filed against Drummond in the Northern District of Alabama.

182. The RICO Defendants' false and misleading statements, and their evidence procured through bribery, have been relied upon by Drummond, U.S. courts, U.S. law enforcement agencies, Colombian courts, Colombian law

enforcement agencies, Drummond's customers, the media, and the general public. The RICO Defendants' false and misleading statements have caused Drummond substantial damages.

*Pattern of Racketeering Activity:*
*Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951*

183. At all times material to this Complaint, Drummond was engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

184. As described herein, the RICO Defendants have orchestrated a massive and multifaceted campaign of public attacks against Drummond based on false and misleading statements, evidence procured through bribery, a threatened civil judgment, investigations by U.S. and Colombian law enforcement agencies, and ongoing harassment and disruptions of business operations, all with the intent and effect of causing a reasonable fear of economic loss on the part of Drummond and to negatively affect Drummond's production and sale of coal in interstate commerce.

185. As described herein, the RICO Defendants manufactured false evidence – which they are relying on in their cases against Drummond – with the intent and effect of causing a reasonable fear of economic loss on the part of Drummond.

186.  As described herein, the RICO Defendants have also attempted to instigate criminal proceedings against Drummond in Colombia and the U.S. in order to extort a payment from Drummond.

187.  The RICO Defendants' actions are intended to induce in Drummond the fear that the RICO Defendants will, among other things:  (1) continue to pursue a scheme of misrepresentation and fraud to the great harm and public destruction of Drummond, unless and until Drummond pays the RICO Defendants under the guise of settlement or judgment to cease their extortionate scheme; (2) continue to seek to have Drummond indicted criminally in Colombia and the U.S. based on false evidence; (3) disseminate false evidence and statements to the media and Drummond's customers to harm Drummond's business operations.  These actions, as described herein, have created a reasonable fear of harm on the part of Drummond, including fear of economic loss.

188.  Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected – and conspired and attempted to obstruct, delay, and affect – commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the RICO Defendants attempted to induce Drummond to consent to relinquish property through the wrongful use of actual and threatened force, violence, and fear – including fear of economic harm.

*Pattern of Racketeering Activity:*
*Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A)*

189.   As described above and in Appendices A through C, RICO Defendants Collingsworth, Bill Scherer, Conrad & Scherer, and IRAdvocates have on multiple occasions, knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States ████████████████ ████████████████████████████ with the intent that those funds be used to promote the carrying on of unlawful activity, including but not limited to violations of 18 U.S.C. §§ 201, 1341, 1343 and 1951, including payments to Colombian witnesses in exchange for false testimony against Drummond.

*Pattern of Racketeering Activity:*
*Obstruction of Justice in Violation of 18 U.S.C. § 1503*

190.   In a concerted effort to defraud Drummond and thwart Drummond's attempts to uncover the truth and avoid discovery, the RICO Defendants have habitually filed or caused to be filed documents, including declarations sworn under penalty of perjury, that falsely represent the nature and scope of their payments to witnesses in Colombia.   They have also suborned the perjured testimony of the Colombian criminals they have bribed in an effort to conceal their witness payments.   Drummond incorporates by reference the attached Appendices A through D, which set forth the particular instances in which Defendants have

filed documents and false declarations, and purposefully elicited testimony they knew to be false, in furtherance of the RICO Defendants' scheme to defraud.

191.  On April 21, 2014, RICO Defendant Collingsworth knowingly misrepresented the scope and nature of his witness payments in open court in response to a direct question from a federal judge.  This misrepresentation was part of the Enterprise's efforts to conceal the true scope of the witness payments from Drummond.

192.  The RICO Defendants have made these misrepresentations with full knowledge that their statements were false.  By making these deliberate and false representations in various federal judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

*Pattern of Racketeering Activity:*
*Witness Bribery in Violation of 18 U.S.C. § 201*

193.  The RICO Defendants corruptly offered and gave money to witnesses ███████████████████ Charris, Duarte, and El Canoso, and/or their criminal lawyers, with the intent to influence the testimony of these witnesses.  The RICO Defendants corruptly offered to help Blanco with authorities in the United States, also with the intent to influence his testimony.   Drummond incorporates by

reference paragraphs ▮▮▮▮▮▮ above and the attached Appendices A through

C, which set forth the particular instances in which these witnesses received bribes

and/or other inducements in furtherance of the RICO Defendants' scheme to

defraud.  In exchange for these funds and promises, these witnesses provided false

testimony against Drummond which the RICO Defendants then utilized in their

multifaceted and massive scheme to extort money from Drummond or obtain a

fraudulent monetary judgment.

*Pattern of Racketeering Activity:*
*Witness Tampering in Violation of 18 U.S.C. § 1512*

194.   As described in paragraphs ▮▮▮▮▮▮ above and in Appendices

A through C, the RICO Defendants corruptly offered and paid money and other

illicit benefits to ▮▮▮▮▮▮▮▮ Charris, El Canoso and Duarte, and/or

their criminal lawyers.

195.   The RICO Defendants made these offers and payments with the intent

and purpose of influencing testimony by corruptly persuading ▮▮▮▮▮▮

▮▮▮ Charris, El Canoso and Duarte to falsely testify in judicial proceedings

against Drummond.   The RICO Defendants then filed this testimony in United

States federal court in Birmingham, Alabama as part of this scheme.

*Summary of the Pattern of Racketeering Activity*

196.   Each of the RICO Defendants has engaged in multiple predicate acts,

as described above and in Appendices A through E.  The conduct of each of the

96

RICO Defendants described above constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). ███████████████████

████████████ the Enterprise continues to rely on the witness testimony that was corruptly obtained through these witness payments in the various lawsuits against Drummond. ██████████████████████████ the Enterprise is fully capable of continuing to pay these and other witnesses in the future. The Enterprise has instituted lawsuits against several corporations under the Alien Tort Statute and other causes of action that rely on the same or similar paramilitary witnesses. Thus, the wrongful conduct in this case is capable of repetition and it is very likely that it will be repeated both in the lawsuits against Drummond and against other corporations.

197. Drummond was injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Drummond caused by the RICO Defendants' violations of 18 U.S.C. § 1962(c) include but are not limited to the attorneys' fees, costs, and other expenses incurred defending itself in the sham litigation in the Northern District of Alabama; damage to Drummond's business interests, including adverse effects on its sale of coal to European customers; disruption of its business, including substantial loss and diversion of time of key personnel and damage to its union relations; and expenses

of responding to and dealing with the political and public effects of the RICO Defendants' fraudulent schemes.

198. The injuries to Drummond were a but for, direct, proximate, and reasonably foreseeable result of the RICO Defendants' violations of 18 U.S.C. § 1962. Drummond is the most frequent target and victim of the RICO Defendants' unlawful Enterprise. Drummond has been and will continue to be injured in its business and property in an amount to be determined at trial.

199. Pursuant to 18 U.S.C. § 1964(c), Drummond is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## COUNT II
## CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)

200. The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

201. Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

202.   Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

203.   Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Drummond. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs 66 through 170 above and Appendices A through E.

