## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-01916-MD-MARRA/JOHNSON

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC., ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATS ACTIONS
_____/

Case No. 08-80465-CIV-MARRA
Case No. 10-80652-CIV-MARRA
Case No. 11-80404-CIV-MARRA
Case No. 11-80405-CIV-MARRA
Case No. 13-80146-CIV-MARRA
_____/

**Doe Plaintiffs' Response to Individual Defendants'
Joint Consolidated Motion to Dismiss Plaintiffs' Amended
Complaints, and Supplemental Memoranda of Law**

Paul David Wolf
Attorney for Does 1-144,
1-976, 1-677, 1-254, 1-97
P.O. Box 46213
Denver, CO 80201
(202) 431-6986
paulwolf@yahoo.com

June 22, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. *i*

TABLE OF AUTHORITIES ...................................................................... *ii*

FACTUAL SUMMARY ............................................................................ 1

      A.      Individual A ..................................................................... 2

      B.      Individual B ..................................................................... 3

      C.      Individual C ..................................................................... 4

      D.      Individual D ..................................................................... 6

      E.      Individual E ..................................................................... 6

      F.      Individual F ..................................................................... 7

      G.      Individual G ..................................................................... 7

      H.      Individual H ..................................................................... 8

      I.      Individual I ..................................................................... 8

      J.      Individual J ..................................................................... 9

      K.      Keith Lindner ..................................................................... 9

      L.      Charles Kaiser ..................................................................... 10

      M.      William Tsacalis ..................................................................... 10

      N.      Steven Warshaw ..................................................................... 11

      O.      Fernando Aguirre ..................................................................... 11

SUMMARY OF ARGUMENT ................................................................... 12

ARGUMENT ........................................................................................... 14

I.      In <u>Jane Doe v. Drummond</u>, the Eleventh Circuit recently
reaffirmed that secondary liability is available under the TVPA. ... 14

II.   Corporate liability is based on liability for acts committed by
      the corporation's employees and agents. .......................................   16

III.  The Individuals Defendants were all part of a hub-and-spoke
      conspiracy with the AUC. .............................................................   17

IV.   The Individual Defendants Aided and Abetted the Conduct of
      the AUC. .......................................................................................   18

      CONCLUSION .......................................................................................   20

## TABLE OF AUTHORITIES

**Cases**

Aldana v. Del Monte Fresh Produce, N.A., Inc.,
416 F.3d 1242 (11th Cir.2005) ..................................................... 14

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ....................................... 15

Bell Atl. Corp. v Twombly, 127 S.Ct. 1955 (2007) ..................................... 15

Cabello v. Fernandez-Larios, 402 F.3d 1148 (11th Cir. 2005) ................. 14

*  Doe et. al. v. Drummond Company, Inc.,
Case No. 13-15503, slip op. (11th Cir. March 25, 2015) ........................ 14, 19

Ford v. State, 330 Md. 682 (1993) ............................................... 18

*  Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) .......................... 14, 19

Kotteakos v. United States, 328 U.S. 750 (1946) ...................................... 17

Mohammed v. Palestinian Authority,
566 U.S. at ___, 132 S.Ct. 1702 (2012) ..................................... 14

New York Central & Hudson R.R. v. United States,
212 U.S. 481 (1909) ..................................................... 16

Nye & Nissen v. United States, 336 U.S. 613 (1949) ............................... 18

Pinkerton v. United States, 328 U.S. 640 (1946) ..................................... 18

Romero v. Drummond Co., 552 F.3d 1303 (11th Cir. 2008) .................... 14

Sandstrom v. Montana, 442 U.S. 510 (1979) ............................................ 18

Sayles v. Picadilly Cafeterias, Inc., 242 Va. 328 (Va. 1991) ................... 16

State v. Hobbs, 252 Iowa 432, 107 N.W.2d 238 (1961) ........................... 18

United States v. Frazier, 880 F.2d 878 (6th Cir. 1989),
cert. denied, 493 U.S. 1053 (1990). ........................................... 19

United States v. Nearing, 252 F. 223 (SDNY 1918) ............................... 17

**Statutes**

28 U.S.C. § 1350 note (2006) (Torture Victim Protection Act) ................        13-14

## FACTUAL SUMMARY

The Court is already familiar with the facts of this case. The Doe Plaintiffs will only restate several facts which pertain to the Individual Defendants and their individual Motions to Dismiss. The ten "Individual Defendants" sued herein are the ten individuals described as "Individual A" through "Individual J" in the criminal case. See, eg., Complaint in Does 1-144 v. Chiquita Brands, R. 50-2 at ¶¶ 187-205. For example, "David Doe 1 was a high-ranking officer of Defendant Chiquita, described as 'Individual A' in Criminal Case 07-CR-0555 (RCL) in the United States District Court for the District of Columbia." R. 50-2 at ¶ 187. Eight of the Individual Defendants were Chiquita's employees, and the two others were employees of Chiquita's Colombian subsidiary Banadex. Id. at ¶¶ 187-205.

