UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 08-01916-MD-Marra/Johnson

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.,
ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATS ACTIONS
JOSE AND JOSEFA LOPEZ NOS. 1 THROUGH 352,
(commonly referred to as the *Valencia* action)

      Plaintiffs,

vs.

CHIQUITA BRANDS INTERNATIONAL, INC.,
a New Jersey corporation; MOE CORPORATIONS
MOES 11-25,

      Defendants.
_____/

**THE *VALENCIA* PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT KEITH LINDNER'S SUPPLEMENTAL MEMORANDUM IN
SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINTS**

      As Chiquita's President, COO and Vice Chairman of the Board, Keith Lindner exercised

his authority to support the AUC's campaign of terror. DE 576 ¶¶ 12, 14.[1] Lindner was

personally involved in and professionally responsible for almost all the conduct that this Court

has determined to constitute intentional substantial assistance to and conspiracy with the AUC.

*See In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ("MTD Order").

---

[1] Unless otherwise indicated, all citations to "DE" refer to entries on the docket of the above-captioned Multi-District Litigation, No. 08-MD-01916 (S.D. Fla.).

During Lindner's tenure, Chiquita made dozens of payments to the AUC totaling hundreds of thousands of dollars. DE 576 ¶¶ 14, 71-77, 80, 104-105, 108-109, 124. Lindner approved Chiquita's payments to the AUC as well as procedures designed to disguise the purpose and recipient of those payments, all the while knowing that the AUC was a violent paramilitary organization. DE 576 ¶¶ 14, 72-77, 80, 1253-1254. Indeed, he authorized Chiquita's support of the AUC despite knowing that the AUC was designated a Foreign Terrorist Organization and that the payments were illegal. DE 576 ¶¶ 77, 103, 1324.

Plaintiffs have stated a TVPA claim against Lindner. First, his specific involvement constitutes knowing and substantial assistance to the AUC sufficient for aiding and abetting liability. Second, the allegations are sufficient to infer that he entered into an agreement with the AUC, Chiquita, and other officers and directors to pay the AUC to control the banana-growing regions, creating a foreseeable risk of extrajudicial killings, which is sufficient for conspiracy liability. Third, as chief executive with oversight responsibility and the ability to restrain the actions of employees who carried out the payments, Lindner is liable via agency theory and the doctrine of command responsibility. Lindner's motion to dismiss should be denied.

1. **Plaintiffs have pled non-conclusory allegations that Lindner individually engaged in conduct for which he can be held liable under the TVPA.**

Lindner makes two general attacks on the *type* of pleadings in the Complaints. Neither has merit. First, Lindner objects that many of the allegations in the Complaints are conclusory. DE 732 at 3. They are not. *See* Pls.' Opp. to Supp. Mot. to Dismiss by Def. Freidheim at 2. ("Opp. to Freidheim"). Indeed, Lindner admits, or at least does not contest, that Plaintiffs have pled the following non-conclusory individual facts: Lindner, as Vice Chairman of the Board, President, and COO of Chiquita, personally approved payments to the AUC and procedures for disguising the nature and destination of those payments. DE 576 ¶¶ 14, 71-77, 80, 104-105, 108-

1

109, 124, 1253-1254. Those are well-pled factual allegations, entitled to the presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *see* Opp. to Freidheim at 2-3.

Second, Lindner objects that some of Plaintiffs' allegations group him with the other Defendants. DE 732 at 3-4. But Plaintiffs allege precisely "the nature of his alleged participation in" the torts and conspiracies at issue. *Curtis Inv. Co. v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 493-94 (11th Cir. 2009). To be sure, Plaintiffs have some collective allegations; these are, after all, torts committed by a group of people. Plaintiffs seek to hold Lindner liable *because* he acted jointly and as a co-conspirator. The fact that those torts were committed jointly—and that the Complaints allege that several Defendants engaged in the same conduct—does not mean that the allegations are not entitled to the presumption of truth. *See* Opp. to Freidheim at 2-3. The only question then is whether the individual and collective allegations, taken together, state a claim under the TVPA. As Plaintiffs show *infra*, they surely do.

