**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 08-01916-MD-MARRA/JOHNSON**

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.,
ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION

_____/

This Document Relates To:
ATS ACTIONS

08-80421-CIV-MARRA
08-80465-CIV-MARRA
08-80508-CIV-MARRA
10-60573-CIV-MARRA
08-80480-CIV-MARRA
07-cv-60821-KAM

_____/


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT CHIQUITA'S MOTION TO DISMISS UNDER FEDERAL RULE OF
CIVIL PROCEDURE 12(B)(6) AND FOR *FORUM NON CONVENIENS***

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

I.  INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

II.  BACKGROUND ............................................................................................................... 4

    A.  Procedural Posture ................................................................................................. 4

    B.  The persistent backdrop of intimidation, violence, and dysfunction in Colombia ....... 6

III.  ARGUMENT .................................................................................................................. 11

    A.  This Court should not allow Chiquita to shop for a forum in which it has no assets, because any judgment would be enforced and hotly contested in the U.S. ................. 12

        1.  Because they have no assets in Colombia, Defendants could use enforcement proceedings to relitigate thousands of Colombian judgments in U.S. courts ... 12

        2.  This Court should not invite a replay of the Chevron/Ecuador fiasco ............. 14

    B.  Colombia is not an adequate forum for these actions .................................................. 16

        1.  Colombia is an inadequate forum because, if forced to litigate there, Plaintiffs would face physical danger .................................................................................. 16

            a.  Physical danger is a basis to find that Colombia is an inadequate forum ........................................................................................................ 16

            b.  Plaintiffs cannot safely file their claims in their home regions ............. 18

            c.  The Justice and Peace process and conciliation demands are irrelevant to whether Plaintiffs could litigate safely against Chiquita in Colombia ................................................................................................ 20

        2.  Pervasive delay and corruption – particularly in cases involving paramilitary and government violence – make Colombia an inadequate forum ................... 22

            a.  Corruption ................................................................................................ 22

            b.  Delay ........................................................................................................ 23

        3.  Colombia is an inadequate forum because Chiquita has not guaranteed the timeliness of claims which are timely in the United States ................................... 24

    C.  The private interest factors favor retention of this case in the United States ............. 25

i

1.   Location and availability of evidence ..................................................... 26

     a.   Plaintiffs' secondary liability theories do not require forum non
          conveniens dismissal ................................................................ 26

     b.   Key evidence and witnesses are located in both the United States and
          Colombia ................................................................................ 27

2.   Interests of litigating in a single forum ................................................ 30

3.   Location of third party defendants ...................................................... 31

4.   Impracticality of litigating in Colombia .............................................. 32

5.   Judgment enforceability ..................................................................... 33

D.   The public interest factors favor this forum .............................................. 33

1.   The interests of the respective countries do not favor Colombia ......................... 33

2.   Litigation in Colombia would create an undue judicial burden ............................. 35

3.   Comity concerns favor litigation in this forum ...................................... 38

     a.   There is no Colombian judgment with which a U.S. judgment might

          conflict ................................................................................. 38

     b.   Defendants' preferred strategy would implicate comity concerns .................. 39

4.   The presence of U.S. law claims weighs in favor of retention .............................. 40

5.   Defendants' choice to litigate other arguments for dismissal weighs against
     FNC                                                                    ....................... 41

E.   Additional conditions would be necessary – but not sufficient – if this Court did
     grant *forum non conveniens* ................................................................ 42

CONCLUSION ................................................................................... 45

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002) ………………………………………………...14

*In re Air Crash Disaster Near New Orleans,* 821 F.2d 1147 (5th Cir. 1987) ......................................17, 41

*Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283 (11th Cir. 2009) .............................. passim

*Allarcom Pay Television, Ltd. v. Home Box Office, Inc.*, 210 F.3d 381 (9th Cir. 2000)...................... 42, n.23

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) .................................................... 24, n.13

*Aracruz Trading Ltd. v. Japaul Oil & Maritime Servs. PLC*, No. 08 Civ. 3511, 2009 WL 667298

(S.D.N.Y. Mar. 16, 2009) ...............................................................................................................17, n.9

*A/S Dan-Bunkering Ltd. v. M/V Centrans Demeter*, No. 14-0297-CG-N, 2015 WL 1470830 (S.D. Ala.

Mar. 31, 2015).................................................................................................................................... 24

*In re Banco Santander Sec.-Optimal Litig.,* 732 F. Supp. 2d 1305 (S.D. Fla. 2010) ................................ 30

*Barboza v. Drummond Co.*, No. 06-61527-CIV, 2007 WL 8025825 (S.D. Fla. July 17, 2007) ............. 17

*Beattey v. College Ctr. of Finger Lakes Inc.*, 613 So. 2d 52 (Fla. Dist. Ct. App. 1992) ............................. 34

*Bell v. Louisville & Nashville R. Co.*, 106 Ill.2d 135 (Ill. 1985) ....................................................... 42

*BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 247 F.R.D. 427 (S.D.N.Y. 2007) .................... 18, n.10

*Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220 (3d Cir. 1995) ............................................... 22

*Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276 (S.D.N.Y. 1999) ............................................... 14

*Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185 (11th Cir. 2014).............................................. 6

*Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216 (9th Cir. 2011) ............................................ passim

*Carnival Corp. v. Rolls-Royce PLC*, No. 08-23318-CIV, 2009 WL 3861450 (S.D. Fla. 2009)...... 24, n.13

*Ceramic Corp. of Am. v. Inka Maritime Corp. Inc.*, 1 F.3d 947 (9th Cir. 1993)......................................16

*Chang v. Baxter Healthcare Corp.,* 599 F.3d 728 (7th Cir. 2010)...................................................44

*Chevron Corp. v. Camacho Naranjo*, 667 F.3d 232, 236 (2d Cir. 2012).....................................15

*Chevron Corp. v. Donzinger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011), rev'd, 667 F.3d 232 (2d Cir. 2012)15

*Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ......................................15, n.7

*In re Chiquita Brands Int'l, Inc.,* 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ........................... passim

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ........................38

*In re Cuisinart Food Processor Antitrust Litigation*, 506 F. Supp. 651, (J.P.M.L. 1981) ..............36

*Doe v. Exxon Mobil Corp.,* 393 F. Supp. 2d 20 (D.D.C. 2005) .....................................................18

*Doe v. Sun Int'l Hotels, Ltd.,* 20 F. Supp. 2d 1328 (S.D. Fla. 1998) ..........................................32

*Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078 (S.D. Fla. 1997) ...........................................22

*Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G.*, 955 F.2d 368 (5th Cir. 1992) 13

*Ford v. Brown*, 319 F.3d 1302 (11th Cir. 2003)........................................................... passim

*Haddad v. RAV Bahamas, Ltd.,* No. 05-21013-CIV, 2008 WL 1017743 (S.D. Fla. Apr. 9, 2008)......26

*Homen v. M/V SCM TEPUY II*, No. 05-61626-CIV, 2006 WL 3626301 (S.D. Fla. Aug. 2, 2006)..42

*F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300 (D.C. Cir. 1980) ..........................34

*Giglio Sub s.n.c. v. Carnival Corp.,* No. 12-21680-CIV, 2012 WL 4477504, (S.D. Fla. Sep. 26, 2012)..37

*Henderson v. Metro. Bank & Trust Co.,* 470 F.Supp.2d 294, (S.D.N.Y.2006) .............................45

*Int'l Ins. Co. v. Johns*, 874 F.2d 1447 (11th Cir. 1989) ...................................................... 41, n.21

*Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) .........................................12, 14

*Judge v. Am. Motors Corp.*, 908 F.2d 1565 (11th Cir. 1990) ................................................ 40, n.20

*King v. Cessna Aircraft Co.,* 562 F.3d 1374 (11th Cir. 2009) .................................................24, 33

*La Seguridad v. Transytur Line*, 707 F.2d 1304 (11th Cir. 1983)..............................................27

*Lehman v. Humphrey Cayman, Ltd.,* 713 F.2d 339 (8th Cir. 1983)..............................................32

*Leon v. Millon Air, Inc.,* 251 F.3d 1305 (11th Cir. 2001) ................................................ passim

iv

*Lexington Ins. Co. v. Forrest*, 263 F. Supp. 2d 986 (E.D. Pa. 2003) .......................................... 13

*Linder v. Portocarrero*, 963 F.2d 332 (11th Cir. 1992) ................................................. 40, n.20

*Lugones v. Sandals Resorts, Inc.*, 875 F. Supp. 821, 823 (S.D. Fla. 1995) ................................... 42

*McLane v. Marriott Int'l, Inc.*, 960 F. Supp. 2d 1351 (S.D. Fla. 2013) ................................ 13, 43

*Mercier v. Sheraton International, Inc.*, 935 F.2d 419 (1st Cir. 1991) .................................... 25

*Miyoung Son v. Kerzner Int'l Resorts, Inc.*, No. 07-61171-CIV, 2008 WL 4186979 (S.D. Fla. Sept. 5, 2008)

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134 (C.D. Cal. 2005) ..................... 17, 18

*Mujica v. AirScan Inc.*, 771 F.3d 580 (9th Cir. 2014) ................................................... 34

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146 (2d. Cir. 2005) ........................ 12, 16

*Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004) .................................................... 36

*Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307 (S.D. Fla. 2009) ........................................ 14

*Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368 (11th Cir. 1998) .......................................... 39

*Paolicelli v. Ford Motor Co.*, 289 F. App'x 387 (11th Cir. 2008) ................................. passim

*Paper Operations Consultants Int'l, Ltd. v. S.S. Hong Kong Amber*, 513 F.2d 667 (9th Cir.1975) ............. 44

*In re PCH Assocs.*, 949 F.2d 585 (2d Cir. 1991) .................................................. 40, n.20

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ................................................. passim

*Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997) .................. 42, n.23

*Robinson v. TCI/US W. Commc'ns Inc.*, 117 F.3d 900, (5th Cir. 1997) ..................................... 45

*Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir.2001) ......................................... 45

*Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224 (2d Cir. 1996) ............... 42, n.,23

*Singletary v. Grupo Pinero*, 45 F. Supp. 3d 1369 (S.D. Fla. 2014) ....................................... 29

*Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417 (7th Cir. 2009) ............. 24, n.13

*Tazoe v. Airbus S.A.S.*, 631 F.3d 1321 (11th Cir. 2011) ................................................. 31

*Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512 (11th Cir. 1994) .............................. 38, 40

*U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, (7th Cir. 2008) ................................................ 39, n.19

*In re West Caribbean Crew Members*, 632 F. Supp. 2d 1193 (S.D. Fla. 2009) .................................... 17, n.9

*Wilson v. Island Seas Investments, Ltd.*, 590 F.3d 1264 (11th Cir. 2009) ........................................... passim

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) ........................................................ 34

*Wong v. PartyGaming, Ltd.*, 589 F.3d 821 (6th Cir. 2009) .................................................................... 37

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectronics Corp., Int'l.*, 493 U.S. 400 (1990) .......................... 38

## Federal Rules and Statutes

Fed. R. Civ. P. 42(b) ................................................................................................................................ 36

Fed. R. Evid. 902(3) ......................................................................................................................... 28, n.15

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (28 U.S.C. 1350 note) . 34

## Foreign Law - Cases

Corte Provincial de Justicia Sucumbios [Sucumbios Provincial Court of Justice], 14/02/2011, Juicio No. 2003-0002 (Ecuador) ........................................................................................................................ 15

*Vereda La Esperanza*, Case 12.251, Inter-Am. C.H.R., Report No. 85/13 ¶¶ 50-51 (2013) 11, 29, n.16

## Foreign Law – Rules and Statutes

Gen. Proc. Code., L. 1564, July 12, 2012, OFFICIAL GAZETTE [DIARIO OFFICIAL] No. 48, 489, Art. 82(2) (Colom.) ........................................................................................................................................ 19

Civil Proc. Code, D. 1400 of 1970, Aug. 6, 1970, OFFICIAL GAZETTE [DIARIO OFFICIAL] No. 33,150, Art. 75(2) (Colom.) ..................................................................................................................... 19

## Other Sources

Colombia Caravana, *Colombia at the Crossroads: The vital role of lawyers and human rights defenders for real justice and peace* 15, 19-20 (2015) ......................................................................................................... 9, n.4

Eldon E. Fallon *et al.*, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) .............. 36

Restatement (Third) of Foreign Relations Law (1987) ..............................................................................

