**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 08-01916-MD-MARRA/JOHNSON**

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.,
ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION

_____/

This Document Relates To:
ATS ACTIONS

08-80421-CIV-MARRA
08-80465-CIV-MARRA

_____/


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**MOTION BY DEFENDANT CARLA A. HILLS, AS PERSONAL REPRESENTATIVE**
**OF THE ESTATE OF RODERICK M. HILLS, SR., TO DISMISS PLAINTIFFS'**
**AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

ARGUMENT ............................................................................................................................... 4

    I.    Defendant accepted service under Rule 4(e)(2)(C) .................................................... 4

    II.    Plaintiffs met all requirements for this action; there is no basis to dismiss these claims on prudential grounds ........................................................................................ 5

        A.   Defendant provides no reason for this Court to reconsider its Rule 25 decision ....................................................................................................................... 5

        B.   Plaintiffs met the probate requirements ................................................................. 7

        C.   Defendant's prudential mootness argument fails as a matter of law and fact . 9

           i.   Prudential mootness cannot be used to dismiss damages claims ......... 9

           ii.   The Estate has not even shown that the Estate has been distributed or that probate proceedings have closed ............................................... 10

    III.   Plaintiffs' Torture Victim Protection Act claims are viable ......................... 11

        A.   Plaintiffs' TVPA claims are not abated by Hills' death .................................. 11

        B.   Plaintiffs have stated a TVPA claim against Defendant .................................. 12

           i.   Hills knowingly financed terrorists; he aided and abetted their campaign of violence ...................................................................................... 12

               a.   Hills knew he was funding the AUC, knew they were terrorists, and knew they targeted civilians ............................. 13

               b.   Hills' financing was substantial assistance ................................. 17

           ii.   Plaintiffs have adequately alleged conspiracy liability ........................ 19

    IV.   The Colombia law claims may proceed against the Estate ............................. 20

CONCLUSION ......................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

### U.S. CASES

*Acosta Orellana v. CropLife International,*
711 F. Supp. 2d 81 (D.D.C. 2010). ...................................................................................20

*Aetna Casualty & Surety Co. v. Leahey Construction Co.,*
219 F.3d 519 (6th Cir. 2000) ...........................................................................................18

*Ali v. Cangemi,*
419 F.3d 722 (8th Cir. 2005) ......................................................................................10 n.5

*Arce v. Garcia,*
434 F.3d 1254 (11th Cir. 2006)........................................................................................11

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .........................................................................................................17

*Ashley v. Illinois Central Railroad Co.,*
98 F.R.D. 722 (S.D. Miss. 1983)........................................................................................6

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) .........................................................................................................17

*Building & Construction Department v. Rockwell International Corp.,*
7 F.3d 1487 (10th Cir. 1993) .............................................................................................9

*Burnett v. Al Baraka Investment & Development Corp.,*
274 F. Supp. 2d 86 (D.D.C. 2003) ...................................................................................18

*Burrell v. Board of Trustees of Georgia Military College,*
970 F.2d 785 (11th Cir. 1992) .........................................................................................19

*Cox v. Administrator United States Steel & Carnegie,*
17 F.3d 1386 (11th Cir. 1994)....................................................................................18, 19

*Cox v. Roth,*
348 U.S. 207 (1955) ....................................................................................................11,12

*Doe v. Drummond Co.,*
782 F.3d 576 (11th Cir. 2015) .................................................................................12, 14 n.9

*Doe v. Exxon Mobil Corp.,*
69 F. Supp.3d 75, (D.D.C. 2014)......................................................................................20

*Fletcher v. United States,*

iii

116 F.3d 1315 (10th Cir. 1997) ................................................................. 9

*Garcia-Catalan v. United States*,
   734 F.3d 100 (1st Cir. 2013) ........................................................... 13, 14

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ......................................................... *passim*

*In re Estate of Monge*,
   841 A.2d 769 (D.C. 2004) ...................................................................... 7

*In re Estate of Phillips*,
   532 A.2d 654 (D.C. 1987) ...................................................................... 7

*In re Estate of Sato*,
   878 A.2d 1247 (D.C. 2005) ..................................................................... 8

*Ingaseosas International Company v. Aconcagua Investing Ltd.*,
   479 F. App'x 955 (11th Cir. 2012) .................................................... 10 n.5

*International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers v. Kelly*,
   815 F.2d 912 (3d Cir. 1987) ............................................................ 10 n.5

*Julin v. Chiquita Brands International, Inc.*,
   690 F. Supp. 2d 1296 (S.D Fla. 2010) .............................................. 18, 19

*Kilgo v. Bowman Transportation, Inc.*,
   789 F.2d 859 (11th Cir. 1986) ............................................................. 11

*MBIA Insurance. Corp. v. F.D.I.C.*,
   708 F.3d 234 (D.C. Cir. 2013) ............................................................... 9

*Rance v. Rocksolid Granit USA, Inc.*,
   583 F.3d 1284 (11th Cir. 2009) ............................................................. 4

*Ransom v. Brennan*,
   437 F.2d 513 (5th Cir. 1971) ........................................................... 4 n.2

*Resolution Trust Corp. v. Spagnoli*,
   811 F. Supp. 1005 (D.N.J. 1993) ......................................................... 18

*Richard v. McGreevy*,
   953 A.2d 1028 (D.C. 2008) ................................................................... 7

*Rodriguez-Reyes v. Molina-Rodriguez*,
   711 F.3d 49 (1st Cir. 2013) ................................................................. 13

*South Miami Holdings LLC v. F.D.I.C.*,
   No. 10-22032-CV, 2012 WL 4644716(S.D. Fla. 2012) ............................ 10 n.5

iv

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ........................................................................................17

*United States. v. Land, Winston County.*,
   221 F.3d 1194 (11th Cir. 2000) ....................................................................................11

## STATUES AND RULES

D.C. Code § 20-704 .............................................................................................................8

D.C. Code § 20-735 ...........................................................................................................10

D.C. Code § 20-743 ...........................................................................................................10

D.C. Code § 20-903 .............................................................................................................7

D.C. Code § 20-908 .............................................................................................................3

D.C. Code § 20-1302 .........................................................................................................10

D.C. Superior Court Rules of the Probate Division (D.C. SCR-PD), Rule 411 ..................9

Fed. R. Civ. P. 4 ..........................................................................................................4, n.3

Fed. R. Civ. P. 25 ...............................................................................................................5

## OTHER AUTHORITIES

José Miguel Vivanco, Testimony before the Subcommittee on Western Hemisphere, Peace Corps,
   and Narcotics Affairs, Senate Foreign Relations Committee (Apr. 24, 2002),
   https://www.hrw.org/legacy/backgrounder/americas/colombia-testimony0424.htm .......... 15 n.15

U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on
   Human Rights Practices, 2000, Colombia, February 23, 2001 ................................... 15 n.10

U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on
   Human Rights Practices, 2001, Colombia, March 4, 2002 ........................................ 15 n.10

## INTRODUCTION AND SUMMARY OF ARGUMENT

Roderick Hills was a Director of Chiquita and the President of the Board's Audit Committee. He knew that Chiquita was providing assistance to the AUC, a designated terrorist organization. Despite knowing that such payments were illegal, Hills approved additional payments. Under his watch, these payments to the known terrorist organization and the system for disguising them continued for years. During those years, the AUC continued to murder and torture men, women and children, including Plaintiffs' decedents.

