# Declaration of Richard Herz

## DECLARATION OF RICHARD HERZ

I, Richard Herz, declare as follows:

1.     I am the Senior Litigation Attorney for EarthRights International (ERI) and counsel for the Plaintiffs in *John Doe et al. v. Chiquita Brands Int'l et al.*, No. 08-80421 (S.D. Fla.), one of the actions constituting the multi-district litigation, *In re Chiquita Brands Int'l, Inc., Alien Tort Statute & Shareholder Derivative Litigation* (S.D. Fla. 2011) ("Chiquita MDL"). The facts stated herein are based on my personal knowledge. If called upon to do so I could and would competently testify thereto.

2.     During the week of March 9, 2015, counsel for Plaintiffs received several documents from Defendant via her probate counsel, postmarked for March 3, 2015. The documents included a signed memorandum in which Ms. Hills declared that she had been appointed Personal Representative of the estate of the deceased individual defendant Rodrick M. Hills, as well a Notice of Appointment, a Notice to Creditors, and a Notice to Unknown Heirs for the Estate of Roderick M. Hills.

3.     On May 7, 2015, Plaintiffs' counsel spoke with Defendant's counsel about the former's intention to file a motion substituting Ms. Carla Hills (in her capacity as Personal Representative) as a defendant in the Chiquita MDL in light of defendant Roderick Hills's death. During that phone call, Defendant's counsel tried to convince Plaintiffs not to do so, and settlement possibilities were discussed.

4.     Attached hereto as Exhibit 1 is a true and correct copy of the Notice of Appointment and General Information for Heirs, Legatees and Creditors, filed by Defendant with the Probate Division of the Superior Court of D.C. ("the Probate Division") on November 20, 2014.

5.     Attached hereto as Exhibit 2 is a true and correct copy of Creditor Claim of EarthRights International on behalf of John Doe *et. al*, filed by the Plaintiffs in John Doe et al. ("N.J. Plaintiffs")

with the Probate Division on July 21, 2015.

6.      Attached hereto as Exhibit 3 is a true and correct copy of the Notice of Action Taken on Claim of John Doe *et al.*, filed by Defendant with the Probate Division on July 31, 2015.

7.      Attached hereto as Exhibit 4 is a true and correct copy of Email Communications between Counsel for Plaintiffs and Counsel for Defendant, which consists of a thread of email messages exchanged between April 29, 2015 and July 6, 2015.

8.       Attached hereto as Exhibit 5 is a true and correct copy of the complaint in *John Doe et al. v. Carla Hills, Personal Representative of the Estate of Roderick M. Hills,* No. 15-01586 (D.D. C.), filed in the District Court for the District of Columbia on September 29, 2015.

9.      Attached hereto as Exhibit 6 is a true and correct copy of Email Communications Regarding Motion for Substitution, which consists of a thread of email messages exchanged between Plaintiffs' and Defendants' counsel on dates from April 29-May 28, 2015.

10.      Attached hereto as Exhibit 7 is a true and correct copy of Email Communication from myself to Defendant's Counsel, dated June 1, 2015.

11.      Attached hereto as Exhibit 8 is a true and correct copy of Email Communication from Defendant's Counsel to myself, dated June 17, 2015.

12.      Attached hereto as Exhibit 9 is a true and correct copy of Motion to Restrain and/or Reverse Distribution of Assets in the D.C. Probate Court, filed by N.J. Plaintiffs with the Probate Division on November 9, 2015.

13.      Attached hereto as Exhibit 10 is a true and correct copy of Last Will and Testament of Roderick M. Hills, filed in the Probate Division on November 7, 2015, and photographed by Plaintiffs' counsel (there was no option at the Probate Division to print, copy, or store an electronic version of the will). Plaintiffs viewed the electronically-filed version of the will while searching through the publicly-available documents of the Hills Estate at the Probate Division.

2

14.     Attached hereto as Exhibit 11 is a true and correct copy of the original Spanish version of the declaration of JAIME ALBERTO ARRUBLA PAUCAR of November 9, 2015 ("ARRUBLA DECL.") attesting to the survival of claims under Colombian law.

15.     Attached hereto as Exhibit 12 is a true and correct copy of a certified translation of the declaration of JAIME ALBERTO ARRUBLA PAUCAR ("ARRUBLA DECL.").

I declare under penalty of perjury that the foregoing is true and correct.

Executed in West Hartford, CT, on November 9, 2015.

By:

RICHARD HERZ

3

Declaration of Richard Herz


Exhibit 1

# M E M O R A N D U M

**To:**   All Interested Persons in the Estate of Roderick M. Hills

**From**:  Carla A. Hills, Personal Representative

**Date:**  March 3, 2015

**Re:**   Estate of Roderick M. Hills -- Notice of Appointment and General Information for Heirs, Legatees and Creditors

Roderick M. Hills died in the District of Columbia on October 29, 2014.  Pursuant to DC Code § 20-704(a), I am enclosing the Notice of Appointment, Notice to Creditors and Notice to Unknown Heirs for the Estate of Roderick M. Hills.  I also am enclosing the General Information for Heirs, Legatees and Creditors.  Please contact me if you have any questions.


Carla A. Hills
3125 Chain Bridge Road, NW
Washington, DC 20016


Enclosures

405097187v1

FILED

SCANNED

NOV 2 0 2014

DOCKETED

Register of Wills
Office of the Probate Division

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## PROBATE DIVISION

2014 ADM 1194

Roderick M. Hills
_____
Name of Decedent

Ellen Harrison
_____

Pillsbury Winthrop Shaw Pittman LLP
_____

2300 N St., NW, Washington, DC 20037
_____
Name and Address of Attorney

## Notice of Appointment, Notice to Creditors and Notice to Unknown Heirs

Carla A. Hills
_____, whose

address(es) (is/are) is 3125 Chain Bridge Road, NW, Washington, DC 20016

(was/were) appointed Personal Representative(s) of the estate of Roderick M. Hills

_____ who died on October 29, 2014

(with/without) a Will and will serve (with/without) Court supervision. All unknown heirs and heirs

whose whereabouts are unknown shall enter their appearance in this proceeding. Objections to such

appointment (or to the probate of decedent's Will) shall be filed with the Register of Wills, D.C.,

Building A, 515 5th Street, N.W., 3rd Floor, Washington, D.C. 20001, on or before

6/1/2015_____. Claims against the decedent shall be presented to the

undersigned with a copy to the Register of Wills or filed with the Register of Wills with a copy to the

undersigned, on or before 6/1/2015, or be forever barred. Persons believed to be heirs

or legatees of the decedent who do not receive a copy of this notice by mail within 25 days of its

publication shall so inform the Register of Wills, including name, address and relationship.

Date of first publication:

12/1/2014

Name of newspaper and/or periodical:

National Law Journal

Washington Law Reporter

_____
To be signed by Personal Representative(s)

202-966-2065
_____
Telephone Number of Personal
Representative(s)

TRUE TEST COPY

_____
Register of Wills

April 2013 – 124.10.v3

Declaration of Richard Herz


Exhibit 2

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
PROBATE DIVISION

2014 ADM 001194
Estate of Roderick M. Hills (deceased)

### CLAIM AGAINST THE DECEDENT'S ESTATE

Decedent Roderick M. Hills died on October 29, 2014 and was a resident of the District of Columbia. Claimants, John Doe et al., certify that there is owing by Roderick M. Hills, deceased, Case No. 2014 ADM 001194, the sum of $18.5 billion. This sum constitutes the maximum amount in damages sought from the decedent, Roderick M. Hills, by the plaintiffs in the active civil lawsuit in which the decedent was a named defendant, *John Doe et al. v. Chiquita Brands Int'l et al.*, No. 08-80421 (S.D. Fla). Carla Hills, Personal Representative of the estate of defendant Roderick Hills's estate, has been substituted as an individual defendant in that action as of July 1, 2015. This claim therefore encompasses all damages that may be awarded to the plaintiffs against Carla Hills in the aforementioned lawsuit, where a judgment is pending.


On behalf of John Doe et al., Claimants, I do solemnly declare and affirm under penalty of law that the contents of the foregoing document are true and correct to the best of my knowledge, information, and belief.


Name of Claimant: John Doe et al.

c/o EarthRights International

1612 K St. NW, Suite 401

Washington, DC 20006

Tel: 202-466-5188

Email: marco@earthrights.org


Dated: July 21, 2015                                    Respectfully submitted,




                                                    /s/ MARCO SIMONS

                                          Marco Simons, Counsel for Claimts
                                                 D.C. Bar No.: 492713
                                               EarthRights International
                                              1612 K St. NW, Suite 401
                                                Washington, DC 20006
                                                  Tel: 202-466-5188
                                            Email: marco@earthrights.org



### CERTIFICATE OF SERVICE

I hereby certify that I have mailed to Carla Hills, Personal Representative of the estate of

Roderick M. Hills, a copy hereof, and delivered by the eFiling system of this Court a copy hereof

to Ellen K. Harrison, attorney for Ms. Carla Hills, on this 21 day of July, 2015.




                                                    /s/ MARCO SIMONS

                                          Marco Simons, Counsel for Claimants
                                                 D.C. Bar No.: 492713
                                               EarthRights International
                                              1612 K St. NW, Suite 401
                                                Washington, DC 20006
                                                  Tel: 202-466-5188
                                            Email: marco@earthrights.org

# Declaration of Richard Herz


# Exhibit 3

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### PROBATE DIVISION

2014 _____  ADM 001194 _____
_____  SEB _____
_____  FEP _____

Estate of

Roderick M. Hills
_____
                    Deceased

## NOTICE OF ACTION TAKEN ON CLAIM

To  John Doe et al. c/o EarthRights International
_____ :
                    (Claimant)

You are hereby notified that your claim in the amount of $ 18.5 billion
_____

against the above entitled estate is

☐   Allowed in the stated amount.

☐   Allowed in the amount of $ _____ .

☒   Disallowed in the stated amount.

☐   Disallowed in the amount of $ _____ .

☐   Undetermined in the amount of $ _____ and will be presented to the Court for

determination. *

Date Mailed or Delivered: _7/31/15_

_____
Signature

Carla A. Hills
_____
Typed name

3125 Chain Bridge Road, NW
_____
Address (actual address/not Post Office Box)

Washington, DC 20016
_____

_____

202-966-2065
_____
Telephone number

cahills@hillsandco.com
_____
Email address

_____
Bar number (if filer is an attorney)

NOTICE

If your claim has been disallowed in whole or in part, it will be barred to the extent of its disallowance unless you file a verified complaint with the Probate Division of this Court within sixty days after the date of mailing of the notice disallowing the claim pursuant to D.C. Code, sec. 20-908(a).

* If the action indicated above has not been instituted within eight months of the date of the first publication of notice of the appointment of the Personal Representative, you should file a verified complaint pursuant to D.C. Code, sec. 20-908(b) in the Probate Division of this Court.

**Please note: A copy of this form must also be filed with the Probate Division.**

Declaration of Richard Herz


Exhibit 4



Upasana Khatri <upasana@earthrights.org>

## Fwd: Estate of Roderick Hills Meeting

**Portnoi, Dimitri D.** <dportnoi@omm.com>                    Mon, Jul 6, 2015 at 5:57 PM
To: Rick Herz <rick@earthrights.org>, "Blalack II, K. Lee" <lblalack@omm.com>
Cc: Terrence Collingsworth <TC@conradscherer.com>, "Metlitsky, Anton" <ametlitsky@omm.com>, Upasana Khatri <upasana@earthrights.org>

Rick and Terry,

While we believe the Court erred in granting the motion to substitute, the Estate will move forward and intends to file a motion to dismiss. Based on your request that the Estate waive service, which was transmitted to us on June 23, we will respond on or before August 24, per Rules 4(d) and 12(a)(1)(ii).

Dimitri

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Friday, June 26, 2015 11:49 AM
**To:** Blalack II, K. Lee
**Cc:** Portnoi, Dimitri D.; Terrence Collingsworth; Metlitsky, Anton; Upasana Khatri
**Subject:** Re: Estate of Roderick Hills Meeting

Lee:

We don't think this was necessary, but here you go.

Rick

On Thu, Jun 25, 2015 at 9:10 PM, Blalack II, K. Lee <lblalack@omm.com> wrote:

Rick,

Yes, I will accept service via email under FRCP 4. Lee

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Thursday, June 25, 2015 1:33 PM

**To:** Blalack II, K. Lee
**Cc:** Portnoi, Dimitri D.; Terrence Collingsworth; Metlitsky, Anton; Upasana Khatri

**Subject:** Re: Estate of Roderick Hills Meeting

Will you accept service by email?

Rick

On Wed, Jun 24, 2015 at 11:02 PM, Blalack II, K. Lee <lblalack@omm.com> wrote:

Rick,

Our client has authorized us to accept service of the motion to substitute and the notice of hearing pursuant to Rule 25.  Lee

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Tuesday, June 23, 2015 12:24 PM
**To:** Blalack II, K. Lee
**Cc:** Portnoi, Dimitri D.; Terrence Collingsworth; Metlitsky, Anton

**Subject:** Re: Estate of Roderick Hills Meeting

Lee:

We do not believe this is necessary but...Will you accept service or do you want us to serve Ms. Hills personally?

Rick

On Wed, Jun 17, 2015 at 5:05 PM, Blalack II, K. Lee <lblalack@omm.com> wrote:

Rick:

I wanted to get back to you all regarding your Rule 25 motion.  For the reasons we previously discussed, I was disappointed that you all decided to proceed with this motion but I am pleased to hear that you all remain willing to consider further the prudence of investing energy and resources in an action against the Estate of Mr. Hills.  To that end, I propose that we reconvene next week to discuss whatever reservations you all still had as of the time of your filing.  Please let me know if you all think such conversations would be useful.

In the interim, however, I wanted to notify you as a courtesy that the Estate will not be responding to plaintiffs' motion to substitute until the motion -- and a notice of hearing -- is served properly under Rule 4,

as required by Rule 25(a)(3).  Once service is effected in compliance with the Federal Rules, the Estate will
respond to the motion.


Best.  Lee


**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Monday, June 01, 2015 12:53 PM
**To:** Blalack II, K. Lee
**Cc:** Portnoi, Dimitri D.; Terrence Collingsworth


**Subject:** Re: Estate of Roderick Hills Meeting


Dear Lee:

Although we had previously thought we have a bit more time, we now think that our motion for substitution is due
today. Therefore we intend to file it today. But we are still willing to continue discussing this matter with you.


Best,
Rick


On Thu, May 28, 2015 at 10:01 PM, Blalack II, K. Lee <lblalack@omm.com> wrote:


Rick/Terry,


I am still hoping we will connect via telephone, but given my trial and our scheduling difficulties, I wish to provide
some response to your questions in an email.


First, you asked whether, should the Estate be *joined* to the litigation in Florida, would it join the motion to
dismiss for *forum non conveniens* and, in connection with that motion, will it consent to jurisdiction in Colombia.
I can now represent that, if added to the case, the Estate will join Chiquita's motion to dismiss for *forum non
conveniens* and will execute a declaration of consent identical to the one filed by all individual defendants.


Second, you asked whether, if the Estate were *not joined* to the litigation in Florida, would it consent to
discovery.  I can now represent that the Estate will not object to discovery in connection with the federal multi-
district litigation to the same extent as any individual defendant in the federal action, meaning that if and when
discovery commences as against individual defendants in the federal action, the non-party Estate will consent to
be treated in the same manner as those defendants.  The Estate, however, does not waive any relevant
privileges nor does it represent that it has in its possession any relevant information or documents.  Indeed, the
Estate believes that all documents and communications relevant to the facts of your case and Mr. Hills'
employment at Chiquita are in the possession of Chiquita.  Ms. Hills, the personal representative of the Estate,
has no personal knowledge of the facts of this case.

Third, you asked what complexities naming the Estate as a party might pose for plaintiffs.  Reserving all rights to make further arguments, the following arguments, we believe, are relevant.  First, we believe that there are many complexities involved in the D.C. Probate Code, given that Mr. Hills passed away while a resident of the District of Columbia and the Estate will be probated in that jurisdiction.  I am not a probate lawyer, and I obviously do not presume to advise you or your clients of how to comply with probate law in D.C.  However, there are procedures for obtaining recovery from an Estate with which plaintiffs must comply.  It may not be possible to recover from the Estate without complying with certain procedural requirements and, at a minimum, filing certain required notices.  Moreover, we believe your complaints name minors as plaintiffs.  Distributions by an estate to a minor requires that many procedural hurdles be crossed, for the protection of the estate and the minor.  We think it is unlikely that any distribution could be authorized in the absence of a parallel action being filed in D.C. Superior Court.  Second, since the Estate will now be the party, and not Mr. Hills, the Estate will raise personal jurisdiction arguments that the Estate has not had the requisite minimum contacts with New Jersey to maintain that action.  Third, the Estate will make unique arguments under both the TVPA and Colombian law, concerning the survival of the action following the death of Mr. Hills.

I continue to be available to speak with you, although as I've noted I will be in trial during the day on Friday and Monday. Lee

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Tuesday, May 26, 2015 5:51 PM
**To:** Portnoi, Dimitri D.; Terrence Collingsworth

**Cc:** Blalack II, K. Lee
**Subject:** Re: Estate of Roderick Hills Meeting

I would probably have to do it around 9 or so. DOes that work for you guys? Terry?

On Tue, May 26, 2015 at 5:16 PM, Portnoi, Dimitri D. <dportnoi@omm.com> wrote:

Hi Rick,

Lee is in trial now until June 5, but we can set up a call, say, in the evening tomorrow after his trial day wraps up.  Does some time after 6 work for you?

Dimitri

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Tuesday, May 26, 2015 2:05 PM
**To:** Portnoi, Dimitri D.
**Cc:** Blalack II, K. Lee
**Subject:** Re: Estate of Roderick Hills Meeting

Are you guys available to discuss, say tomorrow at 1?

On Wed, Apr 29, 2015 at 5:43 PM, Portnoi, Dimitri D. <dportnoi@omm.com> wrote:

Mr. Hertz,


I am helping Lee Blalack to schedule a call next week to discuss your inquiry concerning substitution of the
Estate of Roderick Hills.  Are you available for a call on Thursday, May 7, at 2:00 Eastern?


Thanks,


**Dimitri Portnoi**

**O'Melveny & Myers LLP**
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-7699
Fax: (213) 430-6407
dportnoi@omm.com


*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP*
*that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy,*
*distribute, or use this information. If you have received this transmission in error, please notify the sender*
*immediately by reply e-mail and then delete this message.*

Declaration of Richard Herz


Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE 1, individually and as representative  of his deceased father JOHN DOE 2; JANE DOE 1, individually and as representative of her deceased mother JANE DOE 2; JOHN DOE 3, individually and as representative of his deceased brother JOHN DOE 4; JANE DOE 3, individually and as representative of her deceased husband JOHN DOE 5; MINOR DOES 1–4, by and through their guardian JOHN DOE 6, individually and as representative of their deceased mother JANE DOE 4; JOHN DOE 7, individually and as representative of his deceased son JOHN DOE 8; JANE DOE 5, individually and as representative of her deceased husband JOHN DOE 9; JANE DOE 6, individually and as representative of her deceased husband JOHN DOE 10; JANE DOE 7, individually and as representative of her deceased husband JOHN DOE 11,

All available through counsel EarthRights International, 1612 K Street NW #401, Washington, DC 20006,[1]

*Plaintiffs,*

v.

Carla A. Hills, Personal Representative of the Estate of Roderick M. Hills

*Defendant*

**CLASS ACTION COMPLAINT FOR DAMAGES**

Civil Action No. _____.

1. EXTRAJUDICIAL KILLING
2. CRIMES AGAINST HUMANITY
3. TORTURE
4. WAR CRIMES
5. TERRORISM
6. MATERIAL SUPPORT TO TERRORIST ORGANIZATIONS
7. CRUEL, INHUMAN, OR DEGRADING TREATMENT
8. VIOLATION OF THE RIGHTS TO LIFE, LIBERTY AND SECURITY OF PERSON AND PEACEFUL ASSEMBLY AND ASSOCIATION
9. CONSISTENT PATTERN OF GROSS VIOLATIONS OF HUMAN RIGHTS
10. WRONGFUL DEATH
11. ASSAULT AND BATTERY
12. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
13. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
14. NEGLIGENCE/NEGLIGENT HIRING/ NEGLIGENCE PER SE
15. LOSS OF CONSORTIUM

---

[1] The residence addresses of the individual Plaintiffs cannot be made public due to the substantial risk of violent reprisals against them.

# TABLE OF CONTENTS

I.     SUMMARY OF THE COMPLAINT ................................................................. 1

II.    JURISDICTION ............................................................................................. 1

III.   PARTIES ....................................................................................................... 2

IV.   NON-PARTIES OF INTEREST ..................................................................... 3

V.    STATEMENT OF FACTS .............................................................................. 7

      A.   Chiquita supported paramilitary terrorists in the Colombian conflict ........................7

      B.   The *convivir* were created to legitimize and provide support to the paramilitaries .....11

      C.   The AUC acted under color of authority of the Colombian government in committing the Acts alleged herein ..........................................................................13

           i.     The AUC and other paramilitary groups were found with the cooperation of the Colombian Government, and were assigned by the Government to combat left-wing guerillas using methods that included using violence against civilians and unions ...........................................................................13

           ii.    The AUC consistently operated in Urabá with the cooperation, coordination, and assistance of the Colombian Government when attacking civilians .......................................................................................17

           iii.   The AUC took on numerous State functions in Urabá, including the maintenance of security and order, the disposition of personal and commercial disputes, the provision and regulation of social services, and the imposition of social rules ......................................................................20

      D.   Chiquita supported the AUC in Urabá ......................................................................21

           i.     Chiquita regularly made payments to the AUC .................................................22

           ii.    Chiquita facilitated the AUC's arm shipments ..................................................29

           iii.   Chiquita facilitated the AUC's drug shipments .................................................31

      E.   Chiquita's conduct aided and abetted the AUC's conduct alleged herein .................31

           i.     Chiquita substantially assisted the persons who personally committed the acts comprising Plaintiffs' claims ......................................................................32

           ii.    Chiquita knew and intended that its actions would assist in the illegal or wrongful activity at the time it provided assistance ...........................................32

ii

F.   Chiquita joined the AUC's conspiracy to commit the acts alleged herein ...............37

    i.   Members of the AUC agreed to fight the FARC by means of illegal violence against particular classes of civilians, thereby constituting a conspiracy of two or more persons who agreed to commit a wrongful act ........38

    ii.   Chiquita joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal ...........................................38

    iii.   The AUC's conduct alleged herein was committed by members of the AUC in furtherance of the conspiracy's goal of fighting the FARC by means of illegal violence against particular classes of civilians ........................39

G.   The AUC acted as Chiquita's agent in committing the acts alleged herein ...............39

VI.   PLAINTIFFS' INJURIES ....................................................................................41

VII.   GENERAL ALLEGATIONS ...............................................................................46

VIII.   CLASS ACTIONS ALLEGATIONS ...................................................................49

IX.   CLAIMS FOR RELIEF .......................................................................................54

A.   First claim for relief – war crimes.............................................................54

    i.   The civil war in Colombia is an armed conflict within the meaning of the laws of war ...........................................................................55

    ii.   The AUC was a party to the armed conflict in Colombia ...............................56

    iii.   Plaintiffs did not take active part in the hostilities. ...........................................56

    iv.   Plaintiffs were killed in the course of armed conflict ......................................57

B.   Second claim for relief – crimes against humanity....................................58

    i.   The killings alleged herein were part of a widespread and systematic attack .........................................................................58

    ii.   The killings alleged herein were part of an attack that was directed against a civilian population ..............................................................59

C.   Third claim for relief - terrorism................................................................60

    i.   The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá .....................................................60

      ii.     The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá and Colombia at large from supporting the FARC ...................................................................................60

D.  Fourth claim for relief – material support to terrorist organization ...........................61

      i.     Chiquita, the Decedent, and the Non-Party Executives provided asserts to the AUC in the form of money, arms and logistical support.....................62

      ii.     The AUC was at all relevant times a terrorist organization..........................62

      iii.    Chiquita knew and intended that the support it provided to the AUC would be used to carry out attacks on the civilian population of Urabá for the purposes of intimidating that population ...............................................63

E.  Fifth claim for relief – extrajudicial killing ...............................................................63

      i.     The AUC's killings were carried out deliberately as part of the role assigned to them by the Colombian State to repress support of the FARC, but unauthorized by a judgment pronounced by any court ................64

