UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-MD-01916-KAM

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION
_____/

This Document Relates to:

ATA ACTION:
_____/

Case No. 15-81585-CIV-MARRA

JORGE PORTER et al.,

　　　　Plaintiffs,

vs.

CHIQUITA BRANDS INTERNATIONAL, INC.;
ROBERT W. OLSON;
ROBERT F. KISTINGER;
WILLIAM A. TSACALIS;
CHARLES KEISER;
STEVEN G. WARSHAW and KEITH E. LINDNER,

　　　　Defendants.
_____/

ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANTS' JOINT CONSOLIDATED MOTION TO DISMISS

**THIS CAUSE** is before the Court on the Defendants' Joint Consolidated Motion to

Dismiss the Plaintiffs' Complaint [DE 1023]. The Court has carefully reviewed the Motion, the

Plaintiffs' Opposition to the Motion [DE 1096] and the Defendants' Joint Reply [DE 1130],

together with the Individual Defendants' Supplemental Memoranda [DE 1020–1022, 1024-

1026], the  Plaintiffs' Responses to the Supplemental Memoranda [DE 1097-1102] and the

Individual Defendants' Replies [DE 1127-1129, 1131-1133].  Having done so, the court has determined to grant the motion in part and deny the motion in part for reasons which follow.

## I.      INTRODUCTION[1]

Plaintiff Jorge Porter is an American citizen who was allegedly kidnaped and tortured over a period of eight days in May, 1999 by the Colombian terrorist organization known as the Autodefensas Unidas de Colombia or the "AUC" (United Self-Defense Groups of Colombia). He is the brother of Juan Carlos Puerta ("Juan Carlos"), a Colombian human rights worker allegedly kidnaped  by the AUC in Uraba, Colombia in  January, 1999, held hostage, tortured and ultimately murdered by the AUC in 2001.  Juan Carlos  was a Colombian citizen  at the time of his kidnapping and death.  Plaintiffs Libia Puerta and Alexander Puerta,  the surviving mother and son of Juan Carlos, respectively, are both American citizens and residents of Florida.

Juan Carlos Puerta was born in Medellin, Colombia and raised in Lowell, Massachusetts. After  serving six years in the United States Army, he returned to Colombia where he became a field volunteer in Uraba with a well-known,   international non-governmental human rights organization, the Peace Brigades International ("PBI") [Complaint, ¶¶ 209-210].  On January 30, 1999, Juan Carlos was kidnapped by the AUC, which targeted the PBI and other human rights organizations which it suspected as leftist-sympathizers.

In March, 1999, AUC representatives telephoned Jorge Porter at his home in Florida, demanding a $500,000.00 ransom for the release of his brother, Juan Carlos.  In April, 1999,

---

[1] The recited facts are drawn from the Plaintiff's Complaint [Case 15-CV-81585-CIV-MARRA/DE 1]. For purposes of this motion, the Court assumes the well-pleaded factual allegations of the Complaint to be true and views those facts, and all reasonable inferences from them, in the light most favorable to the Plaintiff.  *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243 (11th Cir. 2016), citing *Erickson v Pardus*, 551 U.S. 889, 94 (2007).

Jorge made two payments to the kidnapers, the first in the amount of $50,000, and the second in the amount of $100,000 [Complaint ¶¶ 221-223].[2]

In May, 1999, Jorge traveled from Miami, Florida to Medellin, Colombia, at the direction of the kidnappers.  The kidnappers demanded that Jorge personally travel to Colombia to deliver the remainder of the ransom in cash after learning that he had contacted the  U.S. Embassy in Colombia and Colombian police authorities for help after his initial discussions with AUC representatives.   Jorge brought $20,000 cash with him, collected another $80,000 from his grandmother in Colombia, and  met with AUC representatives at a designated park in Medellin. After delivering the cash, Jorge was taken at gunpoint to a house in the Uraba region, where he was held hostage and tortured over an eight day period of time.

Upon his release, Jorge again sought intervention from Colombian law enforcement and governmental authorities, in addition to contacting the United States Department of Justice and FBI.  The AUC,  promptly alerted to these efforts, contacted Jorge the next day and threatened to kill him if he attempted to enlist the assistance of  police or governmental authorities again. Over the next two years, the AUC pressed Jorge for payment of the balance of the ransom, and, finding him unable to deliver,  murdered Juan Carlos on March 8, 2001.

Plaintiffs filed this lawsuit in November, 2015,[3] alleging that Defendant Chiquita Brands International Inc. ("Chiquita")  is civilly liable to the Plaintiffs for damages  under the Anti-

---

[2] Plaintiffs allege that "[b]oth payments were made to AUC representatives that Jorge met in Florida" [Complaint ¶ 224], but do not specify  whether the AUC affiliates in question  travelled to Florida to collect the money from  Jorge in person, whether the Florida meeting preceded the collection of the ransom money, or otherwise describe the circumstances attending the Florida meeting between Jorge and the AUC representatives.

