**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 08-01916-MD-MARRA/JOHNSON**

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.,
ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATA Actions
_____/
          Case No. 1:08-CV-20641-KAM

TANIA JULIN, *et al.*,
                    Plaintiffs,
v.

CHIQUITA BRANDS INTERNATIONAL, INC.
                    Defendant.
_____/
          Case No. 9:09-CV-80683-KAM

OLIVIA PESCATORE, *et al.*,
                    Plaintiffs,
v.

CHIQUITA BRANDS INTERNATIONAL, INC., *et al.*,
                    Defendants.
_____/
          Case No. 9:11-CV-80402-KAM

ESTATE OF JANE PESCATORE SPARROW,
                    Plaintiff,
v.

CHIQUITA BRANDS INTERNATIONAL, INC., et al.,
                    Defendants.
_____/

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS PURSUANT TO L.R. 56.1**

A. **Chiquita's History in Colombia.**

1.      Chiquita Brands International, Inc. ("CBI") and its predecessors, including United Brands Corporation, United Fruit Company, and Boston Fruit Company have been involved in Colombia for more than one hundred years.[1] Ex. B, Keiser Dep., 63:03-64:01.

2.      CBI's operations in Colombia were consolidated under its wholly owned subsidiary C.I. Bananos de Exportacion, S.A. ("Banadex") in approximately 1989. Ex. D, Chiquita's Response to Request for Admission ("CRRFA") No. 7; Ex. B, Keiser Dep., 60:20-61:4; Ex. C, Factual Proffer, ¶ 2. Banadex produced bananas in the Uraba and Santa Marta regions of Colombia. Ex. C, Factual Proffer, ¶ 2.

3.      Banadex was a cost center, and did not have any corporate costs in its own budget. Ex. B, Keiser Dep., 311:17-313:16. Banadex was not expected to earn profits. *Id.* at 35:20-21, 36:8-9, 315:12-316:18.

4.      Historically, CBI has both owned fruit-producing farms in Colombia and has purchased fruit from local growers in Colombia. Ex. A, Ordman 30(b)(6) Dep., 48:19-49:21, 54:1-55:2; Ex. D, CRRFA No. 5. The same is true regarding Guatemala, Costa Rica, and Panama. Ex. A, Ordman 30(b)(6) Dep., 56:17-57:9.

5.      At one point in time, prior to 1975, for instance, CBI sold the farms it owned in Colombia to local growers who, in turn, sold the fruit to CBI. Ex. A, Ordman 30(b)(6) Dep., 54:1-19; Ex. D, CRRFA No. 5.

6.      In the mid-to-late-1980s, CBI owned no farms or wharf facilities in Colombia and had less than 100 Colombian employees, who primarily purchased bananas from local growers in the Uraba and Santa Marta regions. Ex. A, Ordman 30(b)(6) Dep., 43:1-45:5, 52:2-4, 34:7-35:14, 44:6-13, 48:19-49:21; Ex. D, CRRFA No. 4, 5.

---

[1] "CBI" will be used herein to refer to CBI or its predecessors.

B.        <u>**Chiquita's Management Structure**</u>.

7.        Dennis Doyle was the Vice President and Chief Operating Officer of CBI's banana group from 1987 to 1989. Ex. D, CRRFA No. 123. His employment overlapped with the period in which CBI authorized and directed Banadex to make payments to FARC. *Id.* at No. 122.

8.        Robert Kistinger was the Executive Vice President of Operations for the Tropical Products Division of CBI from 1989 through 1994. Ex. D, CRRFA No. 129. He was Senior Executive Vice President of CBI's Banana Group from 1994 through 1997. *Id.* at No. 130. His employment overlapped with the period in which CBI authorized and directed Banadex to make payments to FARC. *Id.* at No. 128.

9.        John Ordman was the Vice President of CBI's Purchased Fruit Division from July 1987 through June 1989. Ex. D, CRRFA No. 135. He was Senior Vice President and Regional Manager of CBI from 1989 through 2003. *Id.* at No. 136. His employment with CBI overlapped with the period in which Banadex made payments to FARC. *Id.* at No. 134. Mr. Ordman was located in Panama City from the late 1980s until approximately 1995 and moved to San Jose, Costa Rica in 1995. Ex. E, Ordman Dep. 43:12-20, 88:17-20. He traveled to Colombia periodically to supervise the Colombian operations. *Id.* at 88:21-89:2.

10.        Charles Keiser served as General Manager of Banadex from 1989 through February of 2000. Ex. D, CRRFA No. 142. He was employed by CBI and certain of its subsidiaries from 1980 until July of 2012, and his employment overlapped with the period in which Banadex made payments to FARC. *Id.* at No. 141; Ex. F, CBI Senior Management Background Information, 2-3.

11.     Charles Morgan was General Counsel to CBI from 1988 until 1995. Ex. D, CRRFA No. 150. His employment overlapped with the period in which Banadex made payments to FARC. Ex. X, CBI Am. and Supp. Resp. to Interrogatory (4/27/2016) ("Am. and Supp. Resp. Int.") No. 3. Mr. Morgan was based in Cincinnati. Ex. A, Ordman 30(b)(6) Dep., 202:8-12.

12.     Robert Thomas began working in CBI's legal department as a senior counsel, reporting to Mr. Morgan, in approximately 1989. Ex. G, Thomas Dep., 9:14-10:13. He continued to work for CBI until 2000. *Id.* at 9:14-10:13. His employment overlapped with the period in which Banadex made payments to FARC. Ex. X, Am. and Supp. Resp. Int. No. 3.

