# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-MD-01916-KAM

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____/

**This Document Relates to**

**ATA ACTIONS:**

**08-20641-CIV-MARRA (*JULIN*)**
**09-80683-CIV-MARRA (*PESCATORE*)**
**11-80402-CIV-MARRA (*SPARROW*)**

_____/

### ORDER DENYING IN PART AND GRANTING IN PART
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE 1329] AND
### GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
### ON THE AFFIRMATIVE DEFENSE OF DURESS [DE 1323]

This is a civil action to recover damages for the murder of six United States citizens in the Republic of Colombia. The Plaintiffs are a missionary organization, New Tribes Mission ("NTM"), and the relatives and representatives of six Americans who were kidnapped and killed in the 1990s by a Colombian terrorist organization known as the Fuerzas Armadas Revolucionarias de Colombia -- "the Armed Revolutionary Forces of Colombia" -- or the "FARC."

Plaintiffs bring claims under the civil liability provisions of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333(a), against Defendant Chiquita Brands International, Inc. ("Chiquita").[1] Plaintiffs allege that Chiquita violated the ATA by providing material support to

_____

[1] The *Pescatore* Plaintiffs also name several fictional defendants, Moe Corporations 1-5, and Moes 6-25 [DE 1287, ¶¶ 33-34], identified as unknown corporate entities who conspired, aided and abetted or acted in concert to cause injury to Plaintiffs' decedents. Although the practice of naming "John Doe" defendants is generally disfavored by federal courts, *see e.g. Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980); *Local Acceptance Co. of Florida v.*

1

the FARC by funneling money to it over a nine-year period of time through one of its wholly-owned Colombian subsidiaries.

The case is currently before the Court on (1) Chiquita's Motion for Summary Judgment [DE 1329], supporting Statement of Material Facts [DE 1330, 1335] and corresponding briefing of the parties [DE 1367, 1405, 1422] and (2) Plaintiffs' Motion for Partial Summary Judgment on Chiquita's Fourth & Fifth Affirmative Defenses [DE 1323], Supporting Statement of Material Facts [DE 1322, 1407] and corresponding briefing of the parties [DE 1365, 1366, 1414].

Chiquita advances three basic arguments in support of summary judgment:

(1)   Plaintiffs' operative Amended Complaints[2] allege secondary liability, which is not supported under the ATA;

(2)   Plaintiffs lack sufficient evidence to prove the essential elements of their ATA claims, i.e. Plaintiffs' evidence would not permit a reasonable jury to find that (a) Chiquita possessed the degree of scienter necessary to be held liable for an "act of international terrorism" as that term is defined under the ATA;  (b) Chiquita possessed the degree of scienter necessary to be held liable under the minimum recklessness *mens rea* standard imposed by the  ATA, *or* the specific *mens rea* requirements of the predicate criminal violation (§2339A) alleged; (c) Chiquita's conduct was the cause  of the Plaintiffs' injuries;

---

*Doe*, 962 F. Supp. 1495 (S.D. Fla. 1997) (dismissing suit against "John Doe" defendants), some courts allow a limited "placeholder" use of "John Doe" designations  where "the complaint makes allegations specific enough to permit the identity of the party to be ascertained  after reasonable discovery."  *Green v. Doe*, 260 Fed. Appx. 717, 719 (5th Cir. 2007); *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995); *Schiff v. Kennedy,* 691 F.2d 196, 197 (4th  Cir. 1982 ).   The "John Doe" designations employed in the *Pescatore* case are noted but have no bearing on the issues framed by the current motions for summary judgment.

[2] The operative complaint in the *Julin* matter is the Third Amended Complaint filed February 17, 2017 [DE 1273]. The operative consolidated complaint in the *Pescatore* matter is the Second Amended Complaint filed March 7, 2017 [DE 1287].

(3)   Plaintiffs' claims are barred by the ATA's ten-year statute of limitations because the deaths of Plaintiffs' decedents occurred more than ten years prior to filing of suit, and Plaintiffs lack sufficient evidence to create a jury question on the issue of equitable tolling.

Plaintiffs, in turn, argue they are entitled to partial summary judgment on Defendant's Fourth Affirmative Defense of "necessity" or "duress," because the undisputed facts attending Chiquita's nine-year history of payments to the FARC are not reasonably susceptible to the inference that Chiquita made the payments under "imminent" threat of death or serious bodily harm, or for the lack of reasonable legal alternatives,[3] and therefore present no jury question on two critical elements of this defense.  Alternatively, they argue Chiquita does not show duress to be an available legal defense to this civil ATA claim as a matter of law.

Having carefully reviewed the parties' briefs and evidentiary submissions, and having heard argument of counsel, the Court grants the motions in part and denies the motions in part for the reasons which follow.

## I.    BACKGROUND

### A.  PROCEDURAL BACKGROUND

On March 11, 2008, the *Julin* Plaintiffs sued Chiquita under the ATA and state law alleging that five members of the New Tribes Mission organization were kidnapped and killed in Colombia by the FARC in the early-to-mid 1990s. The *Pescatore* Plaintiffs filed similar claims on March 13, 2009 and March 9, 2011, alleging that the FARC kidnapped and killed Frank Pescatore, an American geologist affiliated with "GeoMet," an Alabama-based energy company,

---

[3] Plaintiffs' motion also challenges the legal sufficiency of Chiquita's Fifth Affirmative Defense of "corporate separateness," contending this defense has no application to the allegations of corporate policy-making directly attributed to Chiquita executive officers in this case. In response to this exposition of Plaintiffs' direct corporate liability theory, Chiquita has formally withdrawn this defense. Plaintiffs' motion for summary judgment, to the extent directed to the affirmative defense of corporate separateness, shall accordingly be denied as moot.

in December 1996 (kidnapping) and February 1997 (killing).  At this juncture, only ATA claims remain pending against Chiquita in both cases.

In earlier proceedings addressing the sufficiency of the pleadings, much of the dispute centered on the proper causation and scienter standards applicable to Plaintiffs' ATA claims. The scienter debate hinged on the viability of primary and secondary theories of liability alternatively alleged by Plaintiffs.  The Court initially found both theories viable [DE 278], but on reconsideration, agreed that secondary liability is not supported under the ATA and amended its original ruling to dismiss the standalone aiding and abetting and conspiracy claims [DE 692]. The  major cases relied upon in the Court's ruling included  *Boim v. Holy Land Foundation for Relief and Development (Boim III),* 549 F.3d 685 (7th Cir. 2008) (en banc), *cert. denied sub nom*. *Boim v. Salah*, 558 U.S. 981 (2009) and *Rothstein v. UBS AG,* 708 F.3d 82 (2d Cir. 2013).

The causation debate hinged on whether the ATA requirement for a plaintiff to show injury suffered "by reason of" an act of international terrorism requires a showing of "but-for" causation in addition to proximate causation. The Court rejected the imposition of a but-for causation requirement. The Court further found the allegations of Plaintiffs' then operative complaints sufficient to support the inference that Chiquita's material support would fund some of the FARC's terrorist activities, including kidnappings and murders of Americans,[4] and held that the complaints adequately alleged proximate causation [DE 278].   The Court denied Chiquita's motion for reconsideration on this point [DE 692].

---

[4] This initial ruling rested on allegations of a broader array of "material support" than those pled in Plaintiffs' current complaints. Plaintiffs originally alleged that Chiquita knowingly and intentionally supplied the FARC with secret monthly payments of between $20,000 and $100,000 over a nine-year period of time beginning in 1989 (four years before the first kidnapping); that the  payments were fixed to a percentage of its Colombian subsidiary's gross revenues, with as much as ten percent of the revenue diverted to the FARC, and  that Chiquita supplied the FARC with weapons, ammunition and other supplies in addition to providing monetary support.  Plaintiffs' now operative complaints allege that Chiquita systematically paid the FARC in cash, in a series of at least 57 payments, over a nine-year period of time, averaging $32,000 per annum.

After these preliminary rulings, Plaintiffs filed amended complaints in order to tailor their factual allegations and legal claims to the prior rulings of the Court.  In *Pescatore,* Plaintiffs filed their Second Amended Consolidated Complaint on March 9, 2017 [DE 1287].  It is a single count complaint which asserts "primary and secondary liability" under the ATA based on Chiquita's  alleged predicate violation of one of the material support statutes, 18 U.S.C. §2339A, as an actionable "act of international terrorism."  In *Julin,* Plaintiffs filed their Third Amended Complaint on February 17, 2017 [DE 1273]. It is a two count pleading which alleges primary ATA liability based on (1) Chiquita's alleged predicate violation of 18 U.S.C. § 2332(b) [conspiring with FARC to kill U.S. nationals abroad] as an actionable "act of international terrorism" ("Count 2") and (2) Chiquita's alleged predicate violation of one of the material support statutes, 18 U.S.C. § 2339A, as an actionable "act of international terrorism" ("Count 3").

## B.  FACTUL BACKGROUND[5]

### 1.  Chiquita's History in Colombia

Chiquita is a multinational corporation incorporated in New Jersey and headquartered in Cincinnati, Ohio.  For more than 100 years, Chiquita and its corporate predecessors produced, purchased and marketed bananas and other fresh produce from Colombia and other countries around the world.  In Colombia,  Chiquita subsidiaries, including C.I. Bananos de Exportacion, S.A. ("Banadex"), produced and purchased bananas in the banana-growing regions of Uraba, in the Colombian state of Antioquia (near the town of Turbo), and in the state of Magdalena (near Santa Marta), investing millions of dollars' worth of basic infrastructure in these areas.

---

[5] The background facts are drawn from the parties' respective Statements of Material Facts, Counter-Statements of Material Facts and other record evidence, and are undisputed unless otherwise noted.

At times, Chiquita subsidiaries owned and operated their own banana farms ("owned-fruit" farms) and at times they purchased fruit from local growers ("purchased-fruit" farms) in Colombia, Guatemala, Costa Rica, and Panama.  Prior to 1980, Chiquita and its subsidiaries began selling off their owned-fruit farms in Colombia to local growers, who, in turn sold the fruit to Chiquita or its subsidiaries.   As a result, by the mid-to-late 1980s, Chiquita owned no farms or wharf facilities in Colombia and had less than 100 Colombian employees.

From 1987 to 1989, Dennis Doyle was the Vice President and Chief Operating Officer of Chiquita's banana group, which operated Chiquita's banana-related business around the world. At the end of 1987, or early 1988, Dole and other Chiquita executives (Carl Linder, Keith Linder, Robert Kistinger and others) decided to transition Chiquita from purchased-fruit to owned-fruit operations in all Latin American banana-growing countries.  This decision was made in anticipation of increased market demand in the European Union following the elimination or reduction of protective tariff systems.   Chiquita became concerned that local growers in Colombia might try to take advantage of favorable market conditions in Europe by selling bananas directly to European buyers, or by selling them to Chiquita competitors.   Hence, Chiquita made the transition toward owned-fruit farms in order to better control the fruit supply, remain competitive and be in a position to "satisfy expected future global market demands for bananas" from the European market.

In 1988, Chiquita purchased its first three farms in the Uraba region of Colombia from an individual who had previously sold bananas to the company.  Having conducted business in Uraba in the past, Chiquita was aware at the time of this purchase that the FARC was very active in this area, and that it was capable of and routinely engaged in acts of extreme violence. In light of this antagonism, as it expanded its owned-fruit operations in Colombia, Chiquita often

disguised its ownership of the farms by assigning title to a proxy, or nominee, to avoid drawing the attention of FARC to its presence in Colombia.

Chiquita continued to purchase farms from local growers in Colombia so that by the mid-1990s, Chiquita or its subsidiaries employed over 3,000 employees in Colombia and owned between 4,000 and 5,000 hectares of farm land on roughly 35 farms. Between 1988 and 1997, owned-fruit farms belonging to Chiquita's subsidiaries in Colombia produced approximately 1,800 to 2,500 boxes of bananas per hectare.

## 2. Emergence of the FARC

The Fuerzas Armadas Revolucionarias de Colombia ("FARC") emerged as a violent left-wing guerilla group in Colombia in the 1960s.  Along with several other insurgencies, in the mid-to-late 1980s, the FARC expanded its operations into the rural banana-growing regions of Colombia, where it terrorized the countryside with ransom kidnappings, killings and escalating violence.

From the late 1980s through at least early 1997, the FARC exerted control over the regions of Uraba and Magdalena, where Banadex operated owned-fruit banana farms. During this time, the FARC generated enormous amounts of money from its participation in the Colombian drug trade, and, to a lesser extent, from extortion and ransom kidnappings.[6]  The parties dispute the relative amounts generated from the FARC's drug trade as opposed to its kidnapping operations; however it is generally agreed that the FARC conservatively generated more than $100 million annually at the height of its power, making more money than it could spend or launder, and resorting to burying excess cash in the Colombian jungles.

---

[6] Over 90% of the FARC kidnapping victims were Colombian citizens, the majority of whom were released after the payment of a ransom.  An estimated 7% of all the FARC kidnapping victims died in captivity.

Protection money demands from the FARC and other guerilla groups were so common that payments to them were colloquially known as the "vacuna," the Spanish word for "vaccine." The term was based on the supposition that the payments would help immunize the payor from retaliatory attacks.

In the time period relevant to this case, the FARC had a "top-down" command structure, led by a Central High Command, which was comprised of a Secreteriat (composed of FARC Front commanders) and the Estado Mayor (an administrative, logistics and planning body). FARC Fronts, the equivalent of a battalion or military outfits, were grouped into blocs that corresponded with specific geographic regions in Colombia. The fronts were semi-autonomous, due to the size and topography of Colombia, and generally expected to finance their own activities.

