# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 08-MD-01916-KAM

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____/

This Document Relates to:

ATA ACTIONS:

_____/

JORGE PORTER et al.,
     Plaintiffs,

vs.

CHIQUITA BRANDS INTERNATIONAL, INC.;
ROBERT W. OLSON;
ROBERT F. KISTINGER;
WILLIAM A. TSACALIS;
CHARLES KEISER;
STEVEN G. WARSHAW and KEITH E. LINDNER,     **Case No. 15-81585**
                                               **(Florida *Porter*)**
     Defendants.

_____/

JORGE PORTER et al.,
     Plaintiffs,

vs.

CHIQUITA BRANDS INTERNATIONAL, INC.;
ROBERT W. OLSON;
ROBERT F. KISTINGER;
WILLIAM A. TSACALIS;
CHARLES KEISER;
STEVEN G. WARSHAW,
KEITH E. LINDNER and JOHN ORDMAN,
     Defendants.                                    **Case No. 17-80514**
                                               **(Ohio *Porter*)**

_____/

## ORDER DENYING IN PART and GRANTING IN PART
## DEFENDANTS' CONSOLIDATED MOTIONS TO DISMISS
## FLORIDA AND OHIO *PORTER* COMPLAINTS

**THIS CAUSE** is before the Court on the Defendants' Joint Consolidated Motions to Dismiss Plaintiffs' First Amended Complaint in Florida *Porter* [DE 1483] and Plaintiffs' Original Complaint in Ohio *Porter* [DE 1482]. Plaintiffs' filed Responses in Opposition to the Motions [DE 1506, 1511] and the Defendants' Replies [DE 1518, 1520]. Upon consideration, the Court has determined that it will grant the motions in part and deny the motions in part for reasons which follow.

## I.      INTRODUCTION[1]

Plaintiffs allege that Juan Carlos Puerta ("Juan Carlos"), a Colombian citizen and American resident alien, was kidnapped for ransom in January, 1999 by a violent paramilitary terrorist organization in Colombia known as the "Autodefensas Unidas de Colombia (United Self-Defense Groups of Colombia) ("AUC"). They allege that Juan Carlos's brother, Jorge Porter (an American citizen), was contacted in Florida by his brother's kidnappers and, at their direction, eventually traveled to Colombia to pay part of the ransom demanded. Jorge was allegedly kidnapped at the meeting in Colombia, held hostage, and tortured before he was released eight days later. After he returned to the United States, the kidnappers continued to make ransom demands on him for approximately two years. With Jorge's inability to meet the ransom demands, the kidnappers ultimately murdered Juan Carlos in March, 2001.

### A.  Florida Porter

Libia Puerta and Alexander Puerta, the surviving  mother and son of Juan Carlos, respectively, and Jorge Porter "(the Porter Plaintiffs"), are all Florida residents. They first filed

---

[1] For purposes of this motion, the Court assumes the well-pleaded factual allegations of both Complaints are  true and views those facts, and all reasonable inferences from them, in the light most favorable to Plaintiffs. *Dusek v. JPMorgan Chase & Co*., 832 F.3d 1243 (11ᵗʰ Cir. 2016), citing *Erickson v. Pardus*, 551 U.S. 889, 894 (2007).

suit in the Southern District of Florida in November, 2015, against Chiquita Brands International, Inc. ("Chiquita"), alleging that Chiquita is civilly liable to them for damages under the Anti-Terrorism Act ("ATA"). The Porter Plaintiffs allege that Chiquita secretly funded the AUC for an extended time period, and, by so doing, aided and abetted acts of international terrorism causing serious bodily harm to Jorge Porter and extreme emotional distress and injury to Libia and Alexander Puerta. The Porter Plaintiffs also sued six of Chiquita's former directors, officers and other executive employees (Robert Olson, Robert Kistinger, William Tsacalis, Charles Keiser, Steven Warshaw and Keith Lindner) (collectively "Individual Defendants") alleging that they participated in, and implemented the decision, to make furtive payments to the AUC, and are therefore secondarily liable for these injuries under the Torture Victims Protection Act (TVPA). Case No. 15-81585-CIV-MARRA (Florida *Porter*).

