# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-01916-MD-MARRA

IN RE: CHIQUITA BRANDS
INTERNATIONAL INC. ALIEN TORT
STATUTE AND SHAREHOLDERS
DERIVATIVE LITIGATION
_____/

**This Document Relates To:**

**ATS ACTIONS**

**08-80421-CIV-MARRA (N.J. Action) (*Does 1-11*)**
**18-80248-CIV-MARRA (Ohio Action)**
_____/

## ORDER AND OPINION
## DENYING NEW JERSEY PLAINTIFFS' MOTION
## FOR CLASS CERTIFICATION [DE 2290]

### I.   *INTRODUCTION*

This case involves the claims of thousands of Colombian nationals who allege that they or

their family members were victims of kidnapping, torture, extrajudicial killings or other human

rights abuses during the Colombian civil war at the hands of a violent right-wing paramilitary

group with financial ties to a United States-based corporation.   More specifically, Plaintiffs

contend that Chiquita Brands International, Inc. ("Chiquita') funneled approximately 1.7 million

dollars to the *Autodefensas Unidas de Colombia* (United Self-Defense Groups of Colombia, or the

"AUC").   The AUC is a Colombian terrorist organization believed to have massacred over 100,000

persons in Colombia between 1995 and 2006, including over 10,000 civilians living in the fertile

Uraba and Magdalena regions where Chiquita operated. The funds provided by Chiquita allegedly

enhanced the AUC's terror capabilities and facilitated its killing campaign in the regions where Plaintiffs and their families lived.

After Chiquita's financial relationship to the AUC and other Colombian terror groups gained significant media attention in March of 2007, when Chiquita pled guilty to making payments to a designated terrorist organization and agreed to pay a $25 million fine in criminal proceedings filed in the District of Colombia, thousands of persons whose family members were allegedly brutalized by the AUC filed suit in the United States seeking to hold Chiquita and various of its executive officers accountable for their alleged role in strengthening the AUC killing machinery.[1]

On February 20, 2008, the Judicial Panel on Multidistrict Litigation centralized six cases in this district and assigned the case to the undersigned. The Panel has since continued to transfer cases from around the country. In addition, a number of cases were filed in this District, and the Court combined those cases with the multidistrict cases. At this time, there are approximately nineteen cases left in this MDL litigation, comprised of Colombian common law tort claims against all Defendants and statutory claims under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note,[2] against various Individual Defendants. Cumulatively, roughly 7500 individuals appear as plaintiffs in these remaining cases. Of these, the New Jersey plaintiffs, *Does 1-11*, have filed their claims in a representative capacity, pleading a putative class action on behalf of thousands of other unnamed Colombian citizens victimized by the AUC in the Uraba and

---

[1] Several American families who lost family members to the FARC, a left-wing guerilla group similarly alleged to have received payments from Chiquita, also filed lawsuits in the United States under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a). The ATA cases, originally a subset of cases subsumed within this MDL proceeding, were dismissed based on settlement in early 2018. Case Nos. 08-20641 (*Julin*); 09-80683 (*Pescatore*) and 11-80402 (*Sparrow*).

[2] The TVPA authorizes a civil cause of action against "[a]n individual" for acts of torture and extrajudicial killing committed under authority or color of law of any foreign nation. 28 U.S.C. § 1350 note. For purposes of the TVPA, an individual acts under color of law "when he acts together with state officials or with significant state aid." *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (*per curiam*).

Magdalena regions between 1995 and 2004, the time period over which Chiquita allegedly paid the AUC and its predecessor.[3]

## II.       FACT AND PROCEDURAL BACKGROUND

The factual and early procedural history of this case is described in prior rulings of the Court and will not be repeated here [DE 1110] [DE 1194] [DE 1733].[4]  The more recent procedural chronology of the case, as relevant to the instant motion, is highlighted as follows.

In November 2016, after the conclusion of an initial dispositive motion round, the Court dissolved its previously-entered discovery stay [DE 1197].  It next solicited a proposed scheduling order from the parties governing pretrial procedures and trial dates for the Florida-filed cases, along with a proposed scheduling order governing pretrial procedures in all other cases subsumed within this MDL proceeding [DE 1246].  Following submission of proposed scheduling orders outlining pretrial and trial procedures for the parties' bellwether case selections, on April 11, 2017, the Court entered its original Global Scheduling Order which largely tracked and incorporated  the parties' stipulated terms while resolving a few areas of disagreement [DE 1361].[5] Also in early 2017, the New Jersey Plaintiffs sought leave to file a third amended complaint for the stated purpose of

---

[3] On July 7, 2007, Plaintiffs filed their original complaint in New Jersey, Case No. 07-3406 (JAG) naming Chiquita as well as various fictitious "Moe" corporations and "Moe" individuals as defendants.  The New Jersey Plaintiffs' now operative Second Amended Complaint filed in November 16, 2012 [DE 589] names six specific current or former employees of Chiquita allegedly involved in the AUC decision-making processes.

