## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-MD-01916-MARRA

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____/

**This Document Relates to:**

ATS ACTIONS

_____/

### PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF DEFENDANTS' PURPORTED EXPERT WITNESSES, SANCHEZ, RINCON, CUADRADO, FLEMMONS, GADDIS, AND OTERO, REQUEST FOR *DAUBERT* HEARINGS, AND INCORPORATED MEMORANDUM OF LAW

All MDL Plaintiffs, except for the Plaintiffs represented by Paul Wolf (Case Nos. 10-80652, 11-80404, 11-80405), move to preclude the testimony of Defendants' purported expert witnesses, Brigadier General Diego Yesid Sanchez Ruiz ("Sanchez"), Major General Gustavo Rincon Rivera ("Rincon"), Osvaldo Cuadrado Simanca ("Cuadrado"), Jason Flemmons ("Flemmons"), David Gaddis ("Gaddis"), and Andres Otero Leon Gomez ("Otero"). For the reasons discussed below, their testimony is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and Federal Rule of Evidence 702, and they should be precluded from testifying at trial.

### ARGUMENT

In *Daubert*, the Supreme Court held that Federal Rules of Evidence 104(a) and 702 impose a gatekeeping role upon federal judges, requiring judges to screen proffered expert testimony to ensure that the evidence is both reliable and relevant prior to admission at trial. 509 U.S. at 589-90. The burden is on the party offering the proposed expert opinion testimony to prove by a preponderance of the evidence that the testimony satisfies the requirements for admissibility and reliability. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *Phillips v. American Honda Motor Co.*, 238 Fed. Appx. 537 (11th Cir. 2007). A "court must decide any preliminary question about whether a witness is

qualified…or evidence is admissible." Fed. R. Evid. 104.  Federal Rule of Evidence 702 sets the following parameters for admissibility:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. *See also Kilpatrick v. Breg, Inc.*, 613 F. 3d 1329, 1335 (11th Cir. 2010); *Hendrix v. Evenflo Co., Inc.*, 609 F. 3d 1183, 1194 (11th Cir. 2010); *Guinn v. Astrazeneca Pharms. LP*, 602 F. 3d 1245, 1252 (11th Cir. 2010). Purported expert testimony "must be supported by appropriate validation" or "good grounds, based on what is known." *Daubert*, 509 U.S. at 590.

Applying this rule and *Daubert*, "district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant. District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury'' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). Because expert witnesses are free to opine without firsthand knowledge, courts must carefully judge the intellectual rigor employed by the expert in this gatekeeping function. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).

> To fulfill their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: "1) the expert is qualified to testify competently regarding the matters he intends to address; 2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and 3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise to understand the evidence or determine a fact in issue."

*Id*. at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc*., 158 F.3d 548, 562 (11th Cir. 1998)).

"The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Id*. The proponent of expert testimony carries "a substantial burden," *Cook,* 402 F. 3d. at 1107, and has the burden of satisfying each of the above three

elements by a preponderance of the evidence. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). "Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." *Cook*, 402 F. 3d. at 1107 (citing *Frazier*, 387 F.3d at 1260). The Eleventh Circuit refers to these requirements as the qualifications, reliability, and helpfulness prongs. *Id*. To satisfy the relevance requirement of *Daubert*, the Court must ensure that the proposed expert testimony is helpful to the trier of fact in resolving factual disputes. 509 U.S. at 591. "Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant fit." *Bitler v. A.O. Smith Corp.*, 391 F. 3d 1114, 1121 (10th Cir. 2004) (internal citations omitted).

Expert testimony is not admissible if it is speculative. *See General Electric Corp. v Joiner*, 522 U.S. 136, 146 (1997) (observing that a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999), the Supreme Court made clear that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (citing *Joiner*, 522 U.S. at 146). The expert's conclusions must be based on sound scientific principles and the discipline itself must be a reliable one. The key consideration is whether the expert "employs in the court room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*.

"While vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence, the Court is an essential gatekeeper and in all cases must take care to weigh the value of expert testimony against its potential to mislead or confuse." *Hewitt v. Liberty Mut. Group, Inc.*, 268 F.R.D. 681, 685 (M.D. Fla. 2010) (internal citations omitted). Therefore, expert testimony that does not meet these standards should be excluded.  It is incumbent upon the district court to act as a "gatekeeper" to ensure that speculative and unreliable opinions do not reach the jury.

## I. THE PROFFERED TESTIMONY OF GENERALS SANCHEZ AND RINCON IS UNRELIABLE AND THEREFORE INADMISSIBLE

Chiquita submitted an expert report dated November 17, 2018 prepared jointly by Colombian Brigadier General Diego Yesid Sanchez Ruiz and Colombian Major General Gustavo Rincon Rivera, attached hereto as Ex. 1, and their December 21, 2018 rebuttal expert report, attached hereto as Ex. 2.  They billed in excess of 800 hours at $220 per hour for their reports and therefore were paid approximately $160,000 for those reports.  Ex. 1 ¶ 8; Ex. 3, Rincon Dep. at 34-35; Ex. 4, Sanchez Dep. at 29-30.

