UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-MD-01916-MARRA

IN RE:  CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____/

**This Document Relates to:**

ALL ATS ACTIONS

_____/

07-60821-CIV-MARRA (*Carrizosa*)
08-80421-CIV-MARRA (N.J. Action) (Does 1-11)
08-80465-CIV-MARRA (D.C. Action) (Does 1-144)
08-80508-CIV-MARRA (*Valencia*)
08-80480-CIV-MARRA (N.Y. Action) (Juan/Juana Does 1-914)
10-60573-CIV-MARRA (*Montes*)
10-80652-CIV-MARRA (D.C. Action) (Does 1-976)
11-80404-CIV-MARRA (D.C. Action) (Does 1-677)
11-80405-CIV-MARRA (D.C. Action) (Does 1-254)
18-80248-CIV-MARRA (John Doe 1)
17-81285-CIV-MARRA (D.C. Action) (Does v. Hills)
17-80475-CIV-MARRA (Ohio Action) (Does 1-2146)

_____/

## REBUTTAL EXPERT REPORT OF DAVID L. GADDIS

**I.     Introduction & Background**

1.      During my career with the U.S. Drug Enforcement Administration ("DEA")
spanning three decades, I have become familiar with the drug-trafficking operations and assets of
foreign cartels and criminal enterprises involved in the global drug trade.  When I retired from
the DEA in 2011, I held the position of Chief of Global Enforcement Operations, in which I had
operational oversight responsibility for DEA personnel and counter-narcotics operations
worldwide.  My 25-year career at the DEA also included positions as a special agent, Deputy

Chief for International Operations, Regional Director in Bogotá, Colombia, and Regional Director in Mexico City, Mexico. My assignments were focused on counter-narcotics investigations and operations in the United States, Central America, and Colombia. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

2.　　During the course of my work for the DEA, I have had access to specialized briefings, facts, and intelligence regarding organizations participating in the global drug trade, including, but not limited to, the United Self Defense Forces of Colombia, or the right-wing narco-terrorist group ("AUC"), the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), the Medellín Cartel, the Cali Cartel, and the North Valley Cartel. I developed specialized knowledge and accessed intelligence about the drug-trafficking activities and revenues derived from those activities for narco-terrorist groups, such as the AUC, while working as a DEA special agent focused on sensitive counter-narcotics operations in the United States, Central America, and the Andean Region of South America, centered in Colombia.

3.　　I routinely reviewed interagency intelligence reports and attended interagency briefings discussing the various groups involved in the illegal drug trade including the AUC. At times, I personally provided interagency briefings to members of U.S. Congress, the U.S. Attorney General's Office and high command individuals in the U.S. Department of Defense. During this time, DEA investigations identified that the AUC was heavily involved in the supply of illegal narcotics for cartels operating in Mexico and Central America, and that the AUC was trafficking narcotics throughout these regions and all over the world. These complex international investigations are supported by raw intelligence from confidential sources, foreign sources of information, foreign law enforcement, cocaine smuggling interdictions, arrests, federal indictments and successful prosecutions. Part of my responsibilities was to monitor and

2

study information about the organizations involved in the Colombian drug trade, such as the AUC, including public and private estimates of its strength and resources from drug trafficking and other illicit activities. As a senior DEA official living and working in Colombia from 2003 through 2006, I also discussed joint counter-narcotics strategies regarding the AUC with high-ranking Colombian government officials and had responsibility over AUC-related investigations and joint-targeting initiatives with the Colombian government. Such investigations that I was involved in led to the indictment of several senior AUC leaders in U.S. court for drug-trafficking offenses.[1] Other investigations that I was involved in led to the indictment of several senior FARC leaders and members of Colombian drug cartels.[2]

4.     I was asked by Blank Rome LLP to submit this rebuttal report to address certain aspects of the reports submitted by Professor Terry Lynn Karl, Professor Oliver Kaplan, and Manuel Ortega. In particular, I make the following points in rebuttal: (1) from its inception through its demobilization, the AUC was heavily involved in the illegal drug trade in Colombia; (2) the primary source of revenue for the AUC was illegal drug activities that accounted for at least 70% of the AUC's annual income or approximately $200 million per year from the drug trade; (3) the amount of money that the AUC extorted from Chiquita between 1997 and 2004 was insignificant when compared to the AUC's overall annual income and particularly income derived from illegal drug activities; (4) drug traffickers, such as the AUC, victimized companies with commercial transportation operations by smuggling drugs and illegal contraband in cargo using highly sophisticated concealment methods; and (5) Chiquita developed comprehensive

