UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-01916-MD-MARRA

IN RE: CHIQUITA BRANDS
INTERNATIONAL INC. ALIEN TORT
STATUTE AND SHAREHOLDERS
DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATS ACTIONS

07-60821-CIV-MARRA (*Carrizosa*)
08-80421-CIV-MARRA (N.J. Action) (*Does 1-11*)
08-80465-CIV-MARRA (D.C. Action) (*Does 1-144*)
08-80508-CIV-MARRA (*Valencia*)
08-80408-CIV-MARRA (N.Y. Action) (*Manjarres*)
10-60573-CIV-MARRA (*Montes*)
10-80652-CIV-MARRA (D.C. Action) (*Does 1-976*)
11-80404-CIV-MARRA (D.C. Action) (*Does 1-677*)
17-81285-CIV-MARRA (D.C. Action (*Does v. Hills*)
18-80248-CIV-MARRA (Ohio Action) (*John Doe 1*)
_____/

**ORDER  GRANTING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT
ON COLOMBIAN LAW CLAIMS OF BELLWETHER PLAINTIFFS [DE 2283, 2302]
AND  GRANTING INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON TVPA CLAIMS OF BELLWETHER PLAINTIFFS [DE 2289, 2304]**

The bellwether Plaintiffs[1] are family members of Colombian nationals who were killed in

separate attacks in the Uraba or Magdalena regions of Colombia between 1997 and 2004, at the

_____

[1] The original pool of bellwether Plaintiffs selected for summary judgment briefing, and, if necessary, trial have
been  designated as follows:

   1.  Ana Ofelia Torres Torres (10-60573-CIV-MARRA (*Montes*)

   2.  Gloria Eugenia Munoz (10-60573-CIV-MARRA (*Montes*)

   3.  Nancy Mora Lemus (08-80480-CIV-MARRA) (*Manjarres*) (N.Y.Action)

pitch of a prolonged civil war which displaced hundreds of thousands of Colombian civilians from their homes and claimed the lives of thousands. Plaintiffs sued Chiquita Brands International, Inc. ("Chiquita'), claiming it funneled approximately 1.7 million dollars between 1997 and 2004 to the Colombian paramilitary group which allegedly killed their family members -- the *Autodefensas Unidas de Colombia* (the United Self-Defense Groups of Colombia, or "AUC"). They also sued numerous Chiquita executives allegedly involved in Chiquita's decision to fund the AUC, claiming that the financial support and other accommodations extended by Chiquita to the AUC strengthened the AUC's terror capabilities in the banana-growing regions where the Plaintiffs' families resided and facilitated the abductions and deaths of their loved ones. Plaintiffs further

---

4. Pastora Durango (10-60573-CIV-MARRA) (*Montes*)

5. Jane Doe 46 (08-80465-CIV-MARRA) (*Does 1-144*) (D.C. Action)

6. Jane Doe 7 (08-80421-CIV-MARRA) (*Does 1 -11*) (N.J. Plaintiffs)

7. Juana Doe 11 and Minor Doe 11A (07-60821-CIV- MARRA) (*Carrizosa*)

8. Juvenal Enrique Fontalvo Camargo (08-80480-CIV-MARRA) (*Manjarres*) (N.Y.Action)

9. Juana Perez 43A (08-80465-CIV-MARRA) (*Does 1-144*) (D.C. Action)

10. Seven surviving children of Jose Lopez 339 (08-80508-CIV-MARRA) (*Valencia*)

11. John Doe 7 (08-80421-CIV-MARRA) (*Does 1-11*) (N.J. Plaintiffs)

[DE 2218] [DE 2244]. These individuals were drawn from a pool of fifty-six "full discovery cases" in this MDL proceeding and designated as bellwether cases pursuant to a selection procedure reached by agreement between Defendants and those Plaintiff groups represented by counsel other than Attorney Paul Wolf ("non-Wolf Plaintiffs)." A twelfth bellwether Plaintiff from this group, drawn from Case No. 10-60573 (*Montes*), was earlier dismissed pursuant to stipulation of the parties [DE 2244, p. 1].

In addition, since the inception of these proceedings, the claim of Bellwether Plaintiff Jane Doe 46 (*Does 1-144*) (Case 08-80465) was severed from this original pool [DE 2500], leaving the claims of ten non-Wolf Bellwether Plaintiffs for determination in the current summary judgment proceeding.

From the Plaintiff groups represented by Attorney Wolf ("Wolf Plaintiffs") included in the full discovery cases, two bellwether claimants have been selected for summary judgment procedures:

1. Doe 840 (10-80652-CIV-MARRA)

2. Doe 378 (10-80652-CIV-MARRA)

The Wolf Plaintiffs inadvertently made a third bellwether designation (Doe 265) from Case 11-80404, and sought to amend the summary judgment briefing agenda to accommodate this oversight [DE 2241]. Defendants' objection to the proposed amendment was sustained [DE 2499, f.n. 2], removing this claim from consideration in the current summary judgment analysis.

allege that Chiquita was aware of the AUC's status as a violent terrorist organization when it paid the AUC, and continued to pay even after the AUC was formally designated as a Foreign Terrorist Organization by the United States in September 2001.

On this predicate, Plaintiffs assert Colombian law tort claims against Defendant Chiquita Brands International, Inc. ("Chiquita") and the Individual Defendant Keith Linder. They assert Colombian law claims and Torture Victim Protection Act ("TVPA") claims against Individual Defendants Cyrus Freidheim; Charles Keiser; Robert Kistinger; Robert Olson; William Tsacalis; and Estate of Roderick M. Hills, Sr., by and through Carla Hills, as Personal Representative of the Estate.

## I.      INTRODUCTION

The matter is now before the Court on the Defendant Chiquita and the Individual Defendants' Joint Motion for Summary Judgment on the Colombian law claims and the Individual Defendants' Motion for Summary Judgment on the TVPA claims. A central tenet[2] underpinning both motions is that Plaintiffs are unable to identify admissible evidence showing AUC

---

[2] In the Joint Motion for Summary Judgment on the Colombian law claims, Defendants also argue that: (1) Colombian substantive law does not recognize the multiple, individual specific torts alleged in Plaintiffs' complaints, but rather only recognizes the general concept of civil fault-based liability, requiring dismissal of all specific tort claims except general negligence claims; (2) Colombian negligence law requires proof of voluntary action in order to sustain civil liability, and there is no admissible evidence on record showing that Chiquita acted voluntarily in making the AUC payments (extortion variation); (3) there is no competent evidence that Chiquita or the Individual Defendants voluntarily aided the AUC by extending other accommodations, such as the use of its Colombian port facility to ship illegal drugs and arms; (4) there is no evidence that Defendants' alleged tortious acts were the "but for" cause of injury, without evidence that the Chiquita financial aid enabled or empowered the AUC to commit these specific murders (e.g. Defendants argue that Chiquita's payments to the AUC, estimated to average $242,000 a year, amounted to "negligible" portion of the estimated $286 million per year generated by AUC narcotrafficking (.0003)) and (5) punitive damages are not allowed under Colombian law.   On the TVPA claims, the Individual Defendants similarly challenge the sufficiency of admissible evidence showing an AUC link to each death in addition to other challenges to the sufficiency of evidence on the elements of the statutory claim.

involvement in the deaths of their family members, and hence Plaintiffs are unable to demonstrate the existence of a genuine issue of material fact on an essential element of all claims.

In their joint motion on the Colombian law claims, Defendants contend Plaintiffs' evidentiary lapse in this respect is fatal to the sufficiency of proofs on the element of causation. In the Individual Defendants' motion on the TVPA claims, Defendants contend that Plaintiffs evidentiary lapse in this respect is fatal to showing the existence of an "extrajudicial killing" as that term is defined under the TVPA. In the latter regard, Defendants argue that without admissible evidence showing the identity of the decedents' killers, Plaintiffs are unable to show that each killing involved a "deliberated" act, i.e. one "undertaken with studied consideration and purpose" that is linked to a state actor. *See generally Mamani v. Berzin*, 654 F.3d 1148, 1154-55 (11th Cir. 2017).

The Bellwether Plaintiffs recognize that they must show, as a factual predicate for both sets of claims, that the AUC was responsible for the murder of each decedent. They contend, first, that they demonstrate the existence of a genuine issue of material fact on this point for all Bellwether Plaintiffs through circumstantial evidence showing that the murders were all committed in geographical areas and in time periods of AUC dominance, under circumstances conforming to characteristic AUC killing methodologies.[3] In this vein, they offer expert testimony describing proportional regional homicide rates across various terrorist organizations and military groups in

---

[3] Regarding the circumstances of each death, Plaintiffs proffer expert and lay testimonial evidence suggesting: (1) the methodology of the murders in question is consistent with the AUC's "*modus operandi*" (particularly gruesome and "extra-lethal" attacks, often involving execution-style bullet shots to the head; use of face masks and motorcycle transport; removal of victims to remote location for killing; removal of victims identification cards (proof of the killing); (2) the location of the murders is consistent with areas of high AUC activity; (3) the timing of the murders is consistent with AUC's rise to dominance in these regions (after driving out the FARC and other guerilla groups); (4) the profile of many of the murder victims fits the typical AUC target – banana workers, union members and leaders, social activists or progressives, suspected leftist sympathizers.

Colombia during the relevant time frame, and killing patterns and methodologies uniquely associated with AUC operations. Against this backdrop, Plaintiffs offer their own testimony and that of various third-party witnesses illuminating the factual history of each killing in an effort to correlate the case-specific facts of each case with the AUC death patterns described by their experts.

Next, Plaintiffs contend that public records are available in some cases to corroborate the existence of an AUC link to each attack, or, at a minimum, to raise a triable issue of fact on the question of AUC involvement. Here, they proffer documents allegedly excerpted from the Colombian government's Justice and Peace Law files, compiled during war crime reparation proceedings,[4] including in material part: (1) "Record 138," a purported excerpt (translated) from the Colombian government's amended "indictment" of AUC leader Raul Hasbun, inclusive of "Appendix 2," a chart listing multiple homicides (including four bellwether decedents) purportedly charged to Hasbun [DE 2346-78], an untitled document bearing the header, "SUPERIOR COURT, Medellin, Chamber of Justice and Peace Office of Magistrate;" (2) the "*Sentencia*" of AUC leader Jose Lugo Mangones (aka "El Ruso"), a purported excerpt (translated) from a judgment of conviction against Mangones [DE 2346-72], an untitled and unsigned document dated July 31, 2015, bearing the header, "Superior Court of Bogota, Justice and Peace Division," with three pages excerpted from Section IV.A., captioned "Criminal Acts of Which They are Accused and Charges

---

[4] The Justice and Peace Law Process offered an alternative to the ordinary Colombian criminal system for demobilized members of the AUC and its predecessor ("ACCU"). In exchange for truthful confessions to crimes committed as AUC members, offered during hearings known as "Free Versions," paramilitaries received reduced criminal sentences (five to eight-year maximum). As part of this process, the Justice and Peace Unit of the Colombian Office of the Public Prosecutor ("UNFJP") was responsible for investigating the crimes, verifying the confessions and issuing indictments. (Sanchez Declaration, DE 2510-1, ¶¶ 7, 9, 10-15, 22-27) (expert for non-Wolf Plaintiffs). According to Sanchez, the UNFJP was required to keep records of all information collected during its investigations, including confessions, and was required to make that information available to the victims. (Sanchez Declaration, ¶¶ 27-28). A judgment issued in the course of Justice and Peace Law proceedings served as the equivalent of a criminal conviction based on a trial or guilty plea in the conventional Colombian criminal system. *Id*. at ¶34.

Filed" (listing deaths of multiple homicide victims, including one bellwether decedent (John Doe 11)); (3) "First Instance Judgment" against "Block Elmer Cardenas,'" a purported excerpt (translated) from a judgment issued against AUC leader Fredy Rendon Herrera (aka "El Aleman") relative to the death of bellwether decedent Jose Perez 339 [DE 2346-93], a two-page, unsigned document dated August 27, 2014, bearing the header, "Hall of Justice and Peace, Superior Court of Medellin," consisting of sentence fragments excerpted from the charge section against the "Elmer Cardenas Block" (under the command of Fredy Rendon Herrera) [¶ 3.3.14], "….they killed attorney [], they execute mister [] and wounded his nephew [] who as a result of the wounds that the armed illegals inflicted upon him became an invalid;" (4) various letters purportedly generated by Colombian prosecutors, recognizing certain Bellwether Plaintiffs as war crime victims and identifying certain AUC leaders as the persons responsible for the murders of their family members; (5) documents purportedly excerpted from Accion Social (USAID-sponsored relief agency) files recognizing certain Bellwether Plaintiffs as war crime victims.

Defendants challenge the proffered testimonial evidence as riddled with inadmissible hearsay, sometimes at double or triple levels. They also challenge the admissibility of the multiple categories of documentary evidence, arguing Plaintiffs do not show a path for the admissibility of these documents at trial under any hearsay exception, and do not competently explain how they could successfully authenticate these documents for admission at trial. Finally, Defendants challenge Plaintiffs' pool of geographical and temporal circumstantial evidence as too speculative to create a genuine issue of material fact on the threshold issue of the AUC's responsibility for each murder.

Following completion of briefing on Defendants' joint motion for summary judgment on the Colombian law claims [DE 2283, 2325, 2363, 2425, 2431], the Court ordered supplemental

briefing on Defendants' evidentiary challenges to Plaintiffs' proffered causation evidence, directing Plaintiffs to identify specific source material in the summary judgment record which supports their claim of AUC responsibility for each death, and to explain how that evidence is either admissible as presented, or to describe the admissible form anticipated at trial (by explaining either how they would satisfy a hearsay exception, or how they would introduce admissible evidence through a specific witness who is both available and competent to testify to the facts at trial and whose identity is disclosed in the existing record) [DE 2499]. The Wolf Plaintiffs and non-Wolf Plaintiffs have since filed supplemental briefing pursuant to this directive [DE 2508, 2510, 2511-1 (sealed)], and Defendants have filed a consolidated reply [DE 2516, 2517-1 (sealed)].

Having carefully considered the parties' submissions, the Court now turns to a review of the summary judgment record to determine, as a threshold matter, whether a triable issue of fact is presented on the issue of AUC responsibility for the death of each Bellwether Plaintiff's decedent.

## II.  FACTUAL BACKGROUND

The factual background of each case, drawn from the testimonial evidence proffered by Plaintiffs, is set forth below. For purposes of the current motion, the underlying facts and all reasonably available inferences from those facts are interpreted in the light most favorable to the Bellwether Plaintiffs as the non-moving parties. Each synopsis is followed by a list of the various proofs offered by each Plaintiff in support of his or her contention that the AUC was responsible

for the murder of his or her decedent.  An analysis and ruling upon of the competency of the proffered evidence is set forth in the discussion which follows (Section IV).[5]

## A.  Case-Specific Evidence

### 1.  Plaintiff Ana Ofelia Torres Torres (*Montes*)

Plaintiff's common-law husband, Ceferino Antonio Restrepo Tangarife, was  a banana worker killed by two bullet shots to the head in Apartado (Uraba) on June 14, 1997.  Plaintiff did not witness the murder but heard the shots.

Plaintiff's theory that the AUC perpetrated the attack is based on the contention that AUC leader Raul Hasbun accepted responsibility for the murder during proceedings before the Colombian government's Justice and Peace Law Commission.   As proof, Plaintiff proffers "Record 138,"  an excerpt from a purported charging document issued by  Colombian prosecutors which, at "Appendix 2," identifies Plaintiff's decedent as one of the homicides presumably charged to Hasbun [DE 2346-28].  Plaintiff further contends that  Hasbun's deposition testimony in this case -- in which he generally acknowledges responsibility for murders perpetrated by subordinates under his command – is corroborative of the contents of this indictment.

