## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 08-01916-MD-MARRA

IN RE: CHIQUITA BRANDS
INTERNATIONAL INC. ALIEN TORT
STATUTE AND SHAREHOLDERS
DERIVATIVE LITIGATION

_____

**This Document Relates To:**

**ATS ACTIONS**

**17-80323-CIV-MARRA (2017 Florida Action)**
**17-80547-CIV-MARRA (2017 Ohio Action)**
**20-82222-CIV-MARRA (2020 Florida Action)**
**21-60058-CIV-MARRA (2020 Ohio Action)**
_____/

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTIONS TO DISMISS
### SECOND AMENDED COMPLAINTS IN 2017 FLORIDA/OHIO PUTATIVE CLASS
### ACTIONS AND 2020 FLORIDA/OHIO ACTIONS [DE 3040, 3041, 3042, 3043]

This MDL encompasses the claims of thousands of Colombian nationals who allege that

their family members were victims of extrajudicial killings and other human rights abuses during

the Colombian civil war at the hands of violent paramilitary terrorist groups who were funded, in

part, by U.S. corporate interests doing business in Colombia. As relevant to the above-styled cases,

Plaintiffs contend that Chiquita Brands International, Inc. ("Chiquita') funneled approximately 1.7

million dollars through its wholly-owned Colombian subsidiary ("Banadex") to the *Autodefensas*

*Unidas de Colombia* (United Self-Defense Forces of Colombia, or the "AUC"), a violent right-

wing paramilitary organization. The AUC is alleged to have massacred over 100,000 civilians in

Colombia between 1995 and 2006, including thousands of civilians living in the Uraba and

Magdalena regions where Chiquita operated its banana plantations. The funds provided by

Chiquita allegedly enhanced the AUC's terror capabilities and fueled its bloody fratricide in the banana-growing zones where Plaintiffs and their families lived.

After Chiquita's financial support of the AUC and other Colombian terror groups became the subject of significant media attention in March of 2007, when Chiquita pled guilty to engaging in transactions with a specially-designated global terrorist organization (the AUC), and Chiquita agreed to pay a $25 million fine in criminal proceedings charged in the District of Colombia, thousands of persons whose family members were allegedly brutalized by the AUC in Colombia filed suit in the United States seeking to hold Chiquita and various of its officers accountable for their alleged role in strengthening the AUC's killing capacity and facilitating the murders of their loved ones.

On February 20, 2008, the Judicial Panel on Multidistrict Litigation centralized six cases in this district and assigned the case to the undersigned. The Panel has since continued to transfer cases from around the country. In addition, a number of cases were filed in this District, and the Court combined those cases with the multidistrict cases. At this time, there are nineteen cases which remain pending in this MDL, comprised of Colombian law wrongful-death type claims against both Chiquita and the Individual Defendants, and claims under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. §1350 note[1] against the Individual Defendants only.[2]

---

[1] The TVPA authorizes a civil cause of action against "[a]n individual" for acts of torture and extrajudicial killing committed under authority or color of law of any foreign nation. 28 U.S.C. § 1350 note.

[2] The Court earlier dismissed claims under the Alien Tort Statute ("ATS") and state law negligence claims lodged in numerous of these cases as impermissibly extraterritorial. Plaintiffs bringing the instant Complaints relodge both categories of claim seeking to preserve their arguments on the state law claims and to revisit the Court's earlier rulings on the jurisdictional limits of the ATS.

Cumulatively, roughly 7,500 Colombian nationals, divided amongst seven Plaintiffs' groups, are named as Plaintiffs in these remaining cases.

## I.      Procedural History

At issue here is a series of lawsuits generated by counsel for the "New Jersey" Plaintiffs before and after a failed bid for class certification in the original New Jersey Action, *Does 1-11 v. Chiquita*, Case No. 08-80421-CIV-MARRA ("New Jersey Action"). That action, filed July 19, 2007, originally named Chiquita as the sole defendant, along with various fictitious Defendant "Moe" corporations and individuals.  Five years later, on November 16, 2012, the New Jersey Plaintiffs filed a Second Amended Complaint adding various former Chiquita executives (Cyrus Freidheim, Roderick Hills, Robert Kistinger, Robert Olson, Charles Keiser, William Tsacalis) as Individual Defendants.   Another four and one-half years later, on March 10, 2017, the New Jersey Plaintiffs moved to file a third amended complaint, this time seeking to enlarge the plaintiff pool by converting the absent members of the putative class into named class representatives [DE 1289]. The Court denied the motion to amend on March 27, 2017 [DE 1315].

On  March 11, 2017,  a day after the motion to amend was filed in the New Jersey Action, New Jersey counsel filed two new putative class actions against various former Chiquita employees  – one against Cyrus Freidheim and Charles Keiser in the Southern District of Florida, *Does 1-205 et al. v. Cyrus Freidhiem and Charles Keiser* (Case 17-CIV-80323) ("2017 Florida Action") and one against Robert Olson, Robert Kistinger, William Tsacalis and John Ordman in the Southern District of Ohio, *Does 1-205 et al. v. Robert Olson, et al.* (Case 17-CIV-80547) ("2017 Ohio Action"), designating Does 1-205 as the putative named class representatives in both cases.  The operative Second Amended Complaints in these cases, filed November 29, 2021, added

new Plaintiffs to the 2017 Florida Action (DE 3027) and added Chiquita as a Defendant to the 2017 Ohio Action (DE 3026).

In February 2019, the putative class representatives in the New Jersey Action, Does 1-11, moved under Rule 23(b)(3) seeking certification of a class of thousands of Colombian citizens who allegedly lost family members to the AUC in the Uraba and Magdalena regions of Colombia between 1995 and 2004 [DE 2290]. On May 31, 2019, the Court denied the motion for class certification, cautioning "[n]o further motions for class certification shall be entertained." [DE 2471 at 22]. No appeal was taken from that order.

Ten months later, on March 25, 2020, New Jersey counsel filed another suit, Case 20-CIV-60831 (the "2020 New Jersey Action"), this time naming only Chiquita as Defendant and naming as Plaintiffs all unnamed members of the (failed) putative class described in the original New Jersey Action Complaint [Case 20-CIV-60831, DE 1, ¶ 1031]. On September 30, 2020, the Court dismissed the 2020 New Jersey Action with prejudice, finding the Colombian law claims against Chiquita time-barred under Colombia's ordinary ten-year statute of limitations, and finding the state law claims prohibited as impermissibly extraterritorial [DE 2691, 2692], a ruling currently under review by the Eleventh Circuit Court of Appeals [USCA Case 21-10211] [DE 2811].

On December 4, 2020, New Jersey counsel filed two more actions, this time naming as Plaintiffs the absent members of the putative class described in the original New Jersey Complaint and the absent members of the putative classes described in the 2017 Florida Action and 2017 Ohio Action:[3] (1) *Jane Doe 29 et. al v. Olson et. al*, Case 21-60058, filed in the Southern District of Ohio ("2020 Ohio Action") naming Olson, Kistinger, Tsacalis and Ordman as Individual

---

[3] In the original complaint filed in the 2020 Florida Action, as in the operative Seconded Amended Complaint, Plaintiffs are described as the "absent class members" of two previously filed putative class actions (DE 3024, ¶¶ 666-667) (describing Plaintiffs as absentee members of a putative class from the original New Jersey Complaint and from (Continued…)

Defendants, and (2) *Jane Doe 29 et. al v. Freidheim et. al*, Case 20-82222, filed in the Southern District of Florida ("2020 Florida Action") naming Freidheim and Keiser as Individual Defendants.

At issue here is the viability of claims asserted in the Second Amended Complaints in the 2017 Ohio Action, 2017 Florida Action, 2020 Ohio Action and 2020 Florida Action [DE 3024, 3025, 3026, 3027] -- all filed November 19, 2021 -- which Defendants seek to dismiss with prejudice for failure to state a claim upon which relief may be granted.  Although these Complaints identify different subsets of Plaintiffs, with some overlap, seeking recovery for losses arising out of different AUC attacks, the historical factual background and substantive legal content is virtually identical, as summarized below and at Part II of this Order.  All of the Complaints assert the following causes of action based on "Chiquita's illegal and tortious assistance to the AUC paramilitaries, and the Individual Defendants' roles in that course of action":

(1) War Crimes; Crimes Against Humanity; Terrorism; Material Support to Terrorist Organizations; Cruel, Inhuman, or Degrading Treatment; Violation of the Rights to Life, Liberty and Security of Person and Right to Peaceful Assembly and Association; Gross Violations of Internationally Recognized Human Rights – all alleged to constitute

---

the putative class action pled in the 2017 Florida Complaint which "has yet to be ruled upon").  Similarly, in the 2020 Ohio Action (Case 21-60058), originally filed December 4, 2020, the operative Second Amended Complaint also identifies the named Plaintiffs as absent class members of two previously filed putative class actions (DE 3025, ¶¶ 681-682) (describing Plaintiffs as absent members of a putative class described in the original New Jersey Complaint and in the putative class action pled in the 2017 Ohio Complaint which "has yet to be ruled upon").

actionable torts under the Alien Tort Statute, 28 U.S.C. §1350 (Claims One through Four and Seven through Nine).

(2) Extrajudicial Killings and Acts of Torture, alleged to constitute actionable torts under the Alien Tort Statute and the Torture Victims Protection Act, 28 U.S.C. § 1350 note (Claims Five and Six).

(3) Acts Constituting Wrongful Death, alleged to constitute actionable torts under the state law of New Jersey, Ohio, and Florida; federal common law; Colombian law (Claim Ten).

(4) Acts Constituting Assault and Battery, alleged to constitute actionable torts under the state laws of New Jersey, Ohio, and Florida; federal common law; Colombian law (including independent claims for damages suffered by Plaintiffs themselves and survival claims for pre-death pain and suffering experienced by Plaintiffs' decedents) (Claim Eleven).

(5) Acts Constituting Intentional Infliction of Emotional Distress (independent claims for Plaintiffs' own damages and survival claims for pre-death damages of decedents o/b/o estates) (Claim 12) and Acts Constituting Negligent Infliction of Emotional Distress (independent claims and survival claims) under state law, federal common law, and Colombian law (Claim 13).

(6) "Analogous" claims under the laws of Colombia (analogous to U.S. state law claims) (Claim 15).

(See DE 3025 ¶¶ 685-801; DE 3026 ¶¶ 1172-1288). In addition to the above claims, resting on a theory of secondary liability, Plaintiffs bring primary liability claims against Chiquita and the

Individual Defendants based on the theories of negligence, negligent hiring, and negligence *per se* under state law (New Jersey, Ohio, Florida), federal common law and Colombian law (Claim 14).

By their current motions,  Defendants seek dismissal of the ATS claims and state tort law claims as impermissibly extraterritorial, as previously ruled by the Court; dismissal of the Colombian law claims as time-barred under the 10-year Colombian statute of limitations and related tolling law (and on *res judicata* grounds as to a certain subset of Plaintiffs who sued Chiquita in the 2020 New Jersey Action); dismissal of  the TVPA claims as time-barred and for failure to state a cause of action for lack of adequate "color of law" and secondary liability allegations; dismissal of the entire complaints as impermissible shotgun pleadings lumping together the conduct of multiple defendants and nonparties; dismissal of the claims against Defendant Freidheim for injuries occurring prior to his start date in March 2002, in accordance with prior Court rulings; dismissal of the claims against Defendant Keiser for injuries occurring after his departure date (March 2000) as Banadex GM in Colombia; and dismissal of the claims against Defendant Olson for injuries that occurred prior to his start date (August 1995) as Chiquita's General Counsel.

