# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-MD-01916-MARRA

|  |  |
|---|---|
| JOHN DOE 1, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>CYRUS FREIDHEIM and CHARLES KEISER,<br>*Defendants* | **THIRD AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**No. 17-80323-CIV-MARRA** |

## I. SUMMARY OF THE COMPLAINT

1.      This case arises as a result of the actions of Chiquita Brands International, Inc., and its subsidiaries and affiliates (collectively, "Chiquita"), in funding, arming, and otherwise supporting terrorist organizations in Colombia in their campaign of terror against the civilian population of the Urabá region, in order to maintain its profitable control of Colombia's banana growing regions. Plaintiffs are family members of trade unionists, banana workers, political organizers, social activists, and others targeted and killed by terrorists, most notably the paramilitary organization United Self-Defense Groups of Colombia (*Autodefensas Unidas de Colombia*, or AUC), from at least 1992 through 2004. In order to produce bananas in an environment free from labor opposition and social disturbances, Chiquita, the Defendants Cyrus Freidheim and Charles Keiser, and other non-party individuals funded, armed, and otherwise supported the AUC. The deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious support of terrorist organizations. Chiquita and the Defendants' actions violated not only Colombian law and U.S. law, but also customary

1

international law prohibiting crimes against humanity, extrajudicial killing, torture, war crimes, and other abuses.

## II.   JURISDICTION

2.      The Court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute) and 28 U.S.C. § 1350 note (Torture Victim Protection Act); and 28 U.S.C. § 1332 (diversity jurisdiction). The amount in controversy for each Plaintiff exceeds $75,000, and the action is between citizens of a State and citizens or subjects of a foreign state.

3.      In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to claims based upon laws of the Republic of Colombia, or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

## III.   PARTIES

4.      The term "Plaintiffs" herein includes the named plaintiffs and the decedents on behalf of whom they bring this action.

5.      Plaintiff Jane Doe 8 is a resident and citizen of Colombia. She brings claims based on the death of her father, John Doe 12, as well as her own injuries.

6.      Plaintiff Jane Doe 9 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 13, as well as her own injuries.

7.      Plaintiff Jane Doe 10 is a resident and citizen of Colombia. She brings claims based on the death of her sons, John Doe 14 and John Doe 15, as well as her own injuries.

8.      Plaintiff Jane Doe 11 is a resident and citizen of Colombia. She brings claims based on the death of her sister, Jane Doe 12, as well as her own injuries.

9.      Plaintiff Jane Doe 13 is a resident and citizen of Colombia. She brings claims based on

the death of her partner, John Doe 16, as well as her own injuries.

10.     Plaintiff Jane Doe 14 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 17, as well as her own injuries.

11.     Plaintiff Jane Doe 16 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 19, as well as her own injuries.

12.     Plaintiff Jane Doe 17 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 20, as well as her own injuries.

13.     Plaintiff Jane Doe 18 is a resident and citizen of Colombia. She brings claims based on the death of her husband, John Doe 21, as well as her own injuries.

14.     Plaintiff Jane Doe 19 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 22, as well as her own injuries.

15.     Plaintiff Jane Doe 221 was a resident and citizen of Colombia. Jane Doe 221 has died since the commencement of this suit; she is represented in this action by her husband John Doe 372 and her son, John Doe 373, who have moved to substitute for her. Jane Doe 221 brought claims on her behalf based on the death of her son, John Doe 24, as well as her own injuries. Plaintiff Jane Doe 221 was erroneously labeled "Jane Doe 119" in a prior complaint due to a scrivener's error.

16.     Plaintiff Jane Doe 20 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 25, as well as her own injuries.

17.     Plaintiff Jane Doe 21 is a resident and citizen of Colombia. She brings claims based on the deaths of her mother, Jane Doe 22, and her stepfather, John Doe 26, as well as her own injuries.

18.     Plaintiff Jane Doe 23 is a resident and citizen of Colombia. She brings claims based on

the death of her son, John Doe 27, and her husband, John Doe 28, as well as her own injuries.

19.     Plaintiff Jane Doe 24 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 29, as well as her own injuries. Decedent John Doe 29 was erroneously labeled "Jane Doe 29" in a prior complaint due to a scrivener's error.

20.     Plaintiff Jane Doe 25 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 30, as well as her own injuries.

21.     Plaintiff Jane Doe 26 is a resident and citizen of Colombia. She brings claims based on her own injuries.

22.     Plaintiff Jane Doe 27 is a resident and citizen of Colombia. She brings claims based on the death of her father, John Doe 105, as well as her own injuries.

23.     Plaintiff Jane Doe 30 is a resident and citizen of Colombia. She brings claims based on the death of her mother, Jane Doe 31, as well as her own injuries.

24.     Plaintiff Jane Doe 99 is a resident and citizen of Colombia. She brings claims based on the death of her mother, Jane Doe 100, as well as her own injuries.

25.     Plaintiff Jane Doe 121 is a resident and citizen of Colombia. She brings claims based on her own injuries.

26.     Plaintiff Jane Doe 122 is a resident and citizen of Colombia. She brings claims based on her own injuries.

27.     Plaintiff John Doe 23 is a resident and citizen of Colombia. He brings claims based on his own injuries.

28.     Plaintiff John Doe 32 is a resident and citizen of Colombia. He brings claims based on his own injuries.

29.     Plaintiff John Doe 33 is a resident and citizen of Colombia. He brings claims based on his

own injuries.

30.     Plaintiff Jane Doe 28 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 34, and her partner, John Doe 150, as well as her own injuries. Plaintiff Jane Doe 28 was erroneously labeled "Jane Doe 160" in a prior complaint due to a scrivener's error.

31.     Plaintiff Jane Doe 29 is a resident and citizen of Colombia. She brings claims based on her own injuries.

32.     Plaintiff John Doe 35 is a resident and citizen of Colombia. He brings claims based on his own injuries.

33.     Plaintiff John Doe 37 is a resident and citizen of Colombia. He brings claims based on his own injuries.

34.     Plaintiff John Doe 39 is a resident and citizen of Colombia. He brings claims based on his own injuries.

35.     Plaintiff Jane Doe 32 is a resident and citizen of Colombia. She brings claims based on her own injuries.

36.     Plaintiff John Doe 46 was a resident and citizen of Colombia. John Doe 46 has died since the commencement of this suit; he is represented in this action by his wife Jane Doe 26, and his daughter, Jane Doe 373, who have moved to substitute for him. John Doe 46 brought claims on his behalf based on his own injuries.

37.     Plaintiff Jane Doe 371 was a resident and citizen of Colombia. Jane Doe 371 has died since the commencement of this suit; she is represented in this action by her daughter Jane Doe 372, who has moved to substitute for her. Jane Doe 371 brought claims based on the death of her son, John Doe 44, as well as her own injuries. Jane Doe 371 was erroneously labeled "Jane Doe

120" in a prior complaint due to a scrivener's error.

38.     Plaintiff John Doe 40 is a resident and citizen of Colombia. He brings claims based on his own injuries.

39.     Plaintiff John Doe 41 is a resident and citizen of Colombia. He brings claims based on his own injuries.

40.     Plaintiff John Doe 42 is a resident and citizen of Colombia. He brings claims based on his own injuries.

41.     Plaintiff John Doe 45 is a resident and citizen of Colombia. He brings claims based on his own injuries.

42.     Plaintiffs Jane Doe 33, Jane Doe 34, John Doe 48, John Doe 49, and John Doe 50 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 47, as well as their own injuries. Jane Doe 34 was eight years old at the time of her brother John Doe 47's death in January 2002. Jane Doe 34 was thirteen years old on March 17, 2007. Jane Doe 34 was seventeen years old on January 29, 2011.

43.     Plaintiff Jane Doe 35 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 51, as well as her own injuries.

44.     Plaintiff Jane Doe 36 is a resident and citizen of Colombia. She brings claims based on the death of her nephew, John Doe 52, as well as her own injuries.

45.     Plaintiffs Jane Doe 37, Jane Doe 38, Jane Doe 39, and John Doe 54 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 53, as well as their own injuries.

46.     Plaintiffs Jane Doe 40, Jane Doe 41, Jane Doe 42, Jane Doe 43, Jane Doe 44, Jane Doe 227, John Doe 56, and John Doe 57, are residents and citizens of Colombia. They bring claims

based on the death of their family member, John Doe 55, as well as their own injuries. Jane Doe 227 was erroneously labeled "John Doe 58" in a prior complaint due to a scrivener's error. Jane Doe 41 was five years old at the time of her father John Doe 55's death in August 1998. Jane Doe 41 was thirteen years old on March 17, 2007. Jane Doe 41 was seventeen years old on January 29, 2011.

47.     Plaintiffs Jane Doe 45 and John Doe 60 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 59, as well as their own injuries.

48.     Plaintiffs Jane Doe 46, Jane Doe 47, John Doe 62, and John Doe 63 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 61, as well as their own injuries.

49.     Plaintiffs Jane Doe 48 and John Doe 65 are residents and citizens of Colombia. They bring claims based on the death of their father, John Doe 64, as well as their own injuries.

50.     Plaintiffs John Doe 66, Jane Doe 50, Jane Doe 51, Jane Doe 52, Jane Doe 53, and Jane Doe 54 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 67, as well as their own injuries. Jane Doe 52 also brings claims on behalf of her deceased mother, Jane Doe 49, for the death of John Doe 67.

51.     Plaintiff Jane Doe 55 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 68, as well as her own injuries.

52.     Plaintiffs Jane Doe 56, Jane Doe 57, Jane Doe 58, and John Doe 70 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 69, as well as their own injuries.

53.     Plaintiffs Jane Doe 59, John Doe 71, and Jane Doe 60 are residents and citizens of

Colombia. They bring claims based on the death of their family member, John Doe 72, as well as their own injuries.

54.     Plaintiffs Jane Doe 61, John Doe 73, and John Doe 75 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 76, as well as their own injuries.

55.     Plaintiffs Jane Doe 62, Jane Doe 63, Jane Doe 64, and John Doe 74 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 78, as well as their own injuries.

56.     Plaintiffs Jane Doe 65, Jane Doe 66, and Jane Doe 67 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 79, as well as their own injuries.

57.     Plaintiffs Jane Doe 68 and Jane Doe 69 are residents and citizens of Colombia. They bring claims based on the death of their mother, Jane Doe 70, as well as their own injuries.

58.     Plaintiffs Jane Doe 71, John Doe 80, Jane Doe 72, Jane Doe 73, and Jane Doe 74 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 81, as well as their own injuries.

59.     Plaintiffs Jane Doe 75, Jane Doe 76, Jane Doe 77, and Jane Doe 78 are residents and citizens of Colombia. They bring claims based on the deaths of their family member, John Doe 82, as well as their own injuries.

60.     Plaintiffs Jane Doe 79, Jane Doe 81, Jane Doe 82, Jane Doe 83, Jane Doe 84, and Jane Doe 85 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 83, as well as their own injuries. Jane Doe 83 was six years old at the time of her father John Doe 83's death in September 2001. Jane Doe 83 was eleven years old on

March 17, 2007. Jane Doe 83 was fifteen years old on January 29, 2011. Jane Doe 84 was four

years old at the time of her father John Doe 83's death in September 2001. Jane Doe 84 was nine

years old on March 17, 2007. Jane Doe 84 was thirteen years old on January 29, 2011.

61.     Plaintiffs Jane Doe 86, John Doe 84, Jane Doe 87, and Jane Doe 88 are residents and

citizens of Colombia. They bring claims based on the death of their family member, John Doe

85, as well as their own injuries. John Doe 84 was one year old at the time of his father John Doe

85's death in February 2001. John Doe 84 was seven years old on March 17, 2007. John Doe 84

was eleven years old on January 29, 2011.

62.     Plaintiff John Doe 86 is a resident and citizen of Colombia. He brings claims based on

the death of his brother, John Doe 87, as well as his own injuries. John Doe 86 also brings claims

on behalf of his deceased mother, Jane Doe 89, for the death of John Doe 87.

63.     Plaintiffs Jane Doe 90, Jane Doe 91, John Doe 89, John Doe 90, and Jane Doe 92 are

residents and citizens of Colombia. They bring claims based on the death of their family

member, John Doe 91, as well as their own injuries. Jane Doe 91 also brings claims on behalf of

her deceased father, John Doe 88, for the death of John Doe 91.

64.     Plaintiff Jane Doe 93 is a resident and citizen of Colombia. She brings claims based on

the death of her father, John Doe 92, as well as her own injuries.

65.     Plaintiffs Jane Doe 94, Jane Doe 95, and John Doe 93 are residents and citizens of

Colombia. They bring claims based on the death of their mother, Jane Doe 96, as well as their

own injuries.

66.     Plaintiffs John Doe 94 and Jane Doe 97 are residents and citizens of Colombia. They

bring claims based on the death of their father, John Doe 95, as well as their own injuries.

67.     Plaintiffs Jane Doe 98, John Doe 96, and John Doe 97 are residents and citizens of

Colombia. They bring claims based on the death of their family member, John Doe 98, as well as their own injuries. John Doe 96 has died since the commencement of this suit; he is represented in this action by his mother, Jane Doe 98, who has moved to substitute for him.

68.     Plaintiffs Jane Doe 103, Jane Doe 104, and John Doe 102 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 103, as well as their own injuries. John Doe 102 was one year old at the time of his father John Doe 103's death in September 2000. John Doe 102 was eight years old on March 17, 2007. John Doe 102 was twelve years old on January 29, 2011. Jane Doe 104 was one year old at the time of her father John Doe 103's death in September 2000. Jane Doe 104 was eight years old on March 17, 2007. Jane Doe 104 was twelve years old on January 29, 2011.

69.     Plaintiffs Jane Doe 105 and Jane Doe 106 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 104, as well as their own injuries. Jane Doe 106 was one or two years old at the time of her father John Doe 104's death in September 2002. Jane Doe 106 was six years old on March 17, 2007. Jane Doe 106 was ten years old on January 29, 2011.

70.     Plaintiffs John Doe 106, Jane Doe 107, Jane Doe 108, and John Doe 368 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 107, as well as their own injuries. John Doe 368 was erroneously labeled "John Doe 105" in a prior complaint due to a scrivener's error.

71.     Plaintiffs Jane Doe 109, Jane Doe 110, Jane Doe 111, Jane Doe 112, and John Doe 108 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 109, as well as their own injuries.

72.     Plaintiffs Jane Doe 113, John Doe 110, John Doe 111, Jane Doe 114, Jane Doe 115, Jane

Doe 116, John Doe 112, Jane Doe 117, and Jane Doe 118 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 113, as well as their own injuries. Jane Doe 116 was four years old at the time of her father John Doe 113's death in January 2001. Jane Doe 116 was ten years old on March 17, 2007. Jane Doe 116 was fourteen years old on January 29, 2011. John Doe 112 was less than one year old at the time of his father John Doe 113's death in January 2001. John Doe 112 was six years old on March 17, 2007. John Doe 112 was ten years old on January 29, 2011. Jane Doe 117 was two years old at the time of her father John Doe 113's death in January 2001. Jane Doe 117 was nine years old on March 17, 2007. Jane Doe 117 was twelve years old on January 29, 2011.

73.     Plaintiff John Doe 114 is a resident and citizen of Colombia. He brings claims based on the death of his brother, John Doe 115, as well as his own injuries.

74.     Plaintiffs Jane Doe 119, Jane Doe 120, Jane Doe 123, Jane Doe 124, Jane Doe 141, Jane Doe 142, John Doe 116, John Doe 117, and John Doe 118 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 120, as well as their own injuries. John Doe 118 was four or five years old at the time of his father John Doe 120's death around June 2000. John Doe 118 was eleven years old on March 17, 2007. John Doe 118 was fifteen years old on January 29, 2011. Jane Doe 124 was two years old at the time of her father John Doe 120's death around June 2000. Jane Doe 124 was nine years old on March 17, 2007. Jane Doe 124 was thirteen years old on January 29, 2011. Jane Doe 119 has died since the commencement of this suit; she is represented in this action by her children Jane Doe 120, Jane Doe 123, Jane Doe 141, Jane Doe 142, John Doe 116, and John Doe 117, who have moved to substitute for her.

75.     Plaintiff Jane Doe 125 is a resident and citizen of Colombia. She brings claims based on

11

the death of her partner, John Doe 121.

76.     Plaintiffs Jane Doe 126, Jane Doe 127, Jane Doe 129, Jane Doe 130, Jane Doe 131, Jane Doe 132, Jane Doe 133, Jane Doe 134, Jane Doe 135, John Doe 123, and John Doe 124 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 125, as well as their own injuries. Jane Doe 130, Jane Doe 131, and John Doe 123 also bring claims on behalf of their deceased mother, Jane Doe 128, for the death of John Doe 125. Jane Doe 127 was one or two years old at the time of her adoptive uncle John Doe 125's death around October 1998. Jane Doe 127 was eleven years old on March 17, 2007. Jane Doe 127 was fourteen years old on January 29, 2011.

77.     Plaintiffs Jane Doe 136, Jane Doe 137, Jane Doe 138, John Doe 126, John Doe 127, John Doe 128, John Doe 129 and John Doe 130 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 131, as well as their own injuries. John Doe 130 was nine years old at the time of his father John Doe 131's death around March 2003. John Doe 130 was thirteen years old on March 17, 2007. John Doe 130 was seventeen years old on January 29, 2011.

78.     Plaintiffs Jane Doe 139, Jane Doe 140 and John Doe 132 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 133, as well as their own injuries. Jane Doe 140 was one year old at the time of her father John Doe 133's death around January 1999. Jane Doe 140 was nine years old on March 17, 2007. Jane Doe 140 was thirteen years old on January 29, 2011.

79.     Plaintiffs Jane Doe 143, Jane Doe 144, John Doe 134, John Doe 135, and John Doe 136 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 137, as well as their own injuries. John Doe 136 was erroneously labeled

"John Doe 135" in a prior complaint due to a scrivener's error.

80.     Plaintiffs Jane Doe 101, Jane Doe 102, John Doe 99, John Doe 100, and John Doe 101, are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 38, as well as their own injuries. Jane Doe 102 was erroneously labeled "Jane Doe 101" in a prior complaint due to a scrivener's error. John Doe 99 was one or two years old at the time of his father John Doe 38's death around November 1996. John Doe 99 was twelve years old on March 17, 2007. John Doe 99 was sixteen years old on January 29, 2011.

81.     Plaintiffs Jane Doe 145, Jane Doe 146, Jane Doe 233, Jane Doe 234, Jane Doe 235, and John Doe 230 are residents and citizens of Colombia. Jane Doe 145 and Jane Doe 146 bring claims based on the death of their family member, John Doe 138, as well as their own injuries. Jane Doe 233, Jane Doe 234, Jane Doe 235, and John Doe 230 bring claims on behalf of their deceased father, John Doe 139, for the death of John Doe 138.

82.     Plaintiff Jane Doe 147 is a resident and citizen of Colombia. She brings claims based on the death of her husband, John Doe 140, as well as her own injuries.

83.     Plaintiff Jane Doe 148 is a resident and citizen of Colombia. She brings claims based on the death of her husband, John Doe 141, as well as her own injuries.

84.     Plaintiff Jane Doe 149 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 142, as well as her own injuries.

85.     Plaintiff Jane Doe 150 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 143, as well as her own injuries.

86.     Plaintiff John Doe 144 is a resident and citizen of Colombia. He brings claims based on the death of his partner, Jane Doe 152, as well as his own injuries. Due to a scrivener's error, the identities of the decedent and plaintiff were reversed in a prior complaint.

87.     Plaintiff John Doe 145 is a resident and citizen of Colombia. He brings claims based on the death of his mother, Jane Doe 155, as well as his own injuries. Due to a scrivener's error, the identities of the decedent and plaintiff were reversed in a prior complaint.

88.     Plaintiff Jane Doe 156 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 146, as well as her own injuries.

89.     Plaintiff Jane Doe 157 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 147, as well as her own injuries.

90.     Plaintiff Jane Doe 158 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 148, as well as her own injuries.

91.     Plaintiff Jane Doe 159 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 149, as well as her own injuries.

92.     Plaintiff Jane Doe 161 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 151, as well as her own injuries.

93.     Plaintiff Jane Doe 162 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 152, as well as her own injuries.

94.     Plaintiff Jane Doe 163 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 153, as well as her own injuries.

95.     Plaintiff Jane Doe 165 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 155, as well as her own injuries.

96.     Plaintiff Jane Doe 166 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 156, as well as her own injuries.

97.     Plaintiffs Jane Doe 167, John Doe 367, and Jane Doe 364 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 157, as well

14

as their own injuries. John Doe 367 was two or three years old at the time of his father John Doe 157's death in 2000. John Doe 367 was nine years old on March 17, 2007. John Doe 367 was thirteen years old on January 29, 2011. Jane Doe 364 was four years old at the time of her father John Doe 157s death in 2000. Jane Doe 364 was eleven years old on March 17, 2007. Jane Doe 364 was fifteen years old on January 29, 2011.

98.     Plaintiff Jane Doe 168 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 158, as well as her own injuries.

99.     Plaintiff Jane Doe 170 is a resident and citizen of Colombia. She brings claims based on the death of her sister, Jane Doe 169, and her brother-in-law, John Doe 201, as well as her own injuries.

100.     Plaintiff Jane Doe 171 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 159, as well as her own injuries.

101.     Plaintiff Jane Doe 172 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 160, as well as her own injuries.

102.     Plaintiff John Doe 162 is a resident and citizen of Colombia. He brings claims based on the death of his son, John Doe 161, as well as his own injuries.

103.     Plaintiff Jane Doe 173 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 163, as well as her own injuries.

104.     Plaintiff Jane Doe 174 is a resident and citizen of Colombia. She brings claims based on the deaths of her father, John Doe 164, and her brothers, John Doe 182 and John Doe 196, as well as her own injuries.

105.     Plaintiff Jane Doe 177 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 167, as well as her own injuries.

106.     Plaintiff Jane Doe 180 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 168, as well as her own injuries.

107.     Plaintiff Jane Doe 181 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 169, as well as her own injuries.

108.     Plaintiff Jane Doe 182 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 170, as well as her own injuries.

109.     Plaintiff Jane Doe 183 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 171, as well as her own injuries.

110.     Plaintiff Jane Doe 184 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 172, as well as her own injuries.

111.     Plaintiff Jane Doe 185 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 173, as well as her own injuries.

112.     Plaintiff Jane Doe 186 is a resident and citizen of Colombia. She brings claims based on the death of her husband, John Doe 174, as well as her own injuries.

113.     Plaintiff Jane Doe 187 is a resident and citizen of Colombia. She brings claims based on the deaths of her brother, John Doe 175, and her father, John Doe 176, as well as her own injuries.

114.     Plaintiff Jane Doe 188 is a resident and citizen of Colombia. Jane Doe 188 has died since the commencement of this suit; her claims are not extinguished upon death and are asserted here so that the proper party may substitute as a plaintiff. Jane Doe 188 brought claims based on the death of her son, John Doe 177, as well as her own injuries.

115.     Plaintiff Jane Doe 189 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 178, as well as her own injuries.

116.    Plaintiff Jane Doe 190 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 179, as well as her own injuries.

117.    Plaintiff Jane Doe 192 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 181, as well as her own injuries.

118.    Plaintiff Jane Doe 194 is a resident and citizen of Colombia. She brings claims based on the death of her mother, Jane Doe 195, as well as her own injuries.

119.    Plaintiff Jane Doe 196 is a resident and citizen of Colombia. She brings claims based on the death of her husband, John Doe 183, as well as her own injuries.

120.    Plaintiff Jane Doe 197 is a resident and citizen of Colombia. She brings claims based on the death of her son, John Doe 184, as well as her own injuries.

121.    Plaintiff Jane Doe 198 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 185, as well as her own injuries.

122.    Plaintiff Jane Doe 199 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 186, as well as her own injuries.

123.    Plaintiff Jane Doe 200 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 187, as well as her own injuries.

124.    Plaintiff Jane Doe 201 is a resident and citizen of Colombia. She brings claims based on the death of her father, John Doe 188, as well as her own injuries.

125.    Plaintiff Jane Doe 202 is a resident and citizen of Colombia. She brings claims based on the deaths of her son, John Doe 204, and her partner, John Doe 189, as well as her own injuries.

126.    Plaintiff Jane Doe 203 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 190, as well as her own injuries.

127.    Plaintiff Jane Doe 204 is a resident and citizen of Colombia. She brings claims based on

the death of her mother, Jane Doe 205, as well as her own injuries.

128.    Plaintiff Jane Doe 206 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 191, as well as her own injuries.

129.    Plaintiff Jane Doe 207 is a resident and citizen of Colombia. Jane Doe 207 brings claims based on the deaths of her parents, John Doe 192 and Jane Doe 208, her brother, John Doe 207, and her partner, John Doe 208, as well as her own injuries.

130.    Plaintiff Jane Doe 209 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 193, as well as her own injuries.

131.    Plaintiff Jane Doe 210 is a resident and citizen of Colombia. She brings claims based on the death of her partner, John Doe 194, as well as her own injuries.

132.    Plaintiff Jane Doe 193 is a resident and citizen of Colombia. She brings claims based on the deaths of her daughter, Jane Doe 212, and her son-in-law, John Doe 209, as well as her own injuries.

133.    Plaintiff Jane Doe 179 is a resident and citizen of Colombia. She brings claims based on the deaths of her sons, John Doe 197, John Doe 198 and John Doe 200, as well as her own injuries.

134.    Plaintiff Jane Doe 191 is a resident and citizen of Colombia. She brings claims based on the death of her brother, John Doe 202, as well as her own injuries.

135.    Plaintiff Jane Doe 178 is a resident and citizen of Colombia. She brings claims based on the death of her father, John Doe 203, as well as her own injuries.

136.    Plaintiffs John Doe 325, Jane Doe 315, Jane Doe 316, and Jane Doe 370 are residents and citizens of Colombia. Jane Doe 370 brings claims on behalf of her deceased father, John Doe 326, for the death of his brother John Doe 324. Jane Doe 315, John Doe 325, and Jane Doe 316

bring claims on behalf of their deceased brother, John Doe 327, for the death of John Doe 324.

137.    Jane Doe 365, Jane Doe 366, Jane Doe 367, Jane Doe 368, Jane Doe 369, and John Doe 369 are residents and citizens of Colombia. They bring claims based on the death of their family member, John Doe 371.

138.    All Plaintiffs bringing this action on behalf of deceased family members are the heirs at law of those decedents under Colombian law, with the right to prosecute claims for their deaths and/or the right to prosecute the claims that they had while alive.

139.    Defendant Cyrus Freidheim Jr., became Chiquita's Chairman and CEO in March 2002, and remained CEO until January 2004 and Chairman until March 2004. In the Factual Proffer submitted by Chiquita in 2007 in support of its guilty plea to the felony of engaging in transactions with a Specially-Designated Terrorist Group (the AUC), Freidheim was designated as Individual A. During his time at Chiquita, Freidheim knew of Chiquita's payments to the AUC and reviewed and authorized these payments. During his tenure with Chiquita, Cyrus Freidheim acted as an agent, co-conspirator, and joint tortfeasor with the company.

140.    Defendant Charles Keiser worked for Chiquita since the 1980s. He became general manager of Chiquita's operations in Colombia in 1989, leaving Colombia in 2000 for Costa Rica. Keiser personally met with leaders of the AUC to initiate payments and, later, to arrange a system to hide Chiquita's payments to the AUC. Because he is responsible for beginning the payments to the AUC and creating the entire system of payments to the AUC, his conduct caused injuries beyond his own tenure in Colombia. On information and belief, Keiser stayed involved in Colombian operations after leaving the country; documents show that he was involved in approving payments to the AUC in 2002, and he admitted that he exercised an oversight role over the Colombian operations starting no later than 2003. During his tenure with Chiquita,

Charles Keiser acted as an agent, co-conspirator, and joint tortfeasor of Chiquita. He also acted as an agent, co-conspirator, and joint-tortfeasors of the Chiquita's Colombian subsidiary Banadex. Keiser has been charged in Colombia with Aggravated Criminal Conspiracy under Article 186 of Colombian Law 100 of 1980, in relation to his role in the payments to the AUC.

## IV.   <u>NON-PARTIES OF INTEREST</u>

141.   Chiquita Brands International, Inc. ("CBI" or "Chiquita"), is a United States-based corporation organized under the laws of the State of New Jersey. Its corporate headquarters were located in Cincinnati, Ohio from 1987 to 2012, and are now located in Fort Lauderdale, Florida. CBI is a leading international producer, distributor, and marketer of bananas and other produce; it is one of the largest banana producers in the world and a major supplier of bananas to Europe and North America. The company was founded in 1899 as the United Fruit Company, became the United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

142.   On information and belief, at all times relevant herein, CBI wholly owned, dominated and controlled C.I. Bananos de Exportación, S.A. ("Banadex"), headquartered in Medellín, Colombia.  At all relevant times, Banadex produced bananas in the Urabá and Santa Marta regions of northeastern Colombia and, by 2003, was Chiquita's most profitable banana-producing operation globally.  At all times material herein, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise.

143.   The individual designated in the Factual Proffer as Individual B is now known to be the late Roderick M. Hills. Hills was the former Chiquita Director and President of the Audit Committee.  Hills knew of Chiquita's payments to the AUC and reviewed and authorized these payments. He implemented new procedures to hide payments to the AUC. He instructed

Chiquita employees to continue making payments after learning that the payments were illegal.

144.    The individual designated in the Factual Proffer as Individual C is now known to be Robert Olson, former Vice President and General Counsel of Chiquita. Olson knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Olson also reviewed and approved new procedures to hide payments to the AUC.

145.    The individual designated in the Factual Proffer as Individual D is now known to be Robert Kistinger, former President and COO of Chiquita Fresh Group. Kistinger knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Kistinger instructed Chiquita employees to continue making payments after learning that the payments were illegal.

146.    William Tsacalis, Controller and Chief Accounting Officer for Chiquita, knew about Chiquita's payments to convivirs and the AUC and designed the new procedures for payments to the AUC after it was designated as a Foreign Terrorist Organization.

147.    John Ordman is a former Senior Vice President for Chiquita Fresh Group, who had operational responsibility for all of Chiquita's Colombian operations, and reported to Kistinger. Upon information and belief, the individual designated in the Factual Proffer as Individual J is now known to be Ordman. Ordman knew about and approved Chiquita's payments to convivirs and the AUC, and reviewed those payments for "reasonableness," including after the AUC was designated as a Foreign Terrorist Organization. Ordman knew about the AUC's FTO designation no later than 2002, but continued to be involved in approving payments.

148.    Upon information and belief, the individual designated in the Factual Proffer as Individual F is now known to be Álvaro Acevedo, a high-ranking officer of Banadex.

149.    Upon information and belief, the individual designated in the Factual Proffer as

21

Individual G is now known to be Víctor Buitrago, a Banadex employee.

150.    Tsacalis, Kistinger, Olson, Hills, Ordman, Acevedo, and Buitrago were each joint tortfeasors and co-conspirators with the Defendants.

151.    Plaintiffs are informed and believe, and on that basis allege, that the Defendants are responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by their conduct, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries. Whenever and wherever reference is made in this Complaint to any conduct committed by Chiquita, CBI, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the benefit of CBI and Banadex.

152.    At all times herein material, with respect to the events at issue, Chiquita, Banadex, and the Defendants (during the time in which they held positions at Chiquita), as well as other individual Chiquita and Banadex executives and employees as described herein, conspired with each other, and/or participated in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were acting within the course and scope of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As described herein, "agency" includes agency by ratification.

153.    Additionally, the individual conspirators are liable for the injuries inflicted by the

conspiracy prior to their joining.

154.  With respect to the events at issue, Chiquita and the Defendants (during the time in which they held positions at Chiquita), among others, conspired with, worked in concert with, participated in a joint criminal enterprise with, acted as the principal of, employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs' injuries, including but not limited to the AUC.  These terrorist organizations were acting within the course and scope of such agency, employment, and/or concerted activity. The wrongful conduct alleged herein was perpetrated by Chiquita management and personnel, including the Defendants, both in Colombia and the United States.

155.   Plaintiffs are informed and believe and based upon such information and belief allege that CBI management and other personnel in the United States and in Colombia including the Defendants were informed of the ongoing events complained of herein and participated in the decision making, planning, preparation, ratification, and/or execution of the acts complained of.

<h2 style="text-align:center">V.   <u>STATEMENT OF FACTS</u></h2>

### A.  Chiquita Supported Paramilitary Terrorists in the Colombian Conflict.

156.   Chiquita supported terrorist groups in Colombia by paying them and assisting them to obtain arms and smuggle drugs. Chiquita knew that these groups used illegal violence against civilians and intended that they employ this strategy to quell social and labor unrest in the Northeast Colombian region of Urabá and safeguard the stability and profitability of Chiquita's enterprises in Colombia.

157.   Among the terrorist organizations that Chiquita supported were two paramilitary groups, including the Popular Commands (*Comandos Populares*, or CP); the demobilized wing of the former EPL (*Ejército Popular de Liberación*) known as Esperanza; the Rural Self-Defense

Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and Urabá*, or ACCU) and its successor and parent, the United Self-Defense Groups of Colombia (*Autodefensas Unidas de Colombia*, or AUC). Whenever reference is made in this Complaint to the AUC, such references shall be construed to mean the AUC, the ACCU, and any other predecessor or constituent part of the AUC or the ACCU, including Esperanza and CP or other former elements of EPL.

158.    Chiquita also paid violent guerrilla groups from the late 1980s through the late 1990s, including the FARC (*Fuerzas Armadas Revolucionarias de Colombia*), ELN (*Ejército de Liberación Nacional*), and EPL, including the EPL-Caraballo wing.

159.    These paramilitaries operated in the banana-growing region of Urabá, an area located in the northeast corner of Colombia and South America, within the Department of Antioquia.

160.    Before the 1960s, the Urabá region was lightly populated, mostly by indigenous communities, and remained isolated from the central government. The United Fruit Company, the predecessor to Chiquita, expanded to the Urabá region in the early 1960s and created a Colombian subsidiary, Banadex, which produced about ten percent of the region's bananas. Many workers migrated to the region as the banana industry grew.

161.    In the 1980s, leftist, anti-government guerrilla groups including the FARC, the ELN, and the EPL were active in Urabá.

162.    Paramilitary groups were originally legally sanctioned "self-defense groups" (*autodefensas*), authorized by a 1968 Colombian law to assist in the fight against the anti-government guerrillas. By 1991, however, the level of extrajudicial violence in which paramilitaries were implicated had become so great that the Colombian government adopted a new law criminalizing membership in and provision of support to the paramilitary groups.

163.    Over the course of the 1980s, the paramilitaries maintained strong ties to the Colombian

government and increasingly worked for and with powerful private groups that were opposed by the leftist guerrillas, including businesses, industrialists, large landowners, and bankers. They also became deeply involved in the drug trade, which gave them a steady source of income to procure arms. As a result, and despite the official criminalization of the paramilitaries, they became a central component of the government's strategy to win the civil war. At all times relevant to this complaint, the AUC and other paramilitary groups in fact collaborated closely with the Colombian government and were used by the government to oppose anti-government guerrilla groups. *See infra*. The AUC's efforts were directed toward the elimination of guerrillas and destroying the suspected bases of guerrilla support. In that effort, they were supported by banana companies like Chiquita, who benefited directly from the suppression of suspected guerrilla sympathizers, such as labor union leaders.

164.    The most notorious of the paramilitary autodefensas in Urabá was known as *Los Tangueros*, formed by the wealthy Castaño family and named for its family ranch, Las Tangas. From the mid-1980s to the early 1990s, this death squad assassinated numerous individuals and especially targeted the EPL guerrillas. Although they rarely engaged in open combat with guerrilla units, they assassinated suspected guerrilla supporters and sympathizers.

