**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 08-01916-MD-MARRA**

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION
_____/

This Document Relates to
ATS ACTIONS:

17-80547-CIV-MARRA
17-80323-CIV-MARRA
20-82222-CIV-MARRA
21-60058-CIV-MARRA
_____/

**ORDER GRANTING INDIVIDUAL DEFENDANTS'**
**OMNIBUS JOINT MOTION TO DISMISS "NEW JERSEY" PLAINTIFFS'**
**THIRD AMENDED COMPLAINTS (DEs 3204, 3206, 3208, 3210)**

**THIS CAUSE** is before the Court on the Individual Defendants' Omnibus Joint Motion to

Dismiss "New Jersey" Plaintiffs' Third Amended Complaints ("Motion"). The Court has carefully

considered the Motion (DE 3295), Opposition (DE 3325)[1], Reply (DE 3346), and Supplemental

Authority (DEs 3427, 3432) and is otherwise fully advised in the premises.

**I. Background**

The factual and procedural history of these cases, carved out among several in this

multidistrict litigation, exists in prior Court rulings and will not be repeated here except as needed

to refresh recollections, frame Plaintiffs' Third Amended Complaints ("TACs")[2], and

contextualize the Court's analysis based on its August 23, 2022 Order Granting in Part and

Denying in Part Defendants' Motion to Dismiss Second Amended Complaints in the 2017

---

[1] Alternately referred to as "Response."
[2] Alternately referred to in the singular as "TAC."

Florida/Ohio Putative Class Actions and 2020 Florida/Ohio Actions ("August Order") (DE 3135).[3]

The Court thus assumes familiarity with the record and its August Order of dismissal with leave

to amend, which detailed Plaintiffs' then-current allegations. Plaintiffs' current allegations are

summarized below as best as possible, in consideration of the narrow issue requiring repleading,

the Motion and attendant briefing.

In pertinent part, the August Order dismissed the Torture Victims Protection Act ("TVPA")

claims as against the Individual Defendants with leave for Plaintiffs to file an amended pleading

addressing the TVPA pleading deficiencies, more specifically the:

> _failure to allege adequately the existence of a symbiotic relationship between the AUC and Colombian government involved in the specific misconduct alleged in the Complaint_, i.e., for failure to allege the Colombian military or government officials either actively participated in the assassinations of their decedents, or that the paramilitary assassins enjoyed a symbiotic relationship with the Colombian military _for the purpose of those assassinations. These_ [TVPA] _claims are_ **DISMISSED** with leave for Plaintiffs to file, should they so elect, an amended pleading which addresses the TVPA pleading deficiencies outlined in this Order and alleges, in good faith, _facts tying the symbiotic relationship alleged to the specific instances of murder and torture alleged in the Complaints._

(DE 3135 at 50-51) (emphasis added). The Court's August Order further provided that repleading

these TVPA claims "shall be the final opportunity for amendment of the Complaints and shall be

limited to this narrow issue" (_Id_. at 51).

On November 30, 2022, following the August Order, "New Jersey" Plaintiffs ("Plaintiffs")

filed four Third Amended Complaints against the following Defendants: Chiquita Brands

International, Inc. ("Chiquita"), Robert Olson ("Olson"), Robert Kistinger ("Kistinger"), William

Tsacalis ("Tsacalis"), and John Ordman ("Ordman") (DE 3204); Olson, Kistinger, Tsacalis and

Ordman (DE 3208); and Cyrus Freidheim ("Freidheim") and Charles Keiser ("Keiser") (DE 3206,

---

[3] The docket entries for the Florida/Ohio case numbers identified in the Motion and the August 2022 Order are: DE 3026 (Case No. 17-80547), DE 3027(17-80323), DE 3024 (20-82222), and DE 3025 (21-60058).

3210). Two of the four TACs are pled as class action complaints (DE 3204, 3206). Reference to "Defendants" shall include all Defendants in DEs 3204, -06, -08 and -10; reference to Individual Defendants shall include those natural persons whom Plaintiffs identify as parties in the respective actions shown above.

## II.    Third Amended Complaint, Motion to Dismiss, and Attendant Briefing

### A.  Plaintiffs' TAC[4]

The current posture of proceedings leads the Court to exclude recitation of the Third Amended Complaints' introductory paragraphs[5] and incorporate some initial observations in presenting the pertinent allegations shown below, mindful of its mandate to view the allegations in the light most favorable to Plaintiffs.

### 1.  General Allegations

At the outset the Court notes that Plaintiffs' TAC refers to a "symbiotic relationship" once, with respect to another district court decision, *Jaramillo v. Naranjo*, Case No. 10-21951-Civ-Torres (S. D. Fla., Sept. 28, 2021) (Order Denying Summary Judgment),[6]  which cited "'an abundance of evidence in [the] record that the [AUC] operated in a symbiotic relationship with Columbian state actors' and that 'State actors actively supported the [AUC's] operations through intelligence sharing, weapons, and military uniforms'" (DE 3204 at ¶ 303). In this case, Plaintiffs claim the AUC acted under color of authority of the Colombian government:

a) "with respect to all of the killings in this action" (*Id.* at ¶¶ 275[7] – 571);

---

[4] For efficiency, the Court will cite to the TAC in the 2017 Ohio Action (DE 3204) as an exemplar pleading in summarizing the relevant allegations. Plaintiffs state that "[i]dentical allegations appear in all of the [TACs]" (DE 3325 at 3, n.1).

[5] *I.e.*, Summary of the Complaint, Jurisdiction, Parties and Non-Parties of Interest (DE 3204 ¶¶ 1-241).

[6] The *Jaramillo* case is discussed below.

[7] Plaintiffs note that they include allegations about Plaintiffs in the subject cases and other MDL cases "because they are relevant to show the overall pattern of AUC abuse and state action.

b) in four (4) cases, through "direct miliary involvement" (*Id*. at ¶¶ 572-584);

c) in 45 other cases "pursuant to the conspiracy" between the AUC and the Colombian State to target and terrorize victims (*Id*. at ¶¶ 585-714);

d) in six cases through the exercise of a de facto state function of "fighting crime'" (*Id*. at ¶¶ 715-733); and

e) as to "all plaintiffs who were murdered or attacked by the AUC in Urabá between 1996 and 2004," because the AUC "exercised broad state functions and was the "'de facto'" state in Urabá (*Id*. at ¶¶ 734-742).

Plaintiffs proffer that Individual Defendants either knew of or approved payments to the

AUC, either directly or through *convivers* (DE 3204 at *e.g.*, ¶¶ 222 through 225, 231, 233), and

that Plaintiffs thus are

> *informed and believe, and on that basis allege, that the Defendants are responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by their conduct, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries*

(DE 3204 at ¶ 237) (emphasis added). Plaintiffs further assert claims that "[t]he Defendants are

liable to Plaintiffs because they directly participated in the provision of material support to the

AUC, and/or they aided and abetted, facilitated, condoned, paid, were reckless in dealing with,

participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or

conspired with others, including members of the AUC, to provide material support to the AUC,

whose terrorist actions caused Plaintiffs' injuries" (DE 3204 at ¶ 1680).

Without specifying who (or which among them) the alleged "individual conspirators" are

or what they were "joining," Plaintiffs allege that "the individual conspirators are liable for the

---

Inclusion of a particular victim's or survivor's name in these allegations does not signify that they are a Plaintiff in this action, if they are not identified as a Plaintiff elsewhere in this Complaint" (DE 3204 at 45, n.1).

injuries inflicted by the conspiracy prior to their joining" (DE 3204 at ¶ 239). Elsewhere, Plaintiffs cite to Columbian courts finding an "effective and organized conspiracy," a "shared goal of combating guerrilla forces,"[8] "collaboration and conspiracy between the 17th Brigade [of the Columbian army] and the AUC," resulting in, among other findings, one General's conviction for conspiracy in connection with the AUC's murder of an individual not identified as a plaintiff herein (*Id*. at ¶¶ 335-338); *see also id.*, at, *e.g*., ¶¶ 347-370 (detailing alleged conspiracy between specific state actors and paramilitaries to drive out guerrillas and terrorize unidentified civilians).

Plaintiffs refer to "lists of alleged guerrilla supporters," lists "provided by the Columbian State" to the AUC or other paramilitary group, and lists and other information that "served as the basis for the execution of innumerable crimes, particularly massacres and selective homicides" without identifying specific state actors who provided lists or other intelligence to the AUC or other paramilitaries, or linking state actors (or Individual Defendants) to the specific misconduct identified in the TAC (DE 3204 at ¶¶ 261, 286, 376; *see also id.* at ¶ 718 ("As the Justice and Peace courts explained, 'The authorities gave [the AUC] lists of repeat offenders or people identified as thieves, drug addicts or drug dealers, whom they executed because they violated the new social order.'")) Plaintiffs claim elsewhere that "[i]n fact, AUC leaders have stated that the military would give them names of alleged guerrillas to kill when the state did not have enough evidence to prosecute the individuals through Colombian Courts." (*Id*. at ¶ 1690). Plaintiffs also more generally identify the AUC's targets as "anyone considered to share the guerrillas' leftist ideology" (DE 3204 at ¶ 262).

---

[8] Plaintiffs allege that AUC Leader Carlos Castaño told "Keiser that Banadex shared a common interest with the government, military, and business community in driving the guerrillas out of Urabá" (DE 3204 at ¶ 849).

Plaintiffs allege paramilitary groups were doing work the armed forces and police could not do, and were not doing -- fighting, taking out the militias, and the guerillas, and killing them (*Id*. at ¶¶ 292, 293; *see also* ¶ 313 (AUC commander cites recommendation from army that AUC should arm themselves illegally and import self-defense groups to the Urabá region in light of "'the state's "inability to keep the guerrillas at bay'"). According to Plaintiffs, "[a]ll the deaths and incidents of torture in this case were the intended and/or the natural and probable consequence of the State's decision to use, encourage, and shield paramilitaries in its war against guerrillas in Urabá" (*Id*. at ¶ 301). "The support, cooperation and impunity that the Colombian State gifted the AUC directly relates to and is causally connected to the deaths in these cases because, without it the AUC would have been unable to carry out its mass and years-long terror campaign" (*Id*. at ¶ 518).

