UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 08-MD-01916-MARRA

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION
_____

**This Document Relates to:**

ATS ACTIONS
_____

17-80535-CIV-MARRA (Ohio *Montes*)
18-80800-CIV-MARRA (remanded/severed *Does 1-144*)

07-60821-CIV-MARRA (*Carrizosa*)
08-80421-CIV-MARRA (N. J. Action) (*Does 1-11*)
08-80465-CIV-MARRA (D.C. Action) (*Does 1-144*)
08-80508-CIV-MARRA (*Valencia*)
08-80480-CIV-MARRA (*Manjarres*)
10-60573-CIV-MARRA (*Montes*)
17-81285-CIV-MARRA (D.C. Action) (*Does v Hills*)
18-80248-CIV-MARRA (*John Doe 1*)
_____/

**ORDER ON MOTIONS IN LIMINE AS TO EXPERT OPINION OF
JASON FLEMMONS, DAVID GADDIS, ANDRES OTERO LEON GOMEZ AND ROBIN
KIRK (DEs 2521, 2527, 3413)**

THIS CAUSE is before the Court on multiple *Daubert* motions *in limine* ("motions"), specifically,

(**1**) Defendants'[1] Consolidated *Daubert* Motion to Preclude Testimony of Plaintiffs' Purported Experts (**DE 2521**);

(**2**) Non-Wolf Plaintiffs' Motion *In Limine* to Preclude the Testimony of Defendants' Purported Expert Witnesses, Sanchez, Rincon, Cuadrado, Flemmons, Gaddis, and Otero (**DE 2527**); and

---

[1] "Defendants" refers to Chiquita Brands International, Inc. ("Chiquita"), Cyrus Freidheim, Carla Hills as the personal representative of the Estate of Roderick Hills, Sr., Charles Keiser, Robert Kistinger, Keith Lindner, Robert Olson, and William Tsacalis ("Chiquita" or "Defendants").

(**3**) Individual Defendants Cyrus Freidheim, Carla Hills as the personal representative of the Estate of Roderick Hills, Sr., Charles Keiser, Robert Kistinger, Robert Olson, John Ordman, and William Tsacalis ("Individual Defendants")'

Consolidated *Daubert* Motion as to All Expert Testimony and Evidence (**DE 3413**).

The motions have been fully briefed and are ripe for review.[2] The Court held a hearing on the motions on March 15, 2024 ("March 15 hearing"). The Court has carefully considered the motions and the arguments of counsel and is otherwise fully advised in the premises.

I. *Background*

Collectively, the motions seek rulings as to whether the Court should allow eleven witnesses to testify as Rule 26(a)(2) experts in the upcoming Bellwether One A trial. This Order focuses on four of the eleven witnesses: Jason Flemmons ("Flemmons"), David Gaddis ("Gaddis"), Robin Kirk ("Kirk"), and Andres Otero Leon Gomez ("Otero").[3] At the March 15 hearing, the parties agreed that the Court could reserve ruling on Jason Flemmons for reasons set forth in the record (DE 3593 at 175.12-179.15). Accordingly, the Court reserves ruling on the admissibility of Flemmons' testimony as may be necessary.[4] Based on the motions, oral argument at the March 15 hearing, and relevant portions of the record, the Court thus turns to the three remaining proffered witnesses who are the subject of this Order.

II. *Legal Standard*

---

[2] DEs 2547, DE 3434, 3449, 3450 (as to DE 2521); DEs 2548, 3435, 3448 (as to DE 2527); and DEs 3433, 3446 (as to DE 3413). The Court presumes familiarity with the record.

[3] In total, the eleven challenged witnesses are: (1) Flemmons, (2) Randall T. Fortenberry, (3) Gaddis, (4) Oliver Kaplan ("Kaplan"), (5) Terry Karl ("Karl"), (6) Kirk, (7) John Robert McBrien, (8) Otero, (9) Gustavo Rincon Rivera (Maj. General) ("Rincon"), (10) Diego Yesid Sanchez Ruis (Brig. General) ("Sanchez"), and (11) Osvaldo Cuadrado Simana ("Cuadrado"). Rincon and Sanchez are alternately referred to, collectively, as "the Generals."

[4] Non-Wolf Plaintiff's Counsel do not challenge Flemmons' qualifications, methodology or reliability to rebut opinions given by Karl (DE 3593 at 173).

