# EXHIBIT AA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **CRIMINAL NO.: 07-055 (RCL)** |
| v. | : | |
| | : | |
| **CHIQUITA BRANDS** | : | **Sentencing: September 17, 2007** |
| **INTERNATIONAL, INC.,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I.    INTRODUCTION

In March of this year, Chiquita Brands International, Inc. ("Chiquita" or "Company"),

entered into a written plea agreement with the United States of America as part of an ongoing

criminal investigation into payments that defendant Chiquita made to a federally-designated

terrorist organization known as the AUC.  Defendant Chiquita agreed to plead guilty to a one-

count criminal Information that charged the Company with the felony of Engaging in

Transactions with a Specially-Designated Global Terrorist.  As a basis for its guilty plea,

defendant Chiquita admitted as true the facts set forth in the Factual Proffer submitted in support

of the guilty plea.  Defendant Chiquita also agreed to cooperate in the ongoing investigation.

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the United States and defendant

Chiquita agreed that, with the Court's approval, the Company should be sentenced to a criminal

fine of $25 million and corporate probation of five years.

At a hearing on March 19, 2007, the United States and defendant Chiquita presented the

plea agreement to the Court for its approval.  Through its General Counsel, James E. Thompson,

Esq.,[1] defendant Chiquita admitted its guilt and pled guilty.  The Court provisionally accepted the

---

[1]    Mr. Thompson appeared at the plea hearing on behalf of defendant Chiquita.  The
plea agreement and the Factual Proffer were executed by Fernando Aguirre, Chairman of the

plea agreement at that time. The Court deferred final acceptance of the plea agreement until the date of the sentencing hearing, which is now scheduled for Monday, September 17, 2007, at 10 a.m.

The United States respectfully recommends that the Court accept the parties' written plea agreement pursuant to Rule 11(c)(1)(C) and sentence defendant Chiquita to a criminal fine of $25 million and corporate probation of five years.

## II.    THE OFFENSE CONDUCT

### A.    Summary

For over six years – from sometime in 1997 through February 4, 2004 – defendant Chiquita, through its wholly-owned Colombian subsidiary, paid money to a violent, right-wing terrorist organization in the Republic of Colombia, known as the "Autodefensas Unidas de Colombia" or "AUC." The AUC was formed around April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. Defendant Chiquita paid the AUC, directly or indirectly, nearly every month. From 1997 through February 4, 2004, defendant Chiquita made over 100 payments to the AUC totaling over $1.7 million.

From around 1989 through 1997, defendant Chiquita paid money to two violent, left-wing terrorist organizations in Colombia, namely the FARC and the ELN.[2] Thus, defendant Chiquita paid money to Colombian terrorist organizations for approximately fifteen years.

---

Board of Directors, President, and Chief Executive Officer of defendant Chiquita.

[2]    The FARC and the ELN were federally-designated as Foreign Terrorist Organizations in October 1997. There is no evidence that defendant Chiquita made any payments to the FARC or the ELN after those terrorist groups were designated as FTOs.

Defendant Chiquita continued to pay the AUC even after the payments were brought directly to the attention of its senior executives during a Board meeting held in September 2000. Defendant Chiquita continued to pay the AUC after the United States designated the AUC as Foreign Terrorist Organization on September 10, 2001, and as a Specially-Designated Global Terrorist on October 30, 2001. Defendant Chiquita continued to pay the AUC after gaining direct knowledge of the AUC's designation as a Foreign Terrorist Organization in September 2002.

Defendant Chiquita continued to pay the AUC even after its outside counsel emphatically and repeatedly advised the Company, beginning in late February 2003, to stop the payments. Defendant Chiquita continued to pay the AUC after Department of Justice officials admonished the Company, on April 24, 2003, that the payments were illegal and could not continue. Defendant Chiquita continued to pay the AUC after the same outside counsel advised the Company, on September 8, 2003, that the Department of Justice had given no assurances that the Company would not be prosecuted for making the payments. Defendant Chiquita continued to pay the AUC even after one of its directors acknowledged in an internal email, on December 22, 2003, that "we appear [to] be committing a felony."

