UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 08-MD-01916-MARRA

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.
ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION

_____/

This Document Relates to:
_____/

ATS ACTIONS

08-80465-CIV-MARRA (D.C. Action) (Does 1-144)
10-80652-CIV-MARRA (D.C. Action) (Does 1-976)
11-80404-CIV-MARRA (D.C. Action) (Does 1-677)
11-80405-CIV-MARRA (D.C. Action) (Does 1-254)
17-80475-CIV-MARRA (OH Action) (Does 1-2146)
07-60821-CIV-MARRA (Carrizosa)
08-80421-CIV-MARRA (N.J. Action) (Does 1-11)
08-80480-CIV-MARRA (Manjarres)
08-80508-CIV-MARRA (Valencia)
10-60573-CIV-MARRA (Montes)
17-81285-CIV-MARRA (D.C. Action) (Does v. Hills)
18-80248-CIV-MARRA (Ohio Action) (John Doe 1)

_____/

**Wolf Plaintiffs' Response to Non-Wolf Plaintiffs' Expedited Motion
to Sever the Wolf Plaintiffs' Claims from Bellwether 1B Trial (DE 3820)**

**I.     The Settlement Agreement between the Wolf Plaintiffs and the Defendants avoids the need to go to trial and moots all of the issues in the Motion.**

The Wolf Plaintiffs have settled all of their claims against the Defendants. The Settlement Agreement was filed earlier today by the Defendants as an Exhibit to their response. See [Doc. 3833-1]. The Settlement Agreement is contingent on the issuance of a Show Cause Order by the Court to dismiss the claims. Id. § 1 on p, 3 of the Settlement agreement. The Wolf Plaintiffs hope

1

that the Court will issue the Order shortly after the Status Conference on Monday, June 24, 2024, so that the issues in the Motion can be put to rest well in advance of trial.

The Non Wolf Plaintiffs' Motion to Sever will be moot once the Show Cause Order has been issued by the Court. This would resolve all of the issues raised by the Non Wolf Plaintiffs' counsel about coordinating the strategy for the second trial, and confidentiality. If the Court has any concerns over the settlement, they should be resolved before the trial, or the Wolf Plaintiffs would lose an opportunity for which they have prepared for seventeen years. In § 4 on p.6, the Court retains jurisdiction over the Settlement Agreement until it's fully implemented, including jurisdiction to review the determinations of the TPA.

The Settlement Agrement has an 18 month term, and a Third Party Administrator ("TPA") Matthew Garretson, in Park City, Utah. One of the concerns is that counsel may not be able to find all of the Plaintiffs in that time period. During my trip last year, I made contact with about 40% of my clients, and expect to find more once I have an office open in Uraba and people are actually receiving checks from the TPA. We have several Colombian agencies ready to start helping us locate the lost Plaintiffs in their record systems but haven't started this work yet. Any unused funds for clients who cannot be located within 18 months will go to a public works project, like building a hospital or a school, and will not be returned to Chiquita.

The Wolf Plaintiffs had wanted to be part of a global settlement, and reached out to all of the Non Wolf Counsel at the beginning of the first bellwether trial, but didn't get any response. In addition, undersigned counsel flew to New York City last July for a mediation with David Geronemus, and paid part of his fee. I sat in a room by myself all day, while about 20 of the Non Wolf counsel, including Tom Girardi's co-counsel Walter Lack, sat in another. I don't know what they discussed and wasn't involved in their negotiations with Chiquita. I do not believe that that

the Non Wolf Plaintiffs would agree to a settlement that includes the Wolf Plaintiffs, or that a global settlement is possible. Therefore we have settled our cases separately. Finally, the settlement between the Wolf Plaintiffs and the Defendants was agreed with a handshake before the jury verdict in the first bellwether trial, and wasn't a result of it.[1]

    a.    **Undersigned counsel has the power to settle the cases of Does 1-144, subject to their approval, notwithstanding the charging lien that Conrad & Scherer LLP put on their cases.**

