**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 08-MD-01916-ALTMAN**

IN RE: CHIQUITA BRANDS INTERNATIONAL, INC.,
ALIEN TORT STATUTE AND
SHAREHOLDER DERIVATIVE LITIGATION
_______________________________________________/

This Document Relates To: HEARING REQUESTED

ATS ACTION
08-80465-CIV-MARRA (D.C. Action) (Does 1-144)

_______________________________________________/

**Plaintiffs' Motion for Revision of Interlocutory Order Enforcing Charging Lien Pursuant to Fed. R. Civ. P. 54(b) [DE 3930]**

Come now the Plaintiffs, Does 1-144, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, to move the Court to vacate its December 24, 2024 Order awarding Conrad & Scherer, LLP (C&S) $225,000 in attorneys' fees and $4,755.42 in non-taxable expenses.[1] DE 3930.

As recently noted by the 11th Circuit in this case, under Florida law, a charging lien depends on the existence of a contract. See In re Chiquita Brands International Inc. et al, Case No. 24-14039, at 5 n 1 and 17 (11th Cir., August 26, 2026) Under Daniel Mones, P.A. v. Smith, 486 So.2d 559 (Fla. 1986) and its progeny, a contract between the attorney and client is an indispensable prerequisite to imposing a charging lien. C&S have no contracts with Does 1-144, and have only ever communicated with thirteen of them.[2] The 11th Circuit dismissed the appeal for lack of

---

[1] The Magistrate Judge made this recommendation due to Wolf's failure to meet and confer line-by-line on 610 time entries for work that was never authorized by Does 1-144 or by Wolf. Our threshold objection is entitlement, not quantum. If there is no valid retaining agreement between Conrad & Scherer and the specific plaintiffs, the firm has no legally cognizable lien under Florida law, rendering a line-by-line review of hours premature or moot.

[2] The fact that C&S communicated with thirteen of Does 1-144 is not in dispute. C&S have never communicated with the other 90% of Does 1-144. This is what their detailed billing records show.

jurisdiction, since the Order adopting the Magistrate Judge's Report and Recommendation, DE 3930, was not a final judgment, and was not effectively unreviewable on appeal from a final judgment or an important interest that would fall under the collateral order doctrine. See Opinion of August 26, 2026 in Case No. 24-14039 (published).

Since the Eleventh Circuit dismissed Does' appeal for lack of jurisdiction, its commentary on the merits is technically dicta. However, the appellate panel highlighted the contractual requirement under Florida law, demonstrating that allowing the lien to stand absent a contract constitutes plain legal error. The court of appeals quoted Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom, 428 So. 2d 1383, 1385 (Fla. 1983) for the rule that "[i]n order for a charging lien to be imposed, there must first be a contract"—express or implied—"between the attorney and the client." Opinion of August 26, 2026 at *5 n. 1. It explained that "[p]ractically speaking, an attorney's right to recover payment may be "treated as [a] contract suit [ ], whether [the right arises] in quantum meruit or [is] based on an explicit contract." Id. at *17, quoting the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 42 cmt. b(ii) (2000) and citing Daniel Mones, P.A. v. Smith, 486 So. 2d 559, 561 (Fla. 1986) (holding that Florida charging liens depend on the existence of a contract). It is beyond dispute that Florida charging liens depend on the existence of a contract. The threshhold question is whether there exist any contracts between Does 1-144 and Conrad & Scherer.

Rule 54(b) explicitly provides that any order adjudicating fewer than all claims or the rights and liabilities of fewer than all parties "may be revised at any time before the entry of a judgment

---

See Declaration of Carey Fischer and attached billing records. DE 3884-2. Wolf and C&S are disputing the legal issue of whether or not implied contracts were formed with these thirteen plaintiffs, or with all 144, as a matter of law. Some type of communication between C&S and Does 1-144 must have occurred in order for a contract to have been formed. Reliance and promissary estoppel do not apply if C&S have never even communicated with the plaintiffs.

adjudicating all the claims and all the parties' rights and liabilities." District courts retain plenary power and inherent authority to reconsider, modify, or vacate interlocutory rulings prior to final judgment.[3]

Conrad & Scherer oppose the motion. However, Conrad & Scherer would also like to see this dispute resolved, and zealously argued to the 11th Circuit that it had jurisdiction under the collateral order doctrine. Both parties would like to see this dispute decided promptly because the money is being held in the court registry.