204.   As a but for, direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Drummond has been injured in its property and business, including the attorneys' fees, costs, and other expenses incurred defending itself in the sham litigation in the Northern District of Alabama; damage to Drummond's business interests, including adverse effects on its sale of coal to European customers; disruption of its business, including substantial loss and diversion of time of key personnel and damage to its union relations; and expenses of responding to and dealing with the political and public effects of the RICO Defendants' fraudulent schemes.

205.   Pursuant to 18 U.S.C. § 1964(c), Drummond is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## COUNT III
## WILLFUL AND/OR RECKLESS MISREPRESENTATION
### in Violation of Ala. Code § 6-5-101 (1975)

206.   As outlined in paragraphs 66 through 170 above and the attached Appendices A through E, the RICO Defendants made numerous misrepresentations of material facts, both to Drummond and to courts and third-parties with the intent that Drummond rely on the same, in violation of Ala. Code § 6-5-101 (1975).

207.   As a direct and proximate result of these misrepresentations, which were relied upon by Drummond, Drummond suffered substantial damages, including but not limited to the attorneys' fees, costs, and other expenses incurred defending itself in the sham litigation in the Northern District of Alabama, as well as harm to its business.

208.   Indeed, to date Drummond has expended more than $8.5 million in the *Balcero* litigation alone, which was not dismissed at the pleadings stage due primarily to the allegations attributed to El Tigre.   The RICO Defendants fraudulently concealed the fact that in order to procure El Tigre and Samario's testimony, their criminal lawyer Ivan Otero was promised a contingency fee in the cases against Drummond ███████████████.   Due to the RICO Defendants'

fraudulent concealment, Drummond did not begin to discover this arrangement until approximately October 2013.

209. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

210. The RICO Defendants' misrepresentations were made willfully and/or recklessly.

211. Drummond is entitled to compensatory and punitive damages in an amount to be determined by a jury, and such further relief as deemed just by the jury or the Court.

## COUNT IV
## FRAUDULENT CONCEALMENT/SUPPRESSION OF MATERIAL FACTS
### in Violation of Ala. Code § 6-5-102 (1975)

212. Drummond realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint, as if set forth in full.

213. As outlined in paragraphs 66 through 170 above and the attached Appendices A through E, the RICO Defendants made numerous misrepresentations of material facts, both to Drummond and to courts and third-parties with the intent that Drummond rely on the same, while at the same time

concealing and suppressing the true facts in violation of Ala. Code § 6-5-102 (1975).

214.  The RICO Defendants had a duty to disclose these facts, both as accurate responses to Drummond's inquiries and in response to court orders requiring disclosure of the same.   Indeed, an ethics expert retained by Collingsworth and Conrad & Scherer has agreed with the opinions of another ethics expert that if payments or other inducements to fact witnesses are to be made, they must be disclosed to the opposing party and the court *before* they are made.

215.  As a direct and proximate result of this concealment and suppression, which was relied upon by Drummond, Drummond suffered substantial damages, including but not limited to the attorneys' fees, costs, and other expenses incurred defending itself in the sham litigation in the Northern District of Alabama, as well as harm to its business, which would have been avoided but for the RICO Defendants' suppression and concealment.

216.  Indeed, to date Drummond has expended more than $8.5 million in the *Balcero* litigation alone, which was not dismissed at the pleadings stage due primarily to the allegations attributed to El Tigre.   The RICO Defendants fraudulently concealed the fact that in order to procure El Tigre and Samario's testimony, their criminal lawyer Ivan Otero was promised a contingency fee in the

cases against Drummond ███████████████ Due to the RICO Defendants'

fraudulent concealment, Drummond did not begin to discover this arrangement

until approximately October 2013.

217. 



218. The RICO Defendants' suppression and concealment was done

willfully and/or recklessly.

219. Drummond is entitled to compensatory and punitive damages in an

amount to be determined by a jury, and such further relief as deemed just by the

jury or the Court.

## COUNT V
## CIVIL CONSPIRACY

220. As alleged above, at all material times, each of the RICO Defendants

acted as the agent, partner, servant, joint venturer and/or co-conspirator of each or

all of the other RICO Defendants. The RICO Defendants conspired to do the

above-described unlawful, oppressive, and immoral acts through unlawful,

oppressive, and immoral means. As outlined in paragraphs 1 through 170 above

and the attached Appendices A through E, some or all of the RICO Defendants

took overt acts in furtherance of their conspiracy in Birmingham, Alabama.

221.  As a direct and proximate result of this conspiracy, Drummond suffered substantial damages, including but not limited to the attorneys' fees, costs, and other expenses incurred defending itself in the sham litigation in the Northern District of Alabama, as well as harm to its business.

222.  Indeed, to date Drummond has expended more than $8.5 million in the *Balcero* litigation alone, which was not dismissed at the pleadings stage due primarily to the allegations attributed to El Tigre.  The RICO Defendants conspired to and did fraudulently conceal the fact that in order to procure El Tigre and Samario's testimony, their criminal lawyer Ivan Otero was promised a contingency fee in the cases against Drummond ██████████████.  Due to the RICO Defendants' fraudulent concealment, Drummond did not begin to discover this arrangement until approximately October 2013.

223.  ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████

224.  The RICO Defendants' acted willfully and/or recklessly in furtherance of this conspiracy.

225. Drummond is entitled to compensatory and punitive damages in an amount to be determined by a jury, and such further relief as deemed just by the jury or the Court.

## PRAYER FOR RELIEF

**RICO**

Based on the allegations set forth above, Drummond avers that Defendants are liable for general damages, trebled in accordance with 18 U.S.C. § 1964(c). Drummond also seeks, pursuant to statute, its reasonable costs and attorneys fees incurred in pursuing this action.

Wherefore, Drummond demands judgment for compensatory damages in an amount to be determined by a jury and trebled pursuant to statute, as well as interest, attorneys fees, costs and expenses, and such other relief as the Court and/or jury deem just.

**STATE LAW CLAIMS**

Based on the allegations set forth above, Drummond avers that Defendants are liable for compensatory and punitive damages in an amount to be determined by a jury.

Wherefore, Drummond demands judgment for compensatory and punitive damages in an amount to be determined by a jury, and such other relief as the Court and/or jury deem just.