In late 2012, the other plaintiff groups in the MDL amended their complaints to add claims by additional plaintiffs as part of a co-counsel agreement to file all of their existing cases, and to treat any new cases as "community property" not to be filed in court, but held in reserve in the event of a settlement. At the same time, these groups decided to name and sue several different individuals.[1] We didn't participate in this

---

[1] Each of the other plaintiff groups chose a different set of individual defendants. The complaints by Boies Schiller & Flexner LLP (10-cv-60573) and Searcy Denny Scarola Barnhardt & Shipley named Kieth Lindner and Cyrus Friedheim as defendants. Mr. Reiter's New York complaint named Cyrus Freidheim, Roderick Hills, and Robert Olson. The New Jersey "class action" complaint named six individuals: Cyrus Freidheim, Roderick Hills, Robert Olson, Robert Kistinger, Charles Keiser, and William Tsacalis. The Conrad & Scherer complaint named eight: Cyrus Freidheim, Roderick Hills, Robert Olson, Robert Kistinger, Charles Keiser, William Tsacalis, Steven Warshaw, and Fernando Aguirre. We don't know why each group chose the particular individual defendants they did, but presume there were differences of opinion as to the certainty of their identities and the evidence available against each.

agreement[2] and did not amend any of our complaints.  We have been waiting until their identities and the evidence could be determined with certainty through discovery.

The naming of these individuals by other plaintiff groups required those individuals to respond.  Eight of them filed individual motions to dismiss, and together they filed a joint motion to dismiss.[3]   R. 216.  None of these eight individuals identified themselves as being among the ten Individual Defendants sued by the Doe Defendants. We haven't served process on any of the Individual Defendants, and it's logical to infer that the other plaintiff groups have only served process on the individual defendants that each of them have named.  Nevertheless, the evidence known about each "Individual Defendant" will be recited infra.

### A.    Individual A

Individual A was a high ranking officer of Chiquita.  Proffer at ¶ 9.  On or about April 23, 2002, at a meeting of the Audit Committe of the Board of directors, Individual A participated in a meeting discussing the payment system utilized by Individuals F and G (see below).  Proffer at ¶ 26.  According to outside counsel's notes, on or before April 4, 2003, Individual C said that his opinion, as well as that of Individual A, is "just let them sue us, come after us."  Proffer at ¶ 60.

The complaints filed  by Conrad & Scherer and Earthrights International state that Individual A is Cyrus Freidheim.  Mr. Freidheim neither admits nor denies that he is Individual A.  R. 739.  Mr. Freidheim was the Chairman of the Board of Directors of Chiquita from March 2002 until May 2004, and the Chief Executive Officer of Chiquita

---

[2] We didn't believe it would be ethical to agree to represent a client, and sign a retainer agreement with her, and then make an agreement with other lawyers not to file her case in court.  We also did not want to be co-counsel with the other attorneys in any more cases.

[3] Roderick Hills, a potential Individual Defendant, passed away during the pendency of this action.  See R. 725.

from March 2002 until January 2004.   According to Mr. Freidheim's Supplemental Memorandum, R. 739, allegations against him include that he (1) "reviewed," "approved," and "authorize[d]" payments to the AUC, including "after the designation of the AUC as a [Foreign Terrorist Organization];" (2) "knew . . . that the AUC was a violent, paramilitary organization led by Carlos Castaño" (3) was reportedly of the opinion to "just let them sue us" when the topic of Chiquita's payments to the AUC was raised and (4) was present at a meeting where the results of an in-house investigation into the payments were presented.   R. 739 at 5.   Therefore, the mens rea of knowledge, and the actus reus of substantial assistance (approving payments) are easily met.