    a.  **Plaintiffs allege specific and concrete facts that demonstrate Lindner aided and abetted the AUC.**

        i.       *Lindner knowingly assisted the AUC.*

To be liable for aiding and abetting under the TVPA, Lindner need only have knowingly provided substantial assistance to the AUC. *Doe v. Drummond Co.*, 782 F.3d 576, 609 (11th Cir. 2015). The Eleventh Circuit's recent decision in *Drummond* knocks the pins out from Defendant Lindner's main argument that Plaintiffs' must allege specific intent. DE 732 at 2, 6. Under *Drummond*, specific intent is not required. And Lindner does not contest—indeed, essentially concedes—that Plaintiffs have alleged knowledge. DE 732 at 6. As the head of Chiquita, Lindner approved sending hundreds of thousands of dollars to the AUC, along with the procedures to hide these illicit payments.  Lindner knew full well that the payments he approved would go to

the AUC and that the AUC was a violent, designated terrorist organization. DE 576 ¶¶ 14, 77, 103, 1324. Indeed, it is hard to imagine—given his position at Chiquita and his attendance at meetings where AUC funding was discussed—that he could disclaim knowledge. DE 576 ¶¶ 14, 73-75, 80.

> ii. *Lindner's assistance was substantial.*

During his many years at Chiquita's helm, Lindner approved and helped conceal more dozens of payments, totaling hundreds of thousands of dollars. Lindner's conduct helped to ensure that the AUC had access to considerable secret funding, which could be and was used to continue a reign of terror. As this Court has already concluded, these were "atypical practices" that constitute substantial assistance. *Julin v. Chiquita Brands Int'l, Inc.*, 690 F. Supp. 2d 1296, 1310 (S.D. Fla. 2010). Lindner's approval was a critical part of maintaining the illicit scheme and his arguments as to why his assistance was not substantial are mistaken. This assistance was undeniably substantial.

Lindner asserts his actions "were superfluous and did not, in and of themselves, have a 'substantial effect' on the perpetration of the crimes did not "provide[ ] any assistance to the AUC beyond financing'" because "many of those payments occurred after [he] left the company." DE 732 at 8. Lindner was at the helm of Chiquita for 13 years from 1989 to 2002. That some of the illegal payments were made after he left Chiquita is no defense. In any event, financing *is* substantial assistance under U.S. law (which provides TVPA theories of liability), even where it only amounts to a fraction of the whole. Opp. to Freidheim at 4; *Julin*, 690 F. Supp. 2d at 1310; *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F.Supp.2d 86, 104-05 (D.D.C. 2003); *see also Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983). And Lindner not only approved payments, he ensured that their purpose and recipients were not discovered. DE 576 ¶¶

14, 31 and 33 (concealment through the *convevirs*), 71-77, 80; 104-105; 108-109; 124; 1253-1254. Such actions to conceal illegal activity likewise constitute substantial assistance. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1410-11 (11th Cir. 1994); *Halberstam*, 705 F.2d at 488 (defendant liable as aider and abettor where she had checks made out to her and falsified tax returns that concealed the criminal conduct); *Resolution Trust Corp. v. Spagnoli*, 811 F. Supp. 1005, 1014 (D.N.J. 1993).

Lindner also argues that *his* approval was not substantial because others' approval was also required. DE 732 at 8-9. But Lindner was the head of Chiquita. As a President, COO and Vice Chairman who was *personally* involved in the payments, he can hardly argue that *his* approval was "superfluous" or did not have a substantial effect on the continuation of Chiquita's payments. *Id.* at 9. Lindner provides no support for his suggestion that when several persons contribute to an act that constitutes substantial assistance, none is liable; that would be a recipe for impunity wherever multiple approvals are required. Indeed, Plaintiffs need not show that his assistance was necessary or sufficient to effect payments to the AUC. *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 584-85 (E.D.N.Y. 2005). As *Halbertsam* held, schemes often have multiple and different components that are each essential to the success of the tortious enterprise. 705 F.2d at 488.

At the very most, the question of whether such assistance rises to the level of substantial assistance is one for the jury. *Cox*, 17 F.3d at 1410. Lindner's motion to dismiss must be denied.

b. **Plaintiffs allege specific and concrete facts that demonstrate Lindner is liable for conspiracy under the TVPA.**

This Court held that Plaintiffs sufficiently alleged a conspiracy between Chiquita and the AUC in which Chiquita shared the AUC's intent to harm civilians. MTD Order, 792 F. Supp. 2d at 1344-49, 1351. Lindner approved and implemented that purpose for Chiquita. Plaintiffs have

pled facts that show Lindner "joined the conspiracy knowing *at least one of the goals* of the conspiracy and intending to help accomplish it." *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005) (emphasis added).