Restatement (Second) of Conflict of Laws (1971) ....................................................................... 41, n.21

Supp. Br. for the United States as *Amicus Curiae* in Partial Support of Affirmance at 4, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491(U.S. 2013) ........................................................................................ 34

U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2013, Colombia* at 1 (2014) ...................................................................................................17

**Internet Sources**

BBC Mundo, "Colombia: las víctimas de la Ley de Víctimas", http://www.bbc.co.uk/mundo/noticias/2012/04/120417_colombia_victimas_restitucion_tierras_a w.shtml (original in Spanish). **................................................................................................ 8**

Press Release, El Colectivo de Abogados "José Alvear Restrepo" y la Corporación Jurídica Libertad, Crímenes de Chiquita Brands siguen impunes en Colombia, (Jun. 22, 2015), at http://www.colectivodeabogados.org/editorial/editorial-cajar/article/crimenes-de-chiquita-brands-siguen (original in Spanish) ["CCAJAR Press Release"]. .............................................................. passim

Freedom House, *Freedom in the World: Colombia* 2014, *available at* https://freedomhouse.org/report/freedom-world/2014/colombia#.VYch4flVhBc ..............10, n.5

Freedom House, *Freedom in the World: Colombia* 2015, *available at* https://freedomhouse.org/report/freedom-world/2015/colombia#.VYciCPlVhBc ............. 10, n.5

Paul Barrett, *After 22 Years, Appellate Judge in Epic Pollution Case Suggests a Do-Over*, BloombergBusiness (Apr. 20, 2015), *at* http://www.bloomberg.com/news/articles/2015-04-20/after-22-years-appellate-judge-in-epic-pollution-case-suggests-a-do-over .........................................................................15, n.8

Central Unitaria de Trabajadores *et al, Report on the First Three Years of Implementation of the Labor Action Plan- Three Years of noncompliance with the Obama-Santos Labor Action Plan*, at http://www.wola.org/sites/default/files/Colombia/Labor/ENS%20LAP%20Report%20English% 20translation.pdf .............................................................................................................9, n.4

Semana, Abogado defensor de víctimas de Urabá fue asesinado en Itagüí, at http://www.semana.com/nacion/articulo/abogado-defensor-victimas-uraba-asesinado-itagi/236496-3 (original in Spanish) (Sierra) ....................................................................9, n.4

Washington Office on Latin America, Colombian Human Rights Defenders Continue to Endure Threats, Attacks, Harassment and Illegal Surveillance under Santos Government, at http://www.wola.org/news/colombian_human_rights_defenders_ continue_to_endure_threats_ attacks_harassment_and_illegal_surv (Cañas) ....................................................................9, n.4

Verna Gates, *Drummond cleared in landmark Colombia rights case*, Reuters (Jul. 26, 2007), *at* http://www.reuters.com/article/2007/07/26/us-usa-colombia-drummond-idUSN2646318320070726 ..................................................................................... 29, n.16

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Chiquita and the Individual Defendants operate and live in the United States. They committed and covered up the federal crimes at the heart of Plaintiffs' claims in the United States. Key witnesses and evidence are located in the United States. Plaintiffs' claims against the Individual Defendants arise in part under the Torture Victim Protection Act (TVPA), which was enacted to provide a U.S. forum for these kinds of claims. Plaintiffs were not forum-shopping; they sued the Defendants in their home forum because they are not present in Colombia, and because they have no assets in Colombia against which to enforce a judgment. This Court has ably managed eight years of litigation – during which Defendants have availed themselves of this forum to try to dismiss Plaintiffs' claims on the merits – and Plaintiffs have lawyers willing and able to litigate their claims here. Despite all of this, Defendants now argue that the United States is not a proper forum. They are wrong.

In 2008, Chiquita filed a motion to dismiss, in which it presumably presented its best arguments. It did not raise *forum non conveniens* (FNC). Until this Court declined to dismiss the case entirely in 2012, Chiquita was apparently content to litigate in the United States. They even argued that the predominant issues in the case related to Chiquita's liability for the crimes committed in Colombia – an inquiry that would be based largely on U.S. evidence – rather than the particularized circumstances of each plaintiff's injuries. After losing their motions to dismiss, however, Defendants changed their minds and trotted out their second-string FNC argument. Yet at the same time they seek to send the case to Colombia, Defendants *still* seek this Court's assistance to dismiss *Colombia* law claims – on the basis of *U.S. state* statutes of limitations – beforehand.

Defendants seek to dismiss this case to Colombia, even though that is a forum that they have long since abandoned. They glibly and mistakenly claim that Colombia is a safe, convenient, and adequate forum for victims of paramilitary terrorism to pursue their claims without intimidation.

1

In fact, just as a court in this district has already found in a similar case implicating the interests of paramilitary terrorists, Plaintiffs face grave security risks if forced to litigate in Colombia. And Defendants will make those circumstances far worse by impleading powerful and well-connected narco-traffickers, landowners, and other paramilitary supporters.

Defendants' rosy scenario, in which Plaintiffs could file aggregated claims that would be handled expeditiously, without undue obstacles, is untethered from the legal and factual reality. Colombia is not an adequate forum for litigating these claims. If Plaintiffs tried to sue there, they would not only face physical danger, they would likely be unable to find counsel, and could not enforce Defendants' promise to waive statutes of limitations defenses. Even if they could overcome those hurdles, they would be unable to file a group action, leaving only the option of inundating the Colombian system with thousands of individual actions that the courts are ill-equipped to handle and show no appetite for pursuing.

And Defendants are not really proposing Colombia as the forum to *finally* litigate these claims. They first sought, or now seek, to dismiss all claims on the merits before this Court. Then they ask to litigate whatever remains as the next step in a three-stage, two-forum strategy. Defendants have no assets in Colombia. If Plaintiffs prevail there, they must return to U.S. courts to enforce judgments. And Defendants have not agreed to satisfy any Colombian judgment, which means they can challenge the Colombian proceedings they now claim to want in an enforcement action. In other words, Defendants' strategy risks never-ending litigation that bounces between jurisdictions and would have U.S. courts repeatedly sit in judgment of the Colombian legal system. This would not be in Plaintiffs' interest, nor the public interest of either the United States or Colombia, and can hardly be considered "convenient."

Courts have been down this road before, and it has been a travesty. In the Chevron/ Ecuador litigation, a U.S. court dismissed a mass tort action to Ecuador, a forum in which the

Defendant lacked assets. This has resulted in collateral and follow-on litigation in an international tribunal and three countries in addition to Ecuador, including dozens of U.S. discovery actions and a RICO case in the United States. And while the initial FNC dismissal occurred thirteen years ago, there is still no end in sight. None of these problems would have occurred had the litigation remained in the United States. This Court should not repeat that saga here.

In addition to Defendants' forum-shopping, the private interest factors are all either neutral or weigh in favor of Plaintiffs. Plaintiffs' forum choice is entitled to substantial deference because Defendants are absent from Colombia. Defendants were sued in their home jurisdiction, where they chose to incorporate, and where they have assets. And as Defendants admit, key evidence and witnesses are in the United States, and they have not shown that they could make U.S. evidence available in Colombia. This case can only be litigated in a single forum in the United States; in Colombia, Plaintiffs would have to file thousands of individual actions in multiple districts. And Defendants' announced intent to implead other Colombian supporters of terrorism is not a reason for litigation in Colombia, because it would create a massive security risk for Plaintiffs.

The public interest factors, too, favor Plaintiffs. The U.S. criminal prosecution of Chiquita evinces a strong interest in regulating the conduct underlying these claims. Similarly, the TVPA demonstrates Congress's desire to provide remedies in the United States for victims of torture and killings at the hands of U.S. citizens.

There are no pending cases in the Colombian courts against any defendant, nor has any final judgment issued. Contrary to Defendants' argument, hypothetical conflicts with nonexistent rulings and unfiled cases do not raise comity concerns. On the other hand, Defendants' two-forum strategy raises precisely the comity concerns that Defendants pretends to champion, because it will result in U.S. courts sitting in judgment actual Colombian court decisions.

Even if Colombia were an appropriate forum for these claims, any suggestion that litigation

3

in Colombia is more convenient for Defendants than the United States is belied by the fact that they first want to use every effort to have U.S. courts dismiss these claims on the merits before heading to Colombia, and later want to preserve their option to challenge any Colombian judgment in U.S. courts. For these reasons, the FNC motion should be denied.[1]

## II.    BACKGROUND

### A.  Procedural Posture

The first complaint in what became this MDL was filed on June 7, 2007, on behalf of 144 Colombian plaintiffs who sought relief from Defendant Chiquita and individual, anonymous Doe Defendants under the Alien Tort Statute (ATS), the TVPA, and non-federal tort law. *See* Compl., *Does 1-144 v. Chiquita Brands Int'l., Inc.*, No. 1:07-cv-1048 (D.D.C. June 7, 2007). After another complaint was filed in this District, *see* Compl., *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 0:07-cv-60821 (S.D. Fla. June 13, 2007), Chiquita's response was not to move for FNC but for transfer to the District of Columbia. *See* Defs.' Mot. to Transfer Venue to the District of Columbia, No. 0:07-cv-60821, 2007 WL 2666222 (S.D. Fla. July 24, 2007). Chiquita argued, *inter alia*, that Chiquita's actions in the United States – the decisions to make and review payments to the AUC – warranted transfer in order to avoid "overlapping discovery." *Id.* at 7-8.

The Court denied transfer, noting that it mattered little whether the claims proceeded in D.C. or Florida since other sources of evidence would be located in Colombia and key corporate witnesses were located in Ohio. *See* Op. & Order, No. 0:07-cv-60821, 2007 WL 3458987 (Nov. 14, 2007). The Court noted the existence of common issues and plaintiff-specific issues, and without privileging one over the other, concluded that individual issues would predominate "*once the common issues are decided . . .* [.]" *Id.* at *4 (emphasis added). Chiquita then filed substantive motions to dismiss

---

[1] The DC Plaintiffs (Case No. 08-cv-80465) and the NY Plaintiffs (Case No. 9:08-cv-80480) respond to the statute of limitations issue in separate briefs filed concurrently herewith.

4

in both Florida and D.C., neither of which raised FNC.

Additional actions were filed, *see* Class Action Compl.*, Does 1-8 v. Chiquita Brands Int'l., Inc.*, No. 2:07-cv-03406 (D.N.J. July 19, 2007); Compl., *Does 1-377 v. Chiquita Brands Int'l, Inc.*, No. 1:07-cv-10300, (S.D.N.Y. Nov. 14, 2007), and Chiquita moved to coordinate the cases for pre-trial purposes. The MDL panel ordered coordination on February 20, 2008. DE 1. A fifth complaint was filed on May 14, 2008, Compl., *López Valencia v. Chiquita Brands Int'l, Inc.*, No. 9:08-cv-80508 (S.D. Fla. May 14, 2008), after which Chiquita filed its first consolidated motion to dismiss, again without raising FNC. Over the next three years, additional complaints were filed against Chiquita,[2] and plaintiffs were added to existing complaints.

Chiquita renewed and amended its consolidated motion to dismiss and sought dismissal of the new complaints in April and May 2010, again without raising FNC. DE 295; DE 313. This Court ruled on Chiquita's Motions on June 3, 2011, granting in part but largely denying dismissal. *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ("MTD Order"). Chiquita moved to certify an interlocutory appeal, and Plaintiffs moved for reconsideration of the dismissal of their non-federal tort claims. Finally, in November, 2011, more than four years after the first complaints were filed and after failing to have the case dismissed, Chiquita raised FNC in a new motion to dismiss. DE 502.

The Court granted (in large part) both the interlocutory appeal and reconsideration motions. DE 516, 518. The Eleventh Circuit accepted interlocutory appeal. DE 579. While the appeal was pending, based on additional information revealing the identities of individual Chiquita officials, Plaintiffs amended their claims to name previously anonymous Doe defendants and add additional

---

[2] Compl., *Does 1-976 v. Chiquita Brands Int'l, Inc.*, No. 1:10-cv-00404 (D.D.C. Mar. 9, 2010); Compl., *Montes v. Chiquita Brands Int'l, Inc.*, No. 0:10-cv-60573 (S.D. Fla. Apr. 14, 2010); Compl., *Does 1-677 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80404 (S.D. Fla. Mar. 22, 2011); Compl., *Does 1-254 v. Chiquita Brands Int'l, Inc.*, No. 9:11-cv-80405 (S.D. Fla. Mar. 22, 2011).

plaintiffs. DE 557, 558, 575, 576, 589. In light of these amendments, the Court denied without prejudice Chiquita's FNC motion. DE 635. On interlocutory appeal, the Eleventh Circuit reversed the District Court and remanded for dismissal of the ATS and TVPA claims against Chiquita. *Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185 (11th Cir. 2014). After denying a petition for rehearing, the Eleventh Circuit issued its mandate on January 7, 2015. DE 693. Chiquita and the Individual Defendants filed renewed Motions to Dismiss, including a renewed FNC argument, on March 9, 2015. D.E. 731–733, 735–741.

**B.  The persistent backdrop of intimidation, violence, and dysfunction in Colombia.**

The claims in this case arise out of violence committed against trade unionists, community organizers, and suspected guerrilla sympathizers by paramilitary groups that dominated Colombia's banana-growing regions of Urabá and Magdalena. *E.g.*, DE 589. These paramilitaries were financed and supported by Chiquita during the Colombian civil war in the late 1990s and early 2000s. Despite steps taken toward investigating abuses and reconciliation with paramilitaries since the complaints were originally filed, Colombia remains an exceedingly dangerous place for human rights defenders and victims who threaten the economic and legal interests of powerful entities by seeking accountability for paramilitary crimes. Judicial and political institutions have proven to be incapable of delivering justice and are tainted by corruption and political influence, especially in cases relating to paramilitaries, their financial supporters, and the ill-gotten proceeds of paramilitary violence.

Though Defendants' expert Michael Shifter argues the security situation has generally improved in Colombia, *e.g.* DE 741-5 ¶ 22, at this is not so for unionists and human rights defenders, and does not apply to Urabá where many of the Plaintiffs in these cases live. In recent years, trade unionists and human rights defenders – including lawyers and community organizers – have been threatened, attacked, and killed in frightening numbers. These threats are amplified by state-sponsored intimidation, including illegitimate surveillance, public vilification, and

criminalization of human rights advocates for vaguely defined crimes. Simons Decl., Ex. 9 ¶ 26 ("Andreu Decl."). Nor has the Colombian government made much effort to address these crimes.

At least 335 human rights defenders were murdered between 2009 and 2015. Andreu Decl. ¶ 57. In 2010, at least five human rights defenders were *murdered*; in 2014 that number rose to at least fifty-five; and since January 2015, twenty-four more.[3] *Id.* ¶¶ 57, 59. Ninety-five percent of the human rights defender murders, between 2009 and 2013, have gone unpunished. *Id.* ¶ 17. In 2015, there were at least two hundred and ninety five *reported* attacks on human rights defenders over a span of three months, preceding the same period from 2014 by a roughly 300% increase. *Id.* ¶ 56. Similarly, dozens of trade unionists have been murdered and disappeared and hundreds threatened since 2011. Report on the First Three Years of Implementation of the Labor Action Plan -- LAP1 "Three years of noncompliance with the Obama-Santos Labor Action Plan," http://www.wola.org/sites/default/files/Colombia/Labor/ENS%20LAP%20Report%20English%20translation.pdf (last visited June 22, 2015).