Ms. Hills (the personal representative of the Estate of Roderick Hills, hereinafter "Defendant") moves to dismiss the Complaints on the basis of a series of misstatements of the applicable law and distortions of the relevant facts. Counsel for Defendant, in writing, stated he had authority to accept service of the Motion for Substitution, but now Defendant asserts service was invalid. Defendant argues for "prudential dismissal" claiming the Estate has been distributed. However, Defendant had actual notice of Plaintiffs' claims, so if she distributed the Estate's assets, she violated D.C. probate law. Moreover, the D.C. probate statute that Defendant claims Plaintiffs violated does not apply if, as is the case here, an action was commenced and served on the decedent before death. Defendant argues that Plaintiffs were negligent in filing for substitution near the end of period prescribed by Rule 25, but Plaintiffs made a timely motion that this Court already granted.

As to the substantive claims, Defendant's arguments are equally without merit. Defendant's only support for the argument that Plaintiffs' Torture Victim Protection Act (TVPA) claims were abated by Hills's death is an incomplete quote from a case that actually contradicts this argument. Claims under remedial statutes, like the TVPA, are not abated by death. The Complaints plausibly state a claim for liability under the TVPA. Hills was a key decision-maker in making and concealing the payments that he knew were unlawful support of a designated terrorist organization. The argument that although Hills knew the AUC was a terrorist organization and that the payments he

1

approved to the AUC were illegal he did not know the "terrorists" killed civilians is incredible on its face and doubly so when accompanied by the claim that the payments were made to the AUC to protect Chiquita workers from AUC violence. Hills's assistance to the AUC was "substantial." And his continuous support for an illegal operation establish the *mens rea* and *actus reus* for both conspiracy and aiding and abetting liability. At the very least, these are summary judgment questions.

Finally, Defendant argues that the Colombian law claims fail because Plaintiffs did not plead the content of Colombian survivorship law, but neither Rule 8 nor Rule 44.1 requires Plaintiffs to plead the elements of foreign law. And the complaints were filed *before Hills died*. Plaintiffs certainly cannot lose their claims for failing to foresee Hills's death.

## STATEMENT OF FACTS

Roderick Hills was a director and President of Chiquita's Audit Committee; he had authority and, in fact, approved nearly $600,000 in payments to the AUC between 2002 and 2004. DE 575 (*Does 1-144 v. Chiquita Brands Int'l, Inc.*, Third Amended Compl. ("DC TAC")) ¶¶ 97-100, ¶¶ 102-16, ¶¶ 119-36. And Hills knew the payments were going to the AUC *and* that the AUC "was a violent, paramilitary organization." DE 589 (*Does 1-11 v. Chiquita Brands Int'l, Inc.*, Second Amended Complaint ("NJ SAC")) ¶ 86. Indeed, Hills had the payments continue even after being told by Chiquita's lawyers that they had to stop. *Id.* ¶¶ 117-18. These payments continued, with Hills's approval, even after the Department of Justice told Hills and Chiquita that the payments were illegal and could not continue. *Id.* at 118; DE 575 (DC TAC) ¶¶ 2053-55.[1] Indeed, Hills's response was not

---

[1] The Final Report of the Special Litigation Committee of Chiquita Brands International, DE 202-4, offers even more facts to support Hills's knowledge and liability. While Plaintiffs certainly do not accept as true the conclusions and/or inferences reached by the SLC, their investigation provides further detail on Hills's role. For example, there is evidence that:

- "[T]he Audit Committee was directing the Company's actions with respect to payments." *Id.* at 96.
- That after the 2003 meeting with the DoJ, "payments would not have resumed without authorization from . . . Hills . . . ." *Id.*

to stop the payments, but rather to "let [the Department of Justice] sue us, come after us." *Id.*; DE 575 (DC TAC) ¶ 2205. Finally, the terror that the AUC visited on civilians in Colombia was open and notorious; Chiquita and Hills knew that the AUC was murdering civilians. *See id.* ¶ 91. *See also infra* § III(B)(1)(b). Indeed in statements to this Court and to the DOJ, Hills argued that Chiquita's payments to the AUC were justified by a need to protect their employees from the AUC.

In addition to knowingly approving the payments to the AUC, Hills knew of and approved procedures to conceal those payments. DE 589 (NJ SAC) ¶ 18. In 2002, Banadex executives would receive checks, recorded as income, cash those checks, and deliver the cash to the AUC. *Id.* ¶¶ 88-89.

On October 29, 2014, Mr. Hills died in the District of Columbia. On March 3, 2015, Hills's counsel filed a Suggestion of Death. DE 725. A few days later, Plaintiffs received a Notice of Appointment of Carla Hills as a Personal Representative, which had been filed with the Probate Division of the D.C. Superior Court almost four months earlier, on November 20, 2014. Declaration of Richard Herz ("Herz Decl.") ¶ 2. On June 1, 2015, Plaintiffs filed a Motion for Substitution, naming Carla Hills as a defendant in her capacity as personal representative of the estate of Roderick Hills. DE 813.

Plaintiffs in *Does 1-11 v. Chiquita Brands Int'l* ("New Jersey Plaintiffs) submitted a creditor's claim to the Probate Division of the Superior Court of D.C. on July 21, 2015. Herz Decl. Ex. 2. On July 31, New Jersey Plaintiffs received notice of Carla Hills's disallowance of the claim, which offered no basis for the disallowance. Herz Decl. Ex. 3. On September 29, within two months of disallowance, pursuant to D.C. Code § 20-908(a), New Jersey Plaintiffs filed a complaint in U.S.