F.  Sixth claim for relief - torture ....................................................................................65

      i.     The AUC caused Plaintiffs and their decedents to suffer severe mental and physical pain and suffering .....................................................................65

      ii.     The AUC tortured Plaintiffs and decedents as part of the role assigned to them by the Colombian State, to intimate and deter them from supporting the FARC ...................................................................................66

G.  Seventh claim for relief – cruel, inhuman, or degrading treatment ............................66

      i.     The AUC inflicted mental and physical suffering, anguish, humiliation, fear and debasement on Plaintiffs and their decedents as part of the role assigned to them by the Colombian State, to intimate and coerce civilians from supporting the FARC...............................................................67

H.  Eighth claim for relief – violation of the rights to life, liberty, and security of person and peaceful assembly and association ............................................................68

      i.     Members of the AUC, as State agents and at the behest of State agents, carried out a systematic campaign of terror and violence...............................69

      ii.     The AUC's campaign was hatched and calculated to suppress any political activity or expression that could be suspected of association with support for the FARC ...........................................................................69

iv

I. Ninth claim for relief – consistent pattern of gross violations of internationally recognized human rights ......................................................................................69

    i.   The AUC committed to acts of abuse against Plaintiffs and their decedents in the context of a consistent pattern of abuses .............................70

J. Tenth claim for relief – wrongful death ..........................................................71

    i.   The AUC caused decedents' deaths as a result of its overt acts of killing .....71

    ii.   If decedents had not died, they would have been able to maintain an action for damages resulting from their injuries ...............................................72

K. Eleventh claim for relief – assault and battery ............................................72

    i.   Members of the AUC attacked decedents intending to cause decedents to suffer harmful contacts or an imminent apprehension of an immediate harmful conduct without their consent ............................................73

    ii.   Decedents suffered harmful conducts or a reasonable, imminent apprehension of harmful contacts because of the AUC's attacks...................73

L. Twelfth claim for relief – intentional infliction of emotional distress........................73

    i.   Chiquita, the Decedent, and Non-Party Executives acted intentionally and recklessly, with the intent and/or deliberate disregard of the high possibility that their support, assistance, direction, and collusion with the AUC would cause the acts alleged herein and cause severe humiliation, mental anguish, and emotional and physical duress. ....................................74

    ii.   Chiquita, the Decedent, and Non-Party Executives' conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community, and was without privilege or justification .......................................................................................75

    iii.   Chiquita, the Decedent, and Non-Party Executives' actions in aiding, facilitating, paying, colluding with, and supporting the AUC caused the Plaintiffs' and their decedents' duress ..........................................75

    iv.   The distress suffered by Plaintiffs is severe enough that no reasonable person would be expected to endure it ..........................................76

M. Thirteenth claim for relief – Negligent Infliction of Emotional Distress

    i.   Chiquita, the Decedent, and Non-Party Executives breached their duty to the Plaintiffs by failing to act so as to stop engaging in the conduct

described herein, and by failing to take steps in their power to prevent or prohibit such conduct ..................................................................................77

    ii.    Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer emotional distress so severe that no reasonable person could be expected to endure it ....................................................................................................78

    iii.    At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that their conduct would and did proximately result in physical and emotional distress to the AUC's victims....................................................78

    iv.    Plaintiffs' and decedents' distress was genuine and substantial....................79

N. Fourteenth claim for relief – negligence/negligent hiring/negligence per se .............80

    i.    Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct Chiquita, the Decedent, and Non-Party Executives' ................80

    ii.    Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer physical and emotional harm, including death...............................................................81

    iii.    At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that the AUC was an organization dedicated to the use of terrorism and violence against civilians and that it would use violence against perceived opponents of Chiquita, and could have foreseen that this could and would cause physical and mental harm to the AUC's victims................81

    iv.    The AUC's dedication to the use of terrorism and violence against civilians proximately caused Plaintiffs' and decedents' injuries....................82

    v.    Chiquita, the Decedent, and Non-Party Executives' acts of material support to the AUC, along with its acts of assistance, support, direction, and collusion, violated laws designed to protect Plaintiffs and decedents, the violation of which constitutes negligence per se ........................................83

O. Fifteenth claim for relief – loss of consortium............................................................83

    i.    As a result of the murders of decedents by the AUC, Plaintiffs were deprived of their spouses', parents', and children's society, companionship, services, and support ............................................................84

X.    PRAYER FOR RELIEF ...............................................................................................85

XI.    JURY TRIAL DEMAND ..............................................................................................85

vi

XII.   VERIFICATION.............................................................................................................85

## I. SUMMARY OF THE COMPLAINT

1.        This case arises as a result of the actions of Chiquita Brands International, Inc., and its subsidiaries and affiliates (collectively, "Chiquita"), in funding, arming, and otherwise supporting terrorist organizations in Colombia in their campaign of terror against the civilian population of the Urabá region, in order to maintain its profitable control of Colombia's banana growing regions. Plaintiffs are family members of trade unionists, banana workers, political organizers, social activists, and others targeted and killed by terrorists, most notably the paramilitary organization United Self-Defense Groups of Colombia (*Autodefensorias Unidas de Colombia*, or AUC), between 1995 and 2004. In order to produce bananas in an environment free from labor opposition and social disturbances, Chiquita, the decedent Roderick M. Hills, and other non-party individuals funded, armed, and otherwise supported the AUC.  The deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious support of terrorist organizations. Chiquita, Mr. Hills, and non-parties' actions violated not only Colombian law and U.S. law, but also customary international law prohibiting crimes against humanity, extrajudicial killing, torture, war crimes, and other abuses.

## II.      JURISDICTION

2.        The Court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1350 (Alien Tort Claims Act); and 28 U.S.C. § 1332 (diversity jurisdiction). The amount in controversy for each Plaintiff exceeds $75,000, and the action is between citizens of a State and citizens or subjects of a foreign state.

**3.**        In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to claims based upon laws of the State of New Jersey, the District of Columbia, or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

### III.    PARTIES

4.      The term "Plaintiffs" herein includes the named plaintiffs and the decedents on behalf of whom they bring this action.

5.      Plaintiff John Doe 1 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased father, John Doe 2.

6.      Plaintiff Jane Doe 1 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased mother, Jane Doe 2.

7.      Plaintiff John Doe 3 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased brother, John Doe 4.

8.      Plaintiff Jane Doe 3 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased husband, John Doe 5.

9.      Minor Does 1–4 are residents and citizens of Colombia. They are all minor children, who prosecute this action by and through their guardian John Doe 6. They bring this action individually and as representatives of their deceased mother, Jane Doe 4.

10.    Plaintiff John Doe 7 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased son, John Doe 8.

11.    Plaintiff Jane Doe 5 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 9.

12.    Plaintiff Jane Doe 6 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 10.

13.    Plaintiff Jane Doe 7 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 11.

14.    The Defendant, Carla A. Hills, is the wife of the late Roderick M. Hills (hereinafter "the

Decedent"), the former Chiquita Director and President of the Audit Committee. Upon information and belief, the individual previously designated in the Factual Proffer as Individual B is now known to be the Decedent.[2] The Decedent knew of Chiquita's payments to the AUC and reviewed and authorized these payments. The Decedent implemented new procedures to hide payments to the AUC. The Decedent instructed Chiquita employees to continue making payments after learning that the payments were illegal. Because Plaintiffs' claims against the Decedent were not extinguished by his death, Plaintiffs now proceed against the Defendant, who, as Personal Representative of the estate of the Decedent, will be required to satisfy any judgment rendered against the estate for the Decedent's tortious conduct.[3]

## IV.    NON-PARTIES OF INTEREST[4]

15.    Chiquita Brands International, Inc. ("CBI" or "Chiquita"), is a United States-based corporation organized under the laws of the State of New Jersey. Its corporate headquarters are located in Cincinnati, Ohio. CBI is a leading international producer, distributor, and marketer of bananas and other produce; it is one of the largest banana producers in the world and a major supplier of bananas to Europe and North America. The company was founded in 1899 as the

---

[2] Chiquita submitted the Factual Proffer in 2007 in support for its guilty plea in the U.S. government's criminal prosecution of the company. In that case, Chiquita agreed to plead guilty to the felony of engaging in transactions with a Specially-Designated Terrorist Group (the AUC). As a basis for its guilty plea, Chiquita admitted as true the facts set out in the Factual Proffer.

[3] The Decedent, along with Chiquita Brands International, Inc., Cyrus Freidheim, Jr., Robert Olson, Robert Kistinger, Charles Keiser, and William Tsacalis are named defendants in the active multidistrict litigation, *In re Chiquita Brands Int'l, Inc., Alien Tort Statute & Shareholder Derivative Litigation*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ("*Chiquita* MDL"). On June 1, 2015, Carla A. Hills, as Personal Representative of the Decedent's estate, was substituted as an individual defendant in two cases in the MDL, including the Plaintiffs', *John Doe et al. v. Chiquita Brands Int'l et al.*, No. 08-80421 (S.D. Fla.). To ensure that any future judgment against Mrs. Hills/the Decedent would be enforceable against the Decedent's estate, Plaintiffs filed a creditor's claim in D.C. Superior Court's Probate Division, which Mrs. Hills disallowed on July 23, 2015. The D.C. Probate Code requires that following a disallowance, a claim be filed in the D.C. Superior Court of another court of competent jurisdiction. Although Plaintiffs believe that their existing complaint against Chiquita and others fulfills this requirement, out of an abundance of caution, Plaintiffs submit this Complaint, which has been modified to name only Carla Hills as the Defendant.

[4] While not designated as individual defendants in this Complaint, the listed non-parties are among the defendants in the *Chiquita* MDL.

3

United Fruit Company, became the United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

16. On information and belief, at all times relevant herein, CBI wholly owned, dominated and controlled C.I. Bananos de Exportación, S.A. ("Banadex"), headquartered in Medellín, Colombia. At all relevant times, Banadex produced bananas in the Urabá and Santa Marta regions of northeastern Colombia and, by 2003, was Chiquita's most profitable banana-producing operation globally. At all times material herein, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise.

17. Upon information and belief, the individual designated in the Factual Proffer as Individual A is now known to be Cyrus Freidheim, Jr., former Chairman of the Board of Directors and former CEO of Chiquita. Freidheim knew of Chiquita's payments to the AUC and reviewed and authorized these payments.

18. Upon information and belief, the individual designated in the Factual Proffer as Individual C is now known to be Robert Olson, former Vice President and General Counsel of Chiquita. Olson knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Olson also reviewed and approved new procedures to hide payments to the AUC.

19. Upon Information and belief, the individual designated in the Factual Proffer as Individual D is now known to be Robert Kistinger, former President and COO of Chiquita Fresh Group. Kistinger knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Kistinger instructed Chiquita employees to continue making payments after learning that the payments were illegal.

20. Charles Keiser, manager of Chiquita's operations in Colombia, personally met with leaders of the AUC to initiate payments and, later, to arrange a system to hide Chiquita's

payments to the AUC.

21.    William Tsacalis, Controller and Chief Accounting Officer for Chiquita, knew about Chiquita's payments to convivrs and the AUC and designed the new procedures for payments to the AUC after it was designated as a Foreign Terrorist Organization.

22.    Tsacalis, Keiser, Kistinger, Olson, and Freidheim, when referred to herein collectively, will henceforth be designated "the Non-party Executives."

23.    Plaintiffs are ignorant of the true names and capacities of the individuals referred to herein as Moes 11 and 12.

24.    The alleged Moe 11 is a high-ranking officer of Banadex designated in the Factual Proffer as Individual F.

25.    The alleged Moe 12 is a Banadex employee designated in the Factual Proffer as Individual G.

26.    Plaintiffs are informed and believe, and on that basis allege, that the Defendant and each fictitiously named Non-Party is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such Non-parties, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries. Whenever and wherever reference is made in this Complaint to any conduct committed by Chiquita, CBI, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the

benefit of CBI and Banadex.

27.    At all times herein material, with respect to the events at issue, Chiquita, Banadex, the Decedent, Non-party Executives, Moes 11 and 12 conspired with each other, and/or participated in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As described herein, "agency" includes agency by ratification. Whenever reference is made in this Complaint to any conduct by Chiquita, the Decedent, or any of the Non-party Executives, ,such allegations and references shall be construed to mean the conduct of each of the abovenamed, acting individually, jointly, and severally.

28.    At all times herein material, with respect to the events at issue, Chiquita conspired with, worked in concert with, participated in a joint criminal enterprise with, acted as the principal of, employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs' injuries, including but not limited to the AUC.  These terrorist organizations were acting within the course and scope of such agency, employment, and/or concerted activity. The wrongful conduct alleged herein was perpetrated by Chiquita management and personnel, including the Decedent, both in Colombia and the United States.

**29.**    Plaintiffs are informed and believe and based upon such information and belief allege that CBI management and other personnel in the United States and in Colombia including the Decedent, Freidheim, Olson, Kistinger, Keiser and Tsacalis were informed of the ongoing events complained of herein and participated in the decision making, planning, preparation, ratification, and/or execution of the acts complained of.

6

## V.     STATEMENT OF FACTS

### A.  Chiquita Supported Paramilitary Terrorists in the Colombian Conflict.

30.     Chiquita supported terrorist groups in Colombia by paying them and assisting them to obtain arms and smuggle drugs.  Chiquita knew that these groups used illegal violence against civilians and intended that they employ this strategy to quell social and labor unrest in the Northeast Colombian region of Urabá and safeguard the stability and profitability of Chiquita's enterprises in Colombia.

31.     Among the terrorist organizations that Chiquita supported were two paramilitary groups, the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and Urabá*, or ACCU) and its successor and parent, the United Self-Defense Groups of Colombia (*Autodefensas Unidas de Colombia*, or AUC).  Whenever reference is made in this Complaint to the AUC, such references shall be construed to mean the AUC, the ACCU, and any other predecessor or constituent part of the AUC.

32.     These paramilitaries operated in the banana-growing region of Urabá, an area located in the northeast corner of Colombia and South America, within the Department of Antioquia.

33.     Before the 1960s, the Urabá region was lightly populated, mostly by indigenous communities, and remained isolated from the central government.  The United Fruit Company, the predecessor to Chiquita, expanded to the Urabá region in the early 1960s and created a Colombian subsidiary, Banadex, which produced about ten percent of the region's bananas. Many workers migrated to the region as the banana industry grew.

34.     In the 1980s, two leftist, anti-government guerrilla groups, the Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarios de Colombia*, or FARC) and the National Liberation Army (*Ejercito Nacional de Liberacion*, or ELN), became active in Urabá.

35.     The paramilitaries were originally legally sanctioned "self-defense groups," authorized by a 1968 Colombian law to assist in the fight against the anti-government guerrillas, including the FARC and the ELN.  By 1991, however, the level of extrajudicial violence in which paramilitaries were implicated had become so great that the Colombian government adopted a new law criminalizing membership in and provision of support to the paramilitary groups.

36.     Over the course of the 1980s, the paramilitaries maintained strong ties to the Colombian government and increasingly worked for and with powerful private groups that were opposed by the leftist guerrillas, including businesses, industrialists, large landowners, and bankers.  They also became deeply involved in the drug trade, which gave them a steady source of income to procure arms.  As a result, and despite the official criminalization of the paramilitaries, they became a central component of the government's strategy to win the civil war.  At all times relevant to this complaint, the AUC and other paramilitary groups in fact collaborated closely with the Colombian government and were used by the government to oppose anti-government guerrilla groups like the FARC.  *See infra* ¶¶45–66.  The AUC's efforts were directed toward the elimination of guerrillas and destroying the suspected bases of guerrilla support.  In that effort, they were supported by banana companies like Chiquita, who benefited directly from the suppression of suspected guerrilla sympathizers, such as labor union leaders.

37.     In the early 1990s, the largest and most well-organized paramilitary group in Colombia was the ACCU.  The organization was distinguished by its central command, which coordinated the activities of local subdivisions, known as "blocs" and "fronts."  Both mobile and stationary units existed, and fighters received a base salary and food, a uniform, weapons, and munitions.  The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade.  In 1997, Castaño and the ACCU sponsored a summit of the Self-

Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership. At all times relevant to this Complaint, Castaño remained the leader of the AUC.

38. The AUC grew rapidly in size during the late 1990s and into the twenty-first century. In 1997, it comprised roughly 4,000 combatants. By 2001, Castaño claimed that the AUC had 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000. By 2002, AUC forces were present throughout Colombia. AUC leaders have claimed that, at the time the process of demobilization began in 2004, the organization included as many as 17,000 armed fighters and 10,000 other associates, including informants, cooks, drivers, and computer technicians.

39. In order to undermine communities' and individuals' support for the guerillas, the AUC and its constituent groups, including the ACCU, adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnapping, forced disappearances, and looting.

40. While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians. The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. Carlos Castaño, the AUC leader, described this strategy as "quitarle agua al pez" (draining the water to catch the fish), as the AUC sought to intimidate and coerce civilians to prevent them from providing support to guerrillas. Inhabitants of small towns in contested rural areas were particularly vulnerable to AUC attack. AUC violence often caused entire communities to disperse, either due to threats of an impending

massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

41.     The AUC also targeted anyone considered to share the guerrillas' leftist ideology, such as teachers, community leaders and activists, trade unionists, human rights defenders, religious workers, and leftist politicians.  The banana companies shared the AUC's opposition to these individuals and organizations.  As part of its efforts to completely dominate the social and political life of the regions it controlled, the AUC also targeted anyone considered socially undesirable, including indigenous persons, persons with disabilities, persons with psychological problems, drug addicts, prostitutes, and suspected petty criminals.

42.     The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out according to a systematic and well-coordinated plan between the government, the paramilitaries, and the companies that financed them.  These groups operated throughout the banana-growing region of Urabá, as well as in other parts of Colombia.  On many occasions from at least 1994 through 2004, they carried out multiple executions or mass-killings of civilians; by 1997, the ACCU and other AUC groups were already responsible for at least 150 such instances of mass-killings. From its founding, the AUC's activities and abuses have been carried out under the direction of a central command.

43.     At all times relevant to this complaint, the AUC and its constituent groups, including the ACCU, participated in an internal armed conflict in Colombia, in which the paramilitaries were fighting on behalf of the government against guerrilla forces.

44.     The AUC was subdivided into two blocs in Urabá, the Banana Bloc and the Elmer Cárdenas Bloc. While there had been paramilitaries under the control of the Castaño family in Urabá since the 1980s, the Banana Bloc was formally created in Urabá in 1994.  José Ever

10

Veloza García – a.k.a. "H.H." – was selected as one of the first commanders.  In later years, the Banana Bloc operated through two fronts: the Turbo Front in Northern Urabá, under the command of H.H., and the Banana Front in the south, led by Raúl Hasbún.

45.      The Elmer Cárdenas Bloc began as a private defense group that united with the ACCU in 1995.  It was commanded by Freddy Rendón Herrera – a.k.a. "El Alemán" – and Elmer Cárdenas until Cárdenas was killed by the guerrillas in 1997.  The Elmer Cárdenas Bloc also received men, training, and assistance from the Banana Bloc.  Both blocs received funding from the banana companies, including Chiquita, directly or through the *Convivir* Papagayo.  *See infra* ¶¶37–44 (*convivir*).

## B.  The *Convivir* Were Created to Legitimize and Provide Support to the Paramilitaries.

46.      Although paramilitarism had been declared illegal in Colombia, the Colombian government still needed the paramilitaries to assist in the armed conflict against the guerillas; Decree 356 of 1994 was therefore enacted as a new legal mechanism to provide cover and a legitimate avenue of funding for the AUC.  Paramilitaries could easily reorganize and continue operating under Chapter 5 of this Decree, which allowed for the authorization of private groups to provide "Special Vigilance and Private Security Services."  These security groups, known commonly by their Spanish-language acronym "CONVIVIR," consisted of civilians who received a license from the government to "provide their own security. . . in areas of high risk or in the public interest, which requires a high level of security."  *Convivir* were permitted to use arms that were otherwise restricted to military use.

47.      The *convivir* units in Urabá were fronts for the AUC from their inception.  Many were directed and populated by known paramilitaries; this was common knowledge in the region.  As

H.H. once remarked publicly, "Let us not deceive ourselves: all the *convivir* were ours." The 17th Brigade of the Colombian Armed Forces, which was infamous for its close collaboration with the paramilitaries in Urabá, was given the authority to select members of the *convivir* in Urabá. *See infra* ¶¶56–61, 64–65 (describing the close collaboration between the 17th Brigade and the paramilitaries).

48.     Álvaro Uribe, the current President of Colombia, was governor of Antioquia at the time of the creation of the *convivir*. Uribe authorized the funding, arming, and funneling of information to the *convivir*, thereby facilitating the sharing of such funds, arms, and information with the AUC. Uribe expected the *convivir* groups to fight the guerrillas – both alongside the military and on their own, since they were often in a position to engage their opponents before troops could arrive. He justified arming these groups with long-range weapons after noting that their revolvers and smaller weapons were insufficient to combat the guerrillas.

49.     On information and belief, the impetus to organize *convivir* groups in Urabá came from Raúl Hasbún, a banana plantation owner who served as an intermediary between the banana companies and the AUC, and who eventually became commander of the AUC's Banana Bloc. Hasbún approached Uribe in 1997 with the intention of creating a *convivir* in Urabá. The paramilitaries, the government, and the banana companies saw the *convivir* as an ideal means of legalizing the companies' payments to the paramilitaries. In just a few months, Urabá had twelve *convivir* units.

50.     The *convivir* units in Urabá facilitated communication and collaboration between the government and paramilitaries. The twelve units functioned as a network and sent intelligence both to the military and to paramilitary commanders such as Hasbún. The military and paramilitaries would both respond to information detailing the location of guerrillas, but often

the military would allow the paramilitaries to take on the majority of the fighting, since the paramilitaries had better resources and fewer limitations on their conduct.

51.    Chiquita and other banana companies often made payments to one unit, the *Convivir* Papagayo, which passed the money on to the AUC.  *See infra* ¶¶76–78 (details on payment arrangements).

52.    The banana companies recorded these as payments for "security services."  However, personnel of Chiquita and other banana companies both in the U.S. and Colombia knew that the *convivir* was directing these payments directly to the AUC.  *See infra* ¶¶76–79, 112 (meeting between Chiquita and paramilitaries; details on payment arrangements).

53.    In 1997, the Colombian Constitutional Court affirmed the legality of the *convivir* system but prohibited *convivir* members from carrying restricted arms or conducting intelligence work. Many *convivir* units were dismantled, as these limitations crippled their effectiveness.  The *Convivir* Papagayo was one of only two *convivir* units that remained, as it remained useful as a conduit for payments from Chiquita and other banana companies to the AUC.   Arnulfo Peñuela, the director of the *Convivir* Papagayo at the time, is being prosecuted in Colombia for his ties to the AUC.

C.  **The AUC Acted Under Color of Authority of the Colombian Government in Committing the Acts Alleged Herein.**

   i)  *The AUC and other paramilitary groups were founded with the cooperation of the Colombian Government, and were assigned by the Government to combat left-wing guerrillas using methods that included using criminal violence against civilians and unions.*

54.    As part of the Colombian government's strategy for defeating the left-wing insurgency, senior officials in the Colombian civilian government and the Colombian security forces collaborated with the AUC and assisted the paramilitaries in orchestrating attacks on civilian

13

populations, extra-judicial killings, murders, disappearances, forced displacements, threats and intimidation against persons including Plaintiffs.

55. Paramilitarism was state policy in the Republic of Colombia. Because the regular military was unable to effectively address the FARC insurgency, the Colombian government decided to facilitate the creation and funding of the AUC and other paramilitaries with the aim of using this unofficial force to defeat the insurgency.

56. As outside organizations placed increased pressure and scrutiny upon the military to improve its human rights record, military leaders decided to leave much of their "dirty work" – brutal violence against civilians and suspected guerrillas in violation of Colombian and customary international law – to the paramilitaries. Despite the fact that the AUC was a party to the armed conflict and thus was subject to the laws of war, one commander of the AUC asserted, "the Colombian military felt itself bound to the Geneva Conventions. The AUC was not."

57. As a result of this interdependence, longstanding and pervasive ties have existed between the paramilitaries and official Colombian security forces from the beginning. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in the campaigns of the official armed forces against guerrilla insurgents. Paramilitary forces included active-duty and retired army and police personnel among their members. Despite the 1989 Decree establishing criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner for Human Rights, and the Colombian Attorney General's office. Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is

so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division" – a reference to their close integration with the five official divisions of the Colombian Army.