[3] This is the fourth-filed ATA case subsumed in this MDL proceeding.  In the first-filed  ATA actions, arising from Chiquita's alleged material support of left-wing guerrilla insurgents in Colombia such as the Fuerzas Armadas Revolucionarias de Colombia (Revolutionary Armed Forces of Colombia or "FARC") and the National Liberation Army ("ELN"), the Court denied Defendant's Rule 12(b)(6) motion to dismiss, finding the Plaintiffs' complaints sufficiently pled the doctrine of fraudulent concealment in support of an equitable tolling of the ATA statute of limitations;  sufficiently alleged aiding and abetting as well as conspiracy liability;  sufficiently alleged  predicate

Terrorism Act ("ATA"), 18 U.S.C. §2331 *et seq*. because it aided and abetted acts of international terrorism by the AUC which caused serious bodily harm to American nationals, such as Jorge Porter (Counts 1-3) and caused extreme emotional distress and psychological injury to American nationals, such as the surviving heirs and family members of Juan Carlos Puerta (Counts 4-5).[4]

Plaintiffs also sue six of Chiquita's former directors, officers and employees (Individual Defendants Robert W. Olson, Robert F. Kistinger, William A. Tsacalis, Charles Keiser, Steven G. Warshaw and Keith E. Lindner), contending the Individual Defendants are civilly liable to Plaintiffs for damages under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. §1350 note, for aiding and abetting the kidnapping and torture of Jorge Porter (Count 6) and for aiding and abetting the kidnapping, torture and extrajudicial killing of Juan Carlos (Count 7).

By its current motion, Defendant Chiquita seeks dismissal of Plaintiffs' ATA claims on the following grounds: (1) Plaintiffs' claims are time-barred under the ATA ten-year statute of limitations because the underlying alleged acts of violence occurred between 1999 and 2001, and this suit was filed in November 2015; (2) Plaintiffs lack standing because they do not allege that they were American citizens at the time of the alleged acts of violence and (3) Plaintiffs fail to state a claim under the ATA because they do not allege that Defendant knew or intended that the AUC specifically targeted American citizens and therefore do not adequately allege scienter.

---

acts of international terrorism, and sufficiently alleged *mens rea* as well as proximate causation. *Julien et al. v. Chiquita Brands International, Inc*., 690 F. Supp. 2d 1296 (S.D. Fla. 2010) (Case No. 08-20641-CIV-MARRA) and *Pescatore/Sparrow v. Chiquita Brands International, Inc.*, 2012 WL 1021819 (S.D. Fla. 2012) (Case No. 11-80402-CIV-MARRA/09-80683-CIV-MARRA).

[4] Section 2333(a) is generally interpreted to include emotional injuries as injury to "person, property or business" within the meaning of the statute, allowing United States nationals to sue for non-physical injuries where their family members, who are not U.S. nationals, become victims of acts of international terrorism. *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) ("in the absence of any limiting language in the statute, the court will not limit the scope of §2333(a) to physical injuries"); *Biton v. Palestinian Interim Self-Gov't Authority*, 310 F. Supp. 2d 172, 181-182 (D.D.C. 2004) ("The [ATA] does not specifically require that a plaintiff suffer physical harm prior to filing suit"); *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19 (D.D.C. 2007) (same).

The Individual Defendants, in turn, seek dismissal of the TVPA claims on the following grounds: (1) Plaintiffs' claims are time-barred under the TVPA ten-year statute of limitations; (2) the Court does not have personal jurisdiction over non-Florida residents Olson, Kistinger, Tsacalis and Warshaw; (3) Plaintiffs do not allege sufficient facts to meet or avoid the TVPA's exhaustion-of-local-remedies requirement and (4) Plaintiffs do not allege sufficient individualized facts to establish secondary liability of the Individual Defendants under aiding and abetting or conspiracy liability theories.

## II.   Standard of Review

To withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Read in conjunction with Rule 8(a), requiring a "short and plain statement of the claim showing that the pleader is entitled to relief," the plausibility standard described in *Twombly* requires a plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 , 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009).

In considering a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). At the same time, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement," do not satisfy the pleading standard. *Iqbal,* 556 U.S. at 678, 129 S. Ct. 1937; *Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011) ("[l]egal conclusions without adequate factual support are entitled to no assumption of truth").

In short, although a complaint need not provide "detailed factual allegations," *Twombly* at 1964, it must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient to raise a right to relief above the speculative level," *Southern Scrap Material Co. v. ABC Ins. Co.,* 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 127 S. Ct. at 1965), and a Rule 12(b) (6) motion is properly granted only when the movant demonstrates that the complaint has failed to include "enough facts to state a claim to relief that is plausible on its face." *Twombly* at 570.

### III.      DISCUSSION

#### A.    Statute of Limitations (**All Defendants**)

Chiquita here argues – as it did in Julin, *Pescatore* and *Sparrow* -- that the Plaintiffs' ATA claims are barred by the statute of limitations because this suit was filed more than ten years after May 10, 2004 -- the date Chiquita issued a Form 10-Q SEC filing and contemporaneous press release reporting its payment of "protection" money to unspecified foreign terrorist organizations in Colombia and the voluntary disclosure of those payments to the United States Department of Justice. Chiquita asks the Court to take judicial notice of these announcements, which were widely reported in the media, and which it  contends effectively started  the clock on the statute of limitations by putting Plaintiffs on inquiry notice of the Defendants' alleged wrongdoing.  The Individual Defendants  similarly argue that the TVPA claims should be dismissed as time-barred under the corresponding ten-year statute of limitations.