13.     Alejandro Bakoczy was employed by CBI from approximately 1989 through June of 2004, and his employment overlapped with the period in which Banadex made payments to FARC. Ex. D, CRRFA No. 155. He was CBI's head of security from approximately 1989 through June of 2004. *Id.* at No. 156. Mr. Bakoczy was based in Cincinnati. Ex. A, Ordman 30(b)(6), 202:13-17.

14.     Juan Manuel Alvarado was employed by CBI as Director of Security for Banadex from March 1992 through October 1999, and his employment overlapped with the period in which Banadex made payments to FARC. Ex. D, CRRFA No. 158, 159.

15.     Wilfred "Bud" W. White was employed by CBI from December 1988 until October 1997, and his employment overlapped with the period in which Banadex made payments to FARC. Ex. D, CRRFA No. 163. He was CBI's Vice President of Internal Audit from December 1988 until October 1997. *Id.* at No. 164.

16.     John Stabler, a CBI corporate security manager (Ex. H, July 1-Sept. 1993 Foreign Corrupt Practices Table, CBI-ATA-00002433) became a member of the regional security team after the first demand for payment from FARC had been received in 1989. Ex. A, Ordman

30(b)(6) Dep., 117:16-22; Ex. B, Keiser Dep., 335:12-19. He was located in Panama, but traveled to Colombia on occasion. *Id.* He served in this position for approximately two years. *Id.* at 335:12-19.

17.     Mr. Keiser's paycheck came from CBI, he considered himself to be an employee of CBI, and he took direction from CBI employees based in Cincinnati while he served as General Manager of Banadex. Ex. B, Keiser Dep., 49:12-22, 50:1-3, 61:8-12.

18.     Mr. Keiser reported to Mr. Ordman, Mr. Ordman reported to Mr. Kistinger, and Mr. Kistinger reported to Mr. Doyle and later to Keith Lindner. Ex. I, Kistinger Dep., 113:25-115:12. Mr. Lindner was Chief Executive Officer of CBI in the late 1980s. Ex. A, Ordman 30(b)(6), 59:5-8; Ex. E, Ordman Dep., 65:1-13.

**C.   Chiquita's Decision to Purchase Farms in the Late-1980s.**

19.     In the late 1980s, CBI had a "banana group," headed by Dennis Doyle, and encompassing all of Chiquita's banana-related business around the world. Ex. A, Ordman 30(b)(6) Dep., 48:19-49:8.

20.     In or around 1987, CBI decided to intensify the production of fruit in Latin America, such as by acquiring existing farms that were at the time selling fruit to CBI or one of its competitors and converting them into owned or produced-fruit operations. Ex. A, Ordman 30(b)(6) Dep., 51:7-52:1.

21.     The decision for CBI to move its operations in Colombia from a purchased-fruit operation to an owned-fruit operation was made at the end of 1987 and in early 1988 by the CEO of CBI, the Board of Directors, and CBI executives managing the European market. Ex. E, Ordman Dep., 64:19-69:10; Ex. A, Ordman 30(b)(6) Dep., 57:10-58:2.

22.     In the late 1980s, in the banana world, there were changes expected that could open up markets in the European Union. Ex. B, Keiser Dep., 80:10-82:11, 319:3-17. Prior to 1989, some European Union countries had protective tariffs or quotas in place that favored their ex-colonies. *Id.* Latin American bananas were limited in their access to Europe by these quota systems. *Id.* After 1989, this system was expected to be restructured allowing for greater access to the European market. *Id.*

23.     Given these changes, there was a risk that farms in Colombia that had previously been under CBI ownership, but that had been sold to Colombians and continued to be developed and expanded, could decide to sell bananas to Europe on their own or to CBI's competitors. Ex. B, Keiser Dep., 80:10-82:11, 244:09-246:03, 246:4-11, 317:02-318:16; *see also id.* at 74:14-75:12, 76:2-77:11; Ex. E, Ordman Dep., 67:15-68:9. This put CBI at risk of losing access to the European market and its significant customer base there. Ex. B, Keiser Dep., 80:10-82:11.

24.     The fear of being cut off from its significant customer base in Europe and potentially losing large volumes of supply when contracts came up for renewal was the reason for CBI's decision to switch to an owned-fruit operation to "control more volume in Colombia." Ex. B, Keiser Dep., 74:14-75:12, 76:2-77:11, 80:10-82:11; Ex. A, Ordman 30(b)(6) Dep., 60:4-7.

25.     Accordingly, CBI engaged in a banana farm expansion, including in Colombia, which was "initiated to satisfy expected future global market demands for bananas" and the strategic opening of the European market. Ex. J, Feb. 26, 1992 Memorandum ("Mem."); *see also* Ex. B, Keiser Dep., 97:14-99:01, 153:9-154:07.

26.     CBI, or certain of its subsidiaries, bought and sold farms or companies that owned banana farms in the banana-growing regions of Uraba and Magdalena, Colombia at points in the 1980s and in the 1990s. Ex. D, CRRFA No. 9.

Case No. 08-01916-MD-MARRA/JOHNSON

27.     In 1988, CBI purchased three farms in Colombia from one individual CBI had previously purchased bananas from. Ex. A, Ordman 30(b)(6) Dep., 61: 22-62:22; Ex. B, Keiser Dep., 83:6-86:1. In 1989, CBI purchased farms from independent growers. Ex. A, Ordman 30(b)(6) Dep., 63: 1-10. In 1990, CBI purchased another 8-10 farms. Ex. B, Keiser Dep. 83:6-86:1. From 1991-1992, CBI purchased about 5 additional farms. *Id.* Finally, in 1993-1994, CBI acquired approximately 20-23 farms from the Restrepo Group. *Id.*; *see also* Ex. K, Feb. 2009 Report of the Special Litigation Committee ("SLC Report")*,* 27; Ex. D, CRRFA No. 9.