The Secretariat, through the Estado Mayor, decided how money and resources were spent and how much each Front received. The Central High Command also had the authority to order money transfers across Fronts (in addition to ordering transfers of munitions, food and other resources), and resource transfers between Fronts were commonly made. Financially successful Fronts supported less successful Fronts, especially those that operated in areas with fewer opportunities to obtain funds.

The Central High Command implemented financial procedures in 1984-85, expanded upon in April 1993, which generally allowed each Front to control its own funding activities. This was done with the understanding that any excess funds would be forwarded to the Central Command within six to twelve months after conclusion of the operation for which the funds were originally designated. The Fifth Front, the one most active in the banana-growing regions,

was credited with collecting approximately two million dollars annually for the FARC's General Secretariat.

### 3.   Chiquita - FARC Interface

As it expanded its "owned-fruit" operations in the Uraba and Magdalena regions of Colombia during the 1980s, Chiquita was aware of the presence of violent guerilla groups in these regions.   Chiquita routinely tracked organizational and trend information regarding guerrilla groups "with influence" in the Uraba area, including the activities of the prosperous Fifth Front.  It was specifically aware of the FARC presence, the FARC's ideological opposition to the presence of U.S. multi-national corporations in Colombia, and the FARC's notoriety for ransom kidnappings, extortion and killing, and its targeting of U.S. interests in Colombia.

In the 1990s, Chiquita's corporate head of security, Al Bakoczy, circulated security updates incorporating threat reports from the United States State Department and Control Risks, a privately-retained security company, which warned of the escalating terrorist threat posed by guerrillas entrenched in the banana-growing zones of Colombia, including the FARC.  Two of the memoranda mentioned two American missionaries who had been kidnapped by the FARC. One memorandum specifically identified Stephen Welsh and Timothy Van Dyke -- two of the ATM missionaries involved in this proceeding -- as victims. Bakoczy's internal security memoranda also included information regarding the general incidence of attacks, kidnappings, murders and other terrorist activities against U.S. interests committed by the FARC and other guerillas in Colombia.

Chiquita does not deny it was aware of the escalating menace of guerilla groups in Colombia's banana-growing zones as it expanded its owned-fruit operations in those areas.  In

hindsight, however, it contends that it "underestimated the challenges that guerilla groups would present as their level of activity and violence increased over the years."

In March 1989, Sergio De la Cuesta, the manager of a Banadex farm in Uraba, was approached by a FARC guerilla who demanded $10,000.00. There is no evidence that this demand was accompanied by an ultimatum or specific threat of any kind directed toward Chiquita employees or other persons.   De la Cuesta relayed the demand to Charles Keiser, then General Manager of Chiquita's Colombian banana operations.  Based on his general awareness of the FARC's reputation as a violent guerilla organization, Keiser testified that he interpreted this demand to mean that noncompliance would result in violence against Chiquita employees, professing to believe "there was a serious risk that the FARC would have killed some of our employees if we did not comply with their demand to pay them money."

Keiser consulted with his immediate supervisor, John Ordman, then Vice-President of Chiquita's Purchased-Fruit Division in Latin America.   Ordman, in turn, alerted Robert Kistinger, then Executive Vice-President of Operations in the Tropical Fruit Division located in Chiquita's U.S. headquarters.  A meeting at Chiquita corporate headquarters in Cincinnati, Ohio followed, attended by several high-ranking Chiquita executives, including Charles Morgan (General Counsel), Robert Kistinger, and Dennis Doyle (Vice-President and Chief Executive Officer of Chiquita's  Banana Group).  Keiser testified that he was also in attendance at this meeting, which lasted less than an hour, and ended with a corporate decision to authorize the payment of the money by Banadex to meet the FARC demand.[7]   The decision was made with

---

[7] At or around the time of this meeting, Chiquita contends it also consulted with in-house legal counsel and Control Risks for advice about the FARC demand, without specifying when or what type of legal advice it sought.  Chiquita apparently sought specific counsel on the legality of the FARC payments under the Foreign Corrupt Practices Act (FCPA), but there is no clear indication it inquired into the legality of payments under any other U.S. law:   In his deposition testimony, Mr. Ordman was  unable to identify what U.S. laws were analyzed, or when Chiquita vetted the legality of Chiquita's guerilla  payments.

the understanding and expectation that it would not be a one-time payment, and that additional demands for payment were likely to follow.

In the late 1980s, Control Risks issued a memorandum outlining various alternatives available to Chiquita for responding to demands from Colombian guerillas, listing the disadvantages associated with each approach along with a general comment. The options included deployment of security forces, with the aim of entrapping the perpetrators; ignoring or refusing to meet the demands; negotiating the demands to a reduced settlement, or simply withdrawing from Colombia ("selling all or some of the farms") [DE 1405-46 p. 8].  As to the withdrawal option, Control Risks commented, "[t]his option would need a detailed business analysis," and "[t]his may just move the problem over to other farms owned by Grupo Restrepo Arrango."

Control Risks ultimately recommended that Chiquita negotiate for reduced settlements with the FARC.  According to Mr. Keiser, Control Risks supported this advice with the warning:

> [Y]ou have to pay … [T]hese people are serious. The military is not able to control them.  You can't just turn them in, give their names to someone.  Because they will take retribution for that, and you can expect violence ... to your people or assets if you – if you say no…[B]ut even though you need to pay, you should make an effort to negotiate, reduce the payments and drag them out as long as possible….

[DE 1365-1, p. 144]. Control Risks also warned that "[a]ny payment, however small, will set a precedent for the future. However discreetly it is done, it will become known through the extortionists themselves. Further demands are likely to follow and these demands are likely to follow each year."

Chiquita elected to negotiate with the FARC, as recommended by Control Risks, allowing it to continue the expansion of its owned-fruit operations in Colombia.  According to

John Ordman, the author of the handwritten "no" in the margin of the Control Risk advice memo next to the "sell farms" option, Chiquita rejected the withdrawal option because "[t]here was a business reason to be in Colombia." [Deposition of John Ordman 156: 5-11].    Ordman and Kistinger then decided on the delivery procedure for the first payment: Charles Keiser traveled to Guatemala to meet Ordman; Ordman handed Keiser $10,000 in cash, withdrawn from Chiquita's Honduras General Manager's Fund; Keiser traveled to Colombia and exchanged the cash for Colombian pesos, and Keiser then made arrangements for delivery of the money to the FARC, hidden in a spare tire on the back of a jeep, through a farm manger or other Banadex employee.

The FARC continued to make more money demands on Banadex, as Control Risks predicted, and Banadex continued to meet the demands.  Keiser kept Ordman informed of all payments, drawn from Chiquita's Colombian General Manager's Fund, and Ordman  kept Kistinger apprised of the payments.  In all, Banadex made a series of at least 57 payments to the FARC between 1989 – 1999.  The payments averaged $32,000 per year for a cumulative total of $220,959.16 [DE 1405-19, 93, 62, 94-95].  In comparison, at its peak, Chiquita's payments to all guerilla groups in Colombia, from the mid-to-late 1990s, totaled about $100,000 to $200,000 per year.

Chiquita hired professional negotiators, as independent contractors, to negotiate with and deliver cash to the guerillas at off-farm locations. It sometimes used lawyer intermediaries, including Rene Osorio, to negotiate with FARC guerillas, resulting in smaller payments and less interruption to Banadex farming operations.  Eventually, Chiquita negotiated a "one-time deal" with the FARC for protection of its entire group of owned-fruit farms in Colombia, obtaining what Mr. Keiser likened to a "volume discount."

Banadex paid the FARC's 5th and 19th Fronts, and at least four of its FARC payments were made after October 8, 1997, the date the United States State Department designated the FARC as a Foreign Terrorist Organization.

### 4. Motivation

Chiquita contends its decision to pay the FARC was motivated solely by a need to protect the safety of its employees on the ground in Colombia.  Chiquita asserts it perceived its employees would be at risk of retaliatory attack if Banadex refused to pay, regardless of whether Chiquita stayed or withdrew from Colombia.  It claims it authorized Banadex to pay only "to the extent necessary to prevent violent retaliation against employees," and did so in the face of an immediate and credible guerilla threat to its personnel and infrastructure in Colombia, knowing that ignored guerilla demands were historically met with swift retaliatory violence.

For example, it  references a 1994 bombing of a Banadex wharf in Uraba perpetrated by another guerilla group, the "ELN," which followed Banadex's refusal to comply with its money demand on a mistaken belief that particular group did not pose a credible threat in the region.  It also references a 1997 incident where FARC affiliates burned down the packing station of a Banadex farm in Magdalena, and shot two Banadex employees, after Banadex ignored a FARC money demand on a mistaken  belief  the group was not strong enough there to pose a credible threat.[8]

Chiquita never sought assistance from the United States or Colombian governments in its dealings with the FARC. Chiquita contends this would have been a futile, and possibly, dangerous, exercise, as the guerillas were notorious for carrying out violent retaliatory attacks, and the Colombian government lacked the resources, in any event, to protect its employees and

---

[8] The 1997 FARC incident occurred after Chiquita began paying a rival guerilla group (the "AUC"), and after all six of Plaintiffs' decedents had been murdered by the FARC.

infrastructure effectively from the threat of guerilla warfare.   On one occasion, in or around 1999, however, a Chiquita subsidiary did contact a local police department for assistance in dealing with a guerilla demand, and agreed to participate in an entrapment effort.   The plan was botched, however, and two policemen nearly kidnapped when they tried to ambush the guerillas at the payment drop.

Plaintiffs dispute that the Colombian government lacked a meaningful ability to repel guerilla threats and extortion demands, and dispute Chiquita's claim that its decision to pay the FARC was motivated purely by a desire to protect its employees from guerilla violence. Plaintiffs contend the FARC guerilla payments were also meant to protect Chiquita infrastructure and obtain assistance with labor issues [DE 1405-16, 1405-53, DE 1405-46], and that Chiquita's decision to negotiate with the FARC was, at best,  the product of a ruthless cost/benefit analysis which accepted a guaranteed human toll (as long as it occurred off-premises) as an unfortunate but necessary cost of doing business in the fertile banana-growing zones of Uraba and Magdalena.  In this regard, Plaintiffs again cite the testimony of John Ordman that "[t]here was a business reason to be in Colombia."  Charles Keiser and Robert Kistinger similarly testified that paying the FARC was viewed as a "cost of doing business" in Colombia.  They viewed the amounts paid to the FARC as "insignificant in terms of the overall budget" for Chiquita's Colombian operations, and never so high that economically it no longer made sense to do business in Colombia.  As Kistinger explained, "We're not going to stop doing business in Colombia because, you know, we're going to have to spend an extra $25,000 [on guerilla payments].  That's not realistic. Right?"

Chiquita never considered leaving Colombia as an alternative to paying the FARC during the nine years of its financial relationship with this guerilla group.  It acknowledged the company

could have withdrawn from Colombia during that time, but from a strategic standpoint, felt doing so would have been a "massive blow" to the company.

### 5. **Payment Methodology**

Control Risks recommended the exercise of "absolute discretion" in making the FARC payments in order to avoid retaliatory strikes by rival guerilla groups.  Chiquita contends this advice prompted its decision to implement a secret coding system for disguising Banadex payments to the FARC and other guerrilla groups.  Thus, between 1990 and 1997, Chiquita's accounting procedures included use of a secretly coded "1016" form to initiate disbursements from Banadex to any guerilla group.  The form was signed by Charles Keiser, or, in his absence, by Juan Manuel Alvardo, Banadex Director of Security between March 1992 and October 1999.

The 1016 forms were filled with specially designated characters, including color codes and other code words known only to relevant personnel.  This was done so that the recipient of a payment would not be readily discernable to local Banadex employees handling the forms, or anyone beyond a small circle of authorized personnel, which included members of Chiquita's internal legal and accounting departments in Cincinnati,[9] Chiquita's external auditors (Ernst & Young),[10] and a small group of Chiquita executive management members and regional Banadex managers.

Banadex payments to guerilla groups were always made in cash.  Mr. Keiser estimated the annual cost of payments to terrorists and included that number in budget forecasting for the

---

[9] In 1993, a Chiquita senior internal auditor, Mark Blackham, learned of the payments to guerillas while performing an audit.  He inquired about certain payments on an account labelled "citizen security payments," and was told that payments to guerillas were being made through the Banadex security department.  He was unable, however, to find supporting documentation indicating what the payments were for or to whom the payments were made.

[10] Plaintiffs contend that Chiquita's outside auditor between 1985 to 2008, Ernst and Young, was generally aware of "sensitive" payments made by Chiquita, but may not have known the payments were to guerillas until a September 10, 1997 meeting of Chiquita's Audit Committee.

following year.  The FARC payments were specifically included in the company's operating budget, and were taken into account in calculating the production cost per box of bananas sold.

In 1997, Keiser met with the head of a right-wing Colombian paramilitary organization, the Autodefensas Unidas de Colombia ("AUC"), who advised that the AUC intended to "squeeze the FARC out of the (banana-growing) regions."  Chiquita was advised that it would need to pay the AUC or "nobody [would] protect" it.  Chiquita agreed to pay, and for a time, simultaneously paid both the FARC and the AUC.  Shortly after Chiquita started making payments to the AUC, the FARC began attacking Chiquita's infrastructure in Colombia.   Banadex payments to the FARC eventually slowed and ceased altogether in 1999.   Chiquita's funding of the AUC, consisting of a series of over 100 payments, continued up through February 4, 2004.

### 6.  Kidnappings and Killings of New Tribes Missionaries

The families of David Mankins, Rich Tenenoff and Mark Rich arrived in South America between 1986 and 1992 to do missionary work on behalf of New Tribes Mission (NTM), an international Christian mission organization, in the remote village of Pucuro, Panama – approximately 15 miles from the Colombian border.  Pucuro is approximately 65 miles from the banana-growing region of Uraba, and about 300 miles from the banana-growing region of Magdalena.