On April 27, 2017, the Court dismissed the TVPA claims in Florida *Porter* as against Olson, Kistinger, Tsacalis and Warshaw for lack of personal jurisdiction.[2] The Court also dismissed the TVPA claim against Lindner for failure to allege a sufficient factual basis from which his alleged knowledge and participation in the AUC payment scheme could reasonably be inferred for purposes of secondary aiding and abetting liability. The Court granted the Porter Plaintiffs leave to amend to correct the jurisdictional defects. At the same time, the Court sustained the ATA claims against Chiquita, and sustained the secondary liability TVPA claims against Keiser [DE 1397] ["*Porter I*"].

Pursuant to the leave given to them, Plaintiffs filed their First Amended Complaint in Florida *Porter* on May 15, 2017 [DE 1436], expanding their conspiracy allegations as against all Individual Defendants (in attempt to cure the personal jurisdiction defects) and expanding the

---

[2] In doing so, the Court rejected Plaintiffs' alternative jurisdictional theory that acts of co-conspirators in Florida could be imputed against them for purposes of triggering the Florida long-arm statute, finding insufficient factual allegations to sustain conspiracy liability under the TVPA.

factual allegations against Defendant Lindner (in an attempt to establish secondary TVPA liability).  Chiquita and the Individual Defendants now move to dismiss the Florida *Porter* First Amended Complaint [DE 1483], contending that Plaintiffs have not yet alleged sufficient facts to establish TVPA conspiracy liability (and thus offer no basis for imputing the Florida-based activity of any co-conspirators to them under the Florida  long-arm statute), and have not yet alleged sufficient, individualized  facts to establish secondary liability under the TVPA as to Individual Defendants Lindner or Warshaw (and thus fail to state a claim on which relief may be granted).

### B.  Ohio *Porter*

On March 10, 2017, about a month before issuance of *Porter I*, and while Defendants' motion to dismiss the original Florida *Porter* complaint was still pending, Plaintiffs filed a virtually identical suit in the Southern District of Ohio (where Chiquita is headquartered).  Case No. 17-CV-158 (S.D. Ohio).  The Porter Plaintiffs named Chiquita and all Individual Defendants previously named in the Florida case, plus one additional defendant (John Ordman).  On April 19, 2017, the JPML conditionally transferred the Ohio case to this District as a tag-along action under 28 U.S.C. §1407, and the matter was assigned to the undersigned.  Case No. 17-80514-CIV-MARRA (S.D. Fla.) ("Ohio *Porter*") [DE 7].   On May 9, 2017, this Court consolidated the Ohio *Porter* case, along with three other newly-filed tag-along actions from Ohio, in this MDL proceeding.

Chiquita and the Individual Defendants now jointly move to dismiss the Ohio *Porter* Complaint [DE 1482], contending it is a duplicative action improperly filed in an attempt to circumvent the Court's prior order denying them leave to amend their Florida *Porter* Complaint. Defendants also seek dismissal of all claims against the newly-added defendant, John Ordman,

for lack of personal jurisdiction and for failure to allege sufficient facts to state a secondary liability TVPA claim against him.   Finally, Defendants  contend that the Ohio *Porter* complaint fails to state a secondary TVPA liability claim against Warshaw or Lindner, and seek dismissal of the claims against these Individual Defendants under Rule 12(b)(6) as well.

## II.      DISCUSSION

### A.     Ohio Porter

#### 1.  Defendant Ordman

John Ordman ("Ordman") was Chiquita's Senior Vice-President, European Banana Sourcing, Chiquita Fresh Group, reporting directly to Robert Kistinger (Compl. 25). He had "bottom line" operational responsibility for Chiquita's Colombian activities, and was employed at Chiquita from 1994 to 2006.  Defendant Charles Keiser (the alleged broker of the AUC payment arrangement) reported directly to Ordman (Compl. 25). Ordman allegedly had "extensive communications" with Chiquita personnel in Colombia, including Keiser, about different violent groups that Chiquita was paying there (Compl. 161).   He allegedly knew Keiser was Chiquita's representative to the AUC, and that the AUC was a violent terrorist organization using paramilitary terrorist tactics to defeat left-wing guerilla groups in the Colombian banana-growing zones (Compl. 161).   Ordman allegedly participated in the decision to pay the AUC, and participated in devising procedures to better conceal the nature and purpose of AUC payments (Compl. 174).