[4] *In re Chiquita Brands International, Inc. Alien Tort Statute and Shareholder Derivative Litigation,* 190 F. Supp. 3d 1100 (S.D. Fla. June 1, 2016) (dismissing in part and sustaining in part various state law, federal law and foreign law claims against Chiquita and various Individual Defendants);  *In re: Chiquita Brands International Inc. Alien Tort Statute and Shareholder Derivative Litigation*, Case 08-MD-1916-MARRA (S.D. Fla. Nov. 29, 2016) (denying motion to dismiss based on *forum non conveniens*);  *In re: Chiquita Brands International Inc. Alien Tort Statute and Shareholder Derivative Litigation,* 284 F. Supp. 3d 1284 (S.D. Fla. Jan. 3, 2018) (denying motion for summary judgment on Anti-Terrorism Act claims arising out of Chiquita's alleged support of the Fuerzaas Armadas Revolucionarias de Colombia ("FARC")).

[5] On September  20, 2018, the Court entered an Amended Global Scheduling Order [DE 2122], pursuant to the parties' joint requests [DE 1877, 2116], altering various of these deadlines which, again, did not include a provision governing class certification motions.

adding, as named plaintiffs, a sizable group of additional claimants originally travelling as unnamed members of the putative class, in addition to other unspecified "minor clerical changes." On March 27, 2017, the Court denied that motion, citing the advanced stage of the proceeding and imminent scheduling of the matter for trial [DE 1315].

In November 2017, the New Jersey Plaintiffs propounded limited fund class discovery on the Defendant Chiquita, and, failing a satisfactory response, moved to compel the production of that material. The motion to compel was denied as untimely in an Omnibus Order entered March 2018 [DE 1856]. Five months later, on August 17, 2018, the New Jersey Plaintiffs first sought leave to file a class certification motion and moved to amend the global scheduling order to incorporate a corresponding briefing schedule [DE 2054] – an item neither side addressed in the originally-proposed scheduling orders. The Court granted this motion, over Defendants' objection to its timeliness, and imposed a briefing schedule which tracked that governing the dispositive motion briefing agenda then in place for selected bellwether cases on track for trial [DE 2246].

Accordingly, on February 15, 2019, the New Jersey Plaintiffs filed the instant motion seeking certification of a "predominance" class under Rule 23(b)(3), or alternatively, an "issue" class under Rule 23(c)(4), against the Defendant Chiquita and various Individual Defendants.[6] In support of the motion, Plaintiffs have filed: (1) the affidavit of counsel Melissa Vahsling, purporting to establish the proposed class representatives' status as AUC-victims, based on Attorney Vahsling's asserted  "personal knowledge" and review of "highly confidential documents" regarding the proposed class representatives. This affidavit, however, does not explain the basis for any personal knowledge of the facts recited, nor does it specifically identify the

---

[6] Plaintiffs also purport to reserve the right to seek certification of a limited fund class under Rule 23(b)(1)(B) at "some later date" if they are ultimately successful in obtaining information regarding Chiquita's assets and the sufficiency of funds available to pay a judgment in this case [DE 2290, at pp.18-19, f.n. 11].

secondary sources on which the statements are presumably based.  It does refer to a review of "highly confidential documents," described by Bates-stamp number, which purportedly show that Jane Doe 7 and John Doe 7, the proposed class representatives, have "registered" as victims of the AUC with the Colombian authorities under its Justice and Peace Law program, and that the Colombian authorities "have opened an investigation" into the murders of their respective family members.  In the case of John Doe 7, the affidavit recites that "an AUC paramilitary has taken responsibility for [his son's] murder during the Justice and Peace process."[7]  Both representatives are alleged to have received administrative payments from the Colombian government as a result of their claims and the apparently still "open investigation[s]" into the murders of their family members [DE 2290-2];  (2) the affidavit of counsel Sean Powers, purporting to authenticate and introduce the following evidentiary matters in support of the class certification motion: (a) the

---

[7] The affidavit does not identify the paramilitary who allegedly took responsibility, nor reference the secondary source or sources from which the assertion is drawn.  It is therefore not possible to decipher from this cryptic reference whether a person with personal involvement accepted responsibility for this particular murder, or if this is a reference to command responsibility accepted by an AUC leader during the Justice and Peace processes.  As described at the deposition of AUC leader Salvatore Mancuso, at the commander level, this process involved a general acceptance of responsibility for acts of subordinate combatants and was not necessarily based on direct participation or even knowledge of the specific underlying crimes.  As Mancuso testified, "There are events in which I did not directly participate and of which I do not have knowledge.  I have to assume responsibility when I'm in the chain of command. If some one of those were combatants under my command, we're responsible for that… [S]pecify for me the time and the place and that way I would be able to certify whether or not someone from the Autodefensas under my command gave a deposition, declared whether or not he was there at that time …[d]eclare whether or not he was responsible." [Deposition of Salvatore Mancuso, June 15, 2018] [DE  2399-2, pp. 109-110]

 Plaintiffs' motion, citing the unsworn allegations of their underlying complaint, amplifies the circumstances attending the murder of John Doe 7's son, contending that "John Doe 7 confronted the AUC about the killing of his son, and was told by the AUC that "the AUC were guarding the farm and were responsible for preventing thefts." [DE 2290, p. 6, citing Complaint DE 589 ¶ 204].  Setting aside the hearsay issues with this statement, for purposes of the present relaxed evidentiary setting, this statement is not reasonably interpreted as an acknowledgment of AUC responsibility for this specific death and is of limited probative value on the issues presented by the current motion.