### A. The Generals Lack Relevant Experience

As an initial matter, both Generals seek to qualify as experts based on their experience. However, neither General was ever stationed in Urabá or Magdalena, the two regions relevant to this case. Rincon Dep. at 59; 61; 62; 68-69; Sanchez Dep. at 22; 23; 25; 30. Nor did either General speak to anyone stationed in Urabá or Magdalena (near Santa Marta). Rincon Dep. at 59; 61; 62; 68-69; Sanchez Dep. at 22; 23; 25; 30. Yet they opined that there was no collaboration between the military and the AUC in those regions. These opinions simply fail to fit with the Generals' experience, as required by *Daubert*. *See Bachmann v. Hartford Fire Ins. Co.*, 323 F. Supp. 3d 1356, 1359 (M.D. Fla. 2018) ("To determine whether the Qualification Requirement is met, 'courts generally look to evidence of the witness's education and experience' and determine whether such qualifications and expertise sufficiently 'fit' with 'the subject matter of the witness's proposed testimony.'") (quoting *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) and citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

Besides never being stationed in or interviewing any military officer who had been based in Urabá or Magdalena between 1997 and 2004, neither General had a position during the relevant time period (or after) that provided them with the relevant experience.  Sanchez Dep. at 30; Rincon Dep. at 68-69. Their experience and background similarly did not qualify them to opine on the role of the AUC in Urabá and Magdalena. A telling example is that Generals Sanchez and Rincon had no idea how the military was collaborating with the AUC in Urabá and Magdalena, they admitted they were unaware of General Rito Alejo del Rio Rojas's highly-publicized conviction of homicide and collaboration with the AUC. Rincon Dep. at 69-70; Sanchez Dep. at 33. They testified that not only were they unaware of this fact but also that it would not change their opinion that the military never collaborated with the AUC. Rincon Dep.

4

at 73; Sanchez Dep. at 18-19.[1]

In addition, General Sanchez was in the army's Directorate of Human Rights and International Humanitarian Law in 2012, Sanchez Dep. at 33, but had no knowledge about any of the Inter-American Court on Human Rights' findings of collaboration between the AUC and the Colombian military. *Id*. He also testified that he was unaware of any investigation by any Colombian governmental agency into the role of the convivirs in the Colombian armed conflict. *Id.* at 43.

### B.   The Generals' opinion constitutes an impermissible legal conclusion

Generals Rincon and Sanchez opined that "[t]here was no symbiotic relationship between the Colombian state including its military forces and the Autodefensas Unidas de Colombia (AUC)," Ex. 1 at 32, because there were written orders and decrees that prohibited the military from cooperating with and assisting paramilitaries. *Id.* at 37, 39. This is an impermissible legal opinion.

The Eleventh Circuit has made clear that legal conclusions or statements instructing what conclusion the jury should reach are impermissible under *Daubert. See Cook*, 402 F.3d at 1112 n.8 ("[C]ourts must remain vigilant against the admission of legal conclusions") (citations & quotations omitted); *see also Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("An expert may not ... merely tell the jury what result to reach."). "A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery*, 898 F.2d at 1541 (citing *U.S. v. Poschwatta*, 829 F.2d 1477, 1483 (9th Cir. 1987), *Specht v. Jensen*, 853 F.2d 805 (10th Cir.1988) (reversible error to permit expert to testify as to legal conclusions to be drawn from the evidence presented; trial judge is the sole arbiter of law), and *U.S. v. Baskes*, 649 F.2d 471, 479 (7th Cir. 1980)); *Webb v. Carnival Corp.*, 321 F.R.D. 420, 426 (S.D. Fla. 2017); *Jordan v. Celebrity Cruises, Inc.*, No. 1:17-20773-CIV, 2018 WL 3584702, at *9 (S.D. Fla. July 25, 2018), report and recommendation adopted, No. 17-20773-CIV, 2018 WL 4776336 (S.D. Fla. Sept. 21, 2018) ("Because Plaintiff's expert reports include legal conclusions, we have no choice but to find that Defendant's *Daubert* motion to strike Mr. Jaques and all of his expert testimony should be granted."). It is blackletter law that this portion of the Report must be excluded.

---

[1] Nor were they aware of Chiquita's guilty plea, or admissions. Sanchez Dep. at 41-42. *See also*, n. 3, *infra*.

**C. The Generals' opinions are not based on sufficient facts or data, nor are they the product of their application of reliable principles and methods**

The second *Daubert* requirement, discreet and independent from a witness's qualifications, is reliability. *Frazier*, 387 F. 3d at 1261. Reliability is different than believability or persuasiveness, which remain an issue for the trier of fact. *Rank* 400 F. 3d at 1283 n.7. The Court should evaluate "whether the expert technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense **or whether it is instead simply a subjective conclusory approach that cannot reasonably be assessed for reliability**." *Daubert*, 509 U.S. at 593-94. (emphasis added). This same analysis applies where, as here, the witness' field of expertise is an experience-based field rather than one of the more traditional "hard sciences." *See Frazier*, 387 F.3d at 1262. ("The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony.") (*citing Kumho Tire*, 526 U.S. at 152).

Rincon and Sanchez's testimony and reports are also inadmissible under Rule 702 and *Daubert* because they did not employ a reliable methodology. *See Kumho*, 526 U.S. at 153-154 (holding that trial court did not abuse its discretion in applying *Daubert* to exclude expert testimony on the ground that methodology employed by expert was unreliable, even though court did not doubt expert's qualifications, where the methodology was not an accepted one and expert's own testimony cast doubt on the reliability of his testimony and conclusions); *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1330-31 (11th Cir. 2014) (affirming district court's exclusion of proffered expert testimony as unreliable, where expert did not explain how his experience and the literature on which he relied supported his opinion, and where he only vaguely described his methodology); *In re Traysol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1347 (S.D. Fla. 2010) (finding expert's proposed testimony inadmissible where expert "could not adequately explain her analysis or methodology," thus rendering her opinions unreliable).

Not only do the Generals have no relevant personal experience relevant to whether the military collaborated with the AUC in Urabá or Magdalena, their deposition testimony also establishes that they did not conduct any research or employ any reliable methodology to support their opinions. General Rincon actually conceded that he had no methodology.  Rincon Dep. at 26.