---

[1] *See United States. v. Carlos Castaño Gil, Salvatore Mancuso, Juan Carlos Sierra Ramirez* (D.D.C. Sept. 2002)

[2] *See United States v. Cabrera Cuevas, et al.,* 1:03-cr-00554 (D.D.C.); *United States v. Marin, et al.*, No. 1:04-cr-00446 (D.D.C.).

drug interdiction policies and procedures, cooperated with law enforcement and customs to prevent drug smuggling, and was recognized as an industry leader in the prevention of drug smuggling on vessels.

5.      In preparing this report, I relied on my extensive experience in the counter-narcotics field, intra- and interagency information accessed during my years in the DEA, and public sources of information regarding the AUC that are similar to or consistent with what I reviewed as part of my responsibilities with the DEA.  The public sources I consulted in preparing this report are listed in Exhibit B.  Some of them are cited in this report.

6.      I have provided deposition testimony as an expert witness once in the past four years.[3]  I have not testified as an expert witness at trial in the past four years.  I do not have, nor have I ever had, any financial interest in the entity or persons named as parties in this case.  I also lack any financial interest in the outcome of this case.  I was engaged by Blank Rome LLP to provide an honest, independent opinion on behalf of Chiquita Brands International, Inc. and the individual defendants.  My time spent in connection with this engagement is being compensated at $650 per hour.

## II.      The Colombian Drug Trade

7.      Colombia has been a major source of illegal drugs consumed in the United States and other parts of the world since the 1970s.  During the 1970s, Colombia transitioned from being a primary producer and distributor of marijuana to being a major producer and distributor of cocaine.  Colombian traffickers have played a key role in the production of cocaine and its distribution to the market, primarily in the United States and Europe.  Colombian drug

---

[3] In re: Chiquita Brands International, Inc. alien Tort Statute and Shareholder Derivative Litigation: ATA Actions.

trafficking organizations—such as the Medellín cartel formed in the 1980s and led by Pablo Escobar—immediately gained control of the worldwide supply of cocaine. In the 1980s, prior to founding the Autodefensas Campesinas de Córdoba y Urabá ("ACCU") and AUC, respectively, brothers Fidel Castaño and Vicente Castaño, were members of the Medellín drug cartel and close allies with Pablo Escobar. Prior to his tenure as a leader of the AUC, Diego Murillo Bejarano aka "Don Berna" was also a prominent member of the Medellín cartel. In the late 1980s and early 1990s, the Medellín and Cali cartels were engaged in bloody battle over the cocaine business. Following Pablo Escobar's brutal murders of key members of the Medellín cartel in 1991, Fidel Castaño and Vincente Castaño defected from the Medellín cartel and joined forces with Carlos Castaño, Don Berna, the Cali cartel and others to form Pereguidos por Pablo Escobar. This translated to people prosecuted by Pablo Escobar. The group known as Los Pepes was largely funded by the rival Cali cartel. Los Pepes played a role in weakening the Medellín cartel and end ending Pablo Escobar's reign.

8.      By the early 1990s, Colombia was the main source of the cocaine sold in the United States and has remained so to this day.[4] Since the 1990s, Colombia has also been one of the main sources of heroin consumed in the United States.[5]

9.      The production and distribution of illegal drugs in Colombia has been a very lucrative business and the preferred source of income for Colombian criminal organizations,

---

[4] U.S. government estimates indicate that over 90% of the cocaine that enters the United States originates in Colombia. *See, e.g.*, U.S. Office of National Drug Control Policy, *Coca in the Andes* (n.d.), https://www.whitehouse.gov/ondcp/targeting-cocaine-at-the-source.