Plaintiff  also proffers her own deposition testimony that "back then and over there, those [paramilitaries] were the ones who were doing all the killing." [DE 2348-87, pp. 35-36].  She proffers the sworn statement of her son, Roberto (a four-year-old child at time of the attack) [DE

_____

[5] In Section IV., Section "A," the Court examines Defendants' hearsay objections to the documentary evidence proffered in select cases to determine whether admissible evidence of AUC involvement is presented through this body of evidence. In Section IV.,  Section "B," the Court  assesses  Defendants'  objections to the admissibility of the testimonial evidence proffered by each Plaintiff to determine, alternatively,  whether admissible evidence of AUC involvement may reasonably be drawn from this body of evidence.   In Section IV., Section "C," the Court reviews Plaintiffs' proffered circumstantial evidence, and corresponding expert witness testimony, to determine whether this evidence, standing alone, is  sufficient to create a genuine issue of material fact on the issue of AUC involvement.

2346-105] who avers that he witnessed the attack, and that his sister later told him his father's killers were paramilitaries.[6]

## 2. Plaintiff Jane Doe 7 (*Does 1-11*) (New Jersey Action)

Plaintiff's husband, John Doe 11, was a banana worker and union leader in Chigorodo (Uraba) who, on June 13, 1999, was abducted from his home in the middle of the night and stabbed to death by masked assailants.   Jane Doe 7 did not witness the death of her husband, but testified at deposition that she believed it was the AUC "[b]ecause they were the ones who would come in like that with their faces covered to kill people." [DE 2348-51 at 139].

In a subsequent sworn statement, filed in opposition to the current motion [DE 2348-130], Jane Doe 7 amplified the basis for this belief, stating that her husband was on an AUC "kill list," information he allegedly imparted to her several months before his death.[7]  In this statement, Jane Doe 7 contends that she and her husband were visited one evening "a few months" before  his death by two unidentified co-workers who appeared to be frightened.  She claims her husband "afterwards" told her that his co-workers had come to warn him that they heard his name read from a  kill list earlier that day by AUC operatives who had stopped the bus in which they were traveling;  the operatives allegedly removed two other men from the bus, after calling out their names,  and summarily executed them.  According to Plaintiff Jane Doe 7,  her husband said if the AUC did

---

[6] In her supplemental briefing, Plaintiff concedes she does not have a foundation to advance this testimony as an "excited utterance," stating "Th[is]  [hearsay] statement can  be disregarded on summary judgment." She falls back on the Hasbun indictment,  Record 138 ("Hasbun Acta")  [DE 2346-78], as evidence that this murder is attributable to AUC leader Raul Hasbun.

[7] Defendants objects to the statements proffered in the declaration as inconsistent with prior deposition testimony, and as hearsay.  Plaintiff contends that this testimony supplements, but does not contradict, her earlier testimony, and that both the statements of the co-workers to John Doe 11, and the statements of John Doe 11 to Jane Doe 7, are admissible as excited utterances and present sense impressions under Fed. R. Evid. 803(1), (2) [Supplemental Brief, DE 2511 at p.11].

come for him, it would be because he was a union leader, and suggested that she begin making advance funeral arrangements so that he would not be "left out in the sun."

Plaintiff also proffers the declaration of her son [DE 2348-99], who testified generally about the prevalence of violence against banana and union leaders in the area where his family lived.  He confirmed that his father was a member of a union.   He also stated that the paramilitaries had "a reputation" for killing banana workers and union leaders, and that he had often seen paramilitaries driving around in the area on motorcycles, wearing helmets and carrying bags.  He said the "convivir" were active in the area, killing people they considered "immoral," and he believed, based on  "comments of people in the area," that the AUC was responsible for the  attack on his father.[8]

Finally, Plaintiff supplies supplemental declarations from the following third-party witnesses: (1) "W-1"  [DE 2348-100], who states that  John Doe 11 was abducted by "men with covered faces" who "beat and stabbed him," and that he himself was later abducted by masked men; (2) "W-2"  [DE 2348-128],  who states that the AUC had checkpoints and graffiti in the area, stopped banana workers on buses, targeted  union workers, and massacred people nearby; and (3) "W-3" [DE 2348-127], who states that the AUC frequently killed union leaders and that AUC killers wore hoods covering their faces.

Jane Doe 7 does not proffer any documentary evidence purporting to confirm an AUC connection to the murder, but does supply a copy of correspondence dated October 29, 2018, purportedly issued by the Colombian National Attorney General's Office. This letter recites simply

---

[8] As foundation for this testimony, Plaintiff advances that Fed. R. Evid. 701(c) permits lay witnesses to testify to matters of common knowledge, and that Fed. R. Evid. 803(21) permits testimony about character reputation in the community  [Non-Wolf Plaintiffs' Supplemental Brief, DE 2511-1 at p. 13].

that this homicide event "is currently in the stage of documentation and verification" [DE 2348-130, p. 22].

### 3. Plaintiff Gloria Eugenia Munoz (*Montes*)

Plaintiff's son, Miguel Angel Cardona Munoz, was abducted from his home in Turbo (Uraba), on January 15, 2001 by two men on motorcycles. His body was later found at a nearby farm with four bullet shots to the head.

Plaintiff's theory that the AUC perpetrated this attack is based on the contention that the assailants were later identified and linked to the AUC through an eye-witness account of the abduction relayed by Plaintiff's former daughter-in-law ("D-1"). On this point, Plaintiff proffers the testimony of her son, Roberto, who was not  a witness to the kidnapping, but who claims to have tracked down his brothers' two assailants based on information supplied by his former wife ("D-1").

According to Roberto, D-1 told him that she witnessed the abduction and that "other witnesses identified the men as of the self-defenses and by their names as aliases - El Muelon and El Tripilla - since she did not live in that region"  [DE 2346-106, p. 2].    Roberto states that he then tracked down these two men in a nearby canteen and asked them what they did to his brother. He avers that  El Muelon and El Tripilla initially disclaimed involvement, but ultimately admitted that they left the body of his brother at the entrance of a nearby banana farm, "La Represa." Roberto later found his brother's body at that location.

Roberto stated he believed these men were "self-defenses" because "[t]hey were recognized by the inhabitants of the area, they, when they committed crimes identified themselves as AUC or

paras," and because the two men later appeared at his brother's burial service where they were recognized by neighbors.  [DE 2346-106 p. 2].

At her deposition, Plaintiff similarly testified that she received an account of the abduction from her daughter-in-law. In both instances, Plaintiff contends D-1's statements are admissible under the hearsay exception for  "excited utterances."

In addition to this testimonial evidence,  Plaintiff  proffers  "Record 138,"  or the "Hasbun Acta" [2346-78], as proof that AUC leader Raul Hasbun later accepted responsibility for this murder.

### 4.   Juana Doe 11 and Minor Doe 11A (*Carrizosa*)

John Doe 11, the common law husband of Bellwether Plaintiff Juana Doe 11 and father of Plaintiff  Minor Doe 11A,  was shot to death in Aracataca, Magdalena on August 13, 2003.  Minor Doe 11A  testified at deposition that she witnessed the death, observing a  man call out to her father by name and then shooting him.

Plaintiff's theory that the AUC perpetrated this attack is based on the contention that AUC leader Jose Mangones accepted responsibility for the murder in Justice and Peace Law proceedings.   As proof,  Plaintiff Juana Doe 11 testified at deposition that she attended a Justice and Peace Commission hearing during which she heard Mangones confess to the murder [DE 2348-38, p.72]. She contends that Mangones' courtroom confession is corroborated by the proffered excerpt from the  "*Sentencia*" of  Mangones (DE 2346-72).

Plaintiff contends the "*Sentencia*"  is admissible as a final judgment of conviction under Fed. R. Evid. 803(22), and that the deposition testimony of Juana Doe 11, reporting the confession

of Mangones, is admissible as a statement against interest under Fed. R. Evid. 804(b)(3), or is admissible under the residual hearsay exception embodied at Fed. R. Evid. 807.[9]

### 5. Plaintiff Juana Perez 43A (*Does 1-144*) (D.C. Action)

Plaintiff's son, Pablo Perez 43A, was abducted and killed near the banana farm where he worked in Magdalena on September 14, 2004.  Plaintiff alleges he was shot in a manner typical of AUC executions, in an area of heavy AUC activity.  Plaintiff did not witness the murder, but testified at deposition that she noticed a young man following her son to work on that morning, and then heard shots in the distance [DE 2348-40, pp. 62-63].

Plaintiff's theory that the AUC was responsible for the attack is based on the contention that AUC commander Jose Mangones "made himself responsible for [her] son's death" in the  Justice and Peace Law processes, as she testified at deposition [DE 2348-40 at p. 101].  She said she learned about Mangones' confession when she "went to Justice and Peace" to make a statement, but admitted that Mangones was not present when she met with government officials to give the statement.  *Id.* at 104.  She also testified she had earlier seen Mangones at a hearing in Santa Marta, and recalled that "a few people" there were "asking him questions," but said she did not ask anything of Mangones and could not recall anything Mangones said at that time. *Id.* at 104-105.[10]

In addition, Plaintiff proffers a letter dated February 14, 2019, purportedly authored by a Colombian prosecutor with the National General Prosecutor's office in Santa Marta, Magdalena,

---

[9] Federal Rule of Evidence 807 allows admission of a hearsay statement not otherwise covered by a specific hearsay exception if the statement has "equivalent circumstantial guarantees of trustworthiness," is "offered as evidence of a material fact," and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," provided that admission of the statement will "serve the purposes of the [evidence] rules and interests of justice," and that the proponent gives reasonable notice of  intent to proffer the statement in advance of trial or hearing.

[10] Recognizing the conflict or ambiguity in the testimony on whether Plaintiff actually witnessed  the alleged Mangones confession, in her  Supplemental Brief  Juana Perez 43A states, "[i]f there is any doubt about the clarity of her testimony" on this point, "it will be resolved when she testifies at trial" [Supplemental Brief, 2511-1, p. 15].

advising that the Office had reviewed testimonies given by "demobilized-accused persons …

finding that the accused person Jose Gregorio Mangones Lugo … confessed the event" at hearings

dated October and November 2008, and further, that another "accused" person "accepted that he

participated in the event" at the "testimony hearing" of April 15, 2004. This letter further references

a "sentence judgment" against Mangones issued July 31, 2015 by the Justice and Peace Court at

the Superior Tribunal of Bogota DC, where "[t]he magistrate judge ruled in favor of the victims ...

in connection to their claims for damages as a result of the incident." [DE 2346-50].

Finally, Plaintiff proffers a letter purportedly issued by National General Prosecutor's

Office in Santa Marta, suggesting that she direct her request for a copy of the July 31, 2015

judgment against Mangones to the Magistrate Judges of the Justice and Peace Tribunal, so that it

might "be considered as evidence within the judicial procedure." [DE 2346-77]. This letter also

refers to an attached "copy of the testimonial hearings of the accused persons," including

Mangones Lugo as well as the underlying "participant" in the murder, which were conducted in

the Justice and Peace Law proceedings. The referenced transcripts, however, do not appear to be

included as exhibits in the summary judgment record.

### 6. Nancy Mora Lemus (*Manjarres*) (New York Action)

Plaintiff Nancy Mora Lemus' common-law husband, Miguel Antonio Rodriguez Duarte,

was killed on December 7, 2003 at the family farm, Canta Gallo, in Magdalena. Plaintiff testified

at deposition that two armed men approached her home on that day, demanded entrance, removed

her husband, walked him down a path to a nearby river, tied him to a pole and cut his throat.

Plaintiff's theory that the AUC was responsible for this attack is based on her contention that

the AUC was active in the area at the time of the killing [DE 2348-45, pp. 77-78]. She testified

she did not speak with the men who killed her husband, but was confident they were associated

the AUC because "they were the ones who were there in that area" and "everybody else was withdrawn." *Id.* at 79.[11]  She did not recognize the men, however, and did not know if they had any affiliation with a criminal group.

   In her Supplemental Brief,  Plaintiff further claims that the  men who accosted her husband were AUC members wearing "identifying armbands" [Supp. Brief,  DE 2511-1, p. 10]. This unsworn statement finds no record support, however, and conflicts with her deposition testimony, where she simply stated that the men who took her husband wore "green shirts," but  no uniforms. When asked if the clothing bore "any form of (identifying) wording," she testified, "They have, like a wheel, like a brand here but I didn't really take notice," and  denied recognizing any symbol. [DE 2348-45, p. 19].

   Plaintiff also proffers the affidavit of her counsel, Attorney John Reiter, who states that Ms. Lemus' family was recently (March 2018) the target of attacks from a group known as the "Black Eagles," which Reiter describes as an AUC "offshoot" still operating in Magdalena [DE 2277], together with a police report and request for police protection generated in connection with those attacks [DE 2346-76, pp. 7-15].   Plaintiff concedes that the affidavit of Mr. Reiter is not based on personal knowledge and is inadmissible in this proceeding; however, she contends that she is available and willing to testify personally at trial to the facts set forth in Mr. Reiter's declaration.

---

[11]   At deposition, Plaintiff recalled giving a statement to the authorities who prepared the autopsy report, acknowledging that she reported the circumstances of the killing near her home by two men armed with rifles, who, at  "[t]he  moment in which they took his life, accus[ed] him of being a collaborator of the paramilitary" [DE 2348-45, p. 75].  This statement suggests that her husband's  killers were *not* affiliated with the AUC (i.e. a paramilitary group), but it is unnecessary to parse either the admissibility or import of this testimony because the Court ultimately concludes, as discussed *infra*, that the evidence proffered by this witness is not sufficient to create a triable issue on AUC involvement in the death  (even without the contrary inference suggested by this statement).

She also intends to tender the corresponding police report and request for protection for admission in evidence at that time as public records under Fed. R. Evid. 803(8) and Fed. R. Evid. 902(3).

### 7.   Seven Surviving Children of Jose Lopez No. 339 (*Valencia*)

Plaintiffs' decedent,  Jose Lopez No. 339,  was abducted and killed on November 4, 1998 in Necoclí, Urabá. None of his surviving children witnessed the death, but were later informed of its  circumstances by unidentified townspeople who reported that their father was shot in the head and died instantly after being accosted by four men on motorcycles. His nephew, who accompanied him, was also shot and later died after suffering in a coma for fourteen years.

Plaintiffs'  theory that the AUC was responsible for this attack is based on the contention that AUC commander Fredy Rendon Herrera (aka El Aleman) personally apologized to the family for the death of their father, explaining it as the result of mistaken intelligence.  As support, Plaintiffs proffer the deposition testimony of  three surviving children,  designated here as C-1, C-2, and C-3,  who testified that they were transported to a remote location by AUC operatives for  a  private meeting with El Aleman approximately two months after the killing.  They aver that El Aleman personally appeared at that meeting, identified himself and apologized for their father's murder -- explaining it as the product of mistaken intelligence gathered by subordinates linking Jose Lopez 339 to the capture and death of another AUC commander.  [DE 2348-94 p. 18] [DE 2348-95 p. 30] [DE 2348-42, pp. 17-18].

Plaintiffs also proffer a two-page excerpt from an unauthenticated document, the "First Instance Judgment" against the "Elmer Cardenas Block," which they contend shows El Aleman

was found responsible for the murder of their father in subsequent Justice and Peace Law proceedings.

Plaintiffs contend that El Aleman's personal apology for the murder of their father is admissible as a statement against interest by an "unavailable" witness under Fed. R. Evid. 804(b) (3), and that the First Instance Judgment against the Elmer Cardenas Block [DE 2346-93] is admissible as a business record or public record under Fed. R. Evid. 803(6), Fed. R. Evid. 803(8), or as a judgment of conviction under Fed. R. Evid. 803(22) [Supplemental Brief, DE 2511-1, p. 16.].

### 8.  Pastora Durango (*Montes*)

Plaintiff's son, Waynesty Duragano, was killed on April 26, 1997 in Apartado (Turbo). Plaintiff's theory that her son was killed by the AUC is based on the contention that the "paramilitaries were the ones who were  killing the people," as she testified at deposition [DE 2348-46, p. 31]. She also contends that AUC commander Raul Hasbun accepted command responsibility for the murder, citing Record 138 ("Hasbun Acta") [DE 2346-78].