Plaintiffs have filed a consolidated Response in Opposition to the Motions to Dismiss [DE 3068] along with a companion motion to certify questions on Ohio state tolling law to the Ohio Supreme Court [DE 3069].  Defendants have filed a consolidated Reply [DE 3094]. Pursuant to the Court's direction, the parties have also submitted supplemental briefing addressing statute of limitations and standing issues attending Plaintiffs' "other tort" claims, including the "survival-style" claims, in the Ohio cases [DE 3118, 3119]. Having carefully reviewed the parties' briefing,

the Court grants the Defendants' motions in part and denies the motions in part for the reasons which follow.

## II.    Historical Factual Background - Summary of Second Amended Complaints[4]

Chiquita, as successor to United Fruit Co. and United Brands Co., has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century.[5] In the 1960s, the company expanded its Colombian operations into the Uraba region and created a Colombian subsidiary, *C.I. Bananos de Exportacion, S.A.* ("Banadex"), which quickly grew to be Chiquita's most profitable banana supplier [DE 3027 ¶142].

Originally, Chiquita operated under a "purchased fruit" model in Colombia, buying product from local fruit producers for distribution in the United States and European markets. By the middle to late 1980s, Chiquita transitioned to an "owned fruit" model, purchasing farmland in Colombia on which to operate its own banana plantations in anticipation of increased demand from the opening of European markets [DE 3027 ¶¶ 220- 221]. Chiquita expanded its Colombian operations against the backdrop of a brutal civil war, dating back to at least 1946, pitting the Colombian government against left-wing guerilla insurgents. Charles Keiser, who began his tenure in Colombia in 1987, and who became General Manager of Banadex in 1989 [DE 3027 ¶ 284], was aware of the history of violent guerilla activity in the area where Chiquita operated, and alerted Chiquita management to the disruptive impact of guerillas on Banadex farming operations. Among

---

[4]As required under the relevant legal standard, for purposes of the instant motions the Court accepts as true all well-pled factual allegations of the Complaints and interprets them in the light most favorable to Plaintiffs. Since the historical factual background and liability allegations are virtually identical across all four pleadings, for efficiency the Court will cite to the Second Amended Complaint in the 2017 Florida Action (DE 3027), as an exemplar pleading, in summarizing the relevant background facts.

[5] Chiquita's predecessor, United Fruit Co., was founded in 1899, became United Brands Co. in 1970, and was renamed Chiquita Brands International in 1990 (DE 3027 ¶ 141).

other things, Keiser advised Chiquita management that "owners and employees are perpetually at risk of murder, violence and extortion by the guerrillas." [DE 3027 ¶¶ 286-287]. Eventually, beginning in the late 1980s and continuing through the late 1990s, Chiquita started paying the guerillas, including the notorious *Fuerzas Armadas de Revolucionarias de Colombia* (The Revolutionary Armed Forces of Colombia, or "FARC"), the ELN and the *Ejercito Popular de Liberacion* ("EPL"), as these groups assumed dominance in Uraba. Chiquita viewed the payments as the "cost of doing business" in Colombia and the price for "operat[ing] in an environment in which labor and community opposition to their operations and policies was suppressed." [DE 3027 ¶¶ 219, 228]. Guerilla activity and attacks on Banadex infrastructure nevertheless continued to disrupt Banadex operations, leading Chiquita executives to grow increasingly "concerned that the guerillas held influence with workers and unions on their farms and that the guerrillas were behind strike activity." [DE 3027, ¶¶ 229, 230]. Chiquita nevertheless continued to acquire farms aggressively, while paying and negotiating with the guerilas. Eventually, Chiquita also began making payments to the Colombian military to support its anti-guerrilla efforts, although it "was concerned that the military's combat capacity was weak and that they were unable to drive out the guerillas." [DE 3027 ¶¶ 231, 233].

In the early 1960s, self-defense groups emerged in rural areas of Colombia to assist the Colombian government and powerful private groups that were opposed to the leftist guerillas [DE 3027 ¶249]. One notorious self-defense or "Autodefensas" group emerging in Uraba was known as *Los Tangueros*. It was formed by the wealthy Castano family, and named for its family ranch, *Las Tangos* [DE 3027 ¶250]. From the 1980s to early 1990s, *Los Tangueros* death squads were responsible for multiple mass-executions, especially targeting left-wing guerilas as well as suspected guerrilla supporters and sympathizers [DE 3027 ¶164]. Initially, under a 1968 law, the

9

Colombian government approved and encouraged the formation of such groups and assisted in training and equipping the self-defense soldiers. As the level of extrajudicial violence in which the paramilitaries were implicated escalated, however, the Colombian government eventually formally distanced itself from these groups and by 1991 ultimately banned paramilitarism in Colombia.

When the Colombian government outlawed paramilitarism in the early 1990s, *Los Tangueros* allegedly pressured the EPL into a peace agreement with the government, under which most of EPL's members, including more than 2,000 fighters, demobilized.  The demobilized wing formed a new political party, under the name *Esperanza Paz y Libertad* ("Hope Peace & Liberty"), generally known as "*Esperanza*."  *Esperanza* developed its own armed wing, known as the Popular Commands (*Comandos Populares* or "CP"), and CP soldiers, counting former EPL guerrillas in their ranks, were commonly stationed on farms and ranches throughout the banana-growing regions,  including on Chiquita's farmlands [DE 3027 ¶¶ 251-253].[6]  These and other self-defense groups continued to thrive, despite the official government ban against their existence, and by the early 1990s, Banadex, with the authorization of Keiser, was paying several paramilitary groups  in Colombia both directly and indirectly through  AUGURA, a banana industry association [DE 3027, ¶¶ 234, 241-242].

At or about this same time, the Castanos brothers (Vincent and Carlos) reformed *Los Tangueros* into a new self-defense group, named the *Autodefensas Campesinas de Cordoba and Uraba* ("ACCU"), a group dedicated to wresting control of Uraba from the guerrillas [DE 3027 ¶254].  The ACCU rapidly grew into the largest and most well-organized paramilitary group in Colombia [DE 3027 ¶256], following a military model with a central command overseeing activity

---

[6] In 1993, Chiquita hired "*Esperanza*" to guard its banana farms, appreciating that its members were "willing to ensure peace in the farms in which they have the most influence." [DE 3027 ¶ 236].

of local subdivisions known as "blocs" and "fronts."  Carlos Castanos -- a long-time paramilitary fighter with family ties to the drug trade -- served as Commander in Chief of the ACCU [DE 3027 ¶256].  Castanos garnered significant financial support for the organization from the banana companies, including Chiquita, via payments channeled through front organizations known as "convivirs." [DE 3027 ¶241].[7]

In early 1997, Carlos Castano and the ACCU sponsored a summit of self-defense groups, summonsing regional paramilitaries from across Colombia, a meeting which culminated with the formation of a national federation, under Castano leadership, called the *Autodefensas Unidad de Colombia* or the "AUC" [DE 3027 ¶257].  Shortly after the AUC's formation, Castanos invited Banadex General Manager Charles Keiser to a meeting at a private residence in Medellin to invite his support of the AUC [DE 3027 ¶277].  Two other Banadex employees attended, including Reinaldo Escobar (Banadex's Colombian counsel), along with banana grower Irving Bernal and AUC leader Raul Hasbun [DE 3027 ¶ 278].

At the Medellin meeting, Castano sought to persuade Keiser and Escobar that Banadex had a common interest with the Colombian government and the local business community in driving the guerillas out of Uraba and said he "looked forward to their support of the convivir" in

---

[7] Although paramilitarism was outlawed in Colombia by 1991, Plaintiffs claim the Colombian government continued to seek out the assistance of paramilitaries to fight the guerilas, and passed legislation, the Decree 356 of 1994, intended to create a "cover" or facially legitimate avenue through which individuals and companies could route private funding to the AUC.

Paramilitaries which reorganized under the decree could receive funding as private groups providing "special vigilance and private security services," groups known by the Spanish language acronym of "CONVIVIR."  These groups consisted of civilians who received a license from the government to "provide their own security in areas of high risk or in the public interest, which requires a high level of security."  [DE 3027 ¶ 181].

Convivirs in Uraba were fronts for the ACCU and the AUC from the beginning [DE 3027 ¶182] and the government, paramilitaries and banana companies viewed the convivir as an ideal way to legalize funding to paramilitaries [DE 3027, ¶184].

furtherance of that movement. Castano allegedly "was polite and sent no explicit threats" in delivering this message [DE 3027 ¶ 291]. Keiser brokered a deal with Castano, agreeing to pay a certain amount per box of bananas exported by Banadex in return for the AUC's services in protecting the company's banana plantations from guerilla attacks [DE 3027 ¶¶358, 369]. Pursuant to this arrangement, from 1997 through 2004, Banadex made regular payments to the AUC totaling over $ 1.7 million [DE 3027 ¶245].

Chiquita's senior executives knew that Banadex was paying the AUC and that the AUC was a violent paramilitary organization led by Carlos Castano [DE 3027 ¶246]. Indeed, Banadex payments to the AUC were specifically reviewed and approved at Chiquita's corporate headquarters in Cincinnati by Cyrus Freidheim, who became Chiquita's President and CEO in 2002, and the late Roderick M. Hills, a former Chiquita Director and President of Chiquita's Audit Committee. Banadex made payments either directly to the AUC or through front organizations such as Convivir *Papagayo* and recorded the payments in its corporate books and records as "security payments" or payments for "security services." [*Id.* at ¶ 247].

Robert Kistinger, former President and Chief Operating Officer of Chiquita Fresh Group, also reviewed and authorized the payments, as did Robert Olson, former Vice President and General Counsel of Chiquita. By September 2000, Robert Olson was apprised of the results of an in-house investigation into the AUC payments confirming that payments to the convivirs were in fact supporting violent paramilitary terrorists [DE 3027 ¶248]. Olson relayed the results of the investigation to Freidheim and Keiser, and to Chiquita's Audit Committee. *Id.* Instead of stopping the payments, however, Chiquita created new procedures to disguise them: Under a plan devised by William Tsacalis, Chiquita's Controller and Chief Accounting Officer, implemented in May 2002 (after the U.S. government designated the AUC as a foreign terrorist organization ("FTO")),

Banadex executives Alvaro Acevedo and Victor Buitrago in Colombia received "bonus" salary checks with the intent and agreement that they would convert the checks to cash for hand delivery to the AUC [DE 3027 ¶249].[8]

John Ordman, former Senior Vice President for Chiquita Fresh Group with operational responsibility for all Colombian operations, also reviewed the AUC payments for "reasonableness" and continued to approve them after the AUC was designated as a FTO [DE 3027 ¶147]. And Robert Kistinger, along with Roderick Hills, allegedly instructed Chiquita employees to continue making the payments even after outside counsel told Chiquita executives at an April 24, 2003, meeting that the payments were illegal and must be stopped [DE 3027 ¶261]. Following those instructions, from May 12, 2003, to February 4, 2004, Acevedo and Buitrago made at least 19 direct payments to the AUC in Santa Marta and Uraba totaling at least $285,915 [DE 3027 ¶ 263].

Enjoying a steady stream of banana industry support, the AUC rapidly expanded its ranks during the late 1990s and into the twenty-first century. The AUC boasted of roughly 4,000 combatants by 1997, and 11,000 by 2002 (although the government places the latter figure at between 8,000 to 9,000 fighters). By 2004, when demobilization of the AUC began, its ranks had

---

[8] Kistinger and Olson began approving convivir payments around 1996 and 1997, allegedly with knowledge that the payments were being routed to paramilitaries. Kistinger, Olson, Tsacalis and Ordman knew about Banadex payments to the AUC and did nothing to stop them. Instead, in 2002, they created and approved new procedures to disguise AUC payments (routing money through "income contributions" made to Banadex executives) (DE 3027 ¶¶ 253, 256). At a full board of directors meeting in April 2003, at which the AUC's status as a designated FTO was discussed, Olson allegedly resisted any departure from this plan, saying "just let them sue us, come after us" (¶ 260), a sentiment allegedly shared by Freidheim and Kistinger. Five days later, Kistinger traveled to Cincinnati and instructed two Chiquita employees to continue making the payments (¶ 267).

swelled to as many as 17,000 armed fighters and 10,000 other associates, including informants, cooks, drivers, and computer technicians [DE 3027 ¶ 172].