165.    In 1991, pressured by Los Tangueros, the EPL entered into a peace agreement with the Colombian government, under which most of its members – more than 2000 fighters – demobilized. The demobilized wing formed a political party under the name *Esperanza, Paz y Libertad* (Hope, Peace & Liberty), generally known as Esperanza. Esperanza also developed its own armed wing, known as the Popular Commandos (*Comandos Populares*). A smaller faction of EPL refused to demobilize, forming the EPL-Caraballo wing.

166.    Demobilized EPL fighters became targets of EPL-Caraballo, as well as of the FARC and

ELN. In response, they re-armed and formed new paramilitary forces, including CP, which recruited new fighters. Former EPL guerrillas, including CP, were commonly stationed on farms and ranches throughout the banana-growing region.

167.    The CP fighters were at least tacitly supported by the Colombian state, which took no action to oppose them.

168.    In 1994, the Castaño family re-formed Los Tangueros into the ACCU, a brutal force focused on taking control of Urabá from the guerrillas.

169.    Around 1995, the CP were essentially merged into the ACCU. The ACCU eliminated any resistance to this move by assassinating several CP leaders.

170.    The ACCU thus became the largest and most well-organized paramilitary group in Colombia. The organization was distinguished by its central command, which coordinated the activities of local subdivisions, known as "blocs" and "fronts." Both mobile and stationary units existed, and fighters received a base salary and food, a uniform, weapons, and munitions. The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade.

171.    In 1997, Castaño and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership. At all times relevant to this Complaint, Castaño remained the leader of the AUC.

172.    The AUC grew rapidly in size during the late 1990s and into the twenty-first century. In 1997, it comprised roughly 4,000 combatants. By 2001, Castaño claimed that the AUC had 11,000 members, though government estimates put the number somewhere between 8,000 and

26

9,000. By 2002, AUC forces were present throughout Colombia. AUC leaders have claimed that, at the time the process of demobilization began in 2004, the organization included as many as 17,000 armed fighters and 10,000 other associates, including informants, cooks, drivers, and computer technicians.

173.    In order to undermine communities' and individuals' support for the guerillas, the AUC and its constituent groups, including the ACCU, adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnapping, forced disappearances, and looting. The AUC purposely used killings and cruelty to terrorize the civilian population into ceasing support for guerrilla groups.

174.    While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians. The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. Carlos Castaño, the AUC leader, described this strategy as "quitarle agua al pez" (draining the water to catch the fish), as the AUC sought to intimidate and coerce civilians to prevent them from providing support to guerrillas.

175.    Inhabitants of small towns in contested rural areas were particularly vulnerable to AUC attack. The AUC would enter villages with lists of alleged guerrilla supporters and attempt to kill everyone on the list. AUC violence often caused entire communities to disperse, either due to threats of an impending massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

176.    The AUC also targeted anyone considered to share the guerrillas' leftist ideology, such as teachers, community leaders and activists, trade unionists, human rights defenders, religious workers, and leftist politicians. The banana companies shared the AUC's opposition to these

individuals and organizations. As part of its efforts to completely dominate the social and political life of the regions it controlled, the AUC also targeted anyone considered socially undesirable, including indigenous persons, persons with disabilities, persons with psychological problems, drug addicts, prostitutes, and suspected petty criminals.

177.    The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out according to a systematic and well-coordinated plan between the government, the paramilitaries, and the companies that financed them. These groups operated throughout the banana-growing region of Urabá, as well as in other parts of Colombia. On many occasions from at least 1994 through 2004, they carried out multiple executions or mass-killings of civilians; by 1997, the ACCU and other AUC groups were already responsible for at least 150 such instances of mass-killings. From its founding, the AUC's activities and abuses have been carried out under the direction of a central command.

178.    At all times relevant to this complaint, the AUC and its constituent groups, including the ACCU, participated in an internal armed conflict in Colombia, in which the paramilitaries were fighting on behalf of the government against guerrilla forces.

179.    Through the ACCU, the AUC was subdivided into two blocs in Urabá, the Banana Bloc and the Elmer Cárdenas Bloc. While there had been paramilitaries under the control of the Castaño family in Urabá since the 1980s, the Banana Bloc was formally created in Urabá in 1994. José Ever Veloza García – a.k.a. "H.H." – was selected as one of the first commanders. In later years, the Banana Bloc operated through two fronts: the Turbo Front in Northern Urabá, under the command of H.H., and the Banana Front in the south, led by Raúl Hasbún.

180.    The Elmer Cárdenas Bloc began as a private defense group that united with the ACCU in 1995. It was commanded by Freddy Rendón Herrera – a.k.a. "El Alemán" – and Elmer Cárdenas

until Cárdenas was killed by the guerrillas in 1997. The Elmer Cárdenas Bloc also received men, training, and assistance from the Banana Bloc. Both blocs received funding from the banana companies, including Chiquita, directly or through the *Convivir* Papagayo. *See infra* (*convivir*).

**B. The *Convivir* Were Created to Legitimize and Provide Support to the Paramilitaries.**

181.    Although paramilitarism had been declared illegal in Colombia, the Colombian government still needed the paramilitaries to assist in the armed conflict against the guerillas; Decree 356 of 1994 was therefore enacted as a new legal mechanism to provide cover and a legitimate avenue of funding for the AUC. Paramilitaries could easily reorganize and continue operating under Chapter 5 of this Decree, which allowed for the authorization of private groups to provide "Special Vigilance and Private Security Services." These security groups, known commonly by their Spanish-language acronym "CONVIVIR," consisted of civilians who received a license from the government to "provide their own security . . . in areas of high risk or in the public interest, which requires a high level of security." *Convivir* were permitted to use arms that were otherwise restricted to military use.

182.    The *convivir* units in Urabá were fronts for the ACCU and the AUC from their inception. Many were directed and populated by known paramilitaries; this was common knowledge in the region. As H.H. once remarked publicly, "Let us not deceive ourselves: all the *convivir* were ours." The 17th Brigade of the Colombian Armed Forces, which was infamous for its close collaboration with the paramilitaries in Urabá, was given the authority to select members of the *convivir* in Urabá.  *See infra* (describing the close collaboration between the 17th Brigade and the paramilitaries).

183.    Álvaro Uribe, the current President of Colombia, was governor of Antioquia at the time of the creation of the *convivir*. Uribe authorized the funding, arming, and funneling of

information to the *convivir*, thereby facilitating the sharing of such funds, arms, and information with the AUC. Uribe expected the *convivir* groups to fight the guerrillas – both alongside the military and on their own, since they were often in a position to engage their opponents before troops could arrive. He justified arming these groups with long-range weapons after noting that their revolvers and smaller weapons were insufficient to combat the guerrillas.

184.    On information and belief, the impetus to organize *convivir* groups in Urabá came from Raúl Hasbún, a banana plantation owner who served as an intermediary between the banana companies and the AUC, and who eventually became commander of the AUC's Banana Bloc. Hasbún approached Uribe in 1997 with the intention of creating a new *convivir* in Urabá. The paramilitaries, the government, and the banana companies saw the *convivir* as an ideal means of legalizing the companies' payments to the paramilitaries.

185.    The *convivir* units in Urabá facilitated communication and collaboration between the government and paramilitaries. The twelve units functioned as a network and sent intelligence both to the military and to paramilitary commanders such as Hasbún. The military and paramilitaries would both respond to information detailing the location of guerrillas, but often the military would allow the paramilitaries to take on the majority of the fighting, since the paramilitaries had better resources and fewer limitations on their conduct.

186.    Chiquita and other banana companies often made payments to one unit, the *Convivir* Papagayo, which passed the money on to the AUC. *See infra* (details on payment arrangements).

187.    The banana companies recorded these as payments for "security services." However, personnel of Chiquita and other banana companies both in the U.S. and Colombia knew that the *convivir* was directing these payments directly to the AUC. *See infra* (meeting between Chiquita and paramilitaries; details on payment arrangements).

188.    In 1997, the Colombian Constitutional Court affirmed the legality of the *convivir* system but prohibited *convivir* members from carrying restricted arms or conducting intelligence work. Many *convivir* units were dismantled, as these limitations crippled their effectiveness. The *Convivir* Papagayo was one of only two *convivir* units that remained, as it remained useful as a conduit for payments from Chiquita and other banana companies to the AUC. Arnulfo Peñuela, the director of the *Convivir* Papagayo at the time, has been prosecuted in Colombia for his ties to the AUC.

**C.    The AUC Acted Under Color of Authority of the Colombian Government in Committing the Acts Alleged Herein.**

**1.    The AUC acted under color of law with respect to all of the killings in this action.**

189.    The murders and torture at issue in this case occurred in the banana-growing region of Urabá, where at all relevant times, the AUC (and its predecessor paramilitary groups) operated under color of Colombian law.[1]

190.    The Colombian State – including, particularly the Colombian Armed Forces and then-governor of Antioquia, Alvaro Uribe – created, trained, supplied, supported and protected the right-wing paramilitaries that committed the acts of murder and torture in this case.

191.    Indeed, paramilitary groups' years-long reign of terror in Urabá would not have been possible without the support, complicity, and encouragement from the Colombian State.

192.    The acts of violence committed by the AUC in Urabá were not independent acts,

---

[1] In the sections below are case specific allegations, which concern both the incidents of Plaintiffs in this case as well as incidents involving plaintiffs in other cases filed in this MDL by Plaintiffs' counsel. The allegations about plaintiffs in these other cases are included here because they are relevant to show the overall pattern of AUC abuse and state action. Inclusion of a particular victim's or survivor's name in these allegations does not signify that they are a Plaintiff in this action, if they are not identified as a Plaintiff elsewhere in this Complaint.

unrelated to their relationship with the Colombian State; rather they were part of a concerted plan with Colombian State actors to drive left-wing guerrillas out of Urabá, and to terrorize any people or groups deemed sympathetic to the guerrillas (or left-wing causes).

193.    Dating back to the late 1980s, and throughout the entire period relevant to this case, the Colombian Military used paramilitaries to carry out acts of terror and to assassinate members of the *Unión Patriótica* ("UP") political party, the SINTRAOFAN and SINTRAINAGRO labor unions, and others seen to be guerrilla sympathizers and the "internal enemy" of Colombia.

194.    Indeed, as the Justice and Peace Chamber of the Superior Court of Medellín found in a decision establishing State responsibility for ACCU killings in Urabá, there was "a dirty war policy to combat insurgent groups, political dissidents and certain social movements and leaders" among the Army and the paramilitaries. And the "[t]he promotion, organization and support of the paramilitary groups was not the conduct of some isolated members of the Armed Forces. . . over time it became a policy drawn up, sponsored and/or permitted and facilitated by the high command of the Armed Forces."

195.    In pursuit of their common objective, the AUC, predecessor paramilitary groups, and the Colombian State carried out many joint operations in Urabá against the guerrillas, and many joint operations that involved civilian massacres.

196.    Beyond these public joint operations and pitched battles against the guerrillas, the AUC, predecessor paramilitary groups, and the Colombian State also operated more clandestinely to achieve their common goal of eliminating the guerrillas and driving civilians from Urabá that were seen as sympathetic to guerrillas and/or leftist causes.

197.    The AUC and predecessor paramilitary groups had a two-fold role in this clandestine scheme – as confessed by several of its commanders and as later found by the Colombian State

itself.

198.    First, paramilitaries carried out the extrajudicial killings that the State could not. For example, if there was insufficient information to formally charge an individual suspected of collaborating with the guerrillas, the Colombian State would identify that person to the AUC or other paramilitary group, which would then murder them.

199.    As Raúl Hasbún, one of the senior AUC commanders in Urabá, told Colombian prosecutors in 2008: "We would have information from the army or the police . . . they arrested someone but were not able to carry on with the indictment because the information was lacking. Then, if we had the chance, we immediately executed or killed the person."

200.    Other paramilitary commanders also confessed to the AUC carrying out hits with intelligence and lists provided by the Colombian State. Salvatore Mancuso Gómez, another senior AUC commander in Urabá, has publicly admitted that "Many crimes were carried out with lists in hand that had been given to them by members of the DAS [Colombia's intelligence service], the Police, the Army and former guerrillas . . . ."

201.    This practice was further confirmed by Éver Veloza (AKA "HH"), another senior AUC commander in Urabá, who told a journalist that "the Public Force gave us lists of people to execute."

202.    Second, the AUC and its predecessor paramilitary groups would terrorize and drive the civilian population – seen to support the guerrillas – out of Urabá.

203.    As shown by Operation Genesis – a 1997 joint operation between the 17th Brigade of the Colombian Army and paramilitaries in Urabá – the AUC not only assisted the military in killing guerrillas in open combat, but also in occupying territory in Urabá and displacing civilians seen as supportive to the guerrillas.

204.    Indeed, a Colombian court found the 17th Brigade's then commander, General Rito Alejo del Rio Rojas, guilty of an AUC murder committed during the operation because he had been part of a command group that gave the AUC a "mission" as part of the plan to eliminate guerrillas, which "included the forced displacement of communities . . . [and] macabre assassinations to terrorize the population" in the area.

205.    At bottom, the Colombian State needed a force that was not bound by the rules of war, which would terrorize civilians seen to support the guerrillas, and occupy areas formerly controlled by the guerrillas – that force was the AUC.

206.    As AUC commander Jesus Ignacio Roldan Perez (AKA, "Monoleche") testified in this case: "The state could have detained us, but it did not because it needed an armed group to fight the guerrillas, to go into homes at night and take out the militias, take out the guerrillas, and murder them. The state was not doing that."

207.    As the Fourth Report of the Colombian Ombudsman's Office to the Congress in 1997 noted, the "paramilitary groups [were] the illegal arm of the armed forces and the police, for whom they do the work that the latter cannot do as authorities subject to the rule of law."

208.    This conspiracy between the AUC and the Colombian State in Urabá ran deep, and the participation of each was necessary to the "success" of both.

209.    For example, AUC Commander "HH" described the AUC's collaboration with Urabá's 17th Brigade as a 10 out of 10 and stated that the success of their campaign against the guerrillas and suspected guerrilla sympathizers would have been impossible without "collaboration and coordination with the Public Force."

210.    Similarly, State Department cables show that General Del Rio "told 17th brigade personnel to cooperate with paramilitaries whenever [he] was physically absent from the area,"

and that his success in "bloodying the nose" of the guerrillas in Urabá was a function of his collaboration with and "systematic arming and equipping of regional paramilitaries."

211.    Colombian prosecutors have come to the same conclusion, finding the backing of the Colombian military necessary to the "success" of the paramilitaries; observing that the Colombian military cleaned the areas for paramilitary incursions, provided guards to their commands, gave logistical support, delayed the entry of the armed forces into certain areas, cleared roads for the movement of troops, and accompanied operations.

212.    The AUC was also shielded by and encouraged to its violence by specific policies and decisions of the Colombian State, including its refusal to intervene to prevent massacres (which they knew in advance would happen); its broad failure to detain, investigate or prosecute AUC violence (and military collaborators); its pattern of letting AUC members (and military collaborators) that were arrested walk out of jail, and/or continue to direct AUC operations from prison; and its policy of rewarding soldiers for "enemy" kills committed by the AUC. Because of this, the AUC was able to conduct its reign of terror in Urabá free from worry and/or punishment.

213.    Further, the AUC enjoyed strong support from countless local political leaders in Urabá through the "Urabá Grande" political alliance, which gave the AUC access to public finances in the municipalities under its control, a free hand for their military actions against the civilian population, and ultimately, influence among members of the Colombian congress and senate, who participated in the criminal alliance and validated the existence of the AUC in Urabá.

*      *      *

214.    The AUC was unleashed and used by the Colombian State to fight its war against guerrillas and civilians seen to support the guerillas. And without the involvement,

encouragement and assistance of the Colombian State, the AUC would not have been able to commit the killings and incidents of torture in this case.

215.   All the deaths and incidents of torture in this case were the intended and/or the natural and probable consequence of the State's decision to use, encourage, and shield paramilitaries in its war against guerrillas in Urabá.

216.   Colombian, international, and U.S. courts have all recognized that the AUC and (substantial portions of) the Colombian State acted together and in a mutually beneficial way to eliminate left-wing guerrillas and suspected sympathizers throughout Colombia.

217.   In denying summary judgment in a Torture Victim Protection Act claim brought by a Colombian victim of the AUC, a federal court in the Southern District of Florida recently recognized that the AUC was a state actor in the Magdalena region of Colombia for the purposes of a civilian killing and torture because: "The Colombian government introduced and used paramilitary members to fight guerrilla groups causing civil unrest in [Colombia]" and there was "an abundance of evidence in [the] record that the [AUC] operated in a symbiotic relationship with Colombian state actors" and that "State actors actively supported the [AUC's] operations through intelligence sharing, weapons, and military uniforms." *Jaramillo v. Naranjo*, Case No., 10-21951-Civ-TORRES (S.D.F.L., Sept. 28, 2021) (Order Denying Summary Judgment). All that (and more) is true of the AUC and the Colombian State in Urabá.

> **a.    The Colombian State used paramilitaries to wage war against the guerrillas and guerrilla sympathizers in Urabá.**

218.   The Colombian State waged war against leftist guerrilla groups – including, the FARC, ELN, and the EPL – since the 1960s.

219.   From the beginning, the Colombian State used, armed, and turned to paramilitary groups. These groups – known as "self-defense groups" or *autodefensas* – were sanctioned by a

36

Colombian law in 1968, to assist in the fight against the guerrillas; and under this law the Colombian Defense Ministry provided the paramilitary groups with training and military-grade weapons that were otherwise prohibited for civilians.

220.    By 1986, there were around 140 active right-wing paramilitary groups across Colombia. Among them was *Los Tangueros*, the paramilitary group established by brothers Fidel and Carlos Castaño on their family farm, "Las Tangas," in Cordoba.

221.    *Los Tangueros* was the foundation for the ACCU, and ultimately the AUC.

222.    As documented by the Inter-American Court of Human Rights in a 2006 judgment, "With the tolerance and collaboration of law enforcement officials, from 'Las Tangas,' Fidel Castaño perpetrated the massacres at Currulao (15 people murdered), Buenavista, Córdoba (28 people assassinated), Punta Coquitos, Turbo (26 people murdered), Canalete, Córdoba (16 victims), Pueblo Bello (43 peasants disappeared and murdered)."

***In the early 1990s, the Colombian Army specifically trained, armed, and organized right-wing paramilitary groups in the banana growing regions of Urabá and Cordoba to fight guerrillas and terrorize the civilian populations that were seen as supporting them.***

223.    Guerrilla groups largely controlled Urabá in the 1980s. And the Colombian State (and its army) were unable to defeat them.

224.    As AUC commander Mancuso testified, "The war was being lost against the guerrillas . . . The military forces were only in the large cities . . . But in the rural areas, in the small towns to the midsized cities, the military forces, as big as they were, were just in the barracks. And it was the guerrillas, they were the ones who were going freely all over the territory there."

225.    Thus, beginning in the late 1980s and early 1990s, the Colombian State (and members of the business sector) began to arm and employ paramilitary groups in Urabá to fight back against the guerrillas.

226.    Carlos Castaño himself admitted that his paramilitaries were trained by the Army, stating that   a major in the Puerto Berrío Battalion (later the Army's 14th Brigade) "was the pioneer of the self-defense groups in Colombia . . .  it was this major who began to recruit farmers, not for the Army . . . but for the self-defense groups, and to shape them and give them training."

227.    AUC Commander Hasbún similarly told Colombian authorities that "[i]t was the army itself that recommended that we arm ourselves illegally, that we import self-defense groups to the Urabá region in the face of the state's inability to keep the guerrillas at bay."

228.    One substantial source for these fighters was former EPL guerrillas. In the early 1990s, around 2000 EPL fighters entered into a cease fire with the Colombian government. The demobilized individuals resided primarily in the banana-zone; and were then targeted by other guerrilla groups, namely the FARC and ELN, in Urabá.

229.    As AUC Commander H.H. testified, these individuals were re-armed by the Colombian Army to fight back against the guerrillas in the banana zone. They were ultimately incorporated into the ranks of the ACCU and AUC.

230.    The Colombian army also equipped and trained others to fight the guerrillas throughout the banana zone in the early 1990s.

231.    Former AUC Commander Mancuso has made clear that his start in paramilitarism in the early 1990s was on the recommendation of Major Walter Domenico Fratini Lobaccio of the Army's 11th Brigade, who trained him in a counter-guerrilla course, and hosted him at the Tierralta base.

232.    Prior to his death, Major Fratini commanded a group that included Colombian military personnel, captured guerrillas, and civilians like Mancuso. And after Fratini's death, Mancuso took those fighters – trained and armed by the Colombian military – and joined the ACCU, in or

around 1994.

233.    Paramilitary training took place in military facilities in Urabá, such as the Army Battalion in San Pedro de Urabá, where AUC commanders and their troops studied military tactics.

234.    Active and ex-military personnel were instructors for the paramilitary schools. These included former Army Captain Carlos Mauricio García Fernández, alias Comandante Rodrigo or Doble Cero, whom Vicente Castaño, brother of Fidel and Carlos Castaño, defined as "the great military strategist of the ACCU."

235.    As Mancuso has further testified, then, he and the ACCU had "a perfect relationship with the military forces," and were supplied with military weapons, such as grenades and grenade launchers.

236.    In 1997, military intelligence officials from the Charry Solano Battalion in Bogota helped organize the First National Conference of delegates of paramilitary structures from different regions of Colombia, leading to the formation of the AUC.

237.    And, as a retired Army major who served in the 11th Brigade explained, colonels and commanders of the 11th and 17th Brigades planned the ACCU's expansion out of Urabá and Cordoba, and strategically transferred officers who already had experience working with the paramilitary groups to the military battalions that had jurisdiction in the regions where the newly created paramilitary bloc would arrive.

### The 17th brigade and paramilitaries conspired to drive the guerrillas from Urabá.

238.    Near the end of 1994 when the ACCU began to operate in Urabá in the Department of Antioquia, there was immediate collaboration with army officers and non-commissioned officers who were present in the area. As H.H. testified, the paramilitaries in Urabá counted on the collaboration of the military, from their arrival in 1995 until their demobilization.

239.    The collaboration between right-wing paramilitaries – namely, the ACCU/AUC – and the Colombian army ran deep in Urabá, particularly with the 17th Brigade.

240.    The 17th Brigade was created in 1993; it was headquartered in Carepa; and its authority covered the region of Urabá.

241.    General Del Rio was its commander from 1995 to 1997 – key years when it worked alongside right-wing paramilitaries to drive the guerrillas out of Urabá.

242.    As noted above, paramilitary commanders described collaboration with the 17th Brigade and its commander, General Del Rio, as 10 out of 10.

243.    And State Department cable show that the 17th Brigade was able to "bloody the nose" of the guerrillas and Urabá through the "systematic arming and equipping of regional paramilitaries."

244.    The collaboration between the 17th Brigade and the paramilitaries was immediate; as AUC Commander H.H. testified, "the public force began to collaborate with us from the moment we arrived."

245.    When AUC Commander H.H. arrived in Urabá before many other paramilitary soldiers, he was brought by a Mr. Peñuela to speak with police and military officers in Urabá to coordinate the arrival of other paramilitary soldiers.

246.    Mr. Peñuela was a business leader and the Director of the CONVIVIR Papagayo – which Chiquita paid, and which had its offices right behind the 17th Brigade – and was ultimately convicted for ties to the AUC, but not before he became mayor of Carepa.

247.    Once the ACCU was in Urabá, there was total collaboration with the 17th Brigade: operations were jointly planned; information was shared; military and paramilitary forces jointly patrolled; joint meetings were held; and paramilitaries moved freely, including within the bases

of the 17th Brigade.

248.    As the Superior Court of Medellín has explained, "General Rito Alejo del Río became personal friends with Carlos Castaño Gil . . . allowing the Peasant Self-Defense Forces of Córdoba and Urabá to grow and mobilize throughout the region without any restriction."

249.    The collaboration and conspiracy between the 17th Brigade and the AUC was such that in 2012, General Del Rio was convicted for conspiracy in connection with the AUC's murder of Marino Lopez Mena in February 1997.

250.    That decision, by the Eighth Criminal Court of the Specialized District of Bogota, details the existence and the goals of the conspiracy between the Colombian Army (through the 17th Brigade) and the ACCU/AUC; as well as the role that the ACCU/AUC played in the conspiracy.

251.    As the Court found, there was an effective and organized conspiracy: "What is certain, as sustained by the District Attorney and demonstrated in the previously referenced evidence, is that with the shared goal of combating guerrilla forces, a '*conspiracy*' emerged between some military forces in the XVII Brigade and self-defense groups in the region . . . [T]his mixed group consisted of Commanders or Leaders, as well as Castaño, Mancuso, and El Aleman, etc., and General DEL RIO ROJAS himself."

252.    Further, General Del Rio "was one of those in charge of designing strategies and the joint operations with paramilitary leaders, as well as assigning responsibilities to the second line of commanders (Captains and Lieutenants, or paramilitary members like CASARRUBIA, 'YUNDA' etc.), who then transmitted those orders to the Commanders of the operative groups or those executing the orders (Army Sergeants and Corporals and paramilitary members such as LUIS MUENTES and alias PANTERA." In other words, this "mixed group" had a "vertical structure" with both members of 17th Brigade and ACCU at the top.

41

***The 17th Brigade-AUC conspiracy ran so deep that it was difficult to tell them apart.***

253.    Pursuant to this conspiracy, the AUC maintained permanent contact with generals and other high-level officials. As AUC commander Hasbún in Urabá explained, "when they appointed new generals and colonels for the area, it was not necessary to contact them [because] they were already read in."

254.    Boundaries between the AUC and the military were amorphous, as some paramilitary members were former police or army members, while some active-duty military members moonlighted as paramilitary members and became thoroughly integrated into these groups.

255.    In one instance, H.H. discovered that a criminal whom the AUC sought was being held at the Brigade headquarters; he and others from the AUC went to the 17th Brigade, picked up the prisoner, transported him to the port at Turbo using a military van, and murdered him. Salvatore Mancuso reported a similar story. Furthermore, on his visits to the 17th Brigade – during which he often planned joint operations with General del Río and then-Captain Bayron Carvajal – H.H. recruited and was permitted to recruit soldiers for the AUC.

256.    Similarly, as AUC commander Sancocho (who was active in Urabá in 1997), explained, the paramilitaries coordinated "everything" with the Colombian military. "I was the commander of the urban area, of those municipalities Mutatá, Chigorodó, Carepa, Apartadó, and Currulao up to a part called el Tres. Up to there I had control over the urban areas at that time.  We coordinated everything with the Convivir and with the public forces."

257.    As former Colombian army soldier Oswaldo de Jesús Giraldo Yepes, who served with the 11th Brigade in 1994-1995 and in Urabá under the command of General del Rio between 1996 and 1997 has repeatedly testified, the permanent directive of General Del Río was to collaborate with the paramilitaries.

258.     Collaboration between the military and the AUC reached the point that, as a former AUC commander explained to Colombia's Commission for the Clarification of Truth (Truth Commission), "No move was possible, if it was not coordinated with the public force."

259.     Indeed, as the Colombian Attorney General's Office found, 50% of the 22 massacres that the Bananero Bloc confessed to in Urabá involved the participation of military personnel.

260.     Investigators from the Attorney General's Office have identified many military personnel as paramilitary collaborators in Urabá, including but not limited to General Martín Orlando Carreño Sandoval, commander of the 17th Brigade between 1997 and 1998 after General del Rio.

***The Colombian State's conspiracy with the AUC was widespread, extended outside Urabá and involved senior military and political leadership at the highest level.***

261.     Cooperation with paramilitaries has been demonstrated in a majority of Colombia's Army units, spread across all of the Army's regional divisions.

262.     As of 2018, 43 of the 51 decisions handed down in the framework of the special criminal Justice and Peace process in Colombia expressly identify members of the Army as part of the support networks for paramilitary groups.

263.     On information and belief, many other army brigades had relationships with the paramilitaries similar to the one between the paramilitaries and the 17th Brigade, including the 4th and 11th Brigades.

264.     As a former Army officer who was directly involved in relations with the AUC told Colombia's Truth Commission, "There was a total and absolute conspiracy and I have no doubt about that. Because it was a sponsorship, let's put it that way and those who looked at the cards, planned all the incursions in different parts of the country, as you know and everyone knows, it was the generals, those who sat down with the high command of the auto defense forces."

265.     As the same officer explained, Carlos Mauricio García Fernández, the lead military

43

instructor of the AUC, and Carlos Castaño met with General Rito Alejo Del Río, General Iván Ramírez Quintero, and General Martín Orlando Carreño to plan and identify which areas had to be liberated from the guerrillas.

266.     Senior officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett, General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del Rio, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, and/or aided and abetted the AUC in the commission of various attacks on civilian populations, extrajudicial killings and other atrocities against civilians, and/or gave tacit support to and acquiescence in the AUC's activities. General Montoya was linked to Diego Murillo, the former leader of an AUC-affiliated paramilitary group in Medellín. Many other high-ranking staff officers are known to have had close ties to the AUC and other paramilitaries, thereby creating a haven for the paramilitary activity in the very heart of the military establishment.

267.     Collaboration between the AUC and the Colombian State occurred at the highest levels of political leadership as well. As Salvatore Mancuso, who succeeded Castaño as national commander of the AUC explained, Vice President Francisco Santos and Defense Minister Juan Manuel Santos met and collaborated with paramilitaries like Mancuso in a plot to extend the paramilitary model to Bogotá.

### *Operation GENESIS was a model of collaboration in Urabá.*

268.     Pursuant to the AUC-Colombia military conspiracy, in February 1997, the 17th Brigade and members of the Elmer Cárdenas Bloc of the ACCU/AUC carried out a coordinated and joint operation, known as GENESIS, near the Cacarica River, in the jurisdiction of the municipality of

44

Riosucio, Department of Choco.

269.     The operation was planned so that the military forces of the 17th Brigade attacked

guerilla bases by air and water; while the Elmer Cárdenas Bloc terrorized civilians in the area.

270.     As the court that convicted General Del Rio found,

> "It is clear that DEL RIO ROJAS as commander of the Brigade, along with the
> paramilitary leaders CASTANO, MANCUSO (who were 'friends' of his, as H.H. refers
> to) considered it advisable within the context of their joint strategy that units from the
> Choco bloc would travel from the Katios natural park to the banks of the Salaqui river,
> passing through the area of the Cacarica River to offer support and reinforcement to the
> military forces carrying out operation GENESIS. They did this not only in armed
> conflicts with guerrilla forces, but also by subsequently occupying and securing areas
> freed of guerrilla influences."

271.     Further, the court found: "In the context of the mission given to the self-defense group . .

. This included the forced displacement of communities along the Cacarica River, macabre

assassinations to terrorize the population (such as the case of MARINO LOPEZ), detentions,

kidnappings, injuries, threats, etc."

272.     Using paramilitaries to terrorize the civilian population was part of the plan agreed on by

the paramilitaries and the military to combat and drive out the guerrillas. Again, the court found

that "It is clear that the subjection [sic] of FARC guerrilla forces and their collaborators required

the execution of parallel activities such as the displacement of guerrilla forces, their sympathizers

and collaborators, and other residents of the region. This, in turn, required acts of intimidation,

terrorism, murder, personal injury, etc."

273.     Thus terrorizing the civilian population of Urabá is not only what the AUC did, but it is

what the Colombian State intended them to do. Again, to quote the court, "the ideal means for

reaching the goal proposed by the 'conspiracy' of official and self-defense troops, to defeat the

guerrilla forces, was precisely the development of actions aimed at provoking or maintaining the

population, or a sector of that population, in a state of anxiety, meaning acts of terrorism."

274.     Accordingly, the AUC committed many of the murders in this case in the presence of family members or other community members, or they subsequently reported to the family that they were responsible for the killings. And they openly killed civilians and discussed such killings in public to intimidate and threaten others.

### *The police were active AUC partners in Urabá.*

275.     The police were active AUC partners in Urabá. By 1995, the AUC's Bananero Bloc had ties to the Police commander in Turbo and then Police captain Gilberto Cárdenas González.

276.     And, a base for what would become the Elmer Cárdenas Bloc of the AUC was just 50 meters from the Turbo Police Command.

277.     By 1996, on information and belief, paramilitaries were meeting regularly with the National Police and police. investigators.  The paramilitaries had links with National Police in at least Carepa, Chigorodó, and Arboletes.  When the convivir proliferated throughout Urabá in 1996, coordination and intelligence sharing with the police increased dramatically.

278.     As retired police chief Gilberto Cárdenas González, head of the Police's Department of Judicial Investigations and Intelligence in Urabá from 1996 to 1998, explained to the U.S. embassy in November 2002, numerous members of police leadership were involved in supporting and protecting the paramilitaries in Urabá.

279.     These collaborators included, among others, Colonel Santiago Parra Rubiano, Commander of the Urabá Police in 1998; Hector Manuel Saavedra Castillo, Chief of Police Intelligence in Urabá between 1996 and 1999; his assistant Luis Javis Toro Franco; Carlos Alberto Osorio Cardona, Police Commander in Dabeiba in 1997; Carlos Alberto Camargo Zamora, Police commander in San Juan de Urabá in 1998; and Luis Ernesto Quinto Ramirez, head of forensics at the Urabá judicial police in 1996.

280.    On information and belief, Police Intelligence Chief Saavedra used advanced equipment at his disposal to intercept communications and tip off paramilitary groups if there was a threat of arrest.

281.    Chief Saavedra was also kept informed by his assistant Toro Franco about which villagers came to the police to denounce paramilitaries. As Cárdenas explained, "The poor villagers, thinking that the police were going to help were going to the police to denounce the paramilitaries and after they would show up dead and disappeared."

282.    As Cárdenas also explained in detail, as part of their work, these officials met regularly with paramilitary leaders. At one point, Cárdenas attended a meeting with General Rito Alejo del Río and Colonel Jorge Eliécer Plazas Acevedo, also of the 17th Brigade, 11 paramilitaries, and three legal representatives of the Convivir.

283.    By 1998, Urabá Police commander Santiago Parra Rubiano was denounced for receiving 30 million pesos a month from the paramilitaries; the chief of police in San Juan de Urabá Carlos Alberto Camargo Zamora was, among other things, providing escort support for a paramilitary leader; and Lieutenant Carlos Alberto Osorio Cardona, chief of Police in Dabeiba, was patrolling with the paramilitaries (on television).

284.    By 2002 and 2003, some police officers were receiving a salary for collaboration with the paramilitaries in Urabá.

### *The AUC did what the Colombian Army could not and terrorized the civilian populations of Urabá; and they did so with the intelligence provided by the Colombian State.*

285.    As Operation Genesis showed, while the AUC and other paramilitaries sometimes fought guerrillas in pitched battles, often alongside the Colombian military, they more often targeted civilians that they believed supported or enabled the guerrillas, including members of left-wing political organizations, social reformers, and labor unions.

286.     Operation Genesis demonstrates that the Colombian State encouraged paramilitaries to do just that; and in the division of labor, it was the job of paramilitaries to target, terrorize and displace the civilians.

287.     Paramilitaries thus filled a critical gap: they were an armed force that was not bound by any laws and that could target and murder civilians seen to support the guerrillas. As H.H. testified, the "laws . . . would limit or hogtie the public force in their fight against the guerrillas." And as AUC Commander Roldan testified, the State "needed an armed group . . . to go into homes at night and take out militias, take out the guerrillas, and murder them. The state was not doing that."

288.     As stated above, the State assisted the AUC (and its predecessor paramilitary groups) in these activities by (among other things) providing the AUC with the intelligence used to target these individuals. AUC Commander Mancuso testified intelligence sharing between the Colombian State and the ACCU/AUC was "frequent' between 1995 and 2004; and also separately stated that "[m]any crimes were carried out with lists in hand that had been given to them by members of the Das, the Police, the Army and former guerrillas who had changed sides and knew who were collaborators with the subversion."