Plaintiffs claim that the "abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out according to a systematic and well-coordinated plan between the government, the paramilitaries, and the [unspecified] companies that financed them" (DE 3204 at ¶ 263). Further allegations refer to the Justice and Peace Chamber "[finding] in a decision establishing State responsibility for ACCU killings in Urabá, [ ] 'a dirty war policy to combat insurgent groups, political dissidents and certain social movements and leaders' among the Army and the paramilitaries," and that "the AUC was able to conduct its reign of terror in Urabá free from worry and/or punishment," without reference to specific misconduct, and tying Defendants to this alleged "dirty war" only "on information and belief" (*Id*. at ¶¶ 280, 298;[9] *cf*., *e.g*., ¶ 967 ("*On information and belief*, Chiquita and the Individual

_____

[9] References to the Justice and Peace proceedings appear throughout the TAC, routinely referring to the State's responsibility for paramilitary killings without identifying specifically alleged misconduct in the TAC or any specific state actors, but occasionally identifying certain paramilitary commanders (*e.g*., DE 3204 at ¶¶ 280, 348, 376, 377, 397, 422, 562, 956 ("John Doe

Defendants caused, intended, conspired in, and/or aided and abetted the deaths of John Doe 14 and John Doe 15 through their support of the AUC in Urabá, which at the time of the events was in control of the region") (emphasis added) and ¶ 975 ("*On information and belief*, Chiquita and the Individual Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 17 through their support of the AUC in Urabá, which at the time of the events was in control of the region") (emphasis added)).

Plaintiffs cast allegations "on information and belief" 279 times in their 285 page, 1,768 paragraph TAC. Germaine to the repleading in this regard, and excluding "information and belief" allegations asserted regarding payments to AUC, Plaintiffs' allegations "tie" Individual Defendants "on information and belief" to innumerable losses of life (*See* DE 3204 at ¶¶ 765, 927 – 1585 (*passim*)) (*e.g*.,

> 765. . . . In 1995, FARC retaliated against Chiquita farm workers suspected of having ties to EPL by massacring approximately 25 workers taken from a bus. On information and belief, the Individual Defendants had contemporaneous knowledge of this incident.
>
> 929. On information and belief, Chiquita and the Individual Defendants caused, intended, conspired in, and/or aided and abetted the death of John Doe 2 through its support of the AUC in Urabá. On information and belief, Chiquita and the Individual Defendants benefited from the death of John Doe 2 by removing a labor activist who threatened the stability of Chiquita's operations.)

---

12's murder is recognized as a paramilitary killing in Colombia's official Justice and Peace proceedings, a governmental process created as part of the demobilization of the AUC to find facts and establish accountability for paramilitary violence") (*see also* John Doe 12 allegations lacking specific state actor link at ¶¶ 728, 729), ¶ 963 ("John Doe 13 is recognized as a victim in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia") (*see also* John Doe 13 lacking specific state actor link at ¶¶ 588, 589), ¶ 971 ("John Doe 16 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza"), ¶ 974 ("John Doe 17 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza") (*see also* John Doe 17 allegations lacking specific state actor link at ¶¶ 651-653, 973).

(*cf.*, DE 3204 at ¶ 388) (former Colombian President Barco is identified as someone who "specifically plotted and planned with the Colombian Military and Intelligence services to eliminate the Union Patriótica and [unspecified] members"). In another case, unspecified "members of the military arrived at John Doe 64's home," secured his identification and left, allegedly leading to the kidnapping and disappearance of John Doe 64 by paramilitaries who "[o]n information and belief" used the State's information to cause the murder of John Doe 64; "his body was never found" (DE 3204 at ¶¶ 572-574). Other allegations that paramilitaries "forcibly removed" John Does from their homes and/or kidnapped them while wearing Columbian military uniforms and carrying Columbian military weapons, causing their deaths, were acting under the color of law because of collaboration and coordination between the government and the AUC to "target and eliminate perceived threats and opposition" (DE 3204 at, *e.g.*, ¶¶ 575 – 584). In many instances, Plaintiffs do not specify how the Doe deaths occurred, where or when they occurred, and they do not link their deaths to specific state actors (or Individual Defendants). In some cases, Plaintiffs specifically identify non-Individual Defendants who either committed or confessed to ordering the murders; mostly they generically claim "[p]aramilitaries killed" or "[p]aramilitaries targeted" their victims (*see generally id.* at ¶¶ 588 – 714).

One unidentified "official of the mayor's treasury of the town of Carepa *warned* John Doe 324 before his death that he should remain silent" (*Id.* at ¶ 604) (emphasis added).

Other allegations lack dates, details, or appear to be unrelated to banana farming (*Id.* at ¶¶ 715 – 733).

Plaintiffs blame the subject murders and attacks by the AUC in Urabá between 1996 and 2004 due to the AUC's carrying out "many exclusive state functions, including doling out their own form of brutal justice and law enforcement to common criminals" (DE 3204 ¶¶ 734-735). Plaintiffs rely on [AUC commander, presumably] testimony to support their allegations that "the

AUC (and its *convivirs*) distributed some of the funds they collected from the businesses that supported them in Urabá to the military to pay for radios, intelligence gathering, and other types of support (like fuel, etc.)" without specifying which businesses were supporting them (*Id.* at ¶ 738). Plaintiffs broadly allege that the *convivirs* funneled "'an enormous fortune'" from "*the Banana companies* to the AUC, as well as from *other powerful business interests* that supported the AUC" "'so that *the companies* would not have legal problems'" (*Id.* at ¶¶ 457 – 459) (emphasis added).

Plaintiffs also assert that Defendant Chiquita, not the Individual Defendants, "received -- and started paying -- extortion demands from guerilla groups almost immediately after it started purchasing land" in the late 1980s, payments which were "considered the cost of doing business in Colombia" (DE 3204 at ¶¶ 744, 754). Further, "[i]n 1993, Chiquita secured an agreement with Esperanza [a paramilitary group] "so that 'people do not steal from us [Chiquita] or damage the farms and so that there is a *peaceful relationship with the workers*.'" (*Id.* at ¶¶ 243, 762) (emphasis added).

### 2. Defendants Keiser, Olson, and Ordman

Defendant Keiser allegedly shared knowledge that "*all* [farm] owners and employees are perpetually *at risk* of murder, violence and extortion by the guerrillas," and he allegedly brokered an agreement on behalf of Chiquita to pay the AUC for their "services in suppressing labor unrest and driving leftist guerrillas and sympathizers out of the banana-growing regions controlled by Chiquita" (*Id.* at ¶¶ 751, 850) (emphasis added). Plaintiffs do not allege specific terms of said agreement as to how, by what means, or to what degree the "suppressing" and "driving out"

mission was to be achieved[10] but, Plaintiffs assert, "*Chiquita* knew that the former EPL fighters targeted workers and unionists suspected of having leftist or FARC sympathies" (*Id.* at ¶ 764) (emphasis added).

Plaintiffs more particularly assert that "[i]n September 2000, Defendant Olson was informed of the results of an investigation into Chiquita's payments to the AUC, which had been carried out by in-house Chiquita attorneys. That investigation confirmed that Chiquita's payments to the *convivir* were in fact supporting violent paramilitary terrorists; on information and belief, [unspecified] Defendants already knew this. Executives including Keiser were presented with the report, and Defendant Olson reported the results to the company's Audit Committee" (*Id.* at ¶ 773; *see also id.*, *e.g.*, at ¶ 816 ("Keiser knew that former EPL fighters targeted workers and unionists suspected of having leftist or FARC sympathies, but did not cease payments to the group"); ¶ 1586 ("At all times, Chiquita and the Individual Defendants knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances"); ¶ 1589 ("On information and belief, at all relevant times Chiquita and the Individual Defendants had knowledge of this" "widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as against several discrete sub-populations, including but not limited to leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers"); and ¶ 1684 ("The AUC's terrorist activities have been well-known at all relevant

---

[10] Plaintiffs assert that "Chiquita would pay the paramilitaries a fixed dollar amount *for each box of bananas exported*" (*Id.* at ¶ 920) (emphasis added), *i.e.*, it did not pay paramilitaries for each person tortured, killed, or driven out of Urabá.

times, and, on information and belief, Chiquita and the Individual Defendants were aware of such activities").

Defendant Keiser "was involved in these [AUC] payments" on or about March 31, 2002, and he was "involved in nearly every documented payment to the AUC from 1997 through May 2000" (DE 3204 at ¶ 780), although Plaintiffs do not tie them to any specific alleged injury or specific state actor. Plaintiffs assert elsewhere in their TAC that Chiquita employees, when asked "what would happen if they [Chiquita] stopped paying the AUC," the "employees did not provide any direct or concrete evidence of threats or extortion" (*Id.* at ¶ 836).

Defendant Ordman "participated directly and indirectly in [Chiquita subsidiary] Banadex's support of the AUC" (*Id.* at ¶ 884).[11] Plaintiffs claim that Ordman "was a part of" a conspiracy between Chiquita and the ACCU or AUC starting in late 1996 or 1997 "whereby Chiquita paid the paramilitaries for their services supporting the banana plantations. These services consisted of threatening or killing civilians, including workers who attempted to strike, union leaders, alleged criminals, and small banana farmers who refused to sell or abandon their land" (*Id.* at ¶¶ 913-914).

### 3.   Additional General Allegations; Tolling and Class Action

According to the Plaintiffs, "[a]t all times relevant to the complaint, Chiquita and the Individual Defendants had knowledge of the horrific violence unfolding in the banana growing regions where Chiquita had operations. They understood the dynamics of the Colombian conflict and the armed groups involved, including the role and reputation of the AUC" (*Id.* at ¶ 888). Citing United States Statement Department Reports from 1997 and 1999, Plaintiffs assert that the Individual Defendants "knew that their actions would assist the AUC to continue killing, torturing,

---

[11] Plaintiffs also allege, without apparent tie to the Plaintiffs at issue herein, that "[o]n information and belief, Defendant Ordman is under investigation in the same criminal proceeding [as other Banadex staff] in Colombia for conspiracy to commit crimes against humanity in relation to financing the AUC" (DE 3204 at ¶¶ 886-887).

and committing other acts of illegal violence against civilians in Urabá. The AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent civilians living in areas under FARC control was well known in Colombia and was widely reported in the press in Colombia and the United States" (*Id.* at ¶¶ 893-894); *see also id.* at ¶ 916 ("Chiquita knew of the AUC's goal of eliminating the FARC through the killing of suspected sympathizers and innocent civilians") and ¶ 917 ("On information and belief, the Individual Defendants shared this knowledge").

Lastly, Plaintiffs assert minority tolling allegations (DE 3204 at ¶¶ 1601 - 1637) and class action allegations (*Id.* at ¶¶ 1638 – 1650).