The Court's evidentiary rulings, including its rulings on the admissibility of expert testimony, is subject to review for abuse of discretion. *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1103–04 (11th Cir. 2005) (internal citations omitted). A district court enjoys "'considerable leeway' in making these determinations." *Id*. at 1103 (citing *United States v. Frazier,* 387 F.3d 1244, 1258 (11th Cir.2004) (*en banc*)). As such, the ruling will not be reversed unless "manifestly erroneous." *Id*. The abuse-of-discretion standard requires that the Eleventh Circuit affirm a district court's decision unless it finds it "made a clear error of judgment, or has applied the wrong legal standard." *Id.* at 1104 (citing *Frazier* at 1259). *See also Izquierdo v. Certain Underwriters at Lloyd's London*, No. 20-13772, 2021 WL 3197008, at *3–4 (11th Cir. July 29, 2021) (addressing "hybrid" expert witnesses, citing *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 678 F.3d 1199, 1201 (11th Cir. 2012) and stating that abuse of discretion may also be found if the Court "'followed improper procedures, or when neither the district court's decision nor the record provide sufficient explanation to enable meaningful appellate review.'") Factors relevant to the determination of whether witness exclusion is appropriate includes "'the explanation for the failure to disclose the witness, the importance of the testimony, and the prejudice to the opposing party if the witness had been allowed to testify.'" *Id.* at *4 (citing *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1321 (11th Cir. 2008) (cleaned up)).

Federal Rule of Evidence Rule 702 provides that: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

3

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that all scientific testimony or evidence be both reliable and relevant pursuant to Rule 702. *Daubert*, 509 U.S. at 589. Thus, the evidence must: (1) constitute scientific knowledge; and (2) assist the trier of fact to understand the evidence or to determine a fact at issue. *Id.* at 589–91 (omitting citations, explaining that another aspect of relevancy under Rule 702 is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute). By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *United States v. Frazier,* 387 F.3d 1244, 1262 (11th Cir. 2004). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Id.* at 1262-63.

The *Daubert* principles apply to soft-science expert testimony. *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1317 (11th Cir. 2022). "'Social science testimony, like other expert testimony ..., must be tested to be sure that the person possesses genuine expertise in a field and that her court testimony adheres to the same standards of intellectual rigor that are demanded in her professional work.'" *Id*. at 1317-18 (citations omitted). As the *Carrizosa* court informs further, however, social science research, theories, and opinions cannot have the exactness of hard science methodologies, and "[w]here 'ideal experimental conditions and controls' are precluded, 'other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations.'" *Id*. at 1318 (citing, inter alia, *United States v. Young*, 916 F.3d 368, 380–81 (4th Cir. 2019) (alteration, internal quotation marks omitted; affirming the admission of expert testimony on extremist groups based on a social sciences-based methodology,

4

which involved a comparative method of focusing on primary-sources, then comparing the primary source conclusions to secondary sources and "events on the ground"). "Where appropriate, social science expert testimony can give 'the jury a view of the evidence well beyond their everyday experience.'" *Carrizosa* at 1318. (citation omitted).

Furthermore, although an expert may rely upon hearsay to formulate an opinion if the hearsay is of the kind upon which an expert in that field would reasonably rely, Fed. R. Evid. 703, the expert may not merely be a conduit to bring hearsay before the jury. *Mamani v. Berzain,* 2018 WL 1010582 *3, n.6 (S.D. Fla. February 22, 2018), citing *Marvel Characters, Inc. v. Kirby,* 726 F.3d 119, 136 (2d Cir. 2013).

Of course, evidence is relevant only if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is *of consequence* in determining the action. Fed. R. Evid. 401 (emphasis added). And finally, expert testimony that otherwise meets the admissibility requirements may still be excluded by applying Fed. R. Evid. 403. *Frazier,* 387 F.3d at 1263.