Not all of defendant Chiquita's executives agreed with the Company's course of action. For example, upon first learning of the payments at a Board meeting on April 3, 2003, one director objected to the payments and recommended that defendant Chiquita consider taking immediate corrective action, to include withdrawing from Colombia. Moreover, within one month of his arrival as defendant Chiquita's new Chief Executive Officer in January 2004, Fernando Aguirre decided that the payments had to stop. According to an internal document, Mr.

3

Aguirre stated: "At the end of the day, if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country."

### B.    Inception of the Payments to the AUC

Starting sometime in 1997, defendant Chiquita made payments to two different components of the AUC in the Urabá and Santa Marta regions, where defendant Chiquita had its Colombian operations. Defendant Chiquita made these payments through its wholly-owned Colombian subsidiary, C.I. Bananos de Exportación, S.A. ("Banadex").[3]

Defendant Chiquita began paying the AUC in Urabá following a meeting sometime in 1997 between Carlos Castaño, the leader of the AUC, and the general manager of Banadex. Castaño advised that the AUC was about to drive the FARC out of the Urabá region and instructed defendant Chiquita's subsidiary to make payments to the AUC through an intermediary known as a "*convivir*."[4] Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property. Within a few months after the AUC drove the FARC out of Urabá, and following a demand made by an AUC intermediary, defendant Chiquita began paying the AUC in Urabá by check through a *convivir*. The AUC demanded payment based on a formula tied to the production of bananas. Defendant Chiquita quickly routinized the payments. Sometime in 1998 or 1999, following a similar instruction, defendant Chiquita began making payments to the AUC in the Santa Marta region.

---

[3]      Defendant Chiquita's payments to the FARC and the ELN had been in those same regions.

[4]      "*Convivirs*" were private security companies licensed by the Colombian government to assist the local police and military in providing security. Notwithstanding their intended purpose and apparent legal authority under Colombian law, the AUC used certain *convivirs* as fronts to collect money from businesses for use to support its illegal activities.

4

For several years defendant Chiquita paid the AUC by check through various *convivirs* in both the Urabá and Santa Marta regions. The checks were nearly always made out to the *convivirs* and were drawn from the Colombian bank accounts of defendant Chiquita's subsidiary. No *convivir* ever provided defendant Chiquita or Banadex with any actual security services or actual security equipment in exchange for the payments, such as, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendant Chiquita recorded these payments in its corporate books and records as "security payments," payments for "security," or "security services."

From the outset, officers of defendant Chiquita and Banadex recognized that the payments to the AUC were illicit, even though they were being made through a *convivir*. These officers also assumed that the payments were a necessary and acceptable cost of doing business in Colombia. For example, in early 1997, according to a contemporaneous, written account, one officer of defendant Chiquita remarked about the payments: "Cost of doing business in Colombia – maybe the question is not why are we [Chiquita] doing this but rather we [Chiquita] are in Colombia and do we [Chiquita] want to ship bananas from Colombia." In June 1997, a senior officer of Banadex approved a *convivir* payment with the written comment: "No alternative. But next year needs to be less."

C. **Knowledge of Defendant Chiquita's Senior Officers and Directors**

Defendant Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees. No later than September 2000, defendant Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. An in-house attorney for defendant Chiquita conducted an internal investigation into

5

the payments in August 2000 and prepared a memorandum detailing that investigation. The memorandum made clear that the *convivir* was merely a front for the AUC and described the AUC as a "widely-known, illegal vigilante organization."

The in-house attorney presented the results of his investigation to the Audit Committee of the Board of Directors during a meeting in defendant Chiquita's Cincinnati headquarters in September 2000. According to contemporaneous notes of the meeting, defendant Chiquita's ongoing payments to the AUC were described as "not a voluntary decision (extortion)" and Carlos Castaño was named as the "*convivir* leader." According to the notes, one director responded to the presentation by asking: "Can we reduce [the] amount per box?" There was no recorded discussion about whether to stop the payments or whether to report the payments to any United States or Colombian authorities.[5] Notwithstanding the knowledge of senior officers and directors that the Company was making regular payments to a violent, paramilitary organization, defendant Chiquita continued to make payments to the AUC for another three and a half years.