On April 28, 2020, the Court entered an Order Granting undersigned counsel Paul Wolf's Cross-Motion and Renewed Motion to Disqualify Attorney Terrence Collingsworth and Conrad & Scherer, LLP from Further Representation of Does 1-144. [Doc. 2658] Although undersigned counsel had resolved this dispute with Collingsworth and Contrad & Scherer by agreement twelve years earlier, the agreement was to jointly represent them, with Collingsworth acting as lead counsel. To the best of my knowledge, neither contacted any of Does 1-144 for the next decade, until two or three of the bellwether plaintiffs were selected from this group, which I only learned of after they had been deposed. In any event, the Court's Order disqualifying Collingsworth and

---

[1] Although the first trial might suggest that almost any Plaintiff, or their family member, could obtain a two million dollar jury award in a subsequent trial, we don't believe this is a realistic estimate of the values of the cases. It is difficult to bring the Plaintiffs to the United States, and the pace of the bellwether trials, in groups of ten, suggests it would take many more years to bring a purported 7,500 claims to trial. The amount of damages may also be found to be excessive, and reversed on appeal. The Wolf Plaintiffs disclosed two expert witnesses, Colombian attorneys Manuel Echavarria and Omaira Palomeque, who provided expert reports with opinions about the applicable damages for the Wolf Plaintiffs upcoming four bellwether cases under Colombian law. These were attached as Exhibits to the Wolf Plaintiffs Opposition briefs in both the first and second rounds of summary judgment briefing. It had appeared that the Plaintiffs would have the burden to prove the damages according to Colombian law, which are either 25, 50 or 100 monthly salaries at the Colombian minimum wage, depending on the person's relationship with the decedent. However, instead of applying the statutory damages, the jury in the first bellwether trial awarded between 20-100 times more than these amounts. It's not clear why the jury wasn't instructed on the damages in the Colombian Civil Code, or why the choice of laws rules wouldn't also apply to statutory damages.

Conrad & Scherer [Doc. 2658] means that the undersigned counsel is responsible for them, so they were included in the settlement.

Conrad & Scherer cast a cloud over these cases by filing a charging lien in the amount of $245,772.78. [Doc. 2687]  The lien is frivolous and should be quashed by the Court.  Neither Mr. Scherer nor anyone else at his firm has met any of Does 1-144, except for a few who were selected as bellwether plaintiffs.  Neither Mr. Scherer nor anyone else currently at his firm has contracts with Does 1-144.  My contracts with these Plaintiffs mention my name, Terry Collingsworth, and another attorney named Bob Childs whom I have never met, but apparently had some relationship with Collingsworth.  These were already filed in the record of this case in connection with the Motion to Disqualify.  I met each and every one of Does 1-144 on my first trip to Apartadó in May-June of 2007. Does 1-144 all think that I am their lawyer.  It's doubtful that any of them would recognize the name of Bill Scherer or Conrad & Scherer, since no contract refers to them.

The law is clear that without a retainer agreement signed by the client, Conrad & Scherer cannot recover fees for any work done in quantum meruit.  No benefits were ever provided to any of Does 1-144, including work done during the first bellwether trial, which didn't include any Wolf Plaintiffs, and played no role in amount of the settlement, which was agreed with a handshake beforehand.  The work done by Conrad & Scherer on two bellwether cases was done behind the back of undersigned counsel, and those two cases were dismissed in summary judgment. While Conrad & Scherer might have had expenses related to defending those depositions, they didn't lead to any benefit to these Plaintiffs or any others in the MDL.

"The charging lien is an equitable right to have costs and fees due an attorney for services in suit secured to him in the judgment or recovery in that particular suit." Naftzger v. Elam, 41 So. 3d 944, 946 (Fla. 2d DCA 2010) (quoting Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik,

4

P.A. v. Baucom, 428 So. 2d 1383, 1384 (Fla. 1983).  An attorney who seeks to enforce an attorney's fee charging lien is required to "show: (1) an express or implied contract between attorney and client; (2) an express or implied understanding for payment of attorney's fees out of the recovery; (3) either an avoidance of payment or a dispute as to the amount of fees; and (4) timely notice." Id. (quoting Daniel Mones, P.A. v. Smith, 486 So. 2d 559, 561 (Fla. 1986)).  There was no judgment or recovery in either of the bellwether cases that Conrad & Scherer worked on, so there is nothing to recover against. "To avoid restricting a client's freedom to discharge his attorney, a number of jurisdictions in recent years have held that an attorney discharged without cause can recover only the reasonable value services rendered prior to discharge. ... The ... court established quantum meruit recovery for the attorney on the theory that the client does not breach the contract by discharging the attorney.  Rather, the court reasoned, there is an implied condition in every attorney-client contract that the client may discharge the attorney at any time with or without cause. Rosenberg v. Levin, 409 So. 2d 1016, 2020 (Fla. 1982)  The doctrine has no application where there is no contract, as is the case here.  In addition, where an attorney is discharged for cause, some or all of the attorney's quantum meruit award may be forfeited.  Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Scheller, 629 So. 2d 947, 954–55 (Fla. Dist. Ct. App. 1993).