**FACTUAL SUMMARY**

*Background Facts*

For at least 7 years, the Defendant Chiquita Brands made monthly protection payments to the *Autodefensas Unidas de Colombia* (the United Self Defense Forces of Colombia, hereinafter "AUC"). After the AUC was designated by the U.S. State Department as a terrorist group, the Defendant notified the Department of Justice of the payments. A criminal investigation ensued, resulting in a guilty plea in March of 2007. In May and June of 2007, undersigned counsel traveled to Colombia, and obtained retainer agreements with 144 legal heirs to 173 murders committed by the AUC and other terrorist groups, and filed the first complaint in the MDL. Before leaving, undersigned counsel met with Attorney Terrence Collingsworth, who did business as International Rights Advocates. Wolf and Collingsworth agreed to work together on these cases as co-counsel. Wolf pesonally met with each of Does 1-144 and signed retainer agreements with them in May-June of 2007. See Declaration of Paul Wolf, DE 3885-3 at ¶ 4; English Translation of May 8, 2007

[3] There are no limitations on the Court's power to change its order, as there would be with Rules 59(e) and 60, since the Order awarding fees to C&S wasn't a final judgment. Nor is the 11th Circuit's opinion the law of case, since it dismissed the appeal without reaching the merits.

Retainer Agreement with Plaintiff Gladys Nohemy Corea Munoz, DE 3884-1. Collingsworth did not meet with any of Does 1-144 or sign agreements with any of them. Id.

One year later, in the Spring of 2008, Collingsworth was hired as a Senior Partner at C&S. See June 14, 2024 Declaration of William R. Scherer, Jr., DE 3885-1. "When Collingsworth joined Conrad & Scherer in 2008, C&S opened an office in Washington, D.C., for Collingsworth and the team he was bringing over from his non-profit law firm, International Rights Advocates." Id. at ¶11. Collingsworth didn't work for C&S at the time the agreements with Does 1-144 were signed in May-June of 2007. The retainer agreements, signed by Wolf and by the plaintiffs, listed Wolf, Collingsworth, and Attorney Bob Childs as counsel. DE 3884-1 Wolf had never even heard of C&S at the time. DE 3885-3 at ¶ 4.

On April 15, 2008, Wolf wrote Collingsworth a Breach Letter. DE 3885-2. The Letter alleged that:

> Dear Terry:
>
> Your acceptance of a position as a senior partner at Conrad & Scherrer [sic], LLP breaches our agreement, which we reduced to writing on September 14, 2007, to work as equal partners on all Colombian fruit cases for the next ten years. This agreement doesn't transfer to Conrad & Scherrer.
>
> Conrad & Scherrer has been competing with us since we filed the Chiquita case last June, and I understand that Conrad & Scherrer intends to continue its own case and add new plaintiffs to it. As a partner in this firm, you are directly competing with me in that case. This is particularly true in Uraba where there are several lawyers running around claiming to be working with me who are not. The independent Conrad & Scherrer case will confuse the situation even more. ...

Id. Wolf and Collingsworth attempted to resolve the dispute by agreeing to work together on the cases of Does 1-144, and on September 15, 2008 filed a stipulation that Collingsworth would be

lead counsel for those cases. DE 144 in Does 1-144 v. CBI.[4] For the next decade, Wolf continued communicating with Does 1-144, maintaining offices in Apartado, Colombia for three different periods of time, lasting about 1-2 years each. Neither Collingsworth nor C&S ever communicated with Does 1-144 during that time. To this day, neither Collingsworth nor C&S have signed retainer agreements with any of Does 1-144.