## DRUMMOND DEMANDS A TRIAL BY JURY ON ALL ISSUES TRIABLE BY A JURY IN THE COMPLAINT

_____

William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL  35259
(205) 868-6000


Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G St. NW, Suite 800
Washington, DC 20001
(202) 627-6900


_Attorneys for Drummond Company, Inc. and Drummond Ltd._

*Drummond Company, Inc., et al. v. Terrence P. Collingsworth, et al.*

## Appendix A - Payments to Jairo de Jesus Charris Castro ("Charris")

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| 1. | July 30, 2009 | Ricardo Garzon | Mery Luz Molina Morales (member or friend of Charris's family) | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Ricardo Garzon, a member of Collingsworth's litigation team and co-conspirator. Garzon then deposits 3,000,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 2. | September 21, 2009 | Ricardo Garzon | Claudia Pinzon Ballesteros (Charris' wife) | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Ricardo Garzon, a member of Collingsworth's litigation team and co-conspirator. Garzon then deposits 1,920,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 3. | October 26, 2009 | Ricardo Garzon | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Ricardo Garzon, a |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
|  |  |  |  | account | 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | member of Collingsworth's litigation team and co-conspirator. Garzon then deposits 1,420,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 4. | December 12, 2009 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 5. | January 7, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
| 6. | February 1, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 7. | March 4, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 8. | April 8, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|------------|-------------|
| | | | | | (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | |
| 9. | April 28, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Jonathan Castano withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 10. | June 3, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 11. | July 13, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 12. | August 2, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,440,400 Colombian pesos into Charris' wife's Colombian bank account. |
| 13. | September 7, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,397,500 Colombian pesos into Charris' wife's Colombian bank account. |
| 14. | September 8, | Yineth Baeza | Claudia Pinzon | International wire | 18 U.S.C. § 1343 | Yineth Baeza, a member of |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | 2010 | | Ballesteros | followed by a cash deposit into Charris' bank account | (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Collingsworth's litigation team and co-conspirator, receives an international money wire from the RICO Defendants in the United States. Baeza then deposits 102,500 Colombian pesos into Charris' wife's Colombian bank account. |
| 15. | October 6, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 16. | November 10, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of | Jeremy Puentes withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
| | | | | | justice); 18 U.S.C. § 1512 (witness tampering) | |
| 17. | December 10, 2010 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Jonathan Castano withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,469,700 Colombian pesos into Charris' wife's Colombian bank account. |
| 18. | January 12, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,530,300 Colombian pesos into Charris' wife's Colombian bank account. |
| 19. | February 14, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) | Jonathan Castano withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  |  | (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 20. | March 9, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 21. | April 11, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Jeremy Puentes withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,422,700 Colombian pesos into Charris' wife's Colombian bank account. |
| 22. | May 9, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a | 18 U.S.C. § 1343 (wire fraud); 18 | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  | cash deposit into Charris' bank account | U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,361,250 Colombian pesos into Charris' wife's Colombian bank account. |
| 23. | June 7, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,410,700 Colombian pesos into Charris' wife's Colombian bank account. |
| 24. | July 12, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. | Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator, receives an international money wire from the RICO Defendants in the United States. Baeza then deposits 1,453,300 Colombian pesos into Charris' wife's Colombian bank account. |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  |  | § 1512 (witness tampering) |  |
| 25. | August 1, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash payment | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then provides a direct $202.19 payment to Charris' family. |
| 26. | August 9, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,852,050 Colombian pesos into Charris' wife's Colombian bank account. |
| 27. | September 13, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  |  | laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Charris' wife's Colombian bank account. |
| 28. | October 14, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 29. | December 7, 2011 | Yineth Baeza | Claudia Pinzon Ballesteros | International wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon withdraws cash from Conrad & Scherer's bank account in the United States and sends it via Western Union to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 3,000,000 Colombian pesos into Charris' wife's Colombian bank account. |

| 30. | January 12, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████ in Washington, D.C. Maggie Crosby withdraws cash ████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| --- | --- | --- | --- | --- | --- | --- |
| 31. | February 7, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████ in Washington, D.C. Maggie Crosby withdraws cash ████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,450,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 32. | March 6, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 | ████████████ in Washington, D.C. Maggie Crosby withdraws cash ████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos |

| | | | | | | (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | into Charris' wife's Colombian bank account. |
|---|---|---|---|---|---|---|---|
| 33. | April 10, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████████ ██████████ in Washington, D.C. Maggie Crosby withdraws cash ████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,452,200 Colombian pesos into Charris' wife's Colombian bank account. |
| 34. | May 10, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████████ ██████████ in Washington, D.C. Maggie Crosby withdraws cash ████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,413,650 Colombian pesos into Charris' wife's Colombian bank account. |
| 35. | June 8, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank | | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) | ████████████████ ██████████ in Washington, D.C. Maggie Crosby withdraws cash ████████ and sends it via MoneyGram to Colombia to Yineth |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | account | (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,430,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 36. | July 12, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ██████████████████ in Washington, D.C. Maggie Crosby withdraws cash ██████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,437,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 37. | August 8, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ██████████████████ in Washington, D.C. Maggie Crosby withdraws cash ██████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,472,900 Colombian pesos into Charris' wife's Colombian bank account. |
| 38. | October 11, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 | ██████████████████ in Washington, D.C. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | wire followed by a cash deposit into Charris' bank account | (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Maggie Crosby withdraws cash ███ ████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 2,958,250 Colombian pesos into Charris' wife's Colombian bank account. |
| 39. | November 7, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████████ ████████ in Washington, D.C. Maggie Crosby withdraws cash ████████████t and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,487,800 Colombian pesos into Charris' wife's Colombian bank account. |
| 40. | December 13, 2012 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████████ ████████ in Washington, D.C. Maggie Crosby withdraws cash ████████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,483,650 Colombian pesos into Charris' wife's Colombian bank account. |

| 41. | January 4, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ███████████████ in Washington, D.C. Maggie Crosby withdraws cash ██████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,445,650 Colombian pesos into Charris' wife's Colombian bank account. |
| 42. | February 6, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ███████████████ in Washington, D.C. Maggie Crosby withdraws cash ██████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,400,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 43. | March 4, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of | ███████████████ in Washington, D.C. Maggie Crosby withdraws cash ██████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,485,100 Colombian pesos into Charris' wife's Colombian bank |

| | | | | | justice); 18 U.S.C. § 1512 (witness tampering) | account. |
|---|---|---|---|---|---|---|
| 44. | April 8, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████████████ ████████ in Washington, D.C. Maggie Crosby withdraws cash ████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 45. | May 6, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████████████████████ ████████ in Washington, D.C. Maggie Crosby withdraws cash ████ ████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 46. | June 7, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money | ████████████████████ ████████ in Washington, D.C. Cristina Stam withdraws cash ████████████ and sends it via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 47. | July 8, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ███████████ in Washington, D.C. ██████ sends cash via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 48. | August 3, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by a cash deposit into Charris' bank account | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ███████████ in Washington, D.C. ██████ sends cash via MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 49. | September 30, 2013 | Yineth Baeza | Claudia Pinzon Ballesteros | Domestic bank wire followed by an international wire followed by | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); | ███████████ in Washington, D.C. ██████ sends cash via |



| | | | | a cash deposit into Charris' bank account | 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | MoneyGram to Colombia to Yineth Baeza, a member of Collingsworth's litigation team and co-conspirator. Baeza then deposits 1,500,000 Colombian pesos into Charris' wife's Colombian bank account. |
| 50. | | | | | | |