### B.   Individual B

Individual B was a member of the Chiquita's Board of Directors.   Proffer at ¶ 10. On or about April 23, 2002, at a meeting of the Audit Committe of the Board of Directors, Individual B participated in a discussion of the payment system utilized to pay the AUC.   Proffer at ¶ 26.   On or about April 3, 2003, Individuals B and C reported to the full Board of Directors that Chiquita was paying a designated Foreign Terrorist Organization.   Proffer at ¶ 59.   According to outside counsel's notes, on or before April 4, 2003, Individual C said that his opinion, as well as that of Individual B, is "just let them sue us, come after us."   Proffer at ¶ 60.   On or about April 24, 2003, Individual B was advised by officials of the Department of Justice that the payments were illegal and could not continue.   Id. at ¶ 62.   He then advised the Board of Directors about the April 24, 2003 meeting.   Id.   On or about Dec. 4, 2003, Individual B provided the Board of Directors with additional details concerning Chiquita's payments to the AUC.   A member of the Board responded by stating: "I reiterate my strong opinion - stronger now - to sell

our operations in Colombia."  Proffer at ¶ 81.  On about Dec. 22, 2003, Individual B sent an email to other Board members on the subject of Chiquita's payments to the AUC, stating, among other things, that "we appear to [be] committing a felony."  Proffer at ¶ 84.  Therefore, the <u>mens rea</u> of knowledge, and the <u>actus reus</u> of substantial assistance (approving payments) are easily met.

The complaints filed  by Conrad & Scherer and Earthrights International state that Individual B is Roderick Hills.  Mr. Hills is a former Chiquita Director and President of the Audit Committee.  According to the Defendant, Mr. Hills passed away on October 29, 2014.  R. 725.  No party representing the estate of Mr. Hills has appeared or moved to dismiss the claims against Mr. Hills.

### C.  Individual C

Individual C was a high ranking officer of Chiquita.  Proffer at ¶ 11.  An in-house attorney for Defendant Chiquita conducted an internal investigation into the payments and provided Individual C with a memorandum detailing that investigation.  Proffer at ¶P 22.  Individual C was also in attendence when the Audit Committee of Chiquita's Board of Directors discussed the payments at a meeting in September 2000. Proffer at ¶ 22.  In or about March 2002, Individual C and others established new procedures regarding Chiquita's cash payments to the AUC.  Proffer at ¶ 25.  On or about April 23, 2002, at a meeting of the Audit Committe of the Board of directors, Individual C described the payment system utilized.  Proffer at ¶ 26.  On or about April 3, 2003, Individual C reported to the full Board of Directors that Chiquita was paying a designated Foreign Terrorist Organization.  Proffer at ¶ 59.  According to outside counsel's notes, on or before April 4, 2003, Individual C said that his opinion is "just let them sue us, come

after us."  Proffer at ¶ 60.  On or about April 8, 2003, Individual C met with other co-conspirators at Chiquita's headquarters in Cincinnatti, where Individual C instructed Individuals F and G to "continue making payments" to the AUC.  Proffer at ¶ 61.  On or about April 24, 2003, Individual C was advised by officials of the Department of Justice that the payments were illegal and could not continue.  Id. at ¶ 62.  He then advised the Board of Directors about the April 24, 2003 meeting.  Id.

On or about September 8, 2003, outside counsel advised Individual C that "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumsatances presented as a technical violation and cannot endorse current or future payments."  Proffer at ¶ 74.  On or about Dec. 4, 2003, Individual C provided the Board of Directors with additional details concerning Chiquita's payments to the AUC.  A member of the Board responded by stating: "I reiterate my strong opinion - stronger now - to sell our operations in Colombia."  Proffer at ¶ 81.

The complaints filed  by Conrad & Scherer and Earthrights International state that Individual C is Robert Olsen.  Mr. Olsen neither admits nor denies that he is Individual C.  R. 736.  Mr. Olsen is a  former Vice President and General Counsel of Chiquita, joining the company in 1995.  Id.  According to Mr. Olsen's Supplemental Memorandum, R. 736, allegations against him include that he "approved the company's payments to violent extremists in Colombia, approved unspecified procedures to 'disguise' the payments, and discussed the company's payments with Chiquita's outside counsel and the U.S. Department of Justice ("DOJ"), including in connection with the company's

disclosure of the payments to DOJ."  Id. at 2.  Therefore, the <u>mens rea</u> of knowledge, and the <u>actus reus</u> of substantial assistance (approving payments) are easily met.

### D.    Individual D

Individual D was a high ranking officer of Chiquita.  Proffer at ¶ 12.  On or about April 8, 2003, Individual C, D, F, G, H and I met at Chiquita's headquarters in Cincinnatti, where Individual D instructed Individuals F and G to "continue making payments" to the AUC.  Proffer at ¶ 61.

The complaints filed  by Conrad & Scherer and Earthrights International state that Individual D is Robert Kistinger.  Mr. Kistinger neither admits nor denies that he is Individual D.  R. 189 in 08-cv-80421-KAM.  Mr. Kistinger is a former President and COO of Chiquita Fresh Group.  According to Mr. Kistinger's Supplemental Memorandum, R. 189, the allegations against him include that he reviewed and approved payments to the AUC, continued approving payments to the AUC after he discovered they were unlawful, and instructed Chiquita employees to continue making payments after learning that the payments were illegal.  <u>Id</u>. at 3.  Therefore, the <u>mens rea</u> of knowledge, and the <u>actus reus</u> of substantial assistance (approving payments) are easily met.