Regardless, Lindner is wrong when he claims Plaintiffs must show that he intended the killings. Plaintiffs have adequately alleged that Lindner joined a conspiracy with the AUC to unlawfully control the banana-growing regions, and that the fact that they would commit killings was a foreseeable consequence. That is enough. Opp. to Freidheim at 5.

i.      *Lindner had the requisite intent.*

An individual's intent to pursue a conspiracy's objectives is often proved by circumstantial evidence and inferences drawn from that individual's conduct. *Id.*; *United States v. Brenson*, 104 F.3d 1267, 1282 (11th Cir. 1997); *Julin*, 690 F. Supp. 2d at 1311-12. Lindner complains that Plaintiffs have failed to plead his intent. DE 732 at 5. But the facts alleged regarding his conduct create the reasonable inference that he sought to effectuate illegal payments in furtherance of the AUC and Chiquita's scheme. *See Iqbal*, 556 U.S. at 681; *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 556 (2002); *Julin*, 690 F. Supp. 2d at 1311.

Lindner supported violent terrorists for years, overseeing the scheme at the heart of this Court's ruling that Plaintiffs plausibly alleged Chiquita's conspiracy liability and intent. MTD Order, 792 F. Supp. 2d at 1344-52. The natural inference is that he joined Chiquita and the AUC's agreement and shared their intent. Opp. to Freidheim at 6; *see also Halberstam*, 705 F.2d at 486-87; *Linde*, 384 F. Supp. 2d at 584 (inferring intent where defendant administered activities that provided substantial assistance). At a minimum, his actions raise the reasonable inference that he shared another wrongful goal with them—to exert control over the banana regions—

5

which would also make him responsible for the abuses that were the consequence of the conspiracy.

Lindner also concealed the payments, which itself is sufficient to support an inference that a defendant had the requisite intent, as this Court has concluded. *See Julin*, 690 F. Supp. 2d at 1311 ("allegations of . . . secret payments and fraudulent concealment, sufficiently support an inference of . . . knowing and intentional participation in the agreement's illegal goals"); *see also* Opp. to Freidheim at 6; *Cox*, 17 F.3d at 1411.

Moreover, Lindner oversaw the scheme for two years—the full length of his tenure at the helm of Chiquita—even after being advised that the payments were illegal and needed to stop. His "continuous participation reflected [his] *intent* and *desire* to make the venture succeed." *Halberstam*, 705 F.2d at 488 (emphasis added).[2] *See* Opp. to Freidheim at 6. It is hard to think of a more obvious explanation for why someone would *illegally* and *consistently* support a terrorist organization than that they shared goals and tactics; this underlies Chiquita's own lawyer's conclusion that the length of time cut against a duress defense. DE 575 ¶ 2147; DE 589 ¶ 117.

Lindner argues that the possibility the payments were made under duress defeats these plausible allegations, but even if that defense were plausible—which even Chiquita's own lawyer doubted, DE 575 ¶ 2147; DE 589 ¶ 117—this Court may not choose between competing plausible explanations.[3] Opp. to Freidheim at 7.  Plaintiffs' allegations are plausible, and thus

---

[2] Chiquita and Lindner put cash *directly* in the hands of the AUC, unlike in *Abecassis v. Wyatt*, 704 F. Supp. 2d 623 (S.D. Tex. 2010), where defendants paid a *state* that, among other things, sponsored terrorism.

[3] Of course, extortion and willing assistance are not necessarily mutually exclusive. Even if Defendants were able to prove at trial that they funded the AUC *in part* because of a threat of violence, this does not mean Defendants were not *also* motivated by financial incentives. Only a jury can determine whether Defendants' motivations amount to the affirmative defense of duress.

pass muster under *Iqbal* and *Twombly*. *See* Opp. to Freidheim at 7.[4] Moreover, this Court's

finding that Plaintiffs adequately pled that *Chiquita* did not act under duress precludes Lindner's

argument. MTD Order, 792 F. Supp. 2d at 1348.