The murders and attacks included a significant number in Antioquia, the department where Urabá is located; last year there were 95 attacks against human rights defenders in Urabá alone. Andreu Decl. ¶ 67. Antioquia remains a haven for paramilitary groups (mostly formed from the remnants of the same paramilitary groups Chiquita supported) that now operate as narco-traffickers. Simons Decl. Ex. 6 ¶¶ 12-13, 15 ("Lopez Decl."). Just last year, the Director of the Antinarcotics Police acknowledged ongoing conflict in the regions where Chiquita operated and spoke of the role large criminal gangs play in the drug trade in Antioquia. *Id.* ¶ 46.

To be sure, since the complaints were originally filed, Colombia has proceeded with a truth and reconciliation process under the rubric of the Justice and Peace Law. Under this process,

---

[3] Between 2009 and 2013, 219 human rights defenders were murdered. At least another 116 have been killed since 2013. Andreu Decl. ¶ 17.

demobilized paramilitaries are required to lay down their arms, tell the truth about their crimes, and turn over ill-gotten assets to a victims' reparation fund, in return for reduced prison sentences. Simons Decl. Ex. 3 ¶¶ 57-58 ("Arrubla Decl."). Thousands of victims have registered under the Justice and Peace Law. But this regime is not an adversarial process in which a victim claims compensation from individual paramilitaries; the victim claims only against the *fund. Id.* Unlike in a civil suit, paramilitaries' exposure to financial loss or criminal penalties is completely unaffected by any individual victim's participation. Accordingly, the participation of victims in this process suggests little about the dangers they would face if forced to *litigate* these claims in Colombia.

The violence experienced by victims seeking restitution of their land wrongfully confiscated by paramilitaries is a stronger indication of the dangers Plaintiffs would face. Unlike the Justice and Peace process, in which former paramilitaries receive benefits for participating, land restitution claims directly attack the economic interests of the paramilitaries' backers. Andreu Decl. ¶ 79. Plaintiffs seeking such restitution through the proceedings designed specifically for land restitution are regularly threatened or killed; including Jesús Adán Quinto, who was killed in April 2014, in Turbo (the location of Chiquita's private port), Andreu Decl. ¶ 67, and Manuel Antonio Ruiz, from Urabá, who disappeared along with his son in March 2012 after they won roughly US $1,600 in their restitution action. BBC Mundo, "Colombia: las víctimas de la Ley de Víctimas", http://www.bbc.co.uk/mundo/noticias/2012/04/120417_colombia_victimas_restitucion_tierras_a w.shtml (last visited June 22, 2015) (original in Spanish).

The violence is likely to increase as paramilitaries are released from prison under the Justice and Peace program, which imposes a maximum eight-year sentence; as many as 2,000 may be eligible as of July 2014. Andreu Decl. ¶ 49 Most of these individuals continued to commit crimes and direct paramilitary groups from prison. *Id.*

Victims' advocates, including lawyers, are also regularly intimidated and threatened. For

example, in a case against businessmen who collaborated with paramilitaries to displace communities in Chocó (adjacent to Urabá), human rights defenders were subject to death threats and assassination attempts. *Id.* ¶ 66. In 2012, paramilitaries offered a $120,000 reward to attack a human rights lawyer known for working on paramilitary cases, including ones relating to violence against trade union leaders. *Id.* Other human rights attorneys have received coffins with death threats inside, been attacked with acid, or murdered; most of the known perpetrators were paramilitary successor organizations. Colombia Caravana, *Colombia at the Crossroads: The vital role of lawyers and human rights defenders for real justice and peace* 15, 19-20 (2015). Lawyers representing victims in the Justice and Peace process are also in the crosshairs, including Ricardo Rodriguez Cajamarca (killed in 2013), Ricardo Alberto Sierra (killed in 2011), and Gisela Cañas, who received death threats in 2011.[4] Paramilitary successor groups explicitly target lawyers who bring cases that "slow[] the progress of multinational companies." Lopez Decl. ¶ 18.

The Colombian judiciary has proven unable to provide justice for the victims of paramilitary violence. As of September 2014, there were final convictions in the cases of only nine paramilitaries under Law 975 of the Justice and Peace program. Arrubla Decl. ¶ 55. Most of the 30,000 paramilitaries who reportedly laid down their arms failed to submit themselves to the Law's limited scrutiny. Andreu Decl. ¶ 39. Meanwhile, in the ordinary penal system, judges and magistrates face great dangers – especially those involved in the land restitution process. In 2014 and 2015, eight judicial actors were killed, thirteen were threatened and one forcibly disappeared. *Id.* ¶ 22. Fifty-three

---

[4] *See* Colombia Caravana, European Lawyers Protest against Intimidation, Arrests, Violence and Assasination of Human Rights Lawyers in Colombia, at http://www.uianet.org/sites/default/files/Petition%20-%20THE%20Day%20of%20the%20endangered%20Lawyer%20-%202014%20-%20Colombia_0.pdf (Cajamarca); Semana, Abogado defensor de víctimas de Urabá fue asesinado en Itagüí, at http://www.semana.com/nacion/articulo/abogado-defensor-victimas-uraba-asesinado-itagi/236496-3 (original in Spanish) (Sierra); Washington Office on Latin America, Colombian Human Rights Defenders Continue to Endure Threats, Attacks, Harassment and Illegal Surveillance under Santos Government, at http://www.wola.org/news/colombian_human_rights_defenders_continue_to_endure_threats_attacks_harassment_and_illegal_surv (Cañas).

threats were made against judges who were involved in cases under the Victims' and Land Restitution Law. *Id.*

Freedom House gave Colombia a score of 7 out of 16 in the "Rule of Law" category of its annual survey in 2014 and 2015, noting that the judicial system remains "compromised by corruption and extortion."[5] In fact, the last few years corruption scandals involving justices from the High Courts of Justice have been publicized, and few have been sanctioned for this abuse of power including accepting bribes. Andreu Decl. ¶¶ 9, 10, 12. These abuses have been connected to paramilitary crimes in a number of cases. For example:

- In 2011, the Director of Prosecution in Medellín, Antioquia, was sentenced to 15 years in prison for links to paramilitaries and narco-traffickers. *Id.* ¶ 12.

- The judiciary was implicated in the "false positives" scandal, in which security forces murdered civilians and passed their bodies off as guerrillas. For example, a Supreme Court justice colluded with a colonel, who was arrested in connection with the deaths of twelve civilians, to transfer his case to a military tribunal. Lopez Decl. ¶ 30. A judge investigating false positives cases in Urabá was intimidated into fleeing the country. Andreu Decl. ¶ 34. In 2013, a corruption inquiry revealed that the President of the Constitutional Court, Jorge Pretelt Chaljub, owned property in Urabá that was wrongfully confiscated from paramilitary victims. *Id.* ¶ 10.

Delays pervade Colombia's judicial system, especially in cases relating to human rights abuses. Indeed, a criminal investigation into the allegations at issue in *this case* that includes Banadex employees has been pending for eight years, with no apparent progress. Press Release, El Colectivo

---

[5] Freedom House, Freedom in the World: Colombia 2014, *available at* https://freedomhouse.org/report/freedom-world/2014/colombia#.VYch4flVhBc; Freedom House, Freedom in the World: Colombia 2015, *available at* https://freedomhouse.org/report/freedom-world/2015/colombia#.VYciCPlVhBc.

de Abogados "José Alvear Restrepo" y la Corporación Jurídica Libertad, Crímenes de Chiquita

Brands siguen impunes en Colombia, (Jun. 22, 2015), at http://www.colectivodeabogados.org/

editorial/editorial-cajar/article/crimenes-de-chiquita-brands-siguen (original in Spanish) ["CCAJAR

Press Release"].

Similarly, the Inter-American Commission on Human Rights found that Colombia failed to

provide justice by virtue of a 17-year delay in the *Vereda La Esperanza* case, which involved the

forced disappearance and murder of nearly twenty people in Antioquia. Case 12.251, Inter-Am.

C.H.R., Report No. 85/13 ¶¶ 50-51 (2013). The U.S. State Department concluded "[m]uch of the

judicial system was overburdened and inefficient, and subornation and intimidation of judges,

prosecutors, and witnesses hindered judicial independence." Andreu Decl. ¶ 18.

Finally, civil remedies against perpetrators of atrocities committed during Colombia's civil

war have proven elusive. Victims may not be able to find lawyers able or willing to file claims; of the

roughly 1,700 conciliation claimants to whom Chiquita refers in its Motion, *none* actually filed a civil

claim. DE 798 at 5-6. Civil claims associated with the criminal investigation into Banadex employees

are on hold until that investigation results in convictions, an outcome that is not expected anytime

soon. CCAJAR Press Release.

### III.   ARGUMENT

The Court should deny the FNC motion because these claims can *only* be litigated in the

United States.

FNC is "an exceptional tool to be employed sparingly, and not a doctrine that compels

plaintiffs to choose the optimal forum." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224

(9th Cir. 2011). Its historical purpose is to root out cases seeking to "harass[]," particularly where a

plaintiff tries to "forc[e] the trial at a most inconvenient place for an adversary." *Id.*

If a plaintiff, including a foreign plaintiff, has a legitimate basis for choosing the forum, his

11

choice is entitled to deference. *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001); *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 155-56 (2d. Cir. 2005). Plaintiffs' choice of a U.S. forum is due "substantial deference" because it was made in order to obtain jurisdiction over Defendants, *Norex*, 416 F.3d at 155-56, and for the additional legitimate reason that Defendants have assets here to satisfy a judgment. No Defendant is present in Colombia nor has assets there. It is Defendants who are engaging in forum-shopping by seeking to try this action in a forum where they have no presence.

Defendants bear the burden of showing: (1) that Colombia is an available and adequate forum; (2) that the balance of private and public interest factors favor dismissal; and (3) that the plaintiffs can reinstate their suits in Colombia without undue inconvenience or prejudice. *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1310-11 (11th Cir. 2001). Defendants have not carried their burden as to *any* of these requirements.

### A. This Court should not allow Defendants to shop for a forum in which they have no assets, because any judgment would be enforced and hotly contested in the U.S.

Defendants' motions are not about finding the most convenient forum. They first seek to have this Court continue to rule on their efforts to dismiss Plaintiffs' claims. Colombia would then be the second stage of a three-stage, two-forum strategy. Neither Chiquita nor any of the Individual Defendants has assets in Colombia, nor has any Defendant agreed to satisfy a Colombian judgment. So, the third stage would require Plaintiffs to file enforcement actions in the United States where the Defendants can challenge the Colombian proceedings and the Colombian judiciary. Thus, a Colombian judgment for Plaintiffs would only be the next stage of a long, multi-jurisdictional odyssey requiring rounds of litigation *in U.S. courts*, in which U.S. judges might have to review the details of each of over 4,000 Colombian cases. That is not convenient.

### 1. Because they have no assets in Colombia, Defendants could use enforcement proceedings to relitigate thousands of Colombian judgments in U.S. courts.

In June 2004, Chiquita sold its Colombian subsidiary, Banadex, to C.I. Banacol S.A. ("Banacol"), a Colombian-based fruit producer. DE 589 ¶ 22. Chiquita no longer has operations in Colombia, and no Defendant has claimed to have any assets in Colombia.[6] FNC is not appropriate because a judgment for Plaintiffs would not be enforceable in the foreign forum. In *McLane v. Marriott Int'l, Inc.*, 960 F. Supp. 2d 1351, 1359 (S.D. Fla. 2013), for example, FNC was granted only because Costa Rican defendants had assets there, and the U.S. defendant undertook to satisfy any Costa Rican judgment. In *Carijano*, by contrast, the fact that the defendant had no assets in Peru weighed against dismissal. 643 F.3d at 1232. Judicial economy weighs heavily against FNC if plaintiffs would be required to return to the U.S. to enforce a judgment. *See Lexington Ins. Co. v. Forrest*, 263 F. Supp. 2d 986, 995 (E.D. Pa. 2003).

If FNC were granted, thousands of individual lawsuits will need to be litigated in Colombia. According to Dr. Jaime Arrubla, a former Colombian Supreme Court Justice and an expert in civil and commercial law, the statute of limitations to file a class action in Colombia has lapsed, so *each* Plaintiff in this MDL would have to file a separate Colombian action. Arrubla Decl. ¶ 48. Thus, there could be 4,000 individual Colombian judgments against the Defendants, each of which would have to be enforced, likely in the United States, and could be contested individually. And because the Defendants may not have assets in the same U.S. jurisdiction, a successful Colombian plaintiff might be forced to file numerous enforcement actions in the United States.

Each enforcement action would likely be vigorously contested. Defendants have not committed to satisfy a Colombian judgment. DE 741 at 19. Defendants reserves the right to challenge the Colombian judiciary on the grounds that it is corrupt, biased, or lacks due process. Thus, Defendants could use the many of the same arguments that *Plaintiffs* raise, and they oppose,

---

[6] Defendants bear the burden of proving that a judgment would be enforceable in Colombia, *Empresa Lineas Maritimas Argentinas, S.A. v. Schichau–Unterweser, A.G.*, 955 F.2d 368, 375 (5th Cir.1992), a burden they have failed to carry.

13

here, including that Colombia has inadequate tribunals. *See Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1312 (S.D. Fla. 2009) (foreign judgment could be challenged if it was rendered under system that does not provide procedures compatible with due process and "that lacks impartial tribunals"); *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 283 (S.D.N.Y. 1999) *aff'd*, 201 F.3d 134 (2d Cir. 2000) (because defendant never expressly took the position in Liberian proceedings that Liberian courts are fair and impartial, it was not estopped from challenging enforcement of Liberian judgment on those grounds). And Defendants could challenge each of the 4,000 proceedings individually, questioning the conduct of Colombian judges and the adequacy of the judicial system in each case.