---

- Hills recognized that Chiquita could have stopped paying the AUC by withdrawing from Colombia; indeed he was told by DoJ that they "did not see Chiquita's case one of true duress." *Id.* at 91.

If this court finds that the current allegations are inadequate to state a claim against Hills, then Plaintiffs request leave to amend their Complaints.

District Court for the District of Columbia. Herz Decl. Ex. 5. After Defendant's lawyers told

Plaintiffs' counsel that the estate had already been distributed despite Defendant's notice of

Plaintiffs' claims, on November 9, New Jersey Plaintiffs filed a Motion to Restrain and/or Reverse

Distribution and a request for a hearing in the Probate Division. Herz Decl. Ex. 9.

**ARGUMENT**

**I.     Defendant accepted service under Rule 4(e)(2)(C).**

Defendant's argument that she was not validly served with the Motion for Substitution,

MTD at 5-7, is surprising; she authorized her counsel to accept service. On June 24, counsel stated:

"Our client has authorized us to accept service of the motion to substitute and the notice of hearing

pursuant to Rule 25." Herz Decl. Ex. 4. Thus counsel was "an agent authorized by appointment . . .

to receive service." Fed. R. Civ. P. 4(e)(2)(C).[2] Because counsel agreed, the next day, to "accept

service via email under FRCP 4," *id.*, Plaintiffs' delivery via email June 26 completed service. *Id.*

While defense counsel later described this as a "request that the Estate waive service," *id.*

Ex. 4 (email dated July 6, 2015), Plaintiffs never accepted this characterization, and it is incorrect. An

ordinary agreement to "accept service" – phrased exactly as such – does not somehow require

Plaintiffs to follow the requirements for a waiver of service under Rule 4(d).[3] Nonetheless, if

Defendant did not authorize her counsel to accept service, counsel's representation of such

authority would qualify as "good cause" for extending the time for service under Rule 4(m). Good

cause "exists when some outside factor, such as reliance on faulty advice, rather than inadvertence or

negligence, prevented service." *Rance v. Rocksolid Granit USA, Inc.,* 583 F.3d 1284, 1286 (11th

Cir.2009) (internal quotation omitted). Good cause is amply demonstrated here.

---

[2] Defendant's reliance on *Ransom v. Brennan*, 437 F.2d 513, 518-19 (5th Cir. 1971) is misplaced, because in that case counsel had not been specifically authorized to accept service.
[3] Nor were Plaintiffs required to file, contemporaneously, documentation of service. Any "[f]ailure to prove service does not affect the validity of service." Fed. R. Civ. P. 4(l)(3).

4

II.     **Plaintiffs met all requirements for this action; there is no basis to dismiss these claims on prudential grounds.**

Defendant erroneously argues that plaintiffs failed to meet requirements of Rule 25 and Washington D.C.'s Probate Code; that the Estate was properly distributed and that, as a result the Complaints should be dismissed for "prudential mootness." But the Rule 25 motion was timely filed; the Probate code requirements were met; because the Defendant had actual knowledge of the pendency of the claim against Hills at the time of his death, the distribution of the Estate would be improper; and the discretionary doctrine of "prudential mootness" is inapplicable. There has been no showing that the Estate has been distributed, and even if it had, a judgment obtained in this proceeding has substantial value to Plaintiffs because a liability finding is a necessary predicate for a recovery action against Ms. Hills in her personal capacity, as contemplated under D.C. probate rules.

A.     **Defendant provides no reason for this Court to reconsider its Rule 25 decision.**

This Court has already granted Plaintiffs motion to substitute Ms. Hills as Personal Representative of Roderick Hills. DE 843. Defendant's suggestion that the Court should reverse its grant of substitution is meritless. Plaintiffs filed the motion for substitution within 90 days of service of the notice of death, and were *timely* under Rule 25. Defendant nonetheless argues that because the filing was at the end of the required period but within its limits, it reveals a want of diligence. MTD at 9-10. But filing *within the deadline* hardly suggests that, and provides no basis for the Court to deny a Rule 25 motion, let alone revisit its prior grant of the substitution motion.

Defendant argues that a motion for substitution *can* be denied even if filed within the 90 day period. *Id.* at 9. While a situation might arise where such a denial would be appropriate, it is not this one. The Advisory Committee notes that a motion "may be denied by the court in the exercise of a sound discretion *if made long after the death . . . and circumstances have arisen rendering it unfair to allow substitution*." Fed. R. Civ. P. 25 advisory comm. n. (emphasis added). The Committee further notes that a party cannot wait "indefinitely" for a suggestion of death and only then file a motion for

substitution. *Id.* But here Plaintiffs did not wait "indefinitely," or show any lack of diligence. Ms. Hills delayed several months before filing the suggestion of death.

Plaintiffs waited until the end of the time period because Plaintiffs were, in good faith, discussing with Defendant whether the case could be resolved. On May 7, 2015, Plaintiffs' counsel spoke with Defendant's counsel about filing a motion for substitution; Defendant's counsel tried to convince Plaintiffs not to do so, and settlement possibilities were discussed. Herz Decl. ¶ 3. On May 28, Defendant's counsel emailed Plaintiffs' counsel, again making the case that Plaintiffs should not sue Defendant. Herz Decl. Ex. 6. On June 1, Plaintiffs' counsel notified Defendant's counsel that Plaintiffs would be going ahead with a motion for substitution because of the upcoming deadline, but that "we are still willing to continue discussing this matter with you." Herz Decl. Ex. 7. Defendant's counsel responded, more than two weeks later, stating that he "was disappointed that you all decided to proceed with this motion," but wished to continue talking. Herz Decl. Ex. 8. While Plaintiffs filed at the end of the 90-day period, there was no lack of diligence, but rather an effort to resolve the issue without further litigation.

The single case Defendant cites does not support dismissal. In *Ashley v. Ill. Cent. July R.R. Co.*, 98 F.R.D. 722 (S.D. Miss. 1983), the court denied a motion for substitution even though it was made within 90 days of the suggestion of death, but it was the *plaintiff* who died and the *plaintiff*'s representative that had delayed in providing notification. *Id.* at 723-24. The defendant filed the suggestion of death; the plaintiff's widow moved for substitution 89 days later, but was not the legal representative. *Id.* Those facts are far afield from this case, where Plaintiffs filed a valid substitution motion in response to a suggestion of death filed by the deceased party's representatives.