58.     Since 2006, considerable information on paramilitarism and the atrocities of the Colombian civil war has emerged as part of Colombia's Reparation and Reconciliation process. Largely using information derived from this process, Colombian authorities have charged members of Colombia's Congress, former lawmakers, the former head of the secret police, mayors and former governors with illegally collaborating with paramilitaries. According to testimony from Salvatore Mancuso, who succeeded Castaño as national commander of the AUC, Vice President Francisco Santos and Defense Minister Juan Manuel Santos met and collaborated with paramilitaries like Mancuso in a plot to extend the paramilitary model to Bogotá.  Senior officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett,  General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del Rio, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, and/or aided and abetted the AUC in the commission of various attacks on civilian populations, extrajudicial killings and other atrocities against civilians, and/or gave tacit support to and acquiescence in the AUC's activities.  General Montoya was linked to Diego Murillo, the former leader of an AUC-affiliated paramilitary group in Medellín. Many other high-ranking staff officers are known to have had close ties to the AUC and other paramilitaries, thereby creating a haven for the paramilitary activity in the very heart of the military establishment.

59.     Boundaries between the AUC and the military at times were amorphous, as some paramilitary members were former police or army members, while some active-duty military

members moonlighted as paramilitary members and became thoroughly integrated into these groups.  Paramilitary leaders noted that Colombian security forces in Urabá allowed members of the AUC to serve as proxies in their pursuit of guerrilla forces, largely due to the military's operative incapacity to defeat the guerrillas on its own.

60.     Colombian security forces in Urabá – with the knowledge and collaboration of high-level officials in the national government – have willfully failed to prevent or interrupt the crimes of the AUC, actively conspired with them, and coordinated activities with them. Documented examples in Urabá include:

- Allowing paramilitaries to establish permanent bases and checkpoints without interference, often within short distance of military bases for mutual support;

- Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;

- Withdrawing security forces from villages deemed sympathetic to guerrillas, leaving them vulnerable to attack by paramilitaries;

- Failing to intervene to stop ongoing attacks on civilian populations occurring over a period of days;

- Sharing intelligence, including the names of suspect guerrilla collaborators;

- Sharing vehicles, including army trucks used to transport paramilitary fighters;

- Supplying weapons and munitions;

- Providing special military training;

- Allowing passage through roadblocks;

- Providing support with helicopters and medical aid;

- Communicating via radio, cellular telephones, and beepers;

- Sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and

- Planning and carrying out joint operations.

61.     Accordingly, by late 1996, the AUC had become a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC.  By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities.  The AUC became infamous for using tactics of terror on civilians living in and around areas that had been under FARC control, as a means of deterring support for the guerrillas and their ideologies.

   *ii) The AUC consistently operated in Urabá with the cooperation, coordination, and assistance of the Colombian Government when attacking civilians.*

62.     It was in Urabá that a model of collaboration between the paramilitaries, the business sector, and the government was developed and perfected.  An alliance was formed between politicians, active military units, multinational companies, businessmen, and paramilitaries in order to impose a regime of terror and consolidate the dominance of the AUC, which would wrest control of the countryside back from the leftist guerrillas.  The first paramilitary groups to operate in Urabá in a systematic and continuous manner received special training from the Colombian military.

63.     When the government or the military was not able to legally arrest or attack civilians, they would delegate the task to the AUC or to *convivir* associated with the paramilitaries to act on their behalf.  These targets included suspected guerrilla sympathizers, including teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians, as well as people with no known or suspected ties to the guerrillas but who were

17

killed to terrify and dominate the civilian population.  According to both H.H. and Raúl Hasbún, the military gave the AUC lists of people to kill when they felt impotent to fight the guerrillas themselves legally and constitutionally, or when they could not arrest and try them for any crime.

64.      In addition to violently attacking civilians, the paramilitary performed other functions for the military in its war against the guerrillas.  For example, at times, the military and paramilitaries would cooperate to evict communities from their land.  In 2001, the paramilitaries carried out a food blockade in Urabá that severely affected the civilian population in an effort to "decrease the military capacity of the enemy."

65.      The AUC in Urabá consistently ran joint operations with the military.  The 17th Brigade of the Colombian Army, located in the Urabá region, and the 4th Brigade, sister unit to the 17th Brigade in the Medellín region, were especially active in their support of and involvement in paramilitary activities, up to and including engaging in joint operations.  For example, the Elmer Cárdenas Bloc of the AUC regularly received logistical support and transportation from the 17th Brigade and other units of the Colombian army and conducted joint operations with the 17th Brigade.

66.      General Rito Alejo del Río Rojas, the commander of the 17th Brigade from 1995 to 1997 who was responsible for military operations in Urabá, was notorious for his collaboration and collusion with paramilitaries in the region.  H.H. has described General del Río as one of the most important factors in allowing the expansion of paramilitarism in Urabá, because of the cooperation and support he gave the AUC in the regions where the 17th Brigade operated and elsewhere.  General del Río was known as the "father of the paramilitaries" because he gave them uniforms and military training.

67.     General del Río was finally arrested in 2008 and is currently in custody on a military base in Bogotá and is on trial for his collaboration with the AUC. He is accused of conspiracy to murders committed by paramilitaries in Urabá during his time as 17th Brigade Commander. H.H. has testified that he twice witnessed del Río meeting with the founder and national commander of the AUC, Carlos Castaño. Salvatore Mancuso testified that del Río met with him and other commanders to coordinate the paramilitaries' expansion throughout northern Colombia.

68.     AUC paramilitaries could enter and leave the 17th Brigade's headquarters at will, with the knowledge and permission of General del Río. In one instance, H.H. discovered that a criminal whom the AUC sought was being held at the Brigade headquarters; he and others from the AUC went to the 17th Brigade, picked up the prisoner, transported him to the port at Turbo using a military van, and murdered him. Salvatore Mancuso reported a similar story. Furthermore, on his visits to the 17th Brigade – during which he often planned joint operations with General del Río and then-Captain Bayron Carvajal – H.H. was consistently allowed to recruit soldiers for the AUC.

69.     General del Río's role in promoting and supporting paramilitarism was not merely the work of a single rogue military officer; rather it was part of the Colombian government's strategy to fight the guerrillas. On information and belief, many other army brigades had similar relationships with paramilitaries, including the 4th and 11th Brigades.

70.     Gloria Cuartas, then the mayor of Apartadó, and others complained repeatedly and provided evidence to the General's superiors about his collusion with paramilitaries, but their complaints were ignored. Colonel Carlos Alfonso Velasquez Romero, a 17th Brigade officer, was investigated and discharged in January 1997 on the order of Army Commander Harold Bedoya when he tried to report on the General and the 17th Brigade's close association with the AUC.

19

71.     On information and belief, Colonel Anatolio Correa Figueroa and Colonel Santiago Parra Rubiano of the Urabá Police colluded with the AUC to block complaints against the AUC or their military collaborators from developing into investigations or prosecution.

72.     In October 1997, members of the Army's 4th Brigade established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.  Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.

73.     On February 19, 2000, the AUC selectively assassinated five banana workers in the "peace community" of San Jose de Apartadó, in Urabá; reports indicated that members of the 17th Brigade were direct participants in the attack.

74.     When asked to rank their collaboration between the AUC and the Colombian military on a scale of one to 10, with 10 being maximum collaboration, H.H. rated it as a 10, specifically citing the helpfulness of General del Río and Colonel Carvajal.

75.     This model of collaboration between the paramilitaries, the companies, and the government was so successful in Urabá that Raúl Hasbún explained it to Jorge 40, commander of the AUC in the Magdalena region, so he could implement it there.  Thereafter, the model spread to many other regions of Colombia.

> iii)The AUC took on numerous State functions in Urabá, including the maintenance of security and order, the disposition of personal and commercial disputes, the provision and regulation of social services, and the imposition of social rules.

76.     Throughout Urabá, Santa Marta and other regions of Colombia, the AUC took on a wide variety of roles that are generally thought of as state functions.  In many urban areas, the AUC

coexisted with civilian authorities and took on police and military functions, among others. In some rural areas – and particularly on banana plantations – the paramilitaries were virtually the only public authority.

77.     The paramilitaries took on so many governmental functions in Urabá that it became a common saying in the area that "Here, paramilitaries and the State are the same thing." It was the paramilitaries who would receive complaints from locals regarding criminal activity or conflicts with neighbors, and it was they who dispensed their brutal brand of justice in response.

78.     In addition to settling disputes between individuals, the AUC became involved in social issues. The paramilitary organizations' involvement in residents' daily lives reached the extent of intervention in domestic issues, disputes between neighbors, collection of debts, and truancy from school.

79.     The AUC was even able to control the roads; on information and belief, they were able to shut down stretches of the Pan-American Highway on some occasions in order to use it as a runway for planes arriving with weapons and ammunition and exporting drugs.

   **D.  Chiquita Supported the AUC in Urabá.**

80.     Chiquita, as the successor to the United Fruit Company and the United Brands Company, has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century. At all relevant times, Chiquita produced bananas in the Urabá and Santa Marta regions of Colombia.

81.     On information and belief, from no later than 1995 until at least 2004, Chiquita provided material support, including money and services, to the AUC and its predecessors.

82.     Chiquita's assistance helped the paramilitaries to consolidate as a decisive actor in the political, military, and social terrain of the banana region. In exchange for its financial support

to the AUC, Chiquita was able to operate in an environment in which labor and community

opposition to their operations and policies was suppressed.

   i)    *Chiquita regularly made payments to the AUC.*

83.    From 1995 until at least February 2004, Chiquita provided material support to the AUC

in Urabá and Santa Marta.  By 1997, the AUC effectively controlled large swathes of territory –

particularly in the towns and urban areas – as well as exerting influence in institutions such as

labor organizations and local governments in these regions.

84.    In 1995 and 1996, Chiquita made payments to the ACCU's Banana Bloc.

85.    Chiquita paid the AUC nearly every month during the period 1997–2004, making over

one hundred payments to the AUC totaling over $1.7 million. During those years, the AUC

killed 3,778 people and displaced approximatedly 60,000 in its war on the guerrillas in Urabá.

86.     Chiquita's payments to the AUC were reviewed and approved by senior executives of

the corporation, including the Decedent, Freidheim, Olson, Kistinger, Keiser and Tsacalis and

high-ranking officers, director and employees. Chiquita's senior executives knew that the

corporation was paying the AUC and that the AUC was a violent, paramilitary organization led

by Carlos Castaño.

87.    Some of Chiquita's payments were made directly to the AUC or to front organizations

like the *Convivir* Papagayo.  The majority of direct payments were made in the form of checks

written to the *convivir*, drawn on Banadex's Colombian bank account.  Chiquita concealed the

nature of these payments by recording them in corporate books and records as "security

payments" or payments for "security" or "security services."

88.    In September 2000, Olson was informed of the results of an investigation into Chiquita's

payments to the AUC, which had been carried out by in-house Chiquita attorneys. Olson then

reported the results to the company's Audit Committee. Both Friedheim and the Decedent were present at this meeting. By March 2002, Tsacalis had designed new procedures to disguise payments to the AUC. Olson, Hills and other individuals who had been present at the presentation of the investigation reviewed and implemented these procedures.

89.     Under the new procedures, Banadex executives Moe 11 and Moe 12 received checks with the intent that they would be withdrawn as cash and handed directly to the AUC. Moe 11 received a check made to him personally and drawn on the Colombian bank accounts of Chiquita's subsidiary. Moe 11 then endorsed the check and Moe 11 or Moe 12 cashed it. Moe 12 hand delivered the cash to AUC personnel in Santa Marta. Corresponding tax liability was withheld and Moes 11 and 12 reported and paid income tax as if the payments were actually being made to them instead of the AUC. Chiquita made payments in this way in order to conceal the fact that they were actually paying the AUC; it recorded these payments simply as income contributions.

90.     Chiquita formed an agreement with the AUC, paying them in exchange for their services in pacifying the banana-growing region and suppressing union activity. This agreement specified that Chiquita would pay the paramilitaries a fixed amount for each box of bananas exported.

91.     At all relevant times, Chiquita knew that the AUC was a violent, terrorist paramilitary organization, as its brutal aims and tactics were well-known in Colombia as a central feature of the Colombian civil war. On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO"). That designation was well-publicized in the American public media, including in the *Cincinnati Post* on October 6, 2001, and in the *Cincinnati Enquirer* on October 17, 2001, as well as in the Colombian media. Following the

designation, from on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.

92.     On or about September 12, 2001, Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $31,847.

93.     On or about November 14, 2001, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in the amount equivalent to $56,292.

94.     On or about December 12, 2001, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $26,644.

95.     On or about February 4, 2002, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

96.     On or about March 7, 2002, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

97.     On or about March 31, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

98.     On or about April 16, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $35,675.

99.     On or about May 15, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $10,888.

100.     On or about May 31, 2002, Moe 11 and Moe 12 paid the AUC Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

101.     In or about June 2002, Moe 11 and Moe 12 began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 89.

24

102. On or about June 11, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670 and $6,269, respectively.

103. On or about June 14, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $31,131.

104. On or about July 2, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $11,585.

105. On or about July 9, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

106. On or about August 6, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

107. On or about August 15, 202, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $27,841.

108. On or about September 2, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

109. On or about October 7, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

110. On or about October 15, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $40,419.

111. On or about November 8, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

112. On or about November 29, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

113. On or about December 9, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in

25

an amount equivalent to $47,424.

114.    On or about January 21, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

115.    On or about January 27, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $22,336.

116.    On or about February 11, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

117.    In 2003, Chiquita consulted with attorneys from the District of Columbia office of a national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC.  Outside counsel advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly.  Among other things, outside counsel advised Chiquita:

> "Must stop payments."
> (notes, dated February 21, 2003)
>
> "Bottom Line: CANNOT MAKE THE PAYMENT"
> "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
> "General Rule: Cannot do indirectly what you cannot do directly"
> "Concluded with: CANNOT MAKE THE PAYMENT"
> (memo, dated February 26, 2003)
>
> "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. CHIQUITA should leave Colombia."
> (notes, dated March 10, 2003)
>
> "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
> (memo, dated March 11, 2003)
>
> [T]he company should not make the payment."
> (memo, dated March 27, 2003)

118.    Although CBI's Board of Directors agreed to disclose its payments to the AUC to the

U.S. Department of Justice on or about April 3, 2003, on or about April 4, 2003, according to

outside counsel's notes concerning a conversation about Chiquita's payments to the AUC, Olson

said, "His and Hills' opinion is just let them sue us, come after us. This is also Freidheim's

opinion." On April 8, 2003, the Decedent Hills and Kistinger met with two Chiquita employees

and Moes 11 and 12 and instructed them to continue making the payments to the AUC.  On April

24, 2003, the Decedent and Olson, along with outside counsel, met with Justice Department

officials, who told CBI the payments were illegal.  Nonetheless, Chiquita continued to make the

payments through Moes 11 and 12 until at least February 2004.

119.    On or about May 12, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

an amount equivalent to $6,105.

120.    On or about May 21, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an

amount equivalent to $47,235.

121.    On or about June 4, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an

amount equivalent to $7,623.

122.    On or about June 6, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

two payments in amounts equivalent to $6,229 and $5,764, respectively.

123.    On or about July 14, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

an amount equivalent to $7,139.

124.    On or about July 24, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an

amount equivalent to $35,136.

125.    On or about August 8, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

an amount equivalent to $5,822.

126.  On or about August 25, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $12,850.

127.  On or about September 1, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

128.  On or about October 6, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $18,249.

129.  On or about October 6, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent $9,439.

130.  On or about October 24, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $30,511.

131.  On or about November 5, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

132.  On or about December 1, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,337.

133.  On or about December 2, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in the amount equivalent to $30,193.

134.  On or about January 9, 2004, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

135.  On or about January 13, 2004, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $27,958.

136.  On or about February 4, 2004, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $4,795.

137.     On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of

Colombia to one count of engaging in transactions with a specially designated global terrorist.

The company's sentence included a $25 million criminal fine, the requirement to implement and

maintain an effective compliance and ethics program, and five years' probation.

   *ii)*     *Chiquita facilitated the AUC's arms shipments.*

138.     In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition

from Nicaragua to the AUC.

139.     The Nicaraguan National Police and Army were involved in a deal that provided 3,000

AK-47 assault rifles and 5 million rounds of ammunition to a private Guatemalan arms

dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for

weapons more suited to police work.  GIR S.A., in turn, arranged to sell the AK-47s and

ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama.  In November

2001, Yelinek loaded the arms onto the *Otterloo*, a Panamanian-registered ship, with Panama as

its declared destination.

140.     Instead of docking in Panama, the *Otterloo* instead went to Turbo, Colombia, where

Chiquita, through Banadex, operated its own private port facility for the transport of bananas and

other cargo.

141.     After the *Otterloo* docked at Chiquita's port in Turbo, Banadex employees unloaded the

crates containing the rifles and ammunition. On information and belief, the AUC, which had free

access to the port, then loaded these rifles onto AUC vehicles and took possession of them.

142.     Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the

AUC, and intended to provide such support and assistance to the AUC.  The documents

accompanying the shipment declared that the crates that in fact contained arms were filled with

plastic and/or rubber balls. However, in unloading the crates, the Banadex employees used heavy lifting machinery that would not have been necessary to move the crates' declared cargo. After being off-loaded, the crates remained at Chiquita's facilities for at least two additional days before fourteen AUC vehicles arrived to take possession of the arms. At least some of the arms were received by Freddy Rendón Herrera, the commander of the Elmer Cárdenas Block of the AUC in Urabá.

143.     Giovanny Hurtado Torres, a highly-placed Chiquita employee from the port at Turbo, and several Colombian customs officials have been prosecuted for their purposeful involvement in the *Otterloo* transaction.

144.     On information and belief, Chiquita facilitated at least four other arms shipments to the AUC; one of these shipments of arms through Chiquita's port involved the entry of 4,200 assault rifles.

145.     On at least one occasion, José Leonardo Lopez Valencia, an electrical mechanic at Turbo, witnessed uniformed AUC members offloading crates directly from a Chiquita ship. On information and belief, those crates contained smuggled firearms.

146.     In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

147.     The arms that Chiquita knowingly and intentionally aided the AUC to procure have been of substantial assistance to the AUC in its commission of untold crimes, including the killings and other conduct alleged herein. Many of these guns have not been turned in to the government and are still in use by the paramilitaries. In 2008, some were seized in Urabá from the Daniel Rendón Herrera's 'Heroes de Castaño' Front – another AUC subunit. The raid, executed by

Colombian authorities, netted hand grenades, mortar rounds, Claymore mines, electrical detonators, and 47 AK-47 assault rifles; the assault rifles were traced to the 2001 *Otterloo* shipment.

iii)     *Chiquita facilitated the AUC's drug shipments.*

148.     Chiquita also assisted the AUC by allowing the use of its private port facilities for the illegal exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a major source of income for the AUC, and Chiquita allowed the AUC access to its port facilities and ships for the purpose of smuggling drugs.

149.     Colombian prosecutors have charged that the AUC shipped drugs on Chiquita's boats carrying bananas to Europe.  According to H.H., the AUC would tie drugs to the hulls of banana ships at high sea to evade the control points of the security agencies.

150.     Cocaine hidden in Chiquita's banana shipments has been seized by the Colombian government on seven separate occasions.  More than one and one-half tons of cocaine have been found hidden in Chiquita's produce, valued at over 33 million dollars.  Two of the ships on which drugs were found were named the *Chiquita Bremen* and the *Chiquita Belgie*.

151.     On information and belief, drug shipments could not have been attached to Chiquita's banana boats without the active collusion or willful ignorance of Chiquita employees.  Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly and purposely allowed use of its port and banana transportation boats for this purpose.

### E.  Chiquita's Conduct Aided and Abetted the AUC's Conduct Alleged Herein.

152.     Chiquita's conduct aided and abetted the killings and other conduct alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and

31

association; and terrorism, among other violations of Colombian, New Jersey, United States, and customary international law. Chiquita 1) substantially assisted the AUC paramilitaries who personally undertook the wrongful acts alleged herein, and 2) knew that its actions would assist in the wrongful acts at the time it provided the assistance.

> i) *Chiquita substantially assisted the persons who personally committed the acts comprising Plaintiffs' claims.*

153.    Chiquita's payments and facilitation of drug shipments contributed significantly to the perpetration of the crimes committed by the AUC by improving the AUC's financial situation and enabling it to purchase weapons and other war materiel. *See supra* ¶¶74–98 (Chiquita's support to the AUC).

154.    In addition to Chiquita's payments and facilitation of drug shipments, its assistance to the AUC in smuggling arms substantially and directly increased the paramilitaries' capacity to carry out its violent campaign against Urabá's civilian population. *See supra* ¶93 (smuggling of arms was major AUC achievement)

155.    Most of the firearms that were transferred to the AUC from the *Otterloo* shipment have never been recovered. On information and belief they and other similarly obtained firearms have been used in the commission of war crimes, crimes against humanity, and other violations, including those alleged in this complaint. *See supra* ¶94 (*Otterloo* shipment).

> ii) *Chiquita knew and intended that its actions would assist in the illegal or wrongful activity at the time it provided the assistance.*

156.    Chiquita knew that its actions would assist the AUC to continue killing, torturing, and committing other acts of illegal violence against civilians in Urabá. The AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent civilians living in areas under FARC

control was well known in Colombia and was widely reported in the press in Colombia and the

United States. In 1997, for example, the State Department noted:

> "[t]he many paramilitary groups took the offensive against the guerrillas, often perpetrating **targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base** . . . **An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerrilla support**, was the primary cause of the growing internal displacement problem."

United States Department of State, *1997 Human Rights Report: Colombia*, at 2 (emphasis added).

157.    In 1999, the State Department noted:

> Paramilitary groups and guerrillas were responsible for the vast majority of political and extrajudicial killings during the year. Throughout the country, paramilitary groups **killed, tortured and threatened civilians suspected of sympathizing with guerrillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerrillas of civilian support**. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerrilla control.

United States Department of State, *1999 Human Rights Report: Colombia*, at 2 (emphasis added).

158.    The United States government designated the AUC as a Foreign Terrorist Organization on

September 10, 2001, and that designation was well-publicized in the American public media. *See*

*supra* ¶81 (US media coverage). The AUC's designation was even more widely reported in the

public media in Colombia, where Chiquita had its substantial banana-producing operations.

159.    Chiquita had information about the AUC's designation as a Foreign Terrorist

Organization specifically and global security threats generally through an Internet-based,

password-protected subscription service that Chiquita paid money to receive. On or about

September 30, 2002, an employee of Chiquita, from a computer within defendant Chiquita's

Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the

following reporting on the AUC:

> US terrorist designation. International condemnation of the AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries

33

in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections.

160.    From on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.  Chiquita never applied for nor obtained any license from the Department of the Treasury's Office of Foreign Assets Control with respect to any of its payments to the AUC.

161.    On or about February 20, 2003, Olson and an in-house attorney had a conversation about the AUC's designation by the United States government as a Foreign Terrorist Organization. Shortly thereafter, Olson and the Chiquita lawyer spoke with outside counsel about Chiquita's ongoing payments to the AUC.   Outside counsel advised Chiquita, through Olson and the in-house lawyer, that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. *See supra* ¶82 (advice of counsel about payments to the AUC).

162.    Despite the February 26, 2003 communication from counsel advising Chiquita's executives against making payments to the AUC, on or about February 27, 2003, two Chiquita employees in Colombia paid the AUC in Urabá by check in an amount equivalent to $17,434.

163.    Despite the March 27, 2003 communication from counsel advising Chiquita executives against making payments to the AUC, on or about March 27, 2003, the same two employees paid the AUC in Urabá by check in an amount equivalent to $19,437.

164.    Chiquita's acts of assistance to the AUC were made with the intent that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers.  In exchange for its financial support to the AUC, Chiquita was able

to operate in an environment in which labor and community opposition was suppressed. Chiquita's assistance was not given out of duress; rather it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC in the Urabá region.

165.    Chiquita, along with other banana companies in Colombia, sought a meeting with the paramilitaries in late 1996 or early 1997. The meeting took place in Medellín, and a high-level U.S. Chiquita employee, most likely Charles Keiser, was present.  It was decided at this meeting that the banana companies would pay the paramilitaries. Carlos and Vicente Castaño led the negotiations with the companies; as a result of the negotiations, H.H. was ordered to patrol large swathes of the banana-growing region.