Chiquita alternatively argues for an even earlier accrual date, contending that, at best, equitable tolling stopped the clock on the running of the statute up through 2003, when Chiquita revealed its AUC payments to the U.S. Department of Justice but did not publicly disclose this

information.  Chiquita characterized the omission as the last alleged affirmative act of concealment attributable to it.  For reasons which follow, both contentions are rejected.

Equitable tolling of a statute of limitations is appropriate where a defendant misleads the plaintiff, allowing the statutory period to lapse, or where the plaintiff has no reasonable way of discovering the wrong perpetrated against him or her.  *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005).  Equitable tolling is applicable to claims brought under the ATA or TVPA, and where appropriately invoked, "the statutory clock is stopped while tolling is in effect," meaning  the clock is stopped until relevant information regarding the existence of the claim is finally revealed.  *Id.* at 1156.

Equitable tolling by concealment may be established in one of two ways - either through "affirmative actions by the defendant constituting concealment," or "where the wrong is of such a character as to be self-concealing." *Foudy v. Indian River County Sheriff's Office*, 845 F.3d 1117 (11th Cir. 2017), *citing Hill v. Texaco, Inc.,* 824 F.2d 333, 325 n. 2 (11th Cir. 1987).   A "self-concealing" wrong is one in which the clandestine nature of the activity is essential to the act itself, where a "deception, misrepresentation, trick or contrivance is a necessary step in carrying out the illegal act," not merely "separate from the illegal act and intended only to cover up the act."  *Id., citing Hobson v. Wilson*, 737 F.2d 1, 33-34 n. 102 D.C. Cir. 1984), *overruled in part on other grounds, Leatherman v. Tarrant City,* 507 U.S. 163 (1993).

While equitable tolling is often applied where a defendant has engaged in acts of fraudulent concealment, either by way of a self-concealing fraud, *or* active concealment separate from the underlying wrongdoing,  *Martin v. Consultants & Administrators, Inc*., 966 F.2d 1078 (7th Cir. 1992),  application of the doctrine is not limited to such cases.  The overarching question is instead whether the plaintiff, through circumstances beyond his or her control, was unable to

reasonably learn of the existence of the cause of action.    *See Valdez ex rel. Donely v. United States*, 518 F.3d 173, 183 (2d Cir. 2008), citing Veltri *v. Bldg. Serv. 32B- J Pension Fund*, 383 F.3d 318, 323 (2d Cir. 2004) ("The relevant question is not the intention underlying defendant's conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action"). Thus, "fraudulent concealment is not essential to equitable tolling, " *id*. at 182,  although it is often linked (and confused with) this doctrine.  As explained by the Second Circuit in *Valdez*:

> Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations:
>
> if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.  Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule – governing … accrual – on the other.  It differs from the former in that it does not assume a wrongful – or any – effort by the defendant to prevent the plaintiff from suing.

*Valdez,* at 182, citing  *Cada v. Baxter Healthcare Corp*, 920 F.2d 447, 451  (7th Cir. 1990).

In this case, the Complaint alleges that unknown members of the AUC   kidnapped and tortured Jorge Porter, and kidnapped, held hostage, tortured and ultimately killed Juan Carlos. The Complaint also alleges that Chiquita and the Individual Defendants aided and abetted the AUC in the commission of these acts of international terrorism by providing material support which was intended and used to achieve a "bloody pacification," of the profitable banana-growing regions of Marta and Uraba where Chiquita's Colombian subsidiary, "Banadex," operated.

Plaintiffs allege that between 1997 and 2004, Chiquita made over one hundred payments to the AUC totaling over $1.7 million. The funding was originally disguised as "security" payments,  transmitted by checks issued from the bank account of Banadex  and made payable to front organizations known as "convivirs," which were understood to be controlled by the AUC

and other terrorist organizations [Complaint, ¶¶265-266]. After being warned that payments to the AUC violated federal criminal laws, the Defendants continued to make the payments, but changed the method by which money changed hands in order to "more completely conceal[] their unlawful conduct." This included depositing the money – now disguised as bonus compensation -- into the bank account of a Banadex employee who was responsible for endorsing the checks, converting them to cash and delivering the funds to another Banadex employee, who then personally delivered the cash to the AUC. As part of the ruse, the Banadex recipient of the checks maintained a private ledger of the payments that did not identify the AUC as an intended recipient [Complaint ¶ ¶ 172, 266(b), (d)]. This new procedure for concealing the illegal payments, adopted in April 2002, continued up through the last payment made by Chiquita in February, 2004 [Complaint ¶¶172-174, 266 (b)].

Plaintiffs contend they could not reasonably have discovered Chiquita's furtive support of the AUC until three years later, in March, 2007, when Chiquita pled guilty to federal charges of "engaging in transactions with special designated global terrorists," and the plea was made public along with a factual proffer outlining the participation of Chiquita executives, identified only by pseudonym, in Chiquita's lengthy history of material support to Colombian terrorist organizations, including the FARC, ELN and AUC [Complaint ¶¶ 249, 261-62, 269]. Plaintiffs allege that Chiquita itself recognized the success of its own subterfuge up through this time, as reflected in public comments made by its former CEO, Fernando Aguirre, who, in a 2008 "60 minutes" interview with CBS, stated that "no one would know about" the payments if Chiquita had not self-reported its activity to the DOJ [Complaint ¶268].