28.     Ultimately, CBI, or certain of its subsidiaries, acquired somewhere between 4,000 and 5,000 hectares of farm land in Colombia (Ex. A, Ordman 30(b)(6) Dep., 63:22-64:3; Ex. D, CRRFA No. 12), or roughly 35 farms. Ex. E, Ordman Dep., 77:8-12; *see also* Ex. L, Aug. 24, 1998 Corporate Notebook, 7-9. Between 1988 and 1997, these farms produced from approximately 1,800 to as many as 2,500 boxes of bananas per hectare. Ex. A, Ordman 30(b)(6) Dep., 111:4-16.

**D.  Chiquita's Knowledge of Guerilla Groups in Colombia in the 1980s and 1990s.**

29.     Due to the years it spent conducting business in the Uraba region, CBI was aware prior to its purchase of farms that guerillas were active there, guerillas were capable of (and in fact were engaged in) acts of extreme violence, including murder, and that FARC had a reputation as an extremely violent group. Ex. A, Ordman 30(b)(6) Dep., 82:4-18, 83:5-22; Ex. D, CRRFA Nos. 17, 27, 31, 34; Ex. E, Ordman Dep., 69:12-71:8, 81:6-11, 83:4-84:5, 87:17-88:16.

30.     Before it purchased farms, CBI knew that the guerillas groups who had a presence in the banana zone were leftist, and Anti-American. Ex. E, Ordman Dep., 69:12-71:8. CBI assumed that if it openly owned farms, it would be a more likely target of extortion demands. *Id.* at 69:12-71:8, 243:3-15.

31.     Notwithstanding its awareness of the presence of guerilla groups and violence, CBI made a strategic, voluntary decision to purchase farms in the Uraba region of Colombia. Ex. A, Ordman 30(b)(6) Dep., 72:20-73:9.

32.     CBI's outside security consultant, Control Risk, provided consulting services on an ongoing basis from 1988 through 1997. Ex. A, Ordman 30(b)(6) Dep., 95:14-96:18.

33.     A memorandum prepared by Control Risk in the 1980s warned the company that that FARC and other terrorists in Colombia's banana growing region commonly demanded funds in exchange for good labor relations and protection of property. Ex. N, Control Risks Mem., §1.2; Ex. A, Ordman 30(b)(6) Dep., 133:10-14, 136:6-20. The memorandum also warned that "[a]ny payment, however small, will set a precedent for the future," and that additional demands were likely to follow. Ex. N, Control Risks Mem., § 6.3.1(c); Ex. A, Ordman 30(b)(6) Dep., 155:5-17.

34.     There was an awareness that FARC was among the violent terrorist or guerilla groups operating in Colombia; that FARC was engaged in kidnapping for ransom, extortion, and killing people; and that the FARC targeted U.S. interests and engaged in kidnapping and ransom of U.S. citizens for "political purposes." Ex. B, Keiser Dep., 107:3-6, 115:12-15, 135:2-137:2, 153:9-154:1; Ex. A, Ordman 30(b)(6) Dep., 168:3-6, 209:15-211:11, 212:12-15, 212:22-213:6; Ex. E, Ordman Dep., 93:3-10; 108:14-109:16; Ex. D, CRRFA No. 39-42, 43-46; Ex. I, Kistinger Dep., 92:14-25, 106:2-4; Ex. O, Feb. 10, 1993 Mem.

35.     CBI's corporate head of security, Al Bakoczy, circulated security memoranda to CBI management during the 1990s containing threat reports from either the U.S. State Department or the private security firm Control Risks explicitly warning that Colombian guerrillas, including FARC and ELN, were a serious terrorist threat, especially to American

citizens. *See*, *e.g.*,  Ex. P, Feb. 7, 1994 Mem., 2; Ex. Q, Security Forecast Renewal; Ex. R, Feb. 3, 1994 Mem.; *see also* Ex. A, Ordman 30(b)(6) Dep. 96:9-18, 169:9-16, 209:3-211:12; Ex. O, Feb. 10, 1993 Mem.  Two of these memoranda indicated that two American missionaries had been kidnapped by FARC. Ex. R, Feb. 3, 1994 Mem.; Ex. P, Feb. 7, 1994 Mem.; Ex. A, Ordman 30(b)(6) Dep., 170:19-172:4.

36.     CBI continued to purchase farms in Uraba even though violent activities were significantly increasing and ramping up during the timeframe in which CBI carried out these purchases. Ex. A, Ordman 30(b)(6) Dep., 72:22-73:19; Ex. D, CRRFA No. 19.

37.     CBI understood that it was transitioning into farm ownership in a very dangerous area with guerilla activity that escalated over time. Ex. A, Ordman 30(b)(6) Dep., 140:3-7; *see also* Ex. I, Kistinger Dep., 106:2-4.

38.     At certain points in the late 1980s and 1990s, CBI anticipated that guerilla groups would target it for extortion as an owner of farms, and therefore tried to conceal or disguise its ownership of the farms. Ex. A, Ordman 30(b)(6) Dep., 80:7-15; Ex. D, CRRFA No. 21, 24.

39.     For instance, to keep a low profile and avoid requests for payment from guerilla groups, CBI attempted to conceal ownership of farms in the Uraba region by having an individual named Jaime Restrepo purchase farms on behalf of CBI. Ex. A, Ordman 30(b)(6) Dep., 77:4-80:3.