The families of Stephen Welch and Timothy Van Dyke, arrived between 1984 and 1989, and settled in the NTM school (the "Finca") and compound near Villavicencio, in central Colombia.  Villavicenio is approximately 330 miles from the banana-growing region of Uraba, and about 455 miles from the Magdalena region.

Mankins, Tenenoff and Rich were kidnapped from their homes in Panama by armed FARC members on January 31, 1993.  A year later, on January 13, 1994, FARC guerrillas raided

the Finca compound and kidnapped Messrs. Welsh and Van Dyke.  At the time of both kidnappings, the captors identified themselves to the victims' wives as members of the FARC. The FARC later demanded a ransom of $5 million for Messrs. Rich, Tenenoff and Mankins, and $3 million for Messrs. Welsh and Van Dyke.  New Tribes Mission assembled a Crisis Management Committee, comprised of members of the NTM, private consultants and FBI negotiators.  NTM Committee members engaged in negotiations directly with the kidnappers via radio, and also reached out to the International Red Cross and members of Congress for assistance.

NTM offered to pay $10,000 to the Pucuro kidnappers for the release of all five men, and in the course of negotiations in 1996, paid more than $2,000 to the FARC through an intermediary.  All five men ultimately died in captivity.  Messrs. Welsh and Van Dyke were killed in June 1995 in a confrontation between the FARC and Colombian military, an event then promptly reported to their families. There is evidence that the FARC's 53rd Front was responsible for the kidnapping and murders of Messrs. Welsh and Van Dyke.

 Messrs. Rich, Tenenoff and Mankins were killed in 1996, but their bodies were never recovered.  Up through January 1998, NTM received conflicting reports on whether these three Panamanian missionaries were dead or alive.  Ultimately, NTM concluded, based on its inability to restore communications with the kidnappers and various investigatory reports, that these men had been killed in 1996, and presented this information to the families in 2000.  The Panamanian missionaries were declared dead in 2001, and death certificates issued in 2004.  In a report issued in 2007, at NTM's request, the Colombian National Prosecutor concluded these three men had been murdered in mid-1996, and implicated the 57th Front in the kidnappings and killings. However, FBI and State Department reports  suggest  involvement of  FARC's 34th Front in the

initial abduction, with a later transfer of the hostages to the custody of FARC 5th Front,  and then to the 57th Front [DE 1404-28 through 1404-34].

   7.  **Kidnapping and Killing of Frank Pescatore**

Frank Pescatore, Jr., was an American geologist and part owner and vice-president of GeoMet, Inc. GeoMet was an Alabama-based oil and gas exploration company involved in energy development projects in the United States and overseas.  Mr. Pescatore traveled to the northeastern state of La Guajira, Colombia in December 1996 to work on a coal-bed methane development project for GeoMet.  On December 2, 1996, Mr. Pescatore was held up at gun point while en route to the project, but his entourage successfully repelled the attackers.

On December 10, 1996, Mr. Pescatore was kidnapped at the GeoMet project site in La Guajira, which is about 340 miles from the banana-growing region of Uraba, and 100 miles from the banana-growing region of Magdalena, Colombia.  His kidnappers demanded $2.5 million from GeoMet, in addition to a tax levy on gas production.  GeoMet retained a hostage crisis management firm, Corporate Risk International (CRI), for advice in handling the demand; there were, however, no negotiations for his release.

GeoMet also contacted the FBI and Colombian police, and Mr. Pescatore's family contacted the U.S. embassy, members of Congress and other government officials.  Mr. Pescatore was ultimately shot and killed by his captors during an attempted escape, and his body was later found with a single bullet wound to the chest on February 23, 1997.   In July 1998, the FARC's 59th Front (part of FARC Caribbean bloc) sent a letter on 59th Front letterhead, claiming responsibility for Pescatore's death and demanding money from GeoMet as the cost of maintaining a business presence in Colombia.  GeoMet refused to pay and withdrew from all Colombian operations.  It never informed the Pescatore family members about the letter or

events that occurred after Pescatore's death, believing it would be too emotionally upsetting for them.  In April 2004, the FBI advised the Pescatore family that the FARC Caribbean Bloc claimed responsibility for the kidnapping and killing, and that its commander, Simon Trinidad, had been involved.  The FARC fronts which Chiquita funded between 1989 and 1990 were part of the Caribbean Bloc.

8.  **U.S. Government Intervention**

In the late 1990s, the United States Securities and Exchange Commission (SEC) conducted an unrelated investigation into suspected bribery payments made by a Banadex employee to Colombian customs officials.  As part of that investigation, a number of Chiquita employees testified before the SEC about Chiquita's history of payments to the FARC and other guerilla groups, and the manner in which those payments were recorded in Banadex's books and records.

While the FARC payments were not the subject of the SEC investigation, the topic came up when witnesses testified that local custom official payments went undetected for a time under supposition that the transfers were just "routine payments" to guerilla groups.  Ordman was the only executive who mentioned the FARC payments in non-public testimony given to the SEC, without detail as to a time frame or amounts of the payments.   At the conclusion of its investigation in 2001, the SEC published a Litigation Bulletin announcing that Chiquita would pay a fine for a Foreign Corrupt Practices Act (FCPA) violation based on  Banadex's customs official bribery; however, this notice made no mention of Chiquita's payments to the FARC or other Colombian guerilla groups.

From 1995 to the early 2000s, Chiquita's public SEC filings contained general disclosure of "risks that are inherent in operating in Central and South America," without any specific

reference to guerilla payments.  In 2003, its SEC filings became more detailed, revealing "threats to employees, political instability and terrorist activities, including extortion and risks of action by U.S. and foreign governmental entities," and stating "[s]hould such circumstances occur … the Company might need to curtail, cease or alter its activities."

In 2004, Chiquita issued a public statement generally indicating it made "protection payments" to illegal Colombian groups, without specifying which groups it had paid and without specific mention of the FARC.  In a statement published on May 12, 2004 in the Cincinnati Post, Chiquita revealed that its Colombian subsidiary, Banadex, had made payments to guerillas in Colombia, again without stating the amount or recipients of the payments, or indicating how long the payments had continued.

On September 10, 2001, the United States government designated the Autodefensas Unidas de Colombia (AUC) as a foreign terrorist organization (FTO).[11]  In February 2003, a Chiquita employee relayed this information to a high ranking Chiquita officer.   In April 2003, Chiquita's Board of Directors agreed to self-report Banadex's AUC payments to the U.S. Department of Justice.

During the pendency of the criminal investigation which followed, on or about February 21, 2003, Chiquita's outside counsel advised that the payments to the AUC, then a designated FTO, were illegal, and should stop immediately; notes from a March 10, 2003 meeting summarize counsel's further admonition,  "You voluntarily put yourself in this position.  Duress defense can wear out through repetition.   Buz [business] decision to stay in harm's way. Chiquita should leave Colombia." [D.C. Factual Proffer][DE 1405-62, p. 12].

---

[11] The FARC became a designated FTO in 1997.

Chiquita's payments to the AUC continued up through February 4, 2004.  By May 2004, Chiquita sold Banadex and no longer owned any farms in Colombia, although it continued to rely on local growers for its fruit supply.

In March 2007, Chiquita pled guilty in the District of Colombia to one count of engaging in transactions with a specially-designated global terrorist (the AUC) and paid a $25,000 million fine.[12] *United States v. Chiquita Brands International*, 1:07-CR-00055 (D.D.C.).  In conjunction with this plea, the government filed a factual proffer, signed by Chiquita's counsel.  The factual proffer identified numerous Chiquita executive decision-makers involved in authorizing payments to the AUC and other terrorist groups in Colombia, including the FARC and ELN, over the span of more than a decade.  According to Plaintiffs, this is the first time Chiquita's financial support of the FARC and other Colombian guerilla groups became public, and Plaintiffs' first notice of Chiquita's role in the funding of Colombian terrorist groups responsible for the killing of their family members.[13]

The parties dispute whether Chiquita had an obligation to publish this information earlier.  Chiquita contends it had no such obligation, and that the books of its Colombian subsidiaries,

---

[12] At the time of sentencing, the government attorney stated, "Regardless of the company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism.  Simply put, defendant Chiquita funded terrorism."  Then outside counsel for Chiquita, Eric Holder, responded:

> The company quote, "funded terrorism." I would agree with that.  Yes, in the same way that an extortion victim funds the mafia.  That money that is extorted from the company and goes to the AUC is not something that was willingly given, it was given at the barrel of a gun and threats.

[13] Plaintiffs acknowledge that in late 1990, the SEC's  investigation into Banadex's bribery of customs officials in Colombia revealed the company's payments to guerrilla groups generally, noting this did not result in publication of Banadex's or Chiquita's support of any specific guerilla group.  Plaintiffs also acknowledge that in 2004, Chiquita issued public statements indicating it made "protection payments" to "illegal Colombian groups," in which it also identified several guerrilla groups that had been designated by the government as FTOs, but without revealing which groups  it had  paid and without specific mention of the FARC.   With these gaps in Chiquita's public reporting, Plaintiffs argue that there were was no information in the public domain regarding Chiquita's payments to the FARC prior to  March 19, 2007, the time the D.C. criminal plea was published, and that no Plaintiff otherwise had knowledge of Chiquita's financial ties to the  FARC prior to that point in time.

containing the secret coding for guerilla payments, were never a matter of public record. Plaintiffs contend, under operation of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards, that Chiquita was required to disclose in its financial reports the existence of illegal payments, such as those made to the FARC, because these payments represented "qualitatively material risks," or at a minimum, would be information material to a reasonably prudent investor.   Plaintiffs buttress this proposition with expert opinions of its accounting expert, Antonio Argiz, which, as discussed at the time of oral argument, the Court found admissible on the limited issue of whether Chiquita's failure to disclose the information earlier represented a deviation from acceptable accounting and auditing standards.

### B. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and it is genuinely in dispute "if the [record] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The moving party carries its initial burden of proof by "identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  If this burden is met, "the non-moving party [must] go beyond the pleadings  … and designate specific facts in the record showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 584-86 (1986) (non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts").

Where a summary judgment motion relates to issues on which the non-moving party will bear the burden of proof at trial, "the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge its initial burden. *Fitzpatrick*, 2 F.3d at 1115 (emphasis in original). Instead, the moving party simply may show – that is, point out to the district court – that there is an absence of evidence to support the non-moving party's case." *Id.* at 1116. In this scenario, the non-moving party can avoid summary judgment only by showing the existence of a genuine issue for trial on each element of its claim or defense, i.e. the burden is on the non-moving party to point to or adduce evidence which would be sufficient to withstand a directed verdict at trial. *Fitzpatrick*, 2 F.3d at 1116-17.

In analyzing a motion for summary judgment, the court must view all of the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228 (11th Cir. 2017). The determinative inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Ziegler v. Martin County School. District,* 831 F.3d 1309 (11th Cir. 2016). A court need not permit a case to go to a jury when the inferences that are drawn from the evidence, and upon which the non-movant relies, are "implausible." *Cuesta v. School Bd of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002). Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. *Leigh v. Warner Bros., Inc*., 212 F.3d 1210, 1217 (11th Cir. 2000).

Ultimately, the standard for summary judgment is "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving] party is entitled to a verdict."

*Anderson*, 477 U.S. at 252.   In making this assessment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.   With these precepts in mind, the examination turns to the legal issues and corresponding factual proofs framed by the parties' competing summary judgment motions in this case.

## C.     STATUTORY FRAMEWORK

The Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a),  authorizes  "[a]ny national of the United States injured in his or her person … by reason of an act of international terrorism, or his or her estate, survivors, or heirs" to sue "in any appropriate district court of the United States and … recover threefold the damages he or she sustains."   Liability under the ATA has three elements: (1) unlawful action, i.e. an "act of international terrorism;" (2) the requisite mental state, and (3) causation.   *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 514 (S.D.N.Y. 2014).

The statute defines "international terrorism," at  § 2331(1),  as  activities that:

(A)     involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the  United States or of any  State;

(B)     appear to be intended –

(i)     to intimidate or coerce a civilian population;
(ii)     to influence the policy of a government by intimidation or coercion; or
(iii)     to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C)     occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1).

24

The  civil liability provisions of the ATA thus incorporate by reference a broad range of state and federal crimes that may qualify as "act(s) of international terrorism," actionable under the ATA, if a plaintiff can show that the defendant committed a predicate crime which satisfies all criteria listed in §2331(1) (A) through  (C) – that is, if plaintiff can show that (1) the predicate crime involved violent acts or acts dangerous to human life (§2331(1)(A)); (2) the predicate crime *objectively* appeared to be intended to intimidate or coerce a civilian population, or to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by destruction, assignation or kidnapping (i.e. if the predicate crime satisfies at least one of the three intent requirements enumerated at §2331(1)(B)), and (3) the predicate crime occurred outside the boundaries of the United States, or transcended national boundaries by the means in which accomplished (§2331(1)(C)). *Gilmore v. Palestinian Interim Self-Government Authority*, 53 F. Supp. 3d 191, 200 (D.D.C. 2014) (quoting *Estate of Parsons v. Palestinian Authority*, 651 F.3d 118, 122 (D.C. Cir. 2011).

### 1. Limitations

The ATA incorporates two express limitations.  First, it contains a ten-year statute of limitations. 18 U.S.C. § 2335 (a).[14] Second, it expressly exempts "acts of war" as actionable conduct.  18 U.S.C. § 2336 (a).[15] The statute makes no mention of any other affirmative

---

[14] 18 U.S.C. § 2335(a), entitled "Limitation of actions," provides in material part, "[A] suit for recovery of damages under section 2333 of this title shall not be maintained unless commenced within 10 years after the date the cause of action accrued."