Two weeks after Department of Justice officials told Individual Defendant Olson and Chiquita's director that the company's payments to the AUC were illegal and could not continue, Ordman and another Chiquita employee traveled from Colombia to meet with Chiquita executives in Costa Rica to discuss continuing payments to the AUC.   During that meeting, the

group called an in-house Chiquita attorney in Cincinnati to inquire whether they should continue making payments to the AUC (Compl 185, 186).  The Chiquita attorney told them to continue the payments, and three days later Ordman and other Individual Defendants implemented the directive and resumed regular payments to the AUC (Compl. 187).    At all relevant times, Ordman allegedly knew that the AUC was a violent terrorist organization, and knew it was designated a Foreign Terrorist Organization by the United States government.

### a.  **Personal Jurisdiction**[3]

Ordman contends, first, that he is not subject to personal jurisdiction in Ohio.  He avers he is not a resident of Ohio and further avers to a number of indicia relevant to exclusion of general personal jurisdiction [DE 1482, Ex. A].   The Porter Plaintiffs contend that  Ordman is properly subject to personal jurisdiction under the Ohio long-arm statute, Section 2307.382(A), which provides in relevant part:

> A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
>
> (a)  Transacting any business in this state.

Plaintiffs argue this section of the Ohio long-arm has been broadly interpreted by the Ohio Supreme Court to encompass any dealings or business transactions directed to or conducted in the Ohio forum, and is not necessarily confined to contractual dealings.   *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (Ohio 1990);  *ALTA Analytics, Inc. v. Muuss*, 75 F. Supp. 2d 773, 779 (S.D. Ohio 1999) (non-resident employee contract dispute).  They argue that Ordman's conduct falls within the ambit of this provision, because he was

---

[3] Individual Defendant Charles Keiser also challenges personal jurisdiction in the Ohio forum.   The Court does not address Keiser's personal jurisdiction challenge in that forum because it has concluded that the Ohio Porter case is properly dismissed against him under the first-filed rule.  Keiser is already named as an  Individual Defendant in the Florida *Porter* case, where he is not contesting personal jurisdiction over him.

employed by and provided services to Chiquita at its Ohio headquarters over the course of the AUC payment program, and he communicated with executives in Ohio regarding the continuation of payments to the AUC.

Defendant contends the "transaction of business" provision of the Ohio long-arm should not be interpreted so broadly. It observes that jurisdiction over a corporate officer does not automatically follow jurisdiction over the corporate employer, *Balance Dynamics Corp v. Schmitt*, 204 F.3d 683, 698 (6th Cir. 2000), and that an independent basis for the exercise of jurisdiction must be found to justify the exercise of personal jurisdiction over a non-resident employee.

In *Kentucky Oaks Mall v. Mitchell's Formal Wear*, 53 Ohio St. 3d 73, 559 N.E.2d 477 (1990), the Ohio Supreme Court held that the broad wording of the "transaction of business" segment of the Ohio long-arm allows jurisdiction over non-residents who are transacting any business in Ohio. As stated by the Court, to "transact" in this context means "to prosecute negotiations; to carry on business; to have dealings… [t]he word embraces in its meaning the carrying on or prosecution of business negotiations but it is a broader term than the word 'contract' and may involve business negotiations which have been either wholly or partly brought to a conclusion…." *Id.* at 480.

Here, Plaintiffs allege that Ordman communicated with Chiquita personnel in Ohio regarding the AUC payments, and he took direction from Chiquita's Ohio-based in-house counsel to continue the payments after Chiquita was told by the government to stop. To the extent Ordman was thus allegedly involved in implementing and continuing the illicit AUC payment scheme, following direction from Ohio-based legal counsel, his conduct may be deemed "transacting" business in Ohio. Further, to the extent Plaintiffs claim the decision to

continue paying the AUC contributed to the deaths of Plaintiffs' decedent, and kidnapping and torture of Jorge Porter, it may also be said that their TVPA causes of action arise from that transaction of business.   Under such circumstances, the first prong of the Ohio long-arm statute would be met.

Since Ohio law would permit this Court to exercise personal jurisdiction, the next step is to determine whether the exercise of such jurisdiction is consistent with federal due process requirements.