Similarly, with regard to Jane Doe 7, the motion cites to allegations of the underlying complaint for the proposition that "the AUC arrived at the home [the victim] shared with Jane Doe 7, dragged him from the house, and killed him with a knife." [Motion DE 2290, p. 5, citing Complaint DE 589 ¶215]. It does not explain how this crime was attributed to the AUC or cite any secondary source material implicating its involvement.

United States government's sentencing memorandum from the 2007 D.C. criminal case; (b) the Factual Proffer entered in the D.C. criminal case; and (c) excerpts from reports generated by Plaintiffs' retained experts, Professor Oliver Kaplan, Professor Terry Lynn Karl and Col. Carlos Alfonso Velasquez Romero [DE 2290-3].

Defendant Chiquita and the Individual Defendants ("Chiquita Defendants") have filed a Response in Opposition to the Motion [DE 2323], as have the ATS Plaintiff groups represented by Attorney Wolf [DE 2294]. The New Jersey Plaintiffs have filed their Reply [DE 2399]. Having carefully reviewed the motion, proffered evidentiary support, and underlying briefing of all parties, the Court finds the prerequisites to class certification have not been established in this case and denies the motion for class certification.

## III.    NEW JERSEY PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### A.  THE PROPOSED CLASS

The New Jersey Plaintiffs seek certification of a "predominance" class under Rule 23(b)(3) consisting of the following individuals:

> All persons who were the victims of (or who are the relatives and/or legal representatives of decedent victims) of extrajudicial killing; forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced displacement; crimes against humanity; or crimes against civilians constituting war crimes committed by the AUC in the banana-growing regions of Uraba and Magdalena from 1995 through 2004.

[DE 2290, Motion p. 5]. The proposed class representatives are "Jane Doe 7," whose husband (John Doe 11) was a banana worker and union leader allegedly killed by the AUC in June 1999,

and "John Doe 7," whose son (John Doe 8) was a banana worker allegedly killed by the AUC in

2000 after being accused of stealing from a banana farm in Uraba [DE 2290, Motion pp. 5-6].

The New Jersey Plaintiffs alternatively seek certification of an "issues" class under Rule

23(c)(4), proposing certification of the following asserted common issues:

a.   Was the AUC a violent, right-wing organization in Colombia that engaged in the
     kidnapping and murder of civilians?

b.   Did Chiquita make more than 100 payments totaling more than $1.7 million to the
     AUC, through Chiquita's subsidiary Banadex, from at least 1997 through 2004?

c.   Were these payments reviewed and approved by senior Chiquita executives?

d.   Did the AUC use convivirs as front organizations to collect money?

e.   Did the AUC instruct that Banadex should make payments to convivirs?

f.   In 2003 and 2004, did Chiquita continue to pay the AUC against the advice of its
     outside counsel, even after being advised that the payments were illegal under U.S.
     law?

[DE 2290, p. 23] [DE 2290-1].

### B.  PLAINTIFFS' FACTUAL PROFFER

#### 1.  Report of Professor Oliver Kaplan[8]

The university affiliation and general credentials of Professor Kaplan are not apparent from

the limited excerpts of the report which Plaintiffs have supplied as an attachment to the affidavit

---

[8] The proffered excerpts from the Kaplan report (pp. 1, 10-11, 19-24, 26-27, 41, 44 and 53]   do not appear as sworn
expert testimony supplied via affidavit or deposition.   Although a floating signature of "Oliver Kaplan," is appended
to the excerpted pages, there is no attestation block averring that the contents are sworn under penalties of perjury.
Although not submitted as sworn testimony, and although the contents of the report itself - to the extent it relays
second and third-hand information - have been challenged by Defendant as pure hearsay which should be excluded
from the analysis, the Court shall accept and consider the substantive contents of the excerpts  in this narrow context,
recognizing that "the Federal Rules of Evidence are not stringently applied at the class certification stage because of
the preliminary nature of such proceedings." See *Fisher v. Ciba Specialty Chemicals Corp.,* 238 F.R.D. 273, 279 (S.D.
Ala. 2006) and cases cited *infra.*   That is, in the context of determining class certification, the evidence rules are
relaxed, and courts may consider evidence that may not ultimately be admissible at trial. *Shamblin v. Obama for
America,* 2015 WL 1909765 (M.D. Fla. 2015).