> Q. What were the criteria that experience led you to apply to your Google search?
> MR. CIOFFI: Objection, vague but if you're able to answer, you can.
> THE WITNESS: The truth.
> Q. Did you have any particular methodology?
> A. No.

*Id*. His attorney, Mr. Cioffi, tried to rehabilitate him on methodology. General Rincon rambled that his methodology was the chiefs of staff's methodology for preparing for a mission:

> [W]e utilize the military methodology when we make decisions, which is included in the manual of chiefs of staff, … the chiefs of staff manual is a methodology that clearly reflects the working of all the surrounding of the armed forces and again I'll explain, you receive a mission, you do the analysis of the mission. Once the mission is analyzed you call your top brass or your chiefs of staff and you order a clear study, broad and sufficient, so that they can recommend what the best course of action is in order to execute the mission. … and nobody in the army can be outside of the guidelines dictated by the national government through decrees, through laws, through directives, through operations orders. So that's how we can determine that if someone is outside the law or has committed a crime…. and because in our research, we did not find any order, no decree, no directives, no operations orders, no written orders that would say the contrary. That all groups outside the law must be fought against the same way. That's how we were able to determine that there has been no symbiotic relationship between the government, the military forces, with groups outside the law….

Rincon Dep. at 86-87; 89. However, Rincon never called any chiefs of staff or intelligence officers, *id.* at 92, so he did not follow his own purported methodology. *See Smith v. Freightliner, LLC*, 239 F.R.D. 390, 393 (D. N.J. 2006) ("In this case, Mr. Barone did not adequately assess factors two and three of this own methodology.... Here the methodology was not followed by Mr. Barone and thus cannot be replicated."); *Cano v. Everest Minerals Corp*., 362 F. Supp. 2d 814, 836 (W.D. Tex. 2005) (excluding expert who failed to follow his own methodology). General Sanchez, in turn, adopted General Rincon's testimony regarding the preparation of the report and thus effectively conceded that he too employed no reliable methodology. Sanchez Dep. 18-19 (testifying that he agreed with everything General Rincon said in his deposition, for which General Sanchez was present); *id.* at 28.

Furthermore, the Generals' report, and the opinions within, cannot be considered reliable. The report contains various cut and paste cites from other sources without attribution to the underlying data. *In re TMI Litig*., 193 F.3d 613, 697-98 (3d Cir.1999), *amended*, 199 F.3d 158 (3d Cir.2000) (expert's opinion was so unreliable that no reasonable expert could base an

opinion on it); *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (affirming exclusion of expert testimony on grounds that the data underlying his opinion was so unreliable that no reasonable expert could base an opinion on it, where the expert relied on a document but did not know the source or basis of the document). It contains multiple stale websites as sources on which the Generals purportedly relied that could not have been visited between July 2018 (when they were retained by Chiquita) and November 2018, *see* Ex. 1 at 42, 43 (listing website sources as last visited in 2007), the time period in which Rincon supposedly "personally reviewed" each of the sources. Rincon Dep. at 55-56. For example, the report cites: Colombian Revolutionary Armed Forces. (2007). Official page of the Revolutionary Armed Forces of Colombia. Retrieved on September 20, 2007. Available at http://www.farcep.org. *See* Ex. 1 at 43. But "Farcep.org" is a marble flooring website: "The Many Types of Marble Flooring You Can Choose From." Also, the report contains English articles as sources when neither General speaks English. *See, e.g.,* Ex. 1 at 44 ("On the Economic Causes of Civil War" and "Crisis, Breakdown and Re-equilibration of Competitive Democracies."); Rincon Dep. at 14 (testifying that he does not speak English); 45-46; Sanchez Dep. at 8 (same). Use of outdated or suspect data as the base of an expert's testimony are proper grounds to exclude that testimony. *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567–568 (5th Cir.1994) (upholding the exclusion of expert testimony based on "outdated, statistically suspect, and untrustworthy evidence."); *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010) (excluding expert report as unreliable because it was not based on sufficient facts or data).

The deposition testimony of Generals Rincon and Sanchez establishes that their testimony is not based on sufficient facts or data; is not the product of reliable principles and methods; and fails to apply the principles and methods they identified to the actual facts in the record. The Generals purport to have relied upon the published laws of Colombia, the Colombian Constitution, and their own individual experience while in the military, but they ignored or were unaware of important facts and information that contradicted their pre-established views. *Fail–Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889–90 (E.D. Wis. 2010) (finding expert's methodology unreliable because of the expert's unwarranted dismissal of the evidence that undermined his conclusion or outright blindness to contrary evidence). And they employed no reliable methodology. Here, as in *Frazier*, the generals "offered precious little in the way of a reliable foundation or basis for [their] opinion." 387 F.3d at 1265. "Since [the expert] was

relying solely or primarily on his experience, it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case."  *Id.*

Accordingly, the Generals' reports and proffered testimony are unreliable and therefore inadmissible under *Daubert* and Rule 702.

## II.    THE PROFFERED TESTIMONY OF PURPORTED EXPERT CUADRADO IS INADMISSIBLE BECAUSE HE IS A FACT WITNESS.

Cuadrado's report and testimony should be stricken because he is merely a fact witness who Chiquita paid $10,000 for fact testimony based on his personal experiences as a trade union leader. Cuadrado's paid fact testimony does not make him an expert as it does not satisfy the "qualifications," "reliability," and "helpfulness" prongs required by *Frazier*, 387 F.3d at 1260.