[5] *See, e.g.*, U.S. Department of State, 2015 International Narcotics Control Strategy, *Country Report: Colombia* (n.d.), http://www.state.gov/j/inl/rls/nrcrpt/2015/vol1/238958.htm ("Colombia remains a major source country for cocaine, heroin and marijuana."); U.S. Department of State, *1999 International Narcotics Control Strategy Report* (Mar. 1, 2000), *available at* http://www.state.gov/j/inl/rls/nrcrpt/1999/903.htm ("Colombia produces and distributes more cocaine than any other country in the world and is also an important supplier of heroin.").

including the AUC. With staggering profits from the cocaine production and trafficking business, from the formation of the AUC through the AUC's Peace Process dismantlement, the AUC aimed and focused its operational efforts to be one of the largest cocaine suppliers in the world. With exponential revenue streaming from their cocaine business operations since the mid 1990s, the AUC did not need or require seed money derived by extortion, and any income from criminal activities aside from drug trafficking is insignificant in comparison. Several, if not the majority, of the paramilitary leaders were, first and foremost, major drug traffickers.[6] Most of these narcotics revenues came from cocaine trafficking, which has been the most important and profitable aspect of the illicit drug business in Colombia since the 1970s.

10.    Several groups have participated and profited handsomely from the illegal drug business in Colombia. Notorious drug cartels—most notably the Medellín and Cali cartels—dominated the business in the 1980s but were substantially weakened or dismantled by the early-to-mid 1990s. The AUC has played a key role in the Colombian drug trade since its formation in the mid-1990s. The paramilitary groups, such as the AUC, had always been engaged in the narcotics business and dependent on income from drugs. In 2001, AUC leader Carlos Castaño admitted that 70 percent of the financing of paramilitary units was derived from narcotics.[7] That percentage likely increased after 2001 as the AUC's involvement in illegal drug activities increased. Credible estimates put the FARC's revenue from the drug trade at as high as $630

---

[6] *The Peace Process in Colombia with the AUC, Woodrow Wilson Center Report on the Americas #13, edited by Cynthia J. Arnson; 2004*

[7] *Countering Threats to Security and Stability in a Failing State, Lessons from Colombian Center for Strategic & International Studies Report; 2009*

million per year.[8] From the inception of the AUC through 2005, the FARC and AUC were at war over the drug trade and territory.

### III. The AUC Has Actively Participated in the Illegal Drug Business and Derived Substantial Income from It

11. The AUC emerged from and developed hand and hand with the drug trade in Colombia.[9] The AUC began as a group of loosely knit hired guns for the Cali and Medellín cartels.[10] The AUC began by working with the drug cartels and expanded to fighting a war for control of the coca growing areas and drug supply routes.[11] As the AUC increased their involvement in the Colombian drug trade, battles with the guerillas over control of the illegal drug business were frequent. The founding leaders of the AUC had access to renegade chemists from the major cartels who could refine coca paste into pure cocaine. The cocaine manufacturing process takes place in labs set up in remote areas of Colombia. This allowed the AUC to profit from the more lucrative sale of pure cocaine.

12. By the mid-1990s, the AUC was already controlling coca farming, refining and distribution in the vast rural areas of Colombia, including in the Departments of Antioquia, Cordoba, Magdalena, Meta, Atlantico, Valle del Cauca, Tolima and Cauca, in which it had a presence and where coca farming and refining occurred. The heightened violence in Turbo and Santa Marta in the late 1990s and early 2000s is explained by an increased demand for cocaine in

---

[8] *See Colombian Report Shows FARC is World's Richest Insurgent Group*, Jane's Intelligence Report, September 2005.

[9] International Crisis Group Latin America Report No. 11, War and Drugs in Colombia, p. 13.

[10] International Crisis Group Latin America Report No. 11, War and Drugs in Colombia, p. 13.

[11] International Crisis Group Latin America Report No. 11, War and Drugs in Colombia, p. 13.

the US and the EU, as the FARC and AUC waged a very intense war because cocaine was so profitable.[12]

13.     The AUC endeavored to expand its territory in Colombia and quickly controlled many coca-growing and cocaine-producing regions.  The presence of the paramilitaries in Barranquilla was also due to its close links with drug trafficking and organized crime.[13]  This AUC territorial expansion frequently resulted in combat against the FARC's traditional areas of control and led to murders in the two narco-terrorist groups as well as civilians caught in between them, including coca farmers.

14.     By the mid-1990s, the AUC had also begun "taxing" the movement of crude and refined cocaine, as well as precursor chemicals, used in the multiple clandestine laboratories set up by drug trafficking organizations in areas controlled by the AUC.