### 9.  Juvenal Enrique Fontalvo Camargo (*Manjarres*) (New York Action)

Plaintiff's son, Franklin Fabio Fontalvo Salas, a banana worker, was abducted and killed on July 3, 2003 near Sevilla, Magdalena. Plaintiff did not witness the abduction or killing, and testified at deposition that he did not know who killed his son.

Plaintiff's theory that the AUC  is responsible for the attack is based on the contention, as he testified at his deposition, that his family was threatened, on the evening of the abduction, by

four men who came to his home, and that his cousin ("W-1"), later identified these men by name as AUC operatives [DE 2348-39].

Plaintiff proffers supporting declarations from the following third-party witnesses: (1) "W-2" [DE 2346-58], who states that he witnessed the decedent's abduction by four men on motorcycles, one of whom he identified as "El Ruso" (alleged nickname for AUC leader Mangones); (2) "W-3" [DE 2346-59], who states he later discovered the body of Plaintiff's son, covered with banana leaves, at a nearby farm, brought the body back to his father and alerted the police.  This witness claims he was later detained and threatened by unidentified  AUC operatives, who admonished him for moving the body, and that AUC commander Jose Mangones also directly contacted him by telephone and asked him why he moved the body.[12]

As   documentary evidence, Plaintiffs proffer a "Justice and Peace" letter purportedly authored by Colombian prosecutors, stating that AUC leader Lugo Mangones acknowledged

---

[12] Plaintiff also proffers the unsworn audio statement of his cousin "W-1" [DE 2346-56], who claims personally to have witnessed the decedent's abduction by four armed men on motorcycles, one wearing an AUC armband. Plaintiff acknowledges that this statement is unsworn, but nevertheless urges its consideration, saying this audiotape "with certifying declaration" bears the indicia of reliability, and that this witness is available to testify at trial. Because the unsworn statement does not comply with Rule 56(c) requirements, it is disregarded for  summary judgment purposes.

responsibility for this murder [DE 2346-50],[13] together with the decedent's  autopsy report [DE 2346-61] and death certificate [DE 2346-62].

### 10.  John Doe 7 (*Does 1-11*) (New Jersey Action)

Plaintiff's son, John Doe 8, was a banana worker and suspected petty thief who was abducted and killed in Turbo (Uraba), on September 24, 2000.    Plaintiff did not witness the abduction or death.

Plaintiff's theory that the AUC was responsible for the attack is based on the contention that a now-deceased AUC leader, Gilberto Camacho, later "confessed" to the murder when Plaintiff confronted him about John Doe 8's disappearance. In his deposition testimony [DE 2348-50], Plaintiff stated that a young woman, "W-1," told him she saw his son abducted from a public street by a single man on a motorcycle, a person she identified as Gilberto Camacho [DE 2348-50, p. 11].  Several hours later, a friend of his son's came to his home to report that "they killed your son."  When Plaintiff confronted Camacho fifteen days later, Camacho allegedly told him his son "was full of vices and that's why he had to be killed…" [2348-50, p. 13].

Plaintiff proffers a further sworn statement [DE 2348-129] in which he claims personally to have observed a paramilitary presence in Nueva Colonia, and recognized AUC operatives in the area by their "long and short weapons."  He said he attended meetings where the AUC harassed small farmers and threatened workers exercising their rights, and that Camacho was a paramilitary

---

[13] Plaintiff also contends that the Mangones "*Sentencia*" documents Mangone's responsibility for this murder. Plaintiff acknowledges that the translated "*Sentencia*"  excerpt submitted in opposition to summary judgment, does not reference the  Franklin Fontalvo murder "due to a clerical error," and  states he intends to supplement the record at a later date and in some undetermined fashion with a corrected document supplying the missing information on the Fontalvo  homicide [Supp. Brief., DE 2511-1, p. 14 f.n. 17].   The Court will not consider anticipated evidence in reviewing the sufficiency of the summary judgment evidentiary record, however, and  summarily disregards the Mangones *Sentencia* as an alternative and additional channel of documentary proof  linking the AUC to the murder of Plaintiff's decedent.

area commander who often came to those local farmer meetings. Plaintiff claimed "[he] knew he was already a paramilitary because he was armed and attended those meetings." [DE 2348-129, p. 6].

Plaintiff also submits the declarations of the following third-party witnesses: (1) "W-1" [DE 2348-98], who testified that she was with John Doe 8 when Camacho abducted him, and that his body was later found at "a farm where the AUC left bodies;" (2) "W-2" [DE 2348-126], who states that he knew the AUC murdered and targeted union leaders, and (3) "W-3" [DE 2348-107], who describes his general observations about purported AUC activities in the area.

Finally, Plaintiff contends that AUC leader Raul Hasbun accepted responsibility for this murder as one carried out under his command, as shown, first, by Record 138, or the "Hasbun Acta," and the attached Appendix 2 [DE 2346-78], and second, by a letter from the office of the National Attorney General's Office in Medellin purportedly recognizing Hasbun as the paramilitary who accepted responsibility for the death of his son [DE 2348-129, Ex. 11 (p. 36)]. [14]

Plaintiff contends the alleged "confession" of Camacho is admissible under Fed. R. Evid. 804(b)(3) as a "statement against interest" by an unavailable witness (unavailable due to death), and that the Hasbun indictment is admissible as a public record under Fed.R. Evid. 803(b)(8).

### 11. Doe 840 (Wolf Plaintiff )

Doe 840's son was abducted by armed men who stormed her home in Uraba at gunpoint in the middle of the night on May 2, 2001. Her son was later found, shot to death, two blocks away.

---

[14] The latter correspondence, dated October 29, 2018, captioned "Response to Right to Petition," recites simply that after confirming the victim's registration in the Justice and Peace Information System, "it was possible to prove that, as of this date, the matter is currently in a Concentrated Hearing before the Superior Court of Medellin, Court of Justice and Peace"-- suggesting that charges were pending as of that time with no official action yet taken.

Plaintiff witnessed the abduction, along with several other family members, but did not witness the murder.

Plaintiff's theory that the AUC was responsible for the attack is based on the contention that she recognized one of the abductors as a young man from her neighborhood, a person she identified by name at deposition. She testified she "heard from his families that he was in jail or imprisoned in Cartegena, because over there he killed a merchant," and that "back then….the people said he was a paramilitary." [DE 2274, pp. 23-25].[15] She did not know the identity of the other four men, and did not know if they were affiliated with any organizations. *Id.*

In addition, Plaintiff proffers the following categories of documentary evidence: (1) the decedent's death certificate (listing the probable manner of death as "violent"), which she contends is admissible as a business record, a public record, or a vital statistic under Fed. R. Evid. 803(6), (8) and (9) and Fed. R. Evid. 901(7) [DE 2330 at 2]; (2) letters from Accion Social [USAID organization] [DE 2330 at pp. 3-4] identifying the members of Plaintiff's family as war crime victims; (3) a letter from the Colombian prosecutor in Turbo [DE 2330, p.6] pertaining to the murder of the victim's father by the AUC, which Plaintiff contends is admissible as a business record, public record or ancient document under Fed. R. Evid. 803(6), (8) or Fed. R. Evid. 907(7); (4) a letter from the Justice and Peace Commission [DE 2330 at pp. 6-7] pertaining to the murder of the victim's father, which Plaintiff contends is admissible as a business record, public record or

---

[15] Plaintiff testified to these events at her video-deposition in Fort Lauderdale, Florida on September 28, 2017. She later died in Colombia on August 24, 2018, and a motion seeking the substitution of her daughter, Ludy Rivas, as the named party Plaintiff in this case is currently pending [DE 2338].

investigative report under Fed. R. Evid. 803(6), (8), or Fed. R. Evid. 901(7), and (5) the decedent's birth certificate [DE 2330 at p. 8].

### 12. Doe 368 (Wolf Plaintiff)

Plaintiff's brother, a banana worker, was shot and killed while walking home from a soccer game broadcast at a local park on the evening of April 8, 1997 in Cigorodo, Colombia. Plaintiff did not witness the killing and has no personal knowledge of the identity of the killers.

Plaintiff's deposition testimony is not included in the summary judgment record, and she cites excerpts from an interview that she provided to an expert witness, Manuel Ortega, to relay the circumstances of the killing [DE 2326, at pp. 10-11]. She contends that an unidentified witness to the attack, a woman who allegedly witnessed the murder from the balcony of her apartment, told Plaintiff's mother about the incident, and that Plaintiff's mother, in turn, relayed the details to Plaintiff.

Plaintiff contends that the statements of her mother and the unidentified witness are admissible in evidence under the hearsay exception for statements against interest, theorizing that both witnesses "would have been safer had they kept quiet, rather than telling others that the first witness saw the paramilitaries kill the decedent." She contends that her mother is unavailable as a witness due to death, while the balcony witness is unavailable as "having moved away many years ago" [DE 2508 p. 2].

Plaintiff's theory that the AUC was responsible for this attack is based on the contention that an AUC curfew was in effect at time of the decedent's murder, and that the decedent intentionally defied the curfew by going out after his family warned him to stay home. She also contends that the circumstances of the shooting -- as relayed through the unidentified witness who allegedly observed the attack from her balcony -- suggest that the killers knew her brother and intentionally

targeted him.  The balcony witness allegedly reported that she heard two men outside a gas station call out to the victim by name, and, when he seemingly ignored them, shot him in the back and removed his identification card.

As documentary support for the alleged AUC connection to this death, Plaintiff proffers: (1) the death certificate of the victim [DE 2328 at p. 2], showing the time, place and cause of death as "traumatic shock multiple wounds firearm projectiles," which she proffers  as a business record, public record or record of a vital statistic under Fed. R. Evid. 803(6), (8), (9) and Fed. R. Evid. 901(7);  (2)  a letter from the hospital concerning the victim's autopsy [DE 2328 at p. 3], proffered as business record or public record; (3) letters from the prosecutor's office in Chigorodo [DE 2328 p. 4], offered as a business record or public record; (4) a letter from  Accion Social recognizing Plaintiff's family members as war crime victims, proffered as business record or  public record;[16] (5) a letter from the Unit for Attention and Integral Reparation of Victims  [DE 2328 p. 10],  and (6) a letter from the prosecutor's office in Chigorodo regarding the death of another member of Plaintiff's family [DE 2328 at p. 6].

### III. LEGAL STANDARDS

#### A.  Summary Judgment Standard

Summary judgment is appropriate where the moving party shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and it is genuinely in dispute "if

---

[16] Plaintiff states she intends to authenticate the Accion Social file contents through expert witness Carlos Eusse, a person identified in the existing record, and a prior employee of Accion Social in Uraba, who is familiar with the agency's "internal workings and correspondence" even though he is not the author of the letter in question.

the [record] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

A summary judgment movant may carry its initial burden by "pointing out … that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  If this burden is met, the non-moving party must then come forward with "evidence showing that there is a triable issue as to an element essential to that party's claim." *Celotex*, 477 U.S. at 322; *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 584-86 (1986) (non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts").

In analyzing a motion for summary judgment, the court must view any admissible evidence in the light most favorable to the non-moving party, draw all reasonable inferences in its favor, and abstain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228 (11th Cir. 2017).  The determinative inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law.  *Ziegler v. Martin County School. District,* 831 F.3d 1309 (11th Cir. 2016).

A court need not permit a case to go to a jury when the inferences that are drawn from the evidence, and upon which the non-movant relies, are "implausible." *Cuesta v. School Bd. of Miami-Dade County, Fla.*, 285 F.3d 962, 970 (11th Cir. 2002).  Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).  On the other hand, if the nonmovant has

presented competent evidence on which a reasonable juror could rule in its favor on each element of its claim, summary judgment must be denied. *Anderson*, 477 U.S. at 249-50.

Ultimately, the standard for summary judgment is "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving] party is entitled to a verdict." *Anderson*, 477 U.S. at 252. In making this assessment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## B. Evidentiary Precepts

Rule 56 generally requires that "supporting and opposing affidavits be made on personal knowledge, "set forth such facts as would be admissible in evidence," and affirmatively show that the affiant is competent to testify to the matters stated.[17] More broadly, inadmissible hearsay is not properly considered in ruling on a motion for summary judgment. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (citing *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, unless it is a prior inconsistent statement of a witness, a party admission, or deposition testimony offered under the circumstances set forth in Fed. R. Evid. 32. *See* Fed. R. Evid. 801(c)-(d); Fed. R. Civ. P. 32. Under the Federal Rules of Evidence, "hearsay" is not admissible unless an exception

---

[17] *Poitevint v. United Recovery Systems, LP*, 899 F. Supp. 2d 1230 (N.D. Fla. 2012) (statements describing phone calls made to sister and others were not based on personal knowledge and were not admissible); *Hegre v. Alberto-Culver USA, Inc.*, 508 F.Supp.2d 1320 (S.D. Ga. 2007) (affiant's statement that she understood ex-husband talked to another person was not based on personal knowledge and was inadmissible at summary judgment); *A Slice of Pie Productions, LLC v. Wayans Bros. Entertainment*, 487 F.Supp.2d 33 (D. Conn. 2007) (testimony attributing affiant's understanding or knowledge to statements of another person constituted inadmissible hearsay); *Block v. City of Los Angeles*, 253 F.3d 410 (9th Cir. 2001) (abuse of discretion to admit affidavit of administrative analyst which relied on data from unsworn departmental personnel officers).

applies.  Fed. R. Evid. 802.  Thus, absent an applicable exception, hearsay "counts for nothing" on summary judgment.  *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (citations omitted).

An exception to the general prohibition against consideration of hearsay evidence at summary judgment obtains, under procedures implicated by Rule 56(c)(2),[18] if a non-party resists summary judgment with evidence which *could be* reduced to admissible form at trial.  *Jones* at 1293-94; *Gleklen v. Democratic Congressional Campaign Committee, Inc.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000).  In other words, while a party opposing summary judgment "is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Glecklen*, 199 F.3d at 1369.  If it were otherwise, "the objective of summary judgment – to prevent unnecessary trials – would be undermined."  *Id.*

The "most obvious way" of reducing hearsay testimony to admissible form is to have the hearsay declarant testify directly to the matter at trial.  *Jones* at 1294 (citing *Pritchard v. Southern Co. Servs.,* 92 F.3d 1130, 1135 (11th Cir. 1996) (affidavit  may be "reduced to admissible form at trial" by calling the affiant as a witness)).  Hearsay may also be reducible to  admissible form if, for example, it falls within an exception to the hearsay rule, it does not constitute hearsay at all, or it is used solely for impeachment purposes and not as substantive evidence. *Macuba,* 193 F.3d at 1323-24.

Alternatively, hearsay may be reducible to admissible form through the anticipated testimony of a known witness who has personal knowledge of the substantive content of the matter; however, in this situation  the proponent of the evidence must identify,  by reference to the existing

---

[18] Under Fed. R. Civ. P. 56(c)(2), "[a] party may object that the material cited to support or dispute a  fact cannot be presented in a form that would be admissible in evidence."  An objection under this provision "functions much as an objection at trial," shifting the burden to the proponent of the evidence to show that the material is admissible as presented, or to explain the admissible form that is anticipated. Fed. R. Civ. P. 56,  Advisory Committee's Note to 2010 Amendments.

record, a specific witness who is available to competently testify on the matter. The possibility that an unknown witnesses will emerge to provide testimony is insufficient to establish that a hearsay statement could be reduced to admissible evidence at trial. *Jones*, 683 F.3d at 1294; *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990); *Henry v. Colonial Baking Co. of Dothan*, 952 F. Supp. 744, 750 (M.D. Ala. 1996) ("[T]he mere possibility that the hearsay statement will be presented in the form of admissible evidence at trial [through a potential  witness suggested by counsel at the pretrial hearing] d[id] not warrant consideration of the hearsay evidence at the summary judgment stage"). *See e.g. Benjamin v. Thomas*, 766 Fed. Appx. 834 (11th Cir. 2019) (rejecting reliance on hearsay account of shooting where proponent did not identify any eyewitness regarding events preceding shooting who could corroborate plaintiffs' accounts of (missing) video described in proffered affidavit).