Although the AUC's mission was to eliminate the guerillas, most of its alleged victims were innocent civilians which it terrorized with routine death threats, extrajudicial killings, torture, rape, kidnapping, forced disappearances and village looting -- tactics intended to deter community support for the guerillas by "draining the sea." [DE 3027 ¶¶ 173-174]:

> The AUC claimed that it was justified in targeting civilians with no known ties to guerillas because guerilla groups required the logistical support of local towns to operate in the region.  Carlos Castano, the AUC leader, described this strategy as "*quitarle agua al pez*" (draining the water to catch the fish), as the AUC sought to intimidate and coerce civilians to prevent them from providing support to guerrillas.

[DE 3027 ¶174].  Between 1994 and 2004, the AUC and its constituent groups allegedly carried out hundreds of mass killings of civilians in furtherance of this strategy [¶177].  It frequently targeted persons perceived to share the guerrillas' leftist ideology, such as teachers, community leaders and activists, trade unionists, human rights defenders, religious workers, and leftist politicians, along with anyone else it considered socially undesirable, including indigenous persons, persons with disabilities, persons with psychological problems, drug addicts, prostitutes, and suspected petty criminals [¶176].

The AUC operated unimpeded by the Colombian government, with which it collaborated and enjoyed an "interdependence" or symbiotic relationship [¶189]:  When the government or military was not able to legally arrest or attack civilians, they allegedly delegated the task to the AUC or a convivir associated with it to do the government's "dirty work," operating outside the constraints of the Geneva Convention [DE 3027 ¶191].  In exchange, the government offered material and tactical support to the AUC and  criminal impunity for its transgressions [DE 3027 ¶¶ 192-195].  The Colombian government is alleged to have "willfully failed to prevent or interrupt

the crimes of AUC, actively conspired with them, and coordinated activities with them" [¶195], as illustrated through the following examples:

- allowing paramilitaries to establish bases and checkpoints without interference.

- withdrawing security from villages deemed sympathetic to guerillas, leaving them vulnerable to attack by paramilitaries.

- sharing intelligence, including the names of suspected guerilla collaborators.[9]

- sharing personnel, including army soldiers who moonlighted as paramilitary operatives.

- failing to intervene to stop ongoing attacks on civilian populations.

- allowing paramilitary commanders to lodge on military bases.

- providing special military training.

- allowing passage through roadblocks.

- allowing paramilitaries to perform military functions and use military-grade equipment.

- allowing AUC operatives free access to facilities at the Army's 17th Brigade headquarters and detention facilities, where the AUC occasionally picked up prisoners and murdered them.

- allowing AUC to take over various state functions in Uraba, including security and order; resolution of neighborhood and commercial disputes; regulation of social services; collection of debts; controlling school truancy; and control over transportation systems (e.g., allowing

---

[9]In Uraba, for example, General Rito Alejo del Rio Rojas, Commander of the 17th Brigade (1995 to 1997) notoriously supported and collaborated with the AUC.  Rojas ultimately was arrested in 2008 for collaboration with the AUC and conspiracy to commit murders committed during his tenure by paramilitaries in Uraba. (¶ 202). Similarly, Salvatore Mancuso, who succeeded Castano as national commander of the AUC, testified that the Colombian defense minister and Colombian Vice-President regularly met and collaborated with him and other AUC paramilitaries to coordinate the paramilitaries' expansion throughout northern Colombia (¶202).

the AUC to shut down stretches of the Pan American highway to use as a runway for planes arriving with weapons and ammunition and for planes departing with narcotics.

- running joint operations with the AUC involving civilian attacks [¶200]: In October 1997, for example, the Colombian Army's 4th Brigade allegedly established a perimeter around a village in Antioquia, preventing entry and escape of its inhabitants, allowing the AUC to move in and pillage the village over a five-day period, killing at least eleven civilians while burning houses, looting stores; destroying pipes carrying potable water, and forcibly "disappearing" over thirty people as they attempted to escape. And on February 19, 2000, members of the Army's 27th Brigade allegedly participated in an AUC killing of five selectively designated banana workers in the "peace community" of San Jose de Apartado in Uraba [DE 3027 ¶¶ 293-298].

By 2001, the conflict between the AUC and the FARC had become "a notorious exchange of atrocities," and the AUC was infamous for using terror tactics on civilians living in and around areas that had once been FARC strongholds as a means of deterring support for the guerrillas and their ideologies [DE 3027 ¶196].

### III.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. A court may dismiss a complaint under Rule 12(b)(6) if a plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In deciding a Rule 12(b)(6) motion, the court must accept all well-pleaded factual allegations as true and interpret those facts in a light most favorable to the non-moving party. *DaCosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002). However, conclusory allegations,

unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002).

## IV.   Discussion

### A.  Extraterritoriality:  Alien Tort Statute (ATS) and State Law Claims

The Second Amended Complaints assert claims under the ATS, which grants federal district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  The ATS is a "strictly jurisdictional statute." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004).  It "does not expressly provide any causes of action" but instead allows federal courts to recognize private claims for violations of international law under federal common law. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 114-115 (2013).

Here, Plaintiffs claim that Defendants have aided and abetted or conspired to commit extrajudicial killings, acts of terrorism and crimes against humanity against Colombian citizens in violation of the law of nations. Defendants argue that Plaintiffs' ATS claims are impermissibly extraterritorial, drawing from earlier Eleventh Circuit precedent, *Cardona v. Chiquita Brands Int'l*, 760 F.3d 1185 (11th Cir. 2014) (no subject matter over ATS claims where all  relevant conduct occurred in Colombia) and more recent Supreme Court guidance, *Nestle USA, Inc. v. Doe,*  593 U.S. ___, 141 S. Ct. 1931, 210 L.Ed.2d 207 (2021) (rejecting ATS jurisdiction based on United States-based operational decision-making, where nearly all the conduct constituting alleged "aiding and abetting" of child slavery practices occurred  in the Ivory Coast).  Plaintiffs contend that the facts of this case are distinguishable from this precedent and urge the Court to revisit the viability of their ATS claims in light of the teachings of *Nestle,* where "general corporate activity" lacking a "sufficient connection" to the cause of action sued upon was rejected as premise for

domestic application of the ATS, without foreclosing the possibility that domestic activity sufficiently linked to tortious conduct abroad could support a domestic application of the statute.

In general, federal statutes are presumed to apply "only domestically," unless "the statute gives a clear, affirmative indication" that rebuts this presumption. *Nestle,* 141 S. Ct. at 1936 (quoting *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337 (2016)). In *Kiobel*, the Supreme Court held that the "presumption against extraterritorially applies to claims under the ATS, and that nothing in the statute rebuts that presumption." *Kiobel*, 569 U.S. at 124, 133 S. Ct. at 1669. On the facts before it in *Kiobel*, the Court determined that the ATS did not confer jurisdiction because "all the relevant conduct took place outside the United States." *Id.* However, it did not foreclose the possibility that that there may be circumstances in which the presumption does not apply and stated that the ATS could create jurisdiction for "claims [that] touch and concern the territory of the United States … with sufficient force to displace the presumption against extraterritorially applications." *Kiobel,* 133 S. Ct. at 1669 (citing "focus" inquiry of *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 265-73 (2010)). Nor did it explicitly reach the issue of what conduct should be considered in assessing whether an aiding and abetting claim touched and concerned U.S. territory because, in that case, "all the relevant conduct took place outside the United States" and the sole domestic nexus was the "mere corporate presence" of the foreign corporation defendants. *Kiobel*, 569 U.S. at 125-25.

Since *Kiobel*, federal courts have not limited their extraterritoriality inquiries to the situs of the direct tortious conduct and have indeed viewed the location of accessory liability conduct as relevant to assessing *Kiobel*'s "touch and concern" test. *See Doe v. Drummond Co.,* 782 F.3d 576, 580, 598 (11th Cir. 2015) (assessing extraterritoriality of ATS aiding and abetting and conspiracy claims arising from extrajudicial killings in Colombia, and recognizing that "the domestic or

extraterritorial location of all conduct in support of those claims is relevant to the jurisdictional inquiry"); *Mastafa v. Chevron Corp.,* 770 F.3d 170, 185, 191 (2d Cir. 2014) (addressing ATS claim that defendants aided and abetted torture in Iraq under Saddam Hussein's regime, and finding relevant conduct for assessing exterritoriality to include "the conduct of the defendant which is alleged … to be either a direct violation of the law of nations or … conduct that constitutes aiding and abetting another's violation of the law of nations").

*Nestle,* however, did not detract from this approach. Rather, it reframed the "touch and concern" test of *Kiobel* to center on the question of whether "the conduct relevant to the statute's focus occurred in the United States." *Nestle*, 141 S. Ct. at 1936 (quoting *RJR Nabisco*, 579 U.S. at 337). In other words, under *Nestle,* to ensure a "permissible domestic application" of the ATS, a plaintiff must show that "the conduct relevant to the statute's focus occurred in the United States," even if other relevant conduct occurred abroad. *Id.* By zeroing in on the location of conduct "relevant to the statute's focus," the court assessing the jurisdictional inquiry is best poised to determine whether the claims "touch and concern" United States territory "with sufficient force" to displace the presumption against extraterritoriality. *Mustafa v. Chevron Corp.,* 770 F.3d 170, 182 (2d Cir. 2014). Put another way, if a plaintiff cannot identify domestic conduct relevant to the ATS's focus, then the case involves an impermissible extraterritorial application and the presumption against extraterritoriality bars the action. *Nestle*, 141 S. Ct. at 1936 (quoting *RJR Nabisco*, 579 U.S. at 337).

*Nestle* did not define the universe of relevant conduct in determining the ATS's focus or narrow it to only the direct tortious conduct that caused the injury. It simply held, assuming without deciding, that domestic conduct can aid and abet a violation of international law that occurs overseas, that the complaint in the case before it impermissibly sought an extraterritorial

application of the ATS where "nearly all" of the conduct alleged to have aided and abetted the violation/forced child labor – the provision of training, fertilizer, tools, and cash – occurred in Ivory Coast. *Nestle,* 141 S. Ct. at 1936-37. While the *Nestle* plaintiffs argued that all the "major operational decisions" behind the misconduct occurred in the United States, from where the "financing arrangements" originated that provided personal spending money to Ivory Coast famers to maintain their loyalty as exclusive cocoa suppliers, *Doe v. Nestle USA Inc.,* 906 F.3d 1120, 1126 (9th Cir. 2018), *rev'd sub nom*., *Nestle USA Inc. v. Doe*, 141 S. Ct. 1931 (2021), the Court rejected the proposition that "allegations of general corporate activity – like decision-making [could] alone establish domestic application of the ATS" because they "do not draw a sufficient connection between … aiding and abetting forced labor overseas… and domestic conduct." *Nestle*, 141 S. Ct. at 1937.

Plaintiffs here seek to distinguish *Nestle* on theory that the United States-based decision making alleged to have aided and abetted the human rights violations at issue in *Nestle* constituted "general corporate activity" which is not inherently unlawful. Their case is different, they say, because the United States-based corporate misconduct attributed to Chiquita "include[d] criminal acts, occurring over years, designed specifically to aid and abet the tortious conduct of the AUC" (Opposition at 47), conduct which goes "far beyond general corporate oversight of foreign operations," and which establishes a connection between the domestic activity and the torts committed abroad.