289.     As noted above, AUC Commanders Hasbún and H.H. also confirmed this practice.

290.     The Justice and Peace proceedings also clearly identified the practice: "The Armed Forces, security agencies and State officials were involved in the preparation of these lists and in the information that served as the basis for the execution of innumerable crimes, particularly massacres and selective homicides. Thus, the self-defense groups were in charge of killing the victims and, in many cases, handing over the body to the Army so that it could report the death as if it had occurred in combat."

291.    As Justice and Peace Courts also explained, initially all the actions were carried out with the knowledge or participation of the Military Forces, but later "the Military Forces delegated this responsibility to the Self-Defense Forces."

292.    Colombia's Truth Commission also identified the practice. As it explained, the use of lists of names of alleged guerrillas and collaborators was extensive. These lists were a key element in many witness accounts surrounding massacres and were the product of collaboration between paramilitary groups, military, DAS agents and the networks of informants and collaborators of each of these groups.

293.    With respect to the former guerrillas who had changed sides, AUC Commander Hasbún testified that the Colombian State often turned such individuals over to the AUC, for intelligence gathering.

*The Colombian State and the AUC targeted members of leftist political organizations, like the Unión Patriótica, labor unions (such as SINTRAOFAN and SINTRAINAGRO), and members of Community Action Boards.*

294.    The Colombian State and the AUC had specific civilian targets, namely leftist groups, which were seen as guerrilla supporters and also political opponents of many of the AUC's supporters.

295.    Indeed, in the 1990s when a senior Colombian intelligence official, José Miguel Narváez, was teaching at paramilitary training camps, he specifically spoke to the paramilitaries on the moral legitimacy of killing leftist civilians; Narváez was later convicted of conspiring with the AUC to murder an academic.

296.    AUC Commander El Aleman has publicly stated that Narváez gave the AUC the names and addresses of other civilians, including journalists and NGO workers and that the AUC "took the addresses and names that he gave us because those people were leftist guerrillas infiltrating

universities, NGOs and the media and they had to be killed."

297.   The former AUC Commander known as Don Berna has told Colombian prosecutors that Narváez was actually part of the AUC.

298.   This targeting was confirmed by a CIA report from 1994 that found that "Colombian security forces continue to employ death squad tactics in their counterinsurgency campaign." And that "[t]he military has a history of assassinating leftwing civilians in guerrilla areas, cooperating with narcotics-related paramilitary groups in attacks against suspected guerrilla sympathizers, and killing captured combatants." The report specifically identifies a case where "Naval intelligence officers allegedly paid to have various union and political leaders, as well as common peasants, murdered."

299.   Numerous individuals and groups were targeted, but the attack on supporters and members of the Union Patriótica was particularly brutal and extensive.

300.   The Union Patriótica was founded in 1985 as part of peace agreement between the Colombian State and the FARC. While it grew out of that brief truce, the Union Patriótica was not a part or puppet of the FARC, but a separate and legal political party that was engaged in civil society.

301.   The Union Patriótica and its members were nevertheless targeted for extermination by the Colombian government.

302.   Indeed, in 1986, when former Colombian president Virgilio Barco was elected, he specifically plotted and planned with the Colombian Military and Intelligence services to eliminate the Union Patriótica and its members.

303.   As the Colombian Special Jurisdiction for Peace (JEP) has subsequently found, this plot was successful: around 6,000 members of the party were murdered or disappeared between 1984

and 2018. The JEP deemed it "a systematic pattern of extermination." The Constitutional Court of Colombia called it "progressive elimination" and Colombia's Office of the Attorney called it "systematic extermination."

304.    As the JEP found, these killings were often at the hands of right-wing paramilitaries, in "collusion" with "state agents belonging to the civil and military intelligence agencies."

305.    For example, the Colombian Attorney General recognized that the July 1994 killing of Senator Manuel Cepeda Vargas, the leader of the Union Patriótica, was a joint operation between senior army officers and paramilitaries, including Brigadier General Rodolfo Herrera Luna and Carlos and Fidel Castaño.

306.    For its part, the Inter-American Commission on Human Rights found the State of Colombia responsible for serious human rights violations perpetrated against more than 6,000 officials or members of Union Patriótica, for over 20 years, starting in 1984.

307.    As the Commission explained, the forced disappearances, threats, forced displacements and homicide attempts against officials and members of the party were perpetrated by State agents, or by non-State actors, including the AUC, with the acquiescence of State agents.

308.    And, as the Commission found, the members and officials of Union Patriótica had been constantly stigmatized through statements by public officials and non-State actors, which included branding them "terrorists" and "FARC's political wing."

309.    The State of Colombia itself, in the proceedings before the Commission, has acknowledged responsibility for failing to prevent the murders and other acts of violence against members of the Union Patriótica despite the evidence that a persecution was ongoing against them.

310.    Labor union members were also targeted by right-wing paramilitaries in collusion with

the Colombian military.

311.    As the Justice and Peace Chamber of the Superior Court of Medellín found in its decision

establishing the State of Colombia's responsibility for ACCU killings in Urabá, "trade unionism

was one of the movements most affected by paramilitary action, responsible for hundreds of

selective homicides of trade unionists. This was one of the greatest exercises of violence and

dismantling of social institutions by paramilitary groups, especially in the region of Urabá

Antioquia."

312.    The targeting of these unions was part of "a dirty war policy to combat insurgent groups,

political dissidents and certain social movements and leaders" among the Colombia army and the

paramilitaries.

313.    Indeed, in November 2011, Jorge Nogeuera, former director of DAS, was convicted of

aggravated homicide and conspiracy to commit a crime because, while director, he facilitated the

participation of the AUC in the murders of trade unionists, using the information he had as the

leader of the intelligence agency.

314.    Among the labor union members targeted by the AUC as part of this dirty war in Urabá

were those that belonged to SINTRAOFAN and SINTRAINAGRO.

315.    In 1988, shortly after the main national unions in Colombia moved to collective

bargaining, the national government decided to suspend the legal status of these unions.

Therefore, before upcoming negotiations in 1989, these unions decided to merge into the

National Union of Agricultural Industry Workers, or SINTRAINAGRO, because it still retained

legal status.

316.    At that point, SINTRAINAGRO became the object of violent and indiscriminate attacks

by paramilitary groups in collusion with the State of Colombia because of the perceived

influence of leftist political parties and the guerrilla groups in the unions. As a result, 617 SINTRAINAGRO members in Urabá were killed between January 1, 1991 and July 16, 2003.

317.     The Union of Official Workers and Public Employees of the Municipalities of the Department of Antioquia, or SINTRAOFAN, was also targeted by the AUC in Urabá as part of the State's dirty war policy.

318.     Founded on May 22, 1970, SINTRAOFAN had members who principally worked in construction, cleaning, maintenance, driving vehicles, and other similar jobs. From 1995 until 2005, persecution of trade unions and civic organizations increased in Antioquia, and rank and file members and leaders of SINTRAOFAN were systematically persecuted by the AUC, including through assassinations, detentions, and forced displacement.

319.     The AUC murdered at least thirty-five SINTRAOFAN members and forcibly displaced 1,470 other members between 1994 and 2007.

320.     In March 1997, as threats and forced displacement increased in several municipalities of Antioquia, the Central Board of SINTRAOFAN formed a committee of displaced persons to receive its displaced members in Medellin and make complaints to the authorities. The site received bomb threats because of this work.

321.     Community leaders and activists, particularly those belonging to community action boards (Juntas de Acción Comunal) were also targeted by paramilitaries and the Colombian military pursuant to the Colombian State's dirty war in Urabá.

322.     Community action boards are local civil society organizations in Colombia that promote citizen participation in community decisions and development in neighborhoods, townships and villages.

323.     In the late 1950s legislation was passed to give legal status to community action boards

and regulate them under the authority of various government ministries, but starting in the 1980s and early 1990s, they gained more independence as community activists and non-governmental organizations pressed for greater autonomy.

324.   Each board has a president and a number of other officers, all elected for three-year terms, as well as many members, often hundreds of people, who sign up to participate in community action board projects.

325.   As the U.S. Department of Homeland Security has explained, community action board members "have been targets of violent attacks by the Colombian military and allied, illegal right-wing paramilitary organizations at least since the early 1990s."

326.   Community action boards' emphasis on collective action for community development, and their peaceful efforts to report rights violations to non-governmental organizations in Colombia and abroad led the military and paramilitary groups to view the community action boards as supporting or at least sympathetic to left-wing guerrilla groups.

327.   As Human Rights Watch stated in 1993, the Colombian military "adopts a broad definition of the 'enemy' to include community activists and local leaders, particularly those elected to Community Action Councils (Juntas de Acción Comunal)."

328.   And, as Human Rights Watch stated in September 2001, "Human rights defenders, trade unionists, journalists, and community leaders continue to lead the lists of people killed because of their work," with most of such killings attributed to "paramilitaries who continue to enjoy, at the very least, the tolerance of the Colombian Armed Forces."

329.   Community action boards are particularly vulnerable in those municipalities effectively controlled by paramilitary groups, as citizens groups are forced to submit to the rule of the paramilitaries.

330.     Community action board leaders and members have been targeted by paramilitaries throughout Colombia, including in Urabá. On information and belief, in April 2001, the president of a community action board and two other civilians were killed by paramilitaries in Urabá.

331.     In November 1997, in the city of Apartadó in Urabá, paramilitaries attempted to assassinate a human rights activist. Two of the target's colleagues, members of a local community action board, had already been murdered and had their homes destroyed.

332.     In January 2001, the president of the local community action board was killed by paramilitaries near the town of Caldas in a rural area south of Medellín.

333.     In June 1999, in the Juan de Atalaya section of Cúcuta, the capital of Norte de Santander department, the president and other members of a community action board were forced to resign under threat by a paramilitary group carrying a death list. The community action board president's predecessor had been killed in September 1998.

334.     In January 1997, the office of Asocomunal, an association of community action boards in Medellín, was the target of a daylight bomb attack which left three dead and fifteen wounded.

***Convivir were created in Urabá to legalize support for the AUC, and to consolidate and share intelligence between the AUC and the Colombian State, including for use in assassinations.***

335.     The creation and use of Convivir was particularly strong in Urabá, and facilitated the collaboration between the paramilitaries, the Colombian State, and other powerful actors in important ways.

336.     The Convivir offered critical support to the AUC and played an important role in the counterinsurgency struggle. As a Justice and Peace Court found, "[t]he Convivir were a State strategy in the counterinsurgency struggle and a source or feeder for the paramilitary groups - and in more than one case a tool to cover up their activities - and were promoted, organized,

financed and supported by the Armed Forces and private businessmen."

337.    The creation and proliferation of Convivir coincided with the expansion of paramilitarism in Urabá. As the Superior Court of Antioquia explained, the Convivir strengthened "the self-defense groups," including their equipment and logistics, financing, field operations in coordination with the security forces, as well as the paramilitaries' access to local, regional and national state agencies.

**The CONVIVIR Part 1: A new way to support paramilitaries.**

338.    As discussed above, in the 1960s, Colombia had effectively legalized paramilitaries or *autodefensas*, which were then trained and armed by the Colombian State (with weapons that were otherwise prohibited for civilian use).

339.    When the Colombian Supreme Court held this practice unlawful in 1989 – because of the serious human rights abuses these paramilitaries or *autodefensas* committed – the paramilitaries, the military, and the economic and political interests that supported them, needed a work around.

340.    Enter, the Convivir.

341.    In 1994, the State of Colombia enacted Decree 356, which created a new legal framework that provided cover and a legitimate avenue of funding for the AUC, and other paramilitaries.

342.    Paramilitaries could easily organize and operate under Chapter 5 of Decree 356 as Convivir or "Special Surveillance and Private Security Services."

343.    The groups received a license from the government to "provide their own security . . . in areas of high risk or in the public interest, which requires a high level of security" and, like the *autodefensas* of old, were authorized to use restricted-use weapons and ammunition, and to establish a communications network for rapid response.

344.    Licenses to operate were given by the Superintendence of Surveillance and Private

Security, a state agency.

345.    Thus, as the Superior Court of Antioquia has explained, the Convivir were created, sponsored, and approved by the departmental governments, the security forces, and intelligence agencies.

346.    And under Decree 356, the Convivir would collaborate with the Military Forces and would carry arms for that purpose, establishing a "special relationship" between the CONVIVIR and the Military Forces and giving "the military an important role in approving the creation of CONVIVIR and training and supervising existing CONVIVIR associations."

### The CONVIVIR Part 2: Establishmet in Urabá

347.    Soon after this new law came into effect, it was used to great effect in Urabá.

348.    Álvaro Uribe, the governor of Antioquia (1995-1997), who later became president of Colombia (2002-2010), heavily supported the Convivir in the region.

349.    Uribe authorized the funding, arming, and funneling of information to the Convivir (and also facilitated the sharing of such funds, arms, and information with the AUC).

350.    Uribe's father had been assassinated by the FARC and he backed the Convivir as a bulwark against the guerrillas. He expected the Convivir groups to fight the guerrillas – both alongside the military and on their own, since they were often in a position to engage their opponents before troops could arrive.

351.    Uribe justified arming these groups with long-range weapons after noting that their revolvers and smaller weapons were insufficient to combat the guerrillas.

352.    AUC commander Raul Hasbún – who was also a banana businessman – went to Uribe to present the idea of creating a Convivir in Urabá. He was received by Governor Uribe's Secretary of Government, Pedro Juan Moreno.

353.    Moreno told Hasbún not to create just one Convivir, but a dozen.

354.    In total 13 Convivir were created in Antioquia and given licenses to operate by the Superintendence of Surveillance and Private Security in Urabá, most in 1996.

355.    Convivir were present throughout Urabá, including but not limited to the following municipalities and villages:  Turbo, Necoli, San Juan de Urabá, Pueblo Bello (Turbo), Mutata, Punta de Piedra, Apartado, San Pedro de Urabá, Chigorodo, and Carepa.

**The CONVIVIR Part 3: "All the Convivir were ours"**

356.    The Convivir Urabá were fronts for the ACCU and the AUC from their inception. As ex-ACCU commander, alias HH, declared, "Let's not lie: all the Convivir were ours."

357.    Convivir Papagayo in Carepa served as central command for other Convivir in Urabá.

358.    Papagayo was directed by Arnulfo Peñal, who senior AUC commander H.H. "always saw as a member of the self-defense groups."

359.    The dominance of the AUC over the Convivir Papagayo was so complete that there was little difference between the two.  As the Superior Court of Antioquia explained, "both organizations, one of legal origin and the other a criminal organization, converged in objectives, actors and directors."

360.    As AUC commander Hasbún explained, the 12 Convivir groups that were started in Urabá worked together as a network, and he received information directly from the Convivir as a paramilitary leader, as did the military and the police.

**The CONVIVIR Part 4: Intelligence shared between the State and AUC**

361.    Convivir allowed the Colombian state and AUC to legalize their collaboration. As HH explained, "as self-defense forces, we [ ] created our convivir to have a legal side for intelligence, communications, and coordination with the public force."

58

362.     Coordination was so close that the Convivir Papagayo offices in Carepa were located at the back of the 17th Brigade headquarters.

363.     The 17th Brigade also helped select its members in Urabá.

364.     The creation and use of Convivir paid dividends in intelligence gathering and sharing for the AUC, the Police, and the Colombian military, and dramatically increased the ability of the AUC and State to target civilians seen to support the guerrillas.

365.     Through the Convivir, there was an organized surveillance system throughout Urabá - with some 800 or 900 repeater radios – that covered each of the banana packing plants of all the companies and towns.

366.     The Convivir also had access to the farms (which they provided security for).

367.     This allowed the AUC to permanently monitor the municipalities and the villages of Urabá. And this real time information allowed the AUC to control the inhabitants and to have an invaluable military advantage.

368.     While the military and paramilitaries would both respond, the military often let the AUC lead in acting on the information gathered through this network, since the paramilitaries had better resources and fewer limitations on their conduct. As discussed above, and as Hasbún testified, when it was not able to legally arrest or attack civilians, the State would delegate the task to the AUC or to Convivir associated with the paramilitaries to act.

369.     The Convivir also served an important function in centralizing intelligence that came from the army and police. As AUC commander Hasbún explained, "We realized when we began to function that one of the problems in the region was the fact that the army and the police did not have very good relationships. The intelligence collected by the police they would not share it with the army, and intelligence collected by the army was not shared with the police. And we

would get intelligence from the police and we would get intelligence from the military and we would centralize that intelligence."

370.    And Hasbún explained that while other state agencies were involved "I was in charge, not directly, but indirectly. Army, Prosecutor's Office, Police, DAS, Sijín [Police's Department of Judicial Investigations and Intelligence], all the agencies copied us. We received all the information, we put together a single report and sent it to everyone. The great majority of operations in Urabá were joint."

**The CONVIVIR Part 5: Collection and distribution of funds to fight guerrillas**

371.    Through the Convivir "an enormous fortune" came into AUC hands.

372.    Convivir were used to funnel money from the Banana companies to the AUC, as well as from other powerful business interests that supported the AUC.

373.    As H.H. explained, the Convivir were there in part "to raise funds legally so that the companies would not have legal problems, that they could take out of their accounts and that the exit of these monies would be legal."

374.    Some of these funds, the AUC then directed to support the local police and army.

375.    As senior AUC Commander Mancuso explained, some Convivir funds went to the AUC, some went to pay for informants, armed personnel, and radio equipment, which facilitated communications with the armed forces, and some was given to the Colombia military to use, for example, to fuel their vehicles.

      b.    **The Colombian State participated in numerous AUC massacres, in Urabá and across Colombia.**

376.    The Colombia state has been working with the AUC and its precursors to murder civilians and commit massacres for decades. These massacres include, but are not limited to, the following:

### *The Honduras and La Negra Farms Massacre (1988) – Voltigeros Army Battalion members identified targets in paramilitary massacre of union members.*

377.     On March 4, 1988, paramilitaries (working for Fidel Castaño) murdered 20 workers on the Honduras and La Negra farms in the village of Currulao in the municipality of Turbo in Urabá.

378.     Paramilitaries entered the camp where the workers were resting, called each victim with a list in hand, forced them to line up in a row, and then shot them.

379.     The victims were all members of the Agrarian Workers Union, SINTAGRO.

380.     The paramilitaries later went to the nearby La Negra farm and murdered 3 more workers.

381.     In the days before the massacre, members of the Voltígeros Army battalion, accompanied by people in civilian clothes, carried out searches in the Honduras farms and others in the same area. During the searches, they threatened to kill some workers and beat others in front of their colleagues to prevent them from voting in the upcoming elections in favor of Union Patriótica.

382.     During these searches, Captain Luis Felipe Becerra told the workers he would not kill them personally, but that he had someone to do it.

383.     Four soldiers from the Voltígeros Battalion were convicted for having allowed the killers to carry out joint patrols with their units and to freely carry military weapons, which they later used to commit the massacre.

384.     An investigation by Colombia's Administrative Department of Security determined that the Colombian army integrated demobilized former EPL fighters into their patrols and used them as guides to locate, identify, and eliminate the workers with hired paramilitary assassins.

### *Pueblo Bello Massacre (1990) – Colombian military let paramilitaries pass through checkpoints with kidnapped civilians they later massacred.*

385.     On January 14, 1990, a paramilitary group of 60 men sent by Fidel Castano traveled from

Valencia to Pueblo Bello in Urabá.

386.     They kidnapped 43 civilians, took them back to Valencia, and then tortured and murdered them.

387.     During the journey to and from, they crossed an Army checkpoint located on the road from San Pedro de Urabá to Pueblo Bello and passed in front of the military base and the San Pedro Police Command, where the Francisco de Paula Vélez Infantry Battalion was also stationed.

388.     More than 100 people traveled along that route in two trucks, most of them armed and uniformed, and no police command delayed or interrupted the operation.

### The El Aracatazo Massacre (1995) – intelligence and army officers participated in AUC massacre of civilians, including UP sympathizers, in Urabá.

389.     On August 12, 1995, fifteen members of the Bananero Block of the ACCU entered the Aracatazo Night Club in the town of Chigordo in Urabá and demanded information about weapons they believed were kept there; when they did not find them, under orders from H.H. and Carlos Castaño, they shot the inhabitants – Union Patriótica supporters and banana workers who frequented the club.

390.     One of the guides that helped the paramilitaries in this massacre was under the orders of an intelligence officer of the Voltígeros Battalion.

391.     Colombian courts determined that Voltígeros soldiers had allowed at least two ex-guerrillas who worked as informants to leave the base two days before the massacre. One of them, Gerardo Antonio Palacios, was convicted of participating in the massacre.

### La Horqueta (1995) – Colombian military helped transport AUC Elmer Cárdenas Bloc members from Urabá to Cudinamarca, where they massacred civilians together.

392.     In November 1995, the AUC Elmer Cárdenas block traveled from Necoclí in Urabá to La

Mesa, Cundinamarca, on the orders of the Castaño brothers. They were then picked up by a military truck and taken to the Miguel Antonio Caro Army Battalion, commanded by Colonel Alejandro Navas Ramos.

393.    At the military base, the members of the AUC received new uniforms, weapons, and joined several Army commandos.

394.    In the early hours of November 21, 1995 the mixed group went to La Horqueta in the municipality of Tocaima and murdered twelve people, some in their homes and local shops.

### *The Mapiripan Massacre (July 1997) – The Colombian Army transported the AUC from Urabá to Meta, who massacred civilians suspected of being guerilla sympathizers.*

395.    On July 12, 1997, approximately one hundred members of the AUC left Urabá and landed at the San José de Guaviare airport.

396.    The Colombian army assisted in the AUC's air transportation and provided trucks to transport the paramilitaries to Mapiripán, in the Department of Meta.

397.    At dawn on July 15, 1997, the AUC members surrounded the town of Mapiripán, by land and river. The paramilitary forces then took control of the town, the communications, and the public offices, and proceeded to kidnap, kill, and intimidate the inhabitants suspected of being guerilla sympathizers.

398.    The AUC separated out 27 individuals, torturing and dismembering them.

399.    The paramilitaries stayed in Mapiripán from July 15 to 20, 1997, during which time they impeded the free movement of the municipality's inhabitants and continued to torture, dismember, eviscerate, and decapitate individuals, and throw their remains into the Guaviare River.

400.    The State of Colombia has expressly acknowledged that the Mapiripán massacre was carried out with logistical support from and with collaboration by members of the Colombian

Army, and that this included supplying munitions and communications support.

401.    According to U.S. State Department in cables sent 18 months after the massacre occurred, credible sources told the political affairs officer at the U.S. embassy in Colombia that the massacre was "well-coordinated in advance" with the Colombian Army, with at least five different paramilitary fronts participating.

### The Aro Massacre (1997) – Colombian Army assisted AUC massacre.

402.    In October 1997, members of the Army's 4th Brigade established a perimeter around the village of El Aro, in Antioquia.

403.    While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.

404.    Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.

405.    AUC commander Mancuso confessed that information used in the massacre was given to them by General Alfonso Manosalva Flórez and Pedro Juan Moreno Villa, Secretary of Government of the Government of Antioquia for Álvaro Uribe.

### The Gabarra and Tibu Massacres (1999) – Colombian Military put on AUC armbands and directly participated in AUC massacre, and intentionally refused to stop several others.

406.    In May 1999, AUC forces moved into the region in and around the towns of Gabarra and Tibu in order to "cleanse" guerrilla influence in the area.

407.    They killed around 150 people in more than a dozen attacks over a three-month period, including in Gabarra on May 29th and 30th, and in Tibu, on July 17th.

408.    In the midst of these brutal paramilitary massacres, the Colombian vice president's office "privately reported" that Colombian army soldiers "had donned AUC armbands and participated

directly" in one of the massacres.

409.    The Colombian military hardly reacted to the paramilitary incursions. In a State Department cable at the time, the U.S. ambassador wrote: "The string of mass killings since May without security force response is appalling," adding, "How did seven massacres occur without interference under the noses of several hundred [Colombian] security force members?"

410.    Later, Army Col. Victor Hugo Matamoros, with responsibility for the region around La Gabarra, confirmed to U.S. Embassy staff that he did not pursue paramilitaries in his area of operations during the massacres.

### *San Jose de Apartado Masacre (2000) – 17th Brigade directly participated in AUC massacre.*

411.    On February 19, 2000, 20 AUC members wearing military uniforms and carrying AK, Galil and R-15 weapons selectively assassinated five banana workers in the "peace community" of San Jose de Apartadó, in Urabá.

412.    On information and belief, members of the 17th Brigade were direct participants in the attack.

### *The El Salado Massacre (2000) – The Colombian military cleared the way for one of the largest AUC massacres ever to occur in Colombia.*

413.    In February 2000, over the course of five days, 450 paramilitaries, mostly from North Bloc of the AUC, murdered 60 people in the town of Salado and other towns nearby. They also forced thousands from their homes.

414.    On information and belief, Colombian security forces, including those from the Colombian Navy's 1st Marine Infantry Brigade, facilitated the massacre by vacating the town before the carnage began and constructing roadblocks to delay the arrival of humanitarian aid.

### *The Chengue Massacre (2001)*

415.    On January 17, 2001, an estimated fifty paramilitaries pulled dozens of residents from

their homes in the village of Chengue, Sucre. Twenty-six people were killed – many having their heads crushed with a sledgehammer – and fires were set to the village.

416.     The Colombian Military participated this massacre by giving safe passage to paramilitaries, and by sealing off the area so that they could carry out their killings.

417.     Months after the massacre, a Navy soldier was arrested and charged with supplying weapons and helping to coordinate the attack.

***Operation Orion (2002) – Colombian Military and AUC participated in massive joint operation in Medellin to secure territory for the AUC, killing scores of civilians.***

418.     In October 2002, under orders from President Álvaro Uribe, the Army, Police, Air Force, and DAS, among other agencies, violently entered the Community 13 neighborhood of Medellín in order to retake the area from guerrillas.

419.     State forces were joined by paramilitaries from the AUC's Cacique Nutibara Bloc.

420.     Former paramilitary chief Diego Fernando Murillo Bejarano, alias 'Don Berna' testified that "the self-defense groups of the Cacique Nutiabara Bloc went to the area of Community 13 as part of an alliance with the IV Brigade of the Army, including the commander, General Mario Montoya."

421.     It is estimated that close to 1,000 men participated in the operation, entering by land and air. Operation Orion left many civilians dead, injured, and disappeared.

***San Jose de Apartado (February 2005) — Colombian army captain ordered civilians executed during AUC massacre in Urabá.***

422.     On February 21, 2005, in the Mulatos Village of the San José de Apartadó district in the municipality of Apartadó, eight people were murdered by members of the Heroes de Tolová AUC Bloc, among them two children of 5 and 11 years of age.

423.     According to the testimony of demobilized paramilitary member Francisco Javier

Galindo Perez, during the operation "the self-defense groups went ahead and then the army. . . and it was [ ] agreed . . . that [17th Brigade Army] Captain Gordillo would be the commander of the whole operation."

424.    As the demobilized paramilitary recounts, when the Captain arrived with about eight men, he asked the AUC members whether the civilians had spoken and was told they had not.

425.    One of the civilians, Luis Eduardo Guerra Guerra, addressed the captain: "Sir I know that you are good, you are from the Army, don't let them kill us." The captain responded by telling paramilitary members "'212' and 'Cuatro-Cuatro' and others who were there, 'you know, kill those people, because those people know that we are from the army and they are going to say that the army is with the self-defense groups.'"

426.    On February 20, 2010, Captain Gordillo Sánchez, who accepted his responsibility for the crimes of homicide, barbaric acts and criminal conspiracy, was sentenced to 20 years in prison.

427.    Colombian courts have convicted other officers for their roles in the massacre.

        c.      **The AUC's violence was encouraged by the Colombian State's systematic failure to prevent, investigate, and prosecute AUC crimes and military collaboration.**

428.    The AUC's killings were not only encouraged, requested, and enabled through the AUC-State conspiracy and direct and operational support detailed above, but also through broad policies and practices of the Colombian State, which systematically and deliberately shielded the AUC from State accountability and control.

429.    As late as 1999, the Deputy Army Commander disclaimed any role for the military in combatting the AUC. As U.S. Department of State cables reveal, Deputy Commander Ramirez "ASSERTED THAT THE ARMY HAS NO RESPONSIBILITY TO COMBAT OR APPREHEND PARAMILITARIES."

430.     While the Colombian State later may have had an "official military policy" of opposing the paramilitaries, this was a sham. The State of Colombia conspired with the AUC to kill and terrorize civilians seen to support the guerrilla. They also systematically failed to prevent, investigate, and punish AUC crimes, AUC commanders, and members of the Colombian State and Armed Forces who collaborated with them.

431.     This hands-off approach came, not from a lack of resources, but out of a desire to assist the paramilitaries. As a US Defense Intelligence Agency Cable from 1999 reveals, "THE COLOMBIAN ARMED FORCES HAVE NOT ACTIVELY PERSECUTED PARAMILITARY GROUP MEMBERS BECAUSE THEY SEE THEM AS ALLIES IN THE FIGHT AGAINST GUERRILLAS, THEIR COMMON ENEMY."

*     *     *

432.     The support, cooperation and impunity that the Colombian State gifted the AUC directly relates to and is causally connected to the deaths in these cases because, without it the AUC would have been unable to carry out its mass and years-long terror campaign.

433.     The Colombian State's decision and its dereliction of duty was deliberate and part of its war against the guerrillas.

**The Colombian State refused to respond to calls of AUC attacks before they happened.**

434.     As numerous paramilitary commanders have publicly admitted, the AUC let the public authorities know when they were in an area, when they were conducting operations and carrying out killings.

435.     As Mancuso has publicly stated, "We arrived at a town with 50 uniformed men and with their rifles in the air to carry out an operation against some guerrilla helpers. We would pass in front of the Police station and we would even manage to refresh ourselves and drink something

to quench our thirst. **It was impossible to go unnoticed, but nobody said or did anything."**

436.    This was exemplified in the community of San Jose de Apartado in 1997.

437.    Paramilitaries had established a roadblock less than a mile from an army base, at which they were routinely stopping, harassing, murdering, and disappearing residents.

438.    Members of San Jose de Apartado – as well as local human rights groups and international observers – frequently reported these roadblock and abuses to the Colombian authorities, who completely failed to shut them down – indeed they stood for months.

439.    The reason for the army's failed response was obvious, it wanted the AUC to displace the residents. One soldier admitted as much to a humanitarian aid worker, telling them that if the residents did not leave "head cutters will come and eliminate you."

440.    This was true of the 2001 Chengue Massacre as well. Not only did elements of the Colombian military assist the AUC in carrying out the massacre, but others also deliberately ignored timely information about the movements of paramilitaries who committed the massacres.

441.    Colombia's Internal Affairs agency ultimately brought disciplinary charges against Brig. General Rodrigo Quinones and five others for ignoring information and failing to prevent the atrocity.

442.    As an AUC commander from Urabá, El Alemán, explained, "[t]he self-defense groups had the best relations with the police and the authorities, and in the 10 years that I was in the self-defense groups, I do not remember them persecuting us. We were just another soldier and we worked together in several operations."

### *The Colombian State refused to investigate and prosecute AUC killers.*

443.    Far from investigating the AUC's crimes and bringing the criminals to justice, the Colombian State instead encouraged the AUC to hide their slaughter, when the heat got too high.

444.    As Mancuso testified, the AUC was often asked to bury the bodies of their victims to

protect the reputation of the Colombian State, and its officers:

> "Because the rate of death through violence would go up in the area, and that would affect
> their name, that would tarnish their name, both local and international when it was
> happening. Therefore, they would ask that they be buried so that they would be considered
> disappeared and not murdered, whether in combat or outside of combat. There were a lot of
> debates on that in Autodefensas . . .  But what would always prevail was whatever pressure
> the armed forces would give us."

445.    The Colombian police, as State Department cables demonstrate, effectively had a policy

of not acting against the AUC. When asked by State Department officials why the Colombian

police had not arrested Carlos Castaño, the Colombian Police Intelligence Director "sheepishly"

said that "the police 'do not act' in the part of Urabá under Castaño's control."

446.    Indeed, the prosecutor's office and the attorney general's office collaborated with

paramilitaries in Urabá. The regional prosecutor of Apartadó, Darío Eduardo Leal Rivera, whose

office addressed all cases related to paramilitaries in the area, dismissed at least 80% of the

cases.

447.    And, as stated above, on information and belief, police intelligence officials intercepted

communications to tip off paramilitary members of threat of arrest in Urabá, and coordinated to

murder farmers that came to the police to denounce paramilitary actions.

448.    The Colombian State also failed to prosecute those financing the paramilitaries. As

former Judge Iván Velásquez and Prosecutor Gregorio Gregorio Oviedo explained, the justice

system could have acted effectively to address the financing structure of the ACCU, but the

opposite happened: the investigations were watered down, a good part of the evidence found

disappeared, and the Attorney General decided to transfer the case to the Prosecutor General's

Office in Bogotá, where it languished for years while the paramilitaries committed atrocities in

Urabá.

449.    When prosecutors stumbled upon the ACCU's financial center in Medellin in 1998, which exposed lists of members of the paramilitary groups' network of financiers, as the Truth Commission explained, "once again impunity prevailed. None of the third parties that were found registered in the accounts were prosecuted. Once again, the Colombian State did not demonstrate an effective commitment to contain this counterinsurgency project," depriving itself "its constitutional functions of investigating, judging and sanctioning."

### The Colombian State's "efforts" to stop the AUC were a sham.

450.    While there may have been isolated exceptions – and rare individuals within the Colombian State and Armed Forces actually interested in combatting the AUC and preventing its crimes – the examples of the Colombian State targeting the AUC were part of a "public relations campaign" and not actual statement of policy, instead, "on the ground [the Colombian State] continues to strongly support paramilitary groups."

451.    For example, as a 2001 CIA Cable shows, when the Colombian Army did push the AUC out of an area – for public relations reasons, the Army treated them "well," and even "released" captured AUC commanders "along with their weapons."

452.    The AUC also helped with the sham in Urabá. At times, they would murder civilians, put uniforms on them, and then hand them over to the 17th Brigade so that the Army would show results in its supposed fight against the paramilitaries.

453.    On information and belief, Colonel Anatolio Correa Figueroa and Colonel Santiago Parra Rubiano of the Urabá Police colluded with the AUC to block complaints against the AUC or their military collaborators from developing into investigations or prosecution.

### Warrants without arrests; convictions without jail-time; discharged without charges.

454.    While arrests were sometimes issued against AUC members, they were rarely carried out.

Government investigators admitted to N.G.O. Human Rights Watch (HRW) that the reason was the Colombian military: "We cannot execute warrants against paramilitaries because we lack the military weaponry to confront them" and if the military is involved "[t]he information leaks and when we arrive, nobody is there. In many cases, the military knows exactly where the paramilitaries are, but does nothing."

455.    Even when arrests were carried out, AUC commanders had little to fear. As HRW reported, between 1998 and 2001, "at least fifteen alleged paramilitary leaders who have been arrested have later walked past prison guards, soldiers, and police to freedom."

456.    Jailed paramilitaries often were able to continue organizing military actions from their cells.

457.    This impunity was the same for military officers that collaborated with the AUC.

458.    As HRW reported, between 1996 and 2001, at least 44 soldiers were implicated in serious crimes left military installations.

459.    The approach that Colombia took to members of the State forces collaborating with the AUC ultimately strengthened the AUC. As HRW reported, "military officers linked to human rights abuses and support for paramilitary groups" are discharged without full investigation or criminal referral.

460.    This summary discharge policy was the result of a change in the military penal code, which came into practice in 2000.

461.    Many of these discharged officers and soldiers then officially joined the ranks of the AUC, where they continued to collaborate with their former colleagues in the State forces.