### 4. Relief Sought

Plaintiffs' sixteen claims for relief all "arise out of the same essential factual nucleus – Chiquita's illegal and tortious assistance to the AUC paramilitaries, and the Individual Defendants' roles in that course of action" (DE 3204 at ¶ 1651). Citing the Alien Tort Statute ("ATS"), TVPA, "customary international law and the common law of the United States, the statutes and common law of New Jersey, Ohio, and Florida, and the laws of Colombia,"[12] Plaintiffs seek relief traveling under the following alleged offenses: War Crimes; Crimes Against Humanity; Terrorism; Material Support To Terrorist Organizations; Extrajudicial Killing; Torture; Cruel, Inhuman or Degrading Treatment; Violations of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Association; Consistent Pattern of Gross Violations of Internationally Recognized Human Rights; Wrongful Death; Assault and Battery; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Negligence/Negligent Hiring/Negligence Per Se; Loss of Consortium; Violations of the Laws of Colombia (DE 3204 at 256 – 284, § "IX").

---

[12] *Id.* at, *e.g.*, ¶ 1654.

Among the asserted claims for relief, Plaintiffs claim "*Defendants* are liable to Plaintiffs because they *aided and abetted*, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, *and/or conspired* with the AUC" [alternately interposing, "which was acting under color of law"] in bringing about the variously specified offense(s) committed against Plaintiffs.[13]  Plaintiffs also claim "*Defendants* are liable to Plaintiffs because they directly participated in the provision of *material support to the AUC, and/or they aided and abetted*, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, *and/or conspired* with others, including members of the AUC, to provide material support to the AUC, whose terrorist actions caused Plaintiffs' injuries (*Id.* at ¶1681) (emphasis added).

### B. The Motion

#### 1. Whether Plaintiffs Fail to Adequately and Plausibly Allege State Action

Individual Defendants jointly move to dismiss Plaintiffs' TAC based on Plaintiffs' failure to "cure prior pleading deficiencies under the Torture Victim Protection Act ('TVPA') and allege, in good faith, the existence of a symbiotic relationship between the AUC and Colombian government that is involved in the specific misconduct alleged in the complaints" (DE 3295 at 1).[14] Movants argue that "Eleventh Circuit precedent has clearly established that where – as here-

---

[13] *Id.* at ¶¶ 1655, 1669, 1675, 1688, 1695, 1702, 1706, 1713, 1719, 1726, 1732, 1742, 1766 (emphasis added).

[14] Movants' initial laments include the "misleading and illogical manner" of the pleadings, which copy and paste identical allegations "regardless of whether those individuals' cases are at issue in any particular action" (*Id.*). They also assert that the TACs -- "an exercise in misdirection and obfuscation" -- improperly reassert all claims, including those the Court previously dismissed with prejudice, *i.e.*, "all claims brought under the Alien Tort Statute, all state law claims (under New Jersey, Ohio, and Florida law) and, as to all adult Plaintiffs, all Colombian law wrongful death claims, hereditary or 'survival' style claims, and 'other tort' claims" (Motion ("Mot." or "DE 3295" at n.1, n.3) (August Order/DE 3135 at 49-51, ¶¶ 1, 6 and 7).

TVPA liability is premised upon the actions of private parties, a plaintiff must allege a symbiotic relationship between a private actor and the government that involves the **specific conduct** alleged in the complaint in order to sufficiently plead state action" (DE 3295 at 4). They assert that Plaintiffs' TAC again fails to "sufficiently and plausibly allege that the AUC coordinated or collaborated with the Colombian government **with respect to the specific torture and killings at issue in the TACs**" (*Id.* at 5).

Citing *Romero v. Drummond Co.*, 552 F.3d 1303, 1317-18 (11th Cir. 2008) and *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, at 1266 (11th Cir. 2009), *abrogated on other grounds*, *Mohamad v. Palestinian Authority*, 566 U.S. 449 (2012), Movants argue that allegations of a "'general relationship'" between private actors and a government, untethered to the specific killings alleged in the complaint—are "insufficient to plead state action" (DE 3295 at 5).

Movants assert Plaintiffs futilely advance three theories in support of their cause: (1) direct involvement by the Colombian military in four alleged killings; (2) the AUC and the Colombian state conspired and acted together to target suspected guerrilla sympathizers and terrorize civilians in Urabá; and (3) In six cases, the AUC purportedly exercised an exclusive state function of "'fighting crime,'" "whereby they allegedly 'acted as judge, jury, and executioner, murdering sex workers, drug dealers, criminals, and participants in private disputes, sometimes at the request of the Colombian military'" (DE 3295 at 6). Movants identify a fourth -- "de facto state" – theory, *i.e.*, the AUC acted under color of state law because it exercised broad state functions and was allegedly the "de facto" state in Urabá (*Id.* at n.8).

Under the "direct military involvement" theory, Movants cite Plaintiffs' absence of facts to support their conclusory allegations as to three of four decedents falling under this theory, and the infirmity of these allegations "pled merely 'on information and belief'" which are insufficient to "'nudge their claims across the line from conceivable to plausible'" (*Id.* at 7-8). Apparently

combining the "direct military involvement" and "de facto state" theories, Movants also criticize that "Plaintiffs claim generally that '[f]or the purposes of this complaint, all plaintiffs who were murdered or attacked by the AUC in Urabá between 1996 and 2004 were murdered or attacked at a time *when the AUC had complete control over the region* and were killed pursuant to the exercise of that control,' *id.* at ¶ 734, but [Plaintiffs] do not link this theory to any specific cases" (*Id.* at n.8) (emphasis added).

Under the AUC and Colombian state "conspiracy theory," Movants take issue with Plaintiffs' all encompassing, indiscriminate allegations of murders undertaken by the AUC pursuant to the conspiracy to target and terrorize its victims while linking only 45 specific cases to this theory (DE 3295 at 9). Citing the August Order and *Sinatrainal*, Movants note that "mere 'shared ideology' between the AUC and the paramilitaries against unions is insufficient to state a claim for relief" under the TVPA, without establishing "'involvement' of the symbiotic relationship in the specific murders alleged" in the TACs (*Id.*). All the cases pled under this theory fail because "Plaintiffs point to characteristics of the decedent that, in their view, could have led to AUC targeting, but nothing more" (*Id.* at 10).

Under Plaintiffs' "'Exclusive State Function'" theory, Movants argue Plaintiffs allege that "AUC exercised an 'exclusive state function—fighting crime. . . . *sometimes* at the request of the Colombian military'" (*Id.* at 11). Conclusory allegations aside, "in none of the six cases do Plaintiffs actually plead that the murder was carried out at the request of the Colombian military, let alone sufficiently plead such an allegation with adequate supporting facts," as required under *Iqbal* and *Twombly* (*Id.* at 11-12).

Based upon the August Order, Eleventh Circuit precedent, *Romero* and *Sinatrainal*, Movants argue the Court should dismiss the TACs with prejudice because, "at most, Plaintiffs allege only a general relationship between the AUC and Colombian government and do not allege

the required connection between the alleged symbiotic relationship and the specific injuries at issue in the complaints" (DE 3295 at 13).

2.   Alternate Arguments: TVPA Claims Time Barred; Failure to State a Claim

Movants alternately argue that tolling arguments asserted by Plaintiffs are inapplicable based upon, *inter alia*, the Court's May 31, 2019 order making "clear that no class would be certified in this MDL (*Id.*).[15]

Movants also argue that Plaintiffs' TVPA claims should be dismissed based upon their failure to "plausibly allege that any Defendant personally provided substantial assistance to the AUC that was integral to the AUC's alleged conduct" -- *i.e.*, aiding and abetting -- as required pursuant to *Doe v. Drummond*, 782 F.3d 576, 608 (11th Cir. 2015) and *Halbertstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983); or provide "evidence that any [I]ndividual Defendant 'consciously, voluntarily, and culpably' assisted the AUC in carrying out any of the specific killings at issue," consistent with *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1230 (2023) (DE 3295 at 14; DE 3247 at 1-2). Movants also argue, citing *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008), that in cases of multiple defendants, specific allegations must attach to each defendant, and that "generalized allegations lumping multiple defendants together are insufficient," and as such provide another basis to dismiss the TACs against Movants (DE 3295 at 15, 18).

---

[15] While the May 31, 2019 Order pertained to the New Jersey Plaintiffs' motion for class certification, not the Ohio or Florida Plaintiff cases at issue here, and the Court did not explicitly so state, Movants appear to interpret "[N]o further motions for class certification shall be entertained" to mean that the Court's order in the New Jersey Plaintiffs' case applies to the entire MDL (DE 2471 at 22).

Movants assert Plaintiffs fail to plausibly allege conspiracy. Plaintiffs improperly rely on the Factual Proffer involving Chiquita, in which the Individual Defendants were not involved and which, further, does not reflect an agreement by alleging "that the AUC 'sent an unspoken but clear message that failure to make payments could result in physical harm to [the] personnel and property' of Banadex" (DE 3295 at 15). In other words, there could be no agreement by the Individual Defendants to conspire with the AUC if Banadex was making payments under duress.

Movants also argue that Plaintiffs fail to plausibly allege agency because of the lack of control by the Individual Defendants over the AUC, as required by "'unambiguous precedent'" of this Circuit.[16] Urging the Court to apply the same logic it did as against Chiquita in 2011 (*In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1352-53 (S.D. Fla. 2011)), Movants argue that Plaintiffs "do not allege that any Defendant controlled the military campaign of the AUC, directed the AUC's military strategy, or otherwise exercised any degree of control over the AUC," and that "[t]he Factual Proffer, which the TACs repeatedly reference and rely upon (and thereby incorporate), makes clear that neither Chiquita nor any [I]ndividual Defendant were ever in control of, or had authority over, the AUC" (DE 3295 at 17). Movants reiterate that the "involuntary and extortionary payments to the AUC" contraindicate an agency relationship between the Individual Defendants and the AUC (*Id.*).

Lastly, Movants urge the Court to dismiss all claims against any Individual Defendant based on injuries that occurred before any one of them joined Chiquita (*Id.* at 18).

---

[16] Citing *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003), Movants argue "'[A]n agency relationship requires [allegations that]: (1) the principal [acknowledged] that the agent will act for it; (2) the agent [manifested] an acceptance of the undertaking; and (3) [an exercise of] control by the principal over the actions of the agent'" (DE 3295 at 16).