Disclosures about expert witnesses must be made at the times and in the sequence directed by the Court. Fed. R. Civ. P. 26(a)(2)(D).[5] Rule 26(a)(2)(B) witnesses -- those retained or specially employed to provide expert testimony in the case, or an employee whose duties regularly involve giving expert testimony -- must provide a written report as delineated by such Rule. Rule 26(a)(2)(C) witness need only provide a lesser "disclosure" of subject matter and a summary of facts and opinions of expected testimony. *See generally Pringle v. Johnson & Johnson*, No. 13-81022-CIV, 2019 WL 6723822, at *1-*3 (S.D. Fla. Dec. 11, 2019) (citations and footnotes

---

[5] In this case, the Amended Global Order Governing Certain Deadlines on Pretrial Procedures established November 18, 2018 as the deadline to exchange initial expert reports, December 14, 2018 as the deadline to provide rebuttal expert reports, and January 21, 2019 as the expert discovery deadline (DE 2122 at 5).

omitted; explaining 2010 Amendments to Rule 26 and "hybrid" witnesses, stating, *inter alia*, in context of treating physicians and the requirement (or lack thereof) to provide an expert report, "'the ability to answer hypothetical questions is the essential difference between expert and lay witnesses.' . . . '[W]hen a treating physician's testimony is based on an hypothesis, not the experience of treating the patient, it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702 and the strictures of *Daubert*.'"). *See Prieto v. Malgor*, 361 F.3d 1313, 1318-19 (11th Cir. 2004) (adopting definition of "hybrid" witness as one who may be called upon to testify to both factual and expert matters; excluding proffered "hybrid" witness who "had no connection to the specific events underlying [the] case apart from his preparation for [the] trial. He merely reviewed police reports and depositions provided by counsel and offered expert opinions on the level of force exhibited by Prieto and the appropriateness of the officers' response. . . . he had no direct, personal knowledge of any of [the] facts, his role was simply not analogous to that of a treating physician, the example offered by the Advisory Committee of an employee exempt from the written report requirement. Fed. R. Civ. Proc. 26 advisory committee's note."). *See also Cedant v. United States*, 75 F.4th 1314, 1324 (11th Cir. 2023) (retained -- *i.e.*, report-requiring -- expert witness typically will get involved in a case to provide expert testimony and will derive her knowledge of the case from preparation for trial. A non-retained -- *i.e.*, report exempt -- witness, on the other hand, "*will have at least some first-hand factual awareness* of the subject matter of the suit.") (emphasis added, footnote omitted).

III.   *Discussion*

   A.   Kirk

Defendants seek to exclude Kirk because she relies on third party hearsay "including 522 pages of inadmissible Human Rights Watch reports and similar sources attached to her expert disclosure" and, more significantly, is not exempt from providing an expert report under Rule

6

26(a)(2)(B), as opposed to the Rule 26(a)(2)(C) disclosure she provided (DE 2522-1 (unredacted version of DE 2521) at 15). Citing her deposition, Defendants state that "any 'personal knowledge' [Kirk] had concerning her opinions was not based on her own experiences and observations, but from collecting information as a researcher." *Id.* at 16. She had no "'ground-level involvement in the events giving rise to the litigation'" justifying her exemption from 26(a)(2)(B) reporting requirements. *Id*. at 15. She admits she has no personal knowledge of Banadex's activities in Colombia, the activities of any Chiquita or Banadex employees in Colombia, the Plaintiffs in this case, and any alleged victims; rather, her opinions are "simply predicated on the time she spent 'monitor[ing] the human rights situation in Colombia' from the United States along with some short trips to Colombia." *Id*. at 16.

Plaintiffs' responsive briefing did not substantively address the merits of precluding Kirk as an expert witness. Further, it is undisputed that she did not submit an expert report as would be required given the basis for her opinion(s) -- research into "different armed actors" and their modalities, *writ large*, devoid of any personal knowledge of any Plaintiff's alleged injuries or Chiquita's operations (DE 3593 at 154). Acknowledging that Kirk "didn't observe the bellwethers' deaths or meet with the bellwethers," Plaintiffs' counsel asserts her opinions nonetheless "would be helpful on the different armed actors" and their modalities. *Id*. Kirk would provide a "different set of criteria" than Professor Kaplan and "would be incredibly helpful" on "whether these murders were committed by regular criminals or an armed group," yet Plaintiffs failed to squarely address why Kirk was exempt from providing a Rule 26(a)(2)(B) report (*id*. at 154). Stating that Kirk "would be providing opinion on her 10 years of experience and knowledge and research, documentation in Colombia, 38 weeks on the ground, and then back in DC meeting with policymakers and testifying about it" (*id*. at 151-52) attests to the fact that she would be a classic Federal Rule of Evidence 702 witness, from whom an expert report is required.