**D.    Defendant Chiquita's Knowledge of U.S. Law Designations Criminalizing the AUC Payments**

On September 10, 2001, the AUC was designated as a Foreign Terrorist Organization ("FTO") by the United States Department of State, making defendant Chiquita's payments to the AUC illegal under the material support statute, 18 U.S.C. § 2339B. On October 31, 2001, the AUC was designated as a Specially-Designated Global Terrorist by the United States Department of the Treasury's Office of Foreign Assets Control, making the payments illegal under the

---

[5]    Prior to the meeting with Department of Justice officials on April 24, 2003, defendant Chiquita had never reported any AUC demands to any department or component of the United States government or the Colombian government. As of the date of that meeting, defendant Chiquita had made over 90 payments to the AUC totaling close to $1.4 million.

International Emergency Economic Powers Act, 50 U.S.C. § 1705(b), and the underlying Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.204.

Defendant Chiquita had information about the AUC's designation as an FTO from the public media. The AUC's designation was first reported in the national press, for example, in the Wall Street Journal and the New York Times on September 11, 2001. It was later reported in the local press in Cincinnati where defendant Chiquita's headquarters are located – for example, in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001. The AUC's designation was even more widely reported in the public media in Colombia, where defendant Chiquita had its substantial banana-producing operations.

In addition to these widely-circulated reports, defendant Chiquita had knowledge of the AUC's designation as an FTO specifically, and global security threats generally, through an Internet-based, password-protected security information service to which defendant Chiquita subscribed. The security service's website reported on the AUC's designation as an FTO when that designation first occurred. The security service was able to provide data establishing that an employee of defendant Chiquita – using defendant Chiquita's password – accessed the service's "Colombia – Update page" from the Company's Cincinnati headquarters on September 20, 2002.[6] At that time, the web page displayed the following reporting on the AUC:

> "US terrorist designation
> International condemnation of AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

---

[6]     The security service does not maintain subscriber access data prior to the summer of 2002.

7

**E.    Continuing Payments to the AUC and Misuse of General Manager's Fund**

Defendant Chiquita's payments to the AUC were reported to the Audit Committee of the Board of Directors on a quarterly basis. Throughout the duration of the payments to the AUC in Urabá, defendant Chiquita reported them in its books and records as "security payments" or payments for "security services" to a specifically-named *convivir*, even after it was clear to senior officers and directors that no *convivir* was providing defendant Chiquita or Banadex with any security services in Colombia and the *convivirs* were simply fronts for a terrorist organization.

In late March 2002, in response to a new AUC demand,[7] senior officers of defendant Chiquita established new procedures for paying the AUC in Santa Marta directly and in cash and keeping a private ledger of these cash payments. The procedures involved paying a senior officer of Banadex additional "income" from the Banadex general manager's fund. That money, in turn, was provided to an employee of Banadex, who delivered the cash directly to AUC personnel in Santa Marta. The senior Banadex officer reported this additional "income" on his Colombian tax return, and Banadex increased the payments to him to cover this additional personal tax liability. This made it appear that the senior Banadex officer was more highly paid and thus increased the risk that he would be a target for kidnapping or other physical harm.

On April 23, 2002, these new procedures were reviewed at a meeting of the Audit Committee of the Board of Directors in defendant Chiquita's Cincinnati headquarters. The procedures were implemented beginning in June 2002.

---

[7]    Defendant Chiquita changed its method of payment to the AUC in Santa Marta several times. Initially, defendant Chiquita paid the AUC through a *convivir* located in Santa Marta. Later, defendant Chiquita made combined payments to a *convivir* in Urabá, with the payments shared between the AUC components in Urabá and Santa Marta. Eventually, the AUC in Santa Marta demanded direct cash payments.