In this case, there are no contracts between Does 1-144 and Conrad & Scherer, and no attorney client relationships were ever formed, because Conrad & Scherer never contacted them over the past 16 years.[2]  Without belaboring the point any further, there is a body of 11th Circuit

---

[2] Early in the ligitation, we thought we had resolved the representation of these 144 individuals, which would be jointly represented by Wolf, Collingsworth and Conrad & Scherer.  Part of this agreement was that neither undersigned counsel nor his staff would be permitted to contact these Plaintiffs.  We have had offices in Apartado, Colombia, at three different times over the last 17 years, while neither Collingsworth nor anyone at Conrad & Scherer has ever even been to the Uraba region, to the best of our knowledge. After two or three years of turning them away, we began creating case files for them and treating them as we do our other clients.  Since then, for

5

law that shows there is no basis for Mr. Scherer's lien in the absence of written agreements and attorney-client relationships between someone in his firm and the Plaintiffs.

**II.     If the Settlement Agreement doesn't go into effect before the Second Bellwether trial, then the Wolf Plaintiffs would agree only present evidence particular to their cases.**

Like the Non Wolf Counsel, we worked for over seventeen years to prepare to go to trial, and wouldn't want to miss this opportunity if the Settlement Agreeement isn't in effect by then. Four of the next ten bellwether plaintiffs are Wolf Plaintiffs, and it's really an opportunity of a lifetime. The Wolf bellwether plaintiffs waived their right to remand, and agreed to be part of the bellwether trial process, after having many misgivings about it due to the Non Wolf Counsels' dealings with the AUC and problems arising from my disclosure of a witness bribery conspiracy.[3]

The Wolf Plaintiffs do have common fact witnesses, such as William Avila, who is also a Plaintiff in the MDL. His wife was killed in the "bus massacre" incident mentioned by several of the Defendants' witnesses. <u>See</u> Wolf Plaintiffs' Motion in Limine to Exclude Hearsay Statements Concerning Threats to Defendant and their Employees. [Doc. 3487]  Although we believe this witness, Mr. Avila, has valuable testimony, we would agree not to call him if it interrupts the trial strategy of the Non Wolf counsel. We still believe no one is more familiar this case than Manuel Ortega, the FBI agent who led the investigation that resulted in the guilty. Although his analysis

---

more than 10 years, my office has had regular contact with Does 1-144. We would know if Conrad & Scherer had ever contacted them, which they have not.

[3] We were also prohibited from participating in depositions of common fact witnesses, and sanctioned by the Court to pay $800 to Earthrights International the one time we sent Attorney Alex Morales to participate in one. The only reason we didn't participate in the first trial was that one of our bellwether plaintiffs died, and her case is still unresolved, and the other's case was dismised in summary judgment. The common witness testimony applies to all Plaintiffs in the MDL because the Court ordered the Wolf and Non Wolf Counsel to work together and vote on who would take each deposition. There was never a vote, though, and the Non Wolf counsel controlled every one of them, with the exception of about an hour of Barbara Howland's deposition, in which undersigned counsel participated for about an hour.

is hard to distinguish from that of Dr. Kaplan, and is based on the same Center for Historic Memory database, he was excluded as an expert witness. Nevertheless, he is still a good fact witness, and has never been paid anything for this case. We would agree to forego this valuable witness as well, since the Non Wolf counsel do not want any witness to testify who isn't under their control.

The Wolf Plaintiffs found another expert to replace Manuel Ortega, named Carlos Arcila, who now heads the Human Rights Working Group (*Mesa del Trabajo*) of the Government of Medellin and spent his entire career working on this conflict. He was disclosed to the Defendants and wrote a report. He should be allowed to support the Wolf Plaintiffs' cases by testifying about homicide statistics and the likelihood that the victim was *probably* killed by the AUC, just as Dr. Kaplan did for the Non Wolf Plaintiffs in the first trial.