After a dispute arose over Collingsworth's severence of several of Does 1-144 from the bellwether pool, Wolf moved the District Court to disqualify him, and C&S, from representing Does 1-144, which was granted on April 20, 2020. DE 370 in Does 1-144 v. CBI.[5] At about the same time, Wolf learned that C&S had contacted two of Does 1-144 who had been selected as bellwether plaintiffs, named Rosamari Mechuca Pino and Gladys Nomery Munoz Correa, and defended their depositions. When he learned of this, Wolf objected, and defended both cases in summary judgment, but both cases were dismissed.

The first bellwether trial played no role in amount of the Settlement, which was agreed with a handshake long before the trial ended. Wolf Decl., DE 3885-3 at ¶ 7. The settlement discussions began on April 23, 2024, at the very beginning of the first bellwether trial, and continued throughout the trial. Id. C&S was asked to participate in the Settlement in an April 23, 2024 email. Id. C&S never responded to the offer, and didn't participate in the Settlement or in the negotiations of it. Id.

---

[4] This is docket entry 144 in Case 08-cv-80465, captioned Does 1-144 v. Chiquita Brands International, et al. It is listed on the docket of this case but is not listed on the MDL docket.

[5] This is docket entry 370 in Case 08-cv-80465, captioned Does 1-144 v. Chiquita Brands International, et al. It is listed on the docket of this case but is not listed on the MDL docket.

*Procedural History*

The MDL arises from a criminal prosecution in the U.S. District Court for the District of Columbia in U.S. v. Chiquita Brands, Case #07-cr-055 (RCL). Chiquita pled guilty to engaging in financial transactions with a specially-designated terrorist group, the *Autodefensas Unidas de Colombia* (United Self-Defense Forces of Colombia or AUC). The Multi District Proceedings began in June of 2007, when undersigned counsel, with Terry Collingsworth, filed the first complaint for 144 plaintiffs in the U.S. District Court for the District of Columbia, alleging negligence, wrongful death, and violations of the Alien Tort Statute and Torture Victim Protection Act. 28 USC § 1350. ("Does 1-144" hereinafter) A dispute soon arose over who would be lead counsel for Does 1-144. After the District Court ordered Wolf and Collingsworth to brief who should be lead counsel, Wolf and Collingsworth stipulated that Collingsworth would take on this role. DE 144 in Does 1-144 v. CBI.

On July 24, 2014, the 11th Circuit affirmed the dismissal of claims brought pursuant to the Alien Tort Claims Act, after the U.S. Supreme Court ruled in Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013), in Appeal No. 12-14898. Cardona v. Chiquita Brands Int'l., 760 F.3d 1185 (11th Cir. 2014). In addition, relying on the U.S. Supreme Court's ruling in Mohamad v. Palestinian Authority, 566 U.S. 449 (2012), the Court affirmed that TVPA claims cannot proceed against corporations, as the statute authorizes liability solely against natural persons. This eliminated the Plaintiff's main theories of the case, leaving only claims based on Colombian law and TVPA claims against individual defendants.

On August 23, 2022, the Court dismissed several plaintiffs' TVPA claims for failure to adequately allege state action. The Court held that state action must be shown with respect to each particular murder. In so ruling, the Court "narrow[ed] its earlier, more expansive reading of the

'color of law' element [DE 412] to align its approach more closely with extant Eleventh Circuit precedent." This was affirmed on appeal in Case No. 23-13352, leaving only Plaintiffs' claims based on Colombian law.

On April 28, 2020, the District Court disqualified Collingsworth and C&S from representing Does 1-144, after a hearing in which Collingsworth conceded that he had never communicated with any of them. DE 370 in Does 1-144 v. CBI. Four months later, on September 9, 2020, C&S filed a Notice of Charging Lien. DE 2867.