*Drummond Company, Inc., et al. v. Terrence P. Collingsworth, et al.*

**Appendix B -** ████████████████████████████████████████████

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| 1. | ███ | ████ | ███ | ████ | ████ | ██████████ |
| 2. | ████ | ████ | ███ | ████ | ████ | ██████████ |
| 3. | ███ | ███ | ███ | ███ | ███ | █████████ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | ████ | ████████ | ████████████ |
| 4. | ████ | ████ | ███ | ████ | ████████ | ████████████ |
| 5. | ████ | ████ | ███ | ████ | ████████ | ████████████ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| 6. | ██████ | ████████ | █████ | ████████ | █████████ | ██████████████ |
| 7. | █████ | ████████ | █████ | ████████ | █████████ | ██████████████ |
| 8. | ██████ | ████████ | █████ | ████████ | █████████ | ██████████████ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|------------|-------------|
| | | | | | ███ | |
| 9. | ███ | ███ | ███ | ███ | ███ | ███ |
| 10. | ███ | ███ | ███ | ███ | ███ | ███ |
| 11. | ███ | ███ | ███ | ███ | ███ | ███ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
| | | | | ███ | █████████ | ██████████ |
| 12. | ███ | ███ | ███ | ████ | █████████ | ████████████ |
| 13. | ███ | ███ | ██ | ████ | █████████ | ████████████ |
| 14. | ███ | ███ | ███ | ███ | █████████ | ███████████ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | ▮ | ▮ | ▮ | ▮ |
| 15. | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 16. | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| 17. | ███ | ████ | ███ | ███ | ███ | ████ |
| 18. | ███ | ████ | ███ | ███ | ███ | ████ |
| 19. | ███ | ████ | ███ | ███ | ███ | ████ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
| | | | | | ███ | ███ |
| 20. | ███ | ███ | ███ | ███ | ███ | ███ |
| 21. | ███ | ███ | ███ | ███ | ███ | ███ |
| 22. | ███ | ███ | ███ | ███ | ███ | ███ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | ███████ | ██████ | ████████████ |
| 23. | ████ | ████ | ███ | ████ | ██████ | ████████████ |
| 24. | ██ | ████ | ███ | ████ | ██████ | ████████████ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
| 25. | ███ | ███ | ██ | ███ | ███ | ███ |
| 26. | ███ | ███ | ██ | ███ | ███ | ███ |
| 27. | ███ | ███ | ██ | ███ | ███ | ███ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|------------|-------------|
| 28. | ███ | ███ | ██ | ███ | ███ | ███ |
| 29. | ███ | ███ | ██ | ███ | ███ | ███ |
| 30. | ███ | ███ | ██ | ██ | ███ | ███ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | ███ | ███ | ███ |
| 31. | ██ | ███ | ██ | ███ | ███ | ███ |
| 32. | ██ | ███ | ██ | ███ | ███ | ███ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| 33. | ███ | ████ | ███ | ████ | ████ | ████ |
| 34. | ████ | ████ | ███ | ███ | ████ | ████ |

*Drummond Company, Inc., et al. v. Terrence P. Collingsworth, et al.*

**Appendix C - Payments to alias "Halcon"**

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| 1. | September 11, 2007 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 2. | September 19, 2007 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $980 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 3. | October 5, 2007 | Rebecca Pendleton | Susanna Carrasco | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $500 from Florida via MoneyGram to Susanna Carrasco in |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Colombia, an intermediary who then delivers this payment to "Halcon." |
| 4. | October 5, 2007 | Rebecca Pendleton | Susanna Carrasco | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $438 from Florida via MoneyGram to Susanna Carrasco in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 5. | October 19, 2007 | Rebecca Pendleton | Susanna Carrasco | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $469 from Florida via MoneyGram to Susanna Carrasco in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
| 6. | January 8, 2008 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $290 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 7. | January 11, 2008 | Rebecca Pendleton | Susanna Carrasco | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $1,960 from Florida via MoneyGram to Susanna Carrasco in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 8. | January 31, 2008 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $485 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

|     | Date               | Payor                | Payee            | Method                         | Violations                                                                                                                                                                                                           | Description                                                                                                                                                                                                                                   |
| --- | ------------------ | -------------------- | ---------------- | ------------------------------ | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|     |                    |                      |                  |                                | (obstruction of justice); 18 U.S.C. § 1512 (witness tampering)                                                                                                                                                       |                                                                                                                                                                                                                                             |
| 9.  | February 18, 2008  | Rebecca Pendleton    | Susanna Carrasco | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering)                       | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $1,470 from Florida via MoneyGram to Susanna Carrasco in Colombia, an intermediary who then delivers this payment to "Halcon."                       |
| 10. | March 14, 2008     | Rebecca Pendleton    | Susanna Carrasco | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering)                       | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $1,220 from Florida via MoneyGram to Susanna Carrasco in Colombia, an intermediary who then delivers this payment to "Halcon."                       |
| 11. | April 8, 2008      | Rebecca Pendleton    | Jose Pinzon      | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. §                                                                                                                                         | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $738 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this                                                   |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|------------|-------------|
| | | | | | 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | payment to "Halcon." |
| 12. | April 8, 2008 | Rebecca Pendleton | Susanna Carrasco | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $1,223 from Florida via MoneyGram to Susanna Carrasco in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 13. | May 13, 2008 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $230 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 14. | May 13, 2008 | Rebecca | Susanna Carrasco | International wire | 18 U.S.C. § 1343 | Rebecca Pendleton, a member of |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | Pendleton | | via MoneyGram | (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Collingsworth's litigation team and co-conspirator, wires $1,230 from Florida via MoneyGram to Susanna Carrasco in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 15. | June 17, 2008 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $1,180 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 16. | July 15, 2008 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $1,270 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | justice); 18 U.S.C. § 1512 (witness tampering) | |
| 17. | August 5, 2008 | Rebecca Pendleton | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Rebecca Pendleton, a member of Collingsworth's litigation team and co-conspirator, wires $1,280 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 18. | September 18, 2008 | Susana Tellez | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Susana Tellez, a member of Collingsworth's litigation team, wires $1,225 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 19. | October 20, 2008 | Susana Tellez | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) | Susana Tellez, a member of Collingsworth's litigation team, wires $1,274 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | |
| 20. | December 9, 2008 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 21. | January 15, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 22. | February 26, 2009 | Andy Tejeda | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 | Andy Tejeda, a Conrad & Scherer employee, wires $1,250 from Florida via |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
|  |  |  |  |  | U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 23. | March 30, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 24. | May 12, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | § 1512 (witness tampering) | |
| 25. | June 24, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 26. | August 24, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 27. | September 15, 2009 | Andy Tejeda | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money | Andy Tejeda, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
|  |  |  |  |  | laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) |  |
| 28. | October 19, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 29. | November 12, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 30. | December 17, 2009 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | an intermediary who then delivers this payment to "Halcon." |
| 31. | January 29, 2010 | Andy Tejeda | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Andy Tejeda, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 32. | February 19, 2010 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | tampering) | |
| 33. | March 26, 2010 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 34. | April 23, 2010 | Jonathan Castano | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Jonathan Castano, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 35. | May 28, 2010 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  |  | U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) |  |
| 36. | June 25, 2010 | Richard Gordon | Jose Pinzon | International wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via MoneyGram to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 37. | July 30, 2010 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 38. | September 3, 2010 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | delivers this payment to "Halcon." |
| 39. | October 1, 2010 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 40. | November 8, 2010 | Jeremy Puentes | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Jeremy Puentes, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| 41. | December 7, 2010 | Jonathan Castano | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Jonathan Castano, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 42. | January 10, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 43. | February 11, 2011 | Jonathan Castano | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 | Jonathan Castano, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  |  | (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) |  |
| 44. | March 4, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 45. | April 11, 2011 | Jeremy Puentes | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Jeremy Puentes, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 46. | May 6, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | |
| 47. | June 3, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 48. | July 1, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 49. | August 5, 2011 | Richard Gordon | Jose Pinzon | International wire | 18 U.S.C. § 1343 | Richard Gordon, a Conrad & Scherer |