### E.    Individual E

Individual E was a high ranking officer of Chiquita.  Proffer at ¶ 13.  On or about April 23, 2002, at a meeting of the Audit Committe of the Board of directors, Individual E participated in a meeting discussing the payment system utilized to pay the AUC. Proffer at ¶ 26.  No more about Individual E is known.

### F.     Individual F

Individual F was a high ranking officer of Banadex.  Proffer at ¶ 14.  Individual F received checks made out to him personally and drawn from one of the bank accounts of Chiquita's subsidiary Banadex.  Proffer at ¶ 25.  Individual F then endorsed the checks, which were payments to the AUC.  Id.  Individual F cashed some of the checks.  Id.  Individual F also allowed Chiquita to reimburse him for his tax liability, defrauding the Colombian government of tax revenue.  Id.  Individual F also maintained a private ledger of payments which did not reflect the ultimate and intended reciopient of the payments.  Id.  Individual F's payments to the AUC are detailed in the Factual Proffer at ¶¶ 30-54, 57-58, 65-73, 75-80, 83, 85-87.  On or about April 8, 2003, Individuals C, D, F, G, H and I met at Chiquita's headquarters in Cincinnatti, where Individuals C and D instructed Individuals F and G to "continue making payments" to the AUC.  Proffer at ¶ 61.  Therefore, the mens rea of knowledge, and the actus reus of substantial assistance (making the payments) are easily met.  No more about Individual F is known.

### G.     Individual G

Individual G was an employee of Banadex.  Proffer at ¶ 15.  Individual G cashed some of the checks drawn on Banadex' bank account, and hand-delivered the cash directly to AUC personnel in Santa Marta.  Proffer at ¶ 25.  Individual G's payments to the AUC are detailed in the Factual Proffer at ¶¶ 30-54, 57-58, 65-73, 75-80, 83, 85-87.  On or about April 8, 2003, Individuals C, D, F, G, H and I met at Chiquita's headquarters in Cincinnatti, where Individuals C and D instructed Individuals F and G to "continue making payments" to the AUC.  Proffer at ¶ 61.  Therefore, the mens rea of knowledge,

and the _actus reus_ of substantial assistance (making the payments) are easily met.  No more about Individual G is known.

### H.     Individual H

Individual H was an employee of Chiquita.  Proffer at ¶ 16.  On or about September 30, 2002, Individual H, from a computer with Chiquita's cincinnati headquarters, accessed the website of a password-protected subscription service which advised him that the AUC was designate as a foreign terrorist organization.  Proffer at ¶ 28.     On or about April 8, 2003, Individuals C, D, F, G, H and I met at Chiquita's headquarters in Cincinnatti, where Individuals C and D instructed Individuals F and G to "continue making payments" to the AUC.  Proffer at ¶ 61.  No more about Individual H is known.

### I.     Individual I

Individual I was an employee of Chiquita.  Proffer at ¶ 17.  On or about February 20, 2003, Individual I stated to Individual C that Individual I had discovered that the AUC had been designated as a Foreign Terrorist Organization.  Proffer at ¶ 55.  Shortly thereafter, Individuals I and C discussed the matter with outside counsel, who advised them to stop making the payments. Id. at 55-56.     On or about April 8, 2003, Individuals C, D, F, G, H and I met at Chiquita's headquarters in Cincinnatti, where Individuals C and D instructed Individuals F and G to "continue making payments" to the AUC.  Proffer at ¶ 61.  On or about May 5, 2003, Individual I instructed Individuals F and J to "continue making payments" to the AUC.  Proffer at ¶ 64.  On or about September 8, 2003, outside counsel advised Individual C and I that "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-

prosecution; in fact, officials have repeatedly stated that they view the circumsatances presented as a technical violation and cannot endorse current or future payments." Proffer at ¶ 74.  Therefore, the <u>mens rea</u> of knowledge, and the <u>actus reus</u> of substantial assistance (instructing another to make payments) are easily met.   No more about Individual I is known.

### J.     Individual J

Individual J was a high ranking officer of Chiquita.  Proffer at ¶ 18.  On or about May 5, 2003, Individual I instructed Individual J to "continue making payments" to the AUC.  Proffer at ¶ 64.  Therefore, the <u>mens rea</u> of knowledge, and the <u>actus reus</u> of substantial assistance (making the payments) are easily met.  No more about Individual J is known.