Lindner also insists there are no allegations that he "requested or directed that the AUC

kill and torture civilians." DE 732 at 6. But a participant in conspiracy is liable for all reasonably

foreseeable consequences of the conspiracy, even if he did not plan or order a specific act. *See,*

*e.g.*, *Halberstam*, 705 F.2d at 487; *Burnett*, 274 F. Supp. 2d at 105.

> ii.      *Plaintiffs alleged the existence of an agreement.*

Lindner mistakenly insists that the lack of specific allegations regarding whether he

personally met with the AUC means that he never agreed to join the conspiracy. DE 732 at 9.

Members of a conspiracy are not required to meet and agree with every other member; a

conspirator need not know the identities of all his co-conspirators. Opp. to Freidheim at 7;

*United States v. Marchante*, 514 F. App'x 878, 883 (11th Cir. 2013). The agreement itself can be

informal or implicit, Opp. to Freidheim at 7; *see also Am. Tobacco Co. v. United States*, 328 U.S.

781, 809 (1946); *Raspardo v. Carlone*, 770 F.3d 97, 115 n. 21 (2d Cir. 2014), and can be proven

by circumstantial evidence, including the conduct of the alleged conspirators, *Burrell v. Bd. of*

*Trs. of Ga. Military College*, 970 F.2d 785, 789 (11th Cir. 1992); *Cox*, 17 F.3d at 1410-11; *Julin*,

690 F. Supp. 2d at 1311-12. Moreover, the "long-running nature of the scheme is also crucial to

the inference of agreement" and "makes some kind of accord extremely likely." *Halberstam*, 705

F.2d at 487. For nearly seven years from 1995 to 2002, when Lindner was President and COO

and Vice Chairman of the Bard, despite the AUC's murderous reputation, he maintained both the

payments and the efforts to hide them. *E.g.*, DE 576 ¶¶ 14, 31 and 33 (concealment through the

---

[4] Moreover, duress is an affirmative defense that can only be considered in a 12(b)(6) motion if it appears on the face of the complaint, which it does not here. Opp. to Freidheim at 7.

*convevirs*), 71-77, 80; 104-105; 108-109; 124; 1253-1254.  This consistent and knowing support

is sufficient to infer that he joined in the ongoing agreement between Chiquita and the AUC, and

shared their conspiratorial intent.

    **c.**    **Lindner was responsible for the acts of Chiquita employees who aided and abetted the AUC.**

Lindner acted in a supervisory capacity to authorize, approve, and perpetuate payments

by personnel who were under his effective control and thus working as his agents and the agents

of other high-ranking Chiquita officials. As this Court found, Plaintiffs have sufficiently alleged

that these payments were intended to help the AUC commit atrocities. MTD Order, 792 F. Supp.

2d at 1349. Among Lindner's agents was Charles Keiser, who continued to implement the

original deal to pay the AUC during the time Lindner ran Chiquita. DE 575 ¶¶ 2050, 2075, 2208;

DE 589 ¶¶ 21, 165-66. Lindner was aware that these employees were aiding and abetting torture

and extrajudicial killing and had the authority to stop them or punish them for doing so.  Instead,

Friedheim condoned, prolonged, and concealed the payment scheme, thereby ratifying his

subordinates' acts. *See Cox*, 17 F.3d at 1409. Thus Plaintiffs have alleged his liability through

command responsibility and the principle-agent relationship. *See* Opp. to Freidheim at 7; Opp.

by Plfs. in the DC Cases to Mot. to Dismiss by Def. Warshaw 8-10.

## CONCLUSION

For the foregoing reasons, Lindner's Motion to Dismiss should be denied.

8

Dated: June 22, 2015

Respectfully submitted,

/s/ James K. Green
Florida Bar No: 229466
James K. Green, P.A.
Suite 1650, Esperanté
222 Lakeview Ave.
West Palm Beach, FL 33401
(561) 659-2029 (telephone)
(561) 655-1357 (facsimile)
jameskgreen@bellsouth.net

Attorney for *Valencia* Plaintiffs


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of

the Court using CM/ECF on June 22, 2015. I also certify that the foregoing document is being

served this day on all counsel of record registered to receive electronic Notices of Electronic

Filing generated by CM/ECF, and in accordance with the Court's First Case Management Order

("CMO") and the June 10, 2008, Joint Counsel List filed in accordance with the CMO.


/s/ James K. Green