Enforceability is often considered as a private interest factor. *See Wilson v. Island Seas Invs., Ltd.*, 590 F.3d 1264, 1270 (11th Cir. 2009). Here, however, Defendants' dual-forum strategy stands FNC – which is intended to prevent forum-shopping by the plaintiffs, *see Iragorri*, 274 F.3d at 71 – on its head. The fact that Plaintiffs might have to revisit every Colombian judgment in a hotly-contested enforcement action *in the United States,* refutes any suggestion that Colombia is a convenient forum, or that FNC dismissal would ease any burden on the litigants or the U.S. judicial system, and therefore precludes FNC.

**2. This Court should not invite a replay of the Chevron/Ecuador fiasco.**

By seeking dismissal to a country in which they have no assets while reserving the right to challenge any judgment against them, Defendants would create quagmires like those in the Chevron/Ecuador litigation. There, Ecuadorian villagers brought pollution claims against Chevron (then Texaco) in New York. Chevron, a U.S. company, obtained FNC dismissal to Ecuador over the plaintiffs' strenuous protest that the Ecuadorian judiciary was not impartial or able to handle their claims, and despite the fact that, like Chiquita, Chevron no longer had assets in that jurisdiction. *See Aguinda v. Texaco, Inc.*, 303 F. 3d 470 (2d Cir. 2002). Ten years later, an Ecuadorian court returned a multi-billion dollar judgment in plaintiffs' favor. Chevron appealed the judgment all the way to the

14

Ecuadorian Supreme Court, and lost. To this day, and more than two decades after the case was originally filed, Chevron steadfastly refuses to satisfy the judgment. *See* Corte Provincial de Justicia Sucumbios [Sucumbios Provincial Court of Justice], 14/02/2011, Juicio No. 2003-0002 (Ecuador); *Cf. Chevron Corp. v. Donzinger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011), *rev'd*, 667 F.3d 232 (2d Cir. 2012).

The follow-on litigation that the Ecuadorian case spawned amply demonstrates why dismissal here is such a bad idea. In support of the foreign litigation, Chevron filed dozens of U.S. discovery actions which resulted in at least 50 federal court decisions. *Chevron Corp. v. Camacho Naranjo*, 667 F.3d 232, 236 (2d Cir. 2012). Chevron also sued the Ecuadorian plaintiffs and their lawyers in New York to collaterally attack the Ecuadorian judgment, resulting in a finding by a U.S. court that the Ecuadorian judgment was the product of fraud, and that the *entire* Ecuadorian court system – Chevron's chosen forum – was neither impartial nor provided due process. *Chevron Corp. v. Donzinger*, 974 F. Supp. 2d 362, 609-10 (S.D.N.Y. 2014).[7] In turn, the Ecuadorians have sought enforcement in at least three countries; one action is now pending before the Supreme Court of Canada. *Yaiguaje v. Chevron Corp.*, 2013 ONCA 758, leave to appeal to SCC granted, Case No. 35682 (3 Apr. 2014). There is no end in sight; a Second Circuit judge hearing the appeal of the New York action recently wondered aloud whether the *merits* of the Ecuadorian judgment should be re-tried in the United States[8] – two decades after the original U.S. lawsuit. None of this would have happened if the litigation had simply proceeded in the United States.

Defendants' attempts to dismiss these claims to a jurisdiction where they are not at home and have no assets would all but guarantee unending litigation, including in the United States. Other

---

[7] The court held the standard for assessing foreign legal systems in the FNC context is "far more forgiving" than that applicable to recognition. *Donziger*, 974 F. Supp. 2d at 609 n.1585. If this is true, some judgments issued after a FNC dismissal may be inherently unenforceable here. Chiquita will surely raise similar arguments in the U.S. enforcement actions its two-forum scheme would require.
[8] *See* Paul Barrett, *After 22 Years, Appellate Judge in Epic Pollution Case Suggests a Do-Over*, BloombergBusiness (Apr. 20, 2015), *available at* http://www.bloomberg.com/news/articles/2015-04-20/after-22-years-appellate-judge-in-epic-pollution-case-suggests-a-do-over.

courts have rejected this gambit. *See Carijano*, 643 F.3d at 1231-32. It should not be repeated here.

**B. Colombia is not an adequate forum for these actions.**

Colombia is an inadequate forum for these actions. Although Defendants cite cases that found Colombia to be an adequate forum in other contexts, no case suggests that Colombian victims of paramilitary violence can obtain an adequate remedy from a foreign company that intends to implead powerful military, political, and economic actors. Even where a nation's courts are generally adequate, FNC dismissal is unwarranted where the movant has not established the possibility of filing suit and obtaining a remedy in the foreign court *in the case at bar. See, e.g., Ceramic Corp. of Am. v. Inka Maritime Corp. Inc.*, 1 F.3d 947, 949-50 (9th Cir. 1993); *Norex*, 416 F.3d at 158-59. In *this* case, litigation in Colombia simply would not be possible.

**1. Colombia is an inadequate forum because, if forced to litigate there, Plaintiffs would face physical danger.**

Defendants argue that they need to litigate in Colombia because they intend to "implead some or all of" the AUC's sponsors, including "drug barons, large landowners, industrialists . . . bankers . . . wealthy landowners, businessmen, and multinational corporations." DE 741 at 34 & n.23 (internal citations and quotation marks omitted). Litigating paramilitary-related claims in Colombia is dangerous enough, but Defendants' strategy – making a panoply of powerful Colombian actors directly adverse to the Plaintiffs – would exponentially increase that danger. Defendants are entitled to sue these entities for contribution in any forum they can find them, but making Plaintiffs adverse to them makes litigation in Colombia irretrievably unsafe and Colombia an utterly inadequate forum.

*a. Physical danger is a basis to find that Colombia is an inadequate forum.*

Plaintiffs have a well-grounded fear that they will suffer violent reprisal if forced to litigate in Colombia – a concern that is substantially heightened by the impleader strategy that Defendants intend to pursue in Colombia. This significant possibility of physical danger in the foreign forum

renders that forum inadequate. Indeed, a court in this district has already found Colombia to be an inadequate forum for plaintiffs pursuing claims implicating "terrorist organizations, paramilitary members as well as police and military officers in collaboration with the paramilitary." *Barboza v. Drummond Co.*, No. 06-61527-CIV, 2007 WL 8025825 at *3, (S.D. Fla. July 16, 2007).

Defendants attempt to distinguish *Barboza* by noting that the court relied on a 2006 State Department report and that, at the time *Barboza* was decided, the accused paramilitaries were still present in the region where the plaintiffs resided. DE 741 at 45. Defendants' argument is unavailing. The current State Department report, like the one in *Barboza*, documents ongoing forced disappearances, death threats, killings, and collaboration between the military and criminal groups that are considered to be "a continuation of paramilitary groups." U.S. Dep't of State, *Country Reports on Human Rights Practices for 2013, Colombia* at 1 (2014);[9] *see supra* Part II(B).

*Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283 (11th Cir. 2009), on which Chiquita relies, confirms the centrality of plaintiff safety to the adequacy of an alternative forum; in that case, the court "d[id] not take lightly" the contention that Guatemala was too dangerous of a forum in which to pursue litigation. *Id.* at 1290. The plaintiffs had asylum in the United States and the defendant had guaranteed that the plaintiffs would not need to return to Guatemala to litigate, so the court found these dangers were adequately addressed. *Id.* Similarly, *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134 (C.D. Cal. 2005), held the "significant possibility" that plaintiffs

---

[9] Defendants cite a number of cases purporting to show that Colombia is a safe forum, but in each of those cases, the claims had nothing to do with paramilitary violence, and there was no reason to suppose general security concerns should prevent the cases from being litigated. *See, e.g., Paolicelli v. Ford Motor Co.*, 289 F. App'x 387, 391 (11th Cir. 2008) (claims related to car accident); *Aracruz Trading Ltd. v. Japaul Oil & Maritime Servs. PLC*, No. 08 Civ. 3511, 2009 WL 667298, at *1, 5 (S.D.N.Y. Mar. 16, 2009) (claims related to boat accident); *In re West Caribbean Crew Members*, 632 F. Supp. 2d 1193, 1196, 1201 (S.D. Fla. 2009) (claims related to plane crash, and evidence submitted was of general nature). By contrast, there is a tight connection between the claims themselves and the dangers Plaintiffs would face if forced to pursue them in Colombia; moreover, those dangers are clear and present precisely in the zones where most plaintiffs reside.

would face retaliation rendered Colombia unsafe, but their ability to file a case while residing in the United States was adequate mitigation. *Id.* at 1143. By contrast, there is no such guarantee for Plaintiffs, who mostly live in areas of Colombia where danger is acute and where they have no protection from retaliation. *See Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 29 (D.D.C. 2005) (genuine risk of reprisal based on record evidence rendered forum inadequate).

It is Defendants' burden to show that litigation in Colombia would be safe for these plaintiffs and thus that Colombia is an adequate forum. *Leon*, 251 F.3d at 1311-12. Accordingly, Defendants are wrong to suggest that each individual plaintiff must make a showing of physical danger. Defendants cannot meet their burden because victims of paramilitary violence in the banana-growing regions would likely face intimidation and violence if forced to litigate claims that would affect the interests of powerful and dangerous economic actors there.[10] *See supra* Part II(B). Defendants have failed to show that the Plaintiffs in *this* case can safely pursue their claims in Colombia under these circumstances. FNC dismissal should be denied.

> *b. Plaintiffs cannot safely file their claims in their home regions.*

There is no question that the threats that made Colombia an inadequate forum in *Barboza* continue to endanger Plaintiffs today. While Shifter argues generally that levels of violence have dropped in Colombia, he says nothing about the prevalence of violence in the regions where the Plaintiffs live. Nor does he have anything to say about violence against people situated similarly to the Plaintiffs and the advocates and advisers who would be necessary to a legal action in Colombia. Most of the Plaintiffs still live in the banana-growing regions, where they suffered harm and would

---

[10] Defendants' cases do not require a different result. The language Defendants cite from *Paolicelli* merely describes a showing that one plaintiff attempted to make, not a *rule* requiring completely individualized showings. 289 Fed. App'x at 391. Other cases require a showing that risks in the region have a meaningful connection to the claims at issue, *e.g.*, *BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 247 F.R.D. 427, 432 (S.D.N.Y. 2007), which simply means generalized allegations of danger are insufficient, not that each plaintiff must make a separate showing of danger to herself.

be required to file a civil claim under Colombian law. Arrubla Decl. ¶ 16. In fact, a toxic mix of narco-traffickers, armed groups, and "new" paramilitaries – precisely the parties Defendants seek to implead and thus pit against the Plaintiffs – continue to dispute territory and control the drug trade in Antioquía, where many plaintiffs live. *See supra* Part II(B); Lopez Decl. ¶¶ 11-12.

In *these* areas, violence against individuals who attempt to claim reparations from paramilitaries and their allies remains rampant. *See supra* Part II(B). Some of the Plaintiffs are themselves or are family members of labor activists or community organizers – groups that are still targeted for violence and intimidation. There is no mechanism in Colombia by which plaintiffs who fear reprisal may sue under pseudonyms. Simons Decl., Ex. 10 ¶ 13 ("Calderón Decl."); *See* Gen. Proc. Code, L. 1564, July 12, 2012, OFFICIAL GAZETTE [DIARIO OFICIAL] No. 48, 489, Art. 82(2) (Colom.); Civil Proc. Code, D. 1400 of 1970, Aug. 6, 1970, OFFICIAL GAZETTE [DIARIO OFICIAL] No. 33,150, Art. 75(2) (Colom.). Defendants' requested relief would force Plaintiffs to choose between dropping their case entirely or face the potentially lethal consequences of seeking a remedy by filing publicly in their own names. This is, of course, no remedy at all.

Even if Plaintiffs could safely file their claims, it is unlikely that they could find lawyers who would represent them. Lawyers representing victims of paramilitary violence are frequently threatened and murdered in the banana-growing regions, *see supra* Part II(B); procedures to protect lawyers from threats and violence are inadequate. Lopez Dec. ¶¶ 22-23.

Although Shifter opines that violence has declined in Colombia, violence has in fact jumped against human rights defenders and land restitution claimants, particularly in the banana-growing regions where Plaintiffs live. *Supra* Part II(B). Moreover, Shifter asserts that the Plaintiffs need not fear retaliation because claims would be asserted only against Chiquita and not against those who continue to perpetrate violence against human rights defenders and persons who seek reparations. DE 741-5 ¶ 30. But Defendants undermine Shifter's claim by intending to implead the drug barons

and other powerful supporters of the paramilitaries who continue to wreak havoc in those regions. Oddly, Defendants tout this as a benefit of litigating in Colombia. DE 741 at 33-34.

Because Shifter failed to consider either Plaintiffs' situation or Chiquita's intended impleader strategy, his opinions are largely irrelevant. Colombia is a manifestly dangerous place for plaintiffs and any lawyers or advocates who would support them to pursue claims against Chiquita and other paramilitary supporters.

   *c. The Justice and Peace process and conciliation demands are irrelevant to whether Plaintiffs could litigate safely against Defendants in Colombia.*

Defendants argue that many victims of paramilitary violence have sought reparations under the Justice and Peace process. DE 741 at 36-37, 44-45. But this hardly means that Plaintiffs can safely assert claims against Chiquita. *See, e.g.*, DE 576 ¶¶ 1, 20, 1251.

Under the Justice and Peace process, demobilized paramilitary participants ("*postulantes*") surrender stolen assets to a reparations fund and disclose their crimes in exchange for reduced prison sentences. This is nothing like a civil lawsuit in which the *postulantes'* victims assert damages claims. The victims' participation is *completely irrelevant* to the level of criminal penalties or economic damages assessed against the *postulantes*. By registering with Justice and Peace, each victim is eligible to claim a share of the fund – an amount that in no way corresponds to the particular liability of any individual *postulante* – in a proceeding that is overseen by the fund's manager, completely separately from the criminal proceedings to which the *postulantes* are subject. Arrubla Decl. ¶ 58. So when a victim participates in Justice and Peace, she does not threaten the *postulantes'* interests because her right to reparations is divorced from the criminal proceedings. By participating in the process, victims learn the truth, and the *postulantes* receive reduced sentences. Both benefit.