The Defendant also cites the alleged failure to serve her with the motion and notice of hearing, MTD at 9, but as explained above, Plaintiffs properly served her. And even if there were some defect in filing service – for example, failing to docket the notice of hearing in the MDL

docket – it does not justify dismissing these claims, and Defendant has put forth no authority suggesting such an incredible result would be permissible.[4]

**B.  Plaintiffs met the probate requirements.**

Defendant's argument – that Plaintiffs lacked diligence in D.C. probate proceedings – mischaracterizes Plaintiffs' conduct and D.C. probate rules. First, under section 20-903 of the D.C. Probate Code – the very statute that Defendant relies on, MTD at 7-8 – Plaintiffs did not have to file a creditor's claim in the probate proceeding to prevent distribution of the Estate. That section does not affect "any action that was commenced against the decedent if the decedent had been duly served with process before death." D.C. Code § 20-903(c). Both the New Jersey and D.C. lawsuits were filed against Roderick Hills in 2012, and Mr. Hills waived service before his death. DE 604. Plaintiffs therefore were not required to submit a creditor's claim to preserve their rights.

Second, even if the Complaints had not been filed prior to Hills's death, Defendant had to consider all valid claims and could not distribute with actual notice of them, "even if creditors fail to comply with the [probate] statute's enumerated filing formalities." *In re Estate of Monge*, 841 A.2d 769, 774 (D.C. 2004). *See also See Richard v. McGreevy*, 953 A.2d 1028, 1032-33 (D.C. 2008) (improper distribution where no claim was filed in probate but the personal representative had actual knowledge of their identical claims in D.C. Superior Court and in Maryland); *In re Estate of Phillips*, 532 A.2d 654, 656 (D.C. 1987) (observing that estate had actual notice of the claims, and that there was therefore no basis for a discretionary denial of the claim). It was Defendant, not Plaintiffs, who violated D.C. probate rules by distributing the Estate prematurely. Even if Defendant had not been previously aware of this case, she certainly had actual notice after Plaintiffs filed their Motion for

---

[4] Defendant also appears to make the same arguments it did with respect to prudential mootness regarding D.C. probate rules. MTD at 9-10. For the reasons discussed below, those arguments fail. And even if Plaintiffs had failed to follow D.C. probate rules, Defendant cites no authority suggesting that would be relevant to a Rule 25 substitution decision.

Substitution on June 1. DE 813. Indeed, she had actual knowledge before then. MTD at 2 ("Ms. Hills was fully appraised of the nature and posture of this litigation" on March 3, 2015). And as the D.C. Court of Appeals observed, the Defendant cannot "hide behind a procedural defect" to avoid paying a legitimate debt of which she had actual and timely notice. *In re Estate of Sato*, 878 A.2d 1247, 1251 (D.C. 2005). Ms. Hills was bound to refrain from distributing the Estate regardless of any actions taken by Plaintiffs in D.C. probate proceedings. She cannot wrongfully and prematurely distribute the Estate's assets – to herself – and then claim Plaintiffs' claims are moot.

Third, even if Plaintiffs were required to do more, the New Jersey Plaintiffs took several additional steps, demonstrating their diligence. On July 21, 2015, the New Jersey Plaintiffs filed a creditor's claim with the Estate. Defendant argues that because this claim was filed more than six months after Ms. Hills's appointment as personal representative, it was barred by D.C. probate rules. MTD at 7-8. Once again, however, it is Defendant who violated her duties. D.C. law requires the personal representative to notify potential creditors within twenty days of appointment, D.C. Code § 20-704. But Ms. Hills let over three months pass between her appointment on November 20, 2014, and her notification to Plaintiffs on March 3, 2015. Herz Decl. Ex. 1. Defendant cannot complain of Plaintiffs' lack of diligence in filing a creditor's claim when she missed her own statutory deadline. Plaintiffs submitted their creditor's claim well within six months of being notified by Defendant, which is all that could possibly be required when the Defendant was so dilatory in notification.

The New Jersey Plaintiffs took the additional step – out of an abundance of caution – of filing a new complaint in federal court in D.C. Herz Decl. Ex. 5. Defendant does not suggest that this was untimely, but claims that such a complaint should have been filed in the Probate Division of D.C. Superior Court. MTD at 8. But D.C. probate rules do not require this. The Probate Code requires a creditor to file "a verified complaint in the Court." Although the meaning of "the Court" is not entirely clear in this statute, the Probate Division rules clarify this requirement, in the language

8

prescribed for the notice of disallowance: "If your claim has been disallowed in whole or in part, it will be barred to the extent of its disallowance unless you file a verified complaint with the appropriate Division of this Court *or other court of competent jurisdiction. . . .*" D.C. Superior Court Probate Rule 411 (emphasis added). This, of course, makes sense, because D.C. probate law cannot affect a litigant's substantive rights to litigate federal question or diversity claims in federal court. Given the multidistrict nature of this lawsuit and the fact that a probate court would not be adequately resourced to adjudicate the underlying federal and Colombian tort claims, Plaintiffs made the rational decision to file the verified complaint in a D.C. federal court. D.C. probate law certainly cannot operate to deny Claimants a federal forum for their claims.

Finally, the New Jersey Plaintiffs filed a Motion to Restrain and/or Reverse Distribution of Assets in the D.C. Probate Court. Herz Decl. Ex. 9. While this motion should have been unnecessary because Defendant should not have distributed the Estate's assets in the face of Plaintiffs' claims, Plaintiffs certainly cannot be accused of sitting on their rights.

### C.  **Defendant's prudential mootness argument fails as a matter of law and fact.**

#### i.  Prudential mootness cannot be used to dismiss these damages claims.

Defendant's "prudential mootness" argument misconstrues that doctrine. The animating principle behind this *equitable* doctrine is that a court should stay its hand where it is "unlikely that the court's grant of remedy will actually relieve the injury." *MBIA Ins. Corp. v. F.D.I.C.*, 708 F.3d 234, 245 (D.C. Cir. 2013). "All the cases in which the prudential mootness concept has been applied have involved a request for prospective equitable relief by declaratory judgment or injunction" – not damages. *Building & Construction Department v. Rockwell International Corp.,* 7 F.3d 1487, 1492 (10th Cir. 1993); *see also Fletcher v. United States*, 116 F. 3d 1315, 1321 (10th Cir. 1997).