166.    Keiser personally met with leaders of the AUC and planned a system of payment. On information and belief, in order to operate its banana production in an environment free of labor opposition and social disturbances, Chiquita agreed to a whereby the company would pay the AUC a certain amount per box of banana exported, and would help to arm and otherwise support the AUC and other terrorist groups during the period of the killings and other conduct alleged herein.

167.    The arrangement between Chiquita and the AUC was not one of duress; in fact, it was the banana companies that approached the AUC to initiate their relationship.  Mario Iguaran, the former Attorney-General of Colombia, has charged that there was a criminal relationship between Chiquita and the AUC in which Chiquita supplied money and arms to the AUC in return for the "bloody pacification of Urabá."

168.    As part of its deal with Chiquita, the AUC provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social

35

undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities or social program.

169.     By arming and financing the AUC, Chiquita intended to benefit from the AUC's systematic killings of civilians. After its agreement with Chiquita, the AUC understood that one goal of its campaign of terror was to prevent work stoppages in the banana plantations.  Anyone who disrupted the smooth operations of the plantations knew what the consequences could be. For example, one individual who worked in Chiquita's offices at a plantation in Urabá was present when paramilitaries arrived at the plantation and summarily executed a banana worker who had been seen as a troublemaker because his slow work held up the production line. Another individual saw paramilitaries arrive to threaten banana workers after a salary dispute.

170.     In concert with the army, which assisted banana growers by occupying banana plantations and arresting union leaders or forcing laborers to work during strikes, the AUC undertook an extensive campaign of murdering civilians in order to break the back of the unions. According to Gloria Cuartas, "They pulled out a map where they said which plantations allegedly had a FARC presence and started killing workers and union members, until the organizational structures of the union and the board of Sintrainagro [the local union of planattion workers] were left totally in the hands of the 'Esperanzados' [the ELN]." By that time, the ELN, which had previously been an anti-government guerrilla group, had been coopted by the paramilitaries

171.     Chiquita's assistance also helped the AUC to gain access to its perceived opponents who worked for the company.  José Gehiener Arias Ramirez, a Chiquita employee who was later killed by the AUC, repeatedly witnessed AUC members entering the Chiquita packing house to threaten workers from the Barrio Policarpa, whose residents were viewed as hostile to the AUC.

36

172.     The stability and social control provided by the AUC was to Chiquita's benefit, in that it minimized the expenses incurred and eliminated disruptions in the exportation of bananas.  As a result of the AUC's actions, Chiquita was able to dismantle social assistance programs to which the banana companies had agreed through negotiations with the unions in the 1980s, thereby lowering its production costs.  The influence of the AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced labor strife.

173.     As a result of the paramilitaries' intervention, Castaño was able to brag in 2001 that "**in the past three years there have been no strikes** in the banana-growing region, and the Sintrainagro unions work shoulder-to-shoulder with the employers to promote the [economy of the] zone." Carlos Castaño, *Mi Confesión* (emphasis added).

174.     In addition to directly suppressing labor activity, the paramilitaries regulated the banana-growing population and protected Chiquita's profitability by controlling the provision of medical services in the towns of Urabá.  Residents of Apartadó reported that they feared seeing doctors because they believed that medical personnel were under the control of the AUC.  On information and belief, this arrangement benefited Chiquita because it allowed the paramilitaries to inform the company of its employees' medical issues that could potentially affect labor productivity, including pregnancy.  It also allowed the paramilitaries to prevent doctors from certifying worksite injuries or providing medical excuses to workers, which would have raised costs for the company.

### F.  Chiquita Joined the AUC's Conspiracy to Commit the Acts Alleged Herein.

175.     By its conduct, Chiquita joined the AUC's conspiracy to eliminate the FARC through violent attacks on guerrillas and suspected guerrilla sympathizers and terrorization of the civilian population.  The killings alleged herein, which constitute war crimes; crimes against humanity;

torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, New Jersey, United States, and customary international law, were committed by members of the AUC in furtherance of the conspiracy.  Chiquita's actions constituted conspiracy in that (1) two or more members of the AUC agreed to carry out their terrorist campaign against civilians, (2) Chiquita joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations alleged herein was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.

    i)   *Members of the AUC agreed to fight the FARC by means of illegal violence against particular classes of civilians, thereby constituting a conspiracy of two or more persons who agreed to commit a wrongful act.*

176.    The AUC was formed based on agreement between its leaders, government backers, and private supporters, to eliminate the FARC through extermination of guerrillas and suspected guerrilla sympathizers and the systematic terrorization of the civilian population.  The AUC purposely targeted civilians, even those with no known ties to the guerrillas.  Thus the use of illegal, violent means, including war crimes and extrajudicial killings, was always central to the group's mission and strategies.

    ii)   *Chiquita joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal.*

177.    Chiquita began conspiring with the paramilitaries in 1995 or earlier; its first direct payments to the Banana Bloc of the ACCU were made no later than 1995.  Chiquita sought a meeting with the paramilitaries in late 1996 or early 1997 and concluded an agreement with the AUC whereby Chiquita paid the paramilitaries for their services supporting the banana

plantations. These services consisted of threatening or killing civilians, including workers who attempted to strike, union leaders, alleged criminals, and small banana farmers who refused to sell or abandon their land. *See supra* ¶¶111–121.

178.    Chiquita knew of the AUC's goal of eliminating the FARC through the killing of suspected sympathizers and innocent civilians. They also knew of their primary tactic of targeting civilians in order to intimidate this population from supporting the FARC. *See supra* ¶¶103–104 (Chiquita's knowledge). Chiquita joined the conspiracy intending to benefit from the AUC's strategy; the AUC's methods would reduce Chiquita's costs and risk exposure by suppressing labor unrest through the elimination of those who opposed the banana plantations or threatened their profitability.

179.    Chiquita, as a co-conspirator, arranged illegal money payments, smuggled drugs and arms, and facilitated and condoned murders in furtherance of the conspiracy.

iii) *The AUC's conduct alleged herein was committed by members of the AUC in furtherance of the conspiracy's goal of fighting the FARC by means of illegal violence against particular classes of civilians.*

180.    All of Plaintiffs' decedents were killed by the AUC in furtherance of the conspiracy. Their status as social activists, unionists, alleged criminals, or victims of FARC extortion led to their inclusion in groups perceived by the AUC and the State as being sympathetic to the FARC and ultimately to their murders. *See infra* ¶¶134–163 (Plaintiffs' Injuries).

**G. The AUC Acted as Chiquita's Agent in Committing the Acts Alleged Herein.**

181.    Chiquita formed an agreement with the AUC, paying them in exchange for their performance of inherently dangerous and tortious activities: the suppression of union activity and elimination of alleged FARC supporters and other undesirables. This agreement specified,

39

among other things, that Chiquita would pay the paramilitaries a fixed dollar amount for each box of bananas exported. *See supra* ¶¶71–98, 111–115 (Chiquita's support to the AUC, Chiquita's agreement with the AUC).

182. Chiquita's intended that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers. In providing the AUC with money and assistance with their arms and drug trafficking, Chiquita, the Decedent, and Non-Party Executives intended that the AUC obtain arms and continue their practice of killing civilians, especially those civilians who were perceived as threats to the profitability of the banana industry. *See* ¶¶116–121 (intentional assistance and benefits to Chiquita).

183. The leadership of the AUC did, in fact, carry out killings of union members, social organizers and other undesirable groups, as well as civilians with no known or suspected ties to the guerrillas, knowing that Chiquita expected and intended that they do so using the arms and money provided by Chiquita.

184. The AUC solved Chiquita's labor problems and kept down operational costs by killing and/or intimidating any worker that attempted to strike. *See supra* ¶¶118–120 (suppression of labor was part of agreement). The paramilitaries also dealt out reprisals against real or suspected thieves and social undesirables, and targeted suspected guerrilla sympathizers or supporters who could have threatened Chiquita's operations, including independent business cooperative owners and anyone espousing views that could be characterized as leftist, such as opposition politicians, vocal trade unionists, community leaders, and social activists. *See supra* ¶¶134–163 (Plaintiffs' Injuries).

185.    Chiquita authorized the AUC's strategy of killing, torture, and other illegal violence against civilians in Urabá.  The AUC's agreement with Chiquita involved forcing people to work using threats and illegal violence, as well as the quelling of labor and social unrest through the systematic terrorization of the population of Urabá.  *See supra* ¶¶111–121 (Chiquita's agreement with the AUC).

186.    Furthermore, Chiquita acquiesced in the AUC's conduct after the fact by continuing to pay them – and finding new ways to conceal the nature of those payments – despite full knowledge that their support was being used to carry out the crimes alleged herein.  *See supra* ¶¶103–110 (knowledge of AUC as terrorist group, illegality of payments).

## VI.    PLAINTIFFS' INJURIES

*John Doe 1/John Doe 2*

187.    John Doe 1's father, John Doe 2, was a banana worker in Urabá and active in labor organizing. In 2001, the area in which he lived was effectively controlled by the AUC.

188.    In 2001, John Doe 2 was traveling by bus from his home to the banana farm. The bus was stopped by AUC paramilitaries. The paramilitaries removed John Doe 2 from the bus and executed him.

189.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 2 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 2 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 1/Jane Doe 2*

41

190.    Jane Doe 1's mother, Jane Doe 2, lived in a town in Urabá with her family. She was involved in civic, social and political activities, including advocating for marginalized groups. As a community activist, she was a member of one of the groups targeted by the AUC and the Colombian state in their war against the FARC and perceived FARC sympathizers.

191.    In 1998, Jane Doe 2 told Jane Doe 1 that she was afraid she would be killed for her activities. Approximately one week later, AUC paramilitaries arrived at Jane Doe 2's house. In the presence of her family, the paramilitaries removed Jane Doe 2 from her house and executed her. Subsequently, the family of Jane Doe 2, including Jane Doe 1, fled their community in fear.

192.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 2 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of Jane Doe 2 by removing a social activist who was seen as threatening the stability of Chiquita's operations and the generally established social order.

*John Doe 3/John Doe 4*

193.    John Doe 3's brother, John Doe 4, was a banana worker at a plantation in Urabá, and a leader of a labor union committee.

194.    In 1998, John Doe 4 was involved in a protest against low wages. John Doe 3 and John Doe 4 were eating lunch at their banana plantation when AUC paramilitaries approached John Doe 4, identified him by name, and executed him.

195.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 4 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 4 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 3/John Doe 5*

196.    Jane Doe 3's husband, John Doe 5, was a banana worker in Urabá.

197.    In 1997, John Doe 5 became a target of AUC paramilitaries because they accused him of
paying ransom to the FARC for his kidnapped brother. The AUC took John Doe 5 from his
banana farm and executed him.  AUC paramilitaries subsequently told John Doe 5's family that
they had killed him.

198.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and
abetted the death of John Doe 5 through its support of the AUC in Urabá. On information and
belief, Chiquita benefited from the death of John Doe 5 by strengthening the AUC itself, in
sending a message that payment of revenue to AUC opponents such as the FARC would be dealt
with harshly.

*Minor Does 1–4/John Doe 6/Jane Doe 4*

199.    The mother of Minor Does 1–4, Jane Doe 4, lived in a town in Urabá with her family.
She was a civic and social activist.  As a community activist, she was a member of one of the
groups targeted by the AUC and the Colombian state in their war against the FARC and
perceived FARC sympathizers.

200.    In 2004, AUC paramilitaries came to Jane Doe 4's house and executed her in the presence
of her family. Subsequently, the family of Jane Doe 4, including Minor Does 1–4, fled their
community in fear.

201.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and
abetted the death of Jane Doe 4 through its support of the AUC in Urabá. On information and
belief, Chiquita benefited from the death of Jane Doe 4 by removing a social activist who was

ssen as threatening the stability of Chiquita's operations and the generally established social order.

*John Doe 7/John Doe 8*

202.    John Doe 7's son, John Doe 8, was a banana worker at a plantation in Urabá.

203.    In 2000, John Doe 8 was accused by AUC paramilitaries of stealing from a banana farm. John Doe 8 was taken by an AUC paramilitary commander and executed.

204.    When John Doe 7 approached the AUC about the killing, the commander said that they had killed John Doe 8 because the AUC were guarding the farm and were responsible for preventing thefts, and suggested that they had eliminated a social undesirable.  The commander also threatened John Doe 7 about pursuing an investigation.

205.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 8 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 8 by sending a message that stealing from banana farms would result in being put to death without benefit of any judicial process.

*Jane Doe 5/John Doe 9*

206.    Jane Doe 5's husband, John Doe 9, was a local union leader, a member of the national union organization, and a member of a political party that opposed the AUC.

207.    In July 1997, AUC paramilitaries stopped him while he rode his motorbike.  After speaking with him, they tortured, decapitated, and dismembered him.

208.    A demobilized member of the AUC has confessed to the murder of John Doe 9.

209.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 9 through its support of the AUC in Urabá. On information and

belief, Chiquita benefited from the death of John Doe 9 by removing a labor activist who threatened the stability and profitability of Chiquita's operations.

*Jane Doe 6/John Doe 10*

210.    Jane Doe 6's husband, John Doe 10, was part of the leadership of an independent banana cooperative.

211.    One day in May 1999, John Doe 10 was participating in a soccer game.  After the game finished, two AUC paramilitaries sought him out and kidnapped him.  He was found the next day, dead, with six bullet wounds.

212.    In 1999 alone, four other members of the same banana cooperative were assassinated.

213.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 10 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of John Doe 10 by sending a message that independent banana farms that threatened Chiquita's profitability would not be tolerated.

*Jane Doe 7/John Doe 11*

214.    Jane Doe 7's husband, John Doe 11, was a union leader and a banana worker.  He was a member of the joint committee of workers and management that negotiated salaries and working conditions on a banana farm.

215.    In June 1999, men who identified themselves as AUC paramilitaries arrived at John Doe 11's home and killed him with a knife.

216.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 11 through its support of the AUC in Urabá.  On information and

45

belief, Chiquita benefited from the death of John Doe 11 by removing a labor activist whose actions threatened the stability and profitability of Chiquita's operations.

## VII.  GENERAL ALLEGATIONS

217.    At all times, Chiquita, the Decedent, and Non-Party Executives knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances.  The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority. The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces, pursuant to the overall war strategy of the Colombian government.  Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including at least fourteen members of Congress, seven former lawmakers, the head of the secret police, mayors, and former governors. Furthermore, Chiquita's payments to the AUC were facilitated by *convivir*, which were licensed by and operated with the express authority of the government.

218.    The acts described herein were conducted in the course of an internal armed conflict as part of the Colombian government's war strategy.  The AUC and other paramilitaries were parties to this armed conflict that engaged in combat with guerrilla armies on behalf of the government; they committed the abuses against Plaintiffs as part of their prosecution of this conflict.  The AUC and other paramilitaries were engaged in this conflict in partnership with the Colombian military.  The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as

46

against several discrete sub-populations, including but not limited to leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally-commanded paramilitary organization. On information and belief, at all relevant times Chiquita had knowledge of this attack.

219.    The acts and injuries to Plaintiffs described herein were part of a pattern and practice of systematic human rights violations paid for, facilitated, condoned, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

220.    As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damage, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

221.    Plaintiffs' causes of action arise under and constitute torts under the following laws:

   a)  Alien Tort Claims Act, 28 U.S.C. § 1350;

   b)  Torture Victim Protection Act, 28 U.S.C. § 1350, note;

   c)  Customary international law;

   d)  Common law of the United States of America;

   e)  Statutes and common law of the State of New Jersey and the District of Columbia,
       including but not limited to wrongful death, assault and battery, intentional infliction of
       emotional distress, negligent infliction of emotional distress, negligence, negligent hiring,
       and loss of consortium; and the

   f)  Laws of Colombia.

47

222.     Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its

Colombian subsidiary, Banadex.  On information and belief, Chiquita no longer owns any

production operations in Colombia and is not subject to service there.  Furthermore, the political

and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries

and those who assist them.  The vast majority of arrest warrants for paramilitary leaders are

never carried out, and when such figures are arrested they are frequently released or allowed to

escape from security facilities.  Military officers accused of collaboration with paramilitaries are

routinely exonerated or given token sentences by military courts.  Prosecutors, investigators, and

judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject

to death threats and assassinations, and many have had to resign or flee the country as a result.

223.     Legal action by Plaintiffs in Colombia would also result in serious reprisals.  Individuals

who seek redress for paramilitary crimes committed against them or their family members are

regularly targeted for further retributive violence.

224.     Chiquita, the Decedent, and Non-Party Executives took active steps to conceal its

payments and other forms of support to the AUC.  *See supra* ¶¶74–84 (Decisions to conceal

payments made at high levels within Chiquita).

225.     This concealment had the effect of preventing Plaintiffs from learning that Chiquita was

responsible for their injuries.  Plaintiffs were unaware of Chiquita's support of the AUC until

shortly after Chiquita's guilty plea in March of 2007.

226.     Chiquita's concealment of its role in plaintiffs' injuries prevented Plaintiffs from filing

their claims at an earlier date.

48

227.     Plaintiffs were additionally unable to bring suit in Colombia or the United States until

2007 due to the poor security situation and the danger of reprisals, to which Chiquita's support of

the AUC contributed.

228.     Several of the AUC paramilitary units active in the banana-growing region, including

Bloque Norte and the Bloque Elmer Cárdenas, did not demobilize until 2006.

229.     Throughout this period, paramilitaries continued to kill and make threats against civilians

in the banana-growing region.  In 2006, several human rights workers received death threats,

including lawyers challenging paramilitary violence.

## VIII. CLASS ACTION ALLEGATIONS

230.     Plaintiffs seek certification of this action as a class action pursuant to Rules 23(b)(1)(B),

23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.  Plaintiffs allege that Chiquita

intentionally supported a campaign of military and social control by the AUC from at least 1995

through 2004.  Plaintiffs seek to represent a class consisting of all persons who were the victims

(or who are the relatives and/or legal representatives of decedent victims) of extrajudicial killing;

forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced

displacement; crimes against humanity; or crimes against civilians constituting war crimes

committed by the AUC in the banana-growing region of Urabá from 1995 through 2004.

231.     The members of the Class are so numerous that joinder of all members is impractical.

The exact number and identities of all Class members is not currently known. According to

reliable statistics, however, the AUC was responsible for many thousands of killings and many

hundreds of massacres in Colombia between 1995 and 2004.  In the banana-growing region of

Urabá alone, human rights organizations have documented over 3,700 murders by the AUC

between 1997 and 2004 and 60,000 forced displacements during the same period. These figures suggest that the Class at minimum numbers in the thousands and may exceed ten thousand.

232.    Plaintiffs' claims are typical of those of the Class. Plaintiffs, like all members of the Class, were civilians inhabiting Colombia during the time period in which the AUC received substantial financial and other assistance from Chiquita, the Decedent, and Non-Party Executives, and who were injured by the AUC.  The abuses committed by the AUC were committed as part of the AUC's campaign, supported by Chiquita, the Decedent, and Non-Party Executives, to exert control over the banana-growing region and eliminate the FARC by terrorizing civilians and perceived opponents.

233.    Plaintiffs will fairly represent the interests of the Class because their interest in the case is identical to that of the Class as a whole: to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain.  Plaintiffs' claims implicate the common questions of law and fact listed *infra* ¶¶182(a)–(q), as do the claims of all or virtually all members of the Class.  Plaintiffs have no interests that conflict with or are contrary to the interests of other Class members.

234.    Plaintiffs will adequately represent the class in that their personal interest in the outcome of the case ensures that they will maintain an active awareness and involvement in the litigation so as to protect their own interests and those of the Class.  Furthermore, they are represented by counsel with extensive experience in international human rights and class action litigation.

235.    There are questions of law and fact that are common to the Class, including but not limited to:

    a)  whether Chiquita, the Decedent, and the Non-Party Executives knew, should have known, or recklessly ignored, that the AUC was responsible for the extrajudicial killing,

50

forced disappearance, kidnapping, rape, forced displacement, property destruction, torture, or cruel, inhuman, or degrading treatment of civilians who lived in Colombia;

b)  whether the assistance provided to the AUC by Chiquita, the Decedent, and the Non-Party Executives was substantial;

c)  whether Chiquita, the Decedent, and the Non-Party Executives knew, should have known, recklessly ignored, or intended that the payments they made to the AUC were used to finance a campaign of terror directed at the civilian population in Colombia's banana growing region;

d)  whether the AUC acted as an agent of Chiquita, the Decedent, and the Non-Party Executives in carrying out its campaign of murder and intimidation including whether they ratified such acts;

e)  whether Chiquita, the Decedent, and the Non-Party Executives conspired with, entered into a joint criminal enterprise with, or aided and abetted the AUC;

f)  whether Chiquita, the Decedent, and the Non-Party Executives facilitated the clandestine and illegal transfer of arms and ammunition to the AUC;

g)  whether Chiquita, the Decedent, and the Non-Party Executives facilitated the AUC's drug shipments;

h)  whether the AUC in committing the acts alleged herein acted under the color of state law and/or in a joint venture with official Colombian security forces;

i)  whether the actions of the AUC constitute war crimes;

j)  whether the actions of the AUC constitute crimes against humanity;

51

k)   whether Chiquita, the Decedent, and the Non-Party Executives' actions constitute torts under the Alien Tort Statute, the Torture Victim Protection Act, or New Jersey, D.C., or Colombia law;

l)   whether Chiquita, the Decedent, and the Non-Party Executives have been unjustly enriched by the violations set forth herein;

m)   Chiquita, the Decedent, and the Non-Party Executives' behavior was negligent, including whether any of them engaged the AUC as an independent contractor and the AUC was incompetent and/or hired to do work that posed a risk of physical harm, whether there was a foreseeable risk of harm, and whether imposing a duty is fair;

n)   the statutes of limitations are equitably tolled due to the conflict in Colombia or Chiquita's concealment of its actions;

o)   whether Colombian statutes of limitations apply to the non-ATS claims;

p)   whether this Court should order restitution or disgorgement of revenues and profits relating to the violations described herein; and

q)   whether Chiquita, the Decedent, and Non-Party Executives should be subject to awards of compensatory and/or punitive damages and the proper measure thereof.

236.   Pursuant to Fed. R. Civ. P. 23(b)(1)(B), adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications and/or would substantially impair or impede their ability to protect their interests.

237.   Statistics gathered on human rights abuses committed by the AUC during the years 1997 to 2004 indicate that the Class at minimum numbers in the thousands and may exceed ten thousand. *See supra* ¶178.  In other cases involving claims for human rights abuses under the

Alien Tort Statute and the Torture Victims Protection Act, individual plaintiff cases have received multi-million-dollar recoveries.

238.     Successful actions against the Decedent pursued independently by individual Class members could thus result in combined damages that exceed the damages that could be paid from the assets of the Decedent's Estate.

239.     According to the Probate Division of the District of Columbia Superior Court, the value of the personal property in the Decedent's Estate was reported at $4,200,000.

240.     Upon information and belief, the amount of damages which the Defendant can currently afford to pay from the assets of the Decedent's estate is exceeded by the claims of the Class members.

241.     Pursuant to Fed. R. Civ. P. 23(c)(4), class certification is appropriate as to the issues common to the Class members' claims, identified above, as resolution of these issues would materially advance the litigation and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

242.     In the alternative, certification pursuant to Fed. R. Civ. P. 23(b)(3), is appropriate as questions of law and fact common to the members of the class predominate over any questions affecting only individual members.  The vast majority of Plaintiffs' allegations implicate questions of liability relevant to the entire Class, some of which are identified above; their resolution would therefore address most of the issues required to establish or disprove the Defendant's liability for the injuries of all Class members.

243.     Also pursuant to Fed. R. Civ. P. 23(b)(3) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

# IX. CLAIMS FOR RELIEF

### A. First Claim for Relief – War Crimes

244.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

245.    The AUC's conduct alleged in this complaint constitutes violence to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying out of executions without previous judgment pronounced by a regularly constituted court, incidents of outrages upon human dignity, forced movement, pillage, and denial of medical treatment.

246.    The AUC's acts violate the law of nations in that they were committed in the course of war crimes, because 1) an armed conflict was ongoing; 2) the AUC was a party to the conflict; 3) Plaintiffs and countless other victims of the AUC's acts did not take active part in the hostilities; and 4) the acts were committed in the course of armed conflict.  These acts are thus war crimes regardless of whether the AUC acted under color of state authority.