The Court agrees that the Complaint sufficiently pleads fraudulent concealment as a premise for invocation of equitable tolling, *Cabello v. Fenrnanez-Larios*, 402 F.3d at 1155-56, and that

issues of notice inquiry identified in the Defendants' motion raise a fact-intensive inquiry more properly resolved on a developed factual record.  *See e.g. Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006) (upholding trial court's application of equitable tolling to Salvadoran refugees' claims under the TVPA and ATA based on facts presented at trial).

Further, Plaintiffs are not precluded from invoking equitable tolling, as a matter of law, by failure to plead the words  "due diligence," as this element may be inferred from the allegations of the Complaint, and in any event touches upon a fact-sensitive question more properly resolved on a developed factual record.

Finally, the accrual date of Plaintiffs' claims, for equitable tolling purposes, is not tied, as a matter of law, to the  May 2004 SEC disclosures,  or to the last purported affirmative act of concealment attributable to Chiquita which is alleged to have occurred in 2003 (when Chiquita alerted the Justice Department but did not publicly disclose the payments).  These events may inform, but do not control, the central inquiry of when information attending the Defendants' material support of the AUC  first became reasonably available to the Plaintiffs through the exercise of due diligence.[5]

It is sufficient for purposes of the instant motion that the  Complaint alleges facts which would support the conclusion that this revelation did not occur until  March, 2007, when Chiquita entered its guilty plea and supporting factual proffer in the D.C. criminal action, effectively stopping the  clock on the applicable ten-year statutes of limitations up through that date.  Peripheral  factual disputes relating to competing inquiry notice theories, or the sufficiency

---

[5] Chiquita's contrary suggestion, that the tolling period  cannot as a matter of law extend beyond the date of its last alleged affirmative act of concealment, or first public (generalized) mention of foreign terrorist support, is rejected as an erroneous extrapolation and confusion of equitable estoppel,  equitable tolling and discovery rule (notice inquiry) applications. *See e.g. Valdez ex rel. Donely v. United States*, 518 F.3d 173, 182 (2d Cir. 2008); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 447 (7th Cir. 1990); *Browning v. AT & T Paradyne*, 120 F.3d 222 (11th Cir. 1997).

of Plaintiffs' due diligence cannot be resolved at the motion to dismiss stage.  The  Defendants'

motion to dismiss the ATA and TVPA claims as time-barred on the face of the pleadings shall

accordingly be denied. [6]

## B.  Scienter – ATA Claims (Defendant  Chiquita)

The Anti-Terrorism Act authorizes a United States national (or his estate, survivors or

heirs) injured "by reason of an act of international terrorism" to sue in federal court for money

damages. 18 U.S.C. § 2333(a).  The Act defines "international  terrorism" as activities that, as

relevant here, "involve violent acts or acts dangerous to human life that are a violation of the

criminal laws of the United States or of any State or that would be a criminal violation  if

committed within the jurisdiction of the United States or of a State."  18 U.S.C. § 2331(1)(A).

Thus, to recover pursuant  to §2333(a), a plaintiff must  prove a violation of some federal or state

criminal law.  Typically, this involves  one  or more of the federal material support statutes,  each

of which has its own requirements regarding the requisite mental state.

---

[6] The Court also finds the  fraudulent concealment allegations sufficient to satisfy the pleading requirements set forth in Fed. R. Civil P. 9(b), to the extent applicable, where the Complaint details how Defendants fraudulently concealed the illicit payment activity  [¶¶ 141-92; 171, 172-174; 265-268]; who participated in designing, implementing and approving the procedures for making the illegal payments [Olson, ¶ ¶ 154, 160-6, 166, 168, 172-186] [Kistinger ¶ 155, 160, 172 ,176, 184] [Tscalis ¶¶  156, 160-62; 166, 168, 172, 174] [ Keiser ¶¶ 141-146, 148, 157, 163-64],  and  where and when  the activity directed to the fraudulent concealment took place [¶¶ 160-168; 170-76; 179-80, 184, 186-88; 192].

Defendants complain that these allegations only carry the alleged concealment at best  through February 2004, the date of the last alleged payment, and that failure to identify specifically affirmative acts of concealment up through November, 2005 (ten years prior to the filing date) is a fatal pleading deficiency under Rule 9(b). However, because equitable tolling may hinge upon, but does not necessarily require, acts of  fraudulent concealment or other misconduct of a defendant in the first instance, *see Valdez* and *Cada*, *supra,*  the heightened pleading requirements of Rule 9(b) do not control this inquiry.