40.     In a period of escalating violence by FARC and other terrorist groups, CBI was willing to continue expanding and buying farms because FARC payments were enabling it to safely operate those farms. Ex. A, Ordman 30(b)(6) Dep., 141:12-18.

**E.  Chiquita's Payments to the FARC and Other Guerilla Groups.**

41.    One of the first three farms CBI purchased in 1988 was subject to a demand for payment from FARC within approximately one year of the purchase. Ex. A, Ordman 30(b)(6) Dep., 80:16-81:21.

42.    In 1989, a farm manager named Sergio De la Cuesta informed Mr. Keiser that he had received a demand for $10,000 from FARC guerillas. Ex. B, Keiser Dep., 137:8-140:21, 324:13-16. Mr. Keiser informed Mr. Ordman. *Id.* at 137:8-140:21; Ex. E, Ordman Dep., 110:11-113:12. Mr. Ordman then communicated that there had been a demand for payment by FARC to Mr. Kistinger. Ex. I, Kistinger Dep., 78:11-79:24; *see also* Ex. K, SLC Report, 30-31.

43.    Mr. Keiser was instructed by Mr. Ordman to visit the CBI corporate headquarters in Cincinnati, where he attended a meeting with several senior executives, including Charles Morgan, Robert Kistinger, and Dennis Doyle. Ex. B, Keiser Dep., 137:3-140:21; Ex. E, Ordman Dep., 116:7-12, 121:8-122:9; Ex. K, SLC Report, 31; Ex. ll, Kistinger Aff., ¶¶ 6-7; Ex. mm, Ordman Aff., ¶¶ 3.

44.    Mr. Keiser recalls that Mr. Doyle said, "I'm a man of few words. Let's pay them." Ex. B, Keiser Dep., Tr. 137:8-140:21; *see also* Ex. K, SLC Report, 31.

45.    The meeting in Cincinnati with Mr. Keiser lasted less than one hour and ended with the conclusion that the amount demanded should be paid. Ex. B, Keiser Dep., 137:8-140:21.

46.    It was believed at the time of the Cincinnati meeting that "this would not be a one-time payment" and that additional payments to guerillas groups would be necessary. Ex. I, Kistinger Dep., 82:03-83:16; Ex. B, Keiser Dep., 144:17-146:22, 148:13-148:22; *see also* Ex. A, Ordman 30(b)(6) Dep., 155:5-17; Ex. E, Ordman Dep., 117:10-13; Ex. ll, Kistinger Aff, ¶ 6; Ex. mm, Ordman Aff., ¶ 3.

47.     The memorandum prepared by Control Risk in the late 1980s presented alternatives regarding how to deal with the guerilla activity, including involving security forces with the aim of entrapping the perpetrators, ignoring or refusing to pay, negotiating to a reduced settlement, or withdrawing from Colombia. Ex. N, Control Risk Mem., § 6.3.1; Ex. A, Ordman 30(b)(6) Dep., 96:19-97:21, 99:4-19, 131:7-10, 133:2-5, 135:12-136:2, 151:4-157:12.

48.     The idea of withdrawing was rejected, and the decision was made to pay the guerilla groups, including FARC, because, *inter alia*, there was a "business reason to be in Colombia." Ex. A, Ordman 30(b)(6) Dep., 99:20-100:13, 131:7-10, 133:2-5, 135:12-136:2, 156:5-11, 157:7-20; *see also* Ex. N, Control Risk Mem., § 6.3.1(c).

49.     Mr. Kistinger phoned Mr. Ordman to say that CBI had decided to pay the $10,000 demanded by FARC, and the two men discussed mechanically how that payment should be made. Ex. E, Ordman Dep., 123:3-7, 16-19.

50.     Ultimately, Mr. Keiser traveled to Guatemala, where Mr. Ordman gave him $10,000 in cash from the Honduras General Manager's Fund. Ex. B, Keiser Dep., 141:14-143:8; Ex. K, SLC Report, 32. Mr. Keiser took the money back to Colombia, exchanged it for Colombian pesos, hid it in a tire in the back of a jeep, and transported it for delivery to FARC by a farm manager or other employee. *Id.*

51.     After the first demand for payment from FARC, CBI worked to complete purchases of its next farms in the Uraba region of Colombia in 1990. Ex. B, Keiser Dep., 241:13-242:10.

52.     When CBI continued to purchase farms after the initial demand for payment from FARC in 1989, it was clear that the threat was widespread, and was not limited to one particular farm. Ex. B, Keiser Dep., 241:13-242:10.

53.     In fact, additional demands for payment were made by FARC shortly after the initial demand made in 1989. Ex. A, Ordman 30(b)(6) Dep., 81:22-82:3.

54.     Mr. Keiser continued to inform Mr. Ordman regarding the first payments out of the Colombia General Manager's Fund to the guerillas, and Mr. Ordman spoke to Mr. Kistinger. Ex. E, Ordman Dep., 139:9-140:3. Each time, Mr. Kistinger ratified the fact that CBI had made a decision to make the payments and indicated that Mr. Ordman and Mr. Keiser were authorized to proceed. *Id.*; *see also* Ex. B, Keiser Dep., 178:22-179:13; Ex. mm, Ordman Aff., ¶ 4.

55.     Control Risk advised that an effort should be made to negotiate, reduce, and drag out the payments for as long as possible because if payment was made easy, even more demands could be expected. Ex. B, Keiser Dep., 143:16-144:16. The negotiation strategy was to "continually complain" that the "payments were excessive," "argue about the" time period "the payments would cover," and engage in "foot dragging, to assure that the smallest payment and less frequent payment would be made." Ex. A, Ordman 30(b)(6) Dep., 244:5-22.