[15] 18 U.S.C. § 2336 (a), entitled "Other limitations," provides in relevant part:

    (a)  Acts of War. – No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war.

An "act of war," in turn, is defined at § 2331 (4) to mean "any act occurring in the course of – (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin."

25

defenses, and it makes no distinction between voluntary and involuntary conduct in defining an "act of international terrorism" which is actionable under the statute.

Against this backdrop, Plaintiffs question, as a threshold matter, whether Chiquita carries its initial burden of demonstrating that duress is a valid legal defense to a civil ATA claim. As Congress did not specifically exempt conduct under duress (or otherwise exempt involuntary conduct) from the scope of the Act, Plaintiffs posit no such exemption should be implied. This construction draws from the well-established interpretative canon, "*expressio unius est exclusio alterius*," i.e. expressing one item of [an] associated group or series excludes another left unmentioned," *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 80 (2002), applicable when the contextual "circumstances support [] a sensible inference that the term left out must have been meant to be excluded." *N.L.R.B. v. SW General, Inc.*, __U.S. __, 137 S. Ct. 929, 197 L.Ed.2d 264 (2017). This question may be reframed, more narrowly, as an inquiry into the viability of duress as a legal defense to the specific ATA predicate crime charged in this case – a specific intent 2339A violation based on the knowing or intentional facilitation of terror-related murder (murder of American citizens abroad).[16]

The question of whether Congress intended to allow a duress defense to a Section 2339A material support crime based on the knowing or intentional facilitation of terror-related murder, as charged here, raises an intricate policy-laden question of statutory interpretation, juxtaposed against longstanding common law precedent which universally excluded duress as a defense to

---

[16] A similar query has been addressed under other statutory paradigms, such as the Immigration and Nationality Act (INA), under which duress does not appear to be an available defense for an asylum-seeker who provides material support to a terrorist or terrorist organization. *See Alturo v U.S. Atty. General*, 716 F. 3d 1310 (11th Cir. 2013) (upholding reasonableness of Board of Immigration Appeals finding that material support bar to asylum relief does not impliedly except conduct made involuntarily or under duress); *Jabatch v Lynch*, 845 F.3d 332 (7th Cir. 2017) (same); *Barahona v. Holder*, 691 F. 3d 349 (4th Cir. 2012) (same); *Hernandez v. Holder*, 579 Fed. Appx. 12 (2d Cir. 2014) (same); *Inventor v. Sessions*, 679 Fed. Appx. 544 (9th Cir. 2017) (same).

intentional homicide,[17] a rule extended in some jurisdictions to cases of attempted murder and the aiding and abetting of murder.[18]   The Court ultimately finds is unnecessary to reach this question here, however, because it concludes, on the evidentiary record presented, that Chiquita fails to carry its burden of showing the existence of a genuine issue of material fact on each element of the defense, and necessarily suffers summary judgment upon it.

### 2.  Primary Liability

In *Boim III*, the Seventh Circuit held, agreeing with the reasoning in *Central Bank of Denver N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 183 (1944), that "statutory silence [in section 2333(a)] on the subject of secondary liability means there is none." *Boim III*, 549 F.3d at 689.  The *Boim* majority reasoned that reading secondary liability into Section 2333(a) would enlarge the federal courts' extraterritorial jurisdiction, without a clear manifestation of a corresponding legislative intent, and hence concluded that the ATA, by its terms, does not authorize secondary liability.  *Id*. at 690.  *Accord Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (comparing related criminal provisions of ATA, where Congress explicitly authorized secondary liability).

---

[17]  *See United States v. Naovasaisri*, 150 Fed. Appx. 170 (3d Cir. 2005); *United States v. LaFleur*, 971 F.2d 200 (9th Cir. 1992); *Gimotty v. Elo*, 40 Fed. Appx. 29 (6th Cir. 2002); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1989) (Florida law), *rev'd on other grounds*, 498 U.S. 308 (1992); *United States v. Lynch*, 605 Fed. Appx. 963 (11th Cir. 2015); *Cole v State*, 221 So.3d 534 (Fla. 2017); *Henry v State*, 613 So.2d 429 (Fla. 1992) (duress never justifies killing of an innocent third party); *Hunt v State*, 753 So.2d 609 (Fla. 5th DCA) *rev den*. 767 So.2d 457 (Fla. 2000); *State v. Driggers*, 917 So.2d 329, 331-332 (Fla. 5th DCA 2005), *rev. den*. 767 So.2d 457 (Fla. 2000) (choice of evils rationale underlying duress defense evaporates in intentional homicide cases because the defendant is unable to logically show that the decision to kill the victim, whose life was as worthy as the life of the defendant or threatened third person, was the lesser of two evil choices).

[18]  *Annachamy v. Holder*, 733 F.3d 254, 260 n. 6 (9th Cir. 2012);  *U.S. v Lynch*, 605 Fed. Appx. 963 (11th Cir. 2015) (Fla. law), citing *Henry v State,* 613 So.2d 429, 432 (Fla. 1992) (attempted first degree murder); *Wright v. State*, 402 So. 2d 493 (Fla. DCA 3d 1981) (duress not a defense to intentional homicide, either to a principal or aider and abettor); *State v. Dissicini*, 126 N.J. Super. 565, 570, 316 A.2d 12 (N.J. App. 1974), *aff'd* 66 N.J. 411, 331 A.2d 618 (1975) (duress not a defense to aiding and abetting murder); *People v. Henderson*, 306 Mich. App. 1, 854 N.W.2d 234 (2014); *State v. Mannering*,  150 Wash. 2d 277, 75  P.3d 961 (Wash. 2013)(en banc) ( attempted murder); *People v. Rolan*, 160 Cal. App. 4th 1206, 73 Cal. Rptr. 358 (Cal. 4th Div. 2008) (aider and abettor); *State v. Dissicini*, 126 N.J. Super. 565, 570, 316 A.2d 12 (N.J. App. 1974), *aff'd* 66 N.J. 411, 331 A.2d 618 (1975) (aider and abettor); *People v Viera*, 35 Cal. 4th 264 , 290, 25 Cal. Rptr. 3d 337, 106 P.3d 990 (2005).

At the same time, the *Boim III* majority recognized that the ATA, by its "chain of incorporation by reference," effectively "impose[s] [primary] liability on a class of aiders and abettors," *id.* at 692,  and, further noting that conspiracy liability is effectively incorporated into each of the several material support statutes (2339A, 2339B and 2339C), any one of which  may serve as a predicate "act of international terrorism," concluded that the express statutory limitation on secondary liability is "practically irrelevant" in the end analysis.  *Id.* [19]

This Court, following *Boim III* and *Rothstein*, previously held that secondary lability is not supported under the ATA  [DE 62].   Because § 2333(a) supports only primary liability, a successful ATA plaintiff must allege and prove that the defendant directly committed an "act of international terrorism" which caused the plaintiff's injuries.

### 3.   General Mens Rea

Although the statute does not contain an express intent requirement, in light of the ATA treble damages provision, some courts hold that the statute minimally requires some kind of deliberate misconduct by the defendant, i.e. a showing that the defendant knew or was deliberately indifferent to the fact that it was providing material support to a foreign terrorist organization. *Boim III*, 549 F.3d 685, 692-693 (7th Cir. 2008) (en banc) (defendant must have knowledge of terrorist group's designation as an FTO, or knowledge that the organization

---

[19] Other courts have similarly commented on the essential incorporation of secondary liability precepts into primary ATA liability:

> In the ATA context the secondary liability problem may be of little practical importance. The federal anti-terrorism laws generally criminalize providing material support to terrorists and terrorist groups; a number of statutes provide for what is effectively aiding-and-abetting liability in the terrorism context.  See 18 U.S.C. §§2339A, 2339B, 2339C.  This point was recognized explicitly by the en banc majority in *Boim*.

*Gill v. Arab Bank LLC ("Gill  I),* 893 F. Supp. 2d 474, 502 (E.D.N.Y. 2012), citing  *Boim III*, 549 F.3d at 691-92 (through this chain of incorporation by reference, "Congress has expressly imposed liability on a class of aiders and abettors").

engaged or engages in terrorist activity); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 428 (E.D.N.Y. 2013); *Goldberg v. UBS AG,* 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009).

This means that while §2333 requires at least reckless misconduct, as a general *mens rea*, *see Boim III*, an ATA plaintiff will additionally need to show varying levels of scienter depending on the underlying criminal violation which is alleged to constitute the predicate "act of international terrorism," *see e.g. Gill I*, at 504; *Goldberg*, 660 F. Supp. 2d at 427-28, in addition to one of three intent elements prescribed at § 2331(1)(B).

Also, an ATA plaintiff needs to satisfy the "appears to be intended" objective intent requirement imposed under section 2333(1), defining "acts of international terrorism." In *Boim III,* the Court reasoned that a material support violation under 2339A, by definition, would foreseeably enhance the ability of a known terrorist group to inflict more terror, and would, for this reason alone, objectively "appear to be intended" to intimidate or coerce a civilian population or influence a government:

> A knowing donor to Hamas – that is, a donor who knew the aims and activities of the organization  – would know that Hamas was gunning for Israelis … that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel … and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel.  And given such foreseeable consequences, such donations would "appear to be intended… to intimidate or coerce a civilian population" or to "affect the conduct of a government by … assassination…"

Id. at 694.

### 4.  Section 2339A – A Specific Intent Crime

Plaintiffs allege that Chiquita's decision to pay the FARC violated 18 U.S.C. §2339A, one of the criminal material support statutes.  Section 2339A criminalizes the provision of

"material support or resources"[20] "knowing or intending that they are to be used in preparation for, or in carrying out," a violation of one or more of the terrorism-related crimes enumerated in the statute, including, as relevant here, the murder of United States nationals abroad.  18 U.S.C. § 2339A (a) (enumerating 18 U.S.C. 2332 (a) (1)).[21]  *See e.g. Boim v. Holy Land Foundation for Relief and Development (Boim III),* 549 F.3d 685, 692-93 (7th Cir. 2008) (en banc);  *Gill v. Arab Bank, LLC (Gill I)*, 893 F. Supp. 2d 474, 503 (E.D.N.Y. 2012); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42 (D.D.C. 2010);  *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009).

In *Boim III*, the plaintiffs were the parents of an American-Israeli teenager shot at a bus stop in Israel by a Hamas terrorist. The parents sued various Islamic charities that allegedly provided money to Hamas.  One of the defendants directly gave money to Hamas, while another made donations to another defendant that channeled the money to Hamas.  Like Plaintiffs in the case at bar, the *Boim III* plaintiffs alleged that the defendants violated the ATA by providing material support to terrorists in violation of § 2339A.

The Seventh Circuit concluded that giving money to a known terrorist group, such as Hamas, is "like giving a loaded gun to a child," and, as such, constitutes an "act dangerous to human life," within the meaning of § 2331(1)(A).  *Boim III*, 549 F.3d at 690 (quoting 18 U.S.C.

---

[20] Section  2339A (b) (1) defines "material support or resources" as:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal  substances, explosives, personnel (1 or more individuals who may be or include oneself) and transportation, except medicine or religious materials.

[21] 18 U.S.C. §2332(a) criminalizes the killing of United States nationals abroad; Section 2332(b) criminalizes attempting or conspiring to kill a United States  national abroad, and Section 2332(c) criminalizes engaging in physical violence with the intent to cause, or with the result of causing, serious bodily injury to a United States national abroad.

§ 2331(a)).   It also found donations made to Hamas would violate 18 U.S.C. § 2339A, which makes it a federal crime to "provide [ ] material support or resources … knowing or intended that they are to be used in preparation for, or in carrying out," a violation of specified criminal statutes, including 18 U.S.C. §2332, which, in turn,  makes it a federal crime to kill, attempt to kill, conspire to kill, or inflict serious bodily injury on a United States citizen abroad.

Through this chain of "statutory incorporations by reference," the Court found a § 2339A material support violation may support primary liability under the ATA. *Boim III*, 549 F.3d at 690.  The first link in the chain is § 2333(a), which provides a civil cause of action for injuries suffered by reason of an "act of international terrorism."   The second link is § 2331, which defines an "act of international terrorism" to include activities that involve "acts dangerous to human life" *and* which are also violations of the criminal laws of the United States, 2331(1)(A), provided they  also "appear intended …to intimidate or coerce a civilian population" or "to influence the conduct of a government by … assassination." 2331(1)(B).  The third link is the predicate criminal violation, in this case, a  material support violation under Section 2339A, directly attributed to Chiquita; finally, the fourth link is one of the enumerated terror-related crimes, in this case, 18 U.S.C. § 2332(a), (b) (killing or conspiring to kill  U.S. nationals abroad), the crime allegedly facilitated (prepared for or carried out) with funds supplied by Chiquita.

As noted, 18 U.S.C. § 2339A proscribes "provid[ing] material support or resources … knowing or intending that they are to be used in preparation for, or in carrying out" [various enumerated federal crimes] … or attempting or conspiring to do such an act."   Section 2339B – not charged here - deals with material support for organizations that have been formally designated as foreign terrorist organizations by the United States Secretary of State.  It provides

that "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so," shall be guilty of a crime. 18 U.S.C. § 2339B.

Both sections define "material support or resources" in the same way, but Section 2339A requires proof of a heightened *mens rea*.   To be liable under 2339A, the defendant must have provided the support or resources acting with the knowledge or intent that the support would be used in preparation for, or in carrying out, specific terror-related crimes. *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013),  citing *United States v. Steward*, 590 F.3d 93, 113 (2d Cir. 2009).  Thus, the mental state required under  § 2339A "extends both to the support itself, *and* to the underlying purposes for which the support is given," *Mehanna*, at 43, and an ATA plaintiff proceeding on a 2339A predicate must show evidence of the defendant's specific knowledge of, or intent to further, the specified underlying crime.  *United States v. Awan,* 459 F. Supp. 2d 167 (E.D.N.Y. 2006), *aff'd,* 384 Fed. Appx. 9 (2d Cir. 2010), *cert. den.*, 562 U.S. 1170 (2011).