As "Ohio law does not appear to recognize general jurisdiction over non-resident defendants, but instead requires that the court find specific jurisdiction under one of the bases of jurisdiction listed in Ohio's long-arm state," *Conn v. Azkharov,* 667 F.3d 705, 717 (6th Cir. 2012), the Court will analyze whether it has personal jurisdiction over Ordman under the specific  jurisdiction prong of the due process inquiry.   The Sixth Circuit has articulated a three-part test for determining  whether the exercise of specific personal jurisdiction comports with due process:

> First, the defendant must purposely avail himself of the privilege of acting in the forum state, or causing a consequence in the forum state.  Second, the cause of action arises from the defendant's activities there.   Finally, the acts of the defendant or consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Kerry Steel, Inc. v. Paragon Indus*., 106 F.3d 147, 150 (6th Cir. 1997) (quoting *Southern Mach. Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir. 1968).

The Court is satisfied that the Individual Defendant Ordman would be subject to personal jurisdiction under the *Mohasco* test.  He did not merely communicate with Ohio-based Chiquita executives on unrelated business activities aimed at a general population.   Instead, his relationship with Chiquita was directly tethered to his oversight of Chiquita's Colombian operations, and his interface with Ohio-based counsel was  targeted at a specific transaction – the

continuation of AUC terrorist payments in Colombia. By continuing to coordinate and implement the AUC payment system, as the "bottom line" operational manager of Chiquita's Colombian activities, Ordman undertook a continuing obligation to implement the company's alleged illicit activity, which would create a "realistic and foreseeable impact on the commerce of the forum state," *Weldon F. Stump & Co. v. Delta Metalforming Co.*, 793 F. Supp. 157, 159 (N.D. Ohio 1992), and establish a substantial connection with that state.

Hence, Ordman's relationship to and interface with an Ohio-based corporation was not a "one-shot affair," but was part of an ongoing employment relationship that supports personal jurisdiction. *Compuserve, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996). Recognizing it is the "quality" of Ordmans' contacts and not their "number" with Ohio that counts, *Id.* at 1265, and that the TVPA causes of action asserted against him arose, at least in part, from Ordman's implementation of telephone directives issued from Ohio based counsel to him, the Court finds the exercise of personal jurisdiction over Ordman to be a fairly foreseeable consequence of his relationship with Ohio-based Chiquita. The Court also finds that the exercise of that jurisdiction comports with the due process requirements of reasonableness and fairness.

Based on all of the foregoing, Ordman's motion to dismiss for lack of personal jurisdiction is denied. With this conclusion, the Court finds it unnecessary to address Plaintiffs' alternative contention that Ordman is subject to personal jurisdiction in Ohio under Fed. R. Civ. P. 4(k)(2).

### b. Failure to State a Claim

Following the *Porter I* secondary aiding and abetting analysis, the Court finds the allegations asserted against Ordman sufficient to state a claim for aiding and abetting liability under the TVPA and shall accordingly deny Defendant Ordman's 12(b)(6) motions to dismiss.

2.  **Olson, Kistinger, Tsacalis, Warshaw**

Individual Defendants Olson, Kistinger, Tsacalis and Warshaw do not contest personal jurisdiction.  Additionally, because the aiding and abetting liability allegations of the original Florida Porter complaint are essentially the same as to them, they do not meaningfully challenge the allegations in support of secondary liability in Ohio *Porter* case.   However, they urge dismissal of the Ohio Porter TVPA claims as duplicative, presumably seeking to invoke  the "first-to-file" rule governing duplicative lawsuits in federal courts of equal rank.

The "first-to-file" rule is a prudential doctrine which evolved from the need to manage overlapping litigation across multiple districts.  It provides that "when actions involving nearly identical parties and issues have been filed in two different district courts, 'the court in which the first suit was filed should generally proceed to judgment.'" *Baatz v Colombia Gas Transmission, LLC*, 814 F.3d 785 (2016), citing *Certified Restoration Dry Cleaning Network, LLC v Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) and *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L.Ed. 2d 483 (1976) ("As between federal district courts… the general principle is to avoid duplicative litigation"). The rule encourages comity among federal courts of equal rank, conserves judicial resources by minimizing duplicative or piecemeal litigation, and protects the parties and courts from the possibility of conflicting results. *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assoc., Inc.,* 16 Fed. Appx.  433, 437 ( 6th Cir. 2001) (unpub); *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728-29 (5th Cir. 1985); *EEOC v. Univ. of Pa.*, 850 F.2d 969, 977 (3d Cir. 1988).