of counsel (Attorney Sean Powers).   Kaplan seeks to draw a causal link between Chiquita's financial ties to the AUC and harm to the civilian population in the Uraba and Magdalena regions of Colombia, urging a causal inference based on any given individual's geographical connection to areas laboring under an active AUC presence.   Kaplan does not purport to establish a nexus between any specific human loss and an AUC operative. Rather, he seemingly advances a circumstantial theory of causation based on the AUC's estimated proportionate responsibility for the death toll in these regions: Kaplan generally states in this regard, "Although the AUC was not responsible for all violence in Colombian or in the Uraba or Magdalena areas, they were responsible for a majority of it." [DE 2290-6, p.6].[9]

After synthesizing a large body of historical data regarding the formation, organizational hierarchy and vociferous growth of the  AUC from the 1960s forward,[10] Professor Kaplan opines on the phenomenon of what he describes as "signature" AUC-killing methodologies – public and especially gruesome displays of extra-lethal violence and killings, often involving live bodily dismemberment, decapitations, chain-saw quarterings and the mutilation and abuse of corpses (e.g. playing soccer with decapitated heads)   --- all designed to instill terror in  rural populations and discourage association, sympathy or support for  guerilla insurgents.   To this end, Kaplan states the  AUC  typically  targeted  persons  associated  with  any  progressive  or  social  movement

---

[9] The Kaplan report cites secondary sources for the proposition that 1,982 killings occurred in context of "massacres" (more than four people killed in single attack) between 1980-2012 in Colombia, and of these, 59% (1,166) are attributed to paramilitaries, 17 % (343) to guerillas, and 9 % (170) to state forces.  He also cites secondary sources for the proposition that paramilitaries were responsible for at least 5,311 murders and 565 acts of torture in the Uraba area alone.  Combining Uraba with the Santa Marta region, he contends at least 10,406 civilians were "killed, massacred or disappeared" in this time frame, and notes that "[i]n many cases, the victims were buried in mass graves, most of which have yet to be exhumed or the casualties identified." [DE 2290-6, p. 10].

[10] Kaplan estimates the AUC grew from an umbrella organization formulated in 1997 with approximately 1,000 fighters and arranged into seven blocs, to a total of 37 blocs and a total troop strength of 31,671 by the time of its negotiated demobilization between 2003-2006.  According to Kaplan, this made it the "largest non-state armed actor in Colombia" in that time frame. [DE 2290-6, p. 3].

organizations, including "leftist politicians and activists associated with the Patriot Union party",

"banana workers and unionists," as well as "suspected guerilla militia members." He notes,

however, that much of the AUC's violence was "poorly targeted," resulting in many "errors"

leading to the death of nonviolent and peaceful civilians.   In other cases, the widespread

indiscriminate killing of civilians was an intentional part of a pernicious strategy known as

"draining the sea" – wiping out broad swathes of rural civilian populations in a "scorched earth"

policy designed to flush out the insurgent "fish."   In the end, the AUC negotiated an agreement

with the Colombian government to demobilize in exchange for legal benefits (reduced prison

sentences) conferred under the Justice and Peace Law.[11]

### 2.   *Report of Professor Terry Lynn Karl*

Excerpts from the report (three pages) of Professor Terry Lynn Karl (Stanford University)

are also submitted in support of the Plaintiffs' motion [DE 2290-8].  These excerpts also bear an

attached floating signature without an attestation block [DE 2290-8, p. 6]. The Karl report focuses

on the symbiotic relationship between Chiquita and the AUC, discussing financial and other

contributions allegedly made by Chiquita to the paramilitaries, and strong-arm labor-control

assistance exchanged in return.

### 3.   *Report of Colonel Carlos Alfonso Velasquez Romero*

Plaintiffs also submit the 25-page report of Carlos Alfonso Velasquez Romero, a Professor

of Political Theory at the University of La Sabana and a retired officer of the Colombian Army

(serving between 1970-1996).  This report, submitted in affidavit format,[12] addresses whether links

---

[11]  Professor Karl reports that "[a]pproximately 3,000 people, 10% of the paramilitary forces entering into the demobilization programs, began the Justice and Peace Law process." [DE 2290-8, p. 3].

[12]  This document, dated December 23, 2018, bears an attestation block, but reflects no visible signature mark [DE 2290-9].

existed between the Colombian Military forces and the paramilitaries, including the AUC, from the time of the paramilitaries' initial emergence (1980-1990) to their later "political legitimization" (1994-2002). It also discusses the extent to which these entities coordinated joint activities over time, and the negotiated demobilization process which ultimately took place (2002-2010).

IV.     DISCUSSION

A.  RULE 23 STANDARD

Class action litigation is allowed under Federal Rule of Civil Procedure Rule 23 as "an exception to the usual rule that litigation is conducted by an on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2550 (2011). To successfully move for class certification, the party seeking certification must satisfy an implicit ascertainability requirement, prove all four pre-requisites listed at Rule 23(a), and prove at least one of the requirements set out in Rule 23(b) by a preponderance of the evidence. *Little v. T-Mobile USA, Inc*., 691 F.3d 1302, 1304 (11th Cir. 2012); *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256 (11th Cir. 2009); *Klay v. Humana, Inc.,* 382 F.3d 1241, 1250 (11th Cir. 2004).