Cuadrado was purportedly retained as an expert witness by Chiquita to rebut the testimony of Plaintiffs' experts, Professors Terry Karl and Oliver Kaplan. According to Cuadrado, he was to opine about "union activities in the Uraba, Turbo and Santa Marta regions and the relationships between the union, the banana workers, Chiquita, the AUC and the FARC." Ex. 6, Cuadrado Report ¶ 6. Cuadrado was a Colombian labor union leader from 1983 to 2007, Ex. 5, Cuadrado Dep. at 17, and his assignment was to "provide an opinion about what I knew." *Id.* at 18.  He conducted no research in preparing his report but instead put together a narrative that came from his knowledge and experience. *Id.* at 21–22.  As Cuadrado expressly stated, "I focused only and exclusively [on]…what I know from the history and the knowledge that I have." *Id.* at 29.  "I didn't need to search for research." *Id.* at 30.

Cuadrado's report is not a "rebuttal" to Plaintiffs' experts or the subjects covered. His report makes no further mention of Professors Karl or Kaplan beyond paragraph 6. Cuadrado never addresses the central theses of the Karl or Kaplan reports. According to Professor Karl, the issue was "what Chiquita knew or should have known while funding this enterprise, and the consequences for Colombian civilians living in these regions." *See* Ex. 9, Karl Amended Report at 2.[2] Kaplan explained his report "draws a causal link between Chiquita's financial support for the AUC and the harm to Colombian civilians resulting from the AUC's subsequent actions in

---

[2] Professor Karl's expert report was amended as to items not pertinent to Cuadrado's report and testimony. *See* Ex. 10, Summary of Professor Karl's deletions.

the regions where they operated." Ex. 15, Kaplan Expert Report ¶ 2.  Nevertheless, as Cuadrado admitted, he did not know about Chiquita's payment to the AUC in Uraba and Magdalena although Chiquita admitted that fact in its well-publicized guilty plea. Cuadrado Dep. at 66.[3] Cuadrado also testified that he did not know that the AUC killed civilians. Cuadrado Dep. at 69. It is hard to credit such a statement when he testified that he had attended events connected to the Justice and Peace Process and knew of notorious AUC leaders Castaño and Rendon Herrera.  *Id.* at 70; 82. As a union leader, he claimed to have received information on violence by the EPL, the FARC, and the ELN, but not the AUC.  *Id.* at 77-78, 84.  Given his ignorance of the payments by Chiquita to the AUC and AUC killings of civilians, his conclusions concerning the relationship between the AUC and Chiquita cannot be considered reliable.

When asked to describe his methodology, Cuadrado stated, "It was my experience…the experiences I had lived." *Id.* at 32.  He did not hesitate to admit that the report was about his own personal experiences.  *Id.* at 33. From his experience alone, he opines: "[T]he statements that Chiquita collaborated with the AUC to combat and suppress the unions is a lie." Cuadrado Report ¶ 38.  He does not identify the bases for this conclusion or the method he used to reach it. Given that the statement is based solely on Cuadrado's personal experience, his assertion is

---

[3] According to Chiquita, its

"alleged support of the AUC was widely publicized in Colombia—where Plaintiffs reside—by 2004. Keiser and Freidheim request that the Court take judicial notice of not only the information publicly available in the United States, but also of the information publicly available in Colombia.

**It was widely reported in Colombia that there was a connection between Chiquita and the AUC and that Chiquita was being investigated for making payments**...

For example, **on June 12, 2004, El Tiempo newspaper**—the New York Times of Colombia—reported that Chiquita was being investigated for payments its Colombian subsidiary made to groups designated by the U.S. as terrorist groups. The article reported that the terrorist support investigation was a factor in Chiquita's decision to sell its assets in Colombia. ... Similarly, on May 4, 2006, an article by one prominent Colombia reporter, Ignacio Gomez, was published entitled: "**The Same Gringos from the Banana Plantations Massacre— Chiquita Brands is investigated for arms trafficking, bribery, and financing of terrorism**."

Defendants' Joint Consolidated Motion to Dismiss the Newly-Filed Perez 1 Complaint and Incorporated Memorandum of Law at 14. DE 1552. (emphasis added). *See also*, DE 1552-4, DE 1552-5, DE 1552-6, and DE 1552-7.

nothing more than a summary of one man's limited observations and not an expert opinion. Given Cuadrado's lack of knowledge of basic relevant facts, his report cannot meet the parameters of Rule 702. His testimony is not based on sufficient facts or data. *See* Rule702(b). His testimony was not the product of reliable principles and methods other than his memory of his own experiences. *See* Rule702(c). He failed to explain what facts and methods he used to support his opinion that Chiquita did not collaborate with the AUC. *See* Rule702(d).

As noted, "[b]oth *Daubert* and *Kumho* make clear that the day of the expert who merely opines, and does so on the basis of vague notions of experience, is over." *Kemp v. Tyson Seafood Grp., Inc.*, No. Civ. 5–96–173 JRT/RLE, 2000 WL 1062105, at *7, 55 Fed. R. Evid. Serv. 994 (D.Minn. July 19, 2000). Cuadrado's report and testimony are the mirror opposite of cases like *United States v. Garcia*, 447 F.3d 1327, 1335 (11th Cir. 2006), where the years of experience of a narcotics agent permitted him to have an informed opinion about the operations of drug dealers. Here, Cuadrado's single source of experience was his own and this is far short of what would allow him to make sweeping opinions about the relationship between Chiquita and the AUC when he did not know that Chiquita paid the AUC and did not know that the AUC murdered civilians. Even if Cuadrado was a qualified expert on some aspect of banana worker unions, his fact-based knowledge cannot be extended to establish patterns of action in unrelated factual situations. *See United States v. Cruz, 981 F.2d 659, 663* (2d. Cir. 1992).