15.     Additionally, the AUC struck deals with the cartels to provide security to cocaine-production facilities, smuggling routes, and clandestine airstrips; becoming a partner in the business operations with established drug trafficking organizations.  The AUC also sold franchises to regional drug traffickers who relied on the AUC for security in exchange for a portion of the drug profits.  An example of AUC and traditional drug trafficker associations is reflected in the United States Southern District of New York (SDNY) press release following the conviction of Colombian cocaine kingpin trafficker Daniel Barrera-Barrera, aka "Loco Barrera." According to the SDNY's U.S. Attorney Preet Bharara, "As he has now admitted in our courthouse, Barrera bought cocaine paste from the FARC and, under the protection of the AUC,

---

[12] *Essays on the Economics of the Colombian Armed Conflict, Jamie Milan-Quijano, Doctoral thesis, accepted but not yet published in Economic Inquiry, 2013*

[13] *Paramilitaries in the city of Barranquilla:  Organized crime and violence markets, Luis Fernando Trejos Rosero & Aura Violeta Posada Ramirez, 2014*

8

turned it into hundreds of tons of hugely profitable product annually, some of which he knew was intended for distribution in the U.S. For years, the AUC financed its terrorist activities through the proceeds of cocaine trafficking in AUC-controlled regions of Colombia."

16.    By the mid-to-late 1990s, AUC units had expanded to numerous regions and controlled much of Colombia's cocaine trade. Following the demise of the major old-fashioned cartels, the AUC eventually began essentially operating as a mega drug cartel. AUC contacts abroad helped smuggle cocaine out of Colombia and into foreign markets. AUC elements were directly involved in processing cocaine and exporting cocaine from Colombia.[14]

17.    As a result of these activities, the AUC became one of the largest suppliers of cocaine in the world and soon became a major target of the DEA. Eventually, the AUC was also designated by the U.S. government as a specially designated major narcotics trafficker, in recognition of its importance in the cocaine trade.[15]

18.    Drug trafficking revenues more than doubled in the late-1990s as the AUC became more actively and directly involved in cocaine production and distribution.

19.    The AUC has derived substantial income from its participation in the illegal drug business. Although the AUC publicly stated that their purposes was to defend the population from attacks by the FARC and other guerilla groups in Colombia, the primary goal of the AUC

---

[14] *United Self Defense Forces/Group of Colombia (AUC-Autodefensas Unidas de Colombia). Global Security. N. p. 07 November 2011. Web 3 August 2015*

[15] On May 29, 2003, President George W. Bush designated the AUC as a specially designated narcotics trafficker under the Foreign Narcotics Kingpin Designation Act. *See* Office of the Press Secretary of the White House, *President Submits Report to Congress on "Kingpin" Sanctions* (Jul. 2, 2003),
http://iipdigital.usembassy.gov/st/english/texttrans/2003/07/20030702173737rellims6.809634e-02.html#ixzz4H34LWkGB.

and its leaders was control over the illegal drug business.  In short, the AUC, and its leaders, were first and foremost drug traffickers operating much like a mega drug cartel in Colombia.

20.     Much of the violence perpetrated by the AUC was to control territory and protect its very lucrative drug manufacturing and distribution operations.  Much of the fighting between the FARC and the AUC was for control over coca plantations and drug trafficking routes.[16]  The AUC operated in a similar manner to the violent drug cartels in Colombia that were also targeted by the DEA.

21.     As a DEA agent involved in counter-narcotics investigations, including investigation of narcotics trafficking by or involving the AUC, I reviewed numerous sources providing information on the AUC's drug operations and resources, in addition to intelligence obtained by the DEA, other U.S. agencies such as the FBI, and foreign governments, including Colombia.  In preparing this report, I also reviewed an estimate of the AUC's income derived from the drug trade that I consider to be credible and generally consistent with the intelligence I obtained as a DEA agent and sources I reviewed in the course of DEA investigations.

22.     In 2003, official Colombian government data put the AUC's annual income at approximately $286 million with $200 million derived from the drug trade. [17]  Given the AUC's deep involvement in all aspects of the illegal drug business that number may have been conservative.  Some Intelligence sources put the AUC's share of the cocaine business in Colombia in the early 2000s at approximately 40%.  In 2003, Colombian cocaine production was

---

[16] *The FARC and Colombia's Illegal Drug Trade, John Otis, Wilson Center Latin American Program; 2014*

[17] International Crisis Group Latin America Report No. 11, War and Drugs in Colombia, p. 19; PNUD, *El Conflicto: Callejon con Salida,* Informe Nacional de Desarrollo Humano, (Bogata, 2003), p. 285.