In determining a motion for summary judgment, the district  court is charged with the responsibility of ruling on the admissibility of hearsay evidence. *Gilmore v. Palestinian Interim Self-Government Authority,*  53 F. Supp.3d 191, 201  (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016).  As to expert testimony, the district court is likewise obligated to perform a "gatekeeping" function to ensure that the testimony "both rests on a reliable  foundation and is relevant to the task at hand." *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993)).  Thus, the  district court properly "screen[s] out inadmissible expert testimony on summary judgment," *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 437 (E.D.N.Y. 2013) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)), and "[t]his is true even if the exclusion of expert testimony

would be outcome-determinative." *Id.* (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 142-43 (1997)).

## IV.   DISCUSSION

Defendants advance two basic arguments in support of summary judgment. First, they argue Plaintiffs lack sufficient admissible evidence to support their key theory that the AUC killed their decedents. Second, they contend that even if Plaintiffs had admissible proof that the AUC was the perpetrator of the attacks, there is no basis under Colombian law or the TVPA on which to hold Chiquita or the Individual Defendants liable for the deaths.

The Bellwether Plaintiffs recognize that they must identify admissible evidence showing that the AUC killed their family members in order to survive summary judgment. As outlined above, Plaintiffs proffer several categories of evidence which they contend shows the existence of a genuine issue of material fact on this central issue: (1) Colombian government records purportedly showing acceptance of command responsibility for the murders by AUC leaders Raul Hasbun (four decedents), Mangones Lugo (three decedents) and Fredy Rendon Herrera (one decedent); (2) deposition testimony and third-party affidavits describing the time, place and circumstances of each death; (3) circumstantial evidence describing  geographical and temporal patterns of AUC activity, as well as typical AUC killing methodologies or *modus operandi*, proffered through expert witness reports.

To resolve the pending motions, the Court must determine whether any reasonable jury could find the AUC responsible for each death based on the record evidence available in this case. As explained below, the Court concludes that the designated Bellwether Plaintiffs fail to identify admissible evidence supporting their core theory that the AUC killed their family members, and that summary judgment is appropriately entered on this basis.  With this conclusion, it is

unnecessary to reach the alternative arguments advanced by Defendants in support of summary judgment.

### A. Documentary Evidence

#### 1. "Record 138" or "Hasbun Indictment" ("Hasbun Acta")

Plaintiffs Ana Ofelia Torres Torres (decedent Restrapo Tangerife), Gloria Eugenia Munoz (decedent Miguel Angel Cardona Munoz), Pastora Durango (decedent Waynesty Durango), and John Doe 7 (decedent John Doe 8) proffer "Record 138" as documentary proof of an AUC connection to the murder of their decedents. The excerpted portion of this document on file in the summary judgment record is captioned, "Preliminary hearing for filing of partial and additional indictment and imposition of measure to ensure [Raul Hasbun's] appearance" [DE 2346-78]. Attached to this document is  "Appendix 2," a chart listing multiple homicide cases presumably charged to Raul Hasbun by Colombian prosecutors [Victim No. 490: Angel Munoz; Victim No. 506: John Doe 7; Victim No. 855: Restrapo Tangerife; Victim No. 44: Waynesty Durgano].

Plaintiffs contend this document is admissible as a business record under Fed. R. Evid. 803(6), or a public record under Fed. R. Evid. 803(8).  In effort to qualify the document as such, they proffer the newly-filed Declaration of Nelson Camilo Sanchez Leon, a Colombian lawyer and Director of the International Human Rights Clinic at the University of Virginia Law School [DE 2510-1] [filed July 15, 2019].  Sanchez describes the procedures generally employed under the Colombian Justice and Peace Process, a demobilization process initiated by the Colombian government, primarily directed toward  the United Self -Defense Forces of Colombia (AUC) and its predecessor (ACCU).  Sanchez avers that the Justice and Peace Process is designed to promote the sworn acceptance of responsibility for war crimes and the laying down of arms by illegally-armed groups (such as paramilitaries) in exchange for lenient prison sentences; that the program

and leniency in sentencing available under it is not available to paramilitaries or other criminals who lie about their involvement in attacks; and that the prosecutors overseeing Justice and Peace Law proceedings are charged with the responsibility of conducting a detailed and thorough investigation, including the verification of all supporting confessions as true, prior to requesting an indictment.

From this general exposition on the procedural ideals embodied in the Colombian Justice and Peace Law war-crime reparation processes, Plaintiffs urge the inference that the Hasbun indictment was issued in conformity with these procedures,[19] and therefore should be viewed as reliable and trustworthy evidence of Hasbun's responsibility for the homicides of the decedents whose names are listed in Appendix 2.

Sanchez also explains that a "*Sentencia*" issued in the Justice and Peace Law  process is a "judgment equivalent to a judgment or conviction resulting from a guilty plea or trial under the ordinary criminal process in Colombia," and will contain, among other things, a description of the crimes to which an individual has pled guilty, the sentencing available under ordinary criminal law proceedings, the reduced sentence actually imposed under the Justice and Peace Law, as well as the reparatory obligations of the demobilized individual [DE 2510-1, p. 10, ¶36].

Defendants complain that the Sanchez Declaration was filed on an untimely basis, outside the summary judgment deadlines, and as such should be summarily disregarded. Alternatively, Defendants challenge the contents of the Sanchez affidavit as inadmissible  hearsay.  Finally, they

---

[19] Sanchez states, based on the ordinary investigatory requirements underpinning the Justice and Peace Law processes, that  the crimes "contained in Appendix 2 were compiled based on the confessions of demobilized paramilitary Raul Hasbun in his Free Version," further explaining, "[a]ny acts to which the paramilitary does not accept responsibility cannot be processed through Justice and Peace…Those crimes instead would pass to the respective competent authorities in other sectors of the Office of the Public Prosecutor…Therefore, it can be deduced that [Hasbun] accepted responsibility for all of the crimes listed in Appendix 2, in accordance with the procedures established by the Justice and Peace Process" [DE 2510-1, p. 11, ¶ 34].

argue that the substantive content of the Sanchez affidavit is ultimately irrelevant, because it describes "what should happen" in Justice and Peace Law processes – not "what did happen" in the specific demobilization procedures involving Rasbun, Mangones and Herrera.

The Court agrees that the Sanchez Declaration is filed untimely, and is properly excluded from the summary judgment record in the Court's assessment of the sufficiency of Plaintiffs' proofs on causation. The Court also agrees that the Sanchez Declaration, even if accepted, does not supply a foundation for admission of the proffered Colombian government records under the hearsay exceptions advanced by Plaintiffs, and that Professor Sanchez's "deduction," as to the import of Appendix 2 to the Hasbun indictment, [20] is not a proper subject of expert testimony and is not admissible evidence which supports the inference urged.

Record 138, by its express terms, purports to memorialize the results of a "preliminary hearing" held for the purpose of filing a partial and additional indictment against Hasbun, and for imposing measures to "ensure (Hasbun's) appearance at trial." Hasbun testified at deposition that he simply "appeared" at this proceeding to "sign the record concerning the appearance at the procedure." There is no record evidence that Hasbun gave a confession at this hearing, or otherwise offered testimony pertinent to the homicides charges listed at Appendix 2.

If the Hasbun indictment was the product of confessions earlier made by Hasbun during investigatory Justice and Peace Law processes, as "deduced" by Professor Sanchez, then --- according to Sanchez -- those confessions should have been preserved by Colombian prosecutors, made part of the relevant Justice and Peace Law files, and available to the victims of the crimes. Plaintiffs, however, do not come forward with any such underlying investigatory records from

---

[20] Record 138 describes "Annex 2" simply as a "chart proffered, which will become an integral part of this indictment and the future proceedings" [DE 2346-78 at p. 4]].

Colombian prosecutors, making it unreasonable, on this record, to infer that such confessions were actually made and verified by Colombian prosecutors before issuance of the charging document proffered here, "Record 138."

In any event, Plaintiffs do not show a path for admission of Record 138, the "Hasbun Indictment," as a public record under Fed. R. Evid. 803(8)[21] because Plaintiffs do not demonstrate that this document sets out a "matter observed while under a legal duty," nor does it appear that this document sets out factual findings based on a legally authorized investigation.

Plaintiffs also do not show a path for admission of the document as a business record under Fed. R. Evid. 803(6)[22] because the record does not contain testimony by a custodian of the document (or "other qualified witness" familiar with the organization's recordkeeping practices), nor does it contain a certification showing that the document was "signed in manner that, if falsely made, would subject the maker to criminal liability in [Colombia]." Fed. R. Evid. 902(12).[23] As Plaintiffs offer no predicate or foundation for admission of this document under Rule 803(6) or Rule 803(8), the document is not admissible evidence which may be considered on summary judgment, and does not create a triable issue of fact on AUC involvement in the deaths of Plaintiffs'

---

[21]Federal Rule of Evidence 803(8) states that a record or statement of a public office is admissible if: (1) it sets out either "a matter observed while under a legal duty to report[]" or "factual findings from a legally authorized investigation," and (2) "neither the source of information nor other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(ii)-(iii), (B).

[22] Federal Rule of Evidence 803(6) states that a record of an act, event, condition, opinion or diagnosis is admissible if "the record was made at or near the time" by someone with knowledge; "the record was kept in the course of a regularly conducted activity" of a business, organization, occupation or calling, and the making of the record was "a regular practice" of that activity, provided that these conditions can be shown by the testimony of the custodian or otherwise qualified witness, or by a certification which complies with Fed. R. Evid. 902(11) or (12).

[23] Federal Rule of Evidence 902(12), allows self-authentication of "Certified Foreign Records of a Regularly Conducted Activity," if the record meets the requirements of Rule 803(6)(A)-(C), and contains a certification "signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed." The proponent must also meet the notice requirements of Rule 902(11).

decedents.  And, even if Plaintiffs were able to overcome the hearsay problem with this document, at best it shows that charges were brought against Hasbun for the murders of some of the decedents. It does not establish, nor can it reasonably be inferred from the face of the document or other source evidence on file, that Hasbun confessed to responsibility for the homicides charged.

The proffered excerpts from Hasbun's deposition do not fill this evidentiary gap.  Hasbun did not testify at deposition that he ordered or assumed responsibility for the death of any specific person, nor did he testify that the AUC was involved in the killing of any specific decedent.  He acknowledged his general acceptance of responsibility for murders committed by subordinates under his command, as a participant in the Justice and Peace Law processes, but he did not identify any specific death for which he accepted responsibility.  Hasbun's general acceptance of command responsibility for crimes committed by his subordinates does not support a reasonable inference of AUC involvement in the deaths of the designated Bellwether Plaintiffs' decedents, even if those deaths happened to occur in geographical areas under his command.[24]

### 2. Colombian Government: Justice and Peace Law Files - Prosecutors' Letters (Mangones) (Hasbun)

Bellwether Plaintiffs Juvenal Enrique Fontalvo Camargo, Juana Perez 43A and Juana Doe 11 rely on letters issued by Colombian prosecutors, excerpted from Justice and Peace Law files, purporting to identify AUC Commander Jose Gregorio Mangones Lugo as the individual

---

[24] In this vein, Defendants suggest that former AUC commanders had every incentive, under the "alternative sentencing" provisions of the Justice and Peace Law Process, to accept command responsibility over all deaths recorded in geographical territories under their control, regardless of whether they had personal knowledge of the murder and regardless of whether a subordinate had even confessed to the killing.  This incentive existed because war criminals participating in Justice and Peace Law Processes faced exposure to a maximum sentence of five to eight years imprisonment for the acceptance of responsibility, regardless of the number of killings for which they accepted responsibility [Sanchez Declaration, DE 2510-1, pp. 17, 23].  Hence, AUC leaders could maximize the benefits conferred under the program by enlarging the scope of their confessions without assuming any additional penal risk.

responsible for the murders of their decedents [DE 2346-50, Plaintiff Fontalvo Camargo] [DE 2346-50 and 2346-77, Plaintiff Juana Perez 43A] [DE 2346-75, Plaintiff Juana Doe 11].

Bellwether Plaintiff John Doe 7 similarly relies on correspondence issued by Colombian prosecutors, excerpted from Justice and Peace Law files, purporting to identify AUC Commander Raul Hasbun as the individual responsible for the murder of his decedent [DE 2348-129]. The Wolf Bellwether Plaintiffs, Doe 378 and Doe 840, in turn, rely on correspondence from Colombian prosecutors' offices in Chigorodo and Turbo as proof of AUC involvement in the death of their decedents [DE 2328, pp. 4, 6 (Doe 378)] [DE 2330, p. 5 (Doe 840)].

Plaintiffs urge that these letters are admissible as business records under Fed. R. Evid. 803(6), or as public records under Fed. R. Evid. 803(8). As noted, Fed. R. Evid. 803(8) states that a record or statement of a public office is admissible if: (1) it sets out either "a matter observed while under a legal duty to report[]" or "factual finding from a legally authorized investigation," and (2) "neither the source of the information nor other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(ii)-(iii), (B).

The proffered letters purport to relay information gathered by Colombian prosecutors, but no information is given as to how the prosecutors gathered the information, or from what sources that information was derived. Without knowing where or how the prosecutors obtained the information recited in this correspondence, or anything about the procedures and methods *actually used* to reach the stated conclusions in the specific investigations at hand, the Court is unable to conclude that the letters set out matters personally observed by any Colombian official, or factual findings from any legally authorized investigations. The public records hearsay exception therefore has no application here. *See e.g. United States v. El-Mezain,* 664 F.3d 467, 499 (5th Cir. 2011) (excluding records of Palestinian Authority (describing activities of Hamas) which had nothing to

do with its own activities, and which stated conclusions distinct from the kind of objective factual matters which, when reported as a matter of course, are generally found reliable); *Gilmore v. Palestinian Interim Self-Government Authority*, 53 F. Supp. 3d 191 (D. D.C. 2014), *aff'd* 843 F.3d 958 (D. C. Cir. 2016); *Gill v. Arab Bank*, *PLC*, 893 F. Supp. 2d 542, 571 (E.D.N.Y. 2012); *Mamani v. Berzin*, 309 F. Supp. 3d 1274, 1297 (S.D. Fla. 2018) (excluding military and police reports under Fed. R. Evid. 803(6) and 803(8)).

Nor is this correspondence admissible as a business record under  Fed. R. Evid. 803(6) because the record does not contain testimony by a custodian of the documents, or other qualified person,  nor do Plaintiffs alternatively produce a  certification showing that the letters were "signed in manner that, if falsely made, would subject the maker to criminal liability in [Colombia]."  Fed. R. Evid. 902(12).

As Plaintiffs do not show a path for admissibility of the correspondence under Fed. R. Evid. 803(6) or Fed. R. Evid. 803(8), this correspondence does not create a triable issue on the question of AUC involvement in the murders of the Plaintiffs' decedents.

### 3. Colombian Government: Justice and Peace Law Files - "First Instance Judgment" of Fredy Rendon Herrera [DE 2346-93] and "Sentencia" of Jose Mangones [DE 2346-72]

The Seven Surviving Children of Jose Lopez 339  rely on an excerpt from the  "First Instance Judgment" against Fredy Rendon Herrera, and Plaintiffs Juana Doe 11 and Minor Doe 11A (decedent John Doe 11) rely on  an excerpt from the "*Sentencia*" of Jose Mangones, as evidence of the AUC's judicially-recognized responsibility for the  deaths of their decedents.  In each instance, Plaintiffs contend the documents are admissible under the hearsay exception for a

"final judgment" of previous conviction under Fed. R. Evid. 803(22).[25]  The Children of Jose Lopez

339 also argue the First Instance Judgment is alternatively admissible as a business record or public

record under Fed. R. Evid. 803(6) or 806(8).[26]

Defendants challenge the applicability of Rule 803(22), arguing, first, as to the Herrera

"First Instance Judgment," that this document, by its express terms, does not import  "finality."