The Court concludes that Plaintiffs misread *Nestle* and mischaracterize the factual premise of their Complaints: The domestic activity of Chiquita that allegedly aided and abetted the direct tortious conduct of the AUC in Colombia is not qualitatively distinct from the "general corporate activity" (financing decisions) that allegedly aided and abetted the promotion of Ivory Coast child

slavery in *Nestle.*  In *Nestle*, the allegation was that American corporations aided and abetted child slavery in Ivory Coast by buying cocoa from Ivory Coast farms *that they knew or should have known* used child slavery, and by providing those farms "with technical and financial resources – such as training, fertilizer, tools, and cash – in exchange for the exclusive right to purchase cocoa." *Id.* at 1935.  The payments approved in the United States were made not specifically to support child slavery, but to retain the farms as exclusive suppliers.  Similarly, in this case, Plaintiffs claim that corporate actions in the United States were undertaken with Chiquita executives' actual or constructive knowledge of violations of the law of nations committed by foreign entities, such as the AUC, and resulted in the provision of incidental support to such violations.  The payments approved in the United States were not made specifically to fund civilian attacks, however, but to purchase protection against guerilla attacks on farmlands and infrastructure owned and operated by Chiquita's Colombian subsidiary.

As in *Nestle*, "nearly all" the conduct that Plaintiffs say aided and abetted the violations of the laws of nations abroad also occurred abroad: Charles Keiser allegedly "brokered" the AUC payment agreement with AUC leaders in Medellin; Keiser personally delivered or caused the delivery of cash to AUC operatives in Colombia, either directly or through convivirs located in Colombia; Colombia-based Banadex executives accepted fake "bonus" checks which they converted to cash for personal delivery to AUC operatives; [10]  Banadex General Managers oversaw staff based in Colombia which they knew assisted the AUC, and yet never disciplined or sanctioned

---

[10] Keiser allegedly "personally authorized at least 45 payments to the AUC," following his meeting with Castano, and was allegedly present at an AUGURA meeting in Colombia where the banana companies agreed they would pay the AUC three cents per box of bananas exported.  Similarly, his successor, Valverde, authorized another 13 payments to AUC, and his successor, Acevedo, authorized 37 more (with approval of Defendant Ordman).

them [¶285]; [11]  Banadex  employees allowed AUC operatives access to the company's valuable port in Turbo, facilitating the organization's narcotics exportation  and arms importation;  and Colombian-based corporate decision-making also contributed  to continuation  of  the  AUC payments. Banadex counsel, Reinaldo Escobar, for example, was allegedly responsible for assessing the legality of payments to paramilitaries under Colombian law yet never reported any issues to Banadex management.  Representing both Banadex and Chiquita, Escobar also sat on the board of AUGURA, which paid the AUC and its predecessors through convivirs [DE 3027 ¶¶ 298, 303].  Luis Cuartas Carrasco, a labor lawyer for Banadex who reported to Escobar, knew of the AUC's violent terror tactics yet did nothing to raise a question with the legitimacy of Banadex payments to the AUC [DE 3027 ¶¶ 310-311]. Cuartas has since been charged with criminal conspiracy to commit crimes again humanity for his role in promoting the Banadex AUC scheme (¶ 312).

Although Plaintiffs here claim the domestic activity which aided and abetted AUC atrocities is sufficiently connected to those crimes to warrant domestic application of the ATS, on the theory that Chiquita  approved the payments when it *knew or should have known* that the money paid to the AUC was collaterally used to fuel civilian attacks, *Nestle* teaches that imbuing United States-based corporate decision making with an element of recklessness does not necessarily convert the domestic conduct into "conduct relevant to the ATS's focus."  In *Nestle*, for example, the defendant American corporations involved in that case allegedly knew or should have known that the money paid to Ivory Coast farms would be used to pay for child slavery, but this was held insufficient to

---

[11] For example, Banadex's head of Security, Victor Buitrago Sandoval, allegedly participated in meetings with AUC leaders Raul Hasbun and Carlos Castano and worked closely with directors of convivirs in Uraba who have since been convicted for conspiracy because of their role in channeling funds to the AUC (¶ 290).

establish a connection between the United States-based decision making over the financing arrangements and the torts committed abroad to sustain a domestic application of the ATS.

So too, in this case, the payments approved in the United States were not made specifically to fund terror attacks on innocent civilians, although Chiquita executives allegedly knew or should have known that the money paid to the AUC would incidentally fuel such attacks.  As in *Nestle,* this is insufficient to establish a connection between the U.S. based decision making – intended to purchase protection against guerilla attacks on foreign infrastructure -- and the tortious conduct of the AUC abroad.   The facts of this case – where "nearly all" of the aiding and abetting conduct occurred abroad -- bring it into closer alignment with the facts of *Nestle*, notwithstanding that some financial decision-making relevant to the *actus reus* of the offense occurred in the United States. Following *Nestle,* this Court is bound to dismiss Plaintiffs' ATS claims with prejudice as impermissibly extraterritorial. [12]

As to the state law claims (Florida, Ohio, New Jersey), Plaintiffs recognize that this Court has repeatedly ruled these claims are impermissibly extraterritorial and state that they reassert them here simply "to preserve" them (Opposition at 50).   Finding no cause to revisit its prior rulings on

---

[12] As additional grounds for dismissal, Defendants advance that "aiding and abetting" liability is not a recognized cause of action under the ATS in the first instance, a proposition endorsed by three Justices in the *Nestle* case.  [DE 3094, Reply at 10 n. 1, citing *Nestle,* 141 S. Ct. at 1937 (Part III) (Thomas, J., with Gorsuch J. and Kavanagh, J., joining and Part II (Gorsuch, J. with Kavanaugh, joining)]. This was not the holding of the *Nestle* Court, however, and this Court simply acknowledges the open question on this issue without addressing or resolving it.

this issue, the Court summarily dismisses all Ohio, Florida and New Jersey state law claims as impermissibly extraterritorial.

### B.  Colombian Law "Wrongful Death-Style," "Survival-Style" and "Other Tort" Claims

Defendants seek dismissal with prejudice of all Colombian law claims -- wrongful death-style claims, survival-style claims and "other tort" claims [13] -- as time-barred under Colombia's 10-year ordinary statute of limitations.   They rely on a prior ruling of this Court, issued in the 2020 New Jersey Action, finding that Colombia's ordinary 10-year statute of limitations runs from the date of injury, and that Colombian law does not recognize equitable tolling (e.g., the discovery rule) or class action tolling rules [DE 2691 at 17-19; DE 2777 at 6 n. 3].  Defendants assert, in the instant cases, that all the Colombian law claims alleged in the 2017 Florida/Ohio and 2020

---

[13] Defendants' initial Motions to Dismiss addressed Plaintiffs' wrongful death-style claims, survival-style claims, and amorphous "other tort" claims (presumably assault and battery, intentional/unintentional infliction of emotional distress claims), challenging each category as time-barred under distinct Ohio choice of law analyses.  Defendants' consolidated Reply, however, referenced only the wrongful death- style claims and the impact of the borrowing clause of Ohio Rev. Code §2125.01 (Ohio's wrongful death statute) in triggering the Colombian limitations statute as a time bar to this general category of claims.  Plaintiffs' Sur-reply seized on this shift and challenged Defendants' overlook of the "other tort" claims for Plaintiffs' "own damages" pled in their complaints, which they described as "hereditary" claims akin to "survival" claims under United States jurisprudence, and as to which they advanced a separate limitations argument derived from a distinct choice of law analysis.

The Court accepted the proposed Sur-reply as a clarification and narrowing of the "analogous" category of Colombian law claims loosely pled in Plaintiffs' Ohio Complaints, interpreting it as an intended refinement and limitation of this amorphous category to mean "survival style" claims. Accordingly, the Court directed supplemental briefing from both sides on the interplay of Ohio Rev. Code §2125.01 vis a vis the survival-style "other tort" Colombian law claims.

However, in Plaintiffs' subsequent supplemental briefing [DE 3119], they protest, at footnote 1, that the focus in their Sur-reply on "survival style" claims was not intended to walk back or diminish the sweep of their " analogous" "other tort" Colombian law claims – claims they maintain do include independent claims for Plaintiffs' "own damages" attending the commission of  torts personal to them - assault and battery, infliction of emotional distress -- a distinct subset of claims which they argue are governed by a separate statute of limitations analysis.

Liberally interpreting Plaintiffs' Ohio Complaints to include Plaintiffs' personal "own damages" claims for assault and battery, and intentional/unintentional infliction of emotional distress (to the extent available under Colombian law), as well as hereditary or "survival" style claims, the Court's examination of  Defendants' limitations challenge now proceeds with reference to this larger category of "other tort" claims under which Plaintiff's purport to travel.

Florida/Ohio cases are time-barred on the face of the Complaints, which place the last alleged death in October 2004.[14]

As a threshold point, Plaintiffs dispute the correctness of the Court's earlier limitations ruling in the 2020 New Jersey Action, and the accuracy of the legal expert opinions from which that ruling was drawn. Next, they contend that the 2020 New Jersey Action limitations ruling does not apply to the Ohio-filed and Florida-filed cases at issue here. Plaintiffs assert these actions travel under a different conflicts analysis permitting the importation of the tolling rules of Ohio and Florida to salvage the claims. This argument is addressed, and rejected, in the analysis which follows.

## 1. Ohio Cases

In the MDL context, where a transferee court presides over several diversity actions consolidated under the multidistrict rules, the choice of law rules of each jurisdiction in which the transferred actions were originally filed must be applied. *In re Volkswagen Audi Warranty Extension Lit.*, 692 F.3d 4, 17 (1st Cir. 2012); *Chang v. Baxter Heathcare Corp.,* 599 F.3d 728, 730 (7th Cir. 2010); *In re Air Disaster of Ramstein Air Base, Germany,* 81 F.3d 570, 576 (5th Cir. 1996). Plaintiffs filed the subject cases in the Southern District of Ohio under assertion of its diversity jurisdiction. Since a federal court sitting in diversity must apply the choice of law rules of the state in which it sits, *Klaxon Co. v. Stentor Electric Mfg. Co*., 313 U. S. 487, 496 (1941);

---

[14] The Court's prior ruling was the product of a choice of law analysis, drawing from the choice of law rules of New Jersey, as the state where the transferor court sat. Under controlling New Jersey choice of law precepts in that case, the Court concluded that Colombia's statute of limitation applied, along with Colombia's relevant tolling rules, thus operating as a time-bar on all claims as a matter of law [DE 2691, at 11-14].

*Tele-Save Merchandising Co. v Consumers Distributing Co.*, 814 F.2d 1120 (6th Cir. 1987), Ohio choice of law rules are applicable in the 2017 and 2020 Ohio Actions. [15]

Under Ohio law, statutes of limitations are viewed as procedural in nature for choice of law analysis purposes, *Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994), and the procedural laws of the forum state, including statutes of limitations, are generally applied in choice of law situations. *Lawson v. Valve-Trol Co.,* 610 N.E.2d 425, 81 Ohio App.3d 1, 4 (1991). In other words, under Ohio choice of law precepts, Ohio's statutes of limitations would ordinarily apply in a case filed in Ohio even though the substantive laws of another state provide the rules of decision. *Schwartz v. Cincinnati Museum Ass'n*, 35 F. Appx. 128, 131 (6th Cir. 2002) (quoting *Charash v. Oberlin College,* 14 F.3d 291, 299 (6th Cir. 1994)).   However, when confronted with an express borrowing statute in which the forum state itself has established a choice of law rule, a court presented with a choice of law analysis is bound to follow that rule. *Vaughn v. J.C. Penney Co.,* 822 F.2d 605, 611 (6th Cir. 1987).  The second paragraph of § 2125.01 of the Ohio Revised Code -- containing a "borrowing" provision or its own conflict of laws provision directing Ohio's courts

---

[15] In the direct-filed Florida Actions, Plaintiffs' Colombian law claims are also asserted under the Court's diversity jurisdiction.  As a federal court sitting in diversity, as to these claims, the Court applies the choice of law rules of Florida, the state in which this Court sits, to determine the relevant statute of limitations applications.  *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941); *Interface Kenner LLC v. JP Morgan Chase Bank,* 704 F.3d 927 (11th Cir. 2013).

to apply the statute of limitation of another state or country in wrongful death actions resulting from injuries sustained in a foreign state or country – is such a law. *Vaughn*, 822 F.2d at 608-609.