462.    Those who were not discharged often faced merely a slap on the wrist for serious crimes. For example, Navy General Rodrigo Quinones – who was tied to at least 57 murders of trade

unionists, human rights workers, and community leaders in 1991 and 1992 – was only "severely reprimanded" for creating a network of assassins to carry out these killings when he was a colonel – which did not seem to impact his promotion to general.

*The Colombian Army's body count policy encouraged the AUC's violence.*

463.     The Colombian State's – and in particular, the Army's – "body count" mentality encouraged its agents and individuals to overlook and permit the AUC's violence against guerrillas and anyone that could be clothed in a guerrilla uniform or viewed as guerrilla collaborator.

464.     As a 1994 State Department Cable reveals, "FIELD COMMANDERS WHO CANNOT SHOW TRACK RECORDS OF AGGRESSIVE ANTI-GUERRILLA ACTIVITY . . . DISADVANTAGE THEMSELVES AT PROMOTION TIME."

465.     This "BODY COUNT SYNDROME" persisted throughout the 1990s and 2000s. And as one Colombian military officer told the U.S. government in 1997, it led "to a cavalier, or at least passive, approach when it comes to allowing the paramilitaries to serve as proxies for the [Colombian Army] in contributing to the guerrilla body count."

466.     In other words, Colombian soldiers who needed to make a "quota" of guerrilla kills to advance, were incentivized to permit AUC violence.

467.     Indeed, it was common among paramilitaries to hand over guerrillas captured or killed in combat, as well as ammunition and rifles, to the members of the Colombian military, so members of the military forces could report achievements to their brigades and commanders.

468.     As a former member of the Élmer Cárdenas Bloc recounts, following a fight with the guerilla around 2001, "we gave it to them... all those guerrillas... three dead guerrillas were taken by the Army. [The Army] took them away. . . the rifles too, of course."

469.    The AUC was paid for this service. As former AUC Banana Bloc members have explained, starting in 1995, they received 15 million pesos from the 17th Brigade's General Rito Alejo del Río if they managed to "hit the guerillas."

470.    But the Army did not just pad its "body count" with guerrillas killed in combat by the AUC. Members of the military also used civilians killed by the AUC, known as "false positives," to obtain economic benefits, promotions, breaks, decorations, and other incentives granted by the National Government.

### *Dozens of elected officials in Urabá have been linked with and supported by the AUC, which shielded and encouraged AUC violence in the region.*

471.    The AUC enjoyed strong support from countless local political leaders in Urabá and members of Congress through the "Urabá Grande" political alliance, which gave the AUC access to public finances in the municipalities under its control, a free hand for their military actions against the civilian population, and ultimately, influence among members of the Colombian congress and senate, who participated in the criminal alliance and validated the existence of the AUC in Urabá.

472.    The AUC political alliance "For a Great, United and Peaceful Urabá" or "Urabá Grande" for short was 70% financed by the Bloque Élmer Cárdenas and 30% by the mayor's offices in Urabá.

473.    Through members of the Urabá Grande political alliance serving in elected public positions throughout Urabá, the AUC was able take advantage of public finances in the municipalities under its control.

474.    As one demobilized combatant stated: "In northern Urabá we had a relationship with all the councilmen of the northern municipalities, with absolutely all of them, they would meet with commander Aleman to manage a project, or to evaluate the management of projects presented to

the Municipal Council."

475.     From 2001 onwards all the city council and mayor elections in Urabá depended on the endorsement and support of Commander El Alemán. In return, the paramilitaries received a free hand for their military actions against the civilian population.

476.     During the post-conflict Justice and Peace proceedings, several accusations were made against politicians in Urabá for receiving electoral, logistical, and financial support for their campaigns from the Élmer Cárdenas Bloc.

477.     As a result of these accusations, prosecutors took action against 25 political leaders in Urabá, including mayors, councilmen, deputies, and former local government officials.

478.     From the criminal investigations that were initiated, political leaders Arnulfo Peñuela Marín and Epitacio Antonio Arboleda Vélez were convicted for their participation in the criminal political alliance.

479.     Congressmen Manuel Darío Ávila Peralta, Jesús Enrique Dubal Durango, Cesar Augusto Andrade Moreno, Antonio Valencia Duque and Rubén Darío Quintero were all convicted for conspiracy to commit a crime by the Supreme Court of Justice based on their participation in Urabá Grande.

480.     As the Justice and Peace Chamber of the Superior Court of Medellin found, there is "no doubt" that the Urabá Grande project ultimately achieved what the Elmer Cárdenas Bloc wanted. The criminal alliance influenced the Congress of the Republic, including representatives and senators, and validated the existence of the paramilitary structure in the region of Urabá.

481.     As the Court found, this support was crucial for the AUC to feel it had the endorsement of the State to commit all kinds of illegal acts against the citizens of Urabá.

482.     The Court continues:

By 2002, all of Urabá Antioquia was dominated by paramilitary groups, the "Elmer Cárdenas" block, under the command of FREDDY RENDON HERRERA (a.k.a. Alemán). The center, the region of Chigorodó, Carepa and Apartadó, was under the power of the "Bananero" bloc, under the command of ÉVER VELOZA (a. H.H.). And the south, on the Belén de Bajirá side, was controlled by the "Arles Hurtado" front of RAÚL EMILIO HASBÚN (a.k.a. Pedro Bonito). Each of the aforementioned gave an account of the area under their "jurisdiction." The three paramilitary commanders of Urabá also agreed that in that region their organization had a decisive influence on the 2002 congressional elections. RENDÓN HERRERA said in multiple ways every time he was questioned that he personally exercised power over the political movement "For a Great, United and Peaceful Urabá", so much so that the "in Peace" in that name was his creation [...] (p. 102).

483.    For his part, AUC commander Mancuso affirmed that 35% of the Congress were "friends" of the AUC.

484.    Political support for the AUC ran so deep that, as Mancuso described, in 1997 he met with former President Uribe and former Vice President Francisco Santos, at Uribe's farm El Ubérrimo, when Uribe was Governor of Antioquia.

485.    The meeting was to explain to the political leaders about the activities of the ACCU and the areas where they were present. In the meeting, the three even discussed the creation of an AUC block in the capital of the country.

**2.      There was direct military involvement in the killings in several cases.**

**JOHN DOE 64**

486.    On the day of his death, members of the military arrived at John Doe 64's home and asked for his identification documents. The military men confiscated his identification and left.

487.    About an hour and a half later, paramilitaries arrived on foot, tied up, and kidnapped John Doe 64; his body was never found.

488.    On information and belief, the paramilitaries who murdered John Doe 64 used information and intelligence shared with them by the Colombian State to kill John Doe 64, and therefore acted under color of law because the Colombian military collaborated and coordinated

with the AUC in his murder.

## JOHN DOE 322

489.    Paramilitaries forcibly removed John Doe 322 from his home while wearing Colombian military uniforms and carrying Colombian military weapons.

490.    The paramilitaries, dressed in military uniforms, took John Doe 322 to the farm where he worked where they murdered him and accused him of being a guerrilla collaborator and of storing weapons in his home.

491.    Paramilitaries killed John Doe 322 under the color of law because the Colombian military collaborated and coordinated with the AUC in his murder and conspired to eliminate suspected guerrilla sympathizers.

492.    On information and belief, the paramilitaries in military uniforms were Colombian military soldiers moonlighting as paramilitaries to carry out the murder of John Doe 322.

## JOHN DOE 104

493.    Paramilitaries killed John Doe 104 under the color of law because the Colombian military collaborated and coordinated with the AUC in his murder.

494.    Men wearing military uniforms kidnapped John Doe 104. His lifeless body was found the next day.

495.    On information and belief, the paramilitaries in military uniforms were Colombian military soldiers moonlighting as paramilitaries to carry out the murder of John Doe 104.

## JOHN DOE 301

496.    Paramilitaries killed John Doe 301 under the color of law because of the collaboration and coordination between the government and the AUC to target and eliminate perceived threats and opposition.

497.    Paramilitaries and the National Army targeted John Doe 301 because his land was located in a strategic transport route.

498.    Days before his death, John Doe 301 received threats from the National Army of Colombia for allegedly serving as an informant for the opposition.

### 3.    All killings in this action were undertaken by the AUC pursuant to the conspiracy to target suspected guerrilla sympathizers and terrorize civilians in Urabá.

499.    As stated above, the AUC and the Colombian State conspired – and acted together according to a common design and objective, with defined roles, and regular cooperation – to murder guerrillas and civilians seen as supporting the guerrillas in Urabá, and to terrorize the civilian population of Urabá, as a tactic in their war against the guerrillas.

500.    All of the murders in this case were undertaken by the AUC pursuant to the conspiracy to target suspected guerrilla sympathizers and terrorize civilians.

501.    Individuals who were murdered pursuant to this conspiracy and policy of terror, include, but are not limited to, the following:

### JOHN DOE 13

502.    Paramilitaries killed John Doe 13 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition and activists.

503.    Paramilitaries targeted John Doe 13 for his membership in la Junta de Accion Comunal del Barrio San Sebastian of Nueva Colonia, a civil society organization for community organizing and known target of the Colombian government.

### JOHN DOE 287

504.    Paramilitaries killed John Doe 287 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

505.    Paramilitaries targeted John Doe 287 for his membership in SINTRAINAGRO, a national union for agricultural workers and known target of the Colombian government.

### JOHN DOE 290

506.    Paramilitaries killed John Doe 290 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists and suspected guerrilla sympathizers.

507.    Paramilitaries targeted John Doe 290 for his membership in SINTRAINAGRO, a national union for agricultural workers and known target of the Colombian government. Paramilitaries had previously accused John Doe 290 of being a guerrilla informant.

### JOHN DOE 303

508.    Paramilitaries killed John Doe 303 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

509.    Paramilitaries targeted John Doe 303 for his membership in SINTRAINAGRO, a national union for agricultural workers and known target of the Colombian government.

### JOHN DOE 61

510.    Paramilitaries killed John Doe 61 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists and suspected guerrilla members.

511.    Paramilitaries targeted John Doe 61 for his membership in SINTRAINAGRO, a national union for agricultural workers and known target of the Colombian government.

512.    Days before paramilitaries murdered John Doe 61, they asked him which guerrilla he belonged to, to which he responded none and that he was just a civilian.

### JOHN DOE 109

513.     Paramilitaries killed John Doe 109 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

514.     Paramilitaries targeted John Doe 109 for his membership and leadership role in SINTRAINAGRO, a national union for agricultural workers and known target of the Colombian government.

515.     Raul Hasbún, a paramilitary leader, confessed to this murder in 2018.

**JOHN DOE 324**

516.     Paramilitaries killed John Doe 324 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition and community leaders.

517.     Paramilitaries targeted John Doe 324 for his role as counselor for the liberal party and counselor for the municipality of Carepa.

518.     An official of the mayor's treasury of the town of Carepa warned John Doe 324 before his death that he should remain silent.

**JOHN DOE 131**

519.     Paramilitaries killed John Doe 131 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

520.     Paramilitaries targeted John Doe 131 for his membership in SINTRAINAGRO, a national union for agricultural workers and known target of the Colombian government.

**JOHN DOE 83**

521.     Paramilitaries killed John Doe 83 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition and activists.

522.     Paramilitaries targeted John Doe 83 for his social activism in his community as the

president of the Junta de Accion Comunal de la Vereda Agua Dulce del Corregimiento Currulao of the municipality of Turbo, a civil society organization for community organizing and known target of the Colombian government.

### JOHN DOE 346

523.    Paramilitaries killed John Doe 346 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

524.    Paramilitaries targeted John Doe 346 for his membership in SINTRAOFAN, the union for public workers in Antioquia and known target of the Colombian government.

### JOHN DOE 349

525.    Paramilitaries killed John Doe 349 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

526.    Paramilitaries targeted John Doe 349 for his membership and leadership role of section President in SINTRAOFAN, the union for public workers in Antioquia and known target of the Colombian government.

527.    John Doe 349 was in transit to Medellin where he would testify against the mayor of Medellin and negotiate the terms his union presented to the municipality of Chigorodo when paramilitaries intercepted him and shot him to death.

### JOHN DOE 352

528.    Paramilitaries killed John Doe 352 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists and political activists.

529.    Paramilitaries targeted John Doe 352 for his membership in SINTRAOFAN, the union for public workers in Antioquia and known target of the Colombian government, and his roles as press chief of Union Patriótica, a principal political threat to the Colombian government, and as a

previous counselor for the municipality of Chigorodo.

## JOHN DOE 38

530.    Paramilitaries killed John Doe 38 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

531.    Paramilitaries targeted John Doe 38 for his membership in SINTRAOFAN, the union for public workers in Antioquia and known target of the Colombian government.

## JOHN DOE 87

532.    Paramilitaries killed John Doe 87 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

533.    Paramilitaries targeted John Doe 87 for his membership in SINTRAOFAN, the union for public workers in Antioquia and known target of the Colombian government.

## JANE DOE 70

534.    Paramilitaries killed Jane Doe 70 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition and unionists.

535.    Paramilitaries targeted Jane Doe 70 for her membership in SINTRAINAGRO and Union Patriótica, both known targets of the Colombian government.

536.    The 2020 sentence of Jaime Alonso Carvajal Taborda, a paramilitary leader, attributes Jane Doe 70's targeting to her affiliations to SINTRAINGRO and Union Patriótica.

## JOHN DOE 333

537.    Paramilitaries killed John Doe 333 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members and supporters of the political opposition.

538.    Paramilitaries targeted John Doe 333 because his spouse was a member of Union Patriótica. John Doe 333's spouse was a social leader in Union Patriótica and a manager of the BALSAMAR cooperative, both known targets of the Colombian government's war effort.

539.    Raul Hasbun, a paramilitary leader, confessed to this murder in 2016.

**JOHN DOE 95**

540.    Paramilitaries killed John Doe 95 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition.

541.    Paramilitaries targeted John Doe 95 for his membership and role as counselor in Union Patriótica, a principal political opponent of the Colombian government.

542.    John Doe 95 was also a social leader in his community.

543.    AUC Commander, Herberto Veloza, confessed that he ordered the murder of John Doe 95 for his participation in Union Patriótica and has been sentenced for the murder.

**JOHN DOE 331**

544.    Paramilitaries killed John Doe 331 under the color of law pursuant to the collaboration and coordination between the government and the AUC to target and eliminate perceived political threats and leftists.

545.    Paramilitaries targeted John Doe 331 because they perceived him as a revolutionary.

546.    Jose Isaac Quinto Mejia, a paramilitary member of the Banana Bloque, confessed to John Doe 331's murder and admitted that John Doe 331 was murdered for being a revolutionary.

**JOHN DOE 371**

547.    Paramilitaries killed John Doe 371 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

548.    Paramilitaries targeted John Doe 371 for his affiliation with SINTRAINAGRO, a national union for agricultural workers and known target of the Colombian government.

**JOHN DOE 335**

549.    Paramilitaries killed John Doe 335 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers.

550.    Paramilitaries targeted and murdered John Doe 335 because they suspected he was a guerrilla sympathizer.

551.    John Doe 335 was traveling of Mutata when the paramilitaries killed him.

552.    Mutata was a town where paramilitaries believed there was a group of guerrilla sympathizers, and paramilitaries believed this was the reason for John Doe 335's trip to Mutata.

**JOHN DOE 152**

553.    Paramilitaries killed John Doe 152 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers and political opposition.

554.    Paramilitaries targeted and murdered John Doe 152 because they suspected he was a guerrilla sympathizer because he worked as driver who transported members of armed groups aboard his vehicle on some occasions.

555.    John Doe 152 was also targeted for his political ideology.

**JOHN DOE 232**

556.    Paramilitaries killed John Doe 232 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition.

557.    Paramilitaries targeted John Doe 232 for his political ideology.

**JOHN DOE 168**

558.    Paramilitaries killed John Doe 168 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers.

559.    Paramilitaries targeted and murdered John Doe 168 after he was accused of collaborating with guerrillas.

## JOHN DOE 172

560.    Paramilitaries killed John Doe 172 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

561.    Paramilitaries targeted John Doe 172 because they believed he was a member of the Currulao banana workers union. Union members were a known target of the Colombian government.

562.    On information and belief, paramilitaries entered John Doe 172's home in search of papers showing his membership to the union.

## JOHN DOE 174

563.    Paramilitaries killed John Doe 174 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition and activists.

564.    Paramilitaries targeted John Doe 174 for his membership and leadership role in la Junta de Accion Comunal del Barrio Primera de Mayo de Apartado, a civil society organization for community organizing and known target of the Colombian government.

## JOHN DOE 17

565.    Paramilitaries killed John Doe 17 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition and activists.

566.    Paramilitaries targeted John Doe 17 for his role as a community leader and councilman who spoke out against paramilitaries and their actions in community meetings.

567.    About one month after a meeting with community members and the military, armed men ambushed and killed John Doe 17.

## JOHN DOE 185

568.    Paramilitaries killed John Doe 185 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists and suspected guerrilla members.

569.    Paramilitaries targeted John Doe 185 because he was a member of the banana workers union. Union members were a known target of the Colombian government.

570.    Paramilitaries also accused John Doe 185 of being a guerrilla member while they attacked him.

## JOHN DOE 192

571.    Paramilitaries killed John Doe 192 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla members.

572.    Paramilitaries targeted John Doe 192 and accused him of being in a guerrilla.

## JANE DOE 208

573.    Paramilitaries killed Jane Doe 208 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers.

574.    Paramilitaries targeted Jane Doe 208 because her husband, John Doe 192, was accused of being a guerrilla.

## JOHN DOE 257

575.    Paramilitaries killed John Doe 257 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla members.

576.    Paramilitaries targeted John Doe 257 because they suspected he was a guerrilla member.

**JOHN DOE 263**

577.    Paramilitaries killed John Doe 263 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers.

578.    Paramilitaries targeted John Doe 267 because they suspected he was a guerrilla collaborator.

**JOHN DOE 282**

579.    Paramilitaries disappeared John Doe 282 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition.

580.    Paramilitaries targeted John Doe 282 because he was a member of a leftist political party.

**JOHN DOE 30**

581.    Paramilitaries killed John Doe 30 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition and activists.

582.    Paramilitaries targeted John Doe 30 for his membership in la Junta de Accion Comunal del Corregimiento de Lomas Aisladas, a civil society organization for community organizing and known target of the Colombian government.

583.    Paramilitaries murdered John Doe 30 during a community action meeting while the AUC took over the village, and tortured and raped villagers.

584.    John Doe 29 was killed at the same meeting.

**JOHN DOE 29**

585.    Paramilitaries killed John Doe 29 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate political opposition and activists.

586.    Paramilitaries targeted John Doe 29 for his membership and leadership role in la Junta de Accion Comunal del Corregimiento de Lomas Aisladas, a civil society organization for

community organizing and known target of the Colombian government.

587.    Paramilitaries murdered John Doe 29 during a community action meeting while the AUC took over the village, and tortured and raped villagers.

588.    John Doe 29 served as president of the group. John Doe 30 was killed at the same meeting.

### JOHN DOE 194

589.    Paramilitaries killed John Doe 194 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition.

590.    Paramilitaries targeted John Doe 194 for his membership and activism in Union Patriótica, a principal political opponent and known target of the Colombian government.

### JOHN DOE 32

591.    Paramilitaries attacked and threatened John Doe 32 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

592.    The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target members of the political opposition.

593.    Paramilitaries targeted John Doe 32 for his membership in Union Patriótica, a principal political opponent and known target of the Colombian government.

594.    Paramilitaries attacked John Doe 32 and other members of the Union Patriótica at a billiards hall. Ten members of the Union Patriótica were murdered. John Doe 32 heard his colleagues being killed.

595.    John Doe 32 hid from the attackers and escaped, but was threatened the next day, and left Urabá out of extreme fear for his life and emotional distress.

## JOHN DOE 37

596.     Paramilitaries assaulted and threatened John Doe 37 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

597.     The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers.

598.     Paramilitaries targeted John Doe 37 because his father was accused of being a guerrilla.

599.     Paramilitaries removed John Doe 37 when he was traveling by bus and threatened to kill him. John Doe 37 then fled the area.

## JOHN DOE 23

600.     Paramilitaries assaulted and threatened John Doe 23 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

601.     The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition.

602.     Paramilitaries targeted John Doe 23 as a Union Patriótica sympathizer, a known target of the Colombian government.

603.     Paramilitaries threatened to kill John Doe 23 and his family, forcing them to flee the area. John Doe 23's sons had previously been kidnapped. John Doe 23 received additional death threats after he was displaced, forcing him to flee a second time to a different region.

## JOHN DOE 39

604.     Paramilitaries assaulted and threatened John Doe 39 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

605.     The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition and

unionists.

606.    Paramilitaries targeted John Doe 39 for his membership in a banana workers union, Union Patriótica and the communist party, all known targets of the Colombian government.

607.    In June 1997, several banana workers and others were rounded up by the AUC and taken to a nearby school where paramilitaries threatened to kill them.

608.    John Doe 39 was a victim of this incident who survived and fled the area.

**JOHN DOE 40**

609.    Paramilitaries assaulted and threatened John Doe 40 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

610.    The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition.

611.    Paramilitaries targeted John Doe 40 for his membership in Union Patriótica and the communist party, known targets of the Colombian government.

612.    The AUC threatened to kill John Doe 40, forcing him to leave Urabá.

**JOHN DOE 41**

613.    Paramilitaries attacked and threatened John Doe 41 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

614.    The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate unionists.

615.    Paramilitaries targeted John Doe 41 because he was a union leader. Union leaders were a known target of the Colombian government.

616.    Paramilitaries beat and shot John Doe 41, leaving him disabled and forcing him to flee Urabá.

**JOHN DOE 42**

617.     Paramilitaries attacked and threatened John Doe 42 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

618.     The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers.

619.     Paramilitaries targeted John Doe 42 because they confused him for a guerrilla member. Paramilitaries kidnapped, battered, tortured, and stabbed John Doe 42 with a knife multiple times over the course of four days until he agreed to leave Urabá.

**JOHN DOE 45**

620.     Paramilitaries attacked and threatened John Doe 45 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

621.     The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate suspected guerrilla sympathizers.

622.     Paramilitaries targeted and shot John Doe 45 because they suspected he was a guerrilla sympathizer because he was the dentist for guerrilla members – John Doe 45 treated everyone.

**JOHN DOE 36**

623.     Paramilitaries assaulted and threatened John Doe 36 with extreme bodily injury and/or death causing him to leave Urabá for fear of losing his life and extreme emotional distress.

624.     The paramilitaries acted under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition and unionists.

625.     Paramilitaries targeted John Doe 36 for his role as an advisor to a union, and membership in the communist party, both known targets of the Colombian government.

626.    Paramilitaries threatened to kill John Doe 36. The AUC also invaded his farm, destroyed his crops, and had previously killed some of John Doe 36's family members, forcing him to flee the area after he was threatened.

## JOHN DOE 189

627.    Paramilitaries killed John Doe 189 under the color of law pursuant to the conspiracy between the government and the AUC to target and eliminate members of the political opposition.

628.    Paramilitaries targeted John Doe 189 for his membership in Union Patriótica, a principal political opponent and known target of the Colombian government.

**4.      Many killings were undertaken by the AUC pursuant to the conspiracy to target suspected guerrilla sympathizers and terrorize civilians in Urabá, and as a result of the AUC's exercise of an exclusive state function—fighting crime.**

629.    As stated above, the AUC and the Colombian State conspired – and acted together according to a common design and objective, with defined roles, and regular cooperation – to terrorize the civilian population of Urabá, as a tactic in their war against the guerrillas.

630.    In furtherance of this terrorism, the AUC acted as a brutal law enforcer, and did so with disproportionate violence directed at petty crime.

631.    Pursuant to this policy of terror, and in order to consolidate absolute social control in their fight against the guerillas, the AUC developed strategies of "social cleansing." They acted as judge, jury, and executioner, murdering sex workers, drug dealers, criminals, and participants in private disputes, sometimes at the request of the Colombian military.

632.    As the Justice and Peace courts explained, "The authorities gave [the AUC] lists of repeat offenders or people identified as thieves, drug addicts or drug dealers, whom they executed because they violated the new social order."

633.    And, with respect to the AUC Elmer Cárdenas Bloc in Urabá, "[t]here were indeterminate opportunities in which the Self-Defense groups proclaimed themselves 'judges' of those persons who transgressed the criminal order, by committing theft and extortion, among other crimes, who did not get to be subject to criminal action by the State, but rather, in a de facto trial, the members of the Paramilitary Bloc themselves decided their fate and sentenced them to capital punishment."

634.    The following individuals were murdered by the AUC pursuant to this conspiracy and policy of terror, and as result of the AUC's exercise of an exclusive state function—fighting crime.

### JOHN DOE 115

635.    Paramilitaries killed John Doe 115 under the color of law because he was killed by the AUC pursuant to the conspiracy between the Colombian government and the AUC to terrorize the civilian population of Urabá as a tactic in its war against the guerrillas, and in the exercise of a traditional state function: law enforcement, maintaining order and the administration of justice.

636.    Paramilitaries targeted and murdered John Doe 115 as punishment for alleged abuse of a girl.

### JOHN DOE 47

637.    Paramilitaries killed John Doe 47 under the color of law because he was killed by the AUC pursuant to the conspiracy between the Colombian government and the AUC to terrorize the civilian population of Urabá as a tactic in its war against the guerrillas, and in the exercise of a traditional state function: law enforcement, maintaining order and the administration of justice.

638.    Paramilitaries tortured, burned, and shot John Doe 47 because of an interpersonal conflict with a professor over some damages to a vehicle that John Doe 47 had already paid for.

639.    One of the perpetrators of the murder stated that it did not matter that the damages were already paid for.

## JOHN DOE 67

640.    Paramilitaries killed John Doe 67 under the color of law because he was killed by the AUC pursuant to the conspiracy between the Colombian government and the AUC to terrorize the civilian population of Urabá as a tactic in its war against the guerrillas, and in the exercise of a traditional state function: law enforcement, maintaining order and the administration of justice.

641.    Paramilitaries targeted and murdered John Doe 67 after he received threats from paramilitaries warning they would carry out a social cleansing of individuals considered criminals or degenerates.

## JOHN DOE 12

642.    Paramilitaries killed John Doe 12 under the color of law because he was killed by the AUC pursuant to the conspiracy between the Colombian government and the AUC to terrorize the civilian population of Urabá as a tactic in its war against the guerrillas, and in the exercise of a traditional state function: law enforcement, maintaining order and the administration of justice.

643.    Paramilitaries targeted and murdered John Doe 12 because of a land dispute John Doe 12 had with another person in the same village.

## JOHN DOE 125

644.    Paramilitaries killed John Doe 125 under the color of law because he was killed by the AUC pursuant to the conspiracy between the Colombian government and the AUC to terrorize the civilian population of Urabá as a tactic in its war against the guerrillas, and in the exercise of a traditional state function: law enforcement, maintaining order and the administration of justice.

645.    Paramilitaries targeted and murdered John Doe 125 for a fight he was involved in the

days before his murder.

## JOHN DOE 14

646.    Paramilitaries killed John Doe 14 under the color of law because he was killed by the AUC pursuant to the conspiracy between the Colombian government and the AUC to terrorize the civilian population of Urabá as a tactic in its war against the guerrillas, and in the exercise of a traditional state function: law enforcement, maintaining order and the administration of justice.

647.    Paramilitaries targeted and murdered John Doe 14 under threat because paramilitaries were carrying out a social cleansing of individuals considered criminals or degenerates.

5.    **The AUC also acted under color of state law because it exercised broad state functions and was the "de facto" state in Urabá.**

648.    For the purposes of this complaint, all plaintiffs who were murdered or attacked by the AUC in Urabá between 1996 and 2004 were murdered or attacked at a time when the AUC had complete control over the region and were killed pursuant to the exercise of that control.

649.    The AUC, as several paramilitary commanders testified, filled a security vacuum left by the State in Urabá and operated as a "de facto" state in the area by carrying out many exclusive state functions, including doling out their own form of brutal justice and law enforcement to common criminals.

650.    As Mancuso testified, the AUC was a "de facto state" where it operated. "The Colombian coast" was "practically not under control at all, when you're talking about the Colombian government. And if you have the control of the area -- and if you have control of the area, in other words, if the government or the state does not have control of the area, therefore, you are acting as a de facto state in that area. And you're the one that decides who goes out and who comes in."

651.    The AUC (and its convivirs) therefore stepped in to fill this vacuum (at the behest and

with the cooperation of the Colombian State, *supra.*), and to provide security and administer (its brutal form of) justice. As AUC Commander Hasbún testified, the AUC and the convivir was the solution of "all of the guilds in Urabá to [ ] the problem when it came to the absence of the state or the non-operation of the state in matters of public order."

652.    And through the AUC (and its convivirs), a number of state functions were carried out in Urabá. As Hasbun and Mancuso testified, the AUC (and its convivirs) distributed some of the funds they collected from the businesses that supported them in Urabá to the military to pay for radios, intelligence gathering, and other types of support (like fuel, etc.).

653.    Indeed, the paramilitaries took on so many governmental functions in Urabá that it became a common saying in the area that "Here, paramilitaries and the State are the same thing." The AUC was even able to control the roads; on information and belief, they were able to shut down stretches of the Pan-American Highway on some occasions in order to use it as a runway for planes arriving with weapons and ammunition and exporting drugs.

654.    The AUC (and the Convivir) also used their resources for other infrastructure projects in the area. As Mancuso testified "we decided not only would be provide security for the people, which is the basic well-being for the people, but rather, also the needs that the communities had in that area. And after security, one of the first orders, one of the first requests they asked us for, was for us to help them construct or improve their roadways." Without these improvements, commerce would not have flowed in the region, thus, the AUC was "not only tied to security issues, but rather we had to get involved with political issues for the government with governing. We had to contact, for example, the town hall, the mayor."

655.    As Colombia's Truth Commission has explained, after the AUC seized territory, they would impose a series of rules of conduct (explicit or implicit). Paramilitaries would then co-opt

and shape public institutions, local government, economic sectors, companies, and local powers. The paramilitary strategy was to "embed itself in the institutions of the State."

656.    Filling the State's vacuum was part of the explicit policy of the AUC to "defend national rights and interests neglected by the state." This work even extended to solving boundary problems between neighbors, divorce problems, truancy from school, restitution of leased property, and collection of civil debts, effectively replacing an inoperative judicial system.

**C.  Chiquita Supported the Paramilitaries in Urabá.**

657.    Chiquita, as the successor to the United Fruit Company and the United Brands Company, has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century. At all relevant times, Chiquita produced bananas in the Urabá and Santa Marta regions of Colombia.

658.    Starting in the late 1980s, Chiquita changed its approach to growing bananas in Colombia, purchasing its own farms despite the risk that this would increase its vulnerability to armed groups. Indeed, Chiquita received – and started paying – extortion demands from guerrilla groups almost immediately after it started purchasing land.

659.    In response, Chiquita supported the growth of right-wing, anti-guerrilla paramilitary terrorist groups, while at the same time still purchasing more farms in Colombia.

660.    On information and belief, from no later than 1992 until at least 2004, Chiquita provided material support, including money and services, to the AUC and its predecessors.

661.    Chiquita's assistance helped the paramilitaries to consolidate as a decisive actor in the political, military, and social terrain of the banana region. In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition to their operations and policies was suppressed.

i)     *Chiquita's decision to adopt an "owned-fruit" strategy exposed it to guerrilla threats.*

662.     Although Chiquita has operated in Colombia for many years, it typically purchased bananas from private farms.

663.     In 1987 or 1988, Chiquita concluded that it would be more profitable to directly own banana farms. It made a business decision to purchase farms in Colombia and began to aggressively acquire farms in Colombia's banana zones: Urabá (centered on Turbó) and Magdalena (centered on Santa Marta). Chiquita's top management made the decision to purchase farms in Colombia. This was referred to as switching from a "purchased-fruit" to an "owned-fruit" strategy. Defendant Keiser carried this strategy forward after he became General Manager in Colombia in 1989.

664.     Chiquita was able to benefit from the political instability in the region, including guerrilla violence, to buy bankrupt and financially distressed farms. For example, Chiquita purchased a farm known as 'La Negra' merely months after a well-known and well-publicized massacre of workers on that farm, which was reported on in all major Colombian news outlets in Colombia.

665.     Chiquita was aware that guerrillas attacked farm managers and made extortion demands before and during the period that it decided to purchase farms in Colombia. One internal memo stated: "There was general discussion of the social, political, and guerilla situation in the Urabá zone," where Chiquita was planning to purchase farms.

666.     Defendant Keiser had deep knowledge of the dynamics of the political instability of the region, was aware of the risks that expanding farm ownership in such a context entailed, and was personally involved in making the decision to expand farm ownership in the Urabá region. Keiser provided other decision-makers at Chiquita with "an overview of the activity in the zone. . . . all owners and employees are perpetually at risk of murder, violence and extortion by the

98

guerrillas . . . . All of the marketing associations have had [ ] bombed or vandalized."

667.     Chiquita knew that it would become a target of guerrilla groups if knowledge of its ownership of farms became widespread. Thus, cognizant of the guerrilla threat, Chiquita tried to hide its ownership of the farms, through third parties.

668.     Nonetheless, shortly after beginning to acquire farms, around 1988 or 1989, Chiquita did receive an extortion demand from the FARC; the threat was communicated by Ordman and Defendant Keiser to Chiquita personnel in Cincinnati, and there was a "corporate policy decision" made by top management in Cincinnati to make the payment.

669.     This "corporate policy decision" laid the foundation for all of the payments to armed groups that were to come, including the companies' payments to the AUC.

670.     The payments to the guerrillas were considered the cost of doing business in Colombia. For the next several years – pursuant to direction from the US – Chiquita formalized a system for paying guerrilla groups, ultimately paying the FARC, the ELN, and the EPL.

671.     The guerrillas' extortion threats were not idle. On several occasions, containers were intercepted and burned by guerrillas. Chiquita packing stations were attacked and burned. In the early 1990s, Chiquita facilities in Turbo were attacked and blown up by guerrillas.

672.     Guerrilla activity generally disrupted banana operations for Chiquita, affecting productivity and profitability. Chiquita was concerned that the guerrillas held influence with workers and unions on their farms and that the guerrillas were behind strike activity; union activity was tracked, at times, by Chiquita's security office.

673.     Despite the extortion, Chiquita and Defendant Keiser did not consider changing their "owned-fruit" strategy. To the contrary, it continued to aggressively acquire farms, while paying and negotiating with the guerrillas. As Ordman put it, Chiquita negotiated and tried not to pay a

"filthy fortune."

674.     This strategy was extremely profitable for Chiquita. By the late 1990s Chiquita owned about 35 farms across Urabá and Magdalena and employed around 4,000 employees, and continued to acquire farms until at least 2002. Between September 2001 and January 2004, the Colombian operations generated around $50 million in profits; by 2003, Banadex was Chiquita's most profitable banana producing operation.

*ii)*     *Chiquita supported the AUC's predecessors.*

675.     Though Chiquita also made payments to the Colombian military and supported their antiguerrilla efforts, the company was concerned that the military's combat capacity was weak, and that they were unable to drive out the guerrillas.

676.     No later than 1992, Chiquita began supporting anti-guerrilla paramilitary forces, both directly and through banana industry associations.

677.     Chiquita paid former EPL fighters, including CP/Esperanza, for security on their farms. CP was armed with the assistance of both the army and the banana industry, and former EPL fighters were posted directly on banana farms – including Chiquita's.

678.     In 1993, Chiquita secured an agreement with Esperanza in which Chiquita withdrew its own security guards from farms, to be replaced by former EPL fighters. Internal documents noted that the former guerrillas were "willing to insure peace in the farms in which they have most influence," specifically, Chiquita paid the group so that "people do not steal from us or damage the farms and so that there is a peaceful relationship with the workers."