*C. The Response*

   1. <u>Introductory Arguments</u>

Plaintiffs assert by way of introduction that the August Order "found that the Plaintiffs pled a close relationship between the State and the AUC to fight their common enemy, the guerrillas, but that Plaintiffs had not adequately alleged a nexus between that relationship and the killings, *i.e.*[,] that the relationship 'involved' the killings" (DE 3325 at 1, citing DE 3135 (August Order) at 50). The Court did not make such a finding. The Court considers Plaintiffs' assertion as a reference to the Court's iteration of Plaintiffs' *allegations*, *i.e.*:

> *Plaintiffs do <u>allege</u> the existence of a mutually beneficial relationship between the Colombian Army and the AUC, under which the government offered tactical support to the AUC and overlooked its criminal transgressions in exchange for the benefit of AUC's manpower and freedom from the constraints of the Geneva Convention in resisting the guerillas. Plaintiffs do <u>allege</u> that the Colombian military frequently coordinated activity with AUC operatives, including in the Uraba region where most of Plaintiffs' decedents were murdered. And they do <u>allege</u> the Colombian government tolerated and even encouraged paramilitary activity, further offering examples of instances where the Colombian government assisted and coordinated operations with AUC which involved attacks against civilians and perceived guerilla sympathizers.*

(DE 3135 at 49). The Court continued:

> *Plaintiffs do not allege, however, that the murders or torture of their decedents were the product of such coordinated attacks, or that Colombian Army personnel or any government official had any direct involvement in the assassination of their decedents.*

(*Id.*) The Court concluded that "[w]ithout allegations establishing the 'involvement' of the relationship *in the specific murders alleged* in their Complaints, Plaintiffs do not adequately plead conduct committed 'under color of law' for TVPA purposes" (DE 3135 at 48-49) (emphasis added). *See Romero v. Drummond*, 552 F.3d 1303, 1317 (11th Cir. 2008) (rejecting reliance on State Department reports "that Colombian paramilitaries have a close and regular relationship with

the military of Colombian government" to satisfy burden of state action, noting that "proof of a general relationship is not enough. The relationship must involve the subject of the complaint").

Plaintiffs further argue that the TACs allege facts showing that the symbiotic relationship between the AUC and the Colombian military is sufficiently pled because it was "specifically directed toward a particular means of accomplishing shared goals -- terrorizing civilians to eliminate the guerrillas" and guerrilla sympathizers (DE 3325 at 2). Without citation to the record, Plaintiffs also assert that "as this Court already held, Plaintiffs have plausibly alleged each Defendants' aiding and abetting and conspiracy liability under the TVPA" (*Id.*).[17]

Plaintiffs allege that "[t]he State used the AUC to murder and terrorize civilians, including leftists and those seen to support the guerrilla, as part of its war strategy in Urabá. *Id.* ¶¶ 283-93, 372-378. Initially, all the actions were carried out with the military's knowledge or participation, but later, the army 'delegated this responsibility' to the paramilitaries. *Id.* ¶¶ 376-77" and that "'the [State] Public Force gave [AUC commanders] lists of people to execute'" (DE 3325 at 4). Plaintiffs describe the murder conviction of an "army General Rito Alejo del Rio," the alleged leader of a "massive joint [army/ACCU/AUC] operation in Urabá known as Genesis," the "'draining the water to catch the fish'" and other terrorist strategies, and further assert that the "army and paramilitaries jointly planned operations," the conspiracy about which "has been detailed by the

---

[17] The August 2022 Order specifically states that "In the secondary liability context, private individuals, such as the former Chiquita executives sued here, may *potentially have* aiding and abetting liability under TVPA for facilitating war crimes [citations omitted], without necessarily sharing the criminal intent of the primary tortfeasors. The underlying liability, however, must arise from 'torture' or 'extrajudicial killings' which were specifically committed *under color of law*" (DE 3135 at 43) (first emphasis added); (*see also id*. at 44) ("For reasons expressed below, the Court agrees that the 'color of law' element is not adequately alleged, requiring dismissal of the TVPA claims for lack of subject matter jurisdiction. In so holding, the Court narrows its earlier, more expansive reading of the 'color of law' element [DE 412] to align its approach more closely with extant Eleventh Circuit precedent."). Plaintiffs subsequently acknowledge the foregoing and the Court's repleading requirements (DE 3325 at 3).

Colombian courts" (*Id*. at 4-5). Plaintiffs wide-ranging allegations refer to a U.S. State Department cable showing "the State-AUC conspiracy paid dividends" and that this recurring partnership "resulted in hundreds of deaths and disappearances" (*Id*. at 6). Plaintiffs further allege, presumably as further evidence in support of its paramilitary/state actor conspiracy theory that "[t]he *convivirs* funneled 'an enormous fortune' from the banana companies and others to the AUC. . . .  And the AUC, through the *convivirs*, also funneled money to the military." (*Id*. at 7).

### 2. Argument: Plaintiffs Plausibly Allege that AUC Was a State Actor in Killings

Plaintiffs posit that "[t]he AUC-State relationship 'involved' the killings" and that Plaintiffs satisfy "all three state action tests," *i.e*., joint action, encouragement, and public function[18] (DE 3325 at 10). They assert the "public function" test is met because "it does not require a nexus," but "even if it did, all the killings relate to and flow from the State's delegation to the AUC of the traditional, exclusive public function of performing military operations," implicitly defined to include murder and terrorizing civilians (*Id*.) Plaintiffs cite *Jaramillo v. Naranjo*, Case No., 10-21951-Civ-TORRES, 2021 U.S. Dist. LEXIS 184724, at *2-3, 10 (S.D. Fla. Sep. 28, 2021) as an example of an AUC block being "a state actor under *Romero*'s nexus test, based on indistinguishable facts" (*Id*.).

Plaintiffs assert there are "three general tests" under the state action inquiry applicable as to "whether the wrongful conduct is 'fairly attributable to the State'" (*Id*. at 10). They are the (1) "'State compulsion test,'" (2) "'public function test,'" and (3) "'nexus/joint action test,'"[19] which,

---

[18] *Cf*. the Court's conclusion in its August 2022 order, "that a tie to the specific misconduct and harm alleged in the complaint is required to meet the *Romero* symbiotic relationship /nexus theory of state action. It also concludes that Plaintiffs fail to allege a symbiotic relationship which meets this test. Without allegations establishing the 'involvement' of the relationship in the specific murders alleged in their Complaints, Plaintiffs do not adequately plead conduct committed 'under color of law' for TVPA purposes." (DE 3135 at 48-49)

[19] Accord, *Charles v. Johnson*, 18 F.4th 686, 694 (11th Cir. 2021).

according to the Plaintiffs, are a "similar articulation" of the various tests adopted by the Court in its December 15, 2022 Order (DE 3325 at 10-11).[20]

Plaintiffs argue that they have demonstrated state action because "All of the murders here fulfilled the symbiotic relationship's purpose of carrying out a terror campaign of violence and terror against a civilian population" (DE 3325 at 12). Their perspective is that "[t]he link between the AUC-State relationship and the killings is not, as Defendants argue, merely a general, mutually beneficial relationship or a 'general link to other misconduct of the same genre or other misconduct occurring in the same geographical area,'" "[r]ather, the AUC's reign of terror that included these murders was the whole *point* of the AUC-State relationship, creating a sufficient nexus between the symbiotic relationship and the killings at issue" (*Id*. at 12-13).

Plaintiffs cite *Charles v. Johnson*, 18 F.4th 686, 697 (11th Cir. 2021) -- a case alleging § 1983 and Rehabilitation Act claims; holding that a civilian's rendering of brief, *ad hoc* assistance

---

[20] DE 3238 at n.56 (Plaintiffs' pin cite) reads in its entirety (emphasis added):

> In the 42 U.S.C. § 1983 context, the Supreme Court has recognized several circumstances in which a private party may be characterized as a state actor, such as where the state has delegated to a private party a power "traditionally exclusively reserved to the State," *see Jackson v. Metro. Edison Co*.,419 U.S. 345, 352 (1974); where a private actor is a "willful participant in joint activity with the State or its agents," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151(1970); and where there is "pervasive entwinement" between the private entity and the state, *Brentwood,* 531 U.S. at 291. *The latter category, invoked here, is known as the "symbiotic relationship" test and requires a "close nexus" not merely between the state and the private party, but between the state and the challenged conduct itself.* Brentwood, 531 U.S. at 295.

> No such nexus exists where a private party acts with the mere approval or acquiesce of the state, *Blum v. Yaretsky*, 457 U.S. 991 (1982), *Sinaltrainal,* but a private entity may be considered a state actor if it "has acted together with or has obtained significant aid from the state officials["] in furtherance of the challenged action. *Lugar*, 457 U.S. at 937.

to a law enforcement officer is not state action, absent proof of a conspiracy to violate the constitutional rights of another -- in support of its argument that the showing of a conspiracy between the State and a private entity suffices to support the joint/nexus, *i.e.*, symbiotic relationship analysis[21] (DE 3325 at 13). Further, pursuant to *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005), to be a co-conspirator, "Colombian officials need not have participated in each specific murder, they must only have 'agreed to commit a wrongful act' and have joined the conspiracy knowing one of its goals and intending to help accomplish it"[22] (DE 3325 at 13). According to Plaintiffs, "[a]ll the killings[23] in this case were carried out in furtherance of the AUC-State conspiracy. As a former army officer involved in relations with the AUC summarized, the military and AUC engaged in 'a total and absolute conspiracy.' . . .The conspiracy's overarching goal was to defeat the guerrillas. SOF 4-6; *e.g.*, TAC ¶ 313 (detailing

---

[21] The Supreme Court has cautioned that the nexus/joint action test analysis "will be heavily fact specific." *Charles v. Johnson*, 18 F.4th 686, 696 (11th Cir. 2021) (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) ("'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'")).

[22] More precisely, citing *Halberstam v. Welch*, 705 F.2d 472, 481, 487 (D.C. Cir. 1983), the Eleventh Circuit stated in *Cabello v. Fernandez-Larios* that "[f]or the jury to find [defendant] indirectly liable by means of conspiracy, [plaintiffs] needed to prove by a preponderance of the evidence that (1) two or more persons agreed to commit a wrongful act, (2) [defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." *Cabello v. Fernandez-Larios*, 402 F.3d at 1159. The sole defendant in the *Cabello* case, Chilean military officer Fernandez-Larios, unsuccessfully appealed the jury verdict against him. The court found that evidence presented to the jury was sufficient to show that the defendant joined the conspiracy with knowledge of the conspiracy's plan (to kill civilian prisoners, including the decedent, following a coup) and with the intent of helping to accomplish those goals. Fernandez-Larios provided substantial assistance in decedent's killing, torture or mistreatment based on evidence, *inter alia*, that he was seen selecting and reviewing prisoners' files and took part in selecting those among them who would be "eliminated."

[23] Plaintiffs refer to "all of the killings" or "all killings" throughout their Opposition (*e.g.*, DE 3325 at 1, 2, 14, 15).

AUC Commander Hasbún's statement that '[i]t was the army itself that recommended that we arm ourselves illegally, that we import [paramilitary] groups to the Urabá region in the face of the state's inability to keep the guerrillas at bay'" (DE 3325 at 13).