7

Plaintiffs' improper procedure in providing a hybrid disclosure under Rule 26(a)(2)(C), instead of an expert report under Rule 26(a)(2)(B), and the lack of explanation as to why Plaintiffs chose to leapfrog Rule 26(a)(2)(B)'s requirement is fatal to Kirk testifying as an expert witness in this case. Her conceded lack of personal knowledge as to the Plaintiffs' injuries puts her squarely in the hypothetical -- as opposed to ground-level involvement, "hybrid" -- expert realm for whom a report of her opinions should have been provided. *See Pringle*, *supra*. Based on the record and governing legal authority, she is not a "hybrid" witness. Her expert opinion testimony would be prejudicial to Defendants at least insofar as it would allow Plaintiffs to proceed according to a different set of rules applicable to litigants in federal civil proceedings, including this one. Defendants' motions (**DE 2521, 3413**) as it pertains to Kirk are thus due to be granted.

### B. Otero

Plaintiffs seek to exclude Otero because Defendants retained him "to opine on the 'credibility' of Raul Emilio Hasbun Mendoza ("Hasbun" or "Hasbún") and Jose Gregorio Mangones ("Mangones"), two former AUC members, with respect to whether Chiquita's payments to the AUC were voluntary or the product of extortion" (DE 2527 at 17). Plaintiffs state that, according to his deposition, "Otero's opinions were 'based on [his] experience, and [his] professional criteria as an investigator to determine whether these people tell the truth, are credible, or are not'" (DE 2527 at 19). Otero never met Hasbun or Mangones or saw video of them making statements relating to Chiquita (DE 2527-12 at 51 (Otero deposition)). His primary source of information, Plaintiffs argue, "was a set of materials provided by Chiquita's counsel (who, Otero admits, were selective in what they gave him to review) upon which he then subjectively speculated about what he thinks 'really' happened, offering an unfounded conclusion about the credibility of Hasbun and Mangones" (DE 2527 at 19). These purportedly "expert" opinions are not based on any reliable expert methodology, fail to assist the trier of fact, and go only to issues

8

of witness credibility and reliability, thereby invading the exclusive province of the jury. According to Plaintiffs, "Otero concedes that he conducted no investigation and has no special expertise in assessing credibility, but merely reviewed publicly available documents provided to him by Chiquita's attorneys and then drew his own conclusions" (*Id*. at 20).

Defendants' response cites *United States v. Shay*, 57 F.3d. 126, 131 (1st Cir. 1995), a case not cited in the Eleventh Circuit Court of Appeals or the United States Supreme Court, to argue that Otero's testimony should not be automatically excluded "'simply because it concerns a credibility question'" (DE 3435 at 19). They argue that Otero is "qualified to rebut [Hasbún and Mangones'] testimony, his professional methodology is reliable, and his professional opinion regarding attempts to bribe the two former AUC commanders and their resulting reputation for untruthfulness will be helpful to the jury" (*id*. at 17). They further assert that Otero's report "analyzes and explains the intricate and voluminous trail of documents regarding payments and attempted payments to Hasbún and Mangones and the resulting changes in their respective testimony in Justice & Peace proceedings" (*id*. at 18). His professional opinion is that their inconsistent testimony is not coincidental but rather linked to negotiated payments to improperly influence their testimony (*id*.).

At the March 15 hearing, Defendants argued that the "key question" for the Court was deciding whether Otero had "this specialized, extensive experience and are his opinions connected?" (DE 3593 at 210.) According to Defendants, Otero's opinions are "clearly relevant because he was rebutting [Terry] Karl and the fact that she didn't follow her own methodology" (*id*.). Further, apparently quoting from his deposition, Otero's rebuttal is based upon his "'professional experience, in [his] education of almost 20 years as a private investigator. . . . working next to prosecuting attorneys -- American, Colombian, Latin American -- one goes along learning methods of evaluation and analysis of information that one receives from witnesses,