Defendant Chiquita's corporate books and records never reflected that the ultimate and intended recipient of these funds was the AUC. With respect to the payments to the AUC in Urabá, the books and records only identified payments to various *convivirs*. With respect to the payments to the AUC in Santa Marta, the private ledger only identified the transfer of funds from the senior Banadex officer to the Banadex employee.

### F.    Outside Counsel's Advice: Must Stop the Payments

On February 20, 2003, a senior officer of defendant Chiquita was told that the AUC had been designated as an FTO. Within days, other senior executives of defendant Chiquita were told of the FTO designation. Beginning on February 21, 2003, defendant Chiquita's outside counsel repeatedly advised the Company to stop making the payments because they were illegal under U.S. law, principally the material support statute, 18 U.S.C. § 2339B.

Outside counsel's advice was memorialized in a series of contemporaneous memoranda and notes. Among other things, outside counsel advised defendant Chiquita:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

9

Notwithstanding outside counsel's advice, defendant Chiquita made payments to the AUC in late February and late March 2003.

On April 3, 2003, the full Board of Directors was advised for the first time that defendant Chiquita was making payments to a designated Foreign Terrorist Organization. One director objected to the payments and recommended that defendant Chiquita consider taking immediate corrective action, to include withdrawing from Colombia. That recommendation was not followed.[8] Instead, the Board agreed to disclose promptly to the Department of Justice the fact that defendant Chiquita had been making payments to the AUC.

The following day, on April 4, 2003, according to outside counsel's contemporaneous notes concerning a conversation about defendant Chiquita's payments to the AUC, a senior officer of defendant Chiquita said: "His and [a director's] opinion is just let them sue us, come after us. This is also [a senior officer's] opinion." Four days later, senior officers of defendant Chiquita instructed their subordinates to "continue making payments" to the AUC.

### G.    The Department of Justice's Admonition: The Payments are Illegal

On April 24, 2003, senior executives of defendant Chiquita, along with outside counsel, met with officials of the United States Department of Justice, stated that defendant Chiquita had been making payments to the AUC for years, and represented that the payments had been made under threat of violence. Department of Justice officials told the senior executives that defendant Chiquita's payments to the AUC were illegal and could not continue. Department of Justice officials also cautioned the senior executives, as its outside counsel had warned earlier, that "the

---

[8]        Upon learning additional details about defendant Chiquita's payments to the AUC at a Board meeting on December 4, 2003, this director told his fellow Board members: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

10

situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia."

The Department of Justice never authorized defendant Chiquita to continue under any circumstances the Company's payments to the AUC – not at the meeting on April 24, 2003, nor at any other point. To be sure, when first presented with this issue at the meeting on April 24th, Department of Justice officials acknowledged that the issue of continued payments was complicated. But this acknowledgment did not constitute an approval or authorization for defendant Chiquita to continue to break the law by paying a federally-designated Foreign Terrorist Organization. Indeed, as its outside counsel later stated in writing, the Department of Justice never gave defendant Chiquita any assurance that the Company would not be prosecuted for making the payments.

Nevertheless, about two weeks later, on May 5, 2003, an employee of defendant Chiquita instructed others to "continue making payments" to the AUC. Within a week, defendant Chiquita made another cash payment to the AUC. Defendant Chiquita thereafter continued its regular payments to the AUC.

Representatives of defendant Chiquita had other contacts with Department of Justice officials through September 2003. In a memorandum dated September 8, 2003, outside counsel summarized defendant Chiquita's various contacts with the Department of Justice from April 2003 through September 2003. Outside counsel noted that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments." Senior officers of defendant Chiquita received copies of this memorandum.