Undersigned counsel believed that the Plaintiffs would have to prove damages at trial, and hired two Colombian attorneys, Omaira Palomeque and Manuel Echavarria, each of whom wrote expert reports about the magnitude of damages available in the Colombian Civil Code. In the first bellwether trial, the jury wasn't instructed on damages, and could write in any amount they wanted. This resulted in verdicts that were between 20-100 times larger than than statutory damages in Colombia, greatly benefitting the first group of bellwether plaintiffs. In retrospect, it does not make sense for the Plaintiffs to try to prove damages under foreign law, if they can just ask the jurors for any amount they want.

One final remaining issue concerns the pending Motion for Judgment on the Pleadings. [Doc. 3474]. The Motion involves different statutes of limitations in different jurisdictions where the bellwether cases were filed, as well as an underlying issue of whether secondary liability under the Torture Victim Protection Act (TVPA) requires a nexus between a government actor and the injury in a particular bellwether case, which we believe is too narrow and not the best fit, since the

AUC was performing a public function that the military couldn't perform by itself, and acting with apparent authority of the military.  These issues are tied together because the TVPA has a ten year statute of limitations.  Undersigned counsel included them in a Complaint in Ohio (Does 1-2146) just before the ten years ran, and at least one of the upcoming bellwether cases only has TVPA claims.  Undersigned counsel wasn't involved in the decision by the Non Wolf counsel to dismiss their TVPA claims before trial. We understood that Earthrights (or the "New Jersey" counsel) had filed an appeal, which was complicated by an error in a party's name, but that the TVPA claims were still in the MDL generally, pending the outcome of the appeal.  If this became a problem, we would agree to stay their cases and remove them from the next trial.

III.   **The Court already denied the Non Wolf Plaintiffs' Motion to Sever, and there is no good cause to effectively remove them from bellwether proceedings by presenting different evidence to them.**

Finally, the Court already denied a similar motion by the Non Wolf Plaintiffs' counsel, and nothing has changed. See Order [Doc. 3649] at 8.  They cite concerns about confidentiality, and the posting of the Verdict on the internet, but this Court and the 11th Circuit both held that the Plaintiffs aren't entitled to withhold their names from the record, and the Verdict is supposed to be a public document. I removed the Verdict immediately, but this isn't evidence of any breach of confidentiality, and not good cause.  The renewed Motion quotes from filings many years ago when the Wolf Plaintiffs were asking the Court for remand, when we did complain many times about being excluded from common discovery and just wanted to get out of the MDL into another Court.  In the end, they chose to remain in the MDL and waived their right to remand. They were part of the same bellwether case selection procedure as the Non Wolf Plaintiffs and have been subject to the same orders, and now evidentiary rulings, as all the others.  We are aware that the Non Wolf Plaintiffs put a lot of effort into the first trial - it took a lot of effort to just listen to it -

8

and this could have been resolved through common benefit fees, had the Wolf Plaintiffs not settled on their own. We tried to raise the issue of common benefit fees with Mr. Geronemus, and were willing to pay them, but this wasn't enough to open the door to let us into the mediation room. The Wolf Plaintiffs agreed to settle with the Defendants long before the verdict was reached, and none of what happened in the trial had an effect on it. We expected a Plaintiffs' verdict, but thought that it could have been in the tens of millions of dollars, or anything. But we also expected it to be reduced to what is available under Colombian law by the Court of Appeals.

## Conclusion

For the foregoing reasons, the Court should enter the Proposed Order to Show Cause. The parties' Settlement Agreement is contingent on it, and will be put into effect by it.

Respectfullly submitted,

/s/ Paul Wolf

_____
Paul Wolf, CO Bar #42107
*Attorney for "Wolf Plaintiffs"*
P.O. Box 60584
Colorado Springs, CO 80960
(202) 431-6986
paulwolf@yahoo.com

June 21, 2024

## Certificate of Service

I hereby certify that on June 21, 2024, I filed the foregoing document with the Clerk of the Court using the Court's Electronic Case Filing (ECF) system, which will serve notices on all persons entitled to receive them.

/s/ Paul Wolf

_____
Paul Wolf