On September 6, 2022, this Court affirmed the denial in part of Defendant Chiquita Brands' Motion for Summary Judgment, in Appeal No. 19-13926. Carrizosa v. Chiquita Brands Int'l, Inc., 47 F.4th 1278 (11th Cir. 2022) A six-week bellwether trial was held in April and May of 2024. On June 28, 2024 the Plaintiffs represented by undersigned counsel, including Does 1-144, settled their 2,555 cases with Chiquita for $12.8 million dollars. DE 3847. The Court entered judgment for the first bellwether trial on October 18, 2024, awarding $38.3 million dollars to the families of eight victims. DE 3906. This is currently on appeal in Case No. 24-13770.

On August 27, 2024, C&S filed a Motion to Enforce the Charging Lien and Set an Evidentiary Hearing. DE 3884. The Motion was referred to the Magistrate Judge, whose Report and Recommendation ("R&R") was issued on October 15. 2024. DE 3900. The R&R awarded C&S $225,000 in attorneys' fees and $4,755.42 in non-taxable expenses. Id. The District Court adopted the R&R on December 2, 2024 without comment. DE 3930. No evidentiary hearing was held.

Wolf and Does 1-144 appealed. On August 26, 2026, the 11th Circuit Court of Appeals dismissed the appeal for lack of jurisdiction in Case No. 24-14039. The order on appeal was

interlocutory[6] and could not be reviewed under the collateral order doctrine because it resolved no important issue, and because the order was not effectively unreviewable on appeal from a final judgment. Id. at *26. The mandate was issued today, on September 24, 2026, returning jurisdiction over this matter to this Court.

**SUMMARY OF ARGUMENT**

C&S cannot recover attorneys fees in quantum meruit because C&S do not have written agreements with any of Does 1-144, or understandings with them that C&S would recover attorneys fees from their cases. For all but 13 of them, they have never even communicated. Attorney-client retainer agreements are not assignable. The client must be informed and provide consent to any change in the representation.

The retainer agreements between Wolf and Does 1-144 don't contain an assignment clause, which in any event would violate the Florida Rules of Professional Conduct. They do allow Wolf and Collingsworth to hire other lawyers to assist them, but any agreements with those lawyers would be with Wolf and Collingsworth only, and would not be between those lawyers and Does 1-144. "Client agrees that Attorneys have the sole authority to hire additional attorneys to work with them to prosecute the claims detailed in paragraph number two, and have the sole authority to terminate any previously retained attorneys. **Any other arrangements with any other retained attorney or attorneys are between the Attorneys and those attorneys**." DE 3884-1 ¶ 3. (emphasis added) This clause can't create attorney-client relationships with other, unnamed attorneys. Does 1-144 aren't parties to those other arrangements, whatever they may be. Neither

[6] On December 20, 2024, undersigned counsel moved the Court for an Order pursuant to Rule 54(b) to certify its June 24, 2024 Order approving the settlement agreement, DE 3847, as a partial final judgment. Counsel then withdrew the motion and the attempt to create an appealable order failed.

is Wolf, who isn't aware of the details of those arrangements either. Neither Wolf nor Collingsworth hired C&S. Collingsworth was hired by C&S. When Wolf learned of this, he didn't agree to hire C&S, but wrote a breach letter instead.

Without any contracts with Does 1-144, there is no basis for C&S' charging lien, so a line-by-line review of 610 time entries would have been moot or futile. Rather than insisting that Wolf has procedurally defaulted, the Court should rule on whether C&S can have a valid lien without any contracts with the Plaintiffs. If there is no valid basis for the lien, the money should be returned from the court registry to the Third Party Administrator for payment to Attorney Wolf.

## ARGUMENT

### A. Conrad & Scherer have no express agreements with Does 1-144, who can't be traded to other lawyers.

Florida law governs in the instant matter. "Federal courts, although they recognize no common-law lien in favor of attorneys, give effect to the laws of the states in which they are held." Gottlieb v. GC Fin. Corp., 97 F. Supp. 2d 1310, 1311 (S.D. Fla. 1999).