|  | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
|  |  |  |  | via Western Union | (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 50. | September 2, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 51. | October 7, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | justice); 18 U.S.C. § 1512 (witness tampering) | |
| 52. | November 4, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 53. | December 2, 2011 | Richard Gordon | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Richard Gordon, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |
| 54. | December 5, 2011 | Luisa Pavolini | Jose Pinzon | International wire via Western Union | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) | Luisa Pavolini, a Conrad & Scherer employee, wires $1,250 from Florida via Western Union to Jose Pinzon in Colombia, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | |
| 55. | January 10, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ██████████████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250 ████████████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 56. | February 1, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ██████████████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250 ████████████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 57. | March 5, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by | 18 U.S.C. § 1343 (wire fraud); 18 | ██████████████ |

| | Date | Payor | Payee | Method | Violations | Description |
|---|------|-------|-------|--------|-----------|-------------|
| | | | | an international wire via MoneyGram | U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250 ████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 58. | April 2, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250 ████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 59. | May 7, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. | ████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250 ████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | § 1512 (witness tampering) | |
| 60. | June 7, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ██████████████████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250████ ██████████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 61. | July 10, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ██████████████████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250████ ██████████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 62. | August 3, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money | ██████████████████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250████ ██████████ and wires it to Colombia via MoneyGram to Jose |

| | Date | Payor | Payee | Method | Violations | Description |
|---|---|---|---|---|---|---|
| | | | | | laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 63. | October 1, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ███████████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250 ███ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |
| 64. | October 9, 2012 | Maggie Crosby | Jose Pinzon | Domestic bank wire followed by an international wire via MoneyGram | 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 201 (witness bribery); 18 U.S.C. § 1956(a)(2)(A) (money laundering); 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1512 (witness tampering) | ███████████ in Washington, D.C. Maggie Crosby, a Conrad & Scherer employee, then withdraws $1,250 ███████ and wires it to Colombia via MoneyGram to Jose Pinzon, an intermediary who then delivers this payment to "Halcon." |

*Drummond Company, Inc., et al. v. Terrence P. Collingsworth, et al.*

**Appendix D - Fraudulent Concealment of Witness Payments in Court Filings and Sworn Testimony**

| | Date | Violation(s) | Description |
|---|---|---|---|
| 1. | July 5, 2011 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1512(c)(2) (obstruction of justice) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth signs interrogatory responses in *Balcero*, one of which asked for a description of "anything of value offered or given by Plaintiffs, or anyone acting on Plaintiffs' behalf including counsel, to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness in this litigation." Collingsworth responds by disclosing hamburgers purchased for Libardo Duarte during meetings, travel expenses for plaintiffs being deposed in Alabama, and payments to relocate Plaintiff Claudia Balcero's family due to alleged death threats. There is no disclosure of the payments to Halcon, Duarte, Charris, ███████████████. |
| 2. | September 9, 2011 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1512(c)(2) (obstruction of justice) | Asked whether any member of their litigation team also had an attorney-client relationship with any paramilitary or any other potential witness, Collingsworth signs an interrogatory answer stating, falsely, that other than Collingsworth representing a man named Rafael Garcia, "there are no other attorney-client relationships between Terrence Collingsworth, or anyone acting on Plaintiffs' behalf, and any category of individual listed in this Interrogatory Request or related to this litigation." Collingsworth makes these false representations with the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme. |
| 3. | November 8, 2011 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama that they have already disclosed "anything of value offered or given by Plaintiffs, or anyone acting on Plaintiffs' behalf including counsel, to" any witness in *Balcero*. |

| 4. | March 8, 2012 | 18 U.S.C. § 1503 (obstruction of justice) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth falsely represents to the United States District Court for the Northern District of Alabama in open court that Llanos Oil had "no relationship" to *Balcero*, ███████████████████████████████████████████████████████████. |
| 5. | April 19, 2012 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1512(c)(2) (obstruction of justice) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth elicits knowingly false letters rogatory testimony from Jaime Blanco, ██████████████████████████ Collingsworth later submits this testimony as an evidentiary exhibit in a filing with the United States District Court for the Northern District of Alabama in *Balcero*. |
| 6. | May 16, 2012 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1512(c)(2) (obstruction of justice) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth serves a sworn amended interrogatory response in *Balcero* regarding things of value offered or given to paramilitaries, adding lunches purchased for witnesses during letters rogatory testimony, and expenses to relocate Rafael Garcia. There is no disclosure of the payments to Halcon, Duarte, Charris, Gelvez, ████████████████████. |
| 7. | July 18, 2013 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama that they had already produced "every document that had" and "all responsive documents" which reflected their witness payments. |

| 8. | August of 2013 | 18 U.S.C. § 1503 (obstruction of justice)  18 U.S.C. § 1341 (mail fraud)  18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer submit three sworn declarations in support of motions to quash Drummond's subpoenas to third parties targeting witness payments in the United States District Court for the Eastern District of New York, the United States District Court for the Western District of Pennsylvania, and the United States District Court for the District of Columbia. Collingsworth falsely testifies that he has already produced all responsive documents reflecting the Enterprise's payments to witnesses. Citing this false testimony, Conrad & Scherer and Collingsworth then falsely represent to these three courts that all documents showing the fact of witness payments have been produced. |
| --- | --- | --- | --- |
| 9. | October 10, 2013 | 18 U.S.C. § 1503 (obstruction of justice) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama in open court that, with the exception of one that had placed on a privilege log, they had already "produced all responsive documents" showing their "security" payments to witnesses. |
| 10. | October 31, 2013 | 18 U.S.C. § 1503 (obstruction of justice)  18 U.S.C. § 1341 (mail fraud)  18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Eastern District of New York that they  "[D]isclosed the *fact* of security payments in *Balcero*, producing all responsive, non-privileged documents regarding funds provided to Drummond witnesses through June 2012."  Collingsworth submits a sworn declaration in support of this filing, falsely testifying ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

| 11. | November 7, 2013 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | Citing Collingsworth's sworn declaration, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama that the only witnesses they paid were Halcon, Charris, Duarte and Gelvez. Collingsworth and Conrad & Scherer make these knowingly false representations with the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme. |
| --- | --- | --- | --- |
| 12. | December 6, 2013 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama that Duarte, Gelvez and Charris were "[t]he three *Balcero* witnesses who received security assistance from Defendants." |
| 13. | December 20, 2013 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama that "the facts are clear Defendants properly provided security assistance to three witnesses." |
| 14. | January 22, 2014 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama that they have produced all documents reflecting the fact of payments to witnesses. |