### K.     Keith Lindner

Plaintiff's do not know whether Mr. Lindner is one of the ten Individual Defendants mentioned in the criminal case.  If not, then he is not being sued by these Plaintiffs.  Mr. Lindner was the President and Chief Operating Officer of Chiquita from 1989 to March 1997.   In March 1997, he became Vice Chairman of the Board of Directors of Chiquita, remaining in that position until March 2002.

Mr. Lindner neither admits nor denies that he is one of the Individual Defendants in the criminal case.  According to his Supplemental Memorandum, R. 732, Mr. Lindner is only being sued by other plaintiffs because he is a former Chiquita executive who lives in Florida and would therefore be subject to personal jurisdiction.  <u>Id</u>. at 2.  The Doe Plaintiffs take no position on Mr. Linder's motion to dismiss, since they cannot ascertain whether he is one of the ten Individuals being sued herein.

### L.       Charles Kaiser

Plaintiff's do not know whether Mr. Kaiser is one of the ten Individual Defendants mentioned in the criminal case.  If not, then he is not being sued by these Plaintiffs.  Mr. Kaiser, however, is at the very center of the conspiracy in this case.  In 1997, Mr. Kaiser met with Carlos Castaño and Raul Hasbun to form the agreement that is the basis of the conspiracy.  Proffer at ¶ 21.  Mr. Kaiser neither admits nor denies that he is one of the Individual Defendants in the criminal case.  According to his Supplemental Memorandum, R. 733, Mr. Kaiser states that the agreement he made with these AUC leaders was made under duress.  Id. at 1-2.  This is an affirmative defense, and depends on the disputed factual question whether the payments were voluntary.  The defense may also fail as a matter of law, since Chiquita always had the option to not do business in Colombia at all.   The Doe Plaintiffs take no position on Mr. Kaiser's motion to dismiss, however, since they cannot ascertain whether he is one of the ten Individuals being sued herein.   In the event the Mr. Kaiser is Individual F <u>supra</u> ("a high ranking officer of Banadex") then the arguments about Individual F would also apply.  For Individual F, the <u>mens rea</u> of knowledge, and the <u>actus reus</u> of substantial assistance (making the payments) are easily met.

### M.       William Tsacalis

Plaintiff's do not know whether Mr. Tsacalis is one of the ten Individual Defendants mentioned in the criminal case.  If not, then he is not being sued by these Plaintiffs.  Mr. Tsacalis was the Controller and Chief Accounting Officer for Chiquita.

Mr. Tsacalis neither admits nor denies that he is one of the Individual Defendants in the criminal case.  According to his Supplemental Memorandum, R. 737,  Mr. Tsacalis

is accused of knowing that the payments were intended for the AUC, and of designing the procedures to hide the payments.  Id. at 4.  The Doe Plaintiffs take no position on Mr. Linder's motion to dismiss, since they cannot ascertain whether he is one of the ten Individuals being sued herein.  However, the mens rea of knowledge, and the actus reus of substantial assistance (designing procedures to hide the payments) would easily be met.

### N.    Steven Warshaw

Plaintiff's do not know whether Mr. Warshaw is one of the ten Individual Defendants mentioned in the criminal case.  If not, then he is not being sued by these Plaintiffs.  Mr. Warshaw held various executive positions at Chiquita, including CEO, CFO, and COO and was also a director for approximately five years.

Mr. Warshaw neither admits nor denies that he is one of the Individual Defendants in the criminal case.  According to his Supplemental Memorandum, R. 731, Mr. Warshaw is accused of approving the payments.  Id. at 3.  The Doe Plaintiffs take no position on Mr. Warshaw's motion to dismiss, since they cannot ascertain whether he is one of the ten Individuals being sued herein.  However, the mens rea of knowledge, and the actus reus of substantial assistance (approving the payments) would easily be met.

### O.    Fernando Aguirre

Plaintiff's do not know whether Mr. Aguirre is one of the ten Individual Defendants mentioned in the criminal case.  If not, then he is not being sued by these Plaintiffs.  Mr. Aguirre was the CEO of Chiquita Brands in 2007, when the criminal conspiracy was first revealed to the public, having joined the company three years earlier.

Mr. Aguirre neither admits nor denies that he is one of the Individual Defendants in the criminal case.  According to his Supplemental Memorandum, R. 740,  Mr. Aguirre is accused of approving payments to the AUC.  Id. at 1.  The Doe Plaintiffs take no position on Mr. Aguirre's motion to dismiss, since they cannot ascertain whether he is one of the ten Individuals being sued herein.  However, the mens rea of knowledge, and the actus reus of substantial assistance (approving payments) would easily be met.