By contrast, Defendants' plan to implead the *postulantes'* Colombian backers would pit victims *against* these violent paramilitaries and their supporters. Therefore, Plaintiffs cannot sue Defendants in Colombia without fear of retaliation. Far from supporting Colombia's chosen path

to transitional justice, Chiquita's gambit undermines it.

Defendants also indicate that approximately 1,700 alleged victims of AUC violence have entered into "conciliation" with Chiquita, a pre-requisite to filing a civil demand. Defendants assert that these conciliation demands mean there are available remedies and that it is safe to litigate in Colombia. But Defendants admit none of them have proceeded or ripened into a civil case. The conciliation demands have now been inactive for five years. DE 798 at 5-6. Claims that were never filed hardly suggest the forum is adequate. On the contrary, the fact that *no one* ever filed a claim strongly suggests that there are insuperable obstacles to litigation.

Defendants cannot meet their burden to show that litigation in Colombia would be safe by pointing to preliminary conciliation demands by persons who are unknown to the Plaintiffs. Defendants have not shown that (and Plaintiffs have no idea if) the conciliation applicants are similarly situated to them – *i.e.*, if they also live in places where violence and intimidation remain an everyday reality, or belong to societal groups that are regularly targeted for reprisals.[11] Defendants also have not shown that the conciliation applicants knew that Chiquita intends to implead dangerous individuals and companies if their conciliation demand were to proceed to litigation. Certainly, their ignorance of this fact could explain why they felt secure enough to initiate the process. And Defendants have not explained why *none* of the conciliation applicants chose to follow up with a lawsuit. The likelihood of violence could explain this fact. Plaintiffs have requested FNC discovery to inquire into these matters, DE 795, but Defendants state merely that *they* are unaware of any threat to Plaintiffs, DE 798 – an inadequate response given Defendants' burden to show

---

[11] Plaintiffs have been unable to learn anything about the conciliation process apart from the documents that Defendants provide. Even if there is some overlap between the applicants and Plaintiffs here, the fact that some Plaintiffs decided to join a conciliation attempt says nothing about the level of riskiness for others, as there is no indication that they are similarly situated.

that its chosen forum is adequate.[12]

Finally, Chiquita argues that since a handful of individuals have joined the Banadex criminal investigation as civil parties, individuals can seek private remedies against Defendants in Colombia. DE 741 at 20-21. But this says little about the safety implications of suing Defendants and, through impleader, powerful landowners and narco-traffickers, for the vast majority of Plaintiffs. None of the investigations into Banadex have brought convictions. And the civil proceedings begin only if there is a conviction. Andreu Decl. ¶75. So, like the conciliation demands, these proceedings are nothing more than hypothetical and bear little on whether it is safe to litigate these claims in Colombia.

### 2. Pervasive delay and corruption – particularly in cases involving paramilitary and government violence – make Colombia an inadequate forum.

Where foreign litigation would be subject to "excessive delay," *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1228 (3d Cir. 1995), or corruption, *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084-87 (S.D. Fla. 1997), the forum is inadequate. Even if general corruption is insufficient to find inadequacy, case-specific facts may nonetheless indicate inadequacy. *Id.* at 1086.

   *a. Corruption.*

The Colombian judiciary is plagued with systemic corruption and abuse favoring both paramilitaries and corporate actors. When plaintiffs present "compelling counter-indications" that a foreign forum is unsuitable for the adjudication of *their* claims, courts may accept that the "alternate forum is too corrupt to be adequate." *Kavlin*, 978 F. Supp. at 1085.

Plaintiffs present compelling evidence here. In addition to Dr. Arrubla, Plaintiffs' experts on country conditions are Claudia N. López-Hernández, a Colombian Senator who has dedicated her career to exposing corruption and paramilitary ties in the Colombian judiciary; and Federico Andrés

---

[12] As it turns out, the conciliation demands were doomed from the beginning, as they were filed in the wrong venues and in front of the wrong public entities. Arrubla Decl. ¶ 53.

Paulo Andreu Guzmán, the South American representative to the International Commission of Jurists, an attorney and human rights defender with over thirty years of leadership and experience in Colombia and worldwide. As they explain, corruption in the Colombian judiciary and prosecutorial system reaches the very top and is often linked to paramilitary interests. Lopez Decl. ¶¶ 31-33; Andreu Decl. ¶¶ 9-11. They also emphasize the depth of corruption in Antioquia, including Urabá. Lopez Decl. ¶¶ 31-33; Andreu Decl. ¶¶ 10, 12, 34. Thus, even if the Colombian courts are not incapable of rendering justice in general, the courts in which Plaintiffs would be forced to litigate do not provide an adequate forum for *these* claims.

       *b.   Delay.*

       Although excessive delay arguments rarely succeed, the claims in *this* case will likely suffer from delay so extensive that it mocks the notion of judicial remedy. As Prof. Andreu explains, Colombia has one of the least efficient judicial systems in the world. Andreu Decl. ¶ 86; Arrubla Decl. ¶ 62 ("ordinary" proceedings take on "average" 15 years). The picture only gets worse for major human rights cases, for which criminal investigations can take many years or even decades, such as the 17-year delay in the *La Vereda Esperanza* case. That delay matters because civil cases may be deferred if there are ongoing criminal proceedings, Andreu Decl. ¶ 85; Plaintiffs' claims may therefore languish until the completion of the criminal investigation of Banadex employees that has already dragged on for eight years, with no sign of indictments or final closure. In addition, the civil party proceeding that has been filed in association with that Banadex investigation cannot move forward unless and until convictions are secured. *See id.* ¶¶ 74-75.

       Plaintiffs have already waited too long for an effective remedy. First, they were in the dark about Defendants' involvement with the AUC because Chiquita hid its payments until the 2007 revelation in their guilty plea. Then Chiquita litigated this case in the United States for four years only to suggest a re-start in Colombia. Almost four additional years have passed since then. If this

Court were to grant FNC now, it would put Plaintiffs at the back of a long queue in Colombia with indefinite (or at least decades-long) delays – all before facing the anticipated enforcement challenges. Plaintiffs cannot expect a timely or impartial hearing if they are forced to litigate in Colombia.

### 3. Colombia is an inadequate forum because Defendants have not guaranteed the timeliness of claims which are timely in the United States.

Because Defendants have not ensured that Plaintiffs' claims would be deemed timely in Colombia, no adequate remedy is available in Colombia. *See King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1384 (11th Cir. 2009) (conditioning FNC dismissal on defendant's submitting to jurisdiction *and* waiving foreign statute of limitations). Defendants attempt to skirt this reality by offering, for each plaintiff whose claims are not time-barred in the United States, to toll applicable Colombian statutes from the date those claims were filed in the United States. DE 741 at 19 n.17. This stipulation is not enough to ensure that Plaintiffs whose claims are viable in the United States are not time-barred in Colombia.

First, courts often require waiver of *all* local statute of limitations defenses, which Defendants have not offered to do. *Carijano*, 643 F.3d at 1235; *A/S Dan-Bunkering Ltd. v. M/V Centrans Demeter*, No. 14-0297, 2015 WL 1470830 (S.D. Ala. Mar. 31, 2015), at *5. Defendants coyly offer to waive Colombian statutes of limitations for the named Plaintiffs based on the date *their action* was filed in the United States. But *all* potential plaintiffs, including the named Plaintiffs in *each action* and unnamed *absent* class members, have benefited from class tolling in the United States since the New Jersey class complaint was filed. Therefore, all statutes for all possible plaintiffs – including absent class members[13] – should be tolled as of July 19, 2007, at the latest.

---

[13] Because Chiquita limits its consent to jurisdiction to Plaintiffs, Colombia is an *unavailable* forum for the absent class members. *See Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund.*, 589 F.3d 417, 421 (7th Cir. 2009) ("An alternative forum is 'available' if all of the parties are amenable to process and within the forum's jurisdiction." (emphasis added)); *Carnival Corp. v. Roll-Royce PLC*, 08-23318-CIV, 2009 WL 3861450, at *8 (S.D. Fla. 2009) (denying FNC dismissal where defendant failed to prove that all parties would be subject to jurisdiction in alternative forum). Ignoring their claims

Second, Defendants provide no guarantee that they will not argue for a shorter statute of limitations in Colombia.[14] By limiting their stipulations to claims that were timely when filed in the U.S., but declining to waive arguments that the statute of limitations on Colombia law claims expired *prior* to the U.S. filings, they seek to gain the protection of both the U.S. *and* Colombian statutes. Thus Defendants would gain a defense in Colombia that it would not have had in the United States. FNC cannot be used to procure new procedural rights in this way.

Third, as a matter of Colombian law, Chiquita's stipulation is inadequate because it is unenforceable. In *Mercier v. Sheraton International, Inc.*, 935 F.2d 419, 426 (1st Cir. 1991), a proffered waiver was rejected because the defendant had not shown that Turkey would accept it. As Dr. Arrubla explains, as a matter of public policy, Colombian courts would not recognize a stipulation to waive statute of limitations defenses. Arrubla Decl. ¶¶ 48-49. Even if Defendants decline to raise the statute of limitations, Dr. Arrubla points out that the intended impleaded parties could do so – which would imperil the entire action. *Id.* ¶ 50.

C.  **The private interest factors favor retention of this case in the United States.**

Because plaintiffs – including foreign plaintiffs – are entitled to a presumption that their choice is convenient, *Leon*, 251 F.3d at 1311, "plaintiffs' choice of forum should rarely be disturbed unless the balance [of private interests] is strongly in favor of the defendant." *Wilson*, 590 F.3d at 1270 (internal quotations omitted). Defendants bear the "heavy burden of showing that the [U.S.]

would undermine the reasoning behind *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), which held that federal class actions are "designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *Id.* at 550. Absent class members should not lose their rights because they declined to file such repetitious papers.

[14] There is no question that, by virtue of equitable tolling, class tolling, and relation back, Plaintiffs' non-federal claims against Chiquita are timely in the U.S.; indeed, Chiquita has not even argued the statute of limitations as a defense for most Plaintiffs' claims. The TVPA claims are timely as well. *See* Pls.' Opp. to Defs.' Joint Mot. Moreover, Chiquita's expert, Tamayo, has opined that the Colombian statute of limitations for Plaintiffs' claims is either twenty years or ten years counting from 2002. DE 741-1 ¶ 28. But Chiquita does not commit to Tamayo's interpretation of Colombian law.

forum results in 'oppressiveness and vexation . . . out of all proportion' to the plaintiff's convenience." *Carijano*, 643 F.3d at 1227 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981)). Even for foreign plaintiffs, "dismissal . . . remains the exception rather than the rule." *Haddad v. RAV Bahamas, Ltd.*, No. 05-21013-CIV, 2008 WL 1017743, at *5 (S.D. Fla. Apr. 9, 2008). If Plaintiffs were to litigate in Colombia they would face nearly insuperable physical, legal, and practical obstacles, few of which would be present if they were to proceed in the U.S. Far from strongly favoring Defendants, the balance favors Plaintiffs, and the Court must deny FNC dismissal.

**1. Location and availability of evidence**

*a. Plaintiffs' secondary liability theories do not require* forum non conveniens *dismissal.*

Defendants seek to short-circuit this Circuit's FNC test with the false claim that *Ford v. Brown*, 319 F.3d 1302 (11th Cir. 2003), created a new rule mandating FNC dismissal in all secondary liability cases in which the primary tort occurred abroad, assuming that all key evidence is in the foreign forum. *Ford* does not work the sea-change in FNC law that Defendants assert; it applied the normal, fact-intensive FNC analysis. In any event, Plaintiffs have primary liability claims here.

The *Ford* court noted that FNC involves a "balancing test" with a host of relevant factors, 319 F.3d at 1307, but granted dismissal because "[o]f all possible forums, Florida is unquestionably the worst." *Id.* at 1309. After extensive evidentiary hearings, the court found that "all of the alleged acts occurred in Hong Kong," with virtually no relevant evidence in Florida. *Id.* at 1308-09. But here, Defendants *admit* that much of its relevant conduct occurred in the United States, and there is substantial and relevant evidence in the United States. DE 740 at 27, 32.

There were also comity concerns in *Ford* that are absent here: a Hong Kong court had already determined that no conspiracy had occurred, and the plaintiff wanted to re-litigate the issue. *Id.* at 1309-10. Here, as Defendants admit, there is no current legal proceeding against Chiquita in Colombia, let alone a Colombian judgment that a U.S. proceeding could controvert. *See infra* Part

II(B). And *Ford* did not involve the adequacy, availability and safety concerns presented here.

In short, the Eleventh Circuit did not create a class of FNC cases that could be determined as a matter of law. Rather, it reiterated that, among other things, "the court should make a *reasoned assessment* as to the likely location" of proof that will prove or disprove the plaintiff's cause of action. *Id.* at 1308 (emphasis added). This is a case-specific assessment that Plaintiffs easily meet. Regardless, Defendants' purported secondary liability rule would not assist them, because the complaints allege primary liability for negligence, negligent hiring and negligence *per se. See, e.g.,* DE 589 ¶¶ 357-369.

> *b. Key evidence and witnesses are located in both the United States and Colombia.*

Unlike in *Ford*, significant evidence and witnesses are located here, much of the U.S. evidence is not currently under Defendants' control, and it would be significantly more difficult and burdensome to introduce foreign evidence in Colombian courts. The location and availability of evidence is, at most, a neutral factor.