The doctrine has no application here. Plaintiffs' claims are for damages, not equitable relief. And even assuming Plaintiffs can recover no money from the Estate, they still have an interest in

obtaining a judgment against Defendant. In that event, the Estate's heirs are liable to creditors, D.C. Code § 20-1302, and Ms. Hills appears to be the sole beneficiary/heir. Herz Decl. Ex. 10. The personal representative – again, Ms. Hills – would also be liable for breach of fiduciary duty for distributing the Estate prematurely. D.C. Code § 20-743. Defendant argues that "allowing this action to go forward would require the Estate to engage in costly, meritless, and *needless* litigation," despite its insolvency. MTD at 8 (emphasis added). But this litigation is not "needless" because in the event of a favorable judgment in this action, Plaintiffs can still receive compensation by suing Ms. Hills for her improper distribution or by enforcing against the heirs (including Ms. Hills). None of Defendant's cases suggest that the prudential mootness would bar an action such as this.[5]

> ii. The Estate has not even shown that the Estate has been distributed or that probate proceedings have closed.

Defendant offers no evidence that the Estate is in fact insolvent. To Plaintiffs' knowledge, the Defendant has yet to file a Certification of Completion, which is required to close the estate. D.C. Code § 20-735. As noted above, the N.J. Plaintiffs' have recently filed a motion to restrain and

---

[5] In those cases, the court was unable to provide meaningful relief on grounds of ripeness or other external factors beyond the court's control. *See Ali v. Cangemi*, 419 F.3d 722 (8th Cir. 2005) (alien challenging his extended detention while awaiting deportation was no longer in custody); *Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.*, 479 F. App'x 955, 957 (11th Cir. 2012) (arbitral award party asked court to vacate had already been enforced and incorporated into foreign court's judgment). Another cited case, *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers v. Kelly*, 815 F.2d 912 (3d Cir. 1987), helps Plaintiffs. It held that a decision as to a trusteeship's original validity was necessary to determine an issue of asset control. *Id.* at 916-917. Similarly, even if the Estate's assets have already been distributed, Hills's liability will still need to be determined if Plaintiffs wanted to later enforce the judgment against Defendant (based on improper distribution) or Hills's beneficiaries. Finally, in the one case Defendant cites from this jurisdiction, the court held that "cases in which there are insufficient assets to satisfy a judgment will be dismissed on grounds of mootness *only if all potential forms of relief are permanently precluded*." *S. Miami Holdings LLC v. F.D.I.C.*, No. 10-22032-CV, 2012 WL 4644716, at *3 (S.D. Fla. July 26, 2012) (emphasis added) *aff'd*, 533 F. App'x 898 (11th Cir. 2013). Here, all potential forms of relief are *not* precluded.

claw-back distribution in the Probate Division of D.C. Superior Court. While D.C. law includes provisions allowing recovery from heirs and the Personal Representative after the Estate is closed, Defendant has not shown that the probate court lacks the power to reverse Defendant's wrongful premature distributions while the Estate remains open. So the Estate's predicate for mootness – that the Estate is effectively closed and insolvent, MTD at 8 – does not exist.

## III.     Plaintiffs' Torture Victim Protection Act claims are viable.

### A.     Plaintiffs' TVPA claims are not abated by Hills' death.

Under Eleventh Circuit law, Plaintiffs' TVPA claims survive Hills's death. "[A] federal cause of action generally survives the death of the plaintiff unless it is an action for penalties." *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 876 (11th Cir. 1986). Thus, a remedial action, "which compensates an individual for specific harm suffered," survives death. *United States v. Land, Winston Cnty.,* 221 F.3d 1194, 1197 (11th Cir. 2000). And the Eleventh Circuit has explicitly recognized that the TVPA is "remedial." *Arce v. Garcia,* 434 F.3d 1254, 1265 (11th Cir. 2006). Under this Circuit's controlling precedent, the TVPA is therefore not abated by the death of a party.

The only case Defendant cites, *Cox v. Roth,* 348 U.S. 207 (1955), supports survival. *Cox* held that Jones Act claims did *not* abate on the tortfeasor's death. *Id.* at 210. Defendant plucks from context half of a quote to claim: "The general federal common law rule will 'abat[e] actions on the death of the tortfeasor.'" MTD at 10 (quoting *Cox,* 348 U.S. at 210). But in the passage Defendant purports to quote, the Court *refused* to apply the "old common-law rule" because of its "extreme harshness." *Id.* at 210. The Court noted the old rule "flies in the face of" the Jones Act's remedial purpose, "that advancing civilization and social progress have brought 43 of our States to include in their general law the principle of the survival of causes of action against deceased tortfeasors" and that the survival of actions "has now become the rule in almost every common-law jurisdiction." *Id.*

Defendant suggests that for a claim to survive a defendant's death, Congress must make

survival explicit, MTD at 10, but *Cox* refutes that argument too. The Jones Act *did not* expressly provide for survivorship, *Cox*, 348 U.S. at 208; nonetheless, as has just been noted, its clear remedial purpose required survival of the action. Explicit statutory direction is not required.

**B.      Plaintiffs have stated a TVPA claim against Defendant.**

This Court has already held that the allegations against Chiquita state a claim for aiding and abetting and conspiracy liability. DE 412 (MTD Order, June 3, 2011) at 70-73, 79-81. But Defendant argues that the allegations showing Hills's central role in Chiquita's conduct are insufficient. MTD at 11-16. Defendant is wrong. Chiquita cannot act outside of its key officers, and as the Complaints make clear, Hills was a key decision-maker in making and concealing the illegal payments.[6]

i.      Hills knowingly financed terrorists; he aided and abetted their campaign of violence.

To be liable under the TVPA as an aider and abettor, Hills need only have given "knowing substantial assistance to the [AUC]." *Doe v. Drummond Co.*, 782 F.3d 576, 608 (11th Cir. 2015). Under Hills's watch – and with his approval and knowledge – Chiquita gave hundreds of thousands of dollars to the AUC that the AUC then used in their murderous campaign against civilians. *Supra* Statement of Facts ("SoF"). *See also* DE 589 (NJ SAC) ¶¶ 86, 153. After learning that Chiquita was unlawfully providing support to a terrorist organization, Hills, as head of the audit committee, approved the continuation of the payments *and* new procedures to hide them. *Supra* SoF. *See also* DE 589 (NJ SAC) ¶¶ 18, 88-89, 117-18. And Hills knew the AUC was a violent terrorist organization, and that it had been designated a terrorist organization, but he approved and hid the payments in spite of that fact and knowing it was illegal. DE 589 (NJ SAC) ¶¶ 86, 117-118; DE 575 (DC TAC) ¶ 2037.[7] Defendant's argument that Hills's assistance was not substantial misstates well-established

---

[6] The Justice Department, albeit by pseudonym, identified only 10 individuals responsible for Chiquita's conduct, and Mr. Hills was Individual B. DE 575 (DC TAC) ¶¶ 2035, 2037.