247.    The war crimes described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and the District of Colombia, and the laws of Colombia. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

248.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the war crimes committed against Plaintiffs.

*i)    The civil war in Colombia is an armed conflict within the meaning of the laws of war.*

249.    The Colombian civil war is an "armed conflict not of an international character," as specified in Common Article 3 of the Geneva Conventions, which hold that in such cases, specific acts such as torture and "carrying out of executions without previous judgment pronounced by a regularly constituted court" constitute war crimes when committed against non-combatants.

250.    There is no dispute that at all relevant times, and up until the present, Colombia has been devastated by a long-standing civil conflict. This has been widely documented and, to Plaintiffs' knowledge, has never been disputed in this or any other case. For example, the State Department noted in 1997 that the Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *1997 Human Rights Report: Colombia*, at 1.

251.    During all times relevant to this complaint, the civil war in Colombia pitted the Colombian government – along with its paramilitary allies, including the AUC – against the FARC and other left-wing guerrilla insurgents.  The Colombian civil war has continued uninterrupted since at least 1946, and has claimed the lives of over 300,000 people.  Both Venezuela and Ecuador´s presidents have referred to the FARC as a belligerent force.  The Colombian government has engaged in prisoner exchanges with the FARC in the past.  It held extensive negotiations with the FARC during the 1998–2002 time period, with involvement of the United Nations, and ceded a large portion of its territory to FARC control, referred to as the *zona de despeje*, or cleared zone.  During that time, the FARC assumed the powers of government in the area under its control, including judicial and police powers.

ii)    *The AUC was a party to the armed conflict in Colombia.*

252.    Once Colombia's various paramilitary groups consolidated in 1997 under the leadership of Carlos Castaño, the AUC became the most visible armed opposition to the FARC, which, by late 1996, had become Colombia's most prominent leftist rebel group. From that time until its demobilization, the AUC was a major combatant in Colombia's civil conflict with the FARC.  In most of the rural areas where the FARC had its strongholds, the Colombian military ceded military operations to the AUC.  By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities.  *See also supra* ¶¶27, 45–66 (the AUC role in the Colombian civil war as a tool of the Colombian government, and its campaign of violence against civilians).

iii)    *Plaintiffs did not take active part in the hostilities.*

253.    Civilians are entitled to the protections of Common Article 3 of the Geneva Conventions if they are "[p]ersons taking no active part in the hostilities."  Neither surviving Plaintiffs nor decedents were party to the armed conflict in Colombia, as they were not members of the FARC, the AUC, or, indeed, any armed group that participated in the conflict.  *See supra* ¶¶134–163 (describing Plaintiffs).

254.    Plaintiffs' decedents were not killed because they or anyone related to them had taken part in the hostilities in any way.  Rather, they were victims of the campaign conducted against civilians by the AUC in an effort to discourage support of the FARC.  The AUC systematically murdered thousands of civilians without regard to whether they were actual participants in the civil war, as a warning to any potential guerrilla supporters. The AUC became known for using chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerrillas in their villages.

*iv)*    *Plaintiffs were killed in the course of the armed conflict.*

255.    Decedents were not killed simply against the background of war; rather, the use of criminal violence and intimidation against civilians was part of the war strategy against the FARC agreed on by the AUC and the Colombian Government, in which Chiquita was intentionally complicit.

256.    The AUC used extremely violent means to take back areas held by the FARC and employed tactics of violence and terror to target civilians regardless of whether they were participants in the civil war, with the intention of discouraging civilians from supporting the leftist guerrillas. This military tactic is documented by the U.S. Department of State. *See supra* ¶¶104–105 (State Department reports documenting human rights abuses, including forced displacement)

257.    While this strategy was developed in Urabá, the model of collaboration between government and paramilitary was so successful that it was exported to the rest of the country and became part of the national war strategy. *See supra* ¶66 (paramilitarism model spread to Magdalena and elsewhere).

258.    Decedents were all members of particular social groups that were particularly targeted by the AUC as part of its war strategy. *See supra* ¶¶32, 134–163 (AUC targeted particular groups, Plaintiffs' Injuries).

259.    In fact, all decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold.  They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

### B. Second Claim for Relief – Crimes Against Humanity

260.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

261.    The conduct alleged in this complaint includes willful killing, torture, and arbitrary arrest and detention constituting crimes against humanity, in that the AUC carried out these acts 1) as part of a widespread or systematic attack 2) against a civilian population.  Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.  The acts of the AUC constitute crimes against humanity regardless of whether the AUC acted under color of state authority.

262.    The crimes against humanity described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute  and Torture Victims Protection Act (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

263.    The Defendant is liable to Plaintiffs because Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the crimes against humanity committed against Plaintiffs.

*i)    The killings alleged herein were part of a widespread and systematic attack.*

264.    From late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC became notorious for using

tactics of terror on civilians living in and around areas that had been under FARC control. *See supra* ¶¶53–66 (AUC strategy of targeting civilians in Urabá).

265.    The AUC killed thousands of civilians in Urabá. Their war strategy involved killing civilians in towns near guerrilla groups in order to intimidate the population from providing any support to the guerrillas. This included anyone supporting the guerrillas' ideology, such as teachers, community leaders, social activists, trade unionists, human rights defenders, religious workers, and leftist politicians. Many others not belonging to these groups were killed as well, as part of the AUC's efforts to establish complete dominance and deter support for the guerrillas.

266.    Decedents were all killed as part of a systematic attack on particular societal groups. *See supra* ¶¶134–163 (Plaintiffs' Injuries). In fact, all of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold. They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

*ii)     The killings alleged herein were part of an attack that was directed against a civilian population.*

267.    Decedents were killed as part of the AUC's strategy of terrorizing the civilian population of Urabá to discourage people from supporting the guerrilla insurgency. By design, this attack was carried out without regard to whether the victims were actual participants in the civil war. In fact, AUC commanders explicitly intended to kill civilians, with the understanding that such practices would deprive the guerrillas of their support base. *See supra* ¶¶30–33, 53–55, 63–64, 104–105 (State Department reports, AUC's war strategies).

**C. Third Claim for Relief – Terrorism**

268.    The allegations set forth in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

269.    The conduct alleged in this complaint constitutes violations of the customary international law prohibition on terrorism, in that the AUC 1) directed violence against a civilian population 2) in order to coerce or intimidate that population.  The acts of the AUC constitute terrorism regardless of whether the AUC acted under color of state authority.

270.    The acts of terrorism described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, and the laws of Colombia.

271.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the acts of terrorism committed against Plaintiffs.

   i)   *The killings alleged herein constitute violence directed against the civilian population of Urabá.*

272.    Plaintiffs, decedents, as well as the vast majority of AUC targets in Urabá, were civilians and non-participants in Colombia's civil war.

   ii)  *The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá and Colombia at large from supporting the FARC.*

273.    The AUC targeted not only guerrilla sympathizers but anyone suspected of supporting their leftist ideology, such as teachers, community leaders, trade unionists, human rights

defenders, religious workers, and leftist politicians.  The AUC targeted civilians in towns and
neighborhoods where guerrilla support was believed to be high because they claimed guerrilla
groups could only operate in the region with the logistical support of local towns.  *See supra* ¶¶
30–33, 53–55, 63–64 (AUC war strategy).

274.    Killing the decedents was part of the general strategy of the AUC.  Through these
murders, the AUC intended to deter others from providing support or from expressing views that
could be construed as supporting the FARC or their ideology. *See supra* ¶¶ 134–163 (Plaintiffs'
Injuries).

### D.  Fourth Claim for Relief – Material Support to Terrorist Organizations

275.    The allegations set forth in the above paragraphs are realleged and incorporated by
reference as if fully set forth herein.

276.    The conduct of Chiquita, the Decedent, and the Non-Party Executives alleged herein
constitutes violations of the customary international law prohibition on the illegal provision of
material support to terrorist organizations, in that they 1) provided assets 2) to a terrorist
organization 3) with the knowledge or intent that they would be used to carry out attacks on
civilians 4) for the purpose of intimidating or coercing a civilian population.  Chiquita, the
Decedent, and Non-Party Executives' conduct constitutes material support to terrorist
organizations, regardless of whether they acted under color of state authority.

277.    The acts of material support to the AUC, a terrorist organization, described herein
constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. §
1350), as well as violations of customary international law and the common law of the United
States, the statutes and common law of New Jersey and the District of Columbia, and the laws of

Colombia. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

278.    The Defendant is liable to Plaintiffs because the Decedent directly participated in the provision of material support to the AUC, and/or they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with others, including members of the AUC, to provide material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

   i)    *Chiquita, the Decedent, and Non-Party Executives provided assets to the AUC in the form of money, arms and logistical support.*

279.    Chiquita, the Decedent, and Non-Party Executives provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons and drugs.  The support that Chiquita provided was crucial to the AUC's success against the FARC in the area and its ability to continue killing civilians.  Indeed, prominent AUC commanders considered the group's success in smuggling in massive quantities of arms – some of which were still being used by the paramilitaries to commit crimes as recently as 2008 – as one of the AUC's greatest achievements. This success was made possible partially by Chiquita's money and the use of Chiquita's port at Turbo.  *See supra* ¶¶74–98 (Chiquita's support to the AUC).

   ii)    *The AUC was at all relevant times a terrorist organization.*

280.    At all times relevant to this Complaint, the AUC was an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets. *See supra* ¶¶ 30–33, 53–55, 63–64 (AUC's strategy of terrorizing civilians).

281.     The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Chiquita, the Decedent, and the Non-Party Executives were aware of such activities.  From September 10, 2001, until the present, the AUC has been designated by the United States government as a Foreign Terrorist Organization. *See supra* ¶¶103–111 (Chiquita's knowledge).

   iii)   *Chiquita knew and intended that the support it provided to the AUC would be used to carry out attacks on the civilian population of Urabá for the purpose of intimidating that population.*

282.     Chiquita knew of and intentionally supported the AUC's strategy of targeting civilians in order to intimidate the population of Urabá from supporting the FARC.  Chiquita provided this support in exchange for security and stability on the banana plantations, which the AUC achieved through the murder or disappearance of civilians such as union leaders, community activists, and suspected criminals.  *See supra* ¶¶103–121 (knowing and intentional support).

   **E.  Fifth Claim for Relief – Extrajudicial Killing**

283.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

284.     The extrajudicial killings alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

285.     The AUC committed acts of extrajudicial killing in that they carried out 1) deliberate killing of decedents 2) not authorized by a previous judgment pronounced by a regularly

constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

286. The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the extrajudicial killings committed against Plaintiffs.

i) *The AUC's killings were carried out deliberately as part of the role assigned to them by the Colombian State to repress support of the FARC, but unauthorized by a judgment pronounced by any court.*

287. The AUC killed Plaintiffs' decedents as part of the Colombian state policy of intimidating civilians from supporting the FARC. *See supra* ¶¶ 45–70 (state action). The AUC committed many of these murders in the presence of family members or other community members, or they subsequently reported to the family that they were responsible for the killings. They openly killed civilians and discussed such killings in public in order to intimidate and threaten others.

288. While the state supported the AUC in these efforts, they did not authorize them to commit these killings through a court judgment. In fact, AUC leaders have stated that the military would give them names of alleged guerrillas to kill when the state did not have enough evidence to prosecute the individuals through Colombian courts.

289. None of the decedents was killed pursuant to *any* judicial process at all.

290. Killing the decedents was part of the general strategy of the AUC and Chiquita. Through these murders, the AUC and Chiquita intended to deter others from supporting the FARC or their ideology. *See supra* ¶¶134–163 (Plaintiffs' Injuries).

**F. Sixth Claim for Relief – Torture**

291.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

292.     The acts of torture alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

293.     The AUC committed acts of torture in that they 1) intentionally 2) caused Plaintiffs and their decedents to suffer severe mental or physical pain or suffering 3) for the purpose of punishing, intimidating or coercing Plaintiffs and their decedents.

294.     The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the torture committed against Plaintiffs.

*i)   The AUC caused Plaintiffs and their decedents to suffer severe mental and physical pain and suffering.*

295.     Plaintiffs' decedents were in the custody of the AUC when they were tortured and killed. The family members of Jane Doe 2, Jane Doe 4, and John Doe 4, witnessed AUC members seeking out their relatives and executing them.  AUC paramilitaries removed John Doe 2 from a bus in the presence of others and executed him.  John Does 5, 8, 9, 10, and 11 were kidnapped and executed by the AUC; their family members only found out about their deaths after an

anguishing period of uncertainty. At the time that the AUC paramilitaries murdered decedents, the paramilitaries had effective control of decedents by virtue of their numbers and weapons.

296. The AUC's torture and execution of the decedents caused them severe mental and physical pain. *See supra* ¶¶134–163(Plaintiffs' Injuries).

297. The surviving Plaintiffs suffered severe mental and physical pain upon witnessing or learning of the murder of their family members. Individual Plaintiffs also experienced suffering when they were threatened against pursuing investigations of the deaths of their family members and were forced to flee the area. Furthermore, they suffered severe mental anguish due the feelings of threat and fright that the AUC might target them, too.

   *ii)* *The AUC tortured Plaintiffs and decedents as part of the role assigned to them by the Colombian State, to intimidate and deter them from supporting the FARC.*

298. The AUC would often force its victims to disclose names of other potential guerrilla supporters. They took workers from the plantations and tortured them to the point that many would invent stories and names in the hope that the paramilitaries would let them go. Two union leaders reported that the paramilitaries would use tactics such as tying the worker's hands and feet, using chainsaws or pliers to break them to pieces, and pulling out their nails. The AUC used torture against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government. *See supra* ¶¶45–70 (state action). On information and belief, the torture of Plaintiffs and decedents was intended to accomplish this goal.

### G. Seventh Claim for Relief – Cruel, Inhuman, or Degrading Treatment

299. The allegations set forth in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

300.     The acts of cruel, inhuman, or degrading treatment alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

301.     The AUC committed acts of cruel, inhuman, or degrading treatment in that they inflicted mental or physical suffering, anguish, humiliation, fear, and debasement upon Plaintiffs and their decedents.  The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.  Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

302.     The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

   i)   *The AUC inflicted mental and physical suffering, anguish, humiliation, fear and debasement on Plaintiffs and their decedents as part of the role assigned to them by the Colombian State, to intimidate and coerce civilians from supporting the FARC.*

303.     The AUC used cruel, inhuman, and degrading treatment against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government.  *See supra* ¶¶31–33, 45–70 (state action; atrocious acts of AUC).  Both decedents and surviving plaintiffs were victims of the AUC's cruel, inhuman, and degrading treatment.  *See supra* ¶¶134–164, 242–244 (Plaintiffs' Injuries; mental anguish of decedents and

67

survivors). The AUC targeted Plaintiffs' decedents because their actions and positions in the community were seen as supporting the FARC.

### H. Eighth Claim for Relief – Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Association

304. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

305. The violations of the rights to life, liberty and security of person and peaceful assembly and association alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

306. The AUC violated Plaintiffs' and their decedents' rights to life, liberty and security of person and peaceful assembly and association in that they carried out 1) a systematic campaign of terror and violence 2) conceived and arbitrarily waged by state agents 3) hatched and calculated to suppress political opinion and expression.

307. The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the violations of the rights to life, liberty and security of person and peaceful assembly and association committed against Plaintiffs.

    i)    *Members of the AUC, as State agents and at the behest of State agents, carried out a systematic campaign of terror and violence.*

308.    The AUC carried out a campaign of terror and violence against civilians to intimidate them from providing support to guerrillas, as a central strategy of their fight against the guerrillas on behalf of the government. *See supra* ¶¶31–33, 45–70 (atrocious acts of AUC; state action).

309.    Decedents were killed in the course of the AUC's terrorist campaign against civilian populations.

    ii)    *The AUC's campaign was hatched and calculated to suppress any political activity or expression that could be suspected of association with support for the FARC.*

310.    One of the overriding purposes of the AUC's campaign of terror against civilians, including Plaintiffs and decedents, was to intimidate and coerce civilians in Urabá against supporting the FARC or, indeed, any political ideology that could be associated with the FARC. This could and often did include the violent suppression of any form of political or social organization activity outside of those forms specifically endorsed by the paramilitaries and the government. *See supra* ¶¶26–34, 53–54 (goals and tactics of AUC)

311.    Decedents were killed to suppress their political expression and to prevent them and others from giving political support to the ideologies associated with the FARC. *See supra* ¶¶ 134–163 (Plaintiffs' Injuries).

**I.    Ninth Claim for Relief – Consistent Pattern of Gross Violations of Internationally Recognized Human Rights**

312.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

313.    The consistent pattern of gross violations of internationally recognized human rights alleged herein constitutes torts that give rise to federal jurisdiction under the Alien Tort Statute

(28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

314.    The AUC carried out a consistent pattern of gross violations of internationally recognized human rights against Plaintiffs, their decedents, and others in that the above-described abuses against Plaintiffs and decedents occurred within the context of numerous similar abuses and killings.

315.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the consistent pattern of gross violations of internationally recognized human rights committed against Plaintiffs.

   i)    *The AUC committed its acts of abuse against Plaintiffs and their decedents in the context of a consistent pattern of abuses.*

316.    The torture, murder, and other abuses committed against decedents, surviving Plaintiffs, and their family members was committed as part of and in the context of a consistent pattern of abuses that constitute gross violations of internationally recognized human rights.  These abuses include violations of the right to life, right to security of person, right to security of property, right to privacy, right to freedom of political expression and social organization, and many others.

317.    The specific acts constituting these violations include thousands of murders and incidents of torture and cruel, inhuman and degrading treatment, forced displacement, unwarranted

intrusions into the private medical information and decisions of banana workers, suppression of union activity and peaceful political dissidence. *See supra* ¶¶26–34, 53–55, 63–64, 104–105, 121 (AUC war strategy, State Department reports, control of medical services).

**J.  Tenth Claim for Relief – Wrongful Death**

318.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

319.    The acts described herein constitute wrongful death, actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

320.    The Defendant is liable to Plaintiffs 1) decedents died as a proximate result of the Decedent's acts and omissions and 2) decedents would have been able to maintain an action against the Decedent for damages resulting from their injuries had they survived.

321.    As a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

322.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the wrongful deaths of the decedents.

*i)    The AUC caused decedents' deaths as a result of its overt acts of killing.*

323.    The AUC's intentional abduction and execution of decedents, as part of its campaign of terror against the civilians of Urabá, which was intentionally and knowingly supported by Chiquita, directly caused the the deaths of decedents. *See supra* ¶¶134–164 (Plaintiffs' Injuries).

71

ii)   *If decedents had not died, they would have been able to maintain an action for damages resulting from their injuries.*

324.   Decedents' injuries – both physical and emotional – were caused by intentional and negligent actions and omissions of Chiquita.  Had they not died, they could have maintained actions for damages against Chiquita under the laws of Colombia, New Jersey, the District of Columbia, the United States, and the law of nations.  Their surviving family members therefore may maintain an action for their wrongful death.

### K.  Eleventh Claim for Relief – Assault and Battery

325.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

326.   The acts described herein constitute assault and battery, actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

327.   Chiquita, the Decedent, and Non-Party Executives' actions alleged herein constitute assault and battery in that they 1) acted with the intention of causing offensive and harmful touching of Plaintiffs' or decedents' persons without their consent, and/or 2) they acted with the intention of creating the imminent apprehension that such touching would result, and 3) such touching or apprehension of touching resulted.

328.   As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.

329.   Chiquita, the Decedent, and Non-Party Executives' acts were willful, intentional, wanton, malicious, and oppressive.

330.   The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and decedents.

i)   *Members of the AUC attacked decedents intending to cause decedents to suffer harmful contacts or an imminent apprehension of an immediate harmful contact without their consent.*

331.   The AUC abducted and killed decedents, in some cases in front of Plaintiffs and their family members.  In so doing, the AUC intended to cause decedents to suffer dangerous, harmful, and offensive physical contact without their consent, and also to frighten them with the imminent apprehension of such contact, and they also intended to frighten surviving Plaintiffs with the imminent apprehension of such contact.  *See supra* ¶¶134–163 (Plaintiffs' injuries).

ii)   *Decedents suffered harmful contacts or a reasonable, imminent apprehension of harmful contacts because of the AUC's attacks.*

332.   The AUC's acts of kidnapping, killing, and torture alleged herein included harmful physical contact that caused injury and death to decedents without their consent, and acts of physical and emotional intimidation that caused decedents and surviving Plaintiffs to suffer the fright and apprehension of immediate harmful physical contact.

**L.  Twelfth Claim for Relief – Intentional Infliction of Emotional Distress**

333.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

334.   Chiquita, the Decedent, and Non-Party Executives' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

335.    Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein constitutes international infliction of emotion distress in that it 1) was intentional and/or reckless, 2) was extreme and outrageous, and 3) caused 4) severe distress to Plaintiffs and decedents.

336.    As a direct and proximate result of Chiquita, the Decedent, and Non-Party Executives' acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

337.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress of Plaintiffs and decedents.

i)    *Chiquita, the Decedent, and Non-Party Executives acted intentionally and recklessly, with the intent and/or deliberate disregard of the high possibility that their support, assistance, direction, and collusion with the AUC would cause the acts alleged herein and cause severe humiliation, mental anguish, and emotional and physical distress.*

338.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives intentionally acted, with the intent and/or deliberate disregard of the high possibility that their conduct would lead to the abduction, torture, and killing of decedents, causing severe humiliation, mental anguish, and emotional distress to decedents, surviving Plaintiffs, and their families.  *See supra* ¶¶71–133 (Chiquita's support to the AUC; aiding and abetting; conspiracy; agency).

339.    At all relevant times, it was in Chiquita, the Decedent, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to

prevent or prohibit such conduct, but instead they continued in their course of conduct

continuously from 1995 until at least 2004.

    *ii)*    Chiquita, the Decedent, and Non-Party Executives' *conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community, and was without privilege or justification.*

340.    Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein violated the

laws of Colombia, New Jersey, the District of Columbia, and the United States, as well as the

law of nations. War crimes, crimes against humanity, torture, extrajudicial killing, cruel,

inhuman and degrading treatment, violations of the right to life, liberty, security of person, and

peaceful assembly and expression, terrorism, material support of terrorism, and consistent

patterns of gross violations of internationally recognized human rights are acts that are so

heinous that they are considered to be of universal and mutual concern to all nations of the

world, such that nations have a legally binding obligation to punish and prevent them. Chiquita,

the Decedent, and Non-Party Executives' complicity in such acts is therefore so extreme and

outrageous in character as to be completely unjustifiable and intolerable in a civilized

community.

    *iii)*    *Chiquita, the Decedent, and Non-Party Executives' actions in aiding, facilitating, paying, colluding with, and supporting the AUC caused Plaintiffs' and their decedents' distress.*

341.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as

well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian

government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-

Party Executives proximately caused the injuries alleged in this complaint. Their involvement in

the AUC's activities – including providing arms, money, and other assistance – began before

Plaintiffs' injuries were incurred and continued long after.  Chiquita, the Decedent, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* ¶¶71–98, 100–102 (Chiquita's assistance to the AUC; assistance was substantial)

*iv)  The distress suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure it.*

342.    The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths.  *See supra* ¶¶134–163 (Plaintiffs' Injuries).

343.    The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murder of their family members.  Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the death, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them.  These fears, disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

**M. Thirteenth Claim for Relief – Negligent Infliction of Emotional Distress**

344.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

345.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

346.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes negligent infliction of emotion distress in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care, 2) they breached that duty, 3) emotional distress was reasonably foreseeable, 4)

Chiquita, the Decedent, and Non-Party Executives' conduct proximately caused the distress, and 5) the distress was genuine and substantial.

347.    As a direct and legal result of Chiquita, the Decedent, and Non-Party Executives' wrongful acts, Plaintiffs and decedents have suffered and will continue to suffer significant physical injury, pain and suffering, and extreme and severe mental anguish and emotional distress.

348.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the negligent infliction of emotional distress of Plaintiffs and decedents.

i)    *Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

349.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs to act with reasonable care so as not to cause injury to them. *See supra* ¶¶71–133 (Chiquita's support, aiding and abetting, conspiracy, agency)

350.    At all relevant times, it was in Chiquita, the Decedent, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from 1995 until at least 2004.

ii) *Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer emotional distress so severe that no reasonable person could be expected to endure it.*

351.     By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred and continued long after.  Chiquita, the Decedent, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* ¶¶71–98, 100–102 (Chiquita's assistance to the AUC, assistance was substantial).

iii) *At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that their conduct would and did proximately result in physical and emotional distress to the AUC's victims.*

352.     From the moment of their first involvement with paramilitary groups, Chiquita, the Decedent, and Non-Party Executives were aware that their assistance, collusion, facilitating, and support would result in the killing, torture, and other abuses committed against countless civilians in Urabá by the AUC.