In this case, Plaintiffs rely on 18 U.S.C. § 2339A, entitled "Providing material support to terrorists," which makes it a crime to "provide[] material support or resources … knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" specific violent crimes.   The specific violent crimes alleged here, as to the claims of Jorge Porter,  are causing serious bodily injury to an American national outside the United States in violation of 18 U.S.C. § 2332(c) (Claim 1); torture of an individual outside the United States in violation of 18 U.S.C. § 2340A (Claim 2);  threatening to kill, maim, assault or  cause  serious bodily  injury to a person within the United States by way of conduct that transcends national boundaries, in violation of § 2332b (Claim 3).  As to Juan Carlos Puerta,  and the claims of his heirs, Libia and Alexander Puerta, the specific crimes alleged are hostage-taking,  torture and murder  of an individual outside the United States in violation of § 2340A (Claim 4), and hostage-taking to compel ransom and murder in violation of 18 U.S.C. § 1203 (Claim 5).

On its face, § 2333(a) does not require  an ATA plaintiff to prove that the alleged financier knew that the recipient of its support  planned to commit terrorist acts targeted against Americans specifically – the central tenet of Defendants' scienter challenge.   Chiquita contends that the  failure to allege the AUC was known to specifically target  Americans, and that the Defendant was aware of such a  reputation, distinguishes this ATA case from the earlier-filed ATA actions (which involved the FARC, known to target Americans) and is fatal to an efficient pleading of scienter.

Previously, this Court, following *Boim v. Holy Land Foundation for Relief and Dev*.,  549 F.3d  685, 692-93(7th Cir. 2008) (en banc) ("*Boim  III*"),  held that   "knowingly" providing material support to a terrorist organization in violation of Section 2339A  requires knowledge, intent,  or recklessness (i.e. deliberate indifference) to the fact that the funding would be used to

carry out terrorist activity.  Defendants contend that even under the "relaxed" recklessness standard, articulated in *Boim III*, the Plaintiffs' Complaint fails to adequately allege scienter, where it alleges only  that Americans were targeted for kidnapping and worked for human rights organizations in Colombia [Complaint ¶¶ 254-255], without alleging that Chiquita was aware of this connection, or that it was recklessly or deliberately indifferent to the presence of Americans in targeted groups.

The Court reaffirms that the *Boim III* recklessness standard is appropriately applied as the scienter standard in a § 2333(a) claim  based on a § 2339A violation, and concludes that this standard appropriately extends to the element of the victim's alienage.  This means to prevail on their § 2333 (a) claim, Plaintiffs must allege that the Chiquita Defendant knew, intended, or acted  in reckless disregard to the fact that its actions would further terrorism, *and* the Defendant knew, intended *or acted in reckless disregard* to the substantial probability that American nationals would be harmed as a result of that activity.

As more particularly explained in *Gill v. Arab Bank, PLC,* 893 F. Supp. 2d 474, 505-506 (E.D.N.Y. 2012) ("*Gill I*"), the *Boem III* scienter standard requires the following:

> First, it must be shown that the defendant's  alleged actions were reckless, knowing or intentional. Second, a connection must be made between the defendant's mental state and the potential for harm to American  nationals. If it is proven that the  defendant knew, and it was the case, that a terrorist organization it supported intended to injure Americans, *or* that the defendant intended that its support help a terrorist organization in injuring Americans, *or* that the defendant was reckless with regard to the substantial probability of  injuries that would likely be suffered by Americans as a result of its acts and the terrorist organization actions – i.e. the defendant knew that there was a substantial probability that Americans would be injured as a result of its support of the terrorist organization, but it did not care – then a mental state sufficient for a finding of liability on the part of the defendant will have been shown.  *It is not necessary ... for the plaintiff to show that the defendant knew that American nationals would be harmed as a result of its actions, or that it intended that they would be*.  Combined recklessness on the part of the defendant and the terrorist organization would be a sufficient  basis for liability.

*Gill I,* at 505-506 (emphasis supplied).

Applying that standard here, the Court concludes that the *Porter* complaint contains adequate allegations from which the requisite scienter may be inferred on the Plaintiffs' Section 2339A (and thus § 2333(a)) claims.   The Complaint alleges Chiquita  paid over $1.7 million to the AUC between 1997 and 2004,  continuing its payments even after learning that the AUC was a designated foreign terrorist organization and that its payments to it were illegal. The Complaint alleges Chiquita "knew that the AUC kidnapped, held hostage for extortion, tortured, maimed and murdered human rights workers," [Complaint ¶ 253]. The Complaint also alleges that during the relevant time period,  "all Americans were considered wealthy and were targets of kidnapping for ransom," and that  "American citizens  and family members of American citizens worked  with human rights organizations and non-governmental organizations monitoring and reporting on the political processes in Colombia." [Complaint ¶ 254- 255].   The Complaint also alleges that Chiquita and the Individual Defendants were aware that the  AUC was a violent terrorist organization that kidnaped, tortured, and killed American citizens "involved in what they considered leftist-related activities like to those associated with [Juan Carlos' organization]" [Complaint ¶¶ 276, 286-88].