56.     At some point, CBI stopped negotiating and making separate payments to FARC for each of its farms, and arrived at "one deal" with FARC for the entire group of farms, obtaining what Mr. Keiser likened to a "volume discount." Ex. jj, Keiser Ins. Lit. Dep., 143:10-144:14.

57.     A "negotiating system" was also used to handle payments made to five guerilla groups, resulting in a reduced amount paid and allowing farm administrators to focus on their normal duties. Ex. T, Nov. 17, 1993 Mem., 2.

58.     To negotiate with the guerillas, CBI used intermediaries, including a lawyer named Rene Osorio.[2] Ex. A, Ordman 30(b)(6) Dep., 190:8-14, 205:2-10. Mr. Osorio delivered

---

[2] Mr. Osorio was retained as an independent contractor to deliver payments to FARC and other guerilla groups. Ex. V, Chiquita Answer to Interrogatory No. 6. Mr. Osorio had a predecessor who first served the role of intermediary

funds from the General Manger's account to guerilla groups, such as FARC, ELN, and EPL. Ex. B, Keiser Dep., 287:12-288:16; Ex. U, Blackham Dep. 42:04-23.

59.     Payments to FARC became routine and fairly regular. Ex. E, Ordman Dep., 241:20-242:6.

60.     Payments to terrorist groups in Colombia, including FARC, were in the range of 100 to 200 thousand per year in the 1990s, and were authorized by CBI's management. Ex. I, Kistinger Dep., 95:15-98:3; Ex. A, Ordman 30(b)(6) Dep., 163:20-164:10; Ex. K, SLC Report, 31; Ex. W, CBI Ins. Lit. Mot. for Partial Summary Judgment (Dec. 10, 2008) ("Mot. PSJ"), 7.

61.     CBI estimates that the cost of paying guerilla groups ranged roughly between $100,000 and $200,000 per year over the course of a ten-year period. Ex. A, Ordman 30(b)(6) Dep., 163:16-164:14; Ex. K, SLC Report, 32. An average of roughly $25,000 per year was paid to FARC. Ex. E, Ordman Dep., 239:12-240:10.

62.     CBI's payments to FARC continued from 1989 until 1999. Ex. B, Keiser Dep., 171:11-172:21; Ex. X, Am. and Supp. Resp. Int. No. 3; Ex. C, Factual Proffer, ¶ 20; Ex. W, Mot. PSJ, 7; Ex. Y, CBI Ins. Lit. Complaint ("Ins. Compl."), ¶¶ 18, 33. At least 57 payments were made to FARC during this time period. Ex. X, Am. and Supp. Resp. Int. No. 3.

63.     FARC was designated as a Foreign Terrorist Organization ("FTO") by the U.S. Department of State on October 8, 1997. Ex. gg, U.S. Dep't of State Listing of FTOs; Ex. K, SLC Report, 41. At least four payments were made to the FARC after the designation. Ex. X, Am. and Supp. Resp. Int. No. 3.

64.     From 1988 to 1999, CBI did not seek any assistance from the U.S. government concerning payment demands it received from Colombian guerilla groups. Ex. A, Ordman

---

between the company and the guerillas, but he was kidnapped and no longer able to operate. Ex. B, Keiser Dep., 287:12-288:16.

30(b)(6) Dep., 198:6-17, 200:1-7; Ex. B, Keiser Dep., 259:13-261:13; Ex. I, Kistinger Dep., 79:25-80:10.

66. Nor did CBI inform the Colombian government regarding payment demands from FARC. Ex. B, Keiser Dep., 215:7-10; Ex. I, Kistinger Dep. 79:25-80:10.

66. CBI testified through its corporate designee that it was not aware of Chiquita workers who were killed in Colombia specifically because they were affiliated with Chiquita. Ex. A, Ordman 30(b)(6) Dep., 142:13-21.

67. In 1997, CBI began paying the Autodefensas Unidas de Colombia ("AUC") in Uraba. Ex. C, Factual Proffer, ¶ 21.

68. The decision that Banadex should pay Colombian guerilla groups, including FARC, as well as paramilitary groups, was made by CBI employees in the U.S. Ex. Y, Ins. Compl., ¶¶ 18, 33. CBI admitted in a Factual Proffer accompanying its 2007 guilty plea that CBI had paid FARC. Ex. C, Factual Proffer, ¶ 20.

**F.  Chiquita's Policy for Handling Payments to Guerilla Groups.**

69. At the corporate level, John Ordman, Robert Kistinger, Dennis Doyle, Mr. Bakoczy, and others were deeply involved in decision and policy making regarding making payments in response to threats posed by the guerilla groups (Ex. A, Ordman 30(b)(6) Dep., 107:21-108:8; 147:1-148:1), while CBI's corporate policy "delegated the authority to handle individual extortion payments as demands were made" to managers in Colombia. Ex. ll, Kistinger Aff., ¶ 7; Ex. mm, Ordman Aff., ¶ 4.

70. For instance, Mr. Ordman was apprised of payments to FARC from 1989 through 1997 or 1998 in a broad sense and periodically traveled to Colombia to discuss the magnitude of the payments with Mr. Keiser and Mr. Alvarado. Ex. A, Ordman 30(b)(6) Dep., 204:11-206:11.

Case No. 08-01916-MD-MARRA/JOHNSON

Mr. Kistinger was also made aware of payments on a periodic basis. Ex. I, Kistinger Dep., 95:15-98:03.

71.     Mr. Bakoczy received reports regarding payments to FARC by Mr. Alvarado, as well as Mr. Alvarado's successor, Mr. Buitrago. Ex. A, Ordman 30(b)(6) Dep., 202:13-204:7.