In other words, in contrast to §2339B, which broadly criminalizes the provision of "material support" to formally designated foreign terrorist organizations, and requires knowledge about the organization's connection to terrorism, but not a specific intent to further its terrorist activities, *see Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010),  Section 2339A "raises the scienter requirement" and criminalizes material support only where the defendant acts with actual knowledge or intent that the support will be used to prepare for, or carry out,  certain terrorism-related crimes.  *Awan,* 459 F. Supp. 2d  at 179.[22]

---

[22] *See also United States v. Ghayth*, ___ Fed. Appx. ___, 2017 WL  4287796 (2nd Cir. Sept. 27, 2017) (unpub) (underlying crime defined by Section 2339A involves (1) knowingly (2) providing material support or resources (3) knowing or intending that such resources are to be used in the preparation for or in carrying out (4) an offense identified as a federal crime of terrorism (e.g. killing or conspiring to murder American nationals abroad in violation of 2332(a) or (b)); *United States v. Mohammad*, 2017 WL 2021255 (N.D. Ohio May 11, 2017) (specific intent to materially support one of the enumerated crimes in 2339A required). *Cf. United States  v. Assi*, 414 F. Supp.2d 707 (E.D. Mich. 2006) (language of Section 2339B, enacted two years after 2339A, notably lacks any explicit element of intent to further illegal activities of designated FTO).

So, where § 2339A serves as the predicate ATA crime, an ATA plaintiff must prove that the defendant acted with the specific knowledge or intent that its support would be used in preparation for, or in carrying out, one of the enumerated terrorism-related crimes. On the other hand, it is not necessary for an ATA plaintiff to show the defendant's "specific intent to aid or encourage the *particular attacks* that injured plaintiffs." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 45 (D.D.C. 2010) (emphasis added); *Strauss v. Credit Lyonnaais*, 242 F.R.D. 199 (E.D.N.Y. 2007), citing *Linde v. Arab Bank LLC ("Linde I)*, 384 F. Supp. 2d 571, 586 n. 9 (E.D.N.Y. 2005)  (none of the material support statutes [Sections 2339A, B or C] requires a specific intent to commit specific acts of terrorism).

### 5. **Proximate Cause**

The ATA authorizes suit for treble damages by any United States national injured "by reason of" an act of international terrorism.  This phrase has been interpreted to require a showing that the defendant's conduct (the alleged ATA predicate crime) was the proximate cause of the plaintiff's injuries. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42 (D.D.C. 2010);  *Burnett v. Al Baraka Inv. & Dev. Corp*., 274 F. Supp. 2d 86, 105-106 (D.D.C. 2003) (same).

Proximate cause is a "judicial tool" used to limit a person's responsibility for the consequences of that person's own acts, *Gill v. Arab Bank PLC,* 893 F. Supp. 2d 542,  555-56, a fairness restraint on the window of tort exposure.  It is an amorphous and "notoriously confusing" concept, dogged by a remarkable lack of consensus on any one definition of what constitutes "proximate cause." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 131 Sup. Ct. 2630, 2642 (2011) (applying relaxed standard of proximate cause in action for personal injury under Federal Employers' Liability Act (FELA)).

Both parties agree that the "by reason of" language of the ATA imposes a proximate cause requirement, but disagree as to what  proximate cause in this particular context entails.[23] As the Court of Appeals in the Eleventh Circuit has not yet had opportunity to construe the phrase "by reason of" in the context of adjudicating an ATA claim, this Court must resolve this legal issue before turning to the question of whether a reasonable jury could find that the evidence adduced by Plaintiffs in this case is sufficient to raise a genuine issue of material fact on satisfaction of that standard.

In traditional tort jurisprudence, the "proximate cause" element of a negligence action embraces, at a minimum, "causation-in-fact," meaning there can be no liability in tort unless it is shown that the defendant's act or omission was a cause-in-fact of the plaintiff's claimed injury. This showing, without more, does not establish "proximate cause," but is an essential ingredient in the causation equation.  *Stahl v. Metropolitan Dade County*, 438 So.2d 14 (3d DCA 1983), citing W. Prosser, Handbook of the Law of Torts (4th ed. 1971).  The "causation-in-fact" test, in most jurisdictions, starts with inquiry into whether there is "such a natural, direct and continuous

---

[23] Chiquita argues that the "by reason of" language of the ATA also imposes a "but-for" causation requirement, a point decided against it in earlier proceedings before this Court.  Federal courts have consistently rejected imposition of a  "but for" causation requirement under the ATA, recognizing the impossibilities of proof in tracing damage caused by the funding of  terrorism due to the fungibility of money.  *Gill III*, 893 F. Supp. 2d at 555-56 ("the money alleged to have changed hands need not be shown to have been used to purchase the bullet that struck  the plaintiff); *Strauss*, 925 F. Supp. 2d at 433; *Weiss I*, 453 F. Supp. 2d at 631-62.   This Court previously adopted this position, and today reaffirms its holding that the "by reason of" language of the ATA does not require a showing of "but for" causation; i.e. an ATA plaintiff proceeding on a material support predicate need not show that the support supplied was actually used to carry out the *specific* act of violence causing plaintiff's injuries.  *See e.g.  Hussein v. Dahabshiil Transfer Services Ltd.* 230 F. Supp. 3d 167 (S.D.N.Y. 2017);  *Linde v. Arab Bank, PLC (Linde II)*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015). As explained in  *Goldberg v. UBS AG*, 660 F. Supp. 2d 410  (E.D.N.Y. 2009):

> Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff.  Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA.

*Goldberg* at 429, citing S. Rep. No. 102-342 at 22.

sequence" between the negligent act and the plaintiff's injury, that it can be reasonably said, "but for" the act or omission, the injury would not have occurred.

This test is abandoned in favor of the "substantial factor" test, however, in cases involving concurrent causation, i.e. where two or more causes concur to bring about an injury, and it is impossible to prove that the injury would not have occurred "but for" the defendant's conduct. Here, the more flexible "substantial factor" test is employed, requiring a plaintiff to prove that the defendant's alleged act or omission was a material and substantial contributing cause to the injury.[24]  *Mohr v. Grantham*, 172 Wash. 2d 844, 262 P.3d 490, 495 (Wash. 2011) (en banc);  *El-Zoobi v. United Airlines, Inc*., 50 N.E.3d 1150, 401 Ill. Dec. 668 (Ill. App. (1st). 2016); *Stahl* at 19, citing *Loftin v. Wilson,* 67 So.2d 185, 191 (Fla. 1953). [25]

 In this context, the term "substantial" is used to denote the fact that the defendant's conduct has such an effect in bringing about  the harm as to lead reasonable men to regard it as a cause, i.e., that the defendant's conduct had more than a remote or trivial impact on the circumstances leading up to the cause of the jury. *Eisenbise v. Crown Equipment Corp.,* 2017 WL 2103559 (S.D. Cal. 2017); *Raven H. v. Gamette*, 157 Cal. App. 4th 1017, 68 Cal.Rptr. 3d 897, 901 (2007); *O'Grady v. State*, 140 Hawai'i 36, 398 P.3d 625 (Haw. 2017), citing *Mitchell v.*

---

[24]  Some courts incorrectly import "but for" causation back into the "substantial factor" test, holding that a defendant's conduct cannot operate as a "substantial factor" in causing harm if the same harm would have occurred in the absence of defendant's conduct. The correct analysis examines competing causal forces as a question  of superseding intervening cause, looking instead to whether the  defendant's conduct has created or increased the risk of a  particular harm materializing,  recognizing that  the causal  interaction of another force would not relieve the defendant of liability if the harm which materialized was within the scope of foreseeable risk created by the alleged misconduct. See *Concord Florida Inc. v. Lewin*, 341 So.2d 242 (Fla. 3d DCA 1977) ( "[t]he intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about"); *Deeds v United States*, 306 F. Supp. 348 (D. Mont. 1969) (citing Sections 442A and 442B, Restatement Torts, Second.

[25] See also Florida Standard Jury Instructions (Civil) (2010 ed.), FL JI 401.12(b),  defining "Concurring cause:

In order to be regarded as a legal cause of loss, injury or damage, negligence need not be the only cause.  Negligence may be a legal cause of loss injury or damage, even though it operates in combination with the act of another, some natural cause, or some other cause, if the negligence contributes substantially to producing such loss, injury or damage.

*Branch*, 45 Hawai'i 128, 363 P.2d 969, 973 (1961).  *Compare Komlodi v. Picciano*, 217 N.J. 387, 89 A.3d 1234, 1254 (2014) (negligent treatment of pre-existing condition and increased risk of harm to patient assessed as substantial factor in producing end injury).

In sum, in traditional tort analysis, "causation-in-fact" is a threshold factual inquiry which requires the fact finder to first determine if the injury would not have occurred "but for" the defendant's misconduct; or, in the situation where there are two or more causes, whether the defendant's conduct more likely than not was a "substantial factor" in bringing about the injury, *see e.g. Clement v. United States*, 980 F.2d 48, 54 (1st Cir. 1992); *Quigley v. United States*, 865 F. Supp. 2d 685 (D. Md. 2012),  while  "proximate cause" is a second analytical step in the causation analysis focusing primarily on policy determinations such as reasonable "foreseeability." *Clement*, 980 F.2d at 53 n. 13.  Arguably, this is the approach assumed by the Seventh Circuit in its causation analysis under the ATA in *Boim III,* discussed i*nfra*.

However, while "[s]ome courts and commentators restrict the 'substantial factor' test to the determination of whether negligent conduct in fact caused a particular injury," the "substantial factor" continues to find wide application in both causation-in-fact and proximate cause analyses, [26] and this disarray may account for the wide discrepancies in the formulation of "proximate cause" concepts under the ATA:  While courts interpreting the "by reason of" language of the Section 2333(a) have universally invoked "proximate causation" as the divining guidepost here, they have employed a variety of  analytical and definitional approaches which

---

[26] *Clement*, 980 F.2d at 53 n. 13, contrasting Prosser, Law of Torts, Sec 42 at 248 (4th ed. 1971) (1948 revision of Restatement limited  the application of  the substantial factor test "to the fact of causation alone") and 4 Harper, James & Gray, supra (same) with Wright, *Causation in Tort Law*, 73 Cal. L. Rev. 1735, 1782 (1985) (substantial factor test's incorporation of both causation-in-fact and proximate causation issues persists in the Restatement (Second) of Torts "despite an attempt by Prosser and others to confine the substantial factor formula to the question of causation-in-fact").  *See e.g. Beck v. Prupis*, 162 F.3d 1090 (11th Cir. 1988); *Hepp v. Paul Revere Life Ins. Co*., 120 F. Supp. 3d 1328 (M.D. Fla. 2015); *In Re Sea Star Line, LLC,* 2016 WL 8861620 (M.D. Fla. 2016).

have produced little consistency in defining the contours of liability.  *See Gill v. Arab Bank PLC*, 893 F. Supp. 2d 4, 29-02 (E.D.N.Y. 2012) (describing different judicial approaches).

The Seventh Circuit, for one, has adopted a "relaxed" standard of proximate causation as applied to an ATA material support violation predicate,  *Boim v. Holy Land. Found. for Relief & Dev.,* 549 F.3d 685, 697-98 (7th Cir. 2008) ("*Boim III*");  *Hussain v. Mukasey*, 518 F.3d 534 (7th Cir. 2008), analogizing the  causal link between a defendant's transfer of money to a known terrorist organization and subsequent terror attacks to the anomalies of proof posed by concurrent causation situations in traditional tort jurisprudence, and extending those traditional principles to causation under the ATA. The *Boim III* majority thus concluded  that  a financier of terror found liable for a 2339A violation, a specific intent crime, is appropriately held civilly accountable under the ATA for damages caused by subsequent terror attacks perpetrated by the beneficiary of its  illicit funding.  It illustrated:

> [C]onsider an organization solely involved in committing terrorist acts and a hundred people all of who know the character of the organization and each of whom contributes 1,000 to it, for a total of $100,000.  The organization has additional resources from other, unknown contributors of $200,000 and it uses its total resources of $300,000 to recruit, train, equip and deploy terrorists who commit a variety of terrorist acts, one of which kills an American citizen.   His estate brings a suit under section 2333 against one of the knowing contributors of $1,000.  The tort principles that we have reviewed would make the defendant jointly and severally liable with all those other contributors.  The fact that the death could not be traced to any of the contributors ... and that some of them may have been ignorant of the mission of the organization (and therefore not liable under a statute requiring proof of intentional or reckless misconduct) would be irrelevant. The knowing contributors as a whole would have significantly enhanced the risk of terrorist acts and thus the probability that the plaintiff's decedent would be a victim, and this would be true even if Hamas had incurred a cost of more than $1,000 to kill the American, so that no defendant's contribution was a sufficient condition of his death.

*Id.* at 698. However, the standard of proximate causation adopted in *Boim III* is not without its critics, who argue it ignores traditional tort requirements and creates a boundless expansion of liability under the ATA.[27]

Other courts, while citing "substantial factor" analysis as the first step in a "proximate cause" analysis under the ATA, have seemingly reintroduced "but for" causation concepts back into the equation – suggesting the need to establish a direct causal relationship between the defendant's predicate crime and the plaintiff's claimed injuries. See *Rothstein v. UBS AG,* 708 F.3d 82, 95 (2d Cir. 2013); *In re Terrorism Attacks on Sept. 11, 2011*, 714 F.3d 118 (2d Cir. 2013)) (reaffirming *Rothstein). See also Shatksy v Palestine Liberation Organization,* 2017 WL 2666111 (D.D.C. 2017); *Ofisi v. BNP Paribas, S.A*., 2017 WL 4355922 (D.D.C. Sept. 29, 2017).