To be "duplicative," the suits must involve "nearly identical parties and issues."  *Baatz v. Colombia Gas Transmission, LLC*, 814 F.3d 785 (6th Cir. 2016).  This assessment is generally

10

guided by three criteria: (1) chronology of events (i.e. which suit was filed first) (2) similarity of the parties involved, and (3) similarity of the issues or claims at stake. *Attrade, Inc. v. Uniweld Products, Inc.* 946 F.2d 622, 625 (9th Cir. 1991). The first- to- file rule presumptively applies if each of these three factors is satisfied. *Baatz,* 814 F.3d at 789. However, the presumption may be overcome if the court finds equitable considerations-- such as inequitable conduct, bad faith, pursuit of anticipatory suits or forum shopping—that may justify overriding the rule in a particular case. *Certified Restorations,* 511 F.3d at 551-52.

In this case, the Florida *Porter* and Ohio *Porter* complaints plainly allege and encompass substantially the same parties and issues, with Florida *Porter* filed first. So, the first–to- file rule presumptively applies in favor of the Florida litigation. The Court has also considered general equitable considerations touching on any improper motivation behind the second-filed Ohio suit (e.g. bad faith or forum shopping), and while it finds none which would justify overcoming the presumption, it is yet within the discretion of the court to decline to apply the first-to-file rule. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538 (6th Cir. 1978). Considering the unique procedural history, jurisdictional issues and pleading overlap involved in these cases, the equities support a finding that this is one of those rare cases.

Here, the second-filed Ohio *Porter* suit has already been transferred to the undersigned as a "tag-along" action in this MDL proceeding, and this Court has already consolidated the Ohio *Porter* case with the other member cases subsumed within this MDL proceeding. In these circumstances, the underpinning rationale for the first-to-file rule has absolutely no play: There is no judicial economy to be gained by dismissing the Ohio *Porter* case in favor of the Florida *Porter* case, because both cases are before this Court for resolution of all pretrial proceedings; there are no comity considerations between courts of equal rank because this Court

presides over both cases; and there is no specter of inconsistent results where, after a determination of the current motions to dismiss, there will be no overlapping of parties.

Because the policy objectives underpinning the first-to-file rule are not present in the unique procedural context of this case, and because there is some doubt and ongoing debate as to the existence of personal jurisdiction over Olson, Tsacalis and Kistinger and Warshaw in the Florida forum, where these Defendants continue to press their jurisdictional challenges, the Court shall, in the exercise of its discretion, decline to apply the first-to-file rule as to these Defendants.

Further, having previously sustained the sufficiency of the specific factual allegations pled in support of secondary aiding and abetting liability as to Individual Defendants Olson, Tsacalis and Kistinger in *Porter* I, the Court shall also deny the Rule 12(b)(6) motion to dismiss the essentially equivalent TVPA claims asserted against these three Individual Defendants in Ohio *Porter*.

### 3.   Defendant Warshaw-Rule 12(b)(6)

Like the Florida *Porter* Original Complaint, the Ohio *Porter* Complaint generally alleges that Stephen Warshaw knew of the AUC payments, knew of AUC's violent history, and participated in Chiquita's decision to make payments, approve payments or conceal payments to the AUC.   Porter Plaintiffs also allege, as in Florida *Porter*, that Warshaw was in attendance at the executive meeting where procedures for approving and making furtive payments to the AUC were discussed and devised (Compl. 162).   The Porter Plaintiffs do not allege that Warshaw personally approved of making or continuing payments to the AUC, or that he was personally involved in implementing any of the AUC payment or concealment procedures.   (Compl. 163-164).

The Porter Plaintiffs do allege that Warshaw was in attendance at a meeting of the Audit Committee (of which he was not a member) when the continuation of payments to the AUC was approved, and do allege that Warshaw attended meetings in 1997 and 1998 at which he and other Chiquita executives disclosed AUC payments to the convivirs (Compl. 163, 164). While Warshaw's knowledge of the AUC payments may certainly be inferred from these allegations, they do not support the inference that he actively participated in, or aided and abetted, the illicit payment scheme in any actionable fashion. *See In re Chiquita Brands International Inc. Alien Tort Statute and Shareholder Derivative Litigation,* 190 F. Supp. 3d 1100, 1119 (S.D. Fla. 2016) (conclusory allegations of knowledge and approval by corporate officers insufficient to plausibly establish requite "mens rea" element or "actus resus" element of aiding and abetting liability under TVPA). The Court thus agrees that the allegations against Warshaw are insufficient to establish secondary aiding and abetting or conspiracy liability[4] under the TVPA, and shall dismiss the TVPA claims asserted against him in Ohio *Porter* with prejudice.