A district court has wide discretion in determining a Rule 23 motion, *Birmingham Steel Corp v. Tenn. Valley Authority*, 353 F.3d 1331, 1335 (11th Cir. 2003), but in the exercise of that discretion it must conduct a "rigorous analysis" in determining whether Rule 23's pre-requisites have been met. *Wal-Mart*, 131 S. Ct at 2551; *Gen. Tel. Co of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982). This means the court must go beyond the pleadings in order to "understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of the certification issues." *Unger v. Amedisys Inc*., 401 F.3d 316, 321 (5th Cir. 2005). At this preliminary stage, the Court should not pass on the merits of the claims, but because the merits and the Rule 23 prerequisites are often intertwined, some overlap is

unavoidable. *Cooper v. Southern Co.*, 390 F.3d 695, 712 (11th Cir. 2004); *Heffner v. Blue Cross and Blue Shield of Alabama, Inc*., 443 F.3d 1330, 1337 (11th Cir. 2006).

The prerequisites of Rule 23(a) require the party seeking certification to show, by a preponderance of the evidence, that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the proposed class members, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). *See Valley Drug Co. v. Geneva Pharmaceuticals, Inc*., 350 F.3d 1181, 1188 n. 15 (11th Cir. 2003); *Brown v. Electrolux Home Products, Inc.,* 817 F.3d 1225, 1233 (11th Cir. 2016). These requirements are commonly referred to as (1) numerosity; (2) commonality; (3) typicality, and (4) adequacy of both class plaintiffs and class counsel. *Cooper v. Southern Co.*, 390 F.3d 695, 711 n. 6 (11th Cir. 2004).

Once these prerequisites are satisfied, class certification is permissible only if plaintiffs also satisfy one or more prongs of Rule 23(b). Here, Plaintiffs invoke Rule 23(b)(3), which allows a class to be certified if both common questions of law or fact predominate over questions affecting only individual members, and a class action is superior to other methods for a fair and efficient adjudication of the controversy. The Rule 23(b)(3) predominance inquiry "tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L.Ed.2d 689 (1997).

This standard is similar to the commonality requirement of Rule 23(a), but is more demanding, and mandates particular caution where "individual stakes are high and disparities

among class members great." *Id.; Moore v. PaineWebber, Inc*., 306 F.3d 1247, 1252 (2d Cir. 2002). A plaintiff cannot satisfy the predominance requirement if, as a practical matter, resolution of common issues will "break [] down into an unmanageable variety of individual legal and factual issues." *Cooper*, 390 F.3d at 722 (quoting *Andrews v. American Tel. & Tel. Co*., 95 F.3d 1014, 1023 (11th Cir. 1996)).

The predominance inquiry begins with consideration of the elements of the underlying cause of action, *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 131 S. Ct. 2179, 2184, 180 L.Ed.2d 24 (2011), and requires the court to consider "how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.,* 319 F.3d 205, 218 (5th Cir. 2003). It does not mean that a plaintiff seeking class certification must prove that each "element [] of his or her claim is susceptible to class wide proof, *Amgen Inc. v. Ct. Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S. Ct. 1184, 1196, 185 L. Ed.2d 308 (2013). It does mean that only a small amount of individualized proof or legal analysis be necessary to adjudicate the class members' claims after adjudication of the class-wide issues. *Klay v. Humana, Inc.,* 382 F.3d 12451, 1255 (11th Cir. 2004), *abrogated in part on other grounds by Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Financial Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014). If the addition of more plaintiffs is likely to require presentation of significant amounts of new evidence, this strongly suggest that individual issues are important; conversely, if the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate. *Id.*

## B. CLASS CERTIFICATION ISSUES

Plaintiffs argue that they meet the four requirements of Rule 23(a). They further assert that this case is maintainable as a class under Rule 23(b)(3) because common questions of law and fact

predominate over questions affecting individual plaintiffs, and because the class action mechanism presents a superior method for resolution of these claims. They contend that the liability questions involve common questions of law based on the same set of operative facts (Chiquita's interface and financial relationship with the AUC), and that variations in proofs on causation (AUC-link) and individual damages do not defeat the elements of commonality and predominance.

Chiquita argues that Plaintiff's motion fails to establish Rule 23's ascertainability, numerosity, predominance and superiority requirements, in addition to other alleged defects relating to the timing and scope of the motion.   The Wolf Plaintiffs also challenge the ascertainability of the proposed class, and further complain that there are conflicts of interest between proposed class counsel, the putative class members, and existing named Plaintiffs which impede Rule 23 certification.

This opinion first addresses certification issues pertaining to ascertainability.  Because the New Jersey Plaintiffs do not show an ascertainable class, the Court does not find that Plaintiffs' claims present a viable vehicle for class certification and concludes that the motion is appropriately denied on this basis alone.   Assuming, *arguendo*, that the class definition could be refined to avoid this impediment, the Court alternatively considers whether Plaintiffs have met their burden of proving the prerequisites of Rule 23(a), in addition to the predicate for a "predominance" class under Rule 23(b)(3) or an "issues" class under Rule 23(c)(4).  Following careful consideration of the parties' arguments and proffered evidence on these points, the Court concludes that Plaintiffs do not meet this burden and that the motion is appropriately denied on this alternative basis as well.