In *Morgan v. U.S. Xpress, Inc.*, 2006 WL 278398 (M.D. Ga. 2006), the court addressed the distinction between a fact witness and an expert with this observation:

> [C]ourts in other jurisdictions consistently have held that a witness is not an expert witness merely by virtue of his specialized training and knowledge in a particular field. *Fisher v. Ford Motor Co.*, 178 F.R.D. 195, 197 (N.D. Ohio 1998); *accord Sipes v. United States*, 111 F.R.D. 59, 61 (S.D. Cal. 1986). Instead, a witness with specialized knowledge and training may be a pure "fact witness" when a witness is a direct participant in the events about which he is testifying. *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 113 (1st Cir. 2003). However, if the testimony consists of "opinions based on scientific, technical, or other specialized knowledge," the opinions may be considered expert testimony, regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 n. 2 (7th Cir. 2004) (distinguishing cases holding that a treating physician is not an expert witness if his or her testimony is based on observations made during treatment). Thus, to determine whether a particular witness is a "fact witness" or an "expert witness" under Rule 26, a court should look to the nature of the testimony being given. *Gomez*, 344 F.3d at 113 ("[T]he triggering mechanism for application of

11

> Rule 26's expert witness requirements is not the status of the witness but rather the essence of the proffered testimony.").

*Id*. at *2. Cuadrado admitted with no hesitation that his "expert" report is his personal story written with reference only to his memory of events, Cuadrado Dep. at 29, 20, 32, 35, the very essence of factual testimony.

Finally, even if Cuadrado is found to be a qualified expert, his testimony and report should be stricken for the reasons set forth in Plaintiffs' Motion to Strike the Report and Testimony of Osvaldo Cuadrado Simanca, filed concurrently herewith, because Chiquita paid him $10,000 for fact testimony based on his personal experiences as a trade union leader. Cuadrado Dep. at 22. Further, he understood that if Chiquita liked his report and decided to use him as a witness, he would be paid an extra $350 per hour for his testimony. *Id*. at 24-25. In *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, the court examined the propriety of payments by Lloyds to fact witnesses to induce the cooperation of those witnesses. The court found the question a relatively easy one and resolved it by stating that "quite simply, a witness has the solemn and fundamental duty to tell the truth. He or she should not be paid a fee for doing so." 865 F. Supp. 1516, 1526 (S.D. Fla. 1994), *aff'd in part*, 117 F.3d 1328 (11th Cir. 1997). The testimony was stricken, as it should be here.

Not only did Chiquita improperly pay Cuadrado for his factual testimony, they paid him a relatively exorbitant amount, a strong indication of improper influence. Even if he was an expert, the fee paid to him is exorbitant based on the following factors:

> (1) [T]he witness's area of expertise; (2) the education and training that is required to provide the expert insight which is sought; (3) the prevailing rates of other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; and (6) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26.

*Goldwater v. Postmaster Gen*., 136 F.R.D. 337, 340 (D. Conn. 1991).  Here there is no area of expertise; no education and training; no evidence of prevailing rates of other comparably respected available experts; a 10 page "expert rebuttal" report (Ex.  6) with little, if any, background reading, preparation, or research, and for which he was paid $10,000, Cuadrado Dep. at 21-22; 30; and a low cost of living in Colombia. All of these factors point to an exorbitant expert fee. *See Esso Standard Oil Co. (Puerto Rico) v. Rodriguez-Perez*, 2005 WL

114080 at *2 (D.P.R. January 20, 2005) (granting a motion to strike an expert's report and preclude the expert's testimony due to, among other things, charging an exorbitant fee).

### III. THE PROFFERED TESTIMONY OF PURPORTED REBUTTAL EXPERT FLEMMONS IS INADMISSIBLE

The Court should exclude the rebuttal testimony of Jason Flemmons as irrelevant because Plaintiffs' expert, Professor Karl, no longer offers the opinions Flemmons purports to rebut.

"Rebuttal … expert reports are 'intended solely to contradict or rebut evidence on the same subject matter identified by another party . . . .'" *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 396 (M.D. Fla. 2018) (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)). Courts regularly prohibit rebuttal experts from testifying where the opinions they are rebutting are no longer at issue. *See, e.g., Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1288 (M.D. Fla. 2008) (testimony of defendant's rebuttal expert is moot upon the exclusion of plaintiff's expert); *EEOC v. W. Customer Mgmt. Group, LLC*, 899 F. Supp. 2d 1241, 1253 (N.D. Fla. 2012) (court limited scope of a rebuttal expert opinion to match the scope of the expert's testimony); *Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681 (KBF), 2015 U.S. Dist. LEXIS 123591, *24 n.2 (S.D.N.Y. Sept. 16, 2015) (rebuttal expert's testimony was "unnecessary and thus precluded" when the expert they were rebutting was barred from testifying).

As Flemmons himself described, his opinions are limited to critiquing "[Professor] Karl's statements that Chiquita's accounting strategies were inadequate." Ex. 7, Flemmons Dep. at 85-86; *see also id.* at 80-81; 170. Specifically, Flemmons criticizes Professor Karl for stating that "Chiquita's accounting strategies were inadequate to conceal payments to paramilitary or guerilla groups" and "Chiquita's payments and accounting mechanism was inadequate for knowing who and how much each group received." Ex. 8, Expert Report of Jason Flemmons at II (A) and (B). However, on June 20, 2019, Professor Karl amended her expert report to delete her comments and conclusions related to the effectiveness or adequacy of Chiquita's accounting practices, specifically opinion 10:

> "Chiquita Hides 'Sensitive Payments': The Company devised a system of accounting that deliberately sought to conceal payments that were irregular at best and illegal at worst."

Ex. 9, Amended Expert Report of Professor Terry Karl. *See also* Ex. 10, Summary of Deletions by Professor Karl. Therefore, any testimony Flemmons might offer about Professor Karl's qualifications and methodology to reach such accounting conclusions is simply unnecessary.