440 tons.[18] The price of processed cocaine was on average $1,551/kg in Colombia.[19] At the height of the AUC's drug activities, DEA informants and sources of information, put the AUC's control of the cocaine trafficking stream at 15-20 metric tons per month. This would translate to approximately $279- $372 million in annual income. Unlike the FARC, the AUC was more involved in the lucrative refining and export stages of cocaine, while the FARC was more dependent on the less lucrative crop growing and coca base taxing.

23. In addition to Official data from Colombia on the AUC's income, the head of the AUC, Carlos Castaño, also publicly admitted in 2001 that "70 percent" of AUC operational funding was from drug money. The percentage of income derived from drug money likely increased as the AUC gained greater control over the drug business in the years to follow.

24. In my professional judgment, the AUC's income from the illegal drug business was approximately $200 million per year on average from the late-1990s through 2005. I base this estimate on official data, the number of kilograms produced per year on average, the wholesale price for a kilogram of cocaine sold in Colombia, my knowledge and experience with the drug trafficking industry, statements made by AUC leaders, public sources of information, and my knowledge of the AUC's control over a substantial portion of the illegal drug business in Colombia.

25. The drug trade has been the primary source of funding for the AUC since at least the mid-1990s. The AUC's involvement in the drug trade has generated more cash than the organization could spend, so much so that it resorted to investing a portion of their drug-fueled

---

[18] International Crisis Group Latin America Report No. 11, War and Drugs in Colombia, p. 19

[19] By comparison, the wholesale street value of a kg of cocaine in the United States was more than $42,000 in 2003. *See* International Crisis Group Latin America Report No. 11, War and Drugs in Colombia, p. 19

fortune in, among other things, companies and real estate, including properties in Colombia, Panama and Mexico. In fact, between the years 2003-2007 during and subsequent to the AUC Peace Process Accord an unexplained explosion of infused cash in the real estate markets of Colombian cities created an exponential appreciation of property values. So much so, for instance, that some property values in Bogota, Colombia exceeded the property values of real estate in Manhattan, New York, per square footage. Because of its involvement in the drug trade, the AUC was one of the most well-funded insurgent groups in the world.

26.     Compared to the $200 million of annual income from the drug business, the amount of money that the AUC extorted from Chiquita was insignificant. Accepting Professor Kaplan's extortion payments paid by Chiquita in Figure 6.1 of his report as true, the amounts in each year from 1997 through 2004 are insignificant when compared to the AUC's annual income from drug activities.

27.     In my professional opinion, I disagree with Professors Karl and Kaplan that the money that the AUC extorted from Chiquita's subsidiary to the AUC were important seed money for the AUC. The AUC developed hand in hand with the illegal drug business. The AUC's annual income from the drug business dwarfed the extortion payments made by Chiquita in every year from 1997 through 2004.

28.     In my professional opinion, I also disagree with Agent Ortega's conclusion that payments of thousands of dollars would have been a substantial source of funding for the AUC. Again, when compared to the AUC's overall income and income from drug activities, money that the AUC extorted from Chiquita was not a substantial source of funding for a narco-terrorist group the size of the AUC.

12

## IV.    The AUC's Drug Smuggling Methods

29.    The AUC utilized land, air and sea smuggling methods to distribute hundreds of metric tons of cocaine. As do other drug trafficking organizations, the AUC sometimes used legitimate transportation nodes, i.e. shipping, trucking and aviation companies, to secretly smuggle cocaine and other illegal drugs in extremely sophisticated methods and techniques without the knowledge or consent of the legitimate transportation companies. Over the years, drug traffickers such as the AUC, who profit from highly lucrative cocaine trafficking, have employed very creative methods to conceal the drugs from both law enforcement and the transportation companies that they exploit to move the drugs. The DEA and law enforcement agencies constantly battle the clever ingenuity of drug traffickers. Some of those methods that I encountered during my tenure with the DEA include, but are not limited to, product being dissolved in liquids, concealed in perceived legitimate canned or boxed commodities, and mechanical secret traps in walls, ceilings and floors. DEA has worked thousands of investigations where innocent companies are unaware that concealed drugs were transported in their legitimate transportation nodes. From my experience at the DEA, virtually all transportation companies were facing the same threat from drug traffickers smuggling drugs on their vessels, planes, trains, trucks, etc. Notwithstanding the best efforts of law enforcement and businesses, drugs continue to be smuggled into the country undetected.