Because Plaintiffs only offer an excerpted version of the document,  which does not set forth any

adjudicative findings (or sentencing terms) -- final, interim or otherwise -- the Court is unable to

make an informed assessment of this document as a "final" judgment within the meaning of Fed.

R. Evid. 803(22) on the record presented, and for this threshold reason finds this hearsay exception

inapplicable to the First Instance Judgment.

As to both the Herrera "First Instance Judgment" [DE 2346-93] and the Mangones

"*Sentencia*"  [2346-72], Defendants further contend Rule 803(22) is not applicable because neither

document is offered "to prove a fact essential to sustain the judgment."  They theorize that  an

AUC-based killing is not a fact essential to sustain either judgment, as required by Fed. R. Evid.

---

[25] Fed. R. Evid. 803(22), "Judgment of  a Previous Conviction,"  excludes the following from the rule against hearsay, regardless of whether the declarant is available as a witness:

Evidence of a final judgment of conviction if:

(A) the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

(B) the conviction was for a crime punishable by death or by imprisonment for more than a year;

(C) the evidence is admitted to prove any fact essential to the judgment; and

(D) when offered by the prosecutor  in a criminal case for a purpose other than impeachment, the judgment  was against the defendant.

[26] This argument is rejected out of hand because it would render Fed. R. Evid. 803(22) superfluous. *See United States v. Nguyen*, 465 F.3d 1128 (9th Cir. 2006); *United States v. Gant*, 2012 WL 12895683 (N.D. Iowa) ("The drafters of the Federal Rules of Evidence expressly excluded certain types of convictions from the reach of Rule 803(22), and it would produce an illogical result to find that the limits of Rule 803(22) could be so easily contravened by resort to Rule 803(8)").

803(22)(C), because command responsibility does not hinge on direct participation in, or even knowledge of, an underlying crime perpetrated by a subordinate.

While, in theory, an AUC-based killing would not be a "fact essential to judgment" if a paramilitary leader could participate in Justice and Peace Law proceedings by broadly accepting responsibility for homicides committed in physical territories under his control, regardless of who actually committed the homicide (subordinate or other criminal), it is not clear from the limited record presented whether liability assessed in reparation proceedings under Justice and Peace Law proceedings reached that far.   Under conventional criminal law concepts, an AUC-based killing *would be* a fact essential to judgment against an AUC leader based on command responsibility. However, whether a looser standard obtained in Justice and Peace law proceedings – allowing acceptance of responsibility based purely on the geographical situs of a crime – is not evident here.

Plaintiffs  have the burden of adducing evidence showing a triable issue on causation,[27] a threshold element of claim on which they bear the burden of proof at trial. *See generally Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294 (11th Cir. 2005); *Fitzpatrick v. City of Atlanta*, 2 F.3d  1112 (11th Cir. 1993).  Thus, the obligation of establishing the substantive contents of this purported judgment, for purposes of demonstrating the applicability of the Fed. R. Evid. 803(22) hearsay exception, rests upon Plaintiffs. They do not meet that burden without a clear evidentiary record showing the essential factual predicate, under Colombian law, for imposition of either a

---

[27] In the TVPA claims, Plaintiffs have the burden of establishing the existence of an "extrajudicial killing," as a threshold element of claim, which in the context of this case likewise requires a showing of an AUC connection to each death as discussed *supra*.

"*Sentencia*"  or "First Instance Judgment," under  command responsibility precepts in the Colombian Justice and Peace Law  context.

In the limited excerpts provided, neither judgment identified the victims' killers by name, and it is impossible to determine whether the charges hinged on the geographical situs of the crimes or specific subordinate activity.  In the case of Mangones Lugo, for example, the "*Sentencia*" recites, at ¶37, "the Criminal  acts presented  …… were committed between October 1999 and July 25 2001, when the postulado, Jose Gregorio Mangones Lugo, served as a patrolman in the city of Cienega, Magdalena, and then as commander of the so-called "William Rivas Front."  A synopsis of homicides charged followed, presented in chart form.  There is no indication, from this excerpted  document,  whether  the  charges  were  predicated  on  crimes  actually committed  by subordinates under Mangones' command, or simply by persons committing murders in territories under Mangones' command.  In the synopses, for example, vague reference is simply made to the activity of "unidentified individuals," "armed individuals,"  "two individuals."

Because Plaintiffs do not clearly show how command responsibility was assessed in the context of Colombian Justice and Peace Law proceedings, it is not possible to determine whether an AUC-based killing was a "fact essential" to either the Herrera "First Instance Judgment" or the Mangones "*Sentencia*" from the face of either document.  The  Court therefore finds Fed. R. Evid. 803(22) inapplicable, and concludes that neither document creates a triable issue of fact on the question of AUC involvement in the deaths at issue.

Finally, even if  Plaintiffs were able to overcome the hearsay problem with the "*Sentencia*" or "First Instance Judgment," and the Court were to consider the excerpted portions of these documents as substantive evidence, at best these documents show that Herrera (aka El Aleman) was charged with the homicide of Jose Lopez 339, and that Mangones was charged with the

homicide of John Doe 11; neither excerpt includes adjudicative findings by the relevant tribunal on the liability of the named defendants for any specific homicide.[28]  Nor can it reasonably be inferred from the face of either  document, or other source evidence in the summary judgment record, that Hasbun or Mangones confessed to responsibility for the homicides  charged in these documents.

### 4.   Colombian Government: Justice and Peace Law Files – Authentication

In addressing authentication issues, the non-Wolf Plaintiffs lump all "Justice and Peace" documents, alternatively referenced as "Colombian government documents" into one category, contending that all such documents are "self-authenticating" foreign public documents within the meaning of Fed. R. Evid. 902(3) because they purport to be signed by a person authorized by law to do so.

Presumably, Plaintiffs are here referring to the letters purportedly signed by Colombian prosecutors contained in Justice and Peace law files;  this statement obviously has no application to: (1) the Mangones "*Sentencia*" excerpt [DE 2346-72] [excerpting pp. 1, 2, 14, 29 and 123] which bears no apparent signature(s) except that of the certified interpreter who provided the translation; (2) the Hasbun "Indictment" excerpt [DE 2346-78] [excerpting pp. 24897, 24905- 23908] which shows  signature blocks (in blank) for the signatures of a Magistrate Judge, the relevant "former combatant beneficiaries" and their various legal representatives in the English translation on file (the appended Spanish translation, at DE 2346-78, pp.12-23, appears to bear signature marks corresponding to these persons); or (3) the  Herrera "First Instance Judgment" excerpt [DE 2346-

---

[28] Notably, the translated portion of the Mangones *Sentencia* on file includes a lengthy "Index," showing a Section captioned "About the responsibility ascribed to the postulados," at VII.E., and a Section captioned "Ruling," at VII. (sic).  Plaintiffs did not include English (or Spanish) translations of either of these portions of the excerpted *Sentencia* in their summary judgment opposition papers.

93] [excerpting 2 pages in English translation,  ¶¶ 2.9, 3.3.14, apparent excerpts from pp. 196, 197 and 228 of original document]  which bears no apparent signature or signatures except that of the certified interpreter.

As to the letters allegedly issued by Colombian prosecutors, Plaintiffs state that they intend, before trial, to obtain certified copies of the correspondence from the emitting agency (either the Public Prosecutor or the Center for Judicial Administration), as a precursor to seeking an apostille, and that  they "will obtain … an apostille for all (Justice and Peace Law) documents from the Colombian consulate in the United States" prior to trial [Supplemental Brief, DE  2511-1, pp. 5]. Presumably, by this they express a future intent to obtain apostilles for the Hasbun Indictment, the Mangones *Sentencia,* and the Herrera First Instance Judgment – all of which concededly are unauthenticated as supplied in the summary judgment record.  Plaintiffs do not identify the person or persons from whom they expect to obtain the threshold certified copies (as to Colombian prosecutors' correspondence), nor do they identify the United States or Colombian consulate official or officials from whom they expect to obtain apostilles (as to all documents, including the purported indictment and judgments) in lieu of conventional authentication procedures.

A foreign public document is self-authenticating if (1) it "purports to be signed or attested by a person who is authorized by a foreign country's law to do so," and (2) it is accompanied by a "final certification" – either by certain officials enumerated in the rule or pursuant to treaty – of the genuineness of the signature and official position of the signer or attester.  Fed. R. Evid. 902(3).

There is also a "savings clause" in Rule 902, Fed. R. Evid. 902(3)(A), which permits relaxation of these authentication requirements, allowing a document to be treated as "presumptively authentic,"  without final certification, if two conditions are met: (1) "all parties have been given a "reasonable opportunity to investigate the document's authenticity and

accuracy," and (2) "good cause" exists to excuse the missing final certification. *United States v. McGowan*, 552 Fed. Appx. 950, 954 (11th Cir. 2014). The "good cause" requirement is satisfied only if the proponent of the evidence can demonstrate it was "unable to satisfy" the rule's requirements for authentication "despite [] reasonable efforts." *Starski v. Kirzhnev*, 682 F.3d 51, 54 (1st Cir. 2012) (citing *United States v. De Jongh*, 937 F.2d 1, 4 (1st Cir. 1991) (quoting Fed. R. Civ. P. 44 advisory committee note).

As a threshold matter, in this case, neither the Mangones "*Sentencia*" nor the Herrera "First Instance Judgment" excerpts provided by Plaintiffs reflect signatures of any kind, much less that of "persons authorized by law" to sign these documents.  Further, Plaintiffs concededly do not provide a "final certification," for any of the documents, as required by Fed R. Evid. 902; nor do they show that they were unable to do so despite "reasonable efforts."  Indeed, they offer no explanation as to why they did not secure an apostille for any of the Justice and Peace Law documents prior to filing the excerpted documents with their summary judgment opposition papers.   Plaintiffs do not show that they tried to secure the requisite apostilles in advance of summary judgment,<sup>29</sup> nor do they show that they were unable to supply the proper certification timely because of a collapse in  cooperation by Colombian or United States consulate authorities, or some other factor outside their control.

This delay in pinning down these documentary proofs on AUC involvement is particularly mystifying, given the extraordinary length of this litigation – now ten-plus years running -- and the

---

[29] On August 27, 2019, the Wolf Plaintiffs filed a "status report" [DE 2540] relaying information on counsel's efforts to obtain apostilles from Colombian authorities undertaken after the conclusion of summary judgment briefing. This report indicates that online requests for apostilles submitted by counsel were rejected for three of the four requested documents (including a new unsigned "reference" form – first obtained by one of the Plaintiffs on July 22, 2019 – purportedly indicating that paramilitary Hasbun had confessed to the death of her decedent on June 15, 2017) by Colombian authorities on stated ground that "they were not signed by officials registered with the Ministry of Exterior Relations."

imposition of the current summary judgment scheduling agenda which dates back to April 11, 2017 [DE 1361-Original Global Scheduling Order]. Further, the original discovery stay in this MDL proceeding was dissolved on November 29, 2016 [DE 1197]. A year later, on November 28, 2017, liaison counsel for the non-Wolf Plaintiffs filed a Hague Evidence Convention request for issuance of sixteen letters of request pursuant to that authority, indicating that the Defendant strongly contested the issue of AUC involvement in the deaths of Plaintiffs' decedents, and that the requested depositions of the designated witnesses (alleged AUC operatives) were "necessary to provide evidence for the [] basic elements of Plaintiffs' claims." [DE 1687, p. 7]. On December 21, 2017, the Court granted the requested relief and issued all requested letters [DE 1728]. Clearly, everyone involved in this litigation was on notice by the Fall of 2017, at the very latest, that the question of AUC involvement in the deaths of the bellwether victims was very much at issue in this case.

Thus, the record reflects no "good cause" for lack of a final certification, the proffered Justice and Peace Law file excerpts are not self-authenticating under Fed. R. Evid. 902(3), and the records do not constitute admissible evidence in the form presented. Further, as Plaintiffs do not identify a process by which any United States or Colombian government official might reasonably be expected to supply the requisite apostilles in advance of trial, Plaintiffs do not show that the documents are reducible to admissible form at time of trial.

Finally, the non-Wolf Plaintiffs contend that the Mangones "*Sentencia*" and El Aleman "First Instance Judgment" are available online and can be judicially noticed [DE 2511-1, p. 6 fn.

11].  Plaintiffs state the *Sentencia* is available at https://www.ramajudicial.gov.co, and that the

First Instance Judgment is available at https://www.fiscalia.gov.co.

A court can properly take notice of undisputed information available on a government

website when neither party disputes the website's authenticity, or the accuracy of the information

displayed on it.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010).   In this case,

Defendants do not challenge the website references in either respect, and the Court may,

accordingly, take judicial  notice of these  documents.   However, this is merely a way of

simplifying the process of authenticating documents which would otherwise require certification

under Fed. R. Evid. 901 and 902; it  does not relieve Plaintiffs, as proponents of the evidence, of

the duty to present evidence to the court, nor does it cure any customary objections to the

admissibility of the proffered evidence, such as relevance, prejudice or hearsay.  *In re James*, 300

B.R. 890 (W.D. Tex. 2003).

So, while the Court may take judicial notice of the fact that the *Sentencia* and First Instance

Judgment were filed in Justice and Peace Law proceedings in Colombia, the Court does not

necessarily take judicial notice of any adjudicative facts contained in those records. *In re Harmony*

*Holdings, LLC*, 393 B.R. 409 (D. S.C. 2008); *Kramer v. Time Warner Inc.,*  937 F.2d 767 (2d Cir.

1991);  *M/V American Queen v. San Diego Marine Construction Corp*., 708 F.2d 1483, 1491 (9th

Cir. 1983) (courts generally cannot take judicial notice of proceedings in another cause so as to

supply, without formal introduction of evidence, facts essential to support a contention in the cause

before it).    Plaintiffs' inability to establish a premise for introduction of these documents as

business record or public record hearsay exceptions remains an insurmountable obstacle to the admissibility of the documents.

### 5. Residual Hearsay Exception

Finally, as to any hearsay "reports, documents and confessions" which do not fall under a codified hearsay exception, the non-Wolf Plaintiffs argue that the evidence should be admitted under the "catch-all" or residual hearsay exception at Fed. R. Evid. 807.   Rule 807 provides for the admission of evidence that possesses all the particularized guarantees of trustworthiness found in the other hearsay exceptions, but does not fall within any listed exception.   The test for admissibility under this provision is "onerous," and the exception should only be invoked in exceptional circumstances.   *Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218 (2d Cir. 1999).  To be admissible as such, a statement must be (1) trustworthy; (2) material; (3) more probative than other available evidence, and must fulfill  (4) the interests of justice  and (5) notice.  *Silverstein v. Chase*, 260 F.3d 142, 148-49 (2d Cir. 2001).

Because Plaintiffs do not identify any specific piece of evidence they seek to admit under the residual hearsay exception, the Court is unable to make an informed assessment of its applicability to any specific document or category of proofs.  As a global proposition, it is not made to appear that the several proffered unauthenticated, excerpted and unsigned documents possess any "particularized guaranties of trustworthiness," *Mamani v. Berzain*, 309 F. Supp. 3d 1274, 1299 (S.D. Fla. 2018), nor is it made to appear that any particular document is "more probative" on the issue for which proffered than other available evidence in the case (such as the actual contents of investigatory files, including confessions, complied by Colombian prosecutors, or certified complete copies of adjudications issued  in Justice and Peace Law processes relevant

to the bellwether victims). Finally, the Court does not find that the interests of justice compel the inclusion of any of this category of evidence under the residual hearsay exception.

### B. Testimonial Evidence

#### 1. Ana Ofelia Torres Torres (*Montes*)

This Plaintiff admittedly has no personal knowledge as to whether the AUC was involved in the killing of her husband. The declaration of her son, reporting the identity of the killer based on information relayed through his sister, is inadmissible hearsay, as conceded by the Plaintiff. As plaintiff has not established a basis on which to admit the statements of the sister, this evidence fails to create a triable fact issue on the identity of the decedent's killer.