### a. Wrongful death-style claims

In this case, the parties agree that Ohio Rev. Code § 2125.01,[16] which borrows the limitation period prescribed by a foreign state or country if the death occurred there, applies to Plaintiffs' wrongful-death style Colombian law claims. Thus, they agree, as to the wrongful-death style Colombian law claims, that Colombia's 10-year ordinary statute of limitations, Article 2356 of the Colombian Civil Code, applies pursuant to the "borrowing" clause of Ohio R.C. § 2125.01. They disagree, however, as to whether the tolling rules of Colombia or Ohio properly drive the calculation of that statute's expiration date.

Defendants contend the borrowing clause requires the borrowing of Article 2356 of the Colombian Code as well as Colombia's tolling rules. As previously held by this Court (DE 2691 at 17-19; DE 2777 at 6 n. 3), Colombia does not recognize equitable or class action tolling, and fixes the accrual date of a cause of action as of the date of injury. As a result, Defendants argue all the Colombian law claims in the Ohio Actions are time-barred on the face of the Complaints,

---

[16] Ohio R.C. §2125.01, captioned "Civil action for wrongful death," provides in pertinent part:

When death is caused by a wrongful act, neglect, or default in another state or foreign country for which a right to maintain an action and recover damages is given by a statute of such other state or foreign country, such right of action may be maintained in this state. Every such action shall be commenced within the time prescribed for the commencement of such actions by the statute of such other state or foreign country.

Ohio Rev. Code, § 2125.01, paragraph 2.

since the date of last death alleged is October 2004, and where both Ohio Actions were filed more than ten years after that date.

While conceding the applicability of Article 2356 of the Colombian Code, Plaintiffs still argue they are entitled to the benefit of Ohio's tolling rules, in computing the expiration date of that statute, based upon a separate choice of law analysis which assumes tolling rules are procedural under Ohio choice of law precepts and therefore "must" apply in this case (Opposition at 17, citing *Davis v. Drackett Prods. Co*., 536 F. Supp. 694, 696 (S.D. Ohio 1982) ("All procedure is governed by law of forum state")). Plaintiffs, however, do not identify any case law equating equitable tolling rules of a forum state as "procedural" matters which might apply independently of the operation of a "borrowing" statute containing its own choice of law requirements.[17] Indeed,

---

[17] Plaintiffs cite *Palmieri v. Ahart,* 167 N.E. 2d 353, 355 (Ohio App. 1960), for the proposition that "[p]rocedural issues like tolling are governed by Ohio law, even for wrongful death claims." The Court rejects Plaintiffs' reading of the *Palmieri* decision. *Palmieri* does not contain any language supporting the notion that a forum state's tolling law would control, as a procedural matter, where a borrowing statute has triggered the application of a foreign statute of limitations. In *Palmieri,* the plaintiff filed a personal injury suit in West Virginia, arising out of a West Virginia automobile accident, shortly before expiration of the West Virginia one-year limitations period, only to discover that the defendant had by then moved from West Virginia to Ohio. The plaintiff proceeded to refile the case in Ohio, but the filing was made more than one year from the date of the subject accident giving rise to the claim. The *Palmieri* court addressed the narrow question of whether the borrowed one-year (West Virginia) statute of limitations began to run prior to the defendant's entry into Ohio, and, answering this question in the affirmative, found the Ohio action time-barred. It refused to apply the longer (two year) Ohio statute of limitations, finding it contrary to the prescriptions of Ohio's general borrowing statute, § 2305.20, Ohio Rev. Code.

 In reaching this result, it commented on the fact that the prospective defendant was not a resident of Ohio at the time the statute began to run, finding this of no significance to its analysis and commenting: "If the law of West Virginia governs and it certainly does in this case the removal to Ohio has no effect upon it as borrowing statutes have been universally construed not to include the borrowing of any of the tolling provisions as to the running of the statute of limitations." *Id.* at 355. The "removal" here is a reference to the defendant's move from West Virginia to Ohio, and the *Palmieri* court seems to be suggesting that Ohio tolling rules would be of no avail to plaintiff– i.e., would not be "borrowed" – to salvage plaintiffs' claims where a foreign statute of limitations was prescribed under Ohio's general borrowing statute.

 The partial excerpt from the above quote relied upon by Plaintiffs here ("borrowing statutes have been universally construed not to include the borrowing of any of the tolling provisions…"), taken out of context, is misleading. Viewing this statement in conjunction with the court's antecedent reference to the defendant's "removal" of himself to the State of Ohio, this statement, read in context of the opinion as a whole, logically conveys the *Palmieri* court's refusal to apply Ohio tolling rules to salvage a claim time-barred by the law of the jurisdiction in which the tort accrued (i. e. a refusal to engraft Ohio tolling rules onto West Virginia's borrowed one-year statute). This holding *undercuts* Plaintiffs' contention that Ohio tolling rules should apply here, as matters of state procedure, notwithstanding the trigger of the Colombian statute of limitations under the "borrowing" clause of the second paragraph of Ohio Rev. Code § 2125.01.

the approach advanced by Plaintiffs is contrary to the "generally accepted rule that when borrowing the statute of limitations of a foreign state, the applicable tolling provision of that state is borrowed as well." *Great Plains Trust Co. v. Union Pacific R. Co*., 492 F.3d 986 (8th Cir. 2007) (because Missouri borrowing statute directed application of Kansas limitations statute, the tolling rules of Kansas also applied); *Helinski v. Appleton Papers,* 952 F. Supp. 266 (D. Md. 1997) ("it seems illogical to borrow Virginia's statute of limitations, but not the provision determining when the limitations period begins").  *See also Pricaspian Dev. Corp (Texas) v. Royal Dutch Shell, PLC*, 382 F. App'x 100 (2d Cir. 2010) ("[i]n diversity cases, state statutes of limitations govern the timeliness of state law claims and state law 'determines the related questions of what events serve to commence an action and to toll the statute of limitations'") (quoting *Diffley v. Allied-Signal Inc*., 921 F.2d 421, 423 (2d Cir. 1990)).[18]

Sometimes referenced as the "tandem borrowing" doctrine, this rule holds that when statutes of limitation are borrowed, the accompanying tolling and/or saving provisions of that same jurisdiction are also borrowed.  *Hollins v. Yellow Freight System, Inc.,* 590 F. Supp. 1023, 1026 (N.D. Ill. 1984) (citing *Speight v. Miller*, 437 F.2d 781, 783 n. 4 (7th Cir. 1971) (when a foreign limitations provision is borrowed, you also borrow "all its accouterments"), *cert. den*. 404 U.S. 827 (1971), *quoting American Surety Co. of New York v. Gainfort*, 219 F.2d 111, 112 (2d Cir. 1955)).  *See also Studio & Partners s.r.l v. KI,* 2007 WL 3342597 at *4 (E.D. Wis. 2007).

Ohio courts have followed this approach in choice of law disputes, albeit without employing "tandem borrowing" nomenclature. *See e.g., Mayor v. Ford Motor Co*., 2004 WL 1402692, at *6 (Ohio Ct. App. 2004).  In *Mayor*, the court applied Michigan's statute of limitations

---

[18] This is also consistent with the rule applicable when a federal cause of action borrows its statute of limitations from state law. *Wolfel v. Collins*, 2011 WL 1770234 (S.D. Ohio 2011).

to a cancer death which occurred in Michigan, linked to exposure to noxious chemicals at the decedent's prior place of employment in Michigan. Suit was filed in Ohio eight years after the death, but within one year of the time that the surviving widow first learned the death was the result of her husband's occupational exposure to toxins. Applying Michigan's 3-year statute of limitations, under Ohio's borrowing statute, the *Mayor* court also applied Michigan tolling law in finding the wrongful death action time-barred. It "decline[d] to use Ohio's discovery rule to toll Michigan's statute of limitations," *Mayor,* 2004 WL 1402692 at *6, noting such a result would be illogical under Ohio Supreme Court precedent which treated Ohio's wrongful death borrowing statute as legislation allowing for *enforcemen*t of the right to sue on a wrongful death occurring in foreign state or country, but not *creating* a right to sue for the foreign death. It observed: "If that right [to sue for death occurring in foreign state] no longer exists because of a bar by the statute of limitations in the state in which the cause of action accrued, it seems untenable to extend the time period by use of this state's discovery rule to allow the claim to be filed in Ohio."

Likewise, in this case, it would be "untenable" and illogical to extend the limitations period prescribed by Colombian law by engrafting Ohio's tolling rules onto Colombia's 10-year statute, where the right of action sued upon no longer exists because of a statutory bar in Colombia, the place where the cause of action accrued. *See also Studio & Partners, s.r.l. v. KI (a/k/a Kruger International, Inc.),* 2007 WL 3342597, at *9 n. 6 (E.D. Wis. 2007) (dicta) (citing *Mayor*) (refusing engraftment of Wisconsin's discovery rule onto Italy's statute of limitations). Following *Mayor* and Ohio Supreme Court precedent upon which it relies, this Court rejects engraftment of Ohio tolling precepts onto the 10-year Colombian statute of limitations as a vehicle for salvaging Plaintiffs' Colombian law wrongful death style claims. Applying Colombia's controlling statute of limitations and related tolling law -- which does not recognize equitable or class action tolling -

- the Court holds the wrongful death- style claims of Plaintiffs, who were of the age of majority at the time of the death of their decedents, in both Ohio Actions, are time-barred on the face of the Complaints.[19]

### b. "Survival-style" Colombian law Claims

As to the "other tort" Colombian law clams, including the survival-style claims brought on behalf of the decedents' estates and Plaintiffs' direct "own damages" tort claims, Plaintiffs argue that Ohio's various tort statutes of limitations, as procedural rules, should apply along with Ohio tolling rules.[20]  Plaintiffs submit a companion motion to certify questions of state law pertaining to cross-jurisdictional class action tolling operations to the Ohio Supreme Court as a "back up" procedure in the event this Court has any question on the applicability and operation of Ohio tolling rules [DE 3069].

As to the "hereditary" or survival-style claims, Defendants argue that the "borrowing" clause of Ohio's wrongful death statute, §2125.01, second paragraph, applies.  Defendants assert that the "essential character" of these claims mirrors that of the wrongful death claims, since both categories of claim arise out of deaths caused by the alleged wrongful conduct of third parties in Colombia.   Due to the concentric nature of the claims, Defendants say Ohio law would apply a single limitations period despite the existence of distinct causes of action, citing *Doe v. First United*

---

[19] Further, neither the Ohio nor Florida Colombian law claims are salvaged by *American Pipe and Construction Co. v. Utah,* 414 U.S. 538 (1974) tolling as a matter of federal procedure, as Plaintiffs alternatively argue (Opposition at 16). The Court rejected this proposition in its dismissal ruling in the 2020 New Jersey Action [DE 2691] and finds no occasion to revisit that conclusion here.

[20] The Ohio Plaintiffs say the "other tort" claims were tolled by the filing of the original New Jersey putative class action (on July 19, 2007) as to both Chiquita and the Individual Defendants -- who they contend were on notice of the suit even before they were named in it -- up through the date on which this Court denied class certification on May 31, 2019.  They say Ohio also recognizes other tolling doctrines, including the discovery rule, which would suspend the accrual date of their claims to the date on which Plaintiffs knew or should have known of Defendants' wrongful conduct, as well as equitable estoppel/fraudulent concealment tolling doctrines which potentially suspend the running of the statute and save their claims from dismissal on the face of the pleadings.

*Methodist Church*, 629 N.E.2d 402 (Ohio 1994) (holding a cause of action premised upon acts of sexual abuse subject to a one-year statute of limitations for assault and battery); *Love v. City of Port Clinton*, 524 N.E.2d 166 (Ohio 1988) (applying a one-year statute of limitations for assault and battery where "essential character" of alleged tort was intentional, offensive touching rather than negligence).