679.     Unlike the payments to guerrillas, payments to former EPL fighters/CP/Esperanza were not made to mitigate the risk of violent action against the company, but rather were made to purchase security services. Defendant Keiser had direct knowledge of payments to

Esperanza/CP, but did not consider these payments to be the result of extortion or threats; rather, he considered these payments to be payments for security services.

680.     Chiquita and Defendant Keiser knew that the former EPL fighters targeted workers and unionists suspected of having leftist or FARC sympathies.

681.     Chiquita's reliance on EPL for security also put its own workers at risk of retaliation. In 1995, FARC retaliated against Chiquita farm workers suspected of having ties to EPL by massacring approximately 25 workers taken from a bus. Defendant Keiser and other Banadex and Chiquita employees had knowledge of this incident.

682.     Chiquita also supported the CP through AUGURA, the main banana industry association. Chiquita was a member of AUGURA, and its Colombian counsel Reinaldo Escobar sat on AUGURA's board. Chiquita made contributions to AUGURA, which in turn supported the CP, with Chiquita's knowledge. Escobar reported to Defendant Keiser and, on information and belief, acted with his knowledge and consent.

683.     On information and belief, no later than 1995, Chiquita also began making payments to the ACCU's Banana Bloc, directly and/or through AUGURA.

684.     On information and belief, these payments were authorized by Defendant Keiser.

685.     Much of Chiquita's support was routed through *convivirs*. By 1996, Chiquita was paying the ACCU through the *convivirs*.

686.     By 1997, the AUC – primarily through the ACCU – effectively controlled large swathes of territory – particularly in the towns and urban areas – as well as exerting influence in institutions such as labor organizations and local governments in these regions.

    *iii)*    *Chiquita regularly made payments to the AUC.*

687.     Chiquita paid the AUC nearly every month during the period 1997–2004, making over

one hundred payments to the AUC totaling over $1.7 million. During those years, the AUC killed approximately 3,778 people and displaced approximately 60,000 in the Urabá region. And, according to data from the Colombian Center for Historical Memory, from 1995-2006, the paramilitaries were responsible for killing, massacring, or disappearing a minimum of approximately 101,156 Colombian civilians and committing approximately 10,506 acts of torture around the country.

688.    Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including Defendants Freidheim and Keiser. Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.

689.    Some of Chiquita's payments were made directly to the AUC or to front organizations like the *Convivir* Papagayo. The majority of direct payments were made in the form of checks written to the *convivir*, drawn on Banadex's Colombian bank account. Chiquita concealed the nature of these payments by recording them in corporate books and records as "security payments" or payments for "security" or "security services."

690.    In September 2000, Olson was informed of the results of an investigation into Chiquita's payments to the AUC, which had been carried out by in-house Chiquita attorneys. That investigation confirmed that Chiquita's payments to the *convivir* were in fact supporting violent paramilitary terrorists; on information and belief, Defendants already knew this. Defendants Freidheim and Keiser were presented with the report, and Olson also reported the results to the company's Audit Committee. Defendant Friedheim was present at this meeting.

691.    By May 2002, Chiquita had created new procedures to disguise direct payments to the AUC. Under the new procedures, Banadex executives Álvaro Acevedo and Víctor Buitrago

received checks with the intent that they would be withdrawn as cash and handed directly to the AUC. Acevedo received a check made to him personally and drawn on the Colombian bank accounts of Chiquita's subsidiary. Acevedo then endorsed the check and Acevedo or Buitrago cashed it. Buitrago hand delivered the cash to AUC personnel in Santa Marta. Corresponding tax liability was withheld and Acevedo and Buitrago reported and paid income tax as if the payments were actually being made to them instead of the AUC. Chiquita made payments in this way in order to conceal the fact that they were actually paying the AUC; it recorded these payments simply as income contributions.

692.    Chiquita formed an agreement with the AUC, paying them in exchange for their services in pacifying the banana-growing region and suppressing union activity. This agreement specified that Chiquita would pay the paramilitaries a fixed amount for each box of bananas exported. Chiquita did not report this agreement or these payments to the Colombian authorities at the time.

693.    At all relevant times of their respective involvement in facilitating payments to the AUC, Defendants Keiser and Freidheim knew that the AUC was a violent, terrorist paramilitary organization, whose brutal aims and tactics were well-known in Colombia and internationally.

694.    On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO"). That designation was well-publicized in the American public media, including in the *Cincinnati Post* on October 6, 2001, and in the *Cincinnati Enquirer* on October 17, 2001, as well as in the Colombian media. Following the designation, from on or about September 10, 2001, through on or about February 4, 2004, Chiquita made at least fifty payments to the AUC totaling over $825,000.

695.    According to paramilitary commander Raúl Emilio Hasbún, agents working on behalf of

Chiquita and its Colombian subsidiary Banadex told him that they would need to change their payment system because of changes in the laws of the United States.

696.    From about September 12, 2001, through about May 31, 2002, Acevedo and Buitrago made at least 11 direct payments to the AUC in Santa Marta and Urabá totaling at least $231,970.

697.    Two of these payments were made on or about March 31, 2002, in the amount of approximately $3,689 each. Defendant Keiser was involved in these payments, according to Chiquita's internal documents. The same documents show that Keiser was involved in nearly every documented payment to the AUC from 1997 through May 2000.

698.    In or about June 2002, Acevedo and Buitrago began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced above.

699.    From about June 11, 2002, though about February 11, 2003, Acevedo and Buitrago made at least 17 direct cash payments to the AUC in Santa Marta and Urabá totaling at least $248,746.

700.    In 2003, Chiquita consulted with attorneys from the District of Columbia office of Kirkland & Ellis, a national law firm, about Chiquita's ongoing payments to the AUC. Kirkland & Ellis advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Among other things, Kirkland & Ellis attorneys advised Chiquita:

> "Must stop payments."
> (notes, dated February 21, 2003)
>
> "Bottom Line: CANNOT MAKE THE PAYMENT"
> "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
> "General Rule: Cannot do indirectly what you cannot do directly"
> "Concluded with: CANNOT MAKE THE PAYMENT"
> (memo, dated February 26, 2003)
>
> "You voluntarily put yourself in this position. Duress defense can wear out through

repetition. Buz [business] decision to stay in harm's way. CHIQUITA should leave Colombia."
(notes, dated March 10, 2003)

"[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
(memo, dated March 11, 2003)

[T]he company should not make the payment."
(memo, dated March 27, 2003)

701.    On or about February 27 and March 27,2003, Acevedo and Buitrago made at least two direct payments to the AUC in Urabá totaling at least $36,871.

702.    Although CBI's Board of Directors agreed to disclose its payments to the AUC to the U.S. Department of Justice on or about April 3, 2003, on or about April 4, 2003, according to a Kirkland & Ellis attorney's notes concerning a conversation about Chiquita's payments to the AUC, Olson said, "His and Hills' opinion is just let them sue us, come after us. This is also Freidheim's opinion." On information and belief, Defendant Freidheim participated in the decision to continue making payment to the AUC, which was communicated to Banadex employees and Acevedo and Buitrago.

703.    On April 24, 2003, Chiquita executives, along with Kirkland & Ellis attorneys, met with Justice Department officials, who told CBI the payments were illegal. Nonetheless, Chiquita continued to make the payments through Acevedo and Buitrago until at least February 2004.

704.    After a brief pause, Chiquita resumed making payments to the AUC in May 2003. On information and belief, this resumption was authorized by Defendant Freidheim.

705.    From about May 12, 2003, to February 4, 2004, Acevedo and Buitrago made at least 19 direct payments to the AUC in Santa Marta and Urabá totaling at least $285,915.

706.    On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of Columbia to one count of engaging in transactions with a specially designated global terrorist.

The company's sentence included a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

    *iv)*    *Chiquita's funding was material to paramilitary operations in the Urabá region.*

707.    Chiquita's support was important early funding for paramilitary groups in the banana region of Urabá beginning in the early 1990s. On information and belief, Chiquita, along with other business interests including banana growers and ranchers, funded pre-AUC paramilitary groups, such as the CP and the ACCU, in the early and mid-1990s. Chiquita's funding of these groups was substantial and included funding for guards on Chiquita farms.

708.    Banana industry financing allowed paramilitary groups to enter the Urabá region, and later, the Santa Marta region. When paramilitaries first entered Urabá, they were provided safe haven and allowed to stay on and even live on some banana farms, including Banadex farms.

709.    Since Chiquita's payments to the AUC were negotiated early on and centrally, the funds served as a key initial injection of resources for the AUC. This seed funding enabled them to raise the necessary manpower to engage in other war-making and fundraising activities on the ground.

710.    Banana companies were determinative for starting and prolonging the armed conflict in the Urabá region, providing a permanent source of logistical and financial support that allowed the AUC to expand territorially while ensuring that the production and exportation of bananas would not be paralyzed by strikes promoted by the insurgency.

711.    The paramilitaries that used Chiquita's money, such as H.H. and Hasbún, recognized that the payments were the motor to sustain and grow the self-defense groups. The money Chiquita paid to the AUC helped to fund a headquarters, buy vehicles, equipment, and weapons and ammunition.

712.    Mancuso estimated that it cost $250-300 per month to keep a soldier in the field. The $1.7 million Chiquita paid the AUC would have supported 536 foot soldiers for an entire year, or 76 foot soldiers for the 1997-2004 time period. Payments from Chiquita would have also accounted for a substantial proportion of the arsenals of the AUC blocs operating in the banana regions.

   *v)*    *Chiquita facilitated the AUC's arms shipments.*

713.    In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC. On information and belief, the systems and relationships created by Defendant Keiser during his time in Colombia contributed materially to this facilitation.

714.    The Nicaraguan National Police and Army were involved in a deal that provided 3,000 AK-47 assault rifles and 5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work. GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama. In November 2001, Yelinek loaded the arms onto the *Otterloo*, a Panamanian-registered ship, with Panama as its declared destination.

715.    Instead of docking in Panama, the *Otterloo* instead went to Turbo, Colombia, where Chiquita, through Banadex, operated its own private port facility for the transport of bananas and other cargo.

716.    After the *Otterloo* docked at Chiquita's port in Turbo, Banadex employees unloaded the crates containing the rifles and ammunition. On information and belief, the AUC, which had free access to the port, then loaded these rifles onto AUC vehicles and took possession of them.

717.    Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the

AUC, and intended to provide such support and assistance to the AUC. The documents accompanying the shipment declared that the crates that in fact contained arms were filled with plastic and/or rubber balls. However, in unloading the crates, the Banadex employees used heavy lifting machinery that would not have been necessary to move the crates' declared cargo. After being off-loaded, the crates remained at Chiquita's facilities for at least two additional days before fourteen AUC vehicles arrived to take possession of the arms. At least some of the arms were received by Freddy Rendón Herrera, the commander of the Elmer Cárdenas Block of the AUC in Urabá.

718.    Giovanny Hurtado Torres, a highly-placed Chiquita employee from the port at Turbo, and several Colombian customs officials have been prosecuted for their purposeful involvement in the *Otterloo* transaction.

719.    On information and belief, Chiquita facilitated at least four other arms shipments to the AUC; one of these shipments of arms through Chiquita's port involved the entry of 4,200 assault rifles.

720.    In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

721.    The arms that Chiquita knowingly and intentionally aided the AUC to procure have been of substantial assistance to the AUC in its commission of untold crimes, including the killings and other conduct alleged herein. Many of these guns have not been turned in to the government and are still in use by the paramilitaries. In 2008, some were seized in Urabá from the Daniel Rendón Herrera's 'Heroes de Castaño' Front – another AUC subunit. The raid, executed by Colombian authorities, netted hand grenades, mortar rounds, Claymore mines, electrical

detonators, and forty-seven AK-47 assault rifles; the assault rifles were traced to the 2001 *Otterloo* shipment.

*vi)*      *Chiquita facilitated the AUC's drug shipments.*

722.    Chiquita also assisted the AUC by allowing the use of its private port facilities for the illegal exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a major source of income for the AUC, and Chiquita allowed the AUC access to its port facilities and ships for the purpose of smuggling drugs.

723.    Colombian prosecutors have charged that the AUC shipped drugs on Chiquita's boats carrying bananas to Europe. According to H.H., the AUC would tie drugs to the hulls of banana ships at high sea to evade the control points of the security agencies.

724.    Cocaine hidden in Chiquita's banana shipments has been seized by the Colombian government on seven separate occasions. More than one and one-half tons of cocaine have been found hidden in Chiquita's produce, valued at over $33 million. Two of the ships on which drugs were found were named the *Chiquita Bremen* and the *Chiquita Belgie*.

725.    On information and belief, drug shipments could not have been attached to Chiquita's banana boats without the active collusion or willful ignorance of Chiquita employees. Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly and purposely allowed use of its port and banana transportation boats for this purpose.

**D.  Through their actions, Defendants Keiser and Freidheim supported the AUC in Urabá**

*i.  Defendant Charles Keiser was directly involved in expanding Chiquita's owned-farm presence in the Urabá region, was directly involved in forming the illicit agreement with the AUC, had knowledge of and approved Chiquita's payments to the AUC on an ongoing basis in the critical early years of the conspiracy, and knew that the AUC was a violent terrorist organization engaged in rampant human rights abuses in the banana-growing regions.*

726.    Defendant Keiser began his tenure in Colombia in 1987 as General Manager of

Chiquita's Colombian subsidiary Compañía Frutera de Sevilla. When Banadex was formed in 1989, Keiser became its General Manager. From 1998 through 2000 he was also Banadex's legal representative. For several months at the end of 2003 and at the beginning of 2004 he returned to oversee Banadex.

727.    Defendant Keiser has been charged in Colombia with aggravated conspiracy to commit crimes against humanity in relation to his role in the payments to the AUC.

728.    As a long-term employee of Chiquita in Colombia, Defendant Keiser had knowledge of the dynamics of the violence of the Civil War in Colombia and especially in the banana-growing regions of Urabá and Magdalena.  In his position as General Manager, Defendant Keiser received information from Banadex security personnel on an ongoing basis as to the security situation in the banana-growing regions and the operations of illegal armed groups, including the AUC. "Anything and everything" related to Colombian security issues was reported to Defendant Keiser as Banadex GM, as well as to Al Bakoczy, the Chiquita Head of Security. Defendant Keiser understood the complex relationships between armed groups in the Urabá region, and the risks that different groups presented to farm and union workers.

729.    When Chiquita was considering expanding its ownership of farms in the late 1980s, it was Keiser who provided the U.S. decision-makers with "an overview of the activities in the zone", including information that "owners and employees are perpetually at risk of murder, violence and extortion by the guerrillas" and that the "marketing associations have [been] bombed or vandalized." When Chiquita did receive an extortion demand from the FARC around 1998 or 1989, Keiser personally elevated that demand to Chiquita personnel in Cincinnati.. Keiser never elevated any demands or requests for payment from the AUC as "extortion" demands.

730.   Defendant Keiser was integrally involved in the switch from a purchased-fruit to an owned-fruit strategy – the decision to expand Chiquita's footprint, and vulnerability, by buying farms. When he arrived in Colombia in 1987, Chiquita was strictly a purchased-fruit operation, and had been for decades. Banadex was created when Chiquita began purchasing farms, and Keiser became its General Manager.

731.   Keiser was involved in processing payments to paramilitary precursor groups, including the group known as Esperanza and the Comandos Populares. Mr. Keiser admitted that neither he nor Chiquita considered the payments to Esperanza to be the products of threats or extortion. Rather, he considered that Chiquita paid Esperanza for security services.

732.   Defendant Keiser personally met in Medellín with AUC leaders Carlos Castaño and Raúl Hasbún in 1996 or 1997. This meeting took place at the residence of Mr. Castaño, known as Montecasino. At the time of the meeting Mr. Castaño was already a notorious paramilitary leader with a well-known history of violence. Present at that meeting were also Reinaldo Elías Escobar de la Hoz and Juan Manual Alvarado, both Banadex employees. Also present at that meeting was Irving Jorge Bernal Marin, a banana grower who was also a member of the board of AUGURA. Bernal has since been found guilty of conspiracy in Colombia in relation to his payments to the AUC and his role in the CONVIVIRs. A Colombian army officer was also present.

733.   At the meeting, Castaño "recounted the well-known killings and property destruction carried out in Urabá by various guerrilla groups, and he told Escobar and Keiser that Banadex shared a common interest with the government, military, and business community in driving the guerrillas out of Urabá . . . Castaño said he was sure Escobar and Keiser agreed the guerrillas needed to be driven out of Urabá and looked forward to their support of the Convivir  . . . [He] was polite and sent no explicit threats."

734.    At that meeting, Defendant Keiser brokered an agreement, on behalf of Chiquita, to pay money to the AUC through "convivirs" in exchange for the AUC's services in suppressing labor unrest and driving leftist guerrillas and sympathizers out of the banana-growing regions controlled by Chiquita. According to former paramilitary commander Salvatore Mancuso, Castaño informed him immediately following the meeting that he had discussed with Keiser the possibility of legalizing payments to the AUC via the CONVIVIRs.

735.    Defendant Keiser was also present at an AUGURA meeting where the banana companies agreed that they would pay three cents per dollar on every exported box of bananas.

736.    According to the findings of Colombian prosecutors, Defendant Keiser personally authorized at least 45 payments that went to the AUC. He was also responsible for four cash payment made directly to the AUC following his meeting with Carlos Castaño.

737.    When Chiquita abandoned the convivir cash-funneling system, Defendant Keiser made arrangements for cash to be paid to the AUC from his own personal accounts.

738.    As General Manager of Banadex, Defendant Keiser was responsible for the actions of his employees who acted as his agents and agents of Banadex and Chiquita.

739.    One such employee was Buitrago, who was head of security for Santa Marta from February 1998 to January 1999, head of security for Urabá from January 1999 to November 1999, and head of security for all of Banadex from November 1999 through June 2004.

740.    As a Colombian citizen with a history of working in the banana-growing regions, Mr. Buitrago had knowledge of the Colombian conflict and the illegal armed groups operational in the banana-growing zones. It was part of Buitrago's job to collect, process, and relay information about the security situation in the banana-growing regions to his superiors, including Defendant Keiser.

741.    During his time as Banadex Head of Security, Buitrago was responsible for making monthly payments to the AUC. These payments were requested by Buitrago as Head of Security using a 1016 form, signed by the Banadex General Manager—for the period of his tenure, the Defendant Keiser—and then were sent to the accounting area, who would issue a cheque. All of these payments were processed and documents as payments for security services.

742.    Buitrago was also involved in making payments to Invesiones Manglar, a front company for the AUC in Magdalena which was not registered as a CONVIVIR; when Buitrago discovered that Inversiones Manglar was not registered as a CONVIVIR, Buitrago informed his superiors, and instead of halting payments to that entity, his superiors chose to route the payments through the CONVIVIR in Urabá.

743.    Buitrago, acting in representation of Banadex, also participated in meetings with notorious paramilitary commanders including Raúl Emilio Hasbún Mendoza, Jorge 40, and Carlos Castaño. These figures were well-known paramilitary leaders.

744.    Buitrago also met with Jesus Antonio Osorio and Arnulfo Peñuela, directors of the CONVIVIR in Urabá who have since been convicted for conspiracy for their activities channeling funds to the AUC; Buitrago understood these two individuals to be members of the AUC.

745.    Buitrago was made aware of the designation of the AUC as a Foreign Terrorist Organization under U.S. law, but did nothing to halt the payments to the AUC.  Chiquita's security consultants, the Arkin Group, told the company that Buitrago was a "possible concern" because "[h]e has empathy for the AUC." The U.S. Department of Justice treated Buitrago "like an AUC insider."

746.    Buitrago is now charged in Colombia with criminal conspiracy to commit crimes against

humanity in relation to his role in Banadex's payments to the AUC, in the same case in which Defendant Keiser is charged as a co-conspirator to commit crimes against humanity.

747.    Defendant Keiser never disciplined or otherwise sanctioned Buitrago for his actions in relation to supporting the AUC.

748.    Another Defendant Keiser's employees was Juan Manuel Alvarado, who was head of security for Banadex until October 1999.

749.    As a Colombian citizen with a history of working in the banana-growing regions, Alvarado had knowledge of the Colombian conflict and the illegal armed groups operational in the banana-growing zones. It was part of Alvarado's job to collect, process, and relay information about the security situation in the banana-growing regions to his superiors, including Defendant Keiser.

750.    Alvarado was also present for the meeting between Defendant Keiser and paramilitary commander Carlos Castaño, and had knowledge of Banadex's payments to the AUC.

751.    During his time as Banadex Head of Security, Alvarado was responsible for making monthly payments to the AUC. These payments were requested by Alvarado as Head of Security using a 1016 form, signed by the Banadex General Manager—for the period of his tenure, the Defendant Charles Keiser—and then were sent to the accounting area, who would issue a cheque. All of these payments were processed and documents as payments for security services.

752.    Alvarado, acting in representation of Banadex, also participated in regular meetings with notorious paramilitary commander Raúl Emilio Hasbún Mendoza.

753.    Alvarado is now under investigation in Colombia for criminal conspiracy to commit crimes against humanity in relation to his role in Banadex's payments to the AUC, in the same case in which Defendant Keiser is charged as a co-conspirator to commit crimes against

humanity.

754.    Defendant Keiser never disciplined or otherwise sanctioned Alvarado for his actions in relation to supporting the AUC.

755.    Another of Keiser's employees was Escobar, who was a lawyer for Banadex.

756.    A Colombian lawyer, Escobar had knowledge of the context of violence of the Colombian Civil War and also had knowledge of the governing Colombian law. Escobar also received information about the ongoing conflict in the banana-growing regions from Banadex's security staff from his position as Banadex Legal Representative.

757.    Escobar was the Legal Representative of Banadex from September 1994 through June 1997 and he also sat on the board of AUGURA in representation of Banadex and Chiquita..

758.    Escobar was also present for the meeting between Defendant Keiser and paramilitary commander Carlos Castaño, and Escobar had knowledge of Banadex's payments to the AUC.

759.    Escobar was also present at meetings of AUGURA where the guild decided to pay the paramilitary precursor groups and the CONVIVIRs.

760.    On multiple occasions, Escobar was asked to evaluate the legality of the payments under Colombian criminal law. On information and belief, Escobar also had a legal duty to report the all illegal conduct that he had knowledge of, but never reported such conduct.

761.    Escobar is now charged in Colombia with criminal conspiracy to commit crimes against humanity in relation to his role in Banadex's payments to the AUC.

762.    Defendant Keiser never disciplined or otherwise sanctioned Escobar for his actions in relation to supporting the AUC.

763.    Another of Defendant Keiser's employees was Luis Germán Cuartas Carrasco, who was a labor lawyer for Banadex. Cuartas reported to Escobar, who in turn reported to Defendant

Keiser.

764.     A Colombian lawyer, Cuartas had knowledge of the context of violence of the Colombian Civil War and also had knowledge of the governing Colombian law. Cuartas specifically worked on labor relations with the banana union.

765.     Cuartas was also on the board of AUGURA from 1997 to 1998, and, on information and belief, was present at meetings where the payments to the CONVIVIRs were discussed.

766.     From his work in the banana-growing region of Urabá, Cuartas had knowledge of the CONVIVIRs that operated in the region and their directors, who have since been convicted for their involvement in the paramilitary conspiracy.

767.     On information and belief, Cuartas also had a legal duty to report the all illegal conduct that he had knowledge of, but never reported such conduct to the authorities.

768.     Cuartas was made aware of the designation of the AUC as a Foreign Terrorist Organization under U.S. law, but did nothing to halt the payments to the AUC.

769.     Cuartas is now charged in Colombia with criminal conspiracy to commit crimes against humanity in relation to his role in Banadex's payments to the AUC. Defendant Keiser never disciplined or otherwise sanctioned Cuartas for his actions in relation to supporting the AUC.

770.     Defendant Keiser played a central role in the expansion of Chiquita's owned-fruit operations in Colombia, despite knowing the risk that operating in the Urabá region at that time entailed.

771.     Defendant Keiser was also instrumental in establishing the agreement with Carlos Castaño that Chiquita would make payments to the AUC, formalizing an ongoing conspiracy that would continue for years to come, even beyond his tenure at the company.

772.     The payments approved by Keiser in the early years of Chiquita's financial support of the

AUC were critical in allowing the AUC to consolidate their control of the Urabá region, which allowed the AUC to generate further income and to maintain their reign of terror even after Defendant Keiser left Banadex.

773.    Chiquita's support, arranged by Keiser, was important early funding for the AUC in the banana region. Since banana payments were negotiated early on and centrally, the funds served as a key initial injection of resources for the AUC. This seed funding enabled them to raise the necessary manpower to engage in other war-making and fundraising activities on the ground.

774.    The AUC (and its precursor ACCU) depended on the collaboration of and financing from banana growers in its early years, including substantial funding from Chiquita and Banadex, to initially enter into the Urabá banana region and, later, the Santa Marta region.

775.    The paramilitaries that used Chiquita's money recognized that the payments were the "motor to sustain and grow" the AUC and "[t]oo much money was coming in to CONVIVIR, millions and millions of pesos" that paid for "a headquarters, vehicles, and a radio antenna."

776.    The financing from the payments that Defendant Keiser approved continued to fuel the AUC after he left his role as General Manager.

777.    On information and belief, Keiser's own role in Colombian operations continued even after he left the country in 2000. Chiquita documents show that Keiser was involved in payments to the AUC in 2002, when he claimed not to have any role in Colombia.

778.    Defendant Keiser admitted that he began overseeing Banadex again in late 2003 and early 2004. Even if he was not involved in the AUC payments on a continuous basis, at this point he ratified his role in the ongoing conspiracy by failing to take any action to stop Chiquita's payments to the AUC, despite compounding evidence of the AUC's brutal violence against the citizens of the Colombian banana-growing regions.

779.     Under Defendant Keiser's management and with his knowledge, Banadex employees met with, conspired with, and financed the AUC. Defendant Keiser did not discipline or otherwise sanction these employees for their conduct, and participated directly and indirectly in Banadex's support of the AUC.

780.     At all times relevant to the complaint, Keiser had knowledge of the horrific violence unfolding in the banana growing regions where Chiquita had operations. He understood the dynamics of the Colombian conflict and the armed groups involved, including the role and reputation of the AUC. Nevertheless, Defendant Keiser never reported to either the U.S. or the Colombian authorities that he was being extorted by the AUC, nor did he attempt to find an alternative to paying the AUC.

ii.   *Defendant Cyrus Freidheim had knowledge of Chiquita's payments to the AUC, had knowledge of the AUC's status as a violent terrorist organization engaged in rampant human rights abuses in the banana-growing regions, had knowledge of the AUC's designation as a Foreign Terrorist Organization, had knowledge that the payments were illegal, and supported the continuance of the payments despite this knowledge.*

781.     During Defendant Freidheim's tenure at Chiquita, Chiquita is known to have made at least approximately 42 payments to the AUC totaling about $595,792.00.

782.     After taking over as Chiquita's CEO in 2002, Defendant Freidheim was fully briefed on the AUC payment system and approved AUC payments as well as procedures implemented to disguise the purpose and receipt of the payments. He did so against the advice of counsel, knowing that the AUC was a violent paramilitary organization and a designated foreign terrorist organization.

783.     Freidheim was present at multiple company meetings where AUC funding was discussed, including an April 3, 2003, Board of Directors meeting where the AUC's status as a foreign terrorist organization was reported and the Board agreed to disclose its payments to the U.S.

118

Department of Justice. Shortly afterwards, Freidhiem allegedly expressed agreement with the sentiment of another Board member to "just let them sue us."

784.    Defendant Freidheim understood that the "AUC was providing protection from the guerrillas in return for the money that was paid to them."

785.    On April 24, 2003, Defendant Freidheim attended a meeting in Washington D.C. between Chiquita executives, Kirkland & Ellis attorneys, and officials from the United States Department of Justice, at which DOJ officials advised that Chiquita's AUC payments were illegal and could not continue.

### E.  Chiquita and the Defendants' Conduct Aided and Abetted the AUC's Conduct Alleged Herein.

786.    Chiquita and the Defendants' conduct aided and abetted the killings and other conduct alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, New Jersey, Ohio, United States, and customary international law. Chiquita and the Defendants (1) substantially assisted the AUC paramilitaries who personally undertook the wrongful acts alleged herein, and (2) knew that its actions would assist in the wrongful acts at the time it provided the assistance.

   *i)  Chiquita substantially assisted the persons who personally committed the acts comprising Plaintiffs' claims.*

787.    Chiquita's payments and facilitation of drug shipments contributed significantly to the perpetration of the crimes committed by the AUC by improving the AUC's financial situation and enabling it to purchase weapons and other war material. *See supra* (Chiquita's support to the AUC).

788.     In addition to Chiquita's payments and facilitation of drug shipments, its assistance to the AUC in smuggling arms substantially and directly increased the paramilitaries' capacity to carry out its violent campaign against Urabá's civilian population. *See supra* (smuggling of arms was major AUC achievement).

789.     Most of the firearms that were transferred to the AUC from the *Otterloo* shipment have never been recovered. On information and belief they and other similarly obtained firearms have been used in the commission of war crimes, crimes against humanity, and other violations, including those alleged in this complaint. *See supra* (*Otterloo* shipment).

   *ii) Chiquita and the Defendants knew and intended that their actions would assist in the illegal or wrongful activity at the time it provided the assistance.*

790.     Chiquita and the Defendants knew that their actions would assist the AUC to continue killing, torturing, and committing other acts of illegal violence against civilians in Urabá. The AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent civilians living in areas under FARC control was well known in Colombia and was widely reported in the press in Colombia and the United States. In 1997, for example, the State Department noted:

> [t]he many paramilitary groups took the offensive against the guerrillas, often perpetrating **targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base** . . . **An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerrilla support**, was the primary cause of the growing internal displacement problem.

United States Department of State, *1997 Human Rights Report: Colombia*, at 2 (emphasis added).

791.     In 1999, the State Department noted:

> Paramilitary groups and guerrillas were responsible for the vast majority of political and extrajudicial killings during the year. Throughout the country, paramilitary groups **killed, tortured and threatened civilians suspected of sympathizing with guerrillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerrillas of civilian support**. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerrilla control.

United States Department of State, *1999 Human Rights Report: Colombia*, at 2 (emphasis added).

792.    The United States government designated the AUC as a Foreign Terrorist Organization on September 10, 2001, and that designation was well-publicized in the American public media. *See supra* (US media coverage). The AUC's designation was even more widely reported in the public media in Colombia, where Chiquita had its substantial banana-producing operations.

793.    Chiquita had information about the AUC's designation as a Foreign Terrorist Organization specifically and global security threats generally through an Internet-based, password-protected subscription service that Chiquita paid money to receive. On or about September 30, 2002, an employee of Chiquita, from a computer within Chiquita's Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the following reporting on the AUC:

> US terrorist designation. International condemnation of the AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections.

794.    From on or about September 10, 2001, through on or about February 4, 2004, Chiquita made fifty payments to the AUC totaling over $825,000. Chiquita never applied for nor obtained any license from the Department of the Treasury's Office of Foreign Assets Control with respect to any of its payments to the AUC.

795.    On or about February 20, 2003, Olson and an in-house attorney had a conversation about the AUC's designation by the United States government as a Foreign Terrorist Organization. Shortly thereafter, Olson and the Chiquita lawyer spoke with Kirkland & Ellis about Chiquita's ongoing payments to the AUC. Kirkland & Ellis advised Chiquita, through Olson and the in-

house lawyer, that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. On information and belief, Defendants were made aware of this advice. *See supra* (advice of counsel about payments to the AUC).

796.    Despite the February 26, 2003 communication from counsel advising Chiquita's executives against making payments to the AUC, on or about February 27, 2003, two Chiquita employees in Colombia paid the AUC in Urabá by check in an amount equivalent to $17,434.

797.    Despite the March 27, 2003 communication from counsel advising Chiquita executives against making payments to the AUC, on or about March 27, 2003, the same two employees paid the AUC in Urabá by check in an amount equivalent to $19,437.

798.    Chiquita's acts of assistance to the AUC were made with the intent that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers. In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition was suppressed. Chiquita's assistance was not given out of duress; rather it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC in the Urabá region.

799.    Chiquita, along with other banana companies in Colombia, sought a meeting with the paramilitaries in late 1996 or early 1997. The meeting took place in Medellín, and Defendant Keiser was present. It was decided at this meeting that the banana companies would pay the paramilitaries. Carlos and Vicente Castaño led the negotiations with the companies; as a result of the negotiations, H.H. was ordered to patrol large swathes of the banana-growing region.

800.    Defendant Keiser personally met with leaders of the AUC and planned a system of

payment. On information and belief, in order to operate its banana production in an environment free of labor opposition and social disturbances, Chiquita agreed to a whereby the company would pay the AUC a certain amount per box of banana exported, and would help to arm and otherwise support the AUC and other terrorist groups during the period of the killings and other conduct alleged herein.

801.    The arrangement between Chiquita and the AUC was not one of duress; in fact, it was the banana companies that approached the AUC to initiate their relationship. Mario Iguaran, the former Attorney-General of Colombia, has charged that there was a criminal relationship between Chiquita and the AUC in which Chiquita supplied money and arms to the AUC in return for the "bloody pacification of Urabá."

802.    As part of its deal with Chiquita, the AUC provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities or social program.

803.    By arming and financing the AUC, Chiquita intended to benefit from the AUC's systematic killings of civilians. After its agreement with Chiquita, the AUC understood that one goal of its campaign of terror was to prevent work stoppages in the banana plantations. Anyone who disrupted the smooth operations of the plantations knew what the consequences could be. For example, one individual who worked in Chiquita's offices at a plantation in Urabá was present when paramilitaries arrived at the plantation and summarily executed a banana worker who had been seen as a troublemaker because his slow work held up the production line. Another individual saw paramilitaries arrive to threaten banana workers after a salary dispute.

804.    In concert with the army, which assisted banana growers by occupying banana

plantations and arresting union leaders or forcing laborers to work during strikes, the AUC

undertook an extensive campaign of murdering civilians in order to break the back of the unions.

According to Gloria Cuartas, "They pulled out a map where they said which plantations

allegedly had a FARC presence and started killing workers and union members, until the

organizational structures of the union and the board of Sintrainagro [the local union of planattion

workers] were left totally in the hands of the 'Esperanzados' [the ELN]." By that time, the ELN,

which had previously been an anti-government guerrilla group, had been coopted by the

paramilitaries.

805.    Chiquita's assistance also helped the AUC to gain access to its perceived opponents who

worked for the company. José Gehiener Arias Ramirez, a Chiquita employee who was later

killed by the AUC, repeatedly witnessed AUC members entering the Chiquita packing house to

threaten workers from the Barrio Policarpa, whose residents were viewed as hostile to the AUC.

806.    The stability and social control provided by the AUC was to Chiquita's benefit, in that it

minimized the expenses incurred and eliminated disruptions in the exportation of bananas. As a

result of the AUC's actions, Chiquita was able to dismantle social assistance programs to which

the banana companies had agreed through negotiations with the unions in the 1980s, thereby

lowering its production costs. The influence of the AUC in the leadership of the banana workers'

trade unions was also to Chiquita's benefit, as it reduced labor strife.

807.    As a result of the paramilitaries' intervention, Castaño was able to brag in 2001 that "**in

the past three years there have been no strikes** in the banana-growing region, and the

Sintrainagro unions work shoulder-to-shoulder with the employers to promote the [economy of

the] zone." Carlos Castaño, *Mi Confesión* (emphasis added).