Without citing legal authority, Plaintiffs assert that "[a] showing that the State intended or foresaw each specific murder is not required; the State's knowing, substantial assistance of these murders establish a nexus with the killings" (DE 3325 at 15). According to Plaintiffs, "*Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1222, 1226 (2023), *reaffirmed* the '*Halberstam*' 'knowing and substantial assistance' framework this Court applied in finding that Plaintiffs adequately alleged TVPA violations" (DE 3432 at 1). According to Plaintiffs, and applying the precepts of *Twitter*, "[f]unding AUC terrorists is not [providing] a routine service, and was an affirmative, culpable act that abetted the murders," "Defendants provided more direct aid *and* had more scienter than in *Twitter*," and their assistance was "'direct and extraordinary,' so the Court can 'more readily infer conscious participation' in the tort" (*Id.*) (internal citations omitted). Defendants "'selectively chose to' assist the AUC" (*Id.*).

Plaintiffs next argue that they meet the "public function test" insofar as "[w]hen the AUC committed *these killings*, it was exercising the delegated, traditionally exclusive state power of conducting military operations or suppressing insurgency; *all of the killings* served that function" (DE 3325 at 15) (emphasis added). Citing *Goldstein v. Chestnut Ridge Fire Co.,* 218 F.3d 337, 348 (4th Cir. 2000),[24] Plaintiffs argue that the public function test dispenses with the need to demonstrate a nexus that has been required in other contexts (*Id.* at 15-16). Applying this and other

---

[24] The plaintiff in *Goldstein* brought a § 1983 action against a volunteer fire company, challenging adverse employment actions against him. The Court of Appeals held that: (1) the volunteer fire department was a state actor, but (2) the firefighter's speech was not a substantial factor in the company's decisions to take adverse employment actions against him. The Court knows of no Florida Court or Eleventh Circuit decision which cites this case. *Goldstein v. Chestnut Ridge Fire Co.*, 218 F.3d at 339.

"public function" test cases to the instant matter, Plaintiffs proffer that "it does not matter here if a particular murder was of someone the State did not mean to target" (*Id*. at 17), although they later argue that "even if the public function test requires a nexus between the state's conduct and the specific harm, Plaintiffs allege one here. The military delegated the power to counter an insurgency to the paramilitaries for the specific purpose that the paramilitaries would murder suspected guerrilla sympathizers, enforce order and terrorize local people. All of the murders here fulfilled that purpose" (*Id*. at 18).

### a. *Whether Plaintiffs plausibly allege military's direct involvement in some killings[25]*

The TACs "allege the Colombian military's role in the killings of John Doe 64, John Doe 322, John Doe 104, and John Doe 301. In each case, the military provided weapons, uniforms, information, and/or personnel, or otherwise participated in the murders" (DE 3325 at 18). Citing *Jean-Baptiste v. Bus. Law Grp., P.A*., Case No. 8:16-CV-2027-T-33AEP, 2016 U.S. Dist. LEXIS 102479 at*6 (M.D. Fla. August 4, 2016) (claims under state and federal debt collection laws), Plaintiffs argue that the pleadings' allegations "on information and belief" as to John Does 64, 322, and 104 "cannot be 'disregarded based solely'" upon the use of that phrase (DE 3325 at 18). Plaintiffs argue that providing adequate context for "information and belief" claims "may make such allegations plausible" (*Id*.).[26]

---

[25] DE 3325 at 18 (the Court adopts, with some modification, Plaintiffs' headings in presenting their arguments as set forth herein).

[26] The *Jean-Baptist* court specifically provided that ". . . under *Twombly* and its progeny, the Court separates the conclusory allegations from the remaining well-pleaded factual allegations and determines if the well-pleaded allegations, when accepted as true, plausibly give rise to an entitlement to relief. *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013). *Here, the Complaint contains detailed allegations regarding specific debt collection efforts and attaches the letters and emails to the Complaint as exhibits. The Complaint sets forth precise allegations that, when accepted as true under Rule 12(b)(6), Fed. R. Civ. P., give rise to relief under the relevant statutes*. As [defendant] offers no additional arguments that the allegations against it are insufficient under Rule 8, the Court finds the Complaint sufficient and denies [defendant's] Motion to Dismiss. *Jean-*

The context Plaintiffs proffer to make their "information and belief" allegations plausible to sufficiently allege direct state involvement are that (1) "military members confiscated John Doe 64's identification and that paramilitaries disappeared him [*sic*] less than two hours later," "allow[ing] the reasonable inference that the military gave John Doe 64's information to the paramilitaries, who killed him;" (2) "[p]aramilitaries wearing Colombian military uniforms and carrying Colombian military weapons murdered John Doe 322," and men wearing Colombian military uniforms kidnapped John Doe 104, all of which similarly "allow[s] the reasonable inference that the murderers were soldiers moonlighting as paramilitaries to carry out the murder[s];" and (3) as to John Doe 301, Plaintiffs' specific allegation is "that the Army itself threatened [him] days before his death, for allegedly serving as an informant for the opposition" and "targeted [him] because his land was on a strategic transport route" (DE 3325 at 19).

> b.   *Whether Plaintiffs plausibly allege various killings sprung directly from the conspiracy to murder suspected guerrilla sympathizers, among others*[27]

Plaintiffs next assert that their allegations of a "specific purpose" conspiracy between the AUC and the government, as to 45 cases the TACs highlight, are distinguishable from the broader concept that the AUC and the government had "merely" a "mutually beneficial relationship or shared ideology," and that this "specific purpose" to target suspected guerrillas and terrorize civilians is sufficient for state action purposes (*Id.* at 20). More specifically, "[b]ecause of this specific purpose, Plaintiffs' allegations that they and their loved ones were among the targeted groups [unionists, community leaders, activists, and members of opposition political parties,

---

*Baptiste v. Bus. L. Grp., P.A.*, No. 8:16-CV-2027-T-33AEP, 2016 WL 4163574, at *6 (M.D. Fla. Aug. 4, 2016), *on reconsideration*, No. 8:16-CV-2027-T-33AEP, 2016 WL 4667858 (M.D. Fla. Sept. 7, 2016) (emphasis added).

[27] DE 3325 at 20.

among others] are sufficient" (*Id*. at 20). Plaintiffs assert that targeting certain civilian populations was a "widely known" State and AUC joint strategy; "[t]hus allegations of [*e.g*.,] union membership, taken together with allegations of the AUC and the government's targeting of [19 tortured and/or murdered] unionists, plausibly allege state action" (*Id*.). In sum, Plaintiff argues because "[e]ach respective decedent specifically alleges their targeting factor, [ ] this states a plausible claim for relief under the theory of conspiracy" and is consistent with the August Order to establish "the 'involvement' of the relationship in the specific murders" (DE 3325 at 21).

> c.  *Whether Plaintiffs allege murders as part of the conspiracy to terrorize the population*[28]

Plaintiffs allege the AUC's murder or kidnapping of victims in public or in front of family members or others, taking responsibility for such injury, sometimes through gruesome means or by leaving bodies in public places, was part of the AUC-military conspiracy to terrorize the civilian population (*Id*.). They assert that in so doing, the AUC was performing a "military role delegated by the state," and so satisfies as state action under the public function test (*Id*.). They assert that because the killings were part of a conspiracy with the State, "the symbiotic relationship test is also met" (*Id*.).

> d.  *Whether killings arising out of the delegated State functions of law enforcement and administration of justice*[29]

Under the "de facto" state paradigm, Plaintiffs assert the AUC committed various offenses of murder and torture to maintain social order (*i.e*., to mete out punishment for alleged abuse of a girl; due to an interpersonal conflict; murder over a land dispute; because of fight) under police power delegated to it to maintain social order (*Id*. at 22). Grouped with this argument is Plaintiffs' assertion that "Defendants erroneously conflate the symbiotic relationship and the public function

---

[28] DE 3325 at 21.
[29] DE 3325 at 21-22.

tests," the latter which "has no 'nexus' requirement" (*Id*.). Plaintiffs further assert that "*neither* test requires the state's active participation in each murder," but "[r]egardless, even under the symbiotic relationship test, there is a tie between the relationship and the conduct at issue" (DE 3325 at 22).

3.   Argument: Plaintiffs' TVPA Claims are Timely and Adequately
State a Claim

Plaintiffs' proffers regarding tolling are, in sum, as follows: that the 2017 claims are timely without class tolling; the 2017 and 2020 claims are timely even with class tolling; Ordman's argument that the 2020 claims against him are untimely overlooks equitable tolling; and, lastly, Defendants "do not deny some Plaintiffs' claims are timely based on minority tolling, and other Plaintiffs have timely claims based on a combination of minority and class tolling" (DE 3325 at 22-24).

Lastly, Plaintiffs argue that "the Court recently 'rejected Defendants' challenges to the sufficiency of the evidence' on aiding and abetting and conspiracy for each Individual Defendant (*Id*. at 24) (citing DE 3238 (December 15, 2022 Order on Summary Judgment) at 87).[30] Additionally, citing the Court's 2016 Order Granting in Part & Denying in Part Defendants' Joint Consolidated Motion to Dismiss ("2016 Order") involving some different ATS actions (DE 1110 at 24),[31] Plaintiffs argue that "aiding and abetting requires only 'knowing substantial assistance'" (DE 3325 at 25). Rejecting "Defendants[']" complain[t] that Plaintiffs have not alleged that they 'personally or directly encouraged the AUC to commit' violence, were present at the killings or

---

[30] The December Order on Summary Judgment involved seven other cases -- *Carrizosa*, *Valencia*, *Montes* and four "D.C. Actions" -- distinct from those which Defendants move to dismiss herein.
[31] Case Nos. 07-60821; 08-80421; 08-80465; 08-80508; and 10-60573. The 2016 Order also pertained to additional individual defendants not included in this action, *i.e*., Roderick Hills (deceased), Ferdinand Aguirre (then-CEO or Chiquita), Steven Warshaw (held several executive positions); Keith Linder (former President and COO of Chiquita).

'had any relation with the AUC,'" Plaintiffs point out that Defendants fail to provide any authority to support that the foregoing (encouragement, presence, relation with AUC) are necessary prerequisites to aiding and abetting liability – and assert that "[s]ubstantial assistance alone suffices" (*Id.*).

Plaintiffs rely on the Court's 2016 Order further to support that its conspiracy liability theories are viable against the Individual Defendants for reasons cited therein (DE 3325 at 26); assert that they plausibly alleged agency liability (DE 3325 at 26-27); reject the accusation that the TACs improperly set forth "group pleading," and preserve their argument that "Defendants" can be held liable for injuries which pre-date their employment while simultaneously acknowledging that "this Court has already ruled on the issue" (DE 3325 at 28).