9

victims, parties affected, clients. So would I say it could be called a scientific method. That is the expertise that I employed in my analysis of the testimonies rendered by Hasbún and Mangones.[']" *Id*. Further positing that Otero's methods and analysis are uniquely insightful in determining whether someone is or is not reliable source of information, again apparently quoting from his deposition, Defense counsel reads "'As I explained earlier, one reviews the information and the version as offered by the witness. One analyzes the context within which that person is providing that testimony. One analyzes the timeline during which that witness provides clarifications or enhances their testimony or provides new testimony. And one goes along analyzing those changes to the versions, one with one's own professional criteria after years in the exercise of evaluating people. *When they say something or when they lie* or one ends up developing through your own professional criteria *in order to determine if that person is being inconsistent or is lying* or is changing his testimony, or some unknown reason.'" *Id*. at 211 (emphasis added). This led to the following exchange:

> THE COURT: Isn't that what juries do all the time?
>
> [Defense Counsel ("DC")]: Well, they do, your Honor, but someone has to marshal the facts and explain it to them.
>
> THE COURT: Well, I mean, it's one thing to marshal the evidence to present to it to the jury of the inconsistencies, and then another for them to then say "and this is what I believe as to who is telling the truth or what is credible or what isn't credible."
>
> [DC]: Again, it goes back to DEA agents, police officers, et cetera, because they have a specialized experience, an extensive experience. They can opine about what certain things mean in terms of communication between drug gangs and drug members and how they proceed, how they operate, et cetera. The same thing here because of his specialized experience, which he clearly articulates and he does really tie to his opinions. He can do the same thing. That's what I would submit to you, that it's *beyond the ken of the jury*.
>
> THE COURT: In criminal trials, when a defendant gets up and says I didn't do this or I didn't -- I am not guilty, you can bring in an FBI agent who is experienced in conducting investigations, in evaluating discrepancies and inconsistencies, and have that witness get up in front of the jury and say, yeah, he was lying to you?

10

[DC]: No, but --

THE COURT: I am an expert, I have been doing this for 25 years, I am an FBI agent, here is my badge, believe me, I know what I am talking about, that guy was lying.

[DC]: No, no, no, that's not what Otero does. I know [Plaintiffs' counsel] Mr. Scarola wishes that is what he did, but *all he did is analyze the testimonies, analyze the outside influences from Collingsworth and others, and juxtapose them*. And he does not -- and his conclusion is that they are inconsistent.

THE COURT: Why can't a jury just make that same conclusion? Here is what he said at one time, here is what he said at another time, and they are inconsistent? And the jury decides which one to believe.

[DC]: Because, Judge, there is this specialized extensive experience that assists, they call it experts, that assists the trier of fact. You can say the same thing about communication between drug gangs. But it's black letter law that a DEA agent can come in and testify about what it means. You can play it for the jury, make the same argument, well, the jury can draw that conclusion. And maybe that's true, maybe it's not, but the point is that the case law with experience-based experts allows that DEA agent or that police officer to come in and give his opinion. Could the defendant be acquitted or be convicted without that testimony? Maybe. But that doesn't change the fact that under the rules of evidence that testimony is permissible. And I would submit to you that Otero is permissible.

THE COURT: There's a whole new area for law enforcement to be able to testify as experts now, it seems like, in criminal cases.

[DC]: Well --

THE COURT: They can testify that the person they just heard from is not telling the truth.

[DC]: I will submit to you, he's not saying that. I agree with you. *He is not testifying about credibility. He is testifying about inconsistencies*, which, again, he is doing to point out that *Professor Karl* didn't follow her own methodology, which I just read to you, in which he says, I look at people change their testimonies. She is saying this as an expert. We are submitting to you that Otero, as an experience-based expert, is permitted to do the same thing.

*Id*. at 211-14 (emphasis added).

It is well-settled in the Eleventh Circuit Court of Appeals that, "absent extreme or unusual circumstances, expert scientific testimony concerning the truthfulness or credibility of a witness is

11

inadmissible because it invades the jury's province in determining credibility." *United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) (criminal case) (citing *United States v. Beasley,* 72 F.3d 1518, 1528 (11th Cir.1996); finding that proffered scientific expert "failed to fulfill the minimum requirements for a scientifically reliable psychological assessment as outlined in his own affidavit," and so their "opinion fails to satisfy the reliability prong under *Daubert."*) In this case, Otero's experiential expertise in investigations will not assist the trier of fact to understand the evidence or to determine a fact at issue. Even "inconsistencies" in testimony -- which Otero captures in the same familial penumbra as lying, despite counsel's persistent attachment to the term "inconsistency," instead -- can be drawn out by skilled cross examiners, and no extreme or unusual circumstances warrant invading the jury's province in this regard. Otero is precluded from testifying as an expert as to the opinions he formulated based on his review of public records, lacking any personal interaction with either Hasbún or Mangone, whose opinions, and credibility, will be the subject of the jury's scrutiny in their commonsense weighing of the evidence should it come before them. Plaintiff's motion (**DE 2527**) as it pertains to Otero is thus due to be granted.