11

Senior officers and directors of defendant Chiquita were well aware that the Company was continuing to pay a federally-designated Foreign Terrorist Organization and that the Company was subject to criminal prosecution for its continuing conduct. On December 22, 2003, a director of defendant Chiquita sent an email to other directors regarding the Company's ongoing payments to the AUC, in which he said, among other things: "we appear to [be] committing a felony." A week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that "Chiquita is knowingly violating the law."

### H.     Defendant Chiquita's New CEO: Decision To Stop the Payments

Fernando Aguirre joined defendant Chiquita as its new CEO in January 2004. Within one month of assuming his new position, Mr. Aguirre decided that the payments had to stop. On January 29, 2004, defendant Chiquita issued its last check for a payment to the AUC. The check cleared on February 4, 2004.

In an email to senior officers of defendant Chiquita, dated January 31, 2004, Mr. Aguirre said: "At the end of the day, if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country." In June 2004, defendant Chiquita sold Banadex to a Colombian company.

## III.     DISCUSSION OF THE OFFENSE CONDUCT

### A.     The Gravity of the Core Conduct

This is a very serious matter. Defendant Chiquita has admitted to paying terrorist organizations in Colombia for about fifteen years – from 1989 through February 2004. Defendant Chiquita paid all three major terrorist organizations in Colombia: the AUC, the

FARC, and the ELN. Those terrorist organizations are responsible for a staggering loss of life in that country.

Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. Defendant Chiquita paid the AUC on roughly a monthly basis for over six years. Defendant Chiquita's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million.

The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism. Simply put, defendant Chiquita funded terrorism.

### B.    Defendant Chiquita's Motivations

Defendant Chiquita's motivations for paying the AUC are irrelevant to the illegality of its conduct or to the harm that the Company's conduct has caused to victims of AUC violence. As one federal appeals court has noted, "Terrorist organizations use funds for illegal activities regardless of the intent of the donor[.]" Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev., 291 F.3d 1000, 1027 (7th Cir. 2002) (discussing breadth of criminal liability under the material support statute, 18 U.S.C. § 2339B). Nevertheless, defendant Chiquita's motivations for paying the AUC are relevant to an understanding of the felony charge against the Company.

Preliminarily, it is important to note what defendant Chiquita is not accused of. Defendant Chiquita is not accused of supporting the goals or ideologies of the terrorist organizations that the Company funded. The record reflects that defendant Chiquita did not seek out the AUC to start making these payments. Rather, the AUC, through its leader Carlos

13

Castaño, instructed that defendant Chiquita's subsidiary would have to start making the payments once the AUC moved into the Company's banana-producing region.

Defendant Chiquita, however, did not make one or two payments while deciding on a course of action to take in the face of the AUC's demand (and implied threat) in 1997. Defendant Chiquita decided to accede to the AUC's demand and make routine payments for fully six years. Although defendant Chiquita would later claim that it was the victim of AUC extortion, the Company did not report the "extortion" to any United States or Colombian authorities for several years.

Defendant Chiquita, as a large multinational corporation, had choices to make about where in the world to operate and under what conditions. The Company chose to enter and exit markets and to buy and sell farms based on its business judgment. Defendant Chiquita chose to remain in Colombia and make payments to the AUC that it deemed necessary to operate in the Urabá and Santa Marta regions of Colombia.

Defendant Chiquita's reason for being in Colombia was, of course, to produce bananas profitably. And there is no question that defendant Chiquita profited from its Colombian operations during the period that the Company paid the AUC. According to defendant Chiquita's records, from September 10, 2001 (the date of the AUC's designation as a Foreign Terrorist Organization), through January 2004, the Company earned approximately $49.4 million in profits from its Colombian banana-producing operations. Indeed, by 2003 the Company's Colombian operations were its most profitable.

Whatever motivated defendant Chiquita at the start, the Company made a business decision to remain in Colombia and pay the AUC for over six years. Officers of defendant Chiquita and Banadex referred to the payments as an unsavory "cost of doing business" at their

inception in 1997. When the internal investigation into the payments was presented to the Board in September 2000, the Board treated them as a routine business matter – a tolerable expense to be kept low. When the AUC in Santa Marta demanded direct, cash payments in 2002, senior officers of defendant Chiquita obliged. These senior executives also came up with a procedure to record these monthly payments in the Company's books and records that failed to reflect the ultimate and intended recipient of the payments.