In Florida, the requirements for a charging lien arise from common law. "The charging lien is an equitable right to have costs and fees due an attorney for services in suit secured to him in the judgment or recovery in that particular suit." Naftzger v. Elam, 41 So. 3d 944, 946 (Fla. 2d DCA 2010) (quoting Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom, 428 So. 2d 1383, 1384 (Fla. 1983). An attorney who seeks to enforce an attorney's fee charging lien is required to "show: (1) an express or implied contract between attorney and client; (2) an express or implied understanding for payment of attorney's fees out of the recovery; (3) either an avoidance of payment or a dispute as to the amount of fees; and (4) timely notice." Id. (quoting Daniel Mones, P.A. v. Smith, 486 So. 2d 559, 561 (Fla. 1986)).

This Court can review an example of a retainer agreement, which can be found in English at DE 3884-1, to determine whether C&S is a party to it or an intended beneficiary of it. Although C&S' billing records reflect that they have communicated with thirteen of Does 1-144, and that they did work on two of the cases, even for those cases there are no retainer agreements or communications about payments to C&S.

**1. Conrad & Scherer LLP have no express agreements with any of Does 1-144, which are required in order to recover in quantum meruit.**

Express agreements between attorneys and clients are needed in order to recover in quantum meruit. Daniel Mones, P.A. v. Smith, 486 So. 2d 559, 561 (Fla. 1986)). "In order for a charging lien to be imposed, there must first be a contract between the attorney and the client." Billingham v. Thiele, 107 So. 2d 238 (Fla. 2d DCA 1958), cert. dismissed, 109 So. 2d 763 (Fla. 1959). The contract may be express, Alyea v. Hampton, 112 Fla. 61, 150 So. 242 (1933), or implied, Greenfield Villages; Scott v. Kirtley, 113 Fla. 637, 152 So. 721 (1933). There must also be an understanding, express or implied, between the parties that the payment is either dependent upon recovery or that payment will come from the recovery. Miller v. Scobie, 152 Fla. 328 (1943); Conroy v. Conroy, 392 So. 2d 934 (Fla. 2d DCA 1980), petition denied, 399 So. 2d 1141 (Fla. 1981).

Without a retainer agreement signed by the client, C&S can't recover costs or fees for any work done in quantum meruit. No such agreement has ever existed. The agreements signed by Wolf and Does 1-144 don't refer to C&S at all. The contracts do refer to Terry Collingsworth, but he is not the one who filed the charging lien. Collingsworth stopped working for C&S in 2015. See Scherer Declaration, DE 3885-1 at ¶15. ("C&S hired Collingsworth as a contract partner, not an equity partner, and he remained a contract partner until his separation from the firm in late 2015") Collingsworth wasn't working for C&S in 2019, when C&S filed its charging lien. Id.

Collingsworth only worked for C&S for 7 years, and this doesn't coincide with the signing of the retainer agreements.

**2. The only "implied" attorney-client agreements recognized by the courts involved determinations of the "reasonable" amount of attorneys fees due pursuant to a vague term in an existing contract.**

There is case law referring to "implied" attorney-client agreements, see Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom, 428 So.2d 1383, 1385 (Fla. 1983), but all of those cases involved existing, express agreements that were clarified by determining the reasonableness of the attorneys fees owed. The Sinclair case itself did not involve an implied agreement, but cited the Greenfield and Scott cases from 1950 and 1933 as involving implied agreements. Both involved the determination of a "reasonable" attorney fee. There is no case law in this or any other circuit finding implied agreements where no express agreement of any sort existed.

In Greenfield Villages, Inc. v. Thompson, 44 So. 2d 679 (Fla. 1950), an attorney was retained by the defendant in a real estate dispute. The parties verbally agreed that the defendant would pay the plaintiffs a reasonable attorney's fee from the money arising from the transaction. However, the amount of the fee for this work wasn't specified in the agreement. The court awarded a "reasonable" attorney fee. "We have held on many occasions, where a person employs an attorney to perform legal services and no expressed agreement was reached between the parties as to the amount of the attorney fee to be paid for the services rendered, the law under such circumstances implies a contract upon the part of the party employing the attorney to pay him reasonable compensation for such services." Id., citing Stitt & Co. v. Powell, 94 Fla. 550 (Fla. 1927). Greenfield is distinguishable from the instant case because the client had hired the attorney, but their agreement didn't specify the amount of compensation. In the instant case, Does 1-144

never hired C&S. This is a different kind of "implied agreement" than when there is no relationship at all between the litigant and an attorney who did work that was never contemplated by the litigant.