| 15. | April 14, 2014 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth submits another sworn declaration to the United States District Court for the Northern District of Alabama, testifying that "███████████████████████████████████████████████████████████████████████████████████████" Collingsworth and Conrad & Scherer also falsely represent that "their production in response to the Court's October 15 Order is complete." |
| 16. | April 21, 2014 | 18 U.S.C. § 1503 (obstruction of justice) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama in open court that the only witnesses they paid were Halcon, Charris, Duarte and Gelvez, and ████████████████████████████ |
| 17. | May 30, 2014 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent to a state court in California that payments were made for the benefit of only "three of the many witnesses in the *Drummond* matter." |
| 18. | June 20, 2014 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | In a filing signed by RICO Defendants William R. Scherer, Collingsworth, and Conrad & Scherer represent to the United States District Court for the Southern District of Florida that<br><br>"As noted, these 'payments' were necessary costs to relocate family members of three witnesses whose family members were threatened by armed thugs after the three witnesses were on record implicating Drummond in human rights crimes and before the witnesses were about to testify against Drummond. Dr. Opp. Ex. 4, Collingsworth Decl. at ¶¶ 34-44. For Drummond to now challenge the legitimacy of that emergency assistance is pure Chutzpah; for Drummond to continue to assert without foundation that Defendants 'paid witnesses' is a deliberate |

| | | | |
|---|---|---|---|
| | | | misrepresentation to the Court." This misrepresentation was made with the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme. |
| 19. | July 9, 2014 | 18 U.S.C. § 1503 (obstruction of justice) 18 U.S.C. § 1341 (mail fraud) 18 U.S.C. § 1343 (wire fraud) | Citing Collingsworth's sworn declaration, Collingsworth and Conrad & Scherer falsely represent to the United States District Court for the Northern District of Alabama that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉" This misrepresentation was made with the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme. |
| 20. | July 18, 2014 | 18 U.S.C. § 1503 (obstruction of justice) 18 U.S.C. § 1341 (mail fraud) 18 U.S.C. § 1343 (wire fraud) | Citing Collingsworth's sworn declaration, Collingsworth and Conrad & Scherer represent to the United States District Court for the Northern District of Alabama: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ This misrepresentation was made with the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme. |

| 21. | August 25, 2014 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth and Conrad & Scherer falsely represent in a filing with the United States District Court for the Northern District of Alabama that they only " ████████████████████ ████████ " |
|-----|-----------------|------------------------------------------------|--------------------------------------------------------------------------------------|
| 22. | September 23, 2014 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Conrad & Scherer falsely represents to a Florida state court that the only witnesses they paid were Halcon, Charris, Duarte and Gelvez.  Collingsworth submits a sworn declaration in support of this filing and falsely testifies that the only individuals who received "security" payments were Halcon, Charris, Duarte, Gelvez, and lead *Balcero* plaintiff Claudia Balcero. |
| 23. | October 7, 2014 | 18 U.S.C. § 1503 (obstruction of justice)<br><br>18 U.S.C. § 1341 (mail fraud)<br><br>18 U.S.C. § 1343 (wire fraud) | With the intent to corruptly influence, impede, and obstruct the due administration of justice, and to perpetuate and fraudulently conceal the Enterprise's extortionate scheme, Collingsworth submits a false declaration in California state court, testifying that ████████████████████████████████████ |

*Drummond Company, Inc., et al. v. Terrence P. Collingsworth, et al.*

**Appendix E - Dissemination of False Testimony and Misrepresentations to the Media, the United States Department of Justice, and Other Third Parties in Furtherance of the Enterprise's Multifaceted Extortionate Scheme**

| | Date | To | From | Method | Violations | Description |
|---|------|-----|------|--------|-----------|-------------|
| 1. | March 19, 2009 | ███ | ███ | ██ | 18 U.S.C. § 1343 (wire fraud) | ███ |
| 2. | March 19, 2009 | ███ | ███ | ██ | 18 U.S.C. § 1343 (wire fraud) | ███ |

| 3. | May 19-21, 2009 | ████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | ████ |
| 4. | June 1, 2009 | ████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | ████ |

| 5. | June 12, 2009 | ████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | ██████████ |
|----|---------------|------|------|------|------|------|
| 6. | September 11, 2009 | Department of Justice | Collingsworth | | | According to his billing records, Collingsworth "[m]eets with Justice Dept lawyers re Drummond's criminal activity." Upon information and belief, Collingsworth provides Charris' false declaration, signed less than two weeks earlier, to the United States Department of Justice, with the intent to fraudulently create additional pressure on Drummond by instigating a U.S. criminal investigation against Drummond. Collingsworth knows that this declaration is false, and he does not disclose that the Enterprise is paying Charris approximately 1,500,000 pesos per month. |

| 7. | September 22, 2009 | █████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | ███████████ |
| 8. | September 22, 2009 | ██████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | ███████████ |
| 9. | September 23, 2009 | ██████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | ███████████ |

| 10. | September 24, 2009 | ███████ | ██████ | ███ | 18 U.S.C. § 1343 (wire fraud) | ████████████ |
| 11. | December 9, 2009 | ████ | █████ | ███ | 18 U.S.C. § 1343 (wire fraud) | ████████████ |



| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | ████████████████ |
| 15. | May 25, 2010 | Collingsworth | Albert van Bilderbeek | Email | 18 U.S.C. § 1343 (wire fraud) | Conspiring to generate additional extrajudicial pressure on Drummond, Albert van Bilderbeek emails Collingsworth, stating "I understood from Dan you maybe coming over here within the next few weeks and wanting to meet…I would like to give you media exposure." |
| 16. | June 29, 2010 | Albert van Bilderbeek | Collingsworth | Email | 18 U.S.C. § 1343 (wire fraud) | In furtherance of the Enterprise's extortionate scheme, Albert van Bilderbeek emails Collingsworth stating that there is "a lot of media attention on your Drummond case." Collingsworth responds that he is "look[ing] forward to meeting and together closing down Drummond." Van Bilderbeek replies "Excellent!" and "You will be interviewed for Dutch television!" |
| 17. | July 2, 2010 | Collingsworth | Albert van Bilderbeek | Email | 18 U.S.C. § 1343 (wire fraud) | Albert van Bilderbeek emails Collingsworth and states "Terry the television broadcast is a major success. Dutch parliament has immediately demanded an investigation." With the intent to fraudulently generate public pressure on companies to cease doing business with Drummond, Van Bilderbeek also states that they "need a shipping document stating origin Drummond Colombia and beneficiary a Dutch company." |

| 18. | October 16, 2010 | Collingsworth | Albert van Bilderbeek | Email | 18 U.S.C. § 1343 (wire fraud) | Albert van Bilderbeek emails Collingsworth stating the he met with a "reporter from Dutch magazine HP de Tijd" and that "his magazine will publish a very good article about our situation." Van Bilderbeek also states that "next week I am making a presentation to a large movie producer" and "we may opt to go for royalty proceeds." |
| --- | --- | --- | --- | --- | --- | --- |
| 19. | November 5, 2010 | ███████ | ███████ | ████ | 18 U.S.C. § 1343 (wire fraud) | ███████████████████ |
| 20. | January 19, 2011 | ███████ | ███████ | ████ | 18 U.S.C. § 1343 (wire fraud) | ███████████████████ |



| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| 21. | February 4, 2011 | █████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | █████ |
| 22. | February 18, 2011 | █████ | ████ | ██ | 18 U.S.C. § 1343 (wire fraud) | █████ |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | ■■■■■ |
| 23. | March 1-2, 2011 | ■■■■ | ■■■ | ■■ | 18 U.S.C. § 1343 (wire fraud) | ■■■■■ |
| 24. | April 26, 2011 | ■■■■ | ■■■ | ■■ | 18 U.S.C. § 1343 (wire fraud) | ■■■■■ |
| 25. | May 24, 2011 | ■■■■ | ■■■ | ■■ | 18 U.S.C. § 1343 | ■■■■■ |



| | | | | | |
|---|---|---|---|---|---|
| | | | | | (wire fraud) |
| 26. | June 8, 2011 | | | | 18 U.S.C. § 1343 (wire fraud) |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | ███████████████ |
| 27. | July 7, 2011 | ██████████ | ██████████ | ██████ | 18 U.S.C. § 1343 (wire fraud) | ████████████████████████ |
| 28. | August 25, 2011 | ██████████ | ██████████ | ██████ | 18 U.S.C. § 1343 (wire fraud) | ████████████████████████ |
| 29. | October 3, 2011 | Frank Bajak (AP reporter) & Segundo | Collingsworth | | | According to his billing records, Collingsworth "[d]rafted letter to US Ambassador McKinley re Colombian |

| | | Mercado-Llorens (lobbying firm) | | | | govt's failure to consent to prison depos; met with segundo to retain as lobbyist to get congress to pressure Colombia; prepared summary of history of drummond case for segundo, spoke to Dan Kovalik at United Steelworkers re same; discussed same issue with Frank Bajak and Associated Press; drafted letter to CUT to send to AFL-CIO." All of these communications were with the intent to generate extrajudicial pressure in furtherance of the Enterprise's extortionate scheme. |
|---|---|---|---|---|---|---|
| 30. | October 27 & 28, 2011 | Ivan Otero and Francisco Ramirez | Lorraine Leete | Email  U.S. Mail | 18 U.S.C. § 1343 (wire fraud)  18 U.S.C. § 1341 (mail fraud) | Lorraine Leete emails Ivan Otero and Francisco Ramirez Cuellar attaching a letter sent by U.S. Congressman James P. Moran to Colombian President Santos requesting help with letters rogatory for Samario, El Tigre, Charris, and Blanco. ██████████████████████ ████████████████ Otero responds stating that "Santos knows that supporting TLC depends on the protection of human rights"; ████████████████ |
| 31. | December 28, 2011 | ███████████ | ███████████ | ██████ | 18 U.S.C. § 1343 (wire fraud) | ███████████████████ |



| | | | | | | |
|---|---|---|---|---|---|---|
| 32. | February 4, 2012 | | | | 18 U.S.C. § 1343 (wire fraud) | |
| 33. | February 24, 2012 | | | | 18 U.S.C. § 1343 (wire fraud) | |
| 34. | March 4, 2012 | | | | 18 U.S.C. § 1343 (wire fraud) | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | ███████████████ |
| 35. | March 20, 2012 | Peter Smolders (Dutch journalist), Collingsworth, Francisco Ramirez | Albert van Bilderbeek | Email | 18 U.S.C. § 1343 (wire fraud) | With the intent to fraudulently generate additional extrajudicial pressure on Drummond, Albert van Bilderbeek emails Francisco Ramirez, Collingsworth, Rebecca Pendleton and Peter Smolders regarding an upcoming trip to the Netherlands. Collingsworth states that "collectively we are all very enthusiastic about getting as much press as possible" and tells Francisco Ramirez that "Albert has arranged for you to be on No 1 tv news show." Van Bilderbeek responds that he will "provide very good press coverage for [him]" during his upcoming trip to Amsterdam. |
| 36. | April 10, 2012 | Elisa Poteat (DOJ) | Collingsworth | | | According to his billing records, Collingsworth has a teleconference with "Elisa Piteat [sic] at Justice Department and summarized new facts showing Drummond's role in AUC funding." Collingsworth disseminates these "facts" with full knowledge that they are false and with the intent to fraudulently create additional pressure on Drummond by instigating a U.S. criminal investigation against Drummond. |

| 37. | April 23, 2012 | Frank Bajak (AP reporter) | Collingsworth | Email | 18 U.S.C. § 1343 (wire fraud) | With the intent to fraudulently generate additional extrajudicial pressure on Drummond, Collingsworth emails Frank Bajak an article regarding Jaime Blanco, which includes the false statement that Drummond collaborated with the AUC. ██████████████████████ |
| 38. | April 30, 2012 | Frank Bajak (AP reporter) | Collingsworth | Email | 18 U.S.C. § 1343 (wire fraud) | With the intent to fraudulently generate extrajudicial pressure on Drummond, Collingsworth emails Frank Bajak letters rogatory transcripts for four *Balcero* paramilitary witnesses, ██████████ Collingsworth knows that this testimony is false, and he does not disclose the Enterprise's payments to these witnesses. |
| 29. | August 15, 2012 | Margaret Newkirk (Bloomberg News) | Collingsworth | Email | 18 U.S.C. § 1343 (wire fraud) | With the intent to fraudulently generate additional extrajudicial pressure on Drummond, Collingsworth emails Margaret Newkirk at Bloomberg attaching a copy of the *Balcero* 3rd Amended Complaint. That document is replete with knowingly false allegations against Drummond premised on the paid-for testimony of Colombian paramilitaries. Collingsworth does not disclose that the allegations in that complaint are knowingly false, nor does he disclose ██████████ |

| | | | | | | ████████████████ |
|---|---|---|---|---|---|---|
| 40. | September 25, 2012 | Huffington Post | Cristina Stam (Conrad & Scherer employee) | | | At the RICO Defendants' direction, Cristina Stam "[p]repare[d] and sen[t] materials to Huffington Post reporter." On information and belief, these "materials" include false and misleading statements and witness testimony, which the Enterprise purposefully disseminated with the intent to fraudulently generate additional extrajudicial pressure on Drummond. |
| 41. | November 27, 2012 | Amnesty International | Cristina Stam (Conrad & Scherer employee) | | | At the RICO Defendants' direction, Cristina Stam "[g]ather[ed] documents to send to Amnesty contact." On information and belief, these "documents" include numerous false and misleading statements and witness testimony, which the Enterprise purposefully disseminated with the intent to fraudulently generate additional extrajudicial pressure on Drummond. |
| 42. | November 30, 2012 | PAX Christi, Amnesty International | Collingsworth | | | In an effort to fraudulently generate extrajudicial pressure on Drummond in furtherance of the Enterprise's extortionate scheme, Collingsworth "reviewed email from Pax Cristi re facts in Drummond case fore [sic] report to be published in Netherlands; drafted email response; [and] responded to list of questions from Peter Drury at Amnesty International re Drummond facts report on the case to be published by Amnesty." |