### SUMMARY OF ARGUMENT

The Individual Defendants, defined herein as Individuals A-J in the criminal case, are each liable because each aided and abetted, and actively participated in the criminal conspiracy to pay the AUC, with knowledge that the AUC was a terrorist organization, and of its campaign to kill civilians suspected of siding with the FARC guerrillas.[4]  Each Individual Defendant provided substantial assistance to the conspiracy, from designing the payment system, to participating in planning meetings, to falsifying corporate records, to delivering the cash.  Although the role of each may be slightly different, the corporate criminal responsibility was based **only** on the conduct of these ten individuals.  Therefore, the Plaintiffs have stated a prima facie case of aiding and abetting, and these claims should not be dismissed.

Applying ordinary principles of criminal law, these individuals were part of a hub-and-spoke conspiracy which also included members of the AUC.  The Individual Defendants' argument that there were multiple conspiracies can be ruled out as a matter of law.  There is no requirement that each co-conspirator make an individual agreement with the AUC, since all were part of an overall scheme, and all agreed to participate in

---

[4] They are also named as individual defendants in Does 1-254 v. Chiquita Brands, for victims of the FARC guerrillas.  We won't mention this case again, since the arguments are almost the same, although less is known about which individuals participated in paying the FARC.

the conspiracy. The harms caused by the conspiracy were forseeable, and known to the Individual Defendants, or should have been known, as they were occurring.

The claims against the Individual Defendants have taken on special importance, since they include not only the claims brought under Colombian law, but also claims based on the Torture Victim Protection Act, 28 U.S.C. § 1350 note, which does not apply to corporations. As we argue in our Opposition to Defendant's Motion to Dismiss for *Forum Non Conveniens*, being filed contemporaneously with this brief, a Colombian court would not have jurisdiction over these claims, or be able to interpret U.S. case law, so that the "whole case" could not be heard by a Colombian court. Nevertheless, the Court may presume that at least **some** of these individual defendants could be sued under the TVPA, since the criminal prosecution of Chiquita Brands was based **only** on the conduct of these individuals.

It would be premature to dismiss claims against any of the "Individual Defendants," at least until they identify themselves as Individuals A-J in the criminal case. We have deliberately avoided naming the Individual Defendants until their identities could be determined with certainty in discovery.[5] Presumably, each individual moving to dismiss is one of the Individuals A-J in the criminal case. It's not clear how the Court can even evaluate their motions before determining who is who.

It's also in the interest of judicial economy not to decide these eight motions, totalling 120 pages, until the full record is before the court. If new evidence is uncovered in discovery, after an individual defendant had successfully moved to dismiss, the

---

[5] Discovery in this case is likely to uncover not only the identities of all ten of the individual defendants, but more information about their roles in the criminal conspiracy. This is a legitimate purpose of using fictitious names such as "John Doe" for parties to a case whose identities are unknown. It allows a plaintiff to avoid suing the wrong person, and running afoul of Rule 11, based on speculation.

plaintiffs would want to add him back in, on the basis of this evidence. Since each of these ten individuals played a sufficiently important role in the conspiracy to be named in the criminal proffer, and the successful prosecution of the criminal case was based **only** on their conduct, the court should not dismiss them until the record has been developed.

## ARGUMENT

I. **In <u>Jane Doe v. Drummond</u>, the Eleventh Circuit recently reaffirmed that secondary liability is available under the TVPA.**

In its recent decision of March 25, 2015, the Eleventh Circuit set forth in detail the standards for secondary liability under the TVPA. See <u>Jane Doe et. al. v. Drummond Company, Inc.</u>, Case No. 13-15503, <u>slip op.</u>, attached hereto as Exhibit 1. "The TVPA contemplates liability against those who did not '*personally* execute the torture or extrajudicial killing.'" Id. at *62, <u>citing</u> <u>Mohammed v. Palestinian Authority</u>, 566 U.S. at ___, 132 S.Ct. at 1709 (emphasis in 11th Circuit decision); <u>Aldana v. Del Monte Fresh Produce, N.A., Inc.</u>, 416 F.3d 1242, 1248 (11th Cir. 2005) ("[T]he [TVPA] reaches those who ordered, abetted, or assisted in the wrongful act.") "Importantly, the TVPA and its legislative history in no way disavow reliance on traditional theories of tort liability for secondary actors under the TVPA." <u>Id</u>. "To the contrary, the legislative history endorses an expansive view of liability under the TVPA..." <u>Id</u>. Even a *mens rea* of knowledge, rather than intent, suffices. <u>Id</u>. (persons who "tolerated or knowingly ignored" the acts may be liable)

Reviewing its prior holdings in <u>Cabello</u>, 402 F.3d 1148, 1157-60 (11th Cir. 2005) (per curiam) and <u>Romero v. Drummond Co.</u>, 552 F.3d 1303, 1315 (11th Cir. 2008), the Eleventh Circuit reaffirmed that <u>Halberstam v. Welch</u>, 705 F.2d 472 (D.C. Cir. 1983) sets forth the standards for both conspiracy and aiding and abetting liability under the TVPA.