To be sure, there is evidence in Colombia, but Defendants have not shown that much of that evidence is dispositive of Plaintiffs' claims, as *Ford* requires. 319 F.3d at 1308; *see La Seguridad v. Transytur Line*, 707 F.2d 1304, 1308-09 (11th Cir. 1983) (only location of "dispositive" evidence is relevant to FNC). For example, Defendants argue that they will introduce evidence that other individuals and companies were extorted by the AUC, DE 741 at 26, but this would hardly be dispositive of Plaintiffs' claims. Chiquita also suggest that the Court will be forced to examine the extent of government involvement in the AUC's terror campaign, *id.* at 27, but the remaining claims against Chiquita do not require proof of state action. As for the TVPA claims against Ihe individual Defendants, Plaintiffs need only show a "symbiotic relationship between the Colombian government and the AUC with respect to the AUC's campaign of torture and killing of civilians in the banana-growing regions, not specific government involvement with each individual act of torture and killing of Plaintiffs' relatives." MTD Order, 792 F. Supp. 2d at 1325-26. Defendants do

not contest the existence of this symbiotic relationship; it is so well accepted – and has been determined by Colombian and international tribunals on multiple occasions – that it will require little additional factual development. *See* Andreu Decl. ¶¶ 11-2, 27, 32; Lopez Decl. ¶ 33.

Similarly, Defendants' suggestion that they will need to seek copious evidence related to each individual plaintiff's claim – including testimony from Banadex employees, government officials, and military officials – misses the mark because under the law of this case, Plaintiffs do not need to show that either Defendants or the Colombian government were aware of the specific identities of each victim. They merely need to show that Defendants knew or intended for the AUC to torture and kill civilians. MTD Order, 792 F. Supp. 2d at 1344-45.

As for whether the Plaintiffs were actually killed by the AUC, much of the relevant evidence – witness testimony and documents – will fall to Plaintiffs to produce, not Defendants. Plaintiffs are prepared to meet that burden.[15] Indeed, some crucial evidence in Colombia – the eyewitness testimony of Plaintiffs' family members who saw them kidnapped by the AUC – could *only* be presented without undue difficulty in the United States. Colombian evidentiary procedure considers family members' testimony "suspect" and limits Plaintiffs' ability to testify as to the facts of their own cases, Arrubla Decl. ¶ 26, a serious limitation for many claims. Moreover, due to the failures of the witness protection program in Colombia, *see* Lopez Decl. ¶ 22, it may be safer for witnesses to testify for U.S. litigation, where they could potentially submit evidence under seal. Plaintiffs' counsel have a successful track record of bringing foreign plaintiffs from their home countries for trial in the United States, and this case is no different. *See* Simons Decl., ¶¶ 2, 9 ("Simons Decl.")

Defendants also fail to establish that most of the evidence they claim to need is located

---

[15] Defendants argue that it would be burdensome to require certification of Colombian public documents, citing Fed. R. Evid. 902(3). DE 741 at 31. But it is Plaintiffs' burden, not Defendants', to obtain such certification in Colombia; moreover, this Court may admit foreign public documents without final certification – or, even, summaries of such documents – as long as both parties have had the opportunity to investigate the originals. Fed. R. Evid. 902(3)(a) & (b).

uniquely in Colombia, or that they could produce them in Colombia if necessary. *See Piper Aircraft Co.*, 454 U.S. at 258 (a defendant "must provide enough information to enable the District Court to balance the parties' interests"). Chiquita presumably already gathered any documentary evidence in Colombia supporting its extortion story, for use in defending against the U.S. criminal investigation.

Moreover, while Chiquita stipulates that it will make witness testimony and documents under its control available in Colombian proceedings, it fails to describe the extent of its control over relevant evidence or witnesses. *See Singletary v. Grupo Pinero*, 45 F. Supp. 3d 1369, 1373 (S.D. Fla. 2014) (reviewing witnesses to determine extent of defendant's control over "inflated" witness list). Over ten years have passed since the period relevant to Plaintiffs' claims, and many – if not most – employees and Board members with personal knowledge of the events at issue have likely left Chiquita. (Indeed, none of the Individual Defendants remain affiliated with Chiquita.) Therefore, this offer may well be an empty one that will leave Plaintiffs without means to ensure that non-Defendant witnesses with personal knowledge of Chiquita's involvement in paramilitary violence will appear. Any doubts about witness availability in the foreign forum are to be resolved in favor of plaintiffs. *See Wilson*, 590 F.3d at 1272.

It is not enough for Defendants to show that litigation in the U.S. would be complicated; it will be complicated in either forum. Defendants must show litigation would be less complicated in Colombia. U.S. courts can handle complex human rights claims that arose in Colombia; the fact that Drummond was tried – and acquitted – in Alabama is proof of that.[16]  But Defendants cannot even show litigation would be feasible in Colombia. They cannot point to a single instance in which Colombian courts have ever handled a situation such as the one they propose: thousands of separate civil cases, each of which will require significant evidence from the United States. Indeed, as Dr.

---

[16] *See* Verna Gates, *Drummond cleared in landmark Colombia rights case*, Reuters (Jul. 26, 2007), *at* http://www.reuters.com/article/2007/07/26/us-usa-colombia-drummond-idUSN2646318320070726.

Arrubla explains, Colombian courts cannot easily receive and consider evidence from abroad, especially when it must be translated into Spanish; the procedures for doing so are complex, cumbersome, and poorly known to most Colombian judges. Arrubla Decl. ¶ 21. By contrast, the U.S. courts have considerably more permissive procedures for accepting evidence from abroad, and well established mechanisms for adjudicating mass torts. Indeed, the possibility that the case could be handled as a class action (which is not available in Colombia) – or that the parties could consent to consolidated trials – means that in the United States, unlike Colombia, much foreign evidence could be heard in a way that is coordinated across cases.

### 2. Interests of litigating in a single forum.

Because there are no ongoing claims against Chiquita or the Individual Defendants in Colombia, the Court may deny FNC dismissal without creating the possibility of duplicative litigation in multiple jurisdictions. Defendants cite 1,700 conciliation demands that were purportedly filed against it in Colombia, DE 741 at 33, but none is active and none has proceeded to civil litigation. And if Defendants' expert is correct, none could proceed because all would be barred by the ten-year Colombian statute of limitations. DE 741-1 ¶ 28. Although Defendants cite *In re Banco Santander Sec.-Optimal Litig.,* 732 F. Supp. 2d 1305, 1338 (S.D. Fla. 2010), the court there faced the possibility of trials proceeding in both Florida and Ireland, while Ireland was the only place where all defendants would be subject to personal jurisdiction. There is no such dilemma here because this MDL court can exercise jurisdiction over all Defendants, and there is no prospect – let alone certainty, as in *In re Banco Santander* – of civil litigation in Colombia.

In fact, the convenience of litigating in a single forum is a benefit available *only* if the court retains this case. Only in the United States can Plaintiffs both obtain and enforce a judgment against all Defendants. *Supra* Part III(A)(1). Cases are already coordinated in this MDL for pre-trial issues, and the Court can consider class action treatment, bellwether trials, or consolidated trials (by

30

consent) for efficient case management. In contrast, Colombia's multi-district litigation statute likely would not apply in this case; rather, cases would have to be filed either where the plaintiff resides or where the events occurred. Arrubla Decl. ¶ 16. Thus, while many Plaintiffs would have to sue in Urabá, some may have the option of suing in any of the many Colombian judicial districts to which they have moved. And Plaintiffs' claims could not be aggregated for efficiency in Colombia courts because the two-year statute of limitations for class actions has already expired. *Id.* ¶ 48. Thus, the convenience of all parties would be strongly served if the claims were to be litigated in the only place they can be heard in a single forum in a way that settles issues for the entire class: the United States.

### 3. Location of third party defendants

Potential third-party defendants are present in both the United States and Colombia, but as described above, security risks make it feasible only to implead U.S. defendants.  This factor favors Plaintiffs.

First, Defendants fail to name even a single specific party they intend to implead. They focus on the AUC's Colombian financiers and collaborators, but does not name them. Defendants also that other multinational corporations supported the paramilitaries. DE 741 at 33-34 n.23. But they do not say which of these third parties they intend to implead, which of them is in Colombia, or which would be subjects of follow-on suits for contribution in the United States. Some, such as Dole, appear to be U.S.-based and (like Chiquita) may have no presence in Colombia; dismissal therefore would not enable Defendants to litigate in just one forum. *See Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1332 (11th Cir. 2011) (ability to implead *all* potential defendants in Brazil weighed in favor of FNC dismissal). In the face of strategic silence as to whom it intends to implead, the Court should not credit Defendants' third-party argument.

In addition, as noted above, Defendants' strategy of impleading powerful entities involved in paramilitarism poses grave security risks for Plaintiffs. A U.S. trial would avoid these problems.

Defendants could implead any additional U.S. parties, and would be free to seek contribution from Colombian entities through the Colombian *acción de repitición* procedure. *See* Arrubla Decl. ¶ 19. This would not endanger Plaintiffs because only Defendants (not Plaintiffs) would be suing persons with a track record of intimidating human rights claimants. While suits for contribution may be less convenient for them, it is not *unfair* to require defendants to use such a procedure, *see Piper Aircraft*, 454 U.S. at 259. In any event, it is far more convenient than forcing Plaintiffs to bring thousands of enforcement actions in the United States, and Plaintiffs' legitimate safety concerns outweigh any inconvenience to Defendants.

### 4. Impracticality of litigating in Colombia.

"The court must be alert to the realities of the plaintiff's position, financial and otherwise, and his or her ability as a practical matter to bring suit in the alternative forum." *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 345-46 (8th Cir. 1983). The impracticality of litigating in Colombia favors Plaintiffs.

If forced to litigate in Colombia, many Plaintiffs will likely be unable to find or pay for legal counsel. Attorneys are commonly targeted when their work would uncover the wrongdoing of powerful Colombian entities – or even multinational corporations – or threaten their interests. *See supra* Part II(B). The likelihood of finding lawyers willing to risk their lives to litigate these cases is low. *See* Lopez Decl. ¶ 21. And even if there were lawyers brave enough to do so, Plaintiffs, for the most part, are indigent and could not pay them. Because Plaintiffs will be unable to aggregate their claims in Colombia, each plaintiff will have to find and pay for his own lawyer. *See* Arrubla Decl. ¶ 18. This factor weighs heavily against dismissal. *See Doe v. Sun Int'l Hotels, Ltd.*, 20 F. Supp. 2d 1328, 1330 (S.D. Fla. 1998) (financial inability to find and pay lawyer weighed against FNC). The fact that none of the conciliation demands Defendants identify ever ripened into litigation also suggests that Plaintiffs would be unable to retain lawyers who would see their claims through to completion.

5.  **Judgment enforceability.**

The judgment enforceability prong strongly favors Plaintiffs. A Colombian judgment clearly would *not* be enforceable there; Defendants lack assets in Colombia and have not pledged to satisfy a Colombian judgment. *See Carijano*, 643 F.3d at 1232; *supra* Part III(A)(1).

Defendants argue that a U.S. class judgment exonerating Defendants might not be enforced against unnamed class members in Colombia. DE 741 at 35. But Defendants have little to fear from suits in Colombia by such victims. *If* a class were certified, and *if* a judgment were reached in Defendants' favor, and *if* an unnamed class member were to file a new suit in Colombia, and *if* Defendants inexplicably were to submit to jurisdiction in Colombia to respond to that claim, and *if* that case were not dismissed at the outset on some threshold grounds like statutes of limitations, as Tamayo says it would be, DE 741-1 ¶ 28 – even then, the best such a plaintiff could get is an unenforceable judgment given Defendants' lack of assets in Colombia.

If Defendants were to be *exonerated* in the U.S., it is unlikely that victims who have not yet come forward would suddenly do so. There is no enforceability problem with a U.S. judgment.

D.  **The public interest factors favor this forum.**

Because Colombia is an inadequate and unavailable forum under the circumstances and the private interests weigh against dismissal, there is no need to analyze the public interest factors. *See King*, 562 F.3d at 1382. Regardless, the public interest factors favor Plaintiffs.

1.  **The interests of the respective countries do not favor Colombia.**

Neither the United States nor Colombia has expressed any interest in this case to this Court. This factor is at most neutral, because the United States has a more significant interest, and Colombia a less weighty interest, than Chiquita contends.

The U.S. interests are substantial. Chiquita's payments to the AUC violated U.S. criminal law and undermined our foreign policy by supporting our enemies. And, as the Eleventh Circuit

recognized, the TVPA evinces a "strong public interest in favoring the receptivity of United States courts to [torture and extrajudicial killing] claims." *Aldana*, 578 F.3d at 1299; *accord Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000).

The U.S. has recognized that it would be legally responsible if it harbored or failed to hold liable torturers and others who violate international criminal law. *See, e.g.* Supp. Br. for the United States as *Amicus Curiae* in Partial Support of Affirmance at 4, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491(U.S. 2013). Indeed, Congress enacted the TVPA to "carry out [international] obligations of the United States . . . pertaining to the protection of human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (28 U.S.C. 1350 note).

Defendants are U.S. citizens who acted largely from U.S. soil. The United States has an interest in regulating the conduct of and deciding actions against U.S. citizens whose conduct here causes harm abroad. *See, e.g.*, *Wiwa*, 226 F.3d at 107; *F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1316 (D.C. Cir. 1980); *Carijano*, 643 F.3d at 1232; *Beattey v. Coll. Ctr. of Finger Lakes Inc.*, 613 So. 2d 52, 54–55 (Fla. Dist. Ct. App. 1992) (New York had interest in applying its law to tort committed abroad because of New York corporate defendant). And the United States has a strong policy interest to ensure that U.S. persons do not aid atrocities in other nations with impunity.

Chiquita's criminal conviction does not lessen these interests; it highlights how much Defendants harmed U.S. interests. Certainly, the U.S. government has not *disavowed* an interest in this case as it did in *Mujica v. AirScan Inc.,* 771 F.3d 580, 610 (9th Cir. 2014). And as the TVPA makes clear, our international obligations are not fulfilled until the *victims* have their day in court.[17]

---

[17] Defendants cite *Paolicelli*, 289 Fed. Appx.at 391, but that design defect case entirely lacked the U.S. criminal law violations, frustrations of U.S. foreign policy, and overt, intentional acts in the United States that characterized Chiquita's actions.