[7] Indeed, that designation, officially identifying the AUC as a violent threat to civilians, was "well-publicized in the American public media." DE 589 (NJ SAC) ¶ 91. *See also,* DE 575 (DC TAC) ¶¶

principles of aiding and abetting liability (and this Court's earlier order). Enabling a terrorist

organization with years of financial support undoubtedly aids that group.

> a. *Hills knew he was funding the AUC, knew they were terrorists, and knew they
>    targeted civilians.*

Defendant argues that Plaintiffs do not allege that Hills had "actual" knowledge that the AUC

was killing and torturing civilians. MTD at 13. That is wrong. But, regardless, it is enough that he

knew the AUC was committing acts of terrorism.

First, the facts alleged in the Complaints support an inference that Hills knew the AUC, was

targeting civilians. And that is all that is required. *See Garcia-Catalan v. United States*, 734 F.3d 100, 103

(1st Cir. 2013) (finding that the circumstances "support[ed] a plausible inference that the defendant

had actual or constructive knowledge of the condition"). As the First Circuit explained:

> The relevant question for a district court in assessing plausibility is not whether the
> complaint makes any particular factual allegation but, rather, whether "the complaint
> warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief
> plausible." [*Bell Atl. Corp. v.*] *Twombly*, 550 U.S. [544] at 569 n.14, 127 S. Ct.
> 1955[(2007)]. There need not be a one-to-one relationship between any single
> allegation and a necessary element of the cause of action.

*Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 55 (1st Cir. 2013). Indeed, knowledge can be proven

by inferences even at trial. *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983).

Given that he knew the AUC was a terrorist organization, it is implausible that Hills did not

know that the AUC was targeting civilians. Hills began approving the payments less than a year after

---

2142, 2206, 2209-10. Then-Secretary of State Colin Powell clearly explained why the AUC had been
designated a terrorist organization, stating: "[t]he AUC has carried out numerous acts of terrorism,
including the massacre of hundreds of civilians" and that "[l]ast year, AUC members reportedly
committed at least 75 massacres that resulted in the deaths of hundreds of civilians." Secretary Colin
L. Powell**,** Designation of the AUC as a Foreign Terrorist Organization, September 10, 2001 *available
at* http://2001-2009.state.gov/secretary/former/powell/remarks/2001/4852.htm**.** The New York
Times, for example, covered the designation and described the AUC as "responsible for hundreds of
massacres." Juan Forero, *U.S. Blacklists Paramilitaries in Colombia*, N.Y. TIMES, September 11, 2001,
*available at* http://www.nytimes.com/2001/09/11/international/americas/11COLO.html.

September 11. He surely understood that "terrorism" typically involves violence against innocents. And Defendant's assertion that Hills made the payments because he feared the AUC would harm Chiquita employees belies the claim that he did not know the AUC targeted civilians. MTD at 14.

Chiquita's counsel told Hills the payments were illegal; so did the Department of Justice; Hills himself recognized that "we appear to [be] committing a felony."[8] *Supra* SoF; DE 575 (DC TAC) ¶ 2037; DE 589 (NJ SAC) ¶¶ 117-18. The suggestion that Hills, the head of the Audit Committee, knew the payments were criminal but did not know and never asked anyone – not outside counsel, not anyone else at Chiquita, not anyone at DOJ – why the U.S. had designated the AUC a terrorist organization is not a serious argument.

Hills's purported lack of knowledge is also implausible because the AUC's widespread killing of civilians was so notorious when Hills approved the payments. In particular, it was being discussed in Congress and the media at the time and "was well known in Colombia and was widely reported in the press . . . and the United States." DE 589 (NJ SAC) ¶ 156. *See also id.* ¶ 157.[9] Hills knew, and "discovery can reasonably be expected to fill any holes" in the allegations concerning what Hills knew about the AUC and when. *Garcia-Catalan*, 734 F.3d at 104-05.

Nonetheless, if this Court finds that the Complaint does not adequately allege Hills's knowledge, Plaintiffs respectfully request leave to amend in facts showing that Hills would have

---

[8] Contrary to Defendant's claim that Plaintiffs do not allege what felony he was talking about, MTD at 13, it is obviously the illegal payments. The very next sentence notes that "Hills' opinion regarding what to do about Chiquita's payments to the AUC was to 'just let them sue us.'" DC TAC ¶ 2037.
[9] Hills claims that *Drummond* requires more than "knowledge of the 'general presence of the AUC and the AUC's violent methods." MTD at 14 (quoting *Drummond*, 782 F.3d at 604-05). There, the Court found no *evidence* that the defendants knew "noncombatants were being murdered along the rail lines" *or even* "that the AUC was allegedly being paid by Drummond." Drummond, 782 F.3d at 604. Hills clearly knew of, indeed he approved, the illegal payments to the AUC. And, knowing that unlawful payments were being made to AUC, Hills approved the continuation of the payments and the means of disguising them.  So not only was the posture of *Drummond* different – it was addressing a motion for summary judgment – the factual predicate for that decision is missing here.

known that the AUC regularly killed civilians. Plaintiffs cite just a few examples from just prior to and during Hills's direct involvement in Chiquita's payments to the AUC. The State Department repeatedly singled out the AUC for committing a pattern of killings and massacres against civilians.[10] Human Rights Watch (HRW) reported in 2001 that "paramilitary groups [were] considered responsible for at least 78 percent of the human rights violations recorded in the six months from October 1999" and for "ninety-three massacres in the first five months of 2000."[11] In January, 2001, the Washington Post reported that the AUC pulled 26 men from their homes and killed them by crushing their heads, that there were "23 mass killings attributed to the paramilitaries this month" and that the previous year "507 civilians [were] killed in paramilitary massacres."[12] In March, 2001, the New York Times reported that there had been "dozens of paramilitary massacres this year."[13]A few weeks later, the Washington Post reported that the AUC "used machetes, guns and chain saws to kill at least 40 civilians."[14] On April 24, 2002, immediately after Hills became responsible for directing Chiquita's response, HRW testified to Congress that "Paramilitaries associated with the A.U.C. commit most human rights violations in Colombia today. These acts of terror include massacres, targeted killings and forced displacement."[15] And in May 2002, Senator Patrick Leahy

---

[10] U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices, 2000, Colombia, February 23, 2001; U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices, 2001, Colombia, March 4, 2002.

[11] Human Rights Watch, World Report 2000, Colombia (2001), *available at* http://www.hrw.org/legacy/wr2k1/americas/colombia.html.