353.     At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for their brutal methods and tactic of declining to discriminate between combatants and civilians. Their reputation and method were well known in general and to Chiquita in particular, and were the subject of any number of newspaper articles and investigations both in Colombia and abroad. *See supra* ¶¶103 – 110 (Chiquita's knowledge).  Chiquita, the Decedent, and Non-Party Executives engaged the AUC to provide security, suppress union activity, and discourage FARC

78

support despite their prior knowledge that the paramilitaries in general – and the AUC in particular – used terrorism and violence against civilians as a strategy to carry out those goals. *See supra* ¶¶111–121 (Chiquita's intentional support).

354.    Despite their general knowledge about the paramilitaries' tactics and specific understanding of the paramilitaries' activities in Urabá, Chiquita, the Decedent, and Non-Party Executives specifically engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress union activity and discourage support of the FARC – the very activities for which their brutal tactics were notorious. Chiquita, the Decedent, and Non-Party Executives played this role with the knowledge and intent that the paramilitaries would commit the abuses alleged herein, and they continued to play this role as it became clear that their support was assisting with the torture, murder, and other abuse of Chiquita, the Decedent, and Non-Party Executives' opponents. *See supra* ¶¶103–121 (knowing and intentional assistance).

   *iv)*   *Plaintiffs' and decedents' distress was genuine and substantial.*

355.    The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths. *See supra* ¶¶134 – 163, 242–244 (Plaintiffs' Injuries).

356.    The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murders of their family members. Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the deaths, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them. These fears, disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

### N. Fourteenth Claim for Relief – Negligence/Negligent Hiring/Negligence Per Se

357.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

358.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes negligence and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

359.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes negligence in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care not to injure them, 2) they breached that duty, 3) it was reasonably foreseeable that their negligence would cause injury, damage, loss, or harm to Plaintiffs and their next of kin.

360.    Chiquita, the Decedent, and Non-Party Executives' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

361.    As a result of these acts, Plaintiffs and decedents suffered harm including, but not limited to, death, physical injury, and severe emotional distress.

   i)    *Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

362.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and/or conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs to act with reasonable care so as not to cause

injury to them.  *See supra* ¶¶71–133  (Chiquita's support, aiding and abetting, conspiracy, agency)

363.    At all relevant times, it was in Chiquita, the Decedent, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from 1995 until at least 2004.

    ii)    *Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer physical and emotional harm, including death.*

364.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred and continued long after.  Chiquita, the Decedent, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* ¶¶71–98, 100–102 (Chiquita's support to the AUC, assistance was substantial).

    iii)    *At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that the AUC was an organization dedicated to the use of terrorism and violence against civilians and that it would use violence against perceived opponents of Chiquita, and could have foreseen that this could and would cause physical and mental harm to the AUC's victims.*

365.    From the moment of their first involvement with paramilitary groups, Chiquita, the Decedent, and Non-Party Executives were aware that their assistance, collusion, facilitation, and

support would result in the killing, torture, and other abuses committed against civilians in Urabá by the AUC.

366.    At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for their brutal methods and tactic of declining to discriminate between combatants and civilians. Their reputation and method were well known in general and to Chiquita in particular, and were the subject of any number of newspaper articles and investigations both in Colombia and abroad. *See supra* ¶¶103 – 110 (Chiquita's knowledge).  Chiquita, the Decedent, and Non-Party Executives engaged the AUC to provide security, suppress union activity, and discourage FARC support despite their prior knowledge that the paramilitaries in general – and the AUC in particular – used terrorism and violence against civilians as a strategy to carry out those goals. *See supra* ¶¶111–121 (Chiquita's intentional support).

367.    Despite their general knowledge about the paramilitaries' tactics and specific understanding of the paramilitaries' activities in Urabá, Chiquita, the Decedent, and Non-Party Executives specifically engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress union activity and discourage support of the FARC – the very activities for which their brutal tactics were notorious.  Chiquita, the Decedent, and Non-Party Executives played this role with the knowledge and intent that the paramilitaries would commit the abuses alleged herein, and they continued to play this role as it became clear that their support was assisting with the torture, murder, and other abuse of Chiquita, the Decedent, and Non-Party Executives' opponents.  *See supra* ¶¶103–121 (knowing and intentional assistance).

iv)    *The AUC's dedication to the use of terrorism and violence against civilians proximately caused Plaintiffs' and decedents' injuries.*

368.    It was the AUC's tactic of using terrorism and violence to intimidate civilians, suppress union activity, and discourage support of the FARC – with the assistance and collaboration of

Chiquita – that proximately caused the deaths of decedents and the mental and physical injuries to Plaintiffs.

> v) *Chiquita, the Decedent, and Non-Party Executives' acts of material support to the AUC, along with its acts of assistance, support, direction, and collusion, violated laws designed to protect Plaintiffs and decedents, the violation of which constitutes negligence* per se.

369.    Chiquita, the Decedent, and Non-Party Executives' support of the AUC violated laws of the United States, Colombia, and New Jersey, the District of Columbia, as well as customary international law, which were meant to protect Plaintiffs and others.  These laws include the Alien Tort Statute and the Torture Victim Protection Act (28 U.S.C. § 1350), among other U.S. statutes, and Colombian statutes outlawing paramilitarism and implementing Colombia's international human rights obligations.  The violation of these laws was negligent and willful, therefore constituting negligence *per se*.

### O. Fifteenth Claim for Relief – Loss of Consortium

370.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

371.    Chiquita, the Decedent, and Non-Party Executives' conduct caused surviving Plaintiffs to suffer loss of consortium and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

372.    At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses, parents, and children to the Plaintiffs who are their spouses, children, and parents, respectively.

373.    As a result of the acts of the Decedent, those Plaintiffs who are the spouses, children, and parents of the decedents have been deprived of the decedents' society, comfort, attention,

services, and support, all to their damage, in an amount to be proved at trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

374. The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.

    i)    *As a result of the murders of decedents by the AUC, Plaintiffs were deprived of their spouses', parents', and children's society, companionship, services, and support.*

375. John Doe 1 lost the society, companionship, services, and support of his father, John Doe 2, when John Doe 2 was killed by the AUC.

376. Jane Doe 1 lost the society, companionship, services, and support of her mother, Jane Doe 2, when Jane Doe 2 was killed by the AUC.

377. Jane Doe 3 lost the consortium, society, comfort, attention, services, and support of her husband, John Doe 5, when John Doe 5 was killed by the AUC.

378. Minor Does 1 – 4 and John Doe 6 lost the society, companionship, services, and support of their mother and wife, Jane Doe 4, when Jane Doe 4 was killed by the AUC. John Doe 6 also lost the consortium of Jane Doe 4.

379. John Doe 7 lost the society, companionship, services, and support of his son, John Doe 8, when John Doe 8 was killed by the AUC.

380. Jane Doe 5 lost the society, companionship, services, and support of her husband, John Doe 9, when John Doe 9 was killed by the AUC.

381.    Jane Doe 6 lost the society, companionship, services, and support of her husband, John

Doe 10, when John Doe 10 was killed by the AUC.

382.    Jane Doe 7 lost the society, companionship, services, and support of her husband, John

Doe 11, when John Doe 11 was killed by the AUC.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## X.    PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in excess of

$75,000, as follows:

   (a) for compensatory damages, including general and special damages;

   (b) for punitive damages;

   (c) for injunctive and declaratory relief as this Court deems appropriate;

   (d) for disgorgement of profits;

   **(e)** for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## XI.    JURY TRIAL DEMAND

383.    Plaintiffs hereby demand a jury trial on all issues so triable.

## XII.    VERIFICATION

On behalf of John Doe et al. Plaintiffs, I do solemnly declare and affirm under penalty of perjury

that the contents of the foregoing Complaint are true and correct to the best of my knowledge,

information, and belief.


Executed on:          September 29, 2015          Respectfully submitted,

_Marco Simons_

Marco Simons [D.D.C. Bar No. 492713]

85

Counsel for Plaintiffs

Jonathan Kaufman
Marissa Vahlsing
Michelle Harrison
**EarthRights International**
1612 K Street NW #401
Washington, DC 20006
Tel: 202-466-5188

Agnieszka M. Fryszman
Benjamin D. Brown
**Cohen Milstein Sellers & Toll, PLLC**
1100 New York Ave., N.W.,
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: 202-408-4600
Fax: 202-408-4634

Paul L. Hoffman
**Schonbrun DeSimone Seplow Harris & Hoffman LLP**
723 Ocean Front Walk
Venice, CA 90291
Tel: 310-396-0731
Fax: 310-399-7040

Judith Brown Chomsky
**Law Offices of Judith Brown Chomsky**
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
 Fax: 202-782-8368

Arturo Carrillo
**Colombian Institute of International Law**
5425 Connecticut Ave., N.W., #219
Washington, D.C. 20015
Tel: 202-994-5794

Declaration of Richard Herz


Exhibit 6



Upasana Khatri <upasana@earthrights.org>

## Fwd: Estate of Roderick Hills Meeting

**Rick Herz** <rick@earthrights.org>                                    Fri, May 29, 2015 at 10:45 AM
To: Terrence Collingsworth <TC@conradscherer.com>, "nj-chiquita@googlegroups.com" <nj-chiquita@googlegroups.com>, Upasana Khatri <upasana@earthrights.org>

Hills' lawyers' pitch to us. Terry, NJ team, any thoughts?

---------- Forwarded message ----------
From: **Blalack II, K. Lee** <lblalack@omm.com>
Date: Thu, May 28, 2015 at 10:01 PM
Subject: RE: Estate of Roderick Hills Meeting
To: Rick Herz <rick@earthrights.org>, "Portnoi, Dimitri D." <dportnoi@omm.com>, Terrence Collingsworth <TC@conradscherer.com>

Rick/Terry,

I am still hoping we will connect via telephone, but given my trial and our scheduling difficulties, I wish to provide some response to your questions in an email.

First, you asked whether, should the Estate be *joined* to the litigation in Florida, would it join the motion to dismiss for *forum non conveniens* and, in connection with that motion, will it consent to jurisdiction in Colombia. I can now represent that, if added to the case, the Estate will join Chiquita's motion to dismiss for *forum non conveniens* and will execute a declaration of consent identical to the one filed by all individual defendants.

Second, you asked whether, if the Estate were *not joined* to the litigation in Florida, would it consent to discovery. I can now represent that the Estate will not object to discovery in connection with the federal multi-district litigation to the same extent as any individual defendant in the federal action, meaning that if and when discovery commences as against individual defendants in the federal action, the non-party Estate will consent to be treated in the same manner as those defendants. The Estate, however, does not waive any relevant privileges nor does it represent that it has in its possession any relevant information or documents. Indeed, the Estate believes that all documents and communications relevant to the facts of your case and Mr. Hills' employment at Chiquita are in the possession of Chiquita. Ms. Hills, the personal representative of the Estate, has no personal knowledge of the facts of this case.

Third, you asked what complexities naming the Estate as a party might pose for plaintiffs. Reserving all rights to make further arguments, the following arguments, we believe, are relevant. First, we believe that there are many complexities involved in the D.C. Probate Code, given that Mr. Hills passed away while a resident of the District of Columbia and the Estate will be probated in that jurisdiction. I am not a probate lawyer, and I obviously do not presume to advise you or your clients of how to comply with probate law in D.C. However, there are procedures for obtaining recovery from an Estate with which plaintiffs must comply. It may not be possible to recover from the Estate without complying with certain procedural requirements and, at a minimum, filing certain required notices. Moreover, we believe your complaints name minors as plaintiffs. Distributions by

an estate to a minor requires that many procedural hurdles be crossed, for the protection of the estate and the minor. We think it is unlikely that any distribution could be authorized in the absence of a parallel action being filed in D.C. Superior Court. Second, since the Estate will now be the party, and not Mr. Hills, the Estate will raise personal jurisdiction arguments that the Estate has not had the requisite minimum contacts with New Jersey to maintain that action. Third, the Estate will make unique arguments under both the TVPA and Colombian law, concerning the survival of the action following the death of Mr. Hills.

I continue to be available to speak with you, although as I've noted I will be in trial during the day on Friday and Monday. Lee

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Tuesday, May 26, 2015 5:51 PM
**To:** Portnoi, Dimitri D.; Terrence Collingsworth

**Cc:** Blalack II, K. Lee
**Subject:** Re: Estate of Roderick Hills Meeting

I would probably have to do it around 9 or so. DOes that work for you guys? Terry?

On Tue, May 26, 2015 at 5:16 PM, Portnoi, Dimitri D. <dportnoi@omm.com> wrote:

Hi Rick,

Lee is in trial now until June 5, but we can set up a call, say, in the evening tomorrow after his trial day wraps up. Does some time after 6 work for you?

Dimitri

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Tuesday, May 26, 2015 2:05 PM
**To:** Portnoi, Dimitri D.
**Cc:** Blalack II, K. Lee
**Subject:** Re: Estate of Roderick Hills Meeting

Are you guys available to discuss, say tomorrow at 1?

On Wed, Apr 29, 2015 at 5:43 PM, Portnoi, Dimitri D. <dportnoi@omm.com> wrote:

Mr. Hertz,

I am helping Lee Blalack to schedule a call next week to discuss your inquiry concerning substitution of the Estate of Roderick Hills. Are you available for a call on Thursday, May 7, at 2:00 Eastern?


Thanks,


**Dimitri Portnoi**

**O'Melveny & Myers LLP**
400 South Hope Street
Los Angeles, CA 90071
Phone: (213) 430-7699
Fax: (213) 430-6407
dportnoi@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

Declaration of Richard Herz


Exhibit 7



Rick Herz <rick@earthrights.org>

## Estate of Roderick Hills Meeting

**Rick Herz** <rick@earthrights.org>
Mon, Jun 1, 2015 at 12:53 PM
To: "Blalack II, K. Lee" <lblalack@omm.com>
Cc: "Portnoi, Dimitri D." <dportnoi@omm.com>, Terrence Collingsworth <TC@conradscherer.com>

Dear Lee:
Although we had previously thought we have a bit more time, we now think that our motion for substitution is due today. Therefore we intend to file it today. But we are still willing to continue discussing this matter with you.

Best,
Rick
[Quoted text hidden]

Declaration of Richard Herz


Exhibit 8



Rick Herz <rick@earthrights.org>

## Estate of Roderick Hills Meeting

**Blalack II, K. Lee** <lblalack@omm.com>                                    Wed, Jun 17, 2015 at 5:05 PM
To: Rick Herz <rick@earthrights.org>
Cc: "Portnoi, Dimitri D." <dportnoi@omm.com>, Terrence Collingsworth <TC@conradscherer.com>, "Metlitsky, Anton" <ametlitsky@omm.com>

Rick:

I wanted to get back to you all regarding your Rule 25 motion.  For the reasons we previously discussed, I was disappointed that you all decided to proceed with this motion but I am pleased to hear that you all remain willing to consider further the prudence of investing energy and resources in an action against the Estate of Mr. Hills.  To that end, I propose that we reconvene next week to discuss whatever reservations you all still had as of the time of your filing.  Please let me know if you all think such conversations would be useful.

In the interim, however, I wanted to notify you as a courtesy that the Estate will not be responding to plaintiffs' motion to substitute until the motion -- and a notice of hearing -- is served properly under Rule 4, as required by Rule 25(a)(3).  Once service is effected in compliance with the Federal Rules, the Estate will respond to the motion.

Best.  Lee

**From:** Rick Herz [mailto:rick@earthrights.org]
**Sent:** Monday, June 01, 2015 12:53 PM
**To:** Blalack II, K. Lee
**Cc:** Portnoi, Dimitri D.; Terrence Collingsworth

[Quoted text hidden]

[Quoted text hidden]

Declaration of Richard Herz


Exhibit 9

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### PROBATE DIVISION

In re: Estate of Roderick Hills (deceased) Case No. 2014 ADM 001194; 2014 WIL 000860

### MOTION TO RESTRAIN AND/OR REVERSE DISTRIBUTION OF ASSETS

For the reasons stated below, Claimants John Doe et. al. ("Claimants"), respectfully move this Court to restrain any further distribution and, to the extent possible, reverse distributions already made of the estate of Roderick Hills, and request that the Court schedule a hearing on this issue.

### I.    BACKGROUND

1.      Claimants are creditors of the estate of Roderick Hills based on their lawsuit against the decedent – *John Doe et al. v. Chiquita Brands Int'l et al.*, No. 08-80421 (S.D. Fla) – where Mr. Hills was a named individual defendant. Declaration of Marco Simons ("Simons Decl.") Ex. 1 at 4.

2.      Claimants are family members, including children, of trade unionists, banana workers, political organizers, social activists, and others targeted and killed by terrorists in Colombia, most notably the paramilitary organization United Self-Defense Groups of Colombia (Autodefensas Unidas de Colombia, or AUC), between 1995 and 2004. Simons Decl. ¶ 2. In 2007, Chiquita pled guilty to a federal criminal charge of engaging in transactions with an officially designated terrorist organization, after admitting that it had illegally made over $1.7 million in payments to the AUC over several years.[1]

3.      In 2007, Claimants sued Chiquita and several unnamed Chiquita executives in a class action

---

[1] *See* U.S. Dep't of Justice, Press Release, "Chiquita Brands International Pleads Guilty to Making Payments to a Designated Terrorist Organization And Agrees to Pay $25 Million Fine" (March 19, 2007), *available at* http://www.justice.gov/archive/opa/pr/2007/March/07_nsd_161.html.

1

suit in the District of New Jersey (the "New Jersey" case). In 2008, that suit was transferred, along with several others, to the Southern District of Florida by the Judicial Panel on Multidistrict litigation, where it became *John Doe et al. v. Chiquita Brands Int'l et al.,* No. 08-80421 (S.D. Fla). Simons Decl. ¶ 3.

4.      Claimants' suit alleges that, in order to produce bananas in an environment free from labor opposition and social disturbances, Chiquita and others funded, armed, and otherwise supported the AUC. The deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious support of terrorist organizations. These actions violated not only Colombian law and U.S. law, but also customary international law prohibiting crimes against humanity, extrajudicial killing, torture, war crimes, and other abuses. Simons Decl. Ex. 1 at 2.

5.      In 2012, after discovering information pointing to which of Chiquita's executives were involved in this tortious conduct, the Claimants filed an amended complaint in the New Jersey case naming decedent Roderick Hills, the former head of Chiquita's audit committee, and other former executives, as defendants. Simons Decl. ¶ 4. The Complaint alleges that as a director and chairman of the audit committee, decedent Roderick Hills knowingly authorized payments to AUC, a designated terrorist organization.  *See* Simons Decl. Ex. 1 at 4.  Roderick Hills waived service pursuant to Federal Rule of Civil Procedure 4(d), and executed a waiver of service form, which was filed in the New Jersey case. Simons Decl. Ex. 2.

6.      On March 3, 2015, counsel for Roderick Hills – K. Lee Blalack II, of O'Melveny & Myers – filed a Suggestion of Death in the multi-district litigation, including the New Jersey case. Simons Decl. Ex. 3. Shortly thereafter, counsel for Claimants received a Notice of Appointment of the Personal Representative, which indicated that it had also been sent on March 3, 2015. Simons Decl. ¶ 8. That Notice of Appointment, which indicated that claims needed to be presented to the Personal Representative by June 1, 2015, had been filed with this Court almost four months earlier –

2

on November 20, 2014. Notice of Appointment and General Information for Heirs, Legatees and Creditors. (ADM 001194, Docket date Nov. 20, 2014). On June 1, 2015, pursuant to Federal Rule of Civil Procedure 25(a), Claimants filed a Motion for Substitution in the New Jersey case, naming Carla Hills as a defendant in her capacity as personal representative of the estate of Roderick Hills. Simons Decl. Ex. 4. Based on the ongoing litigation, Claimants submitted a creditor's claim to this Court on July 21, 2015. Creditor Claim of EarthRights International on behalf of John Doe et. al. (ADM 001194, Docket date July 21, 2015). On July 31, Claimants received notice of Carla Hills' disallowance of the claim, which offered no basis for the disallowance. Notice of Action Taken on Claim of John Doe et al. (ADM 001194, Docket date July 31, 2015). On September 29, within two months of disallowance, pursuant to D.C. Code § 20-908(a), Claimants filed a verified complaint in U.S. District Court for the District of Columbia. Simons Decl. Ex. 5.

7.     Claimants filed that complaint out of an abundance of caution; in substance it is identical to the operative complaint in the New Jersey case, but names on Carla Hills as a defendant, again in her capacity as personal representative of the estate of Roderick Hills. Simons Decl. Ex. 5.

8.     On October 7, 2015, Carla Hills filed a motion to dismiss in the New Jersey case arguing that the Plaintiffs' claims in are prudentially moot, as their claims against the estate in this court are time barred. Simons Decl. Ex. 6 at 8.

9.     Claimants requested Ms. Hills' consent to the subject of this motion on November 5, 2015. Counsel for Ms. Hills acknowledged receipt of this request and indicated that Ms. Hills would likely not consent, but as of this writing has not indicated a final position on this motion.

## II.     ARGUMENT

### A. Because Claimants had already sued the decedent and the personal representative had actual knowledge of the claims, the six-month limitation period does not apply here.

10.     In a recently-filed motion to dismiss in the New Jersey case, Ms. Hills has argued that

3

Claimants' claims are time-barred, because 1) the Notice of Claim was presented more than six months after the publication of her appointment of the personal representative, and 2) Claimants filed their claims in federal court in D.C., not D.C. Superior Court, after the personal representative disallowed the claim. Simons Decl. Ex. 6 at 10.

11.      Even if these steps were required here, Claimants complied with them, as set forth below. But none of that is required here, because Claimants had already sued the decedent before his death.

12.      The very statute that imposes the six-month limitation for presentation of claims against the estate states that the limitation does not apply to the claims such as here: "Nothing in this section shall affect any action that was commenced against the decedent if the decedent had been duly served with process before death . . . ." D.C. Code § 20-903. The New Jersey case was commenced against the decedent before his death, specifically in 2012 when an amended complaint was filed in New Jersey naming decedent Roderick Hills as an individual defendant. Mr. Hills had accepted service at the time and therefore was duly served.

13.      The personal representative is personally liable for premature distribution of the estate. The statute shields the personal representative from responsibility in improper distribution of assets only when "1) the personal representative had no actual knowledge of such claim, *and* (2) the claimant had not timely presented such claim in accordance with section 20-905." D.C. Code § 20-903 (emphasis added). Even if Ms. Hills is correct that Claimants did not timely present their claims, there is no dispute that Ms. Hills had actual knowledge of the claims in the New Jersey case. Indeed, the counsel who filed the Suggestion of Death filed in the multi-district litigation both indicated that they were "counsel for defendant Roderick M. Hills, Sr.," and, in the signature block, "Attorneys for Carla M. Hills, as the Personal Representative of the Estate of Roderick M. Hills, Sr." Simons Decl. Ex. 3. Mr. Blalack has continued to represent Ms. Hills in the New Jersey case. Indeed, in the New Jersey case, the Estate conceded that "Ms. Hills was fully appraised of the nature and posture of this

4

litigation." Simons Decl. Ex. 6 at 3. There is no question that the personal representative had actual knowledge of these claims.

**B. Claimants followed the requirements of federal law.**

14.     The New Jersey case is a federal lawsuit, and Federal Rule of Civil Procedure 25(a) expressly sets forth the procedure for continuing claims when a party has died. Claimants followed those procedures, moving to substitute Ms. Hills, in her capacity as personal representative, for the decedent. The court granted that motion. Simons Decl. Ex. 7.

**C. Claimants are in compliance with the requirements of section 20-905.**

15.     Because they had previously sued the decedent in federal court, followed the federal rules for continuing the claims against the estate, and because the personal representative had actual notice of the claims, no further steps were necessary in order to perfect Claimants' claims. Ms. Hills is personally liable for any improper or premature distributions that ignore Claimants' claims. Nonetheless, even if Claimants needed to follow the requirements of D.C. Code § 20-905, they have done so.