These  allegations  sufficiently support the inference that Chiquita was on notice – but did not care -- of the risk and "substantial probability" that Chiquita's support of the AUC would lead to injury to American nationals.  It is alleged that  Chiquita  knew that the AUC targeted human rights workers, as suspected leftist-sympathizers, and that  human rights organizations  in Colombia  typically  included  American  workers, who  were  recognized  in  Colombia as kidnapping targets for ransom in general.  Read together, these allegations support the reasonable inference that Chiquita and the Individual Defendants had reason to know that Americans were

at risk of terrorist targeting by the AUC in Colombia; that kidnapping, torture and killing of American nationals  was therefore a  foreseeable and likely consequence of Chiquita's support of the AUC, and that Chiquita acted in reckless disregard to this probability during the time it provided  material support to  the AUC.   With this, the Court concludes that the Complaint contains sufficient allegations to establish scienter, and shall deny the Defendant's motion to dismiss the ATA claims on this basis.

### C.  Standing -- ATA Claims (Defendant Chiquita)

Chiquita argues that allegations of the Complaint are insufficient to establish standing, because the Complaint does  not specifically allege that each plaintiff was a U.S. citizen at the time of the underlying offenses, as opposed to time of filing of suit.  Plaintiffs do not dispute this omission, but contend  there is no standing deficiency because they are able to show U.S. citizenship at the time of the underlying offenses.   As proofs,  Plaintiffs submit extraneous documents such as   Jorge Porter's United States passport showing an October, 1988 issue date; Libia Puerta's certification of naturalization showing a November, 1995 issue date, and Alexander Puerta's birth certificate showing  a birth date in the United States of November 14, 1992.

The Court interprets these filings as a request to amend the Complaint, and as such, shall grant the Plaintiffs' request to amend the complaint to cure the deficiency in standing allegations.

### D.  Personal Jurisdiction – TVPA Claims (Individual Defendants)

Individual Defendants Olson, Kistinger, Tsacalis and Warshaw, all of whom reside outside of Florida, move for dismissal of   the TVPA claims based on lack of personal jurisdiction.  These Defendants  argue that  the  Complaint does not allege facts showing that any of them engaged in conduct in Florida which might serve as a premise for the exercise of general

or specific personal jurisdiction under the Florida long-arm statute.  Defendants further argue that Plaintiffs' "conspiracy jurisdiction" theory – based on the contention that jurisdiction may be  premised on tortious acts of co-conspirators in this state -  must be rejected because the Complaint does not allege facts showing  a conspiracy  "either engineered in Florida or pursuant to which a tortious act in furtherance was committed in Florida." *United Techs. Corp v. Mazer*, 556 F.3d 1260, 1283 (11th Cir. 2009).

The Florida long-arm statute has been interpreted to support the  exercise of personal jurisdiction over a non-resident conspirator where the following five elements are shown: (1) the existence of an actionable conspiracy; (2) the defendant's membership in the conspiracy; (3) the occurrence of a substantial act or substantial effect in furtherance of the conspiracy in  the forum state;  (4) the defendant's actual or constructive knowledge of the act in the forum state or that the act outside the state would have an effect in the state,  and (5) the conspiracy conduct's direct or foreseeable cause of the act or effect.  *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209 (11th Cir. 1999), citing *Execu-Tech Bus. Syst., Inc. v. New Oji Paper Co.,*  708 So.2d 599,  600 (Fla. 4th DCA 1998) (recognizing theory but finding no jurisdiction for lack of minimum contacts), *quashed on other grounds*, 752 So.2d 582 (Fla. 2000) (finding sufficient minimum contacts to support exercise of jurisdiction over foreign corporation based on conspiracy theory of liability under Florida long- arm statute).

In this case, Plaintiffs allege jurisdiction over the Individual Defendants pursuant to their claim that Defendants conspired with Chiquita and the AUC to cause harm to them in Florida. More specifically, Plaintiffs argue that the allegations of the Complaint support an inference that Defendants were knowing and active participants in a conspiracy to further Paramilitary Terrorism Tactics of the AUC, which included the kidnaping, torturing and killing of American

nationals, or family members of American nationals, and that acts in furtherance of that conspiracy were taken by AUC co-conspirators who communicated with and personally met Jorge Porter in Miami, Florida -- after the kidnap of Juan Carlos -- and induced him to travel to Colombia, where he himself was kidnapped and tortured by the AUC.

The fundamental problem with this jurisdictional theory, however, is that the Complaint, as currently pled, does not properly allege the elements of conspiracy liability; does not allege sufficient facts in support of the inference that the AUC, in fact, committed acts of extortion, or otherwise took steps in furtherance of the conspiracy in Florida, or that Defendants had actual or constructive knowledge of any such acts taken by co-conspirators on Florida soil. [7]    Instead, the Complaint merely alleges aiding and abetting liability against Chiquita and the Individual Defendants (See Complaint, p. 33, Section "C", "Chiquita Purposely Aided and Abetted the AUC's Use of the Paramilitary Terrorism Tactics" and ¶¶ 141-207), making only a passing reference to a conspiracy at paragraph no. 278, which states "[t]he attacks on Jorge and Juan Carolos ... were part of a pattern of ... human rights violations paid for, facilitated, condoned confirmed aided and abetted and/or ratified by Chiquita and the Individual Defendants, and were committed in conspiracy with the AUC."