72.     Communications took place between Mr. Bakoczy and Mr. Thomas, Mr. Bakoczy and Mr. Ordman, Mr. Bakoczy and Mr. White, Mr. White and Mr. Ordman, Mr. White and Mr. Keiser, Mr. Kistinger and Mr. Ordman or Mr. Keiser, and Mr. White and Mr. Morgan regarding payments to guerillas in connection with record keeping, how such payments should be submitted to CBI's internal audit and legal departments for review, or in the context of business or budget reviews. Ex. I, Kistinger Dep., 95:15-96:13; Ex. G, Thomas Dep., 20:14-21:8; Ex. A, Ordman 30(b)(6) Dep., 148:4-13, 201:12-203:18; Ex. K, SLC Report, 36-37; *see, e.g.*, Ex. T, Nov. 17, 1993 Mem. This included circulation of internal memoranda regarding guerilla payments. *See, e.g.,* Ex. B, Keiser Dep., 278:11-281:13; Ex. aa, Aug. 6, 1993 Mem. Mr. Stabler was a recipient of internal memoranda regarding guerilla payments. *See, e.g.,* Ex. aa, Aug. 6, 1993 Mem.; Ex. kk, "Solicitud Desembolso" Mems.

73.     Mr. Bakoczy was also involved in managing payments to guerrilla groups, and over time a process evolved where documentation of the payments was brought to Cincinnati. Ex. G, Thomas Dep., 20:11-21:8.

74.     CBI developed a policy and set of procedures for handling the "sensitive" payments made to guerilla groups, memorialized in a 1990 memorandum authored by Mr. White. Ex. A, Ordman 30(b)(6) Dep., 100:9-101:1; Ex. D, CRRFA No. 98; Ex. bb, Apr. 19, 1990 Mem.; Ex. cc, Kistinger SEC Tr., 32:7-24. This policy was discussed at a meeting held by CBI executives in San Jose, Costa Rica. Ex. E, Ordman Dep., 196:3-197:12. A memorandum

regarding the sensitive payments procedures established in 1990 was circulated annually. *See, e.g.,* Ex. ii, "Accounting for Sensitive Payments" Mems.

75.     The procedure set forth in Mr. White's 1990 memorandum included preparation of documentation to be reviewed quarterly by the "Country Manager" or "Supervisor of the General Manager," in person delivery of supporting detail to Cincinnati for review by Mr. Morgan, review by the Vice President of Internal Audit every six months, annual internal audits, and annual budgeting. Ex. bb, April 19, 1990 Mem. In practice documents were not personally delivered to Cincinnati on a quarterly basis, but a procedure "evolved over time" and "reliance was shifted to the internal audit group." Ex. E, Ordman Dep., 204:13-205:19.

76.     Mr. Thomas was involved in distribution of forms, gathering and summarizing data, and presenting to the audit committee and to the board of directors under CBI's Foreign Corrupt Practices Act compliance program. Ex. G, Thomas Dep., 12:17-13:14, 15:22-16:14. Mr. Thomas spoke with the general manager, a controller who handled accounting records, or a senior lawyer of a division if he had questions about the documentation. *Id.* at 17:12-21. With respect to Colombia, Mr. Thomas' primary contact was Reinaldo Escobar. *Id.* at 18:21-19:7. Mr. Escobar was head of CBI's legal department in Colombia. Ex. A, Ordman 30(b)(6) Dep., 108:9-11.  Mr. Thomas also worked with Mr. Bakoczy, and occasionally with Mr. Ordman and Mr. Keiser. *Id.*

77.     When he received documentation regarding guerilla payments, Mr. Thomas reviewed this information with Mr. White and shared it with Mr. Morgan. Ex. G, Thomas Dep., 27:7-20, 36:18-21, 38:14-19, 39:19-25.

78.     Mr. White also traveled to Colombia on at least one occasion to perform an audit in Colombia. Ex. B., Keiser Dep., 57:19-59:8.

79.     Between 1990 and 1997, CBI's accounting procedures required completion of a document called a "1016" in order to initiate a disbursement to a guerilla group. Ex. D, CRRFA No. 105, 106; Ex. E, Ordman Dep., 140:14-141:17.

80.     The 1016 form was signed by Mr. Keiser, or by Mr. Alvarado in his absence. Ex. B, Keiser Dep., 190:10-15. Mr. Alvarado was responsible for documenting and making requests for payment to terrorist groups, and in most cases was the one who facilitated processing of the 1016 form. *Id.* at 207:2-12.

81.     An effort was made to disguise payments to FARC on the 1016 forms using specially designated words, including color codes and other code words, known only to relevant personnel so that the recipient of a payment would not be readily understandable to local Banadex employees or anyone else not within the limited group who knew the codes. Ex. A, Ordman 30(b)(6) Dep., 123:3-10, 178:15-179:22; Ex. D, CRRFA No. 100, 102; Ex. B, Keiser Dep., 183:1-189:17, 196:8-198:18, 268:11-272:5, 277:16-281:13; Ex. G, Thomas Dep., 22:9-24:14; Ex. E, Ordman Dep., 141:18-142:13, 259:15-261:1. For example, the color "red," or "rojo" was used to identify FARC. Ex. B, Keiser Dep., 279:4-5; Ex. D, CRRFA No. 104.