Other cases reject a "direct causal relationship" requirement, finding it at odds with the impossibilities of proof posed by the fungibility of money. *Strauss,* 926 F. Supp. 2d at 433 (such an approach would "make the ATA practically a dead letter because '[m]oney is fungible'"); *Gill III*, 893 F. Supp. 2d at 556; *Weiss I*, 453 F. Supp. 2d at 631. In these cases, the "substantial factor" analysis focuses on the likelihood or probability that a defendant's act or omission led or contributed to producing the harm; in the context of an a material support violation, the material factors attend the amount and timing of the defendant's payments relative to the terror attacks which caused the injury. For example, "a major recent contribution with a malign state of mind would – and should – be enough," *Gill III,* 893 F. Supp. 2d 474, 507, while "a small contribution

---

[27] *See Gill I*, 891 F. Supp. 2d 335, 367 (E.D.N.Y. 2012) (Judge Posner's opinion for the *Boim* en banc majority has been criticized for having essentially omitted from the elements of a Section 2333(a) cause of action any requirement that a plaintiff prove proximate cause); *Abecassis v. Wyatt ("Abecassis II),* 785 F. Supp. 2d 614, 635 (S.D. Tex. 2011) ("In terms of both scienter and causation, *Boim III* stretched civil liability under the ATA more than previous courts …). See also Peter Budoff, *How Far is Too Far?: The Proper Framework for Civil Remedies Against Facilitators of Terrorism*, 80 Brook. L. Rev. 105, 1058 (2015); Jimmy Gurule, *Holding Banks Liable Under the Anti-Terrorism Act for Providing Financial Services to Terrorists: An Ineffective Legal Remedy in Need of Reform*, 41 J. Legis. 184 (2015).

made long before the event  – even if recklessly made – would not be." *Id.* at 573 (funds transferred in 2002 did not proximately cause injury to an American killed in 2008).

Under this more flexible "substantial factor" yardstick, considerations of temporal proximity and the magnitude of support are assessed on a fact-specific and *ad hoc* basis.   This avoids the potentially boundless window of liability, in time or person, which might otherwise attend the excision of this element from fundamental causation analysis in material support cases.   Hence, the greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attacks.   Similarly, the smaller the amount of payments, the less foreseeable that the payments would contribute to an imminent attack, and the weaker the likelihood the funding played substantial or significant role in facilitating the attacks. [28]

The Court has determined to adopt this flexible "substantial factor" yardstick in deciphering causation under the ATA, finding it truest to traditional common law tort analytical paradigms (whether imported as an exception to but-for causation-in-fact, or as a threshold element of proximate causation) and arguably only a slight refinement to *Boim III,*[29] in analyzing

---

[28] *See* Peter Budoff, *How Far is Too Far? The Proper Framework for Civil Remedies Against Facilitation of Terrorism*, 80 Brooklyn Law Rev. 1082.  *See also Weiss v. National Westminster Bank PLC,* 2017 WL 4480753 (E.D.N.Y. 2017) (distinguishing *Rothstein* and finding jury question on proximate causation where defendant provided funds directly to Hamas front-groups); *Strauss v. Credit Lyonnais*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013) (distinguishing *Rothstein* and finding genuine issue of material fact as to whether bank's transmission of millions of dollars to Hamas front organizations substantially enhanced Hamas ability to  perpetrate the terrorist attacks at issue).

[29] Chiquita predictably urges the Court to eschew the Seventh Circuit's approach in  *Boim III*, and instead adhere to the "direct causal relationship" approach seemingly followed by  the Second Circuit in *Rothstein*.  It argues that such an approach is more consistent with interpretation of "by reason of" causal language in the civil RICO statute, which is held to encompass a directness component as part of its proximate causation equation.  *See e.g. Southeast Laborers Health & Welfare Fund v. Bayer Corp*., 444 Fed Appx 401, 410 (11th Cir. 2011) (citing *Anza v Ideal Steel Supply Corp*., 547 U.S. 451, 461 (2006)) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly  to the plaintiff's injuries").

The stringent proximate causation standard in civil RICO, which authorizes recovery for injury to "business or property," is designed to prevent intricate, uncertain inquiries into layers of economic harm causation  from

whether the  evidence on record  in this case is sufficient to create a  jury question on causation of Plaintiffs' injuries.

Having resolved the threshold liability standards for *actus reus*, *mens rea* and proximate causation under the ATA, the Court must now determine whether any reasonable jury could find Chiquita legally  responsible for the killings of the Plaintiffs' decedents on the evidence available in this case.

## II.    ANALYSIS

### A.    Sufficiency of Allegations of Complaint: Primary Liability

As previously held, Section 2333 (a) does not provide a cause of action for "secondary" liability.  *In re Chiquita Brands Int'l, Inc.,* 2015 WL 71562  (S.D. Fla. 2015).  *See also In re Terrorist Attacks on Sept. 11, 2001 (Terrorist Attacks III),* 714 F.3d 118, 123 (2d Cir. 2013). Invoking this precept, Chiquita argues, as a threshold matter, that Plaintiffs' most recently amended complaints are legally insufficient because both pleadings allege secondary liability under the ATA, i.e. both allege that Chiquita aided and abetted the commission of international acts of terror committed by the FARC, or conspired with the FARC to commit such acts.

Chiquita correctly notes that an ATA  plaintiff must allege and prove an "act of international terrorism" committed by the defendant as a threshold element of claim, and that Plaintiffs in this case do not allege a violation of the ATA based an "act of international

---

overrunning RICO litigation, see *Anza* at 459-60,  a consideration not present in a civil  ATA case predicated on a material support violation allegedly resulting in murder.

Further, the Court does not find the "motivating principles" behind the directness component of the proximate cause standard in RICO cases, *see Anza*, 547 U.S. at 458); *Corcel Corp. v. Ferguson Enters., Inc*., 551 Fed. Appx. 571, 576 (11th Cir. 2014)  applicable to an ATA predicate material support violation involving personal injuries resulting from murder, where the   policy considerations underpinning traditional tort analyses, including  less stringent common law causation principles,  more fairly and logically apply.

terrorism" directly attributed to Chiquita.  Instead, Plaintiffs allege that the FARC committed "acts of international terror" which Chiquita enabled or facilitated by giving money to the FARC.[30]  The Court does not, however, find this erroneous legal conclusion fatal to the sufficiency of the pleadings.

Under the "plausibility" standard established  by *Twombly* and *Iqbal*, the Court must "accept as true all of the allegations contained in the complaint[], "discarding legal conclusions, conclusory statements and factually threadbare recitals of the elements of a cause of action. *Maldonado v. Fontanes,* 568 F.3d 264, 268 (1st Cir. 2009) quoting *Iqbal*, 129 S. Ct. 1937 (internal quotation omitted).  In other words, at the first step of the analysis, the court must "isolate and ignore statements in the complaint that simply  offer legal labels and conclusions or merely rehash cause of action elements."

From there, based on all assertions that were not discarded under the first step of the inquiry, the Court must determine whether the complaint "states a plausible claim for relief." *Schatz v. Republican. State Leadership Comm*., 669 F.3d 50, 55 (1st Cir. 2012);  *Edwards v. Prime Inc.,* 602 F.3d 1276, 1291  (11th Cir. 2010).   This second step is "context specific" and requires the Court to draw from its own "judicial experience and common sense" to decide

---

[30] The *Pescatore* Plaintiffs allege in relevant part for example:

Plaintiffs were injured in their person, property or business by reason of acts of international terrorism committed by FARC with the support of the Defendants that involved violence, were dangerous to human life, and violated the criminal laws of the United States, including the prohibitions against providing material support to terrorist, kidnapping and killing a U.S citizen as set forth in 18 USC 1203, 2332, 2339A. [Para. 87]

…
 FARC's activities were intended to (a) intimidate or coerce the civilian population of Colombia; (b) influence the policy of the governments of Colombia and the United States by intimidation or coercion and (c) affect the conduct of the movements of Colombia and the United States by mass destruction, assassination or kidnapping." [Para 89]. Further, they allege that "[t]he material support that the Defendants knowingly provided FARC substantially facilitated FARC's acts of terrorism which caused Plaintiff's injuries"

whether a plaintiff has stated a claim upon which relief may be granted, or conversely, whether dismissal under Rule 12(b)(6) is appropriate. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In other words, in assessing the sufficiency of a complaint, the court's task is to determine whether the factual allegations "possess enough  heft" to set forth a plausible entitlement to relief. *Financial Sec. Assur., Inc. v. Stephens,* 500 F.3d 1276 (11th Cir. 2007).   In making this assessment, the  Court must accept the  factual allegations  as true, construing them in light most favorable to the plaintiffs, but it is not required  to accept legal labels and conclusions as true – whether the conclusions are erroneously drawn from otherwise adequate factual allegations (as here) or whether those conclusions are simply unsupported by the factual allegations.

In this case, Plaintiffs allege that Chiquita continuously paid substantial sums of  money to the FARC over a nine-year time span, knowing before and during that time of the FARC's notoriety for extreme violence, its antagonism toward U.S. interests in Colombia,  and its targeting of U.S. nationals for ransom kidnappings and murder, including two of the NTM missionaries involved in this case. These allegations support a reasonable inference that Chiquita knew the money it paid the FARC "would be used" to "in preparation for" or to "carry out" terrorism related crimes, including  ransom kidnappings and killings of U.S. nationals in Colombia, and thus are  sufficient to support the legal conclusion that Chiquita violated one of the material support statutes,  Section 2339A,[31] by paying the FARC, and that this crime, in turn,

---

[31] Section 2339A(a), entitled "Providing material support to terrorists,"  establishes criminal penalties for "whoever provides material support or resources   … knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" various federal statutes prohibiting violent terrorist acts, for example and as relevant here, the extraterritorial killing of a U.S. national, or attempting or conspiring to do in violation of Sec. 2332 (a).

The second material support provision, 2339B —criminalizes the knowing provision of material support or resources to a designated foreign terrorist organization.  This requires knowledge of the group's connection to terror, but not a specific intent to further the organization's terrorist activities.

The third material support provision, 2339C– targets the financing of terrorist acts, and makes it a crime to by any means, directly or indirectly, unlawfully and willfully provide[] or collect [] funds … with the knowledge that such funds are to be used" to carry out an act intended to cause death or serious bodily injury, where the purpose of the

qualifies as an "act of international terrorism" within the meaning of Section 2333(1) for which Chiquita may be held primarily liable under Section 2333(a).

Disregarding incorrect legal conclusions regarding the FARC's commission of material support violations, and applying the correct legal labels and conclusions to the factual allegations pled, the Court finds the allegations sufficient to support a primary 2333(a) claim, based on a predicate 2339A violation, directly attributable to Chiquita. Chiquita's threshold challenge to the insufficiency of primary ATA liability allegations is therefore rejected.

Defendant also challenges the sufficiency of the murder conspiracy allegations, which the *Julin* Plaintiffs assert as a separate predicate crime to a separate ATA claim (alleging conspiracy between Chiquita and FARC in violation of Section 2332(b)).[32] On this point, the Court agrees that Plaintiffs do not plead sufficient facts or adduce sufficient evidence to withstand summary judgment on an ATA murder conspiracy predicate.

There is no evidence from which the existence of agreement to kill Americans between the FARC and Chiquita could be inferred; while the allegations may be susceptible to inference that Chiquita gave money to the FARC knowing it would be used for nefarious purposes, including murder, these same allegations do not permit inference that Chiquita agreed with the FARC, expressly or impliedly, to murder American citizens abroad in Colombia. Accordingly, the Court shall enter summary judgment in favor of Chiquita on this distinct ATA claim.

---

act "by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act." This requires proof that defendant knew or was willfully blind to the fact that the funds would be used to finance terror and had the ultimate goal of intimidating or coercing a civilian population, or influencing the policy of a government by intimidation or coercion. See *Wultz v Islamic Repub. of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010).

[32] In their summary judgment briefing, Plaintiffs also argue a separate ATA claim based on predicate crime of conspiracy to kidnap, 18 U.S.C. 1201, to intimidate, 18 U.S.C. 241, and to racketeer, 18 U.S.C. 1962(d). Because the ATA claims were not pled on these predicates, the Court will not consider them here as a separate basis for imposition of ATA liability.

## B.  Sufficiency of Evidence on Elements of ATA Claims

The analysis now turns to whether  the summary judgment  record reveals genuine issues of material fact on the questions of whether (1) Chiquita's payments to the FARC objectively "appeared to be intended" to coerce or intimidate a civilian population, or influence a government (i.e. whether there is sufficient evidence to create a debatable fact question on whether Chiquita acted with requisite intent to establish an "act of international terrorism" as defined at 2331(1)); (2)  Chiquita's payments to the FARC were made with the specific *mens rea* needed to support liability for a 2339A material support violation, as well as general *mens rea* needed to support liability for a civil ATA violation; (3) Chiquita's  alleged material support violation proximately caused  the terror attacks resulting in the deaths of Plaintiffs' family members.  These issues are discussed, in reverse order, in the discussion which follows.