### 4. Defendants Chiquita, Keiser and Lindner

As to Defendant Chiquita, and Individual Defendants Keiser and Lindner (who did not contest personal jurisdiction in Florida), the Court finds that the Ohio *Porter* action is appropriately dismissed under application of the first-to-file rule (finding no equities that would justify a departure from it as to these defendants). Thus, the Court grants the motion to dismiss the Ohio *Porter* complaint as to these Defendants, without prejudice to Plaintiffs' election to pursue their

---

[4] The Ohio *Porter* Complaint alleges that acts of violence were committed in a conspiracy with the AUC, but does not allege when the alleged conspiracy was created, does not allege the aim of conspiracy, and does not identify the alleged participants in the conspiracy (Compl 278). It also fails to describe how Warshaw allegedly agreed to and contributed to its aims. (Unlike the Florida *Porter* Complaint, the Ohio *Porter* Complaint does not even allege that Keiser, on behalf of Chiquita, met with and entered into an agreement with the AUC, pursuant to which Chiquita allegedly agreed to pay the AUC for protection of its banana plantations and the bloody pacification of banana growing regions where its subsidiary operated).

earlier-filed ATA claims against Chiquita, and their earlier-filed  TVPA claims against Keiser and Lindner in the Florida *Porter* case.

### B.  Florida *Porter*

The Florida *Porter* First Amended Complaint attempts to cure the earlier identified personal jurisdiction defects as  against  Individual Defendants Olson, Kistinger, Tsacalis and Warshaw by expanding the factual allegations in support of a claim of secondary liability stemming from a TVPA conspiracy.  The Court finds it unnecessary to determine the sufficiency of these allegations as to Olson, Kistinger and Tsacalis, because the Court has sustained the exercise of personal jurisdiction over them in Ohio *Porter*.  Thus, their renewed personal jurisdictional challenge in Florida *Porter* is rendered moot.

This leaves for determination the single issue of whether the Florida *Porter* Complaint successfully cures the previous outlined pleading deficiencies, under Rule 12(b)(6), as to Defendant  Lindner.   In addition to allegations in the original Florida *Porter* Complaint, the Florida *Porter* First Amended Complaint makes three new allegations against Lindner: That Lindner "was one of a select group of senior executives who participated in the 1987 and 1988 decision for Chiquita to return to growing fruit in Colombia" (Compl. 164); that he "knew of the unsuccessful attempt in 1988 to avoid making payments to left-wing guerilla  groups by deception; and finally, that "Kistinger reported directly to Lindner about the status of Chiquita's banana-growing operations in Colombia and the company's dealings with the AUC" (Compl. 164).

Because Kistinger was an alleged participant in Chiquita's decision to use the AUC to drive left-wing guerrillas out of the banana-growing regions, and because Kistinger allegedly participated personally in planning and implanting those procedures, the Porter Plaintiffs contend

a "reasonable inference" may be drawn that Lindner knew about Chiquita's dealings with the AUC, presumably based on his superior position to Kistinger and receipt of Kistinger's reports on Chiquita's general Colombian operations.

These allegations do nothing to address "how, when or where" Lindner was put on notice of AUC payment activities, or how he personally participated in implementing or hiding those activities.  The Porter Plaintiffs do nothing more than speculate that Lindner may have learned about AUC payment activities at an unspecified number of meetings at unspecified times and places.[5]  None of these allegations gives rise to a reasonable inference of "substantial assistance" proffered by Lindner which might support the secondary aiding and abetting TVPA liability asserted against him in Florida *Porter*.

Nor does the Court find a sufficient factual premise to sustain secondary conspiracy TVPA liability against Lindner.  The Florida *Porter* First Amended Complaint does not allege that any specific Individual Defendant entered into an agreement with the AUC with intent to further the illicit goal of pacifying the banana growing regions of Colombia.  The allegations simply say an agreement was reached between the AUC and the Individual Defendants collectively, without specific and individualized facts suggesting how each Individual Defendant communicated with the AUC and entered into an agreement to aid the AUC to achieve a bloody pacification of the banana growing regions of Colombia.