C. *ASCERTAINABILITY*

The existence of an ascertainable class is an implied prerequisite of Fed. R. Civ. P. 23, and the burden is on the party seeking certification to show that the proposed class is clearly ascertainable. *Little v. T-Mobile USA, Inc*., 691 F.3d 1302, 1304 (11th Cir. 2012); *Heaven v. Trust Co. Bank*, 118 F.3d 735, 736 (11th Cir. 1997). This means the class must be defined "by reference to objective criteria," and that the analysis of those criteria is administratively feasible, i.e. the procedure for identifying class members must be a "manageable process that does not require much, if any, individual inquiry." *Bussey v. Macon County Greyhound Park, Inc*., 562 Fed. Appx. 782, 787 (11th Cir. 2014) (unpub), citing Newberg on Class Actions § 3.3 p. 264 (5th ed. 2012). *See also In re Nexium Antitrust Litigation*, 777 F.3d 9, 19 (1st Cir. 2015); *Brecher v. Republic of Argentina,* 806 F.3d 22 (2nd Cir. 2015); *Perez v. Metabolife Intern., Inc.,* 218 F.R.D. 262, 269 (S.D. Fla. 2003); *Noble v. 93 University Place Corp*, 224 F.R.D. 330, 338 (S.D.N.Y. 2004).

In this case, Defendants contend the class definition proposed by Plaintiffs does not allow for an objective, administratively feasible determination of class membership because it would require individualized fact-finding on the AUC's responsibility for each alleged injury or death, as well as an individualized finding on Chiquita's financial connection to the AUC unit or operative allegedly involved in each specific crime.

Plaintiffs counter that identification of AUC victims is susceptible to determination by reference to objective, reliable criteria, and propose, first, reliance on government records generated in Colombian Justice and Peace Law processes as a method for identifying class membership. In other cases, they propose reliance on a combination of self-identifying

affidavits,[13] and the proffered expert testimony (Kaplan) identifying geographic areas of an active AUC presence and "signature" marks of AUC killing methodologies.

Chiquita complains that the Kaplan report is pure hearsay, the repetition of data collected by second or third parties which should be disregarded in its entirety as incompetent evidence of the matters asserted.   Without ruling upon the admissibility of the contents of the Kaplan report, the Court recognizes the potential hearsay problems associated with it.   *See e.g. Gilmore v. Palestinian Interim Self-Government Authority,* 53 F. Supp. 3d 191 (D.D.C. 2014) (at summary judgment stage, excluding statements of armed PLO faction member as well as pages from Israeli Ministry of Foreign Affairs website), *aff'd,* 843 F.3d 958 (D.C. Cir. 2016).   Notwithstanding those potential problems, the Court accepts and considers its substantive content here, recognizing that relaxed evidentiary standards appropriately apply in this setting where the court, and not a jury, is resolving disputed factual issues and is doing so for the very limited purpose of determining whether the prerequisites to class certification have been satisfied.

The more significant problem with the Kaplan report is its probative value: Professor Kaplan's theory of geographic probabilities does not offer an objectively reliable and administratively feasible method for determining class membership.   After synthesizing historical data on the growth and presence of the AUC, Kaplan notes "the great overlap between the sites of bellwether victim killings and paramilitary active presence" as well as "paramilitary commander

---

[13] In support of the self-identifying affidavit approach, Plaintiffs urge reliance on the relaxed ascertainability analysis used in *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996), permitting use of self-identifying affidavits to determine class membership in a war crime case.   Plaintiffs recognize an unpublished panel decision from the Eleventh Circuit following a different path, adopting a strict ascertainability requirement and holding that ascertainability cannot be met through self-identification, by affidavit, without first establishing that self-identification is administratively feasible and not otherwise problematic.   *Karhu v. Vital Pharmaceuticals, Inc*., 621 Fed. Appx. 945 (11th Cir. 2015) (unpub), However, Plaintiffs argue *Karhu* is not binding precedent and urge this Court to embrace the relaxed ascertainability approach followed in the Ninth Circuit.   This Court declines the invitation to follow this route, finding the *Karhu* approach in better keeping with this Court's obligation to conduct a "rigorous analysis" of  Rule 23's implied and explicit pre-requisites for certification of a class.

testimonies" indicating "that they operated in the same areas and municipalities where the bellwether victims were victimized."  In other words, he infers a causal link based on geographical proximity to AUC activity.  He does not tie any specific victims to an AUC bloc or operative, for example, through testimony of involved parties or official government or judicial records; and without such external indicia of reliability for identification of victims, he does not offer a reliable, administratively feasible method for identifying putative class members. Notably, the idea that the presence of "signature" AUC moves could knit up any uncertainty attending a simple geographic proximity would be of limited, if no use, for ascertaining an AUC link for the estimated thousands of victims whose bodies were dumped in mass graves, yet to even be exhumed.