Flemmons does not purport to and cannot provide helpful testimony regarding Chiquita's accounting procedures or internal controls. Flemmons testified that he is not offering the affirmative opinions that Chiquita's accounting strategies were adequate to conceal payments to paramilitary and guerrilla groups, that Chiquita adopted and implemented significant internal controls, or that Chiquita's payment and accounting mechanisms were adequate to determine who was paid and how much each armed group received. *See* Flemmons Dep. at 147; 169-170; 230. Moreover, he testified multiple times that he has not examined Chiquita's underlying accounting documents or done the analysis necessary to come to affirmative conclusions about them. *See id.* at 69; 79; 80; 82; 88; 90; 92; 93; 106; 107-108; 109; 129; 130-131 16; 173-174; 230.

Since Flemmons' testimony is strictly limited to criticizing Professor Karl's qualifications and methodology in supporting her statements on the adequacy/inadequacy of Chiquita's accounting policies, and since Professor Karl no longer offers those opinions, Flemmons's testimony is moot and should be excluded.

## IV.    THE PROFFERED TESTIMONY OF PURPORTED EXPERT GADDIS IS INADMISSIBLE

An expert's testimony is admissible only so long as the process or technique the expert used in formulating the opinion is reliable. *Daubert*, 509 U.S. at 590. Expert testimony "must be supported by appropriate validation" or "good grounds." *Id.* In addition, even where a technique is valid for one purpose, it may not be valid for another: testimony is inadmissible where there is mismatch between the expert's technique or experience and the issues in the case. *Id.* at 591. Mr. Gaddis' testimony is not admissible because he is not an expert on AUC finances and because his methodology is not reliable.

Chiquita offers Gaddis' testimony to compare the AUC's annual income from drug trafficking to the support provided by Chiquita. Gaddis is a former DEA agent who currently runs a small business that conducts asset location and property theft investigations for companies such as Bowl-More, the bowling lane company. Ex. 11, Gaddis Dep. at 9-10. Gaddis based his testimony on his experience as a DEA agent, but he has no background in accounting; he did not

investigate the AUC when he was at the DEA; could not recall learning about AUC non-drug revenue during his time at the DEA; and he was never an expert on AUC revenue streams. *Id*. at 101 (no background in accounting); 66 (did not work on targets connected to the AUC); 73-74 (did not learn about AUC income sources), 76 (same); 83 (same); 95 (same); 98 (was an expert in manufacture and distribution of cocaine); 100 (during career at DEA was never proffered as an expert on AUC nondrug revenue sources). Mr. Gaddis was unaware, during his years at the DEA, that Chiquita had paid the AUC. *Id*. at 146. Thus, his experience at the DEA is not related to the subject of his testimony. *See Frazier*, 387 F.3d at 1261, 1265 (excluding expert where experience did not support testimony).

Moreover, Gaddis relied on research provided by Chiquita's attorneys and did not conduct any research of his own, beyond googling, for example, the term "convivir." Gaddis Dep. at 15, 19-20, 51, 54, 106 (googled the term "convivir" but did not spend much time on it), 147 (did not speak to Chiquita employees). *See McCorvey v. Baxter Health Care Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2001) (excluding expert who was unable to cite support for theories, did not talk to personnel, did not conduct research).

Due to his lack of expertise and research, Gaddis' conclusion is therefore unreliable and not helpful to the jury. The single document that he cites to support his figure of $200 million a year for AUC annual income between 1997 and 2004 is an International Crisis Group report. Gaddis Dep. at 201. But the ICG report relied does not support his conclusions. To the contrary, it found the estimates of drug-related income to be "highly overstated." *Id*. at 202-203. The ICG estimated that a more accurate figure would be half the amount proffered by Gaddis. *Id*. In response to this information, Gaddis stated, "I'm not an expert in economics. So I couldn't even begin to tell you how that would change the numbers." *Id*. at 206. Because Mr. Gaddis is not an expert in AUC finances, his methodology is unreliable, and his conclusion, because it misstates the report it is based on, will not help the jury, so his testimony on AUC finance streams should be excluded. *Frazier*, 387 F.3d at 1266.

Chiquita has also offered Gaddis' testimony to argue that "Chiquita made considerable efforts to thwart attempts to smuggle drugs and arms on its ships." *See* Ex. 12, Gaddis Report ¶ 31. But Gaddis relies primarily on the testimony of Chiquita's own witness, the head of security in Colombia, for his conclusion. *Id. at* ¶¶ 31-32. In effect, the expert report is being used to bolster the witness's testimony – which is impermissible. *See Mamani v. Berzain*, No. 07-22459-

CIV, 2018 WL 1010582, at *3 & n.6 (S.D. Fla. Feb. 22, 2018) (holding hearsay accounts of specific events are not admissible via expert testimony—expert cannot be used as "a conduit for introducing hearsay"). Gaddis did not do any of his own research to evaluate Chiquita's efforts. Gaddis Dep. at 51.  The only additional evidence beyond Chiquita's own testimony that Gaddis cites was suggested to him by Chiquita's lawyers.  *Id.* at 5 ("Yes, that was added as a suggestion by my lawyer."); *id.* at 162 ("I had no and have no specific knowledge of Chiquita's being involved with – with transport of drugs, yeah, beyond what we've talked about in this case.").