30.    Professor Kaplan opines that Chiquita "facilitated shipments of profitable illegal drugs" for the AUC and concludes that Chiquita provided an estimated $33 million in "in-kind support" to the paramilitaries by facilitating cocaine shipments. See pp. 35-38. Professor Kaplan's report provides no support for such opinions. In my professional opinion based upon the review of the information provided by Professor Kaplan, there is no evidence that Chiquita

13

facilitated shipments of illegal drugs for the AUC.  Nor is there evidence that Chiquita provided an estimated $33 million in "in-kind support" to the paramilitaries by facilitating cocaine shipments.  I am not aware of any facts that suggest that the company permitted, or was complacent, in any attempts by the AUC to utilize the company's transportation nodes to smuggle illegal drugs.

31.    To the contrary, the evidence suggests that Chiquita made considerable efforts to thwart attempts to smuggle drugs and arms on its ships.[20]  A head of Security at Chiquita's subsidiary in Colombia, testified that the company worked closely with the Colombian Police to prevent drug smugglers from hiding drugs in its containers or vessels.[21]  Chiquita had protocols[22] and controls to prevent drug smuggling.[23]  Chiquita conducted full inspections and even drilled holes in cargo to prevent drugs from being hidden.[24]  Chiquita placed seals on containers.[25]

32.    When Chiquita uncovered attempts by drug traffickers to smuggle drugs on its ships, Chiquita fully cooperated with law enforcement to foil such attempts.[26]  U.S. Customs' officials have touted Chiquita as a "leader" among commercial ocean carriers in the prevention of drug smuggling.[27]  Chiquita worked closely with the U.S. Customs Service to develop comprehensive drug interdiction policies and procedures, and its efforts were exemplary.[28]  The

---

[20] Deposition of Hermes Hernandez, October 16, 2018, pp. 14-17

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.;* Report of the Special Litigation Committee Chiquita Brands International, Inc., p. 74.

[27] See Department of the Treasury, U.S. Customs Service Letter,  ChiquitaATS0002924869.

[28] *Id.*

14

U.S. Customs Service also acknowledged Chiquita's efforts to encourage other commercial vessel owners to engage in similar cooperative efforts with the U.S. Customs Service.[29] Likewise, Belgium Customs also commended Chiquita for its close cooperation with Belgian Customs to prevent the transportation of drugs on its vessels.[30]

## V.    Conclusion

33.    From its inception, the AUC was heavily involved in the illegal drug trade in Colombia. The primary source of income for the AUC was illegal drug activities that accounted for at least 70% of the AUC's annual income. The AUC's annual income was approximately $286 million and approximately $200 million was from illegal drugs. The amount of money that the AUC extorted from Chiquita was insignificant compared to the AUC's income from drugs. Drug traffickers, such as the AUC, victimized companies with commercial transportation operations by smuggling drugs and illegal contraband in cargo. Chiquita developed comprehensive drug interdiction policies and procedures, worked closely with law enforcement and customs to prevent drug smuggling, and was recognized as an industry leader in the prevention of drug smuggling on vessels.

---

[29] *Id.*

[30] See Belgian Customs Letter, ChiquitaATS0002925138.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Date: 12-20-2018

David L. Gaddis

16

# Exhibit A

# DAVID LEE GADDIS

3309 Lake Pointe Drive, Belmont, NC 28012

(Mobile/Text phone) 706-490-0256

(Home phone) 919-346-0460

Gaddis@Gglobal-ps.com

## Professional Background

My career spans 30 years in federal law enforcement, seizure assets management, crisis management & business continuity, investigations, compliance/ethics, and risk mitigation. For twenty-five years I served as a Special Agent with the U.S. Department of Justice, Drug Enforcement Administration. In this role, I spent seven + years in the Senior Executive Service and split my career between domestic and international assignments, completing various assignments in U.S. embassies managing an array of security, investigative and crisis management programs to protect the people, property and information of the U.S. Government. I managed programs to protect DEA personnel, their families, coworkers, assets such as residences, vehicles, aircrafts, business facilities and information. My specialized focus and attention on criminal enterprises and terrorist organizations in Latin American countries qualifies me as an expert in this field.