#### 2. Jane Doe 7 (New Jersey Action)

The Court does not find the deposition and affidavit testimony of this Plaintiff to be inherently contradictory, and thus rejects Defendants' threshold argument that the subsequent declaration of Jane Doe 7 should be disregarded.

Turning to its substantive content, the Court finds that Jane Doe 7's subsequent declaration, relaying the appearance of John Doe 11's name on an AUC "kill list," and the issuance of a pre-death warning from his co-workers, rests on multiple levels of hearsay. Because Plaintiff does not competently identify a path for the admission of each layer under a hearsay exception, this testimony does not create a triable issue on the identity of her husband's killers.

Jane Doe 7 herself concedes that the unidentified coworkers did not make the statements at the time of the startling event (at or immediately after the AUC operatives read the kill list), but rather allegedly relayed the information to her husband later that evening, outside of her presence, after the coworkers returned from work. John Doe 11, in turn, at some indeterminate time "afterwards," relayed their comments to Jane Doe 7. While the statements of the unidentified co-

workers might qualify for admission under the excited utterance hearsay exception, notwithstanding the passage of several hours or more between the event and the time they reported it to John Doe 11, *see e.g. United States v. Cruz*, 156 F.3d 22 (1st Cir. 1998) (four-hour delay); *United States v. Tocco*, 135 F.3d 116 (2d Cir. 1998) (three-hour delay), Plaintiff does not realistically show a path for admission of the hearsay statements of John Doe 11 to Jane Doe 7. This testimony – made at some indeterminate point "afterwards" -- does not qualify as an "excited utterance" under Fed. R. Evid. 803(2) (defining an excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused") or a "present sense impression" under Fed. R. Evid. 803(1) (defining a present sense impression as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it"). *See generally United States v. Belfast,* 611 F.3d 783 (11th Cir. 2010); *United States v. Ruckstuhl*, 719 Fed. Appx. 897 (11th Cir. 2017).

Accordingly, Jane Doe's declaration does not contain admissible evidence from which her husband's status as an alleged AUC target and victim may reasonably be inferred, and her testimony does not create a triable issue of fact on the question of AUC involvement in his death.

Further, the declarations of Plaintiff's son, regarding the AUC's general reputation for violence in the community, and "comments of the people" regarding the identity of his father's killers as AUC operatives, do not qualify for admission as lay witness testimony on matters of common knowledge under Fed. R. Evid. 701(c), or as reputation evidence in the community under Fed. R. Evid. 803(21), as advanced by Plaintiffs.

Hearsay statements are admissible under Fed. R. Evid. 803(21) when such statements concern "a reputation among a person's associates or in the community concerning the person's character." When invoking this exception, the community from which the reputation is drawn must

be "well-defined," laying a trustworthy foundation. *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 100 (3d Cir. 1999). Further, the statement proffered must relate to "reputation … concerning [a] person's character," not a rumor about a specific prior act. *See United States v. Arroyo*, 406 F.3d 881, 887 (7th Cir. 2005) (informant's statement that defendant was believed to have "ripped" two kilos of cocaine during drug sale held inadmissible as related to rumor about specific prior act).

The concept of "character," within the meaning of Fed. R. Evid. 404,[30] has been defined by Professor Weinstein to mean:

> [A] generalized description of a person's disposition or a general trait, such as honesty, temperance or peacefulness. Character is not synonymous with habit…. Character is also distinct from reputation. *Character* is what a person is, while *reputation* is what other people think a person is. Thus, reputation is one of the ways of evidencing character.

Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 404.02 [1] (2011). See also Fed. R. Evid. 406 Advisory Committee's Note to 1972 Proposed Rules. The Court finds this definition is logically imported to the interpretation of the concept of "character" as used in Fed. R. Evid. 803(21).

Interpreting 803(21) in this fashion, the Court does not find the statements of the Plaintiff's son, regarding the killer's alleged reputation as an AUC operative, admissible as "a reputation … in the community concerning the person's character." Membership in a criminal, political or terrorist organization does not fit within the traditional definition of "character" as that term is used to connote broad-based descriptions of a person's personality or disposition. A killer's alleged "reputation" for membership in or affiliation with a criminal or terrorist organization does not

---

[30] Federal Rule of Evidence 404(a) defines the narrow circumstances under which "character evidence" may be admissible to prove action taken in conformity with a "trait of character" on a particular occasion, while Fed. R. Evid. 404(b) generally prohibits evidence of "other crimes, wrongs or acts" to prove the character of a person in order to show action in conformity therewith.

conceivably touch on "character" in this sense, and Fed. R. Evid. 803(21) is inapplicable on its face. S*ee e.g. Dick v. Phone Directories Co.,* 397 F.3d 1256, 1270 n. 5 (10th Cir. 2005) (statement that office was known as the "lesbian factory" not admissible under Fed. R. Evid. 803(21) because statement concerned neither a person nor her character)*; Gonzalez v. O'Carroll*, 2019 WL 721434 (S.D. Tex. 2019) (rejecting "vengefulness" as character trait falling within Fed. R. Evid. 803(21) hearsay exception).

And, even if it could be considered as such under a broader reading of Rule 803(21), which is rejected here,[31] Plaintiff does not show how her son, the declarant, was familiar with the relevant "community" in which the killer's alleged "reputation" for an AUC affiliation was formed, how that community was "well-defined," or how that reputation was "likely reliable." Federal Rule of Evidence 803(21) "does not cover out of court statements that [the declarant] has heard including rumors or stories." *Brickhouse v. Redstone*, 2014 WL 1453650 at *3 (S.D. Ill. 2014). For these additional reasons, Fed. R. Evid. 803(21) is not applicable, and the son's statements regarding the AUC affiliation of his father's killers constitute inadmissible hearsay.

Nor are the son's statements admissible under Fed. R. Evid. 701(c) as lay opinion testimony. A lay person can give an opinion about certain evidence if that opinion is "rationally based" on his "personal perceptions, training and experience." *See e.g. United States v. Ledbetter*, 929 F.3d 338 (6th Cir. 2019) (police lieutenant's opinion about street gang held rationally based on his perception of gang's activities and use of gang-related signs during his time as police officer); *United States v. Augustin*, 661 F.3d 1105 (11th Cir. 2011) (allowing Professor of Inner City to give limited lay

---

[31] *But see United States v. Penson*, 896 F.2d 1087, 1092 (7th Cir. 1990) (evidence implying that defendant had transported drugs for other individuals prior to involvement in charged drug conspiracy held admissible under 803(21) to show defendant's "good" reputation in drug-trafficking community); *Benoit v. Metro. Transp. Auth.*, 2016 WL 6902190 (S.D.N.Y. 2016) (admitting fellow officer's statement that it was widely known throughout department that co-worker would "fail to step up to aid a partner in trouble").

opinion testimony about how gang members dressed); *United States v. Castro*, 411 Fed. Appx. 415 (2nd Cir. 2011) (allowing testimony by former members of international gang regarding practices of gang and their experience with organization as lay opinion testimony rationally based on perception); *United States v. Pubien*,  349 Fed. Appx. 473 (11th Cir. 2009) (testimony of law officers on meaning of code words used in conversations between drug traffickers allowed as rationally based on officers' experience with narcotic transactions).  In this case, however, there is no evidence of a prior professional or lay experience of the son in dealing with the AUC organization or its operatives that might form the foundation for an even limited  lay opinion on the subject of AUC operations or the insignia of its operatives, and  no predicate to show how the son's declarations regarding AUC affiliation could be "rationally based" on  his  personal perceptions, rendering Fed. R. Evid. 701(c) inapplicable.

Finally, the proffered declarations of  various third-party witnesses regarding general AUC activity in the area of this homicide does not, standing alone,  reasonably support an inference of AUC involvement in this particular murder, and  does not create a triable issue of fact on causation.

### 3.  Gloria Eugenia Munoz (*Montes*)

Plaintiff recognizes that to admit the testimony of the Plaintiff's son, Roberto, concerning the identity of the victim's assailants, she must establish a basis to admit each out-of-court statement embedded within this declaration, including his former wife's verbal report of the abduction and her identification of the assailants by name and association with the AUC.

Plaintiff argues that the former wife's statement to Roberto regarding the  circumstances of the abduction is admissible as an "excited utterance" within the meaning  of  Fed. R. Evid.

803(2).[32]   The record does not reveal when the statements of the former wife were allegedly made to Roberto, or her mother-in-law, and without this temporal link the Court finds no predicate for admission of the statement as one made while the former wife "was under the stress of excitement" caused by the kidnapping.

Further, even assuming, *arguendo,* that the statement was made immediately after the event, this would only permit introduction of statements of the former wife "relating to [the] startling event or condition," i.e., statements describing what she observed during the physical abduction of the victim.  It would not permit statements pertaining to her identification of the killers which – according to Roberto's description – were not based on her personal knowledge, but rather was derived from unidentified "people in the community."[33]

Excited utterances consist of statements made under the duress of a startling event and relating to that event, and are considered reliable hearsay on the theory that the excitement suspends the declarant's powers of reflection and fabrication.  *United States v. Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003). The party seeking to introduce such a statement is yet required to demonstrate the declarant's personal knowledge of the event, *Ash v. Reilly*, 433 F. Supp. 2d 37, 45 (D. D.C. 2006), and this is not accomplished here as to the daughter-in-law's identification of the abductors – a statement which appears to be based purely on information repeated from unidentified persons in the town. *See also Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004) (excited

---

[32] Federal Rule of Evidence 803(2) defines an  "excited utterance" as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."

[33] Roberto averred that his former wife told him "two men arrived at our house on a motorcycle and began to kidnap my brother… [s]he told me that other witnesses identified the men as of the self-defense and by their names as aliases El Muelon an El Tripilla, since she did not live in that region."   He says  after confronting the men, they first denied "that they knew what I was talking about but after admit[ted] they had left Miguel at the entrance of a farm called Le Represa"] [DE 2346-106 p. 4].

utterance exception requires evidence of personal knowledge).  Her agitated state of mind is only reliable evidence of the truth of what she actually witnessed – not the names or criminal affiliations of the abductors with whom she was unfamiliar.  As  Plaintiff does not suggest how this portion of the former wife's statement (identifying the abductors as "of the self-defenses") conforms to any other hearsay exception,  it is  inadmissible and does not create  a triable issue of fact on the identity of the decedent's killers.

As to Roberto's  description of his confrontation with  El Muelon and  El Tripilla,  the statements allegedly made  by the two men  might be admissible to show, by inference, their involvement in the abduction (inferred from Roberto's successful retrieval of the body from the location  they described),  but there is  no admissible evidence  from which  their alleged AUC affiliation may reasonably be inferred.  Roberto's further  comment, "when they committed crimes identified themselves as AUC or paras," is incomprehensible,  and in any event does connect the AUC  to this specific crime. Roberto also alleges that the two were "recognized by the inhabitants of the area" as AUC operatives, but this is  simply the relay of rumor and innuendo – not an observation "rationally based" on his own perceptions.  For reasons discussed above, this statement is not admissible as reputation of character under Fed. R. Evid. 803(21) or as lay opinion testimony under Fed. R. Evid. 701(c).

As Plaintiff fails to establish a predicate for admission of the hearsay statements of either the former wife or Roberto, as they relate to the  alleged AUC affiliation of the assailants,  this testimony does not create a triable issue on AUC involvement in this murder.

### 4. Juana Doe 11/Minor Doe 11A (*Carrizosa*)

Plaintiffs proffer Juana Doe 11's  testimony, concerning Mangones purported confession made in conjunction with the Justice and Peace Law Process, as a statement against interest under

Fed. R. Evid. 804(b)(3).  Plaintiffs contend Mangones is "unavailable' for purposes of this rule because he is in Colombia, and because Plaintiffs were unable to secure his deposition testimony timely prior to trial.

For the Fed. R. Evid. 804(b)(3) "statement against interest" hearsay exception to apply, the proponent of an inculpatory hearsay statement must show that (1)  the declarant is unavailable to testify at trial and  (2) the statement was "so contrary" to the declarant's pecuniary or penal interests that no reasonable person in the declarant's position would have made it unless he or she believed it to be true.  *United States v. Thomas*, 62 F.3d 1332 (11th Cir. 1995); *United States v. Shukri*, 207 F.3d 412 (7th Cir. 2000).  A declarant is considered "unavailable," for purposes of 804(b)(3),  if he is absent from the hearing, and the proponent of the statement has been unable to procure his attendance or testimony by process or other reasonable means.  Fed. R. Evid. 804(a)(5).

Even  where the absent witness is a foreign national who is beyond the subpoena power of the district court, the proponent must show diligent effort on his or her part to secure the witness' voluntary travel to the United States to testify to satisfy the threshold "unavailability" requirement. *United States v. Samaniego*, 345 F.3d 1280 (11th Cir. 2003); *United States v. Wrenn*, 170 F. Supp. 2d 604 (E.D. Va. 2001). Further,  a witness is not "unavailable" within the meaning of the rule if his pretrial deposition was taken and the transcript could be read. *Campbell by Campbell v. Coleman Co*., 786 F.2d 892, 896 (8th Cir. 1986).

In a related vein, to successfully invoke the hearsay exception for statements against interest under Fed. R. Evid. 804(b)(3) with a showing of  unavailability under Rule 804(a)(5), "the proponent of the out-of-court statement must show that it could not obtain the declarant's 'testimony.'"  Wright and Miller, 30B Fed. Prac. & Proc. Evid. § 6968, p. 3 (2018 ed.) ("Alone among the species of "unavailability," Rule 804(a)(5) contains requirements beyond a

demonstration of the inability to obtain the witness' presence at trial.")   This means  "in situations where a witness is unavailable for trial but available for a deposition, Rule 804(a)(5) requires taking the deposition and introducing testimony from that proceeding in lieu of offering hearsay offered under Rule 804." *Id.*

In this case, Plaintiffs argue that Mangones' statements in Justice and Peace Law proceedings are admissible as "statements against interest," under 804(b)(3) [DE 2511-1, p. 13-14], but they do not show Mangones is "unavailable" within the meaning of Fed. R. Evid. 804(a)(5) under this standard: Plaintiffs do not show that Mangones was "unavailable" for pretrial deposition or why they could not have timely procured his deposition testimony.  Plaintiffs contend simply that "the Colombian government did not grant and permit the deposition until March 27-28 [2019]," [DE 2511-1 p. 4 f.n. 1], leading this Court to grant the Defendants' motion to quash the noticed deposition  [DE 2316].[34]

Notably absent from the suggestion that Colombian authorities contributed to Plaintiffs' inability to depose Mangones is any reference to the lengthy discovery history in this case as it specifically relates to the taking of  Mangones' deposition:   On  December 26, 2014, the non-Wolf Plaintiffs filed an emergency motion for relief, pursuant to the Hague Evidence Convention, asking the Court to lift a then-existing discovery stay in order to permit Plaintiffs to take the foreign depositions of three paramilitary figures *then* imprisoned in Colombia – including Mangones Lugo and Rendon Herrera [DE 688].  Plaintiffs contended that the release of the witnesses from

---

[34] The notice was quashed, and Plaintiffs' request to extend the discovery cut off deadline in order to accommodate a late taking of Mangones deposition denied, due to unexcused delay on the part of  Plaintiffs in pursuing the deposition. *See* DE 2316 p. 3 ("The noticing Plaintiffs have not demonstrated good cause for the requested extension of the discovery deadline, and the requested extension is not, in any event, considered "reasonably necessary for the completion of foreign depositions at this late juncture in the litigation.  To the contrary, the Court finds that the noticing Plaintiffs have  unduly delayed in seeking to notice these depositions and in coordinating the scheduling of these depositions with the Colombian authorities, and shall not be heard now to complain that additional time is needed").