The Court finds this reasoning persuasive.  Applying that reasoning here, the Court concludes that the "essential character" of the "hereditary" or survival-style Colombian law claims is a death caused by a wrongful act, and that such claims appropriately fall within the sweep of the "borrowing" clause of §2125.01, Ohio Rev. Code,  as derived from a right to maintain an action for damages given by the law of a foreign country for a "death [] caused by a wrongful act, neglect, or default in another state or foreign country."  Accordingly, the Court concludes the survival-style claims, like the wrongful-death style claims, are governed by Colombia's 10-year general statute of limitations and accompanying tolling rules, and thus are time time-barred on the face of the Complaints. [21]

Since this category of "other tort" claims fails as facially time-barred, the Court finds it unnecessary to reach Defendants' alternative arguments directed to the standing of certain subsets of Plaintiffs proceeding on the "survival" style claims.

c. **"Other tort" claims**.

Defendants do not argue that Ohio Rev. Code §2305.01's borrowing clause would extend to Plaintiffs "other tort" Colombian law claims to the extent they are based on torts personal to Plaintiffs for the recovery of Plaintiffs' "own damages" (assault and battery;

---

[21] Additionally, and in the alternative, Court agrees that the "survival" style claims are time-barred under application of Ohio's general borrowing statute, § 2305.03(B), Ohio Rev. Code, discussed in the section which follows.

intentional/unintentional infliction of emotional distress). However, in their supplemental briefing, Defendants identify Ohio's general borrowing statute, § 2305.03(B), Ohio Rev. Code, as the governing "choice of law" provision on these "other tort" claims. This provision provides:

> No tort action …. that is based upon a cause of action that accrued in any other state … or foreign jurisdiction may be commenced and maintained in this state if the period of limitation that applies to that action under the laws of that other state …. or foreign jurisdiction has expired or the period of limitation that applies to that action under the laws of this state has expired.

Ohio Rev. Code, §2305.03(B). "In other words, at least as to statutes of limitations, the rule in Ohio is that if another state's substantive law applies to the underlying claim, then Ohio courts must use the shorter limitations period, as between that of Ohio's and that of the other state." *Jones v. Lubrizol Advanced Materials*, *Inc.*, 559 F. Supp. 3d 569 (S.D. Ohio 2021) (citing *Rose v. Bersa*, 2020 WL 5210913, at *8 (S.D. Ohio 2020)). As applied here, if any of Plaintiff's' "other tort" claims are time-barred by the statutes of limitation of Colombia, the Court is required to apply Colombia's statute of limitations, rather than Ohio's, in determining Defendants' time-bar challenge.

In their supplemental briefing, Plaintiffs maintain their general position that a separate choice of law analysis applies to the survival style and "other tort" claims, which they say are governed by Ohio's general tort statutes of limitation as matters of state procedure. They do not address Ohio's general borrowing statute, §2305.03(B),[22] or attempt to explain why the "other tort"

---

[22] Ohio's general borrowing statute, §2305.03(B), has been described as "an exception to th[e] general rule that a federal court sitting in diversity must apply the substantive law, including choice-of-law rules, of the state in which it sits. *Wolper v Hotel Europe*, 552 F. Supp. 2d 687, 691 (N.D. Ohio 2008).

claims would not be governed by it.  This is curious since plainly Plaintiffs' "other tort" claims are "based upon [] cause[s] of action that accrued in any other state… or foreign country."

Instead, in their concluding remarks, captioned "Statement of Defendants' Brief" [DE 3119 at 9], Plaintiffs acknowledge that they reviewed Defendants' supplemental brief shortly before filing their own supplement and complain that the Defendants' reference to §2305.03(B), in addition to various other items, is "inappropriately" injected as a new matter which should be disregarded by the Court. This assertion is also curious since Defendants' supplemental briefing responds to Plaintiffs' sur-reply -- which attempted to frame an avoidance of the asserted time-bar by focusing on the distinct legal character of the survival style claims and "other tort" claims as a basis to trigger a separate choice of law analysis (from that governing the wrongful death actions) permitting importation of Ohio tolling rules.

In responding to that argument in Plaintiffs' Sur-reply, Defendants identified other Ohio statutory authority governing the choice of law analysis on this distinct subset of "other tort" claims.  That Plaintiffs overlooked this authority in framing their competing choice of law analyses on the "other tort" claims, as discussed in their Sur-reply, does not convert the matter into a "new" issue inappropriately injected beyond the scope of Defendants' original motion to dismiss. Defendants moved to dismiss the Colombian law tort claims as time-barred under the Colombia statute of limitations and related tolling law; Plaintiffs contended that Colombian tolling law did not apply, under Ohio choice of law precepts, at least as to the "survival style" claims or the "other tort claims" because Ohio choice of law rules require treatment of tolling rules as procedural matters.   Defendants have challenged the legal viability of that position, by directing the Court's attention to the existence of Ohio's general borrowing statute. This is a disagreement with

Plaintiffs' choice of law analysis, not the injection of new issues beyond the scope of the original motions.

Clearly, Plaintiffs' "other tort" Colombian law claims -- all arising out of attacks on Colombian citizens on Colombian soil perpetrated by Colombian terrorist organizations and allegedly causing direct injury to Plaintiffs as witnesses to the events, or as family members suffering the aftermath of the forced disappearance of loved ones – are causes of action that accrued in a foreign jurisdiction and hence fall within the ambit of Ohio's general borrowing statute.  As a result, Colombia's 10-year ordinary statute of limitations applies along with Colombia tolling rules, and the claims are time barred on the face of the Complaints.

### 2.  Florida Actions

As to the Florida filed actions, where Florida choice of law rules apply, Defendants begin their analysis with the proposition that Florida treats statutes of limitations issues as substantive in nature and applies the most "significant relationship" test to determine the applicable statute in a conflicts of law scenario.[23] Since Colombia has the most significant contacts with the causes of action asserted here, they argue Colombia's 10-year ordinary statute, together with related Colombia tolling law, is appropriately applied to all Colombian law claims asserted in the Florida actions.

Plaintiffs seemingly acknowledge, without expressly agreeing, that Florida choice of law precepts call for application of the Colombian 10-year statute of limitation (Opposition at 39). From there, however, they go on to state simply that they "agree that minority tolling applies,"

---

[23] Since the specific issue here is the applicable statute of limitations, it would appear Florida's general borrowing statute, §95.10, Fla. Stat., which precludes causes of action that would be time barred where they arose, controls the statute of limitations selection. However, Florida applies the same significant relationship test to determine where a cause of action arose (and hence whether §95.10 applies), *Bates v Cook, Inc*., 509 So.2d 1112, 1114-15 (Fla. 1987), as further discussed *infra* in the *Meehan* discussion. So, § 95.10 does not change the outcome.

under Colombian law, and further advance that "at least some Florida (equitable tolling) doctrines also apply here."  Plaintiffs apparently rely on the theory that Florida's tolling rules are a matter of state procedure. *Id.* at 41.

Plaintiffs' argument advanced in favor of Florida tolling and accrual rules seems to rest on the following set of suppositions: (i) Florida follows the "traditional choice of law rule that the forum's procedural rules apply automatically"[DE 3068 at 41];  (ii) Florida's equitable estoppel doctrine – recognizing  fraudulent concealment of facts will delay the accrual date of a cause of action – applies "no matter what other law governs other issues" [*Id.* at 42]  and equitable estoppel therefore applies here "no[] matter whether  Colombian law recognizes a discovery rule;" (iii) A "best *Erie* guess" is that  the Florida Supreme Court would apply cross-jurisdictional class action tolling, even though it has not squarely addressed the issue, because it has espoused similar doctrines [*Id.* at 3], and "Florida's class tolling rule [or its equivalent of this rule] necessarily applies because it is a matter of state procedure" [*Id.* at 41];  (iv) Claims asserted in the 2017 Florida Action are filed timely based on a combination of  Florida's equitable estoppel doctrine (as filed within 10 years of the  March 19, 2007 guilty plea) and the class action tolling rule (under which claims were tolled from date the New Jersey Action was filed on July 19, 2007 through the date class certification was denied on May 31, 2019)  [*Id.* at 43]; (v)  Claims asserted  in the  2020 Florida Action are filed timely "based on a combination of the limitations period not running until February or December 2009 [the date the involvement of Freidheim and Keiser was first revealed due to their alleged fraudulent concealment]  and  cross-jurisdictional class action tolling (under which the statute was tolled up through the date class certification was denied in the New Jersey

Action on May 31, 2019) [*Id.* at 43-44]; and  (vi) Under §95.051, Fla. Stat., the statute of limitations was tolled on claims against  Keiser  during the  various periods of his absences from Florida .

The notion that Florida accrual rules and equitable tolling doctrine should apply as matters of procedure "no matter what" under conventional choice of law precepts, as advanced by Plaintiffs, is rejected.  If the Colombian ordinary statute of limitations applies, under Florida choice of law precepts -- whether as a matter of substantive law under the "significant relationship" test, as advanced by Defendants, or under operation of Florida's borrowing statute, § 95.10, Fla. Stat. --- Colombian law tolling rules would also apply under "tandem borrowing" rule applications.

In an analogous setting, the Florida Supreme Court considered application of Florida's general borrowing statute,[24] to asbestos claims arising from out-of-state toxic exposures. *Celotex Corp. v. Meehan*, 523 So.2d 141 (Fla. 1988).  In *Meehan*, the Court recognized that the application of § 95.10 hinges, in the first instance, on the existence of a "significant relationship" between a foreign state and the cause of action, a connection serving to establish that a cause of action "arose" in another state as contemplated by the statute.  Using criteria drawn in the Restatement (Second) of Conflict of Laws §145(2), it found New York as the place with most significant relationship to the toxic exposure at issue (location of the exposure and residence of plaintiff), and accordingly found the New York statute of limitations triggered by Florida's borrowing statute, *together with the relevant tolling rules of New York*.  In so holding, it rejected reliance on Florida tolling doctrine, including Florida's discovery rule, as a premise for preserving the claim, noting that New York – unlike Florida – expressly rejected the discovery standard for determining when a statute of

---

[24] The Florida borrowing statute, Section 95.10, Florida Statutes (2022) provides:

When the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state.

limitations begins to run. *Id*. at 145. *See also Nance v. Eagle Picher Industries*, 559 So. 2d 93 (Fla. 3d DCA 1990).

In this case, the parties agree the Colombia's 10-year statute of limitations applies to the Florida Action Colombian law claims but disagree as to which forum's tolling rules apply. Florida does not treat tolling rules as strictly procedural matters that would apply in a borrowed statute of limitations context, as *Meehan* illustrates. Therefore, neither Florida's discovery rule, nor any of Florida's equivalent of class action tolling precepts, which Plaintiffs seek to invoke, are available to salvage Plaintiffs' claims. With the limitations period prescribed by Colombia – as the place where the causes of action "arose," and the place with the most "significant relationship" to the causes of action – in play, along with Colombian tolling precepts, the Court finds the Colombian law claims of all Plaintiffs, who were of the age of majority at the time of the death of their decedents, asserted in the 2017 and 2020 Florida Actions, are properly dismissed with prejudice as time-barred on the face of the Complaints.

### 3. Minority Tolling

These conclusions do not dispose of all Colombian law claims, as Plaintiffs note that certain subsets of Plaintiffs in each case were minors on the date of death of their decedents and that minority tolling, under Colombian law, serves as an independent basis to salvage the timeliness of these claims. Defendants agree that Colombian law recognizes minority tolling, and do not contest that at least some of the minority claims at issue, if properly pled, would survive the limitations challenge on face of complaint.

#### a. 2017 Ohio Action

Plaintiffs identify 34 Plaintiffs who were minors within 10 years of the filing of March 2017 Ohio Action (Opposition at 29), while conceding that the complaints did not specifically identify

the age of these individuals at time of death in 15 of these 34 cases.  As to these Plaintiffs, they seek to supply missing information on minority status via tabulations proffered in appendices to their Opposition.