**F.  Chiquita and the Defendants Joined the AUC's Conspiracy to Commit the Acts
Alleged Herein.**

808.    By their conduct, Chiquita and the Defendants joined the AUC's conspiracy to eliminate the FARC through violent attacks on guerrillas and suspected guerrilla sympathizers and terrorization of the civilian population. The killings alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, New Jersey, Ohio, United States, and customary international law, were committed by members of the AUC in furtherance of the conspiracy. Chiquita's actions constituted conspiracy in that (1) two or more members of the AUC agreed to carry out their terrorist campaign against civilians, (2) Chiquita and the Defendants joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations alleged herein was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.

  i)   *Members of the AUC agreed to fight the FARC by means of illegal violence against particular classes of civilians, thereby constituting a conspiracy of two or more persons who agreed to commit a wrongful act.*

809.    The AUC was formed based on agreement between its leaders, government backers, and private supporters, to eliminate the FARC through extermination of guerrillas and suspected guerrilla sympathizers and the systematic terrorization of the civilian population. The AUC purposely targeted civilians, even those with no known ties to the guerrillas. Thus the use of illegal, violent means, including war crimes and extrajudicial killings, was always central to the group's mission and strategies.

  ii)  *Chiquita and the Defendants joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal.*

810.    Chiquita and Defendant Keiser began conspiring with the paramilitaries no later than

1994; its first direct payments to the Banana Bloc of the ACCU were made no later than 1995. Defendant Freidheim joined this conspiracy in 2002 or, at the latest, 2003.

811.    At a meeting with the paramilitaries in late 1996 or early 1997, Defendant Keiser concluded an agreement with the ACCU or AUC whereby Chiquita paid the paramilitaries for their services supporting the banana plantations. These services consisted of threatening or killing civilians, including workers who attempted to strike, union leaders, alleged criminals, and small banana farmers who refused to sell or abandon their land. *See supra*.

812.    Chiquita knew of the AUC's goal of eliminating the FARC through the killing of suspected sympathizers and innocent civilians. They also knew of their primary tactic of targeting civilians in order to intimidate this population from supporting the FARC. *See supra* (Chiquita's knowledge). Chiquita joined the conspiracy intending to benefit from the AUC's strategy; the AUC's methods would reduce Chiquita's costs and risk exposure by suppressing labor unrest through the elimination of those who opposed the banana plantations or threatened their profitability.

813.    On information and belief, Defendant Freidheim shared this knowledge.

814.    Defendant Keiser had knowledge of the AUC's aims and tactics at the time that he negotiated with Castaño, and continued to receive information about the AUC's violence and activities throughout his tenure with Banadex. By the time Defendant Freidheim joined the conspiracy, the activities of the AUC were even more well-known and Freidheim was also briefed on the AUC payments and knew that the AUC was a violent paramilitary organization.

815.    Chiquita, as a co-conspirator, arranged illegal money payments, smuggled drugs and arms, and facilitated and condoned murders and other violent acts in furtherance of the conspiracy.

816.   Defendant Keiser, as a co-conspirator, arranged illegal money payments and facilitated the smuggling of drugs and arms through action or inaction, in the process facilitating and condoning murders and other violent acts in furtherance of the conspiracy.

817.   Defendant Freidheim, as a co-conspirator, arranged illegal money payments, in the process facilitating and condoning murders and other violent acts in furtherance of the conspiracy.

   *iii) The AUC's conduct alleged herein was committed by members of the AUC in furtherance of the conspiracy's goal of fighting the FARC by means of illegal violence against particular classes of civilians.*

818.   All of Plaintiffs' injuries and Plaintiffs' decedents' murders were committed by the AUC in furtherance of the conspiracy. The status of many plaintiffs and decedents as social activists, unionists, alleged criminals, and suspected guerrilla sympathizers, among others, led to their inclusion in groups perceived by the AUC and the State as being sympathetic to the FARC and ultimately to their injuries and murders. Other casualties were collateral damage that represented a foreseeable consequence as the natural result of the AUC's campaign to "drain the sea" of suspected guerrilla informants. *See infra* VI. (Plaintiffs' Injuries).

   **G.  The AUC Acted as Chiquita's Agent in Committing the Acts Alleged Herein.**

819.   Chiquita formed an agreement with the AUC, paying them in exchange for their performance of inherently dangerous and tortious activities: the suppression of union activity and elimination of alleged FARC supporters and other undesirables. This agreement specified, among other things, that Chiquita would pay the paramilitaries a fixed dollar amount for each box of bananas exported. *See supra* (Chiquita's support to the AUC, Chiquita's agreement with the AUC).

820.   Defendant Keiser, and his agents at Banadex, were instrumental to the establishment of

this agreement.

821.    Chiquita intended that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers. In providing the AUC with money and assistance with their arms and drug trafficking, Chiquita and the Defendants intended that the AUC obtain arms and continue their practice of killing civilians, especially those civilians who were perceived as threats to the profitability of the banana industry.

822.    The leadership of the AUC did, in fact, carry out killings of union members, social organizers and other undesirable groups, as well as civilians with no known or suspected ties to the guerrillas, knowing that Chiquita expected and intended that they do so using the arms and money provided by Chiquita.

823.    The AUC solved Chiquita's labor problems and kept down operational costs by killing and/or intimidating any worker that attempted to strike. *See supra* (suppression of labor was part of agreement). The paramilitaries also dealt out reprisals against real or suspected thieves and social undesirables, and targeted suspected guerrilla sympathizers or supporters who could have threatened Chiquita's operations, including independent business cooperative owners and anyone espousing views that could be characterized as leftist, such as opposition politicians, vocal trade unionists, community leaders, and social activists. *See infra* (Plaintiffs' Injuries).

824.    Chiquita authorized the AUC's strategy of killing, torture, and other illegal violence against civilians in Urabá. The AUC's agreement with Chiquita involved forcing people to work using threats and illegal violence, as well as the quelling of labor and social unrest through the systematic terrorization of the population of Urabá. *See supra* (Chiquita's agreement with the AUC).

825.    Furthermore, Chiquita acquiesced in the AUC's conduct after the fact by continuing to pay them – and finding new ways to conceal the nature of those payments – despite full knowledge that their support was being used to carry out the crimes alleged herein. *See supra* (knowledge of AUC as terrorist group, illegality of payments).

## VI.    PLAINTIFFS' INJURIES

*Jane Doe 8/John Doe 12*

826.    John Doe 12 was the father of Jane Doe 8.

827.    John Doe 12 was the owner of a small banana plot in Urabá, near the port in Turbo, which was used to ship bananas and which was also controlled by the AUC.

828.    In September 2004, several members of the AUC shot John Doe 12, causing his death. John Doe 12 had submitted a land reclamation claim in Urabá shortly before his death.

829.    John Doe 12's murder is recognized as a paramilitary killing in Colombia's official Justice and Peace proceedings, a governmental process created as part of the demobilization of the AUC to find facts and establish accountability for paramilitary violence.

830.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 12 through their support of the AUC in Urabá. On information and belief, Chiquita and the Defendants benefited from the death of John Doe 12 by removing the owner of a small banana plot, thereby improving the chances for expanding Chiquita's operations.

*Jane Doe 9/John Doe 13*

831.    John Doe 13 was the partner of Jane Doe 9.

832.    John Doe 13 was a community leader and co-owner of a small banana plot in Urabá.

833.    In November 2003, he took a communal bus within Urabá. At the entrance to a farm, a

group of three or four men belonging to the AUC, who controlled the Urabá region at the time, stopped the vehicle. They took John Doe 13 off of the bus and shot him multiple times.

834.    John Doe 13 is recognized as a victim in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia.

835.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 13 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 10/John Doe 14/John Doe 15*

836.    Jane Doe 10's sons, John Doe 14 and John Doe 15, were killed by the AUC in November 2002. A demobilized member of the AUC confessed to both of their killings. John Doe 15 was a banana worker on a farm in Apartadó and was killed by two members of the AUC known as "Jhon Jairo" and "El Cholo."

837.    John Doe 14 and John Doe 15 are both recognized as victims in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia.

838.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 14 and John Doe 15 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 11/Jane Doe 12*

839.    Jane Doe 11's sister, Jane Doe 12, was murdered by the AUC in a public market in March 2002. A member of the AUC confessed to the killing.

840.    On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of Jane Doe 12 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 13/John Doe 16*

841.    Jane Doe 13's partner, John Doe 16, was murdered by the AUC – in his mother's home and in front of his son – in Apartadó in September 1999. John Doe 16 was a banana worker on a farm in Santa Marta.

842.    John Doe 16 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

843.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 16 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 14/John Doe 17*

844.    Jane Doe 14's partner, John Doe 17, was murdered by the AUC in Apartadó in February 1998. John Doe 17 was a councilman and community leader, in a neighborhood of banana workers. After a meeting with community leaders in the Obrero neighborhood, John Doe 17 was killed by AUC members on his way home.

845.    John Doe 17 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

846.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 17 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

847.    On information and belief, Chiquita and the Defendants benefited from the death of John Doe 17 by removing a community leader whose actions threatened the stability and profitability of Chiquita's operations.

*Jane Doe 16/John Doe 19*

848.    Jane Doe 16's partner, John Doe 19, was murdered by the AUC in June 1997 in Apartadó. John Doe 19 worked as a wood-cutter. Members of the AUC showed up at his house and threatened the people there, asking for John Doe 19's whereabouts. John Doe 19 was murdered by these paramilitaries and his body was found a few blocks from his home.

849.    John Doe 19 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

850.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 19 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 17/John Doe 20*

851.    Jane Doe 17's son, John Doe 20, was murdered by paramilitaries in March 1997 in Turbo. Jane Doe 17 is recognized as a victim in the Justice and Peace proceedings, because her son was murdered by the paramilitaries.

852.    John Doe 20 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

853.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 20 through their support of the paramilitaries in

Urabá.

*Jane Doe 18/John Doe 21*

854.    Jane Doe 18's husband, John Doe 21, was murdered by paramilitaries in March 1997 in Turbo.  The murder has been recognized as a paramilitary killing in the Justice and Peace process.

855.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 21 through their support of the paramilitaries in Urabá.

*Jane Doe 19/John Doe 22*

856.    Jane Doe 19's son, John Doe 22, was killed by paramilitaries in March 1997 in Chigorodó. John Doe 22 was a banana worker and was killed by paramilitaries in the presence of his partner.

857.    John Doe 22 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

858.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 22 through their support of the paramilitaries in Urabá.

*Jane Doe 221/John Doe 24*

859.    Jane Doe 221's son, John Doe 24, was murdered by paramilitaries in front of their house in February 1997. The paramilitaries forced Jane Doe 221 to call her son and have him return to

the house, and then they killed him. Jane Doe 221 has died since the commencement of this suit; she is represented in this action by her husband John Doe 372 and her son, John Doe 373, who have moved to substitute for her.

860.     John Doe 24 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

861.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 24 through their support of the paramilitaries in Urabá.


*Jane Doe 20/John Doe 25*

862.     Jane Doe 20's partner, John Doe 25, was murdered by paramilitaries in January 1997. John Doe 25 was a banana worker on a farm in Apartadó. The paramilitaries rounded up several workers at a restaurant on the farm, and killed John Doe 25 and several others.

863.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 25 through their support of the paramilitaries in Urabá.

864.     On information and belief, Chiquita and the Defendants benefited from the death of John Doe 25 by quelling dissent amongst banana workers that threatened the stability and profitability of Chiquita's operations.


*Jane Doe 21/Jane Doe 22/John Doe 26*

865.     Jane Doe 21's mother and stepfather, Jane Doe 22 and John Doe 26, were murdered by the AUC in January 1997 in Turbo. Jane Doe 21, Jane Doe 22 and John Doe 26 were traveling by

taxi from Apartadó to Turbo – to collect a payment on the sale of a farm – when they were stopped by paramilitaries. Jane Doe 21 was detained and was forced to watch as the paramilitaries killed her parents.

866.    Jane Doe 22 and John Doe 26 are both recognized as victims in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

867.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of Jane Doe 22 and John Doe 26 through their support of the paramilitaries in Urabá.


*Jane Doe 23/John Doe 27/John Doe 28*

429.    Jane Doe 23's son, John Doe 27, and her husband, John Doe 28, were killed by paramilitaries in January 1997 in Mutatá. Four paramilitaries entered a cantina and shot and killed John Doe 27 and John Doe 28.

868.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 27 and John Doe 28 through their support of the paramilitaries in Urabá.


*Jane Doe 24/John Doe 29, Jane Doe 25/John Doe 30*

869.    Jane Doe 24's partner, John Doe 29, and Jane Doe 25's partner, John Doe 30, were murdered by paramilitaries in July or August 1996. John Doe 29 and John Doe 30 were leaders in a local communal action board in Chigorodó and were attending a meeting of that board. Paramilitaries arrived at the meeting and killed John Doe 29 and John Doe 30.

870.    John Doe 30 is recognized as a victim in the Justice and Peace proceedings of AUC

commander Éver Veloza Garcia.

871.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 29 and John Doe 30 through their support of the paramilitaries in Urabá.

872.     On information and belief, Chiquita and the Defendants benefited from the deaths of John Doe 29 and 30 by removing community activists who threatened the stability of Chiquita's operations.

*Jane Doe 26*

873.     Jane Doe 26's first husband was murdered by the AUC in 1986. In June 1997, Jane Doe 26 was approached, mistreated, and threatened by several members of the AUC in Apartadó. The members of the AUC told her that she had twenty-four hours to leave the region.

874.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, forced eviction and relocation of Jane Doe 26 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 23, Jane Doe 27, Jane Doe 30, Jane Doe 99, Jane Doe 121, and Jane Doe 122/ John Doe 105/Jane Doe 31/Jane Doe 100*

875.     Jane Doe 31 and John Doe 105 were the parents of Jane Doe 27, Jane Doe 30, Jane Doe 100, Jane Doe 122, and John Doe 23. Jane Doe 100 was the mother of Jane Doe 99. Jane Doe 121 is the granddaughter of John Doe 105 and Jane Doe 31.

876.     In late 1996, AUC paramilitaries visited a property in Apartadó, owned by John Doe 105 and Jane Doe 31, who were married. The AUC were looking for John Doe 105, who was not

there at the time.

877.    They disappeared Jane Doe 31 and her daughter, Jane Doe 100, killing them. Jane Doe 31 and Jane Doe 100 are both recognized as victims in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia.

878.    Later, the AUC found and murdered John Doe 105. The AUC also threatened Jane Doe 27, Jane Doe 121, John Doe 23, and Jane Doe 122. All were told to leave Urabá, and they all fled around July 1997.

879.    Jane Doe 27 was attacked by the AUC again after she had relocated, forcing her to flee and relocate once again.

880.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, forced eviction/relocation and displacement of Jane Doe 27, Jane Doe 121, Jane Doe 122, and John Doe 23 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region. On information and belief, Chiquita and the Defendants also caused, intended, conspired in, and/or aided and abetted the deaths and disappearances of John Doe 105, Jane Doe 31, and Jane Doe 100 as a result of that same support.

*John Doe 32*

881.    John Doe 32 was threatened by paramilitaries and forced to relocate in 1996. John Doe 32 was a member of a political party, the Union Patriótica, and was also a farmer.

882.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, battery, forced eviction/relocation of John Doe 32 through their support of the paramilitaries in Urabá.

137

883.    On information and belief, Chiquita and the Defendants benefited from the forced displacement of John Doe 32 because there was one less political activist who threatened the stability of Chiquita's operations in the region.


*John Doe 33*

884.    John Doe 33 was threatened and assaulted by the AUC in December 1997 in Turbo. The AUC carried out an attack and killed several people, which John Doe 33 witnessed. The AUC threatened the surviving witnesses and John Doe 33 was forced to relocate.

885.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, battery, forced eviction/relocation of John Doe 33 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 28/John Doe 34/John Doe 150*

886.    Jane Doe 28's brother, John Doe 34, was killed by the AUC in December 2002 in the Carepa municipality. John Doe 34 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

887.    Jane Doe 28's partner, John Doe 150, was a banana worker in Apartadó. He was killed by the AUC in December 2000. On information and belief, the paramilitary responsible for the killing was known as "Cepillo". John Doe 150 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

888.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 34 and John Doe 150 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 29*

889.     Jane Doe 29 had a tavern in Urabá. In 1996, armed men who identified themselves as belonging to the ACCU came up to Jane Doe 29 when she was at a store with a friend. They threatened her with a gun and forced her to take them to her house, where they hit her and sexually assaulted her. When they left her house, they said they would come back the same evening.

890.     Jane Doe 29 fled the Urabá region that day and was displaced to Medellín, but also received threats from the AUC there, and was forced to relocate again in 2002, this time to Bogotá.

891.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, trespass, kidnapping, sexual assault, and forced eviction/relocation of Jane Doe 29 through their support of the AUC in Urabá, which at the time of events had full control of the region.


*John Doe 35*

892.     John Doe 35 was a banana worker working in Apartadó. In December 1998, John Doe 35 was kidnapped and tortured by members of the AUC. He was also threatened upon his release.

893.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the assault, torture and kidnapping of John Doe 35 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 37*

894.    The Colombian army alleged that John Doe 37's father was a guerrilla. In September 1997, John Doe 37 was on a bus stopped by the AUC. The members of the AUC had a list of names; they called John Doe 37 and removed him from the bus. He was told to and did leave Urabá after the threat.

895.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats and forced eviction/relocation of John Doe 37 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 39*

896.    John Doe 39 was a banana worker and a member of the Union Patriótica party. In late 1996, members of the AUC threatened him and told him that he had twenty-four hours to leave. He fled and was displaced with his family around August 1997.

897.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, and forced eviction/relocation of John Doe 39 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 32, John Doe 46*

898.    In June 1997, Jane Doe 32 was detained by AUC paramilitaries in Apartadó and told to leave the region.

899.    In June 1997, John Doe 46 was also detained by AUC paramilitaries, threatened, and told to leave the area. John Doe 46 is now deceased and is represented in this action by his wife, Jane Doe 26, and his daughter, Jane Doe 373, who have moved to substitute for him.

900.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the assault, displacement and other injuries of Jane Doe 32 and John Doe 46 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 371/John Doe 44*

901.    In or around September 1998, Jane Doe 371's son, John Doe 44, was murdered by the AUC in Apartadó. This murder has been recognized in the Justice and Peace proceedings.

902.    Jane Doe 371 has died since the commencement of this suit; she is represented in this action by her daughter Jane Doe 372, who has moved to substitute for her.

903.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 44 by and through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 40*

904.    John Doe 40 was a banana worker on a farm in Turbo; he was also a member of the Communist and Union Patriótica parties. In July 1997, the AUC threatened him and he was forced to flee Urabá.

905.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, and forced eviction/relocation of John Doe 40 by and

through their support of the AUC in Urabá, which at the time of the events was in control of the region.

906.    On information and belief, Chiquita and the Defendants benefited from displacement of John Doe 40 because those torts removed a political activist who threatened the stability of Chiquita's operations in the region.

*John Doe 41*

907.    John Doe 41 was a member of the union and the Union Patriótica party who worked on a farm in Urabá.

908.    Around 1995, several armed paramilitaries arrived at the farm where John Doe 41 was working and gathered the workers at a packing station. They identified themselves as AUC. They beat John Doe 41 and told him they were doing so because he was a union leader. They also burned his house that day.

909.    A few months after this incident, John Doe 41 came home to find two armed paramilitary members in his home. They shot at him, but did not hit him.

910.    About one month later, John Doe 41 was at a camp for workers near a farm when a group of AUC members drove by in a car. Two of them took out arms and started to shoot. They shot John Doe 41 in the leg. He is now disabled due to injuries from this shooting.

911.    After this persecution, John Doe 41 finally left the region in late 1996.

912.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, assault, battery, conversion, trespass and other injuries of John Doe 41 by and through its support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 42*

913.     John Doe 42 worked on a farm in Urabá. In September 1997, he was kidnapped by paramilitaries and detained in a cell for several days. During that time, they battered and tortured him until he promised to leave Urabá.

914.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the threats, assault, battery, conversion, trespass and other injuries of John Doe 42 by and through its support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 45*

915.     John Doe 45 provided dental services in Urabá and also had a small farm. He also did dental work and was a member of the Union Patriótica party.

916.     In late 1994 or early 1995, several armed AUC members came to John Doe 45's house where he provided dental services. They shot him in the buttock before leaving him for dead.

917.     In 1996, John Doe 45 found out that paramilitary members had been looking for John Doe 45 while he was at church. John Doe 45 fled from the Urabá region, followed by his wife. After their displacement, John Doe 45 and his wife learned that the paramilitaries had taken over their house in Urabá.

918.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the shooting, displacement, trespass, and other injuries of John Doe 45 through its support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 48, John Doe 49, John Doe 50, Jane Doe 33, Jane Doe 34/John Doe 47*

919.     John Doe 47 was the son of Jane Doe 33 and the brother of Jane Doe 34, John Doe 48, John Doe 49, and John Doe 50.

920.     John Doe 47 was a worker on a banana farm. In January 2002, John Doe 47 was murdered by the AUC. On that day, John Doe 47 was at his house with Jane Doe 33, his mother, when the AUC called for him. They took him away and killed him. His body was found by banana workers. He had been tortured, burned, and shot.

921.     John Doe 47's death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

922.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided in the murder of John Doe 47 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 35/John Doe 51*

923.     Jane Doe 35's partner, John Doe 51, was murdered by the AUC in March 2001. This murder has been recognized as a paramilitary killing in the Justice and Peace proceedings.

924.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 51 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 36/John Doe 52*

925.     John Doe 52 was the nephew of Jane Doe 36, who treated him like a son.

926.     In May 2002, John Doe 52 and his cousin were traveling from in a park in Urabá to a relative's house. Near the house, they were stopped by two men who detained John Doe 52. The next day, John Doe 52's family found him in the hospital morgue, where they were told that he had been found on the road to a farm. He had been tortured and murdered.

927.     John Doe 52's murder has been recognized as a paramilitary killing in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

928.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 52 through their support of the AUC in Urabá, which at the time of events had full control of the region.


*Jane Doe 37, Jane Doe 38, Jane Doe 39, John Doe 54/John Doe 53*

929.     John Doe 53 was the son of Jane Doe 37 and the brother of Jane Doe 38, Jane Doe 39, and John Doe 54.

930.     John Doe 53 was tortured and murdered by the AUC in March 2003 in Apartadó. This murder has been recognized as a paramilitary killing in the Justice and Peace proceedings.

931.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 53 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 40, Jane Doe 41, Jane Doe 42, Jane Doe 43, Jane Doe 44, Jane Doe 227, John Doe 56, John Doe 57/John Doe 55*

932.     John Doe 55 was the son of Jane Doe 40, the father of John Doe 56 and Jane Doe 41, and the brother of John Doe 57, and Jane Doe 42, Jane Doe 43, Jane Doe 44, and Jane Doe 227.

933.    John Doe 55 worked as a banana farmer on his father-in-law's farm in Turbo. In August 1998, a member of the AUC came to his house and shot him.

934.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 55 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 45 and John Doe 60/John Doe 59*

935.    John Doe 59 was the husband of Jane Doe 45 and the father of John Doe 60.

936.    John Doe 59 was a farm worker in Urabá. In February 1997, he was murdered by paramilitaries. This murder is being investigated in the Justice and Peace proceedings.

937.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 59 through their support of the paramilitaries in Urabá.

*Jane Doe 46, Jane Doe 47, John Doe 62, John Doe 63/John Doe 61*

938.    John Doe 61 was the partner of Jane Doe 46 and the father of John Doe 62, John Doe 63 and Jane Doe 47. John Doe 61 worked as a bus driver. He had previously worked on various farms in Urabá and had been associated with a union.

939.    John Doe 61 was driving a bus in March 1997, which was stopped by paramilitaries. The paramilitaries ordered all of the passengers off the bus, then murdered John Doe 61. This murder has been recognized as a paramilitary killing in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

940.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 61 through their support of the paramilitaries in Urabá.

*Jane Doe 48, John Doe 65/John Doe 64*

941.     John Doe 64 was the father of John Doe 65 and Jane Doe 48.

942.     In December 1998, John Doe 64 was at his home when Colombian soldiers came to his door. Later that day, he was detained by members of the AUC, who told his partner that he was being held; he was disappeared by the AUC. His murder has been recognized as a paramilitary killing in the Justice and Peace proceedings.

943.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the murder of John Doe 64 through their support of the AUC in Urabá, which at the time of events had full control of the region.


*John Doe 66, Jane Doe 49, Jane Doe 50, Jane Doe 51, Jane Doe 52, Jane Doe 53, Jane Doe 54/John Doe 67*

944.     John Doe 67 was the son of John Doe 66 and Jane Doe 49 and the brother of Jane Doe 50, Jane Doe 51, Jane Doe 52, Jane Doe 53, and Jane Doe 54. Jane Doe 49 is deceased and her daughter, Jane Doe 52, brings claims on her behalf.

945.     In September 2000, John Doe 67 was murdered by members of the AUC in his family home. He had previously received threats from the paramilitaries.

946.     John Doe 67's murder has been recognized in the Justice and Peace proceedings.

947.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 67 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 55/John Doe 68*

948.     Jane Doe 55's partner, John Doe 68, was a farmworker. He was murdered in August 2000 by members of the AUC. This murder has been recognized as a paramilitary killing in the Justice and Peace proceedings.

949.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 68 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 56, Jane Doe 57, Jane Doe 58, John Doe 70/John Doe 69*

950.     John Doe 69 was the son of Jane Doe 56 and the brother of Jane Doe 57, Jane Doe 58, and John Doe 70.

951.     John Doe 69 was kidnapped and murdered by the AUC in March 2001. This death is recognized as a paramilitary killing in the Justice and Peace proceedings.

952.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 69 through their support of the AUC in Urabá, which at the time of events had full control of the region.

*Jane Doe 59, Jane Doe 60, John Doe 71/John Doe 72*

953.     John Doe 72 was the husband of Jane Doe 59 and the father of John Doe 71 and Jane Doe 60.

954.     John Doe 72 was a truck driver who was murdered by the AUC in January 2001. His company had received threats from the paramilitaries. This death was recognized as a

148

paramilitary killing in the Justice and Peace proceedings.

955.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 72 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 61, John Doe 73, John Doe 75/John Doe 76*

956.    John Doe 76 was the father of John Doe 75 and the brother of John Doe 73 and Jane Doe 61.

957.    John Doe 76 was a banana farmer who owned his own parcel of land. He and a companion, John Doe 78, were disappeared and murdered by paramilitaries in March 1996. These deaths were recognized as paramilitary killings in the Justice and Peace proceedings.

958.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 76 through their support of the paramilitaries in Urabá.

*Jane Doe 62, Jane Doe 63, Jane Doe 64, John Doe 74/John Doe 78*

959.    John Doe 78 was the son of Jane Doe 62 and the brother of Jane Doe 63, Jane Doe 64, and John Doe 74.

960.    John Doe 78 was a worker on a banana farm belonging to his family. He and a companion, John Doe 76, were murdered by paramilitaries in March 1996. These deaths were recognized as paramilitary killings in the Justice and Peace proceedings.

961.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 78 through their support of the paramilitaries in Urabá.

*Jane Doe 65, Jane Doe 66, Jane Doe 67/John Doe 79*

962.     John Doe 79 was the son of Jane Doe 65 and the brother of Jane Doe 66 and Jane Doe 67. He worked as a banana farmer.

963.     John Doe 79 was disappeared by the AUC in December 2000, and was also, in or around that time, murdered by the AUC. His death is being investigated as a paramilitary killing in the Justice and Peace proceedings.

964.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the disappearance and murder of John Doe 79 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 68, Jane Doe 69/Jane Doe 70*

965.     Jane Doe 70, the mother of Jane Doe 68 and Jane Doe 69, was an agricultural worker and a member of the Sintrainagro union. She was also a member of the Union Patriótica party. In June 1996, she was murdered by paramilitaries. This death was recognized as a paramilitary killing in the Justice and Peace proceedings.

966.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from and/or aided the murder of Jane Doe 70 through their support of the paramilitaries in Urabá.

*Jane Doe 71, Jane Doe 72, Jane Doe 73, Jane Doe 74, John Doe 80/John Doe 81*

967.     John Doe 81 was the partner of Jane Doe 71 and the father of Jane Doe 72, Jane Doe 73, Jane Doe 74, and John Doe 80.

968.    John Doe 81 was murdered in August 2003 by a member of the AUC.

969.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from and/or aided the murder of Jane Doe 70 through their support of the paramilitaries in Urabá.

*Jane Doe 75, Jane Doe 76, Jane Doe 77, Jane Doe 78/John Doe 82*

970.    John Doe 82 was the son of Jane Doe 75 and the brother of Jane Doe 76, Jane Doe 77, and Jane Doe 78.

971.    John Doe 82 worked in construction in Urabá. In November 1999, paramilitaries arrived in a van to the farm where John Doe 82 was working on the construction of packing machinery. The paramilitaries asked for one of the workers, who was John Doe 82's cousin. John Doe 82 asked why they wanted that worker. When the paramilitaries asked again, he insisted on his question. The paramilitaries then tied him up and shot him dead in front of his colleagues.

972.    John Doe 82 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza. His family received administrative reparations from the Colombian government for his murder.

973.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 82 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 79, Jane Doe 81, Jane Doe 82, Jane Doe 83, Jane Doe 84, Jane Doe 85/John Doe 83*

974.    John Doe 83 was the partner of Jane Doe 79 and the father of Jane Doe 81, Jane Doe 82, Jane Doe 83, Jane Doe 84, and Jane Doe 85. He grew bananas on his own property.

975.    John Doe 83 was the president of a local communal action board. The board had a meeting in September 2001, and several members of the AUC interrupted. John Doe 83 was taken by the paramilitaries from the meeting and murdered. John Doe 83 had previously been threatened by paramilitaries.

976.    John Doe 83 has been recognized as a victim in the Justice and Peace proceedings.

977.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 83 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

978.    On information and belief, Chiquita and the Defendants benefited from the death of John Doe 83 by removing a community leader whose actions threatened the stability and profitability of Chiquita's operations.


*John Doe 84, Jane Doe 86, Jane Doe 87, Jane Doe 88/John Doe 85*

979.    John Doe 85 was the partner of Jane Doe 86 and the father of John Doe 84, Jane Doe 87, and Jane Doe 88.

980.    John Doe 85 worked at a fruit company in Apartadó. He was murdered by the AUC, in front of Jane Doe 86, in February 2001. His death is recognized as a paramilitary killing in the Justice and Peace proceedings.

981.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 85 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 89, John Doe 86/John Doe 87*

982.    John Doe 87 was the partner of Jane Doe 89 and the father of John Doe 86. Jane Doe 89 is deceased and her son, John Doe 86, brings claims on her behalf.

983.    John Doe 87 was an active member of a union, SINTRAFOAN. In March 1996, he was in his home when members of the AUC came and murdered him there.

984.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping and murder of John Doe 87 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

985.    On information and belief, Chiquita and the Defendants benefited from the death of John Doe 87 by removing a labor organizer whose actions threatened the stability and profitability of Chiquita's operations.


*John Doe 88, John Doe 89, John Doe 90, Jane Doe 90, Jane Doe 91, Jane Doe 92/John Doe 91*

986.    John Doe 91 was the son of Jane Doe 90 and John Doe 88 and the brother of Jane Doe 91, Jane Doe 92, John Doe 89, and John Doe 90. John Doe 88 is deceased and his daughter, Jane Doe 91, brings claims on his behalf.

987.    John Doe 91 was a farm laborer in Chigorodó. In April 1996, he was murdered by the paramilitaries.

988.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 91 through their support of the paramilitaries in Urabá.

*Jane Doe 93/John Doe 92*

989.    Jane Doe 93's father, John Doe 92, had his own farm where he grew bananas and raised livestock. John Doe 92 was murdered by a paramilitary commander in March 1996 in connection with a land dispute.

990.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnapping and murder of John Doe 92 through their support of the paramilitaries in Urabá.

*John Doe 93, Jane Doe 94, Jane Doe 95/Jane Doe 96*

991.    Jane Doe 96, the mother of John Doe 93, Jane Doe 94, and Jane Doe 95, owned a butcher shop and refused to pay a tax to the AUC. In June 1995, paramilitaries showed up on Jane Doe 96's home, tied her up, and threatened to rape one of her daughters. Jane Doe 96 tried to escape with her daughter but was shot by an AUC member and died.

992.    On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnapping and murder of Jane Doe 96 through their support of the paramilitaries in Urabá.

*John Doe 94, Jane Doe 97/John Doe 95*

993.    John Doe 95, the father of John Doe 94 and Jane Doe 97, was a farmer and a member of Union Patriótica party in Turbo. In January 1996, John Doe 95 was kidnapped by paramilitaries on the way to his farm. He was tortured and eventually murdered. This has been recognized as a paramilitary killing in the Justice and Peace proceedings.

994.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnaping, torture and murder of John Doe 95 through their support of the paramilitaries in Urabá.

995.     On information and belief, Chiquita and the Defendants benefited from the death of John Doe 95 by removing a political activist whose actions threatened the stability and profitability of Chiquita's operations.


*John Doe 96, John Doe 97, Jane Doe 98/John Doe 98*

996.     John Doe 98 was the partner of Jane Doe 98 and the stepfather of John Doe 96 and John Doe 97. John Doe 96 is now deceased and is represented in this action by his mother, Jane Doe 98.

997.     John Doe 98 was threatened and killed by the AUC on the orders of a paramilitary commander known as El Aleman. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

998.     On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 98 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*John Doe 102, Jane Doe 103, Jane Doe 104/John Doe 103*

999.     John Doe 103, the partner of Jane Doe 103 and father of John Doe 102 and Jane Doe 104, worked on a farm owned by his father in Apartadó.

1000.   In September 2000, members of the AUC kidnapped and murdered John Doe 103. He had previously received threats from the paramilitaries.

1001.   John Doe 103 has been recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1002.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided the murder of John Doe 103 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 105, Jane Doe 106/John Doe 104*

1003.   John Doe 104 was the partner of Jane Doe 105 and the father of Jane Doe 106.

1004.   In September 2002, John Doe 104 was abducted from his home in Turbo and later tortured and murdered by the AUC.

1005.   John Doe 104 has been recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1006.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 104 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 107, Jane Doe 108, John Doe 106, John Doe 368/John Doe 107*

1007.   John Doe 107 was the father of John Doe 368 and the brother of John Doe 106, Jane Doe 107, and Jane Doe 108.

1008.   John Doe 107 was a laborer on banana farms in Turbo, in or around March 2003, John Doe 107 was murdered by the AUC. His death has been recognized in the Justice and Peace proceedings.

1009.   On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided the murder of John Doe 107 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 108, Jane Doe 109, Jane Doe 110, Jane Doe 111, Jane Doe 112/John Doe 109*

1010.   John Doe 109 was the partner of Jane Doe 109 and the father of Jane Doe 110, Jane Doe 111, Jane Doe 112, and John Doe 108.

1011.   John Doe 109 was a laborer on several farms in Carepa and a union member. In April 1997, several paramilitaries abducted him from his home and murdered him. His body was found on a nearby farm. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza..

1012.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 109 through their support of the paramilitaries in Urabá.

*John Doe 110, John Doe 111, John Doe 112, Jane Doe 113, Jane Doe 114, Jane Doe 115, Jane Doe 116, Jane Doe 117, and Jane Doe 118/John Doe 113*

1013.   John Doe 113 was the son of Jane Doe 113, the partner of Jane Doe 118, the father of John Doe 112, Jane Doe 116, and Jane Doe 117, and the brother of John Doe 110, John Doe 111, Jane Doe 114, and Jane Doe 115.

1014.   John Doe 113 lived with his family in Apartadó. In January 2001, several members of the AUC broke into his home and killed him.

1015.   John Doe 113's death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1016.   On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided the murder of John Doe 113 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 114/John Doe 115*

1017.   John Doe 114's brother, John Doe 115, was murdered by paramilitaries in Turbo in or around December 1996. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1018.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 115 through their support of the paramilitaries in Urabá.