### C. Reply

1. Circumventing TVPA Test; Secondary Liability Theories; and Public Function Test

Movants assail what they characterize as Plaintiffs' attempt to circumvent the applicable test for their TVPA cases, that which "the Eleventh Circuit has expressly set forth the proper test for state action in TVPA cases" (DE 3346 at 1).  Arguing that "[w]hile there may be various tests applicable in the § 1983 context," the *Romero* test indispensably requires that "'[f]irst, there *must* be proof of a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action under the [TVPA]. Second, a plaintiff may prove that relationship…by presenting evidence of the active participation of a single official'" (DE 3346 at 1-2). This precept was reinforced by the *Sinatrainal* Court, which "'demand[s] allegations of a symbiotic relationship that involves the torture or killing alleged in the complaint to satisfy the requirement of state action'" (*Id.* at 2).

According to Movants, Plaintiffs' citing another court's [*i.e.*, the *Jaramillo v. Naranjo* court's] recent finding that the AUC was a state actor "'under *Romero*'s nexus test, based on indistinguishable facts,' is both false and misleading;" Movants differentiate the case with the instant matter (*see id*. at 2) ("*Jaramillo* opinion cited by Plaintiffs is an unpublished order deciding an unopposed summary judgment motion upon an unchallenged record, where the plaintiff directly sued a high-ranking commander of the AUC for the killing of one specific decedent").

Next, Movants argue that neither conspiracy, aiding and abetting, nor agency, *i.e.*, "'secondary liability theories'" will carry the day for Plaintiffs, because they "still fail to tie that 'symbiotic relationship' *to each specific act of torture or killing alleged in the TACs*" (DE 3346 at 3). Similarly, "Plaintiffs provide no support for applying an 'encouragement' theory to establish state action under the TVPA," because they only cite *Brentwood*, a § 1983 claim, wherein the Supreme Court noted "that challenged private activity may be considered state action for purposes of a § 1983 claim when, among other things, 'the State provides "significant encouragement, either overt or covert' to the private actor" (DE 3346 at 5-6).  Other § 1983 cases – *i.e.*, *Adickes* (race discrimination case) and *Skinner* (Fourth Amendment search and seizure case) are, Movants argue, "wholly inapposite" (DE 3346 at 6).

The "public function test" does not apply in the TVPA context, and the Plaintiffs do not provide any legal authority stating otherwise, say the Movants, which is why the Court did not address this theory in its August Order (DE 3346 at 6). The public function test argument "defies logic," say Movants, and the case Plaintiffs primarily rely on, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("*MCAC*"), underscores this (*Id.* at 7). *MCAC* is a § 1983 First Amendment case which examined whether operating a public access channel qualified as an exclusive public function; the court concluded it did not. "[T]o qualify as a public function, 'the government must have *traditionally* and *exclusively* performed the function,'" and the Supreme

Court stressed that "'very few' functions fall into that category." (DE 3346 at 6-7) (citing *MCAC*). Movants thus urge the Court *not* to hold that terrorizing civilians is properly considered a traditional and exclusive public function of the Colombian state, rather, as Plaintiffs admit, it was "a role that the Colombian military itself *could not and would not* undertake" (DE 3346 at 7-8).

> 2. Argument: Plaintiffs Fail to Plausibly Allege the Colombian
> Military's Direct Involvement in the Four Killings

As to allegations that the Colombian military was directly involved in killing John Doe 64, John Doe 322, John Doe 104, and John Doe 301, Plaintiffs' pleading "on information and belief" as to the first three of these decedents,[32] lacks supporting factual allegations to achieve sufficiency and plausibility, as required by *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (DE 3346 at 8). In this regard, Movants assert Plaintiffs again provide inapposite district court cases, as detailed in the Reply (DE 3346 at 8-9). More specifically, "[t]here is no factual allegation that the military took John Doe 64, only his identification, and there is no plausible factual allegation that the paramilitaries used information provided by the military or state to come and take John Doe 64 away," which, consistent with *Resnick v. City of Troy*, [Case No. 2:17 CV 815-ECM, 2019 WL 2092567, at *6] (M.D. Ala. May 13, 2019) (which quotes *Mann*) is insufficient to defeat a motion to dismiss (DE 3346 at 9).

Plaintiffs allege the decedents John Doe 322 and John Doe 104 were taken and killed by paramilitaries wearing "'military uniforms'" and so conclude, "'[o]n information and belief, the paramilitaries in military uniforms were Colombian military soldiers moonlighting as paramilitaries to carry out'" these murders (DE 3346 at 9). Movants argue that "Plaintiffs'

---

[32] *See* TAC ¶ 574, 578, and 581 (correcting scrivener's errors misstating which TAC paragraphs alleged "on information and belief").

implausible view" necessarily means that "any purchaser of fatigues at a military surplus store would be a state actor for purposes of TVPA liability" (*Id*. at 10).

Finally, as to John Doe 301, Movants rely on their Motion and assail Plaintiffs' failure to address "unwarranted deductions" lacking underpinning support in their Response, including how or why land posed a threat to the AUC or the Colombian military and how or why John Doe 301 was perceived as an informant "'for the opposition'" (DE 3346 at 10). Plaintiffs fail to provide details of purported threats, of his death, and they fail to tie John Doe 301's death to purported threats (*Id*.).

### 3. Argument: Plaintiffs Have Not Alleged a Plausible Conspiracy to Commit Specific Acts of Torture or Killings

Plaintiffs cannot "ignore *Sinaltrainal* and merely assert, without any support, that '[p]laintiffs' allegations that they and their loved ones were among the targeted groups are sufficient'" (DE 3346 at 11); "'pleadings must be something more than an ingenious academic exercise in the conceivable'" (*citing United States v. Students Challenging Regulatory Ag. Proc*., 412 U.S. 669 (1973); *Aldana*, 416 F.3d at 1248; *Iqbal*, 129 S. Ct. at 1949)) (*Id*.). Movants argue further that "[t]he same applies with even greater force to Plaintiffs' wholly unsupported contention that allegations of the disparate ways in which the decedents were allegedly killed are sufficient to plead state action stemming from a vague conspiracy to 'terrorize the population.' *See* Pls. Opp. at 21. Simply because the AUC may have committed acts of terror does not establish state action by the Colombian military" (*Id*.).

### 4. Alternative Arguments

Movants' alternative arguments assert that, as to equitable tolling, Plaintiffs have not exercised diligence in filing a motion for class certification (DE 3346 at 11-12). As to Defendant

Ordman, "unnamed Plaintiffs' TVPA claims brought in the December 2020 Ohio Action would still remain time barred" (*Id*. at 12).

Next, Plaintiffs fail to plausibly allege that any Individual Defendant personally entered into an agreement with the AUC; at best, they allege that their employer, Chiquita, formed an agreement with AUC. Reiterating that the Individual Defendants are not parties to nor bound by the Factual Proffer, Movants also chide Plaintiffs' "attempt to use the Factual Proffer as both a sword and a shield, and now claim that because they did not incorporate the Proffer, the Defendants 'cannot rely on [it]'" (DE 3346 at 13). In any event, they argue, the Factual Proffer "makes clear that Defendants did not enter into any agreement with the AUC for the purpose of killing Plaintiffs' decedents, and thus Plaintiffs have not adequately pled conspiracy liability" (DE 3346 at 13).

The final arguments Movants make are that (1) Plaintiffs fail to plausibly allege agency liability without facts reasonably inferring that "any Defendant exercised control over the AUC or directed the AUC's actions, leading to the injuries alleged in the Complaint" (*Id*. at 13-14); (2) the TACs should be dismissed for improper "group pleading;" and (3) consistent with the Court's prior rulings, no liability can attach as to any Individual Defendant where the claim(s) predate their employment at Chiquita (*Id*. at 14).

## III.   Analysis

### A. *Introduction*

As is well-established, to survive a motion to dismiss, Plaintiffs must allege facts that are enough "to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).  The Court must accept the factual allegations in the complaint as true and must construe them to include any theory on which the plaintiff may recover. Ambiguities are construed in the light most favorable to the nonmovant, and the Eleventh Circuit "can affirm the district court's dismissal of the complaint only if 'it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief.'" *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005) (internal citations omitted). Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Id.*

As the Court explained in its August Order, the TVPA claims Plaintiffs asserted against the Individual Defendants in the Second Amended Complaint were due to be dismissed because -- although the Plaintiffs alleged the existence of a mutually beneficial relationship between the Colombian Army and the AUC, that the Colombian military frequently coordinated activity with AUC operatives, including in the Urabá region where most of Plaintiffs' decedents were murdered, and that the Colombian government tolerated and even encouraged paramilitary activity, Plaintiffs did not allege,

> that the murders or torture of <u>their decedents</u> were the product of such coordinated [Colombian government and AUC] attacks, <u>or that Colombian Army personnel or any government official had any direct involvement in the assassination of</u> <u>their</u> <u>decedents</u>. As Plaintiffs thus offer no facts that connect the symbiotic relationship alleged to the murders of their decedents, they plead no facts from which the Court may infer that AUC acted under "color of law" in carrying out the attacks <u>alleged in their complaints</u>.

(DE 3135 at 49 (emphasis added); *see also id*. at 42-49, explaining the governing law for TVPA claims).

Thus, Plaintiffs' prescribed path to replead their TVPA claims against the Individual Defendants, if they could, was to correct their "failure to allege adequately the existence of a symbiotic relationship between the AUC and Colombian government involved in the specific misconduct alleged in the Complaint," *i.e*., for the purpose of the specific assassinations or other alleged misconduct (DE 3135 at 50-51). Plaintiffs were required to "allege( ), in good faith, facts tying the symbiotic relationship alleged to the specific instances of murder and torture alleged in the Complaints" (*Id*. at 51).

Notwithstanding the forewarning that "[t]his shall be the final opportunity for amendment of the Complaints and shall be limited to this narrow issue" (*Id.*), Plaintiffs assert their causes of action "arise under and constitute torts under," the ATS; TVPA; Customary international law; Common law of the United States of America; Laws of Colombia, and "[t]o the extent that the laws of Colombia do not apply to any of the claims herein, and the laws of any U.S. state or other jurisdiction are applicable, the laws of such states or other jurisdictions" (DE 3204 at ¶ 1592). To the extent these causes of action or Plaintiffs' claims for relief constitute claims brought under the Alien Tort Statute, all state law claims (under New Jersey, Ohio, and Florida law) and, as to all adult Plaintiffs, all Colombian law wrongful death claims, hereditary or 'survival' style claims, and 'other tort' claims, they have been dismissed with prejudice and will not be re-addressed here. Mindful that the Plaintiffs may be trying to preserve the panoply of foregoing arguments for appeal, the Court's August Order, the TACs, the Motion and attendant briefing, and whether Plaintiffs have cured their pleading deficiencies remains the central inquiry commanding the Court's attention.