### C. Gaddis

Plaintiffs move to preclude Gaddis' testimony by arguing that Chiquita offers it to compare the AUC's annual income from drug trafficking to the support provided by Chiquita to show Chiquita's support was relatively insignificant, despite Gaddis' lack of expertise regarding AUC finances and unreliable methodology (DE 2527 at 14; DE 3593 at 187-88). Further, they argue, Gaddis' experience as a former Drug Enforcement Agency ("DEA") agent is unrelated to the subject of his testimony, he has no background in accounting, and he was unaware, during his years at the DEA, that Chiquita had paid the AUC (DE 2527 at 14-15, citing deposition). He lacks

12

expertise and any independent research, leaving any conclusions he may have unreliable and not helpful to the jury. *Id.* at 15.

Defendants argue that Gaddis is qualified as a "trained former federal law enforcement officer with decades of experience investigating sophisticated large-scale criminal drug trafficking enterprises similar to the AUC" (DE 3435 at 14). His work informs his knowledge of the AUC as being involved in the illegal drug trade (*id.*). Gaddis offers five opinions.[6]

The Court finds merit to Plaintiffs' challenge to three of Gaddis' opinions, namely, the opinions relating to the AUC's annual income, the significance of payments by Chiquita to the AUC's overall income, and his opinion regarding Chiquita's efforts to prevent drug smuggling. The Court, however, finds that Gaddis is qualified by training and experience to give opinions on the AUC's involvement in the illegal drug trade and how drug traffickers victimized companies with commercial transportation operations by smuggling drugs in cargo.

As to the opinion regarding the AUC's annual income from the drug trade, the Court concludes that this opinion is based on hearsay and to the extent any admissible evidence is presented at trial regarding the amount of drug trafficking in which the AUC was engaged, the jury is capable of assessing that evidence.[7] Because Gaddis may not testify about the AUC's annual income from drug trafficking, it necessarily follows that he cannot opine on what significance, if any, the payments made by Chiquita had on the AUC's operations. As to Chiquita's efforts to

---

[6] Those opinions are: 1) from its inception the AUC was heavily involved in the illegal drug trade in Columbia; 2) the primary source of revenue for the AUC was illegal drug activity, providing estimates of its annual income; 3) the amount of money paid by Chiquita to the AUC was insignificant; 4) drug traffickers victimized companies with commercial transportation operations by smuggling drugs in cargo and 5) Chiquita developed interdiction policies to prevent drug smuggling.

[7] Depending on how the evidence develops at trial, Gaddis may testify on what the average price of a kilogram of cocaine was during the relevant time period. This is something within Gaddis' field of expertise and is not something an average juror would know.

13

curtail drug smuggling at its port, Gaddis is once again simply relying on hearsay evidence which, if presented at trial, the jury is perfectly capable of evaluating themselves and coming to their own conclusion.[8]

Based on the foregoing, Plaintiff's motion (**DE 2527**), as to Gaddis, is granted in part and denied in part.

IV.  *Conclusion*

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that

1. Defendants' motions (**DE 2521, 3413**) as it pertains to Kirk are **GRANTED**. Kirk shall not testify as an expert in this case.

2. Plaintiff's motion (**DE 2527**) as it pertains to Otero, is **GRANTED**. Otero shall not testify as an expert in this case.

3. Plaintiff's motion (**DE 2527**), as it pertains to Gaddis, it **GRANTED IN PART AND DENIED IN PART**.

**DONE AND ORDERED** in Chambers, in West Palm Beach, Florida this 3rd day of April, 2024.

KENNETH A. MARRA
United States District Judge

cc: All counsel of record

---

[8] By way of example, Gaddis relied upon a U.S. Customs letter which stated: "'Chiquita is a leader among commercial ocean carriers and cooperating with the U.S. Customs regarding the prevention of drug smuggling on company-operated vessels," and "Chiquita cooperated with U.S. Customs to prevent drug smuggling if that's what the U.S. Customs letter says." (DE 3593 at 186-87).

14

15