By late February 2003, when defendant Chiquita's outside counsel advised the Company to stop the payments immediately in light of the AUC's designation as an FTO and the attendant risk of criminal liability, the payments had already been reviewed and approved at the highest levels of the Company for years. The fact of the AUC demand in 1997 and any perceived risk to the Company's employees from doing business in Colombia were not new topics. The payments had been discussed repeatedly in defendant Chiquita's Cincinnati headquarters. The Company had long since made the business judgment to remain in Colombia, to keep paying the AUC, to record the payments in the Company's books and records without identifying the AUC, and not to report the payments to the pertinent United States and Colombian authorities.

The new information in late February 2003 was not the claimed extortion, but rather outside counsel's advice about the risk of criminal liability to the Company for making the payments. Defendant Chiquita chose to reject that advice and to continue to pay the AUC. The Company chose to continue the payments even after being advised by the Department of Justice that the payments were illegal and could not continue.

Defendant Chiquita has claimed that it made the payments to protect its employees. Undoubtedly some officers, directors, and employees of defendant Chiquita with knowledge of the payments firmly believed (and still believe) that the Company's sole motivation for making

15

the payments was to protect its Colombian employees. As mentioned, the Company's motivation

is legally irrelevant and of no comfort to the victims of the AUC's violence. But even this

purported rationale for the payments begs serious questions. If defendant Chiquita was solely

motivated to protect its Colombian employees from the AUC,

- How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

- How did the payments protect the communities in which those employees lived?

- How did the payments protect the families, friends, and associates of the Company's employees?

- What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

- Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

- Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

- Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?

## C.   Defendant Chiquita's Alternatives

The Department of Justice is not in the business of providing outside parties with advice

about how best to comply with the law. Defendant Chiquita is a sophisticated multinational

corporation with access to the highest quality business and legal advice. There were a number of

points at which the Company could have conformed its conduct to the requirements of the law.

Its failure to do so until late in the evolution of this matter is one of the reasons that the Company

appears before the Court having pled guilty to a very serious criminal charge.

Defendant Chiquita was not without any alternative to paying the AUC. While there may

have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option

that the Company could have considered when faced with the AUC's demand in 1997. As one of

its officers noted in 1997, the Company had a choice about whether to remain in Colombia and

make these payments. The officer stated, "[M]aybe the question is not why are we doing this but

rather we are in Colombia and do we want to ship bananas from Colombia." In late February and

March 2003, defendant Chiquita's outside counsel advised it to stop the payments immediately

and recommended that defendant Chiquita withdraw from Colombia. When the full Board was

first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003,

there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia.

Department of Justice officials cautioned defendant Chiquita's senior executives on April 24,

2003, that "the situation that Chiquita described [was] not a case of true duress because Banadex

has a legal option – to withdraw from Colombia." Indeed, within one month of joining defendant

Chiquita as its new CEO, Fernando Aguirre told senior officers that "if extortion is the modus

operandi in Colombia or any other country, we will withdraw from doing business in such a

country."

Defendant Chiquita may well have had other alternatives – other than the course that it

pursued. In the end, the issue is not what defendant Chiquita could have done, but rather what it

chose to do – and that was to continue paying terrorists for over six years.

## IV.    THE PLEA AGREEMENT

### A.    Terms of the Agreement

Pursuant to Rule 11(c)(1)(C), defendant Chiquita signed a written plea and cooperation

agreement with the United States. Defendant Chiquita and the United States presented the plea

agreement to the Court for its approval at a plea hearing on March 19, 2007. Pursuant to the plea

agreement, defendant Chiquita, through its organizational representative James E. Thompson,

17

Esq., pled guilty to one felony count of a criminal Information, charging defendant Chiquita with

Engaging in Transactions with a Specially Designated Global Terrorist, namely the AUC, in

violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204. Defendant Chiquita, through Mr.