In Scott v. Kirtley, 113 Fla. 637 (1933), an attorney was hired by a client to perform legal services whereby the attorney's fee would be paid from any recovery from the lawsuit. When the client refused to pay, the attorney placed a lien on the recovery for the reasonable value of his services, the amount of which wasn't specified in their written agreement. The court found the lien to be enforceable and determined the amount of the fee. Again, there was an express agreement between the attorney and the client, and an implied agreement to pay a court-determined fee.

The Greenfield and Scott cases are similar in that agreements existed between the attorney and the client, but the amount of the fee wasn't specified. Thus, the two cases cited in Sinclair for implied agreements involved attorney client agreements that did exist, but were vague as to the amount. They do not support C&S' position that they have agreements with Does 1-144 because they hired Collingsworth, and his agreements were transferred to them. Determining what is reasonable pursuant to a contract is not the same as finding that an implied contract exists where the supposed parties to it have never even communicated. To find that an attorney can transfer representation of his clients, without their knowledge or consent, would be a mis-application of these precedents that only use the phrase "implied contract" with respect to resolving vague contract terms. Since C&S have neither express nor implied agreements with any of Does 1-144, C&S cannot meet the first requirement for a valid charging lien as set forth by the Florida Supreme Court. Sinclair, 428 So. 2d at 1385.

**3. C&S could not have been an intended third party beneficiary to the contracts between Wolf and Does 1-144 because neither Wolf nor Does 1-144 had ever even heard of C&S when they executed the agreements.**

C&S is not mentioned in the retainer agreements because neither Wolf, nor any of Does 1-1-144, had ever even heard of C&S when the agreements were signed. DE 3885-3 at ¶ 4. C&S could not be an intended third party beneficiary because the intent is lacking. In Fla. Power & Light Co. v. Mid-Valley, Inc., 763 F.2d 1316, 1321 (11th Cir. 1985) "Mid-Valley and FPL intended the bulk of the actual work to be done by employees of Brown & Root and knew that it was being done by those employees." Id. The court found Brown & Root to be an intended third party beneficiary because of this intent and knowledge. In Various Insurers v. General Electric International, Inc., No. 23-11211 (11th Cir. March 18, 2025), the operator of a power plant entered into an agreement that had an arbitration clause. The Court held that the owner of the plant, a different entity, was a third party beneficiary of the agreement, and was required to arbitrate as well. "No one suggests that SKH was an intended beneficiary under § 302(1)(a) of the Restatement. The dispute centers squarely on § 302(1)(b) - whether 'the circumstances indicate that' the parties to the Services Contract intended to give SKH 'the benefit of the promised performance.'" Id. at *7. The Court was quoting the Restatement (Second) of Contracts § 302 (A.L.I. 1981). Here, the parties didn't intend anything with respect to C&S, which is why they aren't named in the contracts. Unidentified third parties who were unknown at the time of contract formation can't be intended beneficiaries when they later appear and do work in performance of the contract. The contracting parties (Wolf and Does 1-144) did not have the required intent.

**4. Wolf and Collingsworth never retained C&S. Even if they had done so, this wouldn't have created a contract between Does 1-144 and C&S.**

There is a provision in the agreements between Does 1-144 and Wolf that says "Client agrees that the Attorneys have exclusive authority to retain additional attorneys to work with the Client to process the claims listed in paragraph number two, and the client has exclusive authority to terminate any prior retained attorney. Any other agreement with any other attorney or attorneys

retained is between the Attorneys and those attorneys." DE 3884-1 at ¶ 3. The Court should decide whether this provision gave Collingsworth the right to assign the power of representation to his new employer, C&S, after taking a job as a Senior Partner in the firm, or whether Collingsworth's employment at C&S would be an "other agreement with any other attorney or attorneys retained" that would be solely "between the Attorneys and those attorneys." Id. This provision also says that the new attorneys would be "retained," meaning hired, or under the supervision of "the Attorneys."