| 43. | December 3, 2012 | Laird Townsend (CNN) | Collingsworth | | | In an effort to fraudulently generate media coverage for his false allegations and further the Enterprise's extortionate scheme, Collingsworth "[s]poke to Laird Townsend, reporter for CNN re a study on Drummond." |
|---|---|---|---|---|---|---|
| 44. | December 3, 2012 | ███████ | ███████ | | | ███████ |
| 45. | December 4, 2012 | ███████ | ███████ | | | ███████ |
| 46. | December 13, 2012 | ███████ | ███████ | | | ███████ |
| 47. | December 13, 2012 | Amnesty International | Collingsworth | | | Collingsworth "responded to lengthy questions from Amnesty International" |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | regarding Drummond in an effort to disseminate false testimony and fraudulently generate extrajudicial pressure on Drummond in furtherance of the Enterprise's extortionate scheme. |
| 48. | January 14, 2013 | Matthew Bristow (Bloomberg News) | Lorraine Leete | Email | 18 U.S.C. § 1343 (wire fraud) | At the RICO Defendants' direction, and with the intent to further disseminate false testimony and fraudulently generate extrajudicial pressure on Drummond in furtherance of the Enterprise's extortionate scheme, Lorraine Leete emails Mathew Bristow at Bloomberg regarding the *Balcero* case, falsely stating that they "have evidence that Drummond's support allowed a major buildup of the AUC in the areas around Drummond's facilities and the AUC, in confronting the guerilla groups, used terrorists tactics and massacred thousands of innocent civilians, including relatives of our client." Leete transmits a copy of Collingsworth's opposition to Drummond Ltd's motion for summary judgment. That opposition makes knowingly false representations and is premised on fraudulent testimony ████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ |
| 49. | January 29, 2013 | Marianne Moor and PAX Christi | Collingsworth | | | In furtherance of the Enterprise's extortionate scheme, Collingsworth meets |

| | | | | | | "with Lorraine and Marianne Moor of Pax Cristi to develop strategy for DR campaign in European Union." That "strategy" includes the dissemination of the false, paid-for testimony of imprisoned Colombian paramiltaries in an effort to generate public pressure on Drummond. |
|---|---|---|---|---|---|---|
| 50. | February 6, 2013 | Frank Bajak (AP reporter) | Collingsworth | Email | 18 U.S.C. § 1343 (wire fraud) | In an effort to fraudulently generate more media coverage for his false allegations and further the Enterprise's extortionate scheme, Collingsworth exchanges emails with Frank Bajak and directs Christian Levesque to send Bajak a copy of the *Balcero* plaintiffs' brief in opposition to Drummond's motion for summary judgment. That brief is replete with knowingly false statements premised on the testimony that the Enterprise obtained through bribery. Collingsworth falsely states that the Enterprise has "tremendous evidence including testimony from Jaime Blanco." ████████████ ████████████████████████ |
| 51. | February 13, 2013 | Frank Bajak (AP reporter) | Collingsworth | Email | 18 U.S.C. § 1343 (wire fraud) | With the intent to fraudulently instigate a criminal investigation against Drummond by Colombian authorities, Collingsworth "drafted [a] letter to Colombian prosecutor re gov'ts investigation of Drummond officials for participation in AUC murders." To fraudulently create generate additional public pressure on Drummond using the media, Collingsworth "drafted [a] press release; |

| | | | | | | spoke to Frank Bajak at Associate Press about the Blanco criminal prosecution; drafted email to Frank Bajak and transmitted Blanco and Charris testimony." Collingsworth knows Blanco and Charris' testimony is false, ███████ ████████ |
|---|---|---|---|---|---|---|
| 52. | February 21-28, 2013 | Anthony Effinger (Bloomberg News) | Lorraine Leete | Email | 18 U.S.C. § 1343 (wire fraud) | Anthony Effinger emails Lorraine Leete, asking questions about Drummond case, requesting deposition transcripts, and stating that he is reading the documents Leete already sent him. At the RICO Defendants' direction, and with the intent to fraudulently create generate public pressure on Drummond using the media, Leete responds by sending "Deposition Highlights," deposition transcripts, and *Balcero* pleadings. The attachments include the false testimony of Gelvez, El Tigre, Blanco, Charris, and Samario, ████████████████████ |
| 53. | March 1 & 4, 2013 | Alexander Emery (Bloomberg News) | Lorraine Leete | Email | 18 U.S.C. § 1343 (wire fraud) | Alexander Emery at Bloomberg News emails Lorraine Leete regarding Drummond and states that he is going to Colombia next week and wants help contacting the *Balcero* plaintiffs' family members. Leete responds, giving Emery contact information for the Colombian Fiscalia, as well as RICO Defendant Ivan Otero's contact info, and stating that she will facilitate meetings with clients in Bogota. Leete represents that Otero is "a lawyer who represents many of the |

| | | | | | | former paramilitaries who have given testimony in the Drummond case." Leete fails to disclose that Otero has been promised a contingency fee in the case, ████████████████████████ ████████████████████ |
|---|---|---|---|---|---|---|
| 54. | March 8, 2013 | Bloomberg News | Collingsworth | | | To garner additional media coverage and fraudulently create public pressure on Drummond, Collingsworth "participated in interview with Bloomberg reporter" regarding the Enterprise's fraudulent lawsuits. On information and belief, Collingsworth does not disclose ████ ████████████████████████ ██████████████ |
| 55. | April 8 & 11, 2013 | Anthony Effinger (Bloomberg News) | Collingsworth | | | Collingsworth participates in a teleconference "with Anthony from Bloomberg News re article on Drummond case." Collingsworth "reviewed plaintiffs' summary judgment opposition to provide key facts to Anthony." Collingsworth knows that the "key facts" he disseminates are false, because they are premised on the testimony of witnesses he has bribed. Collingsworth disseminates these misrepresentations and false evidence with the intent to further the Enterprise's multifaceted extortionate campaign by fraudulently generating public pressure on Drummond. |
| 56. | April 9, 2013 | Anthony Effinger (Bloomberg | Lorraine Leete | Email | 18 U.S.C. § 1343 (wire fraud) | At the RICO Defendants' direction, and with the intent to disseminate false testimony against Drummond and |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | News) | | | | fraudulently generate extrajudicial pressure on Drummond in furtherance of the Enterprise's extortionate scheme, Lorraine Leete emails Anthony Effinger a copy of Rafael Garcia's false declaration. |
| 57. | April 11, 2013 | Anthony Effinger (Bloomberg News) | Lorraine Leete | Email | 18 U.S.C. § 1343 (wire fraud) | At the RICO Defendants' direction, and with the intent to disseminate false testimony against Drummond and fraudulently generate extrajudicial pressure on Drummond in furtherance of the Enterprise's extortionate scheme, Lorraine Leete emails Anthony Effinger the false declaration of Libardo Duarte. Leete does not disclose the fact that Duarte has been paid thousands of dollars by the RICO Defendants. |