Id. The court found that indirect liability for aiding and abetting required the plaintiffs to merely prove "active participation" by the preponderance of evidence. Id. Active participation is proven by a familiar standard: knowing substantial assistance to the persons who committed the wrongful acts. Id. Therefore, for each of the Individual Defendants, the Court should independently determine whether the defendant had knowledge of Chiquita's illegal support of the AUC, and whether the defendant provided substantial assistance.

These elements are readily proven by reference to what is known about each individual defendant from the proffer in the criminal case. For each, the mens rea of knowledge is easily shown below. No later than in or about September 2000, Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. Proffer at ¶ 22. The actus reus of each individual varies, from designing the payment schemes, to discussing the payment schemes in meetings, to making the actual payments themselves. Since the decision to continue making the payments appears to have been a group decision, with no identifiable leader/organizer, everyone involved in these planning meetings provided substantial assistance to those who actually handled the cash.[6]

---

[6] Under Bell Atl. Corp. v Twombly, 127 S.Ct. 1955 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009), plaintiffs have stated sufficient facts to state plausible claims against the Individual Defendants. The Twombly case is particularly instructive, since it held that a showing of parallel behavior was insufficient to state a plausible claim for conspiracy, absent any allegations of an agreement. Here, every individual defendant is alleged to have, at a minimum, participated in meetings in which the agreement with the AUC was discussed, and played a significant enough role in the conspiracy to have been mentioned under a pseudonym in the criminal complaint and proffer. This goes well beyond parallel behavior, and states a plausible, prima facie case for each individual defendant.

II.   **Corporate liability is based onn liability for acts committed by the corporation's employees and agents.**

Each Individual Defendants argues that he was not personally responsible for the conduct of his employer, Chiquita Brands International.  Yet, corporate criminal liability was premised **only** on the individual acts of these ten people.  A corporation can only act through its officers and directors, employees and agents.  The aggregate of their acts was sufficient to find the corporation criminally liable.   Corporations are liable not only for the conduct of corporate officers and managers, but also for the conduct of low-level employees who carry out their policies. See, eg. Sayles v. Picadilly Cafeterias, Inc., 242 Va. 328 (Va. 1991)

The issue of corporate criminal liability was first taken up by the Supreme Court more than 100 years ago, in a case involving a low-level railroad employee violating federal law without the knowledge of his supervisors.  The Court found the railroad criminally liable, based on the concept of respondeat superior.

> "It is true that there are some crimes which, in their nature, cannot be committed by corporations.  But there is a large class of offenses ... wherein the crime consists in purposely doing the things prohibited by statute.  In that class of crimes we see no good reason why corporations may not be held responsible for and charged with the knowledge and purpose of their agents, acting within the authority conferred upon them.

New York Central & Hudson R.R. v. United States, 212 U.S. 481, 494-495 (1909). The Court justified the imputation on public policy grounds, reasoning that it was necessary to control the behavior of the corporation.  Id. at 494.  A decade later, a judge in the Southern District of New York wrote this concise explanation:

> "Now, there is no distinction in essence between the civil and criminal liability of corporations, based on the element of intent or wrongful purpose. Each is merely an imputation to the corporation of the mental conditions of its agents."

16

United States v. Nearing, 252 F. 223, 231 (S.D.N.Y. 1918) (Learned Hand).  These ten individuals were all considered by the Department of Justice to be principals in this criminal conspiracy, even though no one was individually charged with any crime.  This does not absolve them of civil liability, however.

**III.     The Individuals Defendants were all part of a hub-and-spoke conspiracy with the AUC.**

The Individual Defendants each argue that they were not part of the AUC's conspiracy to kill people in Urabá.  The argument is essentially that there were two conspiracies: Chiquita's own internal conspiracy to pay the AUC and disguise the payments, and the AUC's conspiracy to kill people in Urabá.  The argument has no merit when analyzed in terms of the familiar concept of multiple conspiracies in criminal law.

When several seemingly independent groups share a common point of contact, the question is whether they are one conspiracy, or separate conspiracies that overlap.  In the words of the Supreme Court, when separate spokes meet at the common hub, they can only function as a wheel if the spokes and hub are enclosed within a rim - that is, an overarching scheme.  Kotteakos v. United States, 328 U.S. 750, 755 (1946).  Here, the allegation is that there was an overarching plan, among Chiquita Brands in Ohio, other banana companies, and the AUC, to take control of the Urabá region by killing thousands of civilian supporters of the FARC.  This is a classic hub-and-spoke conspiracy and the existence of this overarching plan establishes liability.  At the motion to dismiss stage, this allegation must be taken as true.