Colombia's interests – while substantial – are far less weighty than Defendants suggest. Colombia has shown little initiative in pursuing investigations against the economic supporters of the AUC's crimes in the banana-growing regions. Criminal proceedings against Banadex officials have been pending since at least August 2008, with no sign of progress. Indeed, some victims who have applied to join as civil parties suspect the government is delaying the proceedings to run out the statute of limitations. CCAJAR Press Release. Not only would this mean that Banadex official were criminally immune, but the claims of the civil parties to those proceedings would also die.

Moreover, the Justice and Peace process, which Defendants and Shifter both hold out as the centerpiece of Colombia's transitional justice efforts, does *not* include corporations, nor has its investigations of demobilized paramilitaries led to criminal or civil actions against any of the AUC's financial backers. Andreu Decl. ¶¶ 38-40. And unlike in *Aldana,* 578 F.3d at 1298, Defendants are no longer a major employer – or present at all – in the foreign forum. Colombia's inaction suggests it does not consider adjudicating this foreign company's responsibility a priority.

### 2. Litigation in Colombia would create an undue judicial burden.

Litigating in Colombia would increase the burden on both U.S. and Colombian courts. Defendants' three-stage strategy has already burdened the U.S. courts with years of threshold motions; they now propose to do the same in Colombia. But that will merely delay further burdens on U.S. courts plaintiffs in a Colombian suit will wind up back in U.S. courts for enforcement. The Court should not countenance this strategy.

Defendants argue that these claims "would impose no unusual burden on the Colombian Courts," DE 471 at 38, but that is obviously wrong. Even if Plaintiffs *could* file their claims in Colombia, the courts would face a flood of thousands of individual claims in multiple judicial districts because the Colombian statute of limitations for class actions has expired, and the Colombian procedure for consolidating cases likely would not apply. Arrubla Decl. ¶48. Thus,

Plaintiffs' claims could not be aggregated or even coordinated. Each issue would have to be proven again and again, with the potential for conflicting rulings. Even if Defendants were *exonerated* in one case, that decision would not bind any other court.

The U.S. federal courts, by contrast, have a range of options for handling mass tort claims and complex litigation that will provide both *efficient* and *uniform* resolution. First, the MDL procedure permits this Court both to decide pre-trial motions (narrowing the issues in any trial), and to coordinate discovery (substantially reducing the need for repetitive document productions, testimony and/or depositions). *See In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, 655 (J.P.M.L. 1981). Second, the Federal Rules give U.S. courts great flexibility to manage trials, for example, by bifurcating the liability and damages phases. *See, e.g.*, Fed. R. Civ. P. 42(b). This can save resources and potentially obviate the need (if Defendants win on liability, for example) for damages trials. Third, class certification would greatly expedite these claims. Decisions on common issues would bind the absent class members; trials would only be required for the named class representatives; and class damages could be assessed (and distributed) without the need for over 4,000 individual trials. *See, e.g.*, *Olden v. LaFarge Corp.*, 383 F.3d 495, 508-509 (6th Cir. 2004).

Even if a class were not certified, U.S. federal courts have other means to obtain aggregate resolution. With consent, the MDL Court can fashion consolidated trial procedures; in the Vioxx MDL, for example, Judge Fallon denied class certification but tried informal bellwether cases. *See generally* Eldon E. Fallon *et al.*, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2340-42 (2008). These trials then provided the benchmark for an aggregate settlement that Judge Fallon approved, ultimately resolving the vast majority of the claims without the litigation costs of trying thousands of cases. *Id.* The potential availability of these procedures shows that U.S. courts are well-equipped to handle and *resolve* mass claims.

Chiquita ignores the absence of these case management procedures in Colombia, without

which the burden of litigating would be drastically multiplied. Instead, it relies on Tamayo, DE 741

at 38, who ignores substantial practical problems with the Colombian processes he cites.[18]

Chiquita also argues that Colombian courts can handle foreign evidence. But it is wrong

even on this procedural point. For example, substantial translation of documents will be necessary

whether these cases are heard in the United States or Colombia. But in Colombia, documents must

be translated by official experts appointed by the court and could not be presented via translator's

declaration. Arrubla Decl. ¶ 21.

Moreover, in the United States, the testimony of foreign witnesses can be submitted pre-

trial through declarations, and at trial by deposition. By contrast, in Colombia, any testimony that

either side intends to present would have to be identified with precision at the very beginning of the

civil process, without any opportunity to broaden or add names or topics. Arrubla Decl. ¶¶ 23-24.

Testimony taken abroad must proceed through Letters Rogatory and requires a diplomatic agent to

take the testimony in the place of the Colombian judge. Even if Plaintiffs were able to go through

such a process for all non-Colombian testimony in each individual case, it would likely be assigned

an inferior value because it violates the principle of *inmediación* ("immediacy"), whereby the presiding

judge has the opportunity to evaluate the evidence firsthand. Arrubla Decl. ¶ 25. That Colombia

does not offer the same procedures as the United States is not dispositive, *see Wong v. PartyGaming,*

*Ltd.*, 589 F.3d 821, 831 (6th Cir. 2009), but the procedural hurdles would impose an undue burden

on Colombian courts that could be avoided by litigation here; thus the public interest factor favors

Plaintiffs. *See, e.g., Giglio Sub s.n.c. v. Carnival Corp.*, 2012 WL 4477504 *8 (S.D. Fla. Sep. 26, 2012)

(lack of foreign class action mechanism could influence balance of the private and public interests).

---

[18] Tamayo cites the Justice and Peace proceedings, the conciliation demands and criminal
proceedings against paramilitaries. DE 741-1 ¶ 50. As noted above, the conciliation attempts have
stalled, the criminal investigations have not advanced, and the Justice and Peace process has been
under-resourced and plagued by delays.

### 3. Comity concerns favor litigation in this forum.

Defendants' claim that this case raises comity concerns is wrong. On the other hand, Defendants' three-stage, two-forum strategy – under which a U.S. court would sit in judgment of Colombia's courts after those courts have already reached a judgment – does in fact raise comity concerns. Comity concerns about enforcing judgments cut *against* dismissal.

#### a.   There is no Colombian judgment with which a U.S. judgment might conflict.

Defendants argue that "comity" favors dismissal, DE 741 at 38-40, but this is belied by the very Eleventh Circuit comity case it cites: *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512 (11th Cir. 1994). As *Turner* recognized, "[f]ederal courts have a 'virtually unflagging obligation' to exercise the jurisdiction conferred upon them." *Id.* at 1518. This obligation applies even where the case may potentially implicate foreign affairs. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectronics Corp., Int'l.*, 493 U.S. 400, 409 (1990). Courts may abdicate their jurisdiction in deference to foreign laws or interests only in "exceptional circumstances." *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). There are no such circumstances here.

Defendants raise the specter of "dueling courts," DE 741 at 39 (quoting *Turner*, 25 F.3d at 1521), but this is a red herring. There is no Colombian judgment – either pending or existing – for a U.S. court to defer to. *Turner* itself makes clear these concerns do not apply given the absence of any Colombian judgment. As Defendants admit, there is no active litigation against Chiquita in Colombia, and there is little prospect of any attempt to pursue the conciliation demands, or, indeed, any new legal action in Colombia. Indeed, Defendants' own expert states that such claims would be time-barred. And even if the Colombian conciliation plaintiffs were likely to file civil claims, that would not support dismissal because comity interests are only in play *after* a foreign judgment involving the actual parties in the case has been issued. In *Turner*, the court raised comity concerns

only because a German court issued a judgment while the appeal was pending. 25 F.3d at 1521.

Similarly, in *Ford*, the plaintiff asked a U.S. court to re-litigate an issue he had already lost in Hong

Kong. 319 F.3d at 1306, 1309. No similar circumstances are present here. Defendants' appeal to

comity is misplaced.[19]

      Defendants' claim that Colombia might view adjudication here as a tacit affront to

Colombia's ability to resolve the dispute, DE 741 at 39, is rank speculation. If either nation were

concerned about comity, it could have submitted statements of interest to the Court at any time

during the eight years this case has been pending. *See Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368,

1378 (11th Cir. 1998) (noting that it was "significant. . . that the Venezuelan government has taken

no position on whether this lawsuit proceeds in the United States or in Venezuela").

      There is little risk of affront in a U.S. court retaining jurisdiction to hear claims against U.S.

nationals that have committed federal crimes in the United States, particularly since FNC doctrine

favors a plaintiff's forum choice in such circumstances. Nothing in *Aldana* suggests that a decision to

deny FNC dismissal is presumptively disrespectful to Colombia or its judicial system. If this were so,

then the burdens and presumptions of FNC would be reversed every time a plaintiff seeks to defend

against FNC by challenging the adequacy of the foreign forum, and U.S. defendants would be able

to obtain dismissal unless plaintiffs could *prove* that denial of FNC would not offend the putative

transferee state. That is not how FNC works.

      *b.   Defendants' preferred strategy would implicate comity concerns.*

      Defendants' strategy of seeking dismissal to a forum in which they have no assets – while

retaining the right to challenge enforcement of any Colombian judgment in the United States –

raises far more comity concerns than any "tacit" affront that Defendants imagine would result from

---

[19] Chiquita cites *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 750-51 (7th Cir. 2008), DE 741 at 39 n.25, but that case emphasized that there was an *existing* parallel suit in the foreign forum that was "well advanced."

adjudicating these cases here.

"[O]nce a judgment on the merits is reached in one of the cases, as in the [foreign] forum . . . failure to defer to the judgment would have serious implications for the concerns of international comity." *Turner*, 25 F.3d at 1521. Yet Defendants' two-forum strategy is designed to encourage a U.S. court to do just that when Defendants seek to challenge any Colombian judgment in favor of Plaintiffs. This has a greater potential to offend Colombia than a denial of FNC dismissal, which is at bottom nothing more than a court's decision to retain its own jurisdiction in deference to the plaintiffs' choice of a U.S. forum to sue U.S. defendants. But a finding of inadequacy in an enforcement proceeding is an *express* determination that the foreign judicial system is so unfair that our courts will not recognize a judgment it *already reached*.

Because there is currently no judgment in Colombia to defer to, and because Defendants would have U.S. courts question future *existing* judgments, comity concerns favor Plaintiffs.

### 4. The presence of U.S. law claims weighs in favor of retention.

Defendants emphasize Plaintiffs' Colombia law claims, DE 741 at 1, 40, but there are also claims under U.S. law. The TVPA claims against the Individual Defendants strongly weigh in favor of the U.S. forum. *Supra* Part (III)(D)(1). The Individual Defendants have challenged those claims, but as we show in our Opposition, their objections lack merit.[20]

---

[20] Plaintiffs recognize that the Court has found that U.S. state law cannot apply, MTD Order, 792 F. Supp. 2d at 1355-56, 1358, but the Eleventh Circuit has held otherwise. In *Linder v. Portocarrero*, 963 F.2d 332, 333 (11th Cir. 1992), the court recognized a *Florida* law claim for a killing in the Nicaraguan civil war. As here, the defendants were based in, and committed actionable conduct in, the United States. *Id.* at 334-35. Noting that "there is no foreign civil war exception to the right to sue for tortious conduct," the court concluded that "the allegations of *Florida tort liability* state a claim." *Id.* at 333, 336 (emphasis added). Although this Court did not apply state choice of law rules, those rules do not bar the application of state law to torts arising outside the United States. *See, e.g., Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1566-67, 1575 (11th Cir. 1990). This Court certified the question of whether state law may apply, but the Eleventh Circuit did not reach it. *Cardona*, 760 F.3d 1185. This Court is free to conform its holdings to binding Eleventh Circuit precedent. *In re PCH Assocs.*, 949 F.2d 585, 593 (2d Cir. 1991) (law of the case doctrine is discretionary).

Regardless, the fact that many of Plaintiffs' claims may be decided under Colombian substantive law is not dispositive. *Piper Aircraft*, 454 U.S. at 260 n. 29. U.S. courts regularly apply foreign law, and the parties in this case have been able to find highly qualified experts to brief the court on relevant aspects of Colombian trial procedure who agree in large part on substantive and procedural issues of Colombian law. Moreover, unlike the shareholder liability and products liability laws at issue in *In re Banco Santander* and *Tazoe*, *cf.* DE 741 at 40, many tort law concepts are alike. There is no basis to assume that Colombia's tort rules differ from common law principles; in fact, Dr. Arrubla and Dr. Tamayo agree that liability exists in tort for conduct such as that alleged in the complaint.[21] In any event, since some claims will be decided under the TVPA, a statute that vindicates important U.S. interests, at most, this factor is neutral. *See Carijano*, 643 F.3d at 1233.

### 5. Defendants' choice to litigate other arguments for dismissal weighs against FNC.

Chiquita's long and unexcused delay in filing its first FNC motion – over four years from filing, three years after the MDL motion was granted, and almost two years after renewing its Motion to Dismiss – weighs heavily against dismissal. A defendant must file an FNC motion within a reasonable time after the circumstances underlying the defendant's motion are known. *In re Air Crash Disaster Near New Orleans,* 821 F.2d 1147, 1165 (5th Cir. 1987), *vacated on other grounds*, 490 U.S. 1032 (1989). Chiquita knew all the facts it alleges support its motion *years* before it filed. By 2008, Chiquita knew it was facing over one thousand named plaintiffs and a putative class action, and it knew the location of any witnesses or potential third-party defendants. The Justice and Peace process was in full swing, and many relevant paramilitary commanders had already given testimony on corporate-funded violence in the banana-growing regions. And although the purported

---

[21] Under ordinary choice of law principles, there is no reason to determine or apply foreign law if no party suggests it differs from forum law. *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989); Restatement (Second) of Conflicts of Law (1971) § 136 cmt. h. Defendants have yet to suggest a conflict.

conciliation demands are not dated, Chiquita knew of them by May 2010. *See* DE 741-11 at 8 (noting that summons was presented on May 21, 2010). Yet when Chiquita renewed its Motions to Dismiss in April and May of 2010, it made no mention of FNC. Only in November 2011, after this Court had considered voluminous motions and declined to grant Chiquita the full dismissal it hoped for, did Chiquita finally move for FNC dismissal. This long wait belies any claim of inconvenience.