[12] Scott Wilson, *Chronicle of a Massacre Foretold*, WASHINGTON POST, January 28, 2001, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2008/01/24/AR2008012402532.html.

[13] Juan Forero, *Colombia Paramilitary Group Seizes 30 Villagers, Presumed Dead*, N.Y. TIMES, March 31, 2001, *available at* http://www.nytimes.com/2001/03/31/world/31COLO.html.

[14] Scott Wilson, *Colombian Massacre Large, Brutal,* WASHINGTON POST, April 21, 2001 *available at* http://www.washingtonpost.com/archive/politics/2001/04/21/colombian-massacre-large-brutal/0ea61a75-0e54-4c47-89a0-f1e139597f3f/.

[15] José Miguel Vivanco, Testimony before the Subcommittee on Western Hemisphere, Peace Corps, and Narcotics Affairs, Senate Foreign Relations Committee (Apr. 24, 2002), https://www.hrw.org/legacy/backgrounder/americas/colombia-testimony0424.htm.

noted in the Los Angeles Times that "paramilitary groups [were] responsible for a large share of targeted assassinations and gruesome attacks against unarmed civilians."[16] Anyone with a passing interest in Colombia or the AUC would have known that it regularly killed civilians.

Second, Hills is liable for aiding and abetting even if he did not know the AUC was slaughtering civilians. Hills knew that the AUC was committing acts of terrorism. He did not need to know precisely what sort of terrorism. In *Halberstam*, the D.C. Circuit held a burglar's wife liable for a *murder* committed during a burglary even though her knowing assistance was only directed to a burglary scheme; indeed "[i]t was not necessary that [the wife] knew specifically that [the husband] was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night – whether as a fence, burglar, or armed robber made no difference – because violence and killing is a foreseeable risk in any of these enterprises." *Halberstam*, 705 F.2d at 488. Like the defendant in *Halberstam*, Hills knowingly and unlawfully assisted the AUC. And the connection between the conduct here and the killings is much more direct; murder is a far more foreseeable risk of terrorism than of property crime.

Finally, Defendant's assertion that Hills acted to protect Chiquita employees from AUC violence is not an alternative explanation that defeats his aiding and abetting liability. This Court already rejected that argument, finding that Plaintiffs alleged that "Chiquita's assistance was not given out of duress; rather it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC . . . . [I]t was the banana companies that approached the AUC to initiate their relationship." DE 412 (MTD Order of June 3, 2011) at 70; *accord id.* at 74-75. Regardless, Hills's purpose only matters for conspiracy liability; only knowledge is required for aiding and abetting. Defendant's alternative explanation would not negate

---

[16] Patrick Leahy, *The Colombia Quandary*, L.A. TIMES, May 05, 2002, *available at* http://articles.latimes.com/2002/may/05/opinion/op-leahy.

any element of Plaintiffs' aiding and abetting claims.

In any event, this alternative "explanation" cannot overcome Plaintiffs' plausible explanation. *See* DE 826 (Plaintiffs' Joint Opposition to Individual Defendants' Joint Motion to Dismiss ("Joint Opp.")) at 22-24. Rule 12(b)(6) does not impose a "probability requirement" or allow a court to weigh otherwise plausible inferences. *Id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("'Plausibility' . . . does not imply that the district court should decide whose version to believe."). Contrary to Defendant's assertion, MTD at 14, nothing in *Iqbal* requires otherwise. In *Iqbal*, the Court credited an alternative, plausible and innocent explanation because it found that plaintiffs pled no facts that were anything more than *consistent* with liability; Plaintiffs had alleged no facts that *suggested* liability. *Iqbal*, 556 U.S at 680-83; *see* Joint Opp. 22-23. But here the pleadings *plausibly suggest* knowledge. The court cannot credit an alternative explanation, even a plausible one.

In sum, Hills cannot shoehorn duress, an affirmative defense, into a motion to dismiss, particularly where he puts forward no facts to support it and it is not obvious or even reasonably inferred from the facts alleged in the Complaints. DE 826 (Joint Opp.) at 24.

> #### b.  *Hills' financing was substantial assistance.*

Defendant's argument that Chiquita but not Hills provided substantial assistance because his assistance did not go "beyond financing" misstates this Court's prior holding. MTD at 14-15. "[I]f the defendant engages in additional assistance beyond financing, *or* engages in financing that is gratuitous *or* unrelated to any commercial purpose, the *actus reus* element has been satisfied." DE 412 (MTD Order, June 3, 2011) at 77 (emphasis added, internal quotation marks omitted). Defendant would replace "or" with "and," incorrectly implying that all of these factors are necessary. Since there is no legitimate commercial or non-gratuitous purpose for the $600,000 in illegal payments

17

Hills sent to the AUC, Plaintiffs have alleged this element. DE 826 (Joint Opp.) at 15-17.

Financing alone *is* substantial assistance, even if it is only a fraction of the whole. DE 826 at 15; *Julin v. Chiquita Brands Int'l, Inc.*, 690 F. Supp. 2d 1296, 1310 (S.D Fla. 2010); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 104-05 (D.D.C. 2003). But Hills provided additional assistance beyond financing. He also ensured that their purpose and recipients were not discovered. *Supra* SoF. *See also* DE 589 (NJ SAC) ¶¶ 18, 88. Concealing illegal activity constitutes substantial assistance. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1410-11 (11th Cir. 1994); *Halberstam*, 705 F.2d at 488; *Resolution Trust Corp. v. Spagnoli*, 811 F. Supp. 1005, 1014 (D.N.J. 1993).

Defendant's final argument – that Hills's assistance was not "integral" to the killings and torture, MTD at 14-15 – also fails. His assistance substantially assisted the AUC, and that is enough. DE 826, (Joint Opp.) at 15-17. Defendant selectively quotes *Halberstam*, but that case did not hold that assistance must be integral. In *one* of the cases the *Halberstam* Court cited to explain *one* of the six factors the court identified as relevant for its substantial assistance analysis, it observed that the defendant's conduct had been "integral." *Halberstam*, 705 F.2d at 484. But *Halberstam* adopted a nuanced approach where the assistance is evaluated based on a range factors including the nature of wrongdoing, amount  and duration of assistance, relationship to the wrongdoer, defendant's state of mind, and his presence or absence, *id.*, most of which Defendant does not mention. The nearly $600,000 Hills enabled was important to maintaining the AUC (and its campaign of terror). And Hills's assistance was not isolated, but continuous and long-term. *Halberstam*, 705 F.2d at 488 ("the duration of the assistance has strongly influenced our weighing of Hamilton's assistance). "Substantial assistance, after all, does not mean *necessary* assistance"; all that is required Hills' help made it "easier" for the AUC to target those civilians. *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) (emphasis in original). It surely did.