16.     First, Claimants timely presented a Notice of Claim. Although this was not done within six months of the appointment of the personal representative, it was done within six months of Claimants receiving notice of the appointment. The personal representative has both a due process duty under the Constitution to provide "actual notice to known or reasonably ascertainable creditors," *Tulsa Professional Collection Services, Inc., v. Pope*, 485 U.S. 478, 490 (1988), and a statutory duty: "Not later than 20 days after appointment, a personal representative . . . shall send, by registered or certified mail to . . . all creditors whose identities are known or whose identities are reasonably ascertainable by reasonably diligent efforts, the text of the first newspaper notice of the appointment of such representative, and the following general information in a form developed by the Court . . . ." D.C. Code § 20-704. Ms. Hills failed to do this until more than three months after

her appointment.

17.     The constitutional requirement of actual notice is not fulfilled when the personal representative delays in notifying known creditors, and then relies on the original appointment date to cut off the time for presenting claims. Instead, in such a case, the only sensible rule is that the six-month period for presentation of claims must run from the date of notice. And there is no question that Claimants did present their claims within six months of notification of Ms. Hills's appointment.

18.     Second, Claimants also re-filed their claims, out of an abundance of caution, in accordance with D.C. Code § 20-908. Section 908(a) provides that upon a disallowance, a creditor must file "a verified complaint in the Court, not later than 60 days after the mailing of the notice disallowing the claim." The meaning of "the Court" is not entirely clear in this statute, and Ms. Hills has elsewhere suggested that the operation of this statute requires all claims – even claims in diversity, and claims under federal law – to be filed in the Superior Court. Not so. The Probate Division rules clarify this requirement, in the language prescribed for the notice of disallowance: "If your claim has been disallowed in whole or in part, it will be barred to the extent of its disallowance unless you file a verified complaint with the appropriate Division of this Court *or other court of competent jurisdiction* within 60 days . . . ." D.C. Superior Court Probate Rule 411 (emphasis added). This, of course, makes sense, because D.C. probate law cannot affect a litigant's substantive rights to litigate federal question or diversity claims in federal court.

19.     Thus while Claimants were *already* in compliance with section 20-908 because the New Jersey case had already been filed in a court of competent jurisdiction, they complied again by re-filing those claims in the U.S. District Court for the District of Columbia. Given the multidistrict nature of this lawsuit and the fact that a probate court would not be adequately resourced to adjudicate on the underlying federal and Colombian tort claims, Plaintiffs made the rational decision to file the verified complaint in a D.C. federal court. D.C. probate law certainly cannot operate to deny

Claimants a federal forum for their claims.

20.     Moreover, D.C. law provides that if notice is given to the personal representative and not registered in the probate proceedings within the six month period, a claim nonetheless "shall be deemed presented" if the failure to register with probate proceedings was inadvertent. D.C. Code § 20–905(a)(2). When Claimants submitted their Motion for Substitution in the New Jersey case on June 1, 2015, naming the personal representative, Carla Hills, as a defendant in multi-district litigation, notice to the personal representative was complete. This was within the statutorily required six month period as the date of the publication stated on the Notice of Appointment is December 1, 2015. *See* Notice of Appointment. Claimants did not submit the claim to the probate proceeding until July 21 because they did not think it was required due to the language in D.C. Code § 20-903, which explicitly exempts claims such those of the Claimants. *See supra* at 4. Whether or not an action is inadvertent is a question of fact, *District of Columbia v. Gantt*, 558 A.2d 1120, 1126 (D.C. 1989), where knowledge of the requirement serves as a factor. *In re Estate of Sato*, 878 A.2d 1247, 1250 (D.C. 2005) (personal representative's failure to submit a claim was deemed not to be inadvertent due to her familiarity with the system from responding to notices of claims filed by other creditors). Failure to comply with a requirement because one thought no such requirement existed certainly counts as inadvertent within the meaning of the statute.

**D.   DC law requires a personal representative to consider all valid claims about which she has personal knowledge, even when probate formalities are not followed.**

21.     Even if Claimants had not followed the requirements of the Probate Code, the personal representative would *still* not be justified in distributing the estate without considering their claims. "In administering an estate a personal representative is obliged to consider all valid claims about which he has personal knowledge, *even if creditors fail to comply with the [probate] statute's enumerated filing formalities.*" *In re Estate of Monge*, 841 A.2d 769, 774 (D.C. 2004) (calculus for the distribution of the estate's assets in D.C. should have included claims of 106 creditors filed and recognized in Puerto

7

Rico). In another case, the Court of Appeals went even further, holding that because the personal representative had actual notice of claims, no discretionary basis existed for denying the claim. *In re Estate of Phillips*, 532 A.2d 654, 656 (D.C. 1987), *see also Richard v. McGreevy*, 953 A.2d 1028, 1032 (D.C. 2008) (claimants failed to present their claims in D.C. Probate Division but the personal representative had actual knowledge of their identical claims in D.C. Superior Court and in Maryland). This is so because a "personal representative cannot hide behind a procedural defect in the notice in order to avoid paying a legitimate debt of which the personal representative had actual, timely notice, and the trial court abuses its discretion under D.C. Code § 20–905(c) if it disallows such a claim purely for defect of formal notice to the personal representative." *In re Estate of Sato*, 878 A.2d at 1251. Carla Hills undoubtedly had actual knowledge of the claims here, therefore had no basis for disallowing the claim, let alone for moving ahead with distribution of assets.

### E.  Carla Hills is in violation of her duties to the Claimants as creditors.

22.     The personal representative owes fiduciary and other general duties to creditors, namely to fairly consider their claims among those of other interested persons. D.C. Code § 20-701. *In re Jacobson's Estate*, 387 A.2d 590, 591 (D.C. 1978). Disallowing a claim and proceeding with distribution of the assets prematurely without any explanation, as the personal representative apparently did here, would hardly count as fair – especially when the personal representative herself is the sole named beneficiary of the will. Courts have recognized the difficult job of an executor who has to represent both the creditors and beneficiaries of an estate. *Hagan v. Walker*, 55 U.S. 29, 34-35, (1852); *Cent. Nat. Bank v. Hume*, No. 7906, 1884 WL 20340, at *3 (D.C. Dec. 19, 1884) *aff'd as modified*, 128 U.S. 195 (1888). In this situation, however, Carla Hills – as the sole named beneficiary – did not have the responsibility of balancing other beneficiaries' interests, but only her own. Last Will and Testament of Roderick M. Hills. (WIL 000860, Docket Date 11/07/2014). Therefore, her job was relatively uncomplicated by conflicting duties.

**F.** **Equity requires preserving Claimants' ability to recover.**

23.     Finally, even if Plaintiffs were in anyway deficient in their handling of the proceedings in probate, which they believe they were not, they respectfully ask this Court to consider their claim against the Estate as a matter of equity. Any minor procedural defects on their part, which have arguably been offset by Ms. Hills's own mishandling of the estate's distribution, pale in comparison to the egregious acts of violence they and their families suffered as a result of the decedent's action. Any premature distribution of assets should be restrained and, to the extent possible, reversed.

### III.     REQUEST FOR HEARING

Claimants respectfully request that the Court schedule a hearing on this Motion.

### IV.     RELIEF REQUESTED

For the foregoing reasons, Claimants respectfully request this Court to restrain any further distribution of the Estate of Roderick M. Hills, Sr., and, to the extent possible, to order reversal of any distributions made thus far. At a minimum, distributions made to the personal representative, Carla Hills, should be reversed until such time as the rights of Claimants and other creditors can be determined.

### V.     VERIFICATION

On behalf of John Doe et al. Claimants, I do solemnly declare and affirm under penalty of perjury that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

Dated: November 9, 2015                                   Respectfully submitted,

/s/ MARCO SIMONS
Marco Simons,
*Counsel for Claimants John Doe I et al.*
D.C. Bar No. 492713
EarthRights International

1612 K St. NW, Suite 401
Washington, DC 20006
Tel: 202-466-5188
Fax: 202-466-5189
marco@earthrights.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY the foregoing document was filed with the Clerk of the Court using Court Cases Online system on November 9, 2015. I also certify that the foregoing document is being served this day on Carla A. Hills, Personal Representative of the Estate of Roderick M. Hills via her Counsel as indicated below.

By email:

Ellen Harrison
*Probate Counsel for Carla A. Hills*
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, DC 20001
 Phone: 202-756-8635
Fax: 202-756-8087
Email: eharrison@mwe.com

/s/ MARCO SIMONS
Marco Simons
*Counsel for Claimants John Doe I et al.*
D.C. Bar No. 492713
EarthRights International
1612 K St. NW, Suite 401
Washington, DC 20006
Tel: 202-466-5188
Fax: 202-466-5189
marco@earthrights.org

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

## PROBATE DIVISION

## [PROPOSED] ORDER

Upon consideration of the Motion for filed herein by John Doe et. al., and any response thereto, it is

hereby, by the Court, this _____day of _____, 20_____,

ORDERED

1. That the motion be granted.

2. That any further distribution of the Estate of Roderick M. Hills , Sr., be restrained, and

distributions made to the personal representative, Carla Hills be reversed until such time as the

rights of Claimants and other creditors can be determined.

Affected parties:

Claimants: John Doe et. al.
c/o EarthRights International
1612 K St. NW, Suite 401
Washington, DC 20006
Tel: 202-466-5188

Marco Simons
*Counsel for Claimants John Doe I et al.*
EarthRights International
1612 K St. NW, Suite 401
Washington, DC 20006
Tel: 202-466-5188
Fax: 202-466-5189
marco@earthrights.org

Carla A. Hills, Personal Representative of the
Estate of Roderick M. Hills

Ellen Harrison
*Probate Counsel for Carla A. Hills*
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, DC 20001
Phone: 202-756-8635
Fax: 202-756-8087
Email: eharrison@mwe.com

12

Declaration of Richard Herz


Exhibit 10

FILED

NOV 07 2014

Register of Wills
Office of the Probate Division

SCANNED
DOCKLIE.

# LAST WILL AND TESTAMENT

## OF

## RODERICK M. HILLS

I, RODERICK M. HILLS, domiciled in the District of Columbia, do hereby make, publish and declare this as and for my Last Will and Testament and do hereby revoke all of my prior wills and codicils. I am married to CARLA A. HILLS and all references in this Will to my spouse or wife shall be to CARLA A. HILLS. All references in this Will to my children shall be to LAURA HILLS, RODERICK M. HILLS JR., MEGAN E. HILLS and ALISON M. HILLS and any children I may have or adopt after the date of this Will.

### FIRST:  Payment of Debts and Expenses

My Personal Representative shall pay my debts, provided that no secured debt need be paid prior to its maturity; the expenses of my last illness, funeral and cremation or burial (including grave site, gravestone and perpetual care), without court approval and without regard to any statutory limitations on the amount thereof; and the expenses of administering my estate, except to the extent that the then-acting Trustee of the Declaration of Trust shall pay such debts and expenses pursuant to a direction or discretion set forth in the Declaration of Trust.

### SECOND:  Payment of Taxes

I direct that the taxes imposed by reason of my death upon property passing under and outside this Will be apportioned and paid in the manner provided in the Declaration of Trust, and I incorporate the tax apportionment provisions of the Declaration of Trust as part of this Will.

### THIRD:  Joint Property

I hereby confirm my intention that all property, real or personal, tangible or intangible, that is registered or held jointly at the time of my death (other than as tenants in common) in the names of myself and my spouse or any of my children, shall pass by right of survivorship or

operation of law outside of the terms of this Will to such other person, if he or she survives me. To the extent that my intention may be defeated by any rule of law, I give, devise and bequeath such jointly held property to such other person if he or she shall survive me.

**FOURTH: Bequest of Tangible Personal Property**

I give and bequeath all of my Tangible Personal Property to my wife, if she shall survive me, or, if my wife shall not survive me, to such of my children who shall survive me, to be divided among them in such manner as they may agree, or if they fail to agree, as my Personal Representative determines; provided, however, that if my wife predeceases me, (i) if my daughter, MEGAN, survives me, all contents of the residence located at 3115 Nebraska Avenue, N.W., Washington, District of Columbia (Lot 0863, Square 1427) shall be disposed of as provided in Article FIFTH hereof; and (ii) if my Personal Representative is a beneficiary under this Article, any disputed items shall be sold and the proceeds thereof distributed to such beneficiaries in equitable proportions after taking into account the value of Tangible Personal Property each child has already received under this Article. Any Tangible Personal Property remaining after such division and sale may be donated to one or more charitable organizations selected by my Personal Representative. Any costs of packing, insuring and shipping shall be paid as a general administration expense.

I may leave a letter or memorandum suggesting how the property distributable under this Article shall be divided and/or asking beneficiaries to make gifts on my behalf. I hereby request, but do not require, that the beneficiaries follow my suggestions and keep or dispose of such property in accordance with such instrument, or failing such instrument, in accordance with my wishes as known to them.

The bequest of any property under this Article includes any insurance on such property.

-2-

If, in the opinion of my Personal Representative, any beneficiary is under a disability, my Personal Representative shall represent such beneficiary in the division of property among the beneficiaries entitled thereto. Any or all of the items distributable to any such beneficiary may, in my Personal Representative's discretion, be (i) delivered to the beneficiary, to the parent or guardian of the beneficiary, to a person designated by my Personal Representative to act as custodian for any beneficiary who is a minor, or to the person caring for or having custody of the beneficiary (and a receipt signed by such person shall fully discharge my Personal Representative), (ii) sold and the proceeds distributed to the then-acting Trustee of the Declaration of Trust, to be retained for such beneficiary under Section 1.12 thereof, or (iii) may be distributed to said Trustee to be retained under Section 1.12 of the Declaration of Trust, with any expenses for storage, insurance and safekeeping to be paid from the income of any trust from which such beneficiary is eligible to receive income.

**FIFTH:  Specific Distribution**

If my wife predeceases me and my daughter, MEGAN, survives me, I give any interest owned by me in the real property and improvements located at 3115 Nebraska Avenue, N.W., Washington, District of Columbia (Lot 0863, Square 1427), and the contents of the residence, to the Hills Irrevocable Trust (as defined in Section 5.1 of the Declaration of Trust), to be administered and distributed pursuant to the provisions of Section 1.1 thereof.  If I shall have sold such real property and improvements prior to my death, I give and bequeath an amount equal to the net proceeds from the sale of such property to the Hills Irrevocable Trust. "Net proceeds" means the amount shown as due to the seller on the settlement statement upon the sale of such property.

**SIXTH:  Powers of Appointment**

I do not exercise any powers of appointment of which I am donee.

-3-

400135-3963

**SEVENTH:  Bequest of Residuary Estate**

I give, devise and bequeath my Residuary Estate to the then-acting Trustee of the

Declaration of Trust, to be added to and administered as part of the principal thereunder.  If any

property would be distributable outright to a beneficiary of any trust thereunder when received

by said Trustee, my Personal Representative may distribute such property directly to such

beneficiary.  To the extent necessary to make this bequest effective, I incorporate by reference

the provisions of the Declaration of Trust.

**EIGHTH:  Personal Representative**

The following provisions shall govern the nomination and service of my Personal

Representatives hereunder.

(a)     Nomination of Personal Representative.  I nominate and appoint
my wife as Personal Representative of this, my Last Will and Testament.  If my
wife shall fail to serve as Personal Representative or shall cease to serve as
Personal Representative without having nominated a successor who is willing and
able to serve, I nominate and appoint my daughter, LAURA HILLS, and my son,
RODERICK M. HILLS JR., as successor Co-Personal Representatives hereof.

(b)     Co-Personal Representatives and Successor Personal
Representatives.  At any time, my Personal Representative, acting by unanimous
vote if more than one is serving, may nominate an individual, bank or trust
company to serve as an additional Personal Representative.  In addition, each
Personal Representative may nominate an individual, bank or trust company to
serve in case of such Personal Representative's death, resignation, failure or
inability to act, with power while serving as Personal Representative to revoke
such nominations and make others instead.

(c)     Compensation.  Any corporate Personal Representative shall be
entitled to receive reasonable compensation for its services as provided in any
agreement between such corporate Personal Representative and any individual
Personal Representative hereunder or me.  In the absence of such agreement, a
corporate Personal Representative shall be entitled to receive reasonable
compensation for its services according to its published fee schedule as may be in
effect from time to time during the period in which its services are rendered.  Any
individual Personal Representative shall also be entitled to receive reasonable
compensation for his or her services, and any Personal Representative serving
hereunder shall be entitled to reimbursement for any and all costs, charges and
expenses reasonably incurred and necessary or proper for the administration of

-4-

my estate. Any such compensation and reimbursements may be made without court approval.

(d)    **Personal Representative Dealing with Self and Third Parties.** A Personal Representative shall not be disqualified in the exercise of any powers because of any property interest such Personal Representative owns, and my Personal Representative may enter into dealings with any beneficiary hereunder, any fiduciary hereunder (including my Personal Representative) or fiduciaries of other estates or trusts, even if any such fiduciary is also acting hereunder, upon the condition, however, that any such transactions shall not be for less than full and adequate consideration. No person or organization dealing with my Personal Representative shall be required to inquire into my Personal Representative's authority for entering into any transaction or to see to my Personal Representative's application of the proceeds of any such transaction.

(e)    **Bond; Administration of Estate.** I direct that no bond or other security shall be required in any jurisdiction of any Personal Representative and I direct my Personal Representative to administer my estate without the supervision of any court, to the extent permitted by law. I authorize my Personal Representative to elect modified or unsupervised administration, if available. I specifically waive any requirement that my Personal Representative prepare or file with any court any inventory, appraisal or accounting of any trust funded from my estate. My Personal Representative may from time to time present accounts to any adult and legally competent beneficiary or a parent or guardian of a beneficiary who is under a disability. The written release of such person shall discharge my Personal Representative with respect to all acts or omissions to the date of said account (except for any that were fraudulent, dishonest or committed in bad faith), without the necessity of court approval and such release shall bind all persons at any time having or claiming any interest hereunder in my estate, provided that no Personal Representative may approve an account or deliver a release with respect to any account on behalf of any beneficiary, including himself or herself. No successor Personal Representative shall be required to inquire into or audit the proceedings of any predecessor Personal Representative or to make any claim against such predecessor Personal Representative, and a successor Personal Representative shall not be accountable or liable to any person for failure to make such inquiry or audit. Nothing contained in this Paragraph shall be deemed to give any person acting in conjunction with my Personal Representative any power or right to enlarge or shift beneficial interests of any beneficiary or potential beneficiary hereunder or to restrict my Personal Representative from seeking judicial approval of my Personal Representative's accounts.

(f)    **Liability.** No Personal Representative shall be liable for any loss, damage or expense arising from the administration of my estate, except for any occasioned by my Personal Representative's gross negligence, dishonesty or bad faith. No Personal Representative shall be liable for any acts or omissions of any agent properly selected or delegated authority hereunder with reasonable care. No Personal Representative shall be liable for any loss, damage or expense caused by

-5-

any other Personal Representative, including those caused by the exercise or nonexercise of any powers delegated to the other Personal Representative pursuant to the provisions of this Will.

(g)    **Powers of Successor and Additional Personal Representatives.** Any substituted, successor or additional Personal Representative shall be vested with the same powers, rights, duties, obligations and immunities as the Personal Representative originally named.  Any corporation resulting from any merger, conversion, reorganization or consolidation to which any corporation acting as Personal Representative hereunder shall be a party, or any corporation to which shall be transferred all or substantially all of any such corporation's trust business, shall be the successor of such corporation as Personal Representative hereunder without the execution or filing of any instrument or the performance of any further act and shall have the same powers, authorities and discretion as though originally named herein.

(h)    **Personal Representative Acts** in Fiduciary Capacity.  Every person, firm or corporation contracting or otherwise dealing with my Personal Representative shall look only to the property of my estate for payment of any obligation arising hereunder, and no Personal Representative shall be personally liable therefor even though the Personal Representative did not exempt such Personal Representative from personal liability when entering into any transaction regarding my estate or trust.

**NINTH:  Powers of Personal Representative**

In addition to any authority otherwise granted by law, I grant to my Personal Representative (i) the powers specified in this Article and (ii) all of the powers granted to the Trustee under the Declaration of Trust, which are hereby incorporated by reference.  All of these powers are to be exercised solely in a fiduciary capacity, in the sole and absolute discretion of my Personal Representative, without court approval and shall be exercisable until final distribution of my estate.

(a)    Advance Distributions.  My Personal Representative is authorized to make partial or complete distributions (including distributions of income or distributions as advances of income not yet received) prior to the time prescribed by law, without requiring any security from any legatee or devisee.

(b)    Ancillary Proceedings.  My Personal Representative is authorized to act in any jurisdiction where permitted by law to do so, to designate one or more individuals or institutions to be ancillary Personal Representatives in any jurisdiction in which ancillary administration is necessary, to negotiate and determine the compensation to be paid to any ancillary Personal Representatives,

-6-

400335159v1

whether or not such compensation would otherwise be authorized by law and to remove and replace any ancillary Personal Representative appointed hereunder. I hereby appoint any ancillary Personal Representatives so designated, and direct that they need not post bond or enter security in such jurisdictions. With respect to any property subject to ancillary administration, I hereby grant to such ancillary Personal Representatives all of the powers, authorities and discretion granted herein to my Personal Representative, but any action requiring the investment of additional funds or the assumption of additional obligations shall require the written consent of my domiciliary Personal Representative.

(c)    Tax Elections. My Personal Representative is authorized to make tax elections and allocations in any manner directed by this Will or the Declaration of Trust or, in the absence of any direction, in any manner that appears advisable, provided that only an Independent Personal Representative may make tax elections and allocations that affect beneficial enjoyment (except such elections and allocations that are made in accordance with the directions made by me in my Will or in the Declaration of Trust) and an Independent Personal Representative shall have discretion to make tax elections and allocations in a manner different from my directions and to determine whether any adjustments between one or more beneficial shares or between income and principal shall be made by reason of any such election or allocation. Absent bad faith, no Personal Representative shall be liable to any beneficiary for any result of such election, allocation or determination. In allocating any basis adjustments available under section 1022 of the Code, my Personal Representative shall have no duty to favor the beneficiaries of my probate estate over other persons receiving property eligible for such basis adjustments.

(d)    In General. As a fiduciary, my Personal Representative is authorized to do any and all other acts which my Personal Representative shall deem proper to effectuate the powers specifically conferred by this Will.

My Personal Representative is specifically authorized to acquire and retain investments

not regarded as traditional for estates, and I hereby expressly waive the application of any

"prudent person" or "prudent investor" rule.

**TENTH: Definitions**

The following definitions shall apply to this Will:

(a)    Code. All references herein to the "Code," unless otherwise indicated, are to the Internal Revenue Code of 1986, as amended. Any reference to a specific section of the Code shall also refer to any successor provision of law.

(b)    Declaration of Trust. Any reference herein to the Declaration of Trust shall be to The Roderick M. Hills Declaration of Trust of even date herewith, which I signed before signing this Will, as it may be amended by me

from time to time, provided, however, any terms of the Declaration of Trust that are incorporated herein by reference shall be such terms as are now in effect. Unless otherwise indicated, any terms defined in the Declaration of Trust shall have the same meaning when used in this Will.

(c)     Disability. Except as otherwise provided herein, a person shall be considered to be under a disability while under the age of twenty-one (21) years or at any time when such person shall in the opinion of my Personal Representative be unable by reason of advanced age, illness or other condition (including, but not limited to, substance abuse or cult influence) to manage his or her affairs.

(d)     Independent Personal Representative. Any reference herein to an "Independent Personal Representative" means a person who is not a beneficiary under my Will or Declaration of Trust. If no Independent Personal Representative is serving, the powers granted to an Independent Personal Representative may not be exercised.

(e)     Personal Representative. The word "Personal Representative" as used herein shall also be construed to apply to any executor or administrator.

(f)     Residuary Estate. The term "Residuary Estate" shall refer to all property wherever situated, whether real, personal or mixed, that I own at my death, including any property not otherwise effectively disposed of by this Will, that remains after paying or providing for all specific devises and bequests, legacies and the payment of my debts and the expenses of administering my estate, other than Death Taxes and Direct Skip GST taxes that are payable from my Residuary Estate.

(g)     Tangible Personal Property. The term "Tangible Personal Property" refers to household and personal effects, vehicles, sports equipment, pets, club memberships and frequent flyer miles. It does not refer to money or securities or any tangible personal property used in a trade or business, other than my personal office furniture and equipment.