In short, the Complaint does not plead or allege specific facts from which the elements of an actionable conspiracy between the AUC, Chiquita and the Individual Defendants may be inferred in the first instance, nor does it allege the commission of a tort or other act taken in furtherance of an actionable conspiracy taken by AUC co-conspirators in Florida, or the

---

[7] The Complaint alleges that Jorge Porter received several telephone communications in the United States from AUC affiliates in Colombia in March 1999, in which the AUC presented its $500,000 ransom demand and gave instructions for payment [Complaint ¶¶ 221-223]. As a result, Jorge is alleged to have made two payments in April, 1999 "to AUC representatives that [he] met in Florida," [¶ 224]; the Complaint does not specifically allege that the AUC collected the money from him during the Florida visit, or otherwise describe the circumstances or purpose of the Florida meeting. Without more, the Court is unable to infer that this Florida meeting involved the commission of a tort on Florida soil, or substantial acts taken by co-conspirators on Florida soil in furtherance of a conspiracy to violate federal material support statutes.

Defendants' active or constructive knowledge of such activity.  Accordingly, Plaintiffs do not, by their current complaint, establish a *prima facie* case of jurisdiction over the non-resident Individual Defendants on a conspiracy claim.

The claims against the non-resident Individual Defendants shall accordingly be dismissed for lack of personal jurisdiction under Rule 12(b)(2), with leave for the Plaintiffs to amend and plead a conspiracy-based jurisdictional theory which meets all applicable statutory and constitutional requirements.  *See generally In re Terrorist Attacks on September 11, 2011*, 714 F.3d 659, 678-680 (2d Cir. 2013), *cert. den., O'Neill v. Al Rajhi Bank*,  134 S. Ct. 2870 (U.S. June 30, 2014).

### E.  TVPA Claims- Rule 12(b)(6) Failure to State a Claim

The Individual Defendants also seek dismissal under Rule 12 (b) (6) for failure to state a claim on which relief may be granted based on (1) failure to plead adequately individualized factual allegations in support of  concerted (aiding and abetting) liability under  the TVPA, and (2) failure to plead facts in satisfaction or avoidance of the TVPA's exhaustion-of-local remedies requirement.

### 1.Failure to State a Claim

The Individual Defendants complain that Plaintiffs make only conclusory, collective allegations regarding the Individual Defendants' alleged involvement in Chiquita's AUC payment scheme, without individualized facts showing how each knowingly and substantially assisted the AUC's commission of the alleged acts of terrorism so as to state a plausible claim for aiding and abetting liability under the TVPA.

The Complaint generally alleges each Individual Defendant knew the AUC was a violent terrorist organization that employed Paramilitary Terrorist Tactics in its campaign  to defeat left-

wing guerilla groups, and that the Defendants wanted the AUC to eliminate those groups; that the Individual Defendants participated in Chiquita's decision to support the AUC for that purpose, either by initiating, implementing or approving the decision; and that each Individual Defendant had some role in the review and approval of procedures adopted to conceal the payments, knowing that those actions would substantially assist and fuel the AUC's use of Paramilitary Terrorist Tactics (Complaint ¶¶ 141-159).

Defendants Olson and Tsacalis are alleged to have directly participated in designing the methods for surreptitious payments (¶¶154, 156), and Defendant Keiser is alleged to have personally met with AUC leaders to negotiate the agreement and to have personally delivered cash to the AUC pursuant to that agreement ( ¶157) .

All Individual Defendants, save Keith Lindner, are alleged to have met in Chiquita's Cincinnati, Ohio headquarters on various dates to discuss, review and approve of procedures for making and concealing payments to the AUC (¶¶ 160-162). Defendants Olson and Tsacalis allegedly met with the Audit Committee in September, 2000 to discuss an internal report prepared by in-house counsel revealing that the convivir recipients of Chiquita's funding were merely fronts for the AUC, a " widely-known, illegal vigilante organization." After the United States officially designated the AUC as a foreign terrorist organization, Individual Defendants Olson, Tsacalis and Kistinger, and other unnamed executives, met to devise new procedures for making and disguising the payments (Complaint ¶¶172-173), and ultimately devised a scheme to funnel the money through "compensation" checks issued to Banadex employees in Colombia, a subterfuge which continued between September 10, 2001 through February 4, 2004 (¶ 175). The Court finds these allegations sufficient to plausibly state aiding and abetting liability as against all Individual Defendants except Keith Lindner.

As to the Defendant  Lindner, the Court agrees that the Complaint does not allege sufficient individualized facts to support the aiding and abetting liability alleged in the Complaint.   Plaintiffs make the conclusory allegations that  Lindner knew the AUC was a violent terrorist organization employing Paramilitary Terrorist Tactics to drive out left-wing guerilla groups; knew and approved the decision to pay the AUC through convivirs and later directly in cash; and approved the procedures designed to conceal the payments [¶ 159] but do not allege specific facts showing how, when or where he was put on knowledge of these activities or participated in implementing them.   The Complaint does not, for example,  allege that Lindner was a participant, or even present, at any of the  multiple meetings in Chiquita's Cincinnati  headquarters where decisions on AUC funding  were made, either  before and after the United States government designated the AUC as a foreign terrorist organization.  [¶¶ 160-162; 166- 168].   The Complaint  alleges simply  that given Lindner's  "controlling role in the company and his stock ownership interest with his father, the payments to the AUC could not have been  made or continued without his approval."  [¶159].   The Court does not find  the inference urged to be a fair or reasonable one.  Without more, the Court concludes that the general and collective allegations directed at Lindner  are insufficient to meet the  plausibility pleading standard established by *Twombly*, and shall accordingly dismiss the TVPA claims against Lindner for failure to state a claim under Rule 12 (b) (6).