82.     A small number of individuals would have understood the codes, including Mr. Keiser, Mr. Kistinger, Mr. Morgan, Mr. Alvarado, Mr. Ordman, Mr. Bakoczy, Mr. White, Jorge Forton, Alejandro Guzman, Doug Walker, Reinaldo Escobar, and members of the legal and accounting departments in Cincinnati. Ex. B, Keiser Dep. 183:1-189:17; Ex. G, Thomas Dep., 35:19-37:4. Mr. Forton and Mr. Guzman had served as controllers of Banadex. Ex. A, Ordman 30(b)(6) Dep., 108:12-14; Ex. B, Keiser Dep., 185:17-186:4. The controller reported to Mr. Walker, who was a Banadex administrative officer. Ex. B, Keiser Dep., 185:17-186:4.

Case No. 08-01916-MD-MARRA/JOHNSON

83.     The only documentation identifying payments made to specific guerilla groups was kept by Mr. Alvarado in a safe. Ex. E, Ordman Dep., 143:22-145:18; Ex. A, Ordman 30(b)(6) Dep., 178:15-180:5, 203:20-22. Very few people had access to these documents. Ex. E, Ordman Dep., 143:22-145:18; Ex. A, Ordman 30(b)(6) Dep., 178:15-180:5.

84.     Payments to the guerilla groups were made in cash. Ex. V, Chiquita Answer to Interrogatory No. 8.

85.     Paying FARC was viewed as a cost of doing business. Ex. B, Keiser Dep., 155:17-156:11; Ex. U, Blackham Dep., 72:7-16; Ex. I, Kistinger Dep., 98:18-99:9; Ex. E, Ordman Dep., 165:6-167:6.

86.     During sworn testimony in a SEC investigation of a bribery payment, Mr. Ordman was asked about a conversation he had with Mr. Keiser about why Mr. Keiser had approved the payment. Mr. Ordman testified that Mr. Keiser told him "I got the request for the payment, I got it from Alvarado, I approved it because I was absolutely convinced that it was a payment to the guerillas, I thought it was just another routine payment."  Ex. hh, Ordman SEC Tr., 154:16-155:6.

87.     Discussions between Mr. Kistinger and Mr. Keiser or Mr. Ordman regarding payments to guerillas came up during business reviews or budget reviews to determine whether the payments were staying "within the guidelines . . . talked about initially." Ex. I, Kistinger Dep., 95:15-98:03.

88.     Mr. Keiser estimated the cost of payments to terrorists and included that number in budget forecasting for the next year. Ex. B, Keiser Dep., 175:7-16. These payments were contained in the operating budget for the company. Ex. I, Kistinger Dep., 82:03-83:16; 98:18-99:9.

89.     The cost of paying terrorists was taken into account in the cost per box of bananas sold. Ex. B, Keiser Dep., 175:7-176:11.

**G. <u>Chiquita Ultimately Sold its Farms in Colombia</u>.**

90.     CBI never considered leaving Colombia between 1989 and 1997. Ex. A, Ordman 30(b)(6) Dep., 231:13-16.

91.     CBI could have left Colombia instead of continuing to make payments to guerillas (Ex. U, Blackham Dep., 189:16-19), but, from a strategic standpoint, doing so would have been a "massive blow" to the company. Ex. B, Keiser Dep., 215:19-216:18.

92.     CBI's budget for Banadex was approximately $70 to 100 million. Ex. B, Keiser Dep., 311:17-313:16; Ex. cc, Kistinger SEC Tr., 87:5-6.

93.     Payments to guerilla groups were very minor in the overall cost of producing and shipping a box of bananas. Ex. E, Ordman Dep., 276:8-20. It was, from a business standpoint, not a significant cost that was worried about. *Id.*

94.     Mr. Kistinger testified that "nobody is going to worry about something being off by 25 or $50,000 in the relative scheme of, you know, a guerrilla payment. Relatively speaking, I'm sorry, it doesn't hit the scorecard." Ex. cc, Kistinger SEC Tr., 87:6-9. Further, he testified that "'We're not going to stop doing business in Colombia because, you know, we're going to have to spend an extra $25,000.' That's not realistic. Right?" *Id.* at 87:23-25.

95.     The amounts paid to FARC were considered to be "insignificant in terms of the overall budget" of the operations in Colombia (Ex. E, Ordman Dep., 239:12-240:10) and were never seen as so high that economically it no longer made sense to do business in Colombia. Ex. B, Keiser Dep., 173:19-174:17.

96.     On September 10, 2001, the United States government designated the AUC as a FTO. Ex. C, Factual Proffer, ¶ 27. CBI had information regarding the AUC's designation as a FTO as of September 30, 2002 through a subscription service it paid money to receive. *Id.* ¶ 28. In February of 2003, a CBI employee stated to a high ranking officer of CBI that he or she had discovered that AUC had been designated as a FTO. *Id.* ¶¶ 11, 17, 55. As of February 21, 2003, outside counsel advised CBI that the payments were illegal under U.S. law and that CBI should immediately stop paying the AUC. *Id.* ¶ 56.

97.     In April of 2003, the CBI Board of Directors had agreed to disclose to the U.S. Department of Justice that CBI had been making payments to the AUC.  Ex. C, Factual Proffer, ¶ 59.

98.     Payments to the AUC continued until December of 2003.  Ex. C, Factual Proffer ¶¶ 61, 64-87. From approximately 1997 through February 4, 2004, CBI had made over 100 payments to the AUC. *Id.* ¶ 19.

99.     In 2004, CBI sold Banadex (Ex. C, Factual Proffer, ¶ 2) and no longer owned farms in Colombia. Ex. B, Keiser Dep., 65:6-17; Ex. E, Ordman Dep., 63:8-64:4.

100.    CBI made the decision to sell Banadex because it was unable to continue making payments without being in violation of U.S. law, given the FTO designation. Ex. A, Ordman 30(b)(6) Dep., 232:16-233:3.