### 1.  Proximate Causation

Chiquita argues that Plaintiffs do not adduce sufficient evidence to create a genuine issue of material fact on proximate causation, because they do not show that money paid by Banadex to the FARC 5th and 19th Fronts in the Colombian banana-growing zones had a  direct causal relationship to the attacks perpetrated in Pucaro, Panama and Villavicencio, in central Colombia, by the 53rd, 57th and 59th FARC Fronts tied to the killing of Plaintiffs' decedents.  It  also argues that the amounts paid by Banadex ($32K/year average) to the FARC were but a small fraction of FARC's overall revenues (exceeding $100 million annually at peak), and that this relatively small contribution to FARC's  coffers  money could not realistically function  as a  "substantial factor" in the chain of responsible causation which brought about the kidnapping and killing of Plaintiffs' decedents.   It also argues the deaths of Plaintiffs' decedents in remote areas of

Colombia and Panama were not a "reasonably foreseeable" consequence of Banadex's payments to FARC fronts operating out of the banana-growing regions of Colombia.

As discussed above, the "by reason of" causal language of the ATA does not require Plaintiffs to show that the  money which Banadex gave to the FARC  was actually used to fund the terror attacks that killed the Plaintiffs' decedents, or that the money paid ended up in the hands of the specific FARC fronts that carried out the attacks.  That is, this language does not import a "but for" causation requirement.

On the other hand, Plaintiffs do have the burden of showing that the Defendant's conduct was a material and "substantial factor" in bringing about their injuries – whether analyzed as a threshold causation in fact question (as an exception to but for causation) or a threshold proximate cause question --  and that murders in question were  a reasonably foreseeable consequence of that conduct.   Evaluating the record here, the Court has  no difficulty in concluding that genuine issues of material fact present on both issues.

On the first question, reasonable jurors could debate whether financial contributions of the magnitude and timing as those made by Chiquita were a material and substantial factor in enhancing the FARC's terror capabilities and enabling it to commit more terror,  including the kidnapping and killing of Plaintiffs' decedents between 1994 and 1997.  The evidence shows Banadex paid the FARC in a series of 57 payments, beginning in 1989 and continuing up through and during the time of the FARC's kidnapping and killing of Plaintiffs' family members between 1994 and 1997.  Further, Plaintiffs adduce expert evidence that the cost of putting a FARC guerilla in the field for one year was $12,000, that the cost of supplying a guerilla with an AK-47 was $1,200;  and that with $32K as the average annual funding, Chiquita could have armed  540 guerillas, or put 50 guerillas in the field, full time, for a year.

The evidence further shows that the FARC functioned in a "top down" organizational hierarchy, with excess operational funds forwarded to the central command and fund-sharing common among the FARC front organizations.  With this, a reasonably debatable fact question arises as to whether funds infused at any level of the hierarchy would foreseeably strengthen the organizational mission of the group as a whole, and enhance the terror capabilities of all component Fronts, so that a fairly debatable fact question arises as to whether contributions made to the FARC fronts in Colombia's banana-growing zones conceivably empowered the organization as a whole and enhanced the terror capabilities of the Fronts which carried out the kidnapping and killing of  Plaintiffs' decedents in this case.

Viewing this evidence in the light most favorable to Plaintiffs, as it must, the Court finds sufficient evidence to create a jury question on the issues of whether Banadex's nine-year stream of funding to the FARC was a material and substantial factor in bringing about deaths of Plaintiff's decedents.

The proximate cause inquiry next examines whether Plaintiffs' injuries were a reasonably foreseeable consequence of the alleged material support violations.  Here too, the Court finds genuine issues of material fact which preclude summary judgment.  A reasonable jury could find, on this record, that Chiquita's continuous nine-year stream of payments to the FARC  created a foreseeable likelihood of enhancing its terror capabilities; that  the presence of American citizens living abroad in Colombia, as missionaries or business persons, was reasonably foreseeable to Chiquita; that the FARC's continued targeting of American interests in Colombia, including personal attacks on American nationals, was foreseeable to  Chiquita, and that funneling money to the FARC would predictably enhance and facilitate its ability to perpetrate such attacks, including those on Plaintiffs' decedents.

Stated differently, the Court does not, as a matter of law, view the attacks on Plaintiffs' decedents as highly extraordinary occurrences which are properly cut from the chain of proximate causation.  From common experience, given the widely reported news relating to the decades-long civil war in Colombia, and emergence of notoriously violent guerilla groups in the context of that war, a reasonable juror could conclude that giving money to Colombian guerillas, having no function other than the perpetration of violence, would enhance the terror capabilities of the guerillas and lead to more violence.   While other factors undoubtedly contributed to the strife, none of these causes can be said to be unforeseeable as a matter of law, as they could reasonably be expected to operate in conjunction with the alleged financing of terror.   At any rate, the question of proximate causation, on this record, is one for the jury, not the Court.

2.  **Actus Reus - Act of International Terror**

Chiquita also challenges the sufficiency of evidence on *mens rea* needed to establish an "act of international terrorism" actionable under the ATA, contending there is insufficient evidence from which a fact finder could reasonably conclude that Banadex's payments to the FARC objectively "appeared to be intended" to either "intimidate or coerce a civilian population" or to "influence the policy of a government by intimidation or coercion" within the meaning of Section 2331(1)(B).

Chiquita claims it paid the FARC for the sole purpose of protecting the  lives of its employees in Colombia, and that conduct motivated by such salutary purposes cannot, as a matter of  law, be objectively viewed as conduct which "appears to be intended" to intimidate or coerce a civilian population, or to influence a government by intimidation or coercion.

As a threshold matter, the Court agrees with the *Boim III* reasoning on this point in the 2339A context.   If a defendant gives money to a terror organization, knowing of the aims and

activities of that organization, this conduct creates a jury question as to whether it may objectively be viewed as that which "appears to be intended" to immediate or coerce a civilian population or government.    That Chiquita's material support may have had multiple motivational triggers, some salutary, are factors for the trier of fact to consider.

Even assuming these are part of the motivation for the payments, this would not negate, as a matter of law, the mens *rea* of a 2339A violation (provision of material support "knowing or intending" it will be used to prepare for or carry out terrorism-related crimes), nor would it negate, as a matter of law, the *mens rea* "appears to be intended" requirement of 2331(1)(B). Whether the welfare of its employees was part of its motivation in providing the support does not, as a matter of law,  resolve the question of whether Chiquita acted "knowing or intending" that the resources would be used for nefarious purposes, and whether its conduct objectively appeared to be intended to intimidate or coerce.  *See United States v. Medina*, 167 Fed. Appx 161 (11th Cir. 2006)  (criminal defendant's motivation of intending to seek asylum in the United States from FARC persecution in Colombia did  not negate intent to knowingly use altered passport to gain illegal entry to United States).

There is a fairly debatable fact question here as to whether Chiquita's nine-year payment stream to the FARC is conduct which objectively "appears to be intended" to intimidate or coerce a civilian population, or to influence a government by coercion or intimidation.  See Boim *III* at 693-94.   That is, there are genuine issues of material fact bearing on the question of whether Chiquita's payments to the FARC,  like the donations to Hamas in *Boim III*, "would appear to be intended to intimidate or coerce a civilian population" or to affect the conduct of a government," because  reasonable jurors might debate whether it  would have been reasonably foreseeable to Chiquita, as a knowing financier of FARC, that  its financial

support would enhance the FARC's terror capabilities and enable it to kill, try to kill or conspire to kill more Americans abroad in Colombia.

### 3.  Mens Rea – 2339A Violation

Chiquita also challenges the  sufficiency of evidence on the element of specific intent required to establish a 2339A violation, i.e. it contends there is no genuine issue of material fact as to whether  Chiquita gave money to the FARC "knowing or intending" that the money would be used in preparation for, or to carry out, the murder of Americans abroad.  Here again, it contends that its salutary motive of protecting its employees from retaliatory attacks negates such intent. As discussed above, a salutary motive underlying the commission of a crime does not necessarily negate *mens rea*; it may explain the background circumstances leading up to the crime, but does not resolve, as a matter of law, whether material support was given "knowing or intending" it would be used to prepare for, or carry out, the killing of Americans in violation of Section 2332(a).  *See Medina supra.*

Section 2339A criminalizes the provision of "material support" "knowing or intending" that it will be used in preparation for, or to carry out, one of several enumerated terrorism-related crimes, including, as relevant here, the murder of U.S. nationals abroad.   18 U.S.C. §2339A(a) (enumerating 18 U.S.C. §2332(a)(1).  Section 2339A requires evidence that a defendant either knew, or intended, that its support would be used to prepare for or carry out a terror-related crime.  Where support is given to a known terrorist group having only violent organizational goals – with no philanthropical, educational, or other socially useful purposes – certainly there is at least a jury question as to whether the payments were made with the requisite "knowing or intending" *mens rea*, and this is a fair  question regardless of whether the payments were made as

voluntary donations (as in *Boim III*) or as "protection" money hedging against future personal attacks as claimed here.

## C.  AFFIRMATIVE DEFENSE: STATUTE OF LIMITATIONS

The parties agree that claims under the ATA are subject to a ten-year statute of limitations. 28 U.S.C. §2335.  Because the kidnappings and killings of Plaintiffs' decedents occurred more than ten years prior to the filing of Plaintiffs' original complaints, Chiquita contends all claims are time-barred as a matter of law.  In response, Plaintiffs argue that their claims are timely either under application of an accrual "discovery rule" or equitable tolling doctrine, and that genuine issues of material fact present on the elements of either theory which preclude summary judgment.

Under federal law, equitable tolling is available when "extraordinary circumstances" outside the plaintiff's control made it impossible to timely assert his or her claims. *Hunter v. Ferrell,* 587 F.3d 1304, 1308 (11th Cir. 2009); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999);  *Lake v. Arnold*, 232 F.3d 360, 370 (3d Cir. 2000).   It applies to claims brought under the ATA, and, where appropriately invoked, "the statutory clock is stopped while tolling is in effect," meaning the clock is stopped until relevant information regarding the existence of the claim is revealed.  *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1156 (11th Cir. 2005); *Arce v Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006) (equitable tolling suspends running of statute until time deemed fair by court).

In the Eleventh Circuit, "extraordinary circumstances" are defined to include situations where a defendant either affirmatively conceals its own wrongdoing or otherwise misleads the plaintiff into sleeping on his or her rights, *or* when the plaintiff simply had no reasonable way of timely discovering the wrongs perpetrated against him or her despite the exercise of due

diligence.  *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005).   Under this approach, "fraudulent concealment" is effectively treated as a subset of "equitable tolling," [33]   *Jackson v. Astrue*, 506 F.3d 1349, 1355 (11th Cir. 2007) (extraordinary circumstances "include fraud, misinformation or deliberate concealment"), and, while often relevant, "is not essential to equitable tolling." *Valdez ex rel. Donely v. United States,* 518 F.3d 173, 183  (2d Cir. 2008); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990).

> As explained by the Second Circuit in *Valdez*:
>
> Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations:
>
> if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.  Equitable  tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule – governing … accrual – on the other.  It differs from the former in that it does not assume a wrongful – or any – effort by the defendant to prevent the plaintiff from suing.

*Valdez* at 182, citing *Cada v. Baxter Healthcare Corp.*, 920 F.2d 447, 451 (7th Cir. 1990).

In this case, Plaintiffs argue that summary judgment on the limitations defense is precluded by genuine issues of material fact bearing on the availability of equitable tolling under both avenues - affirmative misconduct (wrongful concealment) directly attributable to Chiquita, or Plaintiffs' blameless ignorance of their rights.

Because Plaintiffs would bear the burden of proof at trial on the issue of equitable tolling, Chiquita, as the moving party at summary judgment, may satisfy its initial burden by presenting evidence negating an essential element of the doctrine, or by pointing to specific portions of the record which demonstrate an absence of evidence to support the elements of the doctrine (on which plaintiffs bear the trial burden of proof). *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606-608  (11th Cir. 1991) (explaining *Adickes v S.H. Kress & Co*., 398 U.S. 144 (1970).

---

[33]  Other courts treat fraudulent concealment, as misconduct attributable to defendant, as a subset of equitable estoppel doctrine.  *In re Copper Antitrust Litigation*, 436 F.3d 782 (7th Cir. 2006); *Lukovsky v City and County of San Francisco*, 535 F.3d 1044 (9th Cir. 2008); *Rhodes v. Guiberson Oil Tools Div*., 927 F.2d 876 (5th Cir. 1991).

Chiquita seeks to carry this burden here by pointing to evidentiary lapses on, in addition to adducing affirmative evidence to negate: (1) the reasonableness of efforts undertaken by Plaintiffs to discover all potential wrongdoers in the ten years after notification of death ("due diligence" element), and (2) acts of *wrongful* concealment attributable to Chiquita during the claimed tolling period ("extraordinary circumstances" element) .

On the issue of due diligence, Chiquita adduces evidence that the NTM Plaintiffs were on immediate notice of FARC's involvement in the abduction and killing of their family members: When the abductors seized the Pucuro missionaries, kidnapped in January 1993, and the Finca missionaries, kidnapped in January 1994, they identified themselves as FARC representatives to family members who witnessed the abductions. NTM later attempted, unsuccessfully, to negotiate with FARC representatives for their release, and all five men died in captivity. As to Frank Pescatore, seized in December 1996, and whose body was found February 1997, the 59th FARC Front took responsibility for the killing in a letter to GeoMet in July 1998. In April 2004, the FBI notified the Pescatore family that the FARC Carribbean block was responsible for the killing.

Chiquita also points to testimonial evidence from decedent's survivors showing, at the time of the attacks, that they were aware of the presence of U.S. multi-national corporations, such as Chiquita, in Colombia, and they were aware that violent guerilla groups, such as the FARC, commonly extorted money from foreign corporations doing business in Colombia. Armed with this knowledge, Chiquita contends the Plaintiffs could and should have promptly investigated sources of FARC funding, and that no reasonable jury could interpret the Plaintiffs' failure to do so before expiration of the ten-year limitations period as anything but a lack of due diligence. More particularly, failing a private investigation into FARC funding, Chiquita

suggests Plaintiffs could have either sued the FARC, opening a vehicle through which to conduct formal discovery on its financiers, or they could have sued Chiquita itself, allowing them to then explore through formal discovery on any financial ties it may have established with the FARC.