As to Lindner specifically, there is no allegation that he ever met with an AUC representative, had knowledge of AUC's status as a terrorist group, or participated in any way in Chiquita's alleged corporate decision to fund it.  Without individualized allegations, Plaintiffs

---

[5] Florida  *Porter* Plaintiffs allege "[o]n information and belief [that]  meetings in furtherance of [the] conspiracy [to violate TVPA] took place in Florida and involved some or all of the Individual Defendants." (Compl. 15).

fail to allege secondary conspiracy TVPA liability against Lindner adequately.   The Florida *Porter* complaint shall accordingly be dismissed with prejudice as to this Individual Defendant.

### III.  CONCLUSION

Based on the foregoing, Defendants' Motions to Dismiss the First Amended Complaint in Florida *Porter* [DE 1483] and to Dismiss the Original Complaint in Ohio *Porter* [DE 1482] are **GRANTED IN PART and DENIED IN PART** as follows:

1.  As to Defendant **CHIQUITA**, the motion to dismiss the ATA claims in  Ohio *Porter* is **GRANTED** under the first-filed rule governing duplicative pleadings.  The Court further affirms its prior ruling, in *Porter I,* on Chiquita's motion to dismiss the ATA claims, and **DENIES** Chiquita's motion to dismiss the ATA claims asserted against it in the Florida Porter First Amended Complaint.

2.  As to Individual Defendant **CHARLES KEISER**, the motion to dismiss the TVPA claims in Ohio *Porter* under the first-filed rule governing duplicative pleadings is **GRANTED**. The Court further affirms its prior ruling, in *Porter I*, on Keiser's motion to dismiss the TVPA claims and **DENIES**  Keiser's motion to dismiss the TVPA claims asserted against him in the Florida Porter First Amended Complaint.

3. As to Individual Defendant **JOHN ORDMAN**, the motion to dismiss the Ohio *Porter* case for lack of personal jurisdiction is **DENIED.**   Defendant Ordman's further  motion to dismiss  the Ohio Porter complaint  for failure to state claim under Rule 12(b)(6), due to insufficient factual allegations in support of secondary TVPA liability, is **DENIED**.

4. As to Individual Defendants **ROBERT OLSON, ROBERT KISTINGER and WILLIAM TSACALIS**, the motion to dismiss the Ohio Porter Complaint as duplicative under

the first-to-file prudential doctrine is **DENIED**, and the motion to dismiss the Ohio Porter TVPA claims for failure to state a claim under Rule 12(b)(6) is **DENIED**.

4. As to Individual Defendant **STEVEN WARSHAW**, the motion to dismiss the Ohio Porter Complaint as duplicative under the first-to-file rule is **DENIED.**   However, Defendant Warhsaw's motion to dismiss  Ohio *Porter* under Rule 12(b)(6) for failure to allege sufficient facts in support of  secondary TVPA liability (aiding and abetting or conspiracy  liability) is **GRANTED** and Defendant Warshaw is **DISMISSED WITH PREJUDICE** as a party defendant to the Ohio Porter proceeding.  A judgment of final dismissal as to this Individual Defendant only shall enter by separate order of the Court.

5. As to Individual Defendant **KEITH LINDNER**, the motion to dismiss the Ohio Porter Complaint as duplicative under the first-to-file rule is **GRANTED**.   As to the Florida Porter First Amended Complaint, Defendant KEITH LINDNER's motion to dismiss for failure to allege  sufficient facts in support  of secondary TVPA liability (under aiding and abetting or conspiracy liability theories) is **GRANTED,** and Defendant Lindner is  **DISMISSED WITH PREJUDICE** as a party defendant to the Florida proceeding.  A judgment of final dismissal in both actions as to this Individual Defendant *only* shall enter by separate order of the Court.

6. In light of the foregoing, the Ohio *Porter* action remains pending as against Individual Defendants Olson, Kistinger, Tsacalis and Ordman *only,* while the Florida *Porter* action remains pending as against Defendant Chiquita and the Individual Defendant Charles Keiser *only*.

7. The parties to both actions are directed to submit a joint proposed trial setting and pretrial scheduling order to the Court within **TWENTY (20) DAYS** of the date of entry of this

Order.

**DONE AND ORDERED** at West Palm Beach, Florida this 8th day of  May,  2018.

KENNETH A. MARRA
United States District Judge

cc.  all counsel