Thus, the optimistic argument that prospective class members could be counted on to self-identify by reporting the geographic area of the loss and circumstances attending the disappearance or death of their loved ones (matching these up to "signature" AUC methodologies) vastly oversimplifies the issue and could not reasonably be expected to produce reliable results on class membership.  Reliance on a "self-identifying" affidavit using these parameters, without further indicia of reliability, would deprive Defendants of their ability to challenge class membership and implicate serious due process concerns.  On the other hand, allowing Defendants to challenge each self-identifying affidavit would run the risk of creating a series of mini-trials in order to locate and vet class members, generating a massive administrative burden which would negate any efficiency gains that the Rule 23 mechanism might otherwise achieve. Plaintiffs thus do not advance a workable, objective model for identification of class members via "self-identification."

Plaintiffs additional proposal for reliance on government records generated in the Colombian Justice and Peace processes fares no better.  Even if the proposed class were redefined to coincide more narrowly with the limited pool of citizens who have registered with the Colombian

government under this program as AUC victims, Plaintiffs do not show that these reparation and reconciliation processes offer a reliable, administratively feasible way of determining AUC involvement in a specific injury or death, where they do not explain who made the findings in these government files, how they made the findings, whether the reporter was under a legal duty to make the findings, whether the findings represent the culmination of an official investigation into the loss, or whether the investigation is ongoing (as seemingly is the case for the proposed class representatives). Without further evidence on the objectives, investigatory mechanisms and reliability of the methodologies employed in the Justice and Peace processes, Plaintiffs do not advance an objectively reliable and administratively feasible method for ascertaining class membership via reference to Justice and Peace records. *See generally Karhu v Vital Pharm., Inc.*, 621 Fed. Appx 945, 947 (11th Cir. 2015) (unpub).

Because the ascertainably requirement is not met, Plaintiffs' motion for class certification is denied on this threshold and independent basis. Assuming *arguendo*, that Plaintiffs' proposed class definition is adequate, or could be redefined in some way to satisfy ascertainability, the Court shall proceed to examine the adequacy of Plaintiff's showing on other Rule 23 pre-requisites for certification of a predominance class.

## D. RULE 23(a) FACTORS

### 1. Numerosity

Defendants contend that the proposed class does not satisfy the numerosity requirement because Plaintiffs do not demonstrate the "impracticability" of joinder all class members. The Court agrees.

Plaintiffs estimate that there are thousands of putative class members victimized by the AUC in the Uraba and Magdalena regions of Colombia who would benefit from the efficiencies of the

class action mechanism, but do not show why it is impractical for them to proceed as individual claimants, as the thousands of other individual claimants already subsumed in the member cases to the MDL proceeding have done over the last ten years of its litigation. Through a mutually agreed-upon process, those claimants have structured a bellwether trial selection paradigm, under which 96 representative individual claimants have been identified within the 12 designated bellwether cases now approaching trials scheduled in October 2019 and February 2020.

Plaintiffs do not persuasively show why it was impractical for the putative class members to have joined in those proceedings at an earlier time, where they may have enjoyed the same litigation efficiencies achieved via bellwether trial procedures now well under way. The size of the putative class is not determinative on the numerosity issue, *O'Neil v. Appel*, 165 F.R.D. 479 (W.D. Mich. 1996), rather, the central question is whether joinder would be impractical. Plaintiffs do not make that showing here, and hence do not satisfy numerosity requirement.

## 2. *Predominance.*

Rule 23(b)(3) burdens Plaintiffs with demonstrating that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly land efficiently adjudicating the controversy." Plaintiffs contend that this requirement is met because one set of operative facts will determine Defendants' liability for making payments to the AUC as well as the AUC's status as a foreign terrorist organization.

Assuming the veracity of Plaintiff's allegations, Defendants' conduct would be actionable under the claims remaining for resolution in this litigation, as this Court has already determined. However, one set of operative facts regarding Defendants' alleged financial and other support of the AUC would not establish liability as to each individual class claimant. It is not necessarily the

case that every person that was tortured, killed or went missing in the Uraba and Magdalena regions during the time frame in question suffered injury at the hands of the AUC.  Instead, a primary issue in each case will be whether the AUC was involved in each crime, and if so, whether a sufficiently significant financial tie existed between the AUC operative and Defendant Chiquita to satisfy proximate cause requirements. This inquiry is necessary and case specific as to each potential victim.

.    In cases where the determination of either liability or damages requires a case-by-case inquiry for each prospective plaintiff, courts generally consider the predominance and superiority requirements of Rule 23(b)(3) unsatisfied.  *Klay v. Humana, Inc*., 382 F.3d 1241, 1276 (11th Cir. 2004) (common questions of pattern and practice of criminal activity predominated on federal RICO claims, but case specific inquiry required for state law claims preluded certification of class). In employment discrimination cases, for example, where a general policy or practice of discrimination may be alleged, "predominance" may not be shown because proof concerning the existence of a general policy of discrimination does not establish discrimination as to any individual plaintiffs.  *See g. Rutstein v. Avis Rent-A-Car Systems, Inc.,* 211 F.3d 1228 (11th Cir. 2000) (policy or practice of discrimination motion may be relevant in given case, but does not show intentional discrimination against every member of putative lass").  *See also Jackson v. Motel 6 Multipurpose, Inc*., 130 F.3d 999, 1006 (11th Cir. 1997) (plaintiffs alleging racial discrimination failed to show "predominance" because proof concerning existence of general policy of racial discrimination did not establish discrimination as to any individual plaintiff) .