Gaddis' smuggling opinions are not based on a reliable methodology. Subjective methodology is a sufficient ground to reject expert testimony. *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1136 (E.D.N.Y. 2006). Gaddis did not employ any methodology. Nor has he specified in detail the facts upon which he relied to reach his conclusions. Absent a methodology that can be replicated and a clear statement of facts upon which he relies, Gaddis fails to establish that his methodology "enjoy[s] general acceptance with the relevant scientific community." *Kumho*, 526 U.S. at 149-50. To be admissible, expert testimony must consist of more than paying an expert a fee to state what trial counsel would like to argue. *Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 303 & n.9 (S.D.N.Y. 2001) (excluding expert's testimony where "it is hard to determine what methodology, if any, [the expert] used to reach his conclusion" as to the likelihood of consumer confusion). *See also Marbled Murrelet v. Pacific Lumber Co.*, 880 F. Supp. 1343, 1364-65 (N.D. Cal. 1995), *aff'd*, 83 F.3d 1060 (9th Cir. 1996) (noting that a "'very significant fact to be considered'" when deciding whether to admit expert testimony is whether the expert arrived at opinions "'growing naturally and directly out of research that they have conducted independent of the litigation'" and finding that the expert's testimony lacked objectivity and credibility where opinions were not developed independent of attorneys) (quoting *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir. 1995)). Gaddis's testimony on Chiquita's drug smuggling interdictions should be stricken.

Finally, Gaddis' report argues that Plaintiff's expert, Professor Kaplan, was wrong to conclude that Chiquita facilitated shipments of illegal drugs, and he opines that "Professor Kaplan's report provides no support for such opinions." Gaddis Report ¶ 30. But Mr. Gaddis conceded that he failed to read the footnotes in Professors Kaplan's report (which is where Kaplan cited his supporting evidence).  Gaddis testified:

> A: I did not read the footnotes, nor any documents referred to in those footnotes
> …. I didn't -- I didn't know of these opinions or these -- these footnotes.
>
> Q: Well, how could you not know?· It's right on the piece of page? [sic]
>
> A: I didn't read them.· I read the report, but I didn't read the footnotes … I simply
> read the report and failed to read those footnotes … I did not go and research any
> of documents -- of the documents reflected in those footnotes.

Gaddis Dep. at 186–188.  Gaddis also testified that he had no personal knowledge about and did not investigate the smuggling incidents described by Professor Kaplan.  *Id.* at 162; 190.  Failing to read the footnotes, failing to investigate, having no personal knowledge, and merely inserting information provided by counsel is not a valid or reliable methodology, to say the least.  *See Marbled Murrelet*, 880 F. Supp. at 1364-65; *Crowley v. Chait*, 322 F. Supp. 2d 530, 545-47 (D.N.J. 2004) (finding expert's testimony unreliable where the expert relied on summaries prepared by counsel and conducted little independent investigation).  Gaddis' testimony regarding Professor's Kaplan's report is inadmissible and should be excluded.

## V.  THE PROFFERED TESTIMONY OF PURPORTED EXPERT ANDRES OTERO IS INADMISSIBLE

The Court should exclude the testimony of Andres Otero because his purportedly "expert" opinions, which are not based on any reliable expert methodology and fail to assist the trier of fact, go only to issues of witness credibility and reliability, thereby invading the exclusive province of the jury.

Otero was retained by Chiquita to opine on the "credibility" of Raul Emilio Hasbun Mendoza ("Hasbun") and Jose Gregorio Mangones ("Mangones"), two former AUC members, with respect to whether Chiquita's payments to the AUC were voluntary or the product of extortion. Ex.  13, Otero Dep. at 34-35. Otero's report (Ex. 14) was proffered as a rebuttal to the expert reports of Plaintiffs' witnesses, Professors Karl and Kaplan, Otero Report ¶ 3, based his determination of the "credibility" of Hasbun and Mangones. Ex.  13, Otero Dep. at 35;[4] Otero

---

[4] *See also id.* at 27 ("what was requested of me by the attorneys, which was to perform an analysis on the credibility of testimony as provided by Hasbun and Mangones in different cases, in particular, the Chiquita case, and above all, if those testimonies could, in any manner, be influenced by third parties"); *id.* at 34 ("so that I could determine the credibility of the statements"); *id.* at 35 ("I'm providing my opinion, based on my experience, and my professional criteria as an investigator to determine whether these people tell the truth, are credible, or are not."). Otero later tried to backtrack from the repeated references to "credibility" in his report,

Report at 15.

Otero's purportedly "expert" opinions go only to issues of witness credibility and reliability, thereby invading the exclusive province of the jury. It is axiomatic that "[t]he credibility and reliability of witness testimony is a question of fact to be determined by the jury." *Edwards v. Jones*, No. 15-81204-Civ-MARRA, 2016 U.S. Dist. LEXIS 113335 at *66 n.11 (S.D. Fla. Aug. 23, 2016) (Marra, J.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)); *Hunter v. McCollum,* No. 07–21372–Civ–LENARD, 2010 WL 7697637 at *19 n.11 (S.D. Fla. May 26, 2010) (same). Indeed, it is well settled that "absent extraordinary circumstances, credibility determinations are for the jury, and not expert witnesses." *U.S. v. Falcon*, 245 F. Supp. 2d 1239, 1248 (S.D. Fla. 2003). *See also U.S. v. Beasley,* 72 F.3d 1518, 1528 (11th Cir. 1996) ("Expert ... testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations."). *See also Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (a proffered expert must "bring to the jury more than the lawyers can offer in argument"). As explained in *Bodner v. Royal Caribbean Cruises, Ltd.*, No. 17-20260-CIV-LENARD/GOODMAN, 2018 WL 2471215, at *3 (S.D. Fla. Apr. 10, 2018):

> "Witness credibility is the sole province of the jury." *Snowden v. Singletary*, 135 F.3d 732, 739 (11th Cir. 1998); *see also United States v. Hamaker*, 455 F.3d 1316, 1334 (11th Cir. 2006). "As such, **'[c]redibility is not a proper subject for expert testimony**; **the jury does not need an expert to tell it whom to believe, and the expert's stamp of approval on a particular witness' testimony may unduly influence the jury.'**" *Dugas v. 3M Co.*, Case No. 3:14–cv–1096–J–39JBT, 2016 WL 7327666, at *7 (M.D. Fla. Mar 30, 2016) (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). … *see also United States v. Henderson*, 409 F.3d 1293, 1299 (11th Cir. 2005) ("The Federal Rules of Evidence preclude a witness from testifying as to the credibility of another witness. Rule 608(a) restricts a party from attacking or supporting a witness' credibility save through evidence 'refer [ring] only to character for truthfulness or untruthfulness.'").