Since retiring from DEA in 2011, I developed and have managed a security consulting firm, G-Global Protection Solutions, Inc.; that achieves corporate security management, investigations, crisis & emergency response management and operational risk. Between June 2013 and July 2015 I designed & governed programs to enhance corporate security at a national financial management services company.

## PROFESSIONAL EXPERIENCE

### G-GLOBAL PROTECTION SOLUTIONS, INC. - Charlotte, NC; President/CEO

April 2011 to Present  I developed and manage an International corporate security consulting firm for global companies requiring investigative support, design & development of security programs that protect people, assets and  information ( **www.Gglobal-ps.com** ).  Involves management of all operations pertaining to physical security assessments, executive protection, crisis management, emergency response policy & procedures, investigations against fraud, theft, FCPA violations, brand protection and other security services.  Key Achievements are:

- ➢ Conducted numerous global investigations, resulting in successful return on investment to clients.

- ➢ Implemented business continuity/global pandemic plans for corporate clients.

- ➢ Developed a crisis management/K&R plan and best practices for global management team.

- ➢ Developed and conducted in concert with other corporate functions a strategic approach to conduct and manage investigations regarding physical security functions, i.e. response- coordinate-collaborate-report, etc.

➢       Developed and executed a strategic security plan with business units and functional leadership.

➢       Collaboratively developed and implemented a global crisis management and business continuity plan for several corporate clients.

➢       Developed an Executive Protection Program and a corporate kidnap and ransom plan for senior management of several corporate clients.

➢       Developed a workplace violence and active shooter program for associate & security vendor training.

**U.S. DEPARTMENT OF JUSTICE, Drug Enforcement Administration February 1986 – Retirement (March 31, 2011)**

**Chief of Enforcement for DEA Global Operations, Arlington, VA  2009-March 2011**

**Regional Director, Mexico City, Mexico 2006-2009**

**Regional Director, Bogotá, Colombia 2003-2006**

**Assistant Special Agent-in-Charge, Charlotte, NC  2001-2003**

**Deputy Chief for International Operations, Arlington, VA  1998-2001**

**Resident Agent-in-Charge, Hermosillo México  1995-1998**

**Special Agent/Criminal Investigator, Miami & Central America  1986-1995**

At the height of my service, I was the DEA chief executive responsible for investigations and enforcement operations throughout 310 DEA offices in 69 countries, with U.S. law enforcement contacts that currently remain viable. Deployed and directed a global enforcement workforce overseeing $500 million operating budget and supervising operational and administrative functions. Ensured the successful implementation of diverse security programs including risk mitigation efforts in high risk environments, new technology upgrades, security policy/procedures, and emergency crisis action management and medical evacuation procedures. I assessed and analyzed data to determine effectiveness of DEA enforcement programs, including anti-kidnaping efforts to mitigate risk against agents, family members and foreign service national employees. I supervised sensitive, complex investigations and assured ethical protocol compliance with U.S. Department of Justice requirements. I managed overseas operations at the SES level for Mexico, Canada & Central America, as well as for the Andean Region in Bogota, Colombia during challenging times in the global drug war. Key Achievements are:

➢       Investigated and apprehended significant international fugitives associated to the FARC, ELN, the AUC, and North Valley Cartel.

➢       Established key connections between Colombian drug trafficking organizations, including the FARC, with Mexico's drug cartels that span throughout the United States.

➢       Supervised a multitude of global investigations against major cartels in Colombia, Mexico and associated organized crime syndicates throughout the globe. Throughout my

career I have conducted hundreds of successful investigations and testified in courts in the U.S. and abroad.

➤ Supervised access control installations for off-sites and residences of DEA employees and host nation colleagues. Safeguarded DEA employees in Colombia, Venezuela, Ecuador, Haiti, Russia, Afghanistan, Mexico and Thailand by championing deployment of agency-wide crisis response plan for high-risk overseas operations.

➤ Developed risk management & security programs for numerous agency functions, including aviation emergency response, travel security, crisis management and manned guard service for protection of people, assets and information..