Colombian prison was --at that point in time-- imminent, and that there was no reason to believe that these witnesses would voluntarily make themselves available for deposition after release, warranting emergency intervention from the Court to permit the preservation of their deposition testimony while their location was known and they remained in penal custody with the Colombian government. *Id.* The Court granted the emergency motion and issued the Letters of Request, in the original form requested, and in a modified form subsequently requested, in March and April, 2015 [DE 750, 788].

For reasons not explained, Plaintiffs failed to coordinate the taking of those depositions with Colombian authorities immediately while the witnesses were still imprisoned. Three years later, in June 2018, the D.C. Plaintiffs asked the Court to issue a second Request for Letters under the Hague Evidence Convention to facilitate the taking of Mangones' deposition, recognizing that "Mangones was one of the witnesses this Court previously issued a Letters Rogatory for in response to a December 26, 2014 Emergency Motion … filed by the New Jersey Plaintiffs to preserve his testimony," while enigmatically adding that "for reasons unclear, the Colombian authorities did not ultimately produce Mangones for a deposition and the Letters Rogatory was returned" [DE 1976].

Opposing the motion, the Chiquita Defendants argued that Mangones was "tainted as a witness because of the witness payment scandal involving Attorney Collingsworth [who sought the reissuance of the letters]," and surmised that no other Plaintiffs' counsel joined in the motion, or filed a separate request for reissuance of the letters, because of allegations of corruption and collusion between Collingsworth and Mangones that had surfaced in other litigation [DE 1995]. Attorney Wolf also opposed the motion [DE 1977], similarly noting that no other Plaintiffs'

counsel had joined in it, and that  "the other plaintiffs in this case can be harmed by Mr. Collingsworth's introduction of tainted evidence." [DE 1977]

On this background, Plaintiffs do not show that Mangones is "unavailable" within the meaning of Fed. R. Evid. 804(a)(5).  Plaintiffs had an opportunity to procure Mangones' deposition testimony while he was still imprisoned in Colombia, in early 2015,  but for "reasons unclear" neglected to avail themselves of that opportunity timely.  Other court filings suggest that a strategic decision may have been made by certain Plaintiff groups due to concerns with the credibility of Mangones, vis a vis his relationship to Attorney Collingsworth, but a strategic  reason for eschewing the deposition does not now translate into his "unavailability" for purposes of using alleged out -of-court statements against  interest attributed to  Mangones by various witnesses.[35]

Accordingly, Fed. R. Evid. 804(b)(3) is not applicable, and Plaintiff's testimony regarding allegedly being a witness of Mangones' confession in Justice and Peace Law proceedings does not create a triable issue on the identity of the decedent's killer.

### 5.  Juana Perez 43A (*Does 1-144*) (D.C. Case)

At deposition, Plaintiff testified that she understood, from her interaction with government officials at the Justice and Peace Commission offices,  that Mangones had confessed to the murder of her son.  Her deposition testimony, outlined above, makes clear she did not  personally observe any confession -- to the contrary she admits that Mangones was *not* in attendance on the day she appeared to give her statement to Justice and Peace Commission officials.  She mentioned another, prior Justice and Peace hearing in Santa Marta at which Mangones allegedly appeared and

---

[35] The same result applies  as to AUC commander Fredy Rendon Herrera, who Plaintiffs also contend is "unavailable" for purposes of the  statement against interest hearsay exception after he was twice noticed for deposition in Colombia (apparently after his release from prison) and failed to appear.  Plaintiffs do not offer any other details concerning the non-appearance at deposition of Fredy Herndon Herrera.

answered questions from unidentified people, but testified she did not recall anything he said on that day. [DE 2348-30, 104-105]. This testimony does not show, in the first instance, that this witness personally observed a confession made by Mangones, rendering her incompetent to testify as to its making. Second, Plaintiff does not show that Mangones is "unavailable" within the meaning of Fed. R. Evid. 804(a)(5), for reasons discussed above, so that the statement against interest hearsay exception under Fed. R. Evid. 803(b)(3) is inapplicable in any event.[36]

### 6. **Nancy Mora Lemus (*Manjarres*) (New York Action)**

Plaintiff's deposition testimony [DE 2348-45], describing the seizure of her husband from her home by two armed men who wore green sweatshirts showing a "brand" circle or "wheel" of some kind which she did not recognize, does not raise a triable issue of fact on the alleged AUC-affiliation inference which Plaintiff now seeks to draw from this testimony. Plaintiff testified she did not recognize the symbol. There is no record evidence connecting the AUC to a wheel or circular symbol.

Nor does Plaintiffs' reference to a more recent event (March 2018) involving threats allegedly made against her family by the Black Eagles, an alleged offshoot of the AUC, create a triable issue of fact on the identity of her decedent's killers. The affidavit submitted by her attorney on this point is, concededly, inadmissible hearsay. Plaintiff represents that she can and will testify as to these recent events at trial, but the Court does not find this separate incident – coming fifteen years after the killing of her husband – probative on the issue of the identity of the husband's killers. In addition to this relevancy problem, Plaintiffs do not show an adequate

---

[36] As to Justice and Peace Law letters from Colombian prosecutors proffered by this Plaintiff [2346-50, 2346-77], Plaintiffs do not establish a foundation for admission of these documents as a business records or public records, as discussed above.

foundation for admission of the police report and request for protection (relative to the March 2018 threats) as public records.  Accordingly, Plaintiff's  deposition testimony does not create a triable issue of fact on the identity of her decedent's killers.

   7.  **The Seven Children of Jose Perez 339 (*Valencia*)**

   The Seven Surviving Children of Jose Perez 339 contend that Fredy Rendon Herrera (aka El Aleman) is the AUC leader responsible for the death of their father.  As proof, they contend that El Aleman personally apologized to their family for this murder, and that this out-of-court statement is admissible as a statement against penal interest under Fed. R. Evid. 804(b)(3) [DE 2511-1, p. 16].

   They contend El Aleman is "unavailable" within meaning of this provision because he is in Colombia.  In a related vein, in support of their proffer of purported confessions made by El Aleman in Justice and Peace Law proceedings, they expound on this concept, suggesting El Aleman is an "unavailable declarant" because he twice  failed to appear for his noticed depositions pursuant to Letters of Request issued by this Court under Hague Evidence Convention [DE 2511-1, p. 3 at  f.n. 5].

   For reasons explained above, as pertaining to AUC commander Mangnoes Lugo,  Plaintiffs fail to show that Fredy Rendon Herrera (aka El Aleman) is "unavailable" within the meaning of Fed. R. Evid. 804(a)(5) because they do not show that they attempted, but were unable, to secure his pretrial deposition testimony due to factors outside their control.  As with Mangones, Plaintiffs were granted an opportunity to take the deposition of Herrera, while he was still imprisoned, pursuant to Letters of Request issued under the Hague Evidence Convention.  Again, Plaintiffs do

not explain why the deposition was not promptly taken pursuant to the emergency discovery relief which they successfully sought in this Court.

For this reason, Fed. R. Evid. 803(b)(3) is inapplicable.  Plaintiffs' testimony recounting the circumstances of the alleged confession does not create a triable issue of fact on the identity of Jose Lopez 339's killers.

### 8.  Pastura Durango (*Montes*)

This Plaintiff proffers no testimony suggesting an AUC-affiliation for the killer of her decedent.  She proffers only the Hasbun Indictment as proof of  AUC involvement in this death, but  the Court has determined, for reasons discussed above, that Plaintiffs do not show an adequate evidentiary foundation for  admission of this  document as a business record or public record hearsay exception under Fed. R. Evid. 803(6) or 803(8).

### 9.  Juvenal Enrique Fontalvo Camargo (*Manjarres*) (New York Action)

Plaintiff testified at deposition that he has no personal knowledge regarding the identity of his son's killers [DE 2348-39].   His belief that an AUC operative was involved is based on hearsay relayed to him by his cousin.  Plaintiff does not identify an applicable hearsay exception, based on evidence in the record, under which his cousin's alleged identification of the men as AUC operatives might be admissible.   There is no sworn testimony on record from the cousin and no evidence demonstrating a premise for the cousin's personal knowledge of the alleged affiliation.

Nor do the proffered declarations of  the third party witnesses create a triable issue of fact on the identity of the decedent's killer, where the first declarant does not establish  any personal knowledge or experience to support his claimed belief that one of the alleged abductors  ("El Russo") was an AUC leader or affiliate, and the second does not establish any personal knowledge for the claimed belief that persons who admonished him for moving the body were AUC affiliates

or commanders. Without any independent source evidence on record from which the alleged AUC affiliation of the abductor may reasonably be drawn, this testimony does not create a triable issue of fact on the identity of the decedent's abductor or killers.

### 10. John Doe 7 (*Does 1-11*) (New Jersey action)

Plaintiff's deposition testimony regarding his alleged confrontation with now-deceased alleged AUC leader Gilberto Camacho over the disappearance of his son does not contain admissible evidence from which an inference of AUC involvement in the death may reasonably be inferred. Plaintiff testified that Camacho was an AUC leader, but did not explain a basis for this belief, based on personal knowledge, nor does Plaintiff otherwise identify a source of evidence in the record establishing an affiliation between Camacho and the AUC.

Plaintiff testified at deposition that Camacho told him his son "was killed because he was full of vices;" he did not testify that Camacho took responsibility for the crime, or even attributed it to an AUC operative. This is not a statement against penal interest within the meaning of Fed. R. Evid. 804(b)(3). Plaintiff's subsequent declaration [DE 2348-129] suggesting that AUC operatives were active in his community, and were recognizable by their carrying of "both short and long weapons" is not competent circumstantial evidence from which an AUC link to the death of his son may reasonably be drawn.

The Declaration of W-1 (DE 2348-98), an alleged witness to the abduction by a person named as Camacho, does not establish personal knowledge of Camacho's identity. This witness testified, based on information from an unidentified friend, that the decedent's body was found on a farm "where the AUC left bodies," but the declarant does not establish any personal knowledge

of the AUC's use of the farm as a body dumping ground, rendering this aspect of the  testimony

as inadmissible hearsay.

The remaining declarations, relating to general AUC activity in the town where the decedent

was killed, do not establish a sufficient evidentiary predicate to support a reasonable inference of

AUC involvement in this specific death.

### 11. Doe 840 (Wolf Plaintiff)

The now-deceased Plaintiff, Doe 840, testified at deposition that she recognized one of her

son's abductors, and identified him by name as a young man from her community [DE 2282-29,

p. 44-45]. She said that the five men who stormed her home "pulled him out, took him and killed

him, because he was a soldier."  *Id.* at p. 43. She testified that an unidentified now-deceased

neighbor told her the man she recognized  was part of a paramilitary group. [DE 2274 at 45]. She

said "that one would see and do his things, they said he was – well back then, they used to call that

paramilitaries…. [t]he people  said  he  was  a  paramilitary." [DE 2274, pp. 8-9] (excerpting

Plaintiffs' deposition testimony at DE 2282-29, p. 47).

Plaintiff contends her deposition testimony is admissible as former testimony of an

unavailable witness under Fed. R. Evid. 804(1).  This is true, but Plaintiff  does not advance any

hearsay exception as a basis for the admission of that portion of her deposition testimony regarding

the alleged  AUC affiliation of  one of the five abductors.   For reasons discussed above, the Court

does not discern  a path  for admission of local rumor and innuendo as reputation evidence of

character, for purposes of Fed. R. Evid. 803(21), or as lay opinion testimony under Fed. R. Evid. 701(c). [37]

Without a path for admission of the proffered testimony linking the decedent's abductor to the AUC, Plaintiff does not show a triable issue of fact on AUC involvement in the death of her son.

   12. **Doe 378 (Wolf Plaintiff)**

As relayed through the expert report of Ortega, Plaintiff Doe 378 reported that her brother went out one evening, while an AUC curfew was in effect, ignoring the warning of his family to stay home. She contends she can testify about a specific conversation she allegedly had with her brother about his intentional defiance of the AUC's curfew in order to watch a soccer game on a projection screen in a public park in the center of town. She reported that an unidentified eyewitness to the murder later relayed circumstances of her brother's deadly encounter with armed assailants to Plaintiff's now-deceased mother, who in turn relayed the circumstances to Plaintiff.

Plaintiff recognizes that the statement of the balcony witness presents a "double hearsay problem involving two unavailable witnesses," but suggests, without discussion, that "[b]oth statement were against the interests of the declarants," on theory they would have been "safer" to keep quiet about what they knew concerning the circumstances of the death. A statement against

---

[37] A lay witness is permitted to provide opinion testimony only to the extent that the testimony is "rationally based on the witness's perception" and is "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701.

A lay witness cannot provide opinion testimony that is based on scientific, technical or other specialized knowledge, such as gang member lexicology. *United States v. Augustin*, 661 F.3d 1105(11th Cir.2011) (expert testimony on gang activity properly admitted, lay testimony on gang lexicology properly limited); *United States v Ledbetter*, 929 F.3d 338 (6th Cir. 2019) (recognizing testimony regarding inner-workings of organized crime as proper subject of expert testimony, and upholding admission of police detective's expert opinion testimony on gang culture and customs as rationally based on his perception of gang activities and use of gang related signs during time as police officer).

 No Plaintiff in this case proffers a predicate for lay opinion testimony on an alleged AUC affiliation that is "rationally based on the witness's perception," and the Court therefore finds no premise for admission of the statement of Doe 840 or any other Bellwether Plaintiff who relies on "community knowledge" of an assailants' status as an AUC operative or leader.

personal security does not meet the definition of a "statement against interest" within the meaning of 803(b)(3), nor does Plaintiff advance a single case suggesting the term may interpreted so broadly.

In addition, Plaintiff fails to show the "unavailability" of the unnamed balcony witness (the unsworn allegation of counsel that she moved away a long time ago does not suffice). And, as to the second hearsay level – the report of the decedent's now-deceased mother relayed to Plaintiff - she does not show how this declaration (from mother to daughter) could conceivably be considered as against the interest (security or otherwise) of the mother. This double hearsay is not admissible evidence and does not create a triable issue of fact on AUC involvement in this killing.

Nor does Plaintiff's anticipated personal testimony regarding an alleged AUC curfew in effect at time of the killing, standing alone, suffice to create a triable issue on the identity of the decedent's killers. Even if Plaintiff could show, based on personal knowledge, that an AUC curfew was indeed in effect at this time, this circumstantial evidence is too speculative, standing alone, to support a reasonable inference that the brother was killed by AUC operatives. This separate testimony hence does not create a triable issue of fact on the identity of the killers.

### C.  Circumstantial Evidence

Even if the above categories of case-specific evidence fail, Plaintiffs alternatively contend they are able to show an AUC link to each death through circumstantial evidence of an active AUC presence in the communities where Plaintiffs' decedents were killed, viewed against case-specific

facts on the circumstances of each death which they contend comports with typical AUC killing patterns and methodologies.

### 1.  Geographical and Temporal Evidence

The non-Wolf Plaintiffs present the expert opinion testimony of Oliver Kaplan, an Associate Professor at the Korbel School of International Studies and Co-Director of the Latin American Center at the University of Denver [DE 2348-41], who concludes, in relevant part, that "[a]lthough the AUC was not responsible for all violence in Colombia or in the Uraba or Magdalena regions, they were responsible for a majority of it." [DE 2348-4 p. 20].  Kaplan collected statistical evidence on war crime and paramilitary homicide rates across Colombia, focusing on AUC and paramilitary behavior in the Uraba and Magdalena regions of Colombia in particular, data he reportedly drew from databases organized by the Human Rights Watch, Amnesty International, the Colombian Commission of Jurists, CINEP, the United States State Department, the United Nations and other organizations.