As to the Colombian law wrongful death claims asserted *against Chiquita* in the 2017 Ohio Action, Defendants argue that 34 of the 38 minor Plaintiffs' claims should be dismissed under *res judicata* precepts because these same individuals asserted claims arising out of the same subject matter against Chiquita in the March 2020 New Jersey Action and suffered a dismissal of those claims with prejudice. As noted, the 2020 New Jersey Action Final Judgment of Dismissal is pending on appeal before the Eleventh Circuit. Nevertheless, a dismissal with prejudice operates as a judgment on the merits unless the court specifies otherwise, *Hart v. Yamaha-Parts Distributors, Inc*., 787 F.2d 1468, 1470 (11th Cir. 1986), and Plaintiffs' pending appeal from the 2020 New Jersey Action judgment does not operate to stay the preclusive effect of this Court's dismissal order. *In re USA*, 624 F.3d 1368, 1379 n. 1 (11th Cir. 2010) ("The established rule in the federal courts is that a final judgment retains all of its *res judicata* consequences pending decision of the appeal") (citing *Jaffree v. Wallace*, 837 F.2d 1461 (11th Cir.1988)).   With this, the Court agrees that as to any overlapping minority Plaintiffs – i.e., those named in the 2020 New Jersey Action and who again appeared in the 2017 Ohio Action – *res judicata* operates as an absolute bar to the claims.  Accordingly, the Colombian law claims of these 34 minority plaintiffs, *as asserted against Chiquita only,* shall be dismissed with prejudice.

However, the Court shall except this group from the operation of its limitations ruling as to the Colombian law wrongful death claims asserted against the Individual Defendants.   It shall further permit the submission of an amended pleading – for administrative purposes only -- which

pleading shall supply the relevant data on each minority Plaintiff's date of birth; date of death of his or her decedent; and age at the time the 2017 Ohio Complaint was initially filed.

Finally, Defendants argue that the claims of Jane Doe 369 and John Doe 369 are barred because they were first filed in January 2021, more than ten years from the date on which they attained the age of majority.  In supplemental briefing on this issue, Plaintiffs acknowledge some typographical errors in relationship to the statement of age as to these individuals.  Here, the Court shall require the parties to submit an additional joint status report indicating whether there is any dispute on the ages of these respective Plaintiffs at the time of the death of their decedents, the date on which they achieved majority status, and whether the first filed pleading on behalf of these individuals was accomplished timely within 10 years of that date.  Ruling is reserved on the motion to dismiss as to these two individuals pending this further submission.

b. **2017 Florida Action**

Plaintiffs advance that 30 Plaintiffs were minors within 10 years of the filing of the Complaint in the 2017 Florida Action, while acknowledging they did not plead the age of these persons in their 2017 Florida Complaint (Opposition at 44 n. 52).  The Court shall except this group from the sweep of its limitations ruling as to the Colombian law wrongful death claims asserted against the Individual Defendants.   It shall further permit the submission of an amended pleading – for administrative purposes only -- which pleading shall supply the relevant data on each minority Plaintiff's date of birth; date of death of his or her decedent; and age at the time the Florida 2017 Complaint was initially filed.

c. **2020 Ohio Action/2020 Florida Action**

Plaintiffs assert that 39 Plaintiffs designated in the 2020 Ohio Action and 2020 Florida Action were minors within ten years of filing of the complaints and, again recognizing that the ages were

not alleged in complaints, seek to supply information on their minority status in charts provided as appendices to their Opposition.  As to these Plaintiffs, the Court shall permit the submission of an amended pleading – for administrative purposes only -- which pleading shall supply the relevant data on each minority Plaintiff's date of birth; date of death of his or her decedent; and age at the time the 2020 Ohio Action and 2020 Florida Action were initially filed.

### 4.  § 1367(d) Tolling

Finally, Plaintiffs alternatively argue class action tolling is "statutorily required" under 28 U.S.C. §1367(d), which tolls the period of limitations for any state claim over which a federal court has supplemental jurisdiction if the claimant asserted the claim in a federal court case (Opposition at 16).   While they do not spell out their reasoning on the purported trigger of §1367(d), they argue that tolling mandated under this statute tolled the claims of the putative class members from the original New Jersey action until this Court denied class certification, and tolled and continues to toll the claims of the putative class members in the 2017 Ohio and Florida putative class actions because  the issue of class certification has not yet been addressed in those cases.

Under §1367(d), the period of limitations for a claim before the court *under its supplemental jurisdiction* "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." This provision is designed to safeguard state claims before a federal court, under its supplemental jurisdiction, from statute of limitations problems if the case is "declined" in the federal action and a subsequent state court filing is pursued.  In other words, §1367(d) operates to guarantee that plaintiffs do not lose their ability to refile their claims in state court, in the event that state law does not provide for the tolling of the statute of limitations during the pendency of the federal action, following the federal court's

failure to exercise *supplemental* jurisdiction. *Parrish v. HBO & Co.*, 85 F. Supp.2d 792, 796 (S.D. Ohio 1999).

However, the federal tolling statute that the Plaintiffs seeks to invoke applies only to state-law claims over which a federal court has exercised supplemental jurisdiction. 28 U.S.C. §1367. In this MDL, the Court *is not* exercising supplemental jurisdiction over the Colombian law claims. Indeed, the Court has previously found, agreeing with Plaintiffs, that it did not have discretion to dismiss the Colombian law claims as these were properly pled under the Court's diversity jurisdiction [DE 516 at 5-6]. Therefore, §1367(d)-tolling requirements are inapplicable. *See Emiabata v. Seton Healthcare Family*, 2021 WL 8055566 (W.D. Tex. 2021) (28 U.S.C. §1367(d) tolling applies only to claims over which the district court has supplemental jurisdiction); *Reaid v. Wilson*, 2020 WL 4530714 at *7 (N.D. Ga. 2020) (same). *See also Leonard J. Strandberg and Associates v. Misan Const. Corp.*, 2010 WL 1565485, at * 8 (§ 1367(d) inapplicable to claims over which court never had supplemental jurisdiction).

### C. TVPA Claims

Congress enacted the TVPA to "create [] an express cause of action for victims of torture and extrajudicial killing in violation of international law." *See Jesner v. Arab Bank, PLC,* 584 U.S. _____,138 S. Ct. 1386, 1398 (2018). Specifically, Section 2 of the Act establishes a civil action for foreign extrajudicial killing or torture and imposes liability under the following terms:

> **(a)** An individual who, under actual or apparent authority, or color of law, of any foreign nation –
>
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
>
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to a person who may be a claimant in an action for wrongful death.

28 U.S.C. §1350 note § 2(a). Thus, to obtain relief for an extrajudicial killing pursuant to the TVPA, a plaintiff must be (1) a legal representative or any person who may be a claimant in an action for wrongful death; (2) of a victim of an extrajudicial killing; (3) committed by an individual acting "under actual or apparent authority, or color of law, of any foreign nation." A plaintiff who satisfies these elements possesses a cause of action under the TVPA. *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1346 (11ᵗʰ Cir. 2011).

In the secondary liability context, private individuals, such as the former Chiquita executives sued here, may potentially have aiding and abetting liability under TVPA for facilitating war crimes, *Mamani v. Sanchez Bustamante*, 968 F.3d 1216 (11ᵗʰ Cir. 2020); *Doe v. Drummond* Co., 782 F.3d 576 (11ᵗʰ Cir. 2015); *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11ᵗʰ Cir. 2005), without necessarily sharing the criminal intent of the primary tortfeasors. The underlying liability, however, must arise from "torture" or "extrajudicial killings" which were specifically committed *under color of law.*

To act "under color" of law does not require that the wrongdoer be an officer of the State. It is enough that he is an active participant in joint activity of the state giving rise to the claim. However, to proceed on a joint operations theory, a plaintiff must present proof of a "symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action under the Torture Act." *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11ᵗʰ Cir. 2008). *See also Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, at 1266 (11ᵗʰ Cir. 2009), *abrogated on other grounds*, *Mohamad v. Palestinian Authority*, 566 U.S. 449 (2012).

The Individual Defendants advance several arguments for dismissal of the TVPA claims. First, they assert the TVPA claims are time-barred and cannot be saved by class tolling. Second,

they contend Plaintiffs fail to sufficiently plead "state action," i.e., Plaintiffs do not adequately allege that the AUC, the entity perpetrating the murders which Defendants allegedly aided and abetted, acted under color of Colombian law.[25]   Third, they contend that Plaintiffs do not plausibly allege aiding and abetting liability, conspiracy liability or agency liability.   Fourth, they contend the Complaints do not adequately allege "deliberate" conduct and do not adequately allege that Plaintiffs' decedents were the subjects of "extrajudicial killing."

For reasons expressed below, the Court agrees that the "color of law" element is not adequately alleged, requiring dismissal of the TVPA claims for lack of subject matter jurisdiction. In so holding, the Court narrows its earlier, more expansive reading of the "color of law" element [DE 412] to align its approach more closely with extant Eleventh Circuit precedent.   In doing so, it makes the following  observations:  First, when the Court initially ruled on this issue as it arose in other MDL member cases in the nascency of this litigation, over ten years ago [DE 412 (Order of June 3, 2011)], it largely relied upon the then relatively recent expression of  a sister court, *Doe v. Drummond*,  2010 WL 9450019 (N.D. Ala. April 30, 2010),[26] as persuasive authority in defining the contours of  "state action" based on a symbiotic relationship/nexus theory – in that case as

---

[25]  Opposing this strand of Defendants' challenge to the TVPA claims, Plaintiffs remark that this Court previously upheld the sufficiency of similar allegations regarding the symbiotic nature of the AUC-Colombian Army/Government relationship, as sufficient to show "state action," where that relationship was nurtured in the general geographical area (Uraba) where Plaintiffs' family members resided and without a specific connection to the decedents' deaths [DE 412]. They urge the Court to take a similar expansive approach in defining the contours of "state action" under the TVPA claims alleged here.

[26]  In *Drummond*, the district court found the development of a symbiotic relationship in the general geographic area where the plaintiffs' decedents were killed sufficient to establish the requisite "involvement" of relationship with misconduct alleged in the complaint, without a connection to specific murders of the plaintiffs' decedents.

between the AUC and Colombian Army – and assessing the requisite connectivity between that relationship and  misconduct alleged as prescribed by *Romero.*

Since that time, the Court has had the benefit of reviewing interim case law developments on the "color of law" concept in this context, and with this history concludes that a narrower approach more closely tailored to Eleventh Circuit precedent is in order. As a threshold matter, the Court questions the accuracy of the *Drummond* district court's inquiry into whether the symbiotic relationship alleged in that case "had anything to do with the conduct at issue here," as prescribed by *Romero v Drummond Co*. 552 F.3d 1303, 1317 (11th Cir. 2008).  *Drummond* broadly defined "the conduct at issue here" as civilian attacks generally taking place in the same geographical area where the plaintiffs' decedents were killed.  *Id.* at * 6.  In finding a nexus, the district court focused on liability issues attaching to the corporate defendant's *mens rea* (i.e., allegations that Drummond paid the AUC with knowledge that the AUC would commit war crimes, including extrajudicial killings of innocent civilians, who lived "in and around the towns Drummond required the AUC to attack and pacify."), *id.* at *7, instead of properly focusing on the connection between the "involvement" of the symbiotic relationship alleged with the murders of the plaintiffs' decedents alleged in the Complaint.  Upon reflection, the Court concludes this approach departs from the teachings of *Romero*.