*John Doe 116, John Doe 117, John Doe 118, Jane Doe 119, Jane Doe 120, Jane Doe 123, Jane Doe 124, Jane Doe 141, Jane Doe 142/John Doe 120*

1019.   John Doe 120 was the son of Jane Doe 119, the brother of Jane Doe 120, Jane Doe 123, Jane Doe 141, Jane Doe 142, John Doe 116, and John Doe 117, and the father of John Doe 118 and Jane Doe 124. Jane Doe 119 has died since the commencement of this suit; she is represented in this action by her children Jane Doe 120, Jane Doe 123, Jane Doe 141, Jane Doe 142, John Doe 116, and John Doe 117, who have moved to substitute for her.

1020.   John Doe 120 was murdered by the AUC in or around June 2000. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1021.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the attempted kidnapping and murder of John Doe 120 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 125/John Doe 121*

1022.   In or around April 2003, Jane Doe 125's partner, John Doe 121, was murdered by the AUC in Urabá. John Doe 121 was an agricultural worker. Two men who were part of the Elmer Cardenas bloc of the AUC, including "El Mono," murdered John Doe 121 when he was on his way to work at a farm. This death is being investigated in the Justice and Peace proceedings.

1023.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 121 through their support of the AUC in Urabá, which at the time of events had full control of the region.


*John Doe 123, John Doe 124, Jane Doe 126, Jane Doe 127, Jane Doe 128, Jane Doe 129, Jane Doe 130, Jane Doe 131, Jane Doe 132, Jane Doe 133, Jane Doe 134, Jane Doe 135/John Doe 125*

1024.   John Doe 125 was the son of Jane Doe 128, the partner of Jane Doe 126, the adoptive father of Jane Doe 127, and the brother of Jane Doe 129, Jane Doe 130, Jane Doe 131, Jane Doe 132, Jane Doe 133, Jane Doe 134, Jane Doe 135, John Doe 123, and John Doe 124. Jane Doe 128 is deceased and her children, Jane Doe 130, Jane Doe 131, and John Doe 123, bring claims on their behalf.

1025.   John Doe 125 was murdered in or around October 1998 by the AUC. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1026.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 125 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 126, John Doe 127, John Doe 128, John Doe 128, John Doe 130, Jane Doe 136, Jane Doe 137, Jane Doe 138/John Doe 131*

1027.   John Doe 131 was the partner of Jane Doe 136 and the father of Jane Doe 137, Jane Doe 138, John Doe 126, John Doe 127, John Doe 128, John Doe 129, and John Doe 130.

1028.   John Doe 131 was a laborer at a farm and a union member. He was murdered by the AUC in or around March 2003 in Turbo after AUC members took him away from the farm where he worked. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1029.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the kidnapping and murder of John Doe 131 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 132, Jane Doe 139, Jane Doe 140/John Doe 133*

1030.   John Doe 133 was the partner of Jane Doe 139 and the father of Jane Doe 140 and John Doe 132.

1031.   John Doe 133 was murdered by the AUC in or around January 1999 in Turbo. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1032.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 133 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 134, John Doe 135, John Doe 136, Jane Doe 143, Jane Doe 144/John Doe 137*

1033.   John Doe 137 was the partner of Jane Doe 143 and the father of Jane Doe 144, John Doe 134, John Doe 135, and John Doe 136. He worked as an administrator on a farm.

1034.   John Doe 137 was murdered by paramilitaries in or around October 1996 in Apartadó. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1035.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 137 through their support of the paramilitaries in Urabá.


*John Doe 99, John Doe 100, John Doe 101, Jane Doe 101, Jane Doe 102/John Doe 38*

1036.   John Doe 38 was the husband of Jane Doe 101 and the father of Jane Doe 102, John Doe 99, John Doe 100, and John Doe 101. John Doe 38 was a municipal employee and union member.

1037.   John Doe 38 was murdered by paramilitaries in or around November 1996 in Apartadó. He had been threatened by paramilitaries before his death.

1038.   This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1039.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 38 through their support of the paramilitaries in Urabá.


*John Doe 139, John Doe 230, Jane Doe 145, Jane Doe 146, Jane Doe 233, Jane Doe 234, Jane Doe 235/John Doe 138*

1040.   John Doe 138 was the son of Jane Doe 145 and John Doe 139 and the brother of Jane

Doe 146. John Doe 139 is deceased and his children, Jane Doe 233, Jane Doe 234, Jane Doe 235, and John Doe 230, bring claims on his behalf.

1041.   John Doe 138 was kidnapped and murdered by the AUC in or around June 1999 in Chigorodó. This death has been recognized as a paramilitary killing in the Justice and Peace proceedings.

1042.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 138 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 147/John Doe 140*

1043.   Jane Doe 147's husband, John Doe 140, was a banana worker in Apartadó. He was murdered by the AUC in May 2004.

1044.   John Doe 140 is recognized as a victim in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia.

1045.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 140 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 148/John Doe 141*

1046.   Jane Doe 148's husband, John Doe 141, was a banana worker who was murdered by the AUC in April 2004 in Apartadó.

1047.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 141 through their support of the AUC in Urabá, which at

the time of the events was in control of the region.

*Jane Doe 149/John Doe 142*

1048.   Jane Doe 149's son, John Doe 142, worked as a banana farmer in Turbo. In August 2003, he was detained by members of the AUC and brought to another farm, where he was murdered. His stepfather and uncle had been murdered years before by the AUC.

1049.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 142 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 150/John Doe 143*

1050.   Jane Doe 150's brother, John Doe 143, worked on a farm in Turbo that was owned by his father. He was murdered by the AUC while he was at the farm in 2003.

1051.   John Doe 143 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1052.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 143 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 144/Jane Doe 152*

1053.   John Doe 144's partner, Jane Doe 152, was a teacher in Apartadó. She was kidnapped from her brother's apartment and murdered by the AUC in November 2001.

1054.   On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided the murder of Jane Doe 152 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 145/Jane Doe 155*

1055.   John Doe 145's mother, Jane Doe 155, was murdered by the AUC in April or May 2001 in Apartadó.

1056.   Jane Doe 155 is recognized as a victim in the Justice and Peace proceedings.

1057.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of Jane Doe 155 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 156/John Doe 146*

1058.   Jane Doe 156's son, John Doe 146, worked on a Banadex farm and was a union member. He was kidnapped from the farm and murdered by the AUC in February 2001. Several months before his death, John Doe 146 had been detained by two AUC members.

1059.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided the murder of John Doe 146 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 157/John Doe 147*

1060.   Jane Doe 157's son, John Doe 147, worked various jobs on banana farms and was a union member. He was murdered by the AUC in February 2001. He was confronted near his home by AUC members under the command of a paramilitary known as "Jorge", who shot and

killed him. In the Justice and Peace Process, responsibility has been attributed to AUC Commander Raúl Emilio Hasbún.

1061.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 147 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 158/John Doe 148*

1062.   Jane Doe 158's son, John Doe 148, was a farm worker in Apartadó. He was killed by the AUC on a public road in February 2001.

1063.   John Doe 148 is recognized as a victim in the Justice and Peace proceedings.

1064.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 148 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 159/John Doe 149*

1065.   Jane Doe 159's partner, John Doe 149, was a banana worker in Apartadó and a union member. He was murdered by the AUC in December 2000.

1066.   John Doe 149 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1067.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 149 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 161/John Doe 151*

1068.   Jane Doe 161's brother, John Doe 151, was a banana worker and union member. He was murdered by the AUC in his home in December 2000.

1069.   John Doe 151 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1070.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 151 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 162/John Doe 152*

1071.   Jane Doe 162's partner, John Doe 152, was a driver. In October 2000, he was murdered by armed AUC members after they boarded his truck.

1072.   John Doe 152 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1073.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 152 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 163/John Doe 153*

1074.   Jane Doe 163's brother, John Doe 153, was a driver and owned a farm. He was driving in Apartadó in October 2000 when he was detained by members of the AUC. He was kidnapped and then murdered.

1075.   John Doe 153 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1076.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 153 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 165/John Doe 155*

1077.   Jane Doe 165's partner, John Doe 155, worked on a farm in Urabá and was a union member. He was murdered by the AUC in September 2000. His body was found at a packing plant next to a farm where he had worked.

1078.   John Doe 155 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1079.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 155 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 166/John Doe 156*

1080.   Jane Doe 166's partner, John Doe 156, was a banana worker in Urabá. He was murdered by the AUC in July 2000.

1081.   John Doe 156 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1082.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 156 through their support of the AUC in Urabá, which at

the time of the events was in control of the region.

*Jane Doe 167, John Doe 367, Jane Doe 364/John Doe 157*

1083.   John Doe 157 was the partner of Jane Doe 167 and the father of John Doe 367 and Jane Doe 364. John Doe 157 was a banana worker in Apartadó and a union member. He was disappeared and murdered by the AUC in 2000. John Doe 157 had previously been threatened by paramilitaries in 1996 because he did not want to work with them. He and Jane Doe 167 moved to Medellín that year, but they later returned to Apartadó because they were unable to find work in Medellín.

1084.   John Doe 157 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1085.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 157 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 168/John Doe 158*

1086.   Jane Doe 168's brother, John Doe 158, was a banana worker. He was murdered by the AUC in April 1998 on or near Zunga, a loading dock for bananas.

1087.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of John Doe 158 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 170/Jane Doe 169/John Doe 201*

1088.   Jane Doe 170's sister, Jane Doe 169, and Jane Doe 169's partner, John Doe 201, were banana workers. They were forced to flee their home with their children. In September 1999, Jane Doe 169 was murdered by the AUC and John Doe 201 was disappeared by the AUC on the same day in Urabá. He has not been seen since and, on information and belief, was subsequently murdered.

1089.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided the murder of Jane Doe 169 and disappearance and murder of John Doe 201 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 171/John Doe 159*

1090.   Jane Doe 171's brother, John Doe 159, worked on banana farms in Urabá and was a union member. He was murdered by the AUC while working on the farms in September or October 1999. His family was forcibly displaced.

1091.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from and/or aided the murder of John Doe 159 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 172/John Doe 160*

1092.   Jane Doe 172's partner, John Doe 160, was a banana worker and a union member. He was told by the owners of the farm that he had been replaced by another worker, but John Doe

160 refused to leave until he received the severance he was entitled under the labor laws. He was murdered by the AUC in August 1999 while waiting for the bus to go to work on a banana farm. Jane Doe 172 and their children were displaced after this incident.

1093.   John Doe 160 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1094.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from, and/or aided the murder of John Doe 160 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 162/John Doe 161*

1095.   John Doe 162's son, John Doe 161, was in charge of the drains on a banana farm. He was killed in July 1999, in Apartadó, by the AUC paramilitaries.

1096.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided in the murder of John Doe 161 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 173/John Doe 163*

1097.   Jane Doe 173's partner, John Doe 163, was a banana worker on in Apartadó and a union member. In July 1999, he was working at the farm when two AUC paramilitaries came on motorcycles and killed him.

1098.   John Doe 163 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1099.   On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided in the murder of John Doe 163 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 174/John Doe 164/John Doe 182/John Doe 196*

1100.   Jane Doe 174's brother, John Doe 182, was forcibly displaced within Urabá following a massacre in San José of Apartadó. The AUC then killed him in his new neighborhood in August 1997.

1101.   Jane Doe 174's brother, John Doe 196, was also displaced following the massacre in San José of Apartadó. He was disappeared and killed by the AUC in Urabá in 1998.

1102.   Jane Doe 174's father, John Doe 164, worked as a coachman and was killed in July 1999 by AUC paramilitaries who arrived at his house in Apartadó and shot him with a firearm.

1103.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided in the murders of John Doe 164, John Doe 182 and John Doe 196 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 177/John Doe 167*

1104.   Jane Doe 177's son, John Doe 167, was killed by the AUC paramilitaries in April 1999 in Apartadó.

1105.   John Doe 167 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1106.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 176 through their support of the AUC in Urabá.

*Jane Doe 180/John Doe 168*

1107.   Jane Doe 180's brother, John Doe 168, was a farmer on his own parcel of land. He was kidnapped and killed by the AUC in October 1998.

1108.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 168 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 181/John Doe 169*

1109.   Jane Doe 181's partner, John Doe 169, was a banana worker in a farm in Carepa.

1110.   In September 1998, he was working on the farm when four men on two motorcycles arrived asking for him. In the packing building they told him to go to the office where the AUC paramilitaries were waiting for him; they tied him up and took him away. They killed him on exiting the farm.

1111.   John Doe 169 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1112.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 168 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 182/John Doe 170*

1113.   Jane Doe 182's partner, John Doe 170, was a banana worker in Apartadó and a union member. In June or July 1998, when he was on the farm, armed men on motorcycles arrived and

172

identified themselves as AUC paramilitaries.

1114.   They were looking for three of the workers, but they only detained and killed John Doe 170 because the other two fled.

1115.   John Doe 170 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1116.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 170 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 183/John Doe 171*

1117.   Jane Doe 183's brother, John Doe 171, was a banana worker and union member. He was killed in Carepa by members of the AUC paramilitaries in June 1998.

1118.   AUC Commander Raúl Emilio Hásbun has accepted responsibility for this murder in the Justice and Peace Process.

1119.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 171 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 184/John Doe 172*

1120.   Jane Doe 184's son, John Doe 172, was a banana worker on the Epoban farm where he ran the producers' cooperative.

1121.   In May 1998, he was tortured and killed in his home in Turbo by three AUC paramilitaries. They tied him up and stabbed a screwdriver into his head before they shot him.

1122.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, benefited from and/or aided and abetted the deaths of John Doe 172 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 185/John Doe 173*

1123.   Jane Doe 185's partner, John Doe 173, was a banana worker in Apartadó and a union member. In or around May 1998, he was detained by the AUC paramilitaries and then tortured and killed.

1124.   John Doe 173 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1125.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 173 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 186/John Doe 174*

1126.   Jane Doe 186's husband, John Doe 174, was a leader of a communal action board in Apartadó.

1127.   In February 1998, he was in his house when the AUC paramilitaries came and took him away on a motorcycle; his whereabouts are unknown to this day. On informed and belief, he was murdered by these paramilitaries.

1128.   John Doe 174's death is recognized as a paramilitary killing in the Justice and Peace proceedings.

1129.   On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of John Doe 174 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

1130.   On information and belief, Chiquita and the Defendants benefited from the death of John Doe 174 by removing a community leader whose actions threatened the stability and profitability of Chiquita's operations.

*Jane Doe 187/John Doe 175/John Doe 176*

1131.   Jane Doe 187's father, John Doe 176, was a banana worker. In December 1996, he was at work when armed AUC members arrived, took him away, and killed him.

1132.   In January 1998, Jane Doe 187's brother, John Doe 175, was detained by the AUC on his way to El Casco (Restrepo Girona) to request the cash benefits due as a consequence of his father's murder.

1133.   He was detained by members of the AUC paramilitaries who forced him on to a pick-up truck. They killed him in the town center of Apartadó.

1134.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 175 and John Doe 176 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 188/John Doe 177*

1135.   Jane Doe 188's son, John Doe 177, was a banana worker on the Santa Marta farm. In December 1997, he was in his house when three men who identified themselves as members of the AUC paramilitaries arrived there. They asked him to go with them. The following day, he was found dead.

1136.   John Doe 177 is recognized as a victim in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia.

1137.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 177 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 189/John Doe 178*

1138.   Jane Doe 189's son, John Doe 178, was a mechanic who worked in Apartadó. In October 1997, he was killed by the AUC paramilitaries who arrived at La Chinita and killed him there.

1139.   John Doe 178 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1140.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 178 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 190/John Doe 179*

1141.   Jane Doe 190's partner, John Doe 179, was a banana worker. He was abducted from his house by three members of the AUC, one of whom was alias "Mononegro." They took him and killed him near the banana farm.

1142.   John Doe 179 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1143.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 179 through their support of the AUC in Urabá,

which at the time of the events was in control of the region.

*Jane Doe 192/John Doe 181*

1144.   Jane Doe 192's partner, John Doe 181, was a banana worker. He was killed by AUC paramilitaries in August 1997.

1145.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 181 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 194/Jane Doe 195*

1146.   Jane Doe 194's mother, Jane Doe 195, was forcibly displaced to Apartadó.

1147.   She was then found and kidnapped in August 1997 by armed men from the AUC. The next day, she was found dead; on information and belief, she was murdered by the AUC.

1148.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 195 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 196/John Doe 183*

1149.   Jane Doe 196's husband, John Doe 183, was a banana worker. He was killed in April 1996 by paramilitaries.

1150.   John Doe 183 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1151.   On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of John Doe 183 through their support of the paramilitaries in Urabá.

*Jane Doe 197/John Doe 184*

1152.   Jane Doe 197's son John Doe 184 was a banana worker. In March 1997, he was abducted from his house by a group of approximately five paramilitaries. His body was found in Chigorodó a few days later.

1153.   John Doe 184 is recognized as a victim in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia.

1154.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 184 through their support of the paramilitaries in Urabá.

*Jane Doe 198/John Doe 185*

1155.   Jane Doe 198's brother, John Doe 185, was a banana worker who was a member of the Unión Patriótica party. He was killed in March 1997 by paramilitaries, together with four other banana workers.

1156.   John Doe 185 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1157.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 184 through their support of the paramilitaries in Urabá.

*Jane Doe 199/John Doe 186*

1158.   Jane Doe 199's partner, John Doe 186, was a banana worker. In February 1997, after he made a claim for unpaid wages, he was killed by paramilitaries.

1159.   John Doe 186 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1160.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 186 through their support of the paramilitaries in Urabá.

*Jane Doe 200/John Doe 187*

1161.   Jane Doe 200's partner, John Doe 187, was a banana worker at a farm. In January 1997, he was murdered by paramilitaries in Apartadó.

1162.   John Doe 187 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza.

1163.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 187 through their support of the paramilitaries in Urabá.

*Jane Doe 201/John Doe 188*

1164.   Jane Doe 201's father, John Doe 188, was a banana worker. In December 1996, he was murdered by paramilitaries in Apartadó.

1165.   On information and belief, Chiquita and the Defendants caused, intended, conspired in,

and/or aided and abetted the death of John Doe 188 through their support of the paramilitaries in Urabá.

*Jane Doe 202/John Doe 189/John Doe 204*

1166.   Jane Doe 202's partner, John Doe 189, was a banana worker at a Banadex farm, a union member, and a member of the political party Unión Patriótica. In December 1996, he was kidnapped and murdered by paramilitaries in Turbo. The paramilitaries disappeared his and Jane Doe 202's son, John Doe 204, in Apartadó, killing him.

1167.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the kidnapping and death of John Doe 189, and the disappearance and murder of John Doe 204, through their support of the paramilitaries in Urabá.

1168.   On information and belief, Chiquita and the Defendants benefited from the death of John Doe 189 by removing a politically active Banadex employee whose actions threatened the stability and profitability of Chiquita's operations.

*Jane Doe 203/John Doe 190*

1169.   Jane Doe 203's brother, John Doe 190, was a banana worker. In November 1996, he was at a tavern in Chigorodó and was murdered by paramilitaries under the orders of a paramilitary leader known by the alias "Pablo."

1170.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 190 through their support of the paramilitaries in Urabá.

*Jane Doe 204/Jane Doe 205*

1171.   Jane Doe 204's mother, Jane Doe 205, was murdered by paramilitaries in October 1996. Jane Doe 205 and her husband owned a farm in Urabá that the paramilitaries wanted to acquire. After Jane Doe 205 and her husband refused to sell the farm, paramilitaries threatened and displaced them. After this, paramilitaries found Jane Doe 205 and killed her in Turbo.

1172.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the forced displacement and death of Jane Doe 205 through their support of the paramilitaries in Urabá.

*Jane Doe 206/John Doe 191*

1173.   Jane Doe 206's partner, John Doe 191, was a banana worker at a farm and a union member. In September 1996, he was kidnapped and murdered by paramilitaries in Apartadó.

1174.   John Doe 191 is recognized as a victim in the Justice and Peace proceedings.

1175.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 191 through their support of the paramilitaries in Urabá.

*Jane Doe 207/John Doe 192/Jane Doe 208/John Doe 207/John Doe 208*

1176.   In September 1996, Jane Doe 207's parents, Jane Doe 208 and John Doe 192, were forcibly displaced, kidnapped and murdered by paramilitaries in Turbo.

1177.   John Doe 207 was Jane Doe 207's brother. John Doe 208 was Jane Doe 207's partner. In March 1997, John Doe 207 and John Doe 208 were disappeared by paramilitaries in Turbo, who

murdered them. Before their disappearances, they received threats from the paramilitaries because they denounced the paramilitaries' murder of Jane Doe 208 and John Doe 192 to a prosecutor.

1178.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the displacement, kidnapping and deaths of Jane Doe 208 and John Doe 192 and the disappearance and deaths of John Doe 207 and John Doe 208 through their support of the paramilitaries in Urabá.

*Jane Doe 209/John Doe 193*

1179.   Jane Doe 209's partner, John Doe 193, was a contractor for Banadex. In September 1996, he was murdered by paramilitaries in Carepa.

1180.   John Doe 193 is recognized as a victim in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia.

1181.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 193 through their support of the paramilitaries in Urabá.

*Jane Doe 210/John Doe 194*

1182.   Jane Doe 210's partner, John Doe 194, worked at a farm and was an activist for the political party Unión Patriótica. In May 1996, he was murdered by paramilitaries in Turbo.

1183.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 194 through their support of the paramilitaries in Urabá.

1184.  On information and belief, Chiquita and the Defendants benefited from the death of John Doe 194 by removing a politically active farm worker whose actions threatened the stability and profitability of Chiquita's operations.


*Jane Doe 193/Jane Doe 212/John Doe 209*

1185.  In 1998, the AUC murdered Jane Doe 193's daughter, Jane Doe 212, and disappeared Jane Doe 212's husband, John Doe 209, in Turbo.

1186.  On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 212 and the disappearance of John Doe 209 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 179/John Doe 197/John Doe 198/John Doe 200*

1187.  The AUC disappeared and killed Jane Doe 179's three sons – John Doe 198 in 2001, John Doe 197 in 2002, and John Doe 200 in 2004 – in Turbo. They were farmers.

1188.  On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearances and murders of John Doe 197, John Doe 198, and John Doe 200 through their support of the AUC in Urabá, which at the time of the events was in control of the region.


*Jane Doe 191/John Doe 202*

1189.  Jane Doe 191's brother, John Doe 202, was a banana worker. In April 2001, he was disappeared and killed by the AUC in Carepa.

1190.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearance and murder of John Doe 202 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*Jane Doe 178/John Doe 203*

1191.   Jane Doe 178's father, John Doe 203, was a banana worker and cattle farmer. He was kidnapped and killed by the AUC in Turbo in or around December 1999. The AUC also robbed cattle and his vehicle.

1192.   Commander Jesús Ignacio Roldán Pérez, Alias "Monoleche", has accepted responsibility for this murder in the Justice and Peace Process.

1193.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the disappearance and murder of John Doe 203 through their support of the AUC in Urabá, which at the time of the events was in control of the region.

*John Doe 326 and John Doe 327/John Doe 324*

1194.   John Doe 324, brother of John Doe 326 and John Doe 327, was a councillor for a municipality in Urabá. John Doe 326 is deceased and his daughter, Jane Doe 370, brings claims on his behalf for the death of John Doe 324. John Doe 327 is deceased and his siblings, Jane Doe 315, John Doe 325, and Jane Doe 316, bring claims on his behalf for the death of John Doe 324.

1195.   In July 1996, John Doe 324 was doing some work in a cemetery in Urabá. An armed paramilitary arrived and shot him several times, causing his death.

1196.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 324 through their support of the paramilitaries in

Urabá.

*Jane Doe 365, Jane Doe 366, Jane Doe 367, Jane Doe 368, Jane Doe 369, John Doe 369/John Doe 371*

1197.   John Doe 371 was the partner of Jane Doe 365 and the father of Jane Doe 366, Jane Doe 367, Jane Doe 368, Jane Doe 369, and John Doe 369.

1198.   In April 1996, John Doe 371 was working on a farm in Urabá when several paramilitary members entered and asked for a tool to fix a vehicle. When John Doe 371 turned his back to them, they shot and injured him. They then took him to a different farm and killed him.

1199.   On information and belief, Chiquita and the Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 371 through their support of the paramilitaries in Urabá.

## VII.   <u>GENERAL ALLEGATIONS</u>

1200.   At all times, Chiquita and the Defendants knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances.

1201.   The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority. The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces, pursuant to the overall war strategy of the Colombian government.  Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary

collaboration, including at least fourteen members of Congress, seven former lawmakers, the head of the secret police, mayors, and former governors. Furthermore, Chiquita's payments to the AUC were facilitated by *convivir*, which were licensed by and operated with the express authority of the government.

1202.   The acts described herein were conducted in the course of an internal armed conflict as part of the Colombian government's war strategy.  The AUC and other paramilitaries were parties to this armed conflict that engaged in combat with guerrilla armies on behalf of the government; they committed the abuses against Plaintiffs as part of their prosecution of this conflict.  The AUC and other paramilitaries were engaged in this conflict in partnership with the Colombian military.

1203.   The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as against several discrete sub-populations, including but not limited to leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally-commanded paramilitary organization. On information and belief, at all relevant times Chiquita and the Defendants had knowledge of this attack.

1204.   The acts and injuries to Plaintiffs described herein were part of a pattern and practice of systematic human rights violations paid for, facilitated, condoned, confirmed, aided and abetted, and/or ratified by Chiquita and the Defendants and/or committed in conspiracy with the AUC.

1205.   As a direct and proximate result of Chiquita and the Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal

injuries, property damage, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

1206.   Plaintiffs' causes of action arise under and constitute torts under the following laws:

a)  Alien Tort Claims Act, 28 U.S.C. § 1350;

b)  Torture Victim Protection Act, 28 U.S.C. § 1350, note;

c)  Customary international law;

d)  Common law of the United States of America;

e)  Laws of Colombia, and

f)  To the extent that the laws of Colombia do not apply to any of the claims herein, and the laws of any U.S. state or other jurisdiction are applicable, the laws of such states or other jurisdictions.

1207.   Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary, Banadex. On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there.  Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them.  The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities.  Military officers accused of collaboration with paramilitaries are routinely exonerated or given token sentences by military courts.  Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

1208.   Legal action by Plaintiffs in Colombia would also result in serious reprisals.  Individuals

who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

1209.   Chiquita and the Defendants took active steps to conceal their payments and other forms of support to the AUC.

1210.   This concealment had the effect of preventing Plaintiffs from learning that Chiquita and the Defendants were responsible for their injuries. No plaintiff was aware of Chiquita or the Defendants' support for the AUC until after Chiquita's guilty plea on March 19, 2007. Many plaintiffs were unaware of this until significantly later.

1211.   Chiquita and the Defendants' concealment of their role in Plaintiffs' injuries prevented Plaintiffs from filing their claims at an earlier date.

1212.   Plaintiffs were additionally unable to bring suit in Colombia or the United States until at least 2007 due to the poor security situation and the danger of reprisals, to which Chiquita's support of the AUC contributed.

1213.   Several of the AUC paramilitary units active in the banana-growing region, including Bloque Norte and the Bloque Elmer Cárdenas, did not demobilize until 2006.

1214.   Throughout this period, paramilitaries continued to kill and make threats against civilians in the banana-growing region.  In 2006, several human rights workers received death threats, including lawyers challenging paramilitary violence.

*Minority tolling allegations*

1215.   The following plaintiffs are entitled to ten-year minority tolling in that they held minority status within ten years prior to the date of filing of their claims. Allegations of their specific birth dates are not included here in accordance with Rule 5.2(a)(2) of the Federal Rules of Civil Procedure and Section 6 of the CM/ECF procedures, but may be found in Addendum A to this

Complaint. Addendum A is hereby incorporated and made part of this Complaint pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

1216.  John Doe 367 was born in 1997. John Doe 157's date of death is March 1, 2000. John Doe 367 was 23 years old when his original complaint was filed in 2021.

1217.  Jane Doe 364 was born in 1995. John Doe 157's date of death is March 1, 2000. Jane Doe 364 was 25 years old when her original complaint was filed in 2021.

1218.  Jane Doe 60 was born in 1989. John Doe 72's date of death is January 16, 2001. Jane Doe 60 was 27 years old when her original complaint was filed in 2017.

1219.  Jane Doe 39 was born in 1989. John Doe 53's date of death is March 23, 2003. Jane Doe 39 was 27 years old when her original complaint was filed in 2017.

1220.  John Doe 75 was born in 1990. John Doe 76's date of death is March 14, 1996. John Doe 75 was 26 years old when his original complaint was filed in 2017.

1221.  John Doe 129 was born in 1990. John Doe 131's date of death is March 14, 2003. John Doe 129 was 26 years old when his original complaint was filed in 2017.

1222.  John Doe 50 was born in 1990. John Doe 47's date of death is January 21, 2002. John Doe 50 was 26 years old when his original complaint was filed in 2017.

1223.  Jane Doe 88 was born in 1991. John Doe 85's date of death is February 26, 2001. Jane Doe 88 was 25 years old when her original complaint was filed in 2017.

1224.  Jane Doe 99 was born in 1991. Jane Doe 100's date of death is June 17, 1997.  Jane Doe 99 was 25 years old when her original complaint was filed in 2017.

1225.  John Doe 54 was born in 1991. John Doe 53's date of death is March 23, 2003.  John Doe 54 was 25 years old when his original complaint was filed in 2017.

1226.  Jane Doe 85 was born in 1992. John Doe 83's date of death is September 1, 2001. Jane

Doe 85 was 25 years old when her original complaint was filed in 2017.

1227.   Jane Doe 87 was born in 1992. John Doe 85's date of death is February 26, 2001. Jane Doe 87 was 24 years old when her original complaint was filed in 2017.

1228.   John Doe 86 was born in 1992. John Doe 87's date of death is March 3, 1996. John Doe 86 was 24 years old when his original complaint was filed in 2017.

1229.   Jane Doe 41 was born in 1993. John Doe 55's date of death is August 21, 1998. Jane Doe 41 was 23 years old when her original complaint was filed in 2017.

1230.   John Doe 130 was born in 1993. John Doe 131's date of death is March 14, 2003. John Doe 130 was 23 years old when his original complaint was filed in 2017.

1231.   Jane Doe 34 was born in 1993. John Doe 47's date of death is January 21, 2002. Jane Doe 34 was 23 years old when her original complaint was filed in 2017.

1232.   John Doe 99 was born in 1994. John Doe 38's date of death is November 25, 1996. John Doe 99 was 22 years old when his original complaint was filed in 2017.

1233.   Jane Doe 73 was born in 1995. John Doe 81's date of death is August 18, 2003. Jane Doe 73 was 22 years old when her original complaint was filed in 2017.

1234.   Jane Doe 83 was born in 1995. John Doe 83's date of death is September 1, 2001. Jane Doe 83 was 21 years old when her original complaint for the death of John Doe 83 was filed in 2017.

1235.   John Doe 118 was born in 1995. John Doe 120's date of death is June 15, 2000. John Doe 118 was 21 years old when his original complaint was filed in 2017.

1236.   Jane Doe 127 was born in 1996. John Doe 125's date of death is October 30, 1998. Jane Doe 127 was 21 years old when her original complaint was filed in 2017.

1237.   Jane Doe 116 was born in 1996. John Doe 113's date if death is January 6, 2001. Jane

Doe 116 was 20 years old years old when her original complaint was filed in 2017.

1238.   Jane Doe 140 was born in 1997. John Doe 133's date of death is January 1, 1999. Jane Doe 140 was 19 years old when her original complaint was filed in 2017.

1239.   Jane Doe 84 was born in 1997.  John Doe 83's date of death is September 1, 2001. Jane Doe 84 was 19 years old when her original complaint for the death of John Doe 83 was filed in 2017.

1240.   Jane Doe 124 was born in 1998. John Doe 120's date of death is June 15, 2000. Jane Doe 124 was 19 years old when her original complaint was filed in 2017.

1241.   Jane Doe 117 was born in 1998. John Doe 113's date of death is January 6, 2001. Jane Doe 117 was 19 years old when her original complaint was filed in 2017.

1242.   Jane Doe 104 was born in 1998. John Doe 103's date of death is September 10, 2000. Jane Doe 104 was 18 years old when her original complaint was filed in 2017.

1243.   John Doe 102 was born in 1998. John Doe 103's date of death is September 10, 2000. John Doe 102 was 18 years old when his original complaint was filed in 2017.

1244.   John Doe 84 was born in 1999. John Doe 85's date of death is February 26, 2001. John Doe 84 was 17 years old when his original complaint was filed in 2017.

1245.   John Doe 368 was born in 1999. John Doe 107's date of death is March 1, 2003. John Doe 368 was 17 years old when his original complaint was filed in 2017.

1246.   Jane Doe 106 was born in 2000. John Doe 104's date if death is September 10, 2002. Jane Doe 106 was 16 years old when her original complaint was filed in 2017.

1247.   John Doe 112 was born in 2000. John Doe 113's date of death is January 6, 2001. John Doe 112 was 16 years old when his original complaint was filed in 2017.

**VIII.   CLASS ACTION ALLEGATIONS**

1248.   Plaintiffs seek certification of this action as a class action pursuant to Rules 23(b)(1)(B), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. Plaintiffs allege that Chiquita and the Defendants intentionally supported a campaign of military and social control by the AUC from at least 1995 through 2004. Plaintiffs seek to represent a class consisting of all persons who were the victims (or who are the relatives and/or legal representatives of decedent victims) of extrajudicial killing; forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced displacement; crimes against humanity; or crimes against civilians constituting war crimes committed by the AUC in the banana-growing region of Urabá from 1995 through 2004.

1249.   The members of the Class are so numerous that joinder of all members is impractical. The exact number and identities of all Class members is not currently known. According to reliable statistics, however, the AUC was responsible for many thousands of killings and many hundreds of massacres in Colombia between 1995 and 2004. In the banana-growing region of Urabá alone, human rights organizations have documented over 3,700 murders by the AUC between 1997 and 2004 and 60,000 forced displacements during the same period. These figures suggest that the Class at minimum numbers in the thousands and may exceed ten thousand.

1250.   Plaintiffs' claims are typical of those of the Class. Plaintiffs, like all members of the Class, were civilians inhabiting Colombia during the time period in which the AUC received substantial financial and other assistance from Chiquita and the Defendants, and who were injured by the AUC. The abuses committed by the AUC were committed as part of the AUC's campaign, supported by Chiquita and the Defendants, to exert control over the banana-growing region and eliminate the FARC by terrorizing civilians and perceived opponents.

1251.   Plaintiffs will fairly represent the interests of the Class because their interest in the case is

identical to that of the Class as a whole: to prosecute the claims alleged herein to obtain full

compensation due to them for the conduct of which they complain. Plaintiffs' claims implicate

the common questions of law and fact listed below, as do the claims of all or virtually all

members of the Class. Plaintiffs have no interests that conflict with or are contrary to the

interests of other Class members.

1252.   Plaintiffs will adequately represent the class in that their personal interest in the outcome

of the case ensures that they will maintain an active awareness and involvement in the litigation

so as to protect their own interests and those of the Class. Furthermore, they are represented by

counsel with extensive experience in international human rights and class action litigation.