### B.  The TACs Alleged State Action

Plaintiffs' TAC relies on **five broad categories** in its attempt to prove state action.

**First**, Plaintiffs assert the AUC acted under color of authority of the Columbian government "with respect to all killings" (DE 3204 at ¶¶ 275-571). Typical among this group of allegations are that acts of violence committed by the AUC in Urabá "were part of a concerted plan with Colombian State actors to drive left-wing guerrillas out of Urabá, and to terrorize any people or groups deemed sympathetic to the guerrillas (or left-wing causes)" (DE 3204 at ¶ 278). The "AUC, predecessor paramilitary groups, and the Colombian State also operated more clandestinely to achieve their common goal of eliminating the guerrillas and driving civilians from Urabá that were seen as sympathetic to guerrillas and/or leftist causes" (*Id.* at ¶ 282). Instead of

identifying specific members of the Colombian military or specific officials in the Colombian government, and tying such actors to the alleged specific injurious conduct, Plaintiffs aver that

> *In the sections below* [presumably ¶¶ 275-571] *are case specific allegations, which concern both the incidents of Plaintiffs in this case as well as incidents involving plaintiffs in other cases filed in this MDL by Plaintiffs' counsel. The allegations about plaintiffs in these other cases are included here because they are relevant <u>to show the overall pattern of AUC abuse and state action</u>. Inclusion of a particular victim's or survivor's name in these allegations does not signify that they are a Plaintiff in this action, if they are not identified as a Plaintiff elsewhere in this Complaint.*

(*Id.* at 45, n.1) (emphasis added). None of the allegations in this group (DE 3204 at ¶¶ 275-571) tie specific state actors to the specific injuries alleged in the TAC, they only assert a general relationship between the AUC and the Colombian military which, even if true, is insufficient to support state action. The relationship must involve the subject of the complaint. *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008). One reference to Colombian President Barco lacks specific details tying him to any particular Plaintiff subject to "eliminat[ion]" of union members in order to support state action (*see* DE 3204 at ¶ 388) (Colombian President Barco is identified as someone who, in 1986, "specifically plotted and planned with the Colombian Military and Intelligence services to eliminate *the Union Patriótica and its members*") (emphasis added). Even viewing this allegation most favorably to Plaintiffs, 1986 predates both the Individual Defendants' employment and the years in which Chiquita is alleged to have been making payments to non-state actors. Individual Defendants were employed by Defendant Chiquita starting in 1989 (Ordman, Tsacalis), 1995 (Olson), and 1997 (Kistinger) (DE 3204 at ¶¶ 222-226), and Chiquita paid violent guerrilla groups and/or supported various paramilitary groups from the late 1980s until 2004 (*Id.* at ¶¶ 244, 746).

**Second**, Plaintiffs assert "direct military involvement" as to four decedents (DE 3204 at ¶¶ 572-584). The "direct military involvement" claims as to three of these four decedents, John Doe

64, John Doe 322 and John Doe 104, are cast "on information and belief," without sufficient factual support to implicate the Individual Defendants through a "color of law" connection. Plaintiffs allege in conclusory fashion that unidentified members of the military, "on information and belief," shared John Doe 64's identification with unspecified paramilitaries on the same day these unspecified paramilitaries allegedly kidnapped and presumptively murdered him (body not found, motive not alleged) (DE 3204 at 90-91). Plaintiffs cite the sharing of information and intelligence by the unidentified military members as the basis for the paramilitaries acting "under color of law" as to John Doe 64 (*Id*. at 91). As to John Doe 322 and John Doe 104, Plaintiffs claim that "[o]n information and belief, the [unspecified] paramilitaries in military uniforms were Colombian military soldiers moonlighting as [unspecified] paramilitaries to carry out the murder of" each of these victims; John Doe 322 was accused of being a guerrilla collaborator and of storing weapons in his home; John Doe 104 was not accused of any specific wrongdoing prompting his murder (*Id*. at 91).

Plaintiffs' bare allegations pled "on information and belief" are insufficient to "nudge their claims across the line from conceivable to plausible." *See Sinaltrainal*, 578 F.3d at 1268 ("the plaintiffs' allegations of conspiracy are 'based on information and belief,' and fail to provide any factual content that allows us 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (quoting *Iqbal*, 129 S. Ct. at 1949)). In making its determination that Plaintiffs have failed to provide enough factual support to buttress their "information and belief" assertions, the Court has not automatically discredited these claims, rather, it is finding the context (where it exists) inadequate to support the specific misconduct alleged as to the "direct involvement" claims of John Doe 64, John Doe 322 and John Doe 104 (DE 3325 at 18-19). *See Jean-Baptiste v. Bus. L. Grp., P.A.*, No. 8:16-CV-2027-T-33AEP, 2016 WL 4163574, at *6 (M.D. Fla. Aug. 4, 2016), *on reconsideration*, No. 8:16-CV-2027-T-33AEP, 2016 WL 4667858 (M.D.

Fla. Sept. 7, 2016) ("under *Twombly* and its progeny, the Court separates the conclusory allegations from the remaining well-pleaded factual allegations and determines if the well-pleaded allegations, when accepted as true, plausibly give rise to an entitlement to relief. *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013)"). While Plaintiffs assert that [p]aramilitaries wearing Colombian military uniforms and carrying Colombian military weapons warrants a "reasonable inference" that "the murderers were soldiers moonlighting as paramilitaries to carry out the murders of John Doe 322 and John Doe 104" (DE 3325 at 19), Plaintiffs do not otherwise allege that paramilitaries were known (or authorized by the state) to wear Colombian military uniforms. Civilians wearing any type of military fatigues may have purchased such items from a military surplus store for any variety of reasons – to assert authority or lend an air of authority, express a statement, or even in conjunction with protesting their government.[33] In sum, the Court agrees with Movants in this regard, that "[i]n Plaintiffs' implausible view, any purchaser of fatigues at a military surplus store would be a state actor for purposes of TVPA liability" (DE 3346 at 16). More importantly, Plaintiffs fail to identify any specific member of the Colombian military or other government official who was "directly involved" in any of these claims.

With respect to the fourth "direct involvement" decedent, John Doe 301, Plaintiffs plead that unspecified "[p]aramilitaries and the National Army targeted John Doe 301 because his land was located in a strategic transport route," and that "[d]ays before his death, John Doe 301 received threats from the National Army of Colombia for allegedly serving as an informant for the opposition" (DE 3204 at 91-92). Plaintiffs further assert that John Doe 301 was killed by paramilitaries "under the color of law because of the collaboration and coordination between the government and the AUC to target and eliminate perceived threats and opposition" (*Id.*) Here

---

[33] In the United States, wearing a service uniform is regulated by law. 10 U.S. C. §772.

again, Plaintiffs fail to identify any specific state actor who may provide any factual content as to how or why land allegedly "located in a strategic transport route" posed a threat or opposition to the AUC or Colombian military, how or why John Doe 301 was perceived as an "informant," nor how the Court may infer that the AUC and any specific member of the Colombian military or other government official actually coordinated and collaborated to target and kill John Doe 301.

**Third**, Plaintiffs posit their conspiracy theory, that "[a]ll of the murders in this case were undertaken by the AUC pursuant to the conspiracy [with the Colombian State] to target suspected guerrilla sympathizers and terrorize civilians" (DE 3204 at ¶ 586; ¶¶ 585-714).

In this group of 45 John Does, Plaintiffs overwhelmingly fail to specify how the deaths occurred, where or when they occurred and, most critically, they do not link their deaths to state actors, rather they simply conclusively allege that their torture or death occurred "under color of law" (*See generally id.* at ¶¶ 588 – 714). In some cases, Plaintiffs specifically identify *non*-State actors who either committed or confessed to ordering the murders; they generically claim "[p]aramilitaries killed" or "[p]aramilitaries targeted" their victims. One unidentified "official of the mayor's treasury of the town of Carepa *warned* John Doe 324 before his death that he should remain silent" (*Id.* at ¶604) (emphasis added).

These allegations are in stark contrast to the *Jaramillo* case Plaintiffs cite as being "indistinguishable" from the instant matter (DE 3325 at 10, DE 3346 at 2-3), as discussed further below. *See also Sinaltrainal*, 578 F. 3d at 1264 (noting that the Eleventh Circuit had "*squarely considered* the state action requirement of the TVPA" in *Aldana* and *Romero*: state action requirement was satisfied in *Aldana v. Del Monte Fresh Produce, N.A., Inc*., 416 F.3d 1242, 1249 (11th Cir.2005), where one public official, a district mayor, was identified by name in the complaint and was alleged to have actively participated in the paramilitary force's armed aggression; complaint could "reasonably be read as depicting the Mayor as an 'armed aggressor,'

not a mere observer;" in *Romero*, 552 F.3d at 1303, "state action requirement was not satisfied because the plaintiffs failed to allege the paramilitaries enjoyed a 'symbiotic relationship' with the state military for the purpose of the alleged assassinations that formed the basis of the complaint")  (emphasis added).

Far from being an "armed aggressor" as to the death of John Doe 324, the "state action" of the unidentified, unranked "official of the mayor's treasury" – tried to help him escape his alleged demise. These allegations are insufficient to support the requisite state action component of Plaintiffs' TVPA claim as to John Doe 324.

**Fourth**, Plaintiffs assert six (6) deaths occurred under the conspiracy penumbra that the "target and terrorizing" campaign was a result of the AUC's exercise of an "exclusive state function - fighting crime" (*Id*. at ¶¶ 715-733). These allegations lack dates and details, and/or appear to be wholly unrelated to banana farming (*Id.*). Setting aside the fact that targeting and terrorizing suspected guerrillas or sympathizers via torture does not seem to fit traditionally acceptable methods of "fighting crime," none of these allegations tie specific state actors to the alleged specific misconduct (not even those actions allegedly undertaken "sometimes at the request of the Colombian military") (*Id*. at ¶ 717), thus they fail to provide the state action component the TVPA claim requires.

**Fifth**, Plaintiffs claim the AUC acted under color of law "because it exercised broad state functions and was the "de facto" state in Urabá (DE 32404 at 109; ¶¶ 734 – 742). These allegations are not tied to any particular Plaintiff "Doe" injuries.

Finally, references to the Justice and Peace Chamber proceedings appear throughout the TAC, routinely referring to the State's responsibility for paramilitary killings without allegations linking such -- or specific -- killings alleged in the TACs to specific Colombian state actors, but occasionally identifying certain *paramilitary* commanders to coordinated efforts (*e.g*., DE 3204 at

¶¶ 280, 348, 376, 377, 397, 422, 562, 956 ("John Doe 12's murder is recognized as a paramilitary killing in Colombia's official Justice and Peace proceedings, a governmental process created as part of the demobilization of the AUC to find facts and establish accountability for paramilitary violence"), ¶ 963 ("John Doe 13 is recognized as a victim in the Justice and Peace proceedings of AUC commander Éver Veloza Garcia"), ¶ 971 ("John Doe 16 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza"), ¶ 974 ("John Doe 17 is recognized as a victim in the Justice and Peace proceedings of AUC commander Raúl Emilio Hasbún Mendoza").