Thompson, admitted its guilt to the offense conduct described in the Factual Proffer that has been

filed with the Court.    Pursuant to Rule 11(c)(1)(C), the plea agreement provides for an agreed-

upon sentence of a criminal fine of $25 million and corporate probation of five years.  The plea

agreement provides that defendant Chiquita must pay the criminal fine in five annual

installments.  Defendant Chiquita must make the first payment of $5 million upon entry of

judgment.  Defendant Chiquita is required to pay an additional $5 million, plus post-judgment

interest, each year for the next four years.

        The plea agreement provides for a five-year term of corporate probation.  In addition to

the general conditions of probation, the plea agreement provides for the following specific

additional conditions of probation: (1) defendant Chiquita shall pay the sums set forth in the

agreement; (2) defendant Chiquita shall implement and maintain an effective compliance and

ethics program that fully comports with the criteria set forth in Section 8B2.1 of the United States

Sentencing Guidelines, including, but not limited to, (a) maintaining a permanent compliance

and ethics office and a permanent educational and training program relating to federal laws

governing payments to, transactions involving, and other dealings with individuals, entities, or

countries designated by the United States as Foreign Terrorist Organizations, Specially-

Designated Global Terrorists, Specially-Designated Narcotics Traffickers, and/or Countries

Supporting International Terrorism, and/or any other such federally-designated individuals,

entities, or countries, (b) ensuring that a specific individual remains assigned with overall

responsibility for the compliance and ethics program, and (c) ensuring that that specific

18

individual reports directly to the Chief Executive Officer and to the Board of Directors of defendant Chiquita, at least annually on the effectiveness of the compliance and ethics program; and (3) pursuant to 18 U.S.C. § 3563(a)(1), defendant Chiquita shall not commit any federal, state or local crimes during the term of probation.

The plea agreement also contains a cooperation provision that has required defendant Chiquita to provide assistance to the United States in this ongoing investigation. As described below, defendant Chiquita has provided significant assistance to the United States pursuant to that cooperation provision.

**B.     Maximum Statutory Penalties and the Sentencing Guidelines**

On the felony charge to which defendant Chiquita has pled guilty, Engaging in Transactions with a Specially-Designated Global Terrorist (in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204), the Company faces a statutory maximum criminal fine of twice the defendant's pecuniary gain from the offense, pursuant to 18 U.S.C. §§ 3571(c)(2) and (d). The United States and defendant Chiquita have agreed that, based on documents that defendant Chiquita provided to the United States, the Company earned no more than $49.4 million in profits from its Colombian banana-producing operations from September 10, 2001, through January 2004. The United States and defendant Chiquita have further agreed that, based on this estimate of $49.4 million in relevant pecuniary gain, the maximum criminal fine is $98.8 million.

Defendant Chiquita is also subject to a term of corporate probation of five years pursuant to 18 U.S.C. § 3561. In addition, pursuant to 18 U.S.C. § 3013(a)(2)(B), defendant Chiquita is obligated to pay the mandatory special assessment of $400 to the Clerk of the United States District Court prior to the date of sentencing.

## V.    PLEA AND SENTENCING RECOMMENDATION

The Court should accept the parties' written plea agreement pursuant to Rule 11(c)(1)(C) and sentence defendant Chiquita to a criminal fine of $25 million and five-years of corporate probation, with the specific additional conditions of probations described above. The plea agreement is a fair resolution of the Company's criminal culpability. The agreement gives defendant Chiquita the benefit of its acceptance of responsibility and cooperation, by providing it with a lesser criminal fine than the Court might otherwise impose after a trial and conviction. The agreement also benefits the United States, because it avoids the expense, time, and risk associated with trial by jury. The agreement has already benefitted the United States, in that defendant Chiquita has provided significant cooperation to the United States in the ongoing investigation of this matter.