Wolf and Collingsworth never retained C&S. Collingsworth took at job as a Senior Partner at C&S, and this was the reason Wolf wrote Collingsworth a Breach Letter. Wolf Declaration, DE 3885-3 at ¶ 3. There was no agreement that would have allowed Collingsworth to make this decision unilaterally, and take the representation of Does 1-144 with him to his new employer. And, as already argued, the representation of Does 1-144 could not have been transferred to traded to C&S without Does 1-144's informed consent.

Does 1-144 never understood that C&S was working on their behalf. C&S isn't mentioned in any retainer agreements, and has never communicated with 90% of Does 1-144. Only thirteen of them have ever even communicated with Collingsworth or C&S.[7] C&S or their agents have only met with 2 of Does 1-144 in person: Gladys Munoz Correa and Rosa Mary Machuca. DE 3885-3 ¶ 5; DE 3884-2. Wolf has met with all of Does 1-144 in person. DE 3885-3 ¶ 5 C&S did

[7] According to Wolf's review of C&S' billing records in support of their Motion to Enforce Charging Lien, see records attached to Declaration of Carey Fischer, DE 3884-2, C&S has only communicated with thirteen of Does 1-144: Gladys Munoz Correa, Rosa Mary Machuca, Liliana Bravo Silgado, Flor Alicia Murillo, Sixta Bejarano, Consuelo Rivas, Clara Bernarda M. Rivas, Maria Rocio Londono de Rengifo, Rosa Zuniga Ibarguen, Lucelly Gutierrez de Osorio, Maria Rolsalva Betancur, Lida Moreno Montoya and Yamerlin Lozano. If C&S ever communicated with the other 131 plaintiffs among Does 1-144, it is not reflected in their billing records. This means that Collingsworth and C&S have only communicated with about 10% of the plaintiffs among Does 1-144.

a small amount of work defending the depositions of these two plaintifffs, but both cases were dismissed and no benefit was ever received from this unauthorized work. Id.

In addition, there was no express or implied understanding for payment of attorney's fees out of the recovery in the Wolf Plaintiffs' Settlement because C&S rejected Wolf's offer to participate in the settlement negotiations. Id. at ¶¶ 7-8. C&S refused to participate in the settlement but now claim a part of the attorneys fees from it.

**5. No benefit accrued to anyone as a result of C&S' work.**

In Montpellier Farm, Ltd v. Crane Environmental, Inc., Case No. 07-22815-CIV- (S.D. Fla. Mar. 18, 2009) the court refused to enforce a charging lien because the claimaints hadn't met their burden of showing that their legal services produced or contributed to the settlement of the case. "The claimants did not participate in settlement negotiations with the defendant that resulted in the settlement of the instant action." Id. at *11.

No benefits were ever provided to any of Does 1-144, including work done during the first bellwether trial, which didn't include any of the Wolf Plaintiffs. The first bellwether trial played no role in amount of the Settlement, which was agreed with a handshake long before the trial ended. Id. at ¶ 7. Only the first 6 out of 610 entries pre-date the breach letter, and they are billing records about a dispute over Collingsworth joining C&S and who should represent the first 144 plaintiffs. These six entries provided no benefit to Does 1-144. Moreover, the work C&S did on other cases in the MDL wasn't ever shared with Does 1-144 or their counsel, Paul Wolf, who had no knowledge of it until the bill of costs for the charging lien was filed.

The only substantial work done on the cases of Does 1-144 was to defend the depositions of two bellwether plaintiffs. However, there was no judgment or recovery in either of them, so there is nothing to recover against. Both were dismissed in the second round of summary judgment;

see Order [Doc. 3238] at 40-43 (Rosamari Mechuca Pino) and 51-53 (Gladys Nomery Munoz Correa); Wolf Declaration, DE 3885-3 at ¶ 5.