Co-conspirators are liable for the unintended, but foreseeable consequences of their criminal agreement.  So long as the partnership in crime continues, the partners act for each other in carrying it forward, and an overt act of one partner may be the act of all

without any new agreement specifically directed to that act.  <u>Pinkerton v. United States</u>, 328 U.S. 640, 647 (1946).  If the unlawful agreement contemplated the type of offense committed in the substantive acts, the conspirators are liable. <u>Id</u>.; <u>see</u> <u>State v. Hobbs</u>, 252 Iowa 432, 107 N.W.2d 238 (1961) (statute making it an offense to possess burglary tools with intent to use them in a burglary construed to require only "general intent" to use tools on some undetermined occasion to commit a burglary, rather than a "specific intent" to burglarize a specific place at a particular time)  More basically, a person is presumed to intend the natural and probable consequences of his acts.  <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979); <u>Ford v. State</u>, 330 Md. 682 (1993) ("where the means employed to commit the crime against a primary victim create a zone of harm around that victim the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone")  Finally, the particular murders committed by the AUC were forseeable because the general pattern of murders was known to the Defendants.  <u>See</u> Proffer at ¶ 28 (admitting that Defendant Chiquita Brands, and Individual H, learned of the AUC's designation as a Foreign Terrorist Organization and about related security threats through an internet-based, password protected subscription service).  It is also reasonable to infer that the two Individual Defendants who were Banadex employees, and in the middle of these thousands of murders, must have known they were occurring.  Chiquita has even tried to justify its payments by citing an incident in which more than a dozen of its own employees were killed.

**IV.     The Individual Defendants Aided and Abetted the Conduct of the AUC.**

Aiding and abetting has a broader application than conspiracy.  <u>Nye & Nissen v.</u> <u>United States</u>, 336 U.S. 613, 620 (1949)  It states a rule of criminal responsibility for acts

which one assists another in performing.  Id.  There is no requirement that there be an agreement in order to convict one of aiding and abetting.  United States v. Frazier, 880 F.2d 878, 886 (6th Cir. 1989), cert. denied, 493 U.S. 1053 (1990).   Under the Federal common law standard, aiding and abetting requires providing substantial assistance to the perpetrator of a crime, with the knowledge or probable knowledge that a crime will occur.  Halberstam v. Welch, 705 F.2d 472, 477-478 (D.C. Cir. 1983).  It does not require a shared intent with the perpetrator.  Id.  The Court may evaluate the arguments of the Individual Defendants by determining whether each (1) provided substantial assistance; and (2) knew the nature of what the assistance was to be used for, which was to support the AUC to fight against the FARC.

The Court may again refer to the recent 11th Circuit decision, Jane Doe et. al. v. Drummond Company, Inc., Case No. 13-15503, slip op., attached hereto as Exhibit 1, which was decided based on aiding an abetting liability.  Even a mens rea of knowledge, rather than intent, suffices.  Id. at 62. (persons who "tolerated or knowingly ignored" the acts may be liable)  The Eleventh Circuit in Drummond found that indirect liability for aiding and abetting required the plaintiffs to merely prove "active participation" by the preponderance of evidence.  Id.  Active participation is proven by a familiar standard: knowing substantial assistance to the persons who committed the wrongful acts.  Id. Therefore, for each of the Individual Defendants, the Court should independently determine whether the defendant had knowledge or probable knowledge of Chiquita's illegal support of the AUC, and whether each defendant provided substantial assistance.

## Conclusion

For the forgoing reasons, the Individual Defendants' Motions to Dismiss should be denied.

Respectfully submitted,

/s/ Paul Wolf

_____

Paul Wolf  CO Bar #42107
Attorney for Does 1-144, 1-976,
1-677, 1-254, and 1-97
PO Box 46213
Denver CO 80201
(202) 431-6986
paulwolf@yahoo.com
Fax: n/a

June 22, 2015

## Certificate of Service

I hereby certify, that on this 22nd of June, 2015, I electronically filed the foregoing Doe Plaintiffs' Opposition to Defendant's Renewed Motion to Dismiss for Forum Non Conveniens, Declaration of Paul Wolf, Esq., and all exhibits thereto, with the Clerk of Court using the ECF system, which will send notification of such filing to all persons entitled to receive such notices.

/s/ Paul Wolf

_____

Paul Wolf CO Bar #42107