Courts may take a "dim view" when a defendant wastes judicial resources by delaying FNC. *See Lugones v. Sandals Resorts, Inc.*, 875 F. Supp. 821, 823 (S.D. Fla. 1995); *Homen v. M/V SCM TEPUY II*, No. 05-61626-CIV, 2006 WL 3626301, *6 (S.D. Fla. Aug. 2, 2006).[22] This case is similar to *Bell v. Louisville & Nashville R. Co.*, 106 Ill.2d 135 (1985), in which an unexcused delay of twelve months after cases were consolidated weighed against FNC dismissal. Here, after four years of delay, Chiquita wants to use FNC as a second bite at the apple, and to gain strategic advantage by seeking dismissal to a country where it has no assets. Indeed, while pushing a Colombian forum, Defendants are *still* trying to dismiss claims based on U.S. statutes of limitations and on other grounds, before the case is sent to Colombia.[23] While untimeliness and gamesmanship do not *per se* waive FNC, this Court should also take a dim view of Chiquita's late-breaking forum preference.

### E. Additional conditions would be necessary – but not sufficient – if this Court did grant *forum non conveniens*.

Many of the facts that make Colombia an unsuitable forum cannot be cured by condition or

---

[22] In both cases, the court declined to specifically consider the delay without explanation – presumably because both cases had moved from filing to being trial-ready in less than one year, without Rule 12(b) or summary judgment motions.

[23] Chiquita cites a number of cases to excuse this strategy, but none is apposite. In *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997), the court granted FNC to one group of defendants and 12(b)(6) dismissal to another; neither group joined the other's motion. *Id.* at 939, 951, 953. Here, the same Defendants seek to invoke both the Federal Rules and the Colombian legal system. In *Scottish Air Int'l, Inc. v. British Caledonan Group, PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996), and *Allarcom Pay Television, LTD v. Home Box Office, Inc.*, 210 F.3d 381, 2000 WL 6058, *1-2 (9th Cir. 2000), the courts found no error in dismissing some claims on the merits and others on FNC because the former were uniquely matters of forum law and experience. By contrast, Defendants here seek to have the court invoke U.S. statutes of limitations on claims under Colombia law.

stipulation because they relate to the workings of the Colombian civil justice system or security in the country. No condition this Court imposes will make Colombia a safe place to litigate. Indeed, Defendants cannot even agree to allow Plaintiffs to proceed under pseudonyms because, as noted above, there is no mechanism for doing so under Colombian law. Nor can Defendants effectively waive statute of limitations defenses; it would be against Colombian public policy, *see* Arrubla Decl. ¶ 47, and any third-party defendants whom they may choose to implead would not be bound by such a stipulation. But if this Court is inclined to grant FNC dismissal, it should give Plaintiffs leave to seek conditions to promote safe, efficient, and enforceable litigation.

"District courts are not required to impose conditions on forum non conveniens dismissals, but it is an abuse of discretion to fail to do so when 'there is a justifiable reason to doubt that a party will cooperate with the foreign forum.'" *Carijano*, 643 F.3d at 1234. First and foremost, in order to prevent the Chevron/Ecuador nightmare scenario, Defendants should waive all defenses to enforcement – including challenges to the adequacy of the Colombian legal system and arguments based on changed country conditions – and stipulate to satisfy any Colombian judgment against them arising out of these claims. *See McLane*, 960 F. Supp. 2d at 1359. If they believe the Colombian judicial system is adequate, they can present any challenges to judgments there. Moreover, because none of the defendants apparently has any assets in Colombia, they should be required to pay at least $100 million into an escrow account in Colombia as a surety.[24]

---

[24] Plaintiffs have calculated this amount by multiplying $25,000, the approximate amount that the Colombian Supreme Court has established for moral damages for wrongful death, by the approximate number of plaintiffs. *See* Arrubla Decl. ¶ 43. This is a highly conservative estimate because many plaintiffs have claims in addition to or instead of wrongful death, and such claims have no cap under Colombian law.

Second, for the reasons described above, *supra* Part III(B)(1), Defendants should stipulate not to implead any third parties in Colombia who would potentially threaten the lives of Plaintiffs and their counsel, such as current or former paramilitaries, powerful landowners, and other financial backers of the AUC. If necessary, Defendants may seek contribution from them after a judgment is obtained. *See* Arrubla Decl. ¶ 19.

Third, Defendants should waive all statute of limitations defenses in Colombia. *See Paper Operations Consultants Int'l, Ltd. v. S.S. Hong Kong Amber*, 513 F.2d 667, 672-73 (9th Cir.1975); *Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 736 (7th Cir. 2010). Defendants have declined to challenge most of the claims in this case based on statute of limitations, but they offer only a limited waiver of the Colombian statutes of limitations that begins only on the date each claim was filed in the United States. Moreover, they intend to implead others who would not be bound by any stipulation. There is therefore "justifiable reason" to believe that their FNC motion does not signal willingness to stand trial in Colombia but rather to seek dismissal based on statute of limitations arguments that are not available to them in this U.S. litigation. *See Carijano*, 643 F.3d at 1234-35. Rather than allowing them to dismiss to a location where they may argue that the claims are time-barred, they should be required to forego all defenses based on timeliness. And if Defendants *do* move to dismiss based on timeliness, or the Colombian court declines to honor Defendants' agreement to waive statute of limitations defenses, this Court should resume jurisdiction of the case.

Fourth, Defendants should stipulate that they will submit to discovery under the Federal Rules, voluntarily produce documents within the United States pursuant to the Federal Rules, and that discovery from third parties in the United States may be conducted pursuant to the Federal Rules. Colombian discovery rules are drastically more limited than those in the United States. *See* Arrubla Decl. ¶¶ 21-22, 25. Defendants should not gain a tactical advantage by moving this litigation to Colombia that would enable them to effectively put U.S.-based evidence out of the reach of

44

compulsory process. *See Satz v. McDonnell Douglas Corp.,* 244 F.3d 1279, 1283 (11th Cir. 2001). Moreover, the Individual Defendants – and Chiquita for witnesses under their control – must stipulate that they will provide testimony in person in Colombia. Merely stipulating to a U.S. deposition is insufficient because it would not be accepted by a Colombian court, and the Colombian procedures for obtaining foreign testimony are "cumbersome and slow" and such testimony may be devalued. Arrubla Decl. ¶ 25. Additionally, should the Plaintiffs secure Colombian counsel, they should not also be forced to bear the burden of expensive international trips in order to take testimony.

Fifth, Defendants should submit to Colombian courts for *all* claims arising out of their support of the AUC – including those of absent class members – not just the named Plaintiffs' claims.

Finally, this Court should resume jurisdiction if it becomes impossible for Plaintiffs to litigate in Colombian courts for any reason, including timeliness, changed country conditions, or any defenses raised by Defendants. *See, e.g., Henderson v. Metro. Bank & Trust Co.,* 470 F.Supp.2d 294, 304 (S.D.N.Y.2006). At least one Circuit holds that failure to include a return jurisdiction clause is an abuse of discretion. *See Robinson v. TCI/US W. Commc'ns Inc.,* 117 F.3d 900, 907 (5th Cir. 1997).

## CONCLUSION

Defendants' request for FNC dismissal would put Plaintiffs in the untenable situation of either risking their lives for a chance to take an almost impossible journey through a legal system unequipped to handle their claims, or to drop them entirely. And even if the Plaintiffs could somehow overcome those hurdles, Defendants reserve for themselves the right to individually contest every Colombian judgment in the United States. FNC dismissal is a shield that protects defendants from harassment in exceptional circumstances, not a sword that allows defendants to establish insuperable barriers to litigation. Only by retaining its jurisdiction can this Court ensure

that these Plaintiffs have their day in court. Defendants' motion should be denied.

Dated: June 22, 2015                                Respectfully submitted,

                                                    /s/ John DeLeon


                                        **Law Offices of Chavez-DeLeon**

                                        5975 Sunset Drive, Suite 605

                                        South Miami, FL 33143

                                        Tel: 305-740-5347

                                        Fax: 305-740-5348


                                        *Counsel for John Doe I Plaintiffs,*

                                        *original docket number: 9:08-cv-*

                                        *80421-KAM*


                                        Richard L. Herz

                                        Jonathan Kaufman

                                        Marco Simons

                                        Marissa Vahlsing

                                        **EarthRights International**

                                        1612 K Street N.W., Suite 401

                                        Washington, D.C. 20006

                                        Tel: 202-466-5188

                                        Fax: 202-466-5189

Paul L. Hoffman

**Schonbrun, DeSimone, Seplow,**

**Harris, Hoffman & Harrison**

**LLP**

723 Ocean Front Walk

Venice, CA 90291

Tel: 310-396-0731

Fax: 310-399-7040


Agnieszka M. Fryszman

Benjamin D. Brown

**Cohen Milstein Sellers & Toll PLLC**

1100 New York Ave., N.W.

West Tower, Suite 500

Washington, D.C. 20005-3964

Tel: 202-408-4600

Fax: 202-408-4634


Judith Brown Chomsky

**Law Offices of Judith Brown**

**Chomsky**

Post Office Box 29726

Elkins Park, PA 19027

Tel: 215-782-8367

47

Fax: 202-782-8368

Arturo Carrillo

**Colombian Institute of**

**International Law**

5425 Connecticut Ave., N.W., #219

Washington, D.C. 20015

Tel: 202-994-5794

John DeLeon, FL Bar No. 650390

**Law Offices of Chavez-DeLeon**

5975 Sunset Drive, Suite 605

South Miami, FL 33143

Tel: 305-740-5347

Fax: 305-740-5348

*Counsel for John Doe I Plaintiffs,*

*original docket number: 9:08-cv-*

*80421-KAM*

James K. Green, FL Bar No. 229466

**James K. Green, P.A.**

Esperanté, Suite 1650

222 Lakeview Ave.

48

West Palm Beach, FL 33401

Tel: 561-659-2029

Fax: 561-655-1357


Jack Scarola, FL Bar No. 169440

William B. King, FL Bar No. 181773

**Searcy Denney Scarola Barnhart &**

**Shipley, P.A.**

2139 Palm Beach Lakes Blvd.

P.O. Drawer 3626

West Palm Beach, FL 33402

Tel: 561-686-6300

Fax: 561-478-0754


*Counsel for Plaintiffs Jose and*

*Josefa Lopez Nos. 1 through 342,*

*original docket number: 9:08-cv-*

*80508-KAM*


Terrence P. Collingsworth

**Conrad & Scherer, LLP**

1156 15th St. NW, Suite 502

Washington, D.C. 20005

Tel: 202-543-4001

49

Fax: 866-803-1125


Eric J. Hager

**Conrad & Scherer, LLP**

Avenida República de El Salvador

500 e Irlanda Edificio Siglo XXI, PH

Oficina W Quito, Ecuador

Tel: 954-462-5500 ext. 461

Fax: 866-803-1125


*Counsel for DOES (1-144),*

*PEREZES (1-95), PEREZES (96-*

*795), and Carmen Tulia Cordoba*

*Cuesta et al.,original docket number: 9:08-cv-*

*80465-KAM 1:07-*

*cv-01048 (RJL)*


Jonathan C. Reiter

**Law Firm of Jonathan C. Reiter**

350 Fifth Avenue, Suite 2811

New York, NY 10118

Tel: 212-736-0979

Fax: 212-268-5297

Ronald S. Guralnick, FL Bar No. 111476

**Ronald Guralnick, P.A.**

Bank of America Tower at

International Place

100 S.E. 2d Street, Suite 3300

Miami, FL 33131

Tel: 305-373-0066

Fax: 305-373-1387

*Counsel for Plaintiffs Juan/Juana Does 1-888 (previous caption), now captioned as Sara Matilde Moreno Manjarres et al. v. Chiquita Brands International, Inc., Case No. 9:08-cv-80480, (Southern District of New York) (main MDL docket: 08-01916-MD-Marra/Johnson)*

Sigrid S. McCawley

**Boies, Schiller & Flexner LLP**

401 East Las Olas Blvd., Suite 1200

Fort Lauderdale, FL 33301

Tel: 954-356-0011

51

Fax: 954-356-0022

Stephen N. Zack

**Boies, Schiller & Flexner LLP**

100 S.E. Second St., Suite 2800

Miami, FL 33131

Tel: (305) 539-8400

Fax: (305) 539-1307

Karen C. Dyer

**Boies, Schiller & Flexner LLP**

121 South Orange Ave., Suite 840

Orlando, FL 32801

Tel: (407) 425-7118

Fax: (407) 425-7047

Nicholas A. Gravante Jr.

Lee S. Wolosky

Magda M. Jimenez Train

**Boies, Schiller & Flexner LLP**

575 Lexington Ave., 7th Floor

New York, NY 10022

Tel: 212-446-2300

Fax: 212-446-2350

52

*Counsel for Plaintiffs Angela Maria Henao*

*Montes, et al.,*

*original docket number 1:10-cv-60573-KAM*


William J. Wichmann

Attorney at Law

888 S.E. 3rd Avenue, Suite 400

Fort Lauderdale FL 33316

Tel: 954-522-8999

Fax: 954-449-6332


*Counsel for Plaintiffs Antonio Gonzalez*

*Carrizosa, et. al., original docket number:*

07-cv-60821-KAM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of

the Court using CM/ECF on June 22, 2015. I also certify that the foregoing document is being

served this day on all counsel of record registered to receive electronic Notices of Electronic Filing

generated by CM/ECF, and in accordance with the Court's First Case Management Order ("CMO")

and the June 10, 2008, Joint Counsel List filed in accordance with the CMO.


By: /s/ John DeLeon

JOHN DELEON


54