Defendant cites no authority suggesting that Plaintiffs must show Hills's assistance was

integral to "the torture or killing of an[] individual plaintiff or decedent." MTD at 15. This Court has already rejected the claim that aiding and abetting requires specific assistance of a specific tort. DE 412 (MTD Order of June 3, 2011) at 57-59. Defendant wrongly assumes that one can only abet individual killings, not a campaign of killings. But that is the kind of claim that "risks rewarding offenders who commit large-scale, as opposed to individual, international torts." DE 412 (MTD Order of June 3, 2011) at 33. It is sufficient that Hills funded a terrorist organization engaged in systematic murder. DE 826, (Joint Opp.) at 15-17. Similarly, in *Halberstam*, 705 F.2d at 488, the defendant was liable for murder even though her assistance was directed at a pattern of burglaries, not at a specific burglary, let alone at a specific murder. Plaintiffs' allegations are sufficient, and whether Hills's assistance was "substantial" is a question for the jury. *Cox*, 17 F.3d at 1410.

      ii.  <u>Plaintiffs have adequately alleged conspiracy liability.</u>

Defendant asserts that Plaintiffs fail to allege conspiracy liability because the Complaints do not allege that Hills personally met with or approved meetings with the AUC, or approved killings. MTD at 15-16. But Plaintiffs need not allege a personal agreement between Hills and the AUC. One can join an ongoing conspiracy, as Hills did; he need not create one. DE 826 (Joint Opp.) at 21-22. Further, "courts have to infer an agreement from indirect evidence in most civil conspiracy cases." *Halberstam*, 705 F.2d at 486. As with intent, the existence of an agreement can be established by circumstantial evidence, including by continuous and knowing action that serves the shared goal. Joint Opp. at 18-22. *See also Burrell v. Bd. of Trustees of Ga. Military College*, 970 F.2d 785, 789 (11th Cir. 1992); *Julin*, 690 F. Supp. 2d at 1311-12.

For over a year, Hills approved illegally financing terrorists, and participated in covering up the payments. *Supra* SoF. He did so even after Chiquita's lawyers and the Justice Department told him the payments were illegal. *Id.* This supports a plausible inference that he joined in Chiquita's agreement with the AUC (which this Court already found to be plausibly alleged). *Halberstam*, 705

F.2d at 487-88 (holding that defendant's "continuous participation reflected her intent and desire to make the venture succeed"). *See also* DE 826 (Joint Opp.) at 19-21.

## IV.     The Colombia law claims may proceed against the Estate.

Plaintiffs were not required to plead the elements of their foreign law claims, and thus the survival of their Colombian law claims, in their Complaints. MTD at 16. When Plaintiffs sued Hills, he was alive. Plaintiffs did not have to predict Hills's death and plead accordingly.

In any event, Plaintiffs need not plead the elements of foreign law; the Federal Rules require only notice of their intent to rely on foreign law, which Plaintiffs have provided. Joint Opp. at 29-31.

Defendant does not deny that Plaintiffs' Colombian law claims survive Hills's death. And Plaintiffs have already provided uncontested Colombian authority, in their first opportunity after Hills' death, the Motion for Substitution, that establishes that their Colombia law claims survive. DE 813 at 5. In Colombia, when a defendant passes away during the pendency of proceedings, "the lawsuit proceeds normally with the deceased's spouse, the executor holding possession of the assets, the heirs or the corresponding representative of the undetermined heirs." Herz Decl. Ex. 12 ¶11 (Arrubla Decl.). Even where the decedent's assets have been fully distributed, there may still be a cause of action for enforcement against the heirs in Colombia based on the idea of inherited liability. *Id.* at ¶18-26.  Plaintiffs have "provid[ed] the Court with information concerning the foreign law it claims should be applied." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 88 (D.D.C. 2010).

In Defendant's only case, there was an actual dispute about whether foreign law allowed the claims; the defendants had submitted an expert opinion to prove that no claim existed. *Doe v. Exxon Mobil Corp.*, 69 F. Supp.3d 75, 103-04 (D.D.C. 2014). But Plaintiffs' showing here is unrebutted.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

Dated:  November 9, 2015                  Respectfully submitted,


/s/ Richard L. Herz


Richard L. Herz
Jonathan Kaufman
Marco Simons
Marissa Vahlsing
**EarthRights International**
1612 K Street N.W., Suite 401
Washington, D.C. 20006
Tel: 202-466-5188
Fax: 202-466-5189


Paul L. Hoffman
**Schonbrun, DeSimone, Seplow,
Harris, Hoffman & Harrison
LLP**
723 Ocean Front Walk
Venice, CA 90291
Tel: 310-396-0731
Fax: 310-399-7040


Agnieszka M. Fryszman
Benjamin D. Brown
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: 202-408-4600
Fax: 202-408-4634


Judith Brown Chomsky
**Law Offices of Judith Brown
Chomsky**
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
Fax: 202-782-8368


Arturo Carrillo
**Colombian Institute of
International Law**
5425 Connecticut Ave., N.W., #219
Washington, D.C. 20015
Tel: 202-994-5794

21

John DeLeon, FL Bar No. 650390
**Law Offices of Chavez-DeLeon**
5975 Sunset Drive, Suite 605
South Miami, FL 33143
Tel: 305-740-5347
Fax: 305-740-5348

*Counsel for John Doe I Plaintiffs,*
*original docket number: 9:08-cv-*
*80421-KAM*

Terrence P. Collingsworth
**Conrad & Scherer, LLP**
1156 15th St. NW, Suite 502
Washington, D.C. 20005
Tel: 202-543-4001
Fax: 866-803-1125

Eric J. Hager
**Conrad & Scherer, LLP**
Avenida República de El Salvador
500 e Irlanda Edificio Siglo XXI, PH
Oficina W Quito, Ecuador
Tel: 954-462-5500 ext. 461
Fax: 866-803-1125

*Counsel for DOES (1-144),*
*PEREZES (1-95), PEREZES (96-*
*795), and Carmen Tulia Cordoba*
*Cuesta et al.,original docket number: 9:08-cv-*
*80465-KAM 1:07-*
*cv-01048 (RJL)*

22

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on November 9, 2015. I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF, and in accordance with the Court's First Case Management Order ("CMO") and the June 10, 2008, Joint Counsel List filed in accordance with the CMO.

By: /s/ Sean Powers

23