## ELEVENTH:  General Provisions

(a)     Disclaimer. Anything in this Will notwithstanding, any person may disclaim in whole or in part any property or power granted to such person as a result of my death, including fiduciary powers. Any such disclaimer shall be made by a duly acknowledged instrument that is executed by such person and is delivered to my Personal Representative. Such instrument need not take effect immediately and may be contingent. In the event that any person having disclaimer rights shall be deceased or under a disability, these rights may be exercised by his or her attorney-in-fact, conservator, guardian, committee or Personal Representative. My Personal Representative may in like manner disclaim, in whole or in part, any property passing to me or my estate or any power granted to my Personal Representative on behalf of such Personal

-8-

Representative alone or on behalf of such Personal Representative and any successor Personal Representatives.

     (b)    **Spendthrift Provision.** As long as my Personal Representative holds the principal of my estate, it shall be free from the control, debts and liabilities of any beneficiary interested therein and shall not be subject to execution or process for the enforcement of judgments or claims against the beneficiary. Except with the prior written approval of my Personal Representative, a beneficiary may not assign such beneficiary's interest hereunder and no beneficiary shall have the power to appoint any agent or attorney-in-fact to collect or receive any income or principal.

     (c)    Gender; Number. The use of any gender in this Will shall be deemed to be and include the other genders, and the use of the singular herein shall be deemed to be and include the plural (and vice versa), whenever appropriate.

IN WITNESS WHEREOF, I set my hand and seal to this Will this 13th day of July, 2006.

                                    (SEAL)

                        RODERICK M. HILLS

On the 13th day of July, 2006, RODERICK M. HILLS declared to us, the undersigned witnesses, that the foregoing instrument was his Last Will and Testament and he asked us to act as witnesses to the same and to his signature thereon. He thereupon signed said Will in our presence, we being present at the same time. And we now at his request, in his presence, and in the presence of each other do hereunto subscribe our names as witnesses. And we and each of us declare that we believe this Testator to be of sound mind and memory.

NAMES                              ADDRESSES

Signature
Print Name: KENNETH D. MIDDLETON    6514 DE LUTSON DRIVE
                                 FORT WASHINGTON, MD 20744,1981

Signature
Print Name: Thomas J Elrod    3434 Realy Dr
                                 Annandale, VA 22003

Signature
Print Name: Ellen Hensen

-9-

4003335159v1

CITY OF WASHINGTON            )
                             )      To wit:
DISTRICT OF COLUMBIA          )

     Before me, the undersigned authority, on this day personally appeared RODERICK M. HILLS, _KENNETH D. MIDDLETON_ _Thomas J. Elrod_, and _Ellen Harrison_, known to me to be the Testator and the witnesses, respectively, whose names are signed to the attached or foregoing instrument and, all of these persons being by me first duly sworn, RODERICK M. HILLS, the Testator, declared to me and to the witnesses in my presence that said instrument is his Last Will and Testament and that he had willingly signed or directed another to sign the same for him and executed it in the presence of said witnesses as his free and voluntary act for the purposes therein expressed, that said witnesses stated before me that the foregoing Will was executed and acknowledged by the Testator as his Last Will and Testament in the presence of said witnesses who in his presence and at his request and in the presence of each other did subscribe their names thereto as attesting witnesses on the day of the date of said Will and that the Testator, at the time of the execution of said Will, was over the age of eighteen (18) years and of sound mind and disposing mind and memory.

     Sworn and acknowledged before me by RODERICK M. HILLS, the Testator, and _KENNETH D. MIDDLETON_, _Thomas J. Elrod_, and _Ellen Harrison_, witnesses, this 13th day of July, 2006.

                              _Gloria Coci_                (SEAL)
                              Notary Public

                              My Commission Expires: ___Gloria Coci___
                                                        Notary Public, District of Columbia
                                                        My Commission Expires 11/14/2010

Declaration of Richard Herz


Exhibit 11

## DECLARACIÓN DE JAIME ALBERTO ARRUBLA PAUCAR

Yo, JAIME ALBERTO ARRUBLA PAUCAR, mayor de edad, identificado en Colombia con cédula de ciudadanía No. 70.050.456 de Medellín, por medio del presente documento declaro bajo la gravedad de juramento que:

1.      Que tengo conocimiento personal de los hechos que adelante indico y que en caso de ser necesario mi testimonio sobre el contenido de esta declaración, testificaría sobre el mismo, también bajo juramento.

### **Antecedentes**

2.      Soy abogado titulado, portador de la tarjeta profesional No. 14.106, expedida por el Consejo Superior de la Judicatura, graduado de la Universidad Pontificia Bolivariana de la ciudad de Medellín, magíster en Derecho Privado, especialista en Derecho Civil y Comercial, Derecho Canónico y Relaciones Laborales de la misma universidad, y también magíster en Estudios Avanzados en Derecho Privado y Doctor en Nuevas Tendencias del Derecho Privado de la Universidad de Salamanca, España.

3.      Entre los años 2004 y 2012 me desempeñé como magistrado de la Sala de Casación Civil de la Corte Suprema de Justicia de Colombia, el máximo organismo de la Jurisdicción Ordinaria del país. Fui vicepresidente de la Corporación en 2009 y presidente en 2010, así como presidente de la Sala de Casación Civil en el año 2006.

4.      Actualmente soy profesor de derecho de obligaciones y contratos mercantiles en los programas de pregrado de las universidades Pontificia Universidad Javeriana y mi *alma mater*, la Universidad Pontificia Bolivariana. A su vez, soy profesor de las especializaciones de Derecho Comercial en las mismas universidades, como también en la Universidad Externado de Colombia y los Andes.

5.    Entre los años 1998 a 2000 me desempeñé como Secretario Jurídico de la Presidencia de la República de Colombia.

6.    Soy autor de la obra jurídica *Contratos Mercantiles*, en cuatro tomos; *Teoría General del Negocio Mercantil* (1987), *Contratos Típicos* (1987), *Contratos Atípicos* (1990) y *Contratos Contemporáneos* (2000), y coautor en más de 30 textos jurídicos colectivos.

7.    Soy miembro del Colegio de Abogados de Medellín, además de su Presidente honorario, y miembro de la Academia Colombiana de Jurisprudencia. Soy cofundador y socio de la firma de abogados Asesorías Arrubla Devis Amaya Abogados SAS, ubicada en la ciudad de Medellín, con sede también en la ciudad de Bogotá.

8.    En la actualidad me desempeño principalmente como abogado litigante y consultor en materia de Derecho Civil y Comercial y como árbitro, inscrito en las Cámaras de Comercio de las ciudades de Bogotá y Medellín. También soy miembro del comité de expertos de la Corporación Excelencia en la Justicia. Una copia de mi *curriculum vitae* será anexada a este documento, como *Exhibit A.*

## Declaración

9.    No tengo ni he tenido nunca ningún interés financiero en Chiquita o en las personas identificadas como partes en las demandas. He sido contratado por *EarthRights International*, quien representa a Does 1-11, únicamente para proporcionar información y mi opinión con respecto a las leyes colombianas, al sistema judicial colombiano y a ciertos procesos relevantes en Colombia.

10.    Esta Declaración se basa en mi conocimiento personal y en investigaciones de las leyes colombianas y de su jurisprudencia. Presento la misma en mi carácter de académico del derecho, jurista y abogado en ejercicio, en Colombia.

11.   En el sistema procesal colombiano existe una institución que se conoce como la sucesión procesal.   El código de Procedimiento Civil la consagra en el artículo 60 y el Nuevo Código General del Proceso en el artículo 68.   En virtud de este instituto, cuando en el trámite  de un proceso fallece alguna de las partes, demandante o demandado,   el proceso no altera su marcha, y continúa con su cónyuge, albacea con tenencia de bienes, los herederos o el correspondiente curador de los herederos indeterminados.

12.   El proceso es una relación jurídica de larga duración y durante su curso pueden ocurrir modificaciones  en cuanto a las partes que la integran.     En principio, se dice que quién  adquiere la calidad de parte desde  su integración, la mantiene hasta el final del proceso;   pero tal situación se puede modificar, por sucesión, cuando una de las partes  fallece, o por cesión, cuando una de ellas, dispone de su derecho litigioso transfiriéndolo a un tercero por acto entre vivos.

13.   Esas modificaciones[1] en cuanto a la estructura de las partes del proceso, no alteran la relación jurídica procesal en cuanto al contenido de la *litiscontestatio,* ni en cuanto a sus efectos o contenido de la sentencia que permanecen inalterables. La sucesión procesal  en cuanto a los sujetos o las personas que constituyen las partes, tiene un sentido formal,  pues se considera que el debate sigue siendo entre los mismos demandantes y demandados, y respecto a la relación sustancial planteada, a pesar de otras personas, asuman esa condición en su lugar.     El proceso sigue siendo el mismo y la sentencia debe recaer sobre las relaciones sustanciales que las partes originalmente plantearon;   solo como cuestión agregada o adicional, una vez resuelta la cuestión principal, se decide sobre  la sucesión o la cesión según sea el caso.

14.   El proceso continúa después de la muerte de la parte demandante o demandada,   y el causante fallecido sigue siendo la parte demandante o demandada,  pero los herederos asumen la representación mientras la sucesión se

---

[1] Devis Echandía, Hernando.   Nociones Generales de Derecho Procesal Civil.   Bogotá, Temis,  2 ed. 2009. Pág. 436.

encuentre ilíquida y solo es  sucedido  por quién reciba la adjudicación del derecho o de la obligación a su cargo objeto sobre el cual verse el juicio, aunque solo una vez aprobada y registrada la partición  en el respectivo proceso de sucesión y solicitado que se reconozca como parte.  En ese momento, solo podrá continuar el adjudicatario en la partición  de la herencia a quién haya correspondido el derecho o la obligación y los demás quedan sin legitimación para seguir interviniendo en el proceso donde el causante es parte demandante o demandada.

15.    Los herederos suceden  al causante, como antes se dijo, en todas sus relaciones jurídicas sustanciales, como acreedor o deudor,  pues tienen vocación a la herencia, con los activos y los pasivos que la componen. Son los herederos los que asumen los derechos y las obligaciones del causante e intervienen para sucederlo en los procesos o litigios que venían en curso al momento de su muerte, bien como demandantes o demandados.

16.    El traspaso de los derechos y obligaciones  del causante, ocurren  en el momento  llamado por  el sistema civil colombiano, de la delación de la herencia, a la muerte de la parte;  pero el reconocimiento de los herederos en el juicio donde es parte el causante depende de su comparecencia, con la prueba respectiva de su calidad de tales.

17.    El real  sucesor de  la parte fallecida en los derechos u obligaciones que se discuten en juicio, dependerá de la adjudicación efectiva en el proceso de sucesión.    Sin embargo, mientras eso ocurre, los procesos donde es parte el causante, continúan con sus herederos,    como antes se indicó y mientras se adjudica la herencia.

18.    Cuando fallece el demandado presunto responsable y se ha procedido a la distribución de su herencia,  es posible sin embargo,  llevar a cabo una demanda

en contra de sus herederos, puesto que ellos también heredan los pasivos, en este caso, la contingencia de los pleitos donde se discute la responsabilidad. Por lo pronto, el proceso donde se discute la responsabilidad continúa con sus herederos.

19.    De conformidad con las leyes colombianas actualmente vigentes, la posibilidad de ejercer la acción de responsabilidad civil extracontractual, bajo los parámetros del artículo 2343 del  Código Civil Colombiano, se mantiene no obstante la muerte del causante del daño. Específicamente señala dicho artículo que "Es obligado a la indemnización el que hizo el daño y sus herederos." (Subrayado fuera del texto). La obligación de reparar el daño ocasionado pasa a los herederos del victimario al momento de su fallecimiento, quienes lo suceden en la obligación de reparar a la víctima. En general, todas las obligaciones y derechos de la persona, pasan a sus herederos a su muerte.

20.    Para conservar la acción de responsabilidad extracontractual, sus titulares no tienen que llevar a cabo ninguna actividad especial, diferente de la que harían estando vivo el causante del daño; esto es, intentarla en tiempo oportuno, para que no ocurra el fenómeno de la prescripción o caducidad.

21.    En el campo de la responsabilidad civil extracontractual, todas las diferentes acciones tendientes a lograr la reparación del daño, como la responsabilidad por hecho de un tercero, la indirecta, la directa, pueden intentarse contra los herederos del victimario fallecido.

22.    Es norma de derecho procesal interno en Colombia, conforme al artículo 81 del Código de Procedimiento Civil, que cuando se demanda a los herederos de una persona hay que dirigir la demanda contra los herederos determinados que se conozcan y además contra los indeterminados. A estos últimos se les designa  un curador para que los represente en el juicio.

23.    Se debe tener en cuenta que en los procesos de sucesión en Colombia, los herederos  pueden repudiar o aceptar la herencia o incluso, aceptarla con beneficio de inventario, es decir, hasta concurrencia de los activos con los pasivos

de la herencia.  Si repudian la herencia, no suceden al causante ni en sus activos ni en sus obligaciones. El tal caso, los acreedores del causante podrán reclamar los bienes para pagarse sus créditos.

24.    En el Código General del Proceso, que entrará en plena vigencia, al parecer, el próximo 1 de Enero del año 2016, en su artículo 87 regula el tema, prácticamente en los mismos términos advertidos anteriormente.

25.    La norma procesal señalada indica claramente cómo debe procederse para demandar a los herederos de una persona:
   i.   Si se conoce quiénes son, hay que dirigir la demanda contra todos ellos, determinándolos.
   ii.  Si no se ha abierto la sucesión y se desconoce quiénes son los herederos, se debe demandar a los indeterminados  y en el auto que admite la demanda se ordena su emplazamiento.
   iii. La Cónyuge en principio no es heredera, tiene derecho a gananciales en sociedad conyugal o a porción conyugal, y como se pueden afectar con las obligaciones de reparación de daños a cargo del causante, también hay que demandarla.
   iv.  Si hay albacea con tenencia de bienes,  que es un ejecutor testamentario, o curador de la herencia yacente y está en curso el proceso de sucesión, también  se dirige la demanda en su contra.
   v.   Si hay un proceso de sucesión en curso, hay que dirigir la demanda contra los herederos que se encuentren reconocidos en dicho proceso y los demás indeterminados.

26.    Si se omite demandar a uno de los herederos, lo que es difícil cuando la demanda se dirige contra los indeterminados, o si no se demanda a la esposa y es una deuda social, estos van a quedar excluidos de la condena, de haberla en el proceso de responsabilidad civil. Los demandados serán los que deban responder solidariamente de conformidad con el artículo 2341 del Código Civil. Los responsables condenados podrán repetir contra el excluido por su cuota, si lo hacen dentro del término legal.

Declaro bajo pena de perjurio, bajo las leyes de la República de Colombia y además bajo las leyes de los Estados Unidos que lo anterior es verdadero y correcto.

Firmado el 9 de noviembre en la ciudad de Bogotá, Colombia.

JAIME ALBERTO ARRÚBLA PAUCAR

Declaration of Richard Herz


Exhibit 12

I, Caleb McLean, hereby certify that I am fluent in both English and Spanish languages, and that I have prepared this translation from the original in the Spanish language to the best of my knowledge and belief, based on my significant experience in legal translation and interpretation.

In witness whereof I hereby sign this translation on November 9, 2015.

**CALEB MCLEAN**

**DECLARATION OF JAIME ALBERTO ARRUBLA PAUCAR**

I, JAIME ALBERTO ARRUBLA PAUCAR, of legal age, bearer of Colombian identification card number 70050456, issued in Medellin, hereby solemnly swear that:

1.      I am personally knowledgeable of the facts indicated hereunder, and if I were required to testify hereon, my sworn testimony would not differ in any way whatsoever.

## Background

2.      I am a qualified attorney, bearer of professional registration No. 14106, issued by the Governing Judiciary Council, having graduated from *Universidad Pontificia Bolivariana* (Pontifical Bolivarian University) in Medellin with a Master's Degree in Private Law, specializing in Civil and Commercial Law, Canon Law, and Labor Relations from the same university. I also have an Advanced Master's Degree in Private Law and in New Private Law Trends from the *Universidad de Salamanca* (University of Salamanca) in Spain.

3.      Between 2004 and 2012, I was a Civil Court judge in the Supreme Court of Justice of Colombia, the highest court of Ordinary Jurisdiction in the country. I was its Corporate Vice-President in 2009 and President in 2010, as well as the President of the Civil Court in 2006.

4.      Currently, I'm an undergraduate professor of commercial contracts and the law of obligations at both the *Pontificia Universidad Javeriana* (Pontifical Xavierian University) and at my *alma mater*, the *Universidad Pontificia Bolivariana* (Pontifical Bolivarian University). Likewise, I am a professor of Commercial Law at both universities, as well as the *Universidad Externado de Colombia y los Andes* (Externado University of Colombia).

5.      From 1998 to 2000, I acted as the Legal Secretary to the Office of the President of the Republic of Colombia.

6.      I authored the legal work *Commercial Contracts*, which consists of four volumes: *General Commercial Theory* (1987)*, Typical Contracts* (1987)*, Atypical Contracts* (1990)*,* and *Contemporary Contracts* (2000), and I have coauthored more than 30 collective legal texts.

7.      I am both a member and the honorary President of the Bar Association of Medellin, and a member of the Colombian Judicial Academy. I am the co-founder and partner of the *Asesorías Arrubla Devis Amaya Abogados SAS* law firm, with offices in Medellin and Bogota.

8.      I currently act as a litigator and consultant in Civil and Commercial Law, and am a registered arbitrator of the Chambers of Commerce of both Bogota and Medellin. I am also a member of the expert committee of the Judicial Excellence Corporation. A copy of my *curriculum vitae* is attached hereto as *Exhibit A.*

### Declaration

9.      I do not have, nor have ever had, any financial interest whatsoever in Chiquita or in the persons identified as parties in the lawsuits. I have been retained by *EarthRights International*, which represents Does 1-11, with the sole purpose of providing information and my opinion regarding Colombian law, the Colombian legal system and certain relevant proceedings in Colombia.

10.     This Declaration is based on my personal knowledge and research into Colombian law and its jurisprudence. I present such knowledge and research as a legal academic, legal expert and exercising attorney in Colombia.

11.     In the Colombian procedural system, there is an institution that is known as procedural succession. The Civil Procedural Code recognizes it in Article 60, as does the New General Procedural Code in Article 68. In virtue thereof, when one of the parties, defendants or plaintiffs to a lawsuit dies while such lawsuit is in

process, the lawsuit proceeds normally with the deceased's spouse, the executor holding possession of the assets, the heirs or the corresponding representative of the undetermined heirs.

12.     This is a lengthy legal proceeding, and while ongoing there may be some modifications to the parties involved. In principle, it is said that he who is named a party from the beginning of a lawsuit remains a party until its conclusion; however, parties to lawsuits can change due to succession if one of the parties dies, or due to assignment when a party transfers his/her legal right to a third party *inter vivos*.

13.     These modifications[1] to the structure of the parties do not alter the procedural legal relationship regarding the content of the *litiscontestatio*- not even regarding its effects or the content of the verdict, which remain unchangeable. Procedural succession regarding the subjects or people who make up the parties is formal, given that the debate is considered to have continued between the plaintiffs and the defendants; and with regards to the substantial relationship suggested, despite the presence of other parties, they assume such condition in their place. The process remains the same, and the verdict shall fall on the substantial relationships that the parties originally suggested. Only once the main issue has been resolved shall the succession or transfer, depending on the case, be decided as an aggregate or additional issue.

14.     The proceeding continues after the death of the plaintiff or defendant, and the deceased party continues to be the plaintiff or defendant, but the heirs assume representation while the succession is processed, and is only succeeded by the person who is awarded the right or the obligation at the heart of the lawsuit, but only once the division in the respective succession process has been registered and approved, and a request has been filed for the heirs to be recognized as a party. In that moment, only the heir awarded the part of the inheritance that the right or

---

[1] Devis Echandía, Hernando.   General Considerations on Civil Procedural Law.   Bogota, Temis,  2 ed. 2009. Page 436.

obligation corresponds to shall continue – the others shall no longer be considered legitimate to continue participating in the process in which the deceased is the plaintiff or defendant.

15.     The heirs succeed the deceased, as was mentioned previously, in all substantial legal relations, as a creditor or debtor, given that they have the right to the inheritance, including the assets and liabilities that correspond to it. Those who assume the rights and obligations of the deceased and intervene to succeed him/her in the proceedings or litigation ongoing when he/she died either as plaintiffs or as defendants are considered to be the heirs.

16.     The transfer of the rights and obligations of the deceased occurs at the moment of the "denouncement of the inheritance", as the Colombian civil system calls it, or the death of the party; but the recognition of the heirs in the lawsuit in which the deceased is a party depends on their condition as an appearing party, along with the respective evidence showing that they are the heirs.

17.     The real successor of the deceased to the rights and obligations debated in the lawsuit will effectively depend on who the succession process is awarded to. However, while that happens, the proceedings in which the deceased is registered as a party continue with his/her heirs, as was already indicated and while the inheritance is being awarded.

18.     When the presumably liable defendant dies, and his/her inheritance is divided up, it is still possible to file a lawsuit against his/her heirs, given that they also inherit the liabilities of the deceased- in this case, the liability that could potentially arise from the legal proceedings. Therefore, the proceedings regarding the liability of the deceased continue with his/her heirs.

19.     In accordance with the Colombian law in force, the possibility of filing an extra-contractual civil liability lawsuit under Article 2343 of the Colombian Civil

Code is upheld; notwithstanding the death of the perpetrator. Such article specifically states that "The party that caused the damage and his/her heirs shall be liable for the indemnity." (Underlining is mine). The obligation to redress grievances passed on to the heirs of the deceased upon death, and they assume the obligation to redress the victim. In general terms, all of the obligations and rights of the person pass on to his/her heirs upon death. There are some rights that Colombian law considers as exceptions, as it considers them to be personal, and therefore expressly exempts them from being passed on to heirs.

20.     To preserve the extra-contractual liability lawsuit, its plaintiffs do not need to do anything other than what they would do if the deceased were alive- simply file the lawsuit in a timely manner, so that prescription or expiry does not occur.

21.     In terms of extra-contractual civil liability, all of the different lawsuits that seek redress for grievances, such as liability for the action of a third party, indirect liability, and direct liability, can be filed against the heirs of a deceased perpetrator.

22.     Internal procedural law in Colombia states that, according to Article 81 of the Civil Procedural Law, when a claim is filed against the heirs of a person, the lawsuit must be filed against the specific heirs who are known, as well as those who are unknown. A representative for the unknown parties is appointed to represent them in the lawsuit.

23.     In succession processes in Colombia, it must be taken into account that heirs can either accept or reject an inheritance, or even accept it with a benefit of inventory, which means only accepting assets once all charges and debts have been paid. If an inheritance is rejected, heirs do not succeed the deceased in his/her assets or obligations. In this case, the creditors of the deceased may claim the assets of the deceased to pay for outstanding debts.

24.     In the General Procedural Law, which will apparently enter into effect on January 1, 2016, Article 87 practically regulates the issue as set forth above.

25.     The aforementioned procedural law clearly indicates the process that must be followed to file a lawsuit against the heirs of a person:

  i.    If the heirs are known, the lawsuit must be filed against all of them, and must specify who they are.

 ii.    If succession has not yet occurred, and the heirs are unknown, the lawsuit must be filed against undetermined heirs, and the writ accepting the lawsuit shall order them to be summoned.

iii.    The Spouse, in principle, is not an heir, but has the right to joint property or dower. Given that joint property and dower can be affected by the redress of grievances filed against the deceased, said spouse must also be named in the lawsuit.

 iv.    If there is a testamentary executor that has possession of assets, or an executor of the inheritance that is already undergoing the succession process, the lawsuit shall also name such executor.

  v.    If there is an ongoing succession process, the lawsuit must be filed against the heirs that are named in such process, as well as undetermined heirs.

26.     If one of the heirs is not named in the lawsuit, which is difficult when the lawsuit is addressed to undetermined heirs, or if the lawsuit does not name the spouse, and such lawsuit addresses a social debt, they will be excluded from the verdict if one is handed down as part of the civil liability proceeding. The defendants must respond to the lawsuit jointly according to Article 2341 of the Civil Code.  The indicted parties may file a claim against the excluded party for his/her share if they do so within the legal term.

I hereby declare under oath, under the laws of the Republic of Colombia, and under the laws of the United States that the foregoing is true and correct.

Signed on November 7 in the city of Bogota, Colombia.

_____
**JAIME ALBERTO ARRUBLA PAUCAR**