As to the remaining Defendant Charles Keiser, who is alleged to have personally met with  AUC leaders to engineer the illicit AUC agreement, to have personally approved and implemented the fraudulent concealment of the payments through  front organizations or "convivirs,"  and  to have personally delivered  cash payments to the AUC [¶¶  141-149; 157, 163-164, 253-256],   the Court finds  sufficient facts from which to infer his knowing and

substantial assistance in the AUC's commission of  the alleged acts of international  terrorism, for purposes of stating an aiding and abetting liability claim under the TVPA against him.  The motion to dismiss as to Defendant Keiser shall accordingly be denied.

### 2. **Failure to Exhaust Local Remedies**

Under the TVPA, the Court must "decline to hear a claim ... if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving raise to the claim occurred."  28 U.S.C. §1350 note, 2(b).   Exhaustion is an affirmative defense, requiring the defendant to bear a "substantial" burden of proof.  *Jean v. Dorelian*, 431 F.3d 776 (11th Cir. 2005).

The Individual Defendants contend that the Complaint fails to allege sufficient facts demonstrating exhaustion of local remedies, or circumstances excusing the requirement, and that the Complaint must therefore be dismissed for failure to allege facts in satisfaction of this requirement.

In response, Plaintiffs contend the Complaint alleges facts showing that exhaustion would be "futile, unobtainable, ineffective or inadequate," Complaint ¶ 274, therefore excusing the exhaustion requirement.  More specifically,  Plaintiffs allege that the close  connection between the AUC, Colombian government and law enforcement authorities effectively vitiates any meaningful opportunity of pursing local relief in Colombia, and in illustration, cite the history of Jorge Porter's unsuccessful pleas for assistance from Colombian government and law enforcement authorities [Complaint ¶272(a)- (e)], the United States government and law enforcement authorities [Complaint ¶272(f)-(g)] and certain well-known human rights organizations with operations in Colombia [8] [Complaint ¶272(h)], with all entities advising it

---

[8] Plaintiff Jorge Porter  alleges that he contacted the Colombian national police in Bogota, and Medellin, Colombia regularly for a period of months; reported the kidnappings and torture to other units of the Colombian national

was futile for him to seek any kind of redress in Colombia [Complaint ¶¶ 273-274]. Porter also alleges that his communications with Colombian and United States law enforcement were immediately  intercepted by the AUC,  which threatened to kill him if he persisted in seeking government intervention [Compliant ¶¶ 273-274].  He contends that the  AUC also sent death threats to a Colombian  attorney whom he retained to investigate the claims, causing the attorney to resign [Complaint, ¶272 (h)].

On this background, the Court finds adequate allegations  showing exhaustion would be "futile, unobtainable ineffective or inadequate,"  in avoidance of the exhaustion- of- local - remedies requirement, and shall deny the Individual Defendant's motion to dismiss on this basis.

### IV.    CONCLUSION

Based on the foregoing, it is  **ORDERED AND ADJUDGED**:

1.   The Chiquita Defendant's motion to dismiss the ATA claims for failure to allege citizenship adequately is **GRANTED**, with leave for Plaintiffs to  file Amended Complaint curing the deficiency within **TEN (10) DAYS**  from the date of entry of this Order.  Chiquita's motion to dismiss the Plaintiffs' ATA claims in the above-styled action  is otherwise  **DENIED.**

2. The non-resident Individual Defendants Olson, Kistinger, Tsacalis and Warshaw's motion to dismiss for lack of personal jurisdiction is **GRANTED,** and the TVPA claims against these Defendants  are **DISMISSED WITHOUT   PREJUDICE** for Plaintiffs to file an Amended Complaint attempting to cure the pleading deficiencies outlined above within **TEN (10) DAYS** from the date of entry of this Order.

3. The Individual Defendant Keith Lindner's motion to dismiss for failure to state a secondary liability claim under the TVPA is **GRANTED,** and the claims against Defendant

---

police and Attorney General of Colombia; met with Colombian foreign counsel in the Consulate in Miami; contacted and reported the kidnappings and torture to the United States Embassy in Colombia, as well as the FBI and the U.S. Department of Justice.   Complaint ¶¶ 72(a) – (i).

Lindner are **DISMISSED WITHOUT PREJUDICE** for Plaintiffs to file an Amended Complaint attempting to cure the pleading deficiencies outlined above within **TEN (10) DAYS** from the date of entry of this Order.

4.   The Individual Defendant **CHARLES KEISER's** motion to dismiss the TVPA claims is **DENIED** in its entirety.

5.   In light of the foregoing, the Porter Plaintiffs' motion for leave to late-file a reply to the Defendants' joint opposition to their motion for leave to amend the complaint [DE 1357] is **DENIED AS MOOT**.

        **DONE AND ORDERED** at West Palm Beach, Florida this 27th day of April, 2017.


                                                KENNETH A. MARRA
                                                United States District Judge

cc.  all counsel