101.    When CBI sold the farms in Colombia, it received a banana supply contract, reverting back to a mainly purchased-fruit operation, which was not inconsistent with what it had done over the previous 40 or 50 year period. Ex. I, Kistinger Dep., 106:5-18; Ex. K, SLC Report, 222.

102.    In 2007, CBI plead guilty to one count of unlawfully providing funds to the AUC. Ex. ff, Mar. 6, 2007 Plea Agreement.

103.    The DOJ stated during the sentencing hearing that "Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism.  Simply put, defendant Chiquita funded terrorism."  Ex. ee, U.S. v. CBI Government's Sentencing Mem., 13.

104.    Counsel for CBI agreed at CBI's sentencing hearing that "The company, quote 'funded terrorism.'" Ex. dd, U.S. v. CBI Transcript of Sentencing, 27:6-7.

105.    On September 23, 2008, CBI commenced an action against three of its insurers, seeking coverage for the costs of its defense in this action and others. *See* Ex. Y, CBI Ins. Lit. Compl., ¶ 18.

Case No. 08-01916-MD-MARRA/JOHNSON

Dated: March 30, 2017

Respectfully submitted,

/s/ Ramon A. Rasco
Robert C. Josefsberg (Fla. Bar No. 040856)
rjosefsberg@podhurst.com
Ramon A. Rasco (Fla. Bar No. 0617334)
rrasco@podhurst.com
PODHURST ORSECK, P.A.
One SE Third Avenue, Suite 2700
Miami, FL  33131
Telephone (305) 358-2800
Facsimile: (305) 358-2382

*Counsel for all Plaintiffs*

Steven M. Steingard
ssteingard@kohnswift.com
Stephen H. Schwartz
sschwartz@kohnswift.com
Neil L. Glazer
nglazer@kohnswift.com
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Gregory P. Hansel (Fla. Bar No. 607101)
ghansel@preti.com
Jeffrey D. Talbert
jtalbert@preti.com
PRETI, FLAHERTY, ET AL
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000

Gary M. Osen
gosen@osenlaw.com
Ari Ungar
aungar@osenlaw.com
Aaron Schlanger
aschlanger@osenlaw.com
Peter Raven-Hansen
pravenhansen@gmail.com
OSEN LLC
2 University Plaza, Suite 402

Case No. 08-01916-MD-MARRA/JOHNSON

Hackensack, New Jersey 07601
(201) 265-6400

Beth J. Kushner
VON BRIESEN &ROPER, S.C.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202
(414) 287-1373

*Counsel for Plaintiffs Tania Julin, et al.*

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Ave, Suite 3300
Seattle, WA 98101
Telephone: 206-623-7292
Facsimile: 206-623-0549
steve@hbsslaw.com

Nathaniel A. Tarnor
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: 212-752-5455
Facsimile: 212-210-3980
nathant@hbsslaw.com

Kiersten Taylor
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone: 617-475-1956
Facsimile: 617-482-3003
kierstent@hbsslaw.com

*Counsel for Plaintiffs Pescatore & Sparrow, et al.*

Case No. 08-01916-MD-MARRA/JOHNSON

## CERTIFICATE OF SERVICE

I, Ramon A. Rasco, hereby certify that on March 30, 2017, I caused the attached Plaintiffs' Statement of Material Fact Pursuant to L.R. 56.1 to be served by Electronic Mail in accordance with the Federal Rules of Civil Procedure upon the following counsel for Defendant:

**Aseem Padukone**
Covington & Burling, LLP
One Front Street
San Francisco, CA 94111-5356
Email: apadukone@cov.com

**Cyril Djoukeng**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Email: cdjoukeng@cov.com

**Emily R. Freeman**
Covington & Burling, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Email: efreeman@cov.com

**Eric Hellerman**
Covington & Burling, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Email: ehellerman@cov.com

**Jaclyn E. Martinez Resly**
 Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Email: jmartinezresly@cov.com

**Ligia M. Markman**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
E-mail: lmarkman@cov.com

**James M. Garland**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Email: jgarland@cov.com

**James Copley Gavigan, Jr.**
Jones, Foster, Johnston & Stubbs, P.A.
505 South Flagler Drive
Suite 1100
West Palm Beach, FL 33401
E-mail: jgavigan@jonesfoster.com

**John E. Hall**
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
E-mail: jhall@cov.com

**Jonathan M. Sperling**
Covington & Burling LLP
650 Eighth Avenue
New York, NY 10018-1405
E-mail: jsperling@cov.com

**Robert William Wilkins**
Jones, Foster, Johnston & Stubbs, P.A.
505 South Flagler Drive
Suite 1100
West Palm Beach, FL 33401
E-mail: rwilkins@jonesfoster.com

**Jose E. Arvelo**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
E-mail: jarvelo@cov.com

Case No. 08-01916-MD-MARRA/JOHNSON

**Mark W. Mosier**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
E-mail: mmosier@cov.com

**Shankar Duraiswamy**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
E-mail: sduraiswamy@cov.com

**Maureen F. Browne**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
E-mail: mbrowne@cov.com

**Sidney Alton Stubbs, Jr.**
Jones, Foster, Johnston & Stubbs, P.A.
505 South Flagler Drive
Suite 1100
West Palm Beach, FL 33401
E-mail: sstubbs@jonesfoster.com

**Megan L. Rodgers**
Covington & Burling, LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065
E-mail: mrodgers@cov.com

**Stephanie Shropshire**
Covington & Burling, LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
E-mail: sshropshire@cov.com

/s/  Ramon A. Rasco
Ramon A. Rasco, Esq.

25