On the issue of "extraordinary circumstances" impeding Plaintiffs' ability to earlier discover their claims, Chiquita contends there is no evidence of wrongful concealment attributable to it which might satisfy this standard. It defends its decision to disguise its FARC payments in the first instance as a legitimate security measure, recommended by Control Risks, which violated no reporting requirements or generally acceptable accounting standards. It argues it had owed no fiduciary obligations to Plaintiffs or other persons which would have required an earlier disclosure of the information. With no affirmative misconduct attributable to it, or external forces outside Plaintiffs' control which might have impeded ability to earlier file suit, *see e.g. Arce v. Garcia* (political climate in El Salvador creating potential for retaliatory attacks on family members pressing TVPA claims for war crimes perpetrated by former El Salvadorian military generals), Chiquita contends the record is devoid of any evidence from which a reasonable jury could infer the existence of "extraordinary circumstances" which would justify an equitable tolling of the statute.

Plaintiffs do not contest their knowledge, at the time of the attacks, of Chiquita's presence in Colombia, or the FARC's reputation for extorting protection money from foreign corporations. However, they argue this knowledge would not have justified filing suit against Chiquita without a factual basis to believe that Chiquita was financing the FARC, and that information sufficiently reliable to make this connection was not reasonably available to them from any source until after March 27, 2007.

They contend the record reveals genuine  issues of material fact on the issue of "due diligence," where the record contains uncontradicted evidence that they at all times cooperated with governmental authorities in investigating the disappearances; that they went to great personal expense in privately investigating the abductions; and that the highly stressful circumstances of negotiating with the captors of their loved ones gives rise, at a minimum to question regarding reasonableness of the extent of their efforts to delve into FARC financing, or to pursue litigation against the FARC.  They argue that their blameless ignorance of Chiquita's involvement qualifies as an "extraordinary circumstance" which prevented them from earlier discovering information needed to pursue their claims, regardless of the intent underlying Chiquita's decision to suppress the information over the decade in which the FARC payments were made.

The Court agrees, at a minimum, that the record presents genuine issues of material fact as to the reasonableness of Plaintiff's "due diligence" in investigating their claims under the circumstances of this case.  A reasonable juror might find the option of pursuing suit against FARC guerillas entrenched in the Colombian  jungle,  locked in a decades-long civil war, an unreasonable one, as well the alternative option of filing suit against Chiquita based solely on its then-presence in Colombia in view of the potential sanctions that could be imposed against them under Fed. R. Civ. P. 11.  At a minimum, reasonable jurors could differ as to the reasonableness of Plaintiffs' selected course of investigation and their "due diligence" in pursuit of their rights.

The Court also finds genuine issues of material fact pertaining to the existence of "exceptional circumstances" which conceivably may excuse Plaintiffs' delay in bringing suit. On the "wrongfulness" of the concealment, Plaintiffs adduced expert  evidence that Chiquita's failure to report Banadex's FARC payments in its  financial disclosures contemporaneously

constituted a violation of generally accepted accounting procedures, as this was information which a reasonably prudent investor would want to know;  Plaintiffs also adduced evidence that Chiquita's suppression of the payments was motivated, at least in part, by  concerns  about the legality of the payments under Colombia law.   And, regardless of the bona fides of its motivation, in the end, Chiquita successfully kept this information out of the public eye for nearly a decade, arguably depriving Plaintiffs of any meaningful opportunity to discover Chiquita's relationship  to the FARC and  its potential responsibility under the ATA for the terror attacks which claimed the lives of their family members.

Viewed in the light most  favorable to Plaintiffs, the summary judgment record shows that before March 2007, when Chiquita entered its guilty plea in the D.C. criminal action, the publicly available  information about its role in Colombian  guerilla payments was arguably vague and carefully worded  to suggest that it  may not have engaged in any wrongdoing at all; and, even after the DOJ launched its criminal investigation, Chiquita continued, for a time, to defend and continue its guerilla payment practices.    This conduct, in conjunction with the limited pre-2007 public information regarding Chiquita's guerilla payments and financial ties to Colombian terror groups, including the FARC,  is sufficient to create a jury question as to whether extraordinary circumstances beyond plaintiffs control existed sufficient to trigger an equitable tolling of the statute, and, secondarily, as to the date on which Plaintiffs were first placed on inquiry notice of their claims.  *In re Copper Antitrust Litig*., 436 F.3d 782, 779 (7th Cir. 2006);

Because the Court cannot say, as a matter of law, that Plaintiffs are unable to prove any set of facts that would justify an equitable tolling of their ATA claims, it shall deny the Defendant's motion for summary judgment on its limitations defense.  With this ruling, it is

unnecessary for the Court to resolve Plaintiff's alternative "discovery rule" argument pertaining to the accrual of their claims.

### D.  AFFIRMATIVE DEFENSE: DURESS or NECESSITY

Plaintiffs seek entry of partial summary judgment on Chiquita's affirmative defense of "duress"  or "necessity," contending that no reasonable juror could find, on the undisputed history of Chiquita's nine-year stream of payments to the FARC presented here, that:   (1) Chiquita acted under an "imminent" threat of death or serious bodily harm when it violated §2339A by making payments to the FARC; (2) Chiquita had no reasonable, legal alternative to paying the FARC in violation of  §2339A, and (3) Chiquita did not negligently or recklessly put itself in harm's way by deciding to expand its  owned-fruit operations in Colombia and then opting to pay the FARC, in violation of 2339A, as the price of doing continued business in Colombia's fertile banana-growing zones.

Assuming, *arguendo*, that duress is an available defense to a Section 2339A material support violation tethered to the facilitation of murder of Americans abroad in violation of Section 2332, the Court agrees that summary judgment is appropriately entered against Chiquita on this issue because it is unable to identify disputed issues of material fact touching on each element of this asserted affirmative defense.

The duress defense is a common-law concept that federal criminal law has incorporated, under which otherwise criminal behavior may be excused under narrow circumstances. *United States v. Willis*, 38 F.3d 170 (5th Cir. 1994); *United States v. Toney*, 27 F.3d 1245 (7th Cir. 1994); *Shannon v. United States*, 76 F.2d 490, 493 (10th Cir. 1935).   To succeed with a duress defense, where available, a defendant must show that he reasonably feared immediate death or severe

bodily injury (to self or others) which could be avoided only by committing the criminal act charged, and that he did not recklessly or negligently place himself in a situation where it was probable he would be coerced and forced to choose criminal conduct. *United States v. Alzate*, 47 F.3d 1103 (11th Cir. 1995); *United States v. Sixty Acres in Etowah County,* 930 F.2d 857 (11th Cir. 1991); *United States v. Blanco*, 754 F.2d 940 (11th Cir. 1985); *United States v. Louis*, 157 Fed. Appx. 165 (11th Cir. 2005).[34] The underlying rationale is that, for reasons of social policy, it is better that a defendant, faced with a choice of evils, chooses to do the lesser evil (i.e. violate the criminal law) in order to avoid the greater evil of grave physical harm threatened by another person. *United States v. Contento-Pachon*, 723 F.2d 691, 695 (9th Cir. 1984); *United States v. Moore*, 486 F.2d 1139 (D.C. Cir. 1973); *Robinson v. Jones*, 2005 WL 1214251 (W.D. Mich. 2005).

The rationale underpinning the defense of "duress" is that even where a defendant's conduct violates the literal language of the criminal law, in the sense he has done the act the crime requires, and has the mental state which the crime requires, his conduct is "excused" because it is coerced. *Dixon v. United States* 548 U.S. 1 (2006). This defense is narrowly construed, and viable only if defendant can show that he or she acted under an immediate threat of death or serious bodily injury at the time the conduct occurred; that he or she had a well-grounded fear that the threat would be carried out, and that he or she had no reasonable opportunity to escape or inform the police. *United States v. Jones*, 32 F.3d 1512, 1515 (11th Cir.

---

[34] Traditionally, the defense of necessity was invoked when natural forces created a situation justifying non-compliance with the law, while duress was the appropriate defense when the situation was the product of human action. *Rosemond v. United States*, 134 S. Ct. 1240 (2014). In modern usage, however, the distinction is blurred and the concepts of duress, coercion and necessity are used interchangeably under the general heading of "justification." *United States v. Paolello*, 951 F.2d 537, 540 (3d Cir. 1991) ("While the defenses of justification and duress were at one time distinct, "[m]odern cases have tended to blur the distinction between duress and necessity"); *U.S. v. Deleveaux*, 205 F 3d. 1292, 1296 (11th Cir. 2000).

1994);  *See also United States v. Paul,* 110 F.3d 869, 871 (2d Cir. 1997);  *United States v. Posada-Rios*, 158 F.3d 832, 874 (5th Cir. 1998).

The requirement of immediacy of the threat is a "rigorous one" in which a "fear of future bodily harm to one's self or to others will not suffice."  *United States v. Sixty Acres in Etowah Cnty*, 930 F.2d 857, 861 (11th Cir. 1991); *United States v. Furr,* 528 F.2d 578 (5th Cir. 1965).  In other words, a generalized apprehension of future harm is insufficient to establish the first element of this defense, *United States v. Wattleton*, 296 F. 3d 1184, 1196 n. 20 (11th Cir. 2002), and "the apprehension of immediate danger must continue during the whole time the crime is committed." *Sixty Acres in Etowah County,* at 861.

In criminal cases, a defendant bears the initial burden of offering evidence on each of the elements, and where it preliminarily fails to proffer evidence sufficient to prove each essential element, he is not entitled to a jury instruction on the issue.  *United States v. Foster*, 153 Fed. Appx. 674 (11th Cir. 2005).  So too, in civil causes of action predicated on underlying criminal offenses, where duress is raised as affirmative defense and the issue is joined in summary judgment  proceedings, the defendant has the burden of adducing evidence sufficient to create a genuine issue of material fact on each essential element of the defense in order to withstand summary judgment.

In this case, Chiquita does not successfully carry this burden, because the undisputed evidence shows (1) Chiquita, by description of its own managers, was responding to a generalized fear of future retaliatory harm from the FARC, not imminent death or serious bodily injury to any employee or other person.  It was not responding to a kidnapping or employee held in captivity, and  there is no evidence of a specific ultimatum or threat from a FARC commander at any time during the nine-year continuum in which it paid money to the FARC.  *See U. S. v.*

58

*Medina,* 167 Fed. Appx. 161 (11th Cir. 2006) (evidence that defendant feared persecution at hands of the FARC in Colombia did not support defense of duress to crime of presenting altered passport where defendant traveled to Panama and Costa Rica for ten days  before presenting to the United States); *United States v. Pestana*, 865 F. Supp. 2d 357 (S.D.N.Y. 2011) (defendants charged with conspiring with FARC to take American citizen hostage in Panama not entitled to present duress defense, notwithstanding history of forced abduction into FARC as child soldiers and threats of harsh punishment or execution for defecting), *aff'd sub. nom U.S. v. Ortiz,* 525 Fed. Appx 41 (2d Cir. 2013); (2) Chiquita had reasonable, legal alternatives to maintaining and expanding its owned-fruit operations in Colombia; it could have withdrawn and could have sought government intervention in the United States or Colombia  in responding to the perceived threats.  The fact that Chiquita ultimately did sell all of its farms, and withdrew from its owned-fruit operations in Colombia -- after the United States launched a criminal investigation into its AUC dealings, and several years after the FARC (1997) and AUC (2001) were formally designated as foreign terrorist organizations -- belies its claim that this was not a reasonable, legal alternative to withdrawal from the outset.  *See United States v. Houston*, 648 F.3d 806 (9th Cir. 2011) (affirming rejection of duress instruction where defendant presented no persuasive evidence of effort to terminate association with source of duress, or to bring situation to attention of authorities).   Even a small window of opportunity to escape is sufficient to preclude presentation of a  duress defense as a matter of law.  *United States v. Alicea,* 837 F.2d 103 (2nd Cir. 1988) (twenty minutes of freedom from abductors prior to boarding plane).   Chiquita's further claim that withdrawal might have exposed thousands of employees left behind to risk of retaliatory attack, is a highly speculative one, unsupported by any  historical evidence, and in any event, does not identify a material issue of fact because this perception at best relates to a

generalized fear of a future retaliatory attacks which would not  touch upon the immediacy requirement of a duress defense. *United States v. Gonzalez,* 407 F.3d 118 (2d Cir. 2005); *United States v. Jankowski*, 194 F.3d 878, 881-83 (8th Cir. 1999), and  (3) Chiquita voluntarily placed itself in harm's way by electing to pursue owned-fruit operations in Colombia, knowing at the time of first purchase of the threat posed by the FARC and other guerillas in the banana-growing zones, and by electing to later expand those operations even as the terror escalated.

As Chiquita does not adduce evidence sufficient to create a genuine issue of material fact on each element of its asserted duress defense, summary judgment is appropriately entered against on this matter.

### III.     CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1.   The Defendant Chiquita's motion for summary judgment [DE 1329] on the ATA claims based on predicate material support violations (Section 2339A) is **DENIED**.

2.   The Defendant Chiquita's motion for summary judgment on the ATA claims based on predicate murder conspiracy violations (Section 2332) is **GRANTED**.

3.   The Plaintiffs' motion for partial summary judgment is **GRANTED** as to the affirmative defense of duress  [DE 1323].

4.   The Plaintiff's motion for partial summary judgment on the affirmative defense of corporate separateness is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 3rd  day of January, 2018.

KENNETH A. MARRA
United States District Judge

cc.  all counsel