So too, in this case, proof that Chiquita and any one or more of the named Individual Defendants engaged in the misconduct alleged will be relevant in each case, but it cannot establish liability as to any individual plaintiff without proof that they were injured by an AUC bloc or AUC

operative that had some financial connection to the Defendant Chiquita.   A case-by-case determination of causation will necessarily be required in all cases, as well as a case-by-case determination of damages.   Where, as here, the addition of more plaintiffs will require significant amounts of new evidence bearing on these individual issues, this lends to the conclusion that individual, and not common, issues will predominate in this case.

Plaintiffs do not describe how they would confront their burden of showing causation in a class action trial, and this is no small obstacle where they propose a class defined by a multiplicity of events spanning a nine-year period of time and two large geographic regions.   No one set of operative facts will establish liability where the identity of the principal perpetrator of each underlying attack in dispute. The judicial efficiencies contemplated by Rule 23 would not be furthered by class certification under these circumstances where individual issues will clearly predominate.   Since Plaintiffs do not meet their burden of showing that common questions of law or fact will predominate over individual ones, the motion for class certification is denied, *Kpadeh v. Emmanuel*, 261 F.R D. 687 (S.D. Fla. 2009), and it is unnecessary to address the remainder of the Defendants' Rule 23 challenges to the Plaintiffs' motion for certification of a predominance class.

### E. Rule 23(c)(4) ISSUE CLASS CERTIFICATION

Failing certification of a predominance class, Plaintiffs alternatively request that an "issues class" be certified under Rule 23(c)(4) to address a limited set of operative liability issues. Defendants contend a Rule 23(c)(4) certification is not available where a predominance class is not met under Rule 23(b), because to allow otherwise would entirely eliminate the Rule 23(b)(3) predominance requirement and result in automatic certification in every case in which any

common issues exists.  Defendants also contend that certification of such a class could violate the parties' Seventh Amendment jury-trial rights [DE 2323 p. 26].

Although a more permissive approach to Rule 23(c)(4) certification has been recognized, *see Martin v. Behr Dayton Thermal Products LLC,* 896 F.3d 405, 414 (6th Cir. 2018) (noting disagreement on how Rule 23(b)(3) requirements interact with Rule 23(c)(4)); *Naparala v. Pella Corp.*, 2016 WL 3125473 *13, 14  (D.S.C. 2016) and cases cited *infra*, on the theory it better serves the purposes of Rule 23 by providing courts with greater flexibility in managing potential class actions,  the Court does not need to make an express ruling on this issue because it finds the prevalence of individual issues in this case such that a limited class certification, of the nature proposed (covering the mechanics of Chiquita's alleged financial transactions with the AUC), would do very little to increase the efficiency of the litigation. For this reason, Plaintiffs cannot establish the superiority requirement of a Rule 23(c)(4) certification.  The class mechanism does not offer a superior method of adjudication, given this limited subset of predicate facts tendered for common issue certification.   Therefore, the Rule 23(c)(4) request for certification is denied. *Naparala v. Pella Corp.*, 2016 WL 3125473 (D. S.C. 2016).

## V.    CONCLUSION

Plaintiffs have failed to demonstrate the ascertainability of the proposed class. Plaintiffs have also failed to carry their burden of demonstrating that common questions of law or fact predominate over individual ones.  Finally, Plaintiffs fail to establish that the class action mechanism is a

superior method of adjudication and hence fail to establish a premise for certification of a common issues class under Rule 23(c)(4).

It is accordingly **ORDERED AND ADJUDGED**:

1. The New Jersey Plaintiffs' motion to certify a predominance class against Defendants under Rule 23 (b) (3) [DE 2290] is **DENIED.**

2. The New Jersey Plaintiffs' alternative motion to certify an "issues" class under Rule 23 (c) (4) [DE 2290] is **DENIED.**

3. The New Jersey Plaintiffs' attempted reservation of a right to file a consecutive motion for certification of a limited fund class at some future point in time is **STRICKEN**.  No further motions for class certification shall be entertained.

4. The above-styled cases will proceed on behalf of the individually-named plaintiffs.

5. The Clerk of Court is directed to file a copy of this order in Case No. 08-MD-1916 and this Order shall apply to each member case in this MDL litigation previously transferred to, removed to or filed in this district, including all member cases consolidated in this proceeding through this date.

6. In any cases subsequently filed in this district, or subsequently removed or transferred to this Court, a copy of the most recent Global Scheduling Order governing "ATS" cases will

be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall thereafter be the responsibilities of the parties to review and abide by all scheduling orders previously entered by the court.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 30th day of May 2019.

KENNETH A. MARRA
United States District Judge

cc. all counsel

23