Clearly Otero's proffered testimony is explicitly focused on opining about the credibility of two witnesses and for that reason alone must be excluded.

In addition, Otero's opinion runs afoul of *Daubert* for two additional reasons. First, Otero failed to employ any expert methodology in reaching his opinions. Second, Otero's opinion

---

Ex. 14 at 8-9, and his deposition, Ex. 13 at 27, 34-35, to claim that he was merely evaluating "reliability." Ex. 13 at 54. In any event, he can opine about neither credibility nor reliability.

cannot aid the jury because his claimed expertise is purely a jury function, determining whether a witness is credible.

Otero's opinions were "based on [his] experience, and [his] professional criteria as an investigator to determine whether these people tell the truth, are credible, or are not." Ex. 13, Otero Dep. at 35.  He did not independently investigate any facts. *Id*. 80-81; 98.[5] He never interviewed Hasbun and Mangones. *Id*. at 51-52. His primary source of information was a set of materials provided by Chiquita's counsel (who, Otero admits, were selective in what they gave him to review) upon which he then subjectively speculated about what he thinks "really" happened, offering an unfounded conclusion about the credibility of Hasbun and Mangones. *See, e.g.*, *id*. at 15-16; 19. Otero was not given, and therefore did not review, testimony of other witnesses who corroborated the testimony of Hasbun and Mangones, or any evidence that was damaging to Chiquita, such as the Factual Proffer supporting Chiquita's guilty plea to knowingly supporting the AUC after its designation as a Foreign Terrorist Organization. *Id*. at 50-51. Further, and incredibly, Chiquita's counsel did not provide Otero with the video depositions of Hasbun and Mangones from the *Dole* litigation, which was the only opportunity he would have had for observing their demeanor when testifying.  *Id*. at 51-52. "[A]n expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology." *See Chaudhry v. Provident Life & Accident Ins. Co*., No. 12-cv-5838, 2015 WL 1756832, at *5 (N.D. Ill. Apr. 15, 2015); *see also Barber v. United Airlines, Inc*., 17 Fed. Appx. 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.' "); *EEOC v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015) (citing a number of cases, including from the First and D.C. Circuits for the proposition that "courts have consistently excluded expert testimony that 'cherry-picks' relevant data"); *Frazier*, 387 F.3d at 1262 (whether the expert's opinions are scientific or not, expert methodology must

---

[5] In his report, he states that he "was asked to investigate D.C. Plaintiffs' counsel Collingsworth's efforts to bribe and influence … Hasbun … and … Mangones …, to testify against Chiquita, and to offer opinions about the reliability of … Hasbun … and Mangones' testimony...."  Otero Report ¶ 3.  But in his deposition, Otero admits that he did not in fact conduct **any** investigation of any alleged bribery of Hasbun and Mangones.  Rather than "investigating," he analyzed publicly available information provided to him by Chiquita.  Otero Dep. at 80-81; 98.

be found by court to be reliable before such opinions can be admitted at trial). Under this authority, Otero's opinions regarding witness credibility and reliability must be excluded; as such evidence would improperly invade the exclusive province of the jury and could unduly influence the jury's determinations.

Furthermore, introduction of Otero's opinions would not be helpful to the jury, which is also a prerequisite to introduction of expert testimony. *See Frazier*, 387 F.3d at 1262 (expert testimony is admissible only if it assists the trier of fact, *i.e.*, "concerns matters that are beyond the understanding of the average lay person"). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262–63 (citing 4 *Weinstein's Federal Evidence* § 702.03[2][a]). Here, Otero concedes that he conducted no investigation and has no special expertise in assessing credibility, but merely reviewed publicly available documents provided to him by Chiquita's attorneys and then drew his own conclusions. Otero's opinions, which offer nothing more than Chiquita's attorneys can argue in closing, are in no way helpful to the jury, which can read any emails or other materials Chiquita attempts (and is permitted) to use at trial to discredit Hasbun and Mangones and then reach their own conclusions. *See National Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-CIV-80371-BLOOM/Valle, 2015 WL 11251759 at *8 (S.D. Fla. July 6, 2015) (excluding expert testimony as speculative and lacking foundation where expert relied solely on police reports and prior investigation materials rather than conducting own independent investigation).

As the proffered expert testimony of Otero goes only to issues of witness credibility and reliability, thereby invading the exclusive province of the jury, it is not based on any reliable expert methodology, and fails to assist the trier of fact, so the Court should exclude it under *Daubert*.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion *in Limine* and preclude Defendants' experts, Rincon, Sanchez, Cuadrado, Flemmons, Gaddis, and Otero, from testifying at trial or, in the alternative, hold *Daubert* hearings on the admissibility of their testimony.

DATED: August 15, 2019.                    Respectfully submitted,

                                           /s/ James K. Green
                                           James K. Green, Esq.
                                           Florida Bar No:  229466
                                           JAMES K. GREEN, P.A.
                                           Suite 1650, Esperantè
                                           222 Lakeview Ave.
                                           West Palm Beach, FL  33401
                                           (561) 659-2029
                                           (561) 655-1357 (facsimile)
                                           *One of Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document was filed with the Clerk of the Court using CM/ECF on this 15th day of August 2019. I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF.

                                           /s/ James K. Green
                                           James K. Green, Esq.