➤ Supervised and conducted complex investigations against threats and serious complaints of DEA.

➤ Served as industry expert in the topics of transnational organized crime, international investigations & security programs; lecturing at IACP, OSAC, ISMA, as well as international forums in Colombia, Mexico and Costa Rica.

## EDUCATION

Bachelor of Arts in Criminal Justice-University of Alabama-Huntsville, 1985

Master of Science in Criminal Justice Management-LaSalle University (Distance Learning Program), 1997

## PROFESSIONAL DEVELOPMENT

Harvard University, John F. Kennedy School of Government: Leadership

Johns Hopkins University: Leadership & Management

University of North Carolina at Chapel Hill: Equal Opportunity in Management

Adjunct Professor at Wake Technical Community College, Raleigh, NC

Frequent Guest Lecturer at Appalachian State University, Boone, NC

## AWARDS & RECOGNITION

Medal of Honor – Presented by the DEA Administrator in 1987

Distinguished Presidential Rank Award, Presented by the U.S. President in 2010

Citations for Exemplary Service, Excellent Performance, and specific Acts of Service between 1986-2010.

## EXHIBIT B – SOURCES

*United States. v. Carlos Castaño Gil, Salvatore Mancuso, Juan Carlos Sierra Ramirez*, 1:02-cr-00388 (D.D.C.  Sept. 2002).

*United States v. Cabrera Cuevas, et al.,* 1:03-cr-00554 (D.D.C.).

*United States v. Marin, et al.*, No. 1:04-cr-00446 (D.D.C.).

U.S. Office of National Drug Control Policy, *Coca in the Andes* (n.d.), https://www.whitehouse.gov/ondcp/targeting-cocaine-at-the-source.

U.S. Department of State, 2015 International Narcotics Control Strategy, *Country Report: Colombia* (n.d.), http://www.state.gov/j/inl/rls/nrcrpt/2015/vol1/238958.htm.

U.S. Department of State, *1999 International Narcotics Control Strategy Report* (Mar. 1, 2000), *available at* http://www.state.gov/j/inl/rls/nrcrpt/1999/903.htm.

*The Peace Process in Colombia with the AUC, Woodrow Wilson Center Report on the Americans #13, edited by Cynthia J. Arnson; 2004.*

*Countering Threats to Security and Stability in a Failing State, Lessons from Colombian Center for Strategic & International Studies Report; 2009.*

*See Colombian Report Shows FARC is World's Richest Insurgent Group*, Jane's Intelligence Report, September 2005.

International Crisis Group Latin America Report No. 11, War and Drugs in Colombia.

*Essays on the Economics of the Colombian Armed Conflict, Jamie Milan-Quijano, Doctoral thesis, accepted but not yet published in Economic Inquiry, 2013.*

*Paramilitaries in the city of Barranquilla:  Organized crime and violence markets, Luis Fernando Trejos Rosero & Aura Violeta Posada Ramirez, 2014.*

*United Self Defense Forces/Group of Colombia (AUC-Autodefensas Unidas de Colombia). Global Security. N. p. 07 November 2011. Web 3 August 2015.*

Office of the Press Secretary of the White House, *President Submits Report to Congress on "Kingpin" Sanctions* (Jul. 2, 2003), http://iipdigital.usembassy.gov/st/english/texttrans/2003/07/20030702173737rellims6.809634e-02.html#ixzz4H34LWkGB.

*The FARC and Colombia's Illegal Drug Trade, John Otis, Wilson Center Latin American Program; 2014.*

PNUD, *El Conflicto: Callejon con Salida,* Informe Nacional de Desarrollo Humano, (Bogata, 2003).

Deposition of Hermes Hernandez, October 16, 2018.

Report of the Special Litigation Committee Chiquita Brands International, Inc.

Department of the Treasury, U.S. Customs Service Letter, ChiquitaATS0002924869.

Belgian Customs Letter, ChiquitaATS0002925138.

*New Drug Trafficking Armed Groups In Colombia and the Applicability of International Humanitarian Law*, Marcela Barón-Soto & Alejandro Gómez-Velásquez, EAFIT Journal of International Law (2015).

*Drug trafficking: genesis of the paramilitaries and inheritance of criminal gangs*, Camilo Echandia Castilla, Serie de informes 19, Fundación Ideas para la Paz. (2013).