Relying on this data, he reports a "temporal overlap" of the violence against the bellwether victims and the "general pattern of AUC violence" in the bellwether victims' municipalities [DE 2348-4 at 41-42].  He opines "[t]his is a first indication that the AUC was responsible for the violence suffered by the bellwether victims," and suggests this is representative of a broader pattern of AUC violence.  He also opines that the "*modus operandi*" of the specific bellwether victims' cases fits the general *modus operandi* of AUC paramilitary violence.  *Id*. at 47.  He cites Justice and Peace Law proceedings in which confessions to the homicides of certain bellwether victims were purportedly offered.   Ultimately, he relies on the geographical and temporal overlap of AUC violence as corroborating evidence of an AUC link to the bellwether victims' homicides:

> [E]ven if many of the bellwether victims cannot be confirmed in existing human rights and violence databases on Colombia, it is evident that most were more than

likely harmed by AUC paramilitaries.  The AUC blocs were dominant in the Uraba and Magdalena zones where the killings occurred during the 1995 to 2007 time period … The locations, dates, case details, and the circumstances of violations of human rights of the bellwether victims are comparable to the general patterns of violence in the banana-growing regions of Colombia.  This leads me to conclude that it is highly probable that they are representative of other absent class plaintiff victims in this case, who were also more than likely to have been harmed by the AUC.

*Id* at 51-52.

The Wolf Plaintiffs' expert, Manuel Ortega, similarly relies on statistical evidence regarding areas of AUC dominance, and the homicide rates attributed to the AUC in the regions where Plaintiffs resided, to conclude that the deaths of Doe 840 and Doe 368 were more probably than not caused by the AUC.  He notes it "would be highly unlikely for local bandits or groups of common criminals to operate in an area controlled/protected by the AUC" [DE 2326, p. 16].  He states the towns of Apartado and Turbo were controlled by the AUC between 1995 and 1997, but does note that  "there were several illegal armed groups, including paramilitaries and guerillas, that operated in the Antioquia Department around this time."  He says  the Uraba region was originally controlled by the left-wing guerrilla group known as the FARC, but that the  AUC eventually took over control of this region between 1995 and 1997.  *Id*. at p. 17.

Citing data from the Colombian National  Center for Historic Memory, he reports that of the 1,982 massacres documented in Colombia between the years 1980 and 2012, 1,166 were committed by paramilitaries;  343 committed by guerrillas; 158 committed by the Colombian military, with  295 deaths remaining unsolved. *Id* at p. 18.  He cites this same government data bank as source evidence for the proposition that, of a total of 16,346 incidents of "selective assassinations" committed between the years 1981 and 2012 - producing 23,161 homicide victims - 38% were committed by paramilitary groups; 16.8% by the guerillas; 27.7% by unknown groups; 10.1%  by the Colombian  military, and 6.5%  by unknown individuals, with  the  remainder

committed by "other groups" or "by more than one group."  According to Ortega, [t]hese figures show that, on a national level the paramilitaries killed more than twice as many people as the guerrillas," and that when "territorial control is also considered, the vast majority of these crimes were committed by the group in control." *Id*. at 18.

Plaintiffs' experts both identify killing methodologies which they contend are uniquely associated with AUC  operations – stopping buses and killing; taking people from their homes and killing elsewhere; killing by brutal and gruesome methods; killing while hooded or masked; execution-style killing by bullets to the head; killing persons associated with union activity or left-leaning organizations; kidnaping as a means of inspiring terror (often on motorcycle); killing with the collection of identification cards as a means of confirming the death.  Against this backdrop of general AUC killing methodologies, Plaintiffs contrast the time, place and circumstances of the death of their family members, contending that each death is consistent, in some way, with  these patterns, and that the existence of an  AUC connection to each death may therefore be inferred on this circumstantial evidence alone.

This novel theory appears to be variation of  "market share lability," a products liability doctrine under which tortious manufacturers who produce a fungible and unidentifiable product that injures a plaintiff may be held liable in proportion to their respective market shares.  *See generally Sindel v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924, *cert. den.*, 449 U.S. 912, 101 S. Ct. 285, 66 L.Ed.2d 140 (1980).  Florida has recognized market share liability as "a theory of last resort, developed to provide a remedy where there is an inherent inability to identify the manufacturer of the product that caused the injury." *Hunnings v. Texaco, Inc.*, 29 F.3d 1480 (11th Cir. 1994) (citing *Conley v. Boyle Drug Co.,*  570 So.2d  275 (Fla. 1990)).  The Court is unaware of any application as an alternative causation theory outside the products

liability arena, and Plaintiffs offer no precedent in law or logic for its extension to the war crimes context, as urged here, due to difficulties in proving assailant identity in a period of prolonged and bloody civil unrest involving multiple warring political factions.

The notion that circumstantial geographical and temporal evidence may support an inference of an AUC-based killing in each of the cases here at issue under a "market share"-reminiscent theory of causation is summarily rejected. This evidence is simply far too speculative, standing alone, to permit a reasonable juror to conclude, more likely than not, that the death of any decedent was linked to an AUC operation.

Turning to the admissibility of the specific case-based evidence as an independent premise for inferring an AUC role in each death, Plaintiffs notably do not adduce any specific evidence distinguishing AUC methodologies from brutalities committed by other terror organizations, military operatives, narcotrafficking criminals, or common criminals operating across Colombia during the time frames in question. Without such distinguishing evidence, the Court finds no basis for admitting the proffered AUC methodologies as "*modus operandi*" evidence under Fed. R. Evid. 404(b) from which the AUC's involvement might be inferred. *See generally United States v Myers*, 550 F.2d 1036, 1045-46 (5th Cir. 1977) (*modus operandi* requires showing of "such peculiar, unique or bizarre similarities as to mark them as handiwork" of particular individual). Nor does the Court see a path for admission of the proffered AUC methodologies as "habit" evidence from which AUC involvement may reasonably be inferred under Fed. R. Evid. 406. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1285 (11th Cir. 2008) (evidence must reflect "systematic response to specific situations" to qualify as habit); *Weil v. Seltzer*, 873 F.2d 1453, 1460 (D.C. Cir. 1989)

("habit" evidence under Fed. R. Evid. 406 must "have a reflexive, almost instinctive quality" that responds to a stimulus).

Tragically, the geographic areas where Plaintiffs' decedents resided were brutalized by numerous warring factions over the course of a long and bloody civil war (with some areas undergoing transition from guerilla-based control to paramilitary-based control during the time frames in question), as noted in the data collected and presented by their experts.  On this background, the proffered circumstantial evidence regarding the manner of the killings is not, standing alone, sufficient evidence from which a reasonable jury could infer that the killings were, more likely than not, attributable to the AUC.  Hence, this evidence is insufficient to create a triable issue of fact on causation.

## 2. Expert Opinions

As a final fallback position, Plaintiffs contend that evidence of AUC responsibility for each death may be drawn from the expert witness testimony of Ortega or Kaplan, who opine, based on statistical evidence of AUC dominance in the Uraba and Magdalena areas during the time of the relevant deaths, that the AUC more likely than not was responsible for the deaths of Plaintiffs' decedents.

Rule 702 governs the admissibility of expert testimony. Under this Rule, a witness who is qualified as an expert may "testify in the form of an opinion or otherwise if: (1) the expert's … specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The test of "reliability" is a "flexible" one, and the law grants a district court the "same broad latitude when it decides how to determine reliability" as it

enjoys in making  the ultimate reliability determinations. *Kumho Tire Co., Ltd.  v. Carmichael*, 526 U.S. 137, 142 (1999).

Although an expert is generally allowed to consider hearsay materials in formulating opinions, he must form his opinions by "applying his extensive experience and a reliable methodology" to the inadmissible hearsay materials.  Otherwise, the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows the proponent of the evidence to "circumvent the rules prohibiting hearsay*." United States v. Mejia,* 545 F.3d 179, 197 (2nd Cir. 2008) (quoting *United States v. Dukagjini*, 326 F.3d 45, 58-59 (2d Cir. 2002)).

Putting aside Defendants' hearsay objections to the statistical data collected and relayed in the  experts' reports,  a subject on which the Court currently expresses no opinion, the Court ultimately finds the opinions of both experts inadmissible under Fed. R. Evid. 702 because neither applied "a reliable methodology" to form the proffered opinions on the "likelihood" of AUC involvement.  They simply collected historical crime war statistics from various government and organizational data bases as a premise for deducing, based on geographical and temporary overlays, an AUC  connection to the death of the bellwether victims.

Neither identifies any reliable "principles [or] methodology" which they applied to draw the conclusions proffered, nor does either demonstrate how their prior experience or "specialized knowledge" was relevant to the making of the proffered "deductions" on the likelihood of AUC involvement.  Both experts are simply repeating statistical evidence, and drawing inferences from it, based on temporal and geographical overlays; neither is applying specialized knowledge or "reliable" methodologies.  This practice is not contemplated under Fed. R. Evid. Rule 702, and there is simply "too great an analytical gap between the data and the opinion[s] proffered" to warrant admission under Fed. R. Evid. 702.  *See generally Guinn v. AstraZeneca Pharmaceuticals*

*LP,* 602 F.3d 1245 (11th Cir. 2010) (temporal proximity between user's ingestion of drug and subsequent development of diabetes held insufficient premise for expert causation opinion); *United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992); *United States v. Mejia,* 545 F.3d 179, 197 (2nd Cir. 2008); *Estate of Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27, 33 (D. D.C. 2010)(excluding expert opinion on identity of killer of plaintiff's decedent), *aff'd,* 651 F.3d 118 (D.C. Cir. 2011); *Romano v. Atkins*, 2004 WL 945140 (E.D. Pa. 2004) (opinions based on logical deduction which a juror may engage in unaided, rather than on type of "scientific, technical or other specialized knowledge" are not properly offered under Fed. R. Evid. 702).

### D.  TVPA Claims – Individual Defendants

Plaintiffs' separate claims against the Individual Defendants under the Torture Victims Protection Act also require proof on the identity of each decedent's killer, as a threshold to showing the existence of a "deliberated" act that  qualifies as an "extrajudicial killing." The quantum of proof here is the same as it is under the Colombian law claims.  In any event, Plaintiffs do not suggest that they can prevail on the TVPA claims without proof that an AUC operative killed each of the Bellwether Plaintiffs' decedents.  Because the Court has concluded Plaintiffs have failed to come forward with admissible evidence linking the AUC to each attack, and Plaintiffs have advanced no other basis to support a showing of "deliberated" extrajudicial killings with respect to these individual statutory claims, summary judgment shall be granted in favor of the Individual Defendants on these claims.

### V.      CONCLUSION

Defendants' initial burden in this summary judgment proceeding consisted of a responsibility to inform the Court of the basis for their  motion, and to identify those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.  Because Plaintiffs would

bear the burden of proof at trial on the issue of causation as to the Colombian tort claims (and the issue of "extrajudicial killings" as to the TVPA claims),  Defendants were not required to come forward with evidence negating Plaintiffs' claim on AUC involvement in each death in order to discharge this initial responsibility.

Instead, Defendants, as the moving parties, could carry their burden by simply showing that there is an absence of evidence to support the existence of an AUC-connection to each death. Alternatively, Defendants could adduce affirmative evidence showing that Plaintiffs, as the non-moving parties, would be unable to prove the essential element of causation (or extrajudicial killings) at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993). Defendants have adequately discharged their initial burden in this regard by pointing to an absence of admissible evidence in the record which would support a finding of AUC involvement in the death of each bellwether victim.

Therefore, the burden shifted to Plaintiffs, as nonmovants in this summary judgment proceeding,  to show the existence of a genuine issue of material fact  on the identity of the killers of their decedents.  Because Plaintiffs would bear the burden of proof at trial on this issue --and because Defendants have successfully discharged their burden of proof by demonstrating the absence of evidence on this issue -- to resist summary judgment successfully, Plaintiffs must respond  in one of two ways:  First, they must  show that the record in fact contains supporting admissible evidence, sufficient to withstand a directed verdict motion, which was overlooked or ignored by Defendants as the moving parties.  Or, Plaintiffs must come forward with additional

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Fitzpatrick*, 2 F.3d at 1116-1117.

Plaintiffs do not successfully meet their burden under either scenario. As discussed above, their proffered documentary evidence constitutes of inadmissible hearsay, and even if accepted for its substantive content, it does not support the inferences urged by Plaintiffs. The proffered testimonial evidence constitutes inadmissible hearsay, and Plaintiffs do not successfully identify a path for its admission under any hearsay exception. The proffered circumstantial evidence, standing alone, is too speculative to support a reasonable inference that the AUC more likely than not was responsible for the death of each bellwether victim, and would be insufficient to withstand a directed verdict at trial. The proffered expert testimony on the "likelihood" of AUC involvement in each death, based on geographical and temporal overlays, does not qualify for admission under Fed. R. Evid.702 because it does not involve the application of reliable methodologies or principles.

As Plaintiffs fail to identify any admissible evidence supporting their foundational allegation that the AUC killed their decedents, they cannot prevail on their claims against Chiquita or the Individual Defendants. Thus, summary judgment is appropriately entered in favor of the Defendants. With this ruling, the Court need not reach the alternative set of arguments advanced in support of summary judgment.

It is accordingly **ORDERED AND ADJUDGED:**

1. Defendant Chiquita and the Individual Defendants' Joint Motion for Summary Judgment on the Colombian Law Claims of the designated Bellwether Plaintiffs [DE 2283, 2302] (listed *infra*, at pp. 1-2, f.n. 1), is **GRANTED** based on Plaintiffs' failure to identify

admissible evidence, or evidence reducible to admissible form at trial, on the issue of AUC responsibility for each murder.

2. In light of this ruling, the Individual Defendant Keith Lindner's Motion for Summary Judgment on the Colombian law claims, based, among other things, on the sufficiency of proofs of his alleged involvement in the AUC payment plan [DE 2186] is **DENIED AS MOOT**.

3. The Individual Defendants' Motion for Summary Judgment on the TVPA claims [DE 2289, 2304] is **GRANTED** based on Plaintiffs' failure to identify  admissible evidence, or evidence reducible to admissible form at trial, on the issue of AUC responsibility for each murder.

4. In light of this ruling, the Wolf Bellwether Plaintiffs' motion for partial summary judgment on  "*per se* negligence" liability [DE 2229] is **DENIED AS MOOT.**  Similarly, the non-Wolf Bellwether Plaintiffs' motion for partial summary judgment on the Defendants' affirmative defense of duress [DE 2288] is  **DENIED AS MOOT**.

5. The non-Wolf Plaintiffs' motion for designation of Bellwether Plaintiff trial groupings [DE 2498] is **DENIED as MOOT.**

6. The following pretrial motions touching upon the claims of the designated Bellwether Plaintiffs are also **DENIED as MOOT**: (1) Plaintiffs' Motion for Petition for Writ of Habeas Corpus *Ad Testificandum* [DE 2518]; (2) Plaintiffs' Motion to Strike Testimony of Osvaldo Cuadrado Simanca as Fact Witness [DE 2520]; (3) Defendants' Consolidated *Daubert* Motion [DE 2521]; (4) Defendants' Joint Omnibus Motion *in Limine* [DE 2523]; (5) Defendants' Motion for a Determination on Maintaining Seal on Documents Identifying Plaintiffs' Purported Expert Witness and Anticipated Trial Testimony [DE 2525]; (6)

Plaintiffs' Omnibus Motion *in Limine* to Admit Certain Evidence and to Prohibit Other Evidence [DE 2526]; (7) Plaintiffs 'Consolidated *Daubert* Motion [DE 2527]; (8) Plaintiffs' Motion for Determination on Whether Certain Documents Should be Filed Under Seal [DE 2528, 2529]; (9) Plaintiffs' Motion for Trial Protections [DE 2532]; (10) Plaintiffs' Motion to Seal Motion to File Documents Under Seal [DE 2533]; (11) Wolf Plaintiff (Doe 840)'s Renewed Motion for Substitution of Party for Deceased Bellwether Plaintiff [DE 2338] and (12) the Wolf Plaintiffs' Motion for Leave to File Motion *in Limine* [DE 2481].

7. Pursuant to Rule 58, final judgment shall enter by separate order of the Court in favor of the Defendants and against the designated Bellwether Plaintiffs.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 5th day of September 2019.

KENNETH A. MARRA
United States District Judge

cc. all counsel