In *Romero*, the Eleventh Circuit cited with approval to the district court's relevant inquiry into "whether the plaintiff had presented evidence 'that the symbiotic relationship between the paramilitaries and the Colombian military had anything to do with the conduct at issue here, *which is the killing of the union officers*."  *Romero*, 552 F.3d at 1317 (emphasis added). The Eleventh Circuit then went on to discuss plaintiffs' proofs on the Colombian military's entwinement with and support of the AUC, including internal Drummond reports documenting the interrelationship,

but held "these reports are not evidence of state action *regarding the murders described in the complaint*." *Id*. The court reinforced this specificity requirement in concluding "[b]ecause the plaintiffs failed to offer evidence either that state actors were actively involved in the assassination of the union leaders *or* that the paramilitary assassins enjoyed a symbiotic relationship with the military *for the purpose of those assassinations*, the district court correctly granted summary judgment against the claims under the Torture Act." *Id*. at 1318 (emphasis added).

A year later, in *Sinaltrainal v. Coca-Cola*, 578 F.3d 1252 (11th Cir. 2009), the Eleventh Circuit reiterated, in the context of the ATS and TVPA, the "color of law" requirement: "We demand allegations of a symbiotic relationship that 'involves the torture or killing alleged in the complaint to satisfy the requirement of state action'" 578 F.3d at 1266 (citing *Romero*, 552 F.3d at 1317), and as to the TVPA claims, found dismissal for want of jurisdiction required because "there [were] no allegations the Colombian government was aware of, much less complicit in, the *murder and torture Plaintiffs allege in their complaints*. *Id.* at 1270 (emphasis added).

Thus, in both *Romero* and *Sinaltrainal*, the Eleventh Circuit Court of Appeals clearly signaled that the required link -- as a predicate for showing action taken under "color of law" relative to a symbiotic relationship /nexus theory -- is one between the symbiosis alleged and the specific misconduct alleged *as the basis for the plaintiffs' claims*, not a general link to other misconduct of the same genre or other misconduct occurring in the same geographical area. It has not since signaled a relaxation of this requirement. Indeed, in the §1983 context, from which the TVPA "state action" contours are drawn, *see Romero v. Drummond Co.*, 552 F.3d 1303, 1316-17 (11th Cir. 2008) (citing *Rayburn ex rel Rayburn v. Hogue*, 241 F.3d 1341 (11th Cr. 2001)), the Eleventh Circuit has since consistently focused on the specific harm/misconduct alleged as the basis for plaintiffs' claims in testing the sufficiency of the required nexus. *Brivik v. Law*, 545 F.

App'x 804 (11ᵗʰ Cir. 2013) (unpublished) (allegations that co-investors knowingly falsified information in meetings with law enforcement held insufficient to establish connection where plaintiff did not plead the co-investors and officer acted together to falsify facts leading to plaintiff's arrest); *Emmanuelli v. Priebus*, 500 F. App'x 886 (11ᵗʰ Cir. 2012) (affirming dismissal of §1983 action against Republican National Committee ("RNC") due to insufficient allegation that Florida and the RNC had a "symbiotic relationship" regarding the delegate-reduction penalty for early primary elections -- the specific conduct challenged in complaint).

The holdings of the Northern District of Alabama in *Drummond* and of this Court [DE 412], regarding the degree of specificity needed to establish a tie between the symbiotic relationship alleged and conduct at issue, did not ultimately reach the Eleventh Circuit for appellate review. [27] Nor does the Court find any other interim case law embracing *Drummond's* expansive approach on this point.  Instead, cases evaluating the connection between the symbiotic relationship alleged and "conduct at issue" – for purposes of pleading "state action" or conduct taken "under color of law" - have consistently focused on assessing the connection between the symbiotic relationship

---

[27] After entry of its June 2011 Order on the point [DE 412], this Court certified several questions for interlocutory appeal under Rule 54(b), including whether the state action element of extrajudicial killing and torture claims brought under the ATS and TVPS required the pleading of facts showing government involvement in the specific torture and killings alleged in the complaint.  In certifying this question, "[t]he Court acknowledge[d] that the narrow question at issue here … is one that has not expressly been addressed by the Eleventh, or any other, Circuit Court of Appeals," and further noted that "substantial ground for difference of opinion exists with regard to the question of specificity raised here." 2012 WL 13214854 (S.D. Fla. March 27, 2012). However, its query ultimately remained unanswered as the Eleventh Circuit did not reach the certified questions due to deficiencies in subject matter jurisdiction, drawn from intervening Supreme Court precedent, which mooted the queries. *Cardona v. Chiquita*, 760 F.3d 1185 (11ᵗʰ Cir. 2014).

In turn, the Northern District of Georgia case on which the DE 412 ruling largely relied, *Doe v. Drummond,* 2010 WL 9450019 (N.D. Ala. April 30, 2010), was eventually the subject of an appeal before the 11ᵗʰ Circuit, resulting in affirmance of a summary judgment for the defense on all claims (including the TVPA claims).  The affirmance, however, was rendered without any discussion of the lower's TVPA color of law ruling, other than a footnote which mentions without comment that the district court found that the state action requirement in the TVPA claims had been met. *Doe v. Drummond*, 782 F.3d 576, 603 n. 37 (11ᵗʰ Cir. 2015).

alleged and the specific harm pled in the plaintiff's complaint. *See e.g., Jaramillo v. Naranjo,* 2015 WL 10857563 (S.D. Fla. 2015) (allegation that municipal mayor and judge had prior relationship with the AUC and "directed" or "conspired with" decedent's assassins held insufficient to plead state action element, where no reasonable reading of complaint supported inference that officials had direct connection with decedent's murder); *Pope v. Big Bend Cares*, 2014 WL 12638871 (N.D. Fla. 2014) (dismissing §1983 complaint where plaintiff did not allege governmental involvement with the specific improper conduct attributed to a private foundation and its executive director); *Smith v. Beasley*, 775 F. Supp. 2d 1344 (M.D. Fla. 2011) (under nexus/joint action test, plaintiff alleging nonprofit foster care placement agency was intertwined in a symbiotic relation with the Florida Dept. of Children and Families failed to sufficiently allege state action in §1983 action arising from the death of a minor which occurred after the minor had run away from the agency's care). *See also Khulumani v. Barclay National Bank Ltd*, 504 F.3d 254 (2d Cir. 2007) (affirming dismissal of TVPA claims where Plaintiffs, although twice having amended their complaint, failed to link any defendants to state actor or conduct of state officials); *Estate of Manook v. Research Triangle Institute, Intern.*, 759 F. Supp. 2d 674, 680 (E.D.N.C. 2010) (state action lacking for TVPA and ATS claims arising from killing committed by a private foreign security provider) (citing *Mentavlos v. Anderson*, 249 F.3d 301, 311 (4th Cir. 2001) (recognizing that the state action inquiry begins by identifying "the specific conduct of which the plaintiff complains")).

In revisiting the issue here, the Court concludes that a tie to the specific misconduct and harm alleged in the complaint is required to meet the *Romero* symbiotic relationship /nexus theory of state action. It also concludes that Plaintiffs fail to allege a symbiotic relationship which meets this test. Without allegations establishing the "involvement" of the relationship in the specific

murders alleged in their Complaints, Plaintiffs do not adequately plead conduct committed "under color of law" for TVPA purposes.

Plaintiffs do allege the existence of a mutually beneficial relationship between the Colombian Army and the AUC, under which the government offered tactical support to the AUC and overlooked its criminal transgressions in exchange for the benefit of AUC's manpower and freedom from the constraints of the Geneva Convention in resisting the guerillas. Plaintiffs do allege that the Colombian military frequently coordinated activity with AUC operatives, including in the Uraba region where most of Plaintiffs' decedents were murdered.  And they do allege the Colombian government tolerated and even encouraged paramilitary activity, further offering examples of instances where the Colombian government assisted and coordinated operations with AUC which involved attacks against civilians and perceived guerilla sympathizers.

Plaintiffs do not allege, however, that the murders or torture of their decedents were the product of such coordinated attacks, or that Colombian Army personnel or any government official had any direct involvement in the assassination of their decedents.  As Plaintiffs thus offer no facts that connect the symbiotic relationship alleged to the murders of their decedents, they plead no facts from which the Court may infer that AUC acted under "color of law" in carrying out the attacks alleged in their complaints.  The TVPA claims are thus due to be dismissed for failure to state a claim on which relief may be granted.

## V.    CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1.   Defendants' motions to dismiss the Colombian law wrongful death claims, hereditary or "survival" style claims, and "other tort" claims personal to Plaintiffs as time-barred under the 10-year Colombian ordinary statute of limitations are **GRANTED** as to all *majority*

Plaintiffs and all such claims are here **DISMISSED WITH PREJUDICE** as time-barred on the face of the Plaintiffs' Complaints.

2.   As to the 2017 Ohio Action, Defendants' motion to dismiss the Colombian law claims of the *minority* Plaintiffs, as against Chiquita only, is **GRANTED** on the ground of *res judicata* as to that subset of 34 Plaintiffs who were also named as Plaintiffs in the 2020 New Jersey Action.

3.   Defendants' motions to dismiss the Colombian law claims as time-barred, as to claims against Chiquita and the Individual Defendants, is otherwise **DENIED** as to those Plaintiffs holding *minority* status within ten years prior to the date of filing of the Complaints**.**  As to these Plaintiffs, the Court grants leave to file amended pleadings, for administrative purposes only, for the limited purpose of adding allegations of the birthdate of each such Plaintiff, the date of death of his or her decedent and Plaintiff's age at the time of filing of the original Complaint.

4.   As to the claims of Jane Doe 369 and John Doe 369, in the 2017 Florida Action, the parties shall submit a joint supplemental position statement respecting these individuals within **TWENTY DAYS** indicating whether agreement is reached on the applicability of minority tolling. If agreement is not reached, the areas of disagreement shall be outlined in the parties' statement.  The Court reserves ruling on the motion to dismiss as to these claimants pending receipt of the parties' position statement.

5.   As to the TVPA claims asserted against the Individual Defendants, the Defendants' motion to dismiss is **GRANTED** for failure to allege adequately the existence of a  symbiotic relationship between the AUC and Colombian government involved in the specific misconduct alleged in the Complaint, i.e., for failure to allege the Colombian military or

government officials either actively participated in the assassinations of their decedents, or that the paramilitary assassins enjoyed a symbiotic relationship with the Colombian military for the purpose of those assassinations. These claims are **DISMISSED** with leave for Plaintiffs to file, should they so elect**,** an amended pleading which addresses the TVPA pleading deficiencies outlined in this Order and alleges, in good faith, facts tying the symbiotic relationship alleged to the specific instances of murder and torture alleged in the Complaints.  This shall be the final opportunity for amendment of the Complaints and shall be limited to this narrow issue.  In light of this ruling, it is unnecessary at this juncture to reach the Individual Defendants' alternative challenges to the viability of the TVPA claims.

6.  As to the ATS claims, Defendants' motions to dismiss on ground of impermissible extraterritoriality are **GRANTED** and all ATS claims are here **DISMISSED WITH PREJUDICE**.

7.  As to all state law claims (New Jersey, Ohio, and Florida law), Defendants' motions to dismiss based on impermissible extraterritoriality are **GRANTED** and all state law claims are **DISMISSED WITH PREJUDICE.**

8.   Plaintiffs' motion to certify questions of state law to the Ohio Supreme Court [DE 3069] is **DENIED as MOOT.**

9.  In light of the foregoing, Plaintiffs' Renewed Motion for Substitution of Plaintiffs under Rule 25(a) in Case No. 17-80323, and Case No. 17-80547, filed August 18, 2022 [DE 3128], would appear to be moot, in whole or in part, depending on the existence and extent of overlap with any minority Plaintiffs excepted from the operation of this Order. Plaintiffs' counsel is accordingly directed to submit a position statement, within **FIFTEEN (15) DAYS** from the date of entry of this Order, indicating whether any of the minority

Plaintiffs excepted from dismissal are overlapping subjects of the pending motions for substitution [DE 3128], and if so, revealing the identity of any such Plaintiffs.  Briefing on Plaintiffs' renewed motion for substitution shall be suspended pending submission of this statement.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 23rd day of August, 2022.

KENNETH A. MARRA
United States District Judge

cc.  all counsel

52