1253.   There are questions of law and fact that are common to the Class, including but not

limited to:

a)  Whether Chiquita and the Defendants knew, should have known, or recklessly ignored,
    that the AUC was responsible for the extrajudicial killing, forced disappearance,
    kidnapping, rape, forced displacement, property destruction, torture, or cruel, inhuman, or
    degrading treatment of civilians who lived in Colombia;

b)  Whether the assistance provided to the AUC by Chiquita and the Defendants was
    substantial;

c)  Whether Chiquita and the Defendants knew, should have known, recklessly ignored, or
    intended that the payments they made to the AUC were used to finance a campaign of
    terror directed at the civilian population in Colombia's banana growing region;

d)  Whether the AUC acted as an agent of Chiquita and the Defendants in carrying out its
    campaign of murder and intimidation including whether they ratified such acts;

e)  Whether Chiquita and the Defendants conspired with, entered into a joint criminal

enterprise with, or aided and abetted the AUC;

f)  Whether Chiquita and the Defendants facilitated the clandestine and illegal transfer of arms and ammunition to the AUC;

g)  Whether Chiquita and the Defendants facilitated the AUC's drug shipments;

h)  Whether the AUC in committing the acts alleged herein acted under the color of state law and/or in a joint venture with official Colombian security forces;

i)  Whether the actions of the AUC constitute war crimes;

j)  Whether the actions of the AUC constitute crimes against humanity;

k)  Whether the Defendants' actions constitute torts under the Alien Tort Statute, the Torture Victim Protection Act, or New Jersey, Florida, Ohio, or Colombia law;

l)  Whether the Defendants have been unjustly enriched by the violations set forth herein;

m)  Whether the Defendants' behavior was negligent, including whether any of them engaged the AUC as an independent contractor and the AUC was incompetent and/or hired to do work that posed a risk of physical harm, whether there was a foreseeable risk of harm, and whether imposing a duty is fair;

n)  Whether the statutes of limitations are equitably tolled due to the conflict in Colombia or Chiquita and the Defendants' concealment of their actions;

o)  Whether Colombian statutes of limitations apply to the non-ATS claims;

p)  Whether this Court should order restitution or disgorgement of revenues and profits relating to the violations described herein; and

q)  Whether the Defendants should be subject to awards of compensatory and/or punitive damages and the proper measure thereof.

1254.  Pursuant to Fed. R. Civ. P. 23(b)(1)(B), adjudications with respect to individual members

of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications and/or would substantially impair or impede their ability to protect their interests.

1255.  Statistics gathered on human rights abuses committed by the AUC during the years 1997 to 2004 indicate that the Class at minimum numbers in the thousands and may exceed ten thousand. *See supra*. In other cases involving claims for human rights abuses under the Alien Tort Statute and the Torture Victims Protection Act, individual plaintiff cases have received multi-million-dollar recoveries.

1256.  Successful actions against the Defendants pursued independently by individual Class members could thus result in combined damages that exceed the damages that the Defendants can currently afford to pay.

1257.  Upon information and belief, the amount of damages which the Defendants can currently afford to pay is exceeded by the claims of the Class members.

1258.  Pursuant to Fed. R. Civ. P. 23(c)(4), class certification is appropriate as to the issues common to the Class members' claims, identified above, as resolution of these issues would materially advance the litigation and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

1259.  In the alternative, certification pursuant to Fed. R. Civ. P. 23(b)(3), is appropriate as questions of law and fact common to the members of the class predominate over any questions affecting only individual members. The vast majority of Plaintiffs' allegations implicate questions of liability relevant to the entire Class, some of which are identified above; their resolution would therefore address most of the issues required to establish or disprove the Defendant's liability for the injuries of all Class members.

1260.   Also pursuant to Fed. R. Civ. P. 23(b)(3) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## IX. CLAIMS FOR RELIEF

1261.   All of the claims for relief arise out of the same essential factual nucleus – the Defendants' role in Chiquita's illegal and tortious assistance to the AUC paramilitaries. The entire course of Chiquita's funding and other assistance to the AUC, as detailed above, forms the basis of the claims alleged herein.

### A.  First Claim for Relief – War Crimes

1262.   The AUC's conduct alleged in this complaint constitutes violence to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying out of executions without previous judgment pronounced by a regularly constituted court, incidents of outrages upon human dignity, forced movement, and pillage.

1263.   The AUC's acts violate the law of nations in that they were committed in the course of war crimes, because 1) an armed conflict was ongoing; 2) the AUC was a party to the conflict; 3) Plaintiffs and countless other victims of the AUC's acts did not take active part in the hostilities; and 4) the acts were committed in the course of armed conflict.  These acts are thus war crimes regardless of whether the AUC acted under color of state authority.

1264.   The war crimes described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

1265.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the war crimes committed against Plaintiffs.

i)    *The civil war in Colombia is an armed conflict within the meaning of the laws of war.*

1266.   The Colombian civil war is an "armed conflict not of an international character," as specified in Common Article 3 of the Geneva Conventions, which hold that in such cases, specific acts such as torture and "carrying out of executions without previous judgment pronounced by a regularly constituted court" constitute war crimes when committed against non-combatants.

1267.   There is no dispute that at all relevant times, and up until the present, Colombia has been devastated by a long-standing civil conflict. This has been widely documented and, to Plaintiffs' knowledge, has never been disputed in this or any other case. For example, the State Department noted in 1997 that the Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *1997 Human Rights Report: Colombia*, at 1.

1268.   During all times relevant to this complaint, the civil war in Colombia pitted the Colombian government – along with its paramilitary allies, including the AUC – against the FARC and other left-wing guerrilla insurgents.  The Colombian civil war has continued uninterrupted since at least 1946, and has claimed the lives of over 300,000 people.  Both Venezuela and Ecuador´s presidents have referred to the FARC as a belligerent force.  The Colombian government has engaged in prisoner exchanges with the FARC in the past.  It held extensive negotiations with the FARC during the 1998–2002 time period, with involvement of

the United Nations, and ceded a large portion of its territory to FARC control, referred to as the *zona de despeje*, or cleared zone.  During that time, the FARC assumed the powers of government in the area under its control, including judicial and police powers.

   ii)    *The AUC was a party to the armed conflict in Colombia.*

1269.   Once Colombia's various paramilitary groups consolidated in 1997 under the leadership of Carlos Castaño, the AUC became the most visible armed opposition to the FARC, which, by late 1996, had become Colombia's most prominent leftist rebel group. From that time until its demobilization, the AUC was a major combatant in Colombia's civil conflict with the FARC.  In most of the rural areas where the FARC had its strongholds, the Colombian military ceded military operations to the AUC.  By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities.  *See also supra* (the AUC role in the Colombian civil war as a tool of the Colombian government, and its campaign of violence against civilians).

   iii)   *Plaintiffs did not take active part in the hostilities.*

1270.   Civilians are entitled to the protections of Common Article 3 of the Geneva Conventions if they are "[p]ersons taking no active part in the hostilities."  Neither surviving Plaintiffs nor decedents were party to the armed conflict in Colombia, as they were not members of the FARC, the AUC, or, indeed, any armed group that participated in the conflict.  *See supra* (describing Plaintiffs).

1271.   Plaintiffs' decedents were not killed because they or anyone related to them had taken part in the hostilities in any way.  Rather, they were victims of the campaign conducted against civilians by the AUC in an effort to discourage support of the FARC.  The AUC systematically murdered thousands of civilians without regard to whether they were actual participants in the civil war, as a warning to any potential guerrilla supporters. The AUC became known for using

chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerrillas in their villages.

iv)   *Plaintiffs were injured and plaintiffs' decedents were killed in the course of the armed conflict.*

1272.   Decedents were not killed simply against the background of war; rather, the use of criminal violence and intimidation against civilians was part of the war strategy against the FARC agreed on by the AUC and the Colombian Government, in which Chiquita was intentionally complicit.

1273.   The AUC used extremely violent means to take back areas held by the FARC and employed tactics of violence and terror to target civilians regardless of whether they were participants in the civil war, with the intention of discouraging civilians from supporting the leftist guerrillas. This military tactic is documented by the U.S. Department of State.  *See supra* (State Department reports documenting human rights abuses, including forced displacement)

1274.   While this strategy was developed in Urabá, the model of collaboration between government and paramilitary was so successful that it was exported to the rest of the country and became part of the national war strategy. *See supra* (paramilitarism model spread to Magdalena and elsewhere).

1275.   Decedents were all members of particular social groups that were particularly targeted by the AUC as part of its war strategy.  *See supra* (AUC targeted particular groups, Plaintiffs' Injuries).

1276.   In fact, all decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold.  They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

### B.  Second Claim for Relief – Crimes Against Humanity

1277.    The conduct alleged in this complaint includes willful killing, disappearance, torture, forced displacement, and arbitrary arrest and detention constituting crimes against humanity, in that the AUC carried out these acts 1) as part of a widespread or systematic attack 2) against a civilian population.  Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.  The acts of the AUC constitute crimes against humanity regardless of whether the AUC acted under color of state authority.

1278.    The crimes against humanity described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute and Torture Victims Protection Act (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia.

1279.    The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the crimes against humanity committed against Plaintiffs.

*i)*    *The killings alleged herein were part of a widespread and systematic attack.*

1280.    From late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC became notorious for using tactics of terror on civilians living in and around areas that had been under FARC control.  *See supra* (AUC strategy of targeting civilians in Urabá).

1281.   The AUC killed thousands of civilians in Urabá.  Their war strategy involved killing civilians in towns near guerrilla groups in order to intimidate the population from providing any support to the guerrillas. This included anyone supporting the guerrillas' ideology, such as teachers, community leaders, social activists, trade unionists, human rights defenders, religious workers, and leftist politicians.  Many others not belonging to these groups were killed as well, as part of the AUC's efforts to establish complete dominance and deter support for the guerrillas.

1282.   Decedents were all killed as part of a systematic attack on particular societal groups.  *See supra* VI. (Plaintiffs' Injuries).  In fact, all of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold. They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

ii)   *The killings alleged herein were part of an attack that was directed against a civilian population.*

Decedents were killed as part of the AUC's strategy of terrorizing the civilian population of Urabá to discourage people from supporting the guerrilla insurgency.  By design, this attack was carried out without regard to whether the victims were actual participants in the civil war.  In fact, AUC commanders explicitly intended to kill civilians, with the understanding that such practices would deprive the guerrillas of their support base.  *See supra* (State Department reports, AUC's war strategies).

**C.  Third Claim for Relief – Terrorism**

1283.   The conduct alleged in this complaint constitutes violations of the customary international law prohibition on terrorism, in that the AUC 1) directed violence against a civilian population 2) in order to coerce or intimidate that population. The acts of the AUC constitute terrorism regardless of whether the AUC acted under color of state authority.

1284.   The acts of terrorism described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, Ohio, Florida and the laws of Colombia.

1285.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the acts of terrorism committed against Plaintiffs.

   *i)*   *The killings alleged herein constitute violence directed against the civilian population of Urabá.*

1286.   Plaintiffs and decedents, as well as the vast majority of AUC targets in Urabá, were civilians and non-participants in Colombia's civil war.

   *ii)*   *The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá and Colombia at large from supporting the FARC.*

1287.   The AUC targeted not only guerrilla sympathizers but anyone suspected of supporting their leftist ideology, such as teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians.  The AUC targeted civilians in towns and neighborhoods where guerrilla support was believed to be high because they claimed guerrilla groups could only operate in the region with the logistical support of local towns.  *See supra* (AUC war strategy).

1288.   Killing the decedents was part of the general strategy of the AUC.  Through these murders, the AUC intended to deter others from providing support or from expressing views that could be construed as supporting the FARC or their ideology. *See supra* VI. (Plaintiffs' Injuries).

### D.  Fourth Claim for Relief – Material Support to Terrorist Organizations

1289.   The conduct of Chiquita and the Defendants alleged herein constitutes violations of the customary international law prohibition on the illegal provision of material support to terrorist organizations, in that they 1) provided assets 2) to a terrorist organization 3) with the knowledge or intent that they would be used to carry out attacks on civilians 4) for the purpose of intimidating or coercing a civilian population. Chiquita and the Defendants' conduct constitutes material support to terrorist organizations, regardless of whether they acted under color of state authority.

1290.   The acts of material support to the AUC, a terrorist organization, described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

1291.   The Defendants are liable to Plaintiffs because they directly participated in the provision of material support to the AUC, and/or they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with others, including members of the AUC, to provide material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

   *i)   Chiquita and the Defendants provided assets to the AUC in the form of money, arms and logistical support.*

1292.   Chiquita and the Defendants provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons and drugs.  The support that Chiquita provided was crucial to the AUC's success against the FARC in the area and its ability to continue killing civilians. Indeed, prominent AUC commanders considered the group's success

in smuggling in massive quantities of arms – some of which were still being used by the paramilitaries to commit crimes as recently as 2008 – as one of the AUC's greatest achievements. This success was made possible partially by Chiquita's money and the use of Chiquita's port at Turbo.  *See supra* (Chiquita's support to the AUC).

> ii)   *The AUC was at all relevant times a terrorist organization.*

1293.   At all times relevant to this Complaint, the AUC was an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets. *See supra* (AUC's strategy of terrorizing civilians).

1294.   The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Chiquita and the Defendants were aware of such activities. From September 10, 2001, until July 15, 2014, the AUC was designated by the United States government as a Foreign Terrorist Organization. *See supra* (Chiquita's knowledge).

> iii)   *Chiquita knew and intended that the support it provided to the AUC would be used to carry out attacks on the civilian population of Urabá for the purpose of intimidating that population.*

1295.   Chiquita knew of and intentionally supported the AUC's strategy of targeting civilians in order to intimidate the population of Urabá from supporting the FARC.  Chiquita provided this support in exchange for security and stability on the banana plantations, which the AUC achieved through the murder or disappearance of civilians such as union leaders, community activists, and suspected criminals.  *See supra* (knowing and intentional support).

### E.  Fifth Claim for Relief – Extrajudicial Killing

1296.   The extrajudicial killings alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of

the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia.

1297.   The AUC committed acts of extrajudicial killing in that they carried out 1) deliberate killing of decedents 2) not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

1298.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the extrajudicial killings committed against Plaintiffs.

> i) *The AUC's killings were carried out deliberately as part of the role assigned to them by the Colombian State to repress support of the FARC, but unauthorized by a judgment pronounced by any court.*

1299.   The AUC killed Plaintiffs' decedents as part of the Colombian state policy of intimidating civilians from supporting the FARC. *See supra* (state action). The AUC committed many of these murders in the presence of family members or other community members, or they subsequently reported to the family that they were responsible for the killings. They openly killed civilians and discussed such killings in public in order to intimidate and threaten others.

1300.   While the state supported the AUC in these efforts, they did not authorize them to commit these killings through a court judgment. In fact, AUC leaders have stated that the military would give them names of alleged guerrillas to kill when the state did not have enough evidence to prosecute the individuals through Colombian courts.

1301.   None of the decedents was killed pursuant to *any* judicial process at all.

1302.   Killing the decedents was part of the general strategy of the AUC and Chiquita. Through these murders, the AUC and Chiquita intended to deter others from supporting the FARC or their ideology.  *See supra* VI. (Plaintiffs' Injuries).

### F.  Sixth Claim for Relief – Torture

1303.   The acts of torture alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia.

1304.   The AUC committed acts of torture in that they 1) intentionally 2) caused Plaintiffs and their decedents to suffer severe mental or physical pain or suffering 3) for the purpose of punishing, intimidating or coercing Plaintiffs and their decedents.

1305.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the torture committed against Plaintiffs.

   i)   *The AUC caused Plaintiffs and their decedents to suffer severe mental and physical pain and suffering.*

1306.   Plaintiffs' decedents were in the custody of the AUC when they were tortured and killed. Some Plaintiffs witnessed AUC members seeking out their relatives and executing them. Other decedents were kidnapped and executed by the AUC; their family members only found out about their deaths after an anguishing period of uncertainty. At the time that the AUC paramilitaries murdered decedents, the paramilitaries had effective control of decedents by virtue of their

206

numbers and weapons.

1307.   The AUC's torture and execution of the decedents caused them severe mental and physical pain.  *See supra* VI. (Plaintiffs' Injuries).

1308.   The surviving Plaintiffs suffered severe mental and physical pain upon witnessing or learning of the murder of their family members. Individual Plaintiffs also experienced suffering when they were threatened against pursuing investigations of the deaths of their family members and were forced to flee the area.  Furthermore, they suffered severe mental anguish due the feelings of threat and fright that the AUC might target them, too.

   *ii)*   *The AUC tortured Plaintiffs and decedents as part of the role assigned to them by the Colombian State, to intimidate and deter them from supporting the FARC.*

1309.   The AUC would often force its victims to disclose names of other potential guerrilla supporters.  They took workers from the plantations and tortured them to the point that many would invent stories and names in the hope that the paramilitaries would let them go.  Two union leaders reported that the paramilitaries would use tactics such as tying the worker's hands and feet, using chainsaws or pliers to break them to pieces, and pulling out their nails.  The AUC used torture against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government.  *See supra* (state action).  On information and belief, the torture of Plaintiffs and decedents was intended to accomplish this goal.

### G.  Seventh Claim for Relief – Cruel, Inhuman, or Degrading Treatment

1310.   The acts of cruel, inhuman, or degrading treatment alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and

common law of New Jersey, Ohio, and Florida, and the laws of Colombia.

1311.   The AUC committed acts of cruel, inhuman, or degrading treatment in that they inflicted mental or physical suffering, anguish, humiliation, fear, and debasement upon Plaintiffs and their decedents. The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance. Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

1312.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

   i)   *The AUC inflicted mental and physical suffering, anguish, humiliation, fear and debasement on Plaintiffs and their decedents as part of the role assigned to them by the Colombian State, to intimidate and coerce civilians from supporting the FARC.*

1313.   The AUC used cruel, inhuman, and degrading treatment against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government.  *See supra* (state action; atrocious acts of AUC).  Both decedents and surviving plaintiffs were victims of the AUC's cruel, inhuman, and degrading treatment.  *See supra* (Plaintiffs' Injuries; mental anguish of decedents and survivors).  The AUC targeted Plaintiffs' decedents because their actions and positions in the community were seen as supporting the FARC.

   ## H. Eighth Claim for Relief – Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Association

1314.   The violations of the rights to life, liberty and security of person and peaceful assembly

and association alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia.

1315.   The AUC violated Plaintiffs' and their decedents' rights to life, liberty and security of person and peaceful assembly and association in that they carried out 1) a systematic campaign of terror and violence 2) conceived and arbitrarily waged by state agents 3) hatched and calculated to suppress political opinion and expression.

1316.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the violations of the rights to life, liberty and security of person and peaceful assembly and association committed against Plaintiffs.

   i)   *Members of the AUC, as State agents and at the behest of State agents, carried out a systematic campaign of terror and violence.*

1317.   The AUC carried out a campaign of terror and violence against civilians to intimidate them from providing support to guerrillas, as a central strategy of their fight against the guerrillas on behalf of the government. *See supra* (atrocious acts of AUC; state action).

1318.   Decedents were killed in the course of the AUC's terrorist campaign against civilian populations.

   ii)   *The AUC's campaign was hatched and calculated to suppress any political activity or expression that could be suspected of association with support for the FARC.*

1319.   One of the overriding purposes of the AUC's campaign of terror against civilians,

including Plaintiffs and decedents, was to intimidate and coerce civilians in Urabá against supporting the FARC or, indeed, any political ideology that could be associated with the FARC. This could and often did include the violent suppression of any form of political or social organization activity outside of those forms specifically endorsed by the paramilitaries and the government.  *See supra* (goals and tactics of AUC)

1320.   Decedents were killed to suppress their political expression and to prevent them and others from giving political support to the ideologies associated with the FARC.  *See supra* VI. (Plaintiffs' Injuries).

I.   **Ninth Claim for Relief – Consistent Pattern of Gross Violations of Internationally Recognized Human Rights**

1321.   The consistent pattern of gross violations of internationally recognized human rights alleged herein constitutes torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia.

1322.   The AUC carried out a consistent pattern of gross violations of internationally recognized human rights against Plaintiffs, their decedents, and others in that the above-described abuses against Plaintiffs and decedents occurred within the context of numerous similar abuses and killings.

1323.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the consistent pattern of gross violations of internationally recognized

human rights committed against Plaintiffs.

      i)   *The AUC committed its acts of abuse against Plaintiffs and their decedents in the context of a consistent pattern of abuses.*

1324.   The torture, murder, and other abuses committed against decedents, surviving Plaintiffs, and their family members was committed as part of and in the context of a consistent pattern of abuses that constitute gross violations of internationally recognized human rights.  These abuses include violations of the right to life, right to security of person, right to security of property, right to privacy, right to freedom of political expression and social organization, and many others.

1325.   The specific acts constituting these violations include thousands of murders and incidents of torture and cruel, inhuman and degrading treatment, forced displacement, and suppression of union activity and peaceful political dissidence. *See supra* (AUC war strategy, State Department reports).

### J.  Tenth Claim for Relief – Wrongful Death

1326.   The acts described herein constitute wrongful death, actionable under the laws of New Jersey, Ohio, Florida, the United States, and Colombia.

1327.   The Defendants are liable to Plaintiffs because 1) decedents died as a proximate result of the Defendants' acts and omissions and 2) decedents would have been able to maintain an action against the Defendants for damages resulting from their injuries had they survived.

1328.   As a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

1329.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the

wrongful deaths of the decedents.

   *i)*   *The AUC caused decedents' deaths as a result of its overt acts of killing.*

1330.   The AUC's intentional abduction and execution of decedents, as part of its campaign of terror against the civilians of Urabá, which was intentionally and knowingly supported by Chiquita, directly caused the deaths of decedents. *See supra* VI. (Plaintiffs' Injuries).

   *ii)*   *If decedents had not died, they would have been able to maintain an action for damages resulting from their injuries.*

1331.   Decedents' injuries – both physical and emotional – were caused by intentional and negligent actions and omissions of the Defendants. Had they not died, they could have maintained actions for damages against the Defendants under the laws of Colombia, New Jersey, Ohio, Florida, the United States, and the law of nations. Their surviving family members therefore may maintain an action for their wrongful death.

### K.  Eleventh Claim for Relief – Assault and Battery

1332.   The acts described herein constitute assault and battery, actionable under the laws of New Jersey, Ohio, Florida, the United States, and Colombia.

1333.   Chiquita and the Defendants' actions alleged herein constitute assault and battery in that they 1) acted with the intention of causing offensive and harmful touching of Plaintiffs' or decedents' persons without their consent, and/or 2) they acted with the intention of creating the imminent apprehension that such touching would result, and 3) such touching or apprehension of touching resulted.

1334.   As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.

1335.   Chiquita and the Defendants' acts were willful, intentional, wanton, malicious, and oppressive.

1336.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and decedents.

i)   *Members of the AUC attacked decedents intending to cause decedents to suffer harmful contacts or an imminent apprehension of an immediate harmful contact without their consent.*

1337.   The AUC abducted and killed decedents, in some cases in front of Plaintiffs and their family members. In so doing, the AUC intended to cause decedents to suffer dangerous, harmful, and offensive physical contact without their consent, and also to frighten them with the imminent apprehension of such contact, and they also intended to frighten surviving Plaintiffs with the imminent apprehension of such contact.  *See supra* VI. (Plaintiffs' injuries).

ii)   *Decedents suffered harmful contacts or a reasonable, imminent apprehension of harmful contacts because of the AUC's attacks.*

1338.   The AUC's acts of kidnapping, killing, and torture alleged herein included harmful physical contact that caused injury and death to decedents without their consent, and acts of physical and emotional intimidation that caused decedents and surviving Plaintiffs to suffer the fright and apprehension of immediate harmful physical contact.

### L.  Twelfth Claim for Relief – Intentional Infliction of Emotional Distress

1339.   Chiquita and the Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of New Jersey, Ohio, Florida, the United States, and Colombia.

1340.   Chiquita and the Defendants' conduct alleged herein constitutes intentional infliction of emotional distress in that it 1) was intentional and/or reckless, 2) was extreme and outrageous, and 3) caused 4) severe distress to Plaintiffs and decedents.

1341.   As a direct and proximate result of Chiquita and the Defendants' acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

1342.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress of Plaintiffs and decedents.

   i)   *Chiquita and the Defendants acted intentionally and recklessly, with the intent and/or deliberate disregard of the high possibility that their support, assistance, direction, and collusion with the AUC would cause the acts alleged herein and cause severe humiliation, mental anguish, and emotional and physical distress.*

1343.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita and the Defendants intentionally acted, with the intent and/or deliberate disregard of the high possibility that their conduct would lead to the abduction, torture, and killing of decedents, causing severe humiliation, mental anguish, and emotional distress to decedents, surviving Plaintiffs, and their families. *See supra* (Chiquita's support to the AUC; aiding and abetting; conspiracy; agency).

1344.   At all relevant times, it was in Chiquita and the Defendants' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from no later than 1993 until at least 2004.

   ii)   *Chiquita and the Defendants' conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community, and was without privilege or justification.*

214

1345.   Chiquita and the Defendants' conduct alleged herein violated the laws of Colombia, New Jersey, Ohio, Florida, and the United States, as well as the law of nations.  War crimes, crimes against humanity, torture, extrajudicial killing, cruel, inhuman and degrading treatment, violations of the right to life, liberty, security of person, and peaceful assembly and expression, terrorism, material support of terrorism, and consistent patterns of gross violations of internationally recognized human rights are acts that are so heinous that they are considered to be of universal and mutual concern to all nations of the world, such that nations have a legally binding obligation to punish and prevent them. Chiquita and the Defendants' complicity in such acts is therefore so extreme and outrageous in character as to be completely unjustifiable and intolerable in a civilized community.

iii)   *Chiquita and the Defendants' actions in aiding, facilitating, paying, colluding with, and supporting the AUC caused Plaintiffs' and their decedents' distress.*

1346.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita and the Defendants proximately caused the injuries alleged in this complaint. Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred, and Chiquita's aid to the AUC through 2004 continued to substantially assist paramilitaries even after Chiquita ceased payments and withdrew from Colombia. Chiquita and the Defendants' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá. *See supra* (Chiquita's assistance to the AUC; assistance was substantial).

iv)   *The distress suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure it.*

1347.   The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths. *See supra* VI. (Plaintiffs' Injuries).

1348.   The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murder of their family members. Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the death, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them. These fears, disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

### M. Thirteenth Claim for Relief – Negligent Infliction of Emotional Distress

1349.   Chiquita and the Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of New Jersey, Ohio, Florida, the United States, and Colombia.

1350.   Chiquita and the Defendants' conduct constitutes negligent infliction of emotional distress in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care, 2) they breached that duty, 3) emotional distress was reasonably foreseeable, 4) Chiquita and the Defendants' conduct proximately caused the distress, and 5) the distress was genuine and substantial.

1351.   As a direct and legal result of Chiquita and the Defendants' wrongful acts, Plaintiffs and decedents have suffered and will continue to suffer significant physical injury, pain and suffering, and extreme and severe mental anguish and emotional distress.

1352.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the

negligent infliction of emotional distress of Plaintiffs and decedents.

*i)   Chiquita and the Defendants breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

1353.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita and the Defendants breached their duty to Plaintiffs to act with reasonable care so as not to cause injury to them. *See supra* (Chiquita's support, aiding and abetting, conspiracy, agency)

1354.   At all relevant times, it was in Chiquita and the Defendants' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from no later than 1993 until at least 2004.

*ii)   Chiquita and the Defendants' conduct alleged herein proximately caused Plaintiffs and decedents to suffer emotional distress so severe that no reasonable person could be expected to endure it.*

1355.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita and the Defendants proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred, and Chiquita's aid to the AUC through 2004 continued to substantially assist paramilitaries even after Chiquita ceased payments and withdrew from Colombia. Chiquita and the Defendants' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra*

(Chiquita's assistance to the AUC, assistance was substantial).

    *iii)*    *At all relevant times, Chiquita and the Defendants knew that their conduct would and did proximately result in physical and emotional distress to the AUC's victims.*

1356.   From the moment of their first involvement with paramilitary groups, Chiquita and the Defendants were aware that their assistance, collusion, facilitating, and support would result in the killing, torture, and other abuses committed against countless civilians in Urabá by the AUC.

1357.   At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for their brutal methods and tactic of declining to discriminate between combatants and civilians. Their reputation and method were well known in general and to Chiquita in particular, and were the subject of any number of newspaper articles and investigations both in Colombia and abroad. *See supra* (Chiquita's knowledge). Chiquita and the Defendants engaged the AUC to provide security, suppress union activity, and discourage FARC support despite their prior knowledge that the paramilitaries in general – and the AUC in particular – used terrorism and violence against civilians as a strategy to carry out those goals. *See supra* (Chiquita's intentional support).

1358.   Despite their general knowledge about the paramilitaries' tactics and specific understanding of the paramilitaries' activities in Urabá, Chiquita and the Defendants specifically engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress union activity and discourage support of the FARC – the very activities for which their brutal tactics were notorious. Chiquita and the Defendants played this role with the knowledge and intent that the paramilitaries would commit the abuses alleged herein, and they continued to play this role as it became clear that their support was assisting with the torture, murder, and other abuse of Chiquita and the Defendants' opponents. *See supra* (knowing and intentional assistance).

    *iv)*    *Plaintiffs' and decedents' distress was genuine and substantial.*

1359.   The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths.  *See supra* VI. (Plaintiffs' Injuries).

1360.   The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murders of their family members. Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the deaths, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them. These fears, disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

**N. Fourteenth Claim for Relief – Negligence/Negligent Hiring/Negligence Per Se**

1361.   Chiquita and the Defendants' conduct constitutes negligence and is actionable under the laws of New Jersey, Ohio, Florida, the United States, and Colombia.

1362.   Chiquita and the Defendants' conduct constitutes negligence in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care not to injure them, 2) they breached that duty, 3) it was reasonably foreseeable that their negligence would cause injury, damage, loss, or harm to Plaintiffs and their next of kin.

1363.   Chiquita and the Defendants' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

1364.   As a result of these acts, Plaintiffs and decedents suffered harm including, but not limited to, death, physical injury, and severe emotional distress.

   i)   *Chiquita and the Defendants breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

1365.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and/or conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita and the Defendants breached their duty to Plaintiffs to act with reasonable care so as not to cause injury to them.  *See supra* (Chiquita's support, aiding and abetting, conspiracy, agency)

1366.   At all relevant times, it was in Chiquita and the Defendants' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from no later than 1993 until at least 2004.

ii)   *Chiquita and the Defendants' conduct alleged herein proximately caused Plaintiffs and decedents to suffer physical and emotional harm, including death.*

1367.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita and the Defendants proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred, and Chiquita's aid to the AUC through 2004 continued to substantially assist paramilitaries even after Chiquita ceased payments and withdrew from Colombia. Chiquita and the Defendants' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* (Chiquita's support to the AUC, assistance was substantial).

iii)   *At all relevant times, Chiquita and the Defendants knew that the AUC was an organization dedicated to the use of terrorism and violence against civilians and that it would use violence against perceived opponents of Chiquita, and could have foreseen that this could and would cause physical and mental harm to the AUC's victims.*

1368.   From the moment of their first involvement with paramilitary groups, Chiquita and the

Defendants were aware that their assistance, collusion, facilitation, and support would result in

the killing, torture, and other abuses committed against civilians in Urabá by the AUC.

1369.   At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for

their brutal methods and tactic of declining to discriminate between combatants and civilians.

Their reputation and method were well known in general and to Chiquita in particular, and were

the subject of any number of newspaper articles and investigations both in Colombia and abroad.

*See supra* (Chiquita's knowledge). Chiquita and the Defendants engaged the AUC to provide

security, suppress union activity, and discourage FARC support despite their prior knowledge

that the paramilitaries in general – and the AUC in particular – used terrorism and violence

against civilians as a strategy to carry out those goals. *See supra* (Chiquita's intentional support).

1370.   Despite their general knowledge about the paramilitaries' tactics and specific

understanding of the paramilitaries' activities in Urabá, Chiquita and the Defendants specifically

engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress

union activity and discourage support of the FARC – the very activities for which their brutal

tactics were notorious. Chiquita and the Defendants played this role with the knowledge and

intent that the paramilitaries would commit the abuses alleged herein, and they continued to play

this role as it became clear that their support was assisting with the torture, murder, and other

abuse of Chiquita and the Defendants' opponents. *See supra* (knowing and intentional

assistance).

iv)   *The AUC's dedication to the use of terrorism and violence against civilians proximately
      caused Plaintiffs' and decedents' injuries.*

1371.   It was the AUC's tactic of using terrorism and violence to intimidate civilians, suppress

union activity, and discourage support of the FARC – with the assistance and collaboration of Chiquita – that proximately caused the deaths of decedents and the mental and physical injuries to Plaintiffs.

> v) *Chiquita and the Defendants' acts of material support to the AUC, along with their acts of assistance, support, direction, and collusion, violated laws designed to protect Plaintiffs and decedents, the violation of which constitutes negligence* per se.

1372.   Chiquita and the Defendants' support of the AUC violated laws of the United States, Colombia, and New Jersey, Ohio, Florida, as well as customary international law, which were meant to protect Plaintiffs and others. These laws include the Alien Tort Statute and the Torture Victim Protection Act (28 U.S.C. § 1350), among other U.S. statutes, and Colombian statutes outlawing paramilitarism and implementing Colombia's international human rights obligations. The violation of these laws was negligent and willful, therefore constituting negligence *per se*.

## O. Fifteenth Claim for Relief – Loss of Consortium

1373.   Chiquita and the Defendants' conduct caused surviving Plaintiffs to suffer loss of consortium and is actionable under the laws of New Jersey, Ohio, Florida, the United States, and Colombia.

1374.   At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses, parents, children, and other family members to the Plaintiffs who are their spouses, children, parents, and other relatives, respectively.

1375.   As a result of the acts of the Defendants, those Plaintiffs who are the spouses, children, parents and other family members of the decedents have been deprived of the decedents' society, comfort, attention, services, and support, all to their damage, in an amount to be proved at trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

1376.   The Defendants are liable to Plaintiffs because they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.

**P. Fifteenth Claim for Relief – Violations of the Laws of Colombia**

1377.   While Plaintiffs have framed their Claims for Relief under state law, they also allege the analogous claims under the laws of Colombia, namely Articles 35, 37, 41-47, 63, 113, 397-99, 1494, 1568, 1571, 1579, 1614, 2302, 2341, 2343-44, 2350, 2355, and 2356 of the Colombian Civil Code; Articles 29-30, 94, 96-97, 103-21, 340, 347, and 454A of the Colombian Criminal Code; Law 54 of 1990; Law 222 of 1995; Law 446 of 1998; Law 975 of 2005; and Law 1448 of 2011; as well as case law interpreting these provisions.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## X.   PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in excess of $75,000, as follows:

(a) For compensatory damages, including general and special damages;

(b) For punitive damages;

(c) For injunctive and declaratory relief as this Court deems appropriate;

(d) For disgorgement of profits; and

**(e)** For costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## XI.   JURY TRIAL DEMAND

1378.   Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: November 30, 2022                     Respectfully submitted,

/s/ Marco Simons
Marco Simons
marco@earthrights.org
Richard L. Herz*
Marissa Vahlsing
Sean Powers
Michelle Harrison
Maryum Jordan
Benjamin Hoffman
Wyatt Gjullin
Gabriela Valentín Díaz
Maya Sikand
**EarthRights International**
1612 K Street NW, Suite 800
Washington, DC 20006
Tel: 202-466-5188

Leslie M. Kroeger (FL Bar No. 989762)
Theodore J. Leopold (FL Bar No. 705608)
Diana L. Martin (FL Bar No. 624489)
**Cohen Milstein Sellers & Toll PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401

Agnieszka M. Fryszman
Benjamin D. Brown
**Cohen Milstein Sellers & Toll, PLLC**
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: 202-408-4600
Fax: 202-408-4634

Paul L. Hoffman
**Schonbrun Seplow Harris Hoffman & Zeldes LLP**
11543 W. Olympic Blvd
Los Angeles, CA 90064
Tel: 310-396-0731
Fax: 310-399-7040

Judith Brown Chomsky

---

* Based in CT; admitted in NY; does not practice in DC's courts.

**Law Offices of Judith Brown Chomsky**
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
Fax: 202-782-8368

Arturo Carrillo
**Colombian Institute of International Law**
5425 Connecticut Ave., N.W., #219
Washington, D.C. 20015
Tel: 202-994-5794

*Counsel for Plaintiffs*