### C. The Motion and Attendant Briefing

As previously noted, the Court's focus is on whether the TAC successfully addresses the previous TVPA pleading deficiencies. The narrow repleading requirement was for Plaintiffs, if they could, to tie the specific misconduct and harm alleged in the complaint to meet the *Romero* symbiotic relationship/nexus theory of state action (DE 3135 (August Order) at 48-49). As previously opined, even "in the §1983 context, from which the TVPA state action' contours are drawn [citing *Romero*], the Eleventh Circuit has since consistently focused on the specific harm/misconduct alleged as the basis for plaintiffs' claims in testing the sufficiency of the required nexus" (*Id*. at 46 - 47 (some citations omitted)). The few remaining pertinent arguments, to the extent the Court has not already addressed them, are shown below.

The Court agrees with Movants that the public function test is not the path upon which Plaintiffs' allegations could successfully travel. Targeting, torturing and killing suspected guerrilla, union, or leftist sympathizers, and terrorizing civilians is, simply put, not a "public function" "traditionally the exclusive prerogative of the State" (DE 3325 at 10-11, citing *Charles v. Johnson,* 18 F.4th 686, 694 (11th Cir. 2021); *accord Manhattan Cmty. Access Corp. v. Halleck,* 139 S. Ct. 1921, 1928 (2019)); nor was it addressed in the Court's August Order.

Another shortcoming of Plaintiffs' TAC and briefing efforts is their mischaracterization of *Jaramillo v. Naranjo*, Case No. 10-21951-Civ-TORRES, 2021 WL 4427455 (S.D.Fla., Sept. 28, 2021). Plaintiffs' assertion that the *Jaramillo* court's finding "that an AUC bloc was a state actor under *Romero*'s nexus test, based on indistinguishable facts" from the instant matter is rejected (DE 3325 at 10, DE 3204 at ¶ 303). The *Jaramillo* court found "an abundance of evidence" in the record that the AUC operated in a symbiotic relationship with Colombian state actors. *Jaramillo v. Naranjo*, 2021 WL4427455 at *3 (S.D. Fla. Sep. 28, 2021)[34]  The case involved the killing of one individual and the torture of his common law wife, in Colombia. Plaintiffs therein sought compensatory and punitive damages for violations of the TVPA, alleging that the sole defendant, Carlos Mario Jimenez Naranjo ("Naranjo"), (1) aided and abetted members of the *Bloque Central Bolivar* ("BCB") (an AUC block), (2) participated in a conspiracy to kill civilians, and (3) exercised command responsibility. Naranjo did not respond to the *Jaramillo* plaintiffs' (ultimately successful) motion for summary judgment. *Jaramillo v. Naranjo*, 2021 WL 4427455 at *1 (S.D.

---

[34] Quoting *Sinaltrainal* for the proposition that "[a]n individual acts under color of law when actions are made together with state officials or with significant state aid (*id*. at 3), the "abundance of evidence" was identified as follows: "*the BCB operated in a symbiotic relationship with Colombian state actors. State actors actively supported the BCB's operations through intelligence sharing, weapons, and military uniforms. [D.E. 199 at ¶ 16-18]. State actors also turned a blind eye to the BCB's presence and the group's criminal acts due to bribes. Id. at ¶ 17. In fact, at the time of* [decedent] *Mr. Estrada's killing, San Pablo residents considered state officials and the BCB to be the same entity because the organization controlled the operations of the state. Id. at 22. The BCB even maintained a payroll for payments to the military and police force. Id. at 23.*" The Court has reviewed the *Jaramillo* record, which includes further unrefuted allegations that "In Defendant's own words about the BCB: 'We were the authority, we fixed everything, we were everything, we were the State'" (*Id*. at 24). The BCB targeted the decedent within earshot of the nearby local police station, yet no police came to inquire about the multiple gunshots, the screaming or the commotion of people trying to aid the decedent. A group of 40 to 50 members of the Colombian military were stationed nearby in a local school – also within earshot of where the BCB targeted Eduardo. One of the soldiers passed by the scene of the killing while Eduardo was lying on the ground, grievously wounded. However, he did not call for assistance or backup, nor did he offer assistance himself. Instead, the soldier left at a leisurely pace and no one else from the army or the police ever came to assist Eduardo, either at the scene of his shooting or later that night at the hospital where he died (*Id*. at ¶¶ 64-66).

Fla. Sep. 28, 2021). The *Jaramillo* court found, as part of the *Romero* nexus analysis that "[t]he evidence here fully supports a conspiracy theory of liability because *Defendant founded the BCB*, used it to combat the illegal drug trade and guerilla forces, and accomplished that goal through a practice of instructing paramilitary members to murder civilians" (*Id. at* *3, 6) (emphasis added). The court found Naranjo secondarily liable through the doctrine of command responsibility, noting that "Defendant had not only effective control but *complete authority* over the killings in San Pablo [where the decedent was killed with a bullet to the back of his head] because he stood at the top of the BCB's hierarchical structure where every command flowed downward," and "evidence further establishes that Defendant personally ordered the killing of a Jesuit priest and that he assumed personal oversight over the murder of civilians. [ ] This is more than sufficient to meet the second element [that Defendant "'knew or should have known, owing to the circumstances at the time,' that soldiers 'had committed, were committing, or planned to commit' extrajudicial killings"] because Defendant not only oversaw the entire organization but had personal knowledge and involvement of the underlying crimes" (*Id*. at *7-8).

In this case, there is no evidence of state action. To the extent that any paramilitary commanders are specifically identified, none are tied to the specific misconduct alleged herein. Plaintiffs that are identified as having been "recognized as a paramilitary killing" in undated Justice and Peace proceedings (DE 3204 at ¶ 956 (John Doe 12)) or victims "recognized as a victim in the Justice and Peach proceedings" of specific AUC commanders (*e.g*., DE 3204 at ¶ 963 (John Doe 13, AUC commander Garcia); at ¶ 966 (John Doe 14 and John Doe 15, AUC commander Garcia); at ¶ 971 (John Doe 16, commander Mendoza) are insufficient to support the state action component under governing law. *See* August 2022 Order (DE 3135 at 43) ("to proceed on a joint operations theory, a plaintiff must present proof of a 'symbiotic relationship between a private actor and the government that involves the torture or killing <u>alleged in the complaint</u> to satisfy the requirement

of state action under the Torture Act.' *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008). *See also Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, at 1266 (11th Cir. 2009), *abrogated on other grounds*, *Mohamad v. Palestinian Authority*, 566 U.S. 449 (2012)").   Recognizing that Plaintiffs need not identify the specific soldier who fired each lethal shot (*see Mamani v. Berzain*, 309 F. Supp. 3d 1274, 1302 (S.D. Fla. 2018)[35]), being identified as a victim in a Justice and Peace proceeding, even of particular AUC commanders, without more, does not tie state action to the specific misconduct alleged herein.   Plaintiffs do not allege the State had any control over the paramilitaries actions in the specific misconduct alleged, even if the AUC was carrying out "extrajudicial killings that the State could not" (DE 3204 at ¶ 284).

Premising a conspiracy, even without ties to specific killings -- simply being "responsible in some manner" -- based upon either payment of money or a shared ideology are vague and conclusory allegations which are "insufficient to state a claim for relief, and 'will not do.'" *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d. at 1268 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). In this vein, the Court notes that the case of *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023) was brought under a different statute, the Antiterrorism Act, 18 U.S.C.S. § 2333 ("ATA"), a statute by which United States nationals who have been "'injured ... by reason of an act of international terrorism' may sue for damages. § 2333(a)." *Twitter, Inc. v. Taamneh*, 143 S. Ct. at 1214. The *Twitter* court's view of the facts "properly rests on the particular allegations in those

---

[35] Defendants in the *Mamani* case were the former President of Bolivia and former Minister of Defense of Bolivia. The *Mamani* court was "satisfied that a showing that decedents' deaths resulted from implementation of Defendants' [military] plan is sufficient to show that these were deliberate killings under the TVPA. Plaintiffs need not, as Defendants argue, identify the specific soldier who fired each lethal shot and introduce evidence regarding what that soldier was 'doing, seeing, hearing, ... processing,' or thinking at the time of the shooting. [ ] As Plaintiffs note, superior officers are consistently held liable under the TVPA for the acts of their subordinates, whether the subordinates can be identified or not." *Mamani v. Berzain*, 309 F. Supp. 3d 1274, 1302 (S.D. Fla. 2018).

complaints," "do not necessarily translate to other contexts" (*id*. at 1231 (Jackson, J., concurring)), and in any event, do not apply here insofar as the Court has found there is no state action based on the specific allegations in the TACs.  In other words, the Court need not rely upon *Twitter* in this TVPA context, notwithstanding its reminder that "the concept of 'helping' in the commission of a crime—or a tort—has never been boundless." *Id*. at 1220.

Finally, Plaintiffs allege "on information and belief" that "Defendants" – without distinguishing which among them -- are "responsible in some manner for the occurrences herein alleged" under a diaspora of legal theories – proximate causation, conspiracy, joint criminal enterprise, aiding and abetting, and/or that among them, they (the Defendants) were the principal, employer or other legally responsible person for persons who caused, conspired, and/or aided and abetted in such injuries (DE 3204 at ¶ 237; ¶¶ 927-1585 (*passim*)).  Plaintiffs improperly group the "Individual Defendants" with other Defendants in similar catch-all legal theory manner in other complaint paragraphs (*Id*. at, *e.g*., ¶¶ 238, 240, 889).  Where, as here, there are multiple defendants, "the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008).

**IV.   Conclusion**

In sum, after careful reading of the Motion, the Third Amended Complaint, and attendant briefing, and other relevant documents in the record, the Court finds that Plaintiffs' TACs fail to meet the specific repleading requirements of its August Order, and the governing law, and so are due to be dismissed.  With this finding, Court finds it unnecessary to reach Plaintiffs' alternative class action tolling and class certification arguments.

It is therefore **ORDERED AND ADJUDGED** that the Individual Defendants' Omnibus Joint Motion to Dismiss "New Jersey" Plaintiffs' Third Amended Complaints (DE 3295) is **GRANTED**.  Plaintiffs' Third Amended Complaints are **DISMISSED WITH PREJUDICE**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 13th day of September, 2023.

KENNETH A. MARRA
United States District Judge

cc:  All counsel