### A.    Acceptance of Responsibility

Defendant Chiquita has pled guilty to a very serious charge. In support of its guilty plea, the Company has admitted the truth of the facts sets forth in the Factual Proffer. In so doing, defendant Chiquita has accepted responsibility for its criminal conduct and deserves the benefit of that acceptance of responsibility.

### B.    Cooperation

This investigation arose from defendant Chiquita's voluntary self-disclosure of its illegal payments. It was a lengthy investigation into conduct that spanned years and that occurred in both the United States and in Colombia. Defendant Chiquita provided voluminous records and made numerous company witnesses available over the course of this investigation. Defendant Chiquita deserves credit for its pre-plea efforts to assist the United States in this investigation.

20

Defendant Chiquita also deserves credit for its significant post-plea assistance pursuant to the cooperation provision of the plea agreement. The United States gave serious consideration to bringing additional charges in this matter. In the exercise of its prosecutorial discretion, the United States has decided not to do so. Defendant Chiquita, through its post-plea cooperation, provided critical evidence and information that the United States considered in making this determination.[9]

## C.    Voluntary Disclosure

Defendant Chiquita's voluntary disclosure – standing alone – merits comment. As a matter of good policy and common sense, the Department of Justice encourages self-reporting. The Company deserves and has received some credit for having done so in this case. It is important to point out, however, that defendant Chiquita also admitted as part of its guilty plea that it continued to engage in the same criminal conduct after its voluntary disclosure.

Self-reporting alone does not automatically protect a company from prosecution, any more than a confession would protect an individual from prosecution. The decision whether to prosecute a voluntary disclosure case depends on a myriad of factors, including the nature and scope of the criminal conduct that has been disclosed. Moreover, a voluntary self-disclosure certainly does not authorize the continuation of the underlying criminal conduct.

---

[9]    The Information and Factual Proffer filed in connection with defendant Chiquita's guilty plea each contain a section captioned "Relevant Persons," who are identified by letter and a cursory description of their respective positions in the Company. Because corporations can only act through individuals, a description of the conduct of certain individuals was necessary to set forth the facts in this case. It was particularly important to make clear that the conduct that led to the Company's guilty plea was not the act of a rogue employee or mid-level manager. However, absent unusual circumstances, Department of Justice policy prohibits the naming of uncharged third-parties. See United States Attorneys' Manual, § 9-27-760.

### D. The Criminal Fine

Defendant Chiquita has agreed to pay a $25 million criminal fine. This fine is a substantial criminal penalty. If accepted by the Court, it would be the largest criminal penalty ever imposed under the Global Terrorism Sanctions Regulations.

As in any criminal case, a plea agreement represents a compromise. The maximum criminal fine that defendant Chiquita could have faced was dependent on the Company's profits derived from its illegal payments. The United States and defendant Chiquita had differing perspectives as to the appropriate methodology and estimate of such profits. By agreeing on the appropriate estimate of profits, based on documents provided by defendant Chiquita to the United States, the parties have avoided the expense, time, and risk associated with litigating the relevant profits.

### E. The Specific Conditions of Probation

Pursuant to the plea agreement, defendant Chiquita has agreed to implement and maintain an effective compliance and ethics program as described above. The purpose of this program is to ensure that this criminal conduct never occurs again.

## VI. CONCLUSION

The United States respectfully requests that the Court accept the parties' plea agreement pursuant to Rule 11(c)(1)(C) and sentence the defendant Chiquita Brands International, Inc., to a criminal fine of $25 million and five years of probation, with the specific additional conditions of

probation provided in the plea agreement.

Respectfully submitted,

By:

Jonathan M. Malis
D.C. Bar No. 454548
Denise Cheung
D.C. Bar No. 451714
Assistant United States Attorneys
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

Stephen Ponticiello
PA Bar No. 44119
Department of Justice Trial Attorney
Counterterrorism Section

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was caused to be served on counsel of record through the Court's Electronic Case Filing system, on this 11th day of September, 2007.

Jonathan M. Malis
Assistant United States Attorney