**6. The District Court didn't create implied agreements between C&S and Does 1-144.**

When the Court approved a stipulation between Wolf and Collingsworth that Collingsworth would be lead counsel for Does 1-144, this didn't create implied attorney-client contracts between C&S and Does 1-144. DE 147 in Does 1-144 v. CBI. This stipulation was between Wolf and Collingsworth, and had nothing to do with C&S. Like the agreements between Wolf and Does 1-144, neither the stipulation nor the order approving it even mention C&S. DE 144, 147 in Does 1-144 v. CBI. Even if this intent could be read into the Order, the Court could not have created attorney-client agreements between Does 1-144 and Conrad & Scherer without the Does' consent. When the Court later charged Conrad & Scherer with the obligation to continue representation of the entire plaintiff pool after they tried to withdraw, see DE 965, this may have included Does 1-144, but could not have created attorney-client contracts absent the clients' consent. See DE 1201 at n 1. C&S are asking for equitable relief, but under Florida law, a contract is required to recover in quantum meruit.

**7. The Court should rule on the merits of the fee dispute, instead of enforcing a default where it would have been moot or premature to confer line-by-line on the fees.**

The Eleventh Circuit has a "strong policy of determining cases on their merits … default judgments are generally disfavored." Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1244-45 (11th Cir. 2015) (citation omitted). "The court may set aside an entry of default for good cause..." Perez v. Wells Fargo, N.A., 774 F.3d 1329, 1338 (11th Cir. 2014). Courts should not find that good cause exists if a defaulting party "demonstrates an intentional or willful disregard of the judicial proceedings." Id. at 1337 n.7. This did not occur here. Wolf concedes that his failure to read LR

7.3 was negligent, but he later tried to confer, and C&S refused, responding that it was too late. A determination on the mertits would begin by resolving the threshold question of whether Conrad & Scherer can have a valid lien in the absence of written agreements with Does 1-144.

**8. C&S isn't entitled to the equitable remedy of quantum meruit recovery because they have unclean hands.**

A litigant seeking equitable relief "must come into court with clean hands." Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 241, 244-46 (1933); United States v. Howell, 425 F.3d 971, 974 (11th Cir. 2005) ("The doctrine of 'unclean hands' is an equitable test that is used by courts in deciding equitable fate."). On October 17, 2025, C&S settled with the Drummond Company for a confidential amount. See Doc. 555 in Drummond v. Collingsworth, 15-cv-506 (NDAL). However, on January 15, 2026, the jury found Collingsworth liable for $256 million dollars for RICO and defamation. Id., Doc. 706.

Evidence of the bribery of key witnesses in this case was presented to this Court at the final pre trial conference for the first bellwether trial, which was held on March 25, 2024. The Court allowed the tainted evidence into the trial anyway. The issue also came up at the oral arguments on January 30, 2026. It seems unlikely the 11th Circuit will reach this issue, but it remains a problem for further bellwether trials. We have urged the Court to simply exclude all the tainted evidence and witnesses. Quantum meruit is an equitable remedy, and there is no equity in awarding C&S a $225,000 windfall after the damage they've done to key fact witnesses in this case.

## CONCLUSION

For the foregoing reasons, the Court should VACATE its December 2, 2024 Order adopting the Magistrate Judge's recommendation to award $225,000 in attorneys' fees and $4,755.42 in expenses to Conrad & Scherer, LLP, DE 3930, and Order that the money held in the Court Registry be returned to the Third Party Administrator for payment to Paul Wolf.

Respectfullly submitted,

/s/ Paul Wolf

______________________

Paul Wolf, CO Bar #42107
*Attorney for "Wolf Plaintiffs"*
P.O. Box 60584
Colorado Springs, CO 80960
(202) 431-6986
paulwolf@yahoo.com

September 24, 2026

**Certificate of Service**

I hereby certify that on September 24, 2026, I filed the foregoing document with the Clerk of the Court using the Court's Electronic Case Filing (ECF) system, which will serve notices on all persons entitled to receive them.

/s/